Anthony R. Scisciani III, OSB No. 070013
Kelsey L. Shewbert, OSB No. 221063
HWS LAW GROUP
101 SW Main Street, Suite 1605
Portland, OR 97204
Phone: (503) 542-1200
Fax: (503) 542-5248
ascisciani@hwslawgroup.com
kshewbert@hwslawgroup.com
*Attorney for Defendant Vidocq Society*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem,* on behalf of S.M., a minor,<br><br>         Plaintiffs,<br><br>  v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>         Defendants. | NO. 6:20-CV-01163-MK<br><br>DECLARATION OF ANTHONY R. SCISCIANI III IN SUPPORT OF VIDOCQ SOCIETY'S MOTION FOR PROTECTIVE ORDER |

I, Anthony R. Scisciani III, declare:

1.  I am an attorney licensed to practice law in the State of Oregon.  I am an attorney of record for Defendant Vidocq Society in this matter.

2.  I have personal knowledge of the matters attested to in this declaration.

3.  Attached hereto as Exhibit A is a true and correct copy of the Leah Freeman Investigation synopsis prepared by Vidocq Society and produced in discovery by Vidocq Society.

4.  Attached hereto as Exhibit B is a true a correct copy of experts from the third of three days of deposition of R. Paul Frasier, taken on August 29, 2023.

5.  Attached hereto as Exhibit C is a true and correct copy of a letter written by R. Paul Frasier, previously marked as Exhibit 31 during the deposition of R. Paul Frasier on August 29, 2023.

6.  Attached hereto as Exhibit D is a true and correct copy of an e-mail from Mark Dannels to Fred Bornhoven, previously marked as Exhibit 10 during the deposition of Mark Dannels taken on September 1, 2023.

7.  Attached hereto as Exhibit E is a true and correct copy of excerpts from the first of three days of deposition of R. Paul Frasier, taken on May 31, 2019.

8.  Attached hereto as Exhibit F is a true and correct copy of Defendant Vidocq's Initial Disclosures previously sent to all Parties in accordance with LR 26.

9.  Attached hereto as Exhibit G is a true and correct copy of Plaintiffs' FRCP 30(b)(6) and FRCP 34 Deposition Notice to Defendant Vidocq Society, served on May 31, 2023.

10. Attached hereto as Exhibit H is a true and correct copy of Defendant Vidocq Society's Objections and Responses to Plaintiffs' FRCP 30(b)(6) and FRCP 34 Deposition Notice to Vidocq Society.

Page 2- DECLARATION OF ANTHONY R. SCISCIANI III SUPPORT
OF VIDOCQ SOCIETY'S MOTION FOR PROTECTIVE ORDER

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

11. Attached hereto as Exhibit I is a true and correct copy of the Leah Freeman Case presentation presented at the Vidocq luncheon on January 21, 2019, and previously produced in discovery by Vidocq.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

EXECUTED this 15th day of September, 2023

HWS LAW GROUP

BY */s/ Anthony R. Scisciani*
BY */s/ Kelsey L. Shewbert*
Anthony R. Scisciani III, OSB No. 070013
ascisciani@hwslawgroup.com
Kelsey L. Shewbert, OSB No. 221063
kshewbert@hwslawgroup.com
Attorneys for Defendant Vidocq Society

Page 3- DECLARATION OF ANTHONY R. SCISCIANI III SUPPORT
OF VIDOCQ SOCIETY'S MOTION FOR PROTECTIVE ORDER

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

**EXHIBIT – A**

**EXHIBIT**
0004
R. Paul Frasier
08.29.2023

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

SYNOPSIS OF VIDOCQ SOCIETY CASES

207. The Murder of Leah Freeman,  2000

This case was presented by DA R. Paul Frasier, of Coos County, OR (503-378-6347) and Mark Dannels, Chief of police of Coquille, OR (541-396-2114) with help from Lisa McOwen, OR DOJ and  Craig Zanni, County Investigator on 21 Jan 2010.   The victim, 15 years old, disappeared on 28 Jun 2000 and her skeletonized remains were found on 3 Aug 2000 and few miles away.  Suspicion fell on her older boyfriend who was described as over controlling and infatuated with Leah.  The Chief of Police appeared to have hindered the investigation of the case and the investigators found that the high school kids had subscribed to a code of silence about the case. The suspect was found to be deceptive on two polygraphs tests and his buddy was found to be deceptive on knowing about the crime.  The suspect and his father were seen burning "trash" during a "no open fires ban" and the suspect's car trunk was completely sanitized with the removal of everything down to the gas tank. Since that time, the suspect has attempted suicide twice when under pressure. Compounding the issue was that although Leah was murdered, the cause of death could not be determined.   We suggested that this was a PA organized murder and the tenth anniversary is coming up soon and some publicity may bring out some information.


Richard advises me that after discussion, they realized that the motive for the crime was that the BF wanted to get Leah pregnant, not the other way around, and they must have had a fight where her bloody shoe was found.  It was a PA case and PAs hit for the face, therefore blood, and then they surmised that the BF put her in the trunk of the car that he was driving and called his father who came over and switched cars, allowing the BF to drive around being noticed while the father dumped the body. It explains the sanitation of the car trunk and the unauthorized burning and that the BF had an alibi of driving around looking for Leah.  His written statements and polygraphs all indicate that the BF was lying about killing her and his buddy was lying about knowing about the case but not having killed her.  He told his buddy what happened knowing that he would not "snitch".


Richard says that the DA was very impressed and indicated that they now saw the case in a new light and he may have enough to indict.


Remember, she was on her way to get birth control pills and the BF after the crime impregnated another 14 year old that he could control. ABC is filming the case. The boy friend, Nick McGuffin was indicted in Aug 2010 and the case was featured on 20/20 on 15 Oct 2010.  Some changes in the thought process were noted where another girl friend's car was used, not the father's car.  Jurors found Nicholas James McGuffin guilty of manslaughter, but not murder. Ten of the 12 jurors voted for the conviction, which indicates McGuffin recklessly killed his 15-year-old girlfriend in June 2000, but not necessarily intentionally. (27 July 2011)

'I kind of lost control," Court-right said. 'I've fought so hard for so long."

VIDOCQ_000009

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

McGuffin will be sentenced Aug. 1. Manslaughter is a Measure 11 crime, so he will face a minimum of 10 years in prison and a maximum of 20. Any sentence will include time served, in this case one year.

District Attorney R. Paul Frasier chose to include manslaughter as a lesser included charge for the jury to consider if it found McGuffin not guilty of murder.

'I did that because I really do not believe that Nick McGuffin woke up that morning and thought, 'I'm going to kill Leah Freeman,'" Frasier said at a press conference after the verdict.

It was a point he made several times during his closing argument Monday.

2
2

VIDOCQ_000010

**EXHIBIT – B**

Robert Paul Frasier
August 29, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as an )
individual and as guardian ad )
litem, on behalf of S.M., a ) Civil No.
minor, ) 6:20-cv-01163-MK
) (Lead Case)
                    Plaintiffs, )
)
        v. )
)
MARK DANNELS, PAT DOWNING, ) DEPOSITION
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )
AS ADMINISTRATOR OF THE ESTATE )
OF DAVID E. HALL, VIDOCQ )
SOCIETY, CITY OF COQUILLE, CITY )
OF COOS BAY, and COOS COUNTY, )
)
                    Defendants. )
)
VIDOCQ SOCIETY, )
)
                    Cross-Claimant, )
)
        v. )
)
MARK DANNELS, PAT DOWNING, )
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )

```
 1   AS ADMINISTRATOR OF THE ESTATE   )
     OF DAVID E. HALL, VIDOCQ         )
 2   SOCIETY, CITY OF COQUILLE, CITY  )
     OF COOS BAY, and COOS COUNTY,    )
 3                                    )
                                      )
 4                  Cross-Defendants.)
     ─────────────────────────────    )
 5                                    )
     NICHOLAS JAMES MCGUFFIN, as an   ) Civil Case No.
 6   individual and as guardian ad    ) 3:21-cv-01719-MK
     litem, on behalf of S.M. a       ) (Trailing Case)
 7   minor,                           )
                                      )
 8                  Plaintiffs,       )
                                      )
 9        v.                          )
                                      )
10   OREGON STATE POLICE,             )
                                      )
11                  Defendant.        )
     ─────────────────────────────    )
12

13

14

15           DEPOSITION UPON ORAL EXAMINATION

16               OF ROBERT PAUL FRASIER

17
```

18      BE IT REMEMBERED THAT, pursuant to the Oregon Rules of

19 Civil Procedure, the deposition of ROBERT PAUL FRASIER was

20 taken on behalf of the Plaintiffs, before JEAN M. KOSTNER, a

21 Certified Court Reporter for Oregon, on Tuesday, the 29th day

22 of August, 2023, at the hour of 9:03 a.m., at the Coquille

23 Community Center, 105 North Birch Street, in the City of

24 Coquille, County of Coos, State of Oregon.

25

Robert Paul Frasier
August 29, 2023

1    Q.   At the Vidocq Society?

2    A.   At the Vidocq Society.

3    Q.   Okay.  And who prepared that --

4    A.   I did.

5    Q.   -- Exhibit 3?

6    A.   I did.

7    Q.   Okay.  And that's a PowerPoint presentation?

8    A.   Yes.

9    Q.   Okay.  So you prepared it, and then who gave it?

10   A.   I did.

11   Q.   And how long did that presentation last?

12   A.   Less than an hour.

13   Q.   And how long did you meet with members of the

14   Vidocq Society after the presentation?

15   A.   Not very long.  Less than 15, 20 minutes.

16   Q.   Okay.  Did you go out to dinner with members of the

17   Vidocq Society afterwards?

18   A.   We went out to dinner with Mr. Walters.

19   Q.   Okay.  And Mr. Walter was a member of the -- you

20   understood that he was a member of the Vidocq Society at the

21   time?

22   A.   That's correct.

23   Q.   How many different members of the Vidocq Society

24   did you speak to personally?

25   A.   I only recall speaking to one or two, not counting

Robert Paul Frasier
August 29, 2023

1  Mr. Walters.

2        Q.    Okay.  Do you recall any of their names?

3        A.    No.  I believe one was the president of the society

4  at that time, but I don't recall his name.

5        Q.    Okay.  Does the name Fred Bornhofen ring a bell?

6        A.    No.

7        Q.    Okay.  But you think that person was the president?

8        A.    I think so, yes.

9        Q.    Okay.

10        A.    Or at least the person that was in charge that day.

11        Q.    Okay.  Do you recall the specialties of any of the

12  folks you met with at the Vidocq Society?

13        A.    Not off the top of my head, no.

14        Q.    Okay.  If you'll go to -- it's like the

15  third-to-the-last page there on Exhibit 3.  You've done the

16  presentation.  At the end of the presentation you've got a page

17  that says "Goal."  Do you see where I'm at?

18        A.    Mm-hm.

19        Q.    It says the goal is to eliminate McGuffin as the --

20              MS. SAWYER:  Can you identify what page you're on.

21              MR. LAUERSDORF:  It's the third-to-the-last page of

22  Exhibit 3.  It's not Bates-labeled.  It's titled "Leah

23  Freeman."  It's got four bullet points.

24              MS. SAWYER:  Okay.  Thank you.  Yep.  I see it.

25  Thank you.

Robert Paul Frasier
August 29, 2023

1  BY MR. LAUERSDORF:

2      Q.   In there it says the goal is to "Eliminate McGuffin

3  given as the suspect and identify the perpetrator of the crime

4  or if McGuffin is guilty, develop a prosecutable case."

5      A.   Yes.

6      Q.   Was that your goal at the time?

7      A.   Yes, it was.  It was if Nick didn't do it, I wanted

8  to know he didn't do it, and I wanted to find who did it.  But

9  if he was responsible, then we needed to develop a prosecutable

10  case.

11          MR. LAUERSDORF:  Okay.  I'm going to -- this will

12  be Number 4.

13          (Document marked for identification as Deposition

14          Exhibit 4.)

15  BY MR. LAUERSDORF:

16      Q.   Okay.  So, Mr. Frasier, you've been handed what's

17  been marked as Exhibit 4.  Have you ever seen that document

18  before?

19      A.   No.

20      Q.   Okay.  Do you want to take a minute to read through

21  that?

22      A.   (Witness complies.)

23      Q.   Let me know when you're finished.

24      A.   Okay.  I've read it.

25      Q.   Anything that you read there strike you as

Robert Paul Frasier
August 29, 2023

1  inaccurate about your -- your meeting with Vidocq?

2      A.   Well, first off, I don't know what the initial PA

3  stands for, but in the first paragraph, "The suspect was found

4  to be deceptive on two polygraph tests," that's inaccurate

5  because I was only aware of one.

6      Q.   Anything else?

7      A.   The third paragraph, "Richard says that the DA was

8  very impressed and indicated that they now saw the case in a

9  new light."  I don't recall ever saying I was impressed and

10 that I saw this case in a new light.  Mr. Walters may have

11 thought that, but I don't recall saying that.

12     Q.   Do you recall saying after the meeting that you

13 thought you may have enough to indict?

14     A.   I don't recall telling that to anybody.

15     Q.   Okay.  Do you -- you talked about the initials PA.

16 Do you recall discussing the concept of power-assertive

17 murderers with Mr. Walter?

18     A.   That came from Mr. Walter.  And -- yeah, that came

19 from him.

20     Q.   Okay.  And do you recall Vidocq recommending that

21 given it was the 10th anniversary, some publicity might bring

22 out some additional information?

23     A.   You know, I don't recall the Vidocq Society giving

24 me any advice.  And, frankly, I was disappointed in the trip.

25     Q.   Okay.

Robert Paul Frasier
August 29, 2023

1      A.    I was looking for information that would help us

2  move forward, either to tell us we were going the wrong way or

3  that this was -- we were going the right way.  And they

4  didn't -- they didn't give us any suggestions whatsoever that I

5  recall.

6      Q.    Okay.  Anything else there that's inaccurate as you

7  read it today?

8      A.    Well, the next-to-the-last paragraph, the boyfriend

9  after the crime impregnated another 14-year-old, I don't know

10  where that came from.  I don't think that's true.

11      Q.    Okay.  Anything else?

12      A.    Just from my quick look going over it, nothing

13  jumped -- nothing else jumps out to me.

14      Q.    Okay.  Let me show you what we will mark as

15  Exhibit 5.

16          (Document marked for identification as Deposition

17          Exhibit 5.)

18  BY MR. LAUERSDORF:

19      Q.    All right.  So you've been handed what's been

20  marked as Exhibit 5.  Do you recognize that document?

21      A.    Yes.

22      Q.    Yes?

23      A.    Yes.

24      Q.    What is that document?

25      A.    This is a document that I prepared regarding

Robert Paul Frasier
August 29, 2023

1   before the luncheon?

2          A.    No.

3          Q.    And was there anyone else besides you who put on

4   the presentation?

5          A.    I was the -- I was the main speaker.  I think there

6   might have been a question-and-answer thing where some

7   questions might have -- I don't recall specifically any

8   questions.  If there was and one of the other three could have

9   answered it, I would have deferred to them.

10         Q.    I guess -- so you put on your PowerPoint

11  presentation, and then what happens?  Did you get any feedback,

12  any perspective, any kind of thoughts from any members of

13  Vidocq Society about the Leah Freeman case?

14         A.    My recollection is -- and, frankly, I was

15  disappointed.  But my recollection is that the president,

16  program provider, whoever, came up to me afterwards, and there

17  may have been two other or three other people there.  I'm

18  expecting them to say, Paul, you need to do A, B, and C; or

19  you're looking at the wrong person, you need to do A, B, and C.

20  I was expecting something like that.  And all I got was, okay,

21  you're doing a good job; you're going down the right track;

22  you've got a better case than what you think.  But they gave us

23  no suggestions to follow through with.

24         Q.    So I take it from that answer that you didn't

25  specifically ask for any particular suggestions or solutions to

Robert Paul Frasier
August 29, 2023

1  follow through with.  Is that fair to say?

2      A.   I would -- since they invited us there, I expected

3  them to tell us.  I wasn't -- I wasn't going to ask them

4  questions.  I expected them to give me something.

5      Q.   Did you, in your presentation to the Vidocq

6  Society, advise them of the fact that there was unidentified

7  male DNA on Leah Freeman's shoes?

8      A.   No.  Because I didn't know about it when we did the

9  presentation.

10     Q.   And did you advise the Vidocq Society during that

11 initial luncheon about the witness statement from Mr. Backman?

12     A.   No.

13     Q.   And why not?

14     A.   Because I frankly don't recall Mr. Backman being

15 involved in the case.  There's that tip sheet, but I don't

16 recall myself seeing it, or I don't recall a tip sheet in and

17 of itself.

18     Q.   Do you recall speaking with Richard Walter at all

19 before, during, or immediately after your luncheon

20 presentation?

21     A.   We arrived early for the luncheon, I think an hour,

22 maybe an hour and a half before its scheduled time because,

23 frankly, I didn't know what the facilities looked like; I

24 didn't know -- you know, was I going to have to use my own

25 computer for the PowerPoint; and so forth.  And so we arrived

Robert Paul Frasier
August 29, 2023

1  early.

2         And it was either as we were walking in the door or

3  shortly thereafter, here's Mr. Walter.  And he immediately

4  walks up to us and starts talking to us, telling us about his

5  credentials, telling us how he had looked at the material that

6  had been sent in.  He started talking about a profile he had

7  developed.  We talked for, you know, a half hour, 45 minutes.

8  He handed me the first article at that time, and I said, "Okay.

9  Well, I'll read it sometime.  I can't read it today,

10  obviously."  I shoved that in my briefcase.

11         Then we did the luncheon, and then afterwards he

12  approached us again, started talking to us again.  And he was

13  saying things, as I said before, that interested us.  And so we

14  actually went to dinner and talked some more that evening.

15  Then after dinner, he left.  Then we returned the next day to

16  Oregon.

17     Q.    What do you recall was discussed during dinner

18  about the Leah Freeman case?

19     A.    Um, he kept reinforcing this control physical

20  aspect thing.  There were also times that he would talk about

21  other cases he worked on.  I don't recall specifics about that.

22  We had already talked with him for a couple, three hours about

23  his theory about the case, and frankly, I think we were getting

24  talked out, and so the conversation changed to other things.

25  But that -- that's the gist of it.

Robert Paul Frasier
August 29, 2023

1      Q.    And when you said "his theory," were you -- are you
2   referring to his power-assertive theory?
3      A.    Yes.  His profile.  Yes.
4      Q.    Did you use that language in your prosecution of
5   the McGuffin --
6      A.    No.
7      Q.    -- at the McGuffin trial?
8      A.    No.
9      Q.    "Power-assertive"?
10     A.    No.
11     Q.    Okay.  And you're saying that very stridently.  Why
12  is that?
13     A.    Because I didn't want to have anything to do with
14  Mr. Walter's theory when we got to trial.
15     Q.    And that's because you didn't find him particularly
16  credible.  Is that correct?
17     A.    It didn't matter whether I found him particularly
18  credible or not.  What mattered was what was in that court
19  opinion.  And to me what was in that court opinion, whether it
20  was true or not, ruined any opportunity for us to use him.
21     Q.    You testified a moment ago that it appeared he had
22  reviewed material that had been already provided either to him
23  or to the Vidocq Society before you got there.  Do I have that
24  right?
25     A.    Yes.  Because he started right off the bat telling

Robert Paul Frasier
August 29, 2023

1  us, okay, I know the facts of the --

2          Q.   Can you hear me?

3          A.   Yes.

4          Q.   Okay.

5          A.   Yes, I -- I believe he did have that information.

6          Q.   So what material was provided to Richard Walter or

7  the Vidocq Society?  And if you can differentiate who got what,

8  that would be helpful --

9          A.   I don't --

10         Q.   -- prior to your arrival in Philadelphia?

11         A.   I don't know exactly what Chief Dannels sent.  I do

12 know that he sent the hand- -- copies of the handwritten

13 statements written by Brent Bartley and Mr. McGuffin.  But

14 other than that, I don't know all of the materials that he sent

15 to the Vidocq Society.  I don't know what was sent.

16         Q.   And do you believe those statements were sent to

17 the Vidocq Society president or to Richard Walter or to someone

18 else, or do you even know?

19         A.   I don't know who they were sent to.

20         Q.   And do you know when those materials were sent?

21         A.   Well, it had to have been at least a couple of

22 months before we finally got there.  We were scheduled to do an

23 appearance about a couple of months before, but we had to

24 cancel.  So those materials had to have been there prior to our

25 first scheduled visit.

Robert Paul Frasier
August 29, 2023

1    Q.    And do you know if Vidocq Society specifically

2  asked for any kind of materials to be provided, or was that

3  just at the discretion of law enforcement?

4    A.    I left all of that to Chief Dannels.  It was his

5  idea that we go, and I left it up to him to -- to provide

6  whatever they requested.

7    Q.    Would there be a record kept by anyone -- Chief

8  Dannels, the Coquille Police Department -- of what materials

9  were provided to Vidocq Society prior to you arriving for the

10  luncheon --

11    A.    I don't know.

12    Q.    -- in January 2010?

13    A.    I don't know if there's one or not.

14    Q.    Did you learn anything at that Vidocq Society

15  luncheon that affected or influenced or had any bearing upon

16  your investigation or eventual prosecution of the case against

17  Nick McGuffin involving the death of Leah Freeman?

18    A.    Besides them giving -- besides them telling me,

19  hey, you're on the right track and you've got a stronger case,

20  they did not give me any specifics whatsoever.

21    Q.    And just to tie up -- follow up on this, other than

22  Richard Walter, can you remember the name of anyone else you

23  spoke with at Vidocq Society at the luncheon or just prior to

24  or immediately after the luncheon?

25    A.    No, I can't recall who I -- the names of the people

Robert Paul Frasier
August 29, 2023

```
 1  I spoke to.

 2              MS. SAWYER:  Can we go off the record for just a

 3  moment.

 4              THE VIDEOGRAPHER:  We're going off the record at

 5  4:05.

 6              (Discussion off the record.)

 7              THE VIDEOGRAPHER:  We are back on the record at

 8  4:06.

 9  BY MS. SAWYER:

10       Q.   Mr. Frasier, I'd like to share my screen with you

11  and show you a document that I'd like to mark as Exhibit

12  Number 31.  Give me one moment here.

13       A.   I'm going to have to get closer to the --

14              THE VIDEOGRAPHER:  We can bring the computer to

15  you.

16              THE WITNESS:  Okay.

17              MS. SAWYER:  Hold on.  Hold on.  Did I just lose

18  that document?  Let me try it again.  All right.

19              (Document marked for identification as Deposition

20              Exhibit 31.)

21  BY MS. SAWYER:

22       Q.   Can you see that document, Mr. Frasier?  Let me see

23  if I can make it a little bigger.  Can you see that?

24       A.   Yes.

25       Q.   And I'll just identify it for the record.  This is
```

Robert Paul Frasier
August 29, 2023

1  a letter from you to Paul Reim, dated August 10, 2016 --

2          A.    Correct.

3          Q.    -- identified as your third installment on the

4  McGuffin matter.  Is that correct?

5          A.    Yes.

6          Q.    Can you tell -- can you just give me a brief

7  explanation about what the purpose of these several installment

8  letters that you wrote to Mr. Reim --

9          A.    My -- okay.  My practice is --

10          Q.    (Video audio garbled.)

11          COURT REPORTER:  I'm sorry.  You'll have to repeat

12  that question.

13          MS. SAWYER:  I need to repeat the question?

14          COURT REPORTER:  Yes.

15  BY MS. SAWYER:

16          Q.    Can you hear me?

17          A.    Yes.

18          Q.    Do I need to repeat the question?

19          A.    Yes.

20          Q.    Okay.  My question is, can you -- can you give me a

21  brief overview about the purpose of these several installment

22  letters that you wrote to Mr. Reim in connection with the

23  post-conviction petition?

24          A.    Um, I don't recall if Mr. Reim specifically asked

25  me to do this, but I do know it is my practice that whenever a

Robert Paul Frasier
August 29, 2023

1  defendant that has been convicted in Coos County on a case that

2  I have personally handled, that if they file a petition for

3  post-conviction relief to assist the Attorney General's office,

4  which represents the State on those petitions, I will write a

5  document addressing the claims raised by the defendant or the

6  petitioner and letting the Department of Justice know,

7  basically, okay, this is where you need to look at -- for

8  information, this is what I recall happening, that type of

9  thing.  It's to assist them in preparing to defend against the

10  petition.

11      Q.    Okay.  So I'd like to turn your attention to page 3

12  of this letter.  And this is where you start talking about the

13  involvement of the Vidocq Society.  Do you see this, where it

14  says as to (audio garbled) point 12?

15      A.    Yes.

16      Q.    Okay.  And then you go on for a while and explain

17  your interactions with the Vidocq Society, which I will go

18  over, but I just wanted to turn your attention to the very last

19  sentence that is made on page 6 of this letter, where you

20  summarize -- or it appears you summarize -- your view of the

21  involvement of the Vidocq Society and Mr. Walter with respect

22  to the Leah Freeman case.  And I'm just going to read this into

23  the record.

24          "Long story short, I did not use anything we

25  learned from Mr. Walter or the Vidocq Society and certainly did

Robert Paul Frasier
August 29, 2023

1  not use it at trial.  It had no effect on the verdict in this

2  case."  Do you see that?

3       A.   Yes.

4       Q.   And is that still your position as we sit here

5  today?

6       A.   As I've explained before, I didn't learn anything

7  new from the Vidocq Society, and obviously we had issues with

8  Mr. Walter and I felt that we needed to stay clear of that, and

9  that's what we did.

10      Q.   Okay.  And I believe you testified a moment ago

11 that nothing you learned from Mr. Walter affected the manner in

12 which you investigated or prosecuted the case against

13 Mr. McGuffin.  Is that correct?

14      A.   Could you repeat that for me, please.

15      Q.   Nothing that you learned from Mr. Walter affected

16 or changed how you investigated or prosecuted the case against

17 Mr. McGuffin?

18      A.   No.  I didn't use anything from him.

19      Q.   Okay.  And is that true with respect to the Vidocq

20 Society entity as well?

21      A.   Well, I did not bring up the Vidocq Society at

22 trial, and we didn't talk about visiting with them, and like I

23 say, the only thing I learned from them was you're on the right

24 track, you've got a better case than what you thought, good

25 luck.

Robert Paul Frasier
August 29, 2023

1     Q.  I was a little confused about your testimony with

2 respect to 20/20 and a meeting that you had with them.  Did

3 that occur in February of 2010, or did that occur in June of

4 2010?

5     A.  When you say "meeting," what do you mean by

6 "meeting"?

7     Q.  You indicated that you had -- and that was a

8 confusing question.  You had a meeting with Mr. Walter when he

9 visited Oregon, and that was when 20/20 was also present.  Do

10 you recall what month that had occurred?

11     A.  I don't recall what month that was.  I know it was

12 summertime, but I -- you know, June, July, August.  I don't

13 recall when that occurred.

14     Q.  Okay.  And with the 20/20 show?

15     A.  Okay.  When 20/20 came to town and they were going

16 to interview people and get ready to do a show, a broadcast,

17 they came, and my recollection is they were here for about a

18 week.  And that was in the summertime sometime -- June, July,

19 August.  They brought Mr. Walter out.  And, you know, frankly,

20 I didn't have much contact with the 20/20 people.  It was at

21 that point I learned that there was no agreement not to

22 broadcast before trial.  I was upset about that, and I

23 didn't -- frankly, I didn't want to have anything to do with

24 the 20/20 people, so I kept my distance.

25     Q.  Do you know if any -- or other Vidocq have come out

Robert Paul Frasier
August 29, 2023

1  to Coquille at the behest of 20/20?

2      A.  I don't know of anybody else that came out other

3  than Mr. Walter.

4      Q.  Right.  My question is do you know if the Vidocq

5  Society, as an entity, knew that he was coming out to Coquille?

6      A.  I don't know if they did or not.

7      Q.  Do you have an understanding as to whether he was

8  there in his personal capacity or as a representative or member

9  of Vidocq Society?

10     A.  I have no personal knowledge about what his

11  capacity was when he came to Coquille.

12     Q.  Do you have any knowledge as to how ABC and the

13  20/20 show became acquainted with Mr. Walter?

14     A.  I do not know.  It wasn't through me.

15     Q.  You testified earlier that after that meeting with

16  Mr. Walter in Coquille, you had dinner with him and with Chief

17  Dannels and with Sheriff Zanni.

18     A.  Sheriff Zanni was -- Sheriff Zanni and his wife --

19     Q.  Is that correct?

20     A.  Yes, that's correct.  It was Sheriff Zanni and his

21  wife, Mr. Walter, myself, Chief Dannels.  I believe our fire

22  chief was there also with his wife, and how they got invited, I

23  don't know.

24     Q.  And was the Leah Freeman case discussed during

25  dinner?

Robert Paul Frasier
August 29, 2023

1        A.    No.

2        Q.    What was discussed during dinner?

3        A.    We had kind of normal social talk, and then

4   Mr. Walters began talking about how he had been working with

5   Scotland Yard on the Jack the Ripper case, and he started --

6   and he must have talked for an hour about things he had done,

7   things that they had found out, things along that line.

8        Q.    Did Mr. Walter prepare any sort of a written

9   profile for use by your office or the Coquille Police

10  Department with respect to the potential offender, murderer of

11  Leah Freeman?

12       A.    The only thing he --

13       Q.    Anything in writing?

14       A.    The only thing he gave me in writing was the first

15  article which he gave us in Pennsylvania, which he claimed had

16  been published.  And he says, "I think this is the profile of

17  the person you are looking for, and I think it fits

18  Mr. McGuffin."  That's the only thing at that time he gave me.

19            And then when we had the meeting in the summertime

20  when 20/20 came to town, I told him I had read the article and

21  I said, "I don't think this thing fits Mr. McGuffin at all."

22            And that's when he handed me the second article,

23  and said, "Well, I haven't published this yet, but this might

24  be more what you need."

25            So the only things in writing he ever gave me were

Robert Paul Frasier
August 29, 2023

1  those two articles.

2       Q.   Did Mr. Walters ever ask to be paid for his

3  services?

4       A.   We never paid him anything, and I don't recall him

5  asking anything.  I don't know what 20/20's arrangement was

6  with him, but my office certainly didn't pay him anything.

7       Q.   Do you have an understanding that the Vidocq

8  Society is an entirely volunteer organization?

9       A.   That was my understanding.  It was a volunteer

10 organization of mostly retired law enforcement professions --

11 professionals from different specialties.

12      Q.   And did you have an understanding as to -- let me

13 strike that.

14           Did you have an understanding that the members were

15 not employees of the Vidocq Society; they were just volunteers?

16      A.   I knew that it was some type of club or social

17 organization because I think I recall we were given some

18 pamphlets about the Vidocq Society and they talked about an

19 annual ball and things along that line.  But in terms of them

20 having employees or anything along that line, I was never told

21 that they did have employees.

22      Q.   And in your view, did the Vidocq Society at any

23 time ever (audio garbled) visit an agent or representative of

24 the Coos County DA's office?

25      A.   You broke up.  We couldn't hear your whole

Robert Paul Frasier
August 29, 2023

1  question.

2         Q.   At any time did Vidocq Society, as an entity, ever

3  act as an agent or representative on behalf of the Coos County

4  DA's office?

5         A.   No.

6         Q.   Did the Coos County DA's office or you personally

7  ever direct or control or have the right to direct or control

8  on the actions or conduct of the Vidocq Society?

9         A.   No.

10        Q.   And to the best of your knowledge, did the Vidocq

11  Society ever act as an agent or representative on behalf of the

12  City of Coquille Police Department?

13        A.   I have no personal knowledge as to what their

14  relationship was or with the Coquille Police Department.

15        Q.   Did Vidocq Society or any of its members ever

16  interview any witnesses in connection with the Leah Freeman

17  investigation?

18        A.   I'm not aware of them doing that, no.  I'm not

19  aware of that.

20        Q.   And did the Vidocq Society or any of its members

21  ever testify at trial?

22        A.   No.

23        Q.   We looked earlier at some handwriting analyses that

24  Mr. Lauersdorf asked you about.  And I can pull those up in a

25  moment, but those -- several of those analyses reference a

Robert Paul Frasier
August 29, 2023

1   VICAP assessment.  Are you familiar with what that is?

2          A.    I'm familiar with the term "VICAP."  I don't -- I

3   assume that --

4          Q.    And I can spell that (audio garbled) --

5          A.    What's that?

6          Q.    (No response.)

7          A.    You broke up.  I'm sorry.

8          Q.    I was going to spell it if you couldn't understand

9   what I was saying.  Go ahead and answer.  If you know what the

10  VICAP assessment is, if you would explain that, that would be

11  great.

12         A.    Okay.  The VICAP assessment -- to my understanding

13  it's a tool that was developed by the FBI and maybe the Oregon

14  State Police, one of the two, where on every homicide you have

15  you enter into the computer or into the system the basic facts

16  of your case, and then what the system does is then look

17  through other geographical areas to determine if there are

18  other cases that perhaps meet a -- that have similar facts.

19  That's my understanding of VICAP.

20         Q.    Let's take a look at those assessments.  If you

21  would take a look at Exhibit Number 6.

22         A.    Yep.  I'm finding it.  I've got it.

23         Q.    So the first assessment appears to be written by

24  Patrick Kelly in an email to fborn on November 18, 2009.

25         A.    Yes.

**EXHIBIT – C**



EXHIBIT
31
R. Paul Frasier
08.29.2023

# R. Paul Frasier
## District Attorney for Coos County

**Office of the District Attorney**
Coos County Courthouse
250 N. Baxter St.
Coquille, OR 97423
Phone: 541-396-7550  Fax: 541-396-1015
TDD: 1-800-735-2900

---

August 10, 2016

Mr. Paul E. Reim
Oregon Department of Justice
Trial Division
1162 Court St NE
Salem, Oregon  97301

Re: McGuffin v. Nooth 15CV1030

Dear Paul:

Here is my third installment on the McGuffin matter. I am jumping ahead to the allegations of regarding Brady violations and misconduct. I will get back to the alleged shortcomings of trial counsel in future letters.

This may become important in the future but I have been informed that Kristen Steinhoff died last week as a result of a drug overdose.

First of all, I want to make it abundantly clear that I deny for myself and law enforcement any allegation that we engaged in any form of misconduct in this case. We worked very hard to make sure this case was investigated properly and to make sure our conduct was above reproach. We wanted the right person to be held accountable for the death of Leah Freeman and the evidence lead us to the person responsible. We investigated several potential suspects in this case. We eliminated all but one, that being Nick McGuffin.

As to paragraph/count 11, with the substance of the allegation being on page 20, I have the following comments:

As to point 1: All reports in this case were given to the defense. I have an open file policy and allowed the defense to examine all of my trial binders well in advance of trial. If there were reports that were missing in discovery, the defense had access to them prior to trial. In addition, I kept a discovery list of all materials sent to them which were Bates numbered. An example of the list, which was current as of June 30, 2011, (which was just before trial in July of 2011) is

1

attached. The defense claims there were reports of witness interviews of witnesses John Lundgren, David Breakfield and Kristen Steinhoff that were not given in discovery. I do not know what reports they are referring to;

As to point 2: It has been my practice, and my understanding, that I am not under any obligation to supply the bench notes for lab personnel unless the defense requests it. We did obtain all bench notes for the DNA testing;

As to point 3: I gave to the defense all records of lab work done that I had in my possession. We had lab work done by several different entities. The majority of the lab work was done by the Oregon State Police. However, we did seek outside lab work. A couple of years after Leah's body was found, my predecessor as District Attorney, Mr. Paul Burgett, arranged for the additional DNA testing and examination of Leah's clothes be done by a lab in England. My understanding is that the lab had some connection to Scotland Yard. I was not involved in that decision to send the clothes to England, but it is my understating that at the time this lab was the only lab in the world that was doing certain types of DNA testing. No usable results were obtained (one of the problems in this case was that because Leah's body and clothing had been exposed to the elements so long was the fact that most, if not all, of the DNA contained in any bodily fluids found on the clothes on the body had degraded and was simply not usable to obtain DNA). Because of a persistent rumor that Leah had been hit by a car, we also sent her outer clothing to a lab in Chicago to be examined to see if there was any evidence of paint transfer on the clothing. Again, the results were negative. The reports we had from England and Chicago were given to the defense prior to trial;

As to point 4: Generally police officer notes are not discoverable unless they contain material not contained within a police report. As a courtesy we did give the defense copies of the notebooks for Officers Brenden, Nichols and Zavala;

As to point 5: We gave to the defense copies of all recordings of interviews in this case. I do not know what the defense is referring to when they claim we did not do so;

As to point 6: We gave to the defense all of the materials for chain of custody of all of the evidence in the case. For example, we gave the defense the evidence accountability sheets (Discovery pages #6678 – 6710), the evidence log (Discovery pages 6711-6716), the forensic evidence request forms (Discovery pages 6717 – 6725), the Lab Submission Forms (Discovery pages 6726 – 6779) and the records for the shipping of evidence back from England (Discovery pages 6675 – 6677). I do not know what records the defense is referring to when they claim we did not do so;

2

As to point 7: I gave to the defense all records I had pertaining to all examinations of evidence. Again, I do not know what records the defense is referring to when they claim otherwise;

As to point 8: I am not sure what crime scene the defense is referring to. There are multiple locations in this case that could be considered crime scenes. For example, the locations of the shoes, the McGuffin home and vehicles, Leah's home, and where the body was found could be considered crime scenes. Any video we had of the various scenes was given to the defense. Again, I am unaware of any video the defense claims was not disclosed;

As to point 9: Notes from briefings of the major crime team. Our major crime team does not have a person designated to keep "notes" of the meetings of the team. A "to do list" with assignments may be established, but generally it is not kept as record. I am not sure what the defense is referring to in this allegation. Further, I do not see how this would have affected the case eventually developed against Mr. McGuffin;

As to point 10: I gave to the defense the death certificate I had in my possession. No request was made of the "original" or the "affidavit" amending it. If the dense wanted it they could have requested it or obtained it from the Department of Vital Statistics. Again, I do not see how the original would have changed the result in this case.

As follow-up to this point, I will make note of the following. Dr. Olsen from the beginning had classified the manner of death of Leah as homicide. I was present at the autopsy of Leah and Dr. Olsen told me that day after he had completed his work that he believed the manner of death was homicide but that the actual cause of the death was some sort of undetermined homicidal violence. As an investigative tactic we did not want anyone outside of the investigation to know that the exact cause of death had not been determined. That included Leah's mother as early on in the investigation she maintained close ties to Mr. McGuffin and his family and we were concerned if we shared with her information about the case that it would go straight back to the McGuffins. Thus the first death certificate listed the manner and cause of death as "pending investigation". By 2004, we had no compelling reason to keep this secret so the death certificate was amended to read that the immediate cause of death was homicidal violence of undetermined type, that the manner of death was homicide that occurred on June 28, 2000, that the time of injury was unknown, that it was undetermined how the injury occurred, that the place of injury was a road embank and that the location was milepost 1.5 of Lee Valley Road, Coquille, Oregon. The amended death certificate was offered at trial and the jury was able to see all of the listings where is the cause of death and injury was undetermined. Had this become an issue, we would have explained why this occurred. It was not done for any nefarious reason; it was done to maintain as best we could some investigative secrets about the case in the early stages of the investigation. In my opinion, any

3

difference between the original and ultimate certificate would have had no impact on the verdict in this case;

As to point 11: Any recordings we had of Kristen Steinhoff were given to the defense. I do not know what recordings the defense is referring to in this allegation;

As to point 12: All materials we had regarding the Vidocq Society were given to the defense. I do not know what other records pertaining to the Society the defense is referring to.

As a follow-up to this point, I need to explain the Vidocq Society involvement in this case. It is my recollection that sometime after we had re-opened the case, Coquille Police were approached by the Society about the case. I do not know how we came to their attention. Chief Dannels brought their request to my attention. I had never heard of them before and asked from some background on who they were. Chief Dannels reported back that he has checked them out and found out that the Society was a group of law enforcement officials, mostly retired, but some who were still active, who were renowned specialists in multiple aspects of homicide investigation. These included forensic scientists, polygraph examiners, investigators, psychologists, profilers and so forth. According to Chief Dannels, this group came highly recommended. The Society's purpose was to help police agencies and prosecutors from across the country in solving particularly difficult cases. Most of the time these cases are sometimes referred to as "cold" cases as a lot of them, like ours, had gone unsolved for years. It was explained to me that the Society met once a month in Philadelphia, Pennsylvania. It was a "lunch" meeting where we would present the case and the society would then critique the case and give us any ideas how to work the case. They assured us that anything we told them would be kept in confidence. At the time we were willing to take any help we could get on the case, so we accepted their offer. The Society had done this for numerous other cases from across the United States as a free service.

The Society paid for me and Chief Dannels to go to the meeting. We thought it best that we also take along Sheriff Zanni, who had spent a lot of time on the case and knew the case just as well as anyone and the analyst from the Oregon Department of Justice who had developed time lines, charts and so forth. The City of Coquille paid for those two to attend.

We did not go to the first date set for the meeting as the night before we left we had an incident where a husband had shot his wife at short distance with a .30-06 rifle. It was a miracle she survived. The husband fled the scene in Coos Bay and then drove to his grandparent's home in Myrtle Point. Chief Dannels spotted the defendant as he was driving by Coquille and was the lone officer in pursuit of the suspect. He followed the suspect to the grandparent's home where the defendant exited his vehicle with the rifle. When the defendant refused to put down the gun

4

and pointed the gun at Chief Dannels, the chief fired at the defendant several times. The Chief did hit the defendant with one of his shots. The defendant then went around a corner of the house and committed suicide. We decided we needed to stay and wrap up this investigation rather than travel to Philadelphia. We eventually went a couple of months later.

The four of us arrived at the meeting location about an hour early. We were met almost immediately by an individual who was one of the founding fathers of the Vidocq Society, Mr. Richard Walter. Mr. Walter claimed to be psychologist and explained he had extensive background in interviewing and working with violent criminals. He presented me with an article he had recently written and claimed to have been published where he indicated that the person who had killed Leah fit a particular profile. The article was somewhat lengthy and I did not have time to review that day. However, Mr. Walter explained to us at length his theory/profile of the person who would have killed Leah, which just happened to fit Mr. McGuffin perfectly. Naturally we were very interested in what he had to say.

We made our presentation to the Society at lunch. After our presentation, the critique we received back was interesting. The Society did not have any specifics for us to do. Their input was basically that we were on the right track, that we were doing the right things, and that we really had a better case than we thought we had.

After the presentation, we decided we wanted to hear more what Mr. Walter had to say. We invited him to spend the afternoon with us and to have dinner with us. Again, his theory or profile of the killer of Leah was spot on as to Mr. McGuffin.

Upon our return from Philadelphia, I read the article given to me by Mr. Walter. I was disappointed in reading the article as it dealt with the profile of a serial killer. I had no evidence to suggest that Mr. McGuffin was serial killer (in fact I do not believe he is). I was having trouble in seeing how this article was on point to Leah's death. I was  considering using Mr. Walter as a witness in the case, but I was concerned about the article he had given me and how it helped our case.

Several months after the Vidocq Society presentation, the show 20/20 came to Coquille to work on a show for the ABC network. They brought Mr. Walter out to do a segment. I met with Mr. Walter one afternoon at Coquille PD. Mr. Walter asked if I had read the article he had given me. I told him I had read it and was having problems with its relevancy to this case as it dealt with a serial killer. Mr. Walter agreed that could a problem. He then produced another article he claimed to have written. This one he claimed had not yet been published. He assured the article me was directly on point to the case. I did not read it at that time but put it aside to look at later.

That night Sheriff Zanni, myself, Chief Dannels and a couple of other people went to dinner with Mr. Walter. During dinner, Mr. Walter made some comments

5

about other cases he had been involved in and in particular he made comments about his involvement and findings he had made at the behest of Scotland Yard pertaining to Jack the Ripper. I rode with Sheriff Zanni on the way home from dinner. Sheriff Zanni had told me that he thought there were issues with the credibility of Mr. Walter. I asked him to explain. It turned out that Sheriff Zanni was a "history buff" as to the Jack the Ripper case and he told me that some of the things Mr. Walter had to say about the case were not true. I told Sheriff Zanni that we had not "vetted" Mr. Walter and that if we were to use him as a witness we needed to do so. I asked Sheriff Zanni to then check out Mr. Walter. The next morning Sheriff Zanni was in my office with some results. Sheriff Zanni found a federal appeals court case called <u>Drake v. Portuondo</u> from the federal second circuit. There are several opinions in the case, but what we found was that Mr. Walter had testified in the case and had expressed a profile that fit the defendant perfectly in that case. The Court found that Walter had misled, if not lied, about his background and credentials. He was not a psychologist and did not even have a master's degree. The court found that Mr. Walter learned the facts of that particular case and then had built a profile that fit the defendant. Basically the court found him to be a fraud.

I realized at that point that the profile built by Mr. Walter was simply not reliable. It appeared to me that he had done the same thing he had done in the second circuit case in that once he knew the facts of our case, in that it appeared he had created a profile that fit Nick McGuffin. Given the second circuit findings, I knew there was no way I could or should use Mr. Walter or his information. I notified Chief Dannels of what we had found out and I also told the producer for 20/20 what had been discovered and even gave the producer a copy of the case Sheriff Zanni had found. I warned 20/20 that it appeared that Mr. Walter was a fraud and that in my opinion they should not rely upon him. I also directed as to our case that we would not use anything given to us by Mr. Walter and that were going to distance ourselves as far as we could from him, and if need be, from the Vidocq Society given he was a founding member and still on their Board of Directors.

Long story short: I did not use anything we learned from Mr. Walter or the Vidocq Society and certainly did not use it a trial. It had no effect on the verdict in this case; and

As to Point 13: I gave any material I had in my possession and control about 20/20 to the defense, which frankly wasn't much if anything.

I should also make some follow-up comments about 20/20. I do not know exactly how this case came to the attention of 20/20 and why they were interested in the case. I knew that they had become involved, but I was under the impression, and I frankly admit that impression was wrong, that there was an agreement that anything 20/20 learned would not be broadcast until after a verdict had been reached in the case. I remember I was asked about them being involved in the case and I did give permission for them to do so, but again, it was under my

6

mistaken impression that nothing would be broadcast until after a verdict had been returned. I learned that was not the agreement when 20/20 came to town to tape segments for the show that would air before trial. At that point I refused to personally cooperate with the show to the extent they wanted. For example, Mr. Avila did interview me, but I would not answer questions he put to me about the case that I felt would be in violation of the rules pertaining to pretrial publicity. My interview with Mr. Avila was not used at all in the show that was broadcast prior to trial.

I have to say after the initial broadcast that I was not happy with what 20/20 had done. They had a whole segment on Mr. Walter, even though I had shown to them that he was likely a fraud. (In retrospect, I remember how in the show that Mr. Walter explained his profile and even went as far to explain how the person with this psychological background would actually use his fist to strike someone so as to explain the blood evidence found in the case. When I look at that now, I realize just how ludicrous Mr. Walter's opinion actually was.)

I was also upset that the show broadcast a motive that Mr. McGuffin killed Leah because he was having sex with her and that to do so would be a criminal act. The theory proffered by 20/20 was that Nick killed Leah to prevent him being prosecuted for having sex with her. That was obviously wrong. First off, Nick and Leah were just barely within three years of age, so having consensual sex between the two would not be criminal. Secondly, it seemed everyone knew they were having sex. In fact, Mom had set up an appointment for Leah to get birth control. Sex was not the motive. It was not used at trial.

To make matters worse, at least for me, concerned a photo of Leah's body that was used on the show. 20/20 had asked me for permission to use a photo of Leah's body at the scene. I refused. Somehow they obtained a photo and used that in the show.

The following Monday I took action I had never done before. I issued a directive to all law enforcement that no one was allowed to talk with the press about the case from that day forward except me. I told them I did not care what arrangements may have been made with the press about future participation in the case. I made it clear that if anyone from the day forward talked to the press without my permission I would seek a gag order and I would not hesitate to prosecute anyone who violated that order. 20/20 was not happy I cut them off. I told them I did not care because they used a fraud in the show, used a photo I told them not to use and put forward a false motive. No one was going to have anything to say to them until after a verdict was reached.

I will point out that the show had no bearing on the verdict. The defense had an opinion poll of likely jurors in Coos County that was done after the 20/20 show was aired. The purpose of the poll was to determine if the defendant could get a fair trial in Coos County and had the poll showed that getting a fair trial would be

7

problematic, I am sure the results of the poll would have been used in support of a motion for a change of venue. Based upon representations of defendant counsel in pre-trial hearings, the poll apparently showed that the defendant could get a fair trial. (As an aside I would think you would want to explore what the poll results were. I suspect they had a question about whether the people of the county thought the defendant was guilty and that the results of the poll were favorable to the defense.) Voir dire showed that if any of the jurors had been exposed to pre-trial publicity that they still could be fair and impartial to all sides. 20/20 had no effect on this verdict.

These are my comments as to paragraph/count 11. I will have further comments as to the petition in the near future.

Sincerely,

R. Paul Frasier

8

**EXHIBIT – D**

## Mark Dannels

**From:**     Mark Dannels [mdannels@cityofcoquille.org]
**Sent:**     Thursday, July 16, 2009 2:53 PM
**To:**        'fborn@comcast.net'
**Cc:**        'Paul Frasier'
**Subject:** Leah Freeman Homicide

Good afternoon Fred,

It was a pleasure to speak to you yesterday in regards to your organization and the possible assistance of your membership. I cc my District Attorney, Mr. Paul Frasier to keep him in the loop with our conversations.
I did some research as you requested regarding your organization (Vidocq Society) and feel confident in the merit of your organization. As a tentative thought, I would be interested in discussing our partnership regarding this case with a potential in-person meeting in November, 2009.

Once again, thank you for the interest with this case and I (we) look forward to hearing from you.

Have a Safe Day,

Mark Dannels
Chief of Police
851 N. Central Blvd.
Coquille, OR. 97423

Fax        541-396-2113
Work      541-396-2114 x 210
Cell        541-294-1542

7/16/2009

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD004603

DEPO EXHIBIT
Dannels 2022-07-14
**10**

**EXHIBIT – E**

*R. Paul Frasier*

*McGuffin v Nooth*

*May 31st, 2019*



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

**1**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR THE COUNTY OF MALHUER

NICHOLAS MCGUFFIN,                )
                                  )
            Petitioner,           )
                                  ) Case No.
    vs.                           ) 15CV1030
                                  )
MARK NOOTH, Superintendent,       )
SRCI,                             )
                                  )
            Respondent.           )
                                  )

DEPOSITION OF R. PAUL FRASIER

May 31, 2019

Friday

8:19 a.m.

THE DEPOSITION OF R. PAUL FRASIER was
taken at the Coos County Courthouse, 250 North
Baxter, in the City of Coquille, County of Coos,
State of Oregon, before Denise C. Zito Smith, CSR,
Certified Shorthand Reporter in and for the State
of Oregon.

**2**

APPEARANCES

For the              FORENSIC JUSTICE PROJECT
Petitioner:          333 SW Taylor Street
                     Suite 403
                     Portland, OR 97204
                     503/664-3641
                     jpuracal@forensicjusticeproject
                     .org
                     BY:  JANIS PURACAL

For the              DEPARTMENT OF JUSTICE TRIAL
Respondent:          DIVISION
                     1162 Court Street NE
                     Salem, OR 97301-4095
                     503/947-4700
                     paul.reim@doj.state.or.us
                     BY:  PAUL REIM

Also Present:        John Comery, Oregon Innocence
                     Project Research Paralegal

Reported By:         Denise C. Zito Smith, CSR

**3**

I N D E X

WITNESS                                          PAGE

R. PAUL FRASIER

     BY MS. PURACAL                                 5

     BY MR. REIM                                  159

EXHIBITS:

            For Identification              Marked

1      Subpoena                                    7

2      Letter Written By Paul Frasier             21

3      England Lab Report                         89

4      Report By Kathy Wilcox                    101

5      E-mail Chain                              107

6      Microtrace File Document                  107

7      Tip Sheet                                 109

8      Document Bates Numbered 003247            112

9      Subpoena to Nicole Price Nelson           117
       and a Letter from Paul Frasier

10     E-mail Chain                              121

11     E-mail Chain                              121

12     Affidavit to Correct a Death             126
       Certificate

13     Witness' Statements                       130

                              (continuing)

**4**

                              (continuing)

14     Document Titled Conversation Log          135

15     CCH for Lonnie Baker                      140

16     Coquille Police Department                142
       Report

17     Handwritten Poem                          143

18     Tip Sheet                                 148

19     Tip Sheet                                 149

REQUEST:

Page 147, Line 6

INSTRUCTIONS: (None.)

157

1  yes, that was unknown male DNA, did you ask them
2  to review any other cases?
3      A.    No.
4      Q.    Did they tell you that they would
5  review other cases that were tested under that
6  protocol?
7      A.    No, they didn't tell me they would do
8  that.  I believe I had expressed, Does that mean,
9  Alex, on cases in the past, do we need to go back
10 and ask you guys to redo stuff?  The answer I got
11 back was, No.
12          So in terms of what to do about past
13 cases, that's kind of left up to my discretion.
14 Okay, do I need to go back and have them redo
15 cases on DNA cases and look at it again?  I have
16 not done that in other cases.
17     Q.    Is there a reason that you haven't
18 gone back to the other cases?
19         MR. REIM:  I would object on
20 relevance grounds.  I don't believe it's part of
21 this case.  It seems to be exploration of
22 Mr. Frasier's past other criminal cases.
23         I mean, this is a deposition so you
24 can answer if you want to, but objection for the
25 record.

158

1          THE WITNESS:  The reason would be
2  that -- the reason is I don't have any other cases
3  back from 2000 forward where DNA was a
4  contributing factor or a noncontributing factor in
5  terms of a homicide or a rape.  I don't have any
6  cases where I would have reason to go back and
7  second-guess those results.  Either the cases are
8  long resolved or -- because of other reasons, like
9  the defendant confessed or whatever, I don't have
10 any reason to go back and check it.
11         And since 2015, since this issue has
12 been brought up, I have had no reason to ask them
13 to redo their testing that they did in 2015 versus
14 today in 2020 or 2019.
15 BY MS. PURACAL:
16     Q.    What about unsolved cases where you
17 thought you didn't have DNA, but it may have been
18 the DNA wasn't reported, like under the protocol
19 that Ms. Winters told you about?
20     A.    Well, in terms of unsolved homicides?
21     Q.    Yes.
22     A.    I can't think of any of our homicides
23 where DNA is a factor of some sort.
24     Q.    What does that mean, "where DNA is a
25 factor"?

159

1      A.    I can't think of any cases that are
2  unsolved -- well, we have one unsolved case where
3  we have DNA, single contributor, female, we also
4  believe we have her fingerprints.  It's from a
5  homicide back in '91, '92.  We run it through
6  CODIS every six months, we get zilch on both, even
7  AFIS, I think the lady's dead.  That's the only
8  one I can think of where we have that.
9          We've got a couple of other unsolved
10 homicides, but we don't have any identifiable
11 fingerprints, DNA, or anything like that in the
12 case.
13         MS. PURACAL:  Can we take a
14 five-minute break and come back.
15         (Recess:  12:11 p.m. - 12:17 p.m.)
16         MS. PURACAL:  I don't have any
17 further questions for you at this point.  I don't
18 know if Mr. Reim does.
19         MR. REIM:  I do have some questions.
20 ///
21              EXAMINATION
22 BY MR. REIM:
23     Q.    Just to refer to some of the issues
24 that came up this morning, Mr. Frasier, I think
25 there's going to be an implication that you didn't

160

1  sufficiently investigate all of the other various
2  rumors and suspects in this matter.
3          Can you clarify for me again how it is
4  you shifted through all of that to ultimately
5  arrive and charge, I guess -- well, I guess the
6  grand jury charged him, but how did you get to the
7  point where Mr. McGuffin was the primary suspect?
8      A.    Well, one thing we did was when we
9  brought the case back out in 2008, 2009, we asked
10 the Oregon Department of Justice to get involved
11 and to provide us an analyst to give us some
12 charts and stuff like that.  And we came up with a
13 potential suspect list, and I think he had 12
14 or -- I don't remember exactly how many names were
15 on it for potential suspects.
16         And one of the things I stressed when
17 we reopened this thing was we need to find the
18 truth.  Who killed Leah.  We've got all these
19 other things going on out here, we've got people
20 saying she was kidnapped, we've got people saying
21 she's been run over by a car, we need to run those
22 down.
23         So one of the things I insisted that
24 they do, anybody that was identified as a
25 potential suspect they needed to investigate

B. Earl Frasier

```
1    STATE OF OREGON.         )
                              ) ss.
2    County of Douglas        )

3

4         I, Denise C. Zito Smith, CSR, a Certified

5    Shorthand Reporter for the State of Oregon, hereby

6    certify that the witness was sworn and the

7    transcript is a true record of the testimony given

8    by the witness; that at said time and place I

9    reported by stenotype all testimony and other oral

10   proceedings had in the foregoing matter; that the

11   foregoing transcript consisting of 204 pages

12   contains a full, true and correct transcript of

13   said proceedings reported by me to the best of my

14   ability on said date.

15        If any of the parties or the witness

16   requested review of the transcript at the time of

17   the proceedings, such correction pages are

18   included.

19        IN WITNESS WHEREOF, I have set my hand this

20   14th day of June 2019, in the City of Canyonville,

21   County of Douglas, State of Oregon.

22

23
         _Denise C. Zito Smith_

24   _____
     Denise C. Zito Smith
25   Oregon CSR No. 01-0375
     Expires 9/30/2021
```

**EXHIBIT – F**



**IRS** Department of the Treasury
Internal Revenue Service

P.O. Box 2508, Room 4010
Cincinnati  OH  45201

In reply refer to:  4051050282
Mar. 03, 2017  LTR 4168C    0
23-2662036    000000 00
                    00024902
              BODC: TE

VIDOCQ SOCIETY
% WILLIAM FLEISHER
1704 LOCUST STREET 2ND FLOOR
PHILADELPHIA  PA  19103-6177

06333

    Employer ID Number:  23-2662036
    Form 990 required:  Yes

Dear Taxpayer:

This is in response to your request dated Feb. 02, 2017, regarding
your tax-exempt status.

We issued you a determination letter in December 1992, recognizing
you as tax-exempt under Internal Revenue Code (IRC) Section 501(c)
(03).

Our records also indicate you're not a private foundation as defined
under IRC Section 509(a) because you're described in IRC Sections
509(a)(1) and 170(b)(1)(A)(vi).

Donors can deduct contributions they make to you as provided in IRC
Section 170. You're also qualified to receive tax deductible bequests,
legacies, devises, transfers, or gifts under IRC Sections 2055, 2106,
and 2522.

In the heading of this letter, we indicated whether you must file an
annual information return. If a return is required, you must file Form
990, 990-EZ, 990-N, or 990-PF by the 15th day of the fifth month after
the end of your annual accounting period. IRC Section 6033(j) provides
that, if you don't file a required annual information return or notice
for three consecutive years, your exempt status will be automatically
revoked on the filing due date of the third required return or notice.

For tax forms, instructions, and publications, visit www.irs.gov or
call 1-800-TAX-FORM (1-800-829-3676).

If you have questions, call 1-877-829-5500 between 8 a.m. and 5 p.m.,
local time, Monday through Friday (Alaska and Hawaii follow Pacific
Time).

```
                                        4051050282
                 Mar. 03, 2017  LTR 4168C   0
                 23-2662036    000000 00
                                        00024903
```

VIDOCQ SOCIETY
% WILLIAM FLEISHER
1704 LOCUST STREET 2ND FLOOR
PHILADELPHIA  PA  19103-6177


                         Sincerely yours,


                         Jeffrey I. Cooper
                         Director, EO Rulings & Agreement

DEC 10 1992

Microfilm Number_____

Filed with the Department of State on_____

Entity Number_____ 2031534

_Bi. Klebbert_

Secretary of the Commonwealth

## ARTICLES OF AMENDMENT-DOMESTIC NONPROFIT CORPORATION
### DSCB:15-5915 (Rev 90)

In compliance with the requirements of 15 Pa.C.S. § 5915 (relating to articles of amendment), the undersigned nonprofit corporation, desiring to amend its articles, hereby states that:

1. The name of the corporation is: ___ THE VIDOCQ SOCIETY ___

2. The (a) address of this corporation's current registered office in this Commonwealth or (b) name of its commercial registered office provider and the county of venue is (the Department is hereby authorized to correct the following information to conform to the records of the Department):

(a) 114 Neshaminy Plaza I, Bristol Pike & Street Road, Bensalem, PA 19020

| Number and Street | City | State | Zip | County Bucks |

(b) c/o:_____

Name of Commercial Registered Office Provider                                      County

For a corporation represented by a commercial registered office provider, the county in (b) shall be deemed the county in which the corporation is located for venue and official publication purposes.

3. The statute by or under which it was incorporated is: ___ Pennsylvania Nonprofit Corporation Law of 1988 ___

4. The date of its incorporation is: ___ June 20, 1991 ___

5. (Check, and if appropriate complete, one of the following):

___X__ The amendment shall be effective upon filing these Articles of Amendment in the Department of State.

_____The amendment shall be effective on: _____at _____
                                                          Date                              Hour

6. (Check one of the following):

_____The amendment was adopted by the members (or shareholders) pursuant to 15 Pa.C.S. § 5914(a).

_____The amendment was adopted by the board of directors pursuant to 15 Pa.C.S. § 5914(b).

7. (Check, and if appropriate complete, one of the following):

_____The amendment adopted by the corporation, set forth in full, is as follows:




___X__ The amendment adopted by the corporation is set forth in full in Exhibit A attached hereto and made a part hereof.

M. BURR KEIM COMPANY
(215) 563-8113  (800) 533-8113

DSCB:15-5915 (Rev 90)-2

9292- 919

8. (Check, if the amendment restates the Articles):

_____The restated Articles of Incorporation supersede the original Articles and all amendments thereto.

IN TESTIMONY WHEREOF, the undersigned corporation has caused these Articles of Amendment to be signed by a duly authorized officer thereof this ___8th__ day of ____Dec.____, 19 _92___.

THE VIDOCQ SOCIETY
(Name of Corporation)

BY: _____
(Signature)

TITLE: __Vice Com_____

92 DEC 10 PM 12: 47
PA DEPT. OF STATE

VIDOCQ_000004

9292- 920

# EXHIBIT A

# R I D E R

## TO THE ARTICLES OF AMENDMENT

## THE VIDOCQ SOCIETY

The corporation is incorporated under the Nonprofit Corporation Law of the Commonwealth of Pennsylvania for the following purpose or purposes:

To solve mysteries in the true tradition of all great investigators and to cultivate good fellowship among its members.

The corporation is organized exclusively for charitable, literary, scientific, religious and educational purposes provided for under Section 501(c)(3) of the Internal Revenue Code of 1986 and does not contemplate pecuniary gain or profit, incidental or otherwise

No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, trustees, officers or other private persons except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of its purposes.

No substantial part of the activities of the corporation shall be the carrying on of propaganda or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the preparation or distribution of statements) any political campaign on behalf of any candidate for public office.  The corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law) or (b) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law).

In the event of dissolution of this corporation, its assets shall be distributable only to organizations which enjoy exempt status in accordance with the provisions of Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law).

However, if the named recipient is not then in existence or no longer a qualified distributee, or unwilling or unable to accept the distribution, then the assets of this corporation shall be distributed to a fund, foundation or corporation organized and operated exclusively for the purposes specified in Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law).

VIDOCQ_000005

Microfilm Number **9138 269**

Filed with the Department of State on **JUN 2 0 1991**

Entity Number **2031534**

*Christopher A. Lewis*

**Secretary of the Commonwealth**

## ARTICLES OF INCORPORATION-DOMESTIC NONPROFIT CORPORATION

### DSCB:15-5306 (Rev 90)

In compliance with the requirements of 15 Pa.C.S. § 5306 (relating to articles of incorporation), the undersigned, desiring to incorporate a nonprofit corporation, hereby state(s) that:

1. The **name** of the corporation is: _____ THE VIDOCQ SOCIETY _____

2. The (a) **address** of this corporation's initial registered office in this Commonwealth or (b) **name** of its commercial registered office provider and the county of venue is:

(a) 114 Neshaminy Plaza I, Bristol Pike & Street Road, Bensalem, PA 19020

| Number and Street | City | State | Zip | Bucks | County |

(b) c/o: _____

Name of Commercial Registered Office Provider                                                    County

For a corporation represented by a commercial registered office provider, the county in (b) shall be deemed the county in which the corporation is located for venue and official publication purposes.

3. The corporation is incorporated under the Nonprofit Corporation Law of 1988 for the following purpose or purposes: To solve mysteries in the true tradition of all great investigators and to cultivate good fellowship among its members

4. The corporation does not contemplate pecuniary gain or profit, incidental or otherwise.

5. The corporation is organized upon a nonstock basis.

6. (Strike out if inapplicable): The corporation shall have ~~no~~ members.

7. (Strike out if inapplicable): ~~The incorporators constitute a majority of the members of the committee authorized to incorporate~~

~~incorporate~~ _____

~~by the requisite vote required by the organic law of the association for the amendment of such organic law~~

8. The **name** and **address**, including street and number, if any, of each incorporator is:

| Name | Address |
| R.W. Worthington | 105 N. Watts Street, Philadelphia, PA 19107 |

9. The specified effective **date**, if any, is: _____

      month          day          year                hour, if any

10. Any additional provisions of the articles, if any, attach an 8 1/2 x 11 sheet.

M. BURK.... COMPANY
(215) 563-8.... 0) 23-6113

VIDOCQ_000006

DSCB:15-5306 (Rev 90)-2

9138 261

IN TESTIMONY WHEREOF, the incorporator(s) has (have) signed these Articles of Incorporation this ____19th__ day of _____June_____ ,19 __91__

_____
                  (Signature)
R.W. Worthington

_____
                  (Signature)

_____
                  (Signature)

91 JUN 20  AM II: 03

PA DEPT. OF STATE

VIDOCQ_000007

COMMONWEALTH OF PENNSYLVANIA

DEPARTMENT OF STATE

07/19/2019

TO ALL WHOM THESE PRESENTS SHALL COME, GREETING:

I DO HEREBY CERTIFY THAT,

THE VIDOCQ SOCIETY

is duly registered as a Pennsylvania Non-Profit (Non Stock) under the laws of the Commonwealth of Pennsylvania and remains subsisting so far as the records of this office show, as of the date herein.

I DO FURTHER CERTIFY THAT this Subsistence Certificate shall not imply that all fees, taxes and penalties owed to the Commonwealth of Pennsylvania are paid.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the Secretary's Office to be affixed, the day and year above written

_____
Acting Secretary of the Commonwealth

Certification Number: TSC190715141456-1

Verify this certificate online at http://www.corporations.pa.gov/orders/verify

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

SYNOPSIS OF VIDOCQ SOCIETY CASES

207. The Murder of Leah Freeman,  2000

This case was presented by DA R. Paul Frasier, of Coos County, OR (503-378-6347) and Mark Dannels, Chief of police of Coquille, OR (541-396-2114) with help from Lisa McOwen, OR DOJ and  Craig Zanni, County Investigator on 21 Jan 2010.   The victim, 15 years old, disappeared on 28 Jun 2000 and her skeletonized remains were found on 3 Aug 2000 and few miles away.  Suspicion fell on her older boyfriend who was described as over controlling and infatuated with Leah.  The Chief of Police appeared to have hindered the investigation of the case and the investigators found that the high school kids had subscribed to a code of silence about the case. The suspect was found to be deceptive on two polygraphs tests and his buddy was found to be deceptive on knowing about the crime.  The suspect and his father were seen burning "trash" during a "no open fires ban" and the suspect's car trunk was completely sanitized with the removal of everything down to the gas tank. Since that time, the suspect has attempted suicide twice when under pressure. Compounding the issue was that although Leah was murdered, the cause of death could not be determined.   We suggested that this was a PA organized murder and the tenth anniversary is coming up soon and some publicity may bring out some information.


Richard advises me that after discussion, they realized that the motive for the crime was that the BF wanted to get Leah pregnant, not the other way around, and they must have had a fight where her bloody shoe was found.  It was a PA case and PAs hit for the face, therefore blood, and then they surmised that the BF put her in the trunk of the car that he was driving and called his father who came over and switched cars, allowing the BF to drive around being noticed while the father dumped the body. It explains the sanitation of the car trunk and the unauthorized burning and that the BF had an alibi of driving around looking for Leah.  His written statements and polygraphs all indicate that the BF was lying about killing her and his buddy was lying about knowing about the case but not having killed her.  He told his buddy what happened knowing that he would not "snitch".


Richard says that the DA was very impressed and indicated that they now saw the case in a new light and he may have enough to indict.


Remember, she was on her way to get birth control pills and the BF after the crime impregnated another 14 years old that he could control. ABC is filming the case. The boy friend, Nick McGuffin was indicted in Aug 2010 and the case was featured on 20/20 on 15 Oct 2010.  Some changes in the thought process were noted where another girl friend's car was used, not the father's car.  Jurors found Nicholas James McGuffin guilty of manslaughter, but not murder. Ten of the 12 jurors voted for the conviction, which indicates McGuffin recklessly killed his 15-year-old girlfriend in June 2000, but not necessarily intentionally. (27 July 2011)

'I kind of lost control," Court-right said. 'I've fought so hard for so long."

VIDOCQ_000009

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

McGuffin will be sentenced Aug. 1. Manslaughter is a Measure 11 crime, so he will face a minimum of 10 years in prison and a maximum of 20. Any sentence will include time served, in this case one year.

District Attorney R. Paul Frasier chose to include manslaughter as a lesser included charge for the jury to consider if it found McGuffin not guilty of murder.

'I did that because I really do not believe that Nick McGuffin woke up that morning and thought, 'I'm going to kill Leah Freeman,'" Frasier said at a press conference after the verdict.

It was a point he made several times during his closing argument Monday.

2
2

# THE VIDOCQ SOCIETY

❧

# CODE OF ETHICS & CONDUCT

Each year, every Vidocq Society member READS and reaffirms adherence to the Vidocq Society Code of Ethics & Conduct (the "Code"). Each new member AFFIRMS adherence to the Code upon joining the organization. As an organization, the Vidocq Society takes pride in its professionalism and assures law enforcement agencies that the confidential details about their matters remain confidential.

By affirming the Vidocq Society Code each year, every member reviews the code and agrees to act in the best interests of referring law enforcement agencies ("LEAs") and victims and to conduct Vidocq Society ACTIVITIES in a manner that maintains high standards of professionalism and ethics.

The Code PROVIDES the Vidocq Society with a method to ensure, and to assure others, that our members adhere to our organization's basic beliefs.

**Client Interests**

To best serve client interests, Vidocq Society members shall:

•     Always conduct their Vidocq Society activities in a manner that places the interests of the LEAs and victims before any personal interests.

•     At all times protect the confidentiality of information provided by LEAs. No disclosure will be made of any information disclosed by an LEA without their prior approval. No disclosure will be made of any information relating to the Vidocq Society's participation in an investigation without the WRITTEN permission of the Chairman of the Board and/or the Commissioner of the Vidocq Society ("Chairperson").

•     Not participate in any investigation in which the Vidocq Society has participated or is scheduled to participate if such participation would create a conflict of interest or the appearance of a conflict of interest between or among the Vidocq Society, the member and/or the LEA.

v. 2014.5

VIDOCQ_000011

• Not seek or accept continued involvement in an investigation in which the Vidocq Society has participated.

## Compensation

As unpaid volunteers, Vidocq Society members shall:

• Neither charge nor accept fees, honoraria or things of value as payment for their participation in activities on behalf of the Vidocq Society.

• Not solicit compensation of any kind from an LEA or other party (e.g., family of a victim) related to an investigation in which the Vidocq Society has participated or is scheduled to participate.

• Not advertise, solicit or propose the use of themselves or their outside businesses in the course of their participation in Vidocq Society activities.

• Not recommend to an involved party (e.g., family of a victim) that such party retain an investigator or consultant, or purchase goods or services, if the member has a direct or indirect financial or business interest in the recommended person or entity.

• A member shall not have continued involvement as an investigator, consultant or in any other capacity in any investigation in which the Vidocq Society has participated.

## Personal Conduct

As long as they are members of the Vidocq Society, members shall:

• Participate in activities when possible, including attending meetings, and shall abide by the Code.

• Not discriminate in any of their Vidocq Society-related activities against any person because of any protected characteristic, including, but not limited to, race, color, national origin, sex, age, religion, marital status, handicap or sexual preference.

• Not make public statements that appear to associate the Vidocq Society with personal opinions of the member or that are critical of the Vidocq Society.

v. 2014.5

- Not make statements that appear to identify the Vidocq Society with a political party or a candidate for federal, state or local office.

- At all times, during the performance of their services, conduct themselves in such a manner as not to discredit themselves or the Vidocq Society.

- Seek advance advice from the Board about the propriety of any action or inaction that they have reason to believe may be or may lead to a violation of the Code BEFORE they or others engage in the activity or fail to act.

## Commitment to the Code

Members shall be fully aware of the Code, and understand and accept that a violation of the Code is grounds for immediate termination of membership.

When individuals apply for membership in the Vidocq Society, they will agree by signing the membership application that they shall comply with the provisions of the Vidocq Society's Code of Ethics & Conduct, which they have read, and also with the other rules for its members.  Applicants shall receive and retain a copy of the current Code at the time they receive an application for membership.

With respect to current members, since changes may occur in the Code, and to refresh members' knowledge of the provisions of the code:

- At the time of annual membership renewal, each member shall be given a current copy of the Code.

- At that time, the member will sign and date an acknowledgement that says, "I have reread the Vidocq Society Code of Ethics & Conduct and reaffirm my agreement to comply with its provisions."

v. 2014.5

# Constitution and Bylaws of the Vidocq Society

## ORGANIZATION AND MEMBERSHIP

### ARTICLE I - NAME

This Association shall be known as The VIDOCQ SOCIETY. Its guiding principle shall be Veritas Veritatum (Truth Begets Truth).

### ARTICLE II - OBJECTIVES

The objects of this organization shall be:

- To render *pro bono* assistance to law enforcement jurisdictions in the solving of "cold case" homicides or other crimes provided that such cases, (1) be brought to the Society's attention by recognized law enforcement agencies or by immediate family members who can assure the Society of the cooperation and interest of the relevant recognized law enforcement agency, (2) are two years old or older (3) and are not cases in which the death of the victim may be the result to the victim's involvement in felonious behavior or engaging in inherently dangerous activities.

- To offer law enforcement jurisdictions in-service seminars in topics related to the functioning of cold case units.
- To offer in-service seminars to the membership relating to the application of forensic techniques as they may be used in solving cold case homicides.

In doing so, the organization seeks to be absolute in promoting the health, safety, and welfare of the membership while they pursue the goals of the Society.

### ARTICLE III - MEMBERS -

Section 1 - The Board of Directors shall decide who shall be elected to, and reinstated in, the Society.

1

<u>Section 2</u> - There shall be three categories of membership: Full Member, Special Member and Honorary Member. The number of full members shall not exceed 82. There shall be no set limit to the number of Special Members except as established by the decision of the Board based on logistical considerations. There shall be no set limit to the number of Honorary Members.

<u>Section 3</u> - Those eligible for membership are:

A. For Full Member - A current Special Member in good standing may be nominated by a Board Member for Full Membership, provided that such nomination will not exceed eighty-two. Full Membership may be granted only by a consensus of the quorum of Board present at a regular business meeting. Only a Full Member shall be eligible to nominate Officers and Directors and vote in elections or on business matters brought forward for the consideration of the Full Membership.

B. For Special Member - An applicant for Special Membership must be nominated to the Board by a Full Member in good standing and seconded by another Full Member. Such a nomination must be accompanied by a completed application form and an annual dues payment, the latter to be returned if the applicant is not approved. The nominee must have attained the age of majority, be of exemplary character, possess a forensic skill or other skill necessary for the management of the organization and demonstrated a commitment to solving cold case homicides.

C. For Honorary Member – Given meritorious service to the Vidocq Society, or to the community or for other distinguished service, an individual may be elected to honorary membership by a majority vote of the Board of Directors at a regular Board meeting. Such honorary membership shall involve no payment of initiation fee, dues or other charges, and shall convey no voice or vote in the affairs of the Society.

<u>Section 4</u> – All members are welcome to all regular business meetings and are encouraged to participate in and contribute to the fulfillment of the objects of the Society.

<u>Section 5</u> – All members are entitled to use the honorific VSM.

2

Section 6 – Any member domiciled within 150 miles of Philadelphia must attend at least one meeting per year.

Section 7 – Any member whose official duties prevent attendance at meetings, whose domicile is more than 150 miles distant from Philadelphia or who is incapacitated shall not be subject to Section 6 (above). These will be expected to aid in the mission of the Society to the best of their ability when asked.

## ARTICLE IV - DISMISSAL FROM THE SOCIETY

Section 1 - All memberships are subject to revocation by the Board for good cause.

Section 2 - At the end of the calendar year, any member who has failed to meet the annual attendance requirement shall receive notice of noncompliance and shall have the right to present an explanation to the Board. The Board shall evaluate the member's response and shall take such action as they shall deem appropriate.

Section 3 – Should the action of the Board be dismissal for non-attendance, the former member may apply for reinstatement. The board shall consider such applications a regular business meeting of the Board provided that a quorum is present and take such action as they deem appropriate.

Section 4 - Should the action of the Board be dismissal from the Society for cause, the member may appeal to the board for reconsideration. Such appeals shall be considered at a regular business meeting of the Board or at a special meeting of the Board, provided that a quorum is present. All decisions regarding the appeal by the member shall be final.

# BY-LAWS

## ARTICLE I - OFFICERS

Section 1 - The officers of this Society shall be a Commissioner, two Deputy Commissioners, the senior of whom shall be the Case Manager, a Secretary, a Treasurer and nine Directors. The Society's officers and constitute the Board of Directors. Additionally, a retiring Commissioner of the Society shall automatically become a

3

supernumerary member of the Board of Directors for two years, unless elected to another office.

Section 2 – All officers shall serve for two years.

Section 3 – The Commissioner, the Second Deputy Commissioner, The Secretary and Four Directors shall stand for election on odd years.  The senior Deputy Commissioner, the Treasurer and Five Directors shall stand for election on even years.

Section 4 – Only for the purpose of bringing the sequencing of elections into compliance as described in Sections 2 and 3, certain officers may on a one-time basis serve three year terms.

## ARTICLE II - DUTIES OF THE OFFICERS -

Section 1 – Duties of the Commissioner:  The Commissioner shall preside at all regular meetings of the Society and set the agenda for all such meetings.  The Commissioner or the Commissioner's designee shall be the only member who shall have the right to speak officially on behalf of the Society.  Upon the authorization of a majority of a quorum of the Board, he shall sign all written contracts and obligations of the Society, and/or delegate or empower other officers of the Society to do so in certain instances.  The commissioner shall perform all ceremonial duties of the office and such other duties that shall normally pertain to such an office.  Additionally, the Commissioner shall appoint *ad hoc* committees and shall serve as an *ex officio* member of all such committees.

Section 2 – Duties of the Senior Deputy Commissioner:  The Senior Deputy Commissioner shall be the Society's Case Manager and shall report on the state of cases currently under management at each meeting.  The Case Manager shall receive all cases submitted to the Society for its consideration.  The Case manager shall decide which cases shall be materially addressed by the Society, having sought the advice and of members whose specialties relate to those particular cases, provided that such cases in the Case Manager's opinion meet the criteria for acceptance established by the Society.  In the absence or disability of the Commissioner, the Deputy Senior Deputy Commissioner shall chair all Board meetings and be Acting Commissioner,  as circumstances require.

4

VIDOCQ_000017

Section 3 – The Second Deputy Commissioner, in the absence and/or disability of both the Commissioner and the Senior Deputy Commissioner, shall assume or delegate the responsibilities of the Commissioner and Senior Deputy Commissioner, chair Board meetings and be Acting Commissioner, as circumstances require.

Section 4 – Duties of the Secretary: The Secretary shall keep minutes of the proceedings of the Society and the Board of Directors and submit the prior meeting's minutes for verification and emendation at the following meeting. The minutes as amended and approved shall be the official record of the proceedings of the Society. The Secretary shall also retain copies of all relevant documents, contracts and correspondence. The Secretary shall issue notices of meetings and the subjects to be addressed to all members two weeks in advance of the meetings via email. The Secretary shall perform such duties as assigned by the commissioner usually associated with the office of Secretary.

Section 5 – Duties of the Treasurer: The Treasurer shall receive all dues and other funds paid into the Society. Such monies shall be deposited in an interest-bearing account in a banking institution or other investment vehicle as designated by the Board. The Treasurer shall retain a record of all such receipts and investments and interest accruing. The Treasurer Shall issue payments for all materials and services as authorized by the Board, except in a case where timeliness is required or preauthorized; in which event, it shall be reported and justified art the next regular Board meeting. The Treasurer shall report on the state of the Societies financial affairs at each Board meeting, be responsible for tax compliance and issue an annual report to the membership concerning the Society's finances.

## ARTICLE III - BOARD OF DIRECTORS

Section 1 - Duties of the Board of Directors:

A: The Board shall elect a Chairperson who would preside over Board Meetings. This person shall serve for a two-year period where another election may take place. The incumbent maybe removed at any time by a majority vote of the Board.

5

VIDOCQ_000018

B. The Board shall pass on all matters relating to membership as stipulated in Organization and Membership, Articles III and IV.   This shall include appointing members to fill Board vacancies to fill any unexpired term except as provide for in the Bylaws, Article II.

C. The Board shall act as a committee of the whole in considering and acting upon matters relating to the Objectives, Finances and Business of the Society

## ARTICLE IV - MEETINGS -

Section 1 – Business meetings shall be on the third Thursday of each month unless other wise designated by the Board or Commissioner.  A quorum of 28 Full Members shall be required to conduct official business in matters that require votes.

Section 2 -

In order for a Board meeting to conduct official business, a quorum of seven members is required.

D. The Agenda for all regular Board meetings shall be:  (1) Reading of the Minutes, (2) Reports of the Officers, (3) Reports of the Committees, (4) Old Business, (5) New Business

E. Additional Board meetings may be called as required to address specific issues, at which only those matters related to the immediate issue may be discussed and decided upon, provided a quorum is present.

Section 3 – Special meetings in which the voting membership shall constitute a committee of the whole may be called by either the Board of Directors or upon the request of 25% of the voting membership.

Section 4 – All meetings shall be conducted according to Robert's Rules of Order.

## ARTICLE V - ELECTIONS

Section 1 – Nominations for Officers and Directors shall be held at the regular October Business meeting.  Mail nominations shall be received and accepted as valid provided they are faxed or postmarked not earlier than October 15th or later

6

than November 15th.

A. Should there be only one nominee for a vacant office, that nominee shall be considered elected by acclamation and the result affirmed by voice vote at a regular business meeting of the membership.

B. Should there be more than one nominee for a vacant office, names of nominees, the offices for which they are candidates and their stated qualifications shall be mailed to all Full Members along with ballot kits on the first business day after ?????????January 1st.

C. A ballot kit shall consist of a ballot and a self-addressed, postage paid envelope with a place for the member's signature on the reverse side.

D. All ballots, to be valid will be inserted in the election envelope which must be signed by the voting member and postmarked no later than February 5th.

E. In order for the election to be official, at least 40 valid ballots must be received.

F. After the closing date for the receipt of ballots, three members of the Board not standing for election shall constitute the election committee. They shall inspect all ballots and set aside all invalid ballots. Provided, 40 valid ballots remain, all valid ballots shall be removed from their envelopes and put into a ballot box. After all envelopes are opened, the ballots shall be counted and the results verified by a recount and the nominees notified in a timely fashion.

G. All newly elected officers shall take office at the February Board meeting.

H. The winners of the election shall be announced to the membership at the regular February business meeting and in the following edition of the Journal.

I. In the event there are not 40 valid ballots, the election shall be voided, and the election shall be held as the first matter of business at the regular February business meeting, providing a quorum is present, the voting done by written ballot. In this event the newly elected officers shall join the Board at its March meeting with the results announced in the next following Journal.

**ARTICLE VI – DUES**

VIDOCQ_000020

<u>Section 1</u> - Dues notices shall be sent out on the first business day of January of each year.

<u>Section 2</u> - Dues not received within 90 days of the mailing shall be considered delinquent and may constitute a basis for termination of membership.

<u>Section 3</u> – For members over the age of 70 or older, who have been members for at least five years shall have their dues waived if requested.

## ARTICLE VII – CHANGES TO THE CONSTITUTION AND THE BYLAWS

<u>Section 1</u> – Notice of a meeting at which the matter of the Constitution and the Bylaws are to be discussed with the purpose of proposing alterations and/or amendments must be given to all members by regular mail or e-mail to be received at least thirty days prior to such meeting.

<u>Section 2</u> - A two-thirds vote of a quorum of members at a regular business meeting or a special convened for that specific purpose, provided that meeting meets the notice requirements in Article VII, Section 1, may alter and/or amend the Constitution and the Bylaws.

VIDOCQ_000021



**The VIDOCQ SOCIETY**
**1704 Locust St.**
**Philadelphia, PA 19103**
**215-545-1450**



████████████

Dear ████████████,

On behalf of the Vidocq Society, I invite you to present the investigation of the death of ████████████.  Our meeting will be held on ████████, ████████ in the Union League of Philadelphia, 140 S Broad St., Philadelphia, PA 19102, telephone number 215.563.6500.

Commissioner William Fleisher, VSM, who can be reached at 215.545.1111, will chair the meeting.  Please feel free to get in touch with me if you have any questions, as I will be your principal point of contact until that time.

At approximately 11:45 am we will conduct a short business meeting, begin lunch, and then introduce you.  As we discussed, please present your case as if briefing a homicide squad.  There will be between 60 to 80 forensic experts, investigators and detectives present who will attempt to help you resolve this case. The presentation should last approximately two hours.  At your discretion, questions can be entertained during or at the end.

**You will need to provide me with a three to four page case synopsis that will be reproduced and distributed to the membership at the beginning of the meeting.**  It will be collected at the end of your presentation and destroyed. If you have a need for audio/video equipment, please let me know in advance. Because of the size of the audience PowerPoint has proven to be very helpful.

As we move ahead please feel free to contact me as questions arise. We are looking forward to seeing you on ███████. Please mark your calendar accordingly and **acknowledge receipt this invitation**.

As time draws closer you should contact our travel agent, UN Travel of Philadelphia at 215-922-4671 and ask for Les. He will help you make suitable reservations for your visit. The Society will pay the travel expenses for you and one other investigator for this visit. This will include airfare if necessary, transfers, and lodging for up to two nights. Your meals will be reimbursed at the prevailing Federal Government per diem rate at that time.

As I mentioned in our initial conversation, from this point on we do not communicate with the family. The press is not allowed at your presentation unless permitted by you.

As a reminder the Vidocq Society is a Nonprofit, 501c(3) corporation, which, by the terms of its charter, is a fraternal organization comprised of professionals and non-professionals who meet in a social setting to discuss unsolved crimes. Our work is pro bono and we do not consider every case presented to us. Our sole purpose is to act as a catalyst and provide guidance to law enforcement agencies to assist them in solving these crimes. Opinions offered by our members are personal opinions offered in the spirit of cooperation and assistance, based only upon the facts presented, and should not be considered formal or legally binding opinions of the Vidocq Society.

I look forward to meeting you and thanks for your interest in the Society.

Sincerely,

William F. Gill III, VSM
Case Manager
609.923.9703



**EXHIBIT – G**

Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR 97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY
100 S. King Street, Ste. 100
Seattle, WA 98104-2885
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br>　　　　　　Plaintiffs,<br><br>　　　v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br>　　　　　　Defendants. | Civil No. 6:20-cv-01163-MK<br>(Lead Case)<br><br><br>PLAINTIFFS' FED. R. CIV. P. 30(b)(6) AND 34 DEPOSITION NOTICE TO DEFENDANT VIDOCQ SOCIETY |

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

VIDOCQ SOCIETY,

          Cross-Claimant,

    v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

          Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

          Plaintiffs,

    v.

OREGON STATE POLICE,

          Defendant.

Civil Case No. 3:21-cv-01719-MK
(Trailing Case)

TO:   Defendant Vidocq Society and its counsel, Anthony R. Scisciani III, Meredith A. Sawyer,
      and HWS Law Group LLP

      PLEASE TAKE NOTICE THAT pursuant to Fed. R. Civ. P. 30(b)(6), and at the instance

and request of Plaintiffs Nicholas James McGuffin and S.M. (collectively "Plaintiffs"), the

testimony of a designated representative of Defendant The Vidocq Society (Vidocq) will be

taken at deposition upon oral examination on Monday, August 17, 2023, beginning at 9:00 a.m.,

by remote video conferencing.  The deposition will be subject to continuance or adjournment

from time to time or place to place until completed.  The deposition will be recorded by

stenographic means.

/ / /

Page 2– FED. R. CIV. P. 30(b)(6) NOTICE – VIDOCQ SOCIETY


MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## I.    FED. R. CIV. P. 30(b)(6) DEPOSITION NOTICE

Pursuant to Fed. R. Civ. P. 30(b)(6), Vidocq is hereby directed to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and to set forth, for each person designated, the matters known on which the deponent will testify. Each person designated to testify shall testify as to matters known or reasonably available to Vidocq, which shall include each of the topics set forth below. Unless specifically stated otherwise, each of the words used in setting forth the topics below is given its plain and ordinary meaning as defined in *Webster's Third New International Dictionary* (unabridged ed. 2002), and the terms "document" and "documentation" include, but are not limited to, all digital media and electronically created, maintained, or stored information and data.

1.    Vidocq's organizational structure from 2009 through 2022, including:

    a.    name, location(s), purpose, and legal status;

    b.    contents of the Constitution and Bylaws of the Vidocq Society;

    c.    organizational hierarchy, including directors, officers, management, supervisors, employees, boards, committees, responsibilities of each officer and committee, and the identity of all persons with final policymaking authority;

    d.    reporting structure and lines of communication, including direct and indirect reporting, responsibility for internal and external communication, and record keeping; and

    e.    description of departments, divisions, committees, or units within Vidocq.

2.    Vidocq's membership criteria and processes from 2009 through 2022, including:

    a.    recruitment and application processes;

    b.    applicant screening and admission processes;

    c.    education, qualifications, certifications, licenses, training and insurance requirements for membership;

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

d.    areas of expertise, including priorities of expertise or specialization, number of members in each area of expertise, and identity of each member identified with or practicing within each area of expertise;

e.    dues, time commitment, and participation requirements for members;

f.    publishing commitments or requirements for members;

g.    continuing education and training requirements for members; and

h.    all written and unwritten expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, applicable to membership in Vidocq or to persons participating in Vidocq activities or events.

3.    Vidocq's policies and policymaking procedures from 2009 through 2022, including the processes by which Vidocq created or implemented written or unwritten expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, addressing:

a.    investigation activities, including the type, scope and quality of investigation undertaken by Vidocq or Vidocq members at the request of law enforcement agencies or individuals;

b.    evidence collection, handling, sharing, preservation, retention, and destruction, including chain of custody management;

c.    requests for evidence examination or testing;

d.    interpretation of data derived from experimentation, modeling, or testing performed by Vidocq or its members, including peer review requirements and processes;

e.    offering opinions, providing guidance, and making recommendations to Vidocq's law enforcement partners, prosecutors, or the public;

f.    documentation and reporting of conclusions, opinions, advice, data and results from investigation or experimentation, guidance, suggestions,

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

or recommendations, including the creation, maintenance, location, use, storage, retention, accessibility, replication or reproduction of such documents or reports;

g.    documentation and reporting of communications between Vidocq and its members, its law enforcement partners, prosecutors, other government agencies, and the public, including the creation, maintenance, location, use, storage, retention, accessibility, replication or reproduction of such documents or reports;

h.    the integrity, reliability, and veracity of information or evidence presented to Vidocq or its members, obtained or relied upon by Vidocq or its members, or shared by Vidocq or its members with Vidocq's law enforcement partners, prosecutors, or the public;

i.    fabrication, falsification, or misrepresentation of information, data, or evidence, including any reporting obligations of Vidocq or its members upon suspicion or discovery of any fabrication, falsification, or misrepresentation of information, data, or evidence by Vidocq or any of its members;

j.    auditing procedures, including the auditing process, the need for audits, types of audits, what prompts the need for an audit, and documentation of audits or requests for audits;

k.    discrepancies, inconsistencies, errors, or differences of opinion between Vidocq members, between Vidocq and its members, or between Vidocq and its law enforcement partners;

l.    correcting errors, and clarifying and updating opinions and recommendations;

m.    investigation, handling, and resolution of internal and external complaints or allegations of misconduct regarding Vidocq or its members, including

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

disciplinary and corrective action processes, the process for filing or providing notice of complaints, the investigative process, rights afforded to Vidocq members related to the conduct of disciplinary investigations, notification of complaints and allegations, administrative proceedings, recording statements, resolution or termination of complaints, types of disciplinary or corrective actions, appeals or reviews of disciplinary or corrective actions, person(s) or committees charged with maintaining discipline within the agency, what constitutes just cause for disciplinary or corrective action, and notice to external agencies or non-Vidocq entities of disciplinary or corrective actions taken by Vidocq;

n.      providing expert testimony and opinions to law enforcement, including testimony by declaration, affidavit, or at trial or other court proceedings;

o.      internal and external training or education provided by Vidocq to its members, its law enforcement partners, other government agencies, private entities, or the public;

p.      confidentiality and external information sharing; and

q.      media requests, communication with media and journalists, and participation in journalism and media reporting, broadcasts, or events.

4.      All training and education provided by Vidocq to its directors, officers, employees, and members from 2009 through 2022, including all training, education, and related materials regarding:

a.      Vidocq's written or unwritten expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal;

b.      investigation activities and procedures, including the type, scope and quality of investigation undertaken by Vidocq or Vidocq members at the request of law enforcement agencies or individuals;

/ / /

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

c.     evidence collection, handling, sharing, preservation, retention, and destruction, including chain of custody management;

d.     evidence examination or testing, including handling requests for evidence examination or testing;

e.     interpretation of data derived from experimentation, modeling, or testing, including peer review requirements and processes;

f.     offering opinions, providing guidance, and making recommendations to Vidocq's law enforcement partners, prosecutors, or the public;

g.     documentation and reporting of conclusions, opinions, advice, data and results from investigation or experimentation, guidance, suggestions, or recommendations, including the creation, maintenance, location, use, storage, retention, accessibility, replication or reproduction of such documents or reports;

h.     documentation and reporting of communications between Vidocq and its members, its law enforcement partners, prosecutors, other government agencies, and the public, including the creation, maintenance, location, use, storage, retention, accessibility, replication or reproduction of such documents or reports;

i.     the integrity, reliability, and veracity of information or evidence presented to Vidocq or its members, obtained or relied upon by Vidocq or its members, or shared by Vidocq or its members with Vidocq's law enforcement partners, prosecutors, or the public;

j.     fabrication, falsification, or misrepresentation of information, data, or evidence, including any reporting obligations of Vidocq or its members upon suspicion or discovery of any fabrication, falsification, or misrepresentation of information, data, or evidence;

/ / /

MALONEY | LAUERSDORF | REINER, PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

k.       auditing procedures, including the auditing process, the need for audits, types of audits, what prompts the need for an audit, and documentation of audits or requests for audits;

l.       discrepancies, inconsistencies, errors, or differences of opinion between Vidocq members, between Vidocq and its members, or between Vidocq and its law enforcement partners;

m.       correcting errors, and clarifying and updating opinions and recommendations;

n.       providing expert testimony and opinions to law enforcement, including testimony by declaration, affidavit, or at trial or other court proceedings;

o.       confidentiality and external information sharing; and

p.       media requests, communication with media and journalists, and participation in journalism and media reporting, broadcasts, or events.

5.    Vidocq's record keeping and document retention policies, procedures, systems, locations, and devices in use between January 1, 2009, and June 1, 2023, including all written and unwritten expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, applicable to the creation, amendment, revision, supplementation, collection, maintenance, retention, storage, and deletion or destruction of documents accessed, created, received, sent, transmitted, or published during or in connection with Vidocq's work on any case or investigation, or during or in connection with Vidocq's work for or collaboration with any law enforcement agency.

6.    Vidocq's quality assurance and quality control from January 1, 2009, through June 1, 2023, including:

a.       quality control measures for ensuring the competence of individual members, including internal or external proficiency testing, skills testing, accreditation and continuing education requirements;

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

b.      internal and external quality control measures for verifying the accuracy of information presented to Vidocq for consideration, including the reliability or veracity of evidence presented to Vidocq by its law enforcement partners;

c.      internal and external quality control measures for verifying the accuracy of information obtained by Vidocq or its members through investigation;

d.      internal and external quality control measures for verifying the accuracy of information provided by Vidocq or its members to Vidocq's law enforcement partners, other Vidocq members, or the public;

e.      internal and external quality control measures for ensuring proper application of the scientific method, and ensuring that conclusions and recommendations made by Vidocq or its members are based upon correct application of sound scientific principles;

f.      internal and external quality control measures for avoiding or protecting against the influence of explicit or implicit biases in evaluating information, drawing conclusions, and making recommendations to Vidocq's law enforcement partners or the public;

g.      names, addresses, and descriptions of laboratories, ranges, proving grounds, test sites, and other facilities and locations accessible to or used by Vidocq or its members to conduct any analysis, testing, or experimentation to be used in reaching conclusions or recommendations to be presented to Vidocq, at Vidocq functions or events, or to Vidocq's law enforcement partners or the public;

h.      processes for intake, investigation, and resolution of complaints made against Vidocq or its individual members;

i.      all complaints or reports of suspected misconduct made to or against Vidocq or individual Vidocq members, including all internal documents

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

containing any reference to any complaint or report of suspected misconduct made to or against Vidocq or individual Vidocq members, and Vidocq's processing, investigation, and resolution of each complaint or report of suspected misconduct made to or against Vidocq or any of its individual members;

j.     internal audits or reviews conducted to assess the overall quality of work performed by Vidocq or its members, including the overall quality and reliability of conclusions and recommendations provided by Vidocq or its members to Vidocq's law enforcement partners;

k.     names, last known addresses, descriptions, dates of discipline, suspension or termination, and circumstances of discipline, suspension or termination, for all persons who have been disciplined by Vidocq, or whose membership in Vidocq has been suspended or terminated, as a result of violations of Vidocq's Code of Ethics & Conduct, or for violating any written or unwritten expectation, custom, guideline, policy, practice, procedure, or routine, whether formal or informal, applicable to membership in Vidocq or to persons participating in Vidocq activities or events;

l.     contents of The Vidocq Society Code of Ethics & Conduct, including the circumstances surrounding any and all occasions in which a Vidocq member has sought advice from the Board about the propriety of any action or inaction that they had reason to believe may have been or might have led to a violation of the Code; and

m.     all written and unwritten expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, applicable to quality assurance, quality control, investigation, testing or experimentation, responding to complaints, internal audits or reviews, or

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the internal investigation, discipline, suspension, or termination of Vidocq

members, officers, directors, or employees.

7.      Richard D. Walter, including:

a.      his application for membership in Vidocq;

b.      the vetting of his application for membership, and each subsequent

renewal of his membership in Vidocq;

c.      Vidocq's understanding of Walter's background, education, training,

employment history, and areas of expertise or specialization, including

detailed explanations of the bases for Vidocq's understanding;

d.      the identity and role of each supervisor, or other person or committee,

responsible for assigning, controlling, monitoring, reviewing, peer-

reviewing, supervising, or correcting Walter's work while employed by or

collaborating with Vidocq and its members, while working or purporting

to work on behalf of Vidocq, its members, or its law enforcement partners,

while using the "VSM" designation or any other title associated with

Vidocq, or at any other time during Walter's membership in Vidocq;

e.      all training and education provided by Vidocq to Walter;

f.      any and all complaints or reports of suspected misconduct made by or to

Vidocq or any of its members regarding Walter;

g.      any and all investigation of Walter conducted by Vidocq, or any member

or committee of Vidocq, whether initiated by complaint or otherwise,

including the reasons for investigation, scope and manner of investigation,

sources consulted or relied upon for purposes of investigation, results of

investigation, and any publication of investigation findings;

h.      any suspension or termination of membership, or any other disciplinary or

corrective action taken by Vidocq with regard to Walter, including all

/ / /

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

corresponding documents and detailed explanations of the bases for such actions;

i.     all documents in Vidocq's possession, custody, or control that make any reference to Walter, including any and all documents authored by Walter, and any and all internal and external correspondence between Vidocq and any person or entity regarding Walter;

j.     Vidocq's identification of "known professional foes" of Walter, including the bases for identifying persons as "professional foes," the scope and manner of any investigation into suspected "professional foes" or colleagues of Walter, any efforts to reconcile professional relationships on behalf of Walter, and all corresponding documents; and

k.     the bases for Vidocq's conclusion that Walter "has an unbelievable record of accomplishment," including detailed explanations of Walter's accomplishments achieved while employed by or collaborating with Vidocq and its members, while working or purporting to work on behalf of Vidocq, its members, or its law enforcement partners, while using the "VSM" designation or any other title associated with Vidocq, or at any other time during Walter's membership in Vidocq.

8.     Vidocq's document(s) entitled Synopsis of Vidocq Society Cases, including:

a.     contents of the complete document as it currently exists and in its current form;

b.     contents of the complete document as it existed in December 2011 and in its form as of December 31, 2011;

c.     authorship of the document and all amendments, corrections, deletions, revisions, and supplements to the document, including the date and detailed explanation for each amendment, correction, deletion, revision, or supplementation;

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

  d.  purpose of the document; and

  e.  maintenance, storage, and any publication or reproduction of the document(s).

9.  The Death of Leah Freeman, including:

  a.  the identity of each and every member of Vidocq who participated in, assisted with, or offered opinions, guidance, or recommendations on any investigation of Nicholas McGuffin or the death of Leah Freeman, including each and every member of Vidocq who was present when the Freeman case was presented to Vidocq on or about January 21, 2010, and every member of Vidocq who spoke to Coos County District Attorney R. Paul Frasier, any of the Defendants named in the above-captioned action, or any of their respective employees or representatives, at any time between January 1, 2009, and June 1, 2023;

  b.  all efforts to identify each and every member of Vidocq who participated in, assisted with, or offered opinions, guidance, or recommendations on any investigation of Nicholas McGuffin or the death of Leah Freeman, including each and every member of Vidocq who was present when the Freeman case was presented to Vidocq on or about January 21, 2010, and every member of Vidocq who spoke to Coos County District Attorney R. Paul Frasier, any of the Defendants named in the above-captioned action, or any of their respective employees or representatives, at any time between January 1, 2009, and June 1, 2023;

  c.  all efforts to identify and produce any and all documents reflecting any effort by Vidocq, or any of its members, to investigate, assist with, or be involved in any investigation of the death of Leah Freeman;

/ / /

/ / /

Page 13– FED. R. CIV. P. 30(b)(6) NOTICE – VIDOCQ SOCIETY

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

d.     all efforts to identify and produce any and all documents reflecting any effort by Vidocq, or any of its members, to investigate, assist with, or be involved in any investigation of Nicholas McGuffin;

e.     all efforts to identify and produce all documents received from, sent to, or containing any reference to the City of Coquille, Oregon, Coos County, Oregon, the Oregon Department of Justice, Leah Freeman, Nicholas McGuffin, Coos County Deputy District Attorney or District Attorney R. Paul Frasier, or any of the Defendants named in the above-captioned action, including any and all records of correspondence between Vidocq, or any of its members, and R. Paul Frasier or any of the Defendants named in the above-captioned action;

f.     the dates, authors, addressees, contents, and last known location and storage medium of all documents referred to in paragraphs 5.c. through 5.e. above;

g.     the absence of or inability to identify and reproduce all documents referred to in paragraphs 5.c. through 5.e. above;

h.     all information, documents, and evidence created, obtained or received, reviewed, or maintained by Vidocq, or any of its members, regarding the death of Leah Freeman or the prosecution of Nicholas McGuffin, including all documents referred to in paragraphs 5.c. through 5.e. above;

i.     Vidocq's understanding of Richard D. Walter's role or involvement in any investigation of the death of Leah Freeman, or in the prosecution of Nicholas McGuffin;

j.     Vidocq's understanding of the role or involvement of any member of Vidocq, other than Richard D. Walter, in any investigation of the death of Leah Freeman, or in the prosecution of Nicholas McGuffin;

/ / /

Page 14– FED. R. CIV. P. 30(b)(6) NOTICE – VIDOCQ SOCIETY

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

k.      the scope and manner of any investigation conducted by Vidocq, or any of its members, into the death of Leah Freeman, including sources consulted or relied upon, evidence collected, tested, or analyzed, conclusions derived from any analysis, research or investigation, and all opinions, guidance, and recommendations made to law enforcement or anyone else by Vidocq or any of its members;

l.      all policies, practices, and procedures of Vidocq that applied to Vidocq's involvement, or the involvement of any of its members, in any investigation of the death of Leah Freeman or the prosecution of Nicholas McGuffin; and

m.      whether or not Vidocq's members adhered to or complied with all of Vidocq's policies, practices, and procedures during their involvement in any investigation of the death of Leah Freeman or the prosecution of Nicholas McGuffin.

10.     All cases in which Vidocq agreed to assist a law enforcement agency with or by evaluating, investigating, opining upon, or solving a crime, between 2000 and 2011, including:

a.      name of decedent, state in which death occurred, name of person(s) who sought Vidocq's assistance, and name of law enforcement agency that presented case to Vidocq;

b.      identity of each and every member of Vidocq who participated in, assisted with, or offered opinions, guidance, or recommendations on each case or investigation;

c.      the role of Vidocq, and any of its members, in each case or investigation;

d.      the scope and manner of any investigation conducted by Vidocq, or any of its members, on each case identified in paragraph 10.a. above, including sources consulted or relied upon, evidence collected, tested, or analyzed,

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

conclusions derived from any analysis, research or investigation, and all opinions, guidance, and recommendations made to law enforcement or anyone else by Vidocq or any of its members;

e.      any publication of Vidocq's involvement in such a case, including publication of any statement or document in which Vidocq, or any of its members, accepted credit or recognition for solving a cold case, or solving any aspect of a cold case, in which Vidocq was involved;

f.      all policies, practices, and procedures of Vidocq that applied to Vidocq's involvement, or the involvement of any of its members, in any case or investigation identified in paragraph 10.a. above; and

g.      whether or not Vidocq's members adhered to or complied with all of Vidocq's policies, practices, and procedures during their involvement in any case or investigation identified in paragraph 10.a. above.

## II.      FED. R. CIV. P. 34 REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, Plaintiffs request that the following categories of documents be produced within thirty (30) days of the date that this request is served upon Defendant Vidocq Society.  Please serve the original of the responses to the offices of Maloney Lauersdorf Reiner PC, 1111 E. Burnside Street, Suite 300, in Portland, Oregon.

Plaintiffs' requests are intended to be perpetual throughout the pendency of this action so that any new documents or information requested below should be promptly forwarded to Plaintiffs' attorneys after any such document or information comes within Vidocq's possession, control, or custody.

If you object to any of the requests below, the reasons for the objection must be stated with particularity.  If your objection applies to only a part of a request for production, the unobjectionable portions must be answered.  If you object on the grounds of privilege, you must explain the basis of your assertion of privilege.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1.      Any and all written expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, identified or addressed in Section I above;

2.      Any and all documents containing the information requested in the topics identified in Section I above;

3.      Any and all documents and materials used by Vidocq or provided to its members for purposes of, or in the course of, any of the training or education identified in Section I.4. above;

4.      Any and all documents setting forth or containing any reference to any complaint or report of suspected misconduct identified in Section I.6.i. above, including all documents created or obtained by Vidocq, or any of its members, in the course of any investigation of such complaint or report;

5.      Any and all documents related to any internal audit or review identified in Section I.6.j. above, including all reports generated as a result of any such audit or review;

6.      Any and all documents setting forth or containing the information requested in Section I.6.k. above;

7.      Any and all documents setting forth or containing any reference to any of the information requested in Section I.7. above;

8.      The complete Synopsis of Vidocq Society Cases and any similar titled document or documents, as identified and referred to in Section I.8. above, including all pages and consecutively numbered synopses;

9.      Any and all documents setting forth any information about, or containing any reference to, the death of Leah Freeman or any corresponding investigation, including all correspondence and documents created, received, obtained, sent, published, stored, maintained or deleted by Vidocq or any of its members;

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

10.    Any and all documents setting forth any information about, or containing any reference to, any investigation or prosecution of Nicholas McGuffin, including all correspondence and documents created, received, obtained, sent, published, stored, maintained or deleted by Vidocq or any of its members;

11.    Any and all documents setting forth or containing any of the information requested in Section I.10. above.

DATED:  May 31, 2023

| MALONEY LAUERSDORF REINER PC | LOEVY & LOEVY |
|---|---|
| By /s/ Andrew C. Lauersdorf<br>    Janis C. Puracal, OSB #132288<br>    E-Mail:  jcp@mlrlegalteam.com<br>    Andrew C. Lauersdorf, OSB #980739<br>    E-Mail:  acl@mlrlegalteam.com | By /s/ David B. Owens<br>    David B. Owens, WSBA #53856<br>    E-Mail:  david@loevy.com<br>    *Pro hac vice* |

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2023, the foregoing PLAINTIFFS' FED. R. CIV. P.

30(b)(6) AND 34 DEPOSITION NOTICE TO DEFENDANT VIDOCQ SOCIETY was served

on the following parties at the following address by sending to them a true copy thereof via the

method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>*Attorneys for Defendants*<br>*City of Coquille, City of Coos Bay, Coos*<br>*County, Craig Zanni, Chris Webley, Eric*<br>*Schwenninger, Sean Sanborn, Ray McNeely,*<br>*Kris Karcher, Pat Downing, Mark Dannels,*<br>*Kip Oswald, Michael Reaves, David Zavala,*<br>*Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>*Attorneys for Defendants Oregon State*<br>*Police, John Riddle, Susan Hormann,*<br>*Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>*Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br>*Attorneys for Defendant Richard Walter* |

☐ by electronic means through the Court's ECF System on the date set forth above.

☐ by mailing a full, true and correct copy thereof in a sealed, first-class postage paid
envelope, addressed to the attorneys as shown above, and deposited with the United
States Postal Office at Portland, Oregon on the date set forth above.

☒ by emailing to each of the foregoing a copy thereof to the email address above.

MALONEY LAUERSDORF REINER PC


By  /s/ Andrew C. Lauersdorf
    Andrew C. Lauersdorf, OSB #980739
    E-Mail: acl@mlrlegalteam.com

Attorneys for Plaintiffs

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**EXHIBIT – H**

Anthony R. Scisciani III, OSB No. 070013
Kelsey L. Shewbert, OSB No. 221063
Rachel Jones, OSB No. 231399
Meredith A. Sawyer, *pro hac vice*
HWS LAW GROUP
101 SW Main Street, Suite 1605
Portland, OR 97204
Phone: (503) 542-1200
Fax: (503) 542-5248
ascisciani@hwslawgroup.com
kshewbert@hwslawgroup.com
rjones@hwslawgroup.com
msawyer@hwslawgroup.com
*Attorneys for Defendant Vidocq Society*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem,* on behalf of S.M., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>Defendants. | Civil Case No. 6:20-CV-01163-MK (Lead Case)<br>Civil Case No. 3:21-cv-01719-MK (Trailing Case)<br><br>DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FED. R. CIV P. 30(B)(6) AND 34 DEPOSITION NOTICE TO VIDOCQ SOCIETY |

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 1

VIDOCQ SOCIETY,
                    Cross-Claimant.
RICHARD WALTER,
                    Cross-Claimant.


NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,
                    Plaintiffs,
    v.

OREGON STATE POLICE,
                    Defendant.


**TO:   PLAINTIFFS NICHOLAS MCGUFFIN AND S.M., AND THEIR ATTORNEYS
OF RECORD:**

## I.      INTRODUCTION

Pursuant to Federal Rules Of Civil Procedure 26 and 34, Defendant Vidocq Society (hereinafter "Defendant VS") provides the following Objections, Answers, and Responses to Plaintiffs' Fed. R. Civ P. 30(b)(6) and 34 Deposition Notice To Vidocq Society.

## II.     RESPONSE TO FED R. CIV. P.  30(b)(6) NOTICE

Defendant VS generally objects to the topics identified in the FRCP Notice on the grounds they are overbroad, burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and are disproportional with respect to the needs of the case. These objections are particularly directed at the time period referenced in each topic, which require the testimony of an identified designee over a period of 10 to 14 years and up to the present year.  In addition, Defendant VS objects to these topics to the extent they seek

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 2

testimony that would require the disclosure of proprietary and confidential information, including information subject to confidentiality agreements with third party law enforcement agencies.

Subject to the above objections, Defendant VS is continuing to work to designate the appropriate representative(s) to testify as to the topics identified in the FRCP 30(b)(6) Notice. Defendant VS expressly preserves and does not waive the above objections or any other objections to any identified topics.

### III.    RESPONSE TO FED R. CIV. P. 34 REQUEST FOR PRODUCTION OF DOCUMENTS - GENERAL OBJECTIONS

1.    Defendant VS objects generally to these discovery requests to the extent they seek information protected by the attorney-client and attorney work-product privileges.

2.    Defendant VS objects generally to these discovery requests to the extent they are premature in that little to no discovery has yet taken place.  Accordingly, the following responses are provided subject to defendant's right to supplement and/or amend these responses as appropriate during the course of discovery.

3.    Defendant VS objects generally to these discovery requests to the extent that the information requested is not within the possession of defendant, or is within his possession, but is obtainable from another source that is more convenient, less burdensome, and less expensive.

4.    Defendant VS objects generally to these discovery requests to the extent they are unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of admissible evidence.

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 3

5.      Defendant VS objects generally to these discovery requests to the extent that the discovery sought is unreasonably cumulative or duplicative.

6.      Defendant VS objects generally to these discovery requests to the extent they require Defendant to produce, reveal, or otherwise disclose information or documents that are confidential, proprietary in nature, or otherwise protected without the parties first entering into an appropriate confidentiality agreement and/or protective order.

## IV.  RESPONSE TO FED R. CIV. P. 34 REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**:   Any and all written expectations, customs, guidelines, policies, practices, procedures, and routines, whether formal or informal, identified or addressed in Section I;

**RESPONSE: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:**

**See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Responses to RFP Nos. 37 and 38.**

**See also previously produced documents VIDOCQ 00011-00023; Vidocq Society website: https://www.vidocq.org/.**

**Investigation and discovery are continuing.**

**REQUEST FOR PRODUCTION NO. 2**:  Any and all documents containing the information requested in the topics identified in Section I;

**RESPONSE: Defendant VS objects to this request on the grounds it is vague and**

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FED. R. CIV P. 30(b)(6) AND 34 DEPOSITION NOTICE (CASE NO. 6:20-CV-01163-MK) – Page 4

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections.

See also, VIDOCQ BATES Nos. 0001-00078, previously produced.

**REQUEST FOR PRODUCTION NO. 3**:  Any and all documents and materials used by Vidocq or provided to its members for purposes of, or in the course of, any of the training or education identified in Section I.4;

**RESPONSE:** Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Responses to RFP Nos. 27 and 40.

Defendant VS has no responsive documents in its possession, custody, or control.

**REQUEST FOR PRODUCTION NO. 4:**  Any and all documents setting forth or containing any reference to any complaint or report of suspected misconduct identified in Section I.6.i. above, including all documents created or obtained by Vidocq, or any of its members, in the course of any investigation of such complaint or report;

**RESPONSE:** Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests, and seeks information not reasonably calculated to lead to the discovery of

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 5

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Response to RFP Nos. 25, 26, and 43.

See also, VIDOCQ BATES NO. 00025-00078, previously produced and
VIDOCQ BATES NO. 00079-00080

**REQUEST FOR PRODUCTION NO. 5:**  Any and all documents related to any internal audit

or review identified in Section I.6.j. above, including all reports generated as a result of any such

audit or review;

**RESPONSE: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:**

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Responses to RFP Nos. 12, 13, 25, and 42.

See, also response to RFP No. 4.

**REQUEST FOR PRODUCTION NO. 6:**  Any and all documents setting forth or containing

the information requested in Section I.6.k.;

**RESPONSE: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows**:

See Response to RFP No. 4.

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 6

**REQUEST FOR PRODUCTION NO. 7:**  Any and all documents setting forth or containing any reference to any of the information requested in Section I.7.;

**RESPONSE:** **Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:**

**See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response dated 1/6/23, including General Objections thereto.**

**See also, VIDOCQ BATES NO. 00025-00078, previously produced.**
**See also, VIDOCQ BATES NO. 00081-00082**

**REQUEST FOR PRODUCTION NO. 8:**  The complete Synopsis of Vidocq Society Cases and any similar titled document or documents, as identified and referred to in Section I.8. above, including all pages and consecutively numbered synopses;

**RESPONSE:** **Defendant VS objects to this request on the grounds it is seeks information that is propriety, subject to confidentiality agreements with third party law enforcement agencies, protected by the rights of assembly, association, and free speech guaranteed under the US Constitution, and is not  reasonably calculated to lead to the discovery of admissible evidence.  Without waiving this or any other objection, Defendant VS responds as follows**:

**See attached privilege log, VIDOCQ BATES NO. 000083-000150.**

**REQUEST FOR PRODUCTION NO. 9:**  Any and all documents setting forth any information about, or containing any reference to, the death of Leah Freeman or any corresponding investigation, including all correspondence and documents created, received, obtained, sent, published, stored, maintained or deleted by Vidocq or any of its members;

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 7

**RESPONSE**: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, duplicative of prior discovery requests, seeks  proprietary and confidential information,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Responses to RFP Nos.  1, 2, 3, 5, 16, 17, and 18.

**REQUEST FOR PRODUCTION NO. 10:**   Any and all documents setting forth any information about, or containing any reference to, any investigation or prosecution of Nicholas McGuffin, including all correspondence and documents created, received, obtained, sent, published, stored, maintained or deleted by Vidocq or any of its members;

**RESPONSE**: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, contains proprietary and confidential information,  and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

See Defendant Vidocq Society's Response to Plaintiffs' First Request for Production of Documents, dated 12/16/20; Amended Response, dated 5/17/21; and Supplemental Response, dated 1/6/23, including General Objections and Responses to RFP Nos.  1, 2, 3, 5, 9, 16, 17, and 18.

**REQUEST FOR PRODUCTION NO. 11:**  Any and all documents setting forth or containing any of the information requested in Section I.10.

**RESPONSE**: Defendant VS objects to this request on the grounds it is vague and ambiguous, compound, overbroad, unduly burdensome, seeks proprietary and confidential information,  lacks foundation, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Defendant VS also objects to the extent it seeks information protected by the attorney client privilege and/or work

product doctrine. Without waiving this or any other objection, Defendant VS responds as follows:

Defendant VS has no responsive documents in its possession, custody, or control.

DATED this 14th day of July, 2023.

HWS LAW GROUP

BY */s/ Meredith A Sawyer*            
/s/*Anthony R. Scisciani, III*            
Anthony R. Scisciani III, OSB No. 070013
ascisciani@hwslawgroup.com
Kelsey L. Shewbert, OSB No. 221063
kshewbert@hwslawgroup.com
Rachel Jones, OSB No. 231399
rjones@hwslawgroup.com
Meredith A. Sawyer, *pro hac vice*
msawyer@hwslawgroup.com

Attorneys for Defendant Vidocq Society

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

## CERTIFICATE OF SERVICE

I certify under penalty of perjury under the laws of the State of Oregon, that the following is true and correct:

I am employed by the law firm of HWS Law Group.

At all times hereinafter mentioned, I was and am a citizen of the United States of America, a resident of the State of Washington, over the age of eighteen (18) years, not a party to the above-entitled action, and competent to be a witness herein.

On the date set forth below I served the document(s) to which this is attached, in the manner noted on the following person(s):

| PARTY/COUNSEL | DELIVERY INSTRUCTIONS |
|---|---|
| **CO / Plaintiffs**<br>Janis C. Puracal<br>Andrew C. Lauersdorf<br>Maloney Lauersdorf Reiner PC<br>1111 E. Burnside Street, Suite 300<br>Portland, OR 97214 | ☐     **Via U.S. Mail**<br>☒     **Via E-Mail**<br>☐     **Via Overnight Mail**<br>☐     **Via Court E-Service, if applicable**<br>jcp@mlrlegalteam.com<br>acl@mlrleaglteam.com |
| **CO / Plaintiffs**<br>David B. Owens, *Pro Hac Vice*<br>Loevy & Loevy<br>100 S. King Street, Suite 100<br>Seattle, WA 98104-2885 | ☐     **Via U.S. Mail**<br>☒     **Via E-Mail**<br>☐     **Via Overnight Mail**<br>☐     **Via Court E-Service, if applicable**<br>david@loevy.com |
| **CO / Defendants City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore and Shelly McInnes**<br>Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477 | ☐     **Via U.S. Mail**<br>☒     **Via E-Mail**<br>☐     **Via Overnight Mail**<br>☐     **Via Court E-Service, if applicable**<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net |
| **CO / Defendants John Riddle, Susan Hormann, Mary Krings and Kathy Wilcox**<br>Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201 | ☐     **Via U.S. Mail**<br>☒     **Via E-Mail**<br>☐     **Via Overnight Mail**<br>☐     **Via Court E-Service, if applicable**<br>Todd.marshall@doj.state.or.us<br>Jesse.b.davis@doj.state.or.us |
| **CO / Defendant Richard Walter**<br>Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Suite 300 | ☐     **Via U.S. Mail**<br>☒     **Via E-Mail**<br>☐     **Via Overnight Mail**<br>☐     **Via Court E-Service, if applicable** |

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 10

| Eugene, OR 97401 | edefreest@luvaascobb.com |
|---|---|
| | KWorkman@luvaascobb.com |

DATED this 14th day of July, 2023.

*/s/ Caroline Bryant*
Caroline Bryant, Legal Assistant

DEFENDANT VIDOCQ SOCIETY'S OBJECTIONS
AND RESPONSES TO PLAINTIFFS' FED. R. CIV P.
30(b)(6) AND 34 DEPOSITION NOTICE
(CASE NO. 6:20-CV-01163-MK) – Page 11

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

**MCGUFFIN v DANNELS, et. al.**
**NO. 6:20-CV-01163-MK**

## PRIVILEGE LOG FOR DEFENDANT VIDOCQ SOCIETY

| Bates No. | Description of Material/Documents Subject to Privilege | Basis of Privilege/Objection |
|---|---|---|
| VIDOCQ BATES NOS. 000083-000150 | Synopsis of Vidocq Society Cases | Propriety, subject to confidentiality agreements with third party law enforcement; any required disclosure contrary guaranteed constitutional protections of assembly, association, and free speech. |

DATED this 14th day of July, 2023.

HWS LAW GROUP

BY */s/ Anthony R. Scisciani*
BY */s/ Kelsey L. Shewbert*
BY */s/ Meredith Sawyer*
Anthony R. Scisciani III, OSB No. 070013
ascisciani@hwslawgroup.com
Kelsey L. Shewbert, OSB No. 221063
kshewbert@hwslawgroup.com
Rachel Jones, OSB No. 231399
rjones@hwslawgroup.com
Meredith Sawyer, WSBA No. 33793
msawyer@hwslawgroup.com
Attorneys for Defendant Vidocq Society

PRIVILEGE LOG FOR DEFENDANT VIDOCQ SOCIETY
(CASE NO. 6:20-CV-01163-MK) – Page 1

**HWS LAW GROUP**
101 SW MAIN STREET, SUITE 1605
PORTLAND, OR 97204
P: (503) 542-1200 F: (503) 542-5248

April 21, 2005

Robert Goldberg, M.D.
1600 Suite D, Oakpointe Drive, SW
Marietta, GA 30060

Dear Bob:

It pains me to write this to you. Today, the Board of Directors met at our regular meeting to discuss the allegation concerning your credentials. You have many friends on the board and we want to proceed in this matter in a fair and equitable way. After much discussion, it was decided that to protect the Vidocq Society we must take the following action.

As it has been more than a month since you have recused yourself from Vidocq Society cases and we have not had your written response to the allegation that you have misstated your professional credentials, the board is directing you to provide a written response to the allegation within fourteen days (14) from the receipt of this correspondence. In your response we expect you to support your professional qualifications with documentation in the form of official records and affidavits if available.

The board has directed me to advise you that if you do not respond to us in the allotted time, we will be forced to remove you from the rolls of the organization. If you feel that you will or cannot reply, you can always resign to avoid the stigma attached with removal.

That being said, I want to thank you for your dedicated service to the Vidocq Society. Furthermore, I want you to know that I am still your friend and will continue to be so regardless of your status in Vidocq.

Wishing you the very best.

Sincerely,


William L. Fleisher, V.S.M.
Commissioner

Cc: Board of Directors

June 20, 2005

Robert H. Goldberg, JD, MD
1600 Suite D, Oakpointe Dr. SW
Marietta,GA   30060

Re: Resignation from Vidocq Society

Dear Dr. Goldberg:

The Board of Directors of the Vidocq Society accepts your resignation form the society effective June 16, 2005.

Due to your resignation, you are no longer authorised to speak on behalf of the society or hold yourself out as a society member.

Please remove all reference of the Vidocq Society from your website and any other documentation used by you.

Your cooperation in this matter is greatly appreciated.

Sincerely,

William L. Fleisher, VSM
Commissioner

and

Frederick Bornhofen, VSM
Chairman of the Board

## Richard Walter

| | |
|---|---|
| **From:** | "Richard Walter" <riwalter@epix.net> |
| **Date:** | Tuesday, December 13, 2016 2:55 PM |
| **To:** | "Redmond Ben" <benredmond1247@comcast.net>; "Fleisher William" <Truthfinder@netcarrier.com>; "Gill, VSM Bill" <wfgill3@gmail.com>; "Cohan, VSM Barbara" <barb@cohan.com>; "Howard & Rachel Lebofsky" <hlebofsky@comcast.net>; "Gaughan Ed" <ejgaughan@live.com>; "Gordon Nate" <truthdoctor@polygraph-training.com>; "Mayer' Frank" <Frank.Mayer@Dinsmore.com>; "Rieders Michael" <Michael.Rieders@NMSLABS.COM> |
| **Cc:** | "Zirpoli Patrick" <pjz6896@ptd.net> |
| **Subject:** | Fw: Open Letter of Resignation to the Vidocq Society Board and Members |

Open Letter to the Vidocq Society Board and Members:

As 2016 comes to a close, one has reflected upon the last 25 years with the Vidocq Society from the early days of Bill Fleisher's novel idea to the development, inception and growth of the organization into an active and vibrant service to the Law Enforcement Community and the Public-at-Large. Again, for many years, we attended to our mission with many skilled and talented people who gladly contributed to the health and well-being of the organization. Unfortunately, for the past several years, the dynamic enthusiasm and momentum has been lost due to a sharp winnowing of their skills and organizational talents. Whether this rapid change and descent was due to an incomplete and ill-conceived organizational structure to protect the integrity of the stated purpose and mission, hubris and/or competing elements of an organization/club scenario, it has become apparent to himself that despite current efforts to remedy the deficits is to little, to late. That said, although one wishes well for the Vidocq Society, it is believed that, despite good intentions, the declination of substantive talent and organizational discipline has and will continue to erode and undermine the the integrity of the organization and product to perdition. This is not acceptable to himself who chooses to only play on the "A" Team.

As for the new future, Greg and Heidi Miller will soon have a National Press Conference announcing that they have formed "The Sherry Black Educational Foundation for Training of Peace Officers" that is intended to serve LE Agencies throughout the nation. Accordingly, the Miller's have recruited Patrick Zirpoli and himself to lead these training sessions. Here, it is expected that a minimum of 1,000 officers can be trained each year. Indeed, this is exciting and productive. Amongst several reasons for sharing this information is that the Vidocq Board will recollect the name Sherry Black as an earlier Vidocq Case. As Board Members may recall, a spirited discussion took place approximately 3 years ago about the ethic's of working on a case that the Vidocq Society did no longer have anything to offer. Since that time, the issue of when does a case end for Vidocq has been raised several times with stonewalled silence. Certainly, the current project would be an ethic's violation of the Vidocq Society that...one has been critical of other for having done. Based upon the above comments, one agrees it is time for himself to sever are long and interesting ties.

Certainly, one has made some acquaintances and friends within the society. Accordingly, at the next

meeting and/or e-mail message, please advise the Membership of this change.  Likewise, the developing Web Site "Sherry Black Educational Foundation for Peace Officers" will be denoted with "Richard D. Walter, Co-Founder and Former Member of the Vidocq Society.  Resigned on 12-31-16.

Note:  Although resigning from the Vidocq Society on 12-31-16, the contract with Mark Goodson Productions is still in play with the Vidocq Society, Bill Fleisher and Richard D. Walter.  Therefore, it is likely we will meet again.

Best Wishes,

Richard D. Walter

**EXHIBIT – I**

# Homicidal Death
# of
# Leah Nicole Freeman

# Leah Freeman

- *__Information to be discussed is law enforcement sensitive__*
- *__It is not to be shared with anyone not directly working on this case__*

**Leah Freeman**



# Leah Freeman

- Born October 29, 1984
- Age 15 at time of disappearance
- Just completed freshman year at Coquille High School, Coquille Oregon
- Mother is Corliss (Cory) Courtright
- Father was Denny Freeman (passed away October 23, 2009)

# Leah Freeman

- Parents were divorced
- Mom had custody of Leah
- No child custody or visitation issues

# Leah Freeman

- June 29, 2000, Cory Courtright reports Leah missing
- Leah did not come home the previous evening
- Did not realize this until Cory got up morning of June 29, 2000

# Leah Freeman

- Police response: probable runaway or with friends
- Leah does not show up
- Coos County Sheriff's Office offers help
- Help declined

# Leah Freeman

- Leah still does not show up
- Coquille PD brings in FBI
- Leah still does not show up
- Finally Coquille PD asks for Major Crime Team help
- Does not occur until one week after Leah disappears

# Leah Freeman

- Investigation begins full force
- Police are aware:
- Leah has a boyfriend who just graduated from Coquille High School
- Nicholas McGuffin
- Leah last seen on June 28, 2000

# Leah Freeman

- June 28, 2000
- Leah picked up by Nick at 2:00 PM
- Between 2:00 PM and 7:00 PM Leah and Nick are seen at various places
- Brent Bartley Home
- Nick McGuffin's Home
- Bartley's grandparents home
- Leah wearing white top, jeans, tennis shoe





# Leah Freeman

- 7:00 PM Nick drops off Leah at Cherie Mitchell home

- Nick to pick up at 9:00 PM

- Leah leaves on foot (small argument at Mitchell home and she left early)

- 9:01 Leah seen in front of McKay's Market

- 9:05 Leah seen in front of Hunter's Restaurant (now Colleen's)

# Leah Freeman

- 9:15 PM Leah seen in front of Oregon First Community Credit Union (now Coquille City Hall)
- Last known sighting
- Route Leah is walking would take her home, or to road leading to Bartley grandparents' home

# Leah Freeman

- 11:40 PM, Tony Messerle finds a shoe in middle of North Elm Street
- Same street to get to Bartley grandparents' home
- Messerle holds on to shoe
- Turns over to investigators July 4, 2000
- DNA – Leah's shoe

Map of Leahs route on 6-28-00 routed



2008 N Fir St, Coquille, OR 97423
2008 N Fir St
Coquille, OR 97423

Leah's right shoe was found
by Tony Messerle

Coquille High School
499 W Central St
Coquille, OR 97423

Leah Freeman's House
1173 N Knott St
Coquille, OR 97423

Oregon Federal Credit Union
851 N Central St
Coquille, OR 97423
Leah was seen walking by here at
approximately 9:15 PM by Ray
Lewis

Fast Mart
611 N Central St
Coquille, OR 97423

Cheri Mitchell's Home
444 N Elm St
Coquille, OR 97423
Leah left walking around 9:00 pm

Hunter's Creamery
809 N Central St
Coquille, OR 97423
Leah seen at 9:05 walking - Mark
Kirn and Mike McAdams

McKays Mkt - Last Place Leah wa...
400 N Central St
Coquille, OR 97423
Leah seen walking N, appeared
angry or upset - Ashley
Hutchinson

Sturdivant Park
Nick was stopped by Officer
Zavala at 2235 hrs, in Mustang,
alone

Copyright © 1988-2003 Microsoft Corp. and/or its suppliers. All rights reserved.  http://www.microsoft.com/mappoint
© Copyright 2002 by Geographic Data Technology, Inc. All rights reserved. © 2002 Navigation Technologies. All rights reserved. This data includes information taken with permission from Canadian authorities © 1991-2002 Government of Canada (Statistics Canada and/or Geomatics Canada), all rights reserved.

0 mi                    0.5                    1                    1.5

# Leah Freeman

- July 4, 2000, Kip Oswald, then with Coos County Sheriff's Office, finds matching shoe on Hudson Ridge
- DNA matches shoe to Leah
- High velocity blood spatter seen on shoe
- Leah's blood



Hudson Ridge?
Leah's left shoe located 7/4/2000 - had Leah's blood on it

Fairview

8-22-00 found items
duct tape around tree
2 spent .22 casings
3 napkins or towelettes with residue

2008 N Fir St, Coquille, OR 9...
2008 N Fir St
Coquille, OR 97423

Leah's right shoe was found by Tony Messerle

Leah's Leah's Body Found
43.1839 -124.0908

Coquille

Leah Freeman's House
1173 N Knott St
Coquille, OR 97423

Cheri Mitchell's Home
444 N Elm St
Coquille, OR 97423
Leah left walking around 9:00 pm

Nick McGuffin House (Parents)
56246 Baker Rd
Coquille, OR 97423

Johnson Mill Pond

Copyright © 1988-2003 Microsoft Corp. and/or its suppliers. All rights reserved. http://www.microsoft.com/mappoint
Copyright © 2002 by Geographic Data Technology, Inc. All rights reserved. © 2002 Navigation Technologies. All rights reserved. This data includes information taken with permission from Canadian authorities © 1991-2002 Government of Canada (Statistics Canada and/or Geomatics Canada), all rights reserved.

0 mi          1          2          3          4

# Leah Freeman

- Investigation continues
- McGuffin and Bartley timelines

# Leah Freeman

- McGuffin
- After leaving Leah at Mitchell home, picked up Nikki Price (Bartley's girlfriend) and drove to grandparents home
- Leaves Bartley and Price
- Goes to Fast Mart and hangs out for an hour
- Goes to Johnson Mill Pond

# Leah Freeman

- At pond for about an hour (seen by six different men at the pond)
- 9:05 PM arrives at Mitchell home
- Leah is gone
- He claims he then drives up and down Central looking for Leah
- Does not see her

# Leah Freeman

- 9:45 Drives by Fast Mart
- 10:15 Back to Mitchell's. Calls Leah's Mom
- Sometime between 10:00 and 10:40 out to Bartley's grandparent's home
- Called his home
- Between 10:40 and 11:00 goes to high school

# Leah Freeman

- 10:50 Pulled over by Officer Zavala. Asks for help looking for Leah
- 10:55 Went to Denny's Pizza and talks to Leah's sister Denise
- Continues driving around town looking for Leah
- 11:30 Goes to Bartley's home. Picks up Bartley and Price

# Leah Freeman

- 11:40 Dropped Nikki off at her home
- 11:50 Goes to Leah's home. Doesn't think she is there
- 12:00 Talks with Officer Lee. Again asks for help looking for Leah
- 12:30 Goes back to Leah's home. Doesn't think she is there

# Leah Freeman

- 1:00 Goes to home of Kristen Steinhoff. Talks to her for about an hour
- 2:00 Goes back to Leah's home. Sees light from bedroom window. Thinks she is home
- 3:00 In bed
- 7:30 Leah's mom calls wanting to know where Leah is

# Leah Freeman

- Bartley's Timeline
- 7:00 He and McGuffin take Leah to Mitchell home
- Go and pick up Nikki Price and go back to grandparent's home
- McGuffin leaves
- 10:30 McGuffin at grandparent's home. Looking for Leah

# Leah Freeman

- 11:30 to 12:00 McGuffin picks up Bartley and Price. Drop off Price

- He and Nick drive around until 2:00 looking for Leah

- 2:00 McGuffin drops off Bartley at Bartley's home

# Leah Freeman

- Discrepancies
- McGuffin says between 1:00 and 2:00 he is with Kristen Steinhoff
- Bartley says he is with McGuffin

# Leah Freeman

- Other witnesses as to activities of McGuffin and Bartley
- 9:00 West and Emler say McGuffin leaves Johnson Mill Pond. Driving the blue Mustang
- Sometime between 9:00 and 10:00, Hamilton and Steinhoff see McGuffin
- McGuffin is angry and confused

# Leah Freeman

- 9:30 McGuffin seen at Fast Mart by Jenkins and West. McGuffin is upset and crying
- Jenkins says McGuffin is now driving T-Bird
- 9:30 to 9:45 Heather Reid sees McGuffin at Fast Mart in T-Bird. McGuffin is staring at the steering wheel

# Leah Freeman

- 10:00 – 11:00 Seen by Zach Elderkin at intersection of north end of Central with Highway 101. No one is with Nick. In the Mustang
- 10:00 – 10:15 seen by Denise Freeman at Denny's Pizza.
- 10:15 McGuffin calls Leah's home
- 10:30 McGuffin calls his home

# Leah Freeman

- 10:35 Nick pulled over in the Mustang. No one in car with him
- 11:00 to 11:15 At Denny's Pizza and sees Denise. She sees Steinhoff in the back and an unknown male (probably Hamilton) in the front of the Mustang
- 12:03 Contacted by Officer Lee

# Leah Freeman

- Sometime after midnight McGuffin is seen by Steinhoff at Fast Gas
- McGuffin goes to her home and stays for about 45 minutes
- They then drive around in her car for about 30 minutes looking for Leah

# Leah Freeman

- Discrepancies
- Switch of Car
- Bartley claims with McGuffin after midnight looking for Leah
- Steinhoff confirms McGuffin's story of him being at her house for about an hour and then riding around together looking for Leah

# Leah Freeman

- According to written statement he only contact's Denny's Pizza one time
- Witnesses say he is there two times

# Leah Freeman

- Other problems
- Why never contact Leah's home even though he claims to be there three different times?
- Why switch cars?
- Why is he upset and crying at Fast Mart at around 9:30 PM?

# Leah Freeman

- There are at least three sightings of Leah on Central during the same time period that McGuffin claims he is driving up and down Central looking for her. Why doesn't he see her?

- If so concerned that Leah is missing, why spend so much time at Steinhoff home?

# Leah Freeman

- Statement of June 30, 2009



# Leah Freeman

- Both McGuffin and Bartley do a handwritten statement
- Nick flunks polygraph
- Per FBI behavioral unit, Nick is deceptive
- Bartley passes polygraph on issue of causing harm to Leah
- Flunks polygraph on issue of if he knows what happened to her

# Leah Freeman

- Bartley refuses offer of immunity
- Bartley claims he has no knowledge what happened to Leah
- Nick refuses to cooperate
- Family hires attorney

# Leah Freeman

- Investigation continued
- Search warrants executed on the McGuffin residence and the Mustang and T-Bird





# Leah Freeman

- Nothing of interest in the T-Bird











# Leah Freeman

- Nothing found in the trunk (No jack, tire iron, spare tire, nothing)
- Reason nothing in the trunk, repairs to quarter panel and gas tank
- Witness reports that day after Leah disappeared, Bruce McGuffin (father) and Nick are burning trash
- Fire season

# Leah Freeman

- Search of Nick's bedroom
- Marijuana and paraphernalia
- Methamphetamine and paraphernalia
- Letters from Leah
- High School Yearbook

Case 6:20-cv-01163-MTK   Document 193   Filed 09/15/23   Page 161 of 200

# ¡Livin

# La Vida Loca!







Left: Leslie Saunders, Stacie Lyons, Leah Freeman, and Chelsea Odom giggle about Stacie's pregnancy belt.
Below: Ryan Ferron and Jenny Ramsey are cooking up trouble in foods class.
Far Below: Leslie Saunders, Tara Smith, and Leah Freeman go wild in Claire's!







Top Left: Amanda Kilmer and Cassie Moore cleaning up in Mr. Loffler's class.
Top Right: Kristy Christopherson and McKenzie Hubbard are having a great time at one of the dances!
Above: What teachers REALLY do on inservice days!
Right: Josh Cumberland and Shawna Ferron are cooking for the teachers!



# Freshmen

 2000

          

           

           

          

           

# Sophomores

# Rock The House!







Top: John Dorland and Tabitha Goble dance the night away. Top Center: Willie Lewis, Amanda Lovell, and Jenny Kunders have got it going on! Mike Bradley and Angela Gregory are dancing so close. Below: Joyce Carver poses for the camera. Left: Showing their affection for each other, Josie Witt and Rosie Craig embrace each other. Bottom Left: Trina Mulford busts a move.




Top Left: Josh Fraley and Morgan Bresko bumpin' booties. Top Right: Mary Bower and Morgan Bresko talk about their next move. Bottom Left: Trevor Hartley and Jamie Sinnett "Senior Twirps." Bottom Middle: A North Bend stranger tries to show the Devils how to dance. Bottom Right: Ashley McMahen and Josh Fraley get caught in the moment.







# Rock The House!





Top Left: Josh Fraley and Morgan Bresko bumpin' booties.
Top Right: Mary Bower and Morgan Bresko talk about their next move.
Bottom Left: Trevor Hartley and Jamie Sinnott "Senior Twirps."
Bottom Middle: A North Bend stranger tries to show the Devils how to dance.
Bottom Right: Ashley McMahon and Josh Fraley get caught in the moment.





















"Playerism is a disease, if you don't like it, take your 'butt' down to the clinic" -Chris Guerin

"Don't date Freshmen." -Nick McGuffin *except for Leah Freeman*

"Don't date Nick." -Kristen Plew

"I am not conceited because being conceited is a flaw and I don't have any." -Amanda Landmark

"Therefore do not worry about tomorrow for tomorrow will worry about itself. Each day has enough trouble of its own. -Matthew 6:34 (Emilio)" -Morgan Bresko

"Reverence for the past is important, but so is regard for the future." -Kristi Starrett

"Use the force!" -Trevor Hartley

"FINALLY!!!" -Ryan Davidson

"Enjoy life, man!" -Trevor Riddle

"Num num num!" -Chantel Truelove

"It's about time!" -Jennie Johnson

"Milkin's good!" -Andrew Vie

"Milkin's great!" -Brandon Walker

"I haven't broken or died yet, so we'll see what happens in the next year or two. Seth Enslow" -Ryan Arellano

"Booyeah!" -David Simmons

"A smile is a little curve that can set a lot of things straight." -Marjie Bradley

"Everything I do I rush through so I can do something else. In such a way do the days pass- a blend of stock car racing and the never-ending building of a gothic cathedral. Through the windows of my speeding car I see all that I love falling away: books unread, jokes untold, landscapes unvisited...." -Tony Anderson

"Grow up to be like Tom Green!" -Chris Cranford

"Bon-us!" -Jennifer Gregory

"Get off my back!" -Zach Ring

"Do or do not; there is no track. -Yoda" -Salvador Sanchez

"6 feet, 5 inches, 200 lbs of pure white chocolate! -Josh Wollman

Top Left: Erin Daugherty, Morgan Bresko, and Brandon Hallom stop to gossip in the hall during break.
Top Right: Chasing the butchery Trent Fisher and Aaron Brewer stand and jabber.
Top Right: Molly Williams studies her notes in Mr. Smith's class.
Middle Left: Leslie Summers and Cindy Harkins share a hug.
Bottom Left: Teacher King and Ryan Arellano cuddle as a happy couple in the senior hall.
Right: Jamie Scarett is talking to the student body at an assembly.



"Don't date
Freshmen."
Nick McGuffin

except for Leah Freeman

"Pla
a di
yo
like
you
dow
clini

"Don't date Nick." -Kristen Plew

"Therefore

# Leah Freeman

- Body discovered August 3, 2000
- Death by homicidal violence



Copyright © 1988-2003 Microsoft Corp. and/or its suppliers. All rights reserved. http://www.microsoft.com/mappoint
Copyright © 2002 by Geographic Data Technology, Inc. All rights reserved. © 2002 Navigation Technologies. All rights reserved. This data includes information taken with permission from Canadian authorities © 1991-2002 Government of Canada (Statistics Canada and/or Geomatics Canada), all rights reserved.



















# Leah Freeman

- All clothes except her shoes and one sock were found on her body
- No underpants
- Have not been able to explain the lack of underwear

# Leah Freeman

- Investigation has taken three different avenues
- Person who lived in apartments on street where shoe was found
- Left town in a hurry
- Tracked him down eventually in Colorado
- Eliminated him as suspect

# Leah Freeman

- Second Avenue
- Rumor that Leah was hit by car and died
- Various persons driving
- William Sero
- Tom Stemmerman

# Leah Freeman

- Problems with scenario
- No injuries consistent with having been hit by a car
- No "road rash" seen on clothes

View of front of vest



L/01/38

View of  damage lower right front in vest



View of damage to front left side



View of damage to left side



View of back of vest



L/01/38

View of shoulder straps at the top of back of vest



View of  back of the sports bra



L/01/38

View of holes in fabric between shoulder straps at the back of sports bra



RP300W  shatter resistant  **181649**



CALIBRATED

BY _____ DATE 15/2/01

View of area of damage to left side of sports bra



L/01/58

View of front of jeans ( NB All holes seen here result of laboratory testing)



View of seat/back of jeans Note frayed hole to right leg and fraying on left seat area.

( NB large area from crotch and hole in leg result of laboratory tests)



# Leah Freeman

- All of the car scenarios lead back to Alisha Michaud
- Burned out meth addict
- Likely the result of meth induced paranoia
- Sero et al eliminated by polygraph

# Leah Freeman

- McGuffin aspect of investigation
- Cannot exclude him as the person who committed this crime

# Leah Freeman

- Extensive Crime Lab Work
- Clothes examined by Oregon State Police Crime Lab
- Sent clothes to United Kingdom for extensive DNA testing
- Fiber analysis currently being done with lab in Chicago
- No forensic evidence

# Leah Freeman

- Reality:
- No forensic or direct evidence showing who committed the crime
- Probability:
- Case will be solved through old fashioned "gum shoe" work that will show by circumstantial evidence who did it; or
- Confession

# Leah Freeman

- Goal:
- Eliminate McGuffin as the suspect and identify the perpetrator of the crime
- Or
- If McGuffin is guilty, develop a prosecutable case

# Leah Freeman

- Cold Case Team of five retired police officers with homicide experience have been quietly putting the case in order

- Larger team of about 15 current police officers are being brought up to date on the case

- Oregon Department of Justice has supplied analyst support

# Leah Freeman

- Current idea is to get the team fully briefed
- Get a wiretap in place on McGuffin's phone(s)
- Announce formation of the team and intent to re-interview all witnesses
- Hope the wire gives us something
- Otherwise, hope the case somehow breaks