Robert Paul Frasier
August 29, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as an      )
individual and as guardian ad      )
litem, on behalf of S.M., a        ) Civil No.
minor,                             ) 6:20-cv-01163-MK
                                   ) (Lead Case)
            Plaintiffs,            )
                                   )
      v.                           )
                                   )
MARK DANNELS, PAT DOWNING,         ) DEPOSITION
SUSAN HORMANN, MARY KRINGS,        )
KRIS KARCHER, SHELLY MCINNES,      )
RAYMOND MCNEELY, KIP OSWALD,       )
MICHAEL REAVES, JOHN RIDDLE,       )
SEAN SANBORN, ERIC                 )
SCHWENNINGER, RICHARD WALTER,      )
CHRIS WEBLEY, ANTHONY WETMORE,     )
KATHY WILCOX, CRAIG ZANNI,         )
DAVID ZAVALA, JOEL D. SHAPIRO      )
AS ADMINISTRATOR OF THE ESTATE     )
OF DAVID E. HALL, VIDOCQ           )
SOCIETY, CITY OF COQUILLE, CITY    )
OF COOS BAY, and COOS COUNTY,      )
                                   )
            Defendants.            )
                                   )
VIDOCQ SOCIETY,                    )
                                   )
            Cross-Claimant,        )
                                   )
      v.                           )
                                   )
MARK DANNELS, PAT DOWNING,         )
SUSAN HORMANN, MARY KRINGS,        )
KRIS KARCHER, SHELLY MCINNES,      )
RAYMOND MCNEELY, KIP OSWALD,       )
MICHAEL REAVES, JOHN RIDDLE,       )
SEAN SANBORN, ERIC                 )
SCHWENNINGER, RICHARD WALTER,      )
CHRIS WEBLEY, ANTHONY WETMORE,     )
KATHY WILCOX, CRAIG ZANNI,         )
DAVID ZAVALA, JOEL D. SHAPIRO      )

Exhibit 3, Page 1 of 52

Robert Paul Frasier
August 29, 2023

Page 2

```
 1   AS ADMINISTRATOR OF THE ESTATE  )
     OF DAVID E. HALL, VIDOCQ        )
 2   SOCIETY, CITY OF COQUILLE, CITY )
     OF COOS BAY, and COOS COUNTY,   )
 3                                   )
                                     )
 4              Cross-Defendants.)
     _____)
                                     )
 5   NICHOLAS JAMES MCGUFFIN, as an  )  Civil Case No.
     individual and as guardian ad   )  3:21-cv-01719-MK
 6   litem, on behalf of S.M. a      )  (Trailing Case)
 7   minor,                          )
                                     )
 8              Plaintiffs,          )
                                     )
 9       v.                          )
                                     )
10   OREGON STATE POLICE,            )
                                     )
11              Defendant.           )
     _____)
12
13
14
15           DEPOSITION UPON ORAL EXAMINATION
16              OF ROBERT PAUL FRASIER
17
18       BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
19   Civil Procedure, the deposition of ROBERT PAUL FRASIER was
20   taken on behalf of the Plaintiffs, before JEAN M. KOSTNER, a
21   Certified Court Reporter for Oregon, on Tuesday, the 29th day
22   of August, 2023, at the hour of 9:03 a.m., at the Coquille
23   Community Center, 105 North Birch Street, in the City of
24   Coquille, County of Coos, State of Oregon.
25
```

Page 3

```
 1                   APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4       Andrew C. Lauersdorf, OSB #980739
         Janis C. Puracal, OSB #132288
 5   MALONEY LAUERSDORF, REINER, PC
         1111 East Burnside Street, Suite 300
 6       Portland, Oregon  97214
         (503) 245-1518
 7       acl@mlrlegalteam.com
         jcp@mlrlegalteam.com
 8
 9   ON BEHALF OF THE DEFENDANTS:
10       Robert E. Franz, Jr., OSB #730915
         Sarah R. Henderson, OSB #153474 (Videoconference)
11   LAW OFFICE OF ROBERT E. FRANZ, JR.
         Post Office Box 62
12       Springfield, Oregon  97477
         (541) 741-8220
13       rfranz@franzlaw.comcastbiz.net
         shenderson@franzlaw.comcastbiz.net
14       (Representing City of Coquille, City of Coos Bay,
           Coos County, Craig Zanni, Chris Webley, Eric
15         Schwenninger, Sean Sanborn, Ray McNeely, Kris
           Karcher, Pat Downing, Mark Dannels, Kip Oswald,
16         Michael Reaves, David Zavala, Anthony Wetmore,
           Shelly McInnes)
17
         Jesse B. Davis, OSB #052290
18   OREGON DEPARTMENT OF JUSTICE
         100 Southwest Market Street
19       Portland, Oregon  97201
         (971) 673-1880
20       jesse.b.davis@doj.state.or.us
           (Representing Oregon State Police, John Riddle,
21         Susan Hormann, Mary Krings, Kathy Wilcox)
22       Meredith A. Sawyer, WSB #33793 (Videoconference)
     HWS LAW GROUP
23       101 Southwest Main Street, Suite 1605
         Portland, Oregon  97204
24       (206) 262-1200
         msawyer@hwslawgroup.com
25         (Representing Vidocq Society)
```

Page 4

```
 1       Eric S. DeFreest, OSB #730915
         LUVAAS COBB
 2       777 High Street, Suite 300
         Eugene, Oregon  97401
 3       (541) 484-9292
         edefreest@luvaascobb.com
 4         (Representing Richard Walter)
 5   VIDEOTAPED BY:
 6       Rocky Garrotto, Videographer
           Subcontractor for:
 7             US LEGAL SUPPORT
 8
     REPORTED BY:
 9
         Jean M. Kostner, CSR #90-0051
10         Subcontractor for:
               US LEGAL SUPPORT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1               INDEX OF TESTIMONY
 2
 3   WITNESS                                      PAGE
 4     ROBERT PAUL FRASIER
 5       Examination by Mr. Lauersdorf . . . . . . .   9
 6       Examination by Mr. DeFreest . . . . . . .  216
 7       Examination by Ms. Sawyer . . . . . . . .  223
 8       Examination by Mr. Franz  . . . . . . . .  243
 9       Examination by Mr. Davis  . . . . . . . .  247
10       Examination by Mr. DeFreest . . . . . . .  249
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Exhibit 3, Page 2 of 52

Robert Paul Frasier
August 29, 2023

Page 6

```
1              INDEX OF EXHIBITS
2
DEPOSITION
3  EXHIBIT NO.        DESCRIPTION        IDENTIFIED
4
5  Exhibit 1  Confidential - Subject to Protective
              Order - Coquille Police Department
6              Assignment List                        69
7  Exhibit 2  Confidential - Subject to Protective
              Order - Handwritten Reports (136 pages)  75
8
   Exhibit 3  Notes, Maps, and Photographs Regarding
9              Leah Freeman (91 pages)                 84
10 Exhibit 4  Confidential - Subject to Protective
              Order - Synopsis of Vidocq Society Cases
11             (2 pages)                               87
12 Exhibit 5  Discovery List  (15 pages)              89
13 Exhibit 6  Statement Analysis and VICAP Assessment
              (64 pages)                              91
14
15 Exhibit 7  Letter from R. Paul Frasier to
              Paul E. Reim, Oregon Department of Justice,
              09/01/16  (12 pages)                   137
16
   Exhibit 8  Supplemental Report, Coquille Police
17             Department  (5 pages)                 140
18 Exhibit 9  Oregon State Police Tip Sheet          142
19 Exhibit 10 Coquille Police Department Incident
              Report with Attachments (6 pages)      143
20
   Exhibit 11 Coquille Police Department Incident
21             Report  (5 pages)                     147
22 Exhibit 12 Confidential - Subject to Protective
              Order - Handwritten Report             149
23
   Exhibit 13 Confidential - Subject to Protective
24             Order - Wikipedia Printout Regarding
              "Survivor: Borneo"  (16 pages)         150
25
```

Page 7

```
1  Exhibit 14 Wikipedia Printout and Info Regarding
              "Richard Walter"  (21 pages)           157
2
   Exhibit 15 Oregon State Police Tip Sheet          179
3
   Exhibit 16 Coos County Dispatch Report            180
4
   Exhibit 17 Coos Bay Police Department Detail Pages
5              (6 pages)                             184
6  Exhibit 18 Confidential - Subject to Protective
              Order - DNA Analysis  (6 pages)        184
7
   Exhibit 19 Confidential - Subject to Protective
8              Order - Coos Bay Police Department
              Detail Pages (5 pages)                 184
9
   Exhibit 20 Oregon State Police Supplemental Report
10             (5 pages)                             184
11 Exhibit 21 Oregon State Police Tip Sheet          186
12 Exhibit 22 Confidential - Subject to Protective
              Order - Case Notes  (8 pages)          189
13
   Exhibit 23 Confidential - Email from Susan Hormann
14             to Lt. Smith  (3 pages)               190
15 Exhibit 24 Lt. Pex's Report on Scene  (4 pages)   194
16 Exhibit 25 Evidence Accountabilty Record          197
17 Exhibit 26 Coquille Police Department Property
              Request                               200
18
   Exhibit 27 Conversation Log                      203
19
   Exhibit 28 Confidential - Subject to Protective
20             Order - Oregon State Police Incident
              Report  (7 pages)                      206
21
   Exhibit 29 Confidential - Subject to Protective
22             Order - Coquille Police Department,
              in Response to "Things to Do"  (5 pages) 209
23
   Exhibit 30 Confidential - Subject to Protective
24             Order - "Things to Do"  (8 pages)     164
25 Exhibit 31 Letter from Paul Frasier to Paul Reim,
              08/10/16                               232
```

Page 8

```
1         THE VIDEOGRAPHER:  The time is 9:03.  Today is
2  August 29th.  This is the audio -- audio and video recording
3  will continue to take place until all parties agree to go off
4  the record.  Please note that the microphones are sensitive and
5  may pick up whispering and private conversations.
6         This is the video recording proceeding of witness
7  R. Paul Frasier, taken by counsel for Plaintiff in the matter
8  of Nicholas James McGuffin vs. Mark Dannels, filed in the
9  United States District Court for the District of Oregon, Eugene
10 Division.
11        This proceeding is being held at the Coquille
12 Community Center, 105 North Birch Street, Coquille, Oregon.
13        My name is Rocky Garrotto.  I am the videographer
14 on behalf of US Legal Support, located at 16825 North Chase
15 Drive, Suite 900, Houston, Texas.  I am not related to any
16 party in this action, nor am I financially interested in the
17 outcome.
18        The court reporter today is Jean Kostner on behalf
19 of US Legal Support.
20        Counsel, will you state your -- their appearances
21 for the record, after which the court reporter will enter the
22 statement for remote proceedings into the record and swear in
23 the witness.
24        MR. LAUERSDORF:  Starting with Plaintiff, Andrew
25 Lauersdorf from Maloney Lauersdorf Reiner, PC, on behalf of the
```

Page 9

```
1  plaintiffs, Nicholas McGuffin and S.M.
2         MS. PURACAL:  Janis Puracal on behalf of Plaintiffs
3  Nicholas McGuffin and S.M.
4         MR. FRANZ:  Robert Franz on behalf of the municipal
5  defendants.
6         MR. DEFREEST:  Eric DeFreest for Defendant Richard
7  Walter.
8         MR. DAVIS:  Jesse Davis on behalf of the State
9  defendants.
10        MS. SAWYER:  Meredith Sawyer on behalf of Vidocq
11 Society.
12             ROBERT PAUL FRASIER,
13 called as a witness on behalf of the Plaintiffs, having been
14 first duly sworn to tell the truth, the whole truth, and
15 nothing but the truth, was examined and testified as follows:
16        THE WITNESS:  Yes.
17             EXAMINATION
18 BY MR. LAUERSDORF:
19   Q.   Okay.  Mr. Frasier, my name is Andy Lauersdorf.
20 You and I have not met before today.  Is that correct?
21   A.   That's correct.
22   Q.   And I'm an attorney representing the plaintiffs in
23 this matter, which is a lawsuit filed by Mr. McGuffin against a
24 number of defendants, including Coos County and the Coos County
25 Sheriff's Department.  Do you understand that?
```

Exhibit 3, Page 3 of 52

Robert Paul Frasier
August 29, 2023

Page 74

1    A.   That was up to the individual agencies who they
2 would assign to the team.  It was usually their detectives.
3 And I don't recall all who had been assigned by the individual
4 agencies to the team.
5    Q.   Okay.  So they weren't folks that you handpicked?
6    A.   No.
7    Q.   Did you attend meetings of the H.I.T. Team?
8    A.   I tried to as best I could.
9    Q.   How often?
10    A.   I tried to go to every one, but there would be
11 occasions where I might have a trial or a court hearing that I
12 couldn't get out of that I wouldn't go -- I would not be there.
13    Q.   If you wanted to go back and figure out which ones
14 you were at, how would you do that?
15    A.   I don't know how I could.  I don't think I kept a
16 record.
17    Q.   It wouldn't be in your -- like a day planner or a
18 calendar or anything?
19    A.   I kept a day planner off and on.  I can't say that
20 I was consistent with it, so it would not be a good source.
21    Q.   Okay.  And even if you kept a day planner, it might
22 show that there was a meeting on that day, but not necessarily
23 show that you attended.  Right?
24    A.   That's correct.
25    Q.   Okay.  Who led the -- who was responsible for

Page 75

1 leading the H.I.T. Team meetings?
2    A.   Chief Dannels.
3    Q.   And what was your role when you attended?
4    A.   Again, it was to be the legal advisor to the team
5 and also to hear what they found and to make suggestions of
6 what else needs to be done.
7    Q.   Okay.  I'll show you --
8         MR. LAUERSDORF:  Let's see.  This one we need to
9 mark, so ...
10         (Document marked for identification as Deposition
11         Exhibit 2.)
12 BY MR. LAUERSDORF:
13    Q.   Do you recognize that document or series of
14 documents at all?
15    A.   No.
16    Q.   Have you ever seen that document before?
17    A.   I don't recall seeing it before.
18    Q.   Do you remember attending a meeting of the major
19 crimes team on October --- or the H.I.T. Team on October 13th,
20 2009?
21    A.   I could have been there, yes.
22    Q.   Do you remember being there?
23    A.   I don't remember the specific date, no.
24    Q.   Okay.  So -- but the notes here indicate that at
25 this point, October 13th, 2009, the suspects are Nick McGuffin

Page 76

1 and Brent Bartley.  Right?
2    A.   Um ...
3    Q.   Right up at the top?
4    A.   Yeah.
5    Q.   Do you know who -- do you recognize this
6 handwriting at all?
7    A.   No, I do not.
8    Q.   Do you know who was taking notes at the H.I.T. Team
9 meetings?
10    A.   I don't recall anybody taking notes, so I don't
11 know who did this.
12    Q.   Was there a secretary or --
13    A.   If somebody kept notes, it would have been on the
14 staff of Coquille PD.
15    Q.   Okay.  Do you recognize these -- these documents?
16 There's a lot of them, I understand.  There's -- well, they're
17 not necessarily in order, so I can't tell how many, but there's
18 a lot of documents.
19    A.   Mm-hm.
20    Q.   And they -- I'll just represent to you -- you can
21 look through it, but they -- they appear to be meeting minutes
22 or some form of notes from H.I.T. Team meetings from October
23 13th, 2009, through May 13th, 2010.
24    A.   Okay.
25    Q.   Do you recall any documents like this being

Page 77

1 provided to you after you had -- after the grand jury had
2 indicted Mr. McGuffin?
3    A.   I don't recall this being provided to me.
4    Q.   If these documents had been provided to you by the
5 agency that prepared them, would you have produced those
6 documents to Mr. McGuffin's defense team?
7         MR. DAVIS:  I'm going to object.  It calls for
8 speculation entirely.  The witness hasn't had a chance to
9 review these likely 100 to 200 pages of documents, and there is
10 no way the witness can answer that question without
11 speculating.
12 BY MR. LAUERSDORF:
13    Q.   Okay.  Let me ask you this.  If these documents had
14 been provided to you in the course of your prosecution of
15 Mr. McGuffin, and you reviewed them and they contained
16 exculpatory information, would you have produced them to
17 Mr. McGuffin's defense team?
18         MR. DAVIS:  I'll raise the same objection, and I'll
19 voice that that's an incomplete hypothetical.
20 BY MR. LAUERSDORF:
21    Q.   Go ahead and answer, if you can.
22    A.   Yes, I would have given them to the defense.
23    Q.   Okay.  And if you had been provided with these
24 documents in the course of Mr. McGuffin's prosecution and they
25 contained information that might be used to impeach a witness

Exhibit 3, Page 4 of 52

Robert Paul Frasier
August 29, 2023

Page 78

1 that you intended to call at trial, would you have produced
2 them to Mr. McGuffin's defense team?
3          MR. DAVIS:  I'll raise the same objections.  Can we
4 agree to that, Counsel, that I don't need to restate all of
5 those objections?
6          MR. LAUERSDORF:  Yes, you can ...
7     A.   Yes, I would have given them to the defense.
8 BY MR. LAUERSDORF:
9     Q.   Okay.  And if you had been provided with these
10 documents in the course of Mr. McGuffin's prosecution and they
11 contained information that might be used to mitigate
12 Mr. McGuffin's guilt or punishment, would you have produced
13 them to Mr. McGuffin's defense team?
14          MR. DAVIS:  Same objections.
15     A.   Yes, I would.
16 BY MR. LAUERSDORF:
17     Q.   Okay.  So what I was asking from this first page of
18 Exhibit 2 is up at the top there, there's a note "Susp" --
19 which I'm taking means "suspect" -- "Nick McGuffin" and "Brent
20 Bartley."  Do you remember when the H.I.T. Team was reconvened
21 on October 13th, 2009, or in 2009 that Nick McGuffin and Brent
22 Bartley had been identified as the primary suspects?
23     A.   I remember them being suspects, but it was also my
24 intent was -- I said, "Look, people, there are other people out
25 there that we need to look at."  And I insisted that they

Page 79

1 interview and run down all these alternate theories or avenues
2 that were out there that pointed to other people.  I insisted
3 that they do that.  Now, why they're not listed there, I don't
4 know.
5     Q.   Okay.  Do you remember early on, when the
6 investigation was reconvened, discussing -- consulting with the
7 Vidocq Society for ideas and suggestions?
8     A.   That was brought to me by Chief Dannels, yes.
9     Q.   And was that discussed in H.I.T. Team meetings?
10     A.   I don't believe so.
11     Q.   Okay.  You see page 2 of that document, down at the
12 bottom it says "OPS Plan - Focus - Nick McGuffin"?
13     A.   I see that.
14     Q.   Was it your understanding at that time that the
15 focus was on Nick McGuffin?
16     A.   I knew we were looking at him, but I kept telling
17 people that we needed to look at all avenues.
18     Q.   Okay.  And then up at the top there, it says
19 "Riddle will make a copy" and "Sean will check through the case
20 files again for the missing diagram."  Are you talking about
21 a -- you're talking about a diagram that was --
22     A.   Right.  There was a diagram supposedly done at the
23 crime scene by Sergeant Stupfel, and we never could find it.
24     Q.   Okay.  And --
25          MR. LAUERSDORF:  Oh, sorry.  I was doing that

Page 80

1 again.  I'm sorry, Meredith.
2 BY MR. LAUERSDORF:
3     Q.   One of the reasons I'm asking you about that is
4 that you had mentioned in your deposition testimony during the
5 post-conviction relief proceedings that when you got to this
6 file, there were missing documents and banana boxes.  And so
7 when this investigation is reconvened in October of 2009, you
8 already know you have an evidence control problem.  Right?
9          MR. DAVIS:  Objection to the extent it
10 mischaracterizes the previous testimony.
11 BY MR. LAUERSDORF:
12     Q.   Well, yeah, I'm sorry.  It's a bad question.  Let
13 me ask it.
14          At that point you were concerned, if I understand
15 correctly, that you might not have all of the reports that had
16 been generated in this case.  Right?
17     A.   That was my -- one of my big concerns when we
18 reopened the case in 2009 was that I did not have everything.
19     Q.   Okay.  And that included you were concerned that
20 you may not have all of the tangible evidence that had been
21 collected as well.  Right?
22     A.   Well, I knew I didn't have copies of the
23 photographs, and I did have some concerns when we went through
24 the actual physical evidence that they had in their evidence
25 locker.  Yes, I did.

Page 81

1     Q.   And you knew you had -- or at some point you knew
2 you had clothes in England somewhere?
3     A.   That was one of the things that popped up almost
4 immediately was where are the clothes and where are the shoes?
5 They're not here.  Where are they?
6     Q.   Okay.  Okay.  So then let's go to the next one.
7 I'm just going to go through each of these meeting dates and
8 ask you if you remember the meetings.  If you do, you do.  If
9 you don't, you don't.  But maybe there are certain things I
10 would like to point out and see if you have any recollection of
11 those discussions.  But if you don't, we'll get through it
12 pretty quickly.
13          Do you remember attending a meeting of the H.I.T.
14 Team on January 5th, 2010?  That would be Exhibit 2 that you're
15 looking at, at page -- and I'm going to refer to this number
16 down in the bottom right-hand corner.  Do you see that, "CPD"?
17     A.   Yes.
18     Q.   The page number is CPD020553.
19          MR. DAVIS:  One more time with the Bates number,
20 Counsel.
21          MR. LAUERSDORF:  CPD020553.
22     A.   Mine's out of order.  It jumps all over the place.
23 BY MR. LAUERSDORF:
24     Q.   It should be in chronological order.  So if you go
25 by the dates up at the top --

Exhibit 3, Page 5 of 52

Robert Paul Frasier
August 29, 2023

Page 82

1    A.   Well, I'm having -- I'm not finding 553, if that's
2 what --
3    Q.   Try page 15. You might have to count them out.
4 Sorry.
5        MR. LAUERSDORF: Mr. Franz, for folks who are
6 following along electronically, I bookmarked the different
7 dates. So if the bookmarks are open, you can click on them --
8        MR. FRANZ: I found 553.
9        MR. LAUERSDORF: Okay.
10       MR. FRANZ: It's 1/5 -- January 5th. Right?
11      MR. LAUERSDORF: Yes. That's right.
12 BY MR. LAUERSDORF:
13    Q.   That's it.
14    A.   Okay.
15    Q.   Do you see the number down at the bottom, 020553?
16    A.   Yes.
17    Q.   You and I are on the same page.
18    A.   Right.
19    Q.   There's a note there about midway down the page
20 that says "Frasier - All documents (over 4,000) have been
21 scanned. Grand jury; Interviews on 3 DVDs; Photos; Documents."
22 Do you recall being in this meeting at all?
23    A.   I don't recall being in the meeting, so I can't say
24 I'm the one that said that, but the information would have had
25 to have come from me.

Page 83

1    Q.   Okay. Then down at the bottom there, it says
2 "Zanni - Copy of interview sent to profilers?" Do you recall
3 discussing sending copies of interviews to the Vidocq Society
4 for profiling?
5    A.   The Vidocq Society requested some materials. What
6 they wanted, I don't recall.
7    Q.   Okay. Did you provide them with any materials?
8    A.   Me directly, no.
9    Q.   Okay. So that all would have come from who?
10    A.   I would assume Coquille Police Department.
11    Q.   Okay.
12    A.   I don't recall providing documents directly to the
13 Vidocq Society. I may have, but I don't recall doing it.
14    Q.   Okay. So then, if I understand correctly, on
15 January 21st, 2010, or sometime around there, you traveled to
16 Pennsylvania to meet with the Vidocq Society. Is that right?
17    A.   I don't recall the date that we went. We were
18 scheduled to go -- well, the first day we had canceled, and so
19 I don't recall what the second day was.
20    Q.   Okay. Who all went when you went to visit the
21 Vidocq Society?
22    A.   Myself, Chief Dannels, Sheriff Zanni, and I forget
23 her name. She was the analyst from the Oregon Department of
24 Justice.
25    Q.   Anyone else?

Page 84

1    A.   No.
2    Q.   How long were you in Pennsylvania?
3    A.   We flew in one day, did the presentation, and flew
4 back the next.
5    Q.   Okay. So you did the presentation. I'll show you
6 what --
7        MR. LAUERSDORF: Well, I'll have you mark that as
8 Exhibit 3, please.
9        Mr. Davis (handing). Mr. DeFreest (handing).
10       (Document marked for identification as Deposition
11       Exhibit 3.)
12 BY MR. LAUERSDORF:
13    Q.   Mr. Frasier, you're being handed what's been marked
14 as Exhibit 3.
15        MS. SAWYER: Can you identify what you're showing?
16       MR. LAUERSDORF: Yeah, I'm going to ask him to
17 right now.
18        MS. SAWYER: Could you please identify it?
19       MR. LAUERSDORF: I'm going to ask Mr. Frasier to
20 identify it.
21    A.   Yes, this looks like the presentation I gave.
22 BY MR. LAUERSDORF:
23    Q.   Okay. That's the presentation that was prepared
24 and given to the Vidocq Society?
25    A.   No. This is the one I used when I spoke at lunch.

Page 85

1    Q.   At the Vidocq Society?
2    A.   At the Vidocq Society.
3    Q.   Okay. And who prepared that --
4    A.   I did.
5    Q.   -- Exhibit 3?
6    A.   I did.
7    Q.   Okay. And that's a PowerPoint presentation?
8    A.   Yes.
9    Q.   Okay. So you prepared it, and then gave it?
10    A.   I did.
11    Q.   And how long did that presentation last?
12    A.   Less than an hour.
13    Q.   And how long did you meet with members of the
14 Vidocq Society after the presentation?
15    A.   Not very long. Less than 15, 20 minutes.
16    Q.   Okay. Did you go out to dinner with members of the
17 Vidocq Society afterwards?
18    A.   We went out to dinner with Mr. Walters.
19    Q.   Okay. And Mr. Walter was a member of the -- you
20 understood that he was a member of the Vidocq Society at the
21 time?
22    A.   That's correct.
23    Q.   How many different members of the Vidocq Society
24 did you speak to personally?
25    A.   I only recall speaking to one or two, not counting

Robert Paul Frasier
August 29, 2023

Page 86

1  Mr. Walters.

2        Q.   Okay.  Do you recall any of their names?

3        A.   No.  I believe one was the president of the society

4  at that time, but I don't recall his name.

5        Q.   Okay.  Does the name Fred Bornhofen ring a bell?

6        A.   No.

7        Q.   Okay.  But you think that person was the president?

8        A.   I think so, yes.

9        Q.   Okay.

10       A.   Or at least the person that was in charge that day.

11       Q.   Okay.  Do you recall the specialties of any of the

12  folks you met with at the Vidocq Society?

13       A.   Not off the top of my head, no.

14       Q.   Okay.  If you'll go to -- it's like the

15  third-to-the-last page there on Exhibit 3.  You've done the

16  presentation.  At the end of the presentation you've got a page

17  that says "Goal."  Do you see where I'm at?

18       A.   Mm-hm.

19       Q.   It says the goal is to eliminate McGuffin as the --

20            MS. SAWYER:  Can you identify what page you're on.

21            MR. LAUERSDORF:  It's the third-to-the-last page of

22  Exhibit 3.  It's not Bates-labeled.  It's titled "Leah

23  Freeman."  It's got four bullet points.

24            MS. SAWYER:  Okay.  Thank you.  Yep.  I see it.

25  Thank you.

Page 87

1  BY MR. LAUERSDORF:

2        Q.   In there it says the goal is to "Eliminate McGuffin

3  given as the suspect and identify the perpetrator of the crime

4  or if McGuffin is guilty, develop a prosecutable case."

5        A.   Yes.

6        Q.   Was that your goal at the time?

7        A.   Yes, it was.  It was if Nick didn't do it, I wanted

8  to know he didn't do it, and I wanted to find who did it.  But

9  if he was responsible, then we needed to develop a prosecutable

10  case.

11            MR. LAUERSDORF:  Okay.   I'm going to -- this will

12  be Number 4.

13            (Document marked for identification as Deposition

14            Exhibit 4.)

15  BY MR. LAUERSDORF:

16       Q.   Okay.  So, Mr. Frasier, you've been handed what's

17  been marked as Exhibit 4.  Have you ever seen that document

18  before?

19       A.   No.

20       Q.   Okay.  Do you want to take a minute to read through

21  that?

22       A.   (Witness complies.)

23       Q.   Let me know when you're finished.

24       A.   Okay.  I've read it.

25       Q.   Anything that you read there strike you as

Page 88

1  inaccurate about your -- your meeting with Vidocq?

2        A.   Well, first off, I don't know what the initial PA

3  stands for, but in the first paragraph, "The suspect was found

4  to be deceptive on two polygraph tests," that's inaccurate

5  because I was only aware of one.

6        Q.   Anything else?

7        A.   The third paragraph, "Richard says that the DA was

8  very impressed and indicated that they now saw the case in a

9  new light."  I don't recall ever saying I was impressed and

10  that I saw this case in a new light.  Mr. Walters may have

11  thought that, but I don't recall saying that.

12       Q.   Do you recall saying after the meeting that you

13  thought you may have enough to indict?

14       A.   I don't recall telling that to anybody.

15       Q.   Okay.  Do you -- you talked about the initials PA.

16  Do you recall discussing the concept of power-assertive

17  murderers with Mr. Walter?

18       A.   That came from Mr. Walter.  And -- yeah, that came

19  from him.

20       Q.   Okay.  And do you recall Vidocq recommending that

21  given it was the 10th anniversary, some publicity might bring

22  out some additional information?

23       A.   You know, I don't recall the Vidocq Society giving

24  me any advice.  And, frankly, I was disappointed in the trip.

25       Q.   Okay.

Page 89

1        A.   I was looking for information that would help us

2  move forward, either to tell us we were going the wrong way or

3  that this was -- we were going the right way.  And they

4  didn't -- they didn't give us any suggestions whatsoever that I

5  recall.

6        Q.   Okay.  Anything else there that's inaccurate as you

7  read it today?

8        A.   Well, the next-to-the-last paragraph, the boyfriend

9  after the crime impregnated another 14-year-old, I don't know

10  where that came from.  I don't think that's true.

11       Q.   Okay.  Anything else?

12       A.   Just from my quick look going over it, nothing

13  jumped -- nothing else jumps out to me.

14       Q.   Okay.  Let me show you what we will mark as

15  Exhibit 5.

16            (Document marked for identification as Deposition

17            Exhibit 5.)

18  BY MR. LAUERSDORF:

19       Q.   All right.  So you've been handed what's been

20  marked as Exhibit 5.  Do you recognize that document?

21       A.   Yes.

22       Q.   Yes?

23       A.   Yes.

24       Q.   What is that document?

25       A.   This is a document that I prepared regarding

Robert Paul Frasier
August 29, 2023

Page 90

1  discovery in the case.
2       Q.  Okay.  And explain that.  What do you mean by that?
3       A.  Well, I had started a process -- well, Coos County,
4  the commissioners, would not give the DA's office money for a
5  discovery clerk.
6       Q.  Okay.
7       A.  And so my predecessor had started what we call the
8  open file policy.  If you wanted discovery, you had to come and
9  copy it.  And we would allow defense attorneys to take copies
10  of the files and take them to their office, photocopy them,
11  whatever they needed to do.  However, that's not feasible on a
12  larger case, and so I started individually on my own.  As I
13  would -- and I was -- and I started -- what I would do is I
14  would scan the documents, and then I would Bates-number them
15  through Adobe Acrobat --
16       Q.  Okay.
17       A.  -- and then I would develop a list with page
18  numbers.  Now, this was -- you know, this would be one of the
19  first times I ever did this.
20       Q.  Okay.  And so then --
21       A.  I was trying to keep track of what I had given to
22  them.
23       Q.  Okay.  So what was the list that you created,
24  Exhibit 5, intended to represent?
25       A.  It was intended to represent the materials that I

Page 91

1  believed that I had sent to the defense.  But I made some
2  mistakes.
3       Q.  Okay.  So it's -- we'll get to this a little bit
4  more later, but my understanding is that generally what you're
5  attempting to do is you've gathered all of the file materials.
6  You've had everything sent to you by law enforcement; you've
7  gathered that all in one place; you're Bates-labeling it; and
8  you're trying to do the defense a solid by producing all that;
9  and you're creating a list of everything that you have and that
10  you've Bates-labeled and that you're producing.  Is that right?
11       A.  Yes.
12       Q.  Okay.  I want to ask you about page 7 of that
13  document, Line Item Number 153.
14       A.  Mm-hm.
15       Q.  And that says "Vidocq Society Materials 5551
16  through 5674."
17       MR. LAUERSDORF:  So now we'll move on to Exhibit 6.
18  Please mark that.
19       (Document marked for identification as Deposition
20       Exhibit 6.)
21  BY MR. LAUERSDORF:
22       Q.  So you've been handed what's been marked as
23  Exhibit 6.  And what I'm going to ask you is to take a look
24  through that and tell me if you recognize that as -- well, just
25  look through it.  Take your time and let me know when you feel

Page 92

1  comfortable with it.
2       A.  (Witness complies.)  This appears to be the
3  material that I sent to the -- to the defense on the Vidocq
4  Society.
5       Q.  Okay.  So is that the material that was provided to
6  you by Vidocq or by somebody else?
7       A.  The first pages, 551 through 561, I don't recall
8  how those came into our possession, whether they were sent to
9  me directly or if they were sent to Chief Dannels.  The
10  remainder, which are articles, were given to me directly by
11  Mr. Walter.
12       Q.  Okay.  And were those given to you while you were
13  in Pennsylvania or some other time?
14       A.  The first article was given to me when we were in
15  Pennsylvania.  The second article was given to me when 20/20
16  was in town and they brought Mr. Walters with him.
17       Q.  Okay.  So the first article is numbered at the
18  bottom 005562.  Is that correct?
19       A.  Yes.
20       Q.  And the second article, where does that start?
21       A.  It looks like 5605.
22       Q.  Okay.  So the first one is titled, for the record,
23  "Profiling Killers: A Revised Classification Model for
24  Understanding Sexual Murder, Robert D. Keppel and Richard
25  Walter."

Page 93

1       Did you -- was it your opinion or your conclusion
2  that Ms. Freeman's murder was a sexual murder?
3       A.  No.
4       Q.  And then the next article is called "Non-Sexual
5  Murder and Violent Crimes By Richard D. Walter."
6       A.  Right.
7       Q.  In those two articles he talks about the subject
8  profiles, anger retaliatory, power-assertive, that kind of
9  thing.  Right?  Did you read those articles?
10       A.  I read the first one.  I did not read the second
11  one.
12       Q.  Okay.  And then 005551, the first page there in
13  Exhibit 6, what do you recognize that to be?
14       MS. SAWYER:  Can you restate what page you're
15  having him look at?
16       MR. LAUERSDORF:  005551 in the bottom right corner
17  or the top right corner.
18       A.  This appears to be an email to somebody with the
19  initials "fborn."
20  BY MR. LAUERSDORF:
21       Q.  And then signed down at the bottom by Fred
22  Bornhofen?
23       A.  Could be.
24       Q.  Case manager of the Vidocq Society?
25       A.  That could -- yes, that's what it says.

Robert Paul Frasier
August 29, 2023

Page 106

1 recall if they were or not.
2        Q.   Was it your idea for McNeely and Webley to do a
3 pretext interview with Mr. Hamilton?
4        A.   I don't recall a pretext interview with
5 Mr. Hamilton.  May have been, but I don't recall -- I don't
6 recall that.
7        Q.   Okay.  If you go forward a ways towards the end of
8 that was meeting, there's a CPD020488.
9        A.   Yes.
10       Q.   And down at the -- towards the bottom of the page
11 there it says "Paul - Grand Jury"?
12       A.   Yeah.
13       Q.   "End of March, question mark."
14            As far as I can tell, this is the first meeting of
15 the H.I.T. Team after the investigation has been reconvened
16 that the grand jury is brought up.  Do you remember if the
17 grand jury had ever been -- impaneling a new grand jury had
18 been brought up at any time before this date on January 26,
19 2010?
20       A.   I don't recall discussing it before, no.  I don't.
21       Q.   Okay.  But as of this point, January 26, 2010,
22 you're still not comfortable moving forward with the grand
23 jury, are you?
24            MR. DAVIS:  Objection.  Calls for speculation,
25 assumes facts, and mischaracterizes the document.

Page 107

1 BY MR. LAUERSDORF:
2        Q.   Answer, if you can.
3        A.   My recollection was is we talked about grand jury,
4 and there was a discussion about when we would do it.  And I --
5 somebody made the suggestion starting at the end of March.  And
6 I know we didn't start at the end of March, it was later,
7 because I felt I needed to have more time to prepare.
8        Q.   Okay.
9        A.   The other thing was is I think this was the -- if I
10 was there, and it sounds like I was, it was -- I believe this
11 was the first time that said, "Look, we're going to present
12 everything."
13       Q.   Okay.
14       A.   Yeah, because it says "Present it as a mini trial."
15 And I think I said -- that was the first time I said, "We're
16 going to go down every avenue in this case" at the grand jury.
17       Q.   Okay.
18       A.   And then I believe -- I know I told the group that
19 was -- that was my goal, that was what I was going to do.
20       Q.   And if you had been ready to convene a grand jury
21 at this time, you would have.  Right?
22       A.   I'd have to go back and look at what my trial
23 schedule was like.  Because I knew it was going to take some
24 time, several days over several weeks.  I don't know if -- if I
25 could have done it in March, just based on my schedule.  I do

Page 108

1 know that I did spend a lot of time preparing for the grand
2 jury, and so I don't know if I was personally ready to start as
3 early as March, but we didn't.  It wasn't until June or July, I
4 think.
5        Q.   Okay.  Let's move up to the next date that I want
6 to talk about, and that's January 27th, 2010, at 0800 hours.
7 That's CPD020507.  And the specific page there is -- well,
8 actually it's the afternoon debriefing.  It's CPD020511, I
9 guess.
10       A.   Okay.  Which -- which page are we looking at?
11       Q.   CPD020511.  Up at the top it's January 27th, 2010,
12 "Debriefing 1500 hours."
13       A.   Okay.
14       Q.   And then if you go towards the end of those notes,
15 CPD020517 on that same date -- or read through it.  Let me know
16 when you're comfortable with it.
17       A.   Okay.  We're looking at 20511.  Right?
18       Q.   Yeah.  And then go from there to 20517.
19       A.   20517.  (Witness referring to documents.)
20       Q.   See down towards the bottom there where it says
21 "Grand Jury in March"?
22       A.   On 20517, yeah, it says "Grand Jury in March."
23       Q.   And there's no question mark this time?
24       A.   That's right.
25       Q.   Do you -- at this time was it confirmed that the

Page 109

1 grand jury would be scheduled for March, or ...
2        A.   I don't know where that came from because we
3 didn't -- I never scheduled grand jury for March.
4        Q.   Okay.  And it seems odd that something would have
5 changed overnight?
6        A.   No.  I don't know where that came from.  I know
7 Chief Dannels wanted me to push, but I said, "I need time.  I
8 need to do this right.  We're going to do it the right way."
9        Q.   Okay.  And then the next one is January 28th, 2010.
10 That's CPD020518.  And if you go to the second page of that
11 meeting, it's page CPD020519.  There's a note there -- do you
12 see where it says "601" in the margin?
13       A.   Mm-hm.
14       Q.   Who do you understand 601 to be?
15       A.   Well, if the 600 numbers are for Coquille police,
16 that would be Chief Dannels.
17       Q.   That's Dannels' -- Chief Dannels' badge number.
18 Right?
19       A.   No.  That would be his radio call sign.
20       Q.   Radio call sign.  I'm sorry.  That's correct.
21            And he says there "Keep the press active.  Bring in
22 Vidocq."  Do you see where I'm at?
23       A.   Yeah.
24       Q.   So at this point Coquille PD at least is still
25 working with Vidocq.  Is that right?  Do you know?

Robert Paul Frasier
August 29, 2023

Page 110

1    A.  I don't know.  I don't think so.
2    Q.  Okay.  Do you remember having any discussions with
3  Chief Dannels about bringing in Vidocq --
4    A.  I know --
5    Q.  -- as of January 28th, 2010?
6    A.  I know we discussed Mr. Walters, but I don't recall
7  discussing anybody else from Vidocq.
8    Q.  If you go to the next one, there's another
9  debriefing that afternoon, January 28th, 2010, at 1500 hours.
10 That starts at CPD020524, but if you'll go to the next page,
11 which is CPD020525.  Do you have it?
12   A.  Yes.
13   Q.  Down there in the margin, there's a little hook --
14   A.  Mm-hm.
15   Q.  -- a little hooked arrow, and it points to a
16 paragraph there that starts with "Pex."  Do you see where I'm
17 at?
18   A.  Right.
19   Q.  It says "Pex doesn't have a great relationship with
20 the lab.  Asterisk, Blood splatter expert.  Question mark,
21 Trace.  Asterisk, Credibility issues, question mark.  Check
22 with Paul."
23   A.  Mm-hm.
24   Q.  Did anybody from the H.I.T. Team ever talk to you
25 about credibility issues related to Mr. Pex?

Page 111

1    A.  No.  There was -- no, we didn't talk about
2  credibility issues about Mr. Pex.
3    Q.  Okay.  If the H.I.T. Team had concerns about
4  Mr. Pex's credibility or they were talking about him having
5  potential credibility issues, is that something that you would
6  expect to see in a police report?
7    A.  Well, I'm not sure what you're asking here.  There
8  was a concern about Jim.
9    Q.  Okay.
10   A.  But it wasn't about credibility.
11   Q.  Okay.  But here they're indicating that there is
12 some kind of question about credibility issues?
13   A.  Somebody did, but that was never expressed to me.
14 It was that -- Jim had retired from the lab.  He had opened his
15 own business.  He had been critical of the OSP lab and how they
16 had processed things and things along that line.  He was not
17 popular with the lab, and that was common knowledge that he was
18 not popular with the lab.  And that's what we were talking
19 about.
20   Q.  Okay.  If somebody from the H.I.T. Team had come to
21 you and discussed concerns about credibility issues involving
22 Mr. Pex, is that information that you would have disclosed to
23 Mr. McGuffin's defense team --
24   A.  Yes.
25   Q.  -- in the criminal prosecution?

Page 112

1         The next one is January 29th, 2010; it's
2  Exhibit 2, page CPD020529.  And the page that I want to refer
3  you to there is the next one, I think.  Nope.  Two more.
4         Page CPD020531, up at the top.  It indicates there
5  "SCINT," S-C-I-N-T -- do you know what that stands for?
6    A.  South Coast Interagency Narcotics Team.
7    Q.  -- "has downloaded camera once and changed
8  battery."  Does that refresh your recollection at all about
9  whether or not a camera was placed out at the site where the
10 body was found?
11   A.  This would seem to suggest that there was one, but
12 I don't recall one being put out there.  I simply don't recall
13 one.  But again, I don't know if they're referring to any other
14 camera.  I don't know what that comment is related to.  But if
15 that's related to at the scene where Leah's body was found,
16 I -- I don't recall ever there being a camera out there.
17   Q.  Okay.  If you go -- next page CPD020532, it looks
18 like you might have been in that meeting because this one
19 says -- attributes a comment to you.  Oh, no.  I'm sorry.  Top
20 of -- no, it's a different date.  January 29th, 2010, "Briefing
21 1200 hours."  And, again, this is at page CPD020532.  So maybe
22 you weren't at the morning meeting where they discussed the
23 SCINT camera.  But here you're saying "We have evidence from
24 the lab that didn't go to the lab - we probably need to do
25 that."  Do you see where I'm at?

Page 113

1    A.  Yes.
2    Q.  And so this is -- I mean, my understanding of this
3  would be you are concerned about crossing your t's and dotting
4  your i's --
5    A.  That's correct.
6    Q.  -- in this investigation.  Right?
7    A.  Correct.
8    Q.  So you're still not ready to go to the grand jury
9  at this time.  Right?
10   A.  Well, we didn't go, so, yeah, I would agree with
11 that.
12   Q.  Okay.  But at some point Chief Dannels starts
13 getting impatient, doesn't he?
14   A.  I don't know if I would call it impatient.  I know
15 he was not happy with what I was doing, but I said, "We're
16 going to do it my way, and that's the way we're going to do
17 it."
18   Q.  Do you remember talking about the difference of
19 opinion between you and Chief Dannels in your deposition in the
20 post-conviction proceedings?
21   A.  Yes.
22   Q.  I'll give you a copy of that.
23        COURT REPORTER:  Do you want it marked?
24        MR. LAUERSDORF:  No, I don't need it marked.
25 ///

Exhibit 3, Page 10 of 52

Robert Paul Frasier
August 29, 2023

Page 114

1  BY MR. LAUERSDORF:
2      Q.  I'm handing you a copy of the mini transcript of
3  your deposition in the post-conviction proceedings.  It's
4  testimony of R. Paul Frasier in McGuffin v. Nooth, taken May
5  31st, 2019.  And I'll refer you to page 161 in the -- do you
6  see where the page numbers are in the upper right-hand corner
7  of each page?
8      A.  Yeah.  I see it.
9      Q.  Starting at line 5 and lines 5 through 19.
10     A.  Yes.
11     Q.  You say there "The other thing I did was grand
12 jury.  Chief Dannels only wanted me to present stuff that
13 showed Nick's guilt.  He wanted me to go in and do a grand jury
14 basically in one day or one afternoon and get an indictment on
15 Nick.  And I told him no.  That was not a popular decision with
16 him.  In fact, he had people come talk to me, and one of them
17 was an idiot from the Vidocq Society, trying to get me to
18 change my mind."  Is that -- did I read that correctly?
19     A.  That's correct.
20     Q.  And so I guess that's -- that's what I mean when I
21 ask at some point Chief Dannels began to lose patience.  Is
22 that right?
23     A.  I don't know if he was losing patience.  He
24 disagreed on what I wanted to do at the grand jury.
25     Q.  Okay.

Page 115

1      A.  He wanted me to concentrate on Nick, and I said,
2  "No, we're not going to do that.  We're going to do it the way
3  I told you before.  We're going to present all angles on this
4  case to the grand jury, and we're going to let the grand jury
5  decide who should get indicted, if someone should get indicted,
6  and who that should be."  He did not agree with my decision to
7  handle the case that way.
8      Q.  Okay.  And who did he send from Vidocq to talk to
9  you and try to persuade you to --
10     A.  It was Mr. Walter.
11     Q.  Mr. Walter?
12     A.  Yes.
13     Q.  Okay.  When did that meeting occur?
14     A.  It was --
15         MR. DAVIS:  Objection.  Assumes facts.
16     A.  When did I meet with Mr. Walter?
17 BY MR. LAUERSDORF:
18     Q.  Yeah.  You said there in your deposition that he
19 sent somebody from the Vidocq Society to try to convince you to
20 move forward with indicting Mr. McGuffin.
21     A.  That's correct.
22     Q.  And so I'm asking when did the meeting with the
23 person from Vidocq take place -- or when did the communication
24 with the person from Vidocq take place?
25     A.  It took place during the week that 20/20 was in

Page 116

1  town.
2      Q.  Okay.
3      A.  And it was an afternoon.  I met with Mr. Walter
4  at -- the chief asked me to meet with Mr. Walter in his office
5  at Coquille PD.
6      Q.  Okay.  And how long did you meet with Mr. Walter?
7      A.  Oh, it was maybe a half hour.
8      Q.  Okay.  And what was Mr. Walter's message?
9      A.  He started off with, you know, "The chief wants you
10 to do this."
11         And I told him, "Look, this is my decision.  That's
12 a nonstarter.  I'm tired of people" -- this was the second
13 person that had been put up to come and talk to me about, and I
14 said, "It's not happening."  And that part of the conversation
15 was very short and to the point.  I said, "I'm doing it my way.
16 Let's not even go down this road."
17     Q.  Okay.  Who was the second person that was sent to
18 talk to you about that?
19     A.  Eric Schwenninger from Coquille -- or from Coos Bay
20 PD and somebody else.  I forget who was with him.  They came
21 and talked to me, and that was well before 20/20 was in town.
22     Q.  Okay.
23     A.  That was the first time.
24         MR. DAVIS:  I just want to clarify.  You had
25 testified that Walter was the second.

Page 117

1          THE WITNESS:  That's correct.
2          MR. DAVIS:  And then you said "the second person,"
3  meaning "the other person"?
4          THE WITNESS:  Right.  Yeah.  That's right.  Not
5  sequentially, yeah.
6  BY MR. LAUERSDORF:
7      Q.  Okay.  And then you said that that was a -- that
8  part of your conversation with Walter was short and to the
9  point.  What was the rest of your conversation with Mr. Walter?
10     A.  I told him that I had read his article that he gave
11 me when we were in Pennsylvania.  And I told him that I did not
12 believe -- when he gave me that article, he represented it to
13 me that this would show a profile that shows that Mr. McGuffin
14 is the murderer.  I read that article, and I'm going, this
15 doesn't fit at all to what I know about this case, that this
16 article is just -- it doesn't make sense to me.  I don't know
17 how this ties in.  And I told him that.  I said, "Look, your
18 article that you gave me frankly doesn't make sense to me
19 because it -- it doesn't match up with what I know about this
20 case."
21         And it was at that point he says, "Oh.  Okay."
22 Then he rummaged around in his briefcase, and he gave me the
23 second article.
24     Q.  Okay.
25     A.  He said, "You ought to read this one."

Robert Paul Frasier
August 29, 2023

1    I said, "Okay. I will read it." But I never did
2  because what we found -- we found out later. It was literally
3  the next day that we found out about Mr. Walter.
4       Q.   Okay.
5       A.   And I said, "That's it. We're done with this guy."
6       Q.   Okay. And so -- but up until that point, the
7  theory that Mr. Walter and Vidocq had shared with you about
8  power assertives, punch for the face, and so there must have
9  been a confrontation at the place where her shoe was found by
10  the cemetery and he must have hit her and she must have bled
11  and then she must have been stuck in the truck, that's the
12  theory that you used at trial. Isn't that right?
13      A.   Yes, but --
14      MS. SAWYER: Object to the form. Misstates his
15  testimony.
16      MR. DEFREEST: Objection. Facts not in evidence
17  and misstates.
18  BY MR. LAUERSDORF:
19      Q.   Go ahead and answer. You started with "Yes."
20      A.   I guess -- one of the things I found out about
21  Mr. Walters was that he would take the facts of the case as we
22  knew them and then he would manufacture, if you will, a profile
23  that would fit the only suspect that the prosecution was
24  looking at. That's the way I read the opinion from the Second
25  Circuit Court of Appeals.

1       Q.   That's Drake vs. Portuondo?
2       A.   Right.
3       Q.   Okay.
4       A.   In my mind, there had to have been an altercation
5  at that scene because of the lost shoe and the blood on the
6  other shoe and so forth. There had to have been -- Leah had to
7  have been bleeding for her blood to get on her shoes, so there
8  had to be some altercation. My argument was based on the facts
9  of the case, not on anything that Mr. Walters told me.
10      Q.   Okay. So let's go to Exhibit 2, CPD020533.
11      A.   Okay.
12      Q.   And that's the same day. And I guess that gets
13  back to you being concerned about crossing your t's and dotting
14  your i's. Do you see where I am at the top of the page there?
15      A.   Right.
16      Q.   It's a note about "Paul, make sure that the DNA
17  profiles - Leah, Cory, and Denny samples; shoes from the
18  bedroom belonging to Leah; Leah's clothing is still in England;
19  there's a problem with customs; Nick's DNA sample, question
20  mark; swabs of blood stains from Leah's shoes; need found
21  shoes."
22           The DNA on the shoes is -- appears to be something
23  that you're focused on at that point. Is that right?
24      A.   No. I think this is -- I'm focusing on the
25  physical evidence that I would probably need to present at

1  trial.
2       Q.   Okay. But you're --
3       MR. DAVIS: And, I'm sorry. Page reference again?
4       MR. LAUERSDORF: CPD020533.
5  BY MR. LAUERSDORF:
6       Q.   Do you remember this meeting at all?
7       A.   I don't remember this meeting, but I do recall
8  talking with the police about these are the things I'm going to
9  need when we present the case at trial. Okay. We developed a
10  DNA profile based on samples from Leah, Cory, and Denny. Cory
11  being Leah's dad; Denny being her father. Where are those
12  samples? Where are those swabs? I need to make sure we have
13  those for the trial.
14      Q.   Okay.
15      A.   Shoes from the bedroom belonging to Leah. There
16  was a set of shoes in her bedroom that were similar to the ones
17  that were missing. Where are those? We need to make sure we
18  have those available for trial. Leah's clothing is still in
19  England. We need to get them back. There was a problem with
20  customs due to 9/11. Bringing stuff that had biological
21  material on them created some issues getting it through
22  customs, and so it took us aback. Where is the DNA sample that
23  we got from Nick? Where is the swab? That's what I was asking
24  for here is where are these items? Where are they?
25      Q.   Yeah, because in essence what you're telling these

1  folks is, hey, we've got to get this DNA evidence dialed in.
2       A.   I said, "We need to have the exhibits ready for
3  trial." I don't know if they were talking about just, you
4  know, going back -- in retrospect, going back and having the
5  DNA redone or -- we never talked about that. It was where are
6  the physical exhibits that I need for trial?
7       Q.   Okay. But at the time you knew how persuasive DNA
8  could be in determining guilt or innocence. Right?
9       A.   Yes.
10      MR. DAVIS: Objection. Calls for speculation.
11           You may answer it.
12      A.   Yeah.
13  BY MR. LAUERSDORF:
14      Q.   In 2010, as a seasoned prosecutor who is -- I think
15  you said at one point you told Mr. Bartley that you were
16  responsible for five of the people on Oregon's death row and
17  that you had prosecuted 20 to 25 murders in the 10 years that
18  you had been at the DA's office at that point. So as a
19  seasoned prosecutor in 2010, isn't it fair to say that you
20  would have known how persuasive DNA can be in determining guilt
21  or innocence?
22      A.   Yes.
23      Q.   I'm not asking you to speculate at all, am I?
24      A.   Well, that's argumentative, but ...
25      Q.   Okay. Fair enough. I'll let that go.

Robert Paul Frasier
August 29, 2023

Page 146

1    A.   Yes.
2    Q.   Okay.  But nothing in his report -- there's nothing
3  in his report about John Lindegren remembering who was voted
4  off of Survivor on the night in question.  Right?
5    A.   Well, there's nothing in the report about it, no.
6    Q.   And there's nothing in his handwritten notes about
7  it either?
8    A.   I can't hardly read the writing, so I don't know,
9  but I'll take your word for it that it's not there.
10   Q.   Okay.  And this has all got your Bates -- if I
11 understand correctly, your Bates numbering with the
12 underscoring, right, at the top?
13   A.   Yes, that would be -- that would be my Bates
14 numbering, yes.
15   Q.   Okay.  And is that -- I noticed that underscoring a
16 lot.  Is that kind of your trademark that you underscore with
17 the number?
18   A.   That's just the way that the Adobe Acrobat does it.
19   Q.   That's just the way it does it?  Okay.
20        And so that means that -- all of these things are
21 Bates-labeled with your Bates numbers.  That means that these
22 documents are all given to you and subsequently produced to
23 Mr. McGuffin's defense counsel.
24   A.   Yes.
25   Q.   If I understand your --

Page 147

1    A.   Right.
2    Q.   -- the thing we went over earlier.
3    A.   Right.
4    Q.   Okay.  So let's look at Exhibit 11.  Keep Exhibit
5  10 handy.  We'll get back to that, but look at 11.
6        (Document marked for identification as Deposition
7        Exhibit 11.)
8  BY MR. LAUERSDORF:
9    Q.   So you've been handed what's been marked as
10 Exhibit 11.  Can you take a look at that document, read it
11 over, and let me know when you're comfortable with it.  And I
12 can tell you the part that I'll be asking you about is the part
13 that starts on page 2 where it says "Hjordis Lindegren."
14   A.   (Witness complies.)  Okay.  I've read the part
15 about Ms. Lindegren.
16   Q.   Okay.  So this is a report of a May 19th, 2010,
17 interview with Officer McNeely and Officer Webley interviewing
18 Hjordis Lindegren at the Coquille Public Library.  Is that your
19 understanding?
20   A.   Yes.
21   Q.   And she tells them that she's an avid fan of the
22 television show Survivor, she's watched all of the episodes of
23 each season since the show began in 2000, and that she and her
24 brother John always watched the show together on Wednesday
25 nights and enjoyed looking forward to the time together each

Page 148

1  week.  She said that John always brought his dog with him on
2  those nights.
3        She said that "on the night of June 28, 2000, she
4  recalled John leaving after the show ended at 2100 hours, to
5  take his dog for a walk.  Hjordis said he might have left just
6  before the end because she thought she remembered him being
7  upset about who was voted off.  Hjordis said that John returned
8  about half an hour later and commented on the 'uncontrollable
9  juveniles' next door."  Do you see where I'm at?
10   A.   Yep.
11   Q.   Hjordis said that "just down the street on North
12 Elm Street was the Mitchell residence.  Hjordis said she knew
13 Cherie Mitchell, who lived there, and her friend, Leah Freeman.
14 Hjordis said on this occasion John mentioned hearing Leah
15 yelling at somebody.  Hjordis said John told her he stopped and
16 talked with Dez Couch, another neighbor who is now deceased,
17 and overheard some yelling between Leah and somebody.  Hjordis
18 said John also mentioned that when he continued on his walk, he
19 passed Leah and Nick McGuffin standing in front of the
20 Mitchell's house."  Do you recall reading that report when it
21 was sent to you?
22   A.   Well, I must have read it, but I don't specifically
23 recall reading it --
24   Q.   Okay.
25   A.   -- at this point.

Page 149

1    Q.   Okay.
2        (Document marked for identification as Deposition
3        Exhibit 12.)
4  BY MR. LAUERSDORF:
5    Q.   Okay.  You've been handed what's been marked as
6  Exhibit 12.  Do you recognize that document?
7    A.   No.
8    Q.   Have you ever seen that document before?
9    A.   No.
10   Q.   Do you recognize the handwriting?
11   A.   No.
12   Q.   And that document does not have your Bates
13 numbering on it, does it?
14   A.   No.
15   Q.   And that document was not attached -- you can see
16 there it says "Hjordis Lindegren 5/19/2010 at library."  And
17 this document was not attached to Webley's report, Exhibit 11,
18 the way that the notes were attached to McNeely's report,
19 Exhibit 10, was it?
20   A.   I don't know who wrote this, so I can't say it's
21 Officer Webley or not.
22   Q.   Okay.  But there it indicates, similar to the
23 report, "avid Survivor fan, watching Survivor on TV, brother
24 over with dog, night Rudy got voted off upset, watched till end
25 of show, brother got up, took dog for walk, got back."

Exhibit 3, Page 13 of 52

Robert Paul Frasier
August 29, 2023

Page 150

1        And down at the midway point again, it says
2  "Maybe" -- "May have left a few minutes before end but after
3  Rudy voted off."
4        And then down at the bottom it says "Continues walk
5  and passed people in front of house (Leah/Nick)."
6        So these notes would indicate that it was Hjordis
7  Lindegren who remembered the night in question because she was
8  upset that Rudy was voted off Survivor that night.  Is that
9  what you take from this document?
10       A.  I don't know what to take from the document.  I
11 have not seen this before, so I -- I can't comment on what
12 Officer Webley meant when he wrote these notes.
13       Q.  Okay.  Okay.  Let's go to ...
14           (Document marked for identification as Deposition
15           Exhibit 13.)
16 BY MR. LAUERSDORF:
17       Q.  Okay.  You've been handed what's been marked as
18 Exhibit 13.  Do you recognize that document at all?
19       A.  No.
20       Q.  Do you recognize the handwriting on page -- either
21 page 1 or page 5?
22       A.  No.
23       Q.  Have you ever seen this document before today?
24       A.  No.
25       Q.  And that document does not have your Bates

Page 151

1  numbering on it either, does it?
2        A.  No.  It does not.
3        Q.  And that document was not attached to either of the
4  Lindegren reports, like the Directory of Prime Time Network and
5  Cable TV Shows was attached to Exhibit 10.  Is that right?
6        A.  That's correct.
7        Q.  And there it shows, on page 5, that the person who
8  was voted off of Survivor on the night that Ms. Freeman
9  disappeared was actually a man named Dirk.  Do you see where
10 I'm at?
11       A.  Yeah.
12       Q.  And Dirk isn't the name that was attributed to John
13 Lindegren, is it?
14       A.  I don't know if John ever told me specifically who
15 got voted off.  I do know that somebody told me that it was
16 thought to have been Rudy, but I don't recall who told me that.
17       Q.  Okay.  And down there at the bottom of page 5 with
18 the date August 23rd, 2000, highlighted and circled -- and I'll
19 represent to you that's not my highlighting; that's in the
20 original document.  August 23rd, 2000, eliminated that date was
21 Rudy.  And that's in the "Season Finale."  Do you see where I'm
22 at?
23       A.  Right.
24       Q.  So that would have been a month and six episodes
25 after Ms. Freeman disappeared.  Is that right?

Page 152

1        A.  Apparently.
2        Q.  Now, if you go back to Exhibit 12, do you see there
3  where it says "Night Rudy got voted off upset," somebody has
4  crossed that off, haven't they?
5        A.  That's what's on the document.
6        Q.  And next to it they've written "wrong episode."  Do
7  you recognize that handwriting at all?
8        A.  No.
9        Q.  Do you know who wrote that?
10       A.  No.
11       Q.  And then if you go back to Exhibit 11, there's no
12 mention in that report, in the discussion about Hjordis,
13 there's no mention of her identifying the wrong episode.
14 There's no mention of her identifying the episode as the one
15 where Rudy got voted off, is there?
16       A.  No.
17       Q.  In fact, Hjordis' identification of the wrong
18 episode was never reported in any police report, was it?
19           MR. DAVIS:  Objection.  Assumes facts.
20       A.  I don't recall that ever being told to me or me
21 having read it.  If this information had been given to me, I
22 would have done something different with Big John.
23 BY MR. LAUERSDORF:
24       Q.  If that information had been provided to you, at
25 the very least, you would have expected it to be in a report,

Page 153

1  and you would have provided that to Mr. McGuffin's defense
2  team.  Right?
3        A.  Yes.
4        Q.  Because that would tend to undermine
5  Mr. Lindegren's credibility, wouldn't it?
6        A.  Absolutely.  Well, I'm not so sure it would
7  underline Big John's credibility because I don't recall if he's
8  the one that we got the information from about Rudy.  It
9  certainly would undermine his sister's testimony.
10       Q.  If Big John had come into the grand jury and
11 testified that it was Rudy that had been voted off the night
12 that he remembered seeing Leah --
13       A.  Well, that could be.  I don't -- I don't recall
14 that he testified to it.  But if he --
15       Q.  No.  I'm just asking if he had come into grand jury
16 and testified to that effect, would that have changed your
17 approach to the trial?
18       A.  It would have changed my approach with John
19 Lindegren.  I don't know if it would have changed my approach
20 to the trial.
21       Q.  Okay.
22       Q.  You know, if I'd have known what's in this
23 particular document, I would have -- I would have said -- and
24 I'm referring to Exhibit 13.  Had I known what's in this
25 document, I would have said, okay, we need to -- we've got a

Robert Paul Frasier
August 29, 2023

Page 154

1  problem here, and we need to resolve this one way or the other.
2       Q.   And do you ever -- so you don't ever recall seeing
3  a report where Hjordis's misidentification was reported.  Do
4  you ever recall seeing a report where anybody reported, hey,
5  somebody went in and crossed this information out and ...
6       A.   No.  I mean, the information I had going into grand
7  jury and trial was that -- was what I've stated so far, is that
8  he claimed to have seen Leah and Nick outside of the Mitchell
9  residence on the evening in question sometime after 9:00
10  o'clock.  And then when I questioned it, they said, well, it's
11  based on Survivor.  And then when I questioned it some more,
12  they kept bringing me information that, okay, it was on
13  Wednesday night versus Thursday night.  And I don't recall
14  where the information about Rudy getting voted off came from,
15  whether that was from John -- I don't recall it coming from
16  John -- or whether it was from his sister.
17       But had I known what's in this document, 13, had I
18  known that Rudy was voted off in the next-to-the-last episode,
19  I would have said, "Hey, guys, we've got an issue, and we need
20  to fix this, or we need to figure out what's going on."
21       Q.   And just that document alone, Exhibit 13 -- or
22  Exhibit 13 and Exhibit 12, if those documents had been provided
23  to you, you would have produced them to Mr. McGuffin's defense
24  team in discovery.  Correct?
25       A.   That's correct.  I would have.

Page 155

1       Q.   Okay.  If you go back to Exhibit 10, and this is
2  Officer McNeely's report of his interview and meeting with
3  Mr. Lindegren, he doesn't mention in his report that Lindegren
4  told McNeely that he was not certain that the person he saw was
5  Mr. McGovern, does he?
6       MR. DAVIS:  Sorry, Counsel.  Can you tell me where
7  we are again?
8       MR. LAUERSDORF:  We're on Exhibit 10, page 1.  This
9  is McNeely's meeting with Bowersox and Lindegren at Coquille
10  Police Department and then a subsequent meeting the next day
11  with Webley and Lindegren outside of Cherie Mitchell's house.
12       MR. DAVIS:  Thank you.  Sorry to interrupt your
13  questioning.
14       MR. LAUERSDORF:  That's okay.
15       A.   I don't remember the question now.
16  BY MR. LAUERSDORF:
17       Q.   The question was McNeely doesn't -- Officer McNeely
18  doesn't mention in his report anywhere that Mr. Lindegren told
19  him -- Officer McNeely -- that he was not certain that the --
20  that Lindegren was not certain that the person he saw was
21  Mr. McGuffin that night?
22       A.   I don't see anything in that report that says that.
23       Q.   Okay.  And he doesn't mention in his report
24  anywhere that Mr. Lindegren told McNeely that the two people he
25  saw were not actually in the street but standing by a carport

Page 156

1  at the opposite end of the driveway at 444 1/2 North Elm
2  approximately 25 to 30 feet away from the road.  He doesn't
3  mention that, does he?
4       A.   I don't see that, no.  But the Mitchell home was
5  tucked in behind 444.  It's 444 1/2, and there is a driveway
6  that leads from there to the road, which is about 20, 30 feet
7  long, maybe longer.
8       Q.   And Officer McNeely doesn't report in there that
9  Lindegren actually told him that he saw those people down at
10  the end of that driveway by the carport, does he?
11       A.   No.  He had Lindegren stand, and they put down
12  cones and they photographed him, where he said he saw him.
13       Q.   And he doesn't report in there that the traffic
14  cones -- that Lindegren had told him that the traffic cones
15  were actually where the truck was that Mr. Lindegren saw that
16  night and not where the two people were.  He doesn't put that
17  in his report, does he?
18       A.   I don't see that, no.
19       Q.   And he doesn't mention in his report that he spoke
20  to Lindegren at length about what happened on Survivor on the
21  night in question or that the interview was recorded, does he?
22       A.   No.
23       Q.   Have you ever seen those things reported anywhere?
24       A.   No.
25       Q.   If that information had been memorialized in police

Page 157

1  reports or other documents and provided to you, you would have
2  provided those documents to Mr. McGuffin's defense team during
3  this prosecution, wouldn't you?
4       A.   Yes.
5       Q.   Go to Exhibit 14.
6       (Document marked for identification as Deposition
7       Exhibit 14.)
8  BY MR. LAUERSDORF:
9       Q.   So, Mr. Frasier, if you will -- you've been handed
10  what's been marked Exhibit 14.  If you could go ahead and look
11  that over and let me know when you're comfortable with it.
12       A.   Yes, I'm familiar with this.
13       Q.   And we talked a little bit about this earlier, I
14  think.  This is Deputy Zanni's that -- well, what is this?
15  What do you recognize this as?
16       A.   Well, this is a document that Craig Zanni brought
17  to me the day after I had that meeting with Mr. Walter at
18  Coquille City Hall in the chief's office.  He brought this to
19  me the next day.
20       Q.   Okay.  This document is dated 6/30/2010 at the top.
21  Is that right?
22       A.   Yes.
23       Q.   Okay.  And he says "Paul, thought you might want to
24  know some of this info.  The Jack the Ripper story piqued my
25  curiosity."  And then it's signed with his initials CZ.  Right?

Robert Paul Frasier
August 29, 2023

Page 158

1    A.   Right.

2    Q.   And then he says "See pages 3 through 24," which is

3  the Drake vs. Portuondo case.  Is that right?

4    A.   Correct.

5    Q.   The Second Circuit case you mentioned earlier?

6    A.   Right.

7    Q.   So was grand jury scheduled already at this point,

8  6/30/2010?

9    A.   I -- I'd have to go back and look at my motion

10  requesting a special panel.  I don't know if I had actually

11  requested the panel at that point or if that was -- I knew I

12  was going to request a panel from the Court, just one -- a

13  panel to hear this one case, and so -- but I don't recall when

14  I requested it.  So I can't tell you if it was before or after

15  I got this information.

16    Q.   Okay.  But it's very close in time.  Right?  It's

17  less than a month from --

18    A.   Yes.

19    Q.   -- when your first witness was examined?

20    A.   Right.

21    Q.   Do you recall talking to Deputy Zanni about this?

22    A.   Yes, I do.

23    Q.   What was the conversation?

24    A.   Well, the evening before we had -- again, I told

25  you about -- where I told Mr. Walters that the article he

Page 159

1  originally gave me didn't fit.  And that's when he gave me the

2  second article, and I didn't have to time to look at it or read

3  it at that time.  We had gone to dinner that night, the sheriff

4  and I -- that would be Craig Zanni -- the sheriff and I, Chief

5  Dannels, and Mr. Walters.  There was a couple of other people

6  there.  I don't recall who they were.  We went to dinner that

7  night, and during dinner Mr. Walter regaled us with his story

8  about how he had been involved in the investigation of Jack the

9  Ripper with Scotland Yard.

10        I had ridden over with Craig Zanni to the dinner.

11  We went to Bandon Dunes.  And on my way back, Craig told me --

12  he said, "Paul, this guy doesn't know what the heck he's

13  talking about Jack the Ripper."  And it turned out Craig

14  is kind of a Jack the Ripper buff, I guess.  I don't know, but

15  he had some knowledge about the case, and he says, "Some of

16  this stuff he said wasn't true."

17        And I said to him, "Well, you know, we've been

18  thinking about calling him as a witness, but we have never

19  vetted him.  We need to vet him."  And I asked him that night,

20  "Would you vet him for me?"

21        Okay.  The next morning, first thing in the

22  morning, he's in my office with this (indicating).

23    Q.   Okay.

24    A.   And he hands me this, and I read this case, and I'm

25  going, "Okay.  We can't use this guy, and we need to

Page 160

1  disassociate ourselves totally and completely from him."

2    Q.   So if I -- and I might have misheard you, but if I

3  understand you correctly, it was the night that Walter had come

4  into your office, and you had said earlier that Chief Dannels

5  had sent Walter to you to try to persuade you to --

6    A.   Right.

7    Q.   -- speed up the grand jury.  And during that

8  meeting he had given you this second article that you didn't

9  have a chance to --

10    A.   That's right.  Because the conversation about grand

11  jury was very short and to the point.

12    Q.   And then so it was that same night that you

13  went out to dinner with Dannels and Zanni and Walter?

14    A.   Yes.

15    Q.   Okay.  So at that point, end of June, somebody is

16  still working with Walter and Vidocq.  Right?  I mean, is it

17  Dannels, or is you, or is it who?

18    A.   Well, 20/20 flew him out --

19    Q.   Okay.

20    A.   -- and he was there because of 20/20.

21    Q.   Okay.

22    A.   When he was talking with us in Pennsylvania, you

23  know, he was saying stuff.  You know, he was claiming to be an

24  expert on this and so forth, and we were seriously thinking

25  about is this a potential witness for us in this trial.  But

Page 161

1  after dinner that night, you know, I said, "We haven't vetted

2  this guy.  We need to vet him."

3    Q.   Okay.

4    A.   And that's when this stuff came up.  And he was

5  there in Coquille that week, not because we brought him out; it

6  was because 20/20 brought him out.

7    Q.   Okay.  So up until this point, though, June 30th,

8  2010, you were still considering using him as a witness?

9    A.   Until I got this stuff, yeah.

10    Q.   Okay.  Let's see.  So let's move on to the last --

11  getting close to the last issue.  You -- it's 2:00 o'clock.

12  Are you okay?  Are you good?

13    A.   I'm doing fine.

14        MR. LAUERSDORF:  Everybody okay?  Anybody need a

15  break?

16        (No response.)

17  BY MR. LAUERSDORF:

18    Q.   Okay.  We'll keep going.

19        So the next thing I want to talk about, then, is

20  Brady issues and Brady vs. Maryland.  Do you know what I'm

21  talking about when --

22    A.   Yes, I do.

23    Q.   -- I refer to Brady vs. Maryland?

24    A.   Yes, I do.

25    Q.   So when a felony case goes up through charging and

Robert Paul Frasier
August 29, 2023

Page 170

1    Q.   And that includes the -- your obligations to turn
2  over all discovery to criminal defendants?  There are some
3  statutes that address that as well.  Right?
4    A.   That's correct.
5    Q.   And during your office's prosecution of
6  Mr. McGuffin, you turned over to the defense all of the
7  information, documents, intangible evidence that you had in
8  your possession or control.  Right?
9    A.   Yes.
10    Q.   Is there anything special or out of the ordinary
11  about the process of obtaining discovery information from the
12  Coquille Police Department?
13    A.   No.  Whenever they have a report, they take -- they
14  hand-deliver them.  They're here in town, so they hand-deliver
15  them.  They don't mail them.  They bring them to the office.
16    Q.   Okay.  Is there anything special or out of the
17  ordinary about the process of obtaining discovery information
18  from the Oregon State Police?
19    A.   No.  They mail their reports -- well, occasionally
20  they'll mail their reports.  A lot of times a trooper, if
21  they're headed this way, they'll hand-deliver their reports to
22  the office.
23    Q.   Okay.  Is there anything special or out of the
24  ordinary about the process of obtaining discovery information
25  from the Oregon State Police Crime Lab?

Page 171

1    A.   I think at the time of this case, they mailed their
2  stuff to us, and so I relied upon them to mail me their
3  reports.
4    Q.   Okay.  Do you remember in the PCR hearing, in the
5  PCR process, you hired an expert, a DNA expert?  Right?
6    A.   Yes.
7    Q.   And why was that?
8    A.   When I -- this was brought to my attention by
9  Ms. Puracal that there was unknown male DNA on the shoe, I made
10  inquiries about why wasn't this given to me or why wasn't I
11  told about this.  And I was told that it was, at the time,
12  within the discretion of the analyst to say yay or nay as to
13  whether or not it was a valid marker.
14    Q.   And yay or nay as to whether or not they were going
15  to report it?
16    A.   Right.  Whether it was background noise or a valid
17  something that should be reported.
18    Q.   Okay.
19    A.   They told me that they had a policy on that.  And
20  for some reason I thought, well, if they were within policy,
21  then we didn't have a PCR issue.  So I asked -- I hired an
22  outside expert to look at their policies to make sure that that
23  was in fact the case, that at the time that the DNA was done
24  back in 2000, 2001, whenever it was, is that they were
25  following their established policy.  And I had this idea in my

Page 172

1  head that if it was within an established policy, that that
2  would probably end the PCR.  And it turned out I was wrong, but
3  anyway.  So I hired him to look at the policies.
4    Q.   Okay.
5    A.   I did not hire him to look at the results.
6    Q.   Okay.  And his conclusion was?
7    A.   His conclusion was that -- as I recall it, he said
8  that he wasn't provided a written policy but that there was a
9  verbal policy and -- that allowed the scientist to do what she
10  did in that particular case.
11    Q.   Didn't he use the word "flabbergasted" in his
12  communications with you?
13    A.   He may have.
14    Q.   He didn't agree with what the lab had done, did he?
15    A.   I don't think so.
16    Q.   Is there anything special or out of the ordinary
17  about the process of obtaining discovery information from the
18  Coos County Sheriff's Office?
19    A.   No.  They're in the same building as us.  They
20  hand-deliver all of their reports directly to the office.
21    Q.   Okay.  Is there anything special or out of the
22  ordinary about the process of obtaining discovery information
23  from the Coos Bay Police Department?
24    A.   They mail all of their reports to us.
25    Q.   How many police agencies are there in Coos County?

Page 173

1    A.   We have 10.
2    Q.   And out of all of those agencies, is there anything
3  about Coquille PD and how they delivered discovery in the
4  McGuffin case that sticks out in your mind at all?
5    A.   No.  They gave me discovery as they normally would
6  in any case.
7    Q.   Okay.  And at the time of the McGuffin prosecution,
8  Coquille Police Department and Coquille Police Department
9  police officers had the same obligations as all of the other
10  police agencies and officers in Coos County.  Is that right?
11    A.   Yes.
12    Q.   And is the same true for Coos County Sheriff's
13  Office and the --
14    A.   Yes.
15    Q.   -- sheriff deputies?
16      And is the same true for Coos Bay Police Department
17  and its officers?
18    A.   Yes.
19    Q.   Is there anything about the Oregon State Police
20  Crime Lab and how they delivered discovery in the McGuffin case
21  that sticks out in your mind?
22    A.   No.  They sent the reports as they normally do.
23  This was one of the first cases where I had requests for the
24  DNA data files, the crime lab bench notes, and so forth.
25  That's one of the first I had ever had somebody request that,

Robert Paul Frasier
August 29, 2023

Page 174

1  and I got those from the crime lab.  I didn't have any issue.
2  They promptly sent me the documents.  I think they scanned them
3  and sent to me on a CD or something like that.
4       Q.   And you mentioned -- I think you mentioned in your
5  letter to Mr. Reim that you had a lot of respect for Shaun and
6  Bob McCrae.
7       A.   I do.
8       Q.   And then I think you actually wrote that you
9  considered them two of the finest defense attorneys you had
10 ever worked with.
11      A.   Yes.
12      Q.   And so you knew them to be thorough?
13      A.   I did.
14      Q.   And diligent in their discovery efforts?
15      A.   Yes.
16      Q.   And I guess that was the first time that somebody
17 had requested the bench notes.  That's a good example of --
18      A.   Yeah, they requested the -- the DNA data files is
19 what they requested, and I got that for them.
20      Q.   Is there anything that you recall in particular or
21 anything that stands out in your mind about receiving any
22 information or discovery materials from any individual officer
23 or deputy during your prosecution of Mr. McGuffin?
24      A.   Other than maybe an officer walking in and said,
25 "Here, Paul, is your report that you requested on that issue."

Page 175

1  Outside of that, no.
2       Q.   Okay.  Is there any information that you were
3  provided by any individual officer or deputy or police agency
4  that you withheld from Mr. McGuffin's defense counsel?
5       A.   No.
6       Q.   As part of your prosecution of Mr. McGuffin, did
7  you ever personally go to Coquille PD to inspect their physical
8  files related to the Freeman investigation?
9       A.   No, I did not.
10      Q.   Did you send anyone else to do that?
11      A.   No.  I relied upon them to give me the stuff.
12      Q.   Did you ever personally go to the Oregon State
13 Police Crime Lab to inspect their physical files or facilities
14 related to the Freeman investigation?
15      A.   No.
16      Q.   Did you ever sit down with anyone from the crime
17 lab prior to trial to discuss their findings and conclusions?
18      A.   I don't think I did because we reached a
19 stipulation that we wouldn't need to call them.  So I don't
20 believe we did any pretrial prep with any DNA person.
21      Q.   Okay.  And that stipulation was based on their
22 reports that omitted --
23      A.   Right.
24      Q.   -- what they called a low level DNA?
25      MR. DAVIS:  I'm going to object to the

Page 176

1  characterization and the mischaracterization.
2  BY MR. LAUERSDORF:
3       Q.   Is that correct?
4       A.   We relied upon the reports that we had from the
5  state police.
6       Q.   Okay.  Which did not disclose the presence of any
7  unknown or unidentified male DNA on the shoes.  Correct?
8       A.   That's correct.
9       Q.   Do you recognize the name Kelly Crowder?
10      A.   The name sounds familiar, but I'm not placing it.
11      Q.   How about Billy Richardson?
12      A.   Again, sounds familiar, but I'm not placing it.
13      Q.   Do you recall either of them being considered as
14 suspects in Ms. Freeman's --
15      A.   They might have been, but I don't recall off the
16 top of my head.
17      Q.   If they had been suspects or considered as suspects
18 or eliminated as suspects in the death of Leah Freeman, would
19 you expect that there would be reports to that effect?
20      MR. DAVIS:  Objection.  Calls for speculation;
21 incomplete hypothetical.
22      A.   Well I don't recall their names being connected
23 with this case at all, so if they were potential suspects, I'm
24 assuming they would have been on a list someplace, but I don't
25 recall their -- how they're a connection to the case.

Page 177

1  BY MR. LAUERSDORF:
2       Q.   And if -- I mean, if they had been potential
3  suspects and they had been eliminated as suspects, wouldn't you
4  expect there to be a police report to that effect?
5       A.   Sure.
6       Q.   Do you have any documents in your personal
7  possession related to the Freeman investigation or your
8  prosecution of Mr. McGuffin?
9       A.   I have the documents, those 6,000 pages and stuff
10 that have been referred to here today.  I have copies of the
11 discs that --
12      Q.   Are -- I'm sorry to interrupt you.  Are those in
13 your possession as the district attorney of Coos County, or are
14 those in your personal possession?
15      A.   They're in the possession of the District
16 Attorney's office.
17      Q.   Okay.  And I'm asking if you keep a personal file,
18 if you have any documents that you keep personally from the
19 McGuffin prosecution?
20      A.   Well, there may be on my computer or a file at the
21 office, but, no, I don't have a -- I don't keep a separate file
22 for personal reasons.
23      Q.   Okay.  I want to take you back to Exhibit 5, which
24 is your discovery log.
25      A.   Okay.  Okay.

Robert Paul Frasier
August 29, 2023

Page 178

1    Q.    So this is the discovery log, the discovery list.
2    We talked about it earlier.  This is a document that you
3    personally created.  Is that right?
4    A.    Yes.
5    Q.    And this is a log of discovery describing the
6    documents that you produced to the defense in the McGuffin
7    criminal case.  Is that right?
8    A.    Yes.
9    Q.    And this is a complete list of all of the documents
10   that your office produced to Mr. McGuffin's defense team.
11   Correct?
12   A.    Well, I think we discovered in the PCR that it is
13   not a complete list because there are multiple pages that have
14   Bates numbers that I know I gave to the defense that somehow
15   did not make this document.  And I can't explain that, but
16   anything that's got a Bates number on it I gave to the defense.
17   And there are documents that were shown to me during the PCR
18   that are not on this list that are Bates-numbered, and there
19   are incorrect numbers.
20   Q.    Okay.  So it may be that a document does not appear
21   on this list or does not appear within the production of these
22   number ranges, but you still believe that you produced it to
23   the defense team?
24   A.    Yes.
25   Q.    Okay.  So let me show you a few different things.

Page 179

1    So one of those documents that was brought up in the
2    post-conviction relief was the Nick Backman --
3    A.    Right.
4    Q.    -- tip sheet, right?
5    A.    Right.
6    Q.    So let's talk about that.
7          (Document marked for identification as Deposition
8          Exhibit 15.)
9    BY MR. LAUERSDORF:
10   Q.    So this is the Nick Backman tip sheet that came up
11   at the post-conviction relief hearing.  And I understand that
12   you believe this was produced to the McCraes during
13   Mr. McGuffin's prosecution.  Is that correct?
14   A.    Well, it's got a Bates number on it, so I was -- I
15   would have sent it.
16   Q.    The Bates number there -- before we talked earlier
17   about the Bates number being underscored.  And on this one the
18   Bates number is not underscored.  Do you know why that would
19   be?
20   A.    No.  I just didn't do any special settings on -- I
21   was just learning how to use the Bates-numbering system in
22   Adobe Acrobat, so I did not do anything special with it.
23   Q.    Okay.
24   A.    So whatever the computer program decided to do that
25   day, that's what it was.

Page 180

1          MR. LAUERSDORF:  Okay.  And then this will be
2    Exhibit 16.
3          (Document marked for identification as Deposition
4          Exhibit 16.)
5    BY MR. LAUERSDORF:
6    Q.    Do you recognize Exhibit 16 at all?
7    A.    Yes.  It's got my handwritten 15 on it, and it does
8    have a Bates number on it.
9    Q.    The Backman tip sheet doesn't have your handwritten
10   number on the top, does it?
11   A.    No.
12   Q.    Why is that?
13   A.    There apparently were documents that didn't make it
14   to my binders.  And, again, I don't know how I missed that, but
15   there are documents -- this appears to be -- the Backman tip
16   sheet appears to be a document that didn't make it to the
17   binders.
18   Q.    Okay.  And so these two documents -- this other
19   document, Exhibit 16, that came up at the post-conviction
20   relief hearing as well.  Right?  You were asked about these two
21   documents and why they had the same Bates number.  Right?
22   A.    Well, I don't -- I don't remember being questioned
23   about it, but I probably was.
24   Q.    Okay.  The Backman tip sheet, in particular, is
25   important.  Right?  So he says -- Zanni goes out -- or Zanni

Page 181

1    is -- do you recognize the handwriting on the Backman tip
2    sheet, Exhibit 15?
3    A.    Well, I recognize the signature, and I think that's
4    Craig's handwriting, but I'm not sure, 100 percent certain, but
5    I think it is.
6    Q.    Okay.  So he says Backman was interviewed at 1352
7    on September 20th, 2000.  "Believes he did see victim on June
8    28, 2000, at 2100 when using ATM at credit union.  Checked with
9    credit union and confirmed a $10 withdrawal on 6/28/2000 at
10   9:04 p.m.  RP believes Leah walked by at that time.  He
11   described her clothes accurately.  He then went to Fast Mart to
12   get something to eat.  He stated there was hardly anyone around
13   at Fast Mart."
14         So Zanni says he went to the credit union and
15   checked with them, so he must have -- well, did Zann- -- did
16   Craig Zanni ever tell you that he interviewed Nick Backman and
17   that Nick Backman brought him the receipt from his transaction
18   at the credit union?
19   A.    I don't recall Craig ever telling me this.
20   Q.    Okay.  If Craig -- if Nick Backman provided his ATM
21   receipt with a timestamp on it to Deputy Zanni at the time in
22   2000, that would be something that you would expect to appear
23   in a police report?
24   A.    That's correct.  That's the other thing.  I checked
25   Craig's report.  There's nothing in his reports about this.

Robert Paul Frasier
August 29, 2023

Page 182

1    Q.   And is that -- that receipt something that you
2    would expect to have been taken into evidence and preserved?
3    A.   Certainly.
4    Q.   And if that was reported in a police report and
5    that receipt was taken into evidence, that's something that you
6    would have turned over to the defense in the criminal
7    prosecution of Mr. McGuffin.   Right?
8    A.   That's correct.
9    Q.   Okay.   And I know you don't -- you're not
10   comfortable using the words "critical" and things like that,
11   but if there's a -- did you ever interview Mr. Backman?   Do you
12   know if anybody ever did?
13   A.   I didn't know he existed.   I don't recall this tip
14   sheet at all.
15   Q.   Okay.
16   A.   The only time that I can recall this ever being
17   brought to my specific attention was during the PCR case.
18   Q.   Okay.   So -- but if there was a witness with a
19   time-stamped ATM receipt that put Ms. Freeman at a specific
20   location at a specific time, that would be important to your --
21   your consideration on how to proceed.   Right?
22   A.   Certainly.
23   Q.   Because timeline was a big issue in Mr. McGuffin's
24   case, wasn't it?
25   A.   Right.   And we had people that were all over

Page 183

1    everywhere in terms of you, know, what time was it when she was
2    at McKay's, what time was it when she was at Hunter's, what
3    time was she -- because I think we had another person who put
4    her at the bank.   What time was it that she was over by the
5    Chevron?   People were all over the place in terms of their
6    times.
7    Q.   There was a lot of estimates.
8    A.   That's correct.
9    Q.   And so a time-stamped document from a witness who
10   knows -- who knew Ms. Freeman would be a pretty important piece
11   of evidence.   Right?
12   A.   Well, it's something we certainly would put into
13   our timeline, yes.
14   Q.   Okay.   And I think the explanation you gave when
15   you were deposed about these two documents during
16   post-conviction -- the post-conviction proceedings was that you
17   must have lost sight of where you left off in the
18   Bates-labeling and doubled up when you created Exhibit 16?
19   A.   Yeah.   This was the first time I was experimenting
20   with Bates-numbering with Adobe Acrobat, and so I -- that's the
21   only thing I can think of, that I screwed up on where I left
22   off and so forth.
23   MR. LAUERSDORF:   Okay.   So we're going to -- we're
24   going to do a little experiment here, and it's going to be a
25   little bit hit or miss.   We'll see where we go.   So this is

Page 184

1    going to be Exhibit 17.
2    (Documents marked for identification as Deposition
3    Exhibits 17 through 20, respectively.)
4    BY MR. LAUERSDORF:
5    Q.   Now, it might -- go ahead and take a look at --
6    you've been handed what's been marked Exhibits 17, 18, 19, and
7    20, and it might be easier to have them -- have all four of
8    them in front of you at the same time.
9    A.   Okay.
10   Q.   We can make you some room here.   At least you
11   won't -- I won't be asking you questions about these again,
12   but ...
13   And so these are -- you see, on Exhibit 17, you've
14   got your handwritten number 2 up there in the right-hand
15   corner.   Right?
16   A.   Right.
17   Q.   And then you've got your underlying Bates Label
18   002943.   Right?
19   A.   Right.
20   Q.   And that's Document 2943 through 2948, handwritten
21   numbers in the top right of each corner.   Right?
22   A.   Yes.
23   Q.   So then you go to Exhibit 18, and that's got the
24   same Bates number, 2943, but this one is not underscored, and
25   this one does not have your handwritten number in the upper

Page 185

1    right-hand corner.
2    A.   Right.
3    Q.   And then if you go to Exhibit 19, same issue.
4    Bates label not underscored.   No handwritten numbers up in the
5    upper right.   And then when you go to Exhibit 20, Bates number
6    underscored; handwritten numeral in the upper right-hand
7    corner.   And the thing that's -- you also notice on Exhibit 18
8    and Exhibit 19 is they're stamped at the bottom "CONFIDENTIAL -
9    SUBJECT TO PROTECTIVE ORDER, Coquille."   Do you see where
10   that's at?
11   A.   Yeah.   I see that.
12   Q.   And so it looks to me, and I could be wrong, and
13   that's why I'm asking you to help me understand, that there are
14   two different people Bates-labeling these documents.
15   A.   No.   It was just me.
16   Q.   Just you.   Okay.   And do you have any explanation
17   for how all of these documents ended up with the same Bates
18   numbers?
19   A.   I don't other than I was -- this was the first time
20   I used it, and I obviously made mistakes in keeping track of
21   where I was on the list.   But I was the one that did all of it.
22   Q.   Okay.   And if it has a Bates number, it was
23   produced to the McCraes?
24   A.   That is my recollection, yes.   If it was
25   Bates-numbered, it was given to them.

Robert Paul Frasier
August 29, 2023

Page 186

1    Q.   Okay.

2    A.   My recollection is I put everything that was

3  Bates-numbered on DVDs or CDs.  I did not give them paper

4  copies.

5    Q.   Okay.  Let's go to the next exhibit, which is going

6  to be 21.

7         (Document marked for identification as Deposition

8         Exhibit 21.)

9  BY MR. LAUERSDORF:

10   Q.   So you're being handed what's been marked as

11  Exhibit 21.  Can you take a look at that document and tell me

12  if you recognize that document at all.

13   A.   I don't -- I recognize it as a tip sheet, but I

14  don't recognize the document.

15   Q.   Okay.  Do you recall ever seeing that document

16  before?

17   A.   I don't recall seeing this document before.

18   Q.   And that's a tip sheet regarding David Jenkins.

19   A.   That's what it purports to be, yes.

20   Q.   Do you recognize the handwriting on the document in

21  the reporting sections?

22   A.   What's on the top, I don't know who wrote that.

23  What's down below in the "Additional Information" section kind

24  of looks like Craig Zanni's writing, but I'm not sure.

25   Q.   Okay.  And this was a tip that had come in from

Page 187

1  this, I guess, young woman at the time, Kim Peet, that she was

2  at a party behind Safeway, and she overheard a conversation

3  with Nick McGuffin and David Jenkins, where David asked Nick

4  about him getting carried away with strangling Leah.  And then

5  Jenkins is interviewed, and he admits that he was at the party

6  at Michelle's.  David and Richard Bryant were there, Michelle,

7  David Jenkins, and Misty.

8         There's a little circled comment up there,

9  "According to Jenkins and others, Nick was not at this party."

10  But then down on this last line, there's a -- or three lines up

11  from the bottom, "There was a conversation between David

12  Jenkins and Richard Bryant about Leah, because Richard had

13  heard a lot of stuff from his dad and was blabbing his mouth.

14  David spoke with him."

15         Do you know who Richard Bryant's dad was?

16   A.   No.

17   Q.   Do you remember who Officer Dave Hall was?

18   A.   Yes, I do remember Dave Hall, but I didn't know who

19  his children were.

20   Q.   Okay.  If Richard Bryant was David Hall's son and

21  the -- where it says "Richard had heard a lot of stuff from his

22  dad," the dad was David Hall, and Richard "was blabbing his

23  mouth about it," is that something that you would expect to be

24  recorded in a police report?

25   A.   Well, maybe.  Yes.

Page 188

1    Q.   Do you remember -- do you remember the role that

2  Richard Bryant played in -- with the grand jury and at trial?

3    A.   I would have to go back and look.  I don't

4  specifically recall what he testified to, no.

5    Q.   Okay.  Do you remember a police report -- there

6  being a report of a jail-house snitch who had apparently heard

7  Mr. McGuffin say something about seeing Leah lying there with

8  her head on a rock and --

9    A.   I remember the conversation, yes.

10   Q.   Okay.  That was Richard Bryant.

11   A.   All right.

12   Q.   Okay.  And Richard Bryant was called to testify at

13  trial.  Is that right?

14   A.   Right.

15   Q.   Okay.  And if Richard Bryant was related to David

16  Hall, is that something that you would have expected to have

17  been reported somewhere and produced to the defense in

18  discovery in a criminal matter?

19        MR. DAVIS:  Objection.  Incomplete hypothetical;

20  compound.

21   A.   Well, the fact -- are you asking is the fact that

22  David Hall was his dad, should that have been in the report?

23  BY MR. LAUERSDORF:

24   Q.   Well, let's say the fact that David Hall was his

25  dad and that he had been hearing a lot of stuff from his dad.

Page 189

1  Should that have been in a police report that was produced to

2  Mr. McGuffin's defense team?

3    A.   Well, I don't know what was said or what supposedly

4  Mr. Hall said, so it's going to depend on what the conversation

5  was about before I can commit to say that a police officer

6  should have written it down and given me this information.

7    Q.   And the way you would know what the conversation

8  was about is if they wrote a report and told you what the

9  conversation was about.  Right?

10   A.   Either that or come and tell me personally about

11  it, but they didn't do either from my recollection.

12   Q.   Okay.  Do you -- do you know if this -- this

13  document doesn't have your Bates labels or your handwriting

14  note on it.  Do you know if this document was ever provided to

15  you?

16   A.   If it doesn't have my Bates number or my

17  handwriting on it, I don't believe it was ever given to me.

18   Q.   Okay.  And if it wasn't given to you, then you did

19  not produce it to Mr. McGuffin's defense team?

20   A.   If it doesn't have a Bates number on it, I would

21  not have given it to the defense.

22        MR. LAUERSDORF:  This will be Exhibit 22.

23        (Document marked for identification as Deposition

24        Exhibit 22.)

25  ///

U.S. Legal Support | www.uslegalsupport.com  186 to 189

Robert Paul Frasier
August 29, 2023

Page 190

1  BY MR. LAUERSDORF:
2      Q.  I'm showing you what's been marked as Exhibit 22.
3  Can you take a look at that document and let me know if you
4  recognize that document.
5      A.  I have not seen this document before.
6      Q.  Yeah, I mean, I -- I think we've figured out who
7  was the author of this document, but you have not seen this?
8  You don't have any idea who authored this document?
9      A.  No.
10     Q.  And do you know if this document was ever provided
11 to you as part of the McGuffin prosecution?
12     A.  Since it doesn't have a Bates number or a
13 handwritten number on there for me, no, I don't believe it was
14 ever given to me.
15     Q.  Okay.  And if it was never given to you, then you
16 did not produce it to Mr. McGuffin's defense team.  Is that
17 correct?
18     A.  That's correct.
19         (Document marked for identification as Deposition
20         Exhibit 23.)
21 BY MR. LAUERSDORF:
22     Q.  Okay.  You've been handed what's been marked as
23 Exhibit 23.  Can you tell me if you recognize that document?
24     A.  No, I don't.
25     Q.  Have you ever seen that document before?

Page 191

1      A.  I don't believe I have.
2      Q.  And that doesn't have your handwriting at the top
3  right, and it doesn't have your Bates-labeling, does it?
4      A.  No, it doesn't.
5      Q.  And that purports to be an email from Susan
6  Hormann.  Who is Susan Hormann?
7      A.  I believe she was at the crime lab, and if I
8  remember correctly, she was with the DNA portion of the lab.
9      Q.  Okay.  And that's from Susan Hormann to
10 Psmith@cityofcoquille.org.  Do you know who that is?
11     A.  That would be Pat Smith.
12     Q.  Okay.  Identified there as Lieutenant Smith?
13     A.  At the time he was Lieutenant Smith.
14     Q.  Okay.  She says there, "I have attached some
15 questions from the FBI.  I know the DA wants the hairs done
16 because the defense has made an issue if they are not
17 examined.  I know you have years of experience doing
18 investigations and I do not want to step on your toes, but I
19 want to be clear in the ramifications of your lab requests.
20 Often people are unaware that hairs can be so easily
21 transferred by direct contact or even through a secondary
22 transfer.  The following are topics to consider before
23 proceeding with the trace evidence."
24         And she says -- she says, Number 1 there, the value
25 of an association with anyone might be minimal.  In Number 2,

Page 192

1  she says, "You are almost guaranteed to find foreign hairs in a
2  trace exam.  This ends up giving the defense the bushy haired
3  stranger they are looking for."  And then she talks in Number 3
4  about trace can be of great value.
5          So if I understand this correctly, you wanted these
6  hairs run by the lab.  Is that right?
7      A.  I don't know what hairs we're talking about, so I
8  don't know where they came from or where they were found.  So I
9  don't know specifically where -- what hairs we're talking
10 about.  If there were some hairs that were like, say, found on
11 Leah's body or clothing or something along that line, I
12 probably would have said let's get them looked at.  But I don't
13 recall what hairs we're talking about, so I don't know exactly
14 what this request was about.
15     Q.  Okay.  But it indicates there that Ms. Hormann is
16 concerned about setting up a defense.  Right?  "The defense of
17 the bushy haired stranger"?
18         MR. DAVIS:  Objection.  Calls for speculation.
19     A.  She does say that.  I think she's trying to warn us
20 that, you know, the hair you found could have gotten there
21 anywhere, any way; do you really want to go down this road,
22 because you may not like the result.  I think that's what she's
23 trying to get across to us.
24 BY MR. LAUERSDORF:
25     Q.  And so what happened?  Did you go down this road or

Page 193

1  not?
2      A.  Well, I don't recall if we ever did any hair
3  analysis in the case at all because my recollection was that --
4  first of all, when was this done?
5      Q.  March 15th, 2010.
6      A.  Hair -- for purposes of comparison, like you want
7  to do a comparison with a potential suspect's hair, you want to
8  look at see if they're similar, after you've had them in
9  custody for a year or two, the hair structure changes or dries
10 out or whatever, so doing a comparison wouldn't do any good.
11 And if there weren't any root balls on the end of the hair,
12 then you wouldn't be able to do nucleic DNA.  So then what
13 you're left with, if you do do it, is mitochondrial DNA, which
14 does not give you an exact match as well as nucleic DNA does.
15         So I don't think we ever followed through with it.
16 I don't recall these reasons as being given to me as to why we
17 should not do it.  It just -- I think the message I got back
18 was the state police doesn't do mitochondrial, we're going to
19 have to send it to an outside lab, and then cost became an
20 issue.
21     Q.  Right.  Then we talked about that earlier when
22 you --
23     A.  Yeah.
24     Q.  -- you came up at that meeting, and it said, yeah,
25 send it to an outside lab.  Do you remember that in the H.I.T.

Robert Paul Frasier
August 29, 2023

Page 194

1  Team?
2      A.  Right.  But I think we were looking at -- there
3  were some things that we needed, and we were looking at a
4  quick, if you will, nucleic DNA.  You know, I think there were
5  some pop cans or something out at the scene that had never been
6  swabbed or anything, and so I was saying, you know, these
7  things that were seized at the scene up on the road and nobody
8  ever looked at them, we ought to look at them.
9      Q.  Okay.
10     A.  And if the crime lab is too busy or whatever, then
11  maybe we need to look at a private lab.
12     Q.  In any event, if this is something -- if this email
13  was something that was produced to you, would you have turned
14  it over to the defense in the prosecution?
15     A.  Oh, I'm sure I would have.
16         MR. LAUERSDORF:  24.
17         (Document marked for identification as Deposition
18         Exhibit 24.)
19  BY MR. LAUERSDORF:
20     Q.  So you've been shown what's been marked as
21  Exhibit 24 for identification.  Do you recall ever seeing that
22  document before?
23     A.  No.  I don't recall seeing this document.  Hm-mm.
24     Q.  And that's another document that doesn't have your
25  handwritten number up on the top right-hand corner, and it

Page 195

1  doesn't have your Bates-labeling.  Is that right?
2      A.  That's right.
3      Q.  And so if it doesn't have those -- that identifying
4  information, it's not something that you produced to the
5  defense during the McGuffin prosecution.  Is that right?
6      A.  That's correct.
7      Q.  In there this is -- it says there, second
8  paragraph, "This is Lt. James Pex and I am going to record
9  information on the scene."  Do you see where I'm at?
10     A.  Yes.
11     Q.  He says, down in the sixth paragraph, "A path will
12  be prepared along the side hill going to the body and we will
13  extract the body in a body bag and transport it for autopsy.
14  Several photographs will be obtained using 35-mm and video film
15  prior to that extraction."  Do you see where I'm at?
16     A.  Yes.
17     Q.  Is that the -- if you go to page 3 of that
18  document, is that the drawing that you were -- we talked about
19  earlier that in the H.I.T. notes they were trying to find a
20  diagram at the --
21     A.  No.
22     Q.  Oh, okay.
23     A.  No.
24     Q.  That's something different?
25     A.  Sergeant Stupfel was an accident reconstruction

Page 196

1  expert who mapped scenes, and particularly he would also map
2  outside scenes.  And there were notes that he had come out and
3  had mapped the scene.  I don't recall seeing Sergeant Stupfel
4  out there.  That's what we were looking for was his detailed
5  diagram, if he did one.
6      Q.  Okay.  So -- but in this document, there's a
7  detailed diagram that somebody did.  Right?  I guess I would
8  assume it was Pex, but I guess I don't know that for sure.
9      A.  Sure.
10     Q.  But this document -- if it had been provided to
11  you, is this document something that you would have produced to
12  the defense and then we got from prosecution?
13     A.  Well, this appears to be part of the bench notes
14  for Jim's work on the case.  And unless I was requested by the
15  defense -- I never requested bench notes prior to this case
16  until after this case, so this appears to be part of his
17  working file or bench notes.  Unless I was asked by the
18  defense, I would not have asked for his bench notes or his
19  working file.  I would have relied solely on his report.
20     Q.  Okay.  But this first page isn't a bench note.
21  That's a report, isn't it?
22     A.  No.  It appears to me that this is a transcript of
23  a recording he made for purposes of writing his report.  So I
24  think this is part of his file.  I don't think this is a report
25  in and of itself.

Page 197

1      Q.  Okay.  But in there he identifies several
2  photographs using 35-mm film and video film.
3      A.  Right.
4      Q.  So did you ever see the video film or the 35-mm
5  photos that he took?
6      A.  I believe we have his photographs that he took at
7  the scene.  I've never seen a video taken at the scene.
8      Q.  That's never been provided to you?
9      A.  I've never -- no.  It's never been provided to me.
10     Q.  Okay.  So it wouldn't have been produced to the
11  defense in this case?
12     A.  That's correct.
13     Q.  And that's something that -- if there was video of
14  the crime scene, that's something that the defense would
15  probably want to see.  Right?
16     A.  Sure.  And I would want to see it.  I would want to
17  use it at trial.
18     Q.  Okay.  So if it had been provided to you, you would
19  have produced it to Mr. McGuffin's defense team in this case,
20  in his prosecution?
21     A.  Absolutely.
22         MR. LAUERSDORF:  Okay.  Let's do 25.
23         (Document marked for identification as Deposition
24         Exhibit 25.)
25  ///

Robert Paul Frasier
August 29, 2023

1  BY MR. LAUERSDORF:

2     Q.  Okay.  You've been handed what's been marked as

3  Exhibit 25.  Do you recognize that document?

4     A.  Right.  Yes, I do.

5     Q.  Okay.  And that's the Evidence Accountability

6  Record for the Coquille Police Department?

7     A.  It appears to be, yes.

8     Q.  And that's got your Bates numbers at the top of it.

9  Correct?

10    A.  Yes.  And it's got my number 102 on it.

11    Q.  So that would be a document that you were provided

12 and that you subsequently produced to Mr. McGuffin's defense

13 team in the prosecution.  Is that right?

14    A.  I believe so, yes.

15    Q.  The first line item there is Evidence Number 224,

16 "Video Tape of crime scene."  Do you see where I'm at?

17    A.  Yeah.

18    Q.  So at some point there was a videotape of the crime

19 scene.  Is that your understanding of what that document is

20 reflecting?

21    A.  Well, the document reflects there was a tape.  I

22 never saw it.

23    Q.  Okay.  Do you know where that videotape is now?

24    A.  I've never saw it, and I didn't know it existed

25 until we -- this was brought up in the PCR case.

1     Q.  Okay.  Did you do anything to look for it when it

2  was brought up in the PCR case?

3     A.  Yes.

4     Q.  Did you find it?

5     A.  No.

6     Q.  Did anybody give you any -- did you talk to anybody

7  about who might have it or where it might be?

8     A.  Well, my recollection is that, when it came up, is

9  that there's a record someplace that said Ms. Karcher had

10 checked it out.  I then went and talked to Ms. Karcher to see

11 if I could run this videotape down, if it existed, because I

12 wanted to make sure that it was -- if it did exist, I wanted to

13 make sure that Ms. Puracal had it.

14        When I saw the document that said Kris Karcher had

15 checked it out, I then went and talked to Kris.  She told me

16 she did not recall checking it out.  She did not recall a

17 video.

18        MR. LAUERSDORF:  Okay.  So we'll take a break so

19 you can mark Exhibit Number 26.

20        MR. DAVIS:  Speaking of taking a break, Counsel,

21 when is an actual break going to happen?

22        MR. LAUERSDORF:  I've got up to 29, so I probably

23 need 10 more minutes.

24        MR. DAVIS:  Do you need a break, Paul?

25        THE WITNESS:  No, I'm fine.  I'm doing all right.

1        MR. FRANZ:  I need a bathroom break.  Can we do

2  five minutes?

3        MR. LAUERSDORF:  Yeah, let's take 10 minutes.

4  We'll come back at 3:00 o'clock.

5        MR. FRANZ:  Okay.

6        THE VIDEOGRAPHER:  We're going off the record at

7  2:52.

8        (Document marked for identification as Deposition

9        Exhibit 26.)

10        THE VIDEOGRAPHER:  We are back on the record at

11 3:04.

12 BY MR. LAUERSDORF:

13    Q.  Okay.  So, Mr. Frasier, you've been handed what's

14 been marked as Exhibit 26.  Can you take a look at that and

15 tell me if you recognize that document.

16    A.  Yes.

17    Q.  That's got your Bates label on it and your

18 handwritten number up on the top right corner.  Is that right?

19    A.  Right.

20    Q.  And that's the -- reason I just handed that out

21 is because that's the document you referred to as the Coquille

22 Police Department property receipt with Kris Karcher's

23 signature on it.  Is that correct?

24    A.  That's correct.

25    Q.  And that -- I think all -- did all three of these

1  documents come up at your deposition in the post-conviction

2  proceedings?

3     A.  They may have.  I -- right off the top of my head,

4  I don't know.

5     Q.  Okay.  This videotape has come up before.  Right?

6     A.  That -- that's correct.

7     Q.  Okay.  And if you look at Exhibit 25 and 26 -- so

8  25 is the Evidence Accountability Record.  The evidence number

9  for the videotape on that document is 224?

10    A.  Could be.  I don't -- I don't know.

11    Q.  Oh, okay.

12    A.  These are all mixed up, so I don't know where it's

13 at.

14        MR. DAVIS:  It should be pretty recent on there.

15    A.  There it is.  Yeah.

16 BY MR. LAUERSDORF:

17    Q.  Okay.  And the evidence item number on Exhibit 26

18 is 224 as well?

19    A.  That's right.

20    Q.  So we can conclude -- or for the sake of argument,

21 we can conclude that that's -- they're talking about the same

22 videotape in those two documents.  Right?

23    A.  Apparently so.

24    Q.  And you've never seen that videotape?

25    A.  No.

Robert Paul Frasier
August 29, 2023

Page 202

1    Q.   That videotape was not produced to you, and it's
2  not something that you produced to the defense in the
3  prosecution of Mr. McGuffin.  Is that right?
4    A.   That's correct.
5    Q.   But if it had been provided to you, you would have
6  provided it to the defense in Mr. McGuffin's prosecution.  Is
7  that right?
8    A.   Yes.
9    Q.   If -- same is true if that is the videotape that
10  Mr. Pex is referring to in Exhibit 24.  If for some reason
11  Mr. Pex is referring to a different video film in Exhibit 24,
12  that is also a video film that you have not been provided but
13  that you would have produced to the defense in Mr. McGuffin's
14  prosecution if it had been provided to you.  Is that correct?
15  Or was that just the most longest, confusing question that I
16  could have asked?
17    A.   Well, I was just looking to see if there was -- on
18  this 224, if there was another identifying number with it.
19  Because oftentimes exhibits that are prepared by other officers
20  are given an officer exhibit number.  And I don't see, frankly,
21  on this sheet at all any officer's exhibit number.  So I was
22  looking to see if it could potentially identify who the officer
23  was that made this video.  I don't know who made it.  I don't
24  recall anybody out there with a video camera.
25    Q.   And I've been assuming that the video that's

Page 203

1  referred to in Exhibits 24, 25, and 26 is the same video.  And
2  the reason I ask that question now is because it just occurred
3  to me that those could be two separate videos.  But either way,
4  whether it's the same video or whether it's two different
5  videos, you have never seen either or --
6    A.   I have never seen a video of the crime scene.
7    Q.   That's -- that's -- okay.  We're good.
8         Let's go to Exhibit 27.  Again, I think this is
9  something that you've -- this is something that you've seen as
10  part of the post-conviction proceedings?
11         (Document marked for identification as Deposition
12         Exhibit 27.)
13  BY MR. LAUERSDORF:
14    Q.   So you've been handed what's been marked as
15  Exhibit 27.  Do you recognize that document at all?
16    A.   I recognize this from the PCR deposition, and I
17  think it was shown to me at trial.
18    Q.   Yeah.  And is that a -- is that a document that you
19  had seen at any point prior to the post-conviction proceedings?
20    A.   Prior to the post-conviction proceedings, no.
21    Q.   Okay.  And that doesn't have your Bates numbers on
22  it anywhere, does it?
23    A.   No.
24    Q.   And it doesn't have your handwritten numbers up in
25  the --

Page 204

1    A.   No.
2    Q.   -- right-hand corner?  Okay.  And that document
3  reflects a "Conversation Log" for "Case Number 00N-0481" up at
4  the top?
5    A.   Correct.
6    Q.   And it purports to record notes of a phone call
7  initiated by you to a lab staff member named Putnam.  Is that
8  right?
9    A.   That's correct.
10    Q.   And in there he recounts a conversation, if you're
11  midway down in that paragraph, "Paul told me that he knew that
12  'we hated Jim'" -- talking about Jim Pex -- "and were we going
13  to be mad that he help in the investigation."
14         And Putnam says "I told him that we didn't 'hate'
15  Jim -- I was very disappointed with Jim's current testimony
16  record and found him untruthful at times."  Do you see where
17  I'm at?
18    A.   I'm reading it, yes.
19    Q.   Okay.  And I remember from your deposition
20  testimony in the post-conviction proceedings that you disagree
21  with the assessment that Mr. Pex had been untruthful.  But not
22  withstanding that assessment, if you had been provided this
23  document in the McGuffin prosecution, this is a document that
24  you would have produced to the defense --
25    A.   Yes.

Page 205

1    Q.   -- in this prosecution as well.  Right?
2    A.   Right.
3    Q.   Because this potentially reflects on --
4    A.   Correct.
5    Q.   -- the credibility of a witness who you were going
6  to call at trial.
7    A.   Correct.
8    Q.   Okay.
9    A.   I guess I've got a question for you.  When you said
10  I disagree with the assessment, what did you mean by that?
11    Q.   In your deposition testimony in the PCR hearing, my
12  recollection was that you testified that you did not believe
13  that Mr. Pex had been untruthful, that this somehow related
14  back to the --
15    A.   I think I testified that I don't recall being told
16  this.
17    Q.   Oh, okay.  Okay.  I thought you talked about that
18  at the Spector trial.
19    A.   I did go on further to say that there were -- and I
20  think it was after this case -- there were allegations that he
21  had been untruthful, which had been turned out to be unfounded,
22  but that was after the McGuffin trial.
23    Q.   Oh, Okay.  That was in the Phil Spector case,
24  though --
25    A.   Right.

Page 214

1  A.  Well, I guess I disagree with that in one respect.
2  I gave them the DNA file that had that profile in it.  They had
3  it.  I didn't know it was in there, and apparently they didn't
4  check it and didn't know it was there, but I gave them that
5  file that had that information.  So they had it.  But what they
6  did with it after I gave it to them, I don't know.
7      Q.  But part of that file in those reports included
8  reports where the lab was reporting that the minor profiles
9  were consistent with Kip Oswald.  Right?
10     A.  Yes.  But I guess what I'm saying is in the bench
11 notes where the markers were and everything, that is where it
12 was discovered that there was an unknown male DNA that wasn't
13 reported.  Okay?  And that was not in the reports that were
14 given to me.  The final reports, that was not mentioned.
15     Q.  Right.
16     A.  But the bench notes with the actual markers of
17 things that they ran at the lab that had that profile
18 apparently --
19     Q.  Right.
20     A.  -- I gave to the defense.  So they had it.
21     Q.  And I get that.
22     A.  Yeah.
23     Q.  But the reports that the lab produced were not
24 accurate because they omitted that information.
25     A.  I --

Page 215

1      MR. DAVIS:  I'm going to object.  It's
2  argumentative, and this is -- we know that this is a disputed
3  issue, but I don't think it's appropriate to get him to comment
4  on the accuracy of the labs' reports.  I mean, essentially this
5  question has been asked and answered by a lot of people
6  throughout the course of the litigation.  So you can ask, I
7  guess, but it does feel like you're asking him to speculate
8  about, you know, an error.  So, I guess, proceed, but ...
9      MR. LAUERSDORF:  All right.  Let's -- let's take
10 five, let me look over my notes, figure out if I have anything
11 more, and then come back and see if I can be done.
12     THE WITNESS:  Okay.
13     THE VIDEOGRAPHER:  We're going off the record at
14 3:23.
15     (Recess taken.)
16     THE VIDEOGRAPHER:  We are back on the record at
17 3:31.
18     MR. LAUERSDORF:  Okay.  Mr. Frasier, I appreciate
19 your time today.  That's all of the questions I have for now,
20 so thank you.
21     THE WITNESS:  Okay.  Who's next?
22     MR. DEFREEST:  Do you want me to go ahead?
23     MR. FRANZ:  Yeah, let me charge up here.
24     MR. DEFREEST:  Okay.
25 ///

Page 216

1                    EXAMINATION
2  BY MR. DEFREEST:
3      Q.  Hello, Mr. Frasier.  My name is Eric DeFreest.  I
4  represent Mr. Walter in this matter --
5      A.  Okay.
6      Q.  -- and I'll try to be efficient here.
7          As far as your interaction with Mr. Walter, you had
8  mentioned that there is information that you got from Officer
9  Zanni, is it, that --
10     A.  Craig Zanni.
11     Q.  Once you received that information from Zanni,
12 then, you chose not to use Mr. Walter at all in any further
13 action you were taking.  Correct?
14     A.  That's correct.
15     Q.  Had you determined to utilize any information that
16 was offered or available from Mr. Walter prior to that time?
17     A.  As I previously testified, we were considering
18 calling him as a potential expert in the case, but once I saw
19 that opinion from the Second Circuit, it was real clear to me
20 that we had to dissociate ourselves from him.
21     Q.  So in that consideration of potentially utilizing
22 Mr. Walter as an expert, you had not explored that opportunity
23 or potential as of yet.  Correct?
24     A.  I know Chief Dannels and Sheriff Zanni and I
25 discussed it, but whether we would want to use him, I think

Page 217

1  the -- general consensus, based on the information we had
2  at that point, was, yes, we probably should consider using him.
3  But again, once we found this material, it was, no, we can't do
4  that.
5      Q.  And so that's kind of the genesis of my questions,
6  is there was the trip that you took with others to Philadelphia
7  to make a presentation at the Vidocq Society in Philadelphia.
8  Correct?
9      A.  That's correct.
10     Q.  And other than the information that you presented
11 to the group at the luncheon, did you present any other
12 information to Mr. Walter?
13     A.  I believe that there were some items sent ahead of
14 time that the Vidocq Society requested, and I believe Chief
15 Dannels took care of that.  I don't recall specifically myself
16 sending stuff to them, and I don't know if Mr. Walters had
17 access to those materials or not.
18     Q.  And so as far as interaction that you had with
19 Mr. Walter, other than when 20/20 or ABC brought Mr. Walter out
20 to Oregon, did you have any one-on-one direct discussions with
21 Walter?
22     A.  After we left Pennsylvania and until he showed up
23 with 20/20 that week, I did not have any conversations with
24 him, although I do believe Chief Dannels may have.
25     Q.  From the -- from your perspective as the DA, did

Page 218

1  you have any agreement with Mr. Walter to conduct any
2  investigation or project for the DA's office?
3      A.  I did not ask him to do anything specifically for
4  our office, no.
5      Q.  Did you have any agreement with Mr. Walter to
6  provide the DA's office with any produceable?
7      A.  No.  We did not have any agreement with him.
8      Q.  Did you receive any -- absent the two published
9  articles that were part of the exhibits that were shown to you
10 earlier, were you given any other document from Mr. Walter with
11 regard to the Leah Freeman investigation?
12     A.  I seem to recall in -- that he -- after I declared
13 him not usable, I seem to recall -- he sent a letter trying to
14 explain himself.  And I basically ignored it.
15     Q.  Did that letter influence your decision-making with
16 regard to the McGuffin case in any way?
17     A.  My decision not to -- I decided we couldn't use
18 Mr. Walter or any of his theories at the trial, and so from my
19 point of view, no.  He -- none of his information did I use at
20 trial.
21     Q.  Did Mr. Walter provide you with any evidence or
22 theory which specifically directed prosecution of Mr. McGuffin?
23     A.  I think in our discussions with him in Pennsylvania
24 and his discussion about the passive aggressive or PA or
25 whatever it was, he certainly was giving us a rendition that

Page 219

1  fit Mr. McGuffin.  And that's why we were so interested in what
2  he had to say.  Based on his representations to us of his
3  qualifications and so forth, we were beginning to think that
4  this was an individual that knew what he was talking about and
5  potentially could be a good witness for us.  But again, once we
6  figured out what he was all about, no.  We got away from him.
7      Q.  Well, but the question I have is whether there
8  was -- I understand that there's some of this --
9  Mr. McGuffin -- sorry.  I understand that Mr. Walter made some
10 statements that were supportive of your beliefs or your
11 investigation, but did Mr. Walter in any way direct or change
12 the course of your investigation?
13     A.  I don't think so.  No.
14     Q.  And it was your understanding that ABC 20/20 had
15 made arrangements for Mr. Walter to travel to Oregon.  Correct?
16     A.  Yes.  I certainly -- with my office funds, I didn't
17 pay for him to come out, no.
18     Q.  Okay.  Understood.
19     A.  That was all 20/20's thing.
20     Q.  And when did you learn that ABC 20/20 had organized
21 Mr. Walter to come out to Oregon?
22     A.  I don't know when exactly, but I was told that
23 20/20 was planning to come out to do a week of shooting.  They
24 wanted to do interviews with specific people.  They wanted to
25 interview me.  They were going to bring Mr. Walters out.  They

Page 220

1  were making a big to-do about it.  That's when I learned that
2  my -- that my insistence that nothing be published or broadcast
3  until after trial had not been brokered.  I was not happy.  So
4  that was part of the -- that week.
5      Q.  How were you first approached by ABC 20/20?
6      A.  I never was directly approached by ABC 20/20.
7      Q.  Who did they approach?
8      A.  It was Chief -- it was all through Chief Dannels.
9      Q.  Do you have any knowledge as to how ABC 20/20
10 contacted or rationale for contacting Mr. Walter?
11     A.  No.
12         MS. SAWYER:  I'm sorry.  Could you repeat that
13 question and answer.
14         (Reporter read back last question and answer.)
15 BY MR. DEFREST:
16     Q.  Other than the information that was provided in
17 your PowerPoint presentation in Philadelphia, did you provide
18 or reveal any other evidence of the investigation to Mr. Walter
19 after that Philadelphia luncheon?
20     A.  No.  I never spoke with him after the Philadelphia
21 luncheon until he came to town.
22     Q.  When he came to town --
23     A.  With -- for the 20/20 thing.
24     Q.  When he came to town -- or to Oregon for the 20/20
25 production, do you know what information was shared with

Page 221

1  Mr. Walter about the investigation, if anything more than what
2  was presented in Philadelphia?
3      A.  I personally did not give him anything.  Coquille
4  PD may have.
5      Q.  But that's outside your knowledge?
6      A.  That's outside my knowledge.
7      Q.  Do you have any knowledge as to -- in the matter of
8  protocol for the investigation which you were overseeing in the
9  cold case in 2010, would Mr. Walter have ever had free access
10 to investigation information held by Coquille or your office?
11     A.  Not from my office.  If he did, it would have been
12 through Coquille PD.
13     Q.  And that would have been under the control of Chief
14 Dannels at that time?
15     A.  Correct.
16     Q.  But once he came out -- once Mr. Walter came out to
17 Oregon for the 20/20 production, then soon after his arrival is
18 when you received Mr. Zanni's report of a concern for
19 Mr. Walter's background?
20     A.  I don't know how long he was here.  I do know that
21 20/20 had interviewed him and filmed him with Chief Dannels
22 around the area where the first shoe was found.  And I think it
23 was the same day that the chief arranged for him to come talk
24 to me about grand jury.  And that was in the afternoon, as I
25 recall, in Chief Dannels' office.  And I believe that was the

Robert Paul Frasier
August 29, 2023

Page 226

1  before the luncheon?
2      A.  No.
3      Q.  And was there anyone else besides you who put on
4  the presentation?
5      A.  I was the -- I was the main speaker.  I think there
6  might have been a question-and-answer thing where some
7  questions might have -- I don't recall specifically any
8  questions.  If there was and one of the other three could have
9  answered it, I would have deferred to them.
10     Q.  I guess -- so you put on your PowerPoint
11 presentation, and then what happens?  Did you get any feedback,
12 any perspective, any kind of thoughts from any members of
13 Vidocq Society about the Leah Freeman case?
14     A.  My recollection is -- and, frankly, I was
15 disappointed.  But my recollection is that the president,
16 program provider, whoever, came up to me afterwards, and there
17 may have been two other or three other people there.  I'm
18 expecting them to say, Paul, you need to do A, B, and C; or
19 you're looking at the wrong person, you need to do A, B, and C.
20 I was expecting something like that.  And all I got was, okay,
21 you're doing a good job; you're going down the right track;
22 you've got a better case than what you think.  But they gave us
23 no suggestions to follow through with.
24     Q.  So I take it from that answer that you didn't
25 specifically ask for any particular suggestions or solutions to

Page 227

1  follow through with.  Is that fair to say?
2      A.  I would -- since they invited us there, I expected
3  them to tell us.  I wasn't -- I wasn't going to ask them
4  questions.  I expected them to give me something.
5      Q.  Did you, in your presentation to the Vidocq
6  Society, advise them of the fact that there was unidentified
7  male DNA on Leah Freeman's shoes?
8      A.  No.  Because I didn't know about it when we did the
9  presentation.
10     Q.  And did you advise the Vidocq Society during that
11 initial luncheon about the witness statement from Mr. Backman?
12     A.  No.
13     Q.  And why not?
14     A.  Because I frankly don't recall Mr. Backman being
15 involved in the case.  There's that tip sheet, but I don't
16 recall myself seeing it, or I don't recall a tip sheet in and
17 of itself.
18     Q.  Do you recall speaking with Richard Walter at all
19 before, during, or immediately after your luncheon
20 presentation?
21     A.  We arrived early for the luncheon, I think an hour,
22 maybe an hour and a half before its scheduled time because,
23 frankly, I didn't know that the facilities looked like; I
24 didn't know -- you know, was I going to have to use my own
25 computer for the PowerPoint; and so forth.  And so we arrived

Page 228

1  early.
2          And it was either as we were walking in the door or
3  shortly thereafter, here's Mr. Walter.  And he immediately
4  walks up to us and starts talking to us, telling us about his
5  credentials, telling us how he had looked at the material that
6  had been sent in.  He started talking about a profile he had
7  developed.  We talked for, you know, a half hour, 45 minutes.
8  He handed me the first article at that time, and I said, "Okay.
9  Well, I'll read it sometime.  I can't read it today,
10 obviously."  I shoved that in my briefcase.
11         Then we did the luncheon, and then afterwards he
12 approached us again, started talking to us again.  And he was
13 saying things, as I said before, that interested us.  And so we
14 actually went to dinner and talked some more that evening.
15 Then after dinner, he left.  Then we returned the next day to
16 Oregon.
17     Q.  What do you recall was discussed during dinner
18 about the Leah Freeman case?
19     A.  Um, he kept reinforcing this control physical
20 aspect thing.  There were also times that he would talk about
21 other cases he worked on.  I don't recall specifics about that.
22 We had already talked with him for a couple, three hours about
23 his theory about the case, and frankly, I think we were getting
24 talked out, and so the conversation changed to other things.
25 But that -- that's the gist of it.

Page 229

1      Q.  And when you said "his theory," were you -- are you
2  referring to his power-assertive theory?
3      A.  Yes.  His profile.  Yes.
4      Q.  Did you use that language in your prosecution of
5  the McGuffin --
6      A.  No.
7      Q.  -- at the McGuffin trial?
8      A.  No.
9      Q.  "Power-assertive"?
10     A.  No.
11     Q.  Okay.  And you're saying that very stridently.  Why
12 is that?
13     A.  Because I didn't want to have anything to do with
14 Mr. Walter's theory when we got to trial.
15     Q.  And that's because you didn't find him particularly
16 credible.  Is that correct?
17     A.  It didn't matter whether I found him particularly
18 credible or not.  What mattered was what was in that court
19 opinion.  And to me what was in that court opinion, whether it
20 was true or not, ruined any opportunity for us to use him.
21     Q.  You testified a moment ago that it appeared he had
22 reviewed material that had been already provided either to him
23 or to the Vidocq Society before you got there.  Do I have that
24 right?
25     A.  Yes.  Because he started right off the bat telling

Robert Paul Frasier
August 29, 2023

Page 230

1 us, okay, I know the facts of the --
2      Q.  Can you hear me?
3      A.  Yes.
4      Q.  Okay.
5      A.  Yes, I -- I believe he did have that information.
6      Q.  So what material was provided to Richard Walter or
7 the Vidocq Society?  And if you can differentiate who got what,
8 that would be helpful --
9      A.  I don't --
10      Q.  -- prior to your arrival in Philadelphia?
11      A.  I don't know exactly what Chief Dannels sent.  I do
12 know that he sent the hand- -- copies of the handwritten
13 statements written by Brent Bartley and Mr. McGuffin.  But
14 other than that, I don't know all of the materials that he sent
15 to the Vidocq Society.  I don't know what was sent.
16      Q.  And do you believe those statements were sent to
17 the Vidocq Society president or to Richard Walter or to someone
18 else, or do you even know?
19      A.  I don't know who they were sent to.
20      Q.  And do you know when those materials were sent?
21      A.  Well, it had to have been at least a couple of
22 months before we finally got there.  We were scheduled to do an
23 appearance about a couple of months before, but we had to
24 cancel.  So those materials had to have been there prior to our
25 first scheduled visit.

Page 231

1      Q.  And do you know if Vidocq Society specifically
2 asked for any kind of materials to be provided, or was that
3 just at the discretion of law enforcement?
4      A.  I left all of that to Chief Dannels.  It was his
5 idea that we go, and I left it up to him to -- to provide
6 whatever they requested.
7      Q.  Would there be a record kept by anyone -- Chief
8 Dannels, the Coquille Police Department -- of what materials
9 were provided to Vidocq Society prior to you arriving for the
10 luncheon --
11      A.  I don't know.
12      Q.  -- in January 2010?
13      A.  I don't know if there's one or not.
14      Q.  Did you learn anything at that Vidocq Society
15 luncheon that affected or influenced or had any bearing upon
16 your investigation or eventual prosecution of the case against
17 Nick McGuffin involving the death of Leah Freeman?
18      A.  Besides them giving -- besides them telling me,
19 hey, you're on the right track and you've got a stronger case,
20 they did not give me any specifics whatsoever.
21      Q.  And just to tie up -- follow up on this, other than
22 Richard Walter, can you remember the name of anyone else you
23 spoke with at Vidocq Society at the luncheon or just prior to
24 or immediately after the luncheon?
25      A.  No, I can't recall who I -- the names of the people

Page 232

1 I spoke to.
2                MS. SAWYER:  Can we go off the record for just a
3 moment.
4                THE VIDEOGRAPHER:  We're going off the record at
5 4:05.
6                (Discussion off the record.)
7                THE VIDEOGRAPHER:  We are back on the record at
8 4:06.
9 BY MS. SAWYER:
10      Q.  Mr. Frasier, I'd like to share my screen with you
11 and show you a document that I'd like to mark as Exhibit
12 Number 31.  Give me one moment here.
13      A.  I'm going to have to get closer to the --
14                THE VIDEOGRAPHER:  We can bring the computer to
15 you.
16                THE WITNESS:  Okay.
17                MS. SAWYER:  Hold on.  Hold on.  Did I just lose
18 that document?  Let me try it again.  All right.
19                (Document marked for identification as Deposition
20 Exhibit 31.)
21 BY MS. SAWYER:
22      Q.  Can you see that document, Mr. Frasier?  Let me see
23 if I can make it a little bigger.  Can you see that?
24      A.  Yes.
25      Q.  And I'll just identify it for the record.  This is

Page 233

1 a letter from you to Paul Reim, dated August 10, 2016 --
2      A.  Correct.
3      Q.  -- identified as your third installment on the
4 McGuffin matter.  Is that correct?
5      A.  Yes.
6      Q.  Can you tell -- can you just give me a brief
7 explanation about what the purpose of these several installment
8 letters that you wrote to Mr. Reim --
9      A.  My -- okay.  My practice is --
10      Q.  (Video audio garbled.)
11                COURT REPORTER:  I'm sorry.  You'll have to repeat
12 that question.
13                MS. SAWYER:  I need to repeat the question?
14                COURT REPORTER:  Yes.
15 BY MS. SAWYER:
16      Q.  Can you hear me?
17      A.  Yes.
18      Q.  Do I need to repeat the question?
19      A.  Yes.
20      Q.  Okay.  My question is, can you -- can you give me a
21 brief overview about the purpose of these several installment
22 letters that you wrote to Mr. Reim in connection with the
23 post-conviction petition?
24      A.  Um, I don't recall if Mr. Reim specifically asked
25 me to do this, but I do know it is my practice that whenever a

Robert Paul Frasier
August 29, 2023

Page 234

1  defendant that has been convicted in Coos County on a case that
2  I have personally handled, that if they file a petition for
3  post-conviction relief to assist the Attorney General's office,
4  which represents the State on those petitions, I will write a
5  document addressing the claims raised by the defendant or the
6  petitioner and letting the Department of Justice know,
7  basically, okay, this is where you need to look at -- for
8  information, this is what I recall happening, that type of
9  thing.  It's to assist them in preparing to defend against the
10  petition.
11     Q.   Okay.  So I'd like to turn your attention to page 3
12  of this letter.  And this is where you start talking about the
13  involvement of the Vidocq Society.  Do you see this, where it
14  says as to (audio garbled) point 12?
15     A.   Yes.
16     Q.   Okay.  And then you go on for a while and explain
17  your interactions with the Vidocq Society, which I will go
18  over, but I just wanted to turn your attention to the very last
19  sentence that is made on page 6 of this letter, where you
20  summarize -- or it appears you summarize -- your view of the
21  involvement of the Vidocq Society and Mr. Walter with respect
22  to the Leah Freeman case.  And I'm just going to read this into
23  the record.
24         "Long story short, I did not use anything we
25  learned from Mr. Walter or the Vidocq Society and certainly did

Page 235

1  not use it at trial.  It had no effect on the verdict in this
2  case."  Do you see that?
3     A.   Yes.
4     Q.   And is that still your position as we sit here
5  today?
6     A.   As I've explained before, I didn't learn anything
7  new from the Vidocq Society, and obviously we had issues with
8  Mr. Walter and I felt that we needed to stay clear of that, and
9  that's what we did.
10     Q.   Okay.  And I believe you testified a moment ago
11  that nothing you learned from Mr. Walter affected the manner in
12  which you investigated or prosecuted the case against
13  Mr. McGuffin.  Is that correct?
14     A.   Could you repeat that for me, please.
15     Q.   Nothing that you learned from Mr. Walter affected
16  or changed how you investigated or prosecuted the case against
17  Mr. McGuffin?
18     A.   No.  I didn't use anything from him.
19     Q.   Okay.  And is that true with respect to the Vidocq
20  Society entity as well?
21     A.   Well, I did not bring up the Vidocq Society at
22  trial, and we didn't talk about visiting with them, and like I
23  say, the only thing I learned from them was you're on the right
24  track, you've got a better case than what you thought, good
25  luck.

Page 236

1     Q.   I was a little confused about your testimony with
2  respect to 20/20 and a meeting that you had with them.  Did
3  that occur in February of 2010, or did that occur in June of
4  2010?
5     A.   When you say "meeting," what do you mean by
6  "meeting"?
7     Q.   You indicated that you had -- and that was a
8  confusing question.  You had a meeting with Mr. Walter when he
9  visited Oregon, and that was when 20/20 was also present.  Do
10  you recall what month that had occurred?
11     A.   I don't recall what month that was.  I know it was
12  summertime, but I -- you know, June, July, August.  I don't
13  recall when that occurred.
14     Q.   Okay.  And with the 20/20 show?
15     A.   Okay.  When 20/20 came to town and they were going
16  to interview people and get ready to do a show, a broadcast,
17  they came, and my recollection is they were here for about a
18  week.  And that was in the summertime sometime -- June, July,
19  August.  They brought Mr. Walter out.  And, you know, frankly,
20  I didn't have much contact with the 20/20 people.  It was at
21  that point I learned that there was no agreement not to
22  broadcast before trial.  I was upset about that, and I
23  didn't -- frankly, I didn't want to have anything to do with
24  the 20/20 people, so I kept my distance.
25     Q.   Do you know if any -- or other Vidocq have come out

Page 237

1  to Coquille at the behest of 20/20?
2     A.   I don't know of anybody else that came out other
3  than Mr. Walter.
4     Q.   Right.  My question is do you know if the Vidocq
5  Society, as an entity, knew that he was coming out to Coquille?
6     A.   I don't know if they did or not.
7     Q.   Do you have an understanding as to whether he was
8  there in his personal capacity or as a representative or member
9  of Vidocq Society?
10     A.   I have no personal knowledge about what his
11  capacity was when he came to Coquille.
12     Q.   Do you have any knowledge as to how ABC and the
13  20/20 show became acquainted with Mr. Walter?
14     A.   I do not know.  It wasn't through me.
15     Q.   You testified earlier that after that meeting with
16  Mr. Walter in Coquille, you had dinner with him and with Chief
17  Dannels and with Sheriff Zanni.
18     A.   Sheriff Zanni was -- Sheriff Zanni and his wife --
19     Q.   Is that correct?
20     A.   Yes, that's correct.  It was Sheriff Zanni and his
21  wife, Mr. Walter, myself, Chief Dannels.  I believe our fire
22  chief was there also with his wife, and how they got invited, I
23  don't know.
24     Q.   And was the Leah Freeman case discussed during
25  dinner?

Robert Paul Frasier
August 29, 2023

Page 238

1    A.   No.

2    Q.   What was discussed during dinner?

3    A.   We had kind of normal social talk, and then
4  Mr. Walters began talking about how he had been working with
5  Scotland Yard on the Jack the Ripper case, and he started --
6  and he must have talked for an hour about things he had done,
7  things that they had found out, things along that line.

8    Q.   Did Mr. Walter prepare any sort of a written
9  profile for use by your office or the Coquille Police
10 Department with respect to the potential offender, murderer of
11 Leah Freeman?

12   A.   The only thing he --

13   Q.   Anything in writing?

14   A.   The only thing he gave me in writing was the first
15 article which he gave us in Pennsylvania, which he claimed had
16 been published.  And he says, "I think this is the profile of
17 the person you are looking for, and I think it fits
18 Mr. McGuffin."  That's the only thing at that time he gave me.

19        And then when we had the meeting in the summertime
20 when 20/20 came to town, I told him I had read the article and
21 I said, "I don't think this thing fits Mr. McGuffin at all."

22        And that's when he handed me the second article,
23 and said, "Well, I haven't published this yet, but this might
24 be more what you need."

25        So the only things in writing he ever gave me were

Page 239

1  those two articles.

2    Q.   Did Mr. Walters ever ask to be paid for his
3  services?

4    A.   We never paid him anything, and I don't recall him
5  asking anything.  I don't know what 20/20's arrangement was
6  with him, but my office certainly didn't pay him anything.

7    Q.   Do you have an understanding that the Vidocq
8  Society is an entirely volunteer organization?

9    A.   That was my understanding.  It was a volunteer
10 organization of mostly retired law enforcement professions --
11 professionals from different specialties.

12   Q.   And did you have an understanding as to -- let me
13 strike that.

14        Did you have an understanding that the members were
15 not employees of the Vidocq Society; they were just volunteers?

16   A.   I knew that it was some type of club or social
17 organization because I think I recall we were given some
18 pamphlets about the Vidocq Society and they talked about an
19 annual ball and things along that line.  But in terms of them
20 having employees or anything along that line, I was never told
21 that they did have employees.

22   Q.   And in your view, did the Vidocq Society at any
23 time ever (audio garbled) visit an agent or representative of
24 the Coos County DA's office?

25   A.   You broke up.  We couldn't hear your whole

Page 240

1  question.

2    Q.   At any time did Vidocq Society, as an entity, ever
3  act as an agent or representative on behalf of the Coos County
4  DA's office?

5    A.   No.

6    Q.   Did the Coos County DA's office or you personally
7  ever direct or control or have the right to direct or control
8  on the actions or conduct of the Vidocq Society?

9    A.   No.

10   Q.   And to the best of your knowledge, did the Vidocq
11 Society ever act as an agent or representative on behalf of the
12 City of Coquille Police Department?

13   A.   I have no personal knowledge as to what their
14 relationship was or with the Coquille Police Department.

15   Q.   Did Vidocq Society or any of its members ever
16 interview any witnesses in connection with the Leah Freeman
17 investigation?

18   A.   I'm not aware of them doing that, no.  I'm not
19 aware of that.

20   Q.   And did the Vidocq Society or any of its members
21 ever testify at trial?

22   A.   No.

23   Q.   We looked earlier at some handwriting analyses that
24 Mr. Lauersdorf asked you about.  And I can pull those up in a
25 moment, but those -- several of those analyses reference a

Page 241

1  VICAP assessment.  Are you familiar with what that is?

2    A.   I'm familiar with the term "VICAP."  I don't -- I
3  assume that --

4    Q.   And I can spell that (audio garbled) --

5    A.   What's that?

6    Q.   (No response.)

7    A.   You broke up.  I'm sorry.

8    Q.   I was going to spell it if you couldn't understand
9  what I was saying.  Go ahead and answer.  If you know what the
10 VICAP assessment is, if you would explain that, that would be
11 great.

12   A.   Okay.  The VICAP assessment -- to my understanding
13 it's a tool that was developed by the FBI and maybe the Oregon
14 State Police, one of the two, where on every homicide you have
15 you enter into the computer or into the system the basic facts
16 of your case, and then what the system does is then look
17 through other geographical areas to determine if there are
18 other cases that perhaps meet a -- that have similar facts.
19 That's my understanding of VICAP.

20   Q.   Let's take a look at those assessments.  If you
21 would take a look at Exhibit Number 6.

22   A.   Yep.  I'm finding it.  I've got it.

23   Q.   So the first assessment appears to be written by
24 Patrick Kelly in an email to fborn on November 18, 2009.

25   A.   Yes.

Robert Paul Frasier
August 29, 2023

Page 250

1        MR. DAVIS:  I want to request on behalf of
2  Mr. Frasier that he be able to read and sign.
3        COURT REPORTER:  And are you ordering a copy?  I
4  assume you guys are ordering the original.
5        MS. PURACAL:  We're ordering.
6        MR. DAVIS:  I would just like an electronic copy.
7        MR. FRANZ:  Copy.
8        COURT REPORTER:  Electronic or --
9        MR. FRANZ:  Electronic.
10        COURT REPORTER:  -- hard?  Okay.
11        MR. FRANZ:  Can you also send it to me in text,
12  TXT?
13        COURT REPORTER:  And text.  So PDF and text.
14        MR. DEFREEST:  Electronic is fine.  Thank you.
15        COURT REPORTER:  Okay.  And, Meredith, are you
16  wanting a copy?
17        MS. SAWYER:  Yes.  I don't need a hard copy, but a
18  PDF and text is also great.
19        COURT REPORTER:  Okay.  Great.  I think I have it
20  all now.  Thank you.
21        MR. DEFREEST:  Because text is searchable.  Right?
22        MR. FRANZ:  Well, PDF is searchable too.
23        MR. DEFREEST:  Oh, okay.  I'll take PDF and text,
24  if that's the case.
25        MR. FRANZ:  It's just at trial, some trial

Page 251

1  presentation software, the PTX are used, and I need it for
2  that.
3        COURT REPORTER:  Did you say we're off?
4        THE VIDEOGRAPHER:  We are off the record at 4:43.
5
6        (WHEREUPON, the deposition ended at the hour
7        of 4:43 p.m.)
8
9                      -o0o-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 252

1  STATE OF OREGON      )
2  County of Douglas    )       ss.  C E R T I F I C A T E
3
4      I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  State of Oregon, do hereby certify that:
6      Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, ROBERT PAUL FRASIER appeared
8  before me at the time and place set forth in the caption
9  hereof;
10      That, at said time and place, I reported in stenotype
11  all testimony adduced and oral proceedings had in the foregoing
12  matter, to the best of my ability;
13      That, thereafter, my notes were reduced to typewriting,
14  and that the foregoing transcript, pages 1 through 251, both
15  inclusive, constitutes a full, true, and correct transcript of
16  all such testimony adduced and oral proceedings had and of the
17  whole thereof.
18      IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19  stamp this 12th day of September, 2023, in the City of
20  Roseburg, County of Douglas, State of Oregon.
21
22
23  JEAN M. KOSTNER
    Certified Court Reporter
24  CSR No. 90-0051
25

Page 253

1            DECLARATION UNDER PENALTY OF PERJURY
2
3      I, ROBERT PAUL FRASIER, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on August 29, 2023; that
6  I have made such corrections as appear noted herein in
7  ink, initialed by me; that my testimony as contained
8  herein, as corrected, is true and correct.
9
10      Dated this _____ day of _____, 20____,
11  at _____, _____.
12
13
14
15                     _____
                            ROBERT PAUL FRASIER
16
17
18
19
20
21
22
23
24
25



EXHIBIT
0012
R. Paul Frasier
08.29.2023

Hjördis A. Lindegren    5-19-10   e library
7-8-58    541-396-2258        390-6216
551 W. 4th Pl.    22 yrs.

1300    - Avid survivor fan.

- Watching survivor on TV. - Brother over w/ dog.
  - ~~Night Rudy got voted off. Upset~~ w/woy/ripple
  - Watched till end of show. Brother got up -
  took dog for walk. Got back.
    - Returned 1/2 hr. later.
    - Left around 2100 - returned appr. 2130.
        - May have less a few minutes before end but after Rudy voted off.

- Recall John commenting about "uncontrollable juveniles"
  after coming back. Leah yelling at somebody.
    - Neighbor, Dez, told Hjördis Leah in fight w/ people in back.

* Neighbor
  - Dez (couch) wife Barbara - daughter lives 2 houses now
    - daughter:
    - Elm/ w. 4th pl. facing Elm.    446 N. Elm.
      ~~410-63~~    91063 N. Bark - Crockett

  - John stopped/talked w/ Dez for while. Continued walk
    & passed people in front of house (Leah/Nick).

Survivor: Borneo - Wikipedia, the free encyc                                        Page 1 of 16



**EXHIBIT**
0013
R. Paul Frasier
08.29.2023

# Survivor: Borneo

From Wikipedia, the free encyclopedia
(Redirected from Gretchen Cordy)

*Survivor: Borneo* is the first season of the United States reality show *Survivor*. It was originally broadcast under the name *Survivor* but its official title has been changed to *Survivor: Borneo* to distinguish it from subsequent installments of the series. Before the change to *Survivor: Borneo*, the season was known universally as *Survivor: Pulau Tiga*, but it was changed again to its present title to avoid confusion with the tenth season, *Survivor: Palau*.[1] The show began filming on March 13, 2000 and ended on April 20, 2000. It aired later that year on CBS. It was set in the South China Sea on the remote Malaysian island of Pulau Tiga in the state of Sabah, about 6 miles (9.7 km) off the north coast of Borneo, Malaysia. The show was released on DVD on May 11, 2004.[1][2]

The sixteen contestants were initially separated into two tribes, named Tagi and Pagong, which represented the names of their beaches.[1] When ten players remained, the contestants merged into one tribe, named Rattana. While Tagi and Pagong's names and makeups were picked by the producers, Rattana was named by contestants Sean Kenniff and Jenna Lewis, because of the large amount of Rattan wood on the island. After 39 days of competition, corporate trainer Richard Hatch was named the Sole Survivor, defeating whitewater rafting guide Kelly Wiglesworth in a 4–3 jury vote. In 2006, it was revealed that Hatch failed to declare his winnings, among other earnings, in his tax return and was sentenced to 51 months imprisonment.[3]

On August 23, 2000, the *Survivor: Borneo* finale received the highest ratings of any *Survivor* episode to date.[4] Richard Hatch, Jenna Lewis, Rudy Boesch, Susan Hawk and Colleen Haskell were invited to participate again in the eighth season of *Survivor*, *Survivor: All-Stars*. Haskell was the only one to turn down the opportunity,[5] while Hatch, Lewis, Boesch and Hawk placed 14th, 3rd, 17th and 13th respectively.

| Survivor: Borneo | |
|---|---|
| **Filming location** | Pulau Tiga, Sabah, Borneo, Malaysia |
| **Winner** | Richard Hatch (4–3) |
| **Original run** | May 31, 2000 – August 23, 2000 |
| **Filming dates** | March 13, 2000[1] – April 20, 2000 |
| **No. of episodes** | 13 |
| **No. of days** | 39 |
| **No. of survivors** | 16 |
| **Tribes** | Tagi / Pagong / Rattana |
| **All-Stars** | Richard Hatch, Rudy Boesch, Susan "Sue" Hawk, Jenna Lewis |
| **Season chronology** | |
| **Next** | Survivor: The Australian Outback |

*(handwritten annotation: 3 Wednesday nights)*

## Contents

- 1 Summary
- 2 Contestants
- 3 The game

- 3.5 Episode 5: Pulling Your Own Weight
- 3.6 Episode 6: Udder Revenge
- 3.7 Episode 7: The Merger
- 3.8 Episode 8: The Name Is Duplicity
- 3.9 Episode 9: Old and New Bonds
- 3.10 Episode 10: Crack In the Alliance
- 3.11 Episode 11: Long Hard Days
- 3.12 Episode 12: Death of an Alliance
- 3.13 Episode 13: Season Finale
- 4 Voting history
- 5 Production
- 6 Reception
- 7 DVD release
- 8 References
- 9 External links

## Summary

The series premiere began with sixteen people split into two boats, divided into two tribes, Pagong and Tagi. During the first night, neither tribe had a completed shelter or a fire. On day two, after losing the combined reward and immunity challenge, Tagi was sent to Tribal Council, where Sonja Christopher was the first contestant voted out of the game. The tribes then continued to build their shelters and search for food. At the Tagi camp, former Navy SEAL, Rudy Boesch and openly homosexual corporate trainer Richard Hatch formed a strong friendship while B.B. Anderson became an annoyance at the Pagong camp. At the second immunity challenge, contestants were forced to eat a typical Malaysian food called Butok, which is the live larva of a beetle. Both tribes were in a tie after every castaway ate the Butok without refusing. In the tiebreaker, Stacey Stillman ate two Butok before Gervase Peterson, winning immunity for Tagi and sending Pagong to Tribal Council. At Tribal Council on day six, B.B. was sent home from the Pagong tribe. Tagi won the next reward challenge on day seven, winning fishing and diving gear. Richard used the tools to catch many fish and feed the Tagi tribe. Pagong caught and ate a rat, after roasting it first. Pagong won the next immunity challenge on day nine and Stacey was the third person voted out. Gretchen became the motherly tribe member of Pagong, and Rudy became the cook at Tagi, cooking the fish that Richard would catch. Tagi would win both the reward challenge on day ten and the immunity challenge on day twelve, sending Pagong to Tribal Council, where Ramona Gray was the next person voted out.

> Their walk through the jungle at night to the Tribal Council will be an hour trek punctuated by stops to wait for six-foot-long snakes to writhe off the trail. Their bodies will be covered with bug bites as they sleep on the sand or in the jungle. They will catch rats to supplement the diet of rice and water provided.
>
> Mark Burnett, *Survivor: The Ultimate Game* — Page 12

At the following reward challenge on day 13, Pagong won fresh fruit and three egg-laying chickens. Pagong also won the immunity challenge on day 15, as Dirk Been was voted off of the Tagi tribe. After winning the reward challenge on day 16, yet losing the immunity challenge on day 18, Joel Klug was voted off of the Pagong tribe. As the merge approached, Sean Kenniff and Jenna Lewis spent time creating guidelines for the new tribe. The merged tribe was named Rattana, and continued to live at the former Tagi beach. After the first individual immunity challenge on day 21, Greg Buis won immunity for Tribal Council. Gretchen Cordy was then voted out, being tagged as the "biggest overall threat." During the following episode on day 22, each castaway except Jenna was shown a one-minute video clip, that either a family member or friend recorded of themselves talking to the contestant.

Jenna's video was never received, so she was unable to view it. The winner of the reward challenge would get to watch the remainder of their five-minute video. Greg won, and was able to watch the rest of his video. Gervase Peterson won the immunity challenge on day 24, and Greg was voted off. During this episode, Sean developed his "alphabet strategy," where his vote would go in alphabetical order for the duration of his time in the game.

Colleen Haskell would win the next reward challenge on day 25, which was a barbecue dinner for two contestants, and would receive their letters sent by family members or friends at home. Colleen chose Jenna to come to the dinner with her, allowing Jenna to read her letter as well. At the dinner, Colleen and Jenna formed an alliance, and discussed getting Gervase to join them. Gervase agreed, but the three did not have enough votes on their side, as Jenna was the next to be voted off on day 27, with Rudy holding immunity. During the following episode, Gervase was informed that his first son, Gunnar, was born. Coincidentally, Gervase won the following reward challenge on day 28, allowing him a phone call home. Richard, however, won immunity on day 30, and Gervase was voted out. Following this, Kelly Wiglesworth decided against working with her alliance of Sue Hawk, Richard, and Rudy anymore. The next reward challenge was won by Sean on day 31, who won a night on a luxury yacht. Little did Sean know until long after getting on the boat that the Captain was his father (Jim Kenniff) who would travel on the yacht with him. Richard joined Sean for breakfast on the yacht the next morning, as Richard was chosen by Sean after the reward challenge. After deciding that if Kelly failed to win immunity, she would be sent home by her former alliance. Kelly won the immunity challenge, and Colleen was voted off on day 33. Kelly continued to win the following reward challenge on day 34. Joined by the show's host, Jeff Probst, Kelly won a night at a bar with a hot meal, a cold beer, and a 5-minute screening of the first episode of *Survivor*. Kelly also won the immunity challenge on day 36, holding off her elimination again, as the tension between herself and Sue grew stronger. Kelly voted with her former alliance to vote Sean out of the game.

As the final three days at the island came, Kelly won immunity again on day 37. The immunity challenge involved the final four contestants being quizzed on how much they knew about their former tribe mates. At Tribal Council, Richard and Sue tied with two votes each. As Kelly and Rudy voted again, Kelly switched her vote to Sue, as Sue was the next voted out. At the final immunity challenge on day 38, Kelly, Richard, and Rudy had to place one hand on the immunity idol held on a pole in the middle of a small well, while the three stood on small stands surrounding the pole. Richard voluntarily stepped out of the challenge on the assumption that the other contestants would "be crazy not to take [him]" to the final Tribal Council. After four hours and eleven minutes, Rudy accidentally removed his hand when changing his position, giving Kelly another victory. Kelly chose Richard to take to the final two, as she voted Rudy off. After Kelly and Richard pleaded their cases with the jury, each jury member cast a vote for one of the final two contestants. The votes were read during the final Tribal Council on day 39, unlike in every season thereafter, when votes were read months later during a live finale. Richard won the first $1 million prize with four votes to Kelly's three.

> The victory was an extraordinary feeling-I think mostly of relief but certainly of exultation as well. Its surrealness was increased by how utterly depleted I felt. I was exhausted, mentally and physically, and starving. I remember walking around the wrap party thinking that it was done. I'd done what I'd come to do and I could relax. I couldn't wait to go to bed. It felt great and I slept like a baby.
>
> Richard Hatch, *Survivor: The Ultimate Game* — Page 227

## Contestants

There were sixteen contestants overall, divided into two tribes, Pagong and Tagi. After six contestants were eliminated, the tribes were combined, or merged, to form one tribe, Rattana. Seven contestants made up the jury, who ultimately decided who would win the game, and the $1 million grand prize.

| Contestant | Original Tribe | Merged Tribe | Finish | Total Votes[A] |
|---|---|---|---|---|
| **Sonja Christopher** 63, Walnut Creek, CA | Tagi | | 1st Voted Out Day 3 | 4 |
| **B.B. Andersen** 64, Mission Hills, KS | Pagong | | 2nd Voted Out Day 6 | 6 |
| **Stacey Stillman** 27, San Francisco, CA | Tagi | | 3rd Voted Out Day 9 | 6 |
| **Ramona Gray** 29, Edison, NJ | Pagong | | 4th Voted Out Day 12 | 6 |
| **Dirk Been** 23, Spring Green, WI | Tagi | | 5th Voted Out Day 15 | 4 |
| **Joel Klug** 27, Sherwood, AR | Pagong | | 6th Voted Out Day 18 | 4 |
| **Gretchen Cordy** 38, Clarksville, TN | Pagong | | 7th Voted Out Day 21 | 4 |
| **Greg Buis** 24, Ridgewood, NJ | Pagong | | 8th Voted Out 1st Jury Member Day 24 | 6 |
| **Jenna Lewis** 22, Franklin, NH | Pagong | | 9th Voted Out 2nd Jury Member Day 27 | 11 |
| **Gervase Peterson** 30, Willingboro, NJ | Pagong | | 10th Voted Out 3rd Jury Member Day 30 | 6 |
| **Colleen Haskell** 23, Miami Beach, FL | Pagong | Rattana | 11th Voted Out 4th Jury Member Day 33 | 7 |
| **Sean Kenniff** 30, Carle Place, NY | Tagi | | 12th Voted Out 5th Jury Member Day 36 | 9 |
| **Susan "Sue" Hawk** 38, Palmyra, WI | Tagi | | 13th Voted Out 6th Jury Member Day 37 | 5 |
| **Rudy Boesch** 72, Virginia Beach, VA | Tagi | | 14th Voted Out 7th Jury Member Day 38 | 8 |
| **Kelly Wiglesworth** 22, Las Vegas, NV | Tagi | | Runner-Up | 0 |
| **Richard Hatch** 39, Middletown, RI | Tagi | | Sole Survivor | 6 |

# The game

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Episode title[6] | Air date[6] | Challenges[B] | | Eliminated | Vote | Finish |
|---|---|---|---|---|---|---|
| | | Reward | Immunity | | | |
| "The Marooning" | May 31, 2000 | Pagong[C] | | Sonja | 4–3–1 | 1st Voted Out Day 3 |
| "The Generation Gap" | June 7, 2000 | Pagong [D] | Tagi | B.B. | 6–2 | 2nd Voted Out Day 6 |
| "Quest for Food" | June 14, 2000 | Tagi | Pagong | Stacey | 5–2 | 3rd Voted Out Day 9 |
| "Too Little, Too Late?" | June 21, 2000 | Tagi | Tagi | Ramona | 4–2–1 | 4th Voted Out Day 12 |
| "Pulling Your Own Weight" | June 28, 2000 | Pagong | Pagong | Dirk | 4–1–1 | 5th Voted Out Day 15 |
| "Udder Revenge" | July 5, 2000 | Pagong | Tagi | Joel | 4–2 | 6th Voted Out Day 18 |
| "The Merger" | July 12, 2000 | None[F] | Greg | Gretchen | 4–1–1–1–1–1 | 7th Voted Out Day 21 |
| "Thy Name Is Duplicity" | July 19, 2000 | Greg | Gervase | Greg | 6–3 | 8th Voted Out 1st Jury Member Day 24 |
| "Old and New Bonds" | July 26, 2000 | Colleen, [Jenna] | Rudy | Jenna | 4–3–1 | 9th Voted Out 2nd Jury Member Day 27 |
| "Crack In the Alliance" | August 2, 2000 | Gervase | Richard | Gervase | 5–2 | 10th Voted Out 3rd Jury Member Day 30 |
| "Long Hard Days" | August 9, 2000 | Sean, [Richard] | Kelly | Colleen | 4–2 | 11th Voted Out 4th Jury Member Day 33 |
| "Death of an Alliance" | August 16, 2000 | Kelly | Kelly | Sean | 4–1 | 12th Voted Out 5th Jury Member Day 36 |
| "Season Finale" | August 23, 2000 | None | Kelly | Susan[E] | 2–2 | 13th Voted Out 6th Jury Member Day 37 |
| | | | Kelly | Rudy | 1 | 14th Voted Out 7th Jury Member Day 38 |
| | | Jury Vote | | Kelly | 4–3 | Runner-Up |
| | | | | Richard | | Sole Survivor |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Exhibit 3, Page 38 of 52

## Episode 1: The Marooning

- **Reward/Immunity Challenge:** Quest for Fire! The tribes swam to a raft where they had to pass and light their bamboo torch. Once they got to the beach they had to lift up their raft and run to the big statue. On the way, there were torches that needed to be lit. Once all of the torches are lit, teams had to light up a fire bowl. First tribe to light up the bowl wins immunity.
  - **Reward:** Water proof matches.

16 castaways began an adventure of a lifetime. There were already separated into two tribes. Both tribes made it to their beaches: Tagi in 2 hours, Pagong in 3. At the Tagi tribe, Rudy got on everybody nerves by taking command. No one at Tagi knew what to start doing until Richard spoke up. Richard was able to get everybody to get started on their camp. At the Pagong tribe, B.B. took leadership at camp. Colleen and Greg were wondering off alone. Back at Tagi, Sonja cut her leg but Sean was able to fix it up, and Stacey got annoyed with Rudy and wanted to get rid of him. At the immunity challenge, Pagong won after Sonja stumbled in the water. They voted out Sonja for being the weakest link 4–3–1.

## Episode 2: The Generation Gap

- **Immunity Challenge:** Each castaway was given a grub. If they refused to eat, their tribe would automatically lose.

At Pagong, people began to realize how they liked B.B., and everyone began to realize that Colleen and Greg were together. At Tagi, Richard told stories of him being gay. Richard didn't tell Rudy because he thought if he found out that he was gay Rudy wouldn't want to be near him. Greg kept everyone entertained with the All New Newly Stranded Survivor Game. The next day, B.B. got frustrated with his tribe because most of them were lazy and Ramona was sick. At the immunity challenge, each tribe member ate their grub, so Pagong picked Stacey and Tagi picked Gervase to represent the other team in a race to eat 2 grubs. Tagi won thanks to Stacey. Pagong went to their first tribal council where B.B. was voted out 6–2.

## Episode 3: Quest for Food

- **Reward Challenge:** Each tribe swam out to an inner tube attached to a sunken treasure chest. Once all of the tribe members are at their tube, they would dive down and drag their chest to shore.
  - **Reward:** Fishing supplies.
- **Immunity Challenge:** Each tribe built a stretcher, and raced into the woods to rescue one tribe member stuck in a tree. They then had to carry that tribe member back to the beach and to the first aid tent.

At the Tagi tribe, Stacey still wanted to get rid of Rudy and tried to create a girl alliance to do so, but Susan didn't want to be a part of the plan. At Pagong, Greg and Colleen found a big mud pit that the entire tribe was able to enjoy. At the reward challenge, Tagi won. Back at Pagong, everyone ate rats, including a hesitant Gervase and Ramona. At Tagi, Dirk annoyed everyone with his bible reading. Pagong won the immunity challenge. At tribal council, Tagi voted out Stacey 5–2. A surprised Stacey mentioned that people had changed their votes.

## Episode 4: Too Little, Too Late

- **Reward Challenge:** The castaways had to make a distress signal. the goal was to make the best

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    CPD 020608

S.O.S. signal for the plane (with Jeff in it) to see.
- **Reward:** Hammocks, towels and pillows, plus two additional items (one chosen by each tribe).

- **Immunity Challenge:** It was a five part relay race. The first member swam to a buoy, dove down and retrieved a map in a bottle. The second member ran across a floating bridge with the bottle to a waiting boat, where the second and third members would paddle to shore. The fourth member would break the bottle, check the map, and sprint into the jungle to find a rope ladder and a key. For the final leg, the two remaining tribe members had to locate a buried treasure chest and dig it up. The first tribe to unearth their treasure chest and bring it back to the start line and have the key inside the lock won.

At Pagong, Ramona started to feel better after having been sick and tried to put her work ethic to place, but Jenna said it might be too late for her. At Tagi, Sean and Dirk were busy fishing, but had no luck; Sean also tried to build a bowling alley. Kelly, Richard, Rudy and Susan created an alliance. At the immunity challenge, Gervase had problems on the sprint into the jungle and Pagong lost. They voted out Ramona 4–2–1.

## Episode 5: Pulling Your Own Weight

- **Reward Challenge:** Tribes would select three tribe members to shoot for the tribe in three rounds. The first one was a blow gun, the second round was a sling shot, and the third round was a spear toss.
  - **Reward:** Fruit and chickens.
- **Immunity Challenge:** One person from each tribe rowed their boat around the buoys, picking up their tribe members waiting in the water. The first tribe to get all members back to shore won.

At Tagi, Dirk and Sean were still trying to fish (with no success) instead of helping around camp. Susan told them that it was a waste of time if they weren't catching anything. At Pagong, everyone felt vulnerable because their tribe was getting smaller. At the reward challenge, Joel helped Pagong win reward with his spear throwing after the first two rounds were tied. At Tagi, Dirk and Sean began to help around the camp but that didn't change their tribe members' minds. At Pagong they decided to let their chickens lay eggs. At the immunity challenge, Gervase help Pagong to victory and Kelly, the white water rafting guide, was upset that "she got beat by a guy who couldn't even swim". At Tagi's tribal council, Dirk was voted out 4–1–1.

## Episode 6: Udder Revenge

- **Reward Challenge:** One at a time, each tribe member raced to a barrack. There were three different items in there (a can opener, a knife, and an Army helmet). The first tribe to get all of their items (with no duplicates) back to the start won reward.
  - **Reward:** Canned foods and a chocolate bar.
- **Immunity Challenge:** Both tribes raced through an Army obstacle course. The first two tribe members raced through the first part and met up with two more members, then they had to go through a puzzle and race to the finish line.

Each tribes were wondering what the merge was going to be like. At Tagi they were afraid that they might get outnumbered after the merge. At Pagong, Joel felt confident because they had the numbers. Colleen thought Joel was an idiot because they weren't merging yet and still had a chance of going in even. Gervase offended the girls by telling them that they were dumber than a cow. At Tagi, Richard

began walking around camp naked. At the reward challenge, Richard brought back a duplicate knife instead of a can opener and Pagong won by default. At Pagong, Gervase tried to create an alliance with Joel to get rid of the girls, and Joel started to get a little bossy, which annoyed the girls. Tagi won the immunity challenge in a very close race. With help from Greg, the women of Pagong voted out Joel 4–2.

## Episode 7: The Merger

- **Immunity Challenge:** All ten castaways submerged themselves underwater to see how long they could hold their breath. The top three castaways then had another competition of releasing buoys along a ladder submerged underwater. The first castaway to release all of their buoys would win immunity.

The day after Pagong voted Joel out, one person from each tribe went to the opposite tribe's camp and would then convene to decide which camp to live on. Jenna went to Tagi and Sean went to Pagong. After a bit of time at camp, Jenna and Sean met with each other at a neutral site (the sandbar) to decide which camp they wanted to live on and what to name the new merge tribe. They were welcomed by a feast, including lobster and wine, and got to stay the night under a canopy shelter and on beds. The next day, Jenna and Sean decided to live at the Tagi beach and named their merged tribe Rattana. All ten castaways are now together and everyone celebrated, except Rudy, who got annoyed because the population doubled. Greg won immunity after a close battle with Sean. At tribal council, the Pagong 5 (as well as Sean) were completely split and voted individually, while the Tagi 4 of Kelly, Richard, Rudy and Susan stayed together and voted out Gretchen 4–1–1–1–1–1.

## Episode 8: The Name Is Duplicity

- **Reward Challenge:** Each tribe member was to shoot at an archery target with a bow and arrow. The closest mark to the bullseye won.
  - **Reward:** A video from home and the chance to send a video home to them.
- **Immunity Challenge:** Each member was connected to a piece of rope and needed to go to the checkpoints in number order (1–6) and collect the color carabiners at each check point and then cross the finish line.

At camp, the remaining members of the former Pagong tribe felt vulnerable because the Tagi tribe voted out their leader Gretchen. Susan thought Jenna was going to be really annoying, but after a while realized she wasn't that annoying. Richard started to worry about who voted for him at tribal council. At the reward challenge, Jeff showed everyone a sneak peek at the award challenge except for Jenna because they never received a video for Jenna. Greg went first and no one hit the mark closer, so he won reward and saw his home video from his sister and sent one back to her. Rudy thought there might be some incest behavior between Greg and his sister. Jenna was frustrated about losing the reward challenge and instead of watching Greg's video, continued to practice with the bow and arrow, continually hitting the target closer than Greg's mark. People began to realize that Richard liked Greg because of the way he was playing the game. Greg realized that Richard was a powerful player in this game. Gervase won immunity. At tribal council, the Tagi 4 and Jenna piggy-backed off Sean's alphabet strategy and voted out Greg 6–3.

## Episode 9: Old and New Bonds

- **Reward Challenge:** A rope course with 16 legs, each leg had a medallion with the castaways number on it. First castaway to receive all of their medallions and get back to the center won reward.

- **Reward:** A barbecue and letters from home.
- **Immunity Challenge:** The castaways started on a square and moved one square at a time. As they moved, they had to flip over the square they were just on. Each castaway would go until they could no longer move. Last person standing wins immunity.

While Richard was catching fish, people began to realize that nobody voted him out because of it. Rudy didn't made the fire hot enough so the fish wasn't done when it got off the fire, and the attempt to recook it simply burnt it. At the reward challenge, Jenna wanted to win because she didn't hear anything from her family at the last challenge. It was a race between Colleen and Kelly, which Colleen narrowly won. When Colleen won, Jeff told her she could pick one other person and she instantly chose Jenna. After the reward challenge, it was Richard 39th birthday and he celebrated in his "birthday suit". Richard spent his entire birthday naked which disturbed some of his tribe mates, especially Colleen and Jenna. Rudy won immunity over Sean. Sean was convinced that his alphabet strategy of voting for people was the fairest way and that there was no alliance because he wasn't asked to be a part of it. He continued to vote that way and even told Jenna beforehand that he was voting for her but that he didn't think it would make a difference. At tribal council he was once again proven wrong, as Richard, Rudy, and Sue again piggy-backed off his vote and Jenna was voted out 4–3–1.

### Episode 10: Crack In the Alliance

- **Reward Challenge:** Each person started at one end of a balance beam. There were three rounds, where the first half to make it to the other end of the balance beam would move on. The first person to get to the end with both feet on the platform without falling off would win.
  - **Reward:** A slice of Pizza and a phone call home.
- **Immunity Challenge:'** Each castaway had a few minutes to grab all of the kindling necessary to build a fire. They then had to take their torch out to the water to floating woks, light their torch, and bring it back to their pile of wood to start their fire. The first person to burn through their rope won.

Some people were happy that Jenna was voted out because she was getting on everyone nerves. Everyone knew that Sean voted for Jenna and that Kelly didn't, so the remainder of the Tagi alliance felt betrayed by Kelly. The alliance thought about replacing Kelly with Sean because he might have been more valuable. Richard's plan was to catch more fish once Colleen and Gervase were gone. At tree mail, the castaways were surprised by cigars and a note saying that Gervase's son Gunner was born yesterday, which they celebrated. Gervase narrowly beat Richard at the reward challenge and had a chance to call his girlfriend and daughter to see how his baby was doing. He shared his slice of pizza with everyone. While he was making his phone call, Rudy questioned Gervase's life choices (having 4 children without being married) and said that having babies out of wedlock would have never happened when he was his age and that the girl would be "taken out of town" and dealt with. At the immunity challenge Richard easily won and at tribal council Gervase was seen as the biggest threat left from Pagong and was voted out 5–2.

### Episode 11: Long Hard Days

- **Reward Challenge:** Each castaway was given a questionnaire about Borneo. The person who answered the most correctly won.
  - **Reward:** The person will go on an overnight trip on a yacht and was given a Visa card.
- **Immunity Challenge:** Each person stood next to each other on a set of 5 planks. One plank would be removed over time until they got down to one plank. Whoever stayed on the longest

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
CPD0206110

would win.

The Tagi alliance began to crumble because Kelly was always talking to the remaining enemy of the alliance, Colleen. Camp life started to take a toll on everyone. Sean won a reward and was surprised to see his dad on the yacht. Sean told Kelly he was going to take her for the feast, but chose Richard instead, which infuriated the women. Sean brought his dad back to camp to meet everyone, who attempted to update them on current events and the stock market (although Sue thought he didn't know anything), and before he left, he gave each person a care package from their loved ones, which rejuvenated their spirits. At the immunity challenge, Rudy fell off first. Rich attempted to annoy people off the planks by singing "99 bottles of beer on the wall"...until he fell off at 64 bottles of beer. On the beach, Rich thought it was funny that Colleen was really trying to win immunity when she had no chance of going home tonight because they were going to blindside Kelly. Sean was third to go, followed almost immediately by Sue. Colleen fell off after 2 hours and 54 minutes, giving immunity to Kelly and foiling the Tagi alliance plans. At tribal council, Sean was grilled for taking Rich on the reward instead of Kelly. Colleen, the last remaining member of Pagong, was voted out 4–2.

## Episode 12: Death of an Alliance

- **Reward Challenge:** Under a time limit of five minutes, tribe members dove into a mud pit and covered their body with as much mud as they can, then raced back and scraped it off into a bucket. They could not carry mud in their arms or in their hands, only their body. The buckets are then weighed, and the heaviest bucket won.
    - **Reward:** A cold beer, then picked up, blindfolded and taken to a mysterious bar to watch the first five minutes of this season.
- **Immunity Challenge:** "Survivor Witch Project": Jeff told the castaways a story about Borneo folklore. Once he was done, the castaways went out to the woods (where the masks with questions on them were scattered) with a video camera to record their answers. The first person to get back to the start with all of the masks and the questions right on tape won immunity.

With only Tagi tribe members left, the two people that felt vulnerable were Kelly and Sean. Kelly mentioned that she didn't trust Rich, while Rich conspired to get Kelly off next. Sean thought he was stuck with the most conniving people ever. Tempers flared at camp as Kelly and Susan had a fight about their alliance since Kelly didn't vote with them again, and Sue said that Kelly made them all look like idiots. Richard attempted to smooth things over, although he said that the fight played to his advantage. Sue got hit by a ray and her hand swelled up. On day 34, all of the castaways talked about how they missed home. Kelly collected 15.9 lbs at the reward challenge, followed by Sean (15.4), Susan (15), Rich (12.4), and Rudy (10). After the reward challenge, Susan and Kelly rekindled their friendship. Kelly went with Jeff to watch the first 5 minutes of episode 1 and talked to Jeff about how the game was going for her. On day 36, Kelly and Susan agreed to keep civil with each other, although Susan told Kelly she didn't want her in the final 3 because she was such a threat. Sean knew he needed to win immunity and attempted to exploit the Kelly-Susan friendship. Kelly won her third challenge in a row. Sean said he was definitely winning this thing even though it would be an uphill battle. Rich tried to decide whether he would be voting for Sean or Rudy, although Rudy was confident that it would be him and Rich in the final 2. While everyone spoke of voting for different people, in the end the original Tagi 4 stuck together and Sean was voted out 4–1.

## Episode 13: Season Finale

- **First Immunity Challenge:** "Fallen Comrades": Jeff asked 10 questions about the jury members. The person who got the most the questions right won immunity.

The remaining 4 reflected on how much their bodies have changed, and how the game was played by them and by others. Kelly said she felt like the odd man out and was stressed because she didn't feel safe. She said that she was now playing for herself. Richard, Rudy, and Sue were planning to vote out Kelly if she didn't win immunity. At the challenge, Kelly and Sue were tied after 10 questions, but Kelly got the tiebreaker question correct, giving Kelly won her fourth challenge and third immunity in a row. Directly after at tribal council, there was a 2–2 tie between Richard and Susan. During the revote in which only Rudy and Kelly voted, Kelly changed her vote and Susan was voted out 2–0.

- **Second Immunity Challenge:** "Hands on the Immunity Idol": Each tribe member held on to the immunity idol while standing on a small log. The person who lasted the longest wins immunity.

At 4:00 am on day 38, the remaining 3 were awoken by Jeff, told to put on something comfortable, and took a long boat ride to their rite of passage and final immunity challenge. For their rite of passage, they covered themselves with mud, walked through palm fronds held by locals, passed the torches of their fallen comrades, then passed through a bamboo curtain and walked barefoot through a fire pit. After two hours of holding on the idol, Jeff tempted the three with oranges. After 2 1/2 hours, Richard gave a speech, said he wouldn't be able to outlast Kelly, and stepped down voluntarily. He said that it was a game of odds and he didn't know what the winner would actually do. After three hours, the two left switched positions while keeping their hand on the idol and were to do so every half hour. While the two were still standing on the pole, Rich addressed the alliance to Jeff and how he wasn't surprised that Kelly changed her vote. After 4 hours, 11 minutes, Rudy took his hand off the idol while switching spots, and Kelly won immunity yet again. Rich and Rudy both said it was in Kelly's best interest to keep themselves. At tribal council Kelly voted out Rudy because she thought she might have a better chance of winning against Richard.

At the final tribal council, Gervase asked if there was one, two or three things they would change about their time on the island, if anything at all (Rich said trusting people so easily; Kelly said making an alliance). Jenna asked who they would put in the final 2 and why (Rich said Rudy and Greg; Kelly said Sonja and Gretchen). Sean had no questions, but congratulated the two and thanked Kelly for being capable and keeping camp afloat, and told Rich that he enjoyed his company although he played the game differently. Colleen asked what three character traits got them where they are and are essential to get future players to the finals (Kelly said faith, strong will, and likability; Rich said self-awareness, observation of relationships, and ethics). Rudy said he had nothing to say to those two, but felt dumb after the mistake he made yesterday. Greg had them choose a number between 1 and 10 (Rich said 7; Kelly 3). Sue gave her famous "rat and snake" speech. In the end, Rudy, Sue, Sean, and Greg voted for Rich and Jenna, Gervase, and Colleen voted for Kelly. With that, Richard Hatch became Survivor's first millionaire by a vote of 4–3.

## Voting history

| | Original Tribes | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Episode #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Eliminated: | Sonja 4/8 votes | B.B. 6/8 votes | Stacey 5/7 votes | Ramona 4/7 votes | Dirk 4/6 votes | Joel 4/6 votes | Gretchen 4/10 votes | Greg 6/9 votes | Jenna 4/8 votes |
| **Voter** | Vote | | | | | | | | |
| Richard | Stacey | | Stacey | | Dirk | | Gretchen | Greg | Jenna |

| Kelly | Rudy | | Rudy | | Dirk | | Gretchen | Greg | Sean |
|---|---|---|---|---|---|---|---|---|---|
| Rudy | Sonja | | Stacey | | Dirk | | Gretchen | Greg | Jenna |
| Susan | Sonja | | Stacey | | Dirk | | Gretchen | Greg | Jenna |
| Sean | Sonja | | Stacey | | Rudy | | Colleen | Greg | Jenna |
| Colleen | | B.B. | | Ramona | | Joel | Richard | Jenna | Richard |
| Gervase | | B.B. | | Colleen | | Jenna | Susan | Jenna | Richard |
| Jenna | | B.B. | | Ramona | | Joel | Gervase | Greg | Richard |
| Greg | | Ramona | | Jenna | | Joel | Jenna | Jenna | |
| Gretchen | | B.B. | | Ramona | | Joel | Rudy | | |
| Joel | | B.B. | | Ramona | | Jenna | | | |
| Dirk | Sonja | | Stacey | | Susan | | | | |
| Ramona | | B.B. | | Colleen | | | | | |
| Stacey | Rudy | | Rudy | | | | | | |
| B.B. | | Ramona | | | | | | | |
| Sonja | Rudy | | | | | | | | |

| Jury vote | | |
|---|---|---|
| Finalist: | Kelly 3/7 votes | Richard 4/7 votes |
| **Juror** | **Vote** | |
| Rudy | | Richard |
| Susan | | Richard |
| Sean | | Richard |
| Colleen | Kelly | |
| Gervase | Kelly | |
| Jenna | Kelly | |
| Greg | | Richard |

## Production

In 1998, CBS offered Mark Burnett the chance to present his idea of this reality show to producers. In October 1999, CBS held a casting call for a new reality show concept. The idea was *Survivor,* in which sixteen people would be stuck on an island 20 miles (32 km) away from the mainland of Borneo. Ten main cameras were set on the island that would film the castaways every day. Every three days, a Tribal Council would be held in which

The abandoned institute is on the island of the boomerang's open "V." This is the leeward side of the island. It faces west, and the South China Sea sunsets turn the sand orange-purple each evening at 6:30. One these shores we built a dock for offloading equipment, then living quarters with cold-water showers for sixty-five personnel-the camera crews, the production staff, and the assorted other individuals vital to producing thirteen hours of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

one castaway would be voted off the island. The last castaway to be on the island would win $1 million.

> prime-time television.
>
> Mark Burnett, *Survivor: The Ultimate Game* — Page 11

Over 6,000 people applied for the show; 800 were then interviewed in sixteen cities. 48 people were then chosen, and after background checks and psychological evaluations done by the producers, the final sixteen contestants and two alternates were picked.[1]

As the survivors awaited the game's start, *Survivor* crews prepared the island for reward and immunity challenges, removing any harmful items, checking for any harmful animals in specific locations, and building a Tribal Council set. Camera and other crews were sent to the island three weeks in advance for testing. On the opposite side of the island from the tribes, headquarters were set up for the producers, and crew to live in on the island. This facility included many traditional trailers with running water, televisions, and one phone line. The Tribal Council set was built two hundred yards from the crew's facility. The Tribal Council set was 30 by 30 feet (9.1 by 9.1 m) with no walls and only a platform. In the middle of the set was a fire lava pit providing fire for the torches, which represented the castaways' life in the game.[1][7]

On March 7, 2000, the contestants were flown to Los Angeles, then to the city of Kota Kinabalu in Malaysian Borneo. From there, they were taken by boat to their island. Contestants were not allowed to speak to one another until they got on the boat headed towards their beaches.[1] The two tribes shared the island of Pulau Tiga, which was divided by over 20 miles (32 km) of forest. The castaways were surrounded by wildlife such as pythons, kraits, adders, monkeys, monitor lizards, and white-bellied sea eagles.[1][7] The show was set to air in the summer of 2000.[1][7]

## Reception

*Survivor: Borneo* received mixed reactions in the media. Bill Carter, a writer for *The New York Times* stated that *Survivor* has "clearly begun to emerge as part of the wider culture, with news and discussion about the show widespread on television and radio talk shows and coverage increasing in newspapers."[8] On the *Late Show with David Letterman*, David Letterman began a segment titled, "Top 10 Things That'll Get You Thrown Off the Survivor Island." During the first season, *USA Today* held coverage of the show as if it were a sporting event, listing which participant was voted off. *USA*

> I always believed it was going to generate strong water cooler conversation. Nobody could have predicted the ratings success. But I knew that the premise — a group of people marooned on an island, where they had to survive by working together, and they had to work against each other to win a million-dollar prize-I knew that premise was superior.
>
> Mark Burnett, *The New York Times*[8]

*Today* also held a poll to see who viewers would have voted off. With 26 percent, Susan Hawk won the poll, although it had no effect on the game, as Sue made it to 4th place. CBS's *The Early Show* held an interview with each contestant the day after the episode in which they were voted off aired. By the second week, the show had already gained over 18 million viewers, beating out ABC's show *Who Wants to Be a Millionaire?* in ratings.[9] After the season finale, Carter said that *Survivor* "built over a 13-week run to what was expected last night to be the biggest single television audience ever assembled for a summer television series, far eclipsed every expectation the network had when it acquired the rights to the show last year." Leslie Moonves, the president of CBS Television said that "it has beaten our expectations by about double."[8] The finale of *Survivor* was watched by 51.7 million viewers, the second-highest viewership of any American television episode during the first decade of the 21st

http://e...iki...GorE.../Survi... CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     CPD...0206915

century, exceeded only by the finale of *Friends*.[10] The finale had higher ratings than the World Series, N.B.A. finals, N.C.A.A. men's basketball finals, and Grammy Awards of that year. CBS was able to make the cost of commercial advertisers up to $600,000 during the season finale.[8]

*Survivor: Borneo* was criticized by the People for the Ethical Treatment of Animals (PETA) in response to footage showing the contestants trapping rats on the island, initially for fish bait but later for human consumption.[11]

> I plead to the jury tonight to think a little bit of the island we have been on. This island is full of, pretty much, only two things - snakes and rats. And in the end of Mother Nature, we have Richard The Snake, who knowingly went after prey; and Kelly, who turned into the rat that ran around like rats do on this island, trying to run from the snake. I believe we owe it to the island spirits we have come to know to let it end in the way that Mother Nature intended: For the snake to eat the rat.
>
> Susan Hawk, *Survivor: Borneo*, Episode 13[12]

Susan Hawk's "snakes and rats" speech given during the final Tribal Council has been considered one of the greatest and more memorable speeches in the show's history.[13][14]

## DVD release

The DVD release of season one was released by CBS Home Entertainment in the U.S. on May 11, 2004, after it had completed broadcast on television. As well as every episode from the season, the DVD release features bonus material including commentary, interviews and behind-the-scenes featurettes.[7][15]

| The Complete First Season | | |
|---|---|---|
| | **Set details**[15] | **Special features**[7] |
| | <ul><li>Audio commentary</li><li>664 minutes</li><li>5-disc set</li><li>1.33:1 aspect ratio</li><li>Languages:<ul><li>English (Dolby Digital 5.1)</li></ul></li></ul> | <ul><li>Documentaries</li><li>Episode Summaries<ul><li>Highlights</li><li>Immunity Challenges</li><li>Reward Challenges</li><li>Voting Results</li></ul></li><li>Survivor Profiles</li><li>Survivor Favorite</li><li>Voting History</li><li>Final Words</li><li>The Island</li></ul> |

**Release dates**[2]

| 🇨🇦 Canada | 🇺🇸 United States |
|---|---|
| May 11, 2004 | May 11, 2004 |

## References

Survivor: Borneo - Wikipedia, the free encyclopedia    Page 15 of 16

## Notes

- **A** The **Total Votes** is the number of votes a castaway has received during Tribal Councils where the castaway is eligible to be voted out of the game. It does not include the votes received during the final Tribal Council.
- **B** In the case of multiple tribes or castaways who win reward or immunity, they are listed in order of finish, or alphabetically where it was a team effort; where one castaway won and invited others, the invitees are in brackets.
- **C** The first challenge was a combined reward/immunity challenge. The winning team received immunity and waterproof matches.
- **D** Sometime between day four and six, a reward challenge took place that was not aired. The challenge involved holding weight on poles. Richard held the weight for Tagi, as Joel for Pagong. The reward was a map to a closer water hole.
- **E** The final four vote was tied with Richard and Sue each receiving two votes. In the tie-breaker vote, Rudy continued to vote against Sue while Kelly changed her vote from Richard to Sue.
- **F** There was no reward challenge because of the tribal merge.
- **G** Richard and Susan were not eligible to vote in the second Tribal Council vote.

## General

- "Survivor: Borneo contestants (Archived (http://web.archive.org/web/20051224192138/http://www.cbs.com/primetime/survivor/survivors/). CBS.com. http://web.archive.org/web/20051224192138/http://www.cbs.com/primetime/survivor/survivors/. Retrieved 2007-06-21.
- Burnett, Mark; Martin Dugard (2000). *Survivor: The Ultimate Game*. New York, New York: TV Books. pp. 237.

## Specific

1. ^ *a b c d e f g h i* Burnett, Mark; Martin Dugard (2000). *Survivor: The Ultimate Game*. New York, New York: TV Books. pp. 237.
2. ^ *a b* "Survivor I — Season 1 (Canadian)" (http://www.tvshowsondvd.com/releases/Survivor-Season-1-Canadian/3527). *TVShowsOnDVD.com*. http://www.tvshowsondvd.com/releases/Survivor-Season-1-Canadian/3527. Retrieved 2008-11-21.
3. ^ "Richard Hatch Sentenced To 51 Months" (http://www.thesmokinggun.com/archive/0516061hatch1.html). The Smoking Gun. 05-16-2006. http://www.thesmokinggun.com/archive/0516061hatch1.html.
4. ^ "Variety: 'Survivor' Finale Racks Up Phenomenal Ratings" (http://groups.google.com/group/alt.tv.survivor/browse_thread/thread/1cc03d896fa831eb/9054cb6ca2952f77?lnk=st&q=%22Survivor+Finale+Racks+Up+Phenomenal+Ratings%22&rnum=1&hl=en#9054cb6ca2952f77). Variety. 2000-08-25. http://groups.google.com/group/alt.tv.survivor/browse_thread/thread/1cc03d896fa831eb/9054cb6ca2952f77?lnk=st&q=%22Survivor+Finale+Racks+Up+Phenomenal+Ratings%22&rnum=1&hl=en#9054cb6ca2952f77.
5. ^ Porter, Rick (2004-01-20). "Burnett Wasted Little Time Finding 'Survivor' Stars" (http://tv.zap2it.com/tveditorial/tve_main/1,1002,271|85851|1|,00.html). Zap2it. http://tv.zap2it.com/tveditorial/tve_main/1,1002,271|85851|1|,00.html. Retrieved 2008-11-11.
6. ^ *a b* ""Survivor" (2000) — Episode list" (http://www.imdb.com/title/tt0239195/episodes#season-1). IMDB. http://www.imdb.com/title/tt0239195/episodes#season-1. Retrieved 2008-11-25.
7. ^ *a b c d e* Mark Burnett and Charlie Parsons-Executive Producer, Jeff Probst-Host. (2004). *Never Before*

*Seen Footage*. [DVD]. Paramount Pictures.

8. ^ *a b c d* Carter, Bill (2000-08-24). "CBS Is Surprise Winner in Ratings Contest" (http://query.nytimes.com/gst/fullpage.html?res=9D00E6DB1431F937A1575BC0A9669C8B63). *The New York Times*. http://query.nytimes.com/gst/fullpage.html?res=9D00E6DB1431F937A1575BC0A9669C8B63. Retrieved 2008-11-22.

9. ^ Carter, Bill (06-08-2000). "'Survivor' Is a Strong Draw, Proving Itself a Hit for CBS" (http://query.nytimes.com/gst/fullpage.html?res=9C05E4DD113FF93AA35755C0A9669C8B63&sec=&spon=&pagewanted=1). *The New York Times*. http://query.nytimes.com/gst/fullpage.html?res=9C05E4DD113FF93AA35755C0A9669C8B63&sec=&spon=&pagewanted=1. Retrieved 2008-11-22.

10. ^ Hibbert, James (2009-12-02). "Top 10 most-watched shows of the decade" (http://www.hollywoodreporter.com/hr/content_display/news/e3i70088a26615e879a5897d303a348a7ec?pn=1). *The Hollywood Reporter*. http://www.hollywoodreporter.com/hr/content_display/news/e3i70088a26615e879a5897d303a348a7ec?pn=1. Retrieved 2009-12-05.

11. ^ "Fury at 'tasteless' TV rat barbecue" (http://news.bbc.co.uk/2/low/americas/796293.stm). BBC. 2000-06-18. http://news.bbc.co.uk/2/low/americas/796293.stm. Retrieved 2008-12-09.

12. ^ "Survivor: Endgame" (http://www.televisionwithoutpity.com/show/survivor/the_final_four.php?page=1). Television Without Pity. 2000-08-23. http://www.televisionwithoutpity.com/show/survivor/the_final_four.php?page=1. Retrieved 2008-12-09.

13. ^ Denhart, Andy (2007-05-14). "Broken promises abound on 'Survivor' finale" (http://www.msnbc.msn.com/id/18648076/). MSNBC. http://www.msnbc.msn.com/id/18648076/. Retrieved 2008-12-09.

14. ^ Probst, Jeff (2008-12-04). "Jeff Probst blogs 'Survivor: Gabon' (episode 12)" (http://popwatch.ew.com/popwatch/2008/12/jeff-probst-blo.html). *Entertainment Weekly*. http://popwatch.ew.com/popwatch/2008/12/jeff-probst-blo.html. Retrieved 2008-12-09.

15. ^ *a b* "Survivor I — Season 1" (http://www.tvshowsondvd.com/releases/Survivor-Season-1/3527). *TVShowsOnDVD.com*. http://www.tvshowsondvd.com/releases/Survivor-Season-1/3527. Retrieved 2008-11-21.

# External links

- Official CBS Survivor Borneo Website (http://www.cbs.com/primetime/survivor/recaps/?season=1)

Retrieved from "http://en.wikipedia.org/wiki/Survivor:_Borneo"
Categories: Islands of Sabah | Survivor seasons

- This page was last modified on 12 May 2010 at 15:52.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

- Privacy policy
- About Wikipedia
- Disclaimers

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    CPD020618

Form #69 (Rev. 8/88)

WHITE — MASTER
YELLOW — WORKSHEET
CARD — FILE

**OREGON STATE POLICE**

PRIORITY    A    B    C

**SUBJECT INFORMATION**          MAKE NO MARKS IN THIS AREA

| LASTNAME Jenkins, | FIRST NAME David | MIDDLE NAME | DEPT. | DEPT. # | SID |
|---|---|---|---|---|---|
| NICKNAME OR ALIAS | | | SOC. SEC. # | | FILE NUMBER |

| HOME ADDRESS 1164 N Grape #4 | CITY Cqu. | STATE OR | ZIP | HOME PHONE 816-3174 | FBI # |
|---|---|---|---|---|---|
| OLD ADDRESS(ES) | | | | GLASSES | FACIAL HAIR |

| EMPLOYER/ADDRESS | CITY | STATE | WORK PHONE | OCCUPATION |
|---|---|---|---|---|

| RACE | SEX | D.O.B. 11/7/77 | PLACE OF BIRTH | AGE | HEIGHT | WEIGHT | HAIR | EYES | BUILD | COMPL |
|---|---|---|---|---|---|---|---|---|---|---|
| DR. LIC. # | | STATE | VEH. YR. | MAKE | | MODEL | COLOR(S) | | BODY STYLE | |
| VEH. LIC. # | | STATE | CONDITION/EQUIP. | | | | OTHER VEH/PLATE(S) | | | |

CONCISE TIP INFORMATION                                SOURCE NAME/XREF

Interview w/ Peet on 9-5-00    Zanni/Downing

Info from Peet was that on @ 8-22-00 she was at Michelle

Emle's Apt. behind Safeway, when she overheard Conversation w/

Nick McGuffin & David Jenkins, where David asked Nick

about him getting Carried away with strangling Leah.

**SOURCE INFORMATION**          MAKE NO MARKS IN THIS AREA

| LAST NAME Peet | FIRST NAME Kim | MIDDLE NAME R. | A.K.A.s | *According to Jenkins and others Nick was not at this Party* |
|---|---|---|---|---|
| RACE W | SEX F | D.O.B. 05-24-86 | HEIGHT | WEIGHT | HAIR | EYES | OCCUPATION/EMPLOYER | |

| ADDRESS 1164 N. Grape Apt #6 | CITY Coquille | STATE OR | ZIP |
|---|---|---|---|
| HOME PHONE 396-7045 | WORK PHONE | DEPT. | DEPT. # | SID |

ADDITIONAL INFORMATION          SUSPECT NAME

Interview w/ Jenkins 9-21-00   Zanni/Down

Jenkins was interview at CCJ on 9-21-00 He did

admitt that he was at Party at Michelle's (his residence also)

At party was David & Richard Bryant, Michelle, David and Misty (David Bryant's GF)
*Jenkins*

There was a Conversation between David Jenkins & Richard Bryant about

Leah, because Richard had heard alot of Stuff from his Dad and was

slabbing his mouth with him     *David spoke*

| RECEIVED BY | DATE | TIME | COMPUTER CHECK BY | DATE | TIME |
|---|---|---|---|---|---|
| ASSIGNED TO | DATE | | CCH | | |
| Zanni/Downing | SUSPENSE DATE | | CRISS | | |
| | | | NCIC | | |

EXHIBIT
0021
R. Paul Frasier
08.29.2023



EXHIBIT
0023
R. Paul Frasier
08.29.2023

| | |
|---|---|
| **From**: | Hormann, Susan [/O=OSP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SUSAN HORMANN944] |
| **Sent**: | 3/15/2010 11:50:08 AM |
| **To**: | Psmith@cityofcoquille.org |
| **CC**: | Grover, Celeste [Celeste.Grover@state.or.us]; Rose, Traci [Traci.Rose@state.or.us] |
| **Subject**: | Re: FBI Mito testing in Leah Freeman Case |

Lt. Smith,

I have attached the questions from the FBI. I know the DA wants the hairs done because the defense would make an issue if they are not examined. I know you have years of experience doing investigations and I do not want to step on your toes, but I want to be clear in the ramifications of your lab requests. Often people are unaware that hairs can be so easily transferred by direct contact or even through a secondary transfer. The following are topics to consider before proceeding with the trace evidence.

#1 The value of an association with anyone she has been known to have frequent or sustained contact with is minimal since we are unable to say when the hairs were transferred. In other words it has limited probative value to find her boyfriend's hairs or hairs of people that she has had previous contact with, especially recent.

#2 You are almost guaranteed to find foreign hairs in a trace exam. This ends up giving the defense the bushy haired stranger they are looking for.

#3 Trace can also be of great value if say pubic hairs from an individual are found on the interior clothing of a victim or a significant number of hairs that are consistent with coming from an individual that was a complete stranger to the victim or her associates. Also, hairs would be more probative if they are found in her hand or if in a clump. Another type of trace evidence to consider in this case would be fibers found on her clothing/body that are similar (or dissimilar) to that found in suspects' vehicle or trunk if Leah was never in the car prior to her disappearance.

From Les McCurdy at the FBI:
*What is the potential probative value of the hairs? Do you have any info regarding what may have occurred to these items at New Scotland Yard (NSY) and Microtrace? I would expect that Microtrace conducted a microscopic exam with no other analysis but want to better understand how these items may have been handled or treated. What did NSY attempt? Unfortunately, until I have a better understanding of what changed between 2000 to present – especially if the 2000 exam revealed "nothing of forensic significance". Are there DNA reference samples from the victim and 2 subjects?*

*In the end, should we determine that the examinations are worth pursuing we can potentially submit this case through our Regional mtDNA program. We can further discuss that after we determine how/if to proceed. I will wait to hear back from you regarding the work done by Scotland Yard & Microtrace. I would prefer to keep you as the conduit with the local investigators as you already have been in touch with them and have provided previous guidance.*

Once we are able to answer the questions asked by the FBI, we can proceed. Thank you.

Susan Torris Hormann
DNA Supervisor
Portland Forensic Laboratory
13309 SE 84th Ave, Suite 200
Clackamas, Oregon 97015
Direct No. 971-673-8258
Fax 971-673-8309


>>> "Pat Smith" <psmith@cityofcoquille.org> 3/9/2010 4:57 PM >>>

Susan,

Sorry I didn't get back to you sooner. As soon as I get the evidence back from Scotland Yard I'll look to see what kind of report they include. Also, I'll check with Kris Karcher and see if she has anything.

Thanks,

Pat

**From:** Susan Hormann [mailto:susan.hormann@state.or.us]
**Sent:** Friday, March 05, 2010 3:18 PM
**To:** Psmith@cityofcoquille.org
**Cc:** Celeste Grover
**Subject:** Mito testing in Leah Freeman Case

Lt. Smith,

I have attached some info on Mitochondrial testing by one private lab but there are other labs available if you do an internet search.  I will have Celeste contact the FBI to see if they will accept your case and what the turn around time will be.  In the past they have worked cases with trial dates fairly quickly so if you have a trial date scheduled let her know.

If you obtain a lab report from Forensic Science Services (Scotland Yard) it would be helpful for us to see for further evaluation of evidence in this case.  Also, to ensure that we do not repeat work that FSS did.

Talk to you soon.


Susan Torris Hormann
DNA Supervisor
Portland Forensic Laboratory
13309 SE 84th Ave, Suite 200
Clackamas, Oregon 97015
Direct No. 971-673-8258
Fax 971-673-8309

OSP002585