Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as )
an individual and as guardian )
ad litem, on behalf of S.M., a )
minor, )
 )
          Plaintiffs, )
 )
  v. ) No. 6:20-cv-01163-MK
 )
MARK DANNELS, PAT DOWNING, )
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. SHAPIRO )
AS ADMINISTRATOR OF THE ESTATE )
OF DAVID E. HALL, VIDOCQ )
SOCIETY, CITY OF COQUILLE, )
CITY OF COOS BAY, and COOS )
COUNTY, )
 )
          Defendants )
 )


REMOTE DEPOSITION OF RICHARD WALTER

Taken on behalf of the Plaintiffs

June 30, 2022

Page 2

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the deposition of RICHARD WALTER was taken by Aaron M. Thomas, Certified Shorthand Reporter and Registered Professional Reporter for Oregon, on June 30, 2022, commencing at the hour of 8:03 a.m., via Zoom.

APPEARANCES:

MALONEY LAUERSDORF REINER PC
Counsel for Plaintiffs
1111 East Burnside Street, Suite 300
Portland, OR 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
    By MR. ANDREW C. LAUERSDORF
        MS. JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore, Shelly McInnes
PO Box 62
Springfield, Oregon 97477
rfranz@franzlaw.comcastbiz.net
BY: MR. ROBERT E. FRANZ, JR.

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
100 SW Market Street
Portland, OR 97201
jesse.b.davis@doj.state.or.us
BY: MR. JESSE B. DAVIS

/////

AARON THOMAS COURT REPORTING - 503-961-5740

Page 2

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the deposition of RICHARD WALTER was taken by Aaron M. Thomas, Certified Shorthand Reporter and Registered Professional Reporter for Oregon, on June 30, 2022, commencing at the hour of 8:03 a.m., via Zoom.

APPEARANCES:

MALONEY LAUERSDORF REINER PC
Counsel for Plaintiffs
1111 East Burnside Street, Suite 300
Portland, OR 97214
acl@mlrlegalteam.com
jpuracal@forensicjusticeproject.org
    By MR. ANDREW C. LAUERSDORF
       MS. JANIS C. PURACAL

LAW OFFICE OF ROBERT E. FRANZ, JR.
Counsel for Defendants: City of Coquille, City of Coos Bay, Coos County, Craig Zanni, Chris Webley, Eric Schwenninger, Sean Sanborn, Ray McNeely, Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald, Michael Reaves, David Zavala, Anthony Wetmore, Shelly McInnes
PO Box 62
Springfield, Oregon 97477
rfranz@franzlaw.comcastbiz.net
BY: MR. ROBERT E. FRANZ, JR.

OREGON DEPARTMENT OF JUSTICE
Counsel for Defendants: Oregon State Police, John Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
100 SW Market Street
Portland, OR 97201
jesse.b.davis@doj.state.or.us
BY: MR. JESSE B. DAVIS

/////

Page 3

--oOo--

WOOD SMITH HENNING & BERMAN LLP
Counsel for Defendants: Vidocq Society and Richard Walter
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
kschaffer@wshblaw.com
BY: KARIN L. SCHAFFER


ALSO PRESENT:  Mr. Nicholas J. McGuffin

Page 4

EXAMINATION INDEX

Page

EXAMINATION BY MR. LAUERSDORF                6

* * *

EXHIBIT INDEX

| No. | Item | Page |
|---|---|---|
| 1 | "About the Vidocq Society" website printout | 173 |
| 2 | Article titled "Cold Case Squad:  Modern-Day 'Sherlock Holmes' Team Takes on Oregon Slaying," dated August 11, 2010 | 238 |
| 3 | Article titled "Murder on the Menu" dated November 19, 2012 | 244 |
| 4 | PowerPoint presentation: "Homicidal Death of Leah Nicole Freeman" | 250 |
| 5 | Statement Analysis, Leah Freeman, An Analysis by Mark McClish, dated September 23, 2011 | 260 |
| 6 | Synopsis of Vidocq Society Cases, 207.  The Murder of Leah Freeman, 2000 | 270 |

AARON THOMAS COURT REPORTING - 503-961-5740

Page 5

--oOo--

* * *

REQUEST BY COUNSEL

Page

REQUEST FOR PRODUCTION                                   153

REQUEST FOR PRODUCTION                                   169

Case 3:21-cv-01719-MTK   Document 218-93   Filed 02/18/25   Page 7 of 18

Page 6

RICHARD WALTER

having first been sworn by the Certified Shorthand Reporter,

testified under oath as follows:


EXAMINATION BY MR. LAUERSDORF:

Q.   Okay.  So I'll introduce myself first.  My name is Andy Lauersdorf appearing on behalf of the plaintiff, Mr. McGuffin, and the initials that I can't recall off the top of my head right now, but appearing on behalf of plaintiff.

Ms. Schaffer, if you want to introduce yourself.

MS. SCHAFFER:  Yes, Karin Schaffer, counsel for Defendant Vidocq Society and Richard Walter.

MR. LAUERSDORF:  Mr. Franz?

MR. FRANZ:  Yeah, I'll just be listening in.  Robert Franz, attorney for the municipal defendants and police officers.

MR. LAUERSDORF:  Mr. Davis?

MR. DAVIS:  Attorney for the state defendants.

MR. LAUERSDORF:  And then Ms. Rockett?

MS. ROCKETT:  Yes, I'm with Vidocq Society and Richard Walter as well and just listening in.

Page 176

A.   Yeah, because Bill -- Bill had some health issues and whatever else and felt it was time that he step aside, so he then accepted sort of an emeritus status and Howard -- not Howard, but Ben then took over.

Q.   Okay.  What does the deputy commissioner and chairman of the board do?  What's his role?

A.   Follow up.  Bill was a strong leader, so generally the deputy commissioner was in league with the commissioner.

Q.   Then in 2007, was there a deputy commissioner and case manager?

A.   Yes.

Q.   Who would that have been?

A.   That was Fred Bornhofen, who's now dead.

Q.   He was somebody that you mentioned earlier.

Is that right?

A.   Right.

Q.   And what was the role of the case manager at Vidocq in 2010?

A.   Departments would contact him to see if they could present at Vidocq and he would then review and then contact them if they were approved and then he'd arrange for them to be at a meeting.

Vidocq then would pay for their flight of two detectives to Philadelphia, they would water, house and feed them, and then they would present a presentation to the Vidocq Society, and then, as we discussed before, sometimes I would take them -- not always, but take them with others including Lebofsky would go along at night, take them out to dinner and have a discussion of the case that they had presented and then they would go home.

Q.    What were the -- in 2010, what were the annual dues for the Vidocq Society?

A.    I don't recall off the top of my head at the moment.

Q.    But the annual dues were enough to bring people in, pay for their flights?

A.    Well, earlier financial issues, we once had a treasurer who was very efficient at keeping the coffers full and would get donations and raise money to keep the coffers adequate.  Since that time, that policy has dissipated, so I don't know their current financial status.

I know that they still pay a lot of money to the -- what's that organization -- anyway, for their meeting spots and all that kind of stuff. I've wondered also about this, but I'm not the best

person to answer that question.

Q. So as far as the case manager goes, would all of the cases that came into Vidocq for review be routed through that person?

A. Right.

Q. So Fred Bornhofen would have had to sign off on the Freeman investigation?

A. Right.

Q. And he would have been an essential point of contact for the Coquille Police Department or whoever was presenting?

A. Yes.

Q. And how long ago did you say he passed?

A. Three or four years ago, maybe five, but I think probably three.

Q. Are you familiar with Mr. Bornhofen's process for how he brought cases in and evaluated them before signing off on them?

A. In brief, it was that they had to be cold for at least two years, the case had to be, and generally they did not take drug cases and they required to get some kind of a prediscussion of what the case was about and see if it met standards that somehow had been established, and from that, we would then decide yes or no.

Page 187

they are today, okay? I think they find acceptable today what I found unacceptable back then.

Q. So as of 2010, were you aware of a protocol for being -- a written protocol for being a member of Vidocq Society?

A. I believe there was. I'm not prepared to discuss it. Others who know more about it are the best evidence.

Q. But you believe there was written protocol for membership in Vidocq Society?

A. I believe there was.

Q. Where would that be kept?

A. I don't know at this point.

Q. Do you recall if -- let's see, I'm just going to go down a list of names.

Was Benjamin Redmond a member of the Vidocq Society in 2010?

A. Yes.

Q. Was he present when the Freeman case was presented to Vidocq Society?

A. He was there, yes.

Q. Do you recall whether he was there or not?

A. I don't know.

Q. Were you there when the Freeman case was presented to Vidocq Society?

A.  Yes.

Q.  But you don't recall if Mr. Redmond was?

A.  Correct.  There was a room full of people.

Q.  How about Mr. Fleisher, was he a member in 2010?

A.  Yes.

Q.  And was he present when the Freeman case was presented?

A.  I don't know.

Q.  How about Mr. Lebofsky, was he a member in 2010?

A.  Yes.

Q.  Do you recall if he was present when the Freeman case was presented?

A.  I don't know.

Q.  How about Mr. Gill, was he a member in 2010?

A.  Yes.

Q.  Do you recall if he was present when the Freeman case was presented?

A.  I do not remember.

Q.  All right.  How about Heather Hines, was she a member in 2010?

A.  I don't know her.

Q.  How about Carey E.G. Galvin, was he or she

the body or offer some kind of explanation for that?

A.    I don't recall being asked.

Q.    Okay.  So you don't recall specifically whether or not this is the PowerPoint or whether or not a PowerPoint was shown at all, but assuming there was some kind of presentation, what's your recollection of what happened with -- after the presentation was given, what happened next on the Freeman case?

A.    I think there was speculation that they didn't have enough to move forward in the room.

Q.    Were there small group discussions of any kind?

A.    No.  I think there were probably -- you asked me earlier, I did respond.  I think there were probably -- generally you'll find about 50 people there at the case presentation.

Q.    Okay.  After the presentation, did half of them get up and leave?  Did all of them get up and leave or stick around and --

A.    Yeah, they stuck around and chatted for a while.  They all had their opinions about this, that and whatever else.  I think that even Dannels and the police officer and everybody but the prosecutor thought that they needed more development and that

Page 256

they couldn't move forward with the prosecution.

However, then, we went to dinner, and it was at dinner, I believe -- it could have happened at the meeting, but I think it was at dinner, then, that the prosecutor then said that he thought it had legs and that he always wanted to try a circumstantial case and this -- he wanted to move forward on this, and I think Dannels and the other police officer weren't gobsmacked pleased, but gobsmacked by it all, okay?

Q.   Did you get the impression that the prosecutor was not convinced before coming to Vidocq?

A.   I don't know.

Q.   Okay.  I'm just kind of wondering why you got the sense that Dannels and the other police officer were gobsmacked.  It seems to me that if the prosecutor was already convinced that he could go forward, there wouldn't be much reason to come up to present at Vidocq Society.

A.   Well, how about this reaction, I'll imitate it, "Really?"

Q.   Okay.  So do you recall -- you went out to dinner, who all went to dinner with you?

A.   Just them and myself.

Page 257

Q. Anyone else from Vidocq decide to go with you?

A. No.

Q. What was discussed at the dinner?

A. The case.

Q. What specifically was discussed about the case?

A. Well, I think that they were still quite loose, very, very loose in their understanding of the collection of material that they had. I then -- I think I offered the suggestion that from my understanding that it was a PA case, that I would have some more evidence and to affirm that and I'd like to see more crime scene photos and all that, kind of stuff, okay?

Q. So at that point, was there a decision made that you would come back to Coquille with them at some point?

A. They asked me if I would, and I think I said it would depend on whether Vidocq agrees with it.

Q. And apparently Vidocq agreed with you.

A. Yes.

Q. Because you went back.

Do you recall during the presentation, did

Page 258

you take any notes?

A. No.

Q. Did you see anyone else at Vidocq taking any notes while they were reviewing the case?

A. I would disapprove.

Q. How about at the dinner, any notes taken at the dinner by anyone that you recall?

A. I can't affirm positively. I think the investigator did.

Q. Okay. And then after you had the dinner and talked a little bit, what happened next? How did the dinner end?

A. I went home. I went back to my hotel room. I can't remember -- it had to be Vidocq called me, or Fred, and said that they had contacted and wanted me to come out and I said "What does the Vidocq Society think about that?" and he said "It's your decision," and apparently it was okay and now the whole issue of payment and stuff is a mystery, but anyway, I got there.

Q. And did Mr. Bornhofen say who had contacted him?

A. No.

Q. So we don't know if it was Dannels or Frasier or who?

A.    Right.

Q.    Okay.  And when you say the question of payment is a mystery, what do you mean?

A.    We never could figure out who paid for the airfare and all that kind of stuff.

Q.    Okay.  Was it another one of those things where you tried to look at Vidocq's records, talked to the travel agents and that sort of thing?

A.    Yeah.  Yeah.

Q.    And there's no record of Vidocq paying for it?

A.    Well, they didn't -- they changed Frasier and all this kind of stuff, but I talked to the most recent treasurer and he looked and they only have six years back, they don't have ten years back.

Q.    So the decision was made that you would travel to Coquille and that Vidocq would participate.

What was the plan for Vidocq Society's involvement in the pre-investigation?

A.    Me going out and getting ideas and giving them suggestions and giving them a sense of perspective and letting them make up their own mind. That's how they wanted to proceed.  I did not say "Go get him," okay?  It's their choice.  I was there

Page 290

STATE OF OREGON      )

County of Multnomah )

I, Aaron M. Thomas, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public for the State of Oregon, do hereby certify that ROBERT WALTER personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and transcribed through computer-aided transcription; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

Witness my hand and Notarial Seal at Portland, Oregon, this 9th day of July, 2022.

_____
Aaron M. Thomas
Oregon CSR 04-0388