McGuffin v Dannels, et al.

**SUZANNE R. BEST, Ph.D.**
Licensed Psychologist

804 Officers Row, Vancouver, WA 98661
503-430-4071 • Fax: 503-296-2378

### INDEPENDENT PSYCHOLOGICAL EVALUATION

**Plaintiff**: Nicholas James McGuffin
**Case Name**: Nicholas McGuffin v Dannels, et al.
**Case No:** 6:20-cv-01163-MK
**DOB**: 4/25/82
**Date of Report**: 2/20/2024

*Notice: The conclusions and opinions presented in this report are derived and presented within a reasonable degree of psychological certainty.*

### REFERRAL INFORMATION
Nicholas (Nick) James McGuffin is a 41-year-old White male who was referred for an independent psychological evaluation by attorney Janis Puracal. Ms. Puracal requested an evaluation to determine what, if any, psychological condition(s) he may have developed as a result of having been the subject of a ten-year police investigation followed by a wrongful conviction and nine-year prison sentence for the 2000 murder of his girlfriend; his conviction having been fully exonerated in 2019.

### SOURCES OF INFORMATION
**Psychological Evaluation (9/25/23- 5.25 hours; 12/18/23- 1.5 hrs.)**
- Nicholas McGuffin

**Collateral Interview (1/18/24- 1 hr.)**
- Georgia Bartholomew (girlfriend)

**Records Provided by Counsel**
- 1st and 2nd Amended Complaint

### NOTIFICATION OF RIGHTS
Prior to beginning the evaluation, Mr. McGuffin was provided with a formal consent form detailing the nature of the evaluation and the limits to confidentiality, which he read, and we verbally reviewed. Specifically, he was informed that any findings derived from the evaluation would be transmitted to his attorney, Ms. Puracal, and may be shared in a court of law. Mr. McGuffin was informed that he could refuse participation at any time, though this would be indicated in my report. Mr. McGuffin expressed his understanding of the nature and purpose of the evaluation, as well as the limits to confidentiality and signed and verbally indicated his agreement to proceed with the evaluation.

1

McGuffin v Dannels et al.

**EVALUATION**

**Behavioral Observations and Mental Status**

Nick McGuffin presented on time to my office for both evaluation meetings. He appeared dressed in appropriate casual clothing with good hygiene. Mr. McGuffin readily engaged, though declined to respond to certain questions concerning the specifics of where he lived or worked, stating that he preferred not to have this information included in the report as he does not want anyone to know where he is or for his employers to know his history (see Testing Results for further information).

Mr. McGuffin's vocabulary and comprehension were average and consistent with his reported level of education. His speech was fluid and his thoughts linear, requiring little redirection. Mr. McGuffin's affect was contextually appropriate and generally well-managed, though he was noticeably tearful while discussing his parents as well as the death of his former girlfriend, Leah Freeman. He did not appear to be attending or responding to internal stimuli and his thought content was not indicative of delusions or cognitive disturbance.

**Clinical Interview\***

**Childhood and Family History**

Nicholas McGuffin was born in Portland, Oregon and raised from the age of two in Coquille. He reported that his father owned several farms through which he operated a produce business that was initially based in downtown Coquille. Mr. McGuffin recalled picking vegetables in the fields as a child, which he characterized as a positive experience, the only negative being that he was made to weed the fields as discipline. *"When you're in trouble, you get upset, but then you realize I deserved it."*

Mr. McGuffin fondly recalled his father's produce market as carrying all the fruits and vegetables that anyone would want. He reported that because the market was so successful, his father then purchased land on the outskirts of Coquille where he built a larger produce market and deli. Mr. McGuffin recalled that he enjoyed assisting his father in the deli where he helped prepare pizzas, paninis, and salads. He noted that he currently uses his family's potato salad recipe in the restaurant where he serves as head chef.

Mr. McGuffin reported that while his father managed the farms and store, his mother worked weekdays as an x-ray technician at Coquille Valley Hospital. He recalled that there were times when his mother was called in on an emergency, and he asked to go with her. *"It was kind of normal. It's a small hospital and everybody knows everybody."*

Asked who took care of him while his parents worked, Mr. McGuffin responded that his maternal aunt and grandmother lived nearby and so cared for him before he was school age, and that his mother was always home by the time he returned from school. He added that when he

*\*Italicized quotations are direct quotes taken from plaintiff*

2

was approximately 12, his father sold the store and began working as a long-haul truck driver which required him to be away 4 to 5 days each week.

Asked to describe his parents' relationship, Mr. McGuffin smiled as he responded, *"Actually, really good. It doesn't happen that much in this day and age."* Regarding his relationship with his parents, Mr. McGuffin stated that he was always very close with both. *"One thing about my parents is, growing up they were always somebody I could talk to. If I'm going to have any issues, I'm going to confide in them. They're like my best friends."*

Mr. McGuffin reported that during his incarceration, he had nearly daily contact with his parents and they visited once each month after he was transferred to Snake River in Ontario, Oregon. He became tearful as he recalled that following his release, he drove to his parents' home each weekend after getting off work. *"We'd talk until 3 or 5 in the morning. All that lost time; we'd try to catch up as much as we can."*

Mr. McGuffin reported that in the early 2000's, his brother moved to Hawaii soon after which his parents purchased property with the plan of retiring there. *"They probably would have made it in 2010 to 2015 but then I got arrested so they stayed in Coquille."* He stated that in late 2021, his mother was diagnosed with cancer and was still undergoing chemotherapy when his father died in May of 2022. Mr. McGuffin explained that his parents were in the process of selling their Coquille property when his father died unexpectedly. His mother then moved to Hawaii a month after his father's passing to live in a 40 ft. trailer next to the home that his brother Wayne had built on her property. He reported that after his mother moved, they continued to talk at least twice weekly and that because of the time difference, they would sometimes speak until 2:30 or later in the morning, leaving only a few hours before he needed to be at work. *"I didn't care. They're conversations you'll never get back."*

At the initial evaluation in September of 2023, Mr. McGuffin reported that his mother's cancer had metastasized, and she was receiving a new round of chemotherapy which left her tired and unable to talk for long. He noted that he had recently gone to Hawaii to visit her. *"I told her I wished I could take her cancer and give it to me to take her pain away. She said your dad used to say that too."* Mr. McGuffin's mother succumbed to cancer on October 11th, 2023. In reflecting upon the influence his parents had had upon him, he stated, *"I probably have both of their drive to not give up. They instilled that. We're not quitters. I try to pride myself in that."*

Mr. McGuffin reported that his grandmother, who he described as "another mom", visited monthly with his parents for the first six years of his Snake River incarceration and died six months before he was released. He added that his aunt, with whom he was also quite close, died soon after he was released from prison.

Nick McGuffin has one sibling, Wayne, who is two years his senior. He stated that they "fought like brothers do" while growing up, but that they always "hung out" and played sports together. Mr. McGuffin reported that after graduating from high school, his brother lived at home for a time before moving to Hawaii. Mr. McGuffin recalled that prior to his arrest, he and his brother were in regular contact, but that they spoke infrequently following his incarceration.

Asked why, he responded, *"When you're inside, you're kind of disconnected. People have their own lives and you kind of get left behind."* He added that he had served approximately two years when he and his brother had a falling out. "*It was because of an argument. He said that I had wasted Mom and Dad's money. That it was my fault that they didn't have a lot and that he wasn't going to get an inheritance."* Mr. McGuffin explained, *"It was the money they spent on my attorney fees. They spent over $100,000 and Grandma spent $50,000. "I asked, "Do you know what it's like to be in here and you're innocent?"* Mr. McGuffin reported that he and his brother did not have any contact for the following five years but that each year he asked his parents to wish Wayne a happy birthday. He again became tearful as he recalled, *"They told me it wasn't my fault and don't worry about the money. That's how my parents are. How they've always been."* Mr. McGuffin later noted that in addition to paying attorney fees, his parents put $300 on his books each month plus another $300 for phone calls and spent approximately $1000 on each of their monthly visits. *"When my brother said that stuff about the money, I guess it weighs on you. I was trying not to spend money. It wasn't mine; it was my family's. I wouldn't have needed that help. I was head chef when I was arrested."* (See Employment History below.)

Mr. McGuffin reported that shortly before his release, he and Wayne began talking again "like nothing happened" and that he and his brother have communicated more in the past few years than they had in the previous decade. *"It's a lot easier now."* He added that there had been some conflict between him and his brother when he was in Hawaii two weeks prior to the initial evaluation. Mr. McGuffin explained that his brother had called him a "burden" because he had come with his 16-month-old daughter who annoyed him and his girlfriend. During the second evaluation, however, Mr. McGuffin stated that he and Wayne had been "doing really good" since the passing of their mother and had been in daily contact including frequent lengthy phone calls. *"That was our promise to Mom."*

Mr. McGuffin denied any history of mental health or substance abuse issues in his family.

### Education and Employment History

Mr. McGuffin reported that he attended public schools in Coquille, Oregon and graduated from Coquille High School in 2000. He stated that he maintained a 'B' average throughout his schooling and took advanced math and science classes in high school. Asked about extracurricular activities, Mr. McGuffin reported that he was on the wrestling team in middle school and the baseball, basketball, and football teams his freshman year in high school which he then narrowed down to football only during his final three years. He denied ever having been disciplined for behavior problems, with the exception of his senior year when he received an in-school suspension for being late to his government class. He further explained that he was unable to wake up on time for school due to a motor vehicle accident injury (see Medical History below), and that his principal allowed him to serve out his suspension at home.

4

Mr. McGuffin reported that while in high school, he earned money washing, detailing, and greasing a neighbor's long-haul truck. He stated that for the first month following his high school graduation, he spent each day with his girlfriend Leah, and then "did nothing" learning of her death in August of 2000. Mr. McGuffin reported that after eight months, he recognized that he had to work. *"I needed money, so I crawled myself out of the hole I was in and got a job at Taco Time."* He recalled that he quickly rose to the position of night manager and remained at Taco Time for approximately one year. Mr. McGuffin then went on to work for the next six months treating wood at a lumber mill and then worked off-and-on in construction for the following few years. He explained, *"It wasn't easy to find work. Who I was wasn't easy after Leah went missing because I was a suspect. It made it hard to even go out anywhere.*

Mr. McGuffin reported that during this time, he helped out in his family's candle and lotion business. He recalled that he was selling his family's candles at an arts festival when his former athletic director saw him and asked what he was doing. Mr. McGuffin explained that he had always enjoyed cooking and that when he mentioned this to the athletic director, he learned that the local community college had a culinary school. He reported that he then visited Southwestern Oregon Community College the following week to meet with the director of the Oregon Coast Culinary Institute and enrolled that day. *"That was one of the smartest decisions I've ever made."* Mr. McGuffin reported that he completed all of his prerequisite classes the summer prior to entering culinary school and then attended culinary classes from 8-1:30 each weekday while working full time at a seafood restaurant. He stated that he enjoyed cooking at the Captain's Choice restaurant and that he waited tables as well to earn more money.

After completing his coursework, Mr. McGuffin relocated to Bend, Oregon to do his culinary internship at the Sun River Resort. He reported that he began as the morning banquet chef and was promoted to lead banquet chef within the first 30 days prior to having completed his internship. He noted that while working at the resort in 2008, he received his associate degree in culinary arts, having graduated at the top of his class.

Mr. McGuffin reported that after working approximately a year at Sun River Resort, he returned to Coquille because his girlfriend was homesick and insisted on moving back there with their daughter (see Relationship History below). He noted that he reluctantly returned to Coquille as he had a family to support and was concerned about his employment options. *"I said I can't make the same money back home. I can't even get a job there."* Mr. McGuffin explained that he had yet to be cleared in the on-going investigation of Leah's death and that this adversely impacted his ability to be hired. He was able, however, to return to the Captain's Choice restaurant, though he was paid only half of what he had made at the resort. He reported that after a month, he decided on a whim to submit his resume at the Mill Casino in North Bend and was called the following day. Mr. McGuffin noted that he was known to the casino staff for having beaten them in a culinary contest while working at the Sun River Resort. He recalled that after one month at the casino, he was made evening sous chef and was promoted to head banquet chef two months later. *"I got lucky."* Mr. McGuffin reported that at the time of his arrest, he was

5

enjoying his position as head chef and was told by the manager that he should expect to be promoted to executive chef within the next two to three years.

Asked what jobs he had while incarcerated, Mr. McGuffin responded that for the first six months, he was tasked with cleaning his unit. He then worked in the bakery for a few months before being assigned to cook in staff dining. Mr. McGuffin reported that he served as head cook in staff dining for approximately four years, at which point he asked to switch to an HVAC job. He explained that because he was on night crew, this gave him more time to work on his case during the day and to maintain a regular exercise routine. *"I always told my daughter I was going to make up for the lost time by living longer."*

Mr. McGuffin reported that in 2016 after being transferred to minimum status at South Fork, he worked in the forestry program planting trees, setting traps, and clearing trails. In addition, he was sent with a crew to fight multiple fires. Mr. McGuffin explained that it was a "near-death experience" while firefighting (see Trauma History below) that led him to return to working in the kitchen. He recalled that this actually turned out to be helpful as he worked a split shift which allowed him to focus on his case while all the inmate crews were out working.

Mr. McGuffin stated that he did not work for the first four months following his release. He explained that the legal assistant who introduced him to the Innocence Project then recommended him for a private chef position in Portland which he accepted as his former girlfriend had relocated there with their daughter. Mr. McGuffin reported that he remained working as a private chef for nearly one year until he was laid off due to the pandemic.

Mr. McGuffin recalled that following his lay-off, he applied for over 60 positions. *"I even applied to Dairy Queen and didn't get a response. It's hard to explain a 10-year gap in work experience."* He reported that he eventually contacted his attorney, Janis Puracal, and she connected him with someone who assisted him in obtaining a position at the Lake Oswego Country Club. Mr. McGuffin stated that he had been working at the country club for six months when the head sous chef was offered the executive chef position at Legends Bar and Grill in Molalla, Oregon and invited him to become his sous chef.

Mr. McGuffin reported that he worked over a year at Legends before seeking out another position. When asked to identify where he is currently employed, he declined stating, *"I don't want it in the report where I am. It's nice to not have anybody know me where I am. Everywhere else I worked, everybody knew who I was, and I didn't want to deal with negative thoughts and judgment of my innocence or guilt. With people looking everything up on-line and believing everything that's there. Then I have to work with people when I don't know if I can trust them."* He further noted, *"This is the first job since I got out that I didn't have to have help from my attorneys or someone in the law field."*

Mr. McGuffin stated that he enjoys his current position as head chef which he has been in since May of 2023. He further noted that he receives good pay and benefits and gets along well with the general manager as well as his kitchen staff. Mr. McGuffin estimated that he works 50

6

McGuffin v Dannels et al.

hours per week, leaving home at approximately 7:30 AM and returning between 4:30 and 9:00 PM.

**Relationship History**

Nick McGuffin reported that his "first true relationship" was with Leah Freeman who he began dating in 1999 during his senior year of high school. Mr. McGuffin described in great detail the first day he saw Leah and how he eventually worked up the courage to ask her out. He smiled as he recalled the plans they had made together, *"We wanted to have three kids; two girls and a boy"* and noted that they would most likely have married as soon as Leah graduated from high school as she was two years his junior.

On June 28, 2000, Leah Freeman was abducted and murdered (see Trauma History below for further information). Nick McGuffin became tearful as he said, *"I'd rather have met her and loved her and known that special a person and have all this happen than not."* He then added, *"But I always look at it as, I wish it could have been me that died and she would still be able to live her life."*

Mr. McGuffin reported that he met Maegan approximately one year after Leah's death. He explained that he was at a convenience store when he saw Maegan arguing with her then boyfriend, who was trying to force her into his car. *"I walked up and said, "Leave her alone. If she doesn't want to leave, she doesn't have to."* Mr. McGuffin reported that he and Maegan moved to Bend after he completed culinary school, and their daughter S.M. was born in 2007. Mr. McGuffin noted that Maegan's father had asked that S.M. be given his last name, though he refused and explained, *"They were told a lot of things by police. I think he didn't want our daughter to have my last name because of who people thought I was."*

Mr. McGuffin reoprted that he was enjoying his success as a chef at the Sun River Resort when Maegan became homesick and told him she was moving back to the Coos Bay area. He then reluctantly left his job and lived with Maegan and his daughter in Allegany and the Greenacres, Oregon until their relationship ended in approximately December of 2009.

Mr. McGuffin reported that his daughter was two years old when he was incarcerated in the county jail and his parents brought her to see him as often as possible. Following his conviction and transfer to Snake River prison, his parents and S.M. made the nearly 9-hour drive once each month. Mr. McGuffin described his visits with his daughter as "traumatizing" because he found it so difficult to say goodbye and know that he would not be able to tuck her into bed at night. In addition, he reported that because S.M. always wanted to go into the playroom, he was forced to endure being strip-searched following each visit (see Testing Results for further information).

Asked if his daughter ever asked why he was in prison, Mr. McGuffin responded that when S.M. was young, she repeatedly asked why he could not come home. He recalled that when she was approximately 7, she told him that his aunt had blamed her for something that her cousin had done. *"I thought, that's perfect. I said, "You know how you got blamed for something you*

7

*didn't do? Well, Daddy got in trouble for something he didn't do and he's an adult, so this is my punishment."* Mr. McGuffin noted that he did not tell S.M. what he was being punished for until she was approximately 11. He recalled that Maegan had given S.M. a phone that she could also use to access the internet and that this concerned him as he did not want her to learn about his case in that manner. Asked how S.M. reacted, Mr. McGuffin reflected, *"I think she felt bad for all aspects of it. I think she felt bad for Leah and for me. It frustrated her more and probably upset her more knowing that I was in there and didn't belong there and should be able to come home."* Mr. McGuffin reported that during his appellate process in 2019, he was offered a deal in which he would be released immediately if he agreed to plead guilty. *"I said innocent people don't take deals, but I have to talk to my daughter. I asked my daughter what she wanted me to do, and she said keep fighting. She said you told me never to quit."* Mr. McGuffin further recalled the frustration felt by both him and his daughter when after his conviction was overturned, he had to remain in prison for another month while the D.A. deliberated on whether to retry the case. *"I'd won and I still had to tell my daughter, I can't come home."* Mr. McGuffin became tearful as he recalled, *"The first day I got out, my parents picked me up and we went straight to see S.M.. We brought her to my parents' house, and I had her the whole Christmas break. It's a good memory."*

Asked how he thinks S.M. has been affected by his incarceration, Mr. McGuffin responded that he believes she is "closed off" and has difficulty expressing herself because she has been overly sheltered. He explained that because of the media and law enforcement interest in him and his case, he and Maegan have not taken S.M. many places. Mr. McGuffin added that he believes his relationship with his daughter has been significantly impacted by his absence. *"She's a teen and I'm her dad but I can't really be a parent to somebody you haven't been a parent to. I don't feel right saying don't do that. I rarely say no because I want to give her everything. She didn't get a lot… not the time she was supposed to get with her father or me with my daughter and now it's not any easier."*

Mr. McGuffin reported that following his release, he moved to Portland to be closer to Maegan who was living there with her fiancé and S.M. Approximately a year-and-a-half ago, Maegan broke off her engagement and returned to Coquille, then asked Mr. McGuffin to move there as well. *"I told her I can't go back to Coquille. I'd never be able to find a job and support myself, let alone child support."* Mr. McGuffin expressed frustration that he does not see S.M., who is now 16, as often as he would like but is happy that they now message each other on a daily basis.

Mr. McGuffin reported that after moving to Portland, he began communicating through an on-line dating site with Aleksandra. He explained that after a month, they were talking every day, but did not meet for another three months because of COVID precautions. Mr. McGuffin reported that he and Aleksandra began cohabitating after six months of dating and their daughter was born in May of 2022 though their relationship had previously ended. Mr. McGuffin reflected, *"Our relationship ended due to both of us. I'm pretty closed off and don't open up a lot. I've not*

8

*always been that way but since all this happened, there are a lot of times I don't know how to explain things or don't want to. She had a hard time understanding me."* He then noted at one point, Aleksandra found and read the diary he had written while in prison, which upset him because it was private. McGuffin reported that since he and Aleksandra separated, he has paid her rent and cares for his daughter 3 to 4 days per week whenever he is not working.

Mr. McGuffin reported that he began dating Georgia, who he met while working at Legends, in the summer of 2022 and they have been living together for approximately one year. He stated that he and Georgia get along well and only argue about outside family issues. *"I decided that maybe if I opened up more and let her inside my brain a little bit more it might help."*

When asked if he considered himself to be relationship-oriented, Mr. McGuffin agreed that he was, though he reflected that he has a tendency to self-sabotage. *"When I find a person, I get scared; scared of losing that."* In addition, he stated that because he has been wrongfully accused and people did not believe him, he has difficulty trusting others. Asked how he manages relationship conflict, Mr. McGuffin responded that he will generally shut down and not speak. He noted that he has been particularly upset on the two occasions when Georgia has left the house during an argument because he does not know where she is or whether she is safe. *"It causes me anxiety. It brings back the stress of not being able to find Leah. If I don't know where you are, anything can happen."* (See Collateral Interview and Testing Results for further information.)

Asked about friendships, Mr. McGuffin stated that after he became a suspect in Leah's death, he lost most of his friends, and the couple who remained did not communicate with him following his arrest. He reported that since his release, he has found it difficult to relate to people, but that he generally gravitates towards "a younger crowd". Mr. McGuffin explained, *"A lot of that comes from prison which is like being in an all-boys college. Everyone acts like they're 20-25 years old.".* He noted that he does not feel the 21-year age difference between himself and Georgia has interfered with their relationship. *"We communicate great and have the same interests. To be honest, the only thing that impacts it is the judgment from others. I think it bothers me more because of how I've been judged in my life."*

**Medical History (by plaintiff report)**

Mr. McGuffin denied any birth complications of which he is aware and did not recall any significant childhood illnesses other than a brief case of Giardia. He reported that at age five, the back of his heal was cut off by a riding lawn mower that his father was driving (see Trauma History below for further information). He explained that his heel was repaired with a skin graft and that he it has not caused him any residual difficulties.

Mr. McGuffin recalled another childhood accident that occurred when he was elementary school age in which he and another child collided head-to-head. Although he does not believe that he lost consciousness, he recalled that his eyes remained swollen for nearly two months.

9

McGuffin v Dannels et al.

In his senior year of high school, Mr. McGuffin separated his AC joint while playing football. He reported that he was then a passenger in an automobile accident in which the driver careened into a ditch, causing him to break his C-5 and C-7 vertebrae (see Trauma History). In addition, he received a laceration on the side of his head, though he did not lose consciousness. Mr. McGuffin reported that since the accident, he has experienced a stiffness in his neck and is unable to turn his head quickly, but has otherwise not had any residual problems.

Mr. McGuffin reported that at age 21, he underwent back surgery to repair a herniated disc. He stated that he continues to experience back pain which was exacerbated by years of sleeping on prison beds.

Finally, Mr. McGuffin reported that when he was transported from the county jail to Snake River, he suppressed his need to urinate because he would have had to do so in the back of the bus while shackled in a jumpsuit. He then experienced difficulty urinating, which resolved after approximately one year.

Asked about prescription medications, Mr. McGuffin reported that prior to his incarceration, he took Flexeril and Percocet for back and neck pain. He stated that he now only takes an occasional Tylenol and does not have any standing prescriptions.

**Mental Health Treatment History (by plaintiff report)**

Mr. McGuffin denied ever seeing a counselor or therapist in childhood or adolescence. He reported that he then saw a mental health professional briefly in 2002. *"I had a lot of issues. A lot of depression and probably anxiety."* He explained that he attempted suicide by taking a bottle of Acetaminophen and was hospitalized on a psychiatric unit for one week, after which he met with a therapist for approximately five sessions. Mr. McGuffin recalled that because the therapist was part of the Coquille community, he knew that he was a suspect in Leah's death. "*I felt that he was judging me and didn't believe me."* He reported that in addition to therapy, he was prescribed Effexor which caused him to no longer care about anything, and so he stopped taking it.

Mr. McGuffin denied receiving any mental health treatment while incarcerated, though he did speak with a counselor on a few occasions regarding his case. He stated that he had not sought therapy since his release as he has been focused on reconnecting with family and rebuilding his career. Asked if he has considered therapy, Mr. McGuffin expressed his belief that although it will be difficult, he would greatly benefit from seeing a therapist and stated that he has the intention of doing so as soon as the present lawsuit has resolved.

**COLLATERAL INTERVIEW**

On 1/18/24 Nicholas McGuffin's girlfriend, Georgia Bartholomew, was interviewed via phone. Ms. Bartholomew reported that she and Nick met in August of 2021 while working at Legends Bar and Grill, and they began dating in 2022. She stated that she had not dated anyone previously because she found males in her age group to be too immature and had difficulty

10

trusting men. Ms. Bartholomew explained, however, that Nick McGuffin was different in that she was able to talk with him comfortably for hours and never had a sense of distrust.

Asked to discuss their 21-year age difference, Ms. Bartholomew responded that she and Nick connected because they have similar interests and values. She noted that he does not act like a man in his early 40's in that he can be playful and is more comfortable with younger people. Ms. Bartholomew further stated that since she has known Nick, he has been uncomfortable around people his age and reflected that his social maturity may have been stunted during his incarceration. She later reflected upon what she has learned over time from Nick. *"I don't think he'd be like that if he hadn't been incarcerated. Also, a lot had to do with everything that happened with Leah being missing and her death, then him being accused and trying to fight all the emotions and having to deal with all the cops investigating and harassing him. Everything that he went through with Leah, but then them playing on those emotions. He's already traumatized by that and then the cops adding to that and then prison probably added to it because it made him feel like time stopped."* She added, however, that Nick is quite mature when it comes to work, financial, and parenting roles and responsibilities. *"When it comes to that, he definitely acts his age."*

Ms. Bartholomew stated that when Nick first told her about his history, she felt shocked and saddened. Asked whether she believes he continues to be impacted by Leah's murder, she responded, *"It affects him a lot. That's a huge reason for why people say he needs to be moving forward. He's stuck in the past."* Ms. Bartholomew explained that Nick's brother has been particularly vocal about him needing to "move on", but that Nick has repeatedly said he cannot until he knows what happened. *"Her murderer is still out there. I know he's thinking about it all the time and is trying to put the pieces together. He hates unknowns now because of it."* Asked if this impacts their relationship in any way, Ms. Bartholomew responded, *"It causes him to shut down sometimes. It's hard for us because I can see that he's upset and I'm empathetic. Those emotions weigh on me and I try to talk to him, but he gets frustrated and doesn't know how to communicate it".*

Asked how Nick manages conflict, Ms. Bartholomew reflected that it depends upon his mood as he can become either very quiet or quite verbal, using "mean words". She stated, however, that Nick does not tend to raise his voice and has not ever become threatening or physically aggressive. Ms. Bartholomew added that on rare occasions, Nick has left the house during an argument but has continued to text her and has returned after one or two hours. Asked if she has left the house, she responded, *"Not often. He gets more upset or scared if I do. He asks me to come back because the idea of me being gone and what can happen and him not being there like with Leah."* Ms. Bartholomew reported that Nick tends to worry about her in general when they are apart and asks her to always communicate with him about where she is going and who she is with. *"He always needs to know I'm safe. He doesn't like me going out in public alone because it scares him, and he doesn't trust anybody."* She noted that Nick's need to know her whereabouts does not bother her as he always communicates his location with her and so she does

11

not feel as though he is controlling. Asked whether Nick tends to be anxious, Ms. Bartholomew responded, *"He's definitely an anxious person. How worried he can get; you can see it on his face or in his tone of voice."* She added that when Nick becomes anxious about something, he tells her he no longer wants to discuss the topic and simply shuts down.

Asked about Nick's sleep, Ms. Bartholomew reported that he sleeps quite poorly as he awakens several times each night and that it generally takes an hour or more for him to return to sleep.

Ms. Bartholomew reported that in spite of his fatigue, Nick works a great deal. *"Part of it is a distraction but a lot has to do with he feels like he's constantly catching up for lost time."* She noted that in addition to paying child support, Nick pays the rent for his youngest child and her mother as well as their own rent. *"He carries a lot of weight."* Ms. Bartholomew noted that Nick worries a great deal about losing his job, even though he is well liked by his managers. *"He hates the idea of anyone knowing about his past and misjudging him for it. As far as we know, no one at his job knows about it, but he's very wary."* She later added that because he was wrongfully accused, Nick tends to be highly sensitive to the smallest criticism or accusation and will immediately become defensive.

Asked what she knows about Nick's years of incarceration, Ms. Bartholomew responded that they have discussed it at great length and reflected, *"It really messed up his head. Being away from his family; his daughter and his parents. The inmates also affected him in the way that he doesn't trust people."* She added that Nick has talked with her about the impact of being strip searched after each visit with his daughter. *"He says it was very invasive and uncomfortable and felt like a sexual assault and like part of his identity was being taken away. He was treated like an animal, and it was emotionally traumatizing. He hated it but it was more important to see his daughter and so he endured it every time."*

Asked how Nick was affected by the recent loss of his mother, Ms. Bartholomew responded that she was truly his best friend with whom he shared everything and so he felt that she was the only person who truly understood what he had been through. She added, *"It angers him in that he's always reminded that both of his parents passed away early and knowing that he spent almost 10 years in prison and losing all that time with them."* Ms. Bartholomew explained that while his parents were alive, he felt a constant pressure to "catch up" for the time that he had lost and that he now blames himself for their relatively early deaths. *"That they paid all this money to help him, and it caused stress that made them go to an early grave. He feels guilty and ashamed. I'll tell him it's not his fault and reassure him, but he fights it in his head and says, "They would have been here if I didn't go through all this." He repeats that over and over."*

Finally, when asked if she believes that Nick has the ability to work through these experiences, Ms. Bartholomew responded, *"I don't think he could ever do it on his own. I've tried to help him a lot, but I think he needs a lot of help from an actual therapist who's trained."*

**TEST RESULTS**

**Tests Administered:**

- **Personality Assessment Inventory**
- **Mini Neuropsychiatric Interview for DSM-5 (M.I.N.I. 7.0)**
- **Clinician Administered PTSD Scale (CAPS-5)**

**Personality Assessment Inventory (PAI)**

The *PAI* is a 344-item standardized self-report inventory used to assess personality and psychopathology. Nicholas McGuffin's responses to the assessment were consistent and did not indicate an attempt to present himself in either an overly favorable or pathological light.

Mr. McGuffin's responses reflect mild to moderate symptoms of depression and anxiety. He reported having experienced a disturbing traumatic event(s) that continues to cause him distress. While he can be independent and somewhat standoffish in relationships, Mr. McGuffin's responses also indicate a tendency to be preoccupied by fears of abandonment and rejection.

Mr. McGuffin can be highly self-critical and troubled by self-doubt. His responses are consistent with those who blame themselves for failures while crediting others for his successes.

Finally, Mr. McGuffin did not respond as someone who is highly motivated to seek treatment, which may be due in large part to his discomfort with sharing personal problems and his general sense of distrust.

**Mini Neuropsychiatric Interview for DSM-5 (M.I.N.I. 7.0)**

The *MINI 7.0* is a structured diagnostic interview for Axis I psychiatric disorders. In respect to mood symptoms, Nicholas McGuffin reported that he did not experience depression until the age of 18 when his girlfriend was killed. He recalled that after Leah's death, he "did not do anything" for 8 months at which point he "crawled out of the hole" because he knew that he needed to work. Mr. McGuffin reported that although he had thoughts of death during this time, he did not know how to kill himself and was too afraid to try.

Mr. McGuffin reported that in 2002, he attempted suicide by ingesting a bottle of Acetaminophen. Asked why, he explained that law enforcement officials had contacted his girlfriend Maegan's parents and told them that he was their prime suspect in Leah's murder. *"They wouldn't let me see her. I was off the deep end."* Mr. McGuffin reported that although he continued to feel depressed after being released from the hospital, he did not make another suicide attempt. He recalled that following his conviction, he was placed in a suicide vest for 72 hours and cried the entire time, though what he wanted most was to be taken off of suicide watch. Mr. McGuffin stated, however, that during his incarceration, he thought a great deal about wanting to die but did not attempt to harm himself because of concerns for how his daughter and parents would be impacted by his death. In reflecting upon death Mr. McGuffin stated, *"When I was in prison, everybody moved on. People forgot about me and didn't care and there was only my parents and grandmother. Then my grandmother dies six months before I get out and she was*

13

*like another mom. Then Mom gets cancer and Dad dies and now Mom. All the people you trust are gone. Now I have kids who need me, but my biggest fear is dying alone."*

Asked if he currently experiences depression, Mr. McGuffin responded that he has become "hardened" and is better able to "play it off" but will still have sudden moments of deep sadness. *"I can be really happy and then have a thought and become sad and depressed. I can be in a good mood and then I think about Leah and can get down, but then I get right back out of it."* However, he later reflected, *"I fake happiness a lot. I can be joking around but sad in my head about Leah."*

Mr. McGuffin reported that he is anxious about going places where people might know his name because he fears that they will misjudge him based upon his wrongful conviction. Throughout the course of the evaluation, he expressed concerns that my report would reveal identifying information that could become public such as where he lived or worked and noted that he has not discussed his history with his current employers. Mr. McGuffin reported that when he becomes anxious, his heart races and his temperature rises, though he did not describe physical symptoms consistent with panic attacks. Asked if he worries about bad things that might happen to him or his loved ones, Mr. McGuffin responded that the loss of Leah has led him to the realization that "anything can happen" and he fears that God will take away everyone he loves.

Regarding substance use, Mr. McGuffin reported that he first drank alcohol at the age of 14. He stated that his alcohol use increased following Leah's death and that following the birth of his first daughter, he decreased the frequency of his drinking but increased his tendency to binge drink. In terms of his current drinking, Mr. McGuffin considered, *"I know I do drink and if I have a drink, I don't want it to affect me. I do like to drink but at the same time I don't."* He stated that approximately one year ago, he stopped drinking for a period of three months, and does not know why he began again. At the time of the initial evaluation in October of 2023, Mr. McGuffin reported that he had been consuming 3-4 drinks each night and that he had decided that morning to decrease his drinking. At the second evaluation in December, he reported that he was continuing to drink approximately four double shots each night. *"The last time I was contemplating quitting and I'm still contemplating. At least I'm not in denial."* Mr. McGuffin further reflected that the stressors in his life as well as his prior stressors and trauma have been the driving force behind his alcohol use. In addition, he later noted that he drinks alcohol nightly as a sleep aid.

Mr. McGuffin reported that he began smoking marijuana in high school. He stated that between the time of Leah's death and his arrest he was smoking twice daily, but that since his release, he has smoked marijuana less than 12 times as it causes him anxiety. *"It makes me go back to all the things that have happened. It makes me relive it all."*

Mr. McGuffin stated that following Leah's death, he used methamphetamine a few times each week for a period of 4 to 6 months before quitting "cold turkey". He reported that he began using methamphetamine again in 2009 and explained, *"When I was being harassed by the cops, I started meddling with oxy. I didn't want to do it, but I was stressed out and lost by being followed*

14

*all the time."* He reported that he smoked Oxycontin for several months and then used methamphetamine to help him taper down from Oxycontin. Mr. McGuffin stated that he was "pretty much off it all" at the time of his arrest and has not used either drug since his release. He reported that currently he takes cannabis edibles along with alcohol to help him sleep and does not engage in any other drug use.

**Results:** The results of this assessment indicate that Nicholas McGuffin has experienced persistent bouts of sadness since the death of his girlfriend in 2000. He did not, however, meet criteria for a depressive disorder as his low mood is specific to the loss of a loved one rather than a more generalized sadness and is thus consistent with Prolonged Grief Disorder (see PTSD assessment for further information). Mr. McGuffin's experience of anxiety and worry does not rise to the level of an anxiety disorder, but is instead indicative of posttraumatic stress (see below). Although he expressed a desire to reduce his alcohol use, Mr. McGuffin did not meet criteria for Alcohol Use Disorder as his use has not resulted in negative consequences or functional impairment.

**Clinician Administered PTSD Scale (CAPS-5)**

The *CAPS-5* is a semi-structured clinical interview of current (in the past month) and lifetime symptoms of Posttraumatic Stress Disorder. Prior to conducting the PTSD assessment, a thorough trauma history interview was conducted utilizing the Life Events Checklist-5 Interview Version.

**Traumatic Events**

Nicholas McGuffin denied experiencing any abuse, assault, or threatening natural disaster during childhood or adolescence and he denied ever witnessing any such traumas. He reported that at age 5, his father accidentally backed into him with a riding lawn mower, cutting off the back of his heel.

At age 17, Nick McGuffin was riding as a passenger when his friend accidentally drove into a ditch. He recalled that after extricating himself from the car, he ran after a bus hoping to get a ride home, not knowing that he was bleeding profusely from the right side of his head and had suffered a neck injury. Mr. McGuffin denied having felt fearful or fearing for the safety of the driver who was uninjured, and he credited the fact that he was later in a neck sling with providing the opportunity to meet Leah.

Asked to discuss the series of events associated with the homicide death of his girlfriend Leah, Mr. McGuffin began by describing how after school was out, they spent every day together "hanging out". He explained that on the evening of Leah's abduction, he had dropped her at a girlfriend's house and then went to spend time with some friends, promising to pick her up at 9 PM. Mr. McGuffin reported that he was late returning to Leah's friend's house and was told she had already left on foot. He then described his increasing fear as he drove around the area in search of her and repeatedly called both his parents and her mother.

Mr. McGuffin reported that after a few days, there were rumors that Leah had been seen in a nearby city and so he and his father went there to distribute flyers. *"I was scared and as time*

15

Case 3:21-cv-01719-MTK    Document 276-2    Filed 07/07/25    Page 16 of 29

McGuffin v Dannels et al.

*went by, I knew it couldn't be good, but the whole time I still had hope that she was okay."* He then tearfully described the day he was told that Leah's body had been found.

Mr. McGuffin reported that there was a period of 2-3 years after Leah's death that local police followed him "everywhere" and again beginning in 2009 until his arrest. He recalled repeatedly seeing the police sitting across the street from his house and in his rearview mirror which caused him to feel quite anxious. Mr. McGuffin further reported that while working at the casino during the last few weeks prior to his arrest, he would find police waiting for him in the parking lot. *"I worried about what they were doing to my car. It stressed me out so much. I remember breaking down to my dad and mom saying that I can't deal with it anymore."*

Asked to describe the day of his arrest, Mr. McGuffin's hands began to observably tremble as he responded, *"I was in shock. I remember them pointing guns at me, rushing me immediately and kicking my feet. I remember them throwing my phone and hitting my hat off my head. Now I think it's because they had a bunch of camera crews and wanted them to see my face."* He further recalled, *"They kept asking, "Do you know what this is for?" I was crying and said, "It's because I'm the boyfriend."*

Mr. McGuffin reported that while incarcerated in the county jail awaiting his trial and subsequent sentencing, he was jumped from behind by a fellow inmate, causing a head injury and ringing in his ears. *"It was pretty traumatic because I didn't know what was happening."* He added that the incident was made more distressing by the fact that his family was just leaving the visiting area and so he worried that his daughter and parents had witnessed the assault.

After 13 months in county jail, Nick McGuffin was transferred to Snake River Correctional Institution. He reported that two inmates were killed during his first two years there and that although he did not witness these murders, he did see multiple riots and fights which he found quite frightening. Mr. McGuffin noted that in addition, there were a few occasions when he was in the yard and tower guards yelled, "Get down!" before firing their rifles.

Mr. McGuffin reported that his time at Snake River was particularly challenging due to the crime with which he was convicted. He explained that given the negative state of inmate race relations, he worked hard to remain accepted by the "white guys" without having to join a gang, but that there were those who did not "approve" of the crime with which he was convicted as it involved the violent murder of a female. Mr. McGuffin noted that the *ABC News 2020* episode concerning his case was repeatedly shown for inmates to see and that each time it ran, he was made to explain his story or risk being ostracized and no longer protected. *"Every moment like that was a turning point of what your prison stay would be like and I knew I had so much time left."* Mr. McGuffin further explained, *"Gangs are gangs, and they have their codes. I had my conviction, and a gang could choose to not like my crime at any time. I was always on edge. I could get jumped at any time or I could be threatened and be forced to beat somebody up or pay them money. Because of my charges, I had to walk on eggshells. I kind of kept a close circle who gave me less chance to get hurt."*

16

Appendix 2, Page 16 of 29

Mr. McGuffin reported that after making minimum security, he was on a wildfire fighting team and nearly died. He explained that he and his fellow inmates were hiking down a bluff with a 70 ft. drop while he carried a 40-pound water bag on his back. Mr. McGuffin appeared anxious as he recalled having to throw the bag off the cliff before grabbing one friend's hand and that they nearly fell off the cliff when another friend grabbed him. *"I finished that fire, but I was pretty much done. It's not my idea of fun, dying in prison. There were numerous times in prison when I thought something bad was going to happen."*

Mr. McGuffin denied ever having been sexually assaulted by an inmate while incarcerated, though noted that he had received threats of assault by people who did not approve of his charge. He estimated, however, that over the course of his incarceration, he was strip-searched over 500 times which was in his experience akin to being sexually assaulted. *"Being dehumanized. You're naked in front of other guys and guards and you have to hold your stuff up and bend over and cough. That bothered me a lot."*

The following PTSD symptoms were assessed relative to the traumatic events described above:

**<u>Reexperiencing Symptoms</u>**

Mr. McGuffin reported that since Leah's death, he has thought about her every day and the circumstances of her murder. He explained that although this causes him distress, he ruminates about what happened and who is responsible. *"I know it won't help to know, but I keep trying to to make sense of it."* Mr. McGuffin reported that he also has repeated unwanted thoughts of being jumped by inmates.

As noted above, Mr. McGuffin becomes anxious when he does not know the whereabouts of his girlfriend because it reminds him of when he was searching for Leah. As he has explained to Georgia, *"If I don't know where you are, anything can happen."*

Mr. McGuffin reported that since Leah's death, he has had repeated nightmares in which she has been taken by someone and he is chasing them but is unable to catch up. He noted that although he used to have this dream with some frequency, he did not recall experiencing the nightmare within the past six months. Mr. McGuffin stated that his current dreams mainly involve being in prison and he has frequent vivid nightmares of waking up in a cell.

Regarding distressing reminders of traumatic events, Mr. McGuffin reported that when he hears sirens or sees a police car, he becomes highly anxious, and he noted that his girlfriend has told him he "looks like a ghost" when he hears or sees police. In addition, he reported being anxious when people are behind him or when he hears an unexpected loud noise because it reminds him of experiencing or witnessing assaults while incarcerated. Mr. McGuffin reported that when confronted by these reminders, his heart races and his temperature rises.

McGuffin v Dannels et al.

**Avoidance Symptoms**

Nick McGuffin reported that to block out unwanted traumatic memories, he stays as busy as possible, primarily by working long hours. He stated that he is also careful to avoid news shows and other programming depicting violence, especially toward women, and so chooses to watch comedy shows.

Although Mr. McGuffin has had a few girlfriends since Leah's death, he reported having difficulty being emotionally vulnerable and will sabotage his relationships due to fears of loss and abandonment. *"I shut down and distance myself when I should fight for it."*

Mr. McGuffin reported that while living with Maegan prior to his incarceration, he was comfortable using the bathroom with the door open, but he now insists on keeping it closed. He explained that in prison, the guards would "come and look as you're doing your business" and that the violation of repeated strip searches has also led him to require more privacy. Mr. McGuffin noted that the restaurant in which he works has side-by-side urinals which he could use more quickly, but he instead waits until the toilet stall is available so that he can shut the door.

**Negative Alterations in Mood and Cognitions**

Nick McGuffin repeatedly expressed a sense of guilt for having been late to pick Leah up the night that she was abducted. He stated that although Leah had actually left her friend's house prior to the time that he was to pick her up, he is plagued by the thought that if he had been there earlier, he would have driven by her as she was walking. *"I keep thinking, should I have driven straight or taken a left instead of a right?" There are so many things I could have done different."* Asked if he ever blames himself for Leah's abduction and death, Nick began to cry and required some time before responding, *"Of course I do. I was supposed to protect her."*

Mr. McGuffin reported that his brother has asked when he is going to "get over it" [Leah's death]. He then tearfully explained, *"I still talk to her every day. I'm never going to... I don't know how to get over it. If I did, I'd feel guilty. If I don't keep her in my life, then I'm doing a disservice to her and I'm letting go. There's a song, "it's easier to live with the pain than let it go". As painful as it may be, she's one of the best memories I have in my life. Now I have a drive to find out what happened. I can't let it go."* Mr. McGuffin later added that he also has blamed himself for the fact that so much of his parents' money went towards his defense and supporting him in prison. He explained that he feels guilty that they were unable to retire in Hawaii as they had planned and he now questions whether if they had, his father might still be alive.

Mr. McGuffin reported that since Leah's murder, he has worried a great deal about the safety of females he cares about and has become very pessimistic. "*It's hard for me to look at positives. I focus on the negatives a lot of times."* He further reflected that Leah's death has affected him "in a lot of weird ways". As an example, he stated, *"I don't say goodbye to people, I say "See you later". I don't like the term "goodbye". It makes me feel like if you say "bye", you're not going to see them again."*

18

Asked how his relationships have been affected, Mr. McGuffin responded, *"I know for that first year, I was pretty closed off. I didn't know what to do. Then I met Maegan which helped. It caused a strain on our relationship though. She knew and was jealous of the fact that I loved Leah more than I loved her. I wouldn't tell her I loved her for the longest time, and she knew I felt guilty for being with her because I didn't feel like I should be."* He noted that this had also been an issue with Aleksandra, though he had become better at keeping his thoughts about Leah to himself, whereas Georgia has been more empathetic and understanding.

Asked if his traumatic experiences have affected his sense of the world, Mr. McGuffin responded that because of Leah's death and his subsequent pursuit by law enforcement and conviction, he has found it difficult to trust others and has become quite guarded. He also reflected, *"I've lost nearly half my life to the whole thing and feel like time's running out and I'm behind."* Regarding his sense of self, Mr. McGuffin stated, *"I have a negative image of myself because of the way people have looked at me. I'm not as confident as I used to be and am more timid."*

### Arousal Symptoms

Mr. McGuffin reported that since his incarceration, he has been highly vigilant and uncomfortable in public and has declined invitations to go to crowded places or events. Asked if he has felt more distant or cut off from others since the time of Leah's death, Mr. McGuffin responded that he fears being misjudged or misunderstood and so does not allow people to get to know him.

Asked if there are times when he is especially irritable or angry, Mr. McGuffin responded that at his prior job, he was often irritable because he felt as though he was being "watched like a hawk" just as he had been by law enforcement and prison guards. He reported, however, that he does not like feeling angry because it reminds him of prison altercations.

Asked how he sleeps, Mr. McGuffin responded, "I don't sleep." He reported that while incarcerated, the security lights were always on and each hour, guards would shine their flashlights into his cell and bang doors while doing rounds. Mr. McGuffin stated that since his release, he has had to sleep in complete darkness but still awakens multiple times each night. He noted that he drinks alcohol primarily as a means of getting to sleep, though finds that he still wakes after three or four hours. *"After that, I'm pretty much up."*

**Results:** The results of this assessment indicate that Nicholas McGuffin meets current criteria for Posttraumatic Stress Disorder developed in reaction to the sudden, violent death of his girlfriend Leah. His condition was then exacerbated by years of being tracked by law enforcement and traumas experienced while incarcerated.

**CONCLUSIONS**
**DSM-5 TR Diagnosis**
Posttraumatic Stress Disorder; Prolonged Grief Disorder

**Discussion and Recommendations**

The circumstances surrounding Leah Freeman's death and the subsequent lengthy investigation of Nicholas McGuffin placed him at significant risk for the development and persistence of what has come to be defined as *Trauma and Stressor-Related Disorders*. Although he did not witness the death of his girlfriend, the indirect experience of learning about her murder is consistent with a traumatic event that confers the potential for a more severe and chronic reaction as his sudden loss of a loved one was characterized by extreme violence of an interpersonal and intentional nature (DSM-5; American Psychiatric Association, 2013). As he struggled to process this traumatic loss, Nick McGuffin endured years of being doggedly pursued as the prime suspect in his girlfriend's murder. This significant stressor served to increase the psychological impact of the trauma as he was repeatedly exposed to upsetting reminders and suffered the loss of support from friends and the community in which he had been raised.

Although Mr. McGuffin attempted to move forward with his life in the years following Leah's death, his relationship functioning was impaired by his persistent bereavement and posttraumatic stress. In 2002, two years after the murder, Nick McGuffin became distressed to the point of attempting suicide when law enforcement contacted the parents of his then girlfriend and alerted them to his suspect status.

In 2009, Mr. McGuffin was enjoying professional success though his mental health continued to suffer as he felt "stalked" and harassed by law enforcement who were pursuing him with renewed interest. Finally, his arrest, wrongful conviction, and nine years of incarceration served to significantly exacerbate and more fully entrench his psychiatric conditions, particularly as these combined traumas and stressors were directly associated with the initial traumatic loss.

The co-occurrence of PTSD and Prolonged Grief Disorder is more often seen in individuals who experienced a trauma involving the violent death of a loved one. As they share the same point of origination as well as some overlap of symptoms, the combination of PTSD and Prolonged Grief can present as a complex and strongly rooted clinical picture posing unique treatment challenges. For one, individuals with prolonged grief as well as PTSD often experience irrational guilt which leads them to believe that they deserve to suffer mental anguish and would be egregiously wrong to "let go" of their grief. In addition, emotional guardedness and numbing, which are commonly seen in both conditions, can make accessing, identifying, and expressing emotions quite difficult. Finally, PTSD and prolonged grief are associated with impairments in age-appropriate development, particularly when the traumatic loss occurs during a normal period of transition or milestones. While each of these challenges clearly exists for Nick McGuffin, he has expressed an interest and motivation to engage in mental health treatment, if for no other reason than to improve his relationships with his partner and daughters. It is therefore recommended that Mr. McGuffin engage in evidence-based treatment with a therapist experienced in addressing traumatic grief. Based upon the chronic and complex nature of his conditions, it is expected that Mr. McGuffin will require 18-24 months of individual treatment. In addition, it is recommended that Nick McGuffin receive a medical consultation to discuss sleep

20

medications as his sleep disturbance, which is a prominent symptom of both PTSD and Prolonged Grief, is a factor which may present further challenges to treatment effectiveness.

**REFERENCES**

American Psychiatric Association (2013). Diagnostic and statistical manual of mental disorders (5th ed.).

*Suzanne Best*

Suzanne Best, PhD
Licensed Psychologist
OR License #: 1770

*Note: The findings, conclusions, and opinions included in this report are based upon the data available to this examiner by the date of the report noted above. Information provided to me after the issuance of this report could result in a modification of my conclusions and opinions. If you have any questions or require further information, please do not hesitate to contact me.*

September 2024                                                                                           Best, Suzanne R.

## SUZANNE R. BEST, Ph.D.
## Clinical & Forensic Psychologist

**804 Officers Row**
**Vancouver, WA 98661**
**503-430-4071**
**Suzanne@suzannebestphd.com**
**www.suzannebestphd.com**

## <u>EDUCATION</u>

| | |
|---|---|
| California State University, Fresno<br>B.A., Psychology | 1980 - 1985 |
| California School of Professional Psychology,<br>Alliant University, San Francisco<br>MA, PhD, Clinical Psychology | 1991 - 1997 |
| SUNY Health Science Center, Syracuse, New York<br>Predoctoral Internship | 1995 - 1996 |
| San Francisco VA Medical Center PTSD Research Program<br>Postdoctoral Training | 1996 - 1997 |
| San Francisco General Hospital Child Trauma<br>Research Project<br>Postdoctoral Training | 1997 - 1998 |

## <u>EMPLOYMENT</u>

| | |
|---|---|
| <u>LEWIS AND CLARK COLLEGE, GRADUATE SCHOOL OF<br>EDUCATION AND COUNSELING</u><br> Adjunct Professor | 2009 - 2017 |
| <u>PACIFIC UNIVERSITY, SCHOOL OF PROFESSIONAL<br>PSYCHOLOGY</u><br> Assistant Professor | 2007 - 2009 |
| <u>SAN FRANCISCO VA MEDICAL CENTER,<br>PTSD RESEARCH PROGRAM</u><br>Research Psychologist | 1996 – 2008 |
| <u>STANFORD MEDICAL CENTER</u><br>Clinical Research Supervisor | 2001 – 2002 |

1

September 2024                                                                 Best, Suzanne R.

UNIVERSITY OF CALIFORNIA SAN FRANCISCO
Staff Psychologist II                                                         2000 – 2005

PRIVATE PRACTICE
Clinical and Forensic Psychologist                                     2000 – present

**CONSULTATION**

DEPLOYMENT ANXIETY REDUCTION TRAINING            2007 - present
San Francisco VA Medical Center and Travis AFB
Clinical Research Consultant

CAREGIVER VILLAGE                                                      2011 – 2012
Host/Facilitator- *Unsung Heroes: Caregivers and Supporters*
*Of Injured Military and First Responders*

ROSEN FAMILY WELLNESS CENTER FOR                        2009 - 2011
LAW ENFORCEMENT AND MILITARY
PERSONNEL
Clinical Consultant

SAN FRANCISCO VA MEDICAL CENTER
PTSD RESEARCH PROGRAM                                           2008 - 2012
Clinical Research Consultant

SUPPORTIVE SOLUTIONS, INCORPORATED                    2006 - 2013
Crisis Support Consultant

COGNITIVE BEHAVIORAL TREATMENT FOR PTSD
CLINICAL CONSULTATION GROUP                                  2006 - 2007
Consulting Supervisor

**MEMBERSHIPS**

International Society for Traumatic Stress Studies            1995 – present
    Trauma and Justice Special Interest Group                 2020 - present

American Psychological Association
Charter Member- Division 56: Trauma Psychology          2006 – present

Association for Scientific Advancement in                        2008 – 2011
Psychological Injury and the Law                                    2014 – 2020

International Law Enforcement Educators and Trainers     2008 – 2010

Society for Police and Criminal Psychology                    2009 – 2023

2

September 2024                                                                    Best, Suzanne R.

| | |
|---|---|
| International Association of Chiefs of Police Psychological Services Section | 2002 – present |
| Oregon Criminal Defense Lawyer's Association | 2021 – present |
| International Association of Forensic Mental Health Services | 2021 - present |
| American Psychology-Law Society (APA Div. 41) | 2022 – present |

## LICENSURES

Licensed Clinical Psychologist, Oregon Board of Psychologist Examiners
License #: 1770

Licensed Psychologist, Washington Board of Psychology
License #: PY00003389

Licensed Psychologist, California Board of Psychology
License #: 16258 (2000 – 2012)

## PUBLIC SERVICE

| | |
|---|---|
| Oregon State Police Critical Incident Response Team/ Resilience Team | 2010 – present |
| Military Child Education Coalition Public Engagement Steering Committee Member | 2011 - 2012 |
| Returning Veterans Project Consultant/Psychotherapist | 2006 - 2017 |
| NY Times New York City Post 9/11Consortium Clinical Trainer | 2001 |
| Children's Psychotherapy Project, San Francisco Psychotherapist | 2001 - 2002 |

## PROFESSIONAL ACTIVITIES

Ad Hoc Reviewer: American Psychological Association PsyCRITIQUE; Journal of Traumatic Stress; Psychological Assessment; Journal of Police and Criminal Psychology; Public Health Reports; Behavior Research and Therapy; European Journal of Psychotraumatology; International Journal of Psychology; Office of Justice Programs, National Institute of Justice

| | |
|---|---|
| Oregon Psychological Association, Continuing Education Committee | 2006 – 2009 |

3

September 2024                                                                                          Best, Suzanne R.

Chair, Officer Involved Shooting Guideline Revision Committee                2009 – 2010
International Association of Chiefs of Police, Psychological Services Section

Chair, Trauma and Justice Special Interest Group                                      2020 – present
International Association for Traumatic Stress Studies

## TEACHING

Lewis and Clark College                                                                            2008 – 2016
Graduate School of Education and Counseling
Adjunct Professor

Pacific University, School of Professional Psychology                             2007 - 2009
Assistant Professor

University of California, San Francisco                                                    2000 – 2001
Adjunct Professor

## BOOKS And BOOK CHAPTERS

2017   Best, SR. *Impact of Warzone Deployment*. In Still at War: A guide for defenders, prosecutors and judges dealing with Oregon's Veteran defendant crisis. Oregon Criminal Defense Attorney's Association.

2013   Domenici, P., Best, SR, Armstrong, K. *Courage After Fire for Parents of Service Members: Strategies for Coping When Your Son or Daughter Returns from Deployment.* New Harbinger Press, Berkeley, CA.

2011   Best, SR, Artwohl, A, Kirschman, E. C*ritical Incidents*. In Handbook of Police Psychology, 2nd Edition. Routledge/Psychology Press, New York, NY.

2006   Armstrong, K, Best, SR, & Domenici, P. *Courage After Fire: Coping strategies for troops returning from Iraq and Afghanistan and their families.* Ulysses Press, Berkeley, CA.

2006   Marmar, CR, McCaslin, S, Metzler, T, Best, SR, Weiss DS, Fagan, J, Liberman, A, Pole, N, Otto, C, Yehuda, R, Mohr, D, Neylan, T. *Predictors of posttraumatic stress in police officers and other first responders.* In Yehuda, R. (Ed.) Psychobiology of posttraumatic stress disorders: A decade of progress. (Vol. 1071) Annals of the New York Academy of Sciences (pp1-18). Blackwell Publishing, Malden MA.

## PUBLICATIONS

2017   McCaslin, S, Newman, E, Armitage, N, **Best, S,** Metzler, T, Chocroun, G, Inslicht, S, & Neylan, T. Deployment Anxiety Reduction Training (DART): A Pilot Study of Acceptability and Feasibility in Current or Recent Active Duty Service Members. *Journal of Military Medicine,* Volume 183, Suppl 1, 371–378.

September 2024                                                                 Best, Suzanne R.

2017  James, L & Best, S. Working Behind the Walls: Physical and psychological health consequences of prison employment. American Journal of Industrial Medicine, 60(5), 449-456.

2017  Doyle, C, Bauer, BW, Yu, Y. & Best, SR. Balancing Care: Examining Parents' Experiences of Supporting Veteran Children Post-Deployment. Journal of Military and Government Counseling, 5(2), 112-170.

2012   Meffert, S. M.; Henn-Hasse, C.; Metzler, T.; Best, SR.; Hirschfeld, A.; McCaslin, S.; Inslict, S.; Neylan, T..; Marmar, C. Prospective Study of Police Officer Spouses/Partners: A New Pathway to Secondary Trauma and Relationship Violence? *Journal of Women's Health*, 21(10):995-995.

2011  Ballenger, JF, Best, SR, Metzler, TJ, Wasserman, DA, Mohr, D, Liberman, A, Delucchi, K, Weiss, DS, Fagan, J , Waldrop, AE, & Marmar, CR. Patterns and Predictors of Alcohol Use in Male and Female Urban Police Officers. *American Journal on Addictions*, 20(1), 21-29.

2009  Lilly, M., Pole, N., Best, SR, Metzler, T., Marmar, CR. Gender and PTSD: What can we learn from female police officers? *Journal of Anxiety Disorders*, 23, 767-774.

2010  Weiss, DS, Brunet, A, Best, SR, Metzler, TJ, Liberman, A, Rogers, C, Neylan, TC, & Marmar, CR. Frequency and severity approaches to indexing exposure to trauma: The Critical Incident History Questionnaire for police officers. *Journal of Traumatic Stress,* 23(6), 734-743.

2009  Best, SR. Proactive Stress Management for Police Executives. *Big Ideas for Smaller Police Departments*, International Association of Chiefs of Police, Spring.

2007  Pole, N, Otte, C, Neylan, TC, Metzler, TJ, Best, SR, Henn-Haase, C, & Marmar, CR. Associations between childhood trauma and emotion-modulated psychophysiological responses to startling sounds: A study of police cadets. *Journal of Abnormal Psychology*, 116, 352-361.

2007  Best, SR. Home from War: Common Readjustment Issues in Returning Veterans. *The Tactical Edge Journal*. Summer, 2007.

2007  Difede, J, Malta, L, Best, S, Henn-Haase, C, Metzler, T, Bryant, R, & Marmar, C. A Randomized Controlled Clinical Treatment Trial for World Trade Center Attack-Related PTSD in Disaster Workers. *Journal of Nervous and Mental Disorders*. 195(10), 861-865.

2007  Fikretoglu, D, Brunet, A, Best, S, Metzler, T, Delucchi, K, Weiss, D, Fagan, J, Liberman, A & Marmar, C. Peritraumatic fear, helplessness and horror and peritraumatic dissociation: Do physical and cognitive symptoms of panic mediate the relationship between the two? *Behaviour Research and Therapy*. 4(1), 39-47.

2006  Marmar CR, McCaslin SE, Metzler TJ, Best S, Weiss DS, Fagan J, Liberman A, Pole N, Otte C, Yehuda R, Mohr D, Neylan T. Predictors of posttraumatic stress in police and other first responders. Ann N Y Acad Sci., Jul; 1071:1-18.

2006  McCaslin SE, Rogers CE, Metzler TJ, Best SR, Weiss DS, Fagan JA, Liberman A & Marmar CR. The Impact of Personal Threat on Police Officers' Responses to Critical Incident Stressors. *Journal of Nervous and Mental Disease*. 194(8); 591-597.

September 2024                                                                                Best, Suzanne R.

2006  McCaslin, SM, Metzler, TJ., Best, SR, Liberman, A., Weiss, DS, Fagan, J. & Marmar, CR. Alexithymia and PTSD Symptoms in Urban Police Officers: Cross-sectional and Prospective Findings. *Journal of Traumatic Stress*. 19:3; 361-373.

2005  Pole, N., Best, S.R., Metzler, T., & Marmar, C.R.. Why Are Hispanics at Greater Risk for PTSD? *Cultural Diversity and Ethnic Minority Psychology* 11:2; 144-161.

2005  Neylan, TC, Brunet, A, Pole, N, Best, SR, Metzler, TJ, Yehuda, R, & Marmar, CR. PTSD Symptoms Predict Waking Cortisol Levels in Police Officers. *Psychoneuroendocrinology*. 30; 373-381.

2005  Otte, C, Neylan, TC, Pole, N, Metzler, T., Best, SR, Henn-Haase, C, Yehuda, R, & Marmar, CR. Association Between Childhood Trauma and Catecholamine Response to Psychological Stress in Police Academy Recruits. *Biological Psychiatry* 57: 27-32.

2003  Ozer, EJ, Best, SR, Lipsey, TL, Weiss, DS. Predictors of Posttraumatic Stress Disorder symptoms in adults: A Meta-analysis. *Psychology Bulletin, Jan; 129(1):* 52-73.

2003  Mohr, D, Vendantham, K, Neylan, T, Metzler, T, Best, SR, & Marmar, C. The Contribution of Sleep Disturbances to Physical Health Problems in Urban Police Officers. *Psychosomatic Medicine.*

2003  Pole, N, Neylan, TC, Best, SR, Orr, S, & Marmar, CR. Effects of Fear-Potentiation on Physiologic Response to Acoustic Startle in Urban Police Officers with Posttraumatic Stress Symptoms. *Journal of Traumatic Stress.*

2002  Neylan, TC, Metzler, TJ, Best, SR, Weiss, DS, Fagan, JA, Liberman, A, Vedantham, K, Brunet, A, Rogers CE, Lipsey, T, & Marmar, C. Critical Incident Exposure and Sleep Quality in Police Officers. *Psychosomatic Medicine,*

2002  Liberman, A. M., Best, S. R., Metzler, T. J., Fagan, J. A., Weiss, D. S., & Marmar, C. R.. Routine Occupational Stress and Psychological Distress in Police. *Policing: An International Journal of Police Strategies and Management*, 25, 421-439.

2001  Brunet, A., Weiss, D. S., Metzler, T. J., Best, SR., Neylan, T. C., Rogers, C., Fagan, J., & Marmar, C. R. The Peritraumatic Distress Inventory: A Proposed Measure of PTSD Criterion A2. American Journal of Psychiatry Sep;158(9):1480-5.

2001  Pole, N, Best, SR, Weiss, DS, Fagan, J, and Marmar, CR. Effects of gender and ethnicity on posttraumatic stress symptoms among urban police officers. Journal of Nervous and Mental Disease, 189 (7), 442-448.

1999  Marmar, CR, Weiss, DS, Metzler, TJ, Delucchi, KL, Best, SR, & Wentworth, KA. Longitudinal course and predictors of continuing distress following critical incident exposure in emergency services personnel. *Journal of Nervous and Mental Disease.*

Appendix 2, Page 27 of 29

September 2024                                                                                  Best, Suzanne R.

**PRESENTATIONS and TRAININGS (Past 12 years)**

2022   Best, S. Veterans in the Justice System: Understanding and Mitigating the Impact of War. *Law Practice CLE* continuing education on-line workshop

2022   Best, S. PTSD 101 for Legal Practice. *Law Practice CLE* continuing education on-line workshop

2020   Best, S.  PTSD 101 for Attorneys. *myLawCLE* and Federal Bar Association sponsored on-line workshop

2020   Best, S. Officer Involved Shootings: Policies and Procedures. Gresham Police Dept., Gresham, OR

2019   Best. S. Organizational and Traumatic Stress in Public Safety. Portland Area Metro Sgt.'s Academy

2018   Best. S. Identifying and Managing Stress in Public Safety. Portland Area Metro Sgt.'s Academy

2017   Best, S. The Neurobiology of PTSD. Center for Community Engagement, Lewis & Clark Graduate School of Education and Counseling Education, Portland, OR.

2017   Best, S. What is PTSD? PTSD and Veterans' Issues: Defense, Mitigation, Community Services. Workshop hosted by Federal Public Defender, District of Oregon.

2016   Best, S. Coping Strategies for Returning Veterans and their Families. Returning Veterans Project/MIRECC VA Trauma Training Series: Case-based Approaches to Treating Complex PTSD, Concordia University, Portland, OR

2016   Best, S. PTSD Prevention and Compassion Fatigue. Camas Police Department, Camas, WA

2015   Best, S. The Neurobiology and Psychopharmacology of PTSD. Center for Community Engagement, Lewis & Clark Graduate School of Education and Counseling Education, Portland, OR.

2015   Best, S. Psychological Fitness in the Face of Critical Incidents. Oregon Public Employees Labor Relations Association and Lake Oswego Police Department Annual Conference, Tigard, OR.

2014   Bauer, B., Jennings, S., Luetmer, E., Wu, Y., Best, S., & Doyle, C. Balancing Care: Examining Parents Experiences of Supporting Veteran Children Post-Deployment. Poster presented at the *International Society of Traumatic Stress Studies 30th Annual Conference*, Miami, FL.

2014   Best, S. Executive Forum on Veteran's Employment. Oregon Federal Executive Board Forum. Portland, OR.

2014   Doyle, C. & Best, S.  Cost of Caring: Understanding Characteristics, Challenges, and Stresses of Parents of Service Members After Warzone Deployment.  Poster presented at the *American Counseling Association 2014 National Convention*. Honolulu, HI.

September 2024                                                                                              Best, Suzanne R.

2014   Dinh, J., Walser, R., Best, S., Cloitre, M., & McCaslin, S. (2014, March). Self-compassion is associated with emotional stress and perceived health-related functioning in Veterans. Poster presented at the *American Psychosomatic Society 72nd Annual Scientific Meeting*, San Francisco, CA.

2013   Best, S. Mental Health Service in the Wake of War: Understanding and Addressing the Impact of War on Veterans and Their Families. *Morrison Contemporary Families 2013, Trauma: Theory and Practice. Portland, OR.*

2012   Best, S.  Helping Clients with PTSD and Trauma-related Disorders Navigate through Litigation. *Multnomah Bar Association Continuing Legal Education. Portland, OR.*

2012   Best, S.  Combating Critical Incident Stress: Predicting and Preventing PTSD and Alcohol Abuse. *Annual Northwest Peer Support Conference, Clackamas, OR*

2012   Best, S. Keynote Speaker, In the Wake of Trauma: Understanding and Addressing the Impact of War, Violence and Disaster. *NASW Oregon Chapter, Oregon Social Workers Conference, Portland, OR*

2012   Best, S. Home from War: Assisting Veterans and their Families Cope with the Impact of War. *NASW Oregon Chapter, Oregon Social Workers Conference, Portland, OR*

2012   Best, S. Featured Speaker, Reintegration from the Veteran and Family Perspective. *Oregon National Guard Reintegration Summit, Salem, OR*

8