Russ Hicks
Hicks Consulting- LLC
P.O. Box 21161
Cheyenne, Wyoming
253.255.5769

# Expert Report of Russ Hicks

Nicholas James McGuffin v. City of Coquille, et al.

-------------------------------------------------------------------------------------------------------

Civil No. 6:20-cv-01163-MK

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON EUGENE DIVISION

**Russ Hicks states the following:**

**<u>My Background:</u>**

I am a retired, 30-year law enforcement officer and former police academy supervisor and trainer.  Specifically, I was the Basic Law Enforcement Academy (BLEA) Assistant Commander and a police instructor (TAC Officer) at the Washington State Criminal Justice Training Commission (WSCJTC) in Burien, WA.

The Basic Law Enforcement Academy (BLEA) is Washington's mandated training academy for all city and county entry-level peace officers in the state.  Through a centralized training model, Washington ensures all officers are equipped with the same base-level understanding of their responsibility to the communities they serve, standards to uphold, and education for effective community-oriented policing.  To facilitate this training, WSCJTC hires exceptional training officers from agencies throughout the state and current subject matter experts.[1]

I worked at the WSCJTC from April of 2007 to October of 2021.  My assignment was to supervise, lead, and manage instructors, contract instructors, manage curriculum, and coordinate with police agencies throughout Washington State.  I was also tasked to oversee the daily operations of BLEA.  As an instructor I taught and created curriculum for a variety of topics to include crisis intervention training (CIT), crisis communication, criminal investigations, patrol tactics, patrol operations, use of force, criminal law, implicit bias, de-escalation, hate crime laws, criminal procedures, and case analysis.

---

[1] https://www.cjtc.wa.gov/training-education/blea

HICKS CONSULTING- LLC    1

As an academy instructor, I was interviewed and featured in numerous articles by local and national media regarding the academy training on implicit bias, constitutional rights, de-escalation, CIT, patrol tactics, and the WSCJTC academy structure.

I was a commissioned police officer for 25 years (1991-2016) which included work in a large metropolitan city as well as in rural and smaller urban locations. I finished first in my academy class and due to my strong work ethic and dedication, I was awarded numerous special assignments throughout my career.  These assignments have included: covert undercover narcotics, internal affairs, plainclothes narcotics, witness protection unit, bicycle patrol, civil disturbance unit, hostage negotiator, field training officer (FTO), community policing team, critical incident stress management, uniformed patrol (rural and urban environments), and police academy assistant commander and police academy instructor.

I have an extensive background in training, patrol, case analysis, investigations, and supervisory assignments.  I started as a police trainer in 2000 and over the course of 21 years I have trained new, experienced, and supervisory law enforcement officers in Washington State, the Pacific Northwest, and throughout the nation.

Janis Puracal and Andrew Lauersdorf of  Maloney Lauersdorf Reiner, PC, and David B. Owens of Loevy & Loevy, retained my analytical services and opinion through Hicks Consulting–LLC to review specific facets of the law enforcement work product in the murder investigation of Leah Freeman and the subsequent arrest and prosecution of Nicholas McGuffin that took place in Coquille, Oregon between 2000 and 2011.

**Materials reviewed include**:
1. October 2010, ABC 20/20 Special, Leah Freeman Murder
2. February 2020, ABC 20/20 Special, Leah Freeman Murder, Follow-up
3. 07/16/2000, Ulmer Interview of Lindgren
4. 08/07/2000, CPD Reaves, re Lindegren
5. 05/18/2010, McNeely Report, re John Lindegren
6. 05/19/2010, Email from Dannels to Frasier
7. 05/19/2010, Handwritten Notes, re Hjordis Lindegren
8. 05/19/2010, Webley Report, re Hjordis Lindegren
9. 05/19/2010, Wikipedia Printout
10. 08/04/2010, Grand Jury Transcript of Hjordis Lindegren
11. 08/04/2010, Grand Jury Transcript of John Lindegren
12. 09/01/2016, Frasier Ltr to DOJ, re importance of Rudy statement
13. 01/04/2023, Civil Suit Deposition of John Lindegren
14. 09/02/2000, Backman Report
15. 07/17/2000, OSP Lab Report
16. 10/15/2010, Transcript of ABC News 20/20 Special
17. 02/28/2020, Transcript of ABC News 20/20 Special
18. 2011 Criminal Trial Transcript, Opening Statements
19. 07/06/2000, HIT Notes

HICKS CONSULTING- LLC   2

20. 07/06/2000, OSP Lab Report
21. 07/06/2000, Photos of Mustang
22. 07/12/2000, CPD Zavala Report
23. 01/28/2010, HIT Team Notes
24. 08/05/2010, CPD Webley, Interview of David Breakfield
25. 07/13/2011, Trial Transcript, David Breakfield
26. 2022 Deposition of McNeely, re Breakfield
27. 2023 Deposition of Traglio, re Breakfield
28. 2023 Deposition of Robert Paul Frasier
29. Remote viewer, Hocus Pocus, A Look into the Claims of Ed Dames, printout
30. 2010-2011 Vidocq Synopsis of Freeman case
31. 08/10/2016, Frasier to DOJ
32. 2007 CPD Policy Manual (Complete Copy)
33. 2010 CPD Organizational Chart
34. 01/27/2023, Second Amended Complaint
35. 04/18/2016, DPSST records for Mark Dannels
36. Coquille Training Docs, re Dannels
37. 04/18/2016, DPSST records for Raymond McNeely
38. Coquille Training Docs, re McNeely
39. 06/15/2021, DPSST Transcript for Sean Sanborn
40. Coquille Training Docs, re Sanborn
41. 04/18/2016, DPSST records for Chris Webley
42. Coquille Training Docs re Webley
43. 08/11/2010, Grand Jury Transcripts of Mark Dannels
44. Deposition of Mark Dannels, July 14, and July 15, 2022
45. Deposition of Kip Oswald, December 22, 2021
46. 07/12/11 Criminal Trial Transcripts of Kip Oswald's testimony
47. 07/21/10 Grand Jury Transcripts of Kip Oswald's testimony
48. 2000-07-11 CCSO, Interview of Alicia Hyatt (Hartwell)
49. 2009-10-13 HIT Notes-p5 and 8
50. 2010-07-21 Grand Jury Testimony- Alicia Hyatt
51. 2010-07-21 Webley (CPD) Interview of Alcia Hyatt
52. 2010-08-11 Grand Jury Testimony- Alicia Hyatt
53. 2011-07-11 Trial Testimony- Alicia Hyatt
54. 2000-7-04 CPD, Ulmer, Messerle turns in shoe
55. 2000-07-05 CCSO Oswald, Found Shoe
56. 2000-07-05 CPD, Hall, Oswald at roadblock
57. 2000-07-05 North Bend PD, Young, report of investigation
58. 2000-07-07 CCSO, Oswald, Lewis's receipt
59. 2000-07-23 CCSO, Lichte and Hermann, Hudson Ridge search
60. 2000-08-21 CCSO, Oswald, garbage dump on Hudson Ridge
61. 2000-08-22 CCSO Oswald, search shoe location
62. 2000-08-22 CCSO Oswald, search shoe location- photo set 1 and 2
63. 2021 CCDA Brady List

HICKS CONSULTING- LLC    3

64. Deposition of Craig Zanni, December 17, 2021
65. Coos County Sheriff's Office Policy Manual revised 03-30-94
66. 2000-08-03 Pex Dictated Notes from Scene
67. 2000-08-07 Evidence Log – scene tape" at page 1 (first row Evidence No. 224)
68. 2001-03-21 Property Request
69. 2009-10-13 HIT Team Notes at page 7 ("vegetation not broken down by road")
70. Shawn Mast file

**Additional materials reviewed:**

1.  IACP Brady Disclosure Requirements Model Policy
2.  WSCJTC BLEA Class, Ethics PowerPoint 2017-2021
3.  https://www.theiacp.org/sites/default/files/Brady-Giglio.pdf
4.  WSCJTC, BLEA, Criminal Procedures, Introduction to Criminal Procedures PowerPoint, 2007-2021
5.  WSCJTC, BLEA, Criminal Procedures, Procedures of Arrest PowerPoint, 2007-2021
6.  Washington State Criminal Justice Training Commission's Basic Homicide Investigation, Law Enforcement In-Service Course No. 0240
7.  https://www.atg.wa.gov/hits-overview
8.  https://www.ojp.gov/pdffiles1/Digitization/138618NCJRS.pdf
9.  https://www.practicalhomicide.com/AboutPHI/bio.htm
10. https://www.practicalhomicide.com/Textbooks/thebooks.htm
11. Practical Homicide Investigation- Tactics, Procedures, and Forensic Techniques (fourth edition by Vernon J. Gerberth
12. CALEA Standards for Law Enforcement Agencies Chapter 33, Training and Career Development, July 2006
13. CALEA Standards for Law Enforcement Agencies Chapter 42-1, Criminal Investigation and Intelligence, July 2008
14. IACP Training Key #558 Criminal Investigations
15. WSCJTC BLEA Crime Scene Management PowerPoint 2014-2017
16. WSCJTC Criminal Investigations, ID Process PowerPoint 2017-2021
17. WSCJTC BLEA, Criminal Investigations, Search Warrant Preparation, 2017-2021
18. WSCJTC BLEA, Criminal Investigations, Report Writing, 2017-2021

I reserve the right to supplement my opinions and review of this matter as the litigation progresses.

**Declarations-**
1.  I have not authored any articles in the past 10 years.

2.  I have testified as an expert at trial or by deposition in the following cases:
    - Sara Lacy and Estate of Cecil Lacy, Jr. v. Snohomish County 2017 (trial testimony)
    - Russell v. Snohomish County 2019 (deposition)
    - Kinney v. Pierce County 2019 (deposition)

HICKS CONSULTING- LLC    4

- Dold v. Snohomish County 2022 (deposition)
- Provencher v. Pierce County 2022 (deposition)
- Novak v. City of Spokane 2022 (deposition)
- Avery v Seattle 2023 (deposition)
- The People of Colorado vs Quinten Stump 2023 (trial testimony)
- Strickland v Auburn 2023 (deposition)
- Harder v Seattle 2023 (deposition)
- Wondie v King County 2023 (deposition)
- Bishop v Buckley 2023 (deposition)
- Watkins v Olympia 2023 (deposition)
- Provencher v Pierce County 2024 (court testimony)
- Hayat v Montgomery County 2024 (deposition x2)
- N.U. v Tacoma 2024 (deposition x2)
- Estate of Karli Moore v Franklin County 2024 (deposition)
- Joquin/Korter v Lakewood 2024 (deposition)
- Washington State v Jeffrey Nelson 2024 (trial testimony)
- Estate of Joshua Sarrett v. King County 2024 (deposition)
- Estate of Jerome Holman v. Pierce County 2024 (deposition)
- Emanuel Fair v. Redmond, et al. 2024 (deposition)
- Estate of Moses Portillo v. Pierce County 2024 (deposition)

3. My CV is attached as a separate document also with the fee schedule included.

4. Hicks Consulting- LLC 2023-2024 fee schedule:

- $275.00 per hour for my research, review, and report preparation.
- $137.50 per hour for travel (portal to portal).
- $350.00 per hour for depositions and court testimony (5-hour minimum).

# TABLE OF CONTENTS

**Hicks Consulting- LLC Analysis and Opinion Methodology:** (page 7)

**Basic Facts:** (page 8)

**Section A:** Failure to Disclose Favorable Material and the Destruction of Evidence (pages 9-17)

**Section B:** Improper Procedures for Eyewitness Identification (pages 17-19)

**Section C:** Lack of Factual Basis for Reporting (pages 20-27)

**Section D:** Practices Inconsistent with What Trained Officers Would Understand Is Required by Brady (pages 27-30)

**Section E:** Failure to Secure Crime Scene (pages 30-41)

**Section F:** Lack of Training on Homicide Investigation (pages 41-47)

INTENTIONALLY LEFT BLANK

# HICKS CONSULTING-LLC ANALYSIS AND OPINION METHODOLOGY

My opinions are based on my experience, education, and training as a police officer, and a review of the documents and depositions listed above. I reserve the right to amend my opinions as new evidence becomes available in this case.

The methodology I use is the same used by law enforcement professionals, law enforcement agencies and law enforcement consultants across the nation for decades. I have reviewed relevant documentary evidence of the incident, witness statements, investigative reports, depositions, and the other matters described in the list of materials above. These are all types of evidence routinely relied on by law enforcement professionals and agencies to analyze the actions and tactics of the law enforcement officers involved. After review, I then evaluate the evidence in light of my own experience, education and training and guidelines, agency policies and law enforcement accepted industry standards. I note that this methodology has long been accepted in the industry, has been accepted by courts and been described with approval in multiple reputable law enforcement publications and training materials.

Intentionally Left Blank

HICKS CONSULTING- LLC    7

# **Basic Facts**

- **Homicide victim:** Ms. Leah Freeman

- **Ms. Freeman went missing:** City of Coquille, June 28, 2000, sometime between 9:15–9:30 p.m.

- **Police Department Jurisdiction:** Coquille Police Department

- **First shoe found**: On June 28, 2000, around 11:30 p.m., Freeman's right Nike athletic shoe was discovered by Tony Messerle next to a cemetery on North Elm Street in Coquille

- **Second shoe found with blood on it:** On July 5th, 2000, Coos County Deputy Kip Oswald found Ms. Freeman's left shoe in the middle of the road on Hudson Ridge.

- **Ms. Freeman found**: August 3, 2000, Lee Valley Road, Coquille (down an embankment)

- **First task force started:** July 5, 2000

- **First task force suspended:** 2002

- **Second Task Force started:** 2008 began task force. In 2010 new Coquille Police Chief Mark Dannels announced a task force had been convened to re-open the homicide investigation of Ms. Freeman.

- **Nicholas McGuffin arrested:** In August 2010, McGuffin was indicted and arrested for the murder of Leah Freeman

- **McGuffin trial commenced:** July 5, 2011

- **10-2 guilty verdict:** July 19, 2011

- **Location of McGuffin's incarceration:** Coos County Jail 2010-2011, Snake River Correctional Institution (2011-2016), South Fork Forest Camp (2016-2019)

- **McGuffin's conviction vacated:** November 2019

- **Nicholas McGuffin released:** December 2019

# Section A: Failure to Disclose Exculpatory Material and the Destruction of Evidence

**Opinion:**

Officers of the Coquille Police Department and Coos County Sheriff's Office failed to disclose favorable information to the Coos County District Attorney's Office and/or McGuffin's criminal defense attorney prior to and after the arrest, trial, and conviction of McGuffin. These failures contributed to the arrest, prosecution, imprisonment, and conviction of McGuffin. These actions were inconsistent with generally accepted police practices and procedures.

**Basis:**

**Police Training: International Association of Chiefs of Police (IACP) Model Policy**

The International Association of Chiefs of Police (IACP) Model Policy titled *Brady Disclosure Requirements*, dated April 2009, under Section II, states, in part:

"The *Brady* decision and subsequent rulings have made it a duty of all law enforcement agencies to: (1) Identify and provide to the prosecution any exculpatory material that would have a reasonable probability of altering the results in a trial, or any material that could reasonably mitigate the sentencing of a defendant and (2) any material relevant to the credibility of government witnesses, including, but not limited to, police officers."

The IACP Model Policy includes the following definitions in Section III:

"*Material Evidence*: Evidence is 'material' if there is a reasonable probability that disclosing it will change the outcome of a criminal proceeding. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome of the trial or sentencing of a criminal case."

"*Exculpatory evidence/*Brady *material*: *Brady* violations are, by definition, violations of an individual's 14th Amendment right to due process of law. Exculpatory evidence is evidence that is favorable to the accused; is material to the guilt, innocence, or punishment of the accused; and that may impact the credibility of a government witness, including a police officer. Impeachment material is included in the *Brady* disclosure requirements."

"*Duty to disclose*: The affirmative constitutional duty of the police to notify the prosecutor of any *Brady* material."

HICKS CONSULTING- LLC    9

**Police Training: Brady v. Maryland**

In police academies across the nation and here in the Pacific Northwest, officers are provided training in the seminal court decision: Brady v. Maryland and what an officer's "*Brady* obligations" entail.[2] As the Assistant Commander at WSCJTC's BLEA, I taught new recruits how their disclosure obligations are germane to the most important attribute of a police officer: integrity. In the BLEA class titled Ethics, I reiterated that all police officers have the fundamental duty to be truthful and ethical in all aspects of their profession. We also discussed the higher standard theory, the continuum of compromise and acts of commission and omission.[3]






Recruits are taught that in Brady v Maryland, the court ruled that prosecutors have the duty to turn over all evidence obtained in a criminal investigation to the defense whether favorable or not to the accused. This requires all police officers to document and turn over <u>all</u> evidence obtained to the prosecutor.

The recruits are also taught that prosecutors have the duty to inform the defense of credibility issues with all prosecution witnesses to include police officers. The police departments in turn have the duty to notify the prosecutor's office of any impeachment information regarding a police officer. The ruling explained that the defense has the right to know if a police officer has any integrity issues. Officers with reported issues are put on what is called the "Brady List." The following are excerpts from the International Association of Chiefs of Police Brady v Maryland

---

[2] Brady v. Maryland:: 373 U.S. 83 (1963)
[3] WSCJTC BLEA Class, Ethics PowerPoint 2017-2021

HICKS CONSULTING- LLC    10

presentation that incapsulates the information that is commonly taught to police officers across the nation.[4]

---

[4] https://www.theiacp.org/sites/default/files/Brady-Giglio.pdf

HICKS CONSULTING- LLC    11



Adequately trained police officers are also trained on another line of cases that make it clear to police officers that they violate due process through the destruction of favorable evidence in the course of an investigation or prosecution.

**Applicable Coquille PD Policy: Brady v. Maryland**
The 2007 Coquille Police Department Manual has a policy regarding the Brady v. Maryland court decision:[5]

> ***1026.9 BRADY MATERIAL IN PERSONNEL FILES***
> *The purpose of this section is to establish a procedure for releasing potentially exculpatory information (so-called Brady material) contained within confidential personnel files.*

> ***1026.91 DEFINITIONS***
> ***Brady Material****- In the Brady v. Maryland decision (363 U.S. 83 (1963)) the United States Supreme Court held that the prosecution has an affirmative duty to disclose to the defendant evidence which is both favorable and material to the guilt and/or punishment of the defendant.*

> ***The Prosecution****- Refers to the District Attorney and all investigative agencies involved in the criminal prosecution of a defendant, including this department.*

> ***Oregon Revised Statutes 135.815****- Oregon law also establishes a criminal defendant's right to access potentially exculpatory evidence.*

**Applicable Coquille PD Policy: Chapter 344 Report Preparation**
Section 344.11 of the Coquille PD policy manual states that:[6]

> *"All reports shall accurately reflect the identity of the persons involved; all pertinent information seen, heard, or assimilated by any other sense, and any*

---

[5] 2007 Coquille Police Manual, Chapter 1026.9 Brady Material
[6] 2007 Coquille Police Manual, Chapter 344.11, Report Preparation

*actions taken.  Employees shall not repress, conceal, or distort facts of any reported incident, nor shall any employee make a false report orally or in writing."*

**Applicable Coquille PD Policy: Conduct That May Result in Discipline**

Section 340.35 of the Coquille PD policy relates to officer discipline.  Section 340.35 states that:[7]

> *(P) Failure to disclose material facts or the making of any false or misleading statement on any application, examination form or other official document, report, or form.*
>
> *(Q) Failure to take reasonable action while on-duty and when required by law, statute, resolution or approved Department practices or procedures*

I address some of these issues below.

1. **Notes and information related to witness John Lindegren**

Officer McNeely and Officer Webley did not turn over their handwritten notes that show that witness John Lindegren's details of the show "Survivor" were incorrect.[8] A properly trained officer would have understood these notes needed to be preserved and produced because they could have been used to attempt to question the credibility of Lindegren's alleged eyewitness account of seeing McGuffin and Freeman together after 9:00 p.m. on the night that she disappeared. District Attorney Frasier relied on Lindegren's account of watching Survivor when he was assessing Lindgren's credibility.[9] In his deposition, District Attorney Frasier confirmed that if he had known this information it would have been problematic.[10]

Officer McNeely and Officer Webley also did not disclose their knowledge that Lindegren was not sure that the person he saw on June 28th, 2000, was indeed McGuffin.[11] Lindegren testified in his deposition that he told McNeely and Webley that he was not confident about his identification of McGuffin.[12] That information was not reported to the prosecutor and, in turn, the defense.  A properly trained officer would have understood this information had to be disclosed and was important to disclose because, again, it could have been used to attempt to undermine the credibility of Lindegren's alleged eyewitness account of seeing McGuffin and Freeman together after 9:00 p.m. on the night that she disappeared.

Standard police practices that existed at the time in 2010 would have required that the information related to Lindegren be documented in official police reports and turned over to the

---

[7] Id, Chapter 340.35, sections P, Q

[8] 05/19/2010, Handwritten Notes, re Hjordis Lindegren; 05/19/2010, Wikipedia Printout; 05/18/2010 McNeely Report, re John Lindegren; 05/19/2010 Webley Report, re Hjordis Lindegren

[9] 09/01/2016, Frasier Ltr to DOJ, re importance of Rudy statement

[10] Deposition of Robert Paul Frasier, August 29, 2023, Page 154, Lines 17-20

[11] Id., Page 155, Line 1 through Page 156, Line 24

[12] Deposition of John Lindegren, Page 136, Line 20, through Page 137, Line 14, and Page 174, Lines 14-17

HICKS CONSULTING- LLC   13

prosecutor. Even though other information about Lindegren was documented and turned over,[13] the failure to disclose this favorable information was not, which is a significant departure from standard police practices, including how standard police practices implement the "Brady obligations."

2. **Notes and documents related to witness Nick Backman**

Deputy Sheriff Zanni and the investigative team did not disclose notes and evidence documenting that witness Nick Backman observed Freeman walking by the credit union ATM at 9:04 pm on June 28th[14]. Deputy Sheriff Zanni received information from Backman, which he documented in handwritten notes, and also received an ATM receipt documenting the exact time of the sighting. An officer who is consistent with training and standards would have understood this information was important and needed to be disclosed because Backman's sighting of Freeman outside the credit union at 9:04 p.m. could have been used to attempt to contradict Lindegren's account.

Established police practices that existed at the time in 2000 would have required that the information related to Backman be documented in official police reports and turned over to the prosecutor. Established police practices further would have required that the receipt (*i.e.*, physical evidence) be tagged, logged, and preserved. The fact that neither the Coquille Police Department nor the Coos County Sheriff's Office disclosed the receipt was a departure from accepted police practices, either because the information was suppressed or because it was destroyed in contravention of the well understood duty to preserve and disclose all favorable information learned or obtained in a criminal investigation.

The withholding or destruction of the ATM receipt is consistent with the information never being placed into the official file for the Freeman investigation. If this is the case, it would represent a fundamental failure by the Coquille Police Department and the Coos County Sheriff's Office to act in accordance with established obligations to preserve and disclose favorable material in the course of a criminal investigation and prosecution. The evidence I have seen is consistent with, and even suggests, the existence of a separate "working file" that included information and documents of which officers were aware, but never disclosed to the prosecutor. By 2000, it was well-established that law enforcement agencies were required to maintain all evidence, whether physical evidence, witness statements, or otherwise, and that standard police practices forbid the suppression of information in clandestine "working files." Any policies or customs of the Coquille Police Department and the Coos County Sheriff's Office that permit evidence to be suppressed or destroyed represent a significant departure from established police practices.

3. **Notes from the HIT Team meetings**

In another departure from established policing standards at the time, officers from the Coquille Police Department did not disclose notes from internal "homicide investigation team" (also called

---

[13] 05/18/2010, McNeely Report, re John Lindegren
[14] Deposition of Robert Paul Frasier, August 29, 2023, Page 181, Lines 19 through Page 182, Line 17

HICKS CONSULTING- LLC    14

the "major crime team"). There was favorable information recorded in those notes that was not documented in official police reports and that even contradicted information reported in official police reports.

For example, the investigative team speculated that McGuffin drove home to switch cars after killing Freeman. On June 28, 2000, the night that Freeman disappeared, Coquille PD Officer Zavala stopped McGuffin because of a defective headlight on his blue Mustang. Zavala did not document the stop until two weeks later on July 12, 2000. This was after the investigative team pursued McGuffin as the lead suspect in Freeman's disappearance. Zavala reported that, after the traffic stop at about 10:35 p.m., Zavala "saw Nick drive over the bridge, which at the time struck me as odd. I was trying to figure out why Nick drove over the bridge if he was looking for Leah, when Nick knew she was last seen in town."[15]

Failing to document this event contemporaneously, rather than two weeks later, was a departure from established practices.

The investigative team was aware that McGuffin did not drive over the bridge to go home at 10:35 p.m. The investigative team did not disclose in discovery a copy of a note from the "homicide investigation team" meeting referring to the investigative team's knowledge of the records that showed that McGuffin made a phone call to his parents' home phone at 10:44 p.m. from the pay phone at Fast Mart in town. This pay phone was located in the opposite direction of the McGuffin home on Baker Road. The investigative team knew that McGuffin's location at the Fast Mart in town at 10:44 p.m. would not allow for time to drive home after Zavala's traffic stop to change cars and still make it back to town by 10:44 p.m. The investigative team failed to disclose in discovery their knowledge of the phone call at the Fast Mart.[16] Standard police practices that existed at the time would have required that the information related to the phone call be documented in official police reports and disclosed.

The notes indicates that the investigative team was in possession of records from the Fast Mart pay phone that confirm McGuffin's timeline. Assuming that were the case, established police practices at the time would have required that the phone records (*i.e.*, physical evidence) be tagged, logged, and preserved. If the Coquille Police Department did not turn over the phone records themselves, not doing so would have been a departure from standard police practices.

Disclosing one report purporting to be inculpatory but failing to disclose notes and phone records that would have been favorable to the defense would be a significant departure from standard police practices. Assuming that officers knew about evidence that suggested untruthfulness by another officer (*i.e.*, Officer Zavala), failure to report or disclose that information is a further departure from standard police practices, including the requirement to report officer misconduct.

---

[15] 2000-07-12 CPD Zavala Report.
[16] 2010-01-28 HIT Team Notes at 1

4. **Notes Related Shawn Mast**

In another significant departure from established policing standards at the time, the Coquille Police Task Force did not disclose an important "person of interest" file to the District Attorney or to Mr. McGuffin's criminal defense team. This person of interest file listed a suspected "sexual deviate" as a "subject of interest" in Ms. Freeman's murder. The sexual deviant was identified as 24 year old, Shawn Paul Mast.

Most importantly, the file documents that Mast was a subject of interest who had been contacted out near where Ms. Freeman's body had been found by officers and was acting somewhat suspicious. Additionally, Mast also lived in the area near where Ms. Freeman's body was found.

The CPD file titled "Shawn Mast File" also contains documents that CPD gathered related to Mast's ex-wife (Teresa) petitioning the court for an annulment because of Mast's sexually deviate behavior. The file further includes photos and handwritten notes of what appears to be Mast's collections of women's underwear, tampons, and other odd items. From the type-written investigative notes, it appears that Mast specifically had a fetish for women's underwear, socks, and nylons. That fact is of particular interest, because when Ms. Freeman's body was found, she was missing her underwear and one sock, which have never been found. The notes also say Mast liked young girls with blond hair, which matches Ms. Freeman.

Additionally, the file documented that Teresa Mast reported that Shawn had violent tendencies and had once held a handgun to her face and threatened to kill her.

Again, none of these documents were disclosed to the prosecution or Mr. McGuffin's defense counsel. Significantly, the type-written investigative notes were never turned into police reports. Standard police practices that existed at the time required that officers document all investigative activities in a format that reveals the investigative steps taken, the date(s) of the investigation, and the officer conducting those investigative steps. A formal report is necessary to preserve evidence, including potentially exculpatory evidence, so that it can be disclosed as required by *Brady*. The fact that the entire "Shawn Mast File" was withheld from the prosecution is a significant departure from standard police practices, especially given the significance of the information documented in the type-written notes from investigative actions.

5. **Lack of policy to handle Brady material**

It is unclear who at the Coquille Police Department was responsible for making sure that all information, including favorable information, was turned over to the District Attorney. There are no audits, logs, or methods in place to determine what was produced to the District Attorney and by whom. In 2010, and well before, it was well-established that a protocol is necessary for ensuring disclosure of all materials generated in the course of an investigation, particularly a serious one involving homicide. Yet, the CPD lacked such policies and practices, which obviously

created a substantial risk that evidence would be lost, suppressed, or destroyed. This is a departure from long standing police practices for documenting and preserving evidence.

# Section B: Improper Procedure for Eyewitness Identification

**Opinion:**

Officers of the Coquille Police Department failed to adhere to generally accepted police practices and procedures while conducting a photo array of McGuffin's vehicle thus influencing an eyewitness. This failure contributed to the arrest, prosecution, imprisonment, and conviction of McGuffin. The officers' actions were inconsistent with generally accepted police practices and procedures.

**Basis:**

**Police Training: Eyewitness Identification Procedures**
Standard practices used by law enforcement for showing photo arrays to witnesses were well established before 2010. The standard practices include:

- The witness must be shown multiple photographs. "Show ups" (*i.e.*, using only one photograph of the suspect) are improper.
- Filler photographs used in the photo array should be similar to the photograph of the suspect.
- The suspect's photograph should not be significantly different than the other five filler photographs.
- The witness must be given an admonishment that the suspect may or may not be in the photo array.
- Affirming the witness's choice as "correct" contaminates the witness's ability to consider other possibilities and falsely inflates the witness's confidence to appear more certain than he/she may be.

These practices apply whether the officer is showing a photo array to identify the suspect, or any identifying item associated with the suspect such as a vehicle.

Police recruits are taught how to present photos to witnesses in police investigations.[17] Below are slides from the BLEA Criminal Investigation's class called ID Process.

---

[17] WSCJTC Criminal Investigations, ID Process (2017) PowerPoint

HICKS CONSULTING- LLC    17



It is important to note that recruits are trained that the process and details of the photo presentation will be documented. Standard police practices require that officers document the admonishment signed by the witness, the photos used in the array, the witness's choice of photo(s), and any certainty statements made by the witness during the process.

Officer McNeely and Officer Webley conducted a photo array with witness Alicia Hyatt in 2010. The manner in which that photo array was conducted, including the lack of documentation related to the photo array procedure, represents a significant departure from standard police practices. In addition, the documentation that exists strongly supports an inference that the officers intentionally tried to construct an unfair and suggestive array designed to ensure that the witness would almost certainly pick out McGuffin's vehicle *ten years* after the alleged sighting.

On July 21st, 2010, Alicia Hyatt (Hartwell) testified at the Coos County Grand Jury proceedings. During her testimony, Hyatt stated that the vehicle she observed behind her alleged sighting of Freeman on June 28, 2000, was a dark colored Honda or Nissan compact car.[18]

On that day (apparently shortly after the grand jury testimony) Officers Webley and McNeely met with Hyatt at the Myrtle Point Police Department. Officer Webley wrote that he showed Alicia different photos of vehicles and that Hyatt picked put "McGuffin's blue Mustang as a possible identification of the car."

---

[18] Grand jury testimony of Alicia Hyatt (Hartwell), July 21st, 2010, page 37

HICKS CONSULTING- LLC    18

The following is an excerpt of Officer Webley's report regarding Hyatt's eyewitness account of a vehicle seen by her during her sighting of Freeman on June 28, 2000:[19]

> *According to Hartwell the car behind them pulled in by Leah and someone on the passenger side either got out or leaned out of the window. When showed photos of different cars, Hartwell chose McGuffin's blue Mustang as a possible identification of the car.*

There are no records of what photos were presented, if an admonishment was given, or any documentation of the presentation to Hyatt.

On August 11, 2020, Hyatt again testified at the grand jury proceedings.  This time Hyatt testified, "I didn't recognize it [vehicle] until I saw pictures of it." Hyatt went on to testify that the vehicle she observed next to Freeman on June 28, 2000, was a "blue mustang."[20]

On July 11th, 2011, Hyatt testified at the murder trial of McGuffin. In her testimony, Hyatt stated, "It was an older model car, that looked like the front end of a Mustang."[21]

It is important to note that throughout all of the different venues, Hyatt testified that she knew a lot about cars because her father was a mechanic and her mother was a car enthusiast.

It is notable that with Hyatt's *vast knowledge of cars,* her statements and testimony changed so dramatically from a dark colored, compact, Japanese car to an older model, blue Mustang *after* she met with Officers McNeely and Webley and was shown photos.

Furthermore, there were no details in Officer Webley's report on how the photo montage was presented, if there was an admonishment, and how the identification was made. The absence of documentation represents a significant departure from standard police practices. An officer adhering to standards and training, would not have thought it was appropriate to omit that type of documentation, especially when the identification is made ten years after the fact and represents a marked difference from the witness's description just hours earlier.

In addition, handwritten notes from the 2009 HIT team indicate that there was a video camera in the interview room at the Myrtle Point Police Department when Hyatt was interviewed. However, there is no documentation that the identification process was recorded or, if it was, that the video was turned over.

With no record of the photo montage presentation, this is a gross deviation from training and standards. It is also entirely inconsistent with investigative standards, training principles, and general police practices, policies, and procedures.

---

[19] City of Coquille Police Department Incident Report, #Q2001905, authored by Officer Webley, dated 07-24-10
[20] Grand jury testimony of Alicia Hyatt (Hartwell), August 11, 2010, page 166-167
[21] Trial testimony of Alicia Hartwell, July 11th, 2011, D4 232

HICKS CONSULTING- LLC   19

# Section C: Lack of Factual Basis for Reporting

**Opinion:**

Officers of the Coquille Police Department failed to adhere to standard police practices for accurate reporting and for assessing the trustworthiness of the information provided in reports. This failure contributed to the arrest, prosecution, imprisonment, and conviction of McGuffin. The officers' actions were inconsistent with generally accepted police practices and procedures.

**Basis:**

**Police Training: Search Warrants and Report Writing[22] [23]**

Police recruits are given foundation training on how to prepare police reports and search warrants. Recruits are taught that the most important aspect of these endeavors is to *accurately* represent the facts for the record. Police recruits are specifically taught it is improper and illegal to embellish or make false representations in a report. Below are some examples of training slides from the WSCJTC:

 

**Police Training: Criminal Procedures**

The 1968 US Supreme Court decision Terry v Ohio[24] and other similar cases are used at the police academies throughout the nation to help establish foundational training and policy considerations related to the seizure and detention/arrests of citizens pursuant to a criminal investigation.

At the WSCJTC, police recruits are given the following definition of criminal procedures:

*Criminal Procedures:*

*A network of laws and rules that establish the standards and limitations to be employed by the government and its agents.  It addresses a variety of issues to*

---

[22] WSCJTC BLEA, Criminal Investigations, Search Warrant Preparation, 2017-2021
[23] WSCJTC BLEA, Criminal Investigations, Report Writing, 2017-2021
[24] Terry v. Ohio :: 392 U.S. 1 (1968)

*include search and seizure, powers of arrest, interrogation, prosecutorial limitations, as well as bail and sentencing.*[25]

**Police Training: Reasonable Suspicion/Probable Cause**

As part of their foundational academy training, police recruits are given classroom training, practical training, and scenario testing in making investigative detentions (Terry stops) and probable cause arrests.

Police officers are taught that the most important aspect of conducting reasonable suspicion stops and probable cause arrests is that officers must have <u>articulable</u> facts and circumstances and <u>reasonably trustworthy information</u> that would lead a reasonable officer to believe that they have met the appropriate burden to make the respective stop or arrest.

**Police Training: Proper Analysis of Informant's Information**

In order to make lawful detentions and arrests, another foundational point of instruction for police recruits is how to analyze information they receive from informants/citizens. Although case law varies slightly from state to state, police officers receive training that the information they receive must have sufficient indicia of reliability. Generally, officers are taught that under a totality of circumstances, there must be articulable facts and circumstances establishing the reliability of the information and the reliability of the informant. Officers are taught that they can bolster the veracity of the information by establishing independent corroboration through the officer's observations.[26]

**Applicable Coquille PD Policy: Chapter 344 Report Preparation**

Section 344.11 of the Coquille PD policy manual states that:[27]

> *"All reports shall accurately reflect the identity of the persons involved; all pertinent information seen, heard, or assimilated by any other sense, and any actions taken. Employees shall not repress, conceal, or distort facts of any reported incident, nor shall any employee make a false report orally or in writing."*

**Applicable Coquille PD Policy: Conduct That May Result in Discipline**

Section 340.35 of the Coquille PD policy relates to officer discipline. Section 340.35 states that:[28]

> *(P) Failure to disclose material facts or the making of any false or misleading statement on any application, examination form or other official document, report, or form.*

---

[25] WSCJTC, BLEA, Criminal Procedures, Introduction to Criminal Procedures PowerPoint, 2007-2021

[26] Aguilar, 378 U.S. at 114; Spinelli, 393 U.S. at 413, Illinois v. Gates :: 462 U.S. 213 (1983), Navarette v. California :: 572 U.S. 393 (2014)

[27] 2007 Coquille Police Manual, Chapter 344.11, Report Preparation

[28] Id, Chapter 340.35, sections P, Q

HICKS CONSULTING- LLC   21

**(Q)** *Failure to take reasonable action while on-duty and when required by law, statute, resolution or approved Department practices or procedures*

The evidence in this case shows that the investigative team made inconsistent or misleading statements to bolster unsupported theories that would incriminate McGuffin, contrary to standard police practices and agency protocols. Many of the unsupported theories appear to have been the creation of Richard Walter from the Vidocq Society and Coquille Police Department Chief Mark Dannels.[29] The investigative team also failed to properly assess the information reported by providing articulable facts and circumstances establishing the reliability of the information and the reliability of the informant, contrary to standard police practices. I address some of these issues below.

1. **False reports of blood on Freeman's right shoe**



ABC's 20/20 Leah Freeman homicide, October 2010. Chief Mark Dannels of Coquille Police Department is featured.

In January of 2010, Coquille PD Chief Mark Dannels sought assistance from the Vidocq Society, a group of self-described "expert investigators" and "confidential consultants," to assist with developing a theory of the crime and a theory of motive to implicate McGuffin. In his deposition on July 15, 2022, Dannels stated that the extent of him "vetting" the Vidocq Society was limited to looking at the Vidocq Society website.[30]

The investigative team then worked with producers of the ABC News "20/20" program who interviewed the team and filmed McGuffin's arrest.  The episode featured Chief Dannels, the Oregon State Police crime lab, the Vidocq Society, and Richard Walter. The show aired nationally prior to McGuffin's criminal trial.[31]

---

[29] 2010-2011 Vidocq Synopsis of Freeman Case
[30] Deposition of Mark Dannels, July 15, 2022, page 309, lines 12-22
[31] 2010-10-15 Transcript of ABC News "20/20"

HICKS CONSULTING- LLC    22

Members of the team made inconsistent statements on the show. The homicide investigative team speculated that McGuffin caught up to Freeman at the cemetery by the high school, got in an argument, hit her in the face, bloodied her lip or nose, and then killed her in that location. In an apparent effort to support their theory, Chief Dannels[32] and the investigative team made the false statement that blood was found on Freeman's right shoe. However, OSP Criminalist Kathy Wilcox examined the right shoe and reported that "no blood was detected on this shoe."[33]

Vidocq co-founder Richard Walter along with other members of the investigative team in this case repeated the inconsistent statement that blood evidence on Freeman's right shoe was evidence that she was punched in the face. Chief Dannels stated on ABC News "20/20" that the (first) shoe was found "with blood on it," and Walter reported that the blood indicated that Freeman "was forcibly taken from that point" where "she got probably smashed in the face."[34]

Vidocq Society documented Walter's unsupported profile and statements in an internal memorandum, which was never disclosed in discovery in the criminal case.[35]

District Attorney Frasier repeated the unsupported theory of the crime in his closing argument during the murder trial when he stated, "He finds her by the high school. He tries to get her into the car. She loses a shoe. She ends up with a bloody lip or a bloody nose." [36]

Later, in a letter to the Oregon Department of Justice, District Attorney Frasier stated that he warned 20/20 that "it appeared that Mr. Walter was a fraud" and that Frasier's opinion was that 20/20 should not rely upon Walter.[37]

The statements made by Chief Dannels, Walter, and other investigators that were featured in the "20/20" episode" were not based on evidence. The information presented to a national television audience before the murder trial was not consistent with training that officers must have articulable facts and circumstances and reasonably trustworthy information that would lead a reasonable officer to believe they have met the appropriate burden to make the respective stop/arrest. The statements made by the investigative team also fell below the standard that requires officers to avoid making any inconsistent statements orally or in writing.

Furthermore, Walter's statement that the blood on the first shoe found indicated that Freeman "was forcibly taken from that point" and where "she got probably smashed in the face" is perplexing. As a 30-year law enforcement officer, police academy trainer, and certified homicide investigator, I have never seen a theory like this repeatedly espoused when no reliable evidence

---

[32] ABC's 20/20, October 2010 transcript, Leah Freeman Homicide
[33] 2000-07-17 OSP Lab Report.
[34] ABC's 20/20, October 2010 transcript, Leah Freeman Homicide
[35] Deposition of Robert Paul Frasier, August 29, 2023, Page 118, Lines 6-25
[36] 2011 Criminal Trial Transcript at D9 156:3–7
[37] August 10, 2016, Letter to Mr. Paul E. Reim, Oregon Department of Justice

supports it. This statement made by Walter appears to be consistent with his history of misconduct as recognized by court admonishments.[38]

Standard police practices that existed at the time would have required the investigative team to accurately report the facts and refrain from offering inconsistent, distorted, or misleading statements orally or in writing.

The fact that Chief Dannels was involved in the inaccurate reporting is particularly troubling. Chief Dannels was in a position of authority. An investigative team such as the one involved in the Freeman investigation takes its cues from its leader. By making statements that are unsupported by evidence, a law enforcement supervisor conveys to his subordinates that such practices are not only acceptable, but encouraged. This represents a gross departure from the supervisory role of a police chief.

2. **False report that McGuffin destroyed evidence**

The investigative team in this case also created an unsupported theory that McGuffin transported Freeman's body in his car and then wiped it clean to destroy any blood evidence.

In 2010, Coquille PD Chief Mark Dannels appeared on "20/20" and stated that McGuffin's Mustang had been "cleaned and wiped," and later represented that he had been told that the trunk had been "sterilized."[39] However, OSP Criminalist Kathy Wilcox examined the Mustang and reported that "the interior surfaces did not appear to have been recently wiped clean" and the trunk compartment was only "empty."[40]

According to 2011 trial documents, Wilcox testified that the seats of the Mustang had been "wiped clean."[41] However, handwritten notes from an internal meeting involving Wilcox and other detectives of the investigative team, which were produced to McGuffin for the first time in the current civil proceedings, reveal that Wilcox initially explained to the other members of investigative team that the vehicle was clean, but had not been "wiped."[42] Wilcox's photographs confirmed this fact.

Again, the statements made by Chief Dannels and other investigators were not based on evidence. The statements were not consistent with training that officers must have <u>articulable</u> facts and circumstances and <u>reasonably trustworthy information</u>. The statements, further, represent a significant departure from standard police practices that existed at the time that required the investigative team to accurately report the facts and refrain from offering inconsistent, distorted, or misleading statements orally or in writing.

---

[38] August 10, 2016, Letter to Mr. Paul E. Reim, Oregon Department of Justice
[39] ABC's 20/20, October 2010 transcript, Leah Freeman Homicide
[40] 2000-07-06 OSP Lab Report.
[41] 2011 Criminal Trial Transcript at D6 81:12–13.
[42] 2000-07-06 Wilcox Handwritten Notes from Homicide Investigation Team ("HIT") Meeting.

HICKS CONSULTING- LLC   24

And again, Chief Dannels' involvement in reporting statements without any factual basis bolsters my opinion that Coquille Police Department leadership created a culture in which officers were permitted or even encouraged to make inaccurate statements to support the investigation and prosecution of McGuffin.

3. **Reliance on David Breakfield**

The investigative team developed the unsupported theory that McGuffin allegedly confessed to David Breakfield. Breakfield dated McGuffin's on-again-off-again girlfriend, Maegan Edgerton (now Traglio), while they were in high school. Breakfield testified at the 2010 criminal trial that he was dating Edgerton after she had recently broken up with McGuffin sometime in 2002. Breakfield testified that McGuffin threatened Breakfield by telling him "I strangled that bitch and I'll strangle you, too."[43]

Breakfield stated on cross-examination that he did not share with anyone that McGuffin had allegedly made a confession for a full eight years before McGuffin was indicted.[44]

Edgerton testified at her deposition in this case that Breakfield called her after he spoke with police. Breakfield told Edgerton that the police heard a rumor that McGuffin tried to run Breakfield off the road. Edgerton stated that Breakfield told her that the Coquille PD wanted him to say that he was run off the road by McGuffin.[45]

According to Edgerton, Breakfield told police that the rumor was false and the incident never occurred. Edgerton also testified in this case that Breakfield told her that the supposed threats were a joke.

McGuffin has always maintained that these threats did not occur. Breakfield's relationship with Edgerton and his 8-year silence of an alleged threat made by McGuffin is not consistent police training that under a totality of circumstances, there must be articulable circumstances establishing the reliability of the information and the reliability of the informant. Breakfield knew the Coquille Police Department had believed that McGuffin was a suspect in the death of Freeman. However, according to Breakfield, he chose not to say a single word about the alleged threat to *anyone* for 8-years. Standard police practices would have required that the officers further investigate the reliability of Breakfield and his statements to prevent one-sided reporting that may be inaccurate.

In addition, Coquille Police Officer McNeely testified in this matter that he remembers thinking during McGuffin's trial that the defense attorney could have got that out of Breakfield at trial.[46]

---

[43]  2011 Breakfield Trial Testimony
[44] Id.
[45] 2023 Edgerton (Traglio) Deposition Testimony re Breakfield
[46] McNeely deposition transcript, page 115, lines 4-13.

However, McNeely and other members of the investigative team never disclosed this material fact during the trial. The failure to disclose this material fact in a homicide investigation is a significant departure from Brady training and Coquille Police procedures.

### 4. Reliance on "psychics"

In 2000, it appears that the investigative team contacted "technical remote viewers" (i.e., psychics), at least one of whom encouraged investigators to continue the pursuit of McGuffin.[47]

The use of psychics is not accepted in the law enforcement profession as a reliable method of solving any crime, especially homicide. Any information received from a "psychic" is certainly not consistent with police training that "under a totality of circumstances, there must be articulable circumstances establishing the reliability of the information and the reliability of the informant."

An officer adhering to standards and training would not involve a psychic in a homicide investigation, and the fact that any psychic appears in the case file for the Freeman investigation is a significant departure from standard police practices.

### 5. Investigation by elimination

Coquille PD Chief Dannels and Vidocq Society co-founder Richard Walter presented their unsupported theory of the crime and motive to the Coos County District Attorney who in turn sought the indictment of McGuffin. Chief Dannels explained to the grand jury that, through the collective efforts of law enforcement and their experts, and despite the absence of any tangible evidence implicating McGuffin, they were able to eliminate all potential suspects except one: McGuffin.[48]

In this civil case, Sheriff Zanni revealed that as a member of the Freeman Task Force he did not believe there was probable cause to bring the murder case against McGuffin to the grand jury. Sheriff Zanni explained:[49]

- **Lauersdorf:** *"Did you recommend or suggest to anyone at any time between 2000 and 2007 that the case be submitted to the Coos County District Attorney's Office for presentation to grand jury?"*

- **Zanni:** *"Not that I recall."*

- **Lauersdorf:** *"Why not?"*

---

[47] Criminal Case Bates Nos. 004667–4685.
[48] Transcript of Mark Dannels' grand jury testimony, page 134, lines 1-8
[49] Deposition of Craig Zanni, December 17, 2021, page 214-215

HICKS CONSULTING- LLC    26

- **Zanni:** *"I didn't believe there was enough information at that time to bring it to the district attorney."*

- **Lauersdorf:** *"What information did you think was still lacking?"*

- **Zanni:** *"Lots of information. DNA information documentation of all of the information we had. From my position, working on the -- not being the case officer directly involved with Coquille Police Department, I don't know all of the information they had, but I wasn't aware of enough being put together to present to the grand jury."*

Later in the deposition, Sheriff Zanni explained that during the time when the case was dormant to the time Chief Dannels took over and formed the new task force, he was not aware of any new evidence being discovered in the case.

- **Lauersdorf:** *"Okay.· So were you aware or did Chief Dannels mention any new evidence being uncovered during the time that you were retired?"*

- **Zanni:** *"Not that I recall."*

Standard police practices require that officers develop *evidence* to support a stop and an arrest. Investigative officers are not permitted to encourage a prosecution based on the *absence of evidence*. Officers must have <u>articulable</u> facts and circumstances based on <u>reasonably trustworthy information.</u>

Standard police practices that existed at the time would have required the investigative team to provide articulable facts and circumstances based on reasonably trustworthy information. The fact that the investigative team encouraged a prosecution based on their inability to eliminate McGuffin, rather than articulable facts and circumstances, and in combination with the inconsistent reports discussed above, is a significant departure from standard police practices.

# Section D: Policies Inconsistent with Established Disclosure Obligations

**Opinion:**

The Coos County Sheriff's Office and the Vidocq Society had official policies that did not comply with established disclosure obligations. These policies allowed task force members to withhold favorable information prior to and after the arrest, trial, and conviction of McGuffin. This failure contributed to the arrest, prosecution, imprisonment, and conviction of McGuffin. The policies were inconsistent with generally accepted police practices and procedures.

HICKS CONSULTING- LLC   27

**Basis:**

**Coos County Sheriff's Office Policy**

Chapter 16 of the Coos County Policy Manual provides guidelines for Coos County Deputies for Reports and Records. 16.01.01 Reports states:

> *Reports constitute the information system of the Sheriff's Office. They document the case against offenders as well as the actions taken by the Sheriff's Office, inform the Sheriff's Office of existing crime problems, and protect the investigating deputy and the Sheriff's Office against unwarranted allegations of improper action.*



The above statement in the Coos County Sheriff's Policy Manual states that reports document the case "against offenders." This statement fails to direct all employees that reports are written to objectively document and report all exculpatory and inculpatory information.

The IACP Model Policy titled *Brady Disclosure Requirements*, quoted above, provides an example of an appropriate policy statement that incorporates the established rules concerning what police understood, and were trained on, concerning disclosure obligations.

The report writing policy of the Coos County Policy Manual (at the time) was inconsistent with training/standards, with law enforcement training principles, general police practices, police policies, and procedures. This deficient policy allowed officers from the Coos County Sheriff's Office to withhold favorable information, such as the Nick Backman report and ATM receipt, discussed above.

**Vidocq Society Policy**

On page one of the Vidocq's Society Code of Ethics (2014), the organization states that it "takes pride in its professionalism and assures law enforcement agencies that the confidential details

HICKS CONSULTING- LLC    28

about their matters remain confidential."[50] The Code of Ethics also requires Vidocq Society members to keep all information confidential:

## THE VIDOCQ SOCIETY

### CODE OF ETHICS & CONDUCT

Each year, every Vidocq Society member READS and reaffirms adherence to the Vidocq Society Code of Ethics & Conduct (the "Code"). Each new member AFFIRMS adherence to the Code upon joining the organization. As an organization, the Vidocq Society takes pride in its professionalism and assures law enforcement agencies that the confidential details about their matters remain confidential.

By affirming the Vidocq Society Code each year, every member reviews the code and agrees to act in the best interests of referring law enforcement agencies ("LEAs") and victims and to conduct Vidocq Society ACTIVITIES in a manner that maintains high standards of professionalism and ethics.

The Code PROVIDES the Vidocq Society with a method to ensure, and to assure others, that our members adhere to our organization's basic beliefs.

**Client Interests**

To best serve client interests, Vidocq Society members shall:

• Always conduct their Vidocq Society activities in a manner that places the interests of the LEAs and victims before any personal interests.

• At all times protect the confidentiality of information provided by LEAs. No disclosure will be made of any information disclosed by an LEA without their prior approval. No disclosure will be made of any information relating to the Vidocq Society's participation in an investigation without the WRITTEN permission of the Chairman of the Board and/or the Commissioner of the Vidocq Society ("Chairperson").

• Not participate in any investigation in which the Vidocq Society has participated or is scheduled to participate if such participation would create a conflict of interest or the appearance of a conflict of interest between or among the Vidocq Society, the member and/or the LEA.

Vidocq's website (2024) also confirms their commitment to confidentiality, "The Vidocq Society's assistance to law enforcement necessarily involves the review and analysis of case materials such as reports, statements, and physical evidence. The confidentiality and security of these materials are of paramount importance."[51]

The above statements in the Vidocq Code of Ethics fail to direct all members involved in law enforcement investigations or consulting with law enforcement to objectively document and disclose all exculpatory and inculpatory information.

Standard police practices at the time in 2010 did not allow law enforcement officers to develop investigatory information through an outside consultant and then hide that information. An officer who was properly trained in police work would not believe that officers could avoid their disclosure obligations by developing leads through an outside consultant. A police officer who was properly trained and adhering to established standards would know that there is no greater duty of an officer than to provide any and all information developed in a criminal investigation to the prosecutor, regardless of whether the information could assist the accused and regardless

---

[50] The Vidocq's Society Code of Ethics & Conduct, page 1, 2014
[51] https://www.vidocq.org/#confidentiality

of whether the information was developed from within the agency or by consulting with outside assistance.

The confidentiality policy of the Vidocq Society was inconsistent with established disclosure training/standards, with law enforcement training principles, general police practices, police policies, and procedures. The deficient policy allowed members from the Vidocq Society to partner with the Coquille Police Department to withhold favorable information, such as the Vidocq internal memorandum discussed above.[52]

# Section E: Failure to Secure Crime Scenes

**Opinion:**

Investigators from the Coquille Police Department and Coos County Sheriff's Office failed to adhere to generally accepted police practices and protocols on crime scene investigation and evidence handling that contributed to the arrest, prosecution, conviction, and imprisonment of McGuffin.

**Basis:**

**Police Training: Securing the Crime Scene**
Basic law enforcement standards that are taught to police recruits at the academy require the following when evidence is found:

1. The area is now a crime scene. A missing person/homicide crime scene needs to be cordoned off and protected.
2. The detective/supervisor should organize the crime scene search to <u>collect as much physical evidence as possible.</u> In addition the search must be based on constitutionally legal grounds, and the evidence collected must be properly documented and handled so that it may be presented in court later. It is imperative that of each piece of physical evidence be treated separately and carefully to avoid cross-contamination."[53]
3. "Homicide and sexually assault crime scenes usually contain an abundance of physical or trace evidence. The systematic search for, collection of, and preservation of physical evidence is the goal of the crime scene search." [54]
4. "No evidentiary item is to be moved until it is marked, photographed and sketched"[55]

---

[52] Deposition of Robert Paul Frasier, August 29, 2023, Page 118, Lines 6-25
[53] Practical Homicide Investigation- Tactics, Procedures, and Forensic Techniques (fourth edition by Vernon J. Gerberth: Chapter 8, page 175
[54] Id.
[55] WSCJTC BLEA Crime Scene Management PowerPoint 2014

HICKS CONSULTING- LLC  30

5. NYPD Lt. Commander (Ret.) Vernon J. Geberth put it best, "Remember, do it right the first time. You only get one chance."[56]

**Police Training: Crime Scene Procedures and Evidence Handling**
At the WSCJTC's Basic Law Enforcement Academy (BLEA), and in police academies in the Pacific Northwest, police recruits are taught basic crime scene investigation.[57] Recruits are given classroom and practical instruction on basic crime scene procedures. The three priorities for crime scene investigation are the following:

- Make the scene safe

- Render medical aid

- Manage the crime scene

Police recruits are given instructions on the critical nature of protecting the crime scene and collecting all items of potential evidentiary value. Specifically, recruits are taught the "Golden Rule" of crime scenes:

- "No evidentiary item is to be moved until it is marked, photographed and sketched"

Police recruits are also taught to wear and change gloves frequently when handling items of potential evidence to avoid cross contamination. In a homicide investigation such as this, the inadequate handling of evidence likely altered the integrity of the evidence.

As an instructor at the WSCJTC, I set up crime scenes at the police academy to assist recruits for the practical portion of the introductory crime scene investigation class. During these practical exercises I would place obvious evidence in plain sight for the recruits to identify, protect, take notes, photograph, sketch and seize. These practical exercises were instrumental in the development of these police recruits in their quest to become new police officers.

**Applicable Coos County Sheriff's Office Policy: Evidence**
The Coos County Sheriff's Office policies at the time stated the following[58]:

> **CHAPTER 15. EVIDENCE AND PROPERTY**
>
> **15.00.00    PURPOSE.** The handling and processing of evidence and found property is a task which must be conducted in an efficient manner. The purpose of this policy is to establish an evidence/property system which protects the property rights of citizens, guards the integrity of the Sheriff's Office, and maintains the chain of evidence. There shall be minimum flexibility in the application of this program and it shall be followed by all personnel.

---

[56] Practical Homicide Investigation- Tactics, Procedures, and Forensic Techniques (fourth edition by Vernon J. Gerberth
[57] WSCJTC BLEA Crime Scene Management PowerPoint 2014-2017
[58] Coos County Sheriff's Office Policies, Revised 03/30/94

HICKS CONSULTING- LLC    31

15.05.00    CHAIN OF EVIDENCE. When processing evidence, members shall keep that evidence secure and in the same condition as when it was received. The custodial chain of evidence shall be maintained and documented.

**Applicable Coos County Sheriff's Office Policy: Supervision**

The Coos County Sheriff's Office policies at the time stated the following[59]:

4.04.00    SUPERVISION AND COMMAND. Successful law enforcement service depends on the level of performance of deputies. The level and efficiency of such performance is in large measure determined by the quality of supervision received.

Supervision can generally be defined as planning the work of personnel in an orderly manner, delegating authority and responsibility for the efficient accomplishment of tasks and following up task assignments to assure satisfactory completion. To this end, the following serve as general supervisory guidelines.

4.04.01    COMMANDERS. Commanding deputies are responsible and accountable for all aspects of their command. Within policy guidelines and legal constraints, a commander has authority to direct and coordinate assigned personnel and allocate resources to achieve organizational goals and objectives. Commanders rely on policy, directives, training and personal initiative to guide them in achieving the highest possible level of performance.

4.04.02    FIRST LINE SUPERVISORS. Sergeants and Corporals are the first level of supervision and have the responsibility to guide, direct, motivate and train those personnel under their supervision.

**Section 4: Handling of Serious Violations**

1. An investigation of a serious violation is based on the serious nature and complexity of an allegation and where such an investigation would require the investigator assigned to obtain a formal, written, typed and/or audio recorded statement from the member involved. An investigation of a serious violation shall be initiated upon the approval of the Sheriff through the appropriate Division Commander.

2. If an allegation of misconduct is serious in nature, the Sheriff and the member's Division Commander shall be notified immediately. A copy of the Citizens Complaint Form shall be supplied to the Sheriff and the member's Division Commander.

3. The Sheriff, through the member's Division Commander, may notify the member of the nature and seriousness of the allegation. The Division Commander may notify the member in writing that he/she is the subject of an internal investigation.

4. The Sheriff shall determine if the investigation should be assigned to another deputy sheriff. If no outside investigator is required, the case shall be handled by the appropriate Division Commander, who may then delegate the investigation to a supervisor or member of the Detective Bureau.

5. If, after the appropriate interviews are completed and necessary documents obtained it appears that criminal charges could possibly be lodged against a member, or that a civil action could possibly be lodged against a member, the Sheriff and County Counsel shall be notified immediately.

   a. Whenever it appears that a member will be charged with a crime, the Sheriff shall be notified immediately and the case file shall be presented to the District Attorney for review.

---

[59] Coos County Sheriff's Office Policy Manual, Chapter 4: Jurisdiction, Organization, and Command Structure, revised 1994; Coos County Sheriff's General Order, Internal Investigations, Policy: G.O. 2.07

HICKS CONSULTING- LLC    32

I discuss some of the failures by the investigative team below.

1.  **Deputy Oswald and Officer Hall failed to secure and process the scene on Hudson Ridge**

On July 5th, 2000, Deputy Kip Oswald on his own accord conducted a search of the Hudson Ridge area to specifically find "something" related to Freeman's disappearance.[60] During this search for evidence, Oswald allegedly found Freeman's shoe in the middle of the road on Hudson Ridge.

Oswald, a patrol corporal, failed in the following ways:
*   Oswald did not notify anyone that he was going to Hudson Ridge, that he arrived and that he had found a major item of evidence in a missing person/homicide case.
*   Oswald did not secure the crime scene and call for additional units to search, photograph, and collect evidence.

Officer Hall reported that Oswald approached Hall while he was at the roadblock on July 5 and showed Hall the shoe found on Hudson Ridge. This happened sometime between 9-10:15 p.m., just after Oswald found the shoe. Hall failed to immediately proceed to the scene to protect the area and conduct an organized and methodical crime scene search, including by processing the scene with video and photos.

Because these are basic, academy-level crime scene processing protocols, the failure to adhere to accepted police practices is egregious. In normal police practices, an officer who found evidence potentially related to a missing child/possible abduction or homicide would immediately notify command, secure the crime scene, and await further instructions to process the scene. A lead officer who was notified of a potential crime scene should immediately dispatch officers to the scene to protect the area and search for additional evidence, possibly even the missing person. The failure to take these basic steps represents a significant mismanagement of the investigation and resulted in the destruction of key evidence as discussed below.

2.  **Oswald contaminated, destroyed, and withheld key evidence**

The following are facts from Oswald's deposition regarding his finding and handling of the victim's shoe and other evidence on July 5th, 2000, and subsequent dates.

**July 5, 2000**
*   Oswald decided to search for Freeman on his own.[61]
*   Oswald did not notify dispatch that he was conducting the search.[62]
*   Oswald had gloves in his vehicle at the time.[63]

---

[60] Deposition of Kip D. Oswald, December 22, 2021, page 129
[61] Deposition of Kip D. Oswald, December 22, 2021, page 119-120
[62] Id., page 121
[63] Id., page 125

HICKS CONSULTING- LLC    33

- Oswald specifically went out to the Hudson Ridge area to find "something" related to Freeman.[64]
- Oswald didn't check with the official search team to see where they had previously searched to coordinate.[65]
- Oswald found Freeman's shoe in the middle of the road on Hudson Ridge.[66]
- Oswald stated he "unfortunately" picked the shoe up without gloves.[67]
- Oswald stated, "I thought this was really strange because it's a newer shoe. And then I thought of the case that they were doing, and I thought, well, there's that possibility. So I put it into a bag, and I put it into my vehicle."[68]
- Oswald stated he also collected cigarette butts, papers, cans, and a piece of string but used a glove when handling those items. Oswald stated he put these items in the same bag.[69]
- Specifically, Oswald stated the cigarette butts and the other items were found within 20 feet of the shoe.[70]
- After finding Freeman's shoe and collecting the other items, Oswald stated he drove up to the roadblock and asked an FBI agent and a Coquille Officer about the shoes Freeman was wearing when she went missing.[71]
- Officer Hall confirmed that on July 5th, 2000, while working the roadblock at N. Central and the credit union, Oswald approached him and stated he found a shoe that possibly belonged to Freeman.[72]
- In his deposition, Oswald was confronted with the fact that Anthony Messerle testified that Oswald showed Messerle the shoe Oswald found. Oswald stated that he "didn't remember [that encounter]."[73]
- Oswald stated that he subsequently turned in the above items into evidence[74] and authored a report.[75]
- It is important to note there is <u>no</u> official documentation that Oswald turned in cigarette butts, papers, cans, and a piece of string.
- Oswald stated that after he collected Freeman's shoe he doesn't remember if he notified dispatch or if he asked for officers to respond to the scene.[76]

---

[64] Deposition of Kip D. Oswald, December 22, 2021, page 129
[65] Id.
[66] Id., page 143
[67] Id.
[68] Id., page 146
[69] Id., page 157
[70] Id., page 156
[71] Id., page 146
[72] Coquille Police Department, Supplemental Report, #00001905, written by David E. Hall
[73] Deposition of Kip D. Oswald, December 22, 2021, page 166
[74] Id., page 147
[75] Id., page 154
[76] Id., page 159

- Oswald stated that "I believe it was the next day and they did a search of the whole ridge in that day."[77]
- There is no documentation of any search by the task force the next day.
- Oswald stated that the only one who talked to Oswald about his mishandling of the central item of evidence in this case [shoe] was Sheriff Zanni. Oswald reported that Zanni stated, "This is a lesson learned, you know."[78]

```
CASE 90046010650        ** COOS COUNTY SHERIFF'S OFFICE **        00064 PAGE:  1
                                INCIDENT REPORT

INCIDENT TYPE: PROPERTY-FOUND          PREMISE TYPE:_____
LOCATION:_____HUDSON RIDGE_____FAI   APT/LOT:____    AREA A12
BUSINESS:_____WEAPON TYPE  NON APPLICABLE_____
BEGIN DATE: 7/05/00  BEGIN TIME: 2107  END DATE: 7/05/00  END TIME: 2107
CENSUS TRACT: 06___  SUB-DIVISION  :_____
   COMMENTS:  CLV DEPUTY REQ FILE NUMBER FOR FOUND PROPERY REF:
              PROPERTY FOUND NEAR POWER LINES FILE # ISSUED


******************************* N A R R A T I V E *******************************
   NARRATIVE BY CPL. KIP OSWALD:
     ON 07-05-00, AT 2107 HOURS, I WAS ON PATROL, CHECKING REMOTE PLACED USED
     FOR PARTYING.  I WAS ALSO LOOKING FOR POSSIBLE EVIDENCE REGARDING THE
     DISAPPEARANCE OF LEAH FREEMAN (A JUVENILE FEMALE REPORTED MISSING TO THE
     COQUILLE POLICE DEPARTMENT).

     UPON TAKING THE FIRST LEFT HAND TURN ON HUDSON RIDGE ROAD, I TURNED ONTO
     THE DIRT ROAD THAT LEADS UP UNDER THE POWER LINES.  WHEN I CAME TO THE
     90 DEGREE TURN TO THE RIGHT ON THAT ROAD, I OBSERVED A WHITE NIKE TENNIS
     SHOE THAT APPEARED TO BE A WOMAN'S SHOE, LYING ON THE RIGHT SIDE OF THE
     ROAD.

     THE SHOE HAS DARK BLUE STRIPES AND A YELLOW NIKE LOGO.  THE LACES WERE
     UNTIED AND INSIDE A TOY SHOWING THE U.S. SIZE OF 6W.  I ALSO OBSERVED
     THAT THERE ARE STRANDS OF HAIR IN THE SHOE AND ALSO ONE ON THE OUTSIDE.

     I KNOW THAT THE VICTIM, LEAH FREEMAN, WAS DESCRIBED AS WEARING WHITE
     NIKE TENNIS SHOES.  THE SHOE IS IN VERY GOOD CONDITION AND DOES NOT
     APPEAR TO BE ONE SOMEONE WOULD THROW AWAY.

     I WAS FURTHER ADVISED BY TONY MESSERLE THAT THE SHOE I HAD MATCHED ONE HE
     HAD FOUND BY HIS HOUSE.
   07-25-00 BKH  > DET/CQPD


CASE STATUS: NO REPORT_____        REPORT DATE: 070500

REPORTING OFFICER:  OSWALD,KIP

RECORDS CLERK 8674
```

**July 7, 2000**
- Oswald testified that on July 7th, 2000, he went back to Hudson Ridge to search again on his own. Oswald stated that he found a receipt and saw a set of tire tracks to a standard car.[79] Oswald took the receipt as evidence because he believed it could be connected to the suspect.[80] Oswald stated that he did not make a radio call that he had found anything and did not call for assistance. Oswald stated he did not take any photos or tire impressions.[81]
- Oswald stated that he authored a report of the July 7th findings, however no report was ever found.[82]

---

[77] Id., page 153
[78] Id., page 208
[79] Id., page 178-183
[80] Id., page 178
[81] Id., page 184
[82] Id., page 188

**July 8, 2000, Task Force Search**

- On July 8th, 2000, the task force, along with two cadaver dogs searched the Hudson Ridge area, powerline access road, and the wooded hillside at the west end of town. Nothing was found.[83]

**August 21, 2000**

- Oswald stated that on August 21st, 2000, he went back up to Hudson Ridge. Again, Oswald stated that he went on his own, didn't tell anyone that he went up there. Oswald stated that he found an illegal garbage dump.[84]

**August 22, 2000**

- Oswald stated that on August 22nd, 2000, he again went back to Hudson Ridge on his own accord. Oswald stated this time he found duct tape, a couple of .22 cartridge casings, and three napkins or towelettes.[85] Oswald stated that he believed these items were 15% percent related to Freeman's homicide. Oswald used gloves and took photos this time.[86]
- When asked why he took photos and used gloves on this visit to Hudson Ridge, Oswald answered, "I realized that the shoe belonged to Leah Freeman, and if there was any other evidence up there, I didn't want to taint it, and I didn't want to screw up again."[87]

From a police practices perspective, as a retired 30-year law enforcement officer and former police academy official, it is important to express how unusual and suspect Oswald's official explanation is regarding the facts and circumstances surrounding his finding of one of the central pieces of evidence in this case: Freeman's shoe.

On July 5th, 2000, Oswald was a Corporal in the Coos County Sheriff's Office with 20 years of law enforcement experience. Oswald was trained and had experience in the proper handling and documentation of evidence.[88] On this day he went to Hudson Ridge on his own with the intention of finding "something" related to Freeman.[89]

Oswald alleged that he found a "newer shoe" in the middle of the road on Hudson Ridge and realized it was likely Freeman's shoe. Oswald handled the shoe without gloves and without taking photos first. Oswald testified that he found other evidence on July 5th and more on subsequent days but used gloves during these evidence findings. Oswald later explains his gross mishandling of this critical evidence as a simple mistake.[90]

---

[83] North Bend Police Department, Supplemental Report, Case No: 20011114, Written by Lt. Bud Young, page 9
[84] Deposition of Kip D. Oswald, December 22, 2021, page 192
[85] Id., page 201
[86] Id., page 203
[87] Id., page 207
[88] In his deposition Sheriff Zanni was asked "What instructions did you give him [Oswald] about collecting the shoe and preserving it as evidence? Zanni answered, "I didn't give him instructions on that. He was a trained deputy."
[89] Deposition of Kip D. Oswald, December 22, 2021, page 129
[90] Id., page 226, line 7

HICKS CONSULTING- LLC   36

Oswald never communicated with the task force that he was conducting these searches, never told dispatch that he was going to Hudson Ridge, and never notified dispatch of his alleged findings on Hudson Ridge.

All of these actions significantly—and egregiously—deviate from generally accepted police training principles, contemporary police tactics, police practices, policies, and procedures. Normal police practices would have required that an officer discovering critical evidence photograph the evidence in place, collect the evidence using gloves to avoid contamination or the loss of critical information, and immediately transport the evidence to the evidence locker. The fact that Oswald stopped and showed the evidence to a witness at the Fast Mart is inexplicable and inexcusable.

I have criticized Oswald's actions but even assuming one were to accept Oswald's testimony about his finding of the shoe, his subsequent actions should have triggered significant ramifications and supervisory actions. I discuss the lack of supervision below.

It is also important to note there is no official documentation that Oswald turned in cigarette butts, papers, cans, and a piece of string found on July 5th. This evidence was critical because it was found so close to Freeman's shoe. These alleged cigarette butts would undoubtedly contain some measure of DNA that could have been compared to the DNA on the shoe. But yet, the report and evidence have not been turned over.

If the jury were to credit Oswald's testimony about finding these items, then it would be highly unlikely, following standard police practices, that there would not be some documentation of this evidence in a report, evidence log, or evidence tags. Because no such documentation has been turned over, there are three obvious possibilities: the evidence and documentation were destroyed; they were withheld; or Oswald never found or collected the items and falsely stated that he did. All three possibilities represent a significant departure from standard police practices.

3. **Zanni failed to supervise Oswald**

Below is Oswald's background of termination from service:

- **Hillsboro Police Department 1977-1980: Resigned in Lieu of Termination for Criminal Conduct**
Oswald testified that he was fired from the Hillsboro Police Department in 1980. Oswald stated that in addition to having "problems in his home life" that he was involved in criminal conduct. Oswald stated that while driving off-duty in the City of Hillsborough, a Hillsborough Police Sgt. attempted a pull over Oswald on a traffic stop. Oswald explained that he refused to pull over, eluded the pursuing Sgt., and escaped. Oswald stated he

came in the next day, met with the Chief, and confessed that he fled from the traffic stop. Oswald stated he resigned in lieu of termination.[91]

- **Coos County Sheriff's Office 1983-2006: Suspect in a homicide, Retired.**
  Oswald stated that he retired from the Coos County Sheriff's Office with the rank of Sgt. During his tenure as a Coos County Deputy, Oswald was a suspect in the murder of Leah Freeman.[92]

- **North Bend Police Department 2007-2012: Resigned in Lieu of Termination for Criminal Conduct**
  Oswald testified that North Bend Police officials believed that Oswald had forged a doctor's note relating to medical leave. Oswald explained that he was told by the chief and the captain that if he didn't resign they would have Oswald charged with the crime of forgery. Oswald also stated that his commission was revoked through the State of Oregon. It appears Oswald was added to the Coos County Brady list because of the alleged forgery.[93]

Oswald testified in his deposition that he was not asked to assist in the Coquille Task Force on the Freeman investigation but did so anyway.  When Oswald began his own investigation, he did not notify, coordinate, or communicate his findings at the appropriate time and manner.

Oswald found additional evidence (*i.e.,* cigarette butts) that would undoubtedly contain a presence of DNA, but this evidence and report was never turned over.

Oswald repeatedly searched for evidence on Hudson Ridge, but he did not notify, coordinate, or communicate his findings at the appropriate time and manner.

Oswald stated that the only one who talked to him [Oswald] about his mishandling of the central item of evidence in this homicide case [shoe] was Deputy Sheriff Zanni. Oswald reported that Zanni stated, "This is a lesson learned, you know."[94]

The Coquille PD Task Force was the official governmental unit comprised of designated law enforcement officers operating under a single point of command to investigate the initial disappearance and subsequent murder of Freeman.

The task force objective was to work collaboratively as a team with the goal of sharing information within the task force[95] pursuant to the collection and analysis of evidence, conducting coordinated investigative activities, and interviewing witnesses and suspects. The

---

[91] Deposition of Kip D. Oswald, December 22, 2021, page 37
[92] Id., page 206
[93] Id., page 52
[94] Deposition of Kip D. Oswald, December 22, 2021, page 208
[95] Sheriff Zanni's testified in his deposition that information was not to be shared outside of the task force. Page 111.

HICKS CONSULTING- LLC    38

task force was also responsible for preparing and maintaining evidence records, reports, interviews, and all manner of investigative work product in collaboration with the district attorney.

In my opinion, Oswald's actions in this case are best described as *rogue*. Oswald was not assigned to the missing person/homicide task force. Oswald did not notify, coordinate, or communicate his search for evidence in this case. Additionally, Oswald did not follow basic police academy evidence handling protocols.

Oswald testified that he collected critical evidence (cigarette butts) that is now missing and there is no record that it was processed at the crime lab. And finally the Coquille Police Task Force believed Oswald's actions were so suspicious that at one point they considered Oswald a suspect in the murder of Leah Freeman.[96] Oswald stated that he took a polygraph and allegedly passed. It is important to note that the data and results of this polygraph apparently were not retained and now does not exist.

Oswald's actions were contrary to the coordinated goals and objectives of the designated task force. His actions call into question his supervision and training.

Law enforcement agencies throughout the country recognize the vital importance of properly supervising members. Without supervision to properly guide, remediate, or discipline an officer, an officer may behave in a manner that is inconsistent with generally accepted police practices and procedures. This can have detrimental effects on the department and the public.

It appears that Oswald's supervision was non-existent. Oswald repeatedly inserted himself into the homicide investigation and was not given any admonishments or direction regarding his repeated rogue actions. This type of activity by a department encourages the same or similar conduct moving forward. And that is exactly what happened in this case. Oswald's continued rogue behavior was so out of line with standard police practices that it resulted in his designation as a murder suspect in Leah Freeman's death.[97]

Furthermore, there is no documentation (or that has been disclosed) from the Coos County Sheriff's Office that there was any internal inquiry into one of their deputies being designated as a murder suspect. In his deposition, Sheriff Zanni confirmed that he did not follow up with Oswald regarding the polygraph.[98]

The lack of supervision for Oswald was far below the standard of care for any investigation but especially a homicide. Coos County Sheriff's Office dereliction of supervision with Oswald likely affected the direction of the homicide investigation that led to the arrest and prosecution of McGuffin.

---

[96] Id., page 206
[97] Deposition of Kip D. Oswald, December 22, 2021, page 206
[98] Deposition of Craig Zanni, December 17, 2021, page 207

This lack of supervision was a gross deviation from law enforcement supervisory standards, training principles, practices, policies, and procedures.

4. **Video of crime scene went missing; never given to prosecutor and HIT team note never turned over to McGuffin's criminal defense team**

Officers found the body of Freeman on August 3, 2000, and Lt. Pex a criminalist from Oregon State Police crime lab, dictated a report saying that he took video at the crime scene.[99]

Coquille PD Officer Hall and Coos County Deputy Sheriff Zanni logged the videotape into evidence on August 7, 2000.[100]

The evidence log shows the tape was released to the case officer (Hall) on March 22, 2001, and there is a property receipt showing it was Hall that requested it.[101]

Hall requested the tape for Coos County Deputy Medical Examiner Kris Karcher, however the video tape evidence of the scene is now missing.  DA Frasier testified in his post-conviction deposition that he didn't even know there was a crime scene tape.[102]

The relevance of the tape is critical because Karcher testified at McGuffin's criminal trial that they could tell from the crime scene that someone stood by the road and looked down at the body, and from other testimony the inference was that it was McGuffin.

It is also important to note that the HIT team never disclosed in the criminal case a note showing that the officers knew that the vegetation by the road was not broken down.[103]

A video of the crime scene would likely have showed the condition of the area by the body.  The HIT Team note, combined with the videotape of the crime scene, would have been important to preserve and disclose.

Coquille PD did not disclose the note and Hall did not keep the videotape secure or make sure it was returned to evidence after he checked it out for Karcher.

The failure to disclose the HIT team note was not consistent standardized basic training that requires all police officers to document and turn over <u>all</u> evidence obtained to the prosecutor.

---

[99] 2000-08-03 Pex Dictated Notes from Scene
[100] 2000-08-07 Evidence Log – scene tape" at page 1 (first row Evidence No. 224)
[101] 2001-03-21 Property Request
[102] Deposition of Robert Paul Frasier, May 31, 2019, Page 122,  Lines 13-21
[103] 2009-10-13 HIT Team Notes at page 7 ("vegetation not broken down by road")

HICKS CONSULTING- LLC    40

The disappearance of the video of the crime scene represents a significant mismanagement of the investigation and resulted in key piece of evidence that was not turned over to the district attorney's office and to Mr. McGuffin's criminal defense team.

As documented in this report, this missing video of the crime scene was not an anomaly.  It is a pattern of mismanagement or malfeasance in the criminal investigation and subsequent prosecution of Mr. McGuffin.

# Section F: Lack of Training on Homicide Investigation

**Opinion:**

The Coquille Police Department failed to properly train members of the police department in various homicide investigation practices and procedures that contributed to the arrest, prosecution, conviction, and imprisonment of McGuffin. A police department's failure to adequately train its members is inconsistent with generally accepted police practices and procedures.

**Basis:**

Across the nation and especially here in the Pacific Northwest, generally accepted standards require that homicide investigators have significant experience as a law enforcement officer and specialized training for homicide investigations.

**Police Training: Commission on Accreditation for Law Enforcement Agencies**
The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) was created in 1979 as a credentialing authority through the joint efforts of the International Association of Chiefs of Police, the National Organization of Black Law Enforcement Executives, the National Sheriffs' Association, and the Police Executive Research Forum.[104]

The CALEA Standards for Law Enforcement Agencies (2006) dedicates an entire chapter (Chapter 33) to training.  That chapter states, in part, in the introduction:

"Training has often been cited as one of the most important responsibilities in any law enforcement agency. Training serves three broad purposes. First, well-trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations. Second, training results in greater productivity and effectiveness. Third, training fosters

---

[104] CALEA Website, About Us. The CALEA Accreditation program seals are reserved for use by those public safety agencies that have demonstrated compliance with CALEA Standards and have been awarded CALEA Accreditation by the Commission.

HICKS CONSULTING- LLC     41

cooperation and unity of purpose. Moreover, agencies are now being held legally accountable for the actions of their personnel and for failing to provide initial or remedial training."

"Training programs should ensure that the needs of the agency are addressed and that there is accountability for all training provided. In particular, training should be consistent with the agency's mission and values as well as goals and objectives. Agency training functions should be the responsibility of the training component, which should be accountable for developing and administering training programs. Program development should provide for input from several sources, including agency personnel in general, a training committee, the inspections function, and, most important, the agency's chief executive officer."

"Career development is a structured process that is utilized by an agency to provide opportunities for individual growth and development at all levels. It is designed to promote productive, efficient, and effective job performance and to improve the overall level of individual job satisfaction."

"So that agencies can deal effectively with law enforcement problems in an increasingly complex and sophisticated society, there should be parallel increases in the level of education and training required for law enforcement officers. Higher education, by itself, is not an absolute answer in achieving improvement in law enforcement agencies. However, officers who have received a broad general education have a better opportunity to gain a more thorough understanding of society, to communicate more effectively with citizens, and to engage in the exploration of new ideas and concepts."

**Police Training: Basic Homicide Investigation**

For all homicide investigators in Washington State, the WSCJTC provides a class that law enforcement agencies *require*. The class is called Basic Homicide Investigation (course No. 0240). I attended the class in 2009 and obtained the certification. The homicide class is a 40-hour class and covers a variety of critical elements to investigate, manage, and solve homicides.

The Washington State Attorney General's Homicide Investigation Tracking System (HITS) investigators were the main instructors for the class. In the WSCJTC's Basic Homicide class[105], the HITS Team instructors emphasized the importance of utilizing their services in homicide investigations. From the HITS' Team webpage:

> *"Assigned to geographical regions, the Attorney General's HITS investigators collect homicide, sexual assault, and missing persons data. The data is then analyzed to determine possible linkages. These investigators possess combined investigative experience in violent crimes in excess of 100 years. They are a primary resource to local law enforcement because of their homicide background, experience, and technical expertise. They often are called upon to review cases and*

---

[105] Washington State Criminal Justice Training Commission's Basic Homicide Investigation, Law Enforcement In-Service Course No. 0240

*to provide a new perspective on investigations. HITS services are offered free to local law enforcement."*[106]

The HITS Team instructors also emphasized the importance *of small law enforcement agencies* that do not have the experience in murder investigations, to request assistance from the HITS' Team:

*"Benefits of HITS for small law enforcement agencies that do not encounter murder cases frequently or that have investigators inexperienced in specialized murder investigation techniques have found the HITS program to be especially beneficial. HITS analysts can offer guidance, based upon years of experience, on how to organize a murder investigation and provide access to information not available in anyone department's files."*[107]

NYPD Lt. Commander (Ret.) Vernon J. Geberth with over 40 years of law enforcement experience is a *world-renowned expert* in death investigations and sex-related homicide investigations.[108] Gerberth is the author of the book, Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques. This book is used in [police] academies throughout the nation and is considered the *"definitive resource for homicide investigators."* [109]

Gerberth explains that for success and credibility in homicide investigations it is imperative to have experienced law enforcement officers as homicide detectives. Gerberth also explains that formal education, training schools, and seminars are necessary to achieve the level of expertise needed.

*"The expertise developed by detectives is based upon extensive experience in the field and a familiarity with a large number of cases. Experienced detectives, who have recognized a particular modus operandi from a case in the past or a perpetrator's distinctive signature, have solved innumerable cases. It's this experience coupled with knowledge and continuity within the detective division, which assures successful investigations and that crimes will be solved. And consequently instills the confidence of the community in their police.*

*In order for personnel to attain this level of expertise they must have years and years of practical experience coupled with formal education, training schools and seminars."*[110]

---

[106] https://www.atg.wa.gov/hits-overview

[107] https://www.ojp.gov/pdffiles1/Digitization/138618NCJRS.pdf

[108] https://www.practicalhomicide.com/AboutPHI/bio.htm

[109] https://www.practicalhomicide.com/Textbooks/thebooks.htm

[110] Id.

HICKS CONSULTING- LLC    43

Gerberth also explains that experienced investigators have the leadership to "take charge" of the crime scene and manage the process accordingly:

### Failure to Manage the Crime Scene Process

*"An investigator should immediately take charge of the crime scene not only for the purposes of conducting the investigation but to observe the CSI process and recovery of evidence. Failure to maintain "chain of custody" and proper documentation of evidence is the responsibility of the assigned detective. One of the major missteps in criminal investigation is that someone did not "Take Charge" and "Set the Tone" for the investigation. Remember, if you are the detective of record and your name is on that case, "That's the most important case of your life." You are responsible for the conduct of that investigation and the subsequent court testimony to support any effective prosecution.*

*It is NOT a popularity contest, so be prepared to "tighten-up" and direct personnel accordingly. This is NOT a television production and there is nothing exciting about crime scene processing. However, in order to assure that anything and everything has been documented and collected follow an established protocol, which will allow you look and see everything that is in the scene as well as what should be in the scene."*

### Failure the Take Sufficient Photographs

*"Crime scene photographs are permanent and comprehensive pieces of evidence, which may be presented in a court of law to prove or disprove a fact in question. During the preliminary stage of homicide investigation it is impossible to determine all of the things which may become relevant or important later on. Therefore, it is imperative that photos are taken of the entire area and location where the crime took place, including any sites contiguous with the original crime."*

**Remember, you only get one shot at the homicide crime scene, so obtain as much information and documentation as possible.**

*"A major misstep occurs when you fail to take sufficient crime scene photographs. Many times sufficient photographs were either not taken because the case was NOT handled as a homicide investigation or because it was assumed to be a suicide or natural. In any event you can never recreate the original crime scene and go back to obtain these important photos[111]."*

---

[111] Practical Homicide Investigation- Tactics, Procedures, and Forensic Techniques (fourth edition by Vernon J. Gerberth

HICKS CONSULTING- LLC    44

In Gerberth's publications and also emphasized at the WSCJTC's Homicide certification class, Gerberth discussed that interference from high-ranking officials with little to no detective experience and with their own political agendas was highly problematic.

> "What I consider a **Major Misstep** is command interference. It is one of the most frustrating errors in professional death investigation. It occurs when the too many bosses with "Headquarter type mentality" arrive at the scene with their own agenda, which has nothing to do with the death investigation. Their interests are usually politically driven and are counterproductive to the inquiry.
>
> Many times, especially if the case is sensational or noteworthy, high-ranking officials such as the mayor, the chief of police, fire chiefs, judges, and even the chief prosecutor may appear on the scene. They are usually there to "assist" in operations, but their "assistance" and overall contribution to scene preservation is usually less than helpful. It is important to note that rank does not preclude scene contamination.
>
> Examples of inappropriate actions are making public statements about the case before all the facts are known, insisting on providing information to the press in a timely fashion. This can be disastrous when prematurely releasing information on the cause of death before autopsy.
>
> In many situations because they are at the scene, they feel the need to direct the investigation. Consequently, superior officers will have investigators running in different directions, which have nothing to do with the primary investigative mission. The result is a loss of a cohesive and central command, miscommunications and no one stepping up willing to make decisions and take control for fear of alienating one of the bosses."[112]

The lead investigators for the Freeman homicide investigation had insufficient experience as law enforcement officers and minimal experience in investigating complex crimes as officers in the small town of Coquille. Coquille PD Officer Raymond McNeely had four years of law enforcement experience and no prior experience leading homicide cases when he was assigned to lead the Freeman investigation in 2009.[113] Coquille PD Officer Chris Webley had three years of law enforcement experience and no prior experience in homicide cases when he was assigned to the Freeman investigation in 2009.[114]

---

[112] Practical Homicide Investigation- Tactics, Procedures, and Forensic Techniques (fourth edition by Vernon J. Gerberth

[113] Deposition of Ray McNeely at Page 61, Line 12 through Page 62, Line 21 and Page 65, Lines 7 through 21

[114] Deposition of Chris Webley at Page 53, Line 13 through Page 54, Line 2 and Page 55, Line 7 through Page 56, Line 3

HICKS CONSULTING- LLC    45

Also, in my review of the training documents provided in this case for McNeely, Webley, and Coquille PD Officer David Hall (the first lead case officer in 2000), I did not see a certification course for homicide investigations for any of these officers prior to their work on the Freeman investigation. McNeely completed a homicide investigations course in July 2010, long after he began working as lead case officer in the Freeman case and just one month before McGuffin was indicted. Hall completed a homicide investigations course in December 2000, months after he began working as lead case officer in the Freeman case and long after the essential activity on the case needed to be done to secure key evidence, as discussed above.

The Coquille Police Department officers testified about the lack of training on key elements of a homicide investigation. Officer McNeely testified in his deposition that he did not receive any training on common problems in eyewitness identifications.[115] He also testified that he did not receive any training on witness bias or the things that might affect a witness's ability to perceive events and relate them credibly.[116] He also testified that he did not receive training on conducting photo arrays of vehicles, such as the one he presented to witness Alicia Hyatt, discussed above.[117]

Officer Webley testified in his deposition that he did not receive any formal training by the Coquille Police Department to conduct a photo array or interview witnesses.[118] Officer Webley also testified that he was only "vaguely familiar" with *Brady*, does not recall any training on it, and his understanding was limited to issues related to the *Brady* list.[119] Officer Webley testified that it was not part of his assigned duty to make sure that his reports were sent to the prosecutor.[120]

The combination of using officers with negligible experience and no specialized training was an inappropriate management of personnel in this homicide investigation. CALEA standards require that, "cases requiring specialized knowledge, or ability should be assigned to those personnel having that expertise."[121]

A generally accepted standard of care and an appropriate course of action in this complex homicide investigation would have been from the outset to train officers in homicide investigation, assign trained officers to lead the investigation, and to request mutual aid from agencies with officers properly trained in homicide investigations. Experienced and certified homicide investigators should have been assigned as lead investigators throughout the entirety of this case.

In addition, as Gerberth stated in his publications, "*What I consider a **Major Misstep** is command interference.*"

---

[115] Deposition of Raymond McNeely at Page 43, Lines 4 through 8
[116] Id., Page 43, Lines 9 through 15
[117] Id., Page 174 Lines 13 through 25
[118] Deposition of Chris Webley, Page 37, Lines 13 through Page 38, Line 3, and Page 148, Lines 6 through 10
[119] Id., Page 47, Lines 6 through 23
[120] Id., Page 43, Lines 12 through 23
[121] CALEA Standards for Law Enforcement Agencies Chapter 42-1, Criminal Investigation and Intelligence, July 2008

HICKS CONSULTING- LLC    46

Chief Dannels made several missteps that *likely interfered with and altered the course* of this homicide investigation by misdirecting the subordinate untrained officers. To highlight a few:

- endorsing, soliciting, and using the Vidocq Society.[122]
- making the unsupported statement on "20/20" that the (first) shoe was found "with blood on it."[123]
- making the unsupported statement on "20/20" that McGuffin's Mustang had been "cleaned and wiped," and later representing that he had been told that the trunk had been "sterilized."[124]

I reserve the right to amend my opinions as new information becomes available and in order to rebut the opinions of any expert offered by the Defendants in this case.

\
\
\
\
\
\
\
\
\
\
\

On this the 5th day of October 2024, in Cheyenne, Wyoming

Russ Hicks | Hicks Consulting- LLC
Civil Rights and Criminal Justice Consulting
253.255.5769 | hicksconsulting@rocketmail.com

---

[122] August 10, 2016, Letter to Mr. Paul E. Reim, Oregon Department of Justice
[123] ABC's 20/20, October 2010 transcript, Leah Freeman Homicide
[124] ABC's 20/20, October 2010 transcript, Leah Freeman Homicide

HICKS CONSULTING- LLC  47

# Russ Hicks

## Hicks Consulting- LLC

P.O. Box 21161
Cheyenne, Wyoming
253-255-5769

## Personal Information:

- Born- 1968 Baltimore, Maryland
- Resident - Honolulu, Hawaii 1970-1996
- Resident- Washington State 1996-2023
- Resident- Wyoming 2023-present
- Ethnicity- Hispanic/Caucasian

## Education:

- Kalaheo High School (Honolulu): 1987
- University of Hawaii 1987 to 1989
- Pierce Community College: 2006-2007

## Law Enforcement Employment: 30 years (retired)

- Washington State Criminal Justice Training Commission (WSCJTC)- Basic Law Enforcement Academy Assistant Commander 2018 to 2021
- WSCJTC Police Academy Instructor (TAC Officer) 2007-2021
- Fife Police Department- January 2005 to 2016
- Tukwila Police Department- 1996 to 2005
- Honolulu Police Department- 1991 to 1996

## Hicks Consulting Rates: 2024

- Consultation, analysis, research, review, and preparation of reports – $275 per hour
- Travel Rates- $137.50 per hour (portal to portal)
- Deposition/Mediation Hearing/Inquest/Court Testimony– $350 per hour (5-hour minimum).

1

Summary of Qualifications for Russ Hicks

## Police Assignments Throughout Career:

- Covert Undercover Narcotics Officer
- Plainclothes Narcotics Officer
- Organized Crime Drug Enforcement Task Force
- Forfeiture Detail
- Witness Protection Unit
- Internal Affairs
- Bicycle Patrol Unit
- Plainclothes officer
- Undercover Vice
- Civil Disturbance Unit
- Hostage Negotiator
- Field Training/Police Training Officer
- Supervisory assignments in uniform patrol, hostage negotiation, and covert operations
- Patrol Officer (rural and urban environments)
- Community Policing Team
- WSCJTC Police Academy Instructor (TAC Officer)
- WSCJTC Basic Law Enforcement Academy Assistant Commander

## Police Instructor Assignments:

- WSCJTC Basic Law Enforcement Academy Assistant Commander
- WSCJTC Police Academy Instructor (TAC Officer)
- WSCJTC Equivalency Academy Manager/Instructor
- WSCJTC Bias Based Policing / Implicit Bias Instructor
- WSJCTC Crisis Intervention Training Instructor
- WSCJTC Criminal Law Instructor
- WSCJTC Report Writing Instructor
- WSCJTC Criminal Procedures Instructor
- WSCJCT Use of Force Instructor
- WSCJTC De-escalation Instructor
- WSCJTC Criminal Investigation Instructor
- WSCJTC Domestic Violence Instructor
- WSCJTC Range Safety Officer
- WSCJTC Respect Effect Instructor
- WSCJTC Patrol Tactics Instructor
- WSCJTC Pursuit Driving Instructor
- WSCJTC DUI Investigations Instructor
- WSCJTC Traffic Instructor

2

Summary of Qualifications for Russ Hicks

- WSCJTC Crisis Communications Instructor
- WSCJTC Blue Courage Instructor
- WSCJTC Ethics Instructor
- National Instructor for Georgetown Law Program; Active Bystandership for Law Enforcement (ABLE)

## Awards:

- Highest Scholastic Award- 112 Honolulu PD Recruit Class- 1991
- M.A.D.D. Top DUI Officer 2002-2003- Tukwila PD
- Medal of Merit for Active Shooter Situation- 2005 Tukwila PD
- Fife Police Department Officer of the Year- 2005
- A.W.C.- Diversity Award 2005-2006 for Fife PD Hispanic Outreach Program
- Numerous commendations in the Honolulu PD, Tukwila PD, Fife PD, WSCJTC
- Recipient of the WSCJTC Leadership Award-2014

## Media:

- Actor for Fox's Television Show "America's Most Wanted" 1993 episode in Honolulu (reenactment of dynamic search warrant service)
- Featured in Honolulu magazine "H3O" for a story on my transition from Pro Surfing to the Honolulu Police Department 1994
- Cover of Law-and-Order Magazine Vol. 6, No. 7 June 1998
- Featured on ABC Seattle Affiliate KOMO 4 News, for a demonstration of a shooting simulator for police use- 1998
- Featured on NBC Affiliate King 5 News, while on patrol with Reporter Linda Byron for story on crime reduction on Hwy 99 in Tukwila- 1999
- Featured on German Television Show "Galileo" for a demonstration of shooting simulator and reenactment of a foot pursuit- 1999
- Authored a published article on skateboarding and police work for the International Longboard Skateboarding Magazine- 2001
- Featured on International Skateboard Video Magazine "The Concrete Wave" for a story on life as a surfer/skateboarder along with my profession as Police Officer. 2002
- Authored a published article in the international skateboarding magazine "The Concrete Wave" for a story on my life as former pro surfer and skateboarder that lived in Honolulu- 2003
- Authored 15 articles on various Community Policing Topics for local newspaper "The Fife Free Press"- 2005-2007
- Featured in (30) articles/segments on ABC, NBC, CBS, FOX, PBS, CNN, Washington Post, Starbucks Media, MSNBC, Wall Street Journal, NPR, Seattle Times, Spokesman Review and local radio stations regarding local and national police procedures, current

3

controversial police events, use of force, tactics, de-escalation, academy training, and police liability at the WSCJTC: 2012-2021.

## Significant Certifications:

- Honolulu Police Academy: 1991 / 1015 hours
- Search Warrant Entry Tactics: Trained by HPD SWAT: 1992
- Honolulu Police Drug Investigator 1992
- National Police Bicycle Certification: Honolulu 1994
- Washington State Equivalency Academy: 1996
- Officer Survival: 1998
- Drug Investigator 1998
- Officer Involved Shooting Investigations: 1999
- Hostage Negotiations: FBI  2000
- Law Enforcement Survival Spanish: 2001
- Advanced Hostage Negotiations: 2001, 2002
- Field Training Officer:  2004
- Police Training Officer: 2006
- FEMA Management- Homeland Security for Domestic Violent Extremists- 2006
- Community Policing: 2006
- Crime Prevention Through Environmental Design: 2006
- Instructor Development: 2007
- WSCJTC General Instructor: 2007 to 2021
- WSCJTC Use of Force Instructor 2007 to 2021
- WSCJTC Criminal Procedures Instructor: 2007 to 2021
- WSCJTC BLEA Equivalency Instructor: 2007 to 2021
- WSCJTC Patrol Tactics Instructor: 2007 to 2021
- WSCJTC Criminal Investigations Instructor: 2007 to 2021
- WSCJTC Bias Based Policing / Implicit Bias Instructor 2007-2021
- WSCJTC Crisis Instructor 2012-2021
- WSCJTC Police Problem Based Policing Certification: 2008
- WSCJTC First Line Supervision: 2008
- WSCJTC Middle Management: 2008
- Critical Incident Stress Management- Group Crisis Intervention: 2008
- WSCJTC Homicide Investigator: 2009
- FEMA Field Force Operations (Riot Training): 2009
- Critical Incident Stress Management- In Line of Duty Death: 2010
- WSCJTC Criminal Law Instructor: 2012 to 2021
- WSCJTC Domestic Violence Instructor 2012 to 2021

4

Summary of Qualifications for Russ Hicks

- WSCJTC Traffic Instructor: 2012 to 2021
- WSCJTC De-Escalation Instructor 2012-2021
- Trainer the Trainer certification for "The Respect Effect": 2014
- Trainer the Trainer certification for "Blue Courage": 2014
- WSCJTC Crisis Intervention Instructor: 2015 to 2021
- WSCJTC Pursuit Driving Instructor 2017 to 2021
- WSCJTC Active Shooter Instructor: 2017 to 2021
- 21st Century Police Leadership: 2019
- VirTra Simulation Instructor for police use of force decisions: 2019
- WSCJTC Range Safety Officer: 2020
- Georgetown Law Program- Active Bystandership for Law Enforcement (ABLE): 2020

## Other Desirable Qualifications:
- Outstanding record of commendations and achievement throughout career
- No disciplinary action for entire career
- Met or exceeded standards on every performance evaluation during entire career

## Driving School Instructor
- Certified Washington State Driving School Instructor from 2021-2023.
- 911 Driving School in Bonney Lake, WA

## Hicks Consulting Business:

Limited liability company founded by Russ Hicks in 2010.  Hicks Consulting is a highly qualified and unique company focusing on providing; courtroom expert witness, criminal justice expertise, case analysis, civil investigations, criminal prosecution/defense, consulting, crisis management, and dynamic training and testing (in person and online) for private businesses and government agencies in the following areas:

- Domestic Violence
- Criminal Procedures
- Criminal Investigations
- Criminal Law
- Use of Force
- Police Investigations
- Hostage Negotiations
- Officer Involved Shootings
- Pursuit Driving
- Police Liability

5

Summary of Qualifications for Russ Hicks

- Police Tactics
- Implicit Bias
- Emotional Intelligence
- Workplace Effectiveness
- Crisis Communication
- Crisis Intervention
- De-escalation Training
- Law Enforcement Training
- Crime Prevention
- Workplace Liability
- Sexual Harassment
- Police Disciplinary Issues
- Workplace Security Analysis
- Expert Witness Testimony
- Report Writing
- Civil Case Investigator
- Crisis Management
- Crisis Response and Management
- Crisis Media Messaging and Mitigation
- Internal Investigations
- Constitutional Rights (US and Washington State)
- Firearms laws and rights (US and Washington State)
- Leadership Training
- Community Outreach

6