DAN RAYFIELD
Attorney General
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Jesse.B.Davis@doj.oregon.gov
        todd.marshall@doj.oregon.gov
        kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann,
Krings, Riddle, Wilcox and Oregon State Police


# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No.  6:20-cv-1163-MTK (Lead Case)<br>          3:21-cv-1719-MTK (Trailing Case) |
| Plaintiffs, | STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | |
| Defendants. | |
| VIDOCQ SOCIETY, | |

Cross-Claimant.

RICHARD WALTER,

Cross-Claimant.

NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor,

Plaintiff,

v.

OREGON STATE POLICE,

Defendant.

# TABLE OF CONTENTS

CERTIFICATE OF CONFERRAL ........................................................................... 1

MOTION.............................................................................................................. 1

MEMORANDUM OF LAW .................................................................................. 1

    I.      Introduction ............................................................................................. 1

    II.     Background ............................................................................................... 3

           A.     Freeman's disappearance and the initial investigation ............................... 3

    III.    Legal standards ........................................................................................ 6

           A.     Standards governing motions for summary judgment ................................ 6

           B.     Standards governing qualified immunity under 42 U.S.C. § 1983. ............. 7

           C.     Standards on Plaintiff's 42 U.S.C. § 1983 claims (First Claim)................. 9

                 1.      Deliberate fabrication of evidence (Count 1).................................. 9

                 2.      Malicious prosecution (First Claim, Count 2) ................................. 9

                 3.      Illegal pretrial detention following the issues of legal process (Count 3) ....................................................................... 10

                 4.      Failure to disclose exculpatory evidence (Count 4)..................... 10

                  5.      Failure to intervene (Count 5)..................................................... 11

                  6.      Conspiracy (Count 6)................................................................. 12

                  7.      Destruction of exculpatory evidence (Count 7) ........................... 12

                  8.      Violation of S.M.'s Fourteenth Amendment Rights (Count 9) ........................................................................................ 13

           D.     Legal standards on Plaintiffs' state law claims......................................... 13

                 1.      False imprisonment (Second Claim, and First Claim against OSP)......................................................................................... 13

           E.     Malicious prosecution (Third Claim, and Second Claim against OSP)........................................................................................... 13

           F.     Civil conspiracy (Fourth Claim, and Third Claim against OSP).............. 14

           G.     Negligent training and supervision (Fourth Claim against OSP) ............. 14

           H.     IIED (Sixth Claim, and Fifth Claim against OSP)................................... 14

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

I.    Negligent/intentional spoliation (Seventh Claim, Sixth Claim against OSP)..........................................................................14

IV.   Probable cause existed to support the grand jury's indictment and the prosecution of McGuffin........................................................15

    A.    The evidence before the grand jury established probable cause..............16

        1.    The grand jury heard evidence undermining McGuffin's professed concern about Freeman.................................16

        2.    McGuffin made strange and incriminating statements and behaviors. .................................................17

        3.    McGuffin later threatened Steinhoff and told her not to talk to police.................................................20

        4.    McGuffin's trunk was unexpectedly empty after Freeman disappeared. ................................................21

        5.    The grand jury heard evidence that Freeman and McGuffin engaged in verbal and sometimes physical confrontations, and that Freeman was upset with McGuffin the night she disappeared. ................................................22

        6.    McGuffin was seen near the high school around the time Freeman was last seen there.....................................24

        7.    The grand jury heard about McGuffin incriminating statements.................................................25

        8.    The grand jury heard testimony that McGuffin had interacted with Freeman after the time he had told police he had last seen her. .........................................26

        9.    Other testimony that contributed to probable cause. ...................27

        10.   The grand jury heard testimony from the medical examiner that the cause of Freeman's death was homicidal violence. .........28

        11.   The grand jury heard limited testimony regarding forensic evidence examinations performed by the State Defendants. ........28

    B.    Plaintiffs cannot establish that the State Defendants fabricated any of the evidence or otherwise caused the jury's probable cause finding to be unlawful. ............................................29

VI.   Defendants Krings, Hormann, and Wilcox are entitled to summary judgment on Plaintiffs' deliberate fabrication and Brady claims. ..................31

    A.    The involvement of Krings, Hormann, and Wilcox ..............................31

        1.    The examination of Freeman's shoes ...........................31

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2.      Hormann performed technical review of Krings' DNA analysis and performed DNA analysis of other items during the Freeman investigation in 2010. ................................................. 35

3.      The reanalysis of the 2000 testing data in 2017 changed the interpretation of the DNA results from Freeman's shoes. ........... 36

4.      The retesting of Freemans' shoes in 2017-2018 further changed the understanding of the DNA profiles on Freeman's shoes. .......................................................................... 37

B.      Krings is entitled to qualified immunity based on her exercise of discretion in performing her DNA interpretation. ..................................... 39

1.      Krings is entitled to qualified immunity from Plaintiffs' claim that Krings fabricated evidence ........................................... 39

a.      A reasonable official in Krings' position could have understood her report stating that the right shoe contained only Freeman's DNA to be correct and consistent with all applicable protocols. ........................... 40

b.      A reasonable official in Krings' position could have understood her report stating that the minor male profile on the left shoe contained was consistent with coming from Deputy Oswald. ................................ 43

c.      Plaintiffs cannot demonstrate an issue of material fact that Krings' reports suggested McGuffin was guilty but Krings knew or should have known that he was innocent. ............................................................ 45

2.      Krings is entitled to qualified immunity from Plaintiffs' Brady claim. ................................................................ 46

a.      Krings did not violate Brady because McGuffin had all of Krings' laboratory notes, which disclosed all facts upon which her analysis and reports were based. ............................................................................... 46

b.      The failure to disclose the OSP Lab's conversation record did not violate Brady because McGuffin's defense team was aware of any exculpatory information it contained. ................................................ 50

C.      Hormann is entitled to summary judgment on Plaintiffs' fabrication and Brady claims based on her exercise of discretion in performing her technical review and DNA analysis. ................................ 51

1.      Hormann is entitled to summary judgment on Plaintiffs' fabrication claim. ............................................................... 51

a.      The March 4, 2010, interview of Steinhoff. ...................... 52

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

b.    Hormann's May 24, 2010, DNA report. ........................... 53

c.    The 2010 broadcast of ABC's "20/20" ............................ 54

2.    Hormann is entitled to summary judgment on Plaintiffs' Brady claim. ..................................................................... 55

D.    Wilcox is entitled to summary judgment on Plaintiff's deliberate fabrication and Brady claims. ................................... 56

1.    Wilcox is entitled to summary judgment on Plaintiff's DNA-related claims for the same reasons as Krings and Hormann. ...................................................................... 56

2.    Wilcox is entitled to summary judgment on Plaintiff's fabrication claims because her reports were not false and she is entitled to immunity for testimony that conflicted with them. ...................................................................... 58

a.    Wilcox did not fabricate evidence of blood on the right shoe. ..................................................... 58

b.    Wilcox did not fabricate evidence of "high velocity blood spatter" on the left shoe. ........................... 59

E.    Wilcox is entitled to summary judgment on Plaintiffs' Brady claims because she did not withhold material exculpatory evidence. ....................................................................... 62

1.    The gas leak .................................................................. 62

2.    The interior of McGuffin's car had not been wiped clean. ........... 63

3.    The presumptive and confirmatory testing of the Mustang and the "high velocity blood spatter." ........................... 64

4.    Wilcox's withholding of her conversations. ................................. 64

VII.    Defendant Riddle is entitled to summary judgment on Plaintiffs' deliberate fabrication and Brady claims. ................................................. 65

A.    Riddle is entitled to summary judgment on Plaintiffs' fabrication claims. ....................................................................... 65

1.    Riddle did not fabricate evidence about Bartley. ........................... 65

2.    Riddle did not fabricate evidence about Hamilton. ...................... 66

3.    Fabricated evidence of violence .................................................. 67

4.    Riddle did not fabricate evidence that McGuffin made statements about Freeman's head on a rock ................................. 67

5.    Steinhoff ...................................................................... 68

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

6.     Fabrication of a "false narrative" of Plaintiff's guilt ................... 71

B.     Riddle is entitled to summary judgment on Plaintiffs' *Brady* claims. ...................................................................... 71

VIII.   The State Defendants are entitled to summary judgment on all of Plaintiffs remaining claims. ....................................................... 73

A.     Plaintiffs cannot support any of their remaining federal claims. ............. 73

B.     Plaintiffs cannot support any of their remaining state claims. ................. 73

IX.   Conclusion ........................................................................ 74

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 7

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................................................. 13

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). .................................................................. 8, 45

*Atkins v. Cnty. Of Riverside*, 151 F. App'x 501 (9th Cir. 2005).......................................... 11, 47

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004)........................................... 9, 15

*Benn v. Lambert,* 283 F.3d 1040 (9th Cir. 2002) ................................................................. 11

*Bliss v. Adewusi*, 2023 WL 6961979 (D. Or. Oct. 20, 2023)........................................... 12

*Brady v. Maryland 373 U.S. 83 (1963)* ...................................... 6, 10, 47, 48, 50, 51, 65

*Briscoe v. LaHue,* 460 U.S. 325 (1983) ................................................................. 57

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ................................................................. 7, 8

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982) ................................................................. 12

*California v. Trombetta*, 467 U.S. 479 (1984)................................................................. 12

*Cannon v. Dep't of Justice*, 288 Or. App. 793 (2017) ................................................................. 74

*Cannon v. Polk Cnty.*, 702 F. App'x 527 (9th Cir. 2017) ................................................................. 13

*Cannon v. Polk*, 702 F. App'x 527 (9th Cir. 2017) ................................................................. 13

*Catt v. Dep't of Human Servs.*, 251 Or. App. 488 (2012) ................................................................. 74

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S.Ct. 2440 (2024) .................. 74

*Costanich v. Dep't of So and Health Servs.*, 627 F.3d 1101 (9th Cir. 2010)................................ 8

*Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101 (9th Cir. 2010)............................ 9

*Crowe v. Cnty. Of San Diego*, 608 F.3d 406 (9th Cir. 2010)........................................... 13

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003)........................................... 69

*Cunningham v. Gates*, 229 F.3d 1271 (9th Cir. 2000)................................................................. 11

*D.C. v. Wesby*, 138 S. Ct. 577 (2018) ................................................................. 8

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ....................................... 7, 9, 46, 68, 69

*Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1 (1987) ................................................. 15

Page vi

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Franklin v. Terr,* 201 F.3d 1098 (9th Cir.2000)..................................................................... 57

*Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013) ..................................... 11, 68

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003) ............................................................ 69

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999)..................................... 12

*Granewich v. Harding*, 329 Or. 47 (1999)..................................................................... 14

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................... 7

*Hiber v. Creditors Collection Serv. Of Lincoln Cnty., Inc.*, 154 Or. App. 408 (1998)................ 13

*Hryciuk v. Robinson*, 213 Or. 542 (1958) ..................................................................... 15

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ........................................... 7

*Kennedy v. City of Ridgefield*, 439 F3d 1055 (9th Cir. 2006) ......................................... 8

*Kisela v. Hughes*, 138 S. Ct. 1148 (2017)....................................................................... 8

*Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................................... 11

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).................................................. 12

*Lacy v. Cnty. of Maricopa*, 631 F. Supp. 2d 1197 (D. Ariz. 2008) ................................... 45

*Leonetti v. Bray*, No. 3:16-CV-00014-AC, 2018 WL 11226238 (D. Or. Feb. 16, 2018),
   report and recommendation adopted, No. 3:16-CV-00014-AC, 2018 WL 11226237
   (D. Or. Apr. 25, 2018), *aff'd,* 774 F. App'x 417 (9th Cir. 2019)................................ 15

*Libby v. City of Medford*, No. 1:15-CV-00298-CL, 2017 WL 2219995 (D. Or. Mar. 17,
   2017) .......................................................................................................... 15

*Lisker v. City of Los Angeles*, 780 F.3d 1237 (9th Cir. 2015) ....................................... 57

*Lisker v. City of Los Angeles*, No. CV09-09374 AHM AJWX, 2013 WL 1276047, (C.D.
   Cal. Feb. 4, 2013), aff'd, 780 F.3d 1237 (9th Cir. 2015) ........................................... 45

*Manuel v. City of Joliet, Ill.*, 580 U.S. 357 (2017)........................................................... 10

*Marcum v. Adventist health System/West*, 215 Or. App. 166 (2007)................................. 14

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ....................... 6, 7

*McGanty v. Staudenraus*, 321 Or. 532 (1995) ............................................................... 14

*McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009)............................... 68

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ........................................................... 11

*Miller v. Columbia Cnty.*, 282 Or. App. 348 (2016)............................................... 10, 13

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Mouktabis v. Clackamas Cnty.*, 327 Or. App. 763 (2023) ............................................................ 10

*Nelson-Baca v. Oregon by and through Dep't of Hum. Servs.*, 2021 WL 3702486 (D. Or. April 21, 2021) ........................................................................................................... 13

*Patton v. J.C. Penney Co., Inc.*, 301 Or. 117 (1986) ................................................................ 14

*Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006) ...................................................................... 11, 48

*Ramirez v. City of Buena Park*, 560 F.3d 1012 (9th Cir. 2009) ................................................ 16

*Rhoades v. Henry*, 596 F.3d 1170 (9th Cir. 2010) .......................................................... 11

*Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011) .......................................................... 11

*Roberts v. Howton*, 13 F.Supp.3d 1077 (D.Or. 2014) ........................................................ 47

*Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071 (9th Cir. 2011) ................................................ 13

*Sanchez v. City of Santa Ana,* 936 F.2d 1027 (9th Cir.1990) .............................................. 12

*Saucier v. Katz*, 533 U.S. 194 (2001) ..................................................................................... 8

*Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010 (9th Cir. 1986) ................................. 7

*Shoemaker v. Selnes*, 220 Or. 573 (1960) .......................................................................... 15

*Simpkins v. Connor*, 210 Or. App. 224 (2006) .................................................................... 15

*Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495 (2010) ...................................... 14

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) .............................................................. 9, 59

*Steckl v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1983) ........................................................ 7

*Troxel v. Granville*, 530 U.S. 57 (2000) ............................................................................. 13

*U.S. v. Bracy*, 67 F.3d 1421 (9th Cir. 1995) ....................................................................... 11

*United States v. Aichele*, 941 F.2d 761 (9th Cir. 1991) ....................................................... 11

*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006) ..................................................... 15

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539 (9th Cir.), cert. denied, 493 U.S. 809 (1989) ............................................................................................ 7

*Villasana v. Wilhoit*, 368 F.3d 976 (8th Cir. 2004) .............................................................. 47

*Woods by & through Wade v. City of Reno, Nevada*, No. 316CV00494MMDVPC, 2018 WL 493015 (D. Nev. Jan. 18, 2018) .......................................................................... 12

**Statutes**

ORS 12.115 ........................................................................................................................... 73

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**United States Code**

42 U.S.C. § 1983 ................................................................................................ 2

42 U.S.C. § 1988(b) ........................................................................................... 3

**Rules and Regulations**

Fed. R. Civ. P. 56 ............................................................................................. 1

Fed. R. Civ. P. 56(c) ......................................................................................... 6

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## CERTIFICATE OF CONFERRAL

Undersigned counsel certifies that in accordance with LR 7-1, the parties' counsel conferred in good faith regarding the issues presenting in this motion, but the parties were unable to resolve the issues disputed herein.

## MOTION

Defendants Susan Hormann, Mary Krings, John Riddle, Kathy Wilcox, and the Oregon State Police (OSP) (collectively "State Defendants"), respectfully move the Court to enter summary judgment in their favor under Fed. R. Civ. P. 56 and dismiss Plaintiffs' claims in their entirety. There are no material issues of fact as to any of the claims. This motion is supported by the following Memorandum of Law, the declarations of Susan Hormann, Mary Krings, John Riddle, Kathy Wilcox, and Jesse B. Davis, and exhibits attached thereto, and the Court's file in this matter.

## MEMORANDUM OF LAW

### I.   Introduction

Leah Freeman disappeared from Coquille, Oregon, on the night of June 28, 2000. Her badly decomposed body was found on August 3, 2000, on a road embankment several miles away from where she was last seen alive. Plaintiff Nicholas McGuffin[1] was Freeman's boyfriend. An initial investigation resulted in no arrests or indictments. The investigation, led by the Coquille Police Department, was reinvigorated in 2008. In 2010, McGuffin was indicted on charges of murder and manslaughter for Freeman's death. In 2011, he was acquitted of murder but was convicted of manslaughter by the Coos County Circuit Court. After pursuing direct appeals unsuccessfully, he obtained post-conviction relief in 2019. The Coos County District Attorney declined to retry McGuffin and the charges against him were dismissed.

---

[1] Plaintiff Nicholas McGuffin will generally be referred to herein as "McGuffin." However, because several of his family members are relevant to various events, occasionally McGuffin will be referred to by his shortened first name, "Nick," because that is how many others referred to him. State Defendants do that only for specificity and mean no disrespect.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

McGuffin and his minor child, S.M., later filed this action.  Now in their Second

Amended Complaint ("SAC"), the gravamen of Plaintiffs' claims is that McGuffin's indictment

and conviction were procured by the defendants' fabrication of false inculpatory evidence and

their suppression of exculpatory evidence.[2]  Plaintiffs assert several claims under 42 U.S.C. §

1983 and several state law tort claims arising from this central theory.  Plaintiffs assert the

following numbered counts under § 1983:  Count 1: violation of the Fourteenth Amendment;

Count 2: malicious prosecution; Count 3:  illegal pretrial detention following the issuance of

legal process; Count 4: failure to disclose exculpatory information; Count 5: failure to intervene;

Count 6: conspiracy; Count 7: destruction of exculpatory evidence; Count 8: unconstitutional

policies, practices, and customs;[3] and Count 9: violation of S.M.'s right to familial relations with

McGuffin under the 14th Amendment.[4]  Plaintiffs also assert the following claims for relief

against the individual State Defendants, which arise under state law:

> Second Claim: false imprisonment;
>
> Third Claim: malicious prosecution;
>
> Fourth Claim:  civil conspiracy;
>
> Fifth Claim: negligent training and supervision;[5]
>
> Sixth Claim: intentional infliction of emotional distress;
>
> Seventh Claim: negligent and/or intentional spoliation of evidence.

Plaintiffs also filed a separate action, *McGuffin, et al. v. Oregon State Police*.[6]  Now on

their First Amended Complaint ("FAC") in that action, Plaintiffs assert the following claims

---

[2] Second Amended Complaint, ECF 143 (cited herein as "SAC").

[3] Count 8 is asserted against only the Municipal Defendants and Vidocq.  SAC at 38-39.

[4] SAC at 32-41.

[5] Plaintiffs' Fifth Claim runs only against the Municipal Defendants and the Vidocq Society. SAC at 45.

[6] That action was originally filed in Clackamas County Circuit Court.  Defendant OSP removed it this Court, where it was consolidated with Plaintiffs' original federal action and became the trailing case, Case No. 3:21-cv-1719-MTK.  Plaintiffs are on their First Amended Complaint (cited herein as "FAC") in that case.  ECF 144 (as numbered in the leading case)

Page 2 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

against OSP: First Claim: false imprisonment; Second Claim: malicious prosecution; Third

Claim: civil conspiracy; Fourth Claim: negligent training and supervision; Fifth Claim:

intentional infliction of emotional distress; Sixth Claim: negligent and/or intentional spoliation of

evidence; Seventh Claim: vicarious liability; Eight Claim: attorney fees pursuant to 42 U.S.C.

§ 1988(b).[7]  Those claims are asserted only against OSP.

## II.     Background

### A.     Freeman's disappearance and the initial investigation

McGuffin and Freeman were high school sweethearts.  In June 2000, McGuffin

graduated from Coquille High School and Freeman finished her freshman year.[8]  McGuffin was

18 years old.  Freeman was 15.  On June 28, 2000, McGuffin and Freeman spent time together.

They washed McGuffin's car, a blue Ford Mustang.[9]  McGuffin dropped Freeman off at the

home of Freeman's friend, Cherie Mitchell, at about 7:00 pm.  The plan was for McGuffin to

return to Mitchell's home at 9:00 pm to pick her up for a double date with McGuffin's friend,

Brent Bartley, and his girlfriend, Nicole Price.[10]

Sometime around 9:00 pm, Mitchell and Freeman argued and Freeman left Mitchell's

home on foot.  Mitchell observed Freeman walk south from Mitchell's home on N. Elm Street

and turn west on W. Fourth Street toward the center of town.  Other witnesses saw Freeman

walking through Coquille going north on N. Central Boulevard, the primary street through

Coquille.  Freeman's last reported whereabouts was in a telephone booth by a gas station at the

intersection of W. Central Boulevard and N. Elm Street, across the street from Coquille High

School, about a half-mile from her home, where she was seen around 9:30 pm.  Her path through

---

[7] FAC at 19-24.

[8] *See* SAC ¶ 21; Ex. 102 page 165-166;

[9] Courtright trial testimony D3 73 Ex. 102 page 195.

[10] Exhibit 102, page 177

Page 3 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

town was generally in the direction of her home, though there was no specific indication that she was heading home.  Sometime after that, Freeman disappeared.

McGuffin returned to Mitchell's home shortly after 9:00 pm.  There, Mitchell told him that Freeman had already left.  McGuffin, according to his statements, began to look for Freeman.  Many witnesses reported seeing McGuffin looking for Freeman over the next few hours.

McGuffin, along with Freeman's mother and sister, reported Freeman missing the next morning.[11]  McGuffin gave a brief statement that day, and a more detailed statement the next day to Defendants Reaves and Hall.  On July 5, 2000, he gave a written timeline of the events of that evening and the morning of June 29.  In these statements, he described driving all over town for the next several hours looking for Freeman, stopping at various places where young people gathered asking if anyone had seen her.  Many other witnesses reported seeing Freeman walking north on N. Central through town; McGuffin reported that he drove north and south on N. Central looking for Freeman but did not see her.[12]  McGuffin stated that he went home at about 2:30 or 3:00 am.  McGuffin expressed concern for Freeman's safety.  He said it was not like Freeman to simply not come home, and that she would not just get in somebody's car if she did not know them.[13]

The Coquille Police Department was the lead investigative agency, but other local, state, and federal investigators were also involved.  The investigation has hampered by investigative shortcomings.  For the first few days, at least, the Coquille PD treated it as a missing person investigation.  Only after Freeman's body was found did the Coquille PD consider it be a homicide investigation.[14]

---

[11] Exhibit 102, pages 182-183

[12] Exhibits 103, 104

[13] Exhibits 103, 104

[14] Reeves Depo. 53 Exhibit 105 page 2.

Page 4 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Two shoes that turned out to be Freeman's were found shortly after she disappeared, one found at 11:30 pm the night she disappeared, and the other a week later. Those shoes were examined by State Defendants Kathy Wilcox, a criminalist in the Coos Bay office of OSP, who them had them sent to OSP's DNA analysis lab in Portland. OSP Forensic scientist Mary Krings examined the shoes, as well as other items, and issued analytical reports, as will be discussed.

The investigation widened as time passed without finding Freeman's body. Freeman's family and friends were interviewed. McGuffin's friends and associates were interviewed, including witnesses Brent Bartley, Scott Hamilton, Richard Bryant, and Kristen Steinhoff, who will be discussed below. Many other individuals were interviewed. A grand jury was convened in July 2000, before Freeman's body was even found.

On August 3, 2000, Freeman's body was found along Lee Valley Road, a remote location several miles from Coquille. Her body was found on a steep embankment between the road and the Coquille River. Her body was in an advanced state of decomposition, with few organs remaining, and appeared to have been outside in the elements for quite some time.

The initial investigation continued for some time, and despite the convening of the grand jury, no arrests were made. OSP's last forensic report from this period occurred in 2002.

Coquille's Police Chief, Defendant Reaves, left the Coquille PD in 2008, and the city hired a new Police Chief, Defendant Dannels. Dannels expressed a commitment to reinvigorating the Freeman investigation. Investigative materials were reviewed and organized. New personnel were added to the investigative team, including Defendant Riddle, an OSP Detective. The investigation began moving more quickly in January 2010. New witnesses were interviewed and many previously interviewed witnesses were interviewed again.

The Coos County grand jury convened again in July and August 2010 to consider the Freeman investigation. Approximately 115 witnesses testified or appeared by report.[15] The evidence McGuffin was indicted on charges of murder and manslaughter.

---

[15] Exhibit 101.

Page 5 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

In July 2011, McGuffin went to trial. McGuffin was represented by attorneys Shaun and Robert McCrea. McGuffin was acquitted of murder but was convicted of manslaughter by a non-unanimous jury verdict. He was sentenced to 120 months' incarceration and 36 months post-prison supervision.

After exhausting his direct appeals, McGuffin sought post-conviction relief. On November 29, 2019, the court granted relief, vacating McGuffin's conviction.[16] The court held that trial counsel was constitutionally ineffective for failing to two reasons. First, trial counsel failed to adequately investigate the DNA evidence or review the DNA reports and analytical notes of OSP forensic scientist Mary Krings.[17] Second, trial counsel failed to adequately investigate the report of witness Nick Backman.[18] Further, the court granted post-conviction relief on the basis of discovery violations in violation of *Brady v. Maryland*.[19] Specifically, the court held that there was male DNA detected on Freeman's shoes during the 2000 testing that was not McGuffin's, was not disclosed at trial.[20] The State did not appeal the post-conviction relief judgment.

Plaintiffs brought these consolidated actions. The State Defendants respectfully move for summary judgment on all claims against them.

## III.  Legal standards

### A.  Standards governing motions for summary judgment

Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[21] The purpose of summary

---

[16] Ex. 109 (PCR Judgment).

[17] Ex. 109 at 7-10.

[18] Ex. 109 at 11-13.

[19] 373 U.S. 83 (1963).

[20] Ex. 109 at 15-17.

[21] Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Page 6 -   STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."[22]  The moving party must show the absence of a genuine dispute as to a material fact.[23]  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and point to "specific facts demonstrating the existence of genuine issues for trial."[24]  This burden is not a light one and the non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue.[25]  The test is whether a reasonable jury could return a verdict for the non-moving party.[26]  A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact.[27]  Subjective belief and speculation are insufficient.[28]

### B.    Standards governing qualified immunity under 42 U.S.C. § 1983.

Qualified immunity shields government officials from liability for damages when they make decisions that, even if constitutionally deficient, reasonably misapprehend the law governing the circumstances confronted.[29]  Qualified immunity "shields § 1983 defendants 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[30] To determine whether qualified immunity applies, the Court considers (1) whether the facts alleged show the official's

---

[22] *Matsushita*, 475 U.S. at 586, n. 11.

[23] *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012).

[24] *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

[25] *Id*.

[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[27] *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), cert. denied, 493 U.S. 809 (1989).

[28] *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983); *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986).

[29] *Brosseau v. Haugen*, 543 U.S. 194, 202 (2004); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

[30] *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Page 7 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

conduct violated a constitutional right, and (2) whether the right was clearly established.[31]  These inquiries need not be made in any particular order.[32]  If the answer to either inquiry favors the official, the official is entitled to qualified immunity.

A government official violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what their action violates that right.[33] "Because the focus is on whether the officer had fair notice that his or her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."[34]  Existing precedent must have placed the statutory or constitutional question beyond debate.[35]  "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law."[36] What constitutes "clearly established" law should not be defined at a high level of generality.  *Id*.  In short, "qualified immunity gives government officials breathing room to make reasonable but mistaken judgments."[37]  Even if the plaintiff has alleged violations of a clearly established right, the government official is entitled to qualified immunity if he or she made a reasonable mistake as to what the law requires.[38]

---

[31] *Costanich v. Dep't of So and Health Servs.*, 627 F.3d 1101, 1110 (9th Cir. 2010).

[32] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[33] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[34] *Brosseau*, 543 U.S. at 198.

[35] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2017).

[36] *D.C. v. Wesby*, 138 S. Ct. 577 (2018).

[37] *al-Kidd*, 563 U.S. at 743.

[38] *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *Kennedy v. City of Ridgefield*, 439 F3d 1055, 1060-61 (9th Cir. 2006).

Page 8 -    STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

C.      **Standards on Plaintiff's 42 U.S.C. § 1983 claims (First Claim)**

1.      **Deliberate fabrication of evidence (Count 1)**

To prevail on a § 1983 claim of deliberate fabrication, a "plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty."[39]  The causation element requires plaintiff must demonstrate that the defendant's conduct was the actionable cause of the claimed injury.  To meet this causation requirement, the plaintiff must establish both causation-in-fact—that the injury would not have occurred in the absence of the conduct—and proximate causation— meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question.[40]  Absent direct evidence of fabrication of evidence, a plaintiff must, at a minimum, point to evidence that either (1) the defendants continued their investigation of the accused despite the fact that they knew or should have known that he was innocent, or (2) the defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.[41]  Regarding evidence obtained from interviews, a deliberate fabrication cannot be based merely on allegations that investigators used interviewing techniques that were in some sense improper.[42]

2.      **Malicious prosecution (First Claim, Count 2)**

For malicious prosecution claims brought under § 1983, the "plaintiff must show that the defendants prosecuted him with malice and without probable cause" to deny plaintiff of a constitutional right.[43]  Federal courts incorporate the state common law elements of malicious prosecution.[44]  Under Oregon law, a plaintiff must show (1) the institution or continuation of

---

[39] *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

[40] *Id.* (internal citation and quotation omitted).

[41] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

[42] *Id*. at 1075; *Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010).

[43] *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).

[44] *Id.*

Page 9 -   STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceedings; and (6) injury or damage as a result.[45]  Malice constitutes "any primary purpose other than to bring a person to justice."[46]  The existence of probable cause is a complete defense to a malicious prosecution claim.[47]

### 3.    Illegal pretrial detention following the issues of legal process (Count 3)

In this claim, Plaintiffs' assert that the Defendants caused McGuffin to be subjected to illegal pretrial detention following the issuance of legal process, for which there was no probable cause, in spite of the fact that they knew McGuffin was innocent.[48]  Claims under § 1983 for illegal pretrial detention arise under the Fourth Amendment's right to be free of unreasonable search and seizure.[49]  Absent probable cause, pretrial detention preceding or following the start of legal process violates the Fourth Amendment.[50]  This species of § 1983 claim appears essentially a malicious prosecution claim in which the criminal defendant remains in custody during the prosecution.  Thus, its elements are the same as Count 3.

### 4.    Failure to disclose exculpatory evidence (Count 4)

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a criminal defendant's right to due process rights under the Fourteenth Amendment is violated when the prosecution suppresses favorable, material evidence.  The elements of a Brady claim under § 1983 are: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from

---

[45] *Miller v. Columbia Cnty.*, 282 Or. App. 348, 360 (2016).

[46] *Mouktabis v. Clackamas Cnty.*, 327 Or. App. 763, 777 (2023) (internal quotation omitted).

[47] *Id*.

[48] SAC ¶ 225.

[49] *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 369 (2017).

[50] *Id*. at 366-67.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

prosecutors.[51]  The harm-to-the-accused element is a materiality requirement.[52]  Suppressed

evidence is material only if the "favorable evidence could reasonably be taken to put the whole

case in such a different light as to undermine confidence in the verdict."[53]  An officer acts with

deliberate indifference if their conduct "shocks the conscience."[54] Deliberate indifference is the

conscious or reckless disregard of the consequences of one's acts or omissions, which requires

more than negligence but is satisfied by something less than intentional or knowing conduct.[55]

When the accused possessed the information at issue, the evidence is not suppressed and

there is no *Brady* violation.[56]  There is no *Brady* violation when the accused possesses the

"salient facts regarding the existence of the records," the accused is sufficiently to be required to

seek out the evidence on their own.[57]

### 5.    Failure to intervene (Count 5)

Police officers have duty to intervene when a fellow officer violates the constitutional

rights of others.[58]  An officer may be held liable for failure to intervene "only if they had an

---

[51] *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018).

[52] *Benn v. Lambert,* 283 F.3d 1040, 1053 n.9 (9th Cir. 2002) ("The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases.").

[53] *Id*. (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see also, Atkins v. Cnty. Of Riverside*, 151 F. App'x 501, 504 (9th Cir. 2005) (suppressed evidence is material if there is a reasonable probability that disclosure would have produced a different result at trial" (quotation omitted).

[54] *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013) (citing *Tennison v. City & Cnty. Of San Francisco*, 560 F.3d at 1089).

[55] *Id*. at 708.

[56] *Rhoades v. Henry*, 596 F.3d 1170, 1181 (9th Cir. 2010), *amended and superseded on other grounds by Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011).

[57] *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *U.S. v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (holding that government did not suppress information pertaining to a key witness' criminality given that they provided the defense with a printout of a database search and two reports on the witness' criminal history).

[58] *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

Page 11 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

opportunity to intercede."[59] An officer does not have an opportunity to intervene if they are not present when the constitutional violation takes place.[60]

### 6.    Conspiracy (Count 6)

"Conspiracy is not itself a constitutional tort under § 1983."[61]  It does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation.[62]  Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the violation.[63]

> A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage. To prove a civil conspiracy, the plaintiff must show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.[64]

To be actionable, the conspiracy must result in overt acts, done in furtherance of the conspiracy, that are both the cause in fact and proximate cause of the plaintiffs' injuries.[65]

### 7.    Destruction of exculpatory evidence (Count 7)

The Due Process clause may impose a duty to preserve constitutionally material evidence.[66]  To meet that standard of materiality, the evidence must "both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available

---

[59] *Id*. (citing *Bruner v. Dunaway*, 684 F.2d 422, 426-27 (6th Cir. 1982)); see also

[60] *Woods by & through Wade v. City of Reno, Nevada*, No. 316CV00494MMDVPC, 2018 WL 493015, at *15 (D. Nev. Jan. 18, 2018) (officer did not fail to intervene where officer was not present for the interview in which fellow officer allegedly coerced a false confession).

[61] *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012).

[62] *Id*.

[63] *Id*.; *see also Bliss v. Adewusi*, 2023 WL 6961979, *12 (D. Or. Oct. 20, 2023).

[64] *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (quotations omitted).

[65] *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1039 (9th Cir.1990).

[66] *California v. Trombetta*, 467 U.S. 479, 486-88 (1984).

Page 12 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

means."[67]  The destruction of exculpatory evidence does not violate a plaintiff's due process rights, unless the plaintiff shows affirmative bad faith on the part of the police.[68]

### 8.    Violation of S.M.'s Fourteenth Amendment Rights (Count 9)

The Due Process clause of the Fourteenth Amendment protects the rights of parents to "establish a home and bring up children."[69]  Interference with the parent-child relationship is a constitutional violation if the parent is wrongfully detained.[70]  To be actionable, the conduct of the official must shock the conscience or offend the community's sense of fair play and decency.[71]

### D.    Legal standards on Plaintiffs' state law claims

### 1.    False imprisonment (Second Claim, and First Claim against OSP)

The tort of false imprisonment is the "unlawful imposition of restraint on another's freedom of movement."[72]  The four elements of false imprisonment include "(1) defendant must confine plaintiff; (2) defendant must intend the act that causes the confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful." *Nelson-Baca v. Oregon by and through Dep't of Hum. Servs.*, 2021 WL 3702486, *4 (D. Or. April 21, 2021) (citing *Hiber v. Creditors Collection Serv. Of Lincoln Cnty., Inc.*, 154 Or. App. 408, 413 (1998)).

### E.    Malicious prosecution (Third Claim, and Second Claim against OSP)

The elements of a claim for malicious prosecution are stated *supra*, section III.C.2.

---

[67] Id. at 489.

[68] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Cannon v. Polk*, 702 F. App'x 527, 529 (9th Cir. 2017) (affirming summary judgment in favor of defendants on plaintiff's deliberate destruction of exculpatory evidence claim where the plaintiff failed to show bad faith).

[69] *Troxel v. Granville*, 530 U.S. 57 (2000).

[70] *Crowe v. Cnty. Of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010).

[71] *Id.* (citing *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011)); *see also Cannon v. Polk Cnty.*, 702 F. App'x 527, 530 (9th Cir. 2017).

[72] *Miller v. Columbia Cnty.*, 282 Or. App. 348, 355 (2016) (citing *Hiber v. Creditors Collection Serv. Of Lincoln Cnty., Inc.*, 154 Or. App. 408, 413 (1998)).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

F.    **Civil conspiracy (Fourth Claim, and Third Claim against OSP)**

Although civil conspiracy is not a standalone tort under Oregon state common-law, defendants may be liable jointly for one another's torts when acting in concert. *Granewich v. Harding*, 329 Or. 47, 55 (1999).

G.    **Negligent training and supervision (Fourth Claim against OSP)**

For a Oregon common-law negligence claim, a plaintiff must prove "(1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent." *Son v. Ashland Cmty. Healthcare Servs.*, 239 Or. App. 495, 506 (2010).

H.    **IIED (Sixth Claim, and Fifth Claim against OSP)**

On an intentional infliction of emotional distress ("IIED") claim, a plaintiff must prove (1) the "defendant intended to inflict severe mental or emotional distress," (2) the defendant's act in fact caused of the plaintiff's severe mental or emotional distress, and (3) the "defendant's action must consist[ed] of 'some extraordinary transgression of the bounds of socially tolerable conduct.'" *Patton v. J.C. Penney Co., Inc.*, 301 Or. 117, 122 (1986). For purposes of IIED claims, a defendant "intends" to inflict distress when a defendant "desires" to inflict distress or "where he knows that such distress is certain, or substantially certain, to result from his conduct." *McGanty v. Staudenraus*, 321 Or. 532, 551-52 (1995).

I.    **Negligent/intentional spoliation (Seventh Claim, Sixth Claim against OSP)**

The precise contours of a claim for "negligent spoliation" claim have not been clearly defined.[73] The claim has been compared to a legal malpractice claim in that the damages flow

---

[73] *Marcum v. Adventist health System/West*, 215 Or. App. 166, 191 (2007).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

from the loss or diminution of value of an underlying claim.[74]  In any event, such a claim is

essentially a claim for lost economic damages, a claim for negligent spoliation must be based on

something more than ordinary foreseeability principles, such as a special status or relationship or

a duty imposed by statute.[75]

## IV.    Probable cause existed to support the grand jury's indictment and the prosecution of McGuffin.

Several plaintiffs' claims depend on a successful showing that there was no probable

cause for McGuffin's indictment.[76]  McGuffin's prosecution was pursuant to a grand jury

indictment.  Under both federal and Oregon state law, grand jury indictment constitutes prima

facie evidence of probable cause, a complete defense to these claims.[77]  To overcome that

presumption, a plaintiff must provide "proof that the [indictment] was obtained by false

testimony or other improper means."[78]

Probable cause does not require certainty or even a preponderance of the evidence, but

there must be "a 'fair probability' the individual in question committed a crime.[79]  However,

"mere suspicion, common rumor, or even strong reason to suspect" the plaintiff has engaged in

---

[74] *Id.*

[75] *Simpkins v. Connor*, 210 Or. App. 224, 229-230 (2006) (referring to the foreseeability principles of *Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1 (1987))

[76] These are the illegal pretrial detention, malicious prosecution, and false imprisonment claims.

[77] *Libby v. City of Medford*, No. 1:15-CV-00298-CL, 2017 WL 2219995, at *5 (D. Or. Mar. 17, 2017), report and recommendation adopted, No. 1:15-CV-00298-CL, 2017 WL 2219980 (D. Or. May 19, 2017) (citing among other cases, *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004); *Hryciuk v. Robinson*, 213 Or. 542, 551 (1958); *Shoemaker v. Selnes*, 220 Or. 573, 581(1960).

[78] *Awabdy*, 368 F.3d at 1067 (stating a plaintiff can overcome a finding of probable cause based on a grand jury indictment "by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith"); *Hryciuk*, 213 Or. at 551 (1958) ("the duty devolves upon the plaintiff to prove that such action was obtained by false testimony or other improper means.").

[79] *Leonetti v. Bray*, No. 3:16-CV-00014-AC, 2018 WL 11226238, at *9 (D. Or. Feb. 16, 2018), *report and recommendation adopted*, No. 3:16-CV-00014-AC, 2018 WL 11226237 (D. Or. Apr. 25, 2018), *aff'd*, 774 F. App'x 417 (9th Cir. 2019) (quoting *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)).

Page 15 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

criminal behavior is not enough to establish probable cause.[80]  Plaintiffs cannot show that the

evidence presented to the grand jury was not sufficient to support a finding of probable cause.

    **A.**    **The evidence before the grand jury established probable cause.**

        **1.**    **The grand jury heard evidence undermining McGuffin's professed concern about Freeman.**

In the days after Freeman disappeared, McGuffin described his efforts to search for

Freeman, presenting the picture of a concerned boyfriend trying to find his missing girlfriend.

Evidence before the grand jury undermined that evidence.

Kristen Steinhoff was a friend of McGuffin.  She testified that on the evening of June 28,

2000, she was driving a friend, Elderkin, home so she could borrow his car.[81]  On the way there,

she saw McGuffin at the Maytag appliance store and stopped to talk him.[82]  McGuffin said "that

they had got in an argument and she took off walking and he couldn't find her."[83]  Steinhoff

offered to help him look for Freeman later if he wanted.[84]  Later that evening, McGuffin drove to

Steinhoff's house to ask her to help him look for Freeman, which they did, but not until after

they did methamphetamine and McGuffin tried to have sex with Steinhoff, which she stopped.[85]

Megan Davidson, a high school friend (and former girlfriend, per his deposition?[86]) of

McGuffin also testified.[87]  After Freeman disappeared but before her body was found, McGuffin

---

[80] *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (citing cases).

[81] Exhibit 101 page 825

[82] Exhibit 101 pages 827-828

[83] Exhibit 101 page 856-857

[84] Exhibit 101 page 856

[85] Exhibit 101, pages 826, 831-834, 882

[86] Megan Davidson Dep. 24:14-25:8: Exhibit 110 pages 2-3

[87] Exhibit 101, pages 1268-1269).  Ms. Davidson's name at the time Freeman disappeared was Megan Pinkley.  Megan Davidson Dep. 40:5-7. Exhibit 110 page 4

Page 16 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

had moved in with Davidson and her mother for a short period.[88]  While McGuffin was staying there, McGuffin and Davidson had sex.[89]  Davidson was 16 or 17 years old at that time.[90]

The grand jury heard from Melissa Smith, a friend of both McGuffin and Freeman. Smith testified that the day of Freeman's memorial service, about two weeks after her body was found, McGuffin had provided her alcohol, she became intoxicated, and had sex with McGuffin.[91]  In attempting to persuading Smith to have sex with him, McGuffin told Smith that "he knows that Leah would want her best friend to be with him."[92]

## 2.    McGuffin made strange and incriminating statements and behaviors.

Several witnesses described unusual or strange behaviors by McGuffin.  Freeman's friend, Cheri Mitchell, was one of them.  Freeman had left on foot from Mitchell's house just before 9:00 pm, and McGuffin had come to her house shortly after that.[93]  McGuffin left and then came back not long after, about 10:00 or 11:00 pm.[94]  Mitchell said McGuffin was "really worried that, you know, something bad had happened," and "he was pretty jumpy."[95]  Mitchell thought his behavior "seemed kind of strange to me that he was so worried because it had only been like an hour or two."[96]  "He was just so dramatic about it.  I thought, well, I don't know what's wrong with him."[97]

---

[88] Exhibit 101, pages 1268

[89] Exhibit 101, pages 1268-1269

[90] Exhibit 101, pages 1275

[91] Exhibit 101, pages 1507-1508 and 1511

[92] Exhibit 101, page 1511

[93] Exhibit 101, page 69-70

[94] Exhibit 101, page 70

[95] Exhibit 101, page 70

[96] Exhibit 101, page 70

[97] Exhibit 101, page 71

Page 17 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Steinhoff testified that McGuffin's behavior was "weird" when she saw him at the Maytag store, that he was walking in circles in the dark saying he couldn't find Leah."[98]  She testified that McGuffin said he hoped Freeman wasn't "doing something stupid."[99]  Steinhoff testified that McGuffin acted strange throughout the whole time that Freeman was missing.[100]

Melissa Smith testified that she had seen McGuffin on June 29 after Freeman did not come home the previous night, and described him as "very upset," "distraught," and "frantic," characterizing his level of distress as "over-dramatic" and "extreme."[101]  Smith testified that McGuffin had referred to Freeman in the past tense before her body was found.[102]

Richard Bryant, another friend and associate of McGuffin, testified that McGuffin came to his house at 6:00 or 6:30 am on June 29, 2000.  It appeared to Bryant that "he'd been up all night, you know, doing some meth or whatever.  His eyes were all bugged out and he kept telling me that Leah was missing something had happened to her."[103]  McGuffin held up a picture of Freeman for Bryant to see.  Bryant noted, "I was like, Nick, I've known you for getting on eight years or whatever.  I know what she looks like.  I don't need to see picture of her."[104]  Bryant described that as "just the weirdest – weirdest thing I've ever experienced with Nick."[105]  Bryant later added, "Nick was acting really funny throughout the whole thing."[106]

Bryant also testified that after Freeman's death, he had shared a jail cell with McGuffin. He described that they were talking about Freeman and McGuffin "started bawling."[107]  Bryant

---

[98] Exhibit 101, page 828

[99] Exhibit 101, pages 827-829

[100] Exhibit 101, page 845

[101] Exhibit 101, pages 1507-1508

[102] Exhibit 101, pages 1509-1510

[103] Exhibit 101, page 939

[104] Exhibit 101, page 939

[105] Exhibit 101, page 939

[106] Exhibit 101, page 944

[107] Exhibit 101, page 941

Page 18 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

testified that McGuffin said, "I can just – I can see her laying there, and I couldn't do anything to help her, and I can't do anything about it."[108]

Another friend, Scott Hamilton, testified.  Hamilton had gone to Steinhoff's home on the evening of June 28, 2000, and saw McGuffin was there.  Hamilton said he was listening to their conversation from outside Steinhoff's window when he heard McGuffin say that he needed Steinhoff's help with something, and that McGuffin said so "repetitively."[109]  This confirmed Steinhoff's testimony both that McGuffin had come to Steinhoff asking for help and that he had been acting strangely at the time.  Hamilton also testified that shortly after Freeman's body had been found, McGuffin had asked Hamilton to go for a ride.[110]  McGuffin picked up Hamilton and, without telling him where they were going, drove out to Lee Valley Road, where Freeman's body had been found.[111]  Hamilton asked McGuffin why he had taken him there.  McGuffin was "real quiet and acting kind of weird."  They got out of the car and McGuffin looked down the embankment and "kept talking weird about how he could see her laying down there by this rock" and pointed at a particular boulder.[112]  McGuffin said he wished he could have helped her.[113]  Hamilton described this as strange and asked McGuffin to take him back to town.[114]  Steinhoff also testified that Hamilton had told her essentially the same story.[115]

---

[108] Exhibit 101, page 941

[109] Exhibit 101, pages 1320-1321

[110] Exhibit 101, page 1324

[111] Exhibit 101, page 1324

[112] Exhibit 101, page 1324

[113] Exhibit 101, page 1325

[114] Exhibit 101, page 1324

[115] Exhibit 101, pages 847-848 (Steinhoff grand jury testimony that Hamilton had told Steinhoff that McGuffin had taken him (Hamilton) out to the body recovery site where McGuffin had said something to Hamilton about Freeman's head being on a rock).

Page 19 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

###### 3.    McGuffin later threatened Steinhoff and told her not to talk to police.

Steinhoff told the 2010 grand jury that McGuffin had threatened her.  Steinhoff said that "before the last grand jury," the one in 2000, she had seen McGuffin at a church near the junior high school, where McGuffin "told me to keep my F-ing mouth shut," and "not to tell them that he was even at my house that night."[116]

Steinhoff also described another event that had occurred at her house when she was living with her grandmother.  On that occasion, McGuffin came over to her house and, while in the bathroom, told her to keep her mouth shut.[117]  Steinhoff said that another person was with McGuffin at that time, who she thought was his friend, Ricky Crook.[118]

Steinhoff also described another incident where McGuffin and Ricky Crook had taken Steinhoff out to a place called Poe Lane.[119]  Steinhoff said that McGuffin was driving, Steinhoff was in the passenger seat, and Crook was in the back seat behind Steinhoff.  Steinhoff said they "were acting really weird," and that McGuffin kept looking Crook through the rearview mirror.  Steinhoff turned around to say something to Crook, and when she did, she saw a "blowtorch and a shotgun in the back seat."[120]  She said that when they got to Poe Lane, they "just sat there and didn't say anything.  Kind of freaked me out, and I told them to take me home.  I don't know why I went with them."[121]

Another witness, Tina Mims, who was also known as Tina Lehman,[122] gave related testimony.  Mims described a night, which she believed was before Freeman's body was found, "about ten years ago," where McGuffin had come over to Steinhoff's grandmother's house.  She described that everyone "was partying," using methamphetamine.  She described that McGuffin

---

[116] Exhibit 101 page 836

[117] Exhibit 101, pages 836-837

[118] Exhibit 101, pages 836-837

[119] Exhibit 101, pages 836, 839, 843, 846

[120] Exhibit 101, page 846

[121] Exhibit 101, page 850

[122] Exhibit 101, pages 695-714

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

making threats to Steinhoff, while in the bathroom: "I heard the words that, 'You could end up like Leah.' Basically to keep her mouth shut. If everybody just keeps their mouth shut, everything would be okay."[123] She also testified that she had heard Ricky Crook threaten Steinhoff and tell her to be quiet that same night.[124]

### 4. McGuffin's trunk was unexpectedly empty after Freeman disappeared.

Bartley, another of McGuffin's friends, testified that McGuffin kept the front of his Mustang clean and that the trunk "usually [] was full of crap that he didn't like having in the front seat."[125] But Bartley said that after Freeman disappeared, McGuffin's trunk was empty, "no liner, nothing."[126] McGuffin's father, Bruce McGuffin, told the grand jury that McGuffin had recently been in an accident during which the gas tank had been punctured such that it only held a small amount of gas, which had not yet been fixed as of June 28, 2000.[127] Although repairing the gas tank required the removal of 12 to 18 bolts located in the trunk, Bruce McGuffin told the grand jury that he had not yet asked McGuffin to clean out the trunk to facilitate the repair.[128] In fact, Bruce McGuffin testified that although it was normal for the trunk to have little in it due to the gas leak, there still was a rubber mat in the trunk.[129] But when police searched the trunk in early July 2000, the trunk was entirely empty.[130] That is, the trunk was even more empty than Bruce McGuffin described it, further strengthening the inference that the trunk had been emptied sometime after Freeman disappeared.

---

[123] Exhibit 101 page 699

[124] Exhibit 101, pages 697-705

[125] Exhibit 101, page 837

[126] Exhibit 101, page 401

[127] Exhibit 101, pages 1048-1049

[128] Exhibit 101 pages 1049-1050

[129] Exhibit 101 page 1050

[130] Exhibit 101 page 1050. Defendant Wilcox did not testify before the grand jury, but she had searched the Mustang on July 6, 2000 and found the trunk to be empty. Exhibit 102 page 964-967.

Page 21 - STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### 5. The grand jury heard evidence that Freeman and McGuffin engaged in verbal and sometimes physical confrontations, and that Freeman was upset with McGuffin the night she disappeared.

Witness Donna Dennis testified that shortly before Freeman disappeared, she was in her car at Coquille High School waiting to pick up her grandson when she heard an argument occurring in the parking lot. When the man and the woman in the argument reached a certain car, the man grabbed her, pushed her against the side of the car, opened the car door, and pushed her inside. Dennis did not know who the participants were at the time, but was informed by her grandson that they were Freeman and McGuffin and that they fought frequently.[131]

Austin Fisher said: "Most of the time they were fighting. They – they argued a lot, and there was always screaming."[132] Asked whether he had seen them fight physically, he said he had seen "where he would come up to her yelling and then she'd push him away and stuff like that, and then he'd try to grab her and then she'd push away," but not fist-fighting.[133] Richard Bryant told the grand jury that Freeman and McGuffin were "constantly arguing and fighting, all the time."[134] He said that their fighting was "main verbal, from what I seen and heard."[135]

Adam Shinar testified that he recalled an incident in April 2000 in which he saw Freeman and McGuffin arguing. When read the statement he gave police in 2000, in which he said that he saw them pushing each other around and then McGuffin threw his keys across the parking lot, he said he recalled only McGuffin throwing his keys.[136]

Stacey Krutchfield testified that she had seen Freeman and McGuffin arguing a lot, and that Freeman could be physically aggressive toward McGuffin.[137] Krutchfield testified that she

---

[131] Exhibit 101, pages 1280-1284

[132] Exhibit 101, page 1297.

[133] Exhibit 101, pages 1297-1298.

[134] Exhibit 101, page 938.

[135] Exhibit 101, page 938-939.

[136] Exhibit 101, pages 1180-1182.

[137] Exhibit 101, pages 1371-1376.

Page 22 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

had not seen McGuffin be physical toward Freeman, but after one fight, he had punched a hole in a wall at school.[138]

The vice-principal of the high school, Mark Nortness, testified that he and others at the school were "really concerned" about the relationship between Freeman and McGuffin. He described a sort of dominance and he felt McGuffin did not treat Freeman well. He described one incident where McGuffin had grabbed Freeman and another incident he saw McGuffin lift her up and push her over. He described McGuffin as volatile.[139] Another witness from the school, Sharon Nelson, who taught health and P.E. in 2000 and was the principal at the time of her testimony, testified that she did not see any physical violence, but that Freeman and McGuffin had loud and vigorous arguments during which they were in each other's faces.[140]

The grand jury also heard evidence that Freeman and McGuffin were not getting along the night she disappeared. Mitchell testified that Freeman, while at Mitchell's house that night, had said they were arguing because Freeman wanted to spend some time alone with Mitchell and McGuffin did not want her to do that.[141] That is, Freeman appeared to be bristling at McGuffin's attempt to control Freeman's other relationships.

Aaron West spent time with McGuffin during the period after McGuffin dropped off Freeman but before he went to pick her up. West testified that McGuffin had told him "something was going on with them, and they had to – he was trying to fix it or something like that."[142] McGuffin "seemed pretty stressed about being adamantly on time * * * and not getting her mad at him any more than she already was."[143]

---

[138] Exhibit 101, pages 1373-1374.

[139] Exhibit 101, pages 1423-1429.

[140] Exhibit 101, pages 1412-1422.

[141] Exhibit 101 pages 75-76 ("[Freeman] was just saying that he wanted to come with her and she wouldn't let him because we hadn't spent any alone time in a long time. Like, Nick was just always there.")

[142] Exhibit 101, pages 316-317.

[143] Exhibit 101, page 317.

Page 23 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Ricky Crook testified that McGuffin had told him that he and Freeman had been fighting the night she disappeared.[144]

### 6. McGuffin was seen near the high school around the time Freeman was last seen there.

The grand jury heard from witnesses that had painted a picture of Freeman walking from Mitchell's house to W. Central and then north onto N. Central toward the high school.[145] Witness Cynthia Jones placed Freeman in a telephone booth at the gas station at the junction of N. Central and N. Elm Street at about 9:30 pm on June 28, 2000.[146] Witness Thomas Bounds saw Freeman twice on the evening of June 28, 2000, the first time in the evening and the second time about 30 minutes later, at dusk, when Freeman was at the phone booth near the gas station. Just a short time later, from his apartment across from the high school, Bounds heard a high-pitched scream coming from the direction of buildings near his apartment or the road that goes past the cemetery. Freeman's right shoe was found in the middle of that road.[147] No witness reported seeing Freeman after about 9:30 pm.

Witness Alicia Hyatt (formerly Hartwell), who was 11 or 12 years old on June 28, 2000, and was in a vehicle with some other kids near the high school. She testified that she saw Leah Freeman walking past the high school, that she saw a car pull over, and that Freeman spoke to one of the occupants of the car. She described the car as a darker, compact car with one headlight that was dimmer than the other, as if it was going out.[148] She returned later and gave further testimony in which she stated that she thought the car was a Ford Mustang.[149]

---

[144] Exhibit 101, page 452.

[145] Heidi Crook Exhibit 101 pages 130-131; Dave Hall Exhibit 101, page 180; David Jenkins Exhibit 101 pages 208-209; Mark Kirn Exhibit 101 page 263; Raymond Lewis Exhibit 101 page 275-276; Heather Reid Exhibit 101 page 300

[146] Exhibit 101, pages 1354-1361

[147] Exhibit 101, pages 118-127.

[148] Exhibit 101, pages 199-208.

[149] Exhibit 101, pages 1347-1353.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

McGuffin's blue Ford Mustang had a bad headlight, for which he was pulled over by Coquille police officer Zavala that same night.[150] This testimony established that a vehicle matching the description of McGuffin's Mustang was in the vicinity of Freeman at about the time she disappeared, and thus that McGuffin himself was near Freeman when she disappeared.

### 7.  The grand jury heard about McGuffin incriminating statements.

The grand jury heard from David Breakfield. After Freeman's death, McGuffin had been in a relationship with a woman named Meghan Edgerton that was punctuated by breakups and reunifications.[151] During a breakup period, Edgerton had begun dating a Breakfield.[152] Breakfield described an incident where he was driving Edgerton home. As they approached Edgerton's home, McGuffin, who had apparently been waiting for them, suddenly turned on his headlights and drove at them aggressively.[153] After that followed some "screaming and yelling," including McGuffin threatening Breakfield, and a physical fight.[154] Another grand jury witness, Jesse Smisek, confirmed that he was present for this incident.[155] Edgerton denied that this incident, described by both Breakfield and Smisek, occurred.[156]

---

[150] Exhibit 103, page 11 (McGuffin's handwritten statement, Trial Ex. 83).

[151] Exhibit 101, page 996-997 (grand jury testimony of Megan Edgerton).

[152] Exhibit 101, page 997-998 (noting that McGuffin was not very happy about that, but "accepted it"). That McGuffin was jealous, possessive, or controlling of his girlfriends was confirmed by numerous grand jury witnesses, including Steinhoff (Exhibit 101 page 874 ("possessive" and "[c]ontrolling")), Melissa Brugnoli (Exhibit 101 page 932), Austin Fisher (Exhibit 101 page 1294), Ricky Crook (Exhibit 101 page 449), Nicole Demain (Decker) (Exhibit 101 pages 988-989).

[153] Exhibit 101 pages 1213-1214. Breakfield answered affirmatively when asked if McGuffin "had driven you guys off the road." Id. page 1213

[154] Exhibit 101 pages 1214, 1215 (including, "I'll kick your ass" and "I'll f-ing kill you").

[155] Exhibit 101 pages 1494-1499. Smisek testified that he, Breakfield, and Edgerton were driving to Edgerton's home to drop her off late one night. McGuffin pulled up behind them, turned on his headlights suddenly, and attempted to run them off the road. Smisek stated that, after Edgerton had been dropped off, McGuffin "told me that he's going to kill me or something like that because he thinks I robbed him a long time ago." See Exhibit 101 pages 1494-1495. Smisek stated that McGuffin "was after the guy driving," who was Breakfield. Exhibit 101 pages 1498-1499..

[156] Exhibit 101 page 998.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Breakfield also described another instance where he was driving Edgerton home, this time during the daytime, when he was confronted by McGuffin.[157]  McGuffin told Breakfield to stay away from Edgerton.  Breakfield refused.  McGuffin again threatened Breakfield, telling him "I've done this before and I'll do it again.  Don't think I won't kill you. I strangled that bitch, I'll strangle you too."[158]

The grand jury also heard from Melissa Beebe, Freeman's cousin.  Beebe testified that in 2003, outside the courthouse in Coquille, McGuffin had grinned at her and said, "It's amazing what you can get away with in Coos County."[159]

### 8.    The grand jury heard testimony that McGuffin had interacted with Freeman after the time he had told police he had last seen her.

McGuffin indicated to police that after he had dropped off Freeman at Mitchell's house, he had not seen her again.  Evidence before the grand jury was to the contrary.

John Lindegren and his twin sister, Hjordis Lindegren, testified before the grand jury.[160] Hjordis lived about a block away from Cheri Mitchell's house.  John routinely came over to Hjordis' house on Wednesday evenings to eat dinner, watch the TV show, *Survivor*, and spend time with his dog, who lived with Hjordis.  On Wednesday, June 28, 2000, they followed their routine.  After the show ended at about 9:00 pm, he left her home on foot.  On his way, he saw Freeman and McGuffin talking in front of Mitchell's house.[161]

At grand jury, Scott Hamilton was asked about a statement he had previously given to police indicating that McGuffin had told him that after returning to Michell's house and learning that Freeman had left, McGuffin had found Freeman walking and picked her up in his car, that they had begun arguing, and that he let her out of the car near McKay's, a grocery store in

---

[157] Exhibit 101 page 1217

[158] Exhibit 101 pages 1217-1218

[159] Exhibit 101 page 920

[160] Exhibit 101 pages 1026-1042; Mr. Lindegren was born in 1958, and thus was about 42 years old when Freeman disappeared.  Lindegren depo, Exhibit 111 page 2.

[161] Exhibit 101 pages 1037-1038.

Page 26 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Coquille.[162]  Hamilton said he did not remember saying but agreed that he had said that to police previously.[163]  In other words, Hamilton testified that he did not recall saying that, but agreed that he said that previously.[164]

> **9.     Other testimony that contributed to probable cause.**

Witness Brett Mauro saw McGuffin at Fast Mart, a local convenience store, at about 9:35 to 9:40 pm on June 28, 2000, where McGuffin described Freeman using the word "gone" seven or eight times, despite the fact that he had been looking for Freeman for only 30 minutes.[165]

Witness Damon Mason testified that during the period when Freeman was missing, he was in a car with Brent Bartley when Bartley saw some law enforcement and appeared to be scared.  When asked why he was scared to see police, Bartley said it was because Freeman was missing and that "he was involved with Leah's disappearance, because he was with Nick the night that it happened."[166]  Later, Mason asked McGuffin and his brother, Wayne, why Bartley was scared of the police, McGuffin and his brother said, "they didn't have nothing to do with it, and don't ask about it any more, it's none of your business."[167]

Witness Janet Reab testified that before Freeman's body was found, she had run into McGuffin and Ricky Crook, at a park.  Crook stated that police were viewing McGuffin as a suspect because "Brent Bartley can't keep his timeline straight."  Reab described that the color drained out of McGuffin's face and that McGuffin was trying to get Crook's attention to get him to stop talking.[168]  Reab, and her daughter, Juliana Curran, who was also present for that

---

[162] *See* Exhibit 101 pages 1322-1326.

[163] Exhibit 101 page 1326.

[164] Exhibit 112 pages 2-3

[165] Exhibit 101 pages 1382-1383..

[166] Exhibit 101 pages 532-533..

[167] Exhibit 101 page 533.

[168] Exhibit 101 page 1470.

Page 27 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

incident, testified that although they had been friendly with McGuffin previously, after this incident McGuffin became unfriendly and would even try to intimidate them.[169]

### 10. The grand jury heard testimony from the medical examiner that the cause of Freeman's death was homicidal violence.

The grand jury also heard testimony from James Olson, MD, the medical examiner, who performed a forensic autopsy. Olson performed x-rays to find any bone fractures or foreign bodies in Freeman's body, such as a bullet or knife that had broken off. Olson did not identify any in his testimony. He examined all of Freeman's bones and found no evidence that a knife or bullet had caused any damage to her bones. Nor did any marks on her skin suggest such a cause of death, though much of her skin had decomposed. Olson testified that nearly all of Freeman's organs had decomposed, but there was a small amount of residual calf muscle that was suitable for performing toxicology, which was negative. Olson opined that it was unlikely Freeman had been stabbed or shot because of the absence of bone and skin injuries. Olson found no evidence to support a theory that Freeman had been hit by a car given the absence of bone fractures. Olson stated that she could have been strangled, though nothing proved that definitively. Olson testified that he was unable to determine the precise cause of Freeman's death, but that her death was not natural and not accidental.[170]

### 11. The grand jury heard limited testimony regarding forensic evidence examinations performed by the State Defendants.

The grand jury received reports from OSP's Krings, Hormann, and Wilcox, among others, which will be described below. The grand jury heard only limited testimony about OSP's forensic examinations, including testimony from Defendant Dannels, who was asked, "So, you didn't have much of anything as far as DNA or – ", to which he responded, "In physical evidence, no."[171]

---

[169] Exhibit 101 pages 1469-1476, 1482-1485.

[170] Exhibit 101 pages 899-914.

[171] Exhibit 101 page 1542.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**B.    Plaintiffs cannot establish that the State Defendants fabricated any of the evidence or otherwise caused the jury's probable cause finding to be unlawful.**

The particular involvement of the state Defendants are described in more below.  For the reasons described, the State Defendants did not fabricate or solicit false evidence to be presented to the grand jury.[172]  Plaintiffs must demonstrate a genuine issue of fact that probable cause would have existed but for Defendants' alleged fabrication.  Upon review of Plaintiffs' allegations of misconduct below, the Court should conclude that there is none.

## V.    Sufficient evidence existed to support McGuffin's conviction.

The trial jury heard much of the same testimony from many of the same witnesses that testified at the 2010 grand jury, as well as other evidence.  For example, North Bend Police Department Sergeant Buddy Young interviewed McGuffin on July 5, 2000, before Freeman's body was found.  During that interview, McGuffin began to speculate about what might have happened to Freeman, including that she might have been walking along the river and stumbled and hit her head on a rock and fallen into the river.[173]  Young testified that that statement seemed strange in light of all the other possibilities of what might have happened.  When pressed if McGuffin really thought she had gone to walk along a riverbank at night, he said he did not believe Freeman would do so.[174]  In fact, Freeman's body was later found between the riverbank of the Coquille River and Lee Valley Road, which runs beside it.[175]  McGuffin also told Young he did not think Freeman would get into a car with a stranger unless she was "extremely depressed and feeling like no one loved or cared for her."[176]  But then he stated that Freeman in fact felt that way when she disappeared because she had just had a confrontation with Michell or

---

[172] *See* Declarations of Hormann, Krings, Riddle, and Wilcox.

[173] Exhibit 102 pages 864-865.

[174] Exhibit 102 page 865.

[175] Exhibit 102 pages 1087-1096 (testimony of Coos Bay Police Officer Wetmore).

[176] Exhibit 102 pages 862-863.

Page 29 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

her mother.[177]  But Cheri Mitchell testified that when McGuffin came to her house at around

9:00 pm, she told McGuffin that she and Freeman had gotten into a fight and Freeman had just

left and that she was sure he could catch her.  She said she did not describe for McGuffin what

the fight had been about, just that he got in his car and left.[178]  McGuffin's knowledge of

Freeman's mental state suggested he had learned about it from Freeman herself.

      Numerous witnesses testified that they saw McGuffin in different cars that night.[179]  This

countered McGuffin's statement that he drove only the Mustang that night.[180]

      At trial, Steinhoff said that McGuffin, in the church parking lot near the middle school,

had told her to keep her mouth shut when she told him she had spoken to the police.[181]  Steinhoff

did not recall whether McGuffin was wearing the same clothes when she saw him at the Maytag

store and when he came to house later that night.  But she agreed that if she had told the grand

jury that he was wearing different clothes, then her earlier recollection would be better.[182]

Steinhoff was asked about the occasion, after Freeman's body was found, where Tina Mims was

at her house and McGuffin had come over.  She was asked whether she recalled telling the grand

jury that McGuffin "threatened you and told you keep your mouth shut or you'd end up like

Leah?"  She said she did not remember, but agreed that if that had been her testimony in 2010,

her memory would have been better then.[183]  However, she had not said that at grand jury.  She

had said only that McGuffin told her, in the bathroom, to keep her mouth shut.[184]  In other words,

---

[177] Exhibit 102 pages 862-863.

[178] Exhibit 102 page 420.

[179] Exhibit 102 page 492 (testimony of Ashley Patton); page 509 (Mike McAdams, McGuffin was driving the Thunderbird); page 366 (Brent Bartley); pages 454, 462-464 (Josh Emler); pages 466-470 (Aaron West), page 499 (Mark Kirn, Thunderbird).

[180] Exhibit 103.

[181] Exhibit 102 page 635.

[182] Exhibit 102 page 631.

[183] Exhibit 106 page 636.

[184] Exhibit 101, pages 836-837.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

she correctly did not remember saying that at grand jury.  In any event, on both of these points—

McGuffin changed clothing and this threats—Steinhoff's trial testimony was weaker than the

testimony she had given at grand jury.

At trial, Bartley again testified that McGuffin had kept items in his trunk before Freeman

went missing, but did not do so afterward.[185]  Defendant Wilcox, who had examined the trunk of

McGuffin's Mustang in July 2000, testified that the trunk was empty when she inspected it.[186]

At trial, some of the DNA reports prepared by Mary Krings and certain other forensic

evidence were received pursuant to a stipulation between the parties.[187]

## VI.    Defendants Krings, Hormann, and Wilcox are entitled to summary judgment on Plaintiffs' deliberate fabrication and Brady claims.

### A.    The involvement of Krings, Hormann, and Wilcox

#### 1.    The examination of Freeman's shoes

At 11:30 pm on June 28, 2000, a man named Tony Messerle found a right Nike shoe in

the middle of N. Elm Street, near the cemetery and near the gas station where Freeman was last

reported seen.[188]  Messerle, who was just getting off work when he found the shoe, thought it

might belong to one of his children, so he took it home, put the shoe on the kitchen floor, and

went to bed.  A few days later, Messerle learned that Freeman was missing, after which he

notified police and turned the shoe over to the Coquille Police Department on July 4, 2000.[189]

On July 5, 2000, at 9:07 pm, North Bend Sheriff's Deputy, Defendant Kip Oswald, found

a left Nike shoe on Hudson Ridge, a rural area several miles from Coquille, where people would

---

[185] Exhibit 102 page 358.

[186] Exhibit 102 pages 967-968.  Pictures were shown to the jury of the trunk.  *Id*. (receiving State's Exhibits 22 through 24) (*see* Exhibit 122 pages 1-3) (trunk).

[187] Exhibit 107 (stipulation and anticipated trial exhibits); Exhibit 107 pages 24-37 (trial exhibits 207, 208, 210-212 as actually received at trial).

[188] Exhibit 116 (maps received at trial as Exhibits 2-6).  This is N. Elm Street, on the north side of Coquille, and not W. Elm Street on which Cherie Mitchell lived near the south side of Coquille.

[189] Exhibit 102 pages 734-736, 741-742 (testimony of Messerle).

Page 31 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

go off-roading and hunting and where kids were known to have outdoor parties. Oswald filed a report with this information on July 6, 2000, stating that he had learned from Tony Messerle that the shoe Oswald had found matched the one Messerle found. Oswald picked up the shoe with his bare hands and put it in his vehicle. On his way back into Coquille, he encountered a road block that had been set up to ask drivers if they had any information relevant to the investigation. That shoe was turned over to the Coquille Police Department.[190]

On July 10, 2000, Coquille Police Officer Hall took both shoes to OSP and requested a DNA test be "performed to determine if the shoes were, in fact, Leah's."[191]

The shoes were first examined by OSP's Kathy Wilcox, who was a criminalist but not a DNA analyst. Wilcox saw no evidence of blood on the right shoe. Wilcox examined the left shoe and found what appeared to be spots of blood on the left shoe sole. She prepared six swabs from those areas of areas, performed testing on some of those swabs, and issued a report stating, "A small amount of human blood was detected on the bottom of this shoe."[192] Both shoes were then sent to OSP's forensic DNA laboratory in Portland for further analysis, again focused on determining whose shoes they were.[193]

The shoes were analyzed by OSP Forensic Scientist Mary Krings. Krings took three cuttings from the right shoe. These cuttings were from the tongue, heel, and ankle areas of the shoe, which became lab Exhibits 1.1, 1.2, and 1.3, respectively.[194] Krings took three cuttings

---

[190] *See* Exhibit 114 (Oswald Depo. and its Ex. 13); Exhibit 101 pages 290-293; Exhibit 102 pages 746-753.

[191] Exhibit 115 page 9; *see also* Krings Depo. 64, 81 117 (stating that her direction was to determine whose shoes they were). Exhibit 118 pages 13, 16, 21

[192] Exhibit 119 page 20 (Wilcox Depo Ex. 18 at 1) (containing all of these findings).

[193] Exhibit 108 page 1 (evidence submission form requesting DNA analysis on the shoes and the six blood swabs and submitting Freeman's toothbrush as a DNA standard).

[194] Exhibit 108 pages 1-2, 4 (Bench notes, describing the cuttings that became Exhibits 1.1, 1.2, and 1.3, and illustrating where on the shoe they came from). These are the exhibit numbers that were assigned within the OSP lab for its purposes, and do not correspond to exhibit numbers that the other law enforcement entities may have assigned to evidence items they collected. Exhibit 108 page 1 (bench notes, describing the right shoe as lab Exhibit 1 and the left shoe as lab Exhibit 2).

Page 32 - STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

from the left shoe, taken from heel, tongue, and ankle areas, which became Exhibits 2.2, 2.3, and 2.4, respectively.[195]  Krings took two of the swabs of blood from the left shoe sole, labeled them as Exhibits 2.1.2 and 2.1.4, and tested them for DNA.[196]  A toothbrush that belonged to Freeman was used to determine her DNA profile, along with DNA samples from Freeman's parents.[197]

Krings reported the results of her testing on August 27, 2000.[198]  She reported: "The DNA profile from Exhibit 1 (right Nike shoe) and Exhibit 2.1.2 (swab from blood on left shoe) matches the DNA profile from Leah Freeman (Exhibit 4)." [199]  She also reported, "The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more than one person.  The major profile is consistent with coming from Leah Freeman.  The minor profile is a male."[200]  The shoes were indeed Freeman's shoes.

Krings also tested two socks seized during the investigation.  The first one, lab Exhibit 11, was a white sock.[201]  Krings reported that Exhibit 11 contained DNA from more than one person, that Freeman was excluded as the contributor of the major profile, and that the minor profile not suitable for making a conclusive comparison.[202]  The second sock, which became lab Exhibit 12, had an Adidas logo and was recovered from a fence in Coquille.[203]  Krings reported Freeman was excluded from the DNA profile on the Adidas sock, which was from a male.  Krings compared the DNA profile on the Adidas sock with profiles in OSP databases and no matches were found.[204]

---

[195] *Id.*

[196] Exhibit 108 page 2.

[197] Exhibit 108 pages 1, 70 (August 27, 2000, report; bench notes pages 1, 69).

[198] Exhibit 107 pages 5-7.

[199] Exhibit 107 page 6.

[200] Exhibit 107 page 6.

[201] Exhibit 108 page 104.

[202] Exhibit 107 pages 5-7.

[203] Exhibit 108 pages 112-113.

[204] Exhibit 107, page 6.

Page 33 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

McGuffin had submitted a reference DNA sample, which was sent to the DNA lab on August 22, 2000. Krings analyzed on September 5 and Krings issued a report on September 6, comparing McGuffin's profile to the two socks. McGuffin could not be excluded as a source of the mixture on the white sock found in his bedroom. McGuffin's DNA profile did not match the Adidas sock found in the fence.[205] These results were unremarkable for purposes of the investigation.

Krings did some other analysis during the investigation, including comparing reference samples from other persons, alternative suspects William Sero and Elzie Shamblin, to the profiles previously obtained on the left shoe and the socks. Both were excluded as contributors to each of those items.[206]

In early 2002, a DNA reference sample was obtained from Deputy Oswald for comparison to evidentiary items.[207] Krings analyzed that sample and compared it to the DNA mixture on the left shoe. Krings issued a January 21, 2002, report concluding that the minor profile on the left shoe was consistent with coming from Oswald.[208]

Krings left the OSP lab in approximately 2003.[209] She did a small amount of forensic DNA consulting and then left the industry entirely.[210] Krings was not contacted about the Freeman investigation after she left the lab before McGuffin's criminal trial.[211] She was unaware of the renewed investigation or the prosecution or conviction McGuffin until after those events had occurred.[212] Krings was not asked by either the prosecution or defense to testify at

---

[205] Exhibit 107 pages 8-9 (Sept. 6, 2000, report).

[206] Exhibit 107 pages 10, 13-14 (Dec. 9, 2001, and Apr. 17, 2002, reports).

[207] Exhibit 108 page 190.

[208] Exhibit 107 pages 11-12 (Jan. 21, 2002, report).

[209] Krings Declaration ¶¶ 1-2.

[210] *Id.* ¶ 2.

[211] Exhibit 118 page 12 (Krings Depo. 60).

[212] Krings Declaration ¶ 3.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

McGuffin criminal trial about her DNA analysis.[213]  Had she been asked to testify about her analysis, she would have testified.[214]

> ## 2. Hormann performed technical review of Krings' DNA analysis and performed DNA analysis of other items during the Freeman investigation in 2010.

In 2000, Susan Hormann was also a criminalist and forensic scientist in the DNA unit of the OSP lab.  Hormann performed the technical review for Krings' DNA analysis and reports described previously.[215]  Technical review is a review by second qualified DNA analyst of the case file and the report to ensure the accuracy of the case documentation and to verify that the conclusions are supported by the data.[216]  Hormann was a qualified DNA analyst. A technical review is required for every forensic DNA analysis performed by the OSP lab.[217] Documentation on the case file indicates that Hormann performed technical review and that the lab's technical leader, Cecilia von Beroldingen, performed administrative review of Krings' analysis.[218]

In approximately 2008, Hormann became the DNA Unit Supervisor for the Forensic Services Division of OSP, which encompasses OSP's forensic science services.[219]  In 2010, Hormann began working as the interim Operations Manager for the Forensic Services Division, to which position she was appointed permanently around August 2011.[220]  She retired from OSP in 2016.[221]

---

[213] *Id.* ¶ 4.

[214] *Id.*

[215] Hormann Decl. ¶ 1.

[216] Exhibit 113 at 29.

[217] *Id.*

[218] Exhibit 118 pages 2. 10-11, 24-27 (Krings Depo.)

[219] Hormann Depo. 31

[220] *Id.* a 31-32

[221] *Id.* at 34.

Page 35 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

She performed additional DNA analysis in 2010 on other items collected during the investigation, including areas of the borrowed Kia in which Steinhoff and McGuffin had driven while looking for Freeman, as well as other items, which made no notable conclusions.[222]

Although Hormann remained employed at OSP at the time of McGuffin's trial, Hormann was not asked to testify by either side about her analysis or her technical review. Had she been asked to testify about her analysis, she would have testified.[223]

Instead, at McGuffin's trial, the August 27, 2000, September 6, 2000, and January 21, 2002, DNA reports were admitted into evidence by the stipulation of the parties, and Defendant Wilcox was asked limited questions about the DNA results reported in those reports, despite the fact that Wilcox was not a DNA analyst and had not performed the testing.[224] Wilcox testified, in relevant part, that the "shoes and the blood on the shoes matched Leah Freeman." Wilcox testified that on the left shoe, the lab found a mixture with a minor male profile that was consistent with the DNA profile of Oswald. Wilcox testified that the lab found only Freeman's DNA on the right shoe. [225]

> **3.    The reanalysis of the 2000 testing data in 2017 changed the interpretation of the DNA results from Freeman's shoes.**

During McGuffin's PCR case, OSP reanalyzed the 2000 testing data by applying updates interpretation and reporting protocols.[226] One of the changes to the protocols relates to how to consider low-level signals. DNA signals are measured in RFU, "relative fluorescence units." In 2000 and 2002, signals between 50 and 150 RFU represented a gray area; such signals were above the noise of the instrument but not strong enough to justify conclusive determinations.

---

[222] May 24, 2010, report.

[223] Hormann Decl. ¶¶ 2-4.

[224] Exhibit 107 (stipulation); Exhibit 102 978-982 (Wilcox trial testimony).

[225] Exhibit 102 978-982 (Wilcox trial testimony).

[226] Kaplan May 9, 2017, report (amended May 17, 2017). "Reanalyzed" means applying the current interpretation and reporting protocols to existing data. That is distinct from retesting the same evidence items with current testing methodologies, which also occurred on the shoes, which is described below.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

They could be interpreted with caution, but were not to be used for making conclusive determinations other than considering them for purposes of exclusion.[227]  The protocols gave analysts clear discretion in how to making these interpretations.[228]

The protocols in effect in 2017 had changed.  Instead of 150 RFU, signals above 100 RFU were deemed reliable for interpretation purposes.[229]  Under that lowered threshold, more of trace peaks became reliable for interpretation.  Lab Exhibit 1.3 from the right shoe was determined to be a mixture assumed to be from two contributors, with Freeman as the major profile.  The minor profile from 1.3 was from an unknown male.  McGuffin was excluded as a contributor to 1.3.[230]

Under the 2017 reanalysis, the results about the DNA mixture on the left shoe also changed.  Again, more of the peaks in the DNA mixture on item 2.3 required interpretation, and under that interpretation, while Freeman was still the major contributor, Oswald could no longer be deemed the contributor of the minor profile.  McGuffin was excluded as a contributor to 2.3.[231]

### 4. The retesting of Freemans' shoes in 2017-2018 further changed the understanding of the DNA profiles on Freeman's shoes.

Separate from the 2017 reanalysis of the original testing data, OSP's Janelle Moore, PhD, performed DNA testing on the shoes in 2017 and 2018.  This testing and analysis was done under the partial supervision of McGuffin's DNA expert in the PCR case, Huma Nasir, who

---

[227] Exhibit 113 at 30, 37, 43; Kaplan's expert report.

[228] Exhibit 113 at 30 ("The following are objective criteria used to evaluate STR profiles.  They are to be used as general guidelines.  Every possible situation is not covered.  Analysts may draw upon experience and other case information when making an interpretation.") (emphasis added).

[229] Kaplan expert report at 5.

[230] Kaplan May 9, 2017, report (amended May 17, 2017); Kaplan Expert report at 5.  In addition, item 1.1 was determined to be mixture with Freeman as the major profile and the minor profile insufficient for comparison.  No results were reported about item 1.1 specifically in 2000, and its results were grouped in with the results from item 1.3.  *Id.*

[231] Kaplan May 9, 2017, report (amended May 17, 2017);

Page 37 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

raised no objections to Dr. Moore's methods or conclusions.[232]  This newer testing was more sensitive than the testing done in 2000, and the results were interpreted using probabilistic genotyping, an interpretation method not used in 2000.[233]

No new samples were taken from the right shoe; instead, the new testing was done on remaining sample extracts taken in 2000, including item 1.3.[234]  With increased sensitivity, it was determined to contain a mixed DNA profile, assumed to be from four individuals, including Freeman.  McGuffin and many individuals and alternative suspects, including reference samples from individuals not previously examined, were compared with the minor profiles on 1.3.  Their contributions were inconclusive, meaning they could not be included or excluded as contributors.[235]

On the left shoe, some existing samples/extracts were tested and some new ones were taken.  Item 2.3 was consumed when it was tested in 2000, so it could not be retested.  Four samples from the upper part of the shoe were tested.  All showed mixed DNA profiles.  Three contained contributions from Freeman and Oswald.[236]  The fourth, 2.6, contained a mixture of at least four contributors, including at least one male, but due to mixture complexity and low levels of DNA, those results were insufficient for comparison.[237]

The 2017 testing also included six swabs taken by Wilcox in 2000 of the blood areas on the left shoe sole.[238]  These were lab Exhibits 2.1.1 to 2.1.6.  All of these contained full or partial

---

[232] Nasir Depo.

[233] Kaplan expert report at 5.

[234] Kaplan expert report at 5.

[235] Moore report Oct. 10, 2017 at 4.

[236] Moore report Oct. 10, 2017 at 5-7 (regarding lab Exhibits 2.2, 2.4, and 2.5).

[237] *Id*. at 7.

[238] Moore report oct. 10, 2017 (referring to lab Exhibits 2.1.1 to 2.1.6).

Page 38 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DNA profiles that matched Freeman.[239]  One of the sole swabs, Exhibit 2.1.3, contained a "low level" of male DNA, an allele consistent with a Y chromosome but otherwise no full or partial DNA profile of anyone other than Freeman.[240]  McGuffin and a many other individuals were excluded as contributors from the partial profiles found on Exhibits 2.1.1 and 2.1.6.  That is, other than showing that the blood areas had DNA profiles consistent with Freeman, the new testing of the shoe soles found little new information or DNA profiles.

> **B.    Krings is entitled to qualified immunity based on her exercise of discretion in performing her DNA interpretation.**
>
> > **1.    Krings is entitled to qualified immunity from Plaintiffs' claim that Krings fabricated evidence.**

The core of Plaintiffs First Claim, Count 1 is that Krings fabricated evidence that was used to secure McGuffin's indictment and trial.[241]  State Defendants refer the Court to the standards for such claims described above.

Plaintiffs allege that Krings fabricated evidence in three ways: 1) That Krings' reports, on the whole, suggest McGuffin was guilty of murder when Krings new or should have known that McGuffin was innocent; 2) That Krings fabricated evidence that male DNA found on Freeman's left shoe was that of Oswald, who found the shoe; and 3) That Krings fabricated evidence that the only DNA on Freeman's right shoe was Freeman's DNA.[242]  These will be addressed in reverse order.

---

[239] Moore report Oct. 10, 2017.  Notably, the phrasing of forensic DNA statistical analysis had also changed by 2017, wherein results were stated as a comparison of the likelihood an obtaining evidentiary profile from a reference individual with an unknown, unrelated individual.

[240] Moore report Oct. 10, 2017 at 5.  To emphasize, this "low level" of male DNA was not a full or even partial DNA minor profile of a male.  It was single allele from a Y chromosome at a very low level, in the absence of any other DNA results inconsistent with Freeman's profile.

[241] SAC ¶¶ 208-217.  In Count 1, Plaintiffs include allegations that the defendants suppressed exculpatory evidence, failed to correct fabricated evidence, and other allegations that are duplicative of other counts.  But the unique core of Count 1 is the fabrication claim.

[242] Plaintiffs Interrog. Response to Krings at 5-6.

Page 39 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

        a.    **A reasonable official in Krings' position could have understood her report stating that the right shoe contained only Freeman's DNA to be correct and consistent with all applicable protocols.**

As to the right shoe, Krings reported only that the DNA found on the right shoe matched the DNA of Leah Freeman.[243]  Plaintiffs contend that this was fabricated evidence, and that Krings should have reported that the right shoe contained a mixture of Freeman's DNA and that of another person.  In order to get there, plaintiffs discard the actual language of OSP's DNA interpretation protocols—which says that trace peaks "may be interpreted with caution" into a command that trace peaks be interpreted and reported."  As explained below, no reasonable DNA analyst, applying those protocols with the information available in 2000, would have understood that "may be interpreted" meant "must be interpreted."  But more to the point for purposes of qualified immunity, Plaintiffs cannot dispute that any reasonable DNA analyst in Krings' position would have understood the protocols that way.  Therefore, Krings is entitled to qualified immunity.

In this type of DNA analysis, the analyst examines a sample for the presence of DNA markers, or "alleles," at several genetic locations, or "loci" (the plural of locus).  The analysis generates peaks on a chart called an electropherogram.  The peak heights represent the strength of the DNA signal representing the alleles that are present at each loci.  The observed alleles at each loci are compiled into a DNA profile, which may be compared with reference DNA profiles from known individuals to make investigative inferences.

But importantly, the analysis is done by *interpreting data*.  And OSP had protocols called "Interpretation Guidelines" in place in 2000 to guide how that interpretation is done.  The protocols from 2000 stated that "Peak heights should be a minimum of 150 relative fluorescent units (RFU).  Peak heights less than 150 RFU **may be interpreted** with caution."[244]  Further

---

[243] Aug. 27, 2000, report at 2.

[244] Aug. 1, 2000, quality manual, p. 30 (emphasis added).  The protocols contain other references to the 150 RFU threshold, each reinforcing the lesson that caution is warranted in making reliable interpretation of peaks below that height.  Id. at p. 21, 36, 41, 43.

Page 40 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

suggesting that "may" really does mean "may" is the preface to the Interpretation Guidelines, which stated: "The following are objective criteria used to evaluate STR profiles. They are to be used as general guidelines. Every possible situation is not covered. Analysts may draw upon experience and other case information when making an interpretation."[245]

The protocols offer three specific indications of a DNA mixture.[246] OSP's expert, Marla Kaplan, has opined that none of these three indicators were present as to the right shoe, but in any event, only the first one is really at issue, the "presence of more than two alleles per locus at more than one locus."[247] The analysis of lab Exhibit 1.3 showed several loci where there were than two peaks between 50 and 150 RFU.[248] The protocols did not require Krings to interpret these peaks as a mixture. Again, the protocols said that such peaks "may be interpreted with caution." At *only one locus* was there more than one peak that was above the 150 RFU threshold.[249] Consistent with the interpretation where there only one locus with two or more alleles above the 150 RFU interpretation threshold, Krings did not report a mixture.

Plaintiffs' expert, Huma Nasir, in her report, does not address these mixture indicators explicitly, like Kaplan does. But at deposition, Nasir was asked the following:

Q.    So is it your position that the lab's protocols, as written, required it to report the results from Item 1.3 as a mixture?

A.    They have -- so I believe that -- I don't know that it says explicitly that it is required to be that way. I do think that there are [sic] guidance that it was a mixture. I think there was guidance that alleles between 50 and 150 should have been reported, considered for exclusion, and they weren't. So in that regard I feel that the lab didn't follow the SOP.[250]

---

[245] Aug. 1, 2000, quality manual, p. 30.

[246] Protocols at 31.

[247] Kaplan expert report at 3-4.

[248] Bench notes page 151.

[249] Bench notes page 151 (locus D5S818).

[250] Nasir Dep. 64.

Page 41 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

It is undisputed that there is no provision in the protocol stating that peaks (or alleles) between 50 and 150 RFU "should be" reported.  What the protocol actually says is that peak heights "should be a minimum of 150" and that peaks "less than 150 RFU may be interpreted with caution."  Thus, the protocol may have permitted—but did not require— Krings to interpret 1.3 as a mixture.  And later in the deposition, Nasir conceded there was no such requirement:

> Q.   Okay. And you've said already that the lab's protocols didn't require the lab to report it as a mixture. Correct?
> A.   The way I interpret it, they're analyzing alleles at 50 RFU. And if you're analyzing it at 50 RFU, that protocol said that if there are more than two alleles at more than one locus, then it may be -- I think you said something like may be reported as a mixture. Yes, there is not a word that says required or must be. I think it's just -- I believe it said it may be reported as a mixture.[251]

The protocols also provided that "Peaks between 50 and 150 RFU will be considered for purposes of exclusion."[252]  That provision is best understood in view of another provision, which stated that where a mixture interpretation has already been made, "Any locus in which the peaks from the minor contributor fall below the threshold are inconclusive and no statistical interpretation shall be made. (Note: These minor peaks may be used for exclusionary purposes)."[253]  In other words, once a mixed DNA profile has been recognized, peaks between 50 and 150 RFU may be used to exclude individuals from that mixture, a purpose distinct from using them to recognize mixtures in the first instance.

Krings has little recollection of her analysis and interpretation of items in the Freeman investigation or how the protocols worked in detail.[254]  She testified that her recollection was that "the default position of the lab was that the peak heights should be 150 or above to -- for

---

[251] Nasir Dep. 67-68.

[252] Aug 2000 protocols at 43.

[253] Aug 2000 protocols at

[254] Krings Dep. 41-47, 81-85.

Page 42 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

interpretation."[255]  She recalled that peaks less than 150 RFU could be used in some

circumstances, generally where the analyst had particular confidence that the peaks under 150

were reliable.[256]  She did not recall if she ever applied the "exception" to the lab's default

minimum of 150 RFU to make an interpretation.[257]

The point here is not to dispute which is the best interpretation of the protocols.  It is that

even Plaintiffs' opposing expert has made statements consistent with Krings' approach, that the

protocols permitted but did not require the results for item 1.3 to be interpreted and reported as a

mixture.[258]  In other words, a reasonable DNA analyst, operating with the knowledge of 2000

and the protocols then in effect, could have reasonably understood her report to be truthful and

consistent with the protocols that governed her work.  There is no evidence that Krings

intentionally fabricated her report or any evidence that Krings had any motivation to do so.

> **b.     A reasonable official in Krings' position could have understood her report stating that the minor male profile on the left shoe contained was consistent with coming from Deputy Oswald.**

As to the left shoe, specifically lab Exhibit 2.3, Krings reported that it contained a mixed

DNA profile.  The major profile matched Freeman, and the minor profile was a male.  When

Deputy Oswald submitted a reference DNA sample, Krings analyzed it and issued a report

stating that Oswald's profile was consistent with coming from the male profile on Exhibit 2.3.

Unlike the right shoe, there was more than one locus at which the Exhibit 2.3 had more

than one allele per locus that was above the 150 RFU threshold.[259]  Thus, Krings' reported it as a

mixture in 2000.  Plaintiffs do not dispute that it was a mixture.  What Plaintiffs dispute is that

the minor male DNA profile was consistent with coming from Oswald.  The male profile was

---

[255] Krings Dep. 82.

[256] Krings Dep. 82-84.

[257] Krings Dep. 85.

[258] *See also* Nasir Dep. 58 ("Again, I understood it to mean that you could look at peaks that were between 50 and 150 for exclusionary purposes, that it was allowed, not required but allowed.").

[259] Bench notes at 152.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

comprised of 13 alleles observed at seven loci.  There is no dispute that the alleles that were above 150 RFU were all completely consistent with Oswald.  Of the remaining 10 alleles that were between 50 and 150 RFU, all but two were consistent with Oswald.  Those two discordances on trace peaks in the gray area between 50 and 150 RFU were not sufficient to exclude Oswald, and the protocol merely directed the analyst to consider such peaks for purposes of exclusion, but did not dictate what conclusion the analyst should reach when doing so.[260]

When Kaplan reanalyzed the data from Exhibit 2.3 in 2017 under the current protocols, the two discordances were more significant.  And because the data supported a conclusion of only two contributors, Oswald was excluded as the minor donor.[261]  But when other samples from the left shoe were retested in 2017, including Exhibit 2.5, which was cut around the place on the shoe where Exhibit 2.3 was taken, three of the four samples had a mixed profile consistent with coming from Freeman, Oswald, and at least one other individual.[262]  Plaintiffs' do not dispute the 2017 results.[263]

The evolution of the results on both shoes demonstrates the critical importance of the interpretation protocols in the results of forensic DNA analysts.  Krings was not called to testify about her results.  Defense counsel could have contacted the OSP lab about the analysis, but did not apparently do so.[264] And, as will be discussed in more detail below regarding Plaintiffs' Brady claim, Krings' bench notes, a compilation of her analyst's notes, observations, calculations, and preliminary results, were provided to Plaintiffs' defense counsel.  Those notes contained all of the facts that were needed to challenge Krings about her interpretations and

---

[260] Kaplan expert report at 13.

[261] Kaplan expert report at 13.

[262] Moore report at 5-7.

[263] Nasir report __; Nasir Dep. __.

[264] McCrea Dep. 66-68.  McGuffin's counsel objected on the basis of work product to McCrea testifying as to whether she had contacted the OSP lab about its analysis in the Freeman investigation.  *Id*. at 69.  Still, no record appears of any such contact.

Page 44 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

conclusions. But defense counsel did not consult with a DNA expert about them before stipulating to the readmission of the reports.[265]

To survive summary judgment, Plaintiffs must present sufficient evidence that a reasonable jury could find that Krings interpretations were reached with a reckless disregard for the truth, were in fact incorrect, and likely affected the jury's verdict.[266] The record permits no dispute that Krings' analysis and reporting about the left shoe was not false, even if the conclusions are different under the interpretation standards that have evolved over the years. And by following the applicable protocols, Krings does not show a reckless disregard for the truth. The District Attorney did not even mention the DNA in his closing argument.[267]

This case illustrates aptly the need for qualified immunity and its continued vitality as a defense. Krings made a reasonable interpretation of available data based on her understanding of the applicable protocols. Another analyst, Hormann, performed technical review of Krings' work and there is no evidence they disagreed. Krings left the lab in 2003. Now, many years later, Plaintiffs' experts have interpreted the data differently. This is precisely the situation in which qualified immunity should allow "government officials breathing room to make reasonable but mistaken judgments." *al-Kidd*, 563 U.S. at 743. Plaintiffs' disagreement with Krings' interpretation does not permit a reasonable inference of reckless fabrication that would vitiate Krings' qualified immunity.

> **c.     Plaintiffs cannot demonstrate an issue of material fact that Krings' reports suggested McGuffin was guilty but Krings knew or should have known that he was innocent.**

In asserting that Krings' reports suggest McGuffin was guilty of murder when Krings knew or should have known he was innocent, Plaintiffs invoke the standard for a fabrication

---

[265] McCrea Dep. (Dec. 4, 2023) 93, 105-06; CT at D6, 90-93 (recording the stipulation).

[266] *Lacy v. Cnty. of Maricopa*, 631 F. Supp. 2d 1197, 1207 (D. Ariz. 2008) (expressing that standard for fabrication claim related to doctor performing autopsy); *Lisker v. City of Los Angeles*, No. CV09-09374 AHM AJWX, 2013 WL 1276047, at *15 (C.D. Cal. Feb. 4, 2013), aff'd, 780 F.3d 1237 (9th Cir. 2015).

[267] CT D9 63-156.

Page 45 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

claim in the absence of direct evidence of fabrication.[268]  Krings' reports stated only that the shoes were Freeman's shoes and that the minor profile on the left shoe was consistent with Oswald.  At no point did Krings or any OSP analyst issue a report linking McGuffin to any evidentiary item in this case.[269]  Krings' reports did not discuss the trace peaks, but her bench notes did.  And there is no evidence that Krings knew McGuffin was innocent or that she had any significant knowledge of the investigation outside of the DNA evidence, from which any reasonable analyst in her position should have known McGuffin was innocent.[270]  Krings was not aware of the evidence presented at grand jury and trial upon which McGuffin's indictment and conviction were established.[271]  In short, Plaintiffs' cannot show a question of fact that Krings knew, or that any reasonable analyst in Krings' position should have known, that McGuffin was innocent.  Krings is entitled to qualified immunity.

### 2.     Krings is entitled to qualified immunity from Plaintiffs' Brady claim.

As to Plaintiffs' Brady claim against Krings, State Defendants refer the Court to the standards for Brady claims described above.  Plaintiffs contend that Krings suppressed 1) evidence of her alleged fabrication of evidence in her reports, 2) evidence of DNA from an unidentified male on Freeman's left and right shoes, 3) evidence of her analysis of the number of contributors to the DNA mixture on Freeman's left shoe, and 4) evidence of her conversations with other defendants, police, and prosecutors about her DNA-related conclusions.[272]

### a.     Krings did not violate Brady because McGuffin had all of Krings' laboratory notes, which disclosed all facts upon which her analysis and reports were based.

Addressing the first two items, Plaintiffs' Brady claims fail because Krings' bench notes describing her analysis were provided to the defense.  Plaintiffs' counsel stated at deposition that

---

[268] *Devereaux*, 263 F.3d at 1076-77.

[269] Kaplan expert report at 16; Nasir Dep. 150.

[270] Krings Decl. ¶ 5.

[271] *Id*.

[272] Plaintiffs' Responses to Krings Interrogatories at 11-12.

Page 46 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

she had received Krings' bench notes, numbering around 256 pages.[273]  The contents of Ms. McCrea's files include these bench notes.[274]  Ms. McCrea stated that she would not have been able to understand the bench notes without an expert but did not hire an expert to review them, explain their meaning to the DNA results, and assist with the defense.[275]

Few cases have explored *Brady* claims involving forensic investigators whose laboratory notes have been turned over to the defense.  More often, claims involving laboratory notes assert that those notes were unlawfully suppressed.[276]  In *Atkins v. County of Riverside*, the court noted that a Brady claims against a serologist were deficient because although the serologist's report lacked specificity and was arguably misleading, it put the criminal defendant on notice of the serology results.[277]  The court observed that the serologist's "failure to turn over the bench notes was not a Brady violation because there was no showing that they included exculpatory information not in the final report."[278]  That passage illuminates the importance of disclosing bench notes that <u>do</u> contain exculpatory information that is not reflected in a forensic report. And that is what happened here.

This Court has rejected a *Brady* claim on the basis that providing the defense with the lab's raw data and bench notes is sufficient.[279]  In *Roberts*, a habeas case, the report stated that DNA mixtures were found on evidentiary samples and that an alternative suspect, Mills, was excluded as a contributor to those mixtures.[280]  The petitioner asserted that a Post-it note on a

---

[273] McCrea Depo. (Dec. 4, 2023) 73.

[274] Exhibit 108 (bearing the MCCREA bates numbers).

[275] McCrea Depo. (Dec. 4, 2023) 56, 81-85.

[276] *See*, *e.g.*, *Villasana v. Wilhoit*, 368 F.3d 976, 977–79 (8th Cir. 2004) (holding that laboratory analyst who did not turn over notes of their, which were later used by an expert to exonerate the criminal defendant, were entitled to qualified immunity).

[277] 151 F.App'x. 501, 506 (9th Cir. 2005).

[278] Id.

[279] *Roberts v. Howton*, 13 F.Supp.3d 1077, 1109-10 (D.Or. 2014).

[280] *Id*.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

forensic DNA report and a "conversation log" were suppressed.  The Post-it contained a notation stating, "Mills not excluded" and the conversation log noted the mixtures included a DNA type that is below the reporting threshold but "may include Ed Mills."[281]  Rejecting this *Brady* claim, the court noted that "petitioner was provided with the core *Brady* material, in the form of the raw data relied upon by the forensic laboratory, to make her own determination."[282]  The court further stated, "For this same reason, I reject petitioner's contention that the omission from the lab reports that DNA on several samples was male supports her *Brady* claim.  Petitioner concedes that she was provided raw lab notes referencing the male DNA."[283]

The same result should obtain here.  McGuffin and his counsel were provided the lab notes upon which Krings' analysis was based.[284]  Those notes referenced the trace DNA found on both shoes and allowed McGuffin to make his own determination.  No *Brady* violation occurs when a defendant "possess[es] the salient facts regarding the existence of the records" claimed to have been suppressed, and therefore the defendant is sufficiently on notice and could have sought out the evidence at issue on their own.[285]  The salient facts at issue here are that the data included i) trace peaks on the right shoe that could be interpreted as DNA that did not come from Freeman and ii) trace peaks on the left shoe that could be interpreted as DNA that did not come from Freeman or Oswald.  Each of those facts were disclosed in the bench notes.

Plaintiffs' assertion that Krings suppressed evidence of the fabrications contained in her reports requires a brief return to Plaintiffs' fabrication claims.  Plaintiffs will likely argue that Krings' report was false because her bench notes contain a handwritten notation that reads

---

[281] *Id.*

[282] *Id.* at 1110.

[283] *Id.* at 1110 n.22.

[284] Although the actual raw data was not from the computer instrument was not provided to the defense, that data was summarized in the bench notes and the raw data has no exculpatory value beyond what is found in the bench notes themselves have

[285] *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

"mx ♀ major"—presumably mix female major—about Exhibit 1.3.[286]  Again, the interpretation protocols undermine this argument.  The protocols devote several pages to describing various analytical artifacts, spurious signals that do not represent reliable DNA signals, and directing the analyst in how to detect and correct them.[287]  Krings made the "mx ♀ major" note on July 27, 2000, on a "results control" sheet used to record analysts' preliminary review for artifacts before completing the interpretation and writing the report.[288]  Four days later, on July 31, Krings printed the electropherogram for Exhibit 1.3 and summarized its results into an allele call table.[289]  The data from Exhibit 1.3 did not meet the protocol's definition of a mixture, as already described, explaining why Krings truthfully did not report a mixture.  But again, this note reflected only Krings' initial impression before doing her full analysis, and in any event this impression was in the bench notes disclosed to counsel, alerting counsel to explore the significance of that impression.

Krings' third alleged Brady violation—that she suppressed evidence of her analysis of the number of contributors to the DNA mixture—is not clear, but ultimately is without merit for the same reason.  At deposition, Krings stated that she was unsure if she had determined the number of contributors to the DNA profile on Exhibit 2.3, the left shoe.[290]  Asked if she had told anyone that she was uncertain of the number of contributors, Krings said she did not know.[291]  Whether Krings was sure or unsure about the number of contributors is not exculpatory to McGuffin.  All the information available to Krings that could be used to discern the number of contributors was also available to McGuffin in the bench notes.

---

[286] Page 16 of the bench notes.

[287] Aug. 1, 2000, protocols at 19-22, 32-36.

[288] Page 16 of the bench notes; Kaplan Expert report at 4.

[289] Pages 24, 151 of bench notes.

[290] Krings Dep. 72, 77.

[291] Krings Dep. 72.

Page 49 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**b.  The failure to disclose the OSP Lab's conversation record did not violate Brady because McGuffin's defense team was aware of any exculpatory information it contained.**

Krings' fourth alleged Brady violation is that she suppressed her conversations with other defendants, police, and prosecutors about her DNA-related conclusions, specifically certain OSP conversation logs that were no produced to counsel.[292]  It is unclear exactly what the putative exculpatory value of these conversation logs is.  Plaintiffs may contend that one of the handwritten entries indicates that Krings had compared McGuffin's DNA profile to the profile on the right shoe, Exhibit 2.3, and concluded that he was not a contributor to that profile,[293] but that Krings did not issue a formal report saying she had done that comparison.

This does not establish a triable issue as to a *Brady* violation.  Krings was not asked, through an evidence submission request, to make a formal comparison of McGuffin's profile to the left shoe.[294]  Her specific direction was to examine the DNA on the shoes to determine if they were Freeman's.[295]  But Kring's informal comparison was known to McGuffin at the time of trial because of a memorandum written by Wilcox.  According to that memorandum, questions had arisen at a September 9, 2000, meeting of the major crimes team, and that Wilcox had spoken with Krings in an effort to answer some of those questions.[296]  Krings stated that "Freeman and McGuffin had some of the same DNA markers," but "the data **suggests** Nick McGuffin was **probably not** the DNA contributor."[297]  This document was sent to the District Attorney, who provided to McCrea before trial.  In fact, a copy of it was found in McCrea's file with McCrea's handwriting on it.[298]  McCrea agreed that she understood at the time of trial that McGuffin's

---

[292] Plaintiffs' Response to Krings Interrogatories at 12 (citing Exhibit 118 pages 28-30 (Kring depo ex. 5) conversation logs).

[293] Krings Dep. Ex. 5 at 2.

[294] Krings Depo. 117, 23-25

[295] Coquille 000797; *see also* Krings Depo. 64, 81 117 (stating that her direction was to determine whose shoes they were).

[296] Wilcox Dep. 157-158, Ex. 20.

[297] Wilcox Dep. Ex. 20 (bold in original).

[298] McCrea Dep. (June 25, 2024) at 18-19, Ex. 42.

Page 50 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

DNA profile did not match the minor male DNA profile on the left shoe.[299]  Thus, to the extent the conversation record can be deemed exculpatory to McGuffin, his attorney was aware of it.

There is no *Brady* violation and Krings is entitled to summary judgment.

**C.     Hormann is entitled to summary judgment on Plaintiffs' fabrication and Brady claims based on her exercise of discretion in performing her technical review and DNA analysis.**

Plaintiffs' allegations of fabrication by Hormann are largely the same as by Krings, with one additional allegation, that Hormann "fabricated evidence of Freeman's blood and DNA in the Kia.".[300]  Hormann's alleged *Brady* violations are essentially the same as Krings' as well.[301]

**1.     Hormann is entitled to summary judgment on Plaintiffs' fabrication claim.**

Again, Hormann performed technical review of Krings' work in 2000-2002.  What is now described as technical review was called "Double Reader" in the 2000 protocols, which required that the "data be independently reviewed by a second qualified analyst to confirm that the conclusions are scientifically supported by the data and that the interpretations have been made objectively, consistently, and within previously agreed limits."[302]  Technical review was not a supervisory review; it was simply a review by another qualified analyst.[303]

---

[299] McCrea Dep. (June 25, 2024) at 19, Ex. 42.

[300] Plaintiffs' Interrogatory Responses to Hormann at 6.  The allegations of fabrication common between Hormann and Krings are 1) that their reports suggest McGuffin is guilty of murder when they knew or should have known that he was innocent, 2) that they fabricated evidence that male DNA on the left shoe was Oswald's, and 3) that the only DNA on Freeman's right shoe was Freeman's.  Krings and Hormann Interrogatory Responses at 5-6.

[301] Hormann Interrogatory Responses at 10-12.  The allegations of Brady violations common between Hormann and Krings are 1) again that their reports suggest McGuffin is guilty of murder when they knew or should have known that he was innocent, 2) that they withheld evidence of DNA from an unidentified male on Freeman's right and left shoes, 3) that they withheld evidence about the number of contributors to the DNA mixture on the left shoe, and 4) they withheld evidence about their conversations with the other defendants and police and prosecutors about her DNA-related conclusions and her attempts to avoid developing evidence that would exonerate McGuffin.  Krings and Hormann Interrogatory Responses at 10-12.

[302] Aug. 2000 protocols at 29.

[303] *Id.*; OSP Rule 30(b)(6) depo of OSP (Marla Kaplan July 25, 2023) at 14.

Page 51 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Unsurprisingly, Hormann does not recall her technical review of Krings' work in 2000-2002, but there is no genuine issue of material fact disputing that she did it.[304]  Hormann initialed and dated a line called "Tech Review" for each of the analytical reports from the 2000-2002.[305]  The technical leader Cecilia von Beroldingen also reviewed the results.  In addition, OSP's file contains a "STR Casework Completion" sheet showing that Hormann completed technical review.[306]  There is no evidence that Hormann voiced any disagreement with Krings' analysis, which would have triggered the resolution process described in the protocols.[307]

Hormann is entitled to summary judgment on the Plaintiffs' fabrication allegations for essentially the same reasons as Krings.  Krings and Hormann were qualified analysts.[308]  Krings' interpretation and reporting of the results was correct under the protocols then in place.  No reasonable jury could find that Hormann's review was done with a reckless disregard for the truth, was in fact incorrect, and likely affected the jury's verdict.

### a.    The March 4, 2010, interview of Steinhoff.

As to Plaintiffs' additional allegation that Hormann "fabricated evidence of Freeman's blood and DNA in the Kia," Plaintiffs refer to three sources, a March 4, 2010, interview with Steinhoff, an OSP lab report from May 24, 2010, and the broadcast of ABC's "20/20" in 2010.[309]

During the renewed investigation, law enforcement tracked down the Kia that Steinhoff had borrowed on the night of June 28, 2000, in which she drove McGuffin.[310]  On March 4,

---

[304] Hormann Depo. at 84.

[305] OSP Rule 30(b)(6) depo of OSP (Marla Kaplan July 25, 2023) Ex. 9 at 1-2.  The technical leader Cecilia von Beroldingen also reviewed the results and initialed the case jacket.  Id.

[306] Hormann Depo. 104-105 and Ex. 8 at 160 ("STR Casework Completion" sheet).

[307] Aug. 2000 protocols at 29 ("[a]ny differences between the two readers must be resolved").

[308] Hormann Decl. ¶ 2; Krings Decl. ¶ 1.

[309] Plaintiffs' Response to Hormann's Interrogatory at 6.

[310] CITE? Pex trial testimony, D7 24.

Page 52 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2010, Defendants Andrews and Riddle interviewed Steinhoff.[311]  During that interview, the conversation turned to the Kia.  Riddle asked, "I need to ask you: Is there any reason why Leah's blood would be found in that car?"[312]  Steinhoff said no.  Riddle asked whether Steinhoff remembered "Nick having blood on his clothes at all?"[313]  She said, "No.  I remember he changed clothes."[314]  Later, Andrews said, "Leah's DNA, in the car," to which Steinhoff responded, "She wasn't in the car when I had the car."[315]  After some discussion of other topics, Andrews said, "Just so you know, we own the car now.  And it's up at the crime lab right now, and it's being processed."[316]  Riddle interrupted to say "From stem to stern."[317]  The officers then asked about who she knew that drove the car, and Andrews said, "I'm trying to get a figure on who all was in that car because, um, we have DNA, you know, stuff from Leah, of course.  And then several other people.  And we're going to be comparing the -- what they call profiles, against that."[318]  Neither Andrews nor Riddle stated that Freeman's blood or DNA was found in the car.

### b.    Hormann's May 24, 2010, DNA report.

OSP forensic scientists had examined the Kia in February 2010.[319]  No blood was detected on a number of items taken from the Kia.  On six items, "Presumptive testing indicated the presence of blood on these items during vehicle processing."[320]  In other words, when Riddle

---

[311] That interview was recorded and the recording and a transcript of it were provided to McGuffin before trial.  See MCCREA_024948-25020 (transcript).

[312] MCCREA_024958.

[313] MCCREA_024959.

[314] Id.

[315] MCCREA_024961.

[316] MCCREA_024973.

[317] MCCREA_024973.

[318] MCCREA_024973-74.

[319] March 10, 2010, report (MCCREA_020963); March 25, 2010, report (MCCREA_020968).

[320] March 10, 2010, report (MCCREA_020963).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and Andrews interviewed Steinhoff in on March 4, they could have been aware that there was presumptive testing indicating blood in the Kia.

Those six items were analyzed for DNA by Hormann.   As mentioned earlier, on May 24, 2010, Hormann issued report of her DNA analysis of those items and other items (mostly beer cans).  DNA was detected from only one of those six items, a driver's seat cover, which was determined to be a mixture of at least four individuals, including male and female profiles.[321] Freeman, McGuffin, Oswald, and an alternative suspect were excluded as contributors.  One additional suspect, Shamblin, could neither be included nor excluded as a contributor.[322]

In short, the results were not notable, though they appeared to rule out blood in the Kia. The grand jury was told by Defendant Dannels that nothing of evidentiary significance found in the Kia.[323]  At trial, the parties stipulated that "there was nothing found in the Kia that implicated anyone in anything in this case."[324]  Neither jury was ever told that Freeman's DNA or blood was in the Kia.

### c.  The 2010 broadcast of ABC's "20/20"

At some point during the 2010 investigation, ABC's 20/20 was permitted to interview law enforcement and observe some of their work on the Freeman investigation.  Among other things, Hormann was interviewed and described some of the items that she tested.  She said nothing about the results.  The show's narrator reported, "No match."  Dannels, on air, said, "thought this was going to be Leah's blood, and of course, it wasn't."[325]  None of this implicates Hormann in any kind of fabrication.  Early in the broadcast, Dannels was interviewed and stated that Freeman's first shoe was found near the cemetery with blood on it the night Freeman

---

[321] May 24, 2010, report.  (MCCREA_020960)

[322] May 24, 2010, report at 2, 3 (describing lab Exhibit 52.2)

[323] GJ at 122-23 (Dannels testimony);

[324] Criminal Trial D7 43.

[325] Davis Decl. ¶ 39.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

disappeared.[326] This was incorrect, as the shoe that was found the night Freeman disappeared was her right shoe, which had no blood on it. The blood was on her left shoe.[327]

None of this suggests that Hormann fabricated any evidence. The 20/20 broadcast was not played for the jury. Plaintiffs can produce no evidence describing what "blood evidence" Hormann allegedly fabricated or how it allegedly resulted in McGuffin's indictment or conviction. Hormann is entitled to summary judgment on Plaintiffs' fabrication claim.

### 2. Hormann is entitled to summary judgment on Plaintiffs' Brady claim.

Hormann's alleged Brady violations are essentially the same as Krings' and Hormann's arguments are essentially the same too. However, Plaintiffs' allegation that Hormann withheld evidence about her "conversations with other Defendants, as well as police and prosecutors, about her DNA-related conclusions and attempts to avoid developing evidence that would exonerate McGuffin" warrants mention.

Beyond the conversation records already discussed, Plaintiffs identify two other documents in support of this allegation, emails from 2010 that were not provided to the defense.[328] The emails suggest that investigators were considering whether to perform a particular type of DNA testing on some hairs. In one email, Hormann advised the Coquille Police Department that finding hairs from people with whom Freeman frequently associated was unlikely to be of much probative value but that finding hairs from other people was likely, and that "This ends up giving the defense the bushy haired stranger they are looking for."[329] Hormann also described scenarios where this kind of trace analysis could be of great value.

---

[326] Davis Decl. ¶ 41.

[327] Wilcox Depo Ex. 18 at 1 (Wilcox's notes of the shoe exam); CT at D6 88, 91, 136 (Wilcox trial testimony).

[328] Plaintiffs' Response to Hormann's Interrogatory at 12.

[329] Hormann Depo Ex. 17.

Page 55 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Hormann then quotes some questions posed by an FBI agent about the potential value of the hairs, and then says, "Once we are able to answer the FBI's questions, we can proceed."[330]

This cannot credibly be deemed an effort to avoid developing evidence helpful to McGuffin. Advising another law enforcement agent about the potential consequences of requested forensic analysis, but then concluding with "we can proceed," would not have permitted any cross-examination that would have significantly impugned the caliber of the investigation.

None of Hormann's alleged Brady violations separately or in combination are sufficient to any question of fact that undermines confidence in the fairness or the outcome of McGuffin's trial. Hormann is entitled to summary judgment.

### D. Wilcox is entitled to summary judgment on Plaintiff's deliberate fabrication and Brady claims.

Beyond examining Freeman's shoes, Wilcox also examined McGuffin's Ford Mustang and the Thunderbird belonging to McGuffin's family in 2000, and she performed some other investigative work as will be discussed. Wilcox worked out of OSP's Coos Bay laboratory.[331] She retired in 2004 and did not do any investigative work or have any professional contact about the Freeman investigation between her retirement and 2011, when she received a subpoena testify at McGuffin's trial.[332]

### 1. Wilcox is entitled to summary judgment on Plaintiff's DNA-related claims for the same reasons as Krings and Hormann.

Plaintiffs' fabrication claims against Wilcox relate to the DNA analysis as well as other analytical work that Wilcox actually performed. Plaintiffs' DNA-related fabrication claims are similar to those of Krings and Hormann in that Plaintiffs allege that Wilcox fabricated evidence

---

[330] Id.

[331] Wilcox Decl. ¶ 1.

[332] Wilcox Depo. 81 Exhibit 119 page 2; Wilcox Decl. ¶ 1-2.

Page 56 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

that male DNA found on Freeman's left shoe was Oswald's Wilcox fabricated evidence that the only DNA on Freeman's right shoe was that of Freeman herself.[333]

These claims fail against Wilcox for all the same reasons they fail against Krings and Hormann, as well as other reasons.

These claims warrant additional discussion as asserted against Wilcox for an additional reason: Wilcox testified at trial, and is the only State Defendant who did so. The prosecution and defense had reached a stipulation that Krings' August 27, 2000, and January 21, 2002, DNA reports would be admitted, as the trial transcript reflects.[334] For the most part, Wilcox simply read the reports into the record, but she answered a few additional questions about those reports, without objection from McGuffin's counsel.[335]

To the extent that Plaintiffs attempt to hold Wilcox liable for reading the reports and attempting to answer questions about them at trial, Wilcox is entitled to testimonial immunity. Witnesses, including police officers, are absolutely immune from liability for testimony at trial.[336] Absolute witness immunity also extends to preparatory activities "inextricably tied" to testimony, such as conspiracies to testify falsely.[337] Pre-testimonial investigative work, such as evidence gathering and report writing, is generally not subject to testimonial immunity, and correspondingly, investigators' testimony about their investigative activities does not immunize those activities.[338] But in testifying about the DNA analysis, which the parties knew she had not performed herself and did not have the expertise to discuss, Wilcox was placed in the same position as any other witness who is charged with reading into the record, at the stipulation of the

---

[333] Plaintiffs' Responses to Wilcox's Interrogatories at 9-10 Exhibit 121 pages 9-11.

[334] Exhibit 107; CT Wilcox D6 90-94 Exhibit 102 pages 978-982; original trial Exhibits 207, 208, 210 Exhibit 107 pages 24-26 and 29-30

[335] CT D6 73-176 (Wilcox trial testimony) Exhibit 102 pages 961-1064.

[336] *Briscoe v. LaHue,* 460 U.S. 325, 345–46 (1983).

[337] *Franklin v. Terr,* 201 F.3d 1098, 1102 (9th Cir.2000).

[338] *See Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242-43 (9th Cir. 2015) (discussing).

Page 57 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

parties, a document that someone else wrote, namely that of an ordinary witness. There is no evidence that Wilcox herself controlled or influenced Krings' analysis or reporting, such that Krings' reports could be deemed to be Wilcox's investigative work, thus depriving Wilcox of immunity for testifying about those reports.

> **2.     Wilcox is entitled to summary judgment on Plaintiff's fabrication claims because her reports were not false and she is entitled to immunity for testimony that conflicted with them.**

The remaining fabrication claims against Wilcox are that: 1) her reports suggest that McGuffin was guilty of murder when Wilcox knew or should have known that he was innocent, 2) Wilcox fabricated evidence of blood on Freeman's right shoe found next to the cemetery across the street from the high school; 3) Wilcox fabricated evidence of "high velocity blood spatter" on the sole of Freeman's shoe, and 4) Wilcox fabricated evidence that McGuffin's car was wiped clean to cover up evidence of a crime.[339]

> **a.     Wilcox did not fabricate evidence of blood on the right shoe.**

In making this claim, Plaintiffs attempt to hold Wilcox liable for an obvious but understandable mistake she made in her paperwork. Wilcox examined both shoes and wrote a report. The report stated, as to the right shoe, "No blood was detected on this shoe." As to the left shoe, she reported, "A small amount of human blood was detected on the bottom of this shoe."[340] This report, and her analytical notes she took during her analysis, were provided to McGuffin attorneys before trial.[341] One page of her notes, which appears to be a handwritten draft of the report, has the same content as her final eventual report as to the blood.[342] The notes contain a handwritten diagram of the sole of a shoe labeled as "left shoe," which describes blood on the shoe sole, which is consistent with the report.[343] The next page of notes describe areas of

---

[339] Plaintiffs' Responses to Wilcox's Interrogatories at 10-11 Exhibit 121 pages 9-11.

[340] Wilcox Depo Ex. 18 at 1 Exhibit 119 page 20.

[341] Davis Decl. ¶ 41.

[342] Wilcox Depo Ex. 18 at 4 Exhibit 119 page 23.

[343] Wilcox Depo Ex. 18 at 5 Exhibit 119 page 24.

Page 58 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

each shoe tested with "phth," referring to phenolphthalein, a substance used to test for the presence of hemoglobin as a presumptive test for blood, which notes are consistent with the report.[344] The next few pages contain photographs of the left shoe and shoe sole from various angles; some photos contain annotations to assist with understanding what is depicted. One such annotation on the last page of note reads, "Right shoe – looking from heel towards front – sole only."[345]

That annotation, calling it the right shoe, was an obvious error, though one that is easy to make because the shoe curves as a right shoe would curve, except that it is upside down. It does not subject Wilcox to liability:

> [N]ot all inaccuracies in an investigative report give rise to a constitutional claim. Mere carelessness is insufficient, as are mistakes of tone. Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim. And fabricated evidence does not give rise to a claim if the plaintiff cannot show the fabrication actually injured her in some way.[346]

At trial, the actual testimony was consistent with the report as to which shoe had blood on it.[347] The diagram with the erroneous annotation was admitted at trial, and on cross-examination, McGuffin's counsel asked if the annotation was an error and Wilcox said "Oh, yes. That is bad."[348] This error was nothing more than mere carelessness, which Wilcox corrected when brought to her attention. As *Spencer* noted, such a trivial error cannot establish that Krings was an actual cause of Plaintiffs' harm.[349]

### b. Wilcox did not fabricate evidence of "high velocity blood spatter" on the left shoe.

---

[344] Wilcox Depo 121-22 Exhibit 119 pages 3-4, Ex. 18 at 5 Exhibit 119 page 24 .

[345] Wilcox Depo 121-22 Exhibit 119 pages 3-4 , Ex. 18 at 10 Exhibit 119 page 29.

[346] *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (cleaned up, internal citations and quotations omitted).

[347] Trial transcript at D6 88, 91, 136 Exhibit 102 pages 976, 979, 1025.

[348] Trial transcript at D6 85 Exhibit 102 page 973 (receiving the State's Ex. 31), 136 (Wilcox's correction) Exhibit 102 page 1025; McCrea Depo (Dec. 4, 2023) Ex. 9 Exhibit 120 page 9.

[349] *Spencer*, 857 F.3d at 798.

Page 59 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

There are two separate issues to this claim.  The first is whether the spots of the left shoe were actually blood.  The second is whether those spots were "high velocity blood spatter."

As to the first issue, Wilcox's report stated that a "small amount of human blood" was found on the bottom of the left shoe.  Her notes describe the six swabs she took from the areas that appeared to be blood on the shoes.[350]  There is some lack of clarity in the notes as to how many swabs were "phth" positive, and , whereas a different page shows there were four "phth" positive areas.[351]  Wilcox could not recall, in 2022, how many phenolphthalein tests she had done or on which swabs in 2000.[352]  She took a swab (swab #2) from one area, which she described as "'high' velocity (small) blood droplet on side of traction square," but her notes do not clearly indicate that she tested that one with phenolphthalein.  Her notes that for one of the swabs, swab #5, Wilcox touched it to several areas, tested it with phenolphthalein, and then used an "ABA card" as a confirmatory test for human blood.  A photo of the confirmatory test is included.[353]

Despite some minor lack of clarity, Wilcox's testing did clearly reveal the presence of human blood.  By taking one swab and touching it to several areas, we cannot be sure exactly which area or areas contributed the material that produced the positive tests.  At least of them did, perhaps more.  But there were only a few spots of blood and very small amounts from each, and Wilcox stated she was probably concerned about consuming too much of the evidence, because each confirmatory test irretrievably consumed some of the blood.[354]  Wilcox noted that from an investigative perspective—where she had areas that looked like blood, at least some of those apparent blood areas were phenolphthalein positive, and at least one of them was confirmed as blood, and a very small amount of remaining blood—in her training and experience

[350] Wilcox Depo Ex. 18 at 5 Exhibit 119 page 24.

[351] Wilcox Depo Ex. 18 at 5-6 Exhibit 119 pages 24-25.

[352] Wilcox Depo. 123-126; Wilcox Depo Ex. 18 at 5-6 124-128 and 142  Exhibit 119 pages 6-11.

[353] Wilcox Depo Ex. 18 at 5 Exhibit 119 page 24.

[354] Wilcox Depo. 147-49 Exhibit 199 pages 12-14  .

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

that justified reporting the result as blood.[355]  Her report stated only that a small amount of human blood was found.

The second issue has to do with whether the blood was "high velocity blood spatter." Wilcox's notes described one droplet as "'high' velocity (small) blood droplet."  At trial, on direct, Wilcox never described it as "high velocity blood spatter," instead calling it "blood spatter" and describing it as "little" or "small."[356]  Wilcox described that the size of blood droplets is related to the force that generated the droplets: "some force has to be involved, like a sneeze or a blow to something.  Usually something that's already bloody has to be hit to cause small droplets to come off."[357]  Wilcox did not offer any opinion what actually caused the blood droplets that she had observed.

It was actually McGuffin's attorney who asked Wilcox about whether there was a "high velocity blood droplet on the side of the traction square."[358]  Wilcox agreed with McCrea's description of blood spatter as blood that has "traveled through the air and lands on other surfaces."[359]  Wilcox gave various examples of what would be low, medium, and high velocity blood spatter.  McCrea got Wilcox to agree that an event that caused high-velocity spatter would be expected to cause small blood droplets to fly off in every direction, and likely land on other items, but that no other item with blood spatter had been found and indeed no blood had been found in the Mustang or the Thunderbird.[360]  But when McCrea asked whether Wilcox could express an opinion about what direction the blood spatter would have come or gone, Wilcox said

---

[355] Wilcox Depo. 147-49 ("If it looks like blood, and it's Phenolphthalein positive, and I have other areas that look like it nearby that are confirmed, it is blood in my report.") Exhibit 199 pages 12-14 .

[356] Criminal trial D6 86-88 Exhibit 102 pages 974-976.

[357] Criminal trial D6 88 Exhibit 102 page 976.

[358] Criminal trial D6 136-37 Exhibit 102 pages 1025-1026.

[359] Id.

[360] Criminal trial D6 137-40 Exhibit 102 pages 1026-1029.

Page 61 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

no.[361]  And on redirect, Wilcox was again clear that droplets of that size could have been caused by being hit with objects, being hit in the nose, coughing, or sneezing.[362]  Wilcox did not suggest any particular cause of the droplets.

Put simply, her testimony was of little consequence.  Wilcox did little to change the fact that investigators, which reasonably suspecting foul play, could not say caused Freeman's death or the blood on her shoe.  Wilcox is entitled to summary judgment on fabrication claims.

> **E.    Wilcox is entitled to summary judgment on Plaintiffs' Brady claims because she did not withhold material exculpatory evidence.**

Plaintiffs assert many of the same Brady claims against Wilcox they assert against Krings and Hormann.  Wilcox is entitled to summary judgment on those for the same reasons.[363]

As to distinct Brady claims against Wilcox, Plaintiffs assert Wilcox 1) withheld her knowledge that McGuffin's trunk was empty because of a gas leak and had not been wiped clean, 2) withheld her knowledge that the interior of McGuffin's car was dusty and had not been wiped clean, 3) withheld the fact the fact that she did not perform presumptive or confirmatory tests on the spot on the bottom of Freeman's shoe that had been reported as blood, 4) withheld the fact that her opinion of high velocity blood spatter was merely an observation and not a conclusion, and 5) withheld evidence about her conversations with other Defendants and police and prosecutors about her conclusions and her knowledge of evidence that was favorable to McGuffin.[364]

> **1.    The gas leak**

It was widely known that the gas tank in McGuffin's Mustang was damaged and leaked.  Of course, McGuffin knew about it because it was his own car, and that subject was discussed

---

[361] Criminal trial D6 169 Exhibit 102 page 1058.

[362] CT D6 172-174

[363] *See* Wilcox Decl. (generally denying any misconduct or awareness of misconduct by others).

[364] Plaintiffs' Response to Wilcox's Interrogatories at 21-23

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

repeatedly during trial.[365]  Plaintiffs' theory here is that it is Wilcox's knowledge of the gas leak that is somehow Brady material.  That theory appears to flow from the fact at trial, Wilcox testified that she was somewhat surprised that the trunk was empty.[366]  At deposition, Wilcox stated that she had been told later that perhaps things had been taken out of the trunk so the gas tank could be repaired, but she had not issued an amended report or otherwise formalize that information.[367]  Plaintiffs appear to contend that Brady required Wilcox to inform other officers and prosecutors, perhaps through a supplemental report, about the leaking tank.  Brady does not require this kind of ministerial work of officers.  Wilcox's report of her examination of the Mustang noted, "The car had dripped a small amount of gasoline."[368]  Wilcox told the operative facts in her report: she was aware the gas tank leaked.  There is no Brady violation.

### 2.    The interior of McGuffin's car had not been wiped clean.

Wilcox's report stated that there was some exterior dust on the Mustang, and the "interior surfaces did not appear to have been recently wiped clean."[369] Wilcox's transcription of her dictation device while examining the Mustang mentions there are "no signs of cleaning or of spatter on the seats or ceiling," and that the seats are a hard blue vinyl and that "they appear fairly clean."[370]  It is not clear whether that transcription was produced to the defense.  Plaintiffs grievance seems to be that at trial, Wilcox read into the record her report, including the "did not appear to have been recently wiped clean" passage.[371]  Just moments later, however, Wilcox explained why she did not do take lifts, which was because of the vinyl seating, "And it was

---

[365] CT at __.

[366] CT at 79 (Wilcox testifying, "No spare tire.  No trunk liner.  I remember when I opened it, I was going, like, "Wow."  There was just nothing.").

[367] Wilcox Depo. 109-115.

[368] Wilcox Depo. Ex. 7 at 1.

[369] Id.

[370] Id. at 8.

[371] CT D6 80-81.

Page 63 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

clean.  I mean it was wiped clean."[372]  Wilcox's testimony was perhaps confusing here, but she was making the point that the seats showed no signs of cleaning from the perspective of someone attempting to conceal something criminal, but also that the seats were clean from the perspective of doing tape lifts, a procedure to find hairs and other trace evidence, which Wilcox opined would not be useful on hard vinyl seating.  Again, Wilcox did not conceal anything exculpatory; if anything, having the transcribed notes would have enabled Wilcox to better explain what she meant.  And in any event, the Brady rule is intended to foster constitutional fairness, not manicured trial testimony or perfect conformance of internal thoughts with published reports.

### 3.    The presumptive and confirmatory testing of the Mustang and the "high velocity blood spatter."

This has already been discussed above as to fabrication claims.  It fairs no better as a Brady issue.  The defense had the notes that described what testing did on which droplets. Careful review of those notes, and perhaps a change in trial tactics, might have enabled a more effective cross-examination of Wilcox.  But the defense was aware of what it needed to know.

The second part of this is about the high velocity blood spatter.  At deposition, Wilcox answered that when she wrote "'high' velocity (small) blood droplet" in her notes, "it is in parenthesis because that was just a way to describe it.  I hadn't made a final determination about what I thought about this.  I was just taking notes as I worked."[373]  Plaintiffs appear to contend that Wilcox had withheld the "fact" of what she was doing when she wrote these notes, which was, just as she described, the simply taking notes as she worked.  These notes were available to the defense, and they were perfectly capable of asking Wilcox at trial (or before) and whether they suggest, as they appear to, that "'high' velocity (small) blood droplet" might mean something different than "high velocity blood spatter."  This is not a Brady violation.

### 4.    Wilcox's withholding of her conversations.

---

[372] CT D6 81.

[373] Wilcox Depo. 126-128.

Page 64 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Wilcox did not "withhold" her conversations with other investigators from the defense. *Brady* does not require an officer to produce everything they hear, particularly from other investigators who are doing the actual investigation and have their own obligations to write reports about their investigative activities. None of the materials Plaintiffs cited in support of this allegation have any material exculpatory or impeachment value, and their information is largely, such as Wilcox's handwritten notebooks of her general daily activities from 2000 or various pages of notes from meetings or conversations with other investigators. Wilcox did not violate Brady in any respect and is entitled to summary judgment.

**VII.    Defendant Riddle is entitled to summary judgment on Plaintiffs' deliberate fabrication and Brady claims.**

    **A.    Riddle is entitled to summary judgment on Plaintiffs' fabrication claims.**

Plaintiffs claim that Riddle fabricated evidence related to witnesses with whom he had contact, namely Brent Bartley, Scott Hamilton and Kristen Steinhoff.

        **1.    Riddle did not fabricate evidence about Bartley.**

Plaintiff claims that Riddle fabricated evidence that Bartley failed a polygraph. Plaintiffs point to what is essentially an internal weekly time sheet in which he stated that "Bartley's written statement, failed polygraphs and other actions indicate deception." OSP002395. Plaintiffs point to another document, notes from a Major Crimes Team (MCT) meeting on August 15, 2010, that says Bartley "Passed poly #1 - failed poly #2, wrt: knowledge and involvement." CPD000324). Bartley did in fact fail a polygraph, on July 27, 2000. (OSP 038036-38038, report of OSP polygrapher Mark Ranger). That Bartley had failed that polygraph was widely known. Riddle is not trained to administer polygraphs or interpret polygraph data, but he did recall reviewing some polygraph reports. (JR Depo 86:14-25, 87:1-2). It is unclear how Riddle fabricated anything here. Perhaps the argument is that Bartley failed only one polygraph but his internal time sheet refers to "failed polygraphs." It is very difficult to see how

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

an internally circulated time sheet could be fabricated "evidence" that caused Plaintiffs some kind of constitutional harm.

Plaintiffs also identify an email Riddle sent to Jodi Shimanek, an investigator with another law enforcement agency, on March 9, 2010, as support for their claim that Riddle fabricated evidence. The email relates to a different investigation, in which Shimanek is involved, and mentions possible follow-up involving Bartley's sister. (OSP002567). Riddle expresses what appears to be opinion about Bartley to a fellow law enforcement officer who *was not* involved in the investigation. (Depo 152:15-25). No evidence in the record supports a claim that Riddle's opinion, shared with an uninvolved investigator, that Bartley had information about Freeman's killer but would not share it had any bearing on the Freeman investigation.

## 2. Riddle did not fabricate evidence about Hamilton.

Plaintiffs accuse Riddle of fabricating evidence that McGuffin made incriminating statements during a January 28, 2010, pretext phone call with Hamilton. Riddle did not facilitate the pretext call, but he and another detective listened to the audio-recording and reviewed a transcript of the call. (JR rpt and Depo 103). After reviewing the call, Riddle documented his opinion of the call in his report, including an opinion that some of McGuffin's statements were inconsistent with commends you'd expect to hear from an innocent person. At his deposition, Riddle further explained why he formed the opinion that he did. (JR Depo, 103-129). Riddle's opinion is not evidence, and whether or documenting his opinion was the best investigative practice, there is no evidence that Riddle's opinion about this phone call had any impact on the Freeman investigation, much less actually caused Plaintiffs constitutional harm. Riddle's opinion, while it was not presented to the grand jury or trial jury, was shared with defense counsel. (find this). And because the phone call was audio-recorded, any investigator or prosecutor could listen and form their own opinions.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### 3.     Fabricated evidence of violence

Plaintiffs allege that Riddle fabricated evidence that Plaintiff was violent which resulted in Riddle pointing his gun at Plaintiff during his arrest. There is absolutely no evidence to support this allegation. Riddle participated, with others, in a felony car stop to arrest McGuffin after he was indicted and a warrant was issued for his arrest. He and some his colleagues performed a felony car stop in the arrest of Plaintiff for the crime of murder. In a felony stop, officers typically exercise a higher degree of caution due to the potential risk associated with the stop. This often involves the officer staying back, drawing their weapon, and using a loudspeaker to issue commands, especially if the stop is related to a serious crime like a murder. (JR declaration).

### 4.     Riddle did not fabricate evidence that McGuffin made statements about Freeman's head on a rock

Plaintiffs allege that Riddle fabricated an "informant statement" that McGuffin could see Freeman laying there and her head on a rock. Several witnesses told law enforcement that McGuffin made similar statements. In her 9/12/2000 interview with Officer Lee, Kristen Steinhoff described being told by Hamilton that McGuffin drove him to the spot where Freeman's body was found. She further reported that McGuffin told Hamilton about Freeman's head being on "that" rock. (Lee rpt., Coquille 00050). Bartley told Riddle that McGuffin told him, "I remember seeing her laying there and I couldn't do anything about it." Richard Bryant testified at the 2010 Grand Jury that he and McGuffin were in jail together several months after Freeman's disappearance. Bryant testified that McGuffin told him that he could "see her laying there and couldn't do anything to help her and I can't do anything about it." 2010 GJ, Bryant, pg. 8. Hamilton was interviewed on January 25, 2010, by Coquille PD Officers and stated that McGuffin drove them out to a specific location, where McGuffin pointed "approximately 15-20 yards off the road and down the hill by a rock." (McCrea, 022392). Scott Hamilton testified at the 2010 Grand Jury that he and McGuffin "walked back down the road a little bit where you can

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

look down in the ravine, and he kept talking weird about how he could see her laying down there by this rock. And he's – this certain boulder."  (GJ xript, pg. 38).

These statements were made by several witnesses in 2000 and 2010 to different law enforcement officers and grand juries.  Plaintiffs offer nothing to show how "fabricated" the informant statement, or that he knew or should have known that it was false.

### 5.      Steinhoff

Steinhoff was interviewed on multiple occasions by law enforcement in 2000, 2001 and 2002.  Riddle participated in two interviews of Kristen Steinhoff in 2010: March 4 and June 17. Plaintiff alleges that Steinhoff, a third party, was subjected to coercive interview techniques which Riddle knew or should have known would yield false information.  The evidence does not support the allegation.

What is required by *Devereaux* is an allegation or a showing that, "the interview techniques employed were so coercive and abusive that the interviewer knew or should have known that they would yield false information." *Devereaux* at 1077.  The circumstances under which aggressive questioning will be deemed so coercive or abuse that an officer knows or should know that they will produce false information depend on the circumstances, but the required level of culpability is that the conduct must shock the conscience. *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013).  But police officers "must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law… that indicates precisely where the line must be drawn." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1136 (9th Cir. 2009).  In *Devereaux*, the plaintiff alleged that investigators failed to interview possible child victims of sexual abuse in a particular way.  The plaintiff argued that repeatedly admonishing the children to tell the truth when they initially denied abuse then ultimately changed their story amounted to deliberate fabrication of evidence. The court pointed out that "interviewers of child witnesses of suspected sexual abuse must be permitted to exercise some discretion in deciding whether to accept initial denials at face value

Page 68 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
JBD/sv3/967533632

and when to reject them (or withhold judgment on them) and proceed further." *Id.* at 1077. The court ultimately held that Devereaux failed to show any evidence that the investigator knew or should have known the plaintiff was innocent and that the witness, having said that initially, was telling the truth. In *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003), the plaintiff claimed that Perez used "overbearing tactics in interviewing the children, which he knew would yield false information." The court rejected the claim: "Gausvik has only shown that Perez carelessly handled the facts and the investigation. He has not pointed to any facts showing Perez knew he was innocent." *Id.* In *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003), a related case, the court considered Perez's conduct with other child witnesses. "It is true that Perez kept questioning the daughters after they initially denied the sex abuse. Perez may have also told Jessica (victim) that she could not leave Pinecrest until she confessed to the abuse. Perez's conduct, while inappropriate, does not satisfy *Devereaux*. Cunningham must produce more than mere allegations that Perez used improper interview techniques." Id. at 812.

 Here, Plaintiffs allege that the March 4 and June 17, 2010, interviews coerced false evidence from Steinhoff. Asked to describe Steinhoff's false statements more specifically, Plaintiffs identified Steinhoff's statement that McGuffin changed his clothes between the times Steinhoff saw him the night Freeman disappeared, that McGuffin was driving two different cars when Freeman disappeared, and that McGuffin told her to keep his mouth stuff. The problem for Plaintiffs is that Steinhoff had made these same statements previously.

But Steinhoff had previously made statements that McGuffin had changed cars and clothes. Steinhoff described McGuffin driving two cars the night Freeman disappeared in a February 14, 2002, interview. (Coquille 000745-751). So did so again in a January 25, 2010, interview. (Looney rpt., Disc. 002141). During that interview, Steinhoff also reported that McGuffin had changed clothes between the times that she saw him that night. When Riddle and Andrews interviewed Steinhoff for the first time on March 4, 2010, and merely she reiterated her

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

previous statements about McGuffin's change of clothes and cars that night. (McCrea 024951-025019).

As to the statements by McGuffin to Steinhoff to keep her mouth shut, she had hinted clearly at that previously. Steinhoff was interviewed on September 12, 2000. Steinhoff described an incident the week before where Plaintiff and Ricky Crook scared her by taking her out to a remote location and sitting in silence. A few days later, Steinhoff saw Crook at a local market, and he asked her why she was telling the cops that he and McGuffin were involved in Freeman's disappearance. He threatened to push her mouth to the curb and kick the shit out of her. (Coquille 00848). In a September 17, 2000, interview, Steinhoff reiterated that McGuffin and Crook had taken her out to a remote location and sat there without saying a word. Steinhoff said that she was scared that something was going to happen to her, and she felt that her life was in great danger. (McCrea 015701). Steinhoff also hinted about threats in her interview January 25, 2010, interview, where she again described the McGuffin and Crook driving her out to some property about a month after Freeman went missing with a blowtorch and shotgun in the car. They told her not to talk to the cops and though they did not make an overt threat to her, she felt threatened. (Coquille 003514-3517).

At the March 4, 2010, interview, Steinhoff was apparently contacted at her home by Riddle and Andrews. After speaking to her for some period of time, she agreed to meet at the station for an interview. At the station, the investigators audio-recorded the interview, confirmed that Steinhoff was there voluntarily, advised her that she was not under arrest and could leave when she wanted. (JR Depo, Ex. 7). Steinhoff acknowledged this in the recording. The interview began at approximately 4:30pm and ended at 5:46 pm. During the interview, Steinhoff said that Plaintiff and Ricky (Crook) told her to "not to tell them anything else." (JR Depo, Ex. 7, 20:4-8). There was a break in the interview and Riddle left the room. Prior to leaving, he told Steinhoff that he forgot about something that he was supposed to ask her. When he returned, he asked Steinhoff if she had seen Plaintiff and Crook in a church parking lot. Steinhoff said yes, it

Page 70 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

happened the day before the grand jury. She further explained that Plaintiff was mad and told her "quit telling the cops stuff. Quit telling the cops that you seen me that night." (JR Depo, Ex. 7, 61-62).

During the June 17 interview, Steinhoff talked in more detail about the threat to keep her mouth shut. (McCrea 025022, 72-74). Steinhoff came to the police station to be polygraphed by Det. Mike Tabor with OSP. Det. Tabor read Steinhoff the Miranda warnings, which she acknowledged in writing. (OSP 037972). After the test, Steinhoff had a post-test interview with Tabor. She talked about seeing Plaintiff and Ricky Crook in a church parking lot on the day prior to her grand jury testimony in 2000. According to Steinhoff, Plaintiff told her to not to tell the cops anything, not even that she saw him that night. Steinhoff's successive statements are never more than a small increment away from any previous statement. At a minimum, they are not so obviously false that any reasonable investigator would know they were false. Again, determining witness credibility is precisely an area where investigators are to enjoy significant leeway, and for good reason. Plaintiffs cannot prevail on their Devereaux claims.[374]

### 6. Fabrication of a "false narrative" of Plaintiff's guilt

In support of this allegation, Plaintiff's interrogatory answer cites to the 10/15/2010 ABC News program "20/20" and the deposition of Riddle on May 2, 2022. This amorphous theory of fabrication is nearly impossible to respond to or defend against due to its breadth and lack of specificity. Plaintiffs can show no genuine issue of fact to support it.

### B. Riddle is entitled to summary judgment on Plaintiffs' *Brady* claims.

Plaintiffs' Brady claims against Riddle are that he suppressed evidence of his other misconduct and withheld his knowledge of gas or phone records that corroborate McGuffin's alibi. Plaintiffs cannot show any misconduct by Riddle, much less any evidence of affirmative

---

[374] Plaintiffs allege that in the March 4, 2010, interview of Steinhoff, Riddle fabricated evidence of Freeman's blood found in the borrowed Kia in which Steinhoff and Plaintiff rode the night Freeman disappeared. As discussed previously with regard to Hormann, this resulted in no fabricated evidence, and certainly none that was obviously false and Riddle knew or should have known they were false.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

efforts to hide t.  As to the gas or phone records, Plaintiffs point to an email from Defendant McNeely to the Major Crimes Team on February 5, 2010, in which McNeeley references Riddle finding "an old document from June 29, 2000, at 0212 am from Bruce McGuffin's gas card being used at the pumps off 42 by 42 S."  A invoice for Bruce McGuffin was disclosed to McGuffin's defense counsel showing a gas card purchase on that date and time. (McCrea 028352).  Plaintiffs also point to notes from a Major Crimes Team meeting on January 28, 2010, noting "previous subpoena records show only the 2244 call from Fast Mart payphone."  Records for a phone number belonging to McGuffin's father, showing a phone call at 2244 hours phone call were disclosed to McCrea. (McCrea 028351).  It is not clear what additional records ever existed or what Riddle had of them.  But Plaintiffs must show that Riddle had some kind of knowledge or role in suppressing something, and Plaintiffs cannot do so.

Plaintiffs also allege that Riddle suppressed records from a phone booth where Freeman was reportedly seen making a call the night she disappeared.  He cites notes from a February 5, 2010, Major Crimes Team briefing which refers to a witness interview of Thomas Bounds.  Bounds told the police that he believed he saw Freeman using a payphone "at the gas station" that night.  The notes also document that "Ray" was running down who had the payphone, "Barb" was running it down through tax records and "get the number for the booth."  (CPD 002172).  It is entirely unclear if the records or information described even exists or if Riddle had any role in identifying it or investigating it.  Plaintiffs cannot support their claims on such speculation.

Finally, Plaintiffs allege Riddle withheld or destroyed his field notebooks from the Freeman investigation.  At deposition, Riddle said that he kept a field notebook and that his practice was to include all his notes from the notebook into his written report. (Riddle 37:10-23).  Riddle also said that he expected his notes to be turned over to the DA's Office for discovery purposes. (Riddle 36:21-37:49).  Whatever the reason that Riddle's notebooks are no longer available, Plaintiffs cannot show there is likely any exculpatory in them.  That makes this claim

Page 72 -  STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

as speculative as the previous one.  Only if Plaintiffs can show some likelihood of favorableness and that Riddle destroyed the notebooks in bad faith can Plaintiffs recover.  *Youngblood*, 488 U.S. at 58.  They cannot do so.

**VIII.    The State Defendants are entitled to summary judgment on all of Plaintiffs remaining claims.**

      **A.    Plaintiffs cannot support any of their remaining federal claims.**

State Defendants respectfully move for summary judgment on plaintiffs remaining federal claims, for failure to intervene, conspiracy, destruction of exculpatory evidence, and violation of S.M.'s right to familial association.  The State Defendants were not aware of any violation of Plaintiffs' rights at any point and thus not fail to intervene.  The State Defendants did not make any unlawful agreement with any person, or take any overt acts toward accomplishing an unlawful agreement.  State Defendants did not destroy any exculpatory evidence.  And because they did not violate McGuffin's rights in any way, the did not violate S.M.'s either.

      **B.    Plaintiffs cannot support any of their remaining state claims.**

For the same reasons, State Defendants move for summary judgment on plaintiffs' remaining state claims.

State Defendants briefly address Plaintiffs' negligent training and supervision claim.  First, that claim fails because it is premised on OSP's alleged failure to train and supervise its employees, allegedly resulting in the deprivation of Plaintiffs' civil rights by OSP employees.  Because Plaintiffs cannot show any violation of their rights by any OSP employee, this claim fails.

Further, Plaintiffs' negligent training and supervision claim is barred by the statute of ultimate repose.  Pursuant to ORS 12.115(1), an action for "negligent injury to person or property" cannot be brought more than ten years from the date of the act.  The period of ultimate repose runs from the date of the act or omission complained of, regardless of when the damage resulted or when the act or omission was discovered.  *Cannon v. Dep't of Justice*, 288 Or. App.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

793, 798 (2017); *Catt v. Dep't of Human Servs*., 251 Or. App. 488, 508 (2012) ("Unlike the statute of limitations, the discovery rule does not toll the statute of ultimate repose, because it was intended to provide an overall maximum upper limit on the time within which a tort action could be brought, regardless of the date of discovery or of any other circumstances.").  A statute of ultimate repose establishes an "outer limit on the right to bring a civil action" which "reflect[s] a 'legislative judgment that a defendant should be free from liability after the legislatively determined period of time.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 144 S.Ct. 2440, 2452 (2024) (citations omitted).  Therefore, every allegation of negligence that occurred prior to July 20, 2010, is unequivocally barred by the statute of ultimate repose, regardless of when the damage resulted, and regardless of when the claim otherwise accrued.  To the extent that Plaintiffs claims seek to recover for any injury that accrued

IX.    **Conclusion**

For all of the reasons set forth above, the State Defendant are entitled to summary judgment in their favor against all of Plaintiff's claims for relief.

DATED January 7, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General

  *s/ Jesse B. Davis*
JESSE B. DAVIS #052290
Senior Assistant Attorney General
TODD MARSHALL #112685
Senior Assistant Attorney General
KRISTEN E. HOFFMEYER #085338
Senior Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Email: Jesse.B.Davis@doj.oregon.gov
        todd.marshall@doj.oregon.gov
        kristen.hoffmeyer@doj.oregon.gov

Of Attorneys for State Defendants Hormann, Krings, Riddle, Wilcox and Oregon State Police

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000