Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR 97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA 98145-1110
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br>    Plaintiffs,<br><br>  v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br>    Defendants. | Civil No. 6:20-cv-01163-MK<br>(Lead Case)<br><br><br><br><br>PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY WILCOX'S FIRST SET OF INTERROGATORIES |

Page 1– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
   WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

VIDOCQ SOCIETY,

                Cross-Claimant,

      v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

                Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

                Plaintiffs,

      v.

OREGON STATE POLICE,

                Defendant.

Civil Case No. 3:21-cv-01719-MK
(Trailing Case)

TO:     Defendant Kathy Wilcox and her counsel of record

## **GENERAL RESPONSE**

1.      Any statement that responsive documents or information will be provided is not a representation that any such documents or information exist.

2.      No documents or requested information that embody material that is private, business, confidential, proprietary, trade secret, or otherwise protected from disclosure will be produced without the prior entry of any appropriate protective order against unauthorized use or disclosure of such documents or information.

3.      All objections or other questions are reserved as to the competency, relevance,



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

materiality, privileged nature, or admissibility in evidence of any documents or information produced in this or any other action.

4.    The right to object to such other supplemental interrogatories as may be later propounded involving or relating to the same subject matter of these requests is reserved.

5.    This Response to Defendant Kathy Wilcox's First Set of Interrogatories is made to the best of Plaintiffs' knowledge, information, and belief.  This Response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of recollection, is subject to such further recollection and such additional knowledge and facts as may result from further discovery or investigation.  The right is reserved to make use of, or to introduce at any hearing and at trial, documents and information responsive to these requests for production located, discovered, or obtained subsequent to the date of this Response.

## GENERAL OBJECTIONS

1.    Plaintiffs object to the definitions and instructions set forth in Defendant Kathy Wilcox's First Set of Interrogatories to the extent they impose obligations beyond those set forth in the Federal Rules of Civil Procedure, including, but not limited to, any implication that the requests for production are "continuing" to any extent beyond the scope of FRCP 26.

2.    Plaintiffs object to the definitions in Defendant Kathy Wilcox's First Set of Interrogatories to the extent the definitions are inconsistent with FRCP 26 and 33, and to the extent that the definitions so expand the information requested that the requests are unduly burdensome.  *See Diversified Products Corporation v. Sports Center Co.*, 42 F.R.D. 3, 4 (D.C. Md. 1967).

3.    Plaintiffs object to any interrogatory to the extent it seeks or requires the production of any documents or information outside of Plaintiffs' possession, custody, or control.

///

Page 3– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
       WILCOX'S FIRST SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

4.      Plaintiffs object to any interrogatory to the extent that it seeks documents or information protected by the attorney-client privilege, work product doctrine, or FRCP 26.  Any inadvertent disclosure of such privileged documents or information is not to be deemed a waiver of any privilege with respect to such documents or information.

These General Objections are incorporated into each and every answer, response, and/or objection set forth below.

<div align="center">

**OBJECTIONS AND RESPONSES**

</div>

**INTERROGATORY NO. 1:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend any Defendant fabricated during the Investigation or Criminal Case.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

Page 4– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time each Defendant fabricated, lied, or withheld something. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that each Defendant fabricated, lied, or withheld something. Nonetheless, *see*, *e.g.*, Answer to Interrogatory No. 2. *See also* Plaintiffs' Response to Defendant City of Coquille's First Set of Interrogatories; Plaintiffs' Response to Defendant City of Coos Bay's First Set of Interrogatories; Plaintiffs' Response to Defendant Coos County's First Set of Interrogatories; Plaintiffs' Response to Defendant Susan Hormann's First Set of Interrogatories; Plaintiffs' Response to

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Defendant Mary Krings' First Set of Interrogatories; Plaintiffs' Response to Defendant John Riddle's First Set of Interrogatories.

In addition, officers and agents of Oregon State Police fabricated evidence that McGuffin, Brent Bartley, and Kristen Steinhoff failed polygraphs. (*See*, *e.g.*, Criminal Case Bates Nos. 000010–59, 005529–50, 008196–8207; OSP000053–56; OSP002631; OSP002767–69; OSP003045–48; CPD000324)

In addition, Plaintiffs cannot possibly state (or know) every single time Defendant Richard Walter fabricated, lied, or withheld something. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Walter fabricated, lied, or withheld something. Nonetheless, Plaintiffs contend that Defendant Walter's statements, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Walter knew, and should have known, that McGuffin was innocent. (*See*, *e.g.*, CPD000148–55; CPD002174; CPD020471; 2000-07-17 OSP Lab Report; OSPLab_002003–2018; KW000001–41; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Richard Walter; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Raymond McNeely; Civil Suit Deposition of Chris Webley)

As another example, Walter fabricated evidence that Freeman was pregnant at the time of her disappearance and McGuffin's motive was a fear of statutory rape charges. (*See*, *e.g.*, 2010-10-15 ABC News "20/20"; Civil Suit Deposition of Raymond McNeely)

As another example, Walter fabricated evidence of blood on Freeman's right shoe found next to the cemetery across the street from the high school. (*See*, *e.g.*, 2000-07-17 OSP Lab Report; OSPLab_002003–2018; KW000001–41; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of

///

Page 6– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Richard Walter; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher)

As another example, Walter fabricated evidence that Freeman was hit in the face, causing her mouth or nose to bleed. (*See*, *e.g.*, 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Richard Walter; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher)

As another example, Walter fabricated a profile of the killer to match McGuffin. (*See*, *e.g.*, VIDOCQ_000009–10; Civil Suit Deposition of Paul Frasier; Civil Suit Deposition of Richard Walter)

As another example, Walter fabricated a theory of guilt by process of elimination. (*See*, *e.g.*, CPD000148–55; CPD002174; CPD020471; 2010-10-15 ABC News "20/20"; Civil Suit Deposition of Chris Webley; Civil Suit Deposition of Mark Dannels)

As another example, Walter fabricated a false narrative of McGuffin's guilt and then unlawfully suppressed, withheld, or destroyed evidence of his knowledge of the falsity. (*See*, *e.g.*, 2010-10-15 ABC News "20/20"; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Richard Walter)

As another example, Walter fabricated his credentials to bolster the credibility of his investigation. (*See*, *e.g.*, Criminal Case Bates Nos. 005551–5614, 005646–5666)

Plaintiffs reserve the right to supplement this response.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving any objection, officers and agents of Oregon State Police fabricated evidence that McGuffin could neither be included nor excluded as a contributor of DNA to Lab Exhibit 1.3. (*See*, *e.g.*, OSPLab_001284–1293; OSPLab_001323; OSPLab_001411; OSPLab_001446–1449; OSP039967–39977)

///

///

///

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 2:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend Defendant Wilcox fabricated during the Investigation or Criminal Case.

      **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

      "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Wilcox fabricated, lied, or withheld something. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Wilcox fabricated, lied, or withheld something. Nonetheless, Plaintiffs contend that Defendant Wilcox's reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Wilcox knew, and should have known, that McGuffin was innocent. (*See*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; 2000-07-17 OSP Lab Report; 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSPLab_002003–2018; OSP000749; OSP000751; OSP002584–85; OSPLab_002792–2816; KW000001–41; KW000254; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil

///

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier).

For example, Wilcox fabricated evidence that male DNA found on Freeman's left shoe was that of Defendant Oswald, the deputy who found the shoe. (*See*, *e.g.*, 2000-07-17 OSP Lab Report; 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSPLab_002003–2018; OSP000749; OSP002584–85; KW000001–41; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier) As another example, Wilcox fabricated evidence that the only DNA on Freeman's right shoe was that of Freeman herself. (*See*, *e.g.*, 2000-07-17 OSP Lab Report; 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSPLab_002003–2018; OSP002584–85; KW000001–41; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier).

As another example, Wilcox fabricated evidence that McGuffin's car was wiped clean to cover up evidence of a crime. (*See*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; KW000001–41; KW000254; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mark Dannels)

MALONEY | LAUERSDORF | REINER, PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

As another example, Wilcox fabricated evidence of blood on Freeman's right shoe found next to the cemetery across the street from the high school. (*See*, *e.g.*, 2000-07-17 OSP Lab Report; OSPLab_002003–2018; KW000001–41; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Richard Walter; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher)

As another example, Wilcox fabricated evidence of "high velocity blood spatter" on the sole of Freeman's shoe. (*See*, *e.g.*, 2000-07-17 OSP Lab Report and bench notes; 2000-08-27 OSP Lab Report; OSPLab_002003–2018; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher)

Plaintiffs reserve the right to supplement this response.


**INTERROGATORY NO. 3:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend was obtained as a result of any Defendant allegedly "solicit[ing] false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero

v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

 "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

 The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

 **ANSWER:** Subject to and without waiving any objection, *see*, *e.g.*, Answer to

Interrogatory No. 1.



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 4:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend was obtained as a result of Defendant Wilcox allegedly "solicit[ing] false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see, e.g.*, Answer to Interrogatory No. 2.


**INTERROGATORY NO. 5:**  Describe with particularity the actions or omissions by which any Defendant allegedly "solicited false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of

MALONEY | LAUERSDORF | REINER ₚ
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 14 of 43 to
State Defendants' Motion for Summary Judgment

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

 "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

 The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

 <u>**ANSWER:**</u> Subject to and without waiving any objection, *see, e.g.*, Answer to

Interrogatory No. 1.



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 6:**  Describe with particularity the actions or omissions by which Defendant Wilcox allegedly "solicited false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:**    Plaintiffs object to this interrogatory on the grounds that it misstates the allegations in the Second Amended Complaint.  Plaintiffs further object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

> "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see*, *e.g.*, Answer to Interrogatory No. 2.


**INTERROGATORY NO. 7:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes exculpatory evidence that Plaintiffs contend any Defendant unlawfully suppressed, destroyed, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

"Contention interrogatories which 'systematically track all of the allegations in

Page 17– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero

v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

     "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

     The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

///



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 18 of 43 to
State Defendants' Motion for Summary Judgment

**ANSWER:**  Subject to and without waiving any objection, *see*, *e.g.*, Answer to Interrogatory No. 1.

In addition, Plaintiffs cannot possibly state (or know) every single time Defendant Richard Walter fabricated, lied, or withheld something.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Walter fabricated, lied, or withheld something.  Nonetheless, Plaintiffs contend that Defendant Walter's statements, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Walter knew, and should have known, that McGuffin was innocent.

As another example, Walter unlawfully suppressed, withheld, or destroyed evidence of the misconduct described in Interrogatory No. 1 above.

As another example, Walter unlawfully suppressed, withheld, or destroyed evidence of his conversations with the other Defendants, as well as police and prosecutors, about his conclusions and his attempts to encourage charges against McGuffin.  (*See*, *e.g.*, VIDOCQ_000009–10; Civil Suit Deposition of Paul Frasier; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Craig Zanni; Civil Suit Deposition of Richard Walter)

As another example, Walter unlawfully suppressed, withheld, or destroyed evidence about the extent of his and Vidocq's involvement in the Freeman investigation.  (*See*, *e.g.*, VIDOCQ_000009–10; Civil Suit Deposition of Paul Frasier; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Craig Zanni; Civil Suit Deposition of Richard Walter)

As another example, Walter conspired with the other Defendants to suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Walter knew, and should have known, that McGuffin was innocent.  (*See*, *e.g.*, documents listed above)

Plaintiffs reserve the right to supplement this response.

///



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 19 of 43 to
State Defendants' Motion for Summary Judgment

**INTERROGATORY NO. 8:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes exculpatory evidence that Plaintiffs contend Defendant Wilcox unlawfully suppressed, destroyed, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Wilcox fabricated, lied, or withheld something.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Wilcox fabricated, lied, or withheld something.  Nonetheless, Plaintiffs contend that Defendant Wilcox's reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Wilcox knew, and should have known, that McGuffin was innocent. (*See*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; 2000-07-17 OSP Lab Report; 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSPLab_002003–2018; OSP000749; OSP000751; OSP002584–85; OSPLab_002792–2816; KW000001–41; KW000254; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier).

For example, Wilcox unlawfully suppressed, withheld, or destroyed evidence of the misconduct described in response to Interrogatory No. 2. As another example, Wilcox unlawfully suppressed or withheld evidence of DNA from an unidentified male on Freeman's right and left shoes. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000749; OSP002584–85; KW000001–41; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier).

As another example, Wilcox withheld her knowledge that the trunk of McGuffin's car was empty because of a gas leak and had not been wiped clean. (*See*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; KW000254; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mark Dannels).

As another example, Wilcox withheld her knowledge that the interior of McGuffin's car was dusty and had not been wiped clean. (*See*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; KW000001–41; KW000254; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mark Dannels).

As another example, Wilcox withheld the fact that she did not perform presumptive or confirmatory tests on the spot on the bottom of Freeman's shoe that Wilcox and Krings reported as blood. (*See*, *e.g.*, 2000-07-17 OSP Lab Report; 2000-08-27 OSP Lab Report;

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

OSPLab_002003–2018; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mary Krings)

As another example, Wilcox withheld the fact that her opinion of "high velocity blood spatter" was merely an observation and not a conclusion.  (*See*, *e.g.*, 2000-07-17 OSP Lab Report; OSPLab_002003–2018; Civil Suit Deposition of Kathy Wilcox).

As another example, Wilcox withheld evidence about her conversations with the other Defendants, as well as police and prosecutors, about her conclusions and her knowledge of evidence that would exonerate McGuffin.  (*See*, *e.g.*, KW000001–41; KW000254; OSP000749; CPD000331; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Kristine Karcher).

Plaintiffs reserve the right to supplement this response.


**INTERROGATORY NO. 9:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes impeachment evidence that Plaintiffs contend any Defendant unlawfully suppressed, destroyed, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

"Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

Page 23– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 23 of 43 to
State Defendants' Motion for Summary Judgment

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see*, *e.g.*, Answer to

Interrogatory No. 7.

Page 24– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES



**INTERROGATORY NO. 10:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes impeachment evidence that Plaintiffs contend Defendant Wilcox unlawfully suppressed, destroyed, tampered with, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

     **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

     "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see*, *e.g.*, Answer to Interrogatory No. 8.


**INTERROGATORY NO. 11:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that constitutes "fabricated blood evidence on Freeman's right shoe that did not exist," as alleged in the Second Am. Compl. ¶ 182(c).

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

Contention interrogatories which ask the respondent to systematically recite
"all facts" in support of that party's contention are generally disfavored.
"Contention interrogatories which 'systematically track all of the allegations in

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

      "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

      The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 27 of 43 to
State Defendants' Motion for Summary Judgment

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time each Defendant fabricated, lied, or withheld evidence.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that each Defendant fabricated, lied, or withheld evidence.  Nonetheless, *see, e.g.*, 2000-07-17 OSP Lab Report; OSPLab_002003–2018; 2010-10-15 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mark Dannels; Civil Suit Deposition of Richard Walter.


**INTERROGATORY NO. 12:**  Describe with particularity actions or omissions by which Defendant Wilcox "fabricated blood evidence on Freeman's right shoe that did not exist," as alleged in the Second Am. Compl. ¶ 182(c).

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see, e.g.*, Answer to Interrogatory No. 11.

**INTERROGATORY NO. 13:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that constitutes "fabricated evidence that the car had been wiped clean when it had not." Second Am. Compl. ¶ 182(d).

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act"

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

     "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

///



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time each Defendant fabricated, lied, or withheld evidence. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that each Defendant fabricated, lied, or withheld evidence. Nonetheless, *see*, *e.g.*, 2000-07-06 OSP Lab Report and bench notes; OSPLab_2003–2018; KW000254; 2010-10-15 ABC News "20/20"; 2020-02-28 ABC News "20/20"; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Mark Dannels.

**INTERROGATORY NO. 14:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each action or communication that plaintiffs contend support their assertion that Defendant Wilcox reached an agreement with any other defendant to frame McGuffin for Freeman's abduction and murder, as alleged in in the Second Am. Compl. ¶ 244.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

///



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Wilcox conspired with the other Defendants.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Wilcox conspired with the other Defendants.  Nonetheless, *see*, *e.g.*, Answer to Interrogatory Nos. 1, 2, 7, 8, 11, and 13.  *See also*, *e.g.*, OSP000749; Coquille 007393; OSP000746–748; CPD000148–155; CPD000302–339; CPD002092–2113; CPD002124–75; CPD002177–78; CPD020445–20580; CPD020646–47.

**INTERROGATORY NO. 15:**  Describe with particularity the "overt acts" and the "joint activity" in which Defendant Wilcox was allegedly "an otherwise willful participant," as alleged in support of plaintiffs' conspiracy claims in the Second Am. Compl. ¶ 247.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

Page 33– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 2, 7, 8, 11, 12, 13, and 14.

**INTERROGATORY NO. 16:** Describe with particularity the actions or omissions by which any defendant "conceal[ed] their misconduct" and describe with particularity the misconduct that was concealed, as alleged in the Second Am. Compl. ¶ 296.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act"

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

///



MALONEY | LAUERSDORF | REINER ᴾᶜ
ᴬᵀᵀᴼᴿᴺᴱᵞˢ ᴬᵀ ᴸᴬᵂ
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 35 of 43 to
State Defendants' Motion for Summary Judgment

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 2, 7, 8, 11, 12, 13, and 14.

**INTERROGATORY NO. 17:** Describe with particularity the actions or omissions by which Defendant Wilcox allegedly "conceal[ed] [her] misconduct" and describe with particularity the misconduct that was concealed, as alleged in the Second Am. Compl. ¶ 296.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 121  Page 36 of 43 to
State Defendants' Motion for Summary Judgment

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 2, 8, 12, 13.

**INTERROGATORY NO. 18:**  Describe with particularity the actions or omissions by which Defendant Wilcox "targeted" or "harassed" McGuffin as alleged in the Second Am. Compl. ¶¶ 86, 90, 98, 171.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

 **ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 2, 8, 12, 13, and 14.

 **INTERROGATORY NO. 19:**  Describe with particularity the instances in which Defendant Wilcox deliberately disseminated fabricated and false information to the news media and the manner in which Defendant Wilcox did so, as alleged in the Second Am. Compl. ¶¶ 171, 190.

 **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

Page 39– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 2, 7, 8, 11, 12, 13, and 14.

**INTERROGATORY NO. 20:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, all instances of misconduct by Defendant Wilcox of which Plaintiffs complain in this case not otherwise described in response to these Interrogatories.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Contention interrogatories which ask the respondent to systematically recite

"all facts" in support of that party's contention are generally disfavored.

"Contention interrogatories which 'systematically track all of the allegations in

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

Page 41– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY
WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 2, 7, 8, 11, 12, 13, and 14.

**INTERROGATORY NO. 21:**  Identify each expert witness who has expressed any opinion relating to any alleged misconduct of Defendant Wilcox for which Plaintiffs complain in this litigation, and for each such expert: a) identify each opinion expressed; b) provide a statement of the basis of support for each opinion expressed; c) identify the information considered by the expert witness in forming each opinion expressed; d) identify the qualifications of the witness as an expert witness; e) identify the publications if any authored by the witness; f) identity the specific text portions from each authoritative writing which were relied upon by the witness in formation  of the opinions expressed; and g) provide a list of all cases in which the witness has testified as an expert at trial or by deposition.

**OBJECTIONS:**  Plaintiffs object to this interrogatory as premature and in violation of the Court's order on expert disclosures.  Plaintiffs further object to this interrogatory to the extent that it imposes obligations beyond the scope of Fed. R. Civ. P. 26(a)(2) and Fed. R. Civ. P. 33(a)(1).

**ANSWER:**  *See* Objections.

DATED:  August 12, 2024

MALONEY LAUERSDORF REINER PC

By /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail:  jcp@mlrlegalteam.com
    Andrew C. Lauersdorf, OSB #980739
    E-Mail:  acl@mlrlegalteam.com

Page 42– PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY WILCOX'S FIRST SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, the foregoing PLAINTIFFS'

SUPPLEMENTAL RESPONSE TO DEFENDANT KATHY WILCOX'S FIRST SET OF

INTERROGATORIES was served on the following parties at the following address by sending

to them a true copy thereof via the method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>*Attorneys for Defendants*<br>*City of Coquille, City of Coos Bay, Coos*<br>*County, Craig Zanni, Chris Webley, Eric*<br>*Schwenninger, Sean Sanborn, Ray McNeely,*<br>*Kris Karcher, Pat Downing, Mark Dannels,*<br>*Kip Oswald, Michael Reaves, David Zavala,*<br>*Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>*Attorneys for Defendants Oregon State*<br>*Police, John Riddle, Susan Hormann,*<br>*Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>Rachel Jones<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>rjones@hwslawgroup.com<br>*Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br><br>Laura E. Coffin<br>Coffin Law<br>541 Willamette Street, Ste. 211<br>Eugene, OR 97401<br>lauracoffin@coffin.law<br>*Attorneys for Defendant Richard*<br>*Walter* |

☒ by emailing to each of the foregoing a copy thereof to the email address above.

MALONEY LAUERSDORF REINER PC

By  /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail:  jcp@mlrlegalteam.com

Attorneys for Plaintiffs

Page 1– CERTIFICATE OF SERVICE



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417



Exhibit 122  Page 1 of 3 to
State Defendants' Motion for Summary Judgment



STATE'S
EXHIBIT

Exhibit 122  Page 2 of 3 to
State Defendants' Motion for Summary Judgment



STATE'S
EXHIBIT

Exhibit 122  Page 3 of 3 to
State Defendants' Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf Of S.M., a minor, | ) Civil No.<br>) 6:20-cv-01163-<br>) MK<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | )<br>) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVE HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants.<br>_____ | )<br>) |

DEPOSITION OF SUSAN HORMANN

Taken in behalf of Plaintiffs

May 06, 2022

* * *

Exhibit 123 Page 1 of 17 to
State Defendants' Motion for Summary Judgment

```
 1    A.  Yes.

 2    Q.  Once you transferred into the DNA unit, did you

 3  receive a different title other than criminalist?

 4    A.  No.

 5    Q.  Did your title as criminalist continue until the

 6  time that you left Oregon State Police?

 7    A.  No.

 8    Q.  At what point did your title change?

 9    A.  In 2008 I became the DNA Unit Supervisor.

10    Q.  What did that work involve?

11    A.  That was overseeing the DNA unit and the

12  analysts in that unit; you know, budget, operations,

13  supervision of employees.

14    Q.  Were you also doing DNA work, or were you on the

15  management end?

16    A.  There was a transition time where I was still

17  doing some, but not very much DNA work.

18    Q.  How long was that transition time?

19    A.  Probably until 2010.  Through 2010 probably.

20    Q.  After 2010, or sometime in 2010, were you the

21  DNA Unit Supervisor exclusively?

22    A.  During that transition time, 2010, I took a

23  temporary position as Operations Manager at the Salem

24  General Headquarters, so it was -- I sort of had both

25  hats on for a little while.
```

Exhibit 123 Page 2 of 17 to
State Defendants' Motion for Summary Judgment

Page 32

1    Q.  Do you remember when that was in 2010?

2    A.  No, I don't remember the specific dates.

3    Q.  So I'm trying to understand when your work on

4    DNA testing stopped and you transitioned into the

5    management role.

6        Do you have estimates of when that was?

7    A.  I would say I was fully transitioned out by

8    August of 2011 when I took the operations positions

9    full time.

10   Q.  Before you took that operations position and

11   transitioned into the management end of things, did you

12   report to someone on your DNA work?

13   A.  Yes.  There was a technical leader and I had a

14   supervisor at the laboratory.

15   Q.  Who was your technical leader?

16   A.  Marla Kaplan was the technical leader during the

17   period of time from -- I'm not sure when she started,

18   but at the end of my DNA career.  Earlier on the

19   technical leaders were Cecelia Von Beroldingen, Phil

20   Kinsey, and Terry Coons.

21   Q.  And now is as good a time as any.  I know that

22   our court reporter has been looking for this spelling

23   of Cecelia's last name, and maybe you can help us with

24   that.

25       Do you know how to spell Cecelia's last name?

Exhibit 123 Page 3 of 17 to
State Defendants' Motion for Summary Judgment

1    A.  No.  Beth was earlier.  I don't recall when she

2    retired, but Tom took her place after she retired.

3    Q.  And I know you mentioned that you at some point

4    left the Oregon State Police, and I may have written it

5    down.  Can you remind me with you left the Oregon State

6    Police.

7    A.  February of 2016.

8    Q.  Why did you end up leaving the Oregon State

9    Police?

10   A.  I retired.  I was eligible for retirement, and I

11   took another job.

12   Q.  Where did you go after Oregon State Police?

13   A.  Multnomah County District Attorney's office.

14   Q.  What was your title there?

15   A.  Forensic Consultant.

16   Q.  Did that role have a job description with it?

17   A.  It was reviewing forensic results from a private

18   laboratory, and advising and reviewing sexual assault

19   reports, and working with the -- it was a grant

20   position working with the assigned attorney.

21   Q.  So you were working with the prosecutors on

22   individual cases --

23   A.  Yes.

24   Q.  -- and as a consultant?

25   A.  Yes.

Exhibit 123 Page 4 of 17 to
State Defendants' Motion for Summary Judgment

1    A.  Yes.

2    Q.  When you did your work in the Freeman case in

3    2010, did you reinterpret the data from the testing of

4    the cutting from Ms. Freeman's shoes that was done in

5    2000?

6    A.  I don't have any independent recollection of the

7    analysis, but reviewing, you know, the stuff that you

8    have provided for the deposition today, it does not

9    appear that I did any reinterpretation of that

10   evidence.

11   Q.  You knew that cuttings had been tested back in

12   2010 when the case first came to the Oregon State

13   Police lab, though, correct?  Because you were the

14   technical reviewer on that work, right?

15   A.  Yes.  From reviewing this, I can see that I was

16   technical reviewer on that.  Once again, I don't have

17   any recollection of doing that technical review.

18   Q.  Did you tell the prosecutor that the lab's

19   policy had changed in 2010 and the interpretation

20   threshold had dropped to 100?

21   A.  I don't know.

22   Q.  Did you tell the prosecutor that the lab could

23   reinterpret data if there was information that was, at

24   the time, not interpreted because it was within the 50

25   to 150 range?

Exhibit 123 Page 5 of 17 to
State Defendants' Motion for Summary Judgment

1    A.   Instead of technical reviewer, then it's changed

2    to technical review.  That's the same thing.

3    Q.   Okay.  Is there some kind of documentation that

4    the technical reviewer then fills out as well?

5    A.   Yes.  At the very front of the case file, you

6    would put your initials and a date in the part where it

7    says technical reviewer.  I don't know if that always

8    was the case, but there was a form at the very back of

9    the case file saying that you had completed the case

10   review, is my recollection.  And I believe I saw that

11   in review of the case file.

12        So on, like, SWS000275 it says STR case

13   completion sheet, and then at the bottom is the

14   technical reviewer's initials and date.

15   Q.   I'll just share my screen here.

16        (Exhibit No. 8 marked for identification.)

17   Q.   I'm showing you what I have marked as Exhibit 8,

18   just so you can see it here.  It's the August 27th,

19   2000 report in the Freeman case that Ms. Krings

20   authored here.  If I scroll all the way to the bottom

21   of the bench notes, I see this STR case completion

22   sheet at page 160 of the PDF.

23        Is this the form that you're talking about?

24   A.   Yes, it is.

25        MR. DAVIS:  What exhibit is that, Counsel?

Exhibit 123 Page 6 of 17 to
State Defendants' Motion for Summary Judgment

     1          MS. PURACAL:  Exhibit 8.

     2     Q.  Is there any other documentation of the

     3     technical review process that happens?

     4     A.  Yes.  As you notice there under peer review

     5     technical review in LIMS, so laboratory information

     6     system, there would've been some documentation in that

     7     computer system.

     8     Q.  What does that documentation look like?

     9     A.  It just -- when you pulled up those individual

    10     requests, there's different -- there's what we call

    11     different milestones, is my recollection, that if

    12     someone pulled up that particular case, they could see

    13     either that the case was still being analyzed or that a

    14     report had been sent out, and then you could also mark

    15     that it had been technically reviewed and document that

    16     in the LIMS system.

    17     Q.  So is that a check box?

    18     A.  I don't know how -- I don't recall what it

    19     looked like.

    20     Q.  Is there anything -- is there any documentation

    21     about the technical review process that would show us

    22     if the technical reviewer had any notes or comments for

    23     the original analyst?

    24     A.  Not that I remember, no.

    25     Q.  If the technical reviewer disagreed with

Exhibit 123 Page 7 of 17 to
State Defendants' Motion for Summary Judgment

```
 1                  C E R T I F I C A T E

 2   STATE OF OREGON       )

 3                         ) ss.

 4   COUNTY OF MULTNOMAH   )

 5

 6        I, Amanda K. Fisher, a Certified Shorthand

 7   Reporter, do hereby certify that, pursuant to

 8   stipulation of counsel for the respective parties

 9   hereinbefore set forth, SUSAN HORMANN remotely appeared

10   before me at the time and place set forth in the

11   caption hereof; that at said time and place I reported

12   in Stenotype all testimony adduced and other oral

13   proceedings had in the foregoing matter; that

14   thereafter my notes were reduced to typewriting under

15   my direction; and that the foregoing transcript, pages

16   1 to 137, both inclusive, constitutes a full, true and

17   accurate record of all such testimony adduced and oral

18   proceedings had, and of the whole thereof.

19        Witness my hand and stamp at Portland, Oregon,

20   May 17, 2022.

21

22                     _____

23                     AMANDA K. FISHER
                       CSR No. 3229
24

25
```

Stumptown Steno
503.888.1416

CASE NAME:  McGuffin et al v. Dannels et al
DEPONENT: Susan Hormann

| Page: | Line: | Reason: | Correction: |
|-------|-------|---------|-------------|
| 35 | 2 | | replace "2019" with "2020" |
| 35 | 4 | | replace "Yes" with "2020" |
| 103 | 6 | | replace "Washington County" with "working" |

State of Oregon
Washington County

I hereby certify that I have read the deposition taken on May 06, 2022, and that this deposition, together with any corrections or additions, is a true and accurate record of my testimony.

*Susan Hormann*

Susan Hormann

Subscribed and sworn to before me under the penalties of perjury, this _2nd_ day of _June_ 20 _22_

*Jill Reimer Getzendaner*

Notary Public for the State of _Oregon_ .
My commission expires: _9/29/2025_ .

OFFICIAL STAMP
JILL REIMER GETZENDANER
NOTARY PUBLIC - OREGON
COMMISSION NO. 1017463
MY COMMISSION EXPIRES SEPTEMBER 29, 2025



**Oregon**
John A. Kitzhaber, M.D., Governor

**Department of State Police**
**Forensic Laboratory**
1111 S.W. 2nd Avenue, 12th Floor
Portland, OR 97204-3258
(503) 229-5017
FAX (503) 229-6638

August 27, 2000

Coquille Police Department
99 E. 2nd Street
Coquille, Oregon 97423

**Attention: David Hall**

FREEMAN, LEAH (VICTIM)
Agency Case 00-1905
Lab No. 00N-481

Please refer to previous report(s) by Kathy Wilcox.

**SUMMARY: The tennis shoes and blood on the shoes match Leah Freeman. Leah Freeman is excluded as the contributor of the major profile in the mixture from Exhibit #11 (white sock). Leah Freeman is excluded as the contributor of the profile from Exhibit #12 (Adidas sock).**

On July 18, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 1:      One Nike tennis shoe, right. Cuttings were taken and labeled 1.1-1.3.
Exhibit 2:      One Nike tennis shoe, left. Cuttings were taken and labeled 2.2-2.4.
   Exhibit 2.1.1-2.2.6: Swabs from blood on left shoe sole.  DNA analysis was performed on Exhibits 2.1.2 and 2.1.4.
Exhibit 4:      Toothbrush from Leah Freeman used as secondary standard.

On July 25, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 9:      Oral standard from Corliss Courtright.
Exhibit 10:     Oral standard from Dennis Freeman.

On August 3, 2000, this laboratory received sealed from the Coos Bay Laboratory via UPS the following:

Exhibit 11:     One white sock. Cuttings were taken and labeled 11.1 and 11.2.

On August 16, 2000, this laboratory received sealed via Danny Burgard the following:

Exhibit 12:     One Adidas anklet sock. Cuttings were taken and labeled 12.1-12.3. DNA analysis was performed on Exhibit 12.3. Trace evidence was collected, but not examined at this time.



**DEPO EXHIBIT**
Hormann 2022-05-06
**8**

SWS000005

Exhibit 123 Page 10 of 17 to

CONFIDENTIAL

State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 2

DNA from the above items was extracted, amplified and typed at the amelogenin locus and the STR loci listed below by capillary electrophoresis, using the AmpFISTR Profiler Plus and COfiler PCR amplification kits:

| Profiler Loci | COfiler Loci |
|---|---|
| D3S1358 | D3S1358 |
| vWA | D7S820 |
| FGA | D16S539 |
| D8S1179 | TH01 |
| D21S11 | TPOX |
| D18S51 | CSF1PO |
| D5S818 | |
| D13S317 | |
| D7S820 | |

**CONCLUSIONS:**

1.    The DNA profile from Exhibit 1 (right Nike shoe) and Exhibit 2.1.2 (swab from blood on left sole) matches the DNA profile from Leah Freeman (Exhibit 4). The frequency of occurrence of an unrelated individual in a random population exhibiting this STR profile is less than 1 in 10 billion in Caucasians, Hispanics and African-Americans.

2.    The DNA profile from Leah Freeman's toothbrush is consistent with coming from a child of Corliss Courtright (Exhibit 9) and Dennis Freeman (Exhibit 10).

3.    The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more than one person. The major profile is consistent with coming from Leah Freeman. The minor profile is from a male.

4.    The DNA profiles from Exhibit 11 (white sock) indicates the presence of DNA from more than one person. Leah Freeman is excluded as the contributor of the major profile in this mixture. The minor profile is below the threshold for making a conclusive determination.

5.    Leah Freeman is excluded as the contributor to the DNA profile from Exhibit 12.3 (Adidas sock). The profile is from a male. This profile has been compared to profiles stored in the Oregon State Police databases. No matches were found at this time. This profile will be stored and periodically compared to said databases, as new samples continue to be received. Should a future match be found, you will be notified at that time.

The population frequencies are calculated from the allele frequencies found in the FBI STR databases published in the Journal of Forensic Sciences (JFSCAS 44(6)(1999)).

SWS000006

CONFIDENTIAL

Agency Case No. 00-1905
Lab No. 00N-481
August 27, 2000
Page 3

Evidence will be returned at the earliest convenience.

Mary H. Krings, Forensic Scientist
5931-90

MHK:mhk

cc:  Coos County District Attorney
     OSP Forensic Laboratory, Coos Bay

CONFIDENTIAL

l middle

OREGON STATE POLICE

**FORENSIC SCIENCES REQUEST**

☐ Crime Laboratory
☐ Latent Prints
☐ Questioned Documents

*Referral*

**RUSH**

EVIDENCE RECEIPT

(TYPE OR USE BLACK BALL POINT PEN ONLY — INSTRUCTIONS ON BACK)

LABORATORY CASE NO.

OON-481

INCIDENT #

Page _____ of _____

☐ NEW CASE    ☐ ADDITIONAL EVIDENCE TO THE LAB    ☐ ADDITIONAL SUSPECT(S) INFO.

| | | (1) Agency Name | (2) County of Venue | (3) Date Occurred | (4) NCIC No. (ORI) | (5) Agency Case No. |
|---|---|---|---|---|---|---|
| A G E N C Y   D A T A | | Coquille P.D. | Coos | 06-28-00 | | OO-1905 |
| | | (6) Incident Type(s) (Offense) Missing Person | | | (7) Breath Test Given  Yes ☐   No ☐ | |

| | | (8) V DE / S ME | (9) NAME | | | RACE SEX | D.O.B. | SID # |
|---|---|---|---|---|---|---|---|---|
| | V DE | | Last: Freeman | First: ~~Leah~~ KW / Leah | Middle | W F | 10 mo. 29 day 84 yr. | |
| | V DE | | Last | First | Middle | RACE SEX | mo. day yr. | SID # |
| | V DE | | Last | First | Middle | RACE SEX | mo. day yr. | SID # |
| | V DE | | Last | First | Middle | RACE SEX | mo. day yr. | SID # |
| | V DE | | Last | First | Middle | RACE SEX | mo. day yr. | SID # |

| (10) Signature of Investigating Officer | (11) Printed Name of Investigating Officer   Comm. # | (12) Phone Number of Investigating Officer |
|---|---|---|
| | David Hall | 541-396-2114 |

| (13) Lab Exhibit Number | (14) Agency Exhibit Number | (15) Signature of Submitting Officer | (16) Printed Name of Submitting Officer   Comm. # | (17) Date |
|---|---|---|---|---|
| | | *Kathy S. Wilcox* | Kathy S. Wilcox | 7/17/00 |
| | | (18) Description of Evidence | (19) Examination Requested | |
| 1 | 160 | Rt. Nike Shoe | DNA | |
| 2 | 170 | Lt. Nike Shoe | DNA | |
| 2-1 | | 6 swabs from Ex 2 | DNA | |
| 4 | 171 | Leah Freeman's toothbrush | DNA std | |

**FOR LAB USE ONLY**

7-18-00
UPS
1:20pm

1 - TS ENV
3 - TS PAPER BAG

(FRZ #4 Shelf #2)

CMB

| (20) Lab Exhibit Number(s) | (21) Laboratory Employee | (22) Released to: | (23) Date |
|---|---|---|---|
| E V I D E N C E   R E L E A S E D | | | from Coos Bay Lab | |

OFFICER'S REPORT REQUESTED ON ALL PHYSICAL EVIDENCE CASES

IF RUSH CASE INDICATE REASON WHY EXPEDITIOUS HANDLING IS NECESSARY & DATE DUE

Form 49 1/89

LAB COPY

SWS000008

Exhibit 123 Page 13 of 17 to
State Defendants' Motion for Summary Judgment

CONFIDENTIAL

## Allele Calls from Profiler Plus Analysis

Run Date: 082400    Analyst: MwK    0    Date: 082700

| Inj. No. | CDL No./Ex No. | D3S1358 | vWA | FGA | Am | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 9947A CONTROL | 14,15 | 17,18 | 23,24 | X,X | 13,13 | 30,30 | 15,19 | 11,11 | 11,11 | 10,11 |
| 5 | PCR CONTROL | — | | NO ALLELES DETECTED | | | | | — | | |
| 10 | OON-481 #11.1 | 14,15,16⟩ (17) | 17⟩ (16,18) | 23⟩20⟩ (22) | X⟩Y | 13⟩ (10,12,14,16) | 30⟩ (31.2,32.2) | 12⟩ (14,16) | 11⟩ (12,13) | 11⟩ (9,12,14) | 8⟩(10) |
| 11 | OON-481 #11.2 | 14⟩16,17⟩ MwK (17) 15,16 | 17,17 | (20,21,23) | X,Y | 10⟩(12,13) | (30,32.2) | (12,16) | 11⟩13⟩ (10,12) | 12⟩ (9,11) | 8,8 |
| 15 | RB082000#3 | — | | NO ALLELES DETECTED | | | | | — | | |
| 22 | OON-481#12.3 | 15,15 | 16,19 | 20,25 | X,Y | 12,15 | 31.2,32.2 | 16,17 | 11,13⟩ 12 | 8,11 | 9,10 |
| 23 | RB 082100 | — | | NO ALLELES DETECTED | | | | — | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

CONFIDENTIAL

SWS000163

156 ##
MwK

CDL# OON-481

## STR CASE COMPLETION SHEET

**Primary Analyst:** Melk

**Date**
8-27-00

1. Complete in LIMS
   a. Edit findings ✓
   b. Draft complete ✓
   c. Activities ✓
   d. Evidence disposition

2. Enter into CODIS — SEE ME ✓ 

3. Search in CODIS ✓

4. Return Evidence

5. Copy of Report for Report Notebook.

6. Transfer case file to UAM ✓

**Peer Review:**

1. Technical review in LIMS — 4 REQUESTS

2. Upload to LDIS ✓ Ex. 12.3

Susan Harmann                    8-30-00

Technical Reviewer                    Date

| From: | Hormann, Susan [/O=OSP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SUSAN HORMANN944] |
|---|---|
| Sent: | 3/15/2010 11:50:08 AM |
| To: | Psmith@cityofcoquille.org |
| CC: | Grover, Celeste [Celeste.Grover@state.or.us]; Rose, Traci [Traci.Rose@state.or.us] |
| Subject: | Re: FBI Mito testing in Leah Freeman Case |

Lt. Smith,

I have attached the questions from the FBI.  I know the DA wants the hairs done because the defense would make an issue if they are not examined. I know you have years of experience doing investigations and I do not want to step on your toes, but I want to be clear in the ramifications of your lab requests.  Often people are unaware that hairs can be so easily transferred by direct contact or even through a secondary transfer.  The following are topics to consider before proceeding with the trace evidence.

#1 The value of an association with anyone she has been known to have frequent or sustained contact with is minimal since we are unable to say when the hairs were transferred.  In other words it has limited probative value to find her boyfriend's hairs or hairs of people that she has had previous contact with, especially recent.

#2 You are almost guaranteed to find foreign hairs in a trace exam.  This ends up giving the defense the bushy haired stranger they are looking for.

#3 Trace can also be of great value if say pubic hairs from an individual are found on the interior clothing of a victim or a significant number of hairs that are consistent with coming from an individual that was a complete stranger to the victim or her associates.  Also, hairs would be more probative if they are found in her hand or if in a clump.  Another type of trace evidence to consider in this case would be fibers found on her clothing/body that are similar (or dissimilar) to that found in suspects' vehicle or trunk if Leah was never in the car prior to her disappearance.

From Les McCurdy at the FBI:
*What is the potential probative value of the hairs? Do you have any info regarding what may have occurred to these items at New Scotland Yard (NSY) and Microtrace?  I would expect that Microtrace conducted a microscopic exam with no other analysis but want to better understand how these items may have been handled or treated.  What did NSY attempt?  Unfortunately, until I have a better understanding of what changed between 2000 to present – especially if the 2000 exam revealed "nothing of forensic significance".  Are there DNA reference samples from the victim and 2 subjects?*

*In the end, should we determine that the examinations are worth pursuing we can potentially submit this case through our Regional mtDNA program.  We can further discuss that after we determine how/if to proceed.  I will wait to hear back from you regarding the work done by Scotland Yard & Microtrace.  I would prefer to keep you as the conduit with the local investigators as you already have been in touch with them and have provided previous guidance.*

Once we are able to answer the questions asked by the FBI, we can proceed.  Thank you.

Susan Torris Hormann
DNA Supervisor
Portland Forensic Laboratory
13309 SE 84th Ave, Suite 200
Clackamas, Oregon 97015
Direct No. 971-673-8258
Fax 971-673-8309


>>> "Pat Smith" <psmith@cityofcoquille.org> 3/9/2010 4:57 PM >>>
Susan,

Sorry I didn't get back to you sooner.  As soon as I get the evidence back from Scotland Yard I'll look to see what kind of report they include.  Also, I'll check with Kris Karcher and see if she has anything.

Thanks,

Pat



DEPO EXHIBIT
Hormann 2022-05-06
**17**

Exhibit 17 to
State Defendants' Motion for Summary Judgment
CONFIDENTIAL                                                OSP002584

**From:** Susan Hormann [mailto:susan.hormann@state.or.us]
**Sent:** Friday, March 05, 2010 3:18 PM
**To:** Psmith@cityofcoquille.org
**Cc:** Celeste Grover
**Subject:** Mito testing in Leah Freeman Case

Lt. Smith,

I have attached some info on Mitochondrial testing by one private lab but there are other labs available if you do an internet search.  I will have Celeste contact the FBI to see if they will accept your case and what the turn around time will be.  In the past they have worked cases with trial dates fairly quickly so if you have a trial date scheduled let her know.

If you obtain a lab report from Forensic Science Services (Scotland Yard) it would be helpful for us to see for further evaluation of evidence in this case.  Also, to ensure that we do not repeat work that FSS did.

Talk to you soon.


Susan Torris Hormann
DNA Supervisor
Portland Forensic Laboratory
13309 SE 84th Ave, Suite 200
Clackamas, Oregon 97015
Direct No. 971-673-8258
Fax 971-673-8309

Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR  97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA  98145-1110
Telephone: (312) 590-5449

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>               Plaintiffs,<br><br>    v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br>               Defendants. | Civil No. 6:20-cv-01163-MK<br>(Lead Case)<br><br><br><br><br>PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET OF INTERROGATORIES |

Page 1– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
      OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

VIDOCQ SOCIETY,

                       Cross-Claimant,

      v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

                       Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

                   Plaintiffs,

      v.

OREGON STATE POLICE,

                   Defendant.

Civil Case No. 3:21-cv-01719-MK
(Trailing Case)

TO:    Defendant Susan Hormann and her counsel of record

## **GENERAL RESPONSE**

1.    Any statement that responsive documents or information will be provided is not a representation that any such documents or information exist.

2.    No documents or requested information that embody material that is private, business, confidential, proprietary, trade secret, or otherwise protected from disclosure will be produced without the prior entry of any appropriate protective order against unauthorized use or disclosure of such documents or information.

3.    All objections or other questions are reserved as to the competency, relevance,

Page 2– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
        OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

materiality, privileged nature, or admissibility in evidence of any documents or information produced in this or any other action.

4.     The right to object to such other supplemental interrogatories as may be later propounded involving or relating to the same subject matter of these requests is reserved.

5.     This Response to Defendant Susan Hormann's First Set of Interrogatories is made to the best of Plaintiffs' knowledge, information, and belief.  This Response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of recollection, is subject to such further recollection and such additional knowledge and facts as may result from further discovery or investigation.  The right is reserved to make use of, or to introduce at any hearing and at trial, documents and information responsive to these requests for production located, discovered, or obtained subsequent to the date of this Response.

## **GENERAL OBJECTIONS**

1.     Plaintiffs object to the definitions and instructions set forth in Defendant Susan Hormann's First Set of Interrogatories to the extent they impose obligations beyond those set forth in the Federal Rules of Civil Procedure, including, but not limited to, any implication that the requests for production are "continuing" to any extent beyond the scope of FRCP 26.

2.     Plaintiffs object to the definitions in Defendant Susan Hormann's First Set of Interrogatories to the extent the definitions are inconsistent with FRCP 26 and 33, and to the extent that the definitions so expand the information requested that the requests are unduly burdensome. *See Diversified Products Corporation v. Sports Center Co.*, 42 F.R.D. 3, 4 (D.C. Md. 1967).

3.     Plaintiffs object to any interrogatory to the extent it seeks or requires the production of any documents or information outside of Plaintiffs' possession, custody, or control.

4.     Plaintiffs object to any interrogatory to the extent that it seeks documents or information protected by the attorney-client privilege, work product doctrine, or FRCP 26.  Any inadvertent disclosure of such privileged documents or information is not to be deemed a waiver

Page 3– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
     OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

of any privilege with respect to such documents or information.

These General Objections are incorporated into each and every answer, response, and/or objection set forth below.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend Defendant Hormann fabricated during the Investigation or Criminal Case.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 124  Page 4 of 31 to
State Defendants' Motion for Summary Judgment

narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Hormann fabricated, lied, or withheld something.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Hormann fabricated, lied, or withheld something.  Nonetheless, Plaintiffs contend that Defendant Hormann's reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Hormann knew, and should have known, that McGuffin was innocent. (*See, e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2008-11-18 OSP Lab Report; 2010-05-24 OSP Lab Report; 2010-11-10 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; SH002437–2880; OSPLab_002792–2816; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction

Page 5– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
        OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier).

For example, Hormann fabricated evidence that male DNA found on Freeman's left shoe was that of Defendant Oswald, the deputy who found the shoe.  (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2008-11-18 OSP Lab Report; 2010-05-24 OSP Lab Report; 2010-11-10 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; SH002437–2880; OSPLab_002792–2816; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)  As another example, Hormann fabricated evidence that the only DNA on Freeman's right shoe was that of Freeman herself. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2008-11-18 OSP Lab Report; 2010-05-24 OSP Lab Report; 2010-11-10 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; SH002437–2880; OSPLab_002792–2816; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)

As another example, Hormann fabricated evidence of Freeman's blood and DNA in the Kia.  (*See*, *e.g.*, 2010-03-04 Interview of Kristen Steinhoff; 2010-05-24 OSP Lab Report; 2010-10-15 ABC News "20/20")

Plaintiffs reserve the right to supplement this response.

Page 6– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER pc
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 2:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend was obtained as a result of Defendant Hormann allegedly "solicit[ing] false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

    **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

    "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

Page 7– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
      OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory No. 1.


**INTERROGATORY NO. 3:** Describe with particularity the actions or omissions by which Defendant Hormann allegedly "solicited false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of

Page 8– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST SET
    OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

 "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

 The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

 <u>**ANSWER:**</u>  Subject to and without waiving any objection, *see* Answer to Interrogatory

No. 1.



1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 4:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes exculpatory evidence that Plaintiffs contend Defendant Hormann unlawfully suppressed, destroyed, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

 **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

 "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 124  Page 10 of 31 to
State Defendants' Motion for Summary Judgment

propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Hormann fabricated, lied, or withheld something.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Hormann fabricated, lied, or withheld something.  Nonetheless, Plaintiffs contend that Defendant Hormann's reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Hormann knew, and should have known, that McGuffin was innocent. (*See, e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2008-11-18 OSP Lab Report; 2010-05-24 OSP Lab Report; 2010-11-10 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; SH002437–2880; OSPLab_002792–2816; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)

For example, Hormann unlawfully suppressed, withheld, or destroyed evidence of the misconduct described in response to Interrogatory No. 1.  As another example, Hormann unlawfully suppressed or withheld evidence of DNA from an unidentified male on Freeman's right and left shoes.  (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2008-11-18 OSP Lab Report; 2010-05-24 OSP Lab Report; 2010-11-10 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; SH002437–2880; OSPLab_002792–2816; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)  As another example, Hormann unlawfully suppressed, withheld, or destroyed evidence of the analysis about the number of contributors to the DNA mixture on Freeman's left shoe.  (*See*, *e.g.*, Civil Suit Deposition of Mary Krings)  As another example, Hormann withheld evidence about her conversations with the other Defendants, as well as police and prosecutors, about her DNA-related conclusions and her attempts to avoid developing evidence that would exonerate McGuffin.  (*See*, *e.g.*, OSP000746–748; OSP000751; OSP002584–85; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann)

Plaintiffs reserve the right to supplement this response.


**INTERROGATORY NO. 5:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes impeachment evidence that Plaintiffs contend Defendant Hormann unlawfully suppressed, destroyed, tampered with, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas

Page 12– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

McGuffin in the Investigation or Criminal Case.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory No. 4.


**INTERROGATORY NO. 6:**  Describe with particularity actions or omissions by which Defendant Hormann "fabricated blood evidence on Freeman's right shoe that did not exist," as alleged in the Second Am. Compl. ¶ 182(c).

**OBJECTIONS:**    Plaintiffs object to this interrogatory on the grounds that it misstates the allegations in the Second Amended Complaint.  Plaintiffs further object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

Page 14–  PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
          SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Hormann fabricated, lied, or withheld evidence.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Hormann fabricated, lied, or withheld evidence.  Nonetheless, *see*, *e.g.*, 2000-07-17 OSP Lab Report; OSPLab_002003–2018; 2010-10-15 ABC News "20/20"; Civil Suit

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Deposition of Kathy Wilcox.

**INTERROGATORY NO. 7:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each action or communication that plaintiffs contend support their assertion that Defendant Hormann reached an agreement with any other Defendant "to frame McGuffin for Freeman's abduction and murder," as alleged in the Second Am. Compl. ¶ 244.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

> "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting

Page 16– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Hormann conspired with the other Defendants. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Hormann conspired with the other Defendants. Nonetheless, *see*, *e.g.*, Answer to Interrogatory Nos. 1, 4, and 6. *See also*, *e.g.*, OSP000749; Coquille 007393; OSP000746–748; CPD000148–155; CPD000302–339; CPD002092–2113; CPD002124–75; CPD002177–78; CPD020445–20580; CPD020646–47.

**INTERROGATORY NO. 8:** Describe with particularity the "overt acts" and the "joint activity" in which Defendant Hormann was "an otherwise willful participant," as alleged in support of Plaintiffs' conspiracy claims in the Second Am. Compl. ¶ 247.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an

Page 17– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, 6, and 7.


**INTERROGATORY NO. 9:**  Describe with particularity the actions or omissions by which Defendant Hormann allegedly "conceal[ed] [her] misconduct" and describe with particularity the misconduct that was concealed, as alleged in the Second Am. Compl. ¶ 296.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

Page 19– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, and 6.

**INTERROGATORY NO. 10:** Describe with particularity the actions or omissions by which Defendant Hormann "targeted" or "harassed" McGuffin as alleged in the Second Am. Compl. ¶¶ 86, 90, 98, 171.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2
(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,
No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);
*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.
LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-
06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero
v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a
narrative account of its case, including every evidentiary fact, details of testimony of supporting
witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These
propositions are well established.  *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,
2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,
including this one, have held that contention interrogatories which 'systematically track all of the
allegations in an opposing party's pleadings, and that ask for 'each and every fact' and
application of law to fact that supports the party's allegations are an abuse of the discovery
process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.
at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's
strategy, what he deems important, and his analysis of the case.  Such requests exceed the

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at \*7 (W.D. Wash. Jan. 18, 2012).

      **ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, 6, and 7.


**INTERROGATORY NO. 11**:  Describe with particularity the "exculpatory DNA evidence" produced by DNA testing in the original investigation that was allegedly suppressed during the cold case investigation, as alleged in the Second Am. Compl. ¶ 182(a), and describe with particularity the exculpatory inferences that Plaintiffs contend should have been drawn from it (that is, describe what about that evidence made it exculpatory).

      **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at \*2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at \*8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at \*1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

MF  MALONEY | LAUERSDORF | REINER PC
*ATTORNEYS AT LAW*
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory No. 4.

**INTERROGATORY NO. 12:** Describe with particularity the actions or omissions by which Plaintiffs contend Defendant Hormann suppressed the "exculpatory DNA evidence," as alleged in the Second Am. Compl. ¶ 182(a).

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to

MALONEY | LAUERSDORF | REINER pc
*ATTORNEYS AT LAW*
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2
(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,
No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);
*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.
LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-
06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero
v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

    "Contention interrogatories should not require a party to provide the equivalent of a
narrative account of its case, including every evidentiary fact, details of testimony of supporting
witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These
propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,
2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,
including this one, have held that contention interrogatories which 'systematically track all of the
allegations in an opposing party's pleadings, and that ask for 'each and every fact' and
application of law to fact that supports the party's allegations are an abuse of the discovery
process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.
at 594).

    The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's
strategy, what he deems important, and his analysis of the case.  Such requests exceed the

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

 **ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, and 6.


**INTERROGATORY NO. 13:**  Describe with particularity the actions or omissions by which Defendant Hormann "targeted" or "harassed" McGuffin as alleged in the Second Am. Compl. ¶¶ 86, 90, 98, 171.

 **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

Page 25– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
   SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER ᴾᶜ
ᴬᵀᵀᴼᴿᴺᴱ�YˢᵁᵀˡᴬW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, 6, and 7.


**INTERROGATORY NO. 14:** Describe with particularity the instances in which Defendant Hormann deliberately disseminated fabricated and false information to the news media and the manner in which Defendant Hormann did so, as alleged in the Second Am. Compl. ¶¶ 171, 190.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

Contention interrogatories which ask the respondent to systematically recite

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"all facts" in support of that party's contention are generally disfavored.

"Contention interrogatories which 'systematically track all of the allegations in
an opposing party's pleadings, and that ask for 'each and every fact' and
application of law to fact that supports the party's allegations are an abuse of
the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2
(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,
No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);
*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.
LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-
06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero
v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a
narrative account of its case, including every evidentiary fact, details of testimony of supporting
witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These
propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,
2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,
including this one, have held that contention interrogatories which 'systematically track all of the
allegations in an opposing party's pleadings, and that ask for 'each and every fact' and
application of law to fact that supports the party's allegations are an abuse of the discovery
process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.
at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's
strategy, what he deems important, and his analysis of the case.  Such requests exceed the
permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Jan. 18, 2012).

     **ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, 6, and 7. *See also*, *e.g.*, OSP000771–773; 2010-10-15 ABC News 20/20.


**INTERROGATORY NO. 15:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, all instances of misconduct by Defendant Hormann of which Plaintiffs complain in this case not otherwise described in response to these Interrogatories.

     **OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

     "Contention interrogatories should not require a party to provide the equivalent of a

Page 28– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
       SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, 6, 7, and 14.


**INTERROGATORY NO. 16:** Identify each expert witness who has expressed any opinion relating to any alleged misconduct of Defendant Hormann for which Plaintiffs complain in this litigation, and for each such expert: a) identify each opinion expressed; b) provide a statement of the basis of support for each opinion expressed; c) identify the information considered by the expert witness in forming each opinion expressed; d) identify the qualifications of the witness as an expert witness; e) identify the publications if any authored by the witness; f) identity the specific text portions from each authoritative writing which were relied upon by the witness in formation  of the opinions expressed; and g) provide a list of all cases in which the witness has testified as an expert at trial or by deposition.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**OBJECTIONS:**  Plaintiffs object to this interrogatory as premature and in violation of the Court's order on expert disclosures.  Plaintiffs further object to this interrogatory to the extent that it imposes obligations beyond the scope of Fed. R. Civ. P. 26(a)(2).

**ANSWER:**  *See* Objections.


DATED:  December 4, 2023


MALONEY LAUERSDORF REINER PC


By /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail:  jcp@mlrlegalteam.com
    Andrew C. Lauersdorf, OSB #980739
    E-Mail:  acl@mlrlegalteam.com

Page 30– PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN'S FIRST
SET OF INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, the foregoing PLAINTIFFS' RESPONSE TO DEFENDANT SUSAN HORMANN FIRST SET OF INTERROGATORIES was served on the following parties at the following address by sending to them a true copy thereof via the method indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>*Attorneys for Defendants*<br>*City of Coquille, City of Coos Bay, Coos*<br>*County, Craig Zanni, Chris Webley, Eric*<br>*Schwenninger, Sean Sanborn, Ray McNeely,*<br>*Kris Karcher, Pat Downing, Mark Dannels,*<br>*Kip Oswald, Michael Reaves, David Zavala,*<br>*Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>*Attorneys for Defendants Oregon State*<br>*Police, John Riddle, Susan Hormann,*<br>*Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>Rachel Jones<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>rjones@hwslawgroup.com<br>*Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br><br>Laura E. Coffin<br>Coffin Law<br>541 Willamette Street, Ste. 211<br>Eugene, OR 97401<br>lauracoffin@coffin.law<br>*Attorneys for Defendant Richard*<br>*Walter* |

☒ by emailing to each of the foregoing a copy thereof to the email address above.

MALONEY LAUERSDORF REINER PC

By  /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail:  jcp@mlrlegalteam.com

Attorneys for Plaintiffs

Page 1– CERTIFICATE OF SERVICE



MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

1

1

2

3    Case No. 10-CR0782

4    State of Oregon v. Nicholas McGuffin

5    Kristin Steinhoff police interview 3-4-10.

6    Parties present:
     Kelly Andrews, Coos County Sheriff's Office
7    John Riddle, Oregon State Police
     Kristin Steinhoff
8
     Recording provided by Coos County District Attorney
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED
DEC

2

1   Recorded March 4, 2010.

2   **ANDREWS:**  I'm going to say a couple things, okay?  My name is

3   Kelly Andrews.  I'm with the Sheriff's Office.  Inside the

4   room here is John Riddle from the State Police, and Kristin

5   Steinhoff.  It is March 4th, 2010.  I have, it's like, 4:31

6   in the afternoon.  Um.

7            And again, I just asked you this just a minute

8   ago:  Are you here on your own free will, Kristin?

9   **STEINHOFF:**  Yes.

10  **ANDREWS:**  Okay.  You're free to go at any time, you

11  understand that?

12  **STEINHOFF:**  Yeah.

13  **ANDREWS:**  You're not under arrest or anything like that,

14  we're just here to talk to you, right?  Okay.

15  **RIDDLE:**  Previous to this we stopped by your house, talked to

16  you briefly there.  And Deputy Andrews asked if you'd come

17  down, and you voluntarily agreed to come down and talk to us?

18  **STEINHOFF:**  Yes.

19  **RIDDLE:**  Okay.  Is anything -- did anything transpire that,

20  uh, that we've talked about that isn't consistent?  (Pause.)

21  Okay.

22  **STEINHOFF:**  No.

23  **RIDDLE:**  You -- you shook your head no --

24  **STEINHOFF:**  Sorry.

25  **RIDDLE:**  -- but the tape can't pick that up, of course.

1   **STEINHOFF:**  Sorry.

2   **RIDDLE:**  So, you sat down and almost immediately started

3   crying.

4   **STEINHOFF:**  That's 'cause it's sad.  And when that lady and

5   that guy were at my house the other day, my kids were asking

6   why they're there.

7   **ANDREWS:**  What did you tell your kids?

8   **STEINHOFF:**  I didn't tell them anything.  (Pause.)

9           I don't -- I didn't have anything to do with

10  this, and I don't see why I always have to talk to everybody

11  about this.  I don't know anything.

12  **ANDREWS:**  Well, part of it is probably just because, you

13  know, the group of people that ran around back then together,

14  I mean, there was a lot of talk about this.  And in the

15  end -- what we're talking about is the Leah Freeman murder.

16  **STEINHOFF:**  Yeah.

17  **ANDREWS:**  You know?  And, um -- you may have heard something,

18  you may have seen something, or whatever, during that time

19  period, that -- that we don't know about.  And we need to

20  figure that out, so we can -- so we can bring her killer to

21  justice.

22  **STEINHOFF:**  Yeah.

23  **ANDREWS:**  You agree with us on that?

24  **STEINHOFF:**  Yeah.

25  **ANDREWS:**  Okay.  Um, your kids are okay?

4

1   **STEINHOFF:** Yeah.

2   **ANDREWS:** Okay. You said that when the other two detectives

3   showed up at your house and everything, and talked to you

4   there; I mean, they had some questions afterwards. What did

5   you tell them?

6   **STEINHOFF:** I didn't know what to tell them. I didn't tell

7   them anything.

8   **ANDREWS:** How did that make you feel, that you had these guys

9   showing up on your doorstep?

10  **STEINHOFF:** It's upsetting.

11  **ANDREWS:** Okay. As part of this, re-look at -- excuse me --

12  re-look at the investigation, you know, we pored over -- I

13  mean, the one number that was thrown around was there's 4,000

14  pieces of paper on this -- on this case that's already in

15  there. So we had guys poring over that stuff. Um.

16          Starting back in January, we had teams of

17  detectives going out and doing interviews. And you -- you

18  were one of them that was to be interviewed because you had

19  been interviewed originally. We wanted to see if anything

20  had changed in that time period.

21          You know, and I told you back at the house --

22  what, 30 minutes ago or so, when we were there -- that some

23  new things had come up. And I don't know if you've read the

24  paper at all about this, or seen the news, but there's some

25  new forensic stuff that's come up in this case that we're

5

1  having tested.  We're doing a lot of stuff.

2           And part of that is, um -- well, let me back up.

3           You originally in -- and I'm racking my brain

4  here.  In the original statement, you guys -- you and Nick

5  McGuffin drove around that night, that she disappeared?

6  **STEINHOFF:**  I'm not sure if it was that night or the night

7  after.

8  **ANDREWS:**  Okay.

9  **STEINHOFF:**  It was when I told them.  I said you have to look

10 in the file.  I don't remember a whole lot.  I did a lot of

11 drugs, and now I -- it's hard for me to remember stuff.

12 **ANDREWS:**  And let me stop there and ask, what kind of drugs

13 did you do back then?

14 **STEINHOFF:**  Meth.

15 **ANDREWS:**  Just methamphetamine?

16 **STEINHOFF:**  Mm-hmm.

17 **ANDREWS:**  Did you do marijuana at all?

18 **STEINHOFF:**  No.

19 **ANDREWS:**  Heroin?

20 **STEINHOFF:**  No.

21 **ANDREWS:**  Dropped acid?

22 **STEINHOFF:**  No.

23 **ANDREWS:**  Okay.

24 **STEINHOFF:**  Didn't even do mushrooms.

25 **ANDREWS:**  Okay.  And I ask you that just so we can kind of

6

1   get a baseline for what we're, you know, dealing with

2   memory-wise.

3                So you say it may have been that night or the

4   night afterwards?

5   **STEINHOFF:**  Mm-hmm.

6   **ANDREWS:**  Okay.

7   **RIDDLE:**  And that's only your recollection now, ten years

8   later.  What you told people back then, would that have

9   been --

10  **STEINHOFF:**  Probably, yeah.

11  **RIDDLE:**  -- accurate?  So if you said, back then, that you

12  and Nick were together the night Leah disappeared, that would

13  be accurate?

14  **STEINHOFF:**  Yeah.

15  **RIDDLE:**  Okay.

16  **STEINHOFF:**  That's why I said they'd have to look on the

17  files of my statements back then, because they'd probably be

18  more --

19  **ANDREWS:**  I'm going to move that away from the running motor

20  of the computer.

21  **RIDDLE:**  Oh, good idea.

22  **ANDREWS:**  And the reason why we're using the recorder is,

23  number one, we want to make sure of what you say and we want

24  to make sure of what we say too, in asking any of these

25  questions.  And that's the reason for it.

1           What vehicle were you in that night, whichever

2   night it was.

3   **STEINHOFF:**  Um --

4   **ANDREWS:**  Which I believe was the night --

5   **RIDDLE:**  Mm-hmm.

6   **ANDREWS:**  -- according to these reports.

7   **STEINHOFF:**  My friend's Zack's car.

8   **ANDREWS:**  Zack El -- do you remember his last name?

9   **STEINHOFF:**  No.  He was my mom's friend.

10  **ANDREWS:**  El, El -- it starts with an "E" though, doesn't it?

11  **STEINHOFF:**  I don't know.  I don't even remember his last

12  name.

13  **ANDREWS:**  Okay.  What kind of car was it?

14  **STEINHOFF:**  It was like a Kia, or something.

15  **ANDREWS:**  Do you remember what color it was?

16  **STEINHOFF:**  Purple.

17  **ANDREWS:**  Okay.

18  **RIDDLE:**  What do you remember doing in that car that night?

19  **STEINHOFF:**  Just driving around.

20  **ANDREWS:**  Who was in the car with you?

21  **STEINHOFF:**  Me.

22  **ANDREWS:**  And who?

23  **STEINHOFF:**  I think that's it.  (Pause.)  I don't know.

24  **ANDREWS:**  We just talked to you, and you said Nick --

25  **STEINHOFF:**  Well, yeah, but maybe that night.  I don't know

Exhibit 127  Page 7 of 72 to
State Defendants' Motion for Summary Judgment
MCCREA_024954

8

1  if it was the night after or not.

2  **ANDREWS:** Okay. Well, the night that --

3  **STEINHOFF:** 'Cause I know that I --

4  **ANDREWS:** -- the original reports --

5  **STEINHOFF:** I know that I had seen Nick a lot that night when

6  I was driving around.

7  **ANDREWS:** Okay. The night that you drove around with Nick.

8        And you were looking for Leah?

9  **STEINHOFF:** Yeah, he asked me to drive him around and look.

10  **ANDREWS:** Okay. How was Nick acting?

11  **STEINHOFF:** Weird. Really strange.

12  **ANDREWS:** Weird and strange are kind of general terms in some

13  way. How was he acting weird?

14  **STEINHOFF:** He was looking for her, and it was like -- he was

15  acting like he was never going to see her again.

16  **ANDREWS:** Okay.

17  **STEINHOFF:** He said that they had gotten in a fight, and he

18  went to her house. And usually he threw rocks at her window,

19  and she had come to the window, but he said that night she

20  didn't.

21  **ANDREWS:** Okay.

22  **STEINHOFF:** And I thought if they were just fighting, maybe

23  he should wait until the next morning and then go talk to

24  her. But I don't know, he was just acting weird. I'd never

25  seen him act like that.

1   **ANDREWS:**  How long do you know Nick?  Or have you known Nick?

2   **STEINHOFF:**  I've only known him -- knew him, like maybe a

3   year or two.

4   **ANDREWS:**  Prior to that?

5   **STEINHOFF:**  Yeah.

6   **ANDREWS:**  How about since then?  Have you stayed in contact

7   with him?

8   **STEINHOFF:**  Hmm-mm.

9   **ANDREWS:**  When was the last time you think you spoke with

10  him?

11  **STEINHOFF:**  Years ago.

12  **ANDREWS:**  Less than five, more than five?

13  **STEINHOFF:**  I quit talking to him after all this stuff, and I

14  don't know.

15  **ANDREWS:**  Okay.

16  **RIDDLE:**  Why did --

17  **STEINHOFF:**  He didn't --

18  **RIDDLE:**  Why did you stop?

19  **STEINHOFF:**  He didn't seem -- he didn't seem like a friend

20  anymore.

21  **RIDDLE:**  Okay.

22  **ANDREWS:**  And that's why you stopped?  I mean, there was --

23  **STEINHOFF:**  Yes.

24  **ANDREWS:**  Was it specifically that, or was there -- did you

25  guys have a falling out over something else, or anything?

1   **STEINHOFF:**  No, he just seemed different.

2   **ANDREWS:**  Okay.

3   **RIDDLE:**  Did Nick ever tell you that he did anything to Leah?

4   **STEINHOFF:**  No, but, um, I went out with Scott Hamilton.  And

5   he was staying with me, and he went with Nick somewhere one

6   day and said something about her head being on a rock.

7   That's all he said.

8   **RIDDLE:**  So, as far as yours and Nick's contact goes, you

9   were together that night, but he never said or did anything

10  that would indicate to you that he had any involvement?

11  **STEINHOFF:**  I don't know.  He was just acting really weird.

12  **RIDDLE:**  Other than acting weird.

13  **STEINHOFF:**  He never said anything.  Just acting like she was

14  never coming back.

15  **RIDDLE:**  When you were out there, and you and Nick were

16  driving around in your friend's car, did -- was Leah ever in

17  that car?

18  **STEINHOFF:**  No.

19  **RIDDLE:**  She was never in the trunk of that car?

20  **STEINHOFF:**  No.

21  **RIDDLE:**  She was never in the backseat of that car?

22  **STEINHOFF:**  Hmm-mm.

23  **RIDDLE:**  Did you ever let Nick have that car for a little

24  while, while he went and did something else?

25  **STEINHOFF:**  No.  No.

1  **RIDDLE:**  Okay.  When you were in that car, it was just you

2  and Nick, never anybody else?

3  **STEINHOFF:**  No.

4  **RIDDLE:**  Okay.  One of the things, you know, Deputy Andrews

5  was talking about was some of the new stuff that we're doing

6  in this case.  And I'd like for you to look at this right

7  here, and tell me if you can tell what that is.  (Pause.)

8           Okay.  The top page you're looking at is a

9  forensics lab request to have the forensic lab process some

10  evidence.

11  **STEINHOFF:**  Okay.

12  **RIDDLE:**  Okay.  Go ahead and turn the page.  What does that

13  look like to you?

14  **STEINHOFF:**  (Pause.)  Zack's car, I think.  What's on the

15  side of it?

16  **RIDDLE:**  I couldn't tell you.

17  **STEINHOFF:**  Or is that the reflection of the --

18  **RIDDLE:**  The photographer reflection.

19           You can keep looking through those photos.

20  **STEINHOFF:**  (Pause.)  What is it?

21  **RIDDLE:**  That's the trunk of the car.

22           (Pause.)  So Kristin, I need to ask you:  Is

23  there any reason why Leah's blood would be found in that car?

24  **STEINHOFF:**  No.  (Crying.)  I didn't do anything.  I didn't

25  have anything to do with this.  I could never do anything

1   like this.

2   **RIDDLE:**  Think back.

3   **STEINHOFF:**  I am thinking back.

4   **RIDDLE:**  Okay.  Okay.

5   **STEINHOFF:**  I know nothing.  No.

6   **RIDDLE:**  Do you remember Nick having blood on his clothes at

7   all?

8   **STEINHOFF:**  No.  I remember he changed clothes.

9   **RIDDLE:**  Okay.  Where's --

10  **STEINHOFF:**  I had seen him a couple of times downtown and

11  he'd changed clothes, but that was it.

12  **ANDREWS:**  What was he wearing beforehand?

13  **STEINHOFF:**  I don't know.  I just noticed that he was wearing

14  different clothes and he switched cars.

15  **RIDDLE:**  Kristin, what scares you the most about this case?

16  **STEINHOFF:**  Being in trouble for something that I didn't do.

17  **ANDREWS:**  Okay.

18  **RIDDLE:**  Do you think you could be in trouble if somebody

19  told you something that happened?

20  **STEINHOFF:**  No.  Because if they did, then I would have told

21  you guys.

22  **RIDDLE:**  But do you think you could be in trouble for that?

23  **STEINHOFF:**  I don't know.

24  **RIDDLE:**  Do you think you could be in trouble for knowing --

25  do you think you could be in trouble for knowing something

1    that somebody else did, and not telling us all this time?  Do

2    you think you could be in trouble for that?

3    **STEINHOFF:**  I would have told.

4    **RIDDLE:**  No, I'm just -- that's not the -- that's not what

5    I'm saying.

6    **STEINHOFF:**  Look, I don't know.

7    **RIDDLE:**  Do you think you could be in trouble?

8    **STEINHOFF:**  I don't know.  I don't know.

9    **RIDDLE:**  Kristin, did Nick tell you he did something to Leah?

10   **STEINHOFF:**  No, because if he did I would have told you.  I

11   would have told them a long time ago.  I felt so bad.

12   **RIDDLE:**  And why did you feel so bad?

13   **STEINHOFF:**  Because I don't understand how somebody could do

14   something like that to a little girl.  (Crying.)

15   **RIDDLE:**  Well, things happen to people all the time, but you

16   don't necessarily feel bad about it because it isn't -- it's

17   not connected to you.  Why do you feel so bad about this, if

18   you have no connection to it?

19   **STEINHOFF:**  I don't know.

20   **RIDDLE:**  Did you know Leah?

21   **STEINHOFF:**  No.  I just didn't think anything like that could

22   happen in that small town.  And it was sad.

23   **RIDDLE:**  Are you scared about going to prison?

24   **STEINHOFF:**  I didn't do anything, though.

25   **RIDDLE:**  But are you scared about going to prison, regarding

Exhibit 127  Page 13 of 72 to
State Defendants' Motion for Summary Judgment
**MCCREA_024960**

1   this?  Are you scared about --

2   **STEINHOFF:**  I'm scared about my kids.

3   **RIDDLE:**  I know.  I can tell you're scared about something,

4   Kristin.  I talk to people all the time.  Kelly talks to

5   people all the time.  Your reaction to this thing right now

6   isn't consistent with somebody who doesn't know something.

7   It isn't consistent with somebody who hasn't heard something.

8   It isn't consistent with somebody who doesn't know something.

9   **STEINHOFF:**  I don't know anything.  I told you guys about the

10  question over and over and over, and I don't know anything.

11  **RIDDLE:**  And Kristin, we want to believe you.  Trust me, we

12  want to believe you.

13  **STEINHOFF:**  Well, I don't know what else to say.  I don't

14  know anything.  I swear.  If somebody told me anything about

15  doing anything like this, I would've told somebody.  There's

16  no way that I could have kept it to myself.  (Pause.)

17  **ANDREWS:**  Do you know what DNA is?

18  **STEINHOFF:**  Blood, or something.

19  **ANDREWS:**  It's specific bodily fluids that carry cells from

20  your body that identify each person individually.  That's

21  what DNA is, basically.

22            Leah's DNA, in the car.

23  **STEINHOFF:**  She wasn't in the car when I had the car.  I had

24  that car, and nobody was in there.  There was no dead person.

25  I didn't kill anybody.  I couldn't --

1  **RIDDLE:**  We're not saying you did.

2  **STEINHOFF:**  -- do anything like that to anybody.

3  **ANDREWS:**  Did you loan the car out to anybody?

4  **STEINHOFF:**  No.

5  **RIDDLE:**  Did you let Nick drive the car?

6  **STEINHOFF:**  No.

7  **RIDDLE:**  The whole time you had the car, you were in sole

8  possession of it, and did not let anybody else drive it?

9  **STEINHOFF:**  No.

10  **ANDREWS:**  Are you sure?

11  **STEINHOFF:**  Yeah.

12  **ANDREWS:**  (Pause.)  You and Nick that night.  There was some

13  talk -- you were at your house?

14  **STEINHOFF:**  Yeah, doing drugs.

15  **ANDREWS:**  What kind of drugs were you doing?

16  **STEINHOFF:**  Meth.

17  **ANDREWS:**  Both of you?

18          What time, do you remember?

19  **STEINHOFF:**  I don't remember.  It was really late.  I don't

20  know.

21  **ANDREWS:**  You were dating Scott Hamilton at the time?

22  **STEINHOFF:**  Um, I don't know if I was dating him at that time

23  or a little bit after.

24  **ANDREWS:**  Did you guys have sex that night?

25  **STEINHOFF:**  No.

Exhibit 127  Page 15 of 72 to
State Defendants' Motion for Summary Judgment
MCCREA_024962

1    **ANDREWS:**  Did you guys try and have sex that night?

2    **STEINHOFF:**  We were going to, and then we didn't.

3    **ANDREWS:**  Okay.  Sometimes people have intimate relationships

4    when they're under a lot of stress.  And I'm not saying you

5    were under stress, but -- who offered who?

6    **STEINHOFF:**  I don't know.  It just happened.  We just kissed

7    and that was it.

8    **ANDREWS:**  And you had sex?

9    **STEINHOFF:**  No.

10   **ANDREWS:**  How far did it go?

11   **STEINHOFF:**  Almost, and we didn't.

12   **ANDREWS:**  Almost is --

13   **STEINHOFF:**  Like, our pants down.  But we didn't.

14   **ANDREWS:**  Okay.  Fondling?

15   **STEINHOFF:**  I don't know.  I don't really remember.  Maybe.

16   **RIDDLE:**  Did you ever have a sexual relationship with Nick?

17   **STEINHOFF:**  No.

18   **RIDDLE:**  And this kissing incident that occurred, when in the

19   course of the night did that happen?

20   **STEINHOFF:**  I'm not sure.

21   **RIDDLE:**  In amongst the time when you guys were supposed to

22   be out looking for Leah?

23   **STEINHOFF:**  It might have been before, I don't know.  I don't

24   remember exactly when.

25   **ANDREWS:**  Why did Nick ask you to help him?

1  **STEINHOFF:**  I don't know.

2  **ANDREWS:**  He had his own car.

3  **STEINHOFF:**  I felt bad for him.  I don't know.

4  I don't know.  He was just acting really weird.

5  **ANDREWS:**  What was he talking about?

6  **STEINHOFF:**  He was just acting like she was never coming

7  back, and they got in an argument, and I guess that's it.

8  **ANDREWS:**  How did you feel about him?

9  **STEINHOFF:**  What do you mean?

10  **ANDREWS:**  He's talking like Leah's never coming back, I

11  mean --

12  **STEINHOFF:**  Well, I asked him -- I didn't, I didn't think,

13  like, oh, he went out and killed her or something like that.

14  I didn't think anything like that.  But, I don't know.

15  I just, "Well, calm down.  You guys will get over

16  your fight, and you can talk to her in the morning."

17  And he just kept, oh, just acting like she was

18  never coming back.  I don't know.  It was just weird.  It's

19  hard to explain.  I don't know.

20  **RIDDLE:**  Do you think Nick did something to Leah?

21  **STEINHOFF:**  Now that, looking back on all of it, yeah, maybe.

22  I don't know.

23  **ANDREWS:**  What do you think he did?

24  **STEINHOFF:**  I don't know.  (Pause.)  I don't know.  Looking

25  back on all of it, I don't understand why he would act like

1   that.  I don't know.  I just wish I was never friends with

2   any of them.

3   **RIDDLE:**  I can understand that.

4              (Pause.)  Did you have to testify at the grand

5   jury?  How was that?

6   **STEINHOFF:**  I don't know.  There was a lot of people there.

7   **RIDDLE:**  Was that hard for you?

8   **STEINHOFF:**  Yeah, because I felt bad.

9   **RIDDLE:**  Did you cry, like you're crying today with us?

10  **STEINHOFF:**  Now that I'm older and I have my own kids,

11  it's -- I can't imagine what her mom is going through.

12  **RIDDLE:**  Mm-hmm.  You know people have told us that you've

13  actually told them things that happened?

14  **STEINHOFF:**  Things that happened?  Like what?

15  **RIDDLE:**  Well, they've told us that you've actually broke

16  down and told people that Nick did it, that you helped Nick,

17  things like that.  Do you, I mean --

18  **STEINHOFF:**  No.

19  **RIDDLE:**  Where do you think that stuff is coming from?

20  **STEINHOFF:**  I don't know.  It's fucking crack-heads in

21  Coquille.  They make up a bunch of stories.  It's why I moved

22  away from there.

23  **RIDDLE:**  And people are saying that you broke down and told

24  your mom, and, uh, what's that guy's name?  Danny Horlacher

25  (phonetic).

1  **STEINHOFF:** No.

2  **RIDDLE:** You broke down and told them that -- what happened,

3  and --

4  **STEINHOFF:** I didn't tell my mom anything like that.

5  **RIDDLE:** Okay.

6  **STEINHOFF:** Me and my mom don't even get along. Why would I

7  tell her something like that?

8  **RIDDLE:** Well, I don't know. I mean -- that's why I'm asking

9  you. I mean, I don't know your relationship with your mom.

10  I don't know what it was like then, I don't know what it was

11  like now. I don't know that stuff. That's why I'm asking

12  you.

13  **STEINHOFF:** No. I could never do anything like that. And if

14  I knew anything, then I wouldn't fucking keep it to myself.

15  I'd end up telling somebody.

16  **RIDDLE:** But not if you're scared something's going to happen

17  to you.

18  **STEINHOFF:** If I knew something like this --

19  **RIDDLE:** Not if you're scared you're going to be held

20  accountable to it.

21  **STEINHOFF:** -- if I knew that somebody came up to me and told

22  me that they had something to do with this, I would tell the

23  cops. There's no way I'd keep anything like that to myself.

24  **RIDDLE:** Did anybody threaten you? Did anybody tell you that

25  you better quit talking to the cops, or anything like that

1    back then?

2    **STEINHOFF:**  Nick and Ricky.

3    **RIDDLE:**  What was that all about?

4    **STEINHOFF:**  I don't know.  They had seen the cops over at my

5    house, and they asked me what I said to them, and I said I

6    didn't say anything.  They just asked me if I'd seen you that

7    night and I said yes.  And he goes, "Well, you better not

8    tell them anything else."  And that was it.

9    **RIDDLE:**  And did you?

10   **STEINHOFF:**  Well, whenever the cops came around and asked me

11   questions, I'd answer them.

12   **RIDDLE:**  And did they ever -- did Nick or Ricky or anybody

13   like that ever --

14   **STEINHOFF:**  Took me out to Poe Lane, um, with a shot -- a

15   shotgun and a blowtorch.

16   **RIDDLE:**  Okay.  So this is what I don't understand.  I don't

17   understand why Nick and Ricky would be so dead set on keeping

18   you quiet, not wanting you talking to the cops if you didn't

19   know anything.  If they didn't think you knew anything.

20   **STEINHOFF:**  I don't know.

21   **RIDDLE:**  You see where I'm trying -- I mean, it's hard for me

22   to wrap my head around that.

23   **STEINHOFF:**  Yeah.  I don't know.  Because I say to him that

24   night, I told him -- I told the cops how weird he was acting

25   and everything else.

1  **RIDDLE:**  Did you ever see Brent Bartley that night?

2  **STEINHOFF:**  I don't think so.

3  **RIDDLE:**  Do you know Brent Bartley?

4  **STEINHOFF:**  Yeah.

5  **RIDDLE:**  Okay.  What do you know of Brent?  What do you know

6  about Brent?

7  **STEINHOFF:**  I don't really know him that well.

8  **RIDDLE:**  Well, I mean, what -- I mean, have you heard people

9  talk about him, or saying things about him, or --

10  **STEINHOFF:**  I haven't been to Coquille in years.

11  **RIDDLE:**  But -- but we're talking about what did you know

12  back then, not what you know today.  We got to -- it's -- I

13  know it's kind of hard to kind of go back and forth, but --

14  **STEINHOFF:**  I don't know.

15  **RIDDLE:**  -- back then, what did you know of Brent Bartley?

16  **STEINHOFF:**  He hung out with Nick and partied a lot.  That's

17  it.

18  **RIDDLE:**  Was he, uh -- was he considered a good guy?  Was he

19  considered a bad guy?  Was he something else?

20  **STEINHOFF:**  He did drugs too.  I don't know.

21  **RIDDLE:**  You know, you say he did drugs.  I mean, what kind

22  of drugs were they doing?

23  **STEINHOFF:**  Meth and weed and whatever else.

24  **RIDDLE:**  Where did it come from?  Or who was supplying a lot

25  of the drugs?

1   **STEINHOFF:**  Hernan Cortez (phonetic).

2   **RIDDLE:**  Is that coming through you?

3   **STEINHOFF:**  No.

4   **RIDDLE:**  I've heard that.

5   **STEINHOFF:**  No.  Everybody used to go out there.  Ricky Crook

6   did.  Both of his sisters.  Um, a lot of people.

7   **RIDDLE:**  One of the things I hear, and I've heard in

8   following up on this thing, is that you were a source of a

9   lot of drugs.  And be that as it may, whether you were or

10  weren't, that was ten years ago.  And that there was a lot of

11  the Mexican drug connection that was hanging around you.  I

12  don't know if it was from your house or your mom or whoever,

13  but that that was a connection that was pretty prevalent

14  around you.  Is that true?

15  **STEINHOFF:**  No, everybody knew him.  All the kids were doing

16  drugs.

17  **RIDDLE:**  Is it something having to do with a drug debt or

18  something like that, that caused Leah's death?

19  **STEINHOFF:**  I don't know anything about it.  I don't know.  I

20  don't have any idea.  There was no drug dealer hanging around

21  at my house or anything.

22  **RIDDLE:**  Okay.  Hey, I'm just telling you what I hear.

23  **STEINHOFF:**  I know.

24  **RIDDLE:**  And you know what?  That's -- I have to ask you

25  about it.  Because I need to hear it from you, whether it was

1   or wasn't true.  I mean, ten years later it really doesn't

2   matter.

3   **STEINHOFF:**  I know, but --

4   **RIDDLE:**  I mean, everything's good.  And you can't be in

5   trouble for anything that happened like that back then.

6   **STEINHOFF:**  No, there was no --

7   **RIDDLE:**  I mean, if it was, then it was.  I mean, you

8   obviously changed your life now.  You've got beautiful

9   children and, you know, a husband that loves you.  And you've

10  got -- you've got your life ahead of you.

11         And, I mean -- I don't want to -- my biggest fear

12  is, is that somebody goes down for this, and they drag you

13  down with them.

14  **STEINHOFF:**  But I didn't do anything.  I --

15  **RIDDLE:**  I'm just telling you what my biggest fear is.  And

16  for somebody like you, who's got so much going for them, who

17  may have made a mistake or may have been involved with people

18  you shouldn't have been involved with back then, and then you

19  get drug down with them.  The people who aren't going to go

20  down are the people who, if they know something, say

21  something.

22  **STEINHOFF:**  I don't know anything.

23  **RIDDLE:**  I know.  I know you keep saying that, and I

24  appreciate that.  But I'm just trying to shed some light on

25  what's going to happen.  And because of things that we're

1   doing now, not to sound cocky or overconfident or anything

2   like that, this case is going to come to a head, soon.  And

3   there are going to be -- there are going to be people going

4   down, people held accountable for this.

5           And, like I said, my biggest fear is somebody

6   like you, who's got a family, who's got kids, who's got a

7   good thing going in their life, is going to get drug down for

8   something that happened ten years ago.

9           And if you think there's anybody that can drag

10  you down, it's important that we know about it now and you do

11  something good for yourself now.  Because the people who do

12  something good for themselves now are going to save them

13  heartache later.  Does that make sense?

14  **STEINHOFF:**  Yeah.

15  **RIDDLE:**  Okay.  All right, Kristin.  I mean, this is -- this

16  is, you know, maybe one of the last opportunities before this

17  thing goes down.

18  **STEINHOFF:**  But I don't know anything.

19  **RIDDLE:**  I know.  I know.  I'm just shedding some light on

20  you.

21  **STEINHOFF:**  I don't understand what I'm supposed to say.  I

22  don't know.

23  **RIDDLE:**  You're supposed to say the truth, and if that's what

24  you're saying --

25  **STEINHOFF:**  I already have.

Exhibit 127  Page 24 of 72 to
State Defendants' Motion for Summary Judgment
MCCREA_024972

1  **RIDDLE:**  -- and if that's what you're saying, then you can't

2  really say anything else.  I understand that.

3  **ANDREWS:**  We just want to make sure you have the fullest

4  opportunity here.

5  **RIDDLE:**  Yeah, and I want to make sure you have the full

6  effect of what can happen, too.  I'm not saying that -- I'm

7  really not saying that you know something you're not telling

8  us.  I'm not saying that.  I'm saying if you do, if somebody

9  does, then, I mean -- the people who we feel are responsible

10  have already said that when they go down, they're taking

11  other people with them.

12  **STEINHOFF:**  Well, I didn't have anything to do with it so I

13  can't get in trouble for anything.

14  **RIDDLE:**  Okay.  I am so glad to hear to hear you say that.  I

15  am so glad.  I'm sure your family is going to be very glad

16  about that as well, because the last thing your kids need to

17  do is come visit you in prison.  I've seen kids that have had

18  to do that and it is not pretty.  And that's the last thing I

19  want to see your kids have to do, or anybody's kids, for that

20  matter.

21          And I think -- I mean, you know as well as I do.

22  You know how that is.  You've been around.  I mean, I don't

23  know.  Maybe you've even had family in prison.  I don't know.

24  **STEINHOFF:**  No.  Not anybody that I know.

25  **RIDDLE:**  Yeah.  (Pause.)

1   **ANDREWS:**  Just so you know, we own the car now.  And it's up

2   at the crime lab right now, and it's being processed.  And,

3   um --

4   **RIDDLE:**  From stem to stern.

5   **ANDREWS:**  Yep.  You know how --

6   **RIDDLE:**  Every square inch of that car.

7   **ANDREWS:**  Do you watch *CSI*?

8   **STEINHOFF:**  No.

9   **ANDREWS:**  Okay.  Well, a lot of *CSI*, you know, how they do

10  things isn't exactly true, but a lot of it is.  A lot of

11  things we can do with these cars.  Is there -- how many times

12  have you driven that car?

13  **STEINHOFF:**  One time.

14  **ANDREWS:**  Just that one night?

15           How many times has -- you took Nick that night,

16  whichever night it was, you took Nick that night.  And how

17  many times has he ridden in that car that you know of?

18  **STEINHOFF:**  Only one time that I know of.

19  **ANDREWS:**  Okay.  Has Brent Bartley been in that car?

20  **STEINHOFF:**  No.  Zack --

21  **ANDREWS:**  Anybody else in that car besides Zack?

22  **STEINHOFF:**  No.

23  **ANDREWS:**  Your mom?

24  **STEINHOFF:**  I don't know.  The guy was my mom's friend.

25  **ANDREWS:**  Okay.  And that's what I want to make sure.  I'm

1  trying to get a figure on who all was in that car because,

2  um, we have DNA, you know, stuff from Leah, of course.  And

3  then several other people.  And we're going to be comparing

4  the -- what they call profiles, against that.

5           So I just want to kind of get a time line on --

6  not a time line, but on just who all was in that car, so we

7  kind of have an idea.  Okay?

8           You're okay, you know that?

9  **STEINHOFF:**  No, I didn't do anything.  I don't understand

10  this.

11  **ANDREWS:**  Okay.  Well --

12  **RIDDLE:**  If you were in our shoes, who would you go talk to?

13  **ANDREWS:**  Yeah.

14  **STEINHOFF:**  Not me.

15  **ANDREWS:**  Okay.  But who?

16  **STEINHOFF:**  I don't know.

17  **RIDDLE:**  Well, Kristin --

18  **ANDREWS:**  It's just -- it's just a question.

19  **RIDDLE:**  You're with Nick that night.

20  **ANDREWS:**  Yeah.

21  **RIDDLE:**  If Nick has --

22  **STEINHOFF:**  Not the whole night, I wasn't.

23  **RIDDLE:**  If Nick had something to do with it, don't you think

24  it would be important for us to talk to you?

25  **STEINHOFF:**  Yeah, but I've already told you guys everything I

1  know.

2  **RIDDLE:**  Okay.  Well, you know what?  In -- this is one of

3  those cases where when we talk to people multiple times, you

4  get another little piece that maybe you didn't have before.

5  I mean, you know, the next time you talk to them you get

6  another little piece that maybe you didn't have before.  And

7  so it's important -- and not only in this case, but lots of

8  cases are like that.  You know?

9           Especially if people are holding things close to

10 their chest.  You know?  I'm not saying you are.  I'm just

11 saying if people are.  If certain people are.  Okay?  And

12 that's why it's important for us to go back and talk to you

13 again, because maybe since the time that Sergeant Looney and

14 Detective Bowersox came out and talked to you --

15           (Cell phone ringing.)

16 **ANDREWS:**  I love technology.

17 **STEINHOFF:**  Uh-huh.

18 **RIDDLE:**  Maybe that sparks something in your mind that you

19 remember.  Because you told them something that you'd never

20 said before in any of the reports we could find, the last

21 time you talked to them.  So it is important for us to go

22 back and talk to people again.

23 **ANDREWS:**  Right.

24 **RIDDLE:**  And again, and again.  Because, you know what,

25 ultimately I want?  I want the person who killed Leah

1   Freeman, the person who murdered her -- however it was, if it

2   was an accident, if it was in cold blood, or whatever -- I

3   want that person held accountable.  Not for my own

4   gratification, but for the mom who every night has to go to

5   bed thinking of her dead daughter.  Her daughter who was left

6   out in the wood to decompose.  You know?  That's what I want

7   closure for.

8   **STEINHOFF:**  Yeah.

9   **RIDDLE:**  That's what I want somebody held accountable for, is

10  her.  And her sister, and any of her -- you know, the other

11  relatives that have had to deal with this.  (Pause.)

12          See where we're coming from?  See why it's

13  important?  I mean, I know you're a smart girl.  I mean, you

14  know why we're doing this.  I should -- I don't have to tell

15  you.  I mean, you're how old?

16  **STEINHOFF:**  27.

17  **RIDDLE:**  27.  I mean, you're 27 -- you've lived 27 years,

18  you've seen a lot of things, you've done a lot of things.

19  You're a mom, you're raising kids.  I mean, you're a

20  superwoman.  Yeah, we've all done dumb things in the past.

21  All been associated with people we probably regret -- regret

22  being associated with, but we can't take that stuff back.

23  **STEINHOFF:**  Yeah.

24  **RIDDLE:**  But we can sure try to -- try to help out where we

25  can.  You agree?

1          Are you -- what would you -- would you be worried

2    if people labeled you a snitch?

3    **STEINHOFF:**  Not with something like this.

4    **RIDDLE:**  Would you be scared of repercussions from somebody?

5    **STEINHOFF:**  Not with something like this, no.  (Pause.)

6          It's sad.  I feel bad.  I could never -- I didn't

7    think anything like that would happen in Coquille.  It's a

8    small town.

9    **RIDDLE:**  Yeah.  Well, you know, now, anywhere where there's

10   drugs and where there's bad crap like that going on, somebody

11   can obviously get killed over drug debts, over somebody just

12   being too high and wigged out and fly off the handle.  So, I

13   mean that stuff does happen, whether it's in Coquille or

14   Myrtle Point or --

15   **STEINHOFF:**  Yeah.

16   **RIDDLE:**  -- any other -- any other town.  I mean, heck,

17   Bandon had how many -- Girley Crum killed how many people?

18   **ANDREWS:**  Five.

19   **STEINHOFF:**  I read about that.

20   **RIDDLE:**  Five people, and that happened in Bandon.  I mean,

21   so come on.  That stuff happens.

22   **STEINHOFF:**  Yeah.

23   **ANDREWS:**  (Pause.)  You know, we've been asking you a lot of

24   questions.  How about you?  Do you have any questions for us,

25   up to this point?

1   **STEINHOFF:**  No.

2   **ANDREWS:**  No?  Okay.

3   **RIDDLE:**  Kristin, do you remember who the very first officer

4   you talked to about this case was?  The very first officer

5   that interviewed you?

6   **STEINHOFF:**  Um, it was Downing or something.

7   **RIDDLE:**  Pat Downing?

8   **STEINHOFF:**  Yeah.

9   **RIDDLE:**  From the Sheriff's Office?

10  **STEINHOFF:**  Yeah.

11  **ANDREWS:**  Do you remember who else you've talked to, besides

12  us and the ones a couple weeks ago?

13  **STEINHOFF:**  Um, there was a guy that was with him.  A

14  skinnier guy.  Had like grayish hair, or maybe blond hair.

15  **ANDREWS:**  Okay.

16  **STEINHOFF:**  And that's it, I think.  I don't know.

17  **ANDREWS:**  How about Danny Lee?  You know, Officer Lee?

18  **STEINHOFF:**  Maybe.

19  **ANDREWS:**  Coquille PD?

20  **STEINHOFF:**  Mm-hmm.

21  **ANDREWS:**  Okay.  (Pause.)

22  **RIDDLE:**  Do you remember going and talking to Danny Lee about

23  some of the stuff that you heard over at Sturdivant Park, or

24  meeting him at Sturdivant Park and talking to him?

25  **STEINHOFF:**  No.  Scott got pulled over at Sturdivant Park

1    though, and was questioned about it.

2    **ANDREWS:**  This was over at the gazebo, I think.  And there

3    was somebody with her.

4    **RIDDLE:**  Mm-hmm.  I can find that here in a second, I'm

5    just --

6    **ANDREWS:**  Yeah.

7    **RIDDLE:**  I'm just trying to find the very first time she was

8    interviewed.

9    **ANDREWS:**  Yeah.

10   **RIDDLE:**  From what you said.  I'm just maybe trying to jog

11   your memory of something that you sort of forgot about.

12              (Pause.)  So what have you heard over the years

13   as regarding this?

14   **STEINHOFF:**  I haven't lived in Coquille since I was, like,

15   19.  18 or 19.

16   **ANDREWS:**  Well, I mean, murders like this, uh, go throughout

17   the county.  I mean, you know, people talk all over the

18   place.  That's why we ask that question.  Whether you live

19   there or not, what have you heard?

20   **STEINHOFF:**  Nothing, since I moved over here.

21   **ANDREWS:**  What did you hear when you were there?

22   **STEINHOFF:**  A bunch of stuff.  A bunch of rumors, but it was

23   all stupid.  Like, I didn't know if any of it was true, or --

24   it was just a bunch of stuff.

25              There was a big acid party or something, and Kyle

1  Slawson (phonetic), everybody was there and they were all

2  doing acid.  And I heard Leah was there, but I don't know.

3  **ANDREWS:** Would you classify that as a rumor --

4  **STEINHOFF:** Yeah.

5  **ANDREWS:** -- and bad stuff.  Not true?

6  **STEINHOFF:** I didn't know what to believe.  I don't ever

7  believe anything anybody says, because most of the time it

8  doesn't turn out to be true.

9  **ANDREWS:** Nature of the beast, isn't it?

10  **STEINHOFF:** Yeah.

11  **RIDDLE:** (Laughs.)  Now, just reading over what you told Pat

12  Downing back then -- pretty, pretty vague stuff, really.

13  That you remember running into Nick, and he appeared to be

14  panicking, saying he was looking for Leah and not seeing her.

15  You talked to Nick for a few minutes, learning from him that

16  Leah was missing.  That you told Nick if he did not stop --

17  or if he did not find Leah, to stop by your house and you'd

18  help look for her.  And then, after a period of time, Nick

19  comes by.  You drive him around in a purple Kia for about

20  half an hour.

21  **ANDREWS:** Where did you guys go?

22  **STEINHOFF:** Just around town, and, um, he heard there was a

23  party at Sennets'.

24  **ANDREWS:** Where's that?

25  **STEINHOFF:** It's when you go into Fairview.  You know that

1    little bridge that's over that little creek?

2    **ANDREWS:**  Mm-hmm.

3    **STEINHOFF:**  It's, like, the road right there on the right.

4              We didn't see any cars out there, so --

5    **RIDDLE:**  Out past Four Corners?  That far out?  Or --

6    **STEINHOFF:**  No.

7    **RIDDLE:**  Oh.

8    **STEINHOFF:**  Right past, um, Scolaris'.

9    **RIDDLE:**  Um, he'd be more familiar with that than I would be.

10   **ANDREWS:**  Right.  I think it's Lobster Creek, or something

11   like that.

12   **STEINHOFF:**  Yeah, it's on the right-hand side of the road.

13   **ANDREWS:**  Before you get to the bridge.

14   **STEINHOFF:**  It's, um --

15   **ANDREWS:**  Because, if you wait -- if, the right-hand side --

16   **STEINHOFF:**  Do you know where that sharp corner is?  That

17   really sharp corner where --

18   **ANDREWS:**  Mm-hmm.

19   **STEINHOFF:**  -- they fixed that bank and that garage thing --

20   **ANDREWS:**  Mm-hmm.

21   **STEINHOFF:**  -- was sliding down it.  It's right around there.

22   **ANDREWS:**  Okay.

23   **STEINHOFF:**  And that's where he told me to go.  He said that

24   he heard there was a party out there, but we didn't see any

25   cars so we just turned around and went back into town.

1  **ANDREWS:**  Okay.  Did you see any officers that night?

2  **STEINHOFF:**  Hmm-mm.

3  **ANDREWS:**  Anybody stop and talk to you, or anything?

4  **STEINHOFF:**  Not that I know of.

5  **ANDREWS:**  And you say Nick was only with you for half an

6  hour?

7  **STEINHOFF:**  He wasn't with me that long.

8  **ANDREWS:**  How long was he with you before you went out in the

9  car?

10  **STEINHOFF:**  Not very long.

11  **ANDREWS:**  Okay.  Well, I'm -- if you're in the car for half

12  an hour driving around Coquille, but before that you're at

13  your house, right?

14  **STEINHOFF:**  Mm-hmm.

15  **ANDREWS:**  And you're doing meth.  And you almost have sex.

16  How long did all that take?

17  **STEINHOFF:**  Maybe an hour, altogether.

18  **ANDREWS:**  How did you do meth?

19  **STEINHOFF:**  Smoke it.

20  **ANDREWS:**  So, he was with you for about an hour and a half?

21  **STEINHOFF:**  Maybe something like that.

22  **ANDREWS:**  Okay.  At least an hour and a half.  That, kind

23  of -- I mean, do you agree with that?

24  **STEINHOFF:**  Probably, yeah.

25  **ANDREWS:**  Okay.  When you -- when he left you and the Kia,

1   where was that?

2   **STEINHOFF:**  At my house.

3   **ANDREWS:**  And what did he do?

4   **STEINHOFF:**  He left.

5   **ANDREWS:**  And what was he driving?

6   **STEINHOFF:**  I don't remember what he was driving.

7   **ANDREWS:**  Where were you living at the time?

8   **STEINHOFF:**  On Dean Street.

9   **ANDREWS:**  What was the numbers, do you remember?

10  **STEINHOFF:**  1026.

11  **ANDREWS:**  Okay.  And refresh my memory, I don't know Coquille

12  that well.  Where is that address on Dean?  Where is Dean?

13  **STEINHOFF:**  Um.

14  **ANDREWS:**  How would you get there?

15  **STEINHOFF:**  You know where Tenth Street Market used to be?

16  **ANDREWS:**  Yes.

17  **STEINHOFF:**  You go up, um -- if you're coming down from the

18  middle school, you go up to the stop sign and then there's

19  Tenth Street Market.  You go up to the next road, and you

20  turn left.  And that's out --

21  **ANDREWS:**  Towards Central?

22  **STEINHOFF:**  No, you're coming from Central.

23  **ANDREWS:**  Okay.  Coming from Central.  Okay.

24  **STEINHOFF:**  Yeah, and you go past Tenth Street Market --

25  **ANDREWS:**  Uh-huh.

1  **STEINHOFF:**  -- and it's the first left, right there.

2  **ANDREWS:**  Okay.

3  **STEINHOFF:**  And it's the little house that sits back on the

4  right side of the road.

5  **ANDREWS:**  Okay.  So you're there when you come back.  So you

6  went out Fairview, up there to -- it's around milepost --

7  it's like a mile up, right?  Roughly?

8  **STEINHOFF:**  I'm not sure.  I don't --

9  **ANDREWS:**  I think where you're talking about.  It's out past

10  Milky Way and everything, right?

11  **STEINHOFF:**  Yeah, it's right past it.

12  **ANDREWS:**  Okay.  Um, you come back.  Where else did you go in

13  town?

14  **STEINHOFF:**  Just driving around town.

15  **ANDREWS:**  Who did you see?  I mean, it's summertime.  I know

16  there's people running around town, even that late.

17  **STEINHOFF:**  I don't remember.

18  **ANDREWS:**  Because Fast Mart was open 24 hours, wasn't it?

19  **STEINHOFF:**  I think so.

20  **ANDREWS:**  Yeah.  Did you stop there?

21  **STEINHOFF:**  I don't remember.

22  **ANDREWS:**  Did you stop anyplace else?  See anybody, saying

23  like, "Hey, I'm looking for somebody."

24  **STEINHOFF:**  No.

25  **ANDREWS:**  Okay.  Let's see, drove up Fairview.

38

1   **STEINHOFF:**  My stomach's growling.  I'm starving.

2   **ANDREWS:**  (Laughter.)  To small bridge.  Drove around town.

3           And how was Nick acting in the car?

4   **STEINHOFF:**  Just -- I don't know.  Weird.

5   **ANDREWS:**  Have you -- have you ever seen Nick use meth

6   before?  Before that time?

7   **STEINHOFF:**  Yeah.

8   **ANDREWS:**  How was his reaction to it that night?

9           You know how people have different reactions to

10  it.  I mean, you've been around it a lot.  We've seen it.

11  How was he reacting to it?  Does it make him mellow?  Does

12  it, you know, hype him up?  What's it do?

13  **STEINHOFF:**  Hyped him up.

14  **ANDREWS:**  Okay.  Um.

15  **STEINHOFF:**  He was like really antsy.  Kind of.  (Pause.)

16  **ANDREWS:**  Antsy.  Okay.  Did he ask you to take him anyplace

17  else, except for around town?

18  **STEINHOFF:**  Hmm-mm.

19  **ANDREWS:**  Okay.  Did you, um -- I can't remember.  And bear

20  with us.  The -- you know, a lot of this is kind of -- you

21  know, there's a lot of reports out there and everything.

22          But when Nick was at your house, did Scott

23  Hamilton come around and you tell him to leave?  Did that

24  occur?

25  **STEINHOFF:**  Not that I can remember.

Exhibit 127  Page 38 of 72 to
State Defendants' Motion for Summary Judgment
MCCREA_024986

1  **ANDREWS:**  Okay.  So he didn't come around that night?

2  **STEINHOFF:**  Hmm-mm.

3  **ANDREWS:**  Now, you and Nick, did you continue having, um,

4  your friendship relationship past -- I mean, keep going on

5  for a while?  I know you said you haven't spoken to him in

6  years, but how long after that night did it go on?

7  **STEINHOFF:**  A little while.  Not too long.

8  **ANDREWS:**  Okay.  And I know you said that you guys never had

9  sex or anything, but did you have a -- ever have a

10  more-than-friends relationship where you were actually, you

11  know -- maybe you had a crush on him, he had a crush on you?

12  Anything like that?

13  **STEINHOFF:**  Hmm-mm.

14  **ANDREWS:**  Did you ever -- did you ever really like him, that

15  you wanted to do that?

16  **STEINHOFF:**  No, we were just really good friends.

17  **ANDREWS:**  Okay.  Did you ever go out to his house or

18  anything?

19  **STEINHOFF:**  Hmm-mm.

20  **ANDREWS:**  Did you ever meet his parents?

21  **STEINHOFF:**  Hmm-mm.

22  **ANDREWS:**  Brother?

23  **STEINHOFF:**  I know his brother.

24  **ANDREWS:**  Wayne, right?

25  **STEINHOFF:**  Yeah.

40

1  **ANDREWS:**  Have you heard from him lately?

2  **STEINHOFF:**  Huh-uh.

3  **ANDREWS:**  Do you know where he is, by any chance?

4  **STEINHOFF:**  No.

5  **ANDREWS:**  Okay.  I didn't know if you had heard through the

6  grapevine or anything.

7  **STEINHOFF:**  No.

8  **RIDDLE:**  What do you know about the parents?

9  **STEINHOFF:**  I don't really know them.  I heard that they were

10  not too nice.  Like, mean.  I don't know.

11  **RIDDLE:**  I mean, tell me more about that.  Where did you hear

12  that from?

13  **STEINHOFF:**  I don't know.  I just heard it.  I never met the

14  parents, but I heard his dad was an asshole.  That's what I

15  heard.

16  **RIDDLE:**  All right.  (Pause.)

17           Kristin, I know we talked about the polygraph

18  earlier.  Do you remember what questions you were asked

19  during that polygraph?  Do you have an idea?

20  **STEINHOFF:**  Hmm-mm.

21  **RIDDLE:**  Um, if we're not able to find those polygraph

22  results, would that be something you'd be willing to do to

23  clear your name on this thing?  To whether you had any

24  involvement, or have any knowledge of it?

25  **STEINHOFF:**  I already told -- I already told you --

41

1  **ANDREWS:**  It's okay.

2  **RIDDLE:**  I know, I know.  But we're not able to find that.

3  So I'm saying if we're not able to find that, it becomes

4  important to clear your name on this.

5  **STEINHOFF:**  That's what they told me last time when I took

6  it --

7  **RIDDLE:**  I know, but --

8  **STEINHOFF:**  -- and then they still keep coming around.  This

9  is --

10  **RIDDLE:**  Right.  And you know why?  Because ten years later,

11  when we look at everything that we have, obviously we don't

12  have that to look at and go, "Oh, well, she was cleared on

13  this question, this question, that question."  That's totally

14  pertinent, totally relative to what we know Kristin knows.

15           But what if they asked you questions that weren't

16  pertinent?  You passed it, but what if they weren't pertinent

17  at all?

18  **STEINHOFF:**  What's that mean?

19  **RIDDLE:**  Well, say, for example, you didn't kill Leah.  But

20  one of the questions were, "Did you kill Leah."

21  **STEINHOFF:**  They asked me that one.

22  **RIDDLE:**  Okay.  But what if we don't think you did?  That

23  question's really not pertinent.  What if we only thought

24  that, well, the only thing Kristin could know is, one, did

25  anybody tell her they did it?  Two, did you help someone

42

1   conceal the body?  And three, do you know who concealed the

2   body?  Something like that.  You know, those would be more

3   pertinent questions to what we think your involvement may or

4   may not be.  You know what I'm saying?  From what we're

5   hearing from other people.  That's what I'm saying.

6           If they asked you, "Did you kill Leah Freeman,"

7   well, I mean, I don't believe you killed Leah Freeman.

8   **ANDREWS:**  I don't think you did.

9   **RIDDLE:**  He doesn't think you did.  So, I mean, that wouldn't

10  really be a relevant question to clearing your name in this

11  investigation.  But, if there's people out there that believe

12  that, well, Kristin Steinhoff knows more than what she's

13  saying, then let's clear that up.  Let's clear it up so that

14  we don't have to come back and talk to you.

15          Is that something you'd consider doing?

16  **STEINHOFF:**  Yeah, I guess.

17  **RIDDLE:**  I'm going to keep looking for that to see exactly

18  what you were asked.  And that's something we've had to go

19  over with somebody today, and in -- in a interview we did

20  with somebody today, was talked about exactly what question

21  you failed or passed, and discussed that with them.

22          And -- you know, because different questions you

23  could pass.  If, you know -- if you were asked if you killed

24  her and you didn't, then of course you're going to pass that

25  question.

1　**STEINHOFF:**　I didn't kill anybody.

2　**RIDDLE:**　Right.　Then you would pass that question.　So is

3　that something that you would consider, and help us out?

4　**STEINHOFF:**　Yeah, if it means no more cops at my house.

5　**RIDDLE:**　Oh, come on.　We're not that bad.

6　**ANDREWS:**　(Laughs.)

7　**RIDDLE:**　Are we?　Are we?

8　**STEINHOFF:**　No, but --

9　**ANDREWS:**　(Laughs.)

10　**RIDDLE:**　Well, it's not in uniform with a marked car or

11　anything, and showing up with our lights and sirens on.

12　**STEINHOFF:**　Yeah.

13　**RIDDLE:**　I mean, that would be a heck of a lot worse.　But we

14　look like insurance salesmen, don't we?

15　**ANDREWS:**　(Laughs.)

16　**STEINHOFF:**　No, but the car gave it away.

17　**RIDDLE:**　What?

18　**ANDREWS:**　No.

19　**STEINHOFF:**　There's a red one just like it that lives right

20　down the road from me.

21　**RIDDLE:**　Oh.　And that's a police officer?

22　**STEINHOFF:**　Yeah.

23　**RIDDLE:**　Who is it?

24　**STEINHOFF:**　Oh, I can't remember.　He's Coos Bay, though.

25　**ANDREWS:**　And, you know, John was talking about the

1   polygraph.  Why did they wait?  Because you were pregnant?

2   **STEINHOFF:**  Yeah.

3   **ANDREWS:**  So, do you remember when in 2002 it was?  You did

4   say 2002, right?  Before?

5   **STEINHOFF:**  Yeah.  Because my son was born in 2001.

6   **ANDREWS:**  Okay.  Do you remember when in 2002 you took this

7   test?  That might help us track it down.

8   **STEINHOFF:**  Had to be earlier in the year, probably.

9   **ANDREWS:**  And where did you take it?

10  **STEINHOFF:**  At the --

11  **RIDDLE:**  OSP.

12  **STEINHOFF:**  -- State Police Office there in Coos Bay.

13  **ANDREWS:**  Huh?

14  **RIDDLE:**  She's --

15  **ANDREWS:**  Oh, okay.

16  **RIDDLE:**  I asked her a lot -- a lot of these.

17  **ANDREWS:**  Okay.  I didn't know that.  Sorry.

18  **STEINHOFF:**  (Laughs.)

19  **ANDREWS:**  Wasn't listening apparently, at that one.  Okay.

20  **RIDDLE:**  Did you have your own car back then?

21  **STEINHOFF:**  Yeah, but it was broke.

22  **RIDDLE:**  It was broke.

23  **STEINHOFF:**  Yeah, it --

24  **RIDDLE:**  What was it?

25  **STEINHOFF:**  Uh, Hyundai Elantra.

1   **RIDDLE:**  Whatever happened to that car?

2   **STEINHOFF:**  I have no clue.

3   **RIDDLE:**  Did you sell it?  Did somebody steal it?  Did --

4   **STEINHOFF:**  No, it was parked on the side of the road and I

5   don't know what happened to it.  It had a lot of transmission

6   problems.

7   **ANDREWS:**  Do you think it got towed?

8   **STEINHOFF:**  It might have.

9   **ANDREWS:**  Okay.

10  **STEINHOFF:**  I don't know.

11  **ANDREWS:**  Why did you borrow Zack's car that night?

12  **STEINHOFF:**  Because my car wasn't working.

13  **ANDREWS:**  Was he okay with you driving it?

14  **STEINHOFF:**  Yeah.  He said that he had to be in Eugene.  He

15  had to leave at 6:00, so I had to bring his car back before

16  then.

17  **ANDREWS:**  Okay.  6:00 a.m.?

18  **STEINHOFF:**  Mm-hmm.

19  **ANDREWS:**  And, I think you said before that, um, you saw Nick

20  down by the Maytag place?

21  **STEINHOFF:**  Yeah.

22  **ANDREWS:**  What time was that, do you remember?

23  **STEINHOFF:**  When I was taking Zack to his house.

24  **ANDREWS:**  Do you remember when that was?  I guess, daylight?

25  Not daylight?  Dusk?  I mean --

1   STEINHOFF:  It had been dark for a while.

2   ANDREWS:  It had been dark for a while?

3   STEINHOFF:  Yeah.

4   ANDREWS:  And I think you told the original investigators

5   that he was pacing?

6   STEINHOFF:  Yeah, pacing in circles.  And there was no car

7   there or anything.

8   ANDREWS:  Okay.  And you stopped and talked to him?

9   STEINHOFF:  Yeah.

10  ANDREWS:  Was Zack in the car?

11  STEINHOFF:  Mm-hmm.

12  ANDREWS:  And -- how did that go?

13  STEINHOFF:  That's when I asked him what he was doing.  He

14  said that he was looking for Leah.

15  ANDREWS:  Okay.

16  STEINHOFF:  You know.

17  ANDREWS:  And then how much later until he shows up at your

18  house?

19  STEINHOFF:  I'm not sure.

20  ANDREWS:  But you remember that he was wearing clothes then

21  that he wasn't wearing later?

22  STEINHOFF:  Mm-hmm.

23  ANDREWS:  Is that right?  Okay.

24          Typical night like that, I think it was a -- was

25  it a Thursday?  Do you remember?  Kristin, do you remember?

1   **STEINHOFF:**  I don't know.

2   **ANDREWS:**  John, do you remember what night of the week it

3   was?

4   **RIDDLE:**  Not off the top of my head.

5   **ANDREWS:**  I don't remember it was a weekend night.  I thought

6   it was like a Wednesday or Thursday night.

7   **RIDDLE:**  We could find out.

8   **ANDREWS:**  Summertime, what was your typical evening like back

9   then?  How old were you then, in 2000?  You would have been

10  17?  Okay.

11           What was your typical evening like?  I mean, did

12  you stay up late and, you know, sleep in late, or what did

13  you do?

14  **STEINHOFF:**  I stayed up during the night, and did drugs and

15  drove around.

16  **ANDREWS:**  Okay.  And when you do meth -- or did meth, I

17  should say -- did it keep you awake a long time or -- what

18  did it do to you?

19  **STEINHOFF:**  Just --

20  **ANDREWS:**  I know some people it keeps them awake.

21  **STEINHOFF:**  I did a lot of it.  It only kept me up until like

22  the next morning.  Then I'd go to bed.

23  **ANDREWS:**  Okay.

24  **STEINHOFF:**  Then wake up and do it all over again.

25  **ANDREWS:**  Are you done with that lifestyle?

48

1   **STEINHOFF:**  Yeah.

2   **ANDREWS:**  Okay.  I sure hope so.  (Laughs.)

3   **STEINHOFF:**  Yeah.

4   **ANDREWS:**  So it wasn't unusual for you to be out running

5   around at night?

6   **STEINHOFF:**  Hmm-mm.

7   **ANDREWS:**  Okay.  Were you still in school?

8   **STEINHOFF:**  No.

9   **ANDREWS:**  I mean it was during the summer, but I mean, had

10  you graduated from school or --

11  **STEINHOFF:**  I dropped out my sophomore year.

12  **ANDREWS:**  Okay.  Have you ever gone back to get your GED or

13  anything?

14  **STEINHOFF:**  No.  I'm going to do online classes.

15  **ANDREWS:**  Oh, very good.  Good for you.  Good for you.

16  Strongly urge it.  A lot of people don't go back and, uh, you

17  know.  And it just kind of haunts them later on down the

18  road.  So please do.

19  **STEINHOFF:**  Yeah.

20  **ANDREWS:**  So you would have been like a normal fixture at

21  night for the cops to see and everything.  I don't mean that

22  in a bad way, but --

23  **STEINHOFF:**  (Laughs.)

24  **ANDREWS:**  I mean, you know, they would be used to seeing you

25  running around?

1   **STEINHOFF:**  Yeah.

2   **ANDREWS:**  Would they notice that -- did you always have

3   people with you?  Or would they notice that Nick was in

4   there?  Or what do you think?

5   **STEINHOFF:**  No, I'd have people with me.  I hung out with

6   Heidi and --

7   **ANDREWS:**  Heidi.

8   **STEINHOFF:**  Heidi Crook.

9   **ANDREWS:**  Okay.

10  **STEINHOFF:**  Ricky's sister.

11  **ANDREWS:**  Mm-hmm.

12  **STEINHOFF:**  Hung out with them, and just did drugs.  Really

13  stupid.

14  **ANDREWS:**  It's okay.

15  **RIDDLE:**  Did you ever own a -- did you ever own a necklace

16  that said "Nick" on it or something like that?

17  **STEINHOFF:**  No.

18  **RIDDLE:**  You never did?

19  **STEINHOFF:**  No.

20  **RIDDLE:**  I remember hearing that from somebody now.  You had

21  a necklace or something that said "Nick," or you had a crush

22  on Nick, or -- back then?

23  **STEINHOFF:**  I never had a crush on Nick, really.

24  **RIDDLE:**  Really?  Okay.

25          The 28th would have been Friday, the 29th

1  Saturday.  We're talking July, or June?

2  **ANDREWS:**  June.

3  **RIDDLE:**  June.  I'm sorry.  June would have been a Wednesday.

4  **ANDREWS:**  Okay.

5  **RIDDLE:**  June 28th was a Wednesday night.

6  **ANDREWS:**  Okay.  So, I mean, middle of the week.  Even though

7  it's summertime, that's what I was kind of figuring out, you

8  know?  Would -- was it every night you did that?  Okay.

9          Nick was kind of a girls' -- a ladies' man,

10 wasn't he?

11 **STEINHOFF:**  Yeah.

12 **ANDREWS:**  A lot of girls had crushes on him.  But you didn't?

13 **STEINHOFF:**  No.  Well, not too many.  I don't know.  I never

14 seen him with a lot of girls.  Only one girl, Megan Pinkley

15 (phonetic).

16 **ANDREWS:**  And was that before or after Leah?

17 **STEINHOFF:**  Before.

18 **ANDREWS:**  How about after Leah?

19 **STEINHOFF:**  I didn't really see him with any girls.

20 **ANDREWS:**  (Pause.)  We've heard that he's -- you know, he's

21 had girlfriend after girlfriend after girlfriend.  Did he

22 ever get married?

23 **STEINHOFF:**  I don't know.  (Pause.)

24 **ANDREWS:**  Hmm.

25 **RIDDLE:**  Well, I guess, um -- I guess at this point, unless

1  you have any questions for us, I don't know -- I don't know

2  how we can -- I guess the only thing we could do is try to

3  resolve any -- any -- I hate to use the word "suspicion," but

4  surrounding you and your activities that night, would be to

5  clear it up with a polygraph.  Unless -- and I'm going to

6  keep looking to see if I can find where that is, and what

7  questions you were asked.

8  **ANDREWS:**  But would you be willing to do one, to help us out?

9  **RIDDLE:**  It would most likely be here.

10  **ANDREWS:**  Yeah.

11  **RIDDLE:**  It would most likely be with me here, if he's

12  available as well.  And then the polygraph examiner would be

13  here.  It would be in this room.  It would take roughly,

14  two -- three hours, probably, to do it.  Because they -- you

15  remember how it goes.  A bunch of stuff ahead of time, then

16  they hook you up to the machine and they do the test, then

17  they talk to you about the test afterwards.  So.

18  **ANDREWS:**  You willing to do that?

19  **STEINHOFF:**  Yeah, if you -- I want you to look, though, and

20  try to find --

21  **RIDDLE:**  Oh, I'm certain.

22  **ANDREWS:**  Oh, yeah.  Definitely.

23  **RIDDLE:**  Yeah, yeah.  I mean, I've been -- as we've been

24  sitting here talking, I've been looking as well, and --

25  **ANDREWS:**  Yeah.  Yeah.  Bodell (phonetic).

1   **RIDDLE:**  Anything you can think of.  Anything.  The minorest

2   little detail that might be significant to us in this case?

3   **STEINHOFF:**  No.  Because I've thought about it and thought

4   about it since the last two detectives were at my house, and

5   I don't know anything else.  That's all.  (Pause.)

6   **RIDDLE:**  You don't lose sleep over it, do you?

7   **STEINHOFF:**  Well, I have, just thinking about it.  Like, is

8   there anything that I could have picked up on or noticed that

9   I didn't say anything about, but there isn't.  Just the way

10  he was acting and everything.  And that's all.

11  **RIDDLE:**  Have you -- that may not be that great of a

12  question, actually, but I mean -- did you ever lie to the

13  police about anything involving this case at all?  Even early

14  on?

15  **STEINHOFF:**  No, because I --

16  **RIDDLE:**  About things that you and Nick did, or anything that

17  night?  Is there anything that you can recall that you may

18  have just kind of fudged on, initially?

19  **STEINHOFF:**  No.

20  **RIDDLE:**  Okay.

21  **STEINHOFF:**  I'm the one that came to the cops first and said

22  how Nick was acting.  And that's when they started

23  questioning me about it.  So it wasn't just them coming to

24  me.  When they had that little roadblock thingy --

25  **RIDDLE:**  Mm-hmm.

1   **STEINHOFF:**  -- um, where Dairy Queen or whatever used to be.

2   **RIDDLE:**  Mm-hmm.  Yeah, I remember.

3   **STEINHOFF:**  I stopped and talked to one of the people there

4   and told them how Nick was acting, and that that was her

5   boyfriend, so --

6   **RIDDLE:**  You mean you stopped and talked to one of the police

7   officers there?

8   **STEINHOFF:**  Yeah.

9   **RIDDLE:**  Okay.  I wanted to make sure I understood you.

10              Did you -- do you recall doing anything else when

11  that roadblock was going on?  Stopping and talking to

12  somebody else and asking what the cops were asking them, or

13  anything like that?

14  **STEINHOFF:**  Hmm-mm.  (Pause.)

15  **RIDDLE:**  Did you know a girl named Quinn Cannon?

16  **STEINHOFF:**  Kind of.

17  **RIDDLE:**  Do you remember talking to her that night at the

18  roadblock?

19  **STEINHOFF:**  Hmm-mm.  I didn't really ever talk to her.  I

20  just knew her from just around town.

21  **RIDDLE:**  Gotcha.  What's she like?

22  **STEINHOFF:**  I don't know.

23  **RIDDLE:**  Is she friends of Nick's, or --

24  **STEINHOFF:**  Yeah.

25  **RIDDLE:**  You know what she's doing now, or anything about her

1  now?

2  **STEINHOFF:**  Hmm-mm.  I haven't really seen anybody that I

3  used to hang out with.  (Pause.)

4  **RIDDLE:**  Do you ever remember a time when you and -- well,

5  actually it was when Nick and Ricky Crook were together, and

6  you guys met somewhere, um -- maybe over by the high school

7  or something.  And you and Nick got in the car together and

8  were talking about something, and Ricky Crook was in his car

9  or was in Nick's car, and you guys had some sort of

10  conversation, and after that --

11  **STEINHOFF:**  No.

12  **RIDDLE:**  You don't remember that at all?

13  **STEINHOFF:**  Hmm-mm.

14  **RIDDLE:**  I need to make a phone call really quick, because

15  there was something I was supposed to ask you about that,

16  something that came up recently.  And I'm going to step out

17  and make that call real quick, and --

18  **STEINHOFF:**  Mm-hmm.

19  **ANDREWS:**  Can you get out?

20  **RIDDLE:**  Yeah.

21          (Riddle exits, door closing.)

22  **ANDREWS:**  Okay.  Now, one of the things with the Kia is --

23  obviously, you see it says here, it says "processed trunk for

24  blood."  But I can tell you they've -- they've -- they've

25  gone over the entire car.

1          This look about the same car you drove that

2    night?  That Zack had?  I mean --

3    **STEINHOFF:**  Looks like not the same color.

4    **ANDREWS:**  Oh, really?

5    **STEINHOFF:**  It's like a -- it's like a blue.

6    **ANDREWS:**  Okay.

7    **STEINHOFF:**  The car that he had was, like, purplish.

8    **ANDREWS:**  But you only drove it the once?

9    **STEINHOFF:**  Mm-hmm.

10   **ANDREWS:**  And how often did you see that car?

11   **STEINHOFF:**  He came over to my grandma's house a lot.  He was

12   friends with my mom.

13   **ANDREWS:**  But they weren't boyfriend/girlfriend?

14   **STEINHOFF:**  No.

15   **ANDREWS:**  Okay.

16   **STEINHOFF:**  Not that I know of.

17   **ANDREWS:**  But Danny Horlacher was?

18   **STEINHOFF:**  Yeah, him and my mom are on and off.

19   **ANDREWS:**  They're off right now, right?

20   **STEINHOFF:**  Yeah, he got a restraining order against her.

21   **ANDREWS:**  Oh.  And who's your mom?

22   **STEINHOFF:**  Heather McMullen.

23   **ANDREWS:**  Okay.  And you don't have much to do with her?

24   **STEINHOFF:**  No, because she does a lot of drugs.

25   **ANDREWS:**  Still?

56

1   **STEINHOFF:** Yeah, and I don't want anything like that around

2   me. It's not worth getting my kids taken away for.

3   **ANDREWS:** Ah, yeah. Yeah. DHS gets kind of finicky about

4   that, don't they?

5   **STEINHOFF:** Yeah.

6   **ANDREWS:** Well, and with just cause. You know, we don't

7   want -- we don't want the kids to be around that stuff, so --

8   and it sounds like you don't either, so that's good too.

9   **STEINHOFF:** No way. I'd rather have her stay away if she's

10  on drugs than come around and be all high around my kids.

11  **ANDREWS:** Mm-hmm. When did you get sober?

12  **STEINHOFF:** Um, when I was 19.

13  **ANDREWS:** How long before this were you into drugs?

14  **STEINHOFF:** Maybe a year.

15  **ANDREWS:** So you were only in there about three years?

16  **STEINHOFF:** Yeah.

17  **ANDREWS:** Do you still drink?

18  **STEINHOFF:** Once in a great while.

19  **ANDREWS:** Okay. I know you smoke.

20  **STEINHOFF:** Yeah.

21  **ANDREWS:** Um. So you started when you were like 16? Using

22  meth?

23  **STEINHOFF:** Yeah, 16, almost 17.

24  **ANDREWS:** Okay.

25  **STEINHOFF:** Probably like a month away from my 17th birthday.

Exhibit 127  Page 56 of 72 to
State Defendants' Motion for Summary Judgment
MCCREA_025004

1   **ANDREWS:**  Mm-hmm.  How did you get started?

2   **STEINHOFF:**  My mom.

3   **ANDREWS:**  Really?

4   **STEINHOFF:**  Mm-hmm.

5   **ANDREWS:**  She gave it to you?  That's sad.

6   **STEINHOFF:**  Yeah.

7   **ANDREWS:**  Mm.  And did she teach you how to smoke it and

8   everything?

9   **STEINHOFF:**  No, um -- Justin Hunter.  I smoked it with him

10  the first time.

11  **ANDREWS:**  Mm-hmm.  And how does -- how -- I mean, what's it

12  do to you?

13  **STEINHOFF:**  Just makes you feel like you have energy.

14  **ANDREWS:**  Okay.

15  **STEINHOFF:**  But I started doing so much of it that it -- it

16  wasn't really doing anything to me.

17  **ANDREWS:**  Mm-hmm.  Did you go through some sort of program to

18  get sober?  You just quit cold turkey?

19  **STEINHOFF:**  Yep.

20  **ANDREWS:**  Good for you.

21  **STEINHOFF:**  I got pregnant, and --

22  **ANDREWS:**  Good for you.  That's the hard way to do it,

23  probably.

24  **STEINHOFF:**  Yeah.  But my -- my son was worth it.

25  **ANDREWS:**  Mm-hmm.  How long have you -- it's John, right?

1    John Farley?

2    **STEINHOFF:**  Mm-hmm.

3    **ANDREWS:**  How long have you guys been together?

4    **STEINHOFF:**  Um, 14 years altogether.  I was with him when I

5    was 13.  Then we broke up.  And I was with him when I was 15,

6    and we broke up, and then when I was 18 or 19.

7    **ANDREWS:**  How much older is he than you?

8    **STEINHOFF:**  Two years.

9    **ANDREWS:**  Mm.  But how long have you guys been together now?

10   I mean, this last part with no breaks?

11   **STEINHOFF:**  Nine years.

12   **ANDREWS:**  Wow.  Long time.

13   **STEINHOFF:**  Yeah.  And we have four kids.

14   **ANDREWS:**  Not -- are you married yet?

15   **STEINHOFF:**  No.

16   **ANDREWS:**  Oh.  Can't pin him down?

17   **STEINHOFF:**  No, we don't want to get married.

18   **ANDREWS:**  Oh.  I don't blame you, you know.  I mean, I'm

19   married, but, you know, there's times when either financially

20   you're not -- not in our situation, but I just -- I just

21   couldn't imagine being without her.

22   **STEINHOFF:**  Yeah.  All our friends who got married ended up

23   getting a divorce.

24   **ANDREWS:**  Oh, really?

25   **STEINHOFF:**  Yeah.

1  **ANDREWS:**  That's too bad.

2  **STEINHOFF:**  (Laughs.)

3  **ANDREWS:**  So, that's one way -- why not to get married, I

4  guess.  (Laughs.)

5  **STEINHOFF:**  Yeah.

6  **ANDREWS:**  You guys talked after we left?  What -- how's he

7  feel about you being down here?  He just wants it to end,

8  too?

9  **STEINHOFF:**  Yeah.

10  **ANDREWS:**  Did you guys argue about it?

11  **STEINHOFF:**  No.

12  **ANDREWS:**  Okay.  I imagine it was kind of a shock to --

13  **STEINHOFF:**  It was just --

14  **ANDREWS:**  -- come home and see two guys in suits in your --

15  in your house, both talking to you.

16  **STEINHOFF:**  Yeah.

17  **ANDREWS:**  But you understand where we're coming from, don't

18  you?

19  **STEINHOFF:**  Yeah, you have to do your job, but --

20  **ANDREWS:**  Yeah.

21  **STEINHOFF:**  I just -- I don't know.

22  **ANDREWS:**  Well, obviously we've been around talking to you,

23  and talking to a bunch of people.  And you know -- you know,

24  like John said, John Riddle, he -- it's coming to a head.

25  And this is only the beginning.

60

1  **STEINHOFF:**  Yeah.

2  **ANDREWS:**  Well, maybe this is maybe partway to the middle.

3  There's still a lot more to go.  And, you know, and if -- if

4  and when it comes to a head, you'll probably end up having to

5  come in and talk some more.

6           So -- that's why we wanted to talk to you about,

7  you know, the polygraph.  If -- if we can't find that one, or

8  if we find it and it's not the pertinent questions, you know,

9  the ones that we need for this, you know -- that's why we ask

10  you would you be willing to do that.

11           And you said yes, and I understand that, So --

12  but we're going to check first.  There's just -- this thing

13  was cataloged in -- we have to search -- we have to know who

14  the officer is, and then we have to search through theirs to

15  find, you know, whatever.  So it just takes a little while.

16           Like I said, you know, there's -- just on the

17  disk that they gave us, there's about 4,000 pages of

18  documents.  So it's a lot of stuff.  I mean, if you think

19  your average book -- your average paperback book that you see

20  on the stand is like 400 pages, maybe 600 pages, we're

21  talking 4,000 full-size pages.

22  **STEINHOFF:**  Yeah.

23  **ANDREWS:**  So, there's a lot of words there.  You know, it's

24  ten years of investigation.  (Yawns.)  Excuse me.

25  **STEINHOFF:**  I got to cook my kids dinner.

61

1   **ANDREWS:**  Oh.  Well, I think as soon as John gets back,

2   he's -- he just wanted to clarify something that somebody had

3   said that we need to talk to you --

4                    (Door opening.)

5                    Well, he's back now.  And I think we'll be done

6   with you after we get that stuff done.

7   **STEINHOFF:**  Okay.

8   **RIDDLE:**  Okay.  Just a couple of things.  That thing that I

9   was talking to you about.  Apparently Ricky and Nick were

10  cruising around some night, and you were cruising around as

11  well.  You guys saw each other.  You pulled into the -- the

12  parking lot of the Faith Lutheran Church.  You know which one

13  that is?  And it's across from the middle school.  Church

14  parking lot, there?

15  **STEINHOFF:**  Oh.

16  **RIDDLE:**  Pulled in there.

17  **STEINHOFF:**  That was the day --

18  **RIDDLE:**  Ricky waited in Nick's car --

19  **STEINHOFF:**  -- before the grand jury.

20  **RIDDLE:**  Okay.  Tell me about that.  Tell me more about that.

21  **STEINHOFF:**  He just -- I don't -- I don't know.  I think it

22  was him saying, Quit telling the cops stuff.  Quit telling

23  the cops that you seen me that night.

24                    And there was other stuff.  He was mad.

25  **ANDREWS:**  Who's he?

1    **STEINHOFF:** Nick.

2    **ANDREWS:** Okay.

3    **RIDDLE:** Did it make you cry?

4    **STEINHOFF:** I don't remember. Probably.

5    **RIDDLE:** Do you cry easily?

6    **STEINHOFF:** Yeah, if I'm upset.

7    **RIDDLE:** Yeah. So, was it -- you recall that being the night

8    before the grand jury?

9    **STEINHOFF:** Yeah.

10   **RIDDLE:** Okay.

11   **STEINHOFF:** Because he wanted to know if I had to go to it.

12   **RIDDLE:** You mean -- do you remember specific things that he

13   told you?

14   **STEINHOFF:** No.

15   **RIDDLE:** Just generally, quit talking to the cops --

16   **STEINHOFF:** Yeah.

17   **RIDDLE:** -- type stuff? Okay. Um --

18   **STEINHOFF:** Because I had told him that, um -- that I told

19   the cops that I had seen him that night, and that's why he

20   was so upset.

21   **RIDDLE:** Do you recall the night that you guys were driving

22   around in the Kia, and supposedly drove out to -- and I don't

23   mean "supposedly"; I shouldn't say it like that, because it

24   makes it sound like I'm not believing you and that's not the

25   case.

1        But you drove out to Sennets' house, you drive

2  around town, and you told us -- or told law enforcement

3  before that you guys put gas -- remember that Nick put gas in

4  your car, or that car, from the -- do you remember any of

5  this stuff?

6  **STEINHOFF:**  No, I think I said --

7  **RIDDLE:**  Do you remember cleaning out the car, and --

8  **STEINHOFF:**  No, I --

9  **RIDDLE:**  -- using air freshener?

10  **STEINHOFF:**  I sprayed air freshener in the car because I was

11  smoking in his car and I wasn't supposed to.

12  **RIDDLE:**  Okay.

13  **STEINHOFF:**  I didn't clean out the car, I put air freshener

14  in there.

15  **RIDDLE:**  Okay.

16  **STEINHOFF:**  It's that spray-gun thingy.

17  **RIDDLE:**  Okay.  And where was that?

18  **STEINHOFF:**  At the -- the car wash at Fast Gas.

19  **RIDDLE:**  Okay.  So was Nick with you when you did that?

20  **STEINHOFF:**  I don't think so.  I think that I ended up seeing

21  him later at that same store, though.

22  **RIDDLE:**  And do you remember Nick putting gas in your car

23  that -- or that car that night?  I keep wanting to call it

24  your car, but --

25  **STEINHOFF:**  Hmm-mm.

1  **RIDDLE:**  Well, that's something that you've said before, is

2  that happened.

3  **STEINHOFF:**  I don't know.  I might have said it.  I don't

4  remember, though.

5  **RIDDLE:**  Okay.  So you don't remember that happening one way

6  or the other?

7           Okay.  And your whole reasoning for spraying air

8  freshener is just because you were smoking cigarettes in

9  there?

10  **STEINHOFF:**  And I wasn't supposed to.

11  **RIDDLE:**  Okay.  Did Zack smoke cigarettes?

12  **STEINHOFF:**  I don't know.  I don't remember.  If he did, I

13  know he didn't smoke in his car, I don't think.

14  **RIDDLE:**  Okay.  Well, that's contrary to what he says.

15  **STEINHOFF:**  Oh, really?

16  **RIDDLE:**  He says you wouldn't have had any reason to, because

17  he smoked in the car.

18  **STEINHOFF:**  Oh.

19  **RIDDLE:**  He smoked in the car with you before, he said.

20  **STEINHOFF:**  I don't know.

21  **RIDDLE:**  Okay.

22  **STEINHOFF:**  I was just told not to smoke in the car.

23  **RIDDLE:**  That's really -- do you remember, any idea what time

24  it was when you got that car back to him?

25  **STEINHOFF:**  Before 6:00.

65

1   **RIDDLE:**  Do you remember what time it was when you and Nick

2   parted ways that night?

3   **STEINHOFF:**  No.

4   **RIDDLE:**  So do you think you remembered back then, and then

5   told anybody who interviewed you back then, like about what

6   time, and --

7   **STEINHOFF:**  Probably.

8   **RIDDLE:**  Okay.  And you just don't remember today --

9   **STEINHOFF:**  No.

10  **RIDDLE:**  -- or ten years later?

11  **STEINHOFF:**  No.

12  **RIDDLE:**  Okay.  (Pause.)  What do you think should happen to

13  the person responsible for Leah's death?

14              (Cell phone ringing.)

15  **STEINHOFF:**  They should get in trouble for it.

16  **RIDDLE:**  Well, what kind of trouble?  What do you mean?

17  **STEINHOFF:**  I don't know.  I've never -- I don't know.  I

18  don't know.

19  **RIDDLE:**  What do you think should happen to anybody who

20  helped or hid information, or helped in any way conceal this

21  crime?

22  **STEINHOFF:**  You keep acting like it's me that's hiding

23  something.

24  **RIDDLE:**  I'm just --

25  **STEINHOFF:**  No.

1   **RIDDLE:**  I'm just curious what your opinion is, that's all.

2   That's all I'm asking you.  If you're getting those feelings,

3   I'm sorry.  That's not what I'm -- that's not what I'm

4   insinuating.  I'm asking what your opinion is.

5             It's -- and you know, I have pretty strong

6   opinions of what -- you know, what should happen to somebody.

7   And I'm just kind of curious what your opinions are, that's

8   all.

9   **STEINHOFF:**  They should get punished for it.  I don't -- I

10  don't know.

11  **RIDDLE:**  Including anybody that -- that aided?

12  **STEINHOFF:**  What's that?

13  **RIDDLE:**  Well, that aided, that assisted, that maybe helped

14  dump the body.  Maybe they're not responsible for -- for the

15  actual killing, but they maybe helped dispose of the body or

16  something like that.

17             (Cell phone ringing.)

18  **STEINHOFF:**  Yeah, I don't know.

19  **RIDDLE:**  What if it was one of your children?  What do you

20  think should happen to them?

21  **STEINHOFF:**  One of my children that did it?

22  **RIDDLE:**  Hmm-mm.  That was dead.  That got murdered.  The

23  body got dumped alongside of a road somewhere.

24  **STEINHOFF:**  Then they should get in trouble for it.

25  **ANDREWS:**  Like, stand-in-the-corner trouble?

67

1   **STEINHOFF:** No, like go to jail trouble, probably.

2              (Pause.)

3   **RIDDLE:** Do you think it's the same if somebody intentionally

4   did something to her or if somebody accidentally did

5   something to her --

6   **STEINHOFF:** Mm-hmm.

7   **RIDDLE:** -- but the result ended up being the same?

8              I mean, she dies either way. Do you think those

9   people -- do you think somebody intentionally did something

10  to her should be held in the same light as somebody that

11  accidentally did something to her?

12  **STEINHOFF:** I don't know. If they covered up the crime after

13  they did it, you mean?

14  **RIDDLE:** No, I just mean if somebody -- if I -- if somebody

15  walked up and killed somebody in cold blood, or somebody

16  accidentally did something that resulted in somebody's death.

17  Should those -- the people involved in that -- should they be

18  held to the same standard, if you will?

19  **STEINHOFF:** No.

20  **RIDDLE:** Should they be treated the same?

21  **STEINHOFF:** No, I don't think so.

22  **RIDDLE:** Well, and explain that to me.

23  **STEINHOFF:** I don't know.

24  **RIDDLE:** I mean, no, you have an opinion on this. This is --

25  **STEINHOFF:** There's somebody that can go up to somebody and

68

1  kill somebody, and then there's something -- somebody that

2  can accidentally do something.

3  **RIDDLE:**  Right.

4  **STEINHOFF:**  Somebody was intentionally trying to kill

5  somebody, or something?

6  **RIDDLE:**  Mm-hmm.

7  **STEINHOFF:**  It should be different than accident, I guess.

8  **RIDDLE:**  Should that person be held -- should whatever

9  punishment be more strict for that person, or less -- less,

10  or more severe or less severe?  I'm trying to understand what

11  you're saying, that's why I'm --

12  **STEINHOFF:**  Probably more severe if somebody did it on

13  purpose.

14  **RIDDLE:**  Okay.  Okay.

15  **STEINHOFF:**  But --

16  **RIDDLE:**  So if somebody accidentally did this, then, you

17  know, they -- it shouldn't be as severe a punishment as --

18  **STEINHOFF:**  Well, it should still be a punishment, but --

19  **RIDDLE:**  Oh, I agree.  I agree a hundred percent.  I'm just

20  trying to get a feel for what your opinions -- people have

21  really strong opinions of how murderers should be dealt with,

22  or how rapists should be dealt with, or how child molesters

23  should be dealt with.  I'm just trying to get a feel for you,

24  and what your feelings are.  That's all.

25          That's all I'm trying to do.  And it doesn't --

1  it sounds like you don't really have a strong opinion,

2  really, one way or the other.

3  **STEINHOFF:**  I don't know.  I'm just -- no.  I feel like you

4  guys think that I had something to do with it.

5  **RIDDLE:**  I'm sorry you feel that way.

6  **ANDREWS:**  Yeah.

7  **RIDDLE:**  I'm sorry you feel that way.  That's not what I'm

8  getting at.

9  **STEINHOFF:**  Or that I know something, and I don't.

10  Everything that I know, I've already said.  And my memory

11  isn't that good because of all the drugs, but --

12  **RIDDLE:**  Yeah, I would venture to say that even with the

13  drugs, you know, something significant as this, that you'd

14  have a pretty good memory about things that happened.

15  **STEINHOFF:**  Things -- stupid things like me getting high all

16  night, driving around --

17  **RIDDLE:**  Yeah.

18  **STEINHOFF:**  -- not remembering exactly what time, anything,

19  no.

20  **RIDDLE:**  Right.  And I agree with you.  But I do think that

21  if -- you know, more significant, more substantial things

22  surrounding this -- because this was a pretty significant

23  thing.  I mean, you cry over it at the drop of a hat,

24  almost --

25  **STEINHOFF:**  Well, yeah.  Because --

1  **RIDDLE:** -- so it was pretty significant to you.  It's

2  affected you.  It's very -- obviously.

3  **STEINHOFF:**  Yeah, it's affecting me.  It's affecting my

4  family, my kids.

5  **RIDDLE:**  Yeah.  And it's affected you this way for ten years.

6  **STEINHOFF:**  Yeah.

7  **RIDDLE:**  So this is a substantial thing that's occurred in

8  your life.  A significant thing that's occurred in your life.

9  **STEINHOFF:**  I just -- I don't know.

10  **RIDDLE:**  And that's what I'm getting at.  I mean, I

11  understand the drug use, and stuff like that.  But I think

12  when there's a significant event in your life, I think you

13  tend to remember more details regardless of whether you're a

14  drug addict, an alcoholic, a -- you know, a chronic dope

15  smoker, whatever.  I mean, you know what I'm saying?  You're

16  going to remember significant things in your life.

17  **STEINHOFF:**  Not getting gas or driving around or anything

18  like that.  I don't remember exactly the times.  I don't

19  know.

20  **RIDDLE:**  Sure.

21  **STEINHOFF:**  17 years old, doing a lot of drugs.  I don't -- I

22  don't know.

23  **RIDDLE:**  Okay.

24  **STEINHOFF:**  And I'm sure if I was with somebody that killed

25  somebody, I would remember that.  But I wasn't.

1   **RIDDLE:**  Okay.

2   **STEINHOFF:**  And I don't know.

3   **RIDDLE:**  Okay.  All right.

4   **STEINHOFF:**  I got to go home and cook my kids dinner.

5   **RIDDLE:**  Gotcha.  All right.  So, you don't have any

6   questions for us, Kristin?

7   **STEINHOFF:**  No.  Try to find that, and then --

8   **RIDDLE:**  Okay.

9   **STEINHOFF:**  -- let me know.

10  **RIDDLE:**  All right.

11  **ANDREWS:**  Let me move my chair, here.

12  **RIDDLE:**  Well, let's up -- at least do something for the

13  tape.  It's about 5:46 p.m., and we're going to go ahead and

14  shut the tape off and end the interview.  Kristin's leaving,

15  and leaving it open for us to call you about the polygraph

16  thing when we find it.  Is that correct?

17  **STEINHOFF:**  Yeah.

18  **RIDDLE:**  Okay.  Thanks, Kristin.

19  **ANDREWS:**  Oh.

20  **RIDDLE:**  Kristin, can I shake your hand?

21  **STEINHOFF:**  Mm.

22  **RIDDLE:**  Thank you.  I'm sorry you feel that we think that.

23  I really am, because that's not what we're getting at, okay?

24  All right.

25  **ANDREWS:**  I'll walk you out.

72

1              (End of recording.)

2

3

4

5                        --oOo--

6

7    I certify, by signing below, that the foregoing is a correct

8    transcript of a DVD recording dated March 4, 2010, and

9    transcribed this 27th day of December, 2010.

10

11    _____

12         PEGGY S. JILLSON, TRANSCRIBER

13

14

15

16

17

18

19

20

21

22

23

24

25

004122                                004122                                004122

*An ASCLD/LAB Accredited Laboratory since 1985*



# Oregon
Theodore R. Kulongoski, Governor

Department of State Police
**Forensic Laboratory**
3620 Gateway Street
Springfield, OR 97477
(541) 726-2590
FAX (541) 726-2524

March 10, 2010

Coquille Police Department
851 N. Central Blvd.
Coquille, OR 97423-1253

**Attention: P. Smith**

FREEMAN, LEAH (Victim)
MCGUFFIN, NICHOLAS JAMES (Suspect)
Agency Case 00-1905
Lab No. 00N-000481                    **Analytical Report**
Refer to previous laboratory reports

On February 9, 2010, the Forensic Services Division received sealed via P. Smith the following:

**Exhibit 54 (3227)**: Two swabs with gray-brown staining reportedly collected from the ceiling above the driver's seat. No blood was detected.

**Exhibit 55 (3228)**: Two swabs with gray-brown staining reportedly collected from the ceiling near the passenger door. No blood was detected.

**Exhibit 56 (3229)**: Thirteen swabs with gray-brown staining reportedly collected from under the lip of the gas tank in the trunk. No blood was detected.

**Exhibit 57 (3230)**: Four swabs with gray-brown staining reportedly collected from screw holes. No blood was detected.

**Exhibit 58 (3220)**: Eleven mid-sized hex bolts, two large hex bolts with washers, one large washer and one Phillips screw, all reportedly collected from the trunk. No blood was detected.

On February 23, 2010, the Forensic Services Division received sealed via C. Webley the following:

**Exhibit 52.2**: One swatch of gray fabric collected from the seat portion of the driver's removable seat cover. Spermatozoa heads and nucleated epithelial[1] cells were detected.

The following items were not opened or examined at this time. Presumptive testing indicated the presence of blood on these items during the vehicle processing.

**Exhibit 52.1**: Cutting from the fabric trunk liner.
**Exhibit 52.3**: Swabs from the driver's side rear floorboard area.
**Exhibit 52.4**: Tested[1] swab from the passenger side rear floorboard area.

---

[1] Epithelial cells line the surfaces of all mucous membranes, including the oral and vaginal cavities.

004122                                004122                                004122

004123                                       004123                                       004123



Agency Case No. 00-1905
Lab No. 00N-000481
March 10, 2010
Page 2

**Exhibit 52.5**: Untested swab from the passenger side rear floorboard area.
**Exhibit 52.6**: Tested swab from the driver's side front floorboard area.
**Exhibit 52.7**: Untested swab from the driver's side front floorboard area.

Exhibits 52.1 – 52.7 were collected from a purple Kia Sephia.

On March 9, 2010, the Forensic Services Division received sealed via P. Johnson the following resubmitted evidence:

**Exhibit 28 (JP-003/013)**: One empty Blitz Weinhard beer can and multiple pieces of broken glass. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 28.1).

**Exhibit 29 (JP-004/013)**: One white plastic bottle cap. Potential DNA evidence was collected from the screw threads of the cap via two swabs (Exhibit 29.1).

**Exhibit 31 (JP-006/013)**: One empty Steel Reserve beer can. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 31.1).

**Exhibit 32 (JP-007/013)**: One empty Busch Light beer can reportedly collected from the side of the road. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 32.1).

**Exhibit 33 (JP-008/013)**: One empty Busch Light beer can reportedly collected from the side of the road. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 33.1).

**Exhibit 34 (JP-009/012)**: One empty Mountain Dew can reportedly collected from the road near the body. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 34.1).

**Exhibit 35 (JP-010/012)**: One empty Hamm's beer can reportedly collected from near the body. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 35.1).

**Exhibit 36 (JP-011/012)**: One empty Lucky Lager beer can reportedly collected from near the body. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 36.1).

On March 9, 2010, the Forensic Services Division received sealed via P. Johnson the following evidence:

**Exhibit 59 (057)**: One empty Coors Light beer can reportedly collected from milepost 0.6 on Hudson Ridge. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 59.1).

**Exhibit 60 (056)**: One empty Hamm's beer can reportedly collected from milepost 0.5 on Hudson Ridge. Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 60.1).

---

[1] For the purposes of this report, "tested" swabs were treated with phenolphthalein, a presumptive test for the presence of blood, while "untested" swabs were not subjected to phenolphthalein testing.

004123                                       004123                                       004123

Exhibit 128  Page 2 of 3 to
State Defendants' Motion for Summary Judgment
**MCCREA_020965**

004124                              004124                                004124

Agency Case No. 00-1905
Lab No. 00N-000481
March 10, 2010
Page 3

**Exhibit 61 (054):** One empty Bud Light beer can reportedly collected from milepost 1.5 on Hudson Ridge.  Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 61.1).

**Exhibit 62 (050):** One empty Budweiser beer can reportedly collected from milepost 0.07 on Hudson Ridge.  Potential DNA evidence was collected from the mouth of the can via two swabs (Exhibit 62.1).

**Exhibit 63 (051):** One empty plastic Powerade bottle with cap reportedly collected from milepost 2.5 on Hudson Ridge.  Potential DNA evidence was collected from the mouth of the bottle and the screw threads on the cap via two swabs (Exhibit 63.1).


**DISPOSITION OF EVIDENCE:**

The following items will be forwarded to the latent print section of the laboratory:

Exhibits 59 – 63          Cans and bottle

The following items will be forwarded to the DNA section of the Portland Forensic Laboratory:

Exhibits 52.1 – 52.7     Swabs and cuttings from vehicle
Exhibits 28.1 – 29.1,    Swabs from cans and bottle
          31.1 – 36.1,
          59.1 – 63.1


All additional evidence is available for return to the agency at the earliest convenience.


I certify this to be my report concerning my laboratory tests on the evidence in the above identified case.


_Traci L. Rose_

Traci L. Rose, Forensic Scientist

Pursuant to ORS 40.460 (25), I hereby certify that I retrieved this
document directly from the computer system maintained and operated by
the Oregon Department of State Police and that this document accurately
reflects and is a true copy of the information contained in that computer
system. In testimony whereof, I have affixed my signature.

_Michelle L. Welch_

Exhibit 128  Page 3 of 3 to
State Defendants' Motion for Summary Judgment
MCCREA_020966

004126                              004126                              004126

*An ASCLD/LAB Accredited Laboratory since 1985*



# Oregon
Theodore R. Kulongoski, Governor

**Department of State Police**
**Forensic Laboratory**
3620 Gateway Street
Springfield, OR 97477
(541) 726-2590
FAX (541) 726-2524

March 25, 2010

Coquille Police Department
851 N. Central Blvd.
Coquille, OR 97423-1253

**Attention: Chris Webley**

FREEMAN, LEAH (Victim)
MCGUFFIN, NICHOLAS JAMES (Suspect)
Agency Case 00-1905
Lab No. 00N-000481                          **Field Investigation**

On Wednesday, February 24th, 2010 Forensic Scientists Traci Rose, Ryan Traff, Odessa Wozniak and I responded to a request from Coquille Police Department to assist in the processing of a car reportedly involved with the 2000 homicide of Leah Freeman.

The vehicle was a 1999 purple, 4-door Kia Sephia with Oregon license plate WZB 143 (Vehicle Identification Number **KNAFB1218X5800703**) and had been transferred to the vehicle bay of the State Police Springfield Area Command where the processing took place.

The vehicle had a grey fabric interior with dark staining covering portions of the rear seats. The interior was examined for the presence of semen using an alternate light source (ALS). The fabric seat covers over both the front seats were removed to examine the uncovered seats. Numerous areas of non-visible staining were visualized throughout the vehicle using the ALS. These stains all yielded negative results with a presumptive test for the presence of seminal fluid; however, one stain located on the front side of the driver seat cover was collected for additional laboratory testing via cutting **(Exhibit 52.2)**.

The interior of the vehicle was also examined for visible blood and tested chemically for non-visible blood using both luminol and phenolphthalein. The following is a list of the areas that yielded presumptive positive results for the presence of blood and the corresponding exhibit numbers for swabs taken from those areas:

- Driver side rear floor board  **(Exhibit 52.3)**
- Rear passenger side floor board **(Exhibits 52.4 and 52.5)**
- Front driver side floor board **(Exhibits 52.6 and 52.7)**
- Bottom of trunk on removable liner **(Exhibit 52.1)**[1]

Digital images were taken of the car process and retained with the above evidence by the Springfield Forensic Laboratory. A DVD of the images was burned **(Exhibit 53)** and will be returned to the investigating agency along with the processed vehicle **(Exhibit 52)**. All other evidence will be forwarded to the Biological Processing unit for further testing.

---
[1] Exhibit 52.1 was obtained via a cutting instead of a swab

004126                              004126                              004126


004127          004127          004127

Agency Case No. 00-1905
Lab No. 00N-000481
March 25, 2010
Page 2

I certify this to be my report concerning my laboratory tests on the evidence in the above identified case.

Pursuant to ORS 40.460 (25), I hereby certify that I retrieved this document directly from the computer system maintained and operated by the Oregon Department of State Police and that this document accurately reflects and is a true copy of the information contained in that computer system. In testimony whereof, I have affixed my signature.

Adam J. Fleischer, Forensic Scientist

004127          004127          004127

Exhibit 129  Page 2 of 2 to
State Defendants' Motion for Summary Judgment
MCCREA_020969

003333    003333    <u>003333</u>
*An ASCLD/LAB Accredited Laboratory since 1985*  13



Theodore R. Kulongoski, Governor

**Department of State Police**
**Forensic Laboratory**
13309 S.E. 84th Ave Suite 200
Clackamas, OR 97015
(971) 673-8230
FAX (971) 673-8309

May 24, 2010

Coquille Police Department
851 N. Central Blvd.
Coquille, OR 97423-1253

**Attention:  Chris Webley**

HOMICIDE
FREEMAN, LEAH (Victim)
MCGUFFIN, NICHOLAS JAMES (Suspect)
ROBINSON, RONALD D. (Suspect)
BARTLEY, BRENT WILLIAM (Suspect)
SHAMBLIN, ELZIE (Suspect)
SERO, WILLIAM (Mentioned)
OSWALD, KIP DEPUTY (Mentioned)
COURTRIGHT, COREY (Mentioned)
FREEMAN, DENNIS (Mentioned)
Agency Case 00-1905
Lab No. 00N-000481            **Analytical Report**

Refer to previous laboratory reports regarding this case.

***On March 11, 2010, this laboratory received the following sealed evidence via UPS from the***
***OSP Forensic Laboratory in Springfield, Oregon.***

<u>**Exhibit 28.1:**</u> (JP-003; 013) Two swabs from the mouth of the beer can. One swab was consumed in
the analysis.  No human DNA was detected.*

<u>**Exhibit 29.1:**</u> (JP-004; 013) Two swabs collected from the screw threads on cap. One swab was
consumed in the analysis. No human DNA was detected.*

<u>**Exhibit 31.1:**</u> (JP-006; 013) Two swabs from the mouth of the beer can. One swab was consumed in
the analysis.

<u>**Exhibit 32.1:**</u> (JP-007; 013) Two swabs from the mouth of the beer can. One swab was consumed in
the analysis.

<u>**Exhibit 33.1:**</u> (JP-008; 013) Two swabs from the mouth of the beer can. One swab was consumed in
the analysis.

<u>**Exhibit 34.1:**</u> (JP-009; 012) Two swabs from the mouth of the Mountain Dew can. One swab was
consumed in the analysis. No human DNA was detected.*

<u>**Exhibit 35.1:**</u> (JP-010; 012) Two swabs from the mouth of the beer can. One swab was consumed in
the analysis. No human DNA was detected.*

003333    003333    003333

003334                                    003334                                    003334  14

Agency Case No. 00-1905
Lab No. 00N-000481
May 24, 2010
Page 2

**Exhibit 36.1:** (JP-011; 012) Two swabs from the mouth of the beer can. One swab was consumed in the analysis. No human DNA was detected. *

**Exhibit 52.1:** (clw001) Cutting from the fabric trunk liner. The fabric was swabbed for DNA analysis. No human DNA was detected.*

**Exhibit 52.2:** (clw001) Cutting from the seat portion of the driver's seat cover. A portion of the material was used in the DNA analysis.

**Exhibit 52.3:** (clw001) Four (4) untested swabs from the driver side rear floor board. Two of the swabs were used for the DNA analysis. No human DNA was detected. *

**Exhibit 52.4:** (clw001) One (1) tested swab from the rear passenger side floor board. This swab was consumed in the DNA analysis.

**Exhibit 52.5:** (clw001) One (1) untested swab from the rear passenger side floor board. No analysis was conducted on this swab.*

**Exhibit 52.6:** (clw001) One (1) tested swab from the front driver side floor board. This swab was consumed in the DNA analysis. No human DNA was detected.

**Exhibit 52.7:** (clw001) One (1) untested swab from the front driver side floor board. No analysis was conducted on this swab.*

**Exhibit 59.1:** (057) Two swabs from the mouth of the "Coors" beer can. One swab was consumed in the analysis. No human DNA was detected. *

**Exhibit 60.1:** (056) Two swabs from the mouth of the "Hamm's" beer can. One swab was consumed in the analysis. No human DNA was detected. *

**Exhibit 61.1:** (054) Two swabs from the mouth of the "Bud Light" beer can. One swab was consumed in the analysis. *

**Exhibit 62.1:** (050) Two swabs from the mouth of the "Bud" beer can. One swab was consumed in the analysis. No human DNA was detected. *

**Exhibit 63.1:** (051) Two swabs from the mouth of the bottle and screw threads of cap. One swab was consumed in the analysis. No human DNA was detected. *

* The remaining evidence was not analyzed at this time and analysis should be considered in the future when DNA methods are available that may be better suited for this type of sample.

PCR-based STR typing was performed on the above evidence. The DNA was extracted from the evidence and then amplified and typed at the amelogenin locus and fifteen STR loci by capillary electrophoresis, using the AmpFlSTR Identifiler PCR amplification kit.

003334                                    003334                                    003334

003335                       003335                          003335  15

Agency Case No. 00-1905
Lab No. 00N-000481
May 24, 2010
Page 3

**Results and Conclusions:**

1. Partial DNA profiles were obtained from the beer cans (Ex. 31.1, 32.1 and 33.1). Leah Freeman, Nicholas McGuffin, William Sero, Elzie Shamblin and Kip Oswald, whose DNA samples were previously analyzed, are excluded from contributing to the partial DNA profiles.

2. The partial DNA profile from the beer can (Ex. 61.1) is inconclusive due to the low level of DNA. The DNA typing results are insufficient for comparison purposes.

3. No DNA profiles were obtained from the rear passenger side floor board (Ex. 52.4).

4. The DNA profile from the driver's seat cover (Ex. 52.2) is a mixture of male and female DNA from at least four people. Leah Freeman, Nicholas McGuffin, William Sero and Kip Oswald are excluded from contributing to the DNA mixture. Elzie Shamblin's contribution to this mixture is inconclusive due the mixture complexity. He cannot be included or excluded as a contributor to the mixture profile.

Evidence will be returned at the earliest convenience.

Susan T. Hormann

Susan Torris Hormann, Criminalist

Pursuant to ORS 40.460 (25), I hereby certify that I retrieved this document directly from the computer system maintained and operated by the Oregon Department of State Police and that this document accurately reflects and is a true copy of the information contained in that computer system. In testimony whereof, I have affixed my signature.

003335                       003335                          003335



Tina Kotek, Governor

**Department of State Police**
**Forensic Laboratory**
13309 S.E. 84ᵗʰ Ave Suite 200
Clackamas, OR 97015
(971) 673-8230
FAX (971) 673-8309

October 25, 2024

Marla Kaplan Expert Disclosure
McGuffin v. Dannels, et al

Mr. Davis,

My name is Marla Kaplan and I am the DNA Technical Leader for the Oregon State Police (OSP) Forensic Services Division. The Technical Leader is a role required by the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories, standards that OSP follows to hold accreditation and maintain access to the CODIS database. In that role, I am "accountable for the technical operations of the laboratory"[1] and "authorized to initiate, suspend, and resume laboratory operations."[2] I have been a qualified DNA analyst since 2006 and have served as DNA Technical Leader since February of 2009. In that time, I have completed over 1200 DNA requests for analysis and been the technical reviewer on over 1400 cases. I am a member of the Scientific Working Group on DNA Analysis Methods (SWGDAM), a group empaneled by the FBI that "serves as a forum to discuss, share, and evaluate forensic biology methods, protocols, training, and research to enhance forensic biology services as well as provide recommendations to the FBI Director on quality assurance standards for forensic DNA analysis."[3] I was first invited to SWGDAM in 2017 and was afforded full voting membership in 2020. I am currently on the SWGDAM Quality Assurance committee, the group responsible for regularly updating the aforementioned FBI's Quality Assurance Standards, having previously served as the co-chair of the Next Generation Body Fluid Identification Working Group and a member of the Lineage Marker Committee. I have also been both a member (2016-2022) and affiliate (2015-2016) on the Biology/DNA Scientific Area Committee on DNA Analysis, which is part of the Organization of Scientific Area Committees administered by the National Institute of Standards and Technology under their Forensic Science Program. I have been invited to speak at both regional and national forensic DNA conferences since 2010, covering topics such as mixture interpretation, validation, analysis of sexual assault evidence, root cause analysis, and subjects related to the use of the STRmix™ interpretation software. I have a Bachelor of Arts degree in Biochemistry from Kenyon College and a Master of Science degree in Forensic Science from the University of Illinois at Chicago. A full copy of my curriculum vitae is attached.

I have reviewed the work done by the OSP laboratory to date as well as the declarations by Ms. Huma Nasir (Exhibit 8) and Mr. Kent Harman (Exhibit 4) and have formed the following opinions. A complete list of documents reviewed in preparation of this declaration can be found at the end of this document.

**Oregon State Police Laboratory Interpretation Thresholds**
The reports by Ms. Nasir and Mr. Harman focus on the results obtained from two white tennis shoes, laboratory exhibits 1 and 2. DNA profiles were first obtained from these exhibits in July of 2000. At

---

[1] *Quality Assurance Standards for Forensic DNA Testing Laboratories*, FBI, Effective July 1, 2020.
[2] Ibid.
[3] SWGDAM Mission Statement from www.swgdam.org

that time, the OSP STR Analysis Casework Procedures directed that peaks should be a minimum of 150 relative fluorescent units (RFU) for DNA profile interpretation, although electropherograms were generated using a 50 RFU threshold.

The late 1990s to early 2000s was a transitional time in forensic DNA analysis. Laboratories were moving away from the Restriction Fragment Length Polymorphism (RFLP) form of DNA analysis to Polymerase Chain Reaction (PCR)-based methods, to include Short Tandem Repeat (STR) typing. These STR methods came with a marked increase in test sensitivity; therefore, there was a concerted effort amongst the DNA community to be "conservative." This approach, as defined in the 1996 National Research Council publication on the Evaluation of Forensic DNA Evidence, was one that was focused on "favoring the defendant."[4] As applied to the implementation of thresholds for interpretation purposes, this meant relying on only the most robust DNA typing results (i.e., those above a defined threshold) for profile interpretation.

The 2000 analysis was performed using the AmpFlSTR® Profiler Plus[TM] PCR amplification kit. The Profiler Plus[TM] user guide recommended a threshold of 150 RFU for the analysis of DNA data, but went on to state that the DNA typing software could be configured to automatically identify low-level signal, recommending a threshold of 50 RFU for that purpose. It cites concerns with the effects of low-level DNA on the quality of the DNA profiling results as the reason for the dual threshold, specifically stating "[p]eak heights <150 RFU should be interpreted with caution."[5] Peer-reviewed publications from the time, including the validation of the AmpFlSTR Profiler Plus[TM] amplification system published in the Journal of Forensic Sciences[6], also relied upon the 150 RFU threshold for STR interpretation. Throughout these publications, the idea that caution should be exercised when interpreting peaks below the laboratory's threshold is reinforced. These documents and internal validation studies led to the selection of 150 RFU as OSP's interpretation threshold.[7] A review of a small number of contemporary protocols from other laboratories revealed that although there was not a single value selected by all laboratories, the 150 RFU threshold was not limited to just OSP. Laboratories also employing the 150 RFU threshold included the statewide systems in Washington and California.

Throughout OSP's STR interpretation protocols, peaks between 50 and 150 RFU are repeatedly described in a manner that indicates that they should not be used for making conclusive determinations about the DNA data obtained, other than considering them for exclusion purposes once the DNA results have advanced to the comparison stage. OSP's internal validation documents, read by DNA analysts during their training, describe the detection of non-allelic peaks in this range, further emphasizing the cautious approach analysts should take to the interpretation of these peaks.

Ms. Krings' interpretation and reporting as it relates to both exhibits 1 and 2 was consistent with requirements of the applicable standards and protocols and is further described below. Detail

---

[4] National Research Council. *The Evaluation of Forensic DNA Evidence.* National Academy Press, 1996.

[5] *AmpFlSTR Profiler[TM] Plus PCR Amplification Kit User's Manual.* PE Applied Biosystems, 1997.

[6] LaFountain et al. "TWGDAM Validation of the AmpFlSTR Profiler Plus and AmpFlSTR COfiler STR Multiplex Systems Using Capillary Electrophoresis." *Journal of Forensic Sciences,* 46, 5, 2001, 1191-1198.

[7] Ms. Nasir describes the 150 RFU interpretation threshold as a "stochastic threshold." This is not correct. The term "stochastic threshold" is defined in the 2010 SWGDAM Interpretation Guidelines for Autosomal STR Typing as "the peak height value above which it is reasonable to assume that, at a given locus, allelic dropout of a sister allele has not occurred." This is not the manner in which the 150 RFU threshold was described in the protocol and applied to profile interpretation.

regarding the 2017 reassessment of the 2000 data, as well as additional testing performed in 2017, is also included.

**Exhibit 1: The right shoe**

Three separate areas of the right shoe were analyzed in 2000: a cutting from the tongue (exhibit 1.1), a cutting from the heel (exhibit 1.2), and a cutting from the ankle (exhibit 1.3). In a report dated August 27, 2000, Ms. Krings reported a single combined conclusion for this item, that the profile "… matches the DNA profile from Leah Freeman (Exhibit 4)."[8] This is a correct conclusion when applying the interpretation guidelines described in the 2000 protocol and is in keeping with the applicable reporting requirements. Although modern accreditation standards require the reporting of "each forensic sample tested,"[9] no such standard existed in 2000; therefore, reporting could be approached as providing results and conclusions for the most informative results obtained as opposed to a detailed description of each sub-sample tested.

A summary of the results greater than 150 RFU obtained from 1.1 and 1.3, alongside the DNA profile obtained from a toothbrush from Leah Freeman (exhibit 4), is shown in Table 1. Although some peaks between 50 and 150 RFU (hereinafter referred to as "trace" peaks) were detected in 1.1 and 1.3, Ms. Krings exercised the discretion allowed by the protocol and did not interpret them, even "with caution."

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---------|---------|-----|-----|------------|---------|--------|--------|--------|---------|--------|
| 1.1 (tongue) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |
| 1.3 (ankle) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13,12 | 10,11 | 11,12 |
| 4 (Freeman) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |

Table 1. DNA types greater than 150 RFU obtained from 1.1, 1.3, and 4. One allele greater than 150 RFU, not attributable to Ms. Freeman, was obtained from 1.3 (at D5S818) and is shown in blue; see mixture discussion below. 1.2 did not yield typing results and is not shown.

For 1.3, Ms. Krings made a note in the case file on a page dated July 27, 2000 (page 16), that reads "mx ♀ major." This note was made during a preliminary data review step, prior to the full application of the interpretation protocols. Based upon the preliminary data review, Ms. Krings initial impressions of the data from 1.3 were that there may be DNA from more than one individual and that the strongest contributor to the DNA sample was female. This does not mean that once the profile was subjected to the full interpretation protocols that it reached the level of a reportable mixture.

The electropherogram for 1.3 was printed on July 31, 2000. This is also the date that Ms. Krings documented the peaks detected from that exhibit on her Summary of Results worksheet. This Summary of Results shows a single locus with more than two alleles greater than 150 RFU (D5S818). The 2000 protocol states that a mixture may be indicated, in part, by "(a) The presence of more than two alleles per locus at more than one locus."[10]  Other mixture indicators were described as "(b) The presence of a peak at a stutter position that is greater in peak height than that typically observed for

---

[8] August 27, 2000 report signed by Mary H. Krings.
[9] *Quality Assurance Standards for Forensic DNA Testing Laboratories*, FBI, Effective July 1, 2020.
[10] *Short Tandem Repeat (STR) Analysis Casework Protocol.* Oregon State Police Portland Forensic Laboratory DNA Unit, March 30, 1999. Also see also August 1, 2000 version of this document.

stutter in a single source sample"[11] and "(c) Significantly imbalanced alleles for a heterozygous genotype at more than one locus."[12]   The result at D5S818 does not constitute more than two alleles at more than one locus. The 12 allele at this locus is in a stutter position and presents as approximately 15% of the parent peak, but that stutter position peak, in isolation, did not lead to the conclusion that the DNA typing results greater than 150 RFU constituted a mixture. The peak height ratios at all remaining loci were well within the expected 70% peak height ratio for heterozygous genotypes. The profile as detected above 150 RFU did not meet the definition of a mixture; therefore, it was consistent with the protocols for Ms. Krings to report the result from this exhibit as matching Ms. Freeman, grouping it in with the result obtained from 1.1.

In the spring of 2017, prompted by Mr. McGuffin's post-conviction proceedings, I revisited the data obtained in 2000, applying updated interpretation and reporting guidelines. The policy on revisiting previously obtained results and applying a lowered interpretation threshold (the legacy reassessment policy) was first established in 2012.[13] The reassessment was summarized in a report dated May 9, 2017[14]. This report explicitly addresses each of the individual results from 1.1, 1.2, and 1.3, lowers the interpretation threshold to 100 RFU as directed by the legacy reassessment policy, and includes the assessment of trace peaks in all aspects of profile interpretation except the application of statistics. Under the lowered threshold,, 1.1 and 1.3 were reported as mixtures assumed to be from two contributors with a major contributor profile matching the DNA profile of Leah Freeman. The minor contributor results from 1.1 were determined to be insufficient for comparison, and the minor contributor results from 1.3 were determined to be from an unknown male individual (unknown male #2). Mr. McGuffin was excluded as a contributor to the unknown male #2 profile.

Later in 2017, the OSP laboratory performed additional testing on samples from the right shoe. Testing was achieved using the GlobalFiler™ PCR Amplification kit and produced DNA results at a greater sensitivity than what was achieved in 2000. Interpretation and comparison was performed using the STRmix™ probabilistic genotyping interpretation software. The testing was performed by Forensic Scientist Janelle Moore, Ph.D. with Ms. Nasir observing much of the work done in the laboratory. As expected, the increased sensitivity of this testing revealed more information about the DNA present on the shoes.

The 2000 testing consumed the available sample for 1.1; therefore, only the previously prepared DNA extracts from 1.2 and 1.3 were subjected to new testing in 2017. No new samples were collected from exhibit 1 for the 2017 testing. The modern testing resulted in the detection of DNA mixtures from both 1.2 and 1.3.  Exhibit 1.2 was interpreted by Dr. Moore to be from three contributors and 1.3 was interpreted to be from four contributors. Dr. Moore's conclusion was that Ms. Freeman could not be excluded as the major contributor to each mixture. Mr. McGuffin and all other individuals compared were excluded as contributors to 1.2. For 1.3, Dr. Moore concluded that the contributions of Mr. McGuffin and all of the other individuals compared were inconclusive.[15]

---

[11] Ibid.
[12] Ibid.
[13] *DNA Quality Manual.* Oregon State Police Forensic Services Division, July 17, 2012.
[14] May 9, 2017 report signed by Marla Kaplan. Note that the May 9, 2017 was amended on May 17, 2017 to correct an agency item number for an unrelated exhibit.
[15] October 10, 2017 report signed by Janelle Moore.

The OSP laboratory generally uses the STRmix<sup>TM</sup> software in lieu of visual comparisons when comparing reference profiles to DNA mixtures, unless making a comparison to an individual who can be reasonably assumed to have contributed DNA to a sample (e.g., the comparison of an individual to DNA swabs collected from their own body or the comparison of the DNA profile from the regular driver of a car to a DNA profile obtained from its steering wheel). This ensures consistency across all DNA profiles interpreted and amongst all DNA analysts. There are two outputs from STRmix<sup>TM</sup> analyses. The first output, the deconvolution, is a detailed breakdown of the possible contributor genotypes to the sample. The second output, one that results from a comparison, is a likelihood ratio (LR). The likelihood ratio is a calculation which compares the probability of observing the evidentiary DNA profile if the person being compared is a contributor (i.e., is included) to the probability of observing the evidentiary DNA profile if the person being compared is not a contributor (i.e., is excluded). The probability of observing the evidence profile under these two states (included and excluded) are mathematically weighed and a numerical result supporting inclusion or exclusion is provided by the software.

Mr. Harman describes a visual comparison of Mr. McGuffin to the DNA mixture obtained from exhibit 1.3 in addition to the analysis he performed using the Sentry<sup>TM</sup> probabilistic genotyping software. It is unclear why a visual assessment is appropriate or necessary given the use of probabilistic genotyping. He quotes the SWGDAM interpretation guidelines ("[I]t would be inappropriate to make inclusions or exclusions based on the statistical approach without first considering the interpretation of the profile")[16] in his reasoning, but he appears to have taken that statement out of context. That guidance is intended to direct the fullest interpretation of the profile possible prior to making comparisons and calculating a statistic, not to somehow direct that a visual comparison must be done before probabilistic genotyping is attempted. Although a visual comparison in lieu of probabilistic genotyping in this instance is not appropriate, to address his statements I have attempted to replicate his visual comparison exercise with some modifications.

Mr. Harman's visual comparison was done without consideration of stutter peaks. They are not shown on his electropherogram. When performing mixture interpretation, peaks in stutter positions must be evaluated as they may be entirely stutter or comprised of both stutter and DNA from an additional contributor. By not showing the stutter peaks on his electropherogram, Mr. Harman has removed them from consideration in his comparison. One of the significant advantages of using a probabilistic genotyping system over performing visual comparisons is that the full range of possibilities for stutter peaks can be assessed by the software.

---

[16] Kent Harman report dated July 15, 2024 (Exhibit 4) page 6, quoted from *SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2017. Revised 2021.





Figure 1 (pages 6 and 7). Electropherogram from exhibit 1.3 that includes all DNA types detected, including those in stutter positions. Alleles matching Mr. McGuffin are shaded in green. DNA types of Mr. McGuffin not detected are shown in red text. Green arrows indicate the locations in which Mr. McGuffin's DNA types are present in a stutter position of the major contributor.

There are two other complicating factors observed in the above electropherogram in relation to a visual comparison of Mr. McGuffin's profile to this mixture. The first is the number of DNA locations in which Mr. McGuffin shares alleles with the major contributor. He shares one or both of his alleles at 15 of the 21 DNA locations tested. Probabilistic genotyping utilizes the data in the profile to determine which peaks, if any, should be split between multiple contributors, accounting for allele sharing. That assessment cannot be done by a visual comparison alone unless stark peak height ratio imbalances are observed. The second complicating factor is the potential for allelic dropout. Allelic dropout occurs "when one or more alleles present in a sample are not observed above the analytical threshold."[17] In forensic samples, the source DNA is not known; therefore, when performing comparisons visually an analyst must assess whether alleles not observed in an evidentiary sample are missing due to allelic dropout or missing because the individual is not a contributor. The SWGDAM guidelines referenced by Mr. Harman state "The simple presence or absence of alleles may be insufficient to draw a proper

---

[17] *SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2017. Revised 2021.

conclusion due to the possibility of allelic drop-out."[18] As with stutter and shared DNA types, probabilistic genotyping software can model the probability of allelic dropout and is therefore a much more robust means by which allelic dropout can be assessed. It is true that there are DNA types from Mr. McGuffin that are not detected in 1.3. Mr. Harman indirectly cites these missing alleles as the means for his visual exclusion. Without interpretation protocols from his laboratory, however, it's not clear what consideration he gave to the possibility of allelic dropout when performing his visual comparison.

When Dr. Moore initiated the STRmix[TM] analysis of 1.3, she first assumed three contributors to the DNA mixture. STRmix[TM] requires an up-front assumption regarding the number of contributors, made by the analyst based upon the evidentiary profile obtained, to identify the DNA types from each contributor that best explain the mixture. Dr. Moore assessed the output of this three-contributor deconvolution and then performed likelihood ratio calculations against the sixteen reference standards she also analyzed. The initial STRmix[TM] deconvolution was performed on September 8, 2017, and likelihood ratios against this deconvolution were run on September 11, 2017.

It is routine practice to perform a final review of all test results prior to authoring an analytical report and submitting it for technical review. OSP procedures in fact required Dr. Moore to do so in this case.[19] In her review, Dr. Moore documents a reassessment of the number of contributors to 1.3 based upon the results obtained at D21S11, D7S820, SE33, D12S391, and D2S1338. This reassessment was not based upon STRmix[TM] diagnostics or likelihood ratio results from the three-contributor deconvolution. If it had been, Dr. Moore would have cited the diagnostics when she documented the reason for the additional deconvolution in the case notes.[20] STRmix[TM] diagnostics alone generally cannot show whether the number-of-contributors assumption made by the analyst is supported by the DNA data. Mr. Harman's accusation that the number of contributors was "shopped"[21] is not supported by the case record. Dr. Moore did her due diligence in finalizing her results and conclusions prior to issuing an analytical report. She revised her assumption to the number of contributors during a routine self-review of her results and conclusions.

Mr. Harman analyzed the data at a lower analytical threshold than the one validated by OSP. He indicates that in doing so, he obtained more support for the assumption of four contributors to the DNA mixture obtained from 1.3. This is consistent with what was done by Dr. Moore. Although she did not lower the threshold beyond the validated level as Mr. Harman did, she appropriately considered peaks less than the analytical threshold, specifically at the loci cited above. There are now two outside laboratories, both Mr. Harman's laboratory and Cybergenetics[22], that agree with Dr. Moore's final reported conclusion that four contributors is a reasonable and appropriate explanation for the 1.3 mixture.

Dr. Moore's comparison of Mr. McGuffin to the 1.3 mixture, when assumed to be from four contributors, returned a likelihood ratio within OSP's validated inconclusive range. Although the

---

[18] Ibid.
[19] *Quality Assurance Manual.* Oregon State Police Forensic Services Division, March 15, 2017.
[20] *STR Analysis Casework Procedures Manual.* Oregon State Police Forensic Services Division, August 7, 2017.
[21] Kent Harman report dated July 15, 2024 (Exhibit 4), page 13
[22] August 9, 2018 report from Cybergenetics signed by Jennifer Hornyak, William Allan, Beatriz Pujols, and Mark Perlin.

SWGDAM Probabilistic Genotyping Validation Guidelines do not use the term "inconclusive," they do call for both sensitivity and specificity testing, the process by which both known contributor and non-contributor DNA types are compared to samples of known composition. The guidelines specifically direct that the sensitivity studies should "demonstrate the potential for Type I errors (i.e., incorrect rejection of a true hypothesis), in which, for example, a contributor fails to yield a LR greater than 1 and thus his/her presence in the mixture is not supported."[23]  Specificity studies "should demonstrate the potential for Type II errors (i.e., failure to reject a false hypothesis), in which, for example, a non-contributor yields a LR greater than 1 and thus his/her presence in the mixture is supported."[24] These studies were performed by the OSP laboratory when validating the STRmix™ software and determined the range in which OSP deemed an LR to be inconclusive. For four person mixtures, the validation showed that likelihood ratios between 0.0000741 and 13,500 may be the result of a Type I or Type II error. Knowing that the possibility of false support for one proposition over the other may occur within this range, the laboratory's interpretation guidelines direct that the results of these comparisons are inconclusive, meaning that the DNA types being compared can neither be included nor excluded, as the likelihood ratio result may be representative of adventitious support for the incorrect proposition.

Mr. Harman states, based upon his Sentry™ analysis, that it is $5.637 \times 10^4$ (56,370) times more likely to observe the 1.3 profile if the contributors are Ms. Freeman and three unknown contributors than if the contributors are Ms. Freeman, Mr. McGuffin, and two unknown contributors.[25] I could not locate any scientific literature on the Sentry™ probabilistic genotyping program, nor have I seen the validation of Sentry™ performed by Mr. Harman. I have also not been provided with the protocols Mr. Harman follows when using the software. I do not know whether this value represents an upper or lower bound to the likelihood ratio distribution, whether allele frequency uncertainty was considered in the calculation, or whether this is a point-estimate likelihood ratio. This is especially confusing since elsewhere in his report he states that he obtained a likelihood ratio of 0.0001484 supporting the exclusionary hypothesis relative to Mr. McGuffin. The reciprocal of this likelihood ratio is 6,738, not 56,370.

The likelihood ratios obtained by Dr. Moore for all the September 2017 comparisons to the 1.3 profile, except that of Leah Freeman, are represented in Figure 2. Mr. McGuffin's likelihood ratio is shown with a red circle.



Figure 2. Log(10) likelihood ratios obtained from the comparisons performed and reported in Dr. Moore's October 2017 report. The validated inconclusive range is shown with the < and > signs. Values within these brackets may be Type I or Type II errors.

---

[23] *SWGDAM Guidelines for the Validation of Probabilistic Genotyping Systems.* Scientific Working Group on DNA Analysis Methods. 2015.
[24] Ibid.
[25] Kent Harman report dated July 15, 2024 (Exhibit 4), page 10

Mr. Harman accuses the laboratory of equivocation and bias in relation to 1.3.[26] A thorough review of the entire case record indicates otherwise. It is a true statement that Mr. McGuffin (and others) were excluded from the DNA profiling results obtained from the 2000 testing when the legacy reassessment was performed in 2017. The 2000 testing, however, was much less sensitive and yielded much less complex DNA typing results than those obtained from the new analytical work done by Dr. Moore in 2017. The new test results revealed a mixture of such complexity that all likelihood ratios, save the one calculated for Ms. Freeman, yielded results in the inconclusive range established during internal validation of the STRmix™ software, as shown in Figure 2. These results were interpreted per protocol, properly assessed by Dr. Moore, and reported in accordance with all established policies and procedures.

**Exhibit 2: The left shoe**

Five separate areas of the left shoe were analyzed in 2000: a cutting from the heel (exhibit 2.2), a cutting from the tongue (exhibit 2.3), a cutting from the ankle (exhibit 2.4), as well as two swabs from different areas of the sole of the shoe (exhibits 2.1.2 and 2.1.4). In her report dated August 27, 2000, Ms. Krings stated that the profile from 2.1.2 "… matches the DNA profile from Leah Freeman."[27] She further reported that "The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more than one person. The major profile is consistent with coming from Leah Freeman. The minor profile is from a male."[28]

A summary of the results greater than 150 RFU obtained from 2.1.2 and 2.1.4, alongside the DNA profile obtained from the toothbrush from Leah Freeman (exhibit 4) is shown in Table 2.

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.1.2 (sole) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |
| 2.1.4 (sole) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | | 11,13 | | |
| 4 (Freeman) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |

Table 2. DNA types greater than 150 RFU obtained from exhibits 2.1.2, 2.1.4, and 4. No DNA types greater than 150 RFU were obtained for exhibit 2.1.4 at D18S51, D13S317, and D7S820 and they are therefore shaded in the table.

Since trace peaks were detected in 2.1.4, Ms. Krings was required by the protocol to consider whether they impacted her conclusion regarding the match to Ms. Freeman. As part of the comparison, Ms. Krings would have returned to her data and reviewed the peaks at D18S51, D13S317, and D7S820 (Table 3).

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.1.2 (sole) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |
| 2.1.4 (sole) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | (12) | 11,13 | (10),(11) | (11),(12) |
| 4 (Freeman) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |

Table 3. All peaks detected greater than 50 RFU. Trace peaks are shown in parenthesis.

The trace peaks in 2.1.4 do not change the conclusion that the profile matches Ms. Freeman. In keeping with the practice of providing the most informative result, since 2.1.2 had the most complete

---

[26] Ibid., page 14
[27] August 27, 2000 report signed by Mary Krings.
[28] Ibid.

data (to include the generation of DNA data at four additional loci using the COfiler™ PCR Amplification Kit, data not shown), this was the exhibit reported.

The DNA types greater than 150 RFU from 2.3 and 2.4 are shown in Table 4, again alongside Ms. Freeman's profile. Both DNA profiles also have trace peaks, but the data in this range from exhibit 2.4 was of low quality, as evidenced by the number of artifacts identified by Ms. Krings on the electropherogram and the multiple attempts at electrophoresis that were required to generate the profile.

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.3 (tongue) | 14,16,17 | 17,18 | 23,25 | X,Y | 10,13 | 28,31.2 | 12,16 | 11,12,13 | 10,11 | 11,12 |
| 2.4 (ankle) | 14,17 | 17,18 | 23,25 | X,Y | 10,12,13 | 28,31.2 | | 11,13 | 10,11 | |
| 4 (Freeman) | 14,17 | 17,18 | 23,25 | X | 10,13 | 28,31.2 | 12,16 | 11,13 | 10,11 | 11,12 |

Table 4. DNA types greater than 150 RFU obtained from exhibits 2.3, 2.4, and 4. No DNA types greater than 150 RFU were obtained for exhibit 2.4 at D18S51 and D7S820 and they are therefore shaded in the table. Alleles not attributable to Ms. Freeman are shown in blue. 2.2 did not yield typing results and is not shown.

Consistent with the approach of advancing the profile with the most information to reporting, exhibit 2.3 was selected for reporting as it had DNA types above 150 RFU at all tested loci as well as two STR alleles from the minor male contributor.

In late 2001, Ms. Krings compared the DNA profile of Mr. Elzie Shamblin to the minor male profile from exhibit 2.3. In early 2002, she did the same with Mr. Kip Oswald. The minor male types from exhibit 2.3, alongside the DNA profiles obtained from Mr. Shamblin and Mr. Oswald, are shown in Table 5.

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.3 (tongue) minor male | 16 | | | Y | | | | 12 | | |
| 45 (Shamblin) | 16,17 | 17,18 | 20,26 | X,Y | 11,12 | 29,31 | 13,16 | 11,12 | 8,11 | 10,11 |
| 47 (Oswald) | 16 | 17,18 | 19,24 | X,Y | 13 | 29,30 | 13,20 | 10,12 | 11,12 | 7,10 |

Table 5. Minor male contributor DNA types greater than 150 RFU shown in green alongside the DNA profiles obtained from Mr. Shamblin and Mr. Oswald. Loci where no minor male contributor DNA types greater than 150 RFU were detected are shaded gray.

The results reported by Ms. Krings are consistent with having followed the requirement to consider trace peaks when comparing Mr. Shamblin and Mr. Oswald to the minor male profile obtained from 2.3. Both Mr. Shamblin and Mr. Oswald have the three DNA types from the minor male profile above 150 RFU; however, Mr. Shamblin was reported as excluded while Mr. Oswald was not. Ms. Krings conclusion regarding Mr. Oswald was that he was "consistent with the minor profile in the previously analyzed Exhibit 2.3 (left Nike shoe)."[29] Revealing the peaks between 50 and 150 RFU (Table 6) demonstrates why.

[29] January 21, 2002 report signed by Mary Krings.

| Exhibit | D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.3 (tongue) minor male | 16 (15) | | (19),(24) | Y | | (29),(30) | | 12 (10) | (12),(14) | (7),(10) |
| 45 (Shamblin) | 16,17 | 17,18 | 20,26 | X,Y | 11,12 | 29,31 | 13,16 | 11,12 | 8,11 | 10,11 |
| 2.3 (tongue) minor male | 16 (15) | | (19),(24) | Y | | (29),(30) | | 12 (10) | (12),(14) | (7),(10) |
| 47 (Oswald) | 16 | 17,18 | 19,24 | X,Y | 13 | 29,30 | 13,20 | 10,12 | 11,12 | 7,10 |

Table 6. Minor male contributor DNA types greater than 50 RFU shown alongside the DNA profiles obtained from Mr. Shamblin and Mr. Oswald. Trace peaks are shown in parenthesis. Peaks in exhibit 2.3 that are also contained in the compared reference profile are shown in green. Peaks not present in the compared reference profile are shown in red. Loci where no minor male contributor DNA types greater than 50 RFU were detected are shaded gray.

When considering the trace peaks, Mr. Shamblin was excluded as a contributor due to the high number of discordances. There is at least one discordant result between Mr. Shamblin's profile and the minor male profile at each locus for which minor contributor data was observed. In contrast, the majority of the trace peaks from exhibit 2.3 are also seen in Mr. Oswald's DNA profile. Only two discordances were observed. Given that the protocol directed Ms. Krings' to approach trace peaks with caution, the two discordances were not sufficient to exclude Mr. Oswald. The case notes and report are consistent with an analyst having considered these peaks in performing both comparisons.

As with the samples from exhibit 1, I subjected the profiles obtained from exhibit 2 to a legacy reassessment in 2017. The conclusions regarding exhibits 2.1.2 and 2.1.4 did not change, as the application of the lowered threshold did not impact the conclusion that these were single-source profiles matching Ms. Freeman. Once the threshold was lowered for exhibit 2.4, it was interpreted and reported as a mixture of two contributors, including one male contributor, with the major contributor matching Leah Freeman and the minor contributor insufficient for comparison.

Once the threshold was lowered for exhibit 2.3, the discordances between Mr. Oswald's profile and the trace peaks took on more significance. The contributor ratios in this sample continued to support the conclusion that Ms. Freeman was a match to the major contributor, but under the assumption of only two contributors to the DNA mixture, Mr. Oswald could no longer be associated with the minor contributor profile due to the discordant DNA types detected at D3S13158 and D13S317. As the 2000 data showed no indications of there being more than two contributors to this DNA sample, I drew the conclusion that there was a single minor contributor and that the minor contributor profile was from an unknown male individual (unknown male #3). This minor male profile was not a match to Mr. Oswald, Mr. McGuffin, or the unknown male from exhibit 1 (unknown male #2), nor any of the other DNA reference standards compared.

In 2017, Dr. Moore also performed additional analysis on samples from the left shoe. She analyzed 2.2, 2.4, 2.1.2, and 2.1.4. Exhibit 2.3 was consumed during the 2000 testing, so a proxy sample, designated 2.5, was collected from an area on the shoe tongue surrounding the area from which the original 2.3 cutting was taken. Additionally, previously unanalyzed swabs from the shoe sole were analyzed (exhibits 2.1.1, 2.1.3, 2.1.5, and 2.1.6), as well as a new swab from the inside of the shoe tongue, exhibit 2.6.

Results from each round of testing of the swabs from the shoe sole (2.1.1-2.1.6) returned DNA profiles matching Ms. Freeman with the exception of 2.1.5. This sample was only tested in 2017, and the resulting profile was insufficient for comparison.

The 2017 testing of 2.2 and 2.5 yielded mixtures that included at least one male contributor, each interpreted by Dr. Moore to be from three contributors. Ms. Freeman and Mr. Oswald could not be excluded as contributors to each mixture. Mr. McGuffin was excluded. The 2017 testing of 2.6 revealed a mixture of at least four contributors, including at least one male contributor, but due to the complexity of the mixture no further interpretations were made.

The DNA typing results obtained from 2.2, 2.5, and 2.6 led to the revision of the two-contributor assumption made during the 2017 reassessment of the 2000 test results from 2.3. The aggregate data no longer supported the assumption that only two contributors were detected in this exhibit. Rather, the collection of minor DNA types originally thought to be from a single unknown individual (unknown male #3) are better explained as a likely composite of Mr. Oswald and at least one other contributor.

**Ms. Nasir's assertion of a common contributor to both shoes**

Ms. Nasir states "It is my professional opinion that there is a strong possibility that an unidentified individual contributed DNA to both the right and left Nike shoes of Leah Freeman."[30] She bases this assertion on the presence of identical alleles at multiple loci from the 2017 testing of 1.2, 1.3, 2.4.1, 2.5, and 2.6. She states that this indicates that "the same person may have touched or handled both of the right and left shoes of Leah Freeman"[31] but makes no mention of the possibility that Ms. Freeman could have encountered DNA from a single contributor simply through routine wear of the shoes and that the DNA from this "unidentified individual" is secondary transfer from Ms. Freeman's environment.

The premise of Ms. Nasir's exercise is flawed in that it makes no acknowledgement of possible foreign contributor alleles in stutter positions nor possible alleles in common with either Ms. Freeman or Mr. Oswald. I have not received the interpretation protocols used by Ms. Nasir to perform this exercise; however, the approach she appears to take is not in alignment with the current SWGDAM Interpretation Guidelines for Autosomal STR Typing.[32] Setting aside the flaws in her method, for the purposes of this document, I have recreated Ms. Nasir's common contributor exercise. In doing so, I found multiple errors and omissions in her work.

---

[30] Huma Nasir report dated July 9, 2024 (Exhibit 8)
[31] Ibid.
[32] *SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2017. Revised 2021.

| Exhibit # | 1.2 | 1.3 | 2.6 | 2.4.1ul | 2.5 | 2.2 |
|---|---|---|---|---|---|---|
| Sample Description | heel | ankle | tongue swab | ankle | tongue cutting | heel |
| Locus | Right Nike Shoe | | | Left Nike Shoe | | |
| D3S3158 | 15,18,16 | 15 | 15,18 | | 15 | |
| vWA | 16,19 | 16,20 | 16 | 15,___ | 15 | |
| D16S539 | 12 | 12,9 | 12,13 | | | |
| CSF1PO | | 11 | | | | |
| TPOX | 12 | 11 | | | | |
| D8S1179 | 15,14 | 11,15 | 12,11,14,15 | 12,___ | | |
| D21S11 | 29,30 | 29,31,30 | 31,27 | | | |
| D18S51 | 15 | 14,21 | 17 | | | |
| D2S441 | 14 | 14,16 | 14,11.3,16 | 14,___ | 14 | 14,___ |
| D19S433 | 13 | 13 | | | | |
| TH01 | 6,9.3,9 | 6,9,8 | 8,6 | 8,___ | 8 | 6,___ |
| FGA | 20,21 | 19 | 22,21 | 20,___ | | |
| D22S1045 | 16,14 | 17,11 | 17,11 | 13.2,17 | 11,17 | 11,___ |
| D5S818 | 12 | 12 | | | | |
| D13S317 | | 8,12 | 8,9 | | | |
| D7S820 | 10 | 10,13,8 | 8,9 | | | |
| SE33 | | 18,29.2,22.2 | 19 | | | |
| D10S1248 | 13,16 | 13 | 16 | | | 12,___ |
| D1S1656 | 16.3,12,15.3 | 12 | 12,16.3,11 | 12,16.3 | 16.3,12 | |
| D12S391 | 19,18.3 | 22,18.3,21 | 23,18.3,21,22 | | | |
| D2S1338 | | 17,20,19 | 17,18,22 | 20,___ | | 25,___ |

Table 7. Replication of Ms. Nasir's subtraction exercise, based on the table in her report. Allele lists in 1.2 and 1.3 were generated by removing the alleles of L. Freeman from the list of DNA types detected with stutter filters enabled. Allele lists in 2.6 and 2.5 were generated by removing the alleles of L. Freeman and K. Oswald from the list of DNA types detected with stutter filters enabled. Alleles listed for 2.4.1 and 2.2 (not present in Ms. Nasir's exercise) are from the STRmix™ contributor output based upon probabilistic genotyping assessment of both profiles assuming L. Freeman and K. Oswald as contributors. Alleles shown in yellow are those highlighted by Ms. Nasir. Alleles highlighted in blue are missing from Ms. Nasir's table, reason unknown.

Because this is an interpretation of data, not simply a technical review,[33] she is not operating under current standards and best practices as it relates to the interpretation of DNA data. She provides no explanation for why the DNA types shown in the table in blue were omitted from her exercise. Although Ms. Nasir's report provides no key regarding the yellow highlighting, I have inferred that it is representative of alleles she's identified as common to both exhibits 1 and 2. What is not clear, however, is why the 18 at D3S1358, the 11 at D8S1179, the 8 at D13S317, the 16 at D10S1248, the 22 at D12S391, or the 20 at D2S1338 are not highlighted, as they are also common to both of the aforementioned exhibits. There is also a 6 common to both exhibits at TH01, an 11 common to both exhibits at D22S1045, and an 8 common to both exhibits at D7S820, but they are not listed by Ms. Nasir as alleles foreign to Freeman and/or Oswald in the table in her report for one or the other of the exhibits.

If all alleles common to both shoes are considered, not just those highlighted by Ms. Nasir, alongside the possibility of allelic dropout due to the low level of DNA present, there are multiple possible genotype combinations that could be made at any one locus. It is not appropriate to assume that just

[33] Huma Nasir deposition transcript from June 17, 2019.

because there are two alleles common to both shoes that they be from a heterozygous genotype, further supported by the fact that there are three alleles common to both shoes at D8S1179. At any one locus, the allele detected can pair with itself in a homozygous genotype or pair with another allele, possibly undetected, as a heterozygote. When all possible genotypes of this "common contributor" are considered, 225 million different unique DNA types are possible.

Ms. Nasir cites "identical alleles of note"[34] at locus D1S1656 and D12S391 to provide statistical support to her assertion that there is a strong possibility of a common contributor. It is unclear why these DNA types are alleles "of note" as opposed to the other DNA types common to both shoes and I cannot determine why she chose to just utilize two loci in her calculation. Selecting only two loci when others are also available for statistical analysis is not in alignment with best practices in the field. In the body of her report, she calculates the probability of obtaining a 12,16.3 genotype as 1 in 61 in the Caucasian population but table 2 of her report lists 1 in 64. She states the probability of obtaining an unpaired 18.3 as 1 in 22 both in the body of the report and her random match probability table, but nowhere does she disclose the formulas she uses to calculate these frequencies, nor does she say whether she is truncating her statistics or following common mathematical rules of rounding. It is my opinion that assuming that the 12 and 16.3 detected at D1S1656 must be from a heterozygous genotype when calculating the statistic is not appropriate, as there also exists the possibility of a common 12,12 contributor or a common 16.3,16.3 contributor or either of those alleles paired with any other allele. Again, although I do not agree with her statistical approach, I have recreated the exercise and provided notes in support of my work to more fully address her statements.

| Nasir Calculations | | | | |
|---|---|---|---|---|
| Locus | Allele Combination | African American | Caucasian | Hispanic |
| D12S391 | 18.3, any allele | 1 in 41 | 1 in 22 | 1 in 23 |
| D1S1656 | 12, 16.3 | 1 in 81 | 1 in 64 | 1 in 103 |
| RMP for D12S391 & D1S1656 | | 1 in 3351 | 1 in 1462 | 1 in 2380 |
| Kaplan Calculations | | | | |
| Locus | Allele Combinations | African American | Caucasian | Hispanic |
| D12S391 | 18.3, any allele | 1 in 42 | 1 in 23 | 1 in 23 |
| D1S1656 | 12,16.3 *or* 12,12 *or* 16.3,16.3 *or* 12,Q *or* 16.3,Q | 1 in 3 | 1 in 3 | 1 in 4 |
| RMP for D12S391& D1S1656 | | 1 in 143 | 1 in 62 | 1 in 86 |

Table 8. Replication of Ms. Nasir's statistical analysis. For D12S391, I used the formula $2p\text{-}p^2$ where p is the frequency of the 18.3 allele. I evaluated all genotype possibilities at D1S1656. Homozygous match probabilities were calculated using the formula $p^2+p(1\text{-}p)\theta$ where p is the frequency of the allele and $\theta=0.01$. The heterozygous 12,16.3 was calculated as 2pq, where p is the frequency of the 12 allele and q the frequency of the 16.3. For heterozygous combinations including a Q allele (Q being any allele other than a 12 or 16.3), the 2pq formula was used where the p is the frequency of either the 12 or 16.3 and the frequency of the Q is 1-the frequency of the 12-the frequency of the 16.3. Individual locus RMP values rounded to the nearest whole number. Rounding for the total RMP was performed after all match probability calculations; therefore, the total RMP is not equal to the product of the rounded whole number frequencies for each locus.

---

[34] Huma Nasir report dated July 9, 2024 (Exhibit 8)

Ms. Nasir's interpretation and statistical analysis is not in alignment with current standards. While I agree that it is possible that there is a common contributor to both shoes, both based upon the overall DNA test results as well as what we know about the transfer and persistence of DNA on to shoes in general, I do not agree with the approach taken by Ms. Nasir. The random match probability is defined as "the probability that the DNA of a randomly chosen person has the same profile as the DNA of an evidentiary sample."[35] Ms. Nasir mischaracterizes the random match probability as "provid[ing] further support for the same individual being present in both the right and left Nike shoes of Leah Freeman."[36] This calculation does not provide support for observing the same DNA types on multiple items of evidence in the manner implied by Ms. Nasir.

Dr. Moore, in contrast, performed her analysis by following OSP's written policies and procedures. These policies and procedures are supported by internal validation testing and are in accordance with the FBI Quality Assurance Standards. Based upon the DNA typing results obtained from the shoes, when following the OSP procedures, it is not possible to draw a conclusion regarding the DNA types of a common contributor.

**Conclusion[37]**

The work done by Ms. Krings was correct and appropriate and conformed to the protocols in place at the time. The more recent work done by Dr. Moore is also correct and in accordance with the applicable policies and procedures.

At no time has any representative of the Oregon State Police ever authored a DNA report that associated Mr. McGuffin with any item of evidence known or assumed to belong to Ms. Freeman. This is one area, in fact, in which all experts agree. The inability to draw a conclusion, either through a DNA typing result that is not suitable or sufficient for comparison or through the determination that the comparison of an individual to an evidentiary profile is "inconclusive," is not evidence of obfuscation. It is routine across scientific disciplines that some results cannot be used to draw definitive conclusions.

Marla Kaplan
October 25, 2024

---

[35] *SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2017. Revised 2021.
[36] Huma Nasir report dated July 9, 2024 (Exhibit 8)
[37] The opinions contained in this statement are based upon the information currently available. They are subject to revision should new information become available.

**Documents Reviewed:**

*AmpFlSTR Profiler*[TM] *Plus PCR Amplification Kit User's Manual.* PE Applied Biosystems, 1997.

*AmpFlSTR Profiler*[TM] *Plus PCR Amplification Kit User's Manual.* PE Applied Biosystems, 2000.

Budowle. "Guidelines for a Quality Assurance Program for DNA Analysis." *Crime Laboratory Digest*, 22, 2, 1995, 21-43.

Buel et al. "Evaluation of Capillary Electrophoresis Performance through Resolution Measurements." *Vermont Forensic Laboratory.*

Congress of the United States Office of Technology Assessment. *Genetic Witness: Forensic Uses of DNA Tests.* U.S. Government Printing Office, 1990

Cybergenetics report dated August 9, 2019 signed by Jennifer Hornyak, William Allan, Beatriz Pujols, and Mark Perlin.

*DNA Quality Manual.* Oregon State Police Forensic Services Division, July 17, 2012.

*DNA Quality Manual.* Oregon State Police Forensic Services Division, August 23, 2017.

Farley, Mark A. and Harrington, James J. *Forensic DNA Technology.* Lewis Publishers, 1991.

*GlobalFiler*[TM] *and GlobalFiler*[TM] *IQC PCR Amplification Kits User Guide.* ThermoFisher Scientific, 2019.

*Guidance Document for the FBI Quality Assurance Standards for Forensic DNA Testing and DNA Databasing Laboratories,* FBI, Effective July 1, 2020, revised 1/1/2023.

Hillier et al. "Recovery of DNA from Shoes." Canadian Society of Forensic Science Journal, 38, 3, 2005, 143-150.

Holt et al. "TWGDAM Validation of AmpFlSTR[TM] PCR Amplification Kits for Forensic DNA Casework." *Journal of Forensic Sciences,* 47, 1, 2002, 66-96.

*Interpretation Guidelines AmpFlSTR® PCR Amplification Kits.* San Francisco Police Department Criminalistics Laboratory, January 2001.

Krings, Mary, deposition transcript from May 5, 2022.

LaFountain et al. "TWGDAM Validation of the AmpFlSTR Profiler Plus and AmpFlSTR COfiler STR Multiplex Systems Using Capillary Electrophoresis." *Journal of Forensic Sciences,* 46, 5, 2001, 1191-1198.

*Minimum Threshold Validation.* Oregon State Police Forensic Services Division DNA Unit, 1999.

*Mixture Analysis STR Casework Validation.* Oregon State Police Forensic Services Division DNA Unit, November 1998.

Case 6:20-cv-01163-MTK     Document 297     Filed 01/08/25     Page 192 of 291

Moretti et al. "Validation of Short Tandem Repeats (STRs) for Forensic Usage: Performance Testing of Fluorescent Multiplex STR Systems and Analysis of Authentic and Simulated Forensic Samples." *Journal of Forensic Sciences,* 46, 3, 2001, 647-660

Nasir, Huma, deposition transcript from June 17, 2019.

National Research Council. *The Evaluation of Forensic DNA Evidence.* National Academy Press, 1996.

Oregon State Police DNA Case File:
- 00N-481 August 27, 2000 report signed by Mary Krings and associated case notes
- 00N-481 September 6, 2000 report signed by Mary Krings and associated case notes
- 00N-481 December 9, 2001 report signed by Mary Krings and associated case notes
- 00N-481 January 21, 2002 report signed by Mary Krings and associated case notes
- 00N-481 April 17, 2002 report signed by Mary Krings and associated case notes
- 00N-481 May 24, 2010 report signed by Susan Hormann and associated case notes
- 00N-481 November 10, 2010 report signed by Susan Hormann and associated case notes
- 00N-481 May 9, 2017 report signed by me and associated case notes
- 00N-481 May 17, 2017 report signed by me amending the May 9, 2017 report
- 00N-481 October 10, 2017 report signed by Janelle Moore and associated case notes[1]
- 00N-481 March 15, 2018 report signed by Janelle Moore, associated case notes[1]
- 00N-481 July 5, 2018 report signed by Janelle Moore, associated case notes[1]
- 00N-481 July 5, 2018 report signed by Janelle Moore amending the March 15, 2018 report
- 00N-481 November 26, 2018 report signed by Janelle Moore and associated case notes
- 00N-481 Administrative portion of DNA Note Packet

*PCR Analysis Procedures.* Washington State Patrol, February 29, 2000.

*Part IV. Protocol for Profiler Plus and COfiler Analysis of DNA Case Evidence.* Oakland Police Department Criminalistics Laboratory DNA Methods Manual, October 1, 2000.

*Protocol for AmpFlSTR Profiler Plus[TM] Typing Using the ABI Prism 310 Genetic Analyzer.* Department of Justice Bureau of Forensic DNA Services Berkeley DNA Laboratory, July 16, 1998.

*Protocols for Forensic STR Analysis Version 7.* Office of the Chief Medical Examiner Forensic Biology Department, May 16, 2000.

*Quality Assurance Manual.* Oregon State Police Forensic Services Division, March 15, 2017.

*Quality Assurance Standards for Forensic DNA Testing Laboratories*, FBI, Effective July 1, 2020.

*Quality Manual*. Oregon State Police Forensic Services Division DNA Unit, May 2000.

*Quality Manual.* Oregon State Police Forensic Services Division DNA Unit, August 25, 2000.

---

[1] Includes associated batch packet(s), STRmix output folder(s), and GeneMapper project(s)

Rudin, N. and Inman, K. *An Introduction to Forensic DNA Analysis, Second Edition.* CRC Press, 2002.

Schmidt et al. "Casework-related DNA transfer on footwear in consideration of the shedder status." *Forensic Science International: Genetics,* 56, 2002.

*Short Tandem Repeat (STR) Analysis Casework Protocol.* Oregon State Police Portland Forensic Laboratory DNA Unit, March 30, 1999.

*Short Tandem Repeat (STR) Analysis Casework Protocol.* Oregon State Police Portland Forensic Laboratory DNA Unit, August 1, 2000.

*STR Analysis Casework Procedures Manual.* Oregon State Police Forensic Services Division, August 7, 2017.

*STR Casework Analysis Using GlobalFiler, the 3500xL, and STRmix.* Oregon State Police Forensic Services Division, November 2, 2016.

*SWGDAM Guidelines for the Validation of Probabilistic Genotyping Systems.* Scientific Working Group on DNA Analysis Methods. 2015.

*SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2010.

*SWGDAM Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories.* Scientific Working Group on DNA Analysis Methods. 2017. Revised 2021.

*Training Manual for STR Typing.* Oregon State Police Portland Forensic Laboratory DNA Unit, October 1, 1999.

Wallin et al. "TWGDAM Validation of the AmpFlSTR[TM] Blue PCR Amplification Kit for Forensic Casework Analysis." *Journal of Forensic Sciences,* 43, 4, 1998, 857-870.

Winter Sermeno. "McGuffin DNA Evidence 00N-481." May 23, 2017, Oregon District Attorney's Association. PowerPoint presentation.

<u>**CURRICULUM VITAE**</u>

**Marla F. Kaplan**
**DNA Technical Leader**
**Oregon State Police Portland Metro Forensic Laboratory**
**13309 SE 84th Avenue, Suite. 200**
**Clackamas, Oregon  97015**
**(971)673-8230**

<u>**EDUCATION**</u>

Master of Science, Forensic Science                                          Graduated 12/2000
University of Illinois at Chicago; Chicago, IL

Bachelor of Arts, Biochemistry                                               Graduated 05/1999
Kenyon College, Gambier, OH

<u>**FORENSIC RELATED EMPLOYMENT**</u>

***DNA Technical Leader***                                                   ***02/2009-present***
Oregon State Police Division of Forensic Services
Portland-Metro Crime Laboratory, Clackamas, OR
- Quality oversight of DNA Unit including file and protocol review, troubleshooting, and validation
- DNA STR typing of evidence samples, including extraction, quantitation, amplification and profiling
- Analysis of items of evidence for presence or absence of blood and/or semen as necessary
- Preparation of written reports on findings
- Court testimony as necessary

***Forensic Scientist***                                                     ***12/2005 – 02/2009***
Oregon State Police Division of Forensic Services
Portland-Metro Crime Laboratory, Clackamas, OR
- DNA STR typing of evidence samples, including extraction, quantitation, amplification and profiling
- Analysis of items of evidence for presence or absence of blood and/or semen as necessary
- Prepare written reports on findings
- Court testimony as necessary

***Forensic Scientist***                                                     ***02/2005 – 12/2005***
Oregon State Police Division of Forensic Services
Portland-Metro Crime Laboratory, Clackamas, OR
- Participate in Controlled Substances Identification training program (2/05-7/05)
- Analysis and identification of physical evidence related to controlled substances
- Preparation of written reports on findings
- Court testimony as necessary

***Forensic Scientist***                                                     ***04/2001-01/2005***
Illinois State Police Division of Forensic Sciences
Southern Illinois Forensic Science Centre, Carbondale, IL
Forensic Science Center at Chicago, Chicago, IL
- Analysis of evidence for presence or absence of bodily fluids
- Preparation of written reports on findings
- Court testimony as necessary

## TRAINING RECEIVED

Advanced STRmix Training                                                         9/2020
    Sponsored by OSP – Provided by ESR

DBLR User Training                                                               5/2020
    Provided (online) by ESR

STRmix Refresher Training                                                        9/2019
    Sponsored by OSP-Provided by Jo-Ann Bright and Zane Kerr, ESR

ANAB Forensic Assessor Course                                                    8/2018
    Sponsored by OSP-Provided by Emma Dutton, ANAB

Forensic Relationship Statistics Training                                        10/2016
    Sponsored by OSP-provided by Kelly Beatty, Marshall University

Advanced Kinship Analysis                                                        8/2015
    California Criminalistics Institute

STRmix Probabilistic Genotyping Software Training Workshop                       1/2015
    NicheVision and ESR, NZ

Lab Retriever and Likelihood Ratio Workshop                                      7/2014
    Sponsored by OSP- provided by SCEIG

DNA Mixture Interpretation Software Workshop                                     6/2014
    Sponsored by the Midwestern Association of Forensic Scientists

Advanced Y-STR Analysis                                                          1/2013
    Sponsored by OSP- provided by Sorenson Forensics

Paternity Statistics for Forensic Casework                                       4/2012
    Bode Technology

FBI DNA Auditor 2-Day Workshop                                                   04/2009

Population Genetics in Forensic DNA Analysis                                     08/2007
    Dr. George Carmody via the California Criminalistics Institute

Advanced Topics in Forensic Statistics                                          10/2006
    Promega Conference, Nashville, TN

STR Typing, Oregon State Police Forensic Science Division                        12/2005-7/2006

Evidence Handling and Identification of Controlled Substances                    02/2005-07/2005
    Oregon State Police Forensic Science Division

Illinois State Police Forensic Biologist Training Program                        04/2001-01/2002
    Illinois State Police Southern Illinois Forensic Science Centre

## PROFESSIONAL MEETINGS

| | |
|---|---|
| National CODIS Conference and DNA Technical Leader Meeting (FBI) | 10/2024 |
| 35th International Symposium on Human Identification, San Antonio, TX (Promega)<br>    *Moderator: Technical Leader Session* | 9/2024 |
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 6/2024 |
| National CODIS Conference and DNA Technical Leader Meeting (FBI)<br>    *Speaker: Root Cause and Corrective Action Surrounding CODIS Candidate Match Assessments* | 11/2023 |
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 06/2023 |
| STRmix Users Group (California Department of Justice and San Diego Police Department)<br>    *Speaker: Using the Explore Deconvolution Function of DBLR* | 06/2022 |
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 06/2021 |
| National CODIS Conference and DNA Technical Leader Meeting (FBI) | 11/2020 |
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 6/2020 |
| 30th International Symposium on Human Identification, Palm Springs, CA (Promega)<br>    *Speaker: Interpreting and Reporting Contaminated DNA Profiles* | 9/2019 |
| National CODIS Conference and DNA Technical Leader Meeting (FBI)<br>    *Speaker: Results of SWGDAM Y-screening Survey* | 11/2019 |
| STRmix Users Group (California Department of Justice and San Diego Police Department)<br>    *Speaker: STRmix 2.6 Validation: Updating Stutter and Drop In Parameters*<br>    *Speaker: Allowing for Manual Comparisons with our STRmix Workflow* | 6/2019 |
| STRmix Users Group (California Department of Justice and San Diego Police Department)<br>    *Speaker: Educating Attorneys to Present STRmix in Court*<br>    *Speaker: Data and Case File Organization, Technical Review* | 6/2018 |
| National CODIS Conference and DNA Technical Leader Meeting (FBI)<br>    *Speaker: Y-screening at the Oregon State Police* | 11/2017 |
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 6/2017 |
| National CODIS Conference and DNA Technical Leader Meeting (FBI)<br>    *Speaker: Y-STR Mixture Interpretation Guidelines at the Oregon State Police* | 11/2016 |
| Promega Technology Tour (Promega)<br>    *Speaker: Validation and Implementation of the Promega PowerPlex Y23 STR System*<br>       *San Antonio, TX—May, 2013*<br>       *New York, NY—June, 2013*<br>       *Chicago, IL—June, 2013*<br>       *Charlottesville, VA—September, 2013* | Various |

*San Diego, CA—April, 2014*
*Houston, TX—July, 2014*
*Los Angeles, CA—August, 2014*
*Austin, TX—July, 2016*

| | |
|---|---|
| STRmix Users Group (California Department of Justice and San Diego Police Department) | 6/2016 |

    *Speaker:  STRmix Validation and Implementation*
    *Speaker:  Comparison of Likelihood Ratio Options Available in STRmix*

| | |
|---|---|
| National CODIS Conference and DNA Technical Leader Meeting (FBI) | 11/2015 |

| | |
|---|---|
| Washington State Patrol Continuing Education Day | 6/2015 |

    *Speaker:  Validation and Implementation of the Promega PowerPlex Y23 STR System*

| | |
|---|---|
| 25th International Symposium on Human Identification, Phoenix, AZ (Promega) | 9/2014 |

| | |
|---|---|
| Tenth Annual Advanced DNA Technical Workshop West, San Diego, CA (Bode Technology) | 3/2013 |

    *Speaker:  Validation and Implementation of the Promega PowerPlex Y23 STR System*

| | |
|---|---|
| Eighth Annual Advanced DNA Technical Workshop West, San Diego, CA (Bode Technology) | 4/2011 |

    *Moderator:  Mixture Interpretation Workshop*

| | |
|---|---|
| 21st International Symposium on Human Identification, San Antonio, TX (Promega) | 10/2010 |

| | |
|---|---|
| Seventh Annual Advanced DNA Technical Workshop- West, San Diego, CA (Bode Technology) | 3/2010 |

    *Speaker:  Mixture Interpretation Workshop 3/29/10*

| | |
|---|---|
| Sixth Annual Advanced DNA Technical Workshop- West, San Diego, CA (Bode Technology) | 4/2009 |

| | |
|---|---|
| 17th International Symposium on Human Identification, Nashville, TN (Promega) | 10/2006 |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| Member:  American Academy of Forensic Sciences | 2011-present |
| Member:  Biology/DNA Scientific Area Committee DNA Analysis 2 Subcommittee | 10/2016-10/2022 |
| Affiliate:  Biology/DNA Scientific Area Committee DNA Analysis 2 Subcommittee | 3/2015-10/2016 |
| Member:  Scientific Working Group on DNA Analysis Methods | 1/2020-present |
| Invited Guest:  Scientific Working Group on DNA Analysis Methods | 7/2017-1/2020 |

## PUBLICATIONS

Bright et al. Internal validation of STRmix™ - A multi laboratory response to PCAST.  Forensic Science International: Genetics (2018) doi: 10.1016/j.fsigen.2018.01.003.

Petersen, D. and Kaplan, M. (2011), The Use of Hemastix® Severely Reduces DNA Recovery Using the BioRobot® EZ1. Journal of Forensic Sciences, 56: 733–735.

**Kaplan Testimony 2020-2024**

| Testimony Date | Laboratory Case Number | Court# | County | Case Name |
|---|---|---|---|---|
| 5/5/2020 | 19L-411 | 19CR64934 | Multnomah County | State of Oregon vs Michael Frank Moody |
| 3/18/2021 | 20E-614 | 20CR06676 | Douglas County | State of Oregon vs Tristan Ray Stanton |
| 4/29/2021 | 15B-634 | 1500834CR | Klamath County | State of Oregon vs Bradley Dean Zimmer |
| 5/13/2021 | 20B-132 | 18CR77859 | Deschutes County | State of Oregon vs Bradley Austin Montgomery |
| 5/19/2021 | 20E-614 | 20CR06676 | Douglas County | State of Oregon vs Tristan Ray Stanton |
| 5/21/2021 | 20E-614 | 20CR06676 | Douglas County | State of Oregon vs Tristan Ray Stanton |
| 9/8/2021 | 19E-2392 | 19CR34449 | Marion County | State of Oregon vs Cody Michael Desmond |
| 9/30/2021 | 20E-1972 | 21CR04570 | Lincoln County | State of Oregon vs Mark Preston Hunt |
| 10/13/2021 | 20E-1972 | 21CR04570 | Lincoln County | State of Oregon vs Mark Preston Hunt |
| 2/22/2022 | 09E-4147 | 09CR1070 | Coos County | State of Oregon VS. Patrick Lee Horath |
| 3/3/2022 | 19L-4175 | 19CR71786 | Clackamas County | State of Oregon vs David Pablo Rodas |
| 5/10/2022 | 16E-2228 | 21CR25607 | Lincoln County | State of Oregon vs Jeffrey Kurtz McMahon |
| 4/24/2023 | 19L-6103 | 19CR53657 | Multnomah County | State of Oregon vs Themba Hasaan Kelley |
| 6/13/2023 | 17L-7707 | 18CR56229 | Yamhill County | State of Oregon vs Earl Douglas Woods, Jr |
| 10/26/2023 | 15E-4171 | 20CR60272 | Lane County | State of Oregon vs James Edward Garrett |
| 2/28/2024 | 00L-3798 | 21CR27474 | Multnomah County | State of Oregon vs Robert Arthur Plympton |
| 10/3/2024 | 88L-6443 | 23CR09787 | Washington County | State of Oregon vs Robert Elmer Atrops |

An ASCLD/LAB - *International* Accredited Testing Laboratory Since 2006

 **Oregon**

Kate Brown, Governor

**Department of State Police**
**Forensic Laboratory**
13309 S.E. 84th Ave Suite 200
Clackamas, OR 97015
(971) 673-8230
FAX (971) 673-8309

October 10, 2017

Coquille Police Department
851 N. Central Blvd.
Coquille, OR  97423-1253

**Attention:  Orrin Wallace**

FREEMAN, LEAH (Victim)
MCGUFFIN, NICHOLAS JAMES (Suspect)
COURTRIGHT, CORLISS (COREY) (Mentioned)
FREEMAN, DENNIS (Mentioned)
SHAMBLIN, ELZIE (Mentioned)
OSWALD, KIP DEPUTY (Mentioned)
SERO, WILLIAM (Mentioned)
BARTLEY, BRENT WILLIAM (Mentioned)
ULMER, RANDY (Mentioned)

MESSARLE, ANTHONY (Mentioned)
ROBINSON, RONALD D. (Mentioned)
EMLER, JOSHUA (Mentioned)
WEST, AARON (Mentioned)
JENKINS, DAVID (Mentioned)
STEMMERMAN, THOMAS (Mentioned)
CROOK, RICHARD (Mentioned)
MICHAUD, ALISA (Mentioned)

Agency Case 00-1905
Lab No. 00N-000481                    **Analytical Report**

*Please refer to previous laboratory reports regarding this case.*

On June 15, 2017, the Forensic Services Division received sealed via UPS the following:

| EXHIBIT # | AGENCY # | DESCRIPTION |
|-----------|----------|-------------|
| 78 | 78 | Two oral swab standards collected from Brent Bartley. |
| 79 | 143 | Two oral swab standards collected from Randy Ulmer. |
| 80 | 144 | Two oral swab standards collected from Anthony Messarle. |
| 81 | 86 | Two oral swab standards collected from Ronald Robinson. |

On August 24, 2017, I received the following sealed evidence from Forensic Scientist K. Devon Sommer:

| EXHIBIT # | AGENCY # | DESCRIPTION |
|-----------|----------|-------------|
| 2.1 | 262 | Six swabs reportedly collected from the left white Nike shoe sole.  Two swabs were previously consumed and analyzed as Exhibits 2.1.2 and 2.1.4.  The remaining 4 swabs were consumed separately for analysis as Exhibits 2.1.1, 2.1.3, 2.1.5, and 2.1.6. |
| 2.5 | 170 | One cutting of a previously sampled area of the inside tongue of the left white Nike shoe.  The cutting was consumed for analysis. |

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 2

| EXHIBIT # | AGENCY # | DESCRIPTION |
|---|---|---|
| 2.6 | 170 | One swab of the inside tongue of the left white Nike shoe. The swab was consumed for analysis. |
| 39.2 - 39.4 | 212 | Three swabs from jeans reportedly collected from Leah Freeman consisting of one swab from the interior/exterior waistband (Exhibit 39.2), one swab from the back knee area of both legs (Exhibit 39.3) and one swab from the ankle area of both legs (Exhibit 39.4). The swabs were consumed separately for analysis. |
| 40.1 | 213 | Two swabs from the exterior of the tank top reportedly collected from Leah Freeman. The swabs were consumed separately for analysis. |
| 41.1 | 214 | One swab of the exterior of the sports bra reportedly collected from Leah Freeman. The swab was consumed for analysis. |
| 42.1, 42.2 | 215 | Two swabs of a sock reportedly collected from Leah Freeman, consisting of one swab of the exterior (Exhibit 42.1) and one swab of the interior (42.2). The swabs were consumed separately for analysis. |
| 44.1 | 217 | One swab of the surface of plastic reportedly collected from under Leah Freeman's head. The swab was consumed for analysis. |
| 82.1, 82.2 | 60 | Two swabs of a white athletic sock, consisting of one swab of the exterior (Exhibit 82.1) and one swab of the interior (82.2). The swabs were consumed separately for analysis. |
| 83 | 65 | Two oral swab standards collected from Josh Emler. |
| 84 | 66 | One oral swab standard collected from Aaron West. |
| 85 | - | Two oral swab standards collected from David Jenkins. |
| 86 | - | Two oral swab standards collected from Thomas Stemmerman. |
| 87 | 67 | One oral swab standard collected from Richard Crook. |

Samples from the items described below were previously prepared by Forensic Scientist Mary Krings and placed in frozen storage. These samples were retrieved for additional STR analysis.

| EXHIBIT # | AGENCY # | DESCRIPTION |
|---|---|---|
| 1 | 160 | One white Nike tennis shoe, right. Cuttings were previously taken and analyzed at Exhibits 1.1 (tongue), 1.2 (heel) and 1.3 (ankle). Exhibit 1.1 was previously consumed for analysis. The previously prepared samples from Exhibits 1.2 and 1.3 were examined at this time. |

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 3

| EXHIBIT # | AGENCY # | DESCRIPTION |
|-----------|----------|-------------|
| 2 | 170 | One white Nike tennis shoe, left.  Cuttings were previously taken and analyzed as Exhibits 2.2 (heel), 2.3 (tongue) and 2.4 (ankle).  In addition, DNA analysis was previously performed on Exhibits 2.1.2 and 2.1.4, swabs from the shoe sole.  Exhibit 2.3 was previously consumed for analysis.  The previously prepared samples from Exhibits 2.2, 2.4, 2.1.2, and 2.1.4 were examined at this time. |
| 4 | 171 | Toothbrush to be used as a secondary standard for Leah Freeman. |
| 9 | 182 | Oral standard from Corey Courtwright. |
| 10 | 183 | Oral standard from Dennis Freeman. |
| 13 | 190 | Oral standard from Nick McGuffin. |
| 45 | 190, CZ001-2 | Oral standard from Elzie Shamblin. |
| 47 | 186 | Oral standard from Kip Oswald. |
| 48 | CZ0100 | Oral standard from William Sero. |

**Results and Conclusions:**

*Evidence reportedly collected from Leah Freeman*

1. No DNA profiles were obtained from the swabs of the interior/exterior waistband (Exhibit 39.2) or back knee area (Exhibit 39.3) of the jeans, the tank top (Exhibit 40.1), the sports bra (Exhibit 41.1) or the sock (Exhibit 42.1, 42.2).

2. Due to low levels of DNA, the limited DNA profile obtained from the ankle area of the jeans (Exhibit 39.4) is insufficient for comparison.

3. The partial DNA profile obtained from swab of the surface of the plastic (Exhibit 44.1) matches the DNA profile of Leah Freeman (Exhibit 4). It is at least $1.94 \times 10^7$ (19.4 million) times more likely to observe this evidentiary profile (Exhibit 44.1) if the contributor is Leah Freeman rather than an unknown, unrelated individual.

   Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as the contributor to this DNA profile.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 4


*Samples from the right Nike shoe (Exhibit 1)*

4.  A mixed DNA profile, assumed to be from three contributors, including at least one male, was obtained from the cutting of the shoe heel (Exhibit 1.2).  A major contributor profile was determined from the mixture.

    - Leah Freeman cannot be excluded as the major contributor to this DNA mixture.  It is at least $4.10 \times 10^{25}$ (41.0 septillion) times more likely to observe this evidentiary mixture (Exhibit 1.2) if the contributors are Leah Freeman and two unknown, unrelated individuals rather than three unknown, unrelated individuals.

    - Additional contributor profiles could not be determined; however this mixture is suitable for comparison.  Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to this DNA mixture.

5.  A mixed DNA profile, assumed to be from four contributors, including at least one male, was obtained from the cutting of the shoe ankle (Exhibit 1.3).  A major profile was determined from the mixture.

    - Leah Freeman cannot be excluded as the major contributor to this DNA mixture.  It is at least $4.77 \times 10^{25}$ (47.7 septillion) times more likely to observe this evidentiary mixture (Exhibit 1.3) if the contributors are Leah Freeman and three unknown, unrelated individuals rather than four unknown, unrelated individuals.

    - Additional contributor profiles could not be determined; however this mixture is suitable for comparison.  The contributions of Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) to this mixture are inconclusive. They can neither be included nor excluded as possible contributors.

*Samples from the left Nike shoe (Exhibit 2)*

6.  The DNA profiles obtained from three of the sole swabs (Exhibits 2.1.2 - 2.1.4) and the partial profiles obtained from two of the other sole swabs (Exhibits 2.1.1 and 2.1.6) match the DNA profile of Leah Freeman.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 5

- It is at least 2.01 x $10^{13}$ (20.1 trillion) times more likely to observe the evidentiary profile obtained from Exhibit 2.1.1 if the contributor is Leah Freeman rather than an unknown, unrelated individual.

- It is at least 1.56 x $10^{26}$ (156 septillion) times more likely to observe the evidentiary profile obtained from Exhibits 2.1.2-2.1.4 if the contributor is Leah Freeman rather than an unknown, unrelated individual.

- It is at least 7.76 x $10^{10}$ (77.6 billion) times more likely to observe the evidentiary profile obtained from Exhibit 2.1.6 if the contributor is Leah Freeman rather than an unknown, unrelated individual.

- A low level of male DNA was detected in Exhibit 2.1.3; however it is insufficient for comparison.

- Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to the partial profiles from Exhibits 2.1.1 and 2.1.6.

7. Due to low levels of DNA, the limited DNA profile obtained from the remaining sole swab (Exhibit 2.1.5) is insufficient for comparison.

8. A mixed DNA profile, assumed to be from three contributors, including at least one male, was obtained from the shoe heel cutting (Exhibit 2.2).

- Leah Freeman cannot be excluded as a contributor to this DNA mixture. It is at least 1.88 x $10^{14}$ (188 trillion) times more likely to observe this evidentiary mixture (Exhibit 2.2) if the contributors are Leah Freeman and two unknown, unrelated individuals rather than three unknown, unrelated individuals.

- Assuming Leah Freeman as a contributor to this DNA mixture, a second contributor profile was determined. Kip Oswald cannot be excluded the second contributor. It is at least 2.11x $10^{25}$ (21.1 septillion) times more likely to observe this evidentiary mixture (Exhibit 2.2) if the contributors are Kip Oswald, Leah Freeman, and an unknown, unrelated individual rather than Leah Freeman and two unknown, unrelated individuals.

- Assuming Leah Freeman and Kip Oswald as contributors to this DNA mixture, the third contributor profile could not be determined; however, this mixture is suitable for comparison. Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to this DNA mixture.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 6

9.  A mixed DNA profile, assumed to be from three contributors, including at least one male, was obtained from the shoe ankle cutting (Exhibit 2.4).  A major contributor was determined from the mixture.

- Leah Freeman cannot be excluded as the major contributor to this DNA mixture.  It is at least $4.27 \times 10^{25}$ (42.7 septillion) times more likely to observe this evidentiary mixture (Exhibit 2.4) if the contributors are Leah Freeman and two unknown, unrelated individuals rather than three unknown, unrelated individuals.

- Assuming Leah Freeman as the major contributor to this DNA mixture, Kip Oswald cannot be excluded as a minor contributor to this DNA mixture.  It is at least $3.24 \times 10^{15}$ (3.24 quadrillion) times more likely to observe this evidentiary mixture (Exhibit 2.4) if the contributors are Kip Oswald, Leah Freeman and one unknown, unrelated individuals rather than Leah Freeman and two unknown, unrelated individuals.

- Assuming Leah Freeman and Kip Oswald as contributors to this DNA mixture, a third contributor profile was determined.  Based on the low level of DNA, the partial third contributor profile is not suitable for entry or searching against the Oregon State Police DNA database.

- Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to this DNA mixture.

- Due to its partial nature, no conclusions can be drawn as to whether the partial third contributor DNA profile described above and the profiles previously obtained from Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), Unknown female #2 (Exhibit 75), and Unknown female #3 (Exhibit 75) are from the same individual or from different individuals.

- Due to its partial nature, the third contributor DNA profile described above is not suitable for comparison to the predominant contributor profiles previously obtained from the cutting of the seat portion of the driver's seat cover (Exhibit 52.2) or the stained area of the white sock (Exhibit 11.1).

10. A mixed DNA profile, assumed to be from three contributors, including at least one male, was obtained from the shoe tongue cutting (Exhibit 2.5).  A major contributor was determined from the mixture.

- Leah Freeman cannot be excluded as the major contributor to this DNA mixture.  It is at least $6.30 \times 10^{25}$ (63.0 septillion) times more likely to observe this evidentiary mixture (Exhibit 2.5) if the contributors are Leah Freeman and two unknown, unrelated individuals rather than three unknown, unrelated individuals.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 7

- Assuming Leah Freeman as the major contributor to this DNA mixture, Kip Oswald cannot be excluded as a minor contributor to this DNA mixture. It is at least $6.69 \times 10^5$ (669,000) times more likely to observe this evidentiary mixture (Exhibit 2.5) if the contributors are Kip Oswald, Leah Freeman and one unknown, unrelated individual rather than Leah Freeman and two unknown, unrelated individuals.

- Assuming Leah Freeman and Kip Oswald as contributors to this DNA mixture, the third contributor profile could not be determined; however, this mixture is suitable for comparison. Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Randy Ulmer (Exhibit 79), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to this DNA mixture.

11. A mixed DNA profile of at least four contributors, including at least one male, was obtained from the shoe tongue swab (Exhibit 2.6). Due to mixture complexity and low levels of DNA, the typing results are insufficient for comparison.

*White Athletic Sock (Exhibit 82)*

12. A mixed DNA profile of at least four contributors, including at least one male, was obtained from the swab of the sock exterior (Exhibit 82.1). Due to mixture complexity and low levels of DNA, the typing results are insufficient for comparison.

13. A mixed DNA profile, assumed to be from three contributors, including at least one male, was obtained from the swab of the sock interior (Exhibit 82.2). A partial unknown contributor profile was determined from the mixture. Additional contributor profiles could not be determined; however the mixture is suitable for comparison.

- Leah Freeman (Exhibit 4), Corey Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nick McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Brent Bartley (Exhibit 78), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to this DNA mixture.

- Randy Ulmer's (Exhibit 79) contribution to this mixture is inconclusive. He can neither be included nor excluded as a possible contributor.

- Due to its partial nature, no conclusions can be drawn as to whether the partial unknown contributor DNA profile described above and the profiles previously obtained from Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), Unknown female #2 (Exhibit 75), Unknown female #3 (Exhibit 75) are from the same individual or from different individuals.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 8

- Due to its partial nature, the unknown contributor DNA profile describe above is not suitable for comparison to the predominant contributor profiles previously obtained from the cutting of the seat portion of the driver's seat cover (Exhibit 52.2) or the stained area of the white sock (Exhibit 11.1).

*Comparison to previously obtained profiles*

14. Due to their partial nature, no conclusions can be drawn regarding the contributions of Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), Unknown Female #2 (Exhibit 75), Unknown Female #3 (Exhibit 75) to the DNA profiles obtained from the new testing performed in this case.

15. Based upon the new profiling results from the sample of the tongue of the left Nike tennis shoe (Exhibit 2.3), the presumption of only two contributors (Leah Freeman and a single male, minor contributor) reported in the May 17, 2017 report is no longer valid.  The minor profile previously reported as "Unknown male #3" may be a composite of more than one individual.  As such, it is insufficient for comparison.

16. Brent Bartley (Exhibit 78), Anthony Messarle (Exhibit 80), Ronald Robinson (Exhibit 81), Josh Emler (Exhibit 83), Aaron West (Exhibit 84), David Jenkins (Exhibit 85), Thomas Stemmerman (Exhibit 86), and Richard Crook (Exhibit 87) are excluded as contributors to the following previously obtained DNA profiles:

- The minor profile from the ankle (Exhibit 1.3) of the right Nike tennis shoe (Unknown male #2).

- The predominant contributor mixture from the stained area (Exhibit 11.1) of the white sock.

- The major profile from the unstained area (Exhibit 11.2) of the white sock.

- The major profile from the ankle (Exhibit 12.3) or the white Adidas sock (Unknown male #1).

- The profile from the mouth of a beer can (Exhibit 31.1, Unknown male #4)

- The predominant contributor mixture from the seat portion of the driver's seat cover (Exhibit 52.2).

- The minor profile from the shoe reportedly belonging to William Sero (Exhibit 75, Unknown female #2).

A comparative DNA standard from Alisa Michaud has not yet been received.  Please submit an oral swab DNA standard from this individual for comparison to the evidentiary profile(s) obtained.

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 9

Evidence will be returned at the earliest convenience.

*Janelle Moore*

Janelle Moore, Ph.D., Forensic Scientist

Pursuant to ORS 40.460 (25), I hereby certify that I retrieved this document directly from the computer system maintained and operated by the Oregon Department of State Police and that this document accurately reflects and is a true copy of the information contained in that computer system. In testimony whereof, I have affixed my signature.

_____

Agency Case No. 00-1905
Lab No. 00N-000481
October 10, 2017
Page 10

## Report Appendix

*The following includes supplemental information on the analysis performed and definitions of some commonly-used terms. Please contact this analyst with any specific questions regarding the DNA analysis in this case.*

<u>General Information:</u>

A **differential extraction** is designed to physically separate the DNA in epithelial cells from the DNA in sperm cells, in samples which potentially contain a mixture of sperm and other cell types. As a result, separate "epithelial cell" and "sperm cell" DNA fractions are generated. Incomplete separation can occur and fractions may contain both sperm DNA and epithelial cell DNA.

Polymerase Chain Reaction (PCR)-based **Short Tandem Repeat (STR)** typing uses the GlobalFiler™ PCR Amplification Kit. This kit is used to analyze 22 different DNA locations possessed by both males and females in addition to two locations that are male-specific.

**CODIS** is the acronym for the COmbined DNA Index System, administered by the FBI. CODIS links DNA evidence profiles with other evidence profiles and also with individuals who are required by law to submit their samples to the State and National DNA databases. DNA profiles may be submitted to CODIS at both the state and national levels depending upon the case scenario and/or the nature of the profile. Profiles submitted at the National level are searched against profiles in all other participating states. All profiles suitable for entry into and searching within CODIS will be submitted to the database. If the above report does not list CODIS entry for a profile for which you believe CODIS entry is appropriate, please contact the reporting analyst for further information.

**Y-STR analysis** is a specialized type of DNA analysis which can specifically target male DNA in mixtures with high levels of female DNA. This type of analysis tests male-specific STRs, not present in females, which are inherited from father to son, and should be identical for all male relatives of the paternal line.

DNA profile interpretation and the calculation of likelihood ratios was facilitated by the use of the **STRmix™** software program.

<u>Profile Interpretation:</u>

A **limited** DNA profile is a profile having DNA typing information at seven or fewer DNA locations.

A **partial** DNA profile is a profile having DNA typing information at sixteen or fewer DNA locations.

A DNA **mixture** is a sample containing DNA from more than one donor.

An individual may be **assumed** to be a contributor when their contribution to a DNA mixture is reasonably expected based upon sample recovery location. For example, an individual may be assumed to have contributed DNA to a sample recovered from their own body, or a sample recovered from an item they regularly use. Prior to making an assumption during profile interpretation, a DNA analyst will first ensure that the assumption is appropriate based upon the DNA testing results obtained from the evidence item and the individual's DNA standard.

A **major** contributor is an individual in a DNA mixture profile who is donating a greater proportion of DNA to a mixture than another individual or individuals.

**Minor** contributors are present when a major contributor has been identified, and are individuals donating a lesser proportion of DNA to a mixture than another individual or individuals.

A **match** occurs when the DNA types detected in an evidence sample are the same as the DNA types detected in another sample at all corresponding tested locations.

An individual **cannot be excluded** as a contributor to a DNA mixture when the interpretation of the evidence profile returns results that show concordance between the DNA types detected and the DNA types found in the individual's reference standard.

An individual is **excluded** as a contributor to a DNA profile when the interpretation of the evidence profile returns results that are not concordant with the DNA types found in the individual's reference standard.

A mixture is too **complex** for interpretation when the number of contributors is such that no conclusions can be drawn from interpretation of the profile.

An evidence profile is **insufficient for comparison** when there is not enough information about one or more contributors to the DNA profile to draw a conclusion.

In DNA mixtures of **closely-related individuals** (such as parents, offspring, and siblings), false inclusions of other closely-related family members can occur due to the elevated sharing of genetic information between relatives.

<u>Providing Weight to an Association:</u>

**Likelihood ratios** provide a statistical measurement of the strength of support for one scenario over another, i.e., one scenario being the person of interest contributed to the DNA profile versus the scenario that an unknown individual, unrelated to the person of interest, contributed instead. Given the information provided, the most relevant scenario(s) was considered; however, additional scenario(s) can be considered upon request. Please contact this analyst for additional information. Likelihood ratios are calculated from the allele frequencies published by Moretti et.al. in Forensic Science International: Genetics 25 (2016). Likelihood ratios are calculated for the three major U.S. population groups; the African-American, Caucasian, and Hispanic populations. The lowest of the three values is reported above.

Likelihood ratios may have been provided in both **scientific notation** and in word form. Scientific notation is a means to express a large number using fewer digits. For example, the number 1,000,000,000,000,000,000 can also be expressed as $1.0 \times 10^{18}$. When reviewing the numbers provided in this report, the "YY" in N.NN x $10^{YY}$ refers to the number of digits that can be found after the first N in the number provided.

**Limited, moderate, and strong support** are terms that can be used to describe the strength or weakness of different ranges of a likelihood ratio. Factors that affect the likelihood ratio value may include (but are not limited to) the total amount of DNA tested, the total amount of DNA from a single contributor to a DNA mixture, and the number of contributors to a DNA mixture. Likelihood ratio values of less than or equal to 500 can be considered to be limited support for the scenario that associates the person (or persons) of interest with the evidentiary profile. Likelihood ratio values between 500 and 2500 are considered to provide moderate support. Likelihood ratios of greater than 2500 demonstrate strong support.

An ASCLD/LAB - *International* Accredited Testing Laboratory Since 2006



# Oregon
Kate Brown, Governor

**Department of State Police
Forensic Laboratory**
13309 S.E. 84th Ave Suite 200
Clackamas, OR 97015
(971) 673-8230
FAX (971) 673-8309

May 17, 2017

#3

Coquille Police Department
851 N. Central Blvd.
Coquille, OR  97423-1253

**Attention: Patrick Smith**

FREEMAN, LEAH (Victim)
MCGUFFIN, NICHOLAS JAMES (Suspect)
ROBINSON, RONALD D. (Suspect)
BARTLEY, BRENT WILLIAM (Suspect)
SHAMBLIN, ELZIE (Suspect)
SERO, WILLIAM (Mentioned)
OSWALD, KIP (Mentioned)
COURTRIGHT, CORLISS (Mentioned)
FREEMAN, DENNIS (Mentioned)
Agency Case 00-1905
Lab No. 00N-000481                    **Amended Report**

**Please refer to the report by this author dated May 9, 2017.  That report has been amended to
correct the previously reported agency item number for Exhibit 12.  All other report content
remains the same.**

**Based upon changes made to DNA profile interpretation guidelines since the time of the
Analytical Reports by Mary Krings and Susan Hormann (dated August 27, 2000, September 6,
2000, December 9, 2001, January 21, 2002, April 17, 2002, May 24, 2010,  and November 10,
2010), the DNA profiles obtained from the following items and any comparisons previously
reported were revisited.**

| EXHIBIT # | AGENCY # | DESCRIPTION |
|---|---|---|
| 1 | 160 | One Nike tennis shoe, right.  Cuttings were previously taken and analyzed as Exhibits 1.1 (tongue), 1.2 (heel), and 1.3 (ankle). No DNA profile was previously obtained from Exhibit 1.2. |
| 2 | 170 | One Nike tennis shoe, left.  Cuttings were previously taken and analyzed as Exhibits 2.2 (heel), 2.3 (tongue), and 2.4 (ankle).  In addition, DNA analysis was performed on Exhibits 2.1.2 and 2.1.4, swabs from the shoe sole.  No DNA profile was previously obtained from Exhibit 2.2. |
| 11 | 191 | One white sock.  Cuttings were previously taken and analyzed as Exhibits 11.1 (stained area) and 11.2 (unstained area). |
| 12 | 226 | One Adidas sock.  Cuttings were previously taken and analyzed as Exhibits 12.1 (toe), 12.2 (heel), and 12.3 (inner back ankle).  Only Exhibit 12.3 was subjected to DNA analysis. |

**EXHIBIT**

**13**

tabbies

3-1

DistrictAttorney_000016

Exhibit 133 Page 1 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 2

| EXHIBIT # | AGENCY # | DESCRIPTION |
|---|---|---|
| 31.1 | JP-008; 013 | Two swabs from the mouth of the beer can. One swab was previously consumed for DNA analysis. |
| 32.1 | JP-007; 013 | Two swabs from the mouth of the beer can. One swab was previously consumed for DNA analysis. |
| 33.1 | JP008; 013 | Two swabs from the mouth of the beer can. One swab was previously consumed for DNA analysis. |
| 52.2 | clw001 | Cutting from the seat portion of the driver's seat cover. A portion of the material was previously consumed for DNA analysis. |
| 66.1 | 207 | One black stained swab from the lateral toe of a right shoe reportedly belonging to William Sero. A portion of the swab was previously consumed for DNA analysis. |
| 74.4 | 232 | One grey stained swab from the lower back of a shirt reportedly belonging to William Sero. The swab was previously consumed for DNA analysis. |
| 75 | 233 | One pair of blue and green striped underwear. A sample of the stained area from the front of the underwear (previously indicated to be human blood) and a sample from the crotch area of the underwear (previously reported to contain spermatozoa) were previously consumed for DNA analysis. |

A differential extraction was previously performed on the crotch area sample, resulting in both sperm and epithelial (non-sperm) fractions. Refer to the appendix for additional information.

**Results and Conclusions:**

1. A mixed DNA profile, assumed to be from two contributors, was previously obtained from the **tongue (Exhibit 1.1) of the right Nike tennis shoe**.

   - A major contributor profile was determined from the mixture. This major profile matches the DNA profile of Leah Freeman (Exhibit 4). The estimated frequency of the DNA profile from a randomly selected individual matching this evidentiary DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

   - Due to low levels of DNA, the minor profile is insufficient for comparison.

2. A mixed DNA profile, assumed to be from two contributors, including one male contributor, was previously obtained from the **ankle (Exhibit 1.3) of the right Nike tennis shoe**. Both major and minor contributor profiles were determined from the mixture.

   - The major profile matches the DNA profile of Leah Freeman (Exhibit 4). The estimated frequency of the DNA profile from a randomly selected individual matching this evidentiary

ɔ - ɔ

DistrictAttorney_000017

Exhibit 133 Page 2 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 3

DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

- The minor profile is from an unidentified male individual **(Unknown male #2)**.

  o Due to low levels of DNA, this profile is not suitable for entry into the Oregon State Police DNA database; however, it is available for comparison.

  o Dennis Freeman (Exhibit 10), Nicholas McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 75), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #3 (Exhibit 2.3), and Unknown male #4 (Exhibit 31.1) are each excluded as the contributor of this minor profile.

3. The DNA profiles previously obtained from the **swabs from the left shoe sole (Exhibits 2.1.2 and 2.1.4)** match the DNA profile of Leah Freeman (Exhibit 4).

  - The estimated frequency of the DNA profile from a randomly selected individual matching the evidentiary DNA profile from the shoe sole (Exhibit 2.1.2) is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

  - The estimated frequency of the DNA profile from a randomly selected individual matching the evidentiary DNA profile from the shoe sole (Exhibit 2.1.4) is 1 in 242 million in the Caucasian population, 1 in 3.67 billion in the African American population, and 1 in 1.32 billion in the Hispanic population.

4. A mixed DNA profile, assumed to be from two contributors, including one male contributor, was previously obtained from **the tongue (Exhibit 2.3) of the left Nike tennis shoe**. Both major and minor contributor profiles were determined from the mixture.

  - The major profile matches the DNA profile of Leah Freeman (Exhibit 4). The estimated frequency of the DNA profile from a randomly selected individual matching this evidentiary DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

  - The minor profile is from an unidentified male individual **(Unknown male #3)**.

    o Due to low levels of DNA, this profile is not suitable for entry into the Oregon State Police DNA database; however, it is available for comparison.

    o Dennis Freeman (Exhibit 10), Nicholas McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 75), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3) and Unknown male #4 (Exhibit 31.1) are each excluded as the contributor of this minor profile.



DistrictAttorney_000018

Exhibit 133 Page 3 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 4

5. A mixed DNA profile, assumed to be from two contributors, including one male contributor, was previously obtained from the **ankle (Exhibit 2.4) of the left Nike tennis shoe**. Both major and minor contributor profiles were determined from the mixture.

   - The major profile matches the DNA profile of Leah Freeman (Exhibit 4). The estimated frequency of the DNA profile from a randomly selected individual matching this evidentiary DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

   - Due to low levels of DNA, the minor profile is insufficient for comparison.

6. A mixed DNA profile from at least three contributors, including at least one male contributor and consisting of both predominant and minor contributors, was previously obtained from the cutting of **the stained area (Exhibit 11.1) of the white sock**.

   - Nicholas McGuffin (Exhibit 13) cannot be excluded as a predominant contributor to this DNA mixture. The estimated frequency of the DNA profile from a randomly selected individual not being excluded from this evidentiary DNA profile is 1 in 116 in the Caucasian population, 1 in 239 in the African American population, and 1 in 134 in the Hispanic population.

   - Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), Unknown female #2 (Exhibit 75), and Unknown female #3 (Exhibit 75) are excluded as predominant contributors to this DNA mixture.

   - Due to their partial nature, the DNA profiles from Unknown male #2 (Exhibit 1.3) and Unknown male #3 (Exhibit 2.3) are not suitable for comparison to the predominant contributor mixture.

   - Due to low levels of DNA, the typing results from the minor contributor(s) to this DNA mixture are insufficient for comparison.

3-4

DistrictAttorney_000019

Exhibit 133 Page 4 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 5

7.  A mixed DNA profile from at least three contributors, including at least one male contributor, was previously obtained from the cutting of **the unstained area (Exhibit 11.2) of the white sock**.

    •  A major contributor profile was determined from the mixture. This major profile matches the DNA profile of Nicholas McGuffin (Exhibit 13). The estimated frequency of the DNA profile from a randomly selected individual matching this evidentiary DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations.

        o  Dennis Freeman (Exhibit 10), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), Unknown male #3 (Exhibit 2.3), and Unknown male #4 (Exhibit 31.1) are each excluded as the contributor of this major profile.

    •  Due to low levels of DNA, the typing results from the minor contributors to this DNA mixture are insufficient for comparison.

8.  A mixed DNA profile, assumed to be from two contributors, including at least one male contributor, was previously obtained from **the ankle (Exhibit 12.3) of the white Adidas sock**. Both major and minor contributor profiles were determined from the mixture.

    •  The major profile is from an unidentified male individual **(Unknown male #1)**. This profile was previously entered into the Oregon State Police DNA database. Based upon the information provided, this profile is no longer suitable for continued searching. Consequently, this profile has been deleted from the State and National DNA databases, and will no longer be searched.

    •  Due to low levels of DNA, the minor profile is insufficient for comparison.

9.  The DNA profile previously obtained from the swab from the mouth of a **beer can (Exhibit 31.1)** is from an unidentified male individual **(Unknown male #4)**. Dennis Freeman (Exhibit 10), Nicholas McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), and Unknown male #3 (Exhibit 2.3) are each excluded as the contributor of this DNA profile.

10. The DNA profile previously obtained from the swab from the mouth of a **beer can (Exhibit 32.1)** is from an unidentified female individual **(Unknown female #1)**. Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), Unknown female #2 (Exhibit 75), and Unknown female #3 (Exhibit 75) are each excluded as the contributor of this DNA profile.

11. Due to low levels of DNA and the indication of a DNA mixture, the DNA profile previously obtained from the swab from the mouth of a **beer can (Exhibit 33.1)** is insufficient for comparison.

3 -- 5

DistrictAttorney_000020

Exhibit 133 Page 5 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 6

12. A mixed DNA profile from at least four contributors, including at least one male contributor and consisting of both predominant and minor contributors, was previously obtained from the cutting of **the seat portion of the driver's seat cover (Exhibit 52.2)**.

   • Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nicholas McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), Unknown female #2 (Exhibit 75), and Unknown female #3 (Exhibit 75) are excluded as predominant contributors to this DNA mixture.

   • Due to their partial nature, the DNA profiles from Unknown male #2 (Exhibit 1.3) and Unknown male #3 (Exhibit 2.3) are not suitable for comparison to this predominant contributor mixture.

   • Due to low levels of DNA, the typing results from the minor contributor(s) to this DNA mixture are insufficient for comparison.

13. A mixed DNA profile, assumed to be from two contributors, including one male contributor, was previously obtained from **swab from the shoe reportedly belonging to William Sero (Exhibit 66.1)**. Both major and minor contributor profiles were determined from the mixture.

   • The major profile matches the DNA profile of Wiliam Sero (Exhibit 48).

   • The minor profile matches the DNA profile of Unknown female #2 (Exhibit 75).

   ○ Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), Dennis Freeman (Exhibit 10), Nicholas McGuffin (Exhibit 13), Elzie Shamblin (Exhibit 45), Kip Oswald (Exhibit 47), William Sero (Exhibit 48), Unknown male #1 (Exhibit 12.3), Unknown male #2 (Exhibit 1.3), Unknown male #3 (Exhibit 2.3), Unknown male #4 (Exhibit 31.1), Unknown female #1 (Exhibit 32.1), and Unknown female #3 (Exhibit 75) are each excluded as the contributor of this minor profile.

14. Due to low levels of DNA and the indication of a DNA mixture, the DNA profile previously obtained from **the swab of the lower back of a shirt reportedly belonging to William Sero (Exhibit 74.4)** is insufficient for comparison.

15. A mixed DNA profile, assumed to be from two female contributors, was previously obtained from the **stained area of the underwear (Exhibit 75)**. Both major and minor contributor profiles were determined from the mixture.

   • The major profile is from an unidentified female individual **(Unknown female #2)**.

   • The minor profile is from another unidentified female individual **(Unknown female #3)**.

   • Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), and Unknown female #1 (Exhibit 32.1) are each excluded as either the major or the minor contributor to this DNA mixture.

$3-6$

**DistrictAttorney_000021**

Exhibit 133 Page 6 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 7

16. The DNA profile previously obtained from the **epithelial cell fraction of the crotch area of the underwear (Exhibit 75)** matches the DNA profile of Unknown female #2. Leah Freeman (Exhibit 4), Corliss Courtright (Exhibit 9), Unknown female #1 (Exhibit 32.1), and Unknown female #3 (Exhibit 75) are each excluded as the contributor of this DNA profile.

17. Due to low levels of DNA and the indication of a DNA mixture, the DNA profile previously obtained from the **sperm cell fraction of the crotch area of the underwear (Exhibit 75)** is insufficient for comparison.

**Comparative DNA Standards from Ronald Robinson and Brent Bartley have not yet been received. Please submit oral swab DNA standards from these individuals for comparison to the evidentiary profile(s) obtained.**

_Marla F. Kaplan, Forensic Scientist_

Pursuant to ORS 40.460 (25), I hereby certify that I retrieved this document directly from the computer system maintained and operated by the Oregon Department of State Police and that this document accurately reflects and is a true copy of the information contained in that computer system. In testimony whereof, I have affixed my signature.

DistrictAttorney_000022

Exhibit 133 Page 7 of 8 to
State Defendants' Motion for Summary Judgment

Agency Case No. 00-1905
Lab No. 00N-000481
May 17, 2017
Page 8

## REPORT APPENDIX

*The following information includes supplemental information on the analysis performed and definitions of some commonly-used terms. Please contact this analyst with any specific questions regarding the DNA analysis in this case.*

### General Information:

A **differential extraction** is designed to physically separate the DNA in epithelial cells from the DNA in sperm cells, in samples which potentially contain a mixture of sperm and other cell types. As a result, separate "epithelial cell" and "sperm cell" DNA fractions are generated. Incomplete separation can occur and fractions may contain both sperm DNA and epithelial cell DNA.

**CODIS** is the acronym for the COmbined DNA Index System, administered by the FBI. CODIS links DNA evidence profiles with other evidence profiles and also with individuals who are required by law to submit their samples to the State and National DNA databases. DNA profiles may be submitted to CODIS at both the state and national levels depending upon the case scenario and/or the nature of the profile. Profiles submitted at the National level are searched against profiles in all other participating states.

**Y-STR analysis** is a specialized type of DNA analysis which can specifically target male DNA in mixtures with high levels of female DNA. This type of analysis tests male-specific STRs, not present in females, which are inherited from father to son, and should be identical for all male relatives of the paternal line.

### Profile Interpretation:

A DNA **mixture** is a sample containing DNA from more than one donor.

A **major** contributor is an individual in a DNA mixture profile who is donating a greater proportion of DNA to a mixture than another individual or individuals.

**Predominant** contributors are a group of individuals who combined donate a greater proportion of DNA to a mixture than another individual or individuals.

**Minor** contributors are present when a major contributor has been identified, and re individuals donating a lesser proportion of DNA to a mixture than another individual or individuals.

A **match** occurs when the DNA types detected in an evidence sample are the same as the DNA types detected in another sample at all corresponding tested locations.

An individual **cannot be excluded** as a contributor to a DNA mixture when the interpretation of the evidence profile returns results that show concordance between the DNA types detected and the DNA types found in the individual's reference standard.

An individual is **excluded** as a contributor to a DNA profile when the interpretation of the evidence profile returns results that are not concordant with the DNA types found in the individual's reference standard.

An evidence profile is **insufficient for comparison** when there is not enough information about one or more contributors to the DNA profile to draw a conclusion.

In DNA mixtures of **biologically related individuals**, false inclusions of closely-related family members (e.g. parents, offspring, siblings) can occur due to the elevated sharing of genetic information between relatives.

### Providing Weight to an Association:

The rarity of a DNA profile can be expressed as a **STR population frequency estimate**. Frequency estimates are used to express the rarity of STR DNA profiles when likelihood ratios are not used and also the rarity of YSTR profiles. These estimates are based upon the evidence profile, not the matching reference, and are reported for the three major U.S. population groups; the African-American, Caucasian, and Hispanic populations.

**STR probability estimates** assume a random population of unrelated individuals and were calculated from the allele frequencies published in the Journal of Forensic Sciences vol. 44 no. 6 (1999), in Forensic Science Communications vol. 3 no. 3 (2001), and in the Journal of Forensic Sciences vol. 60 no. 4 (2015).

3 -- 8

DistrictAttorney_000023

Exhibit 133 Page 8 of 8 to
State Defendants' Motion for Summary Judgment

Janis C. Puracal, OSB #132288
E-mail: jcp@mlrlegalteam.com
Andrew C. Lauersdorf, OSB #980739
E-mail: acl@mlrlegalteam.com
MALONEY LAUERSDORF REINER, PC
1111 E. Burnside Street, Ste. 300
Portland, OR 97214
Telephone: (503) 245-1518
Facsimile: (503) 245-1417

David B. Owens, WSBA #53856, *pro hac vice*
E-mail: david@loevy.com
LOEVY & LOEVY c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA 98145-1110
Telephone: (312) 590-5449

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor,<br><br>         Plaintiffs,<br><br>    v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br>         Defendants. | Civil No. 6:20-cv-01163-MK<br>(Lead Case)<br><br><br><br><br><br>PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF INTERROGATORIES |

Page 1– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
       INTERROGATORIES



1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

VIDOCQ SOCIETY,

                Cross-Claimant,

     v.

MARK DANNELS, PAT DOWNING,
SUSAN HORMANN, MARY KRINGS,
KRIS KARCHER, SHELLY MCINNES,
RAYMOND MCNEELY, KIP OSWALD,
MICHAEL REAVES, JOHN RIDDLE, SEAN
SANBORN, ERIC SCHWENNINGER,
RICHARD WALTER, CHRIS WEBLEY,
ANTHONY WETMORE, KATHY WILCOX,
CRAIG ZANNI, DAVID ZAVALA, JOEL D.
SHAPIRO AS ADMINISTRATOR OF THE
ESTATE OF DAVID E. HALL, VIDOCQ
SOCIETY, CITY OF COQUILLE, CITY OF
COOS BAY, and COOS COUNTY

                Cross-Defendants.

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

                Plaintiffs,

     v.

OREGON STATE POLICE,

                Defendant.

Civil Case No. 3:21-cv-01719-MK
(Trailing Case)

TO:    Defendant Mary Krings and her counsel of record

## **GENERAL RESPONSE**

1.    Any statement that responsive documents or information will be provided is not a representation that any such documents or information exist.

2.    No documents or requested information that embody material that is private, business, confidential, proprietary, trade secret, or otherwise protected from disclosure will be produced without the prior entry of any appropriate protective order against unauthorized use or disclosure of such documents or information.

3.    All objections or other questions are reserved as to the competency, relevance,

Page 2– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
        INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

materiality, privileged nature, or admissibility in evidence of any documents or information produced in this or any other action.

4.     The right to object to such other supplemental interrogatories as may be later propounded involving or relating to the same subject matter of these requests is reserved.

5.     This Response to Defendant Mary Krings' First Set of Interrogatories is made to the best of Plaintiffs' knowledge, information, and belief.  This Response is at all times subject to such additional or different information that discovery or further investigation may disclose and, while based on the present state of recollection, is subject to such further recollection and such additional knowledge and facts as may result from further discovery or investigation.  The right is reserved to make use of, or to introduce at any hearing and at trial, documents and information responsive to these requests for production located, discovered, or obtained subsequent to the date of this Response.

## **GENERAL OBJECTIONS**

1.     Plaintiffs object to the definitions and instructions set forth in Defendant Mary Krings' First Set of Interrogatories to the extent they impose obligations beyond those set forth in the Federal Rules of Civil Procedure, including, but not limited to, any implication that the requests for production are "continuing" to any extent beyond the scope of FRCP 26.

2.     Plaintiffs object to the definitions in Defendant Mary Krings' First Set of Interrogatories to the extent the definitions are inconsistent with FRCP 26 and 33, and to the extent that the definitions so expand the information requested that the requests are unduly burdensome.  *See Diversified Products Corporation v. Sports Center Co.*, 42 F.R.D. 3, 4 (D.C. Md. 1967).

3.     Plaintiffs object to any interrogatory to the extent it seeks or requires the production of any documents or information outside of Plaintiffs' possession, custody, or control.

4.     Plaintiffs object to any interrogatory to the extent that it seeks documents or information protected by the attorney-client privilege, work product doctrine, or FRCP 26.  Any inadvertent disclosure of such privileged documents or information is not to be deemed a waiver

Page 3– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
        INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

of any privilege with respect to such documents or information.

These General Objections are incorporated into each and every answer, response, and/or objection set forth below.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend Defendant Krings fabricated during the Investigation or Criminal Case.

> **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> > Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.

> > "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

> *Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

> "Contention interrogatories should not require a party to provide the equivalent of a

Page 4– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
         INTERROGATORIES

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Krings fabricated, lied, or withheld something. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Krings fabricated, lied, or withheld something. Nonetheless, Plaintiffs contend that Defendant Krings' reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Krings knew, and should have known, that McGuffin was innocent. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)

For example, Krings fabricated evidence that male DNA found on Freeman's left shoe was that of Defendant Oswald, the deputy who found the shoe. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier) As another example, Krings fabricated evidence that the only DNA on Freeman's right shoe was that of Freeman herself. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)

Plaintiffs reserve the right to supplement this response.

**INTERROGATORY NO. 2:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend was obtained as a result of Defendant Krings allegedly "solicit[ing] false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an

Page 6– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
              INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory No. 1.


**INTERROGATORY NO. 3:**  Describe with particularity the actions or omissions by which Defendant Krings allegedly "solicited false evidence" during the Investigation or Criminal Case, as alleged in the Second Am. Compl. ¶ 211.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

Page 8– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
     INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory No. 1.


**INTERROGATORY NO. 4:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes exculpatory evidence that Plaintiffs contend Defendant Krings unlawfully suppressed, destroyed, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an

abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act"

that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to

invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero

v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Krings fabricated, lied, or withheld something. In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Krings fabricated, lied, or withheld something. Nonetheless, Plaintiffs contend that Defendant Krings' reports, on the whole, suggest Nicholas McGuffin was guilty of murder when, in fact, Defendant Krings knew, and should have known, that McGuffin was innocent. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584– 85; Post-Conviction Deposition of Stephenie Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)

For example, Krings unlawfully suppressed, withheld, or destroyed evidence of the misconduct described in response to Interrogatory No. 1. As another example, Krings unlawfully suppressed or withheld evidence of DNA from an unidentified male on Freeman's right and left shoes. (*See*, *e.g.*, 2000-08-27 OSP Lab Report; 2000-09-25 OSP Lab Memorandum; 2002-01-21 OSP Lab Report; 2017-05-09 OSP Lab Report; SWS000001–1554; SWS001628–2678; OSP000751; OSP002584–85; Post-Conviction Deposition of Stephenie

Page 11– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
            INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Winter-Sermeno; Post-Conviction Deposition of Marla Kaplan; Post-Conviction Deposition of Janelle Moore; Post-Conviction Deposition of Paul Frasier; Civil Suit Deposition of Mary Krings; Civil Suit Deposition of Susan Hormann; Civil Suit Deposition of Kathy Wilcox; Civil Suit Deposition of Oregon State Police; Civil Suit Deposition of Paul Frasier)  As another example, Krings unlawfully suppressed, withheld, or destroyed evidence of her analysis about the number of contributors to the DNA mixture on Freeman's left shoe.  (*See*, *e.g.*, Civil Suit Deposition of Mary Krings)  As another example, Krings withheld evidence about her conversations with the other Defendants, as well as police and prosecutors, about her DNA-related conclusions.  (*See*, *e.g.*, OSP000746–748; Civil Suit Deposition of Mary Krings) Plaintiffs reserve the right to supplement this response.


**INTERROGATORY NO. 5:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each document, piece of information, or evidence that Plaintiffs contend constitutes impeachment evidence that Plaintiffs contend Defendant Krings unlawfully suppressed, destroyed, tampered with, or otherwise failed to provide to the District Attorney or to the attorneys or investigators representing Nicholas McGuffin in the Investigation or Criminal Case.

    **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of

Page 12– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF INTERROGATORIES

**MALONEY | LAUERSDORF | REINER** rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile:  503.245.1417

the discovery process because they are overly broad and unduly burdensome.' *Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory No. 4.

Page 13– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF INTERROGATORIES



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**INTERROGATORY NO. 6:** Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, each action or communication that plaintiffs contend support their assertion that Defendant Krings reached an agreement with any other Defendant "to frame McGuffin for Freeman's abduction and murder," as alleged in the Second Am. Compl. ¶ 244.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, Plaintiffs cannot possibly state (or know) every single time Defendant Krings conspired with the other Defendants.  In addition, because this case involves thousands of pages of documents and deposition testimony, Plaintiffs cannot possibly state every single document and page of testimony that shows that Defendant Krings conspired with the other Defendants.  Nonetheless, *see*, *e.g.*, Answer to Interrogatory Nos. 1 and 4.  *See also*, *e.g.*, OSP000749; Coquille 007393; OSP000746–748; CPD000148–155; CPD000302–339; CPD002092–2113; CPD002124–75; CPD002177–78; CPD020445–20580; CPD020646–47.


**INTERROGATORY NO. 7:**  Describe with particularity the "overt acts" and the "joint activity" in which Defendant Krings was "an otherwise willful participant," as alleged in support of Plaintiffs' conspiracy claims in the Second Am. Compl. ¶ 247.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero

v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

   "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

   The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

> **ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, and 6.

**INTERROGATORY NO. 8:**  Describe with particularity the actions or omissions by which Defendant Krings allegedly "conceal[ed] [her] misconduct" and describe with particularity the misconduct that was concealed, as alleged in the Second Am. Compl. ¶ 296.

> **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

>> Contention interrogatories which ask the respondent to systematically recite "all facts" in support of that party's contention are generally disfavored. "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1 and 4.

**INTERROGATORY NO. 9:** Describe with particularity the actions or omissions by which Defendant Krings "targeted" or "harassed" McGuffin as alleged in the Second Am. Compl. ¶¶ 86, 90, 98, 171.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

Contention interrogatories which ask the respondent to systematically recite

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

"all facts" in support of that party's contention are generally disfavored.

"Contention interrogatories which 'systematically track all of the allegations in

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

    "Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See, e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

    The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Page 19– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
        INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Jan. 18, 2012).

      **ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, and 6.


**INTERROGATORY NO. 10:**  Describe with particularity the actions or omissions by which Plaintiffs contend Defendant Krings suppressed the "exculpatory DNA evidence," as alleged in the Second Am. Compl. ¶ 182(a).

      **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and
>
> application of law to fact that supports the party's allegations are an abuse of
>
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

      "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting

Page 20– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
      INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These propositions are well established. *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL, 2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case. Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory No. 4.

**INTERROGATORY NO. 11:** Describe with particularity the actions or omissions by which Defendant Krings "targeted" or "harassed" McGuffin as alleged in the Second Am. Compl. ¶¶ 86, 90, 98, 171.

**OBJECTIONS:** Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection. Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero*

*v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents." *Lucero*, 240 F.R.D. at 594. These

propositions are well established. *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case. Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

**ANSWER:** Subject to and without waiving any objection, *see* Answer to Interrogatory

Page 22– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
        INTERROGATORIES

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Nos. 1, 4, and 6.

**INTERROGATORY NO. 12:**  Describe with particularity the instances in which Defendant Krings deliberately disseminated fabricated and false information to the news media and the manner in which Defendant Krings did so, as alleged in the Second Am. Compl. ¶¶ 171, 190.

    **OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
> "all facts" in support of that party's contention are generally disfavored.
> "Contention interrogatories which 'systematically track all of the allegations in
> an opposing party's pleadings, and that ask for 'each and every fact' and
> application of law to fact that supports the party's allegations are an abuse of
> the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2 (E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*, No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013); *Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist. LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

    "Contention interrogatories should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These propositions are well established.  *See, e.g., Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

Page 23– PLAINTIFFS' RESPONSE TO DEFENDANT MARY KRINGS' FIRST SET OF
       INTERROGATORIES

MALONEY | LAUERSDORF | REINER rc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts, including this one, have held that contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D. at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's strategy, what he deems important, and his analysis of the case.  Such requests exceed the permissible use of contention interrogatories and border too closely to protected work-product." *Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash. Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory Nos. 1, 4, and 6.

**INTERROGATORY NO. 13:**  Identify with particularity, by bates stamp number or by describing the substance of the information or evidence, all instances of misconduct by Defendant Krings of which Plaintiffs complain in this case not otherwise described in response to these Interrogatories.

**OBJECTIONS:**  Plaintiffs object to this interrogatory to the extent it constitutes an abuse of the discovery process, to the extent it requires Plaintiffs to identify "in detail every act" that supports Plaintiffs' contentions, and to the extent it constitutes an improper attempt to invade attorney-client privilege and work product protection.  Indeed:

> Contention interrogatories which ask the respondent to systematically recite
>
> "all facts" in support of that party's contention are generally disfavored.
>
> "Contention interrogatories which 'systematically track all of the allegations in
>
> an opposing party's pleadings, and that ask for 'each and every fact' and

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

application of law to fact that supports the party's allegations are an abuse of

the discovery process because they are overly broad and unduly burdensome.'

*Medlock v. Taco Bell Corp.*, No. 1:07-CV-01314-SAB, 2014 U.S. Dist. LEXIS 113828, at *2

(E.D. Cal. Aug. 15, 2014) (citing *Hanford Executive Mgmt. Employee Ass'n v. City of Hanford*,

No. 1:11-CV-00828-AWI-SAB, 2013 U.S. Dist. LEXIS 150359, at *8 (E.D. Cal. Oct. 17, 2013);

*Miles v. Shanghai Zhenhua Port of Machinery Co., LTS*, No. C08-5743 FDB, 2009 U.S. Dist.

LEXIS 112183, at *1 (W.D. Wash. Nov. 17, 2009); *Tubbs v. Sacramento Cnty. Jail*, No. CIV S-

06-0280 LKK GGH P, 2008 U.S. Dist. LEXIS 128900, at *1 (E.D. Cal. Mar. 28, 2008); *Lucero

v. Valdez*, 240 F.R.D. 591, 594 (D. N.M. 2007)).

"Contention interrogatories should not require a party to provide the equivalent of a

narrative account of its case, including every evidentiary fact, details of testimony of supporting

witnesses, and the contents of supporting documents."  *Lucero*, 240 F.R.D. at 594.  These

propositions are well established.  *See*, *e.g.*, *Luken v. Christensen Grp. Inc.*, No. C16-5214 RBL,

2017 U.S. Dist. LEXIS 189131, at *2 (W.D. Wash. Nov. 15, 2017) ("Numerous federal courts,

including this one, have held that contention interrogatories which 'systematically track all of the

allegations in an opposing party's pleadings, and that ask for 'each and every fact' and

application of law to fact that supports the party's allegations are an abuse of the discovery

process because they are overly broad and unduly burdensome.'") (quoting *Lucero*, 240 F.R.D.

at 594).

The "clear thrust" of such contention interrogatories "is an attempt to discover counsel's

strategy, what he deems important, and his analysis of the case.  Such requests exceed the

permissible use of contention interrogatories and border too closely to protected work-product."

*Wilcox v. Changala*, No. CV-10-3048-RHW, 2012 U.S. Dist. LEXIS 5471, at *7 (W.D. Wash.

Jan. 18, 2012).

**ANSWER:**  Subject to and without waiving any objection, *see* Answer to Interrogatory

Nos. 1, 4, and 6.

MALONEY | LAUERSDORF | REINER PC
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

**<u>INTERROGATORY NO. 14</u>:**  Identify each expert witness who has expressed any opinion relating to any alleged misconduct of Defendant Krings for which Plaintiffs complain in this litigation, and for each such expert: a) identify each opinion expressed; b) provide a statement of the basis of support for each opinion expressed; c) identify the information considered by the expert witness in forming each opinion expressed; d) identify the qualifications of the witness as an expert witness; e) identify the publications if any authored by the witness; f) identity the specific text portions from each authoritative writing which were relied upon by the witness in formation  of the opinions expressed; and g) provide a list of all cases in which the witness has testified as an expert at trial or by deposition.

  **<u>OBJECTIONS:</u>**  Plaintiffs object to this interrogatory as premature and in violation of the Court's order on expert disclosures.  Plaintiffs further object to this interrogatory to the extent that it imposes obligations beyond the scope of Fed. R. Civ. P. 26(a)(2).

  **<u>ANSWER:</u>**  *See* Objections.


  DATED:  December 4, 2023


      MALONEY LAUERSDORF REINER PC


      By <u>/s/Janis C. Puracal       </u>
       Janis C. Puracal, OSB #132288
       E-Mail:  jcp@mlrlegalteam.com
       Andrew C. Lauersdorf, OSB #980739
       E-Mail:  acl@mlrlegalteam.com

MALONEY | LAUERSDORF | REINER ᴘᴄ
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon  97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, the foregoing PLAINTIFFS' RESPONSE TO

DEFENDANT MARY KRINGS' FIRST SET OF INTERROGATORIES was served on the

following parties at the following address by sending to them a true copy thereof via the method

indicated below:

| | |
|---|---|
| Robert E. Franz, Jr.<br>Sarah R. Henderson<br>Law Office of Robert E. Franz, Jr.<br>PO Box 62<br>Springfield, OR 97477<br>rfranz@franzlaw.comcastbiz.net<br>shenderson@franzlaw.comcastbiz.net<br>    *Attorneys for Defendants*<br>    *City of Coquille, City of Coos Bay, Coos*<br>    *County, Craig Zanni, Chris Webley, Eric*<br>    *Schwenninger, Sean Sanborn, Ray McNeely,*<br>    *Kris Karcher, Pat Downing, Mark Dannels,*<br>    *Kip Oswald, Michael Reaves, David Zavala,*<br>    *Anthony Wetmore, Shelly McInnes* | Jesse B. Davis<br>Todd Marshall<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>todd.marshall@doj.state.or.us<br>jesse.b.davis@doj.state.or.us<br>    *Attorneys for Defendants Oregon State*<br>    *Police, John Riddle, Susan Hormann,*<br>    *Mary Krings, Kathy Wilcox* |
| Anthony R. Scisciani III<br>Kelsey L. Shewbert<br>Meredith A. Sawyer<br>Rachel Jones<br>HWS Law Group<br>101 SW Main Street, Suite 1605<br>Portland, OR 97204<br>ascisciani@hwslawgroup.com<br>kshewbert@hwslawgroup.com<br>msawyer@hwslawgroup.com<br>rjones@hwslawgroup.com<br>    *Attorneys for Defendant Vidocq Society* | Eric S. DeFreest<br>Luvaas Cobb<br>777 High Street, Ste. 300<br>Eugene, OR 97401<br>edefreest@luvaascobb.com<br><br>Laura E. Coffin<br>Coffin Law<br>541 Willamette Street, Ste. 211<br>Eugene, OR 97401<br>lauracoffin@coffin.law<br>    *Attorneys for Defendant Richard*<br>    *Walter* |

☒ by emailing to each of the foregoing a copy thereof to the email address above.

MALONEY LAUERSDORF REINER PC

By  /s/Janis C. Puracal
    Janis C. Puracal, OSB #132288
    E-Mail: jcp@mlrlegalteam.com

Attorneys for Plaintiffs



MALONEY | LAUERSDORF | REINER pc
ATTORNEYS AT LAW
1111 E. Burnside Street, Ste. 300
Portland, Oregon 97214
Telephone: 503.245.1518
Facsimile: 503.245.1417

Exhibit 134  Page 27 of 27 to
State Defendants' Motion for Summary Judgment

```
             IN THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF OREGON


NICHOLAS JAMES MCGUFFIN, as    ) No. 6:20-cv-1163-MK
an individual and as guardian  ) (Lead Case)
ad litem, on behalf of S.M.,   ) No. 3:21-cv-1719-MK
a minor,                       ) (Trailing Case)

              Plaintiffs,      )

      v.                       )

MARK DANNELS, PAT DOWNING,     ) Deposition of:
SUSAN HORMANN, MARY KRINGS,    ) Huma Nasir
KRIS KARCHER, SHELLY MCINNES,  ) December 10, 2024
RAYMOND MCNEELY, KIP OSWALD,   )
MICHAEL REAVES, JOHN RIDDLE,   )
SEAN SANBORN, ERIC             )
SCHWENNINGER, RICHARD WALTER,  )
CHRIS WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI,     )
DAVID ZAVALA, ESTATE OF        )
DAVID E. HALL, VIDOCQ SOCIETY, )
CITY OF COQUILLE, CITY OF      )
COOS BAY, and COOS COUNTY,     )
                               )
              Defendants.      )
-----------------------------)
```

Exhibit 135  Page 1 of 8 to
State Defendants' Motion for Summary Judgment

1      again, Ms. Nasir.

2              By the way, I'm sorry.  Can you help me

3      make sure I'm saying your name correctly.  I don't

4      think I was paying attention when you said it

5      earlier.

6          A.    It's correct.  You're saying it correctly.

7          Q.    Okay.  All right.  So this is Exhibit 8.

8                (Deposition Exhibit 8 introduced for

9                  identification.)

10     BY MR. DAVIS:

11         Q.    Are you able to see that?

12         A.    Yes.

13         Q.    And this is entitled "Oregon State Police

14     Portland Forensic Laboratory DNA Unit Short Tandem

15     Repeat (STR) Analysis Casework Protocol."

16         A.    Right.

17         Q.    Is this -- this is a 63-page document.

18     Does this contain the various protocols you were

19     just referring to?

20         A.    Yes, that's the one.

21         Q.    Okay.  So I can see here in the table of

22     contents it references a report writing -- report

23     writing guidelines.  Right?

24         A.    Correct.

25         Q.    Interpretation guidelines.  Right?

Exhibit 135  Page 2 of 8 to
State Defendants' Motion for Summary Judgment

Hunter Nastle

```
1    fairly certain that all peaks from all contributors
2    are being representative.  So there is no -- if
3    there is a heterozygous locus where there were
4    supposed to be two alleles and there's only one
5    above the stochastic threshold, you can be sure that
6    there's only one peak there and a sister allele is
7    not dropping out, that it's not to that low level
8    where it's dropping out.
9         Q.    And that's how you --
10        A.    The stochastic threshold gives you more
11   confidence that that is the allele that should be
12   used for statistical purposes.
13        Q.    And you understand the 150 RFU threshold
14   that was in place in 2000 to be a stochastic
15   threshold?
16        A.    That's how I understood it to be, yes,
17   because they're analyzing everything at 50.  If 150
18   was the analytical threshold, then everything should
19   have been analyzed at 150.  But it seems that they
20   were analyzing the peaks at 50 RFU.
21        Q.    When you issued your opinion, did you
22   consider this portion of the protocol on Page 37
23   that says these minor peaks -- I think you said you
24   did -- well, strike all that.
25             Did you consider this portion that says
```

Exhibit 135  Page 3 of 8 to
State Defendants' Motion for Summary Judgment

Hume Nastle

1    A.    Sure, I agree with that, but at the same

2    time, then, when you say the presence of more than

3    two alleles per locus, then more than two -- the

4    alleles are allele calls at 50 RFU as well.  Alleles

5    are not just over 150, according to this protocol.

6    Q.    So is it your position that the lab's

7    protocols, as written, required it to report the

8    results from Item 1.3 as a mixture?

9    A.    They have -- so I believe that -- I don't

10   know that it says explicitly that it is required to

11   be that way.  I do think that there are guidance

12   that it was a mixture.  I think that there was

13   guidance that alleles between 50 and 150 should have

14   been reported, considered for exclusion, and they

15   weren't.  So in that regard I feel that the lab

16   didn't follow the SOP.

17   Q.    Do you agree that the lab's protocols in

18   2000 did not require the lab to report the presence

19   of male DNA below 150 RFU from Item 1.3?

20   A.    I don't know that it said that it didn't

21   require.

22        So male DNA -- amelogenin marker is not an

23   STR marker, so a Y-peak -- we're not talking about

24   sister alleles here.  It's not an STR marker.

25   Y-peak is a sex determinant marker, where you'll

Exhibit 135  Page 4 of 8 to
State Defendants' Motion for Summary Judgment

Hinds  Nasir

1    A.    There are scientific standards on how to

2   report a mixture when there are more than two

3   alleles present at a locus, so I feel like not

4   reporting it as a mixture is a departure from

5   standard practice and standard protocols that are

6   used in forensic laboratories.

7    Q.    Are you able to identify what those

8   standards or practices were at the time, in 2000?

9    A.    Not at the moment.  I'd have to look up

10   the materials.  But I think their own SOP allowed

11   for it.  It just wasn't reported.

12    Q.    I'm not sure I understood you there,

13   Ms. Nasir.  Are you saying that the lab's protocols

14   allowed it to do what it did but those protocols

15   should not have done so?  Is that accurate?

16    A.    No.  I'm saying that the -- I believe the

17   lab's protocol allowed them to report it as a

18   mixture, but it wasn't reported as a mixture.

19    Q.    Okay.  And you've said already that the

20   lab's protocols didn't require the lab to report it

21   as a mixture.  Correct?

22    A.    The way I interpret it, they're analyzing

23   alleles at 50 RFU.  And if you're analyzing it at

24   50 RFU, that protocol said that if there are more

25   than two alleles at more than one locus, then it may

Exhibit 135  Page 5 of 8 to
State Defendants' Motion for Summary Judgment

1    be -- I think you said something like may be

2    reported as a mixture.  Yes, there is not a word

3    that says required or must be.  I think it's just --

4    I believe it said it may be reported as a mixture.

5        Q.    So, again, the departure from professional

6    and scientific standards is from some document other

7    than the lab's protocols, then.  Is that right?

8        A.    Yes.

9        Q.    And at this point you're unable to

10   identify a different document that sets out those

11   professional and scientific standards --

12       A.    Right.

13       Q.    -- you're talking about?

14       A.    Yes.

15       Q.    Okay.  I think you had said earlier that

16   you had -- you would have described -- you would

17   have described the results from 1.3 as a mixture and

18   that you would have said that mixture is unsuitable

19   for comparison.  Is that right?

20                MS. PURACAL:  Object to --

21       A.    The minor --

22                MS. PURACAL:  -- form.

23                Go ahead.

24       A.    The minor donor is unsuitable for

25   comparison.  I would have said it's a mixture

Exhibit 135  Page 6 of 8 to
State Defendants' Motion for Summary Judgment

Huma Nasir

1      A.    Yes.

2      Q.    And when it did that, Item 2.3 had

3   previously been consumed for analysis in 2000,

4   right --

5      A.    Right.

6      Q.    -- so it couldn't be reexamined?

7            But the lab did test a number of other

8   items on the left shoe.  And those items showed that

9   Oswald was a contributor to that profile after all.

10  Right?

11     A.    Through some of the other items that were

12  tested, yes.

13     Q.    Those areas specifically were 2.2, 2.4,

14  and 2.5.  Right?

15     A.    Yes.

16     Q.    Okay.  And you agreed with those results

17  from 2017, too.  Right?

18     A.    Yes.

19     Q.    Okay.  And is it correct that the lab

20  has not at any point affirmatively said that

21  Mr. McGuffin's DNA was included in any evidentiary

22  item?

23     A.    That's correct, they did not.

24     Q.    You have reviewed Ms. Kaplan's report,

25  you've said?

Exhibit 135  Page 7 of 8 to
State Defendants' Motion for Summary Judgment

```
1    State of Oregon    )
                         )              ss.
2    County of Douglas  )

3

4        I, Deana R. Mead, CSR, Certified Shorthand

5    Reporter for the State of Oregon, certify that the

6    witness was sworn and the transcript is a true

7    record of the testimony given by the witness; that

8    at said time and place I reported by stenotype all

9    testimony and other oral proceedings had in the

10   foregoing matter; that the foregoing transcript

11   consisting of 160 pages contains a full, true and

12   correct transcript of said proceedings reported by

13   me to the best of my ability on said date.

14       If any of the parties or the witness requested

15   review of the transcript at the time of the

16   proceedings, correction pages are included.

17       IN WITNESS WHEREOF, I have set my hand this

18   23rd day of December 2024, in the City of Roseburg,

19   County of Douglas, State of Oregon.

20

21

22

23   Deana R. Mead, CSR

24   CSR No. 98-0350

25   Expiration Date:  June 30, 2026
```

Exhibit 135  Page 8 of 8 to
State Defendants' Motion for Summary Judgment

EXHIBIT 8

Exhibit 136 Page 1 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

---

July 9, 2024

Janis C. Puracal
Andrew C. Lauersdorf
Maloney Lauersdorf Reiner PC
1111 E. Burnside St., Suite 300
Portland, Oregon 97214

David B. Owens
Loevy & Loevy c/o
Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
PO Box 85110
Seattle, WA 98145-1110

RE:     *McGuffin v. Dannels*, *et al.*
        U.S.D.C. District of Oregon
        Case Nos. 6:20-cv-01163-MK and 3:21-cv-01719-MK

Dear Counsel,

My name is Huma Nasir and I am a Forensic DNA Consultant. I previously served as a Forensic Analyst/Supervisor and the Technical Leader of a private DNA lab, Cellmark Forensics in Dallas, TX until this lab merged with a forensic lab in Virginia and became Bode Cellmark Forensics.  I have a Master of Science degree in Pharmaceutical Sciences with a concentration in Forensic Serology and DNA from the University of Florida. I have over twenty years of experience in Forensic DNA analysis and I have personally performed DNA testing and/or analysis for thousands of forensic cases.

I was asked to perform a document review of the DNA testing performed by the Oregon State Police Forensic Laboratory (OSP Lab) in the above referenced case. Among other materials, I have reviewed the following OSP lab casework protocols and laboratory reports related to the DNA analysis performed in this case:

- OSP bench notes and case file including electropherograms/allele charts for samples tested
- OSP lab report dated August 27, 2000 signed by Mary Krings
- OSP lab report dated January 21, 2002 signed by Mary Krings
- OSP lab report dated May 24, 2010 signed by Susan Hormann
- OSP lab report dated November 10, 2010 signed by Susan Hormann
- OSP lab report dated May 9, 2017 signed by Marla Kaplan
- Amended OSP lab report dated May 17, 2017 signed by Marla Kaplan
- OSP lab report dated October 10, 2017 signed by Janelle Moore
- Cybergenetics report for this case dated August 9, 2018

Exhibit 136 Page 2 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

As a result of this review, I have made the following observations and formed the following opinions:

1. The OSP Lab tested three cuttings, 1.1, 1.2 and 1.3, from the right Nike tennis shoe (Exhibit 1). The results from this sample are reported as follows in the report dated August 27, 2000:

   *"The DNA profile from Exhibit 1 (right Nike shoe)...matches the DNA profile from Leah Freeman...".*

   The lab did not report the results obtained from each cutting taken from the right Nike tennis shoe; rather, only one general conclusion was reported for Exhibit 1 – that as matching Leah Freeman.

   Although, it is correct that the DNA obtained from the right Nike tennis shoe matches Leah Freeman, that is not the complete or only conclusion that can be made from the testing performed on this exhibit. The results from each of the cuttings taken from the right Nike tennis shoe should have been reported separately since they were 3 separate samples. Failing to report all results is a significant departure from professional and scientific standards for forensic DNA labs.

2. By reporting one general conclusion from the right Nike tennis shoe, the lab failed to report that the DNA profile obtained from cutting 1.3 is in fact consistent with a mixture of two individuals, including one minor male contributor. The major profile in this sample matches Leah Freeman and the minor profile is generated from an unknown male. Nicholas McGuffin and several other individuals tested are excluded as possible contributors to this mixture profile.

3. According to the laboratory's analysis protocols at the time, there were clear guidelines provided to recognize a mixture profile. In addition, the protocol stated "Peaks between 50 and 150 RFU will be considered for purposes of exclusion". However, the records I reviewed show that the protocol was not followed in this case. The minor alleles in cutting 1.3 are in fact between 50 and 150 RFU and they clearly exclude Nicholas McGuffin; however, this exclusion was never reported. In fact, the lab did not even report that a mixture including a male was obtained from this sample. Ignoring the mixture profile including a male and simply reporting that the profile is consistent with the victim was not the "best" result or the most "conservative" result to report. Even if the minor alleles were below the 150 RFU threshold, the standards and protocols required the lab at least report this sample as a mixture profile including at least one male. If their protocols did not allow statistical calculations on these peaks below 150 RFU, the lab should have at least stated that a mixture profile was obtained with an unknown male but this data was unsuitable for comparison.

4. Omitting the fact that cutting 1.3 produced a mixture profile including a minor male and that Nicholas McGuffin is excluded from this mixture profile was a significant departure from professional and scientific standards. Omitting these results from the report created the misleading impression that only a single source profile consistent with Leah Freeman was obtained from this sample. Failure to report these results was not the conservative approach; it was simply incorrect and misleading. This is especially critical because, as a forensic DNA lab, the OSP Lab should report conclusions in a manner that would allow a lay person reading the lab report to know that a mixture profile was obtained from this sample and there was presence of male DNA in the sample. To determine that there was additional information obtained from testing of the samples in this case requires a review and understanding of the technical data, including lab notes, worksheets and electropherograms. A lay person without technical expertise in DNA analysis would be led to believe from the OSP Lab report that

Exhibit 136 Page 3 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

only Leah Freeman's profile was obtained and there is no additional profile obtained from this sample. Professional and scientific standards require forensic DNA labs to report all conclusions from all tested evidence.

5. Upon inquiring regarding the additional male profile not being reported from sample 1.3, the lab claimed that the analyst did not interpret the alleles present below 150 RFU threshold and therefore did not report the additional data. However, the lab notes indicate otherwise. The lab notes show that the analyst interpreted the DNA profile as a mixture, and there are handwritten notes stating "mixture female major" (see attachment 1). The bench notes reflect an interpretation of a mixture of more than one individual. Furthermore, the note indicating a "major female" in the sample means that there is also the presence of a minor donor. Despite the bench notes documenting the interpretation of a mixture, the analysts did not report the interpretation as such.

6. The lab issued an updated report after the profiles obtained in this case were re-examined and the mixture profiles were re-interpreted. I agree with the conclusions reported in lab report dated May 9, 2017 regarding cutting 1.3 from the right Nike shoe.

7. The OSP lab also tested the left Nike tennis shoe (Exhibit 2). For cutting 2.3 taken from the left Nike tennis shoe, the lab's conclusions were reported as follows in the report dated August 27, 2000:

> *"The DNA profiles from Exhibit 2.3 (left Nike shoe) indicate the presence of DNA from more than one person.  The major profile is consistent from Leah Freeman.  The minor profile is from a male".*

The report dated January 21, 2002 further states:

> *"The DNA profile of Kip Oswald is consistent with the minor profile in the previously analyzed Exhibit 2.3 (left Nike shoe)".*

I do not agree with this conclusion.  If the mixture profile is consistent with Leah Freeman and Kip Oswald, there are two additional alleles at D3 and D13 loci that are foreign to both Leah Freeman and Kip Oswald indicating either a third contributor or a contributor other than Kip Oswald. The lab, however, did not report either possibility. The lab's report creates the incorrect and misleading impression that the only contributors to Exhibit 2.3 (left tennis shoe) were Leah Freeman and Kip Oswald. Professional and scientific standards require that forensic DNA labs report all conclusions from all tested evidence.

The data from testing shows that the DNA profile obtained from Exhibit 2.3 (left tennis shoe) is a mixture of two individuals including a male contributor.  The major profile in this mixture matches Leah Freeman.  The minor profile originated from an unknown male. Kip Oswald, Nicholas McGuffin and several other individuals are excluded as possible contributors to this mixture profile.

8. These conclusions regarding cutting 2.3 from the left Nike shoe were amended by the lab in 2017 and I agree with the conclusions reported in lab report dated May 9, 2017.

9. The OSP lab performed testing on additional items in 2010 and issued additional reports in this case.   In the years prior to 2010, the analysis protocol was changed such that the

Exhibit 136 Page 4 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

stochastic threshold was lowered to 100 RFU instead of 150 RFU. At this time, the lab should have re-interpreted the previously reported profiles and issue correct conclusions prior to the trial in 2011. However, the lab did not re-interpret or correct any of the previously reported conclusions. Therefore, although the lab had knowledge of data they generated where male DNA inconsistent with Nicholas McGuffin was detected on the right and left shoe, the lab did not reveal the presence of an unidentified male on the shoes at the time of the trial. The lab, further, did not issue amended reports to document the exclusion of Nicholas McGuffin as a contributor.

10. OSP Lab criminalist Kathy Wilcox performed presumptive testing for the presence of blood on the left shoe. Four areas are marked on the bottom sole of the shoe and are labeled "#1, #2, #3 and #4" (see attachment 2). Area #2 is labeled as "high velocity (small) blood droplet on side of traction square". However, the handwritten notes indicate that no presumptive blood testing was performed on swab #2 from the shoe. Without any presumptive or confirmatory serological testing for blood performed on a biological sample, it cannot be conclusively stated that the sample source is blood.

11. Forensic testing may be performed on evidentiary items to obtain answers to certain questions i.e. whether an individual's DNA is present on an item. However, once the DNA testing is performed and results are obtained, all results should be reported without bias. If an item was tested for wearer DNA and DNA was detected from someone other than the wearer of the item, the results from the unknown individual should be reported. To withhold any results after testing falls short of professional and scientific standards for forensic DNA labs.

After reviewing the data and report generated by retesting samples in this case in 2017, I conclude the following:

12. It is my professional opinion that there is a strong possibility that an unidentified individual contributed DNA to both the right and left Nike shoes of Leah Freeman.

13. This opinion is based on comparison of possible foreign alleles in the samples tested from the right and left Nike shoes. The possible foreign alleles considered are listed in Table 1 below. As seen in Table 1, there are identical alleles present at numerous loci/markers in samples from the right Nike shoe (Exhibits 1.2 and 1.3) and the left Nike shoe (Exhibits 2.6, 2.4.1ul and 2.5). The presence of identical alleles in samples from right and left Nike shoes indicates the likely presence of the same individual in both shoes. The data indicates that the same person may have touched or handled both the right and left shoes of Leah Freeman.

14. Foreign alleles are those deduced by subtracting a known profile from a mixture profile obtained. For example, if a mixture profile at a given locus/marker is "12,13,14,15" and an individual known to have contributed DNA to this profile has alleles 12,13, then the deduced foreign alleles would be 14 and 15. Foreign alleles are the alleles remaining in a mixture profile after the known individual's DNA profile is accounted for. In this case, I deduced the possible foreign alleles from the right and left shoe profiles by subtracting the known profiles of Leah Freeman and Kip Oswald.

15. There are two loci with identical alleles of note from samples taken from the right and left Nike shoes. At locus D1S1656, alleles 12 and 16.3 are obtained from Exhibit 1.2, cutting from heel of Right Nike shoe. Identical alleles are present at this locus in exhibits 2.6 (tongue swab of left Nike shoe), 2.4.1ul (ankle of left Nike shoe) and 2.5 (tongue cutting of left Nike

Exhibit 136 Page 5 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

shoe). It is my professional opinion that it is highly probable these alleles were contributed to the right and left Nike shoes by the same unknown individual.

I calculated the frequency estimate of obtaining alleles 12 and 16.3 at this locus and this allele combination is expected to be found approximately 1 in 61 Caucasian individuals.

Similarly, allele 18.3 is observed in exhibit 1.2 and 1.3 (heel and ankle areas of Right Nike shoe) as well as in exhibit 2.6 (tongue swab of left Nike shoe) at the D12S391 locus. The frequency estimate of obtaining this allele is approximately 1 in 22 Caucasian individuals.

Random Match Probability (RMP) is a calculation to measure the probability of a random, unrelated person matching the genotype derived from the evidence.

A genotype obtained at any given locus/marker has a number of alleles, and each allele has a frequency in a certain race. This frequency is the RMP of that allele.

Using the random match probability calculation, the frequency estimate of obtaining alleles (12, 16.3) at locus D1S1656 **and** alleles (18.3, any allele) at locus D12S391 is approximately 1 in 1,462 Caucasian individuals. Therefore, this combination of alleles at these two loci is expected to be found 1 in 1,462 Caucasian individuals.
See Table 2 below for similar frequencies in African American and Hispanic populations.

The random match probability at these two loci provides further support for the same individual being present in both the right and left Nike shoes of Leah Freeman.

16. Based on the information provided above, it is my professional opinion that there is strong possibility that the same unknown individual is present in DNA profiles obtained from both the right and left shoes of Leah Freeman.

17. It is my professional opinion that Nicholas McGuffin's DNA is not identified on any evidentiary item associated with Leah Freeman.

18. I reserve the right to change my opinions if new information becomes available.

If I can be of further assistance in this matter, please do not hesitate to contact me.

Sincerely,

*Huma Nasir.*

Huma Nasir, MS, ABC-MB
Forensic DNA Consultant
HN Forensic Consulting LLC

Exhibit 136 Page 6 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

Table 1: Possible Foreign Alleles Obtained from Right and Left Nike Shoes of Leah Freeman

| Exhibit # | 1.2 | 1.3 | 2.6 | 2.4.1ul | 2.5 |
|---|---|---|---|---|---|
| Sample Description | heel | ankle | tongue swab | ankle | tongue cutting |
| | **Right Nike Shoe** | | **Left Nike Shoe** | | |
| **Locus** | | | | | |
| D3S1358 | 15, 16, 18 | 15 | 15, 18 | ND | 15 |
| vWA | 16, 19 | 16, 20 | 16 | 15 | ND |
| D16S539 | 12 | 12 | 12, 13 | ND | ND |
| CSF1PO | ND | ND | ND | ND | ND |
| TPOX | 12 | 11 | ND | ND | ND |
| D8S1179 | 14, 15 | 11, 15 | 11, 14, 15 | 12 | ND |
| D21S11 | 29, 30 | 29, 30, 31 | 31 | ND | ND |
| D18S51 | ND | 14, 21 | 17 | ND | ND |
| D2S441 | 14 | 14, 16 | 11.3, 14, 16 | 14 | ND |
| D19S433 | ND | ND | ND | ND | ND |
| TH01 | 6, 9, 9.3 | 6, 8, 9 | 8 | 8 | ND |
| FGA | 20, 21 | 19 | 21 | 20 | ND |
| D22S1045 | 14, 16 | 17 | 11, 17 | 13.2, 17 | ND |
| D5S818 | 12 | 12 | ND | ND | ND |
| D13S317 | ND | 8, 12 | 8 | ND | ND |
| D7S820 | ND | 8, 13 | ND | ND | ND |
| SE33 | ND | 18 | 19 | ND | ND |
| D10S1248 | 13, 16 | 13 | 16 | ND | ND |
| D1S1656 | 12, 16.3 | 12 | 12, 16.3 | 12, 16.3 | 12, 16.3 |
| D12S391 | 18.3, 19 | 18.3, 22 | 18.3, 21, 22 | ND | ND |
| D2S1338 | ND | 17, 20 | 17 | 20 | ND |

ND = possible foreign allele(s) not determined

Notes:
1. Exhibits 1.2 & 1.3: Possible foreign alleles determined by subtracting the DNA profile of Leah Freeman from the mixture profiles obtained.

2. Exhibits 2.6 and 2.5: Possible foreign alleles determined by subtracting the DNA profiles of Leah Freeman and Kip Oswald from the mixture profiles obtained.

3. Exhibit 2.4.1ul:  Possible foreign alleles provided by OSP lab labeled as Contributor 3 in STRMix analysis sheet on p. 798 of OSP case file. These alleles were obtained by subtracting the DNA profiles of Leah Freeman and Kip Oswald.

Exhibit 136 Page 7 of 40 to
State Defendants Motion for Summary Judgment

*HN Forensic Consulting LLC*

Table 2: Frequency Estimates and Random Match Probability (RMP) for D12S391 and D1S1656

| Locus | Allele Combination | African American | Caucasian | Hispanic |
|---|---|---|---|---|
| D12S391 | 18.3, any allele | 1 in 41 | 1 in 22 | 1 in 23 |
| D1S1656 | 12, 16.3 | 1 in 81 | 1 in 64 | 1 in 103 |
| | | | | |
| RMP for D12S391 & D1S1656 | | 1 in 3351 | 1 in 1462 | 1 in 2380 |

Notes:
1. Frequency estimates calculated using Allele frequencies provided in the GlobalFiler™ PCR Amplification Kit User Guide (2013).

Exhibit 136 Page 8 of 40 to
State Defendants Motion for Summary Judgment

000773

*GeneScan/Genotyper Results Control*

Run Date: 072600

Analyst/Date Reviewed: Mtk 072700

| Inj. | Sample Name | Comments: | Reinj? | Reamp? | GT ? | Genotyper Notes |
|---|---|---|---|---|---|---|
| 1 | Run Control | ok | | | DL | |
| 2 | PP Ladder | ok | | | ✓ | |
| 3 | 9947A Control | ok      PU AT 145B | | | ✓ | |
| 4 | PCR Control | ~~ok~~ mwk Rox | | | ✓ mwk DL | |
| 5 | Co Ladder | ok      1087/2201 : | | | DL | |
| 6 | OON-481 #1.1 | ok      SP AT 206 BGY | | | ✓ | |
| 7 | OON-481 #1.2 | ok      NSD | | | ✓ | |
| 8 | OON-481 #1.3 | ok      mw ? Mixie | | | ✓ | |
| 9 | OON-481 #2.1 | Rex      Mixb OS | ✓ | | DL | |
| 10 | OON-481 #2.2 | ok      NSD | | | ✓ | |
| 11 | OON-481 #2.3 | Rex | ✓ | | DL | |
| 12 | OON-481 #2.1.2 | ok      SP AT 194B | | | ✓ | |
| 13 | OON-481 #2.1.4 | Rex | ✓ | | DL | |
| 14 | ~~CS-072400#2~~ | ok | | | ✓ | |
| 15 | PP Ladder | ok | | | ✓ | |
| 16 | ~~CS-072300~~ | ok | | | ✓ | |
| 17 | OOL-4094 #1.1EPI | Rex | ✓ | | DL | |
| 18 | OOL-4094 #1.1 SP | Rex | ✓ | | DL | |
| 19 | OOL-4094 #1.2EPI | ok      SP AT : mw ? Major | | | ✓ | |

Key:
OS = Off-scale data
ROX = Bad injection/ROX
NC = Not c
PU = Pull-...

SP = Spike
NSD = No signal detected
-A = -A ...der
Mx = ...

Exhibit 136 Page 9 of 40 to
State Defendants Motion for Summary Judgment



00N481
7/17/00
EX 2
KW

p.4

Left shoe



#2
"high" velocity (small)
blood droplet
on side of traction
square

PHTH @ ork

swab #1   PHTH ⊕
    trace of small droplet & smear - top of traction squares.

swab #2
    small droplet on side of traction square.

swab #3
    trace of two smears on top of traction squares.

swab #4   PHTH ⊕
    trace of two "    "    "    "    "    ".

swab #5
    reswabbed above areas ⇒ ABA card & PHTH ⊕.

swab #6
    reswab of all possible blood areas

EX 2
00N481
KW

C.
T
⊕
human
blood
KW

S

State Defendants Motion for Summary Judgment

# *Review of Forensic DNA Testing – Nicholas McGuffin Case*

**Huma Nasir, MS, F-ABC**

**Forensic DNA Consultant**

**July 2024**

# What is DNA?

DNA is the genetic material of all organisms. DNA determines who we are. Half of our DNA is inherited from our biological mothers and half is from our biological fathers.



Exhibit 136 Page 12 of 40 to
State Defendants Motion for Summary Judgment

# Where in the body is DNA found?
# All nucleated cells

- Blood
- Saliva
- Epithelial or skin cells
- Sperm cells

- Tissue
- Bone
- Hair
- Sweat

# DNA is present in nucleus of cells



STR

Exhibit 136 Page 14 of 40 to
State Defendants Motion for Summary Judgment

# Short Tandem Repeats (STRs)



AATG

7 repeats

8 repeats

*The repeat region is variable between individuals while the flanking regions are the same*

Exhibit 136 Page 15 of 40 to
State Defendants Motion for Summary Judgment

**Does DNA vary from person to person?**
Yes, except for identical twins, no two people will have the same DNA profile.

**Can you identify this difference?**
We do forensic testing on genes that do not code for any traits but are possessed by every individual. And since no two people have the same DNA profile, we can identify the difference.

# Steps in DNA Sample Processing



Sample Obtained from
Crime Scene

Take portion
of sample

DNA
extract

Proceed w/
adequate quantity of
extract
Remainder of extract
left for re-testing

DNA
Extraction

DNA
Quantitation

PCR Amplification
of Multiple STR markers

PCR
amplicon

Separation and Detection of
PCR Products
(STR Alleles)

Sample Genotype
Determination

Exhibit 136 Page 17 of 40 to
State Defendants Motion for Summary Judgment

# Amplification—Making Copies
# PCR (Polymerase Chain Reaction)



**28 Cycles**

**1 Cycle**

**2 Cycles**

**3 Cycles**

**4 Cycles**

**5 Cycles**

**DNA**

# Last steps in DNA processing

- Detection and separation of DNA fragments on specialized machines called Genetic Analyzers

- DNA profile obtained using special software that assigns allele calls to DNA fragments

- Compare DNA Profiles from unknown samples to knowns

- Interpretation of the results obtained

- Conclusions based on results

# Possible Conclusions

- No result
- Inconclusive
- Exclusion
- Inclusion

# What exclusion means

- Unknown evidentiary profile and known DNA profile of the subject do not match.

- Known subject's DNA was not detected from the evidence sample, therefore; subject is excluded as a possible DNA donor of the evidentiary sample.

# What inclusion means

- Unknown evidentiary profile and known DNA profile of the subject match (consistent with each other).

- The known subject cannot be excluded as a contributor to the DNA profile obtained from the evidence

- Provide appropriate statistical calculations to provide weight to the DNA match – how common is the DNA profile that was obtained from the evidence and matches subject

# DNA Interpretation Considerations

- Single Source profile vs. Mixture Profile
  - **Single Source** – DNA profile originated from a single individual
  - **Mixture** – DNA profile contains DNA from more than one individual
    - **Major vs. Minor** DNA donors in a mixture

- Analytical vs. Stochastic Thresholds
  - **Analytical Threshold** – an RFU value (peak height) where you are reasonably sure a peak is a true allele and not baseline or background noise
    - OSP analytical threshold in 2000 was 50 RFU
  - **Stochastic Threshold** – an RFU value (peak height) where you are reasonably sure that two alleles from both parents are being represented and there is no allele drop out
    - OSP stochastic threshold in 2000 was 150 RFU

# Single Source Profile Example

Marker D3

Allele: 16
Peak height:
4934 RFU

Two alleles per
marker maximum




Profile from MAAFS conference – Globalfiler presentation 2014

Exhibit 136 Page 24 of 40 to
State Defendants Motion for Summary Judgment

# Mixture Profile Example

Two major and two minor alleles

3 alleles at marker

4 alleles at marker



Profile from: http://www.thermoscientific.com/globalassets/documents/ds/sciencing-the-workflow.pdf

Exhibit 136 Page 25 of 40 to
State Defendants Motion for Summary Judgment

# Analytical vs. Stochastic Thresholds



Two major and two minor alleles – all above analytical and stochastic thresholds

# Analytical vs. Stochastic Thresholds Example



Two major and two minor alleles with two stutter peaks –
two minor alleles are above analytical but below stochastic thresholds

# OSP Lab Report dated August 27, 2000

## Exhibit 1 – Right Nike tennis shoe from victim

- Only one result was reported although 3 separate cuttings were tested from the shoe

- The reported conclusion is "…DNA profile from Exhibit 1 (right Nike shoe)…matches the DNA profile from Leah Freeman…".

- This report does not mention the following:

  - The DNA profile is in fact a mixture of two individuals, including a male DNA donor

  - Nicholas McGuffin is excluded as a contributor to the DNA profile obtained from this shoe

# OSP Lab Report dated August 27, 2000

## Exhibit 1 – Right Nike tennis shoe from victim

- OSP Lab did not report the mixture profile or the presence of male DNA because the alleles indicating a mixture and male DNA were less than the lab's stochastic threshold of 150RFU

- OSP Lab claimed "analyst discretion" for reporting the "best result" from a sample.

# OSP Lab Report dated August 27, 2000

**Exhibit 1 – Right Nike tennis shoe from victim**

- OSP Lab should have reported the mixture profile because OSP Lab protocols from 2000 state the following:
  - Protocols define how to recognize and report a mixture profile
  - Protocol states "Peak height less than 150RFU may be interpreted with caution"
  - Protocol states "Peaks between 50 and 150 RFU will be considered for purposes of exclusion".
    - There were peaks present in profile from cutting 1.3 that were less than 150RFU and they excluded McGuffin. However, McGuffin's exclusion was not reported.
- OSP Lab protocols from 2000 **DO NOT** state that reporting a profile is up to "analyst discretion" or only "best results" will be reported.
- OSP Lab protocols DO NOT define "analyst discretion" or "best results"

# OSP Lab Report dated August 27, 2000

## Exhibit 2 – Left Nike tennis shoe from victim

- The DNA profile obtained from this sample is a mixture with Leah Freeman as the major contributor and the minor is a male.

- Nicholas McGuffin is excluded as a contributor to the minor male profile but that was not reported by the lab.

# Possible Presence of a Same Contributor in Right and Left shoes of the victim

- There is a strong possibility that an unknown individual contributed DNA to both the right and left Nike shoes of Leah Freeman.

- How is a foreign profile deduced from a mixture profile?

  - Assume the number of contributors in the mixture

  - Assume a known contributor's DNA is present in the mixture

  - Subtract the known person's DNA from the mixture to obtain the foreign "deduced" profile

# Possible Presence of a Same Contributor in Right and Left shoes of the victim
# Example of deduced profile

|  | Mixture Profile obtained from victim's vaginal swab | Known Profile of Victim A | Foreign Deduced Profile |
|---|---|---|---|
| **Marker 1** | 12, 13, 14, 15 | 12, 13 | 14, 15 |
| **Marker 2** | 7, 8, 9, 9.3 | 8, 9 | 7, 9.3 |
| **Marker 3** | 20, 22, 23, 24 | 20, 24 | 22, 23 |
| **Marker 4** | 16, 18, 19, 21 | 19, 21 | 16, 18 |
| **Amelogenin** | X, Y | X, X | X, Y |

- Mixture of two individuals including at least one male donor.
- Victim A cannot be excluded.
- Subtract victim A's profile from the mixture.
- What remains is the deduced foreign profile of the unknown male.

**Possible Foreign Alleles Obtained from Right and Left Nike Shoes of Leah Freeman**

| Exhibit # | 1.2 | 1.3 | 2.6 | 2.4.1ul | 2.5 |
|---|---|---|---|---|---|
| Sample Description | heel | ankle | tongue swab | ankle | tongue cutting |
| | Right Nike Shoe | | Left Nike Shoe | | |
| Locus | | | | | |
| D3S1358 | 15, 16, 18 | 15 | 15, 18 | ND | 15 |
| vWA | 16, 19 | 16, 20 | 16 | 15 | ND |
| D16S539 | 12 | 12 | 12, 13 | ND | ND |
| CSF1PO | ND | ND | ND | ND | ND |
| TPOX | 12 | 11 | ND | ND | ND |
| D8S1179 | 14, 15 | 11, 15 | 11, 14, 15 | 12 | ND |
| D21S11 | 29, 30 | 29, 30, 31 | 31 | ND | ND |
| D18S51 | ND | 14, 21 | 17 | ND | ND |
| D2S441 | 14 | 14, 16 | 11.3, 14, 16 | 14 | ND |
| D19S433 | ND | ND | ND | ND | ND |
| TH01 | 6, 9, 9.3 | 6, 8, 9 | 8 | 8 | ND |
| FGA | 20, 21 | 19 | 21 | 20 | ND |
| D22S1045 | 14, 16 | 17 | 11, 17 | 13.2, 17 | ND |
| D5S818 | 12 | 12 | ND | ND | ND |
| D13S317 | ND | 8, 12 | 8 | ND | ND |
| D7S820 | ND | 8, 13 | ND | ND | ND |
| SE33 | ND | 18 | 19 | ND | ND |
| D10S1248 | 13, 16 | 13 | 16 | ND | ND |
| D1S1656 | 12, 16.3 | 12 | 12, 16.3 | 12, 16.3 | 12, 16.3 |
| D12S391 | 18.3, 19 | 18.3, 22 | 18.3, 21, 22 | ND | ND |
| D2S1338 | ND | 17, 20 | 17 | 20 | ND |

ND = possible foreign allele(s) not determined

Highlighted alleles are common in right and left shoe samples

Exhibit 136 Page 34 of 40 to
State Defendants Motion for Summary Judgment

# Conclusions

- **Nicholas McGuffin's DNA is not detected on any items tested originally in 2000 or items retested in 2017.**

  - **Insufficient and inconclusive results DO NOT mean that McGuffin's DNA is identified in any samples.**

- **There is a strong possibility that one same unknown individual is present in both the right and left shoes of Leah Freeman.**

**Curriculum Vitae**

**HUMA NASIR, MS, ABC-MB**

## Education

M.S.                          University of Florida                          2006
Pharmaceutical Sciences with concentration in Forensic Serology and DNA

B.S.                          University of New Orleans                          2000
Biological Sciences

## Professional Experience

June 2017 – Present
*Forensic DNA Consultant*                          HN Forensic Consulting LLC, TX
Forensic DNA Expert providing consulting services to law enforcement agencies in the United States. As an expert, I provide independent review of the DNA testing and testify to my findings as needed. My services include case consultation, trial preparation, testing observation and trial testimony.

March 2019 – October 2023                          DevLab *bio*, LLC, Coppell, TX
*Vice President of Operations*
- Responsible for the overall operations of laboratory, ensuring operations meet or exceed all key performance indicators
- Develop and implement operational standards for the lab
- Oversee laboratory testing and daily operations to complete all projects in the lab
- Ensures that regulatory requirements are met, monitoring test systems to ensure that they are in control
- Supervise employees, including all activities relative to staffing, work assignments, hiring/termination, performance reviews, orientation, and professional development
- Maintain client contact on all current and potential projects in the lab
- Oversee purchasing and testing of lab equipment to support efficiency/cost improvements.
- Create a culture of operational excellence, accountability and collaboration where teamwork and active problem-solving result in continuous improvement
- Lead strategic planning for lab; supporting continual growth, including equipment acquisition, personnel and process evolution.
- Oversee all lab budgeting activities and annual budget planning
- Maintain quality and efficiency, ensuring all laboratory day-to-day execution is consistent and in adherence with regulatory requirements

June 2017 – December 2018                          RealTime Labs, Carrollton, TX

*Lab Manager*
Manage daily operations of the CAP accredited laboratory including supervision of ELISA and molecular testing.

Curriculum Vitae
Huma Nasir, MS, ABC-MB
Page 1 of 4
Revised 2024

June 2016 – June 2017                                    Bode Cellmark Forensics, VA

*Senior Forensic DNA Analyst:*
Duties include casework analysis and report writing, case reviews of work performed by other laboratories, preparing affidavits and providing expert testimony as needed. Also responsible for technical review of all validations provided to external government agencies to ensure compliance with accreditation standards and assist with laboratory work, data analysis and summary reports as needed.

January 2008 – December 2015                    Orchid Cellmark/Cellmark Forensics, Dallas, TX
*Technical Leader/Associate Laboratory Director*

*Forensic DNA Analyst III/IV/Team Leader (1/1/2008-11/31/11)*
*Supervisor Forensics (12/1/11-7/9/12)*
*Technical Leader, mtDNA and Y-STRs (7/9/12 – 3/4/13)*
*Technical Leader, autosomal STRs, Y-STRs and mt DNA (3/5/13-12/2015)*
- Responsible for technical management of the laboratory, including technical problem solving of analytical methods. Responsible for method evaluation and proposing new or modified analytical procedures to be used by the laboratory.
- As Associate Director, assisted in the direction, overall operation and administration of the Forensic laboratory.
- Responsible for assisting with the oversight of training of new employees, quality control and quality assurance, and proficiency testing of all qualified forensic analysts in the laboratory.
- Conducted Internal Audits of the forensic laboratory and ensured compliance with various accrediting agencies. Ensured compliance with FBI's Quality Assurance Standards, SWGDAM guidelines, ASCLD standards and ISO17025 standards.
- Responsible for ensuring that casework is processed in an accurate and timely manner. Duties include case reviews, expert witness testimony as a court qualified expert, and client contact.
- Possesses in-depth expertise with all forensic DNA testing methodologies including autosomal STRs, Mini-STRs, Y-STRs and mitochondrial DNA testing.
- Continued casework analysis, reporting and technical review.

March 2001 – December 2007                    ReliaGene Technologies, Inc. New Orleans, LA

*Associate Scientist I (2001-2003):*
- Extraction, PCR amplification and analysis of samples for CODIS upload.
- Assisted in development and production of Y-PLEX$^{TM}$ 5 and Y-PLEX$^{TM}$ 12 amplification kits, which consists of a primer mix, allelic ladder and controls, used for Y-STR analysis.
- **HIV Genotyping, DNA sequencing to determine patient's drug resistance profile.**
- **Performed Medical Diagnostics Testing for infectious diseases**

*Forensic DNA Analyst I/II/III and Team Leader (2003-2007):*
- Conduct scientific analysis on multiple forms of biological evidence on forensic casework utilizing PCR based DNA analysis following standard operating procedures for forensic DNA testing. Systems used on a routine basis include STR kits, Y-STR kits, MiniSTR, and Mitochondrial DNA analysis using the ABI 310, 3100 and 3130 Genetic Analyzers and the ABI 377 DNA Sequencer platforms.
- Responsible for processing casework in an accurate and timely manner. Prepare, write, and sign case reports, and available as an expert Forensic DNA analysis for court testimony.

Curriculum Vitae
Huma Nasir, MS, ABC-MB
Page 2 of 4
Revised 2024

- Routinely communicate directly with clients regarding various aspects of their case, from evidence collection to trial preparation.
- Available to less senior laboratory personnel as a resource for training, technical advice, problem solving, and questions.
- Assist Senior Forensic Scientists with the maintenance of training, QA/QC, safety measures, and proficiency testing in the laboratory.

## Laboratory Experience

- DNA Extractions (PCR-STR)
- PCR Amplification
- PCR Analysis and Interpretation
- Paternity Testing
- Forensic Biology Screening (Presumptive and Confirmatory Immunoassays)
- Forensic Analysis, Case Reporting and Technical Review
- Y-STR Experience
- Mini STR Experience
- Mitochondrial DNA Experience
- Technical Reviews
- Case Reviews

## Certifications

American Board of Criminalistics (**ABC**) – Molecular Biology

## Memberships

Member – American Academy of Forensic Sciences (**AAFS**)

## Testimony Experience

Qualified and testified as a Forensic DNA analyst/expert over 120 times in several different jurisdictions.

## Publications

1. Shewale, J.G**., Nasir, H.,** Schneida, E., Gross, A.M., Budowle, B. and Sinha, S.K. 2004. Y-Chromosome STR system, Y-PLEX$^{TM}$ 12, for forensic casework: Development and validation. J. Forensic Sci. 49: 1278 - 1290.
2. Sinha, S.K., Budowle, B., Chakraborty, R., Paunovic, A., Guidry, R.D., Larsen C., Lal, A., Shaffer, M., Pineda, G., Sinha S.K., Schneida, E., **Nasir, H.** and Shewale, J.G. 2004. Utility of the Y-STR typing system Y-PLEX$^{TM}$ 6 and Y-PLEX$^{TM}$ 5 in forensic casework and 11 Y-STR haplotype database for three major population groups in the United States. J. Forensic Sci. 49:

Curriculum Vitae
Huma Nasir, MS, ABC-MB
Page 3 of 4
Revised 2024

Exhibit 136 Page 38 of 40 to
State Defendants Motion for Summary Judgment

691-700.

3. Sinha, S.K., **Nasir, H.,** Gross, A.M., Budowle, B. and Shewale, J.G. 2003. Development and validation of the Y-PLEX^TM5, a Y-chromosome STR genotyping system, for forensic casework. J. Forensic Sci. 48: 985-1000.

4. Shewale, J.G., **Nasir, H.** and Sinha S.K. 2003. Variation in migration of the DNA fragments labeled with fluorescent dyes on the 310 Genetic Analyzer and its implication in the genotyping. The Journal of the Association of Genetic Technologists. 29: 60-64.

| Abstracts |
|---|

1. Orchid Cellmark's Osteo-Pure™ Bone Extraction Procedure Captures Degraded DNA to Improve STR Results.C.B. Smitherman, **H. Nasir**, W.L. Hoffman, R.W. Staub, and S.K. Sinha. Promega Meeting, 2010.

2. Shewale, J.G., **Nasir, H.,** Schneida, E., and Sinha, S.K, 2003. Development and Validation of a Y-Chromosome STR Genotyping System, Y-PLEX^TM 12, for Forensic Casework. 29th Annual Meeting NEAFS 2003, Pittsfield, MA. European Academy of Forensic Science Triennial Meeting 2003, Istanbul, Turkey. 14th International Symposium on Human Identification 2003, Phoenix, AZ. American Academy of Forensic Sciences 56th Annual Scientific Meeting 2004, Dallas, TX.

3. Sudhir K. Sinha, PhD, Amrita Lal, MSFS, Chris Larson, BS, Alison Flemming, BA**, Huma Nasir, BS**, Elaine Schneida, BS, and Jaiprakash Shewale, PhD. Validation and Forensic Casework Applications of the Y-STR Genotyping Systems Y-PLEX^TM 6 and Y-PLEX^TM 5. Annual meeting of the American Academy of Forensic Sciences 2003, Chicago, IL.

4. Sinha, S.K., **Nasir, H.,** Schneida, E. and Shewale, J.G. Y-Chromosome Specific STR Analysis Using Y-PLEX^TM6 and Y-PLEX^TM5 Amplification Kits. FASEB Meeting 2002, New Orleans, LA.

5. Sinha, S., **Nasir, H.,** Schneida, E. and Shewale J. Y-Chromosome specific STR analysis using a combination of Y-PLEX™6 and Y-PLEX™5 amplification kits. Proc. 16th 9Meeting of the International Association of Forensic Sciences 2002, Edited by E. Baccino, pp. 21-24, Monduzzi Editore.

Curriculum Vitae
Huma Nasir, MS, ABC-MB
Page 4 of 4
Revised 2024

Exhibit 136 Page 39 of 40 to
State Defendants Motion for Summary Judgment

1. Spokane County Superior Court, **WA** (12/21) (Prosecution, Aguirre)
2. Madison County Circuit Court, Jackson, **TN** (12/22) (Defense, Post-conviction Hearing, Wilson)
3. Marion County Court, **OR** (05/23) (Defense, Post-conviction Hearing, Middleton)
4. Rankin County Court, **MS** (06/23) (Prosecution, Skaggs)
5. Spokane County Superior Court, **WA** (12/23) (Prosecution, Aguirre)
6. 252 District Court, Jefferson County **TX** (12/23) (Prosecution, admissibility hearing, Colone)
7. 209 District Court, Harris County **TX** (01/24) (Defense, evidentiary hearing, Broxton)

No testimony in 2020