Mark Dannels
September 01, 2023

Mark Dannels
September 01, 2023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor, | ) <br> ) <br> ) Civil No. <br> ) 6:20-cv-01163-MK <br> ) (Lead Case) |
| Plaintiffs, | ) |
| v. | ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY, | ) VIDEOCONFERENCE <br> ) DEPOSITION |
| Defendants. | ) |
| VIDOCQ SOCIETY, | ) |
| Cross-Claimant, | ) |
| v. | ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO | ) |

Mark Dannels
September 01, 2023

```
 1  AS ADMINISTRATOR OF THE ESTATE    )
     OF DAVID E. HALL, VIDOCQ          )
 2   SOCIETY, CITY OF COQUILLE, CITY   )
     OF COOS BAY, and COOS COUNTY,     )
 3                                     )
                                       )
 4   Cross-Defendants.                 )
     _____    )
 5                                     )
     NICHOLAS JAMES MCGUFFIN, as an    )
 6   individual and as guardian ad     ) Civil Case No.
     litem, on behalf of S.M. a        ) 3:21-cv-01719-MK
 7   minor,                            ) (Trailing Case)
                                       )
 8              Plaintiffs,            )
                                       )
 9         v.                          )
                                       )
10   OREGON STATE POLICE,              )
                                       )
11              Defendant.             )
     _____    )
12

13

14          DEPOSITION UPON ORAL EXAMINATION

15                  OF MARK J. DANNELS

16

17       BE IT REMEMBERED THAT, pursuant to the Oregon Rules of

18  Civil Procedure, the deposition of MARK J. DANNELS was taken

19  remotely via videoconference on behalf of the Plaintiffs,

20  before JEAN M. KOSTNER, a Certified Court Reporter for Oregon,

21  on Friday, the 1st day of September, 2023, at the hour of

22  9:00 a.m., in the State of Oregon.

23

24

25            U.S. Legal Support | www.uslegalsupport.com
```

1  had was to ensure that our case file matched Mr. Frasier's case
2  file, which was -- I never heard it wasn't, so I could only
3  assume this did go that way.
4           Q.   Okay.  And so that was one of the other things I
5  wanted to clarify from the last time we met.  You had talked
6  about the matching thing, making sure that Coquille PD's file
7  matched Mr. Brady's PD file.  And my understanding is that a
8  lot of time and effort went into that process foundationally
9  when you became involved.  And the reason I used the word
10 "foundationally" is because my understanding from speaking with
11 you before was when you started trying to revitalize the
12 investigation, you wanted to jump off from a firm foundation
13 where you were confident and Mr. Frasier was confident that the
14 two of you had all of the same documents and were starting from
15 the same file.  Does that sound right?
16          A.   That does sound right.  I wanted to make sure that
17 what Mr. Frasier, who -- he was the -- and I just kind of use
18 this term -- illustrated as Wikipedia to this, this case,
19 because he's been there since day one.  What did he have that
20 we didn't have and what was out there that we didn't know
21 about?  So he was the guide on that.  So we wanted to make sure
22 that both files were shared and both files were updated equally
23 as we -- before we moved forward for all of the new detectives
24 looking at this.
25          Q.   Okay.  So when you started that process in October

Mark Dannels
September 01, 2023

1  2009 or January 2010, somewhere around there, you were
2  confident that Coquille Police Department's file and
3  Mr. Frasier's file were identical.  Is that right?
4       A.   Are you saying when we kicked off the new
5  investigation?
6       Q.   When you revitalized it, yes.
7       A.   Yeah.  So once it was all put back together, I was
8  confident because Mr. Frasier was confident and my team was
9  confident, and nobody disputed that.  So, yes.  And under that
10 pretense, yes.
11      Q.   Okay.  So then after that point, when the files
12 were identical, what was the process for making sure that they
13 stayed identical?
14      A.   That was an expectation of the crime team, the new
15 investigative team, to ensure everything -- all reports went
16 both to Coquille and Mr. Frasier's office to ensure that.  And
17 as -- as the case got closer into grand jury, to include as it
18 came out of grand jury, I assigned Ray McNeely to work directly
19 for Mr. Frasier to ensure that any follow-up -- to include any
20 issues that needed to be done, any things that weren't working,
21 that he had a direct resource back into Coquille.
22      Q.   Okay.  So would Officer McNeely have been going
23 through both files at that point to make sure that they were
24 remaining identical?
25      A.   He was our liaison to the fact that if something

Mark Dannels
September 01, 2023

```
 1      A.    Somebody that wants power over their victim that's
 2   also very assertive.
 3      Q.    Okay.  What did he tell you about the basis for his
 4   conclusions about the particular type of offender involved?
 5      A.    I don't recall.  I know he talked to us when --
 6   Mr. Frasier, myself, Craig Zanni, and some -- I don't remember.
 7   I think Lisa might have been with us.  But when we were out in
 8   Philadelphia, he talked about that too based on what Paul had
 9   sent and presented on, and then he talked about it when he was
10   in Coquille.  But we didn't use his information.  It just -- we
11   just didn't use it, so I don't remember all of the details with
12   him.  We didn't go much beyond this interview.
13      Q.    (Playing video.)
14            Okay.  Do you recognize the location where that's
15   being filmed, at the 3 minute, 29 second mark?
16      A.    It's got to be out there toward -- I can't remember
17   what they call that neighborhood out there, but out east of --
18   I think it's east of Coquille, where Leah was found.
19      Q.    Okay.  On Lee Valley Road?
20      A.    Yeah, there you go.  Thank you.
21      Q.    And who is in that -- who is depicted in that film
22   there?
23      A.    The same ones described -- myself, Richard Walter,
24   and Jim Avila.
25      Q.    Okay.  And Mr. Walter is explaining the type of
```

Mark Dannels
September 01, 2023

```
 1  this way.  He didn't have a right to go into our files and
 2  start going through our pertinent information, our most active
 3  invest- -- leads or what we were doing that day, no.
 4       Q.   Okay.  And from your perspective, did you ever
 5  delegate any authority to Mr. Walter to conduct any
 6  investigation of the Leah Freeman case?
 7       A.   No.  Actually, just so I can disclaim, Mister --
 8  20/20 brought Vidocq in.  We did not bring him in, so ...
 9       Q.   I was going to get to that.  What's your
10  understanding of how Mr. Walter came to Coquille?
11       A.   Through the invitation of 20/20 ABC.  I got a word
12  by our on-the-ground producer that they were bringing him in.
13  This was like the last months -- maybe a month, two months --
14  before it even aired that they brought him in there, but their
15  script was done by 20/20, not us.
16       Q.   And so as far as your connection to that, your --
17  you had been in communication with ABC 20/20 about doing a
18  production.  Correct?
19       A.   That is true.
20       Q.   Okay.  And did you request Mr. Walter to come out?
21       A.   I did not.
22       Q.   Did you ever have any contract or written agreement
23  with Mr. Walter with regard to the Leah Freeman matter?
24       A.   No.
25       Q.   To your knowledge, did Mr. Walter have access to
```

Mark Dannels
September 01, 2023

1  interview any witnesses in the Leah Freeman cold case matter?
2       A.   No.  We didn't -- no, we didn't do any of that.  If
3  I can add, Mr. Walter actually -- the last time I saw him was
4  in Coquille when he shot that 20/20.  He had reached out to me
5  a couple times post that -- in fact, I think I was back here as
6  the sheriff, but I did not return his call.  I haven't talked
7  to him.
8       Q.   So you have had no further contact with Mr. Walter
9  after he left Coquille during the production of the ABC 20/20
10 program.  Is that right?
11      A.   I have not.
12      Q.   Okay.  Did you receive any tangible item or
13 deliverable report from Mr. Walter with regard to the Leah
14 Freeman matter at all?
15      A.   I don't recall we did.  I think the only thing -- I
16 know before we left Philadelphia, Mr. Frasier, Mr. Zanni -- or
17 former Sheriff Zanni -- he was the sheriff then -- and myself
18 spent some time with him that evening.  And then -- but I don't
19 recall a report from him at all.  I do -- I know we did get a
20 report from the handwriting analysis guy, I think, that was
21 aired on 20/20, but that was the only thing I remember.
22      Q.   And so to your recollection, there was --
23 Mr. Walter attributed the theory of power-assertive
24 personality.  Did you use that power-assertive theory at all in
25 your workup of the Leah Freeman case?

Mark Dannels
September 01, 2023

```
 1        A.   No.  We -- to the best of my knowledge, Mr. Frasier
 2   did not want to use Mr. Walter in the prosecution or the
 3   investigative process, so that's why we didn't reengage after
 4   that.  That was -- him and Mr. Zanni had a conversation about,
 5   I believe, some credibility issues with the Sherlock Holmes --
 6   I don't recall the details, but ...  So we just drifted away
 7   from that.  We had too much work to do as it was, so we didn't
 8   do it.  If the county -- if the DA -- I say "county attorney."
 9   Arizona has county attorneys.  If the district attorney didn't
10   want to do it, why would we entertain it?  So ...
11        Q.   Okay.  And so did you ever send Mr. Walter to speak
12   with the DA on your behalf at all?
13        A.   Not that I recall, no.
14        Q.   Okay.  Did you ever have a conversation with
15   DA Frasier about Mr. Walter directly?
16        A.   I did.
17        Q.   Okay.  Do you have any recollection of that
18   conversation?
19        A.   I'll paraphrase because I don't remember the exact
20   details, but the general purpose of the meeting was he didn't
21   want to use him because there was some credibility where he
22   testified or something that happened in prior testimony, and
23   then Mr. Zanni had an issue with him on some of his statements
24   with -- something to do with Sherlock Holmes.  I don't know all
25   of the details.
```

Mark Dannels
September 01, 2023

```
 1          Q.   Okay.  But you had mentioned that Mr. Walter had a
 2   different approach when it came to elimination of suspects, I
 3   think, is how it was phrased before.  And so did you ever use
 4   Mr. Walter's approach, or did you stick to your own approach in
 5   the cold case investigation?
 6          A.   I pretty much used my own, what I can prove.  It
 7   really boils down to what I can prove and what I can't prove.
 8   I mean, it's just common sense.  And then you -- like debits
 9   and credits, you push forward.
10          Q.   Okay.  Now, being the sheriff at the time or chief
11   at the time, you were -- you ensured the sanctity and custody
12   of all of the evidence with regard to the Leah Freeman matter.
13   Correct?
14          A.   My department did, yes.
15          Q.   Okay.  Did Mr. Walter have any opportunity to alter
16   any evidence in the Leah Freeman case?
17          A.   No.
18          Q.   Beyond the phrasing of a "power-assertive"
19   personality, which you didn't use in your investigation, was
20   there any actual profile that Mr. Walter provided to you with
21   regard to the Freeman matter?
22          A.   He had provided to us in Philadelphia a summary of
23   what he thought the offender would look like, suspect would
24   look like.  And then here he did that too, when he was in
25   Coquille, when 20/20 came out, as you just saw too.  But when
```

Mark Dannels
September 01, 2023

1  it came to us identifying and taking that forward, we did not
2  because it just nev- -- we just never got into it, plus the
3  county attorney -- or district attorney did not want to engage
4  in it during our briefs.  So ...
5        Q.   Okay.  Did you ever ask Mr. Walter to rule out any
6  suspects?
7        A.   Not that I recall.
8        Q.   The meeting that you had with Mr. Walter, when he
9  was in Oregon, was about an hour or so, you said, in the
10 conference room and then sometime filming -- or with him in the
11 field when they were filming the 20/20.  Is that right?
12       A.   Well, yeah, we -- I think it was -- he was there.
13 I had spent probably two hours with him.  One in the room.  We
14 went over those photos, like you saw, and that was on behalf of
15 20/20.  And then when we went to the scene, which we just aired
16 a few minutes ago.  But that was my involvement with him.  And
17 out to the scene out there east of Coquille, I think it was.
18 But, yeah, that was my dealing with him when he was in Oregon.
19 He didn't spend a lot of time out there.
20       Q.   And you mentioned what we saw on those video clips.
21 The shoes that were shown, were those actual evidence or --
22 belonging to Leah Freeman?
23       A.   No, they're not the shoes.
24       Q.   Okay.
25       A.   I don't know where they got those shoes at.  I

```
 1  don't know whose shoes those are.
 2         Q.   And to your knowledge, the photos that were
 3  utilized when you were in -- pictured in a conference room,
 4  were those actual evidence photos or prop photos, or do you
 5  know?
 6         A.   I don't know.  I can't see them very well.  I don't
 7  remember.  And I don't recall what they were or if they were
 8  just public photos that had already been put out.  I don't
 9  recall what they were.
10         Q.   And you had decided not to engage Mr. Walter in the
11  cold case investigation.  You already made that decision not to
12  involve him before DA Frasier took this matter to grand jury.
13  Correct?
14         A.   Oh, right.  He -- yeah, we never used him for
15  grand -- to my knowledge, I don't think Mr. Frasier -- he said
16  he wasn't going to, so if he did, I don't know he did.
17         Q.   To your knowledge, did Mr. Walter develop any sort
18  of evidence which was used in the prosecution of Mr. McGuffin?
19         A.   Again, based on Mr. Frasier's statement to the team
20  and myself, he wouldn't, so I'd say no.
21         Q.   Okay.  Did Mr. Walter develop any evidence which
22  changed the course of your cold case investigation of Leah
23  Freeman's death?
24         A.   No.
25              MR. DEFREEST:  Thank you very much.  I appreciate
```

Mark Dannels
September 01, 2023

1  your time.
2          THE WITNESS:  Thank you, Eric.
3          MS. HENDERSON:  Oh, there you are.  I figured you'd
4  have some questions, Meredith.
5          MS. SAWYER:  I do.  It just took me a minute.  Does
6  anybody need a break, or is it okay to go ahead and start?
7          (No response.)
8          MS. SAWYER:  I'm taking that as it's okay to go
9  ahead and start.
10                      EXAMINATION
11 BY MS. SAWYER:
12     Q.   Good afternoon, Sheriff Dannels.  My name is
13 Meredith Sawyer, and I represent Vidocq Society.
14          I just -- I'll try to go in order, but I can't make
15 any promises.
16          Who was the person that had the initial contact
17 with Vidocq Society in connection with the Freeman
18 investigation from your office?
19     A.   That would be me.  Well, my receptionist got the
20 call, but we got a call from Vidocq.  How they found out about
21 this case, I don't know, but inquiring that they could help us.
22     Q.   And do you remember when that was?
23     A.   Probably a couple of months before we went to
24 Philadelphia.
25     Q.   And do you remember when you went to Philadelphia?

Mark Dannels
September 01, 2023

1         A.    I want to say it was '09, '10.  I want to say it
2  was late '09, first part of '10, something like that.
3         Q.    If I -- if the records that we've looked at looked
4  like it was in January of 2010, would that be consistent with
5  your memory?
6         A.    That seems fair, as I stated, yeah.
7         Q.    Okay.  And did you have any kind of written
8  agreement or verbal agreement of any kind about the role that
9  Vidocq Society would play in connection with the Freeman case?
10        A.    Can I call you Meredith?  Is that okay?
11        Q.    Yes, you can.
12        A.    Meredith, I didn't even know what Vidocq was.  I'll
13 just tell you.  So when I got the call, I had to look them up.
14 I had them -- I reached out to Paul Frasier to see what his
15 wishes were.  He actually, I believe, spoke with them also.
16 And it was agreed upon that we would take the instrumental
17 people, like Craig Zanni, and him, myself, and I think Lisa
18 from DOJ went too.  I'm not positive, but to go back there, and
19 Paul would present to them.  So -- and I believe they paid for
20 everything.  I believe they paid for -- I think you all paid
21 for everything, for us to come back there and -- it was a
22 freebie for us.
23        Q.    Mr. Frasier testified a couple of days ago that his
24 recollection was that Vidocq Society paid for you and he to go,
25 but someone else paid for Mr. Zanni and Lisa to go.  Is that

Mark Dannels
September 01, 2023

```
 1  STATE OF OREGON      )
                         )    ss.  C E R T I F I C A T E
 2  County of Douglas    )

 3

 4        I, JEAN M. KOSTNER, Certified Shorthand Reporter for the

 5  State of Oregon, do hereby certify that:

 6        Pursuant to stipulation of counsel for the respective

 7  parties, hereinbefore set forth, MARK J. DANNELS appeared

 8  remotely before me at the time and place set forth in the

 9  caption hereof;

10        That, at said time and place, I reported in stenotype

11  all testimony adduced and oral proceedings had in the foregoing

12  matter, to the best of my ability;

13        That, thereafter, my notes were reduced to typewriting,

14  and that the foregoing transcript, pages 1 through 108, both

15  inclusive, constitutes a full, true, and correct transcript of

16  all such testimony adduced and oral proceedings had and of the

17  whole thereof.

18        IN WITNESS WHEREOF, I have hereunto set my hand and CSR

19  stamp this 13th day of September, 2023, in the City of

20  Roseburg, County of Douglas, State of Oregon.

21
                        [signature: Jean M. Kostner]
22
                        _____
23                      JEAN M. KOSTNER
                        Certified Court Reporter
24                      CSR No. 90-0051

25
```