

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
**EUGENE DIVISION**

Nicholas James McGuffin, as an individual
and as guardian ad litem on behalf of
S.M., a minor,

     Plaintiffs,

vs.              Case No.: 6:20-cv-01163-MK

Mark Dannels, Pat Downing, Susan Hormann,
Mary Krings, Kris Karcher, Shelly McInnes,
Raymond McNeely, Kip Oswald, Michael Reaves,
John Riddle, Sean Sanborn, Eric Schwenninger,
Richard Walter, Chris Webley, Anthony Wetmore,
Kathy Wilcox, Craig Zanni, David Zavala,
Joel D. Shapiro as Administrator of the Estate
Of David E. Hall, Vidocq Society, City of
Coquille, City of Coss Bay, and Coos County,

     Defendants.
_____

**DAY 1**

**VIDEOTAPED DEPOSITION OF**

**NICHOLAS MCGUFFIN**

**TAKEN ON**
**THURSDAY, JANUARY 12, 2023**
**9:13 A.M.**

**MALONEY LAUERDSORF & REINER, PC**
**1111 EAST BURNSIDE, SUITE 300**
**PORTLAND, OREGON 97214**

2

```
1                    APPEARANCES
2
3  Appearing on behalf of the Plaintiffs:
4  JANIS C. PURACAL, ESQUIRE
5  Forensic Justice Project
6  333 Southwest Taylor Street, Suite 400
7  Portland, Oregon  97204
8  (503) 782-6650
9  jpuracal@forensicjusticeproject.org
10
11  -and-
12
13  ANDREW C. LAUERSDORF, ESQUIRE
14  Maloney Lauersdorf & Reiner, PC
15  1111 East Burnside Street, Suite 300
16  Portland, Oregon  97214
17  (503) 245-1518
18  (503) 245-1417 (Fax)
19  acl@mlrlegalteam.com
20
21
22
23
24
25
```

4

```
1            APPEARANCES (CONTINUED)
2
3  Appearing on behalf of Defendants
4  Vidocq Society and Richard Walter:
5  AMANDA J. ROCKETT, ESQUIRE
6  KARIN SCHAFFER, ESQUIRE (via Zoom)
7  Wood Smith Henning & Berman, LLP
8  12755 SW 69th Avenue, Suite 100
9  Portland, Oregon 97223
10  (971) 256-4010
11  (971) 274-1928
12  arockett@wshblaw.com
13  kschaffer@wshblaw.com
14
15  ALSO PRESENT:
16  Mark Williamson, CIS Insurance
17  Trista Robischon, OSP Representative
18
19
20
21
22
23
24
25
```

3

```
1            APPEARANCES (CONTINUED)
2
3  Appearing on behalf of Defendants Dannels, Downing,
4  Karcher, McInnes, McNeely, Oswald, Reeves, Sanborn,
5  Schwenninger, Webley, Wetmore, Zanni, Zavala, City of
6  Coquille, City of Coos Bay, Coos County, Oregon, and
7  the Estate of David E. Hall:
8  ROBERT E. FRANZ, JR., ESQUIRE
9  SARAH R. HENDERSON, ESQUIRE
10  Franz Law Offices
11  730 B Street
12  Springfield, Oregon  97477
13  (541) 741-8220
14  (541) 741-8234 (Fax)
15  rfranz@franzlaw.comcastbiz.net
16  shenderson@franzlaw.comcast.com
17
18  Appearing on behalf of the State Defendants:
19  JESSE B. DAVIS, ESQUIRE
20  Oregon Department of Justice
21  100 SW Market Street
22  Portland, Oregon 97201
23  (971) 673-1880
24  (971) 673-1888
25  jesse.b.davis@doj.state.or.us
```

5

```
1             EXAMINATION INDEX
2                    Page
3
4  EXAMINATION BY MR. FRANZ              9
5
6  EXAMINATION BY MR. DAVIS            141
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



6

EXHIBITS INDEX

Exhibit                                                    Page

401    FORENSIC SCIENCES REQUEST              147

402    LETTER FROM LORI TOBIAS               166

403    HAND WRITTEN NOTES/LETTER             167

404    LOVE & TEARS FOR MY PRINCESS,         171
       NOW MY ANGEL

405    LETTER OF INNOCENCE                   177

406    DETAILED CAE PLAN REPORT              216

407    ODOC OIS REPORT                       249

527    06/24/2002 NICHOLAS MCGUFFIN           93
       MEDICAL RECORDS

534    NORTH BEND POLICE                      38

545    GOOGLE EARTH IMAGE                     68

7

EXHIBITS INDEX CONTINUED

Exhibit                                                    Page

546    GOOGLE EARTH IMAGE 2                   68

701    LETTER ABOUT MOVING TO PORTLAND       N/A

702    LETTER ABOUT PARENTING TIME           N/A

8

1            DAY 1
2        VIDEOTAPED DEPOSITION OF
3          NICHOLAS MCGUFFIN
4            TAKEN ON
5        THURSDAY, JANUARY 12, 2023
6            9:13 A.M.
7
8        VIDEOGRAPHER:  We're on the record.  The
9    time is 9:13.  The date is January 12th, 2023.
10        This is the beginning of the deposition of
11    Nicholas McGuffin.  The case caption is McGuffin v.
12    Dannels.
13        Will counsel introduce yourselves and
14    state whom you represent.
15        MR. FRANZ:  Robert Franz.  I've got the
16    individual officers, Coos County, Coquille.
17        MS. HENDERSON:  Sarah Henderson.  I'm with
18    Mr. Franz.
19        MS. PURACAL:  Janis Puracal for the
20    Plaintiff Nicholas McGuffin.
21        MR. LAUERSDORF:  Andy Lauersdorf on behalf
22    of the Plaintiff Nicholas McGuffin.
23        MR. DAVIS:  Jesse Davis on behalf of the
24    State Defendants.
25        MS. ROCKETT:  Amanda Rockett on behalf of

9

1    Vidocq Society and Richard Walter.
2        The Court Reporter will now swear in the
3    witness.
4        THE REPORTER:  Mr. McGuffin, can I have
5    you raise your right hand.
6        Do you affirm under penalty of perjury the
7    testimony you're about to give will be the truth,
8    the whole truth, and nothing but the truth?
9        THE WITNESS:  I do.
10        VIDEOGRAPHER:  You may proceed.
11    NICHOLAS McGUFFIN, being first duly affirmed, was
12    examined, and testified as follows:
13    EXAMINATION
14    BY MR. FRANZ:
15        Q.  For the record, will you please state your
16    full name.
17        A.  Nicholas James McGuffin.
18        Q.  I understand at one point in time we
19    postponed the depositions because you were having a
20    -- a child?
21        A.  Yes, I was.
22        Q.  Okay.  So tell me about that.  Hopefully
23    the child was born okay?
24        A.  Yeah, she was born perfectly.
25        Q.  Okay.  And what's her name?



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

26

1    Q.  Could a passenger sit in the back seat
2  next to the speaker?
3    A.  Yes.
4    Q.  The -- So who went to the river with you
5  on June 27th?
6    A.  I believe Cherie may have.  I know within
7  that week period she had went to the river with us
8  once; I don't know if it was that day or not.
9    Q.  So did you go to the river more than just
10  the 27th, before this incident?
11    A.  Yes.  I mean Leah and I went to the river
12  quite a bit once school got out.
13    Q.  And did, on the 27th, did anybody else go
14  with you?
15    A.  I don't recall.
16    Q.  Did anybody else go with you in another
17  car and meet you there?
18    A.  I don't think so.
19    Q.  And what -- what would be in the trunk of
20  your car?  If we just woke up Wednesday morning,
21  June 28th, what would be in the trunk of your car,
22  if anything?
23    A.  Nothing would be in there because it had
24  the gas leak and everything that I had in there
25  wreaked of gas, so I stopped putting things in

27

1  there.
2        And then it had a -- When the chicken wire
3  pole went underneath my car, it actually cut a spot
4  that enters the trunk.  So on my gravel road, dust
5  would get in there and then mildew would get in
6  there and things started molding.
7    Q.  Would there have been any blankets in the
8  trunk?
9    A.  No.
10    Q.  Towels for swimming?
11    A.  No.
12    Q.  I -- I just assume you went to the river
13  to swim.  Am I wrong?  Or did you swim in the river?
14    A.  No, I went and swam.
15    Q.  Okay.  All right.  So let's -- let's go to
16  October 2019.  You were a senior in high school,
17  right?
18    A.  Correct.
19    Q.  Had you started --
20    MS. PURACAL:  Objection.  I'm going to
21  just object to the question there -- to the --
22    MR. DAVIS:  Confusing dates.
23    MS. PURACAL:  -- form of the question.
24    MR. FRANZ:  Huh?
25    MR. DAVIS:  Date were confusing.  I mean

28

1  you said 2019.
2    MR. FRANZ:  Yes.
3    THE WITNESS:  Oh.
4    MS. PURACAL:  2019?
5    MR. FRANZ:  Yes.
6    THE WITNESS:  Yep.  Sorry.  Yeah.
7    MS. PURACAL:  You can answer again.
8    THE WITNESS:  Can you repeat your
9  question?
10  BY MR. FRANZ:
11    Q.  Yeah.  So I want to go back to October
12  2019.  Did I say '18 or '19?  I said '19 first time,
13  right?  Yeah, '19.
14        I'm trying to bring you back to your
15  senior year in high school, right.  So it probably
16  started --
17    A.  So you mean October '99?
18    Q.  Yeah.
19    A.  Okay.
20    Q.  I see what you mean.  Yeah, '99.  Yeah, I
21  don't think you'd probably be alive then.
22        So '99, October '99, senior year.
23    A.  Mm-hmm.
24    Q.  Had you started dating Leah yet?
25    A.  Yeah, I think we -- October '99 of -- the

29

1  12th, I think was our anniversary.
2    Q.  And how did you meet her?
3    A.  I had broke my neck.  I had a neck sling
4  on.  And this was roughly, I think a week or so, two
5  weeks before that, I was in the gym.  And I remember
6  I was kind of still watching football practices and
7  kind of doing stats for them, 'cause I -- I couldn't
8  play 'cause of my broken neck.
9        And I was in the gym and I saw her.  And
10  she caught me looking at her, kind of gave me a
11  weird look.  And so I'm like, okay, I'm not gonna
12  look no more.
13        And later on, I talked to her friend
14  Cherie, told her the incident that -- when I saw
15  her.
16        And she's like, yeah.  She's like, well,
17  she was looking at you and she likes you.
18        And then, so after that we kind of started
19  talking.
20    Q.  And did you play sports in high school?
21    A.  I did.
22    Q.  What sports?
23    A.  Well, that year, I only tried playing
24  football.  But I separated my shoulder and then
25  broke my neck.

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

58

1 used to live is on this road.
2        THE REPORTER: Sorry. I couldn't hear
3 you.
4        THE WITNESS: Sorry. I'm trying to find
5 Fast Mart. So I'm -- There's no street names, so
6 it's --
7 BY MR. FRANZ:
8    Q. Okay. So --
9    A. So I'm trying to go back from where I know
10 where Leah used to live before they moved in with
11 her grandparents.
12    Q. Okay. So you know --
13    A. And so I --
14    Q. Do you see McKay's?
15    A. I'm thinking it's this building right
16 here.
17    Q. Go down. Do you see McKay's?
18    A. Yeah.
19    Q. Okay. Does that help you?
20    A. Well, yeah. That's what I was just
21 pointing at, this -- I believe that's Fast Mart
22 right here.
23    Q. Okay. Go ahead, stick the pin in.
24    A. (Complied.)
25    Q. And as long as I've got you there, on June

59

1 28th, you went to Cherie Mitchell's house?
2    A. Correct, I did.
3    Q. And what time did you get there?
4    A. Roughly, I believe at 9:07.
5    Q. And which way did you come from?
6    A. I would have had to have came from this
7 direction.
8    Q. Okay. So, so take your finger and go real
9 slow so that the video guy can keep it, and start on
10 West Central. Go real slow. And take us the path
11 you went to Cherie Mitchell's house.
12    A. I believe I would have -- I believe I
13 would have came down Central. I mean, I can start
14 here, 'cause I don't know if I took -- There's a
15 Safeway when you come in from the Myrtle Point way.
16 I don't know if I took a right at Safeway or if I
17 took a right, I think at the Broiler, 'cause there's
18 two ways to get to Central that way. There's
19 actually three, but...
20        I would have either went right at Safeway
21 and then cut over or I would have went right at the
22 Broiler and came right up on Central.
23    Q. Okay. So just take your finger along
24 Central.
25    A. And so I went Central. And then I believe

60

1 this would have been -- What would that be, Fourth
2 Street? Up to Cherie's, and hers is somewhere --
3 its' somewhere in here, I believe.
4    Q. Okay. So let's assume --
5        Take your finger, go up Fourth Street.
6    A. Okay.
7    Q. Okay. And so then you would have taken a
8 right to get to Cherie Mitchell's?
9    A. Correct.
10    Q. And you don't know, because the streets
11 aren't labeled, you don't know which right you'd
12 have taken?
13    A. No. I just, I know I would have taken a
14 slight -- a right into, it's like a -- it's not
15 their driveway. It's like a -- It's kind of like an
16 alleyway. And then I would have took a right. And
17 then I didn't pull all the way in.
18    Q. Okay. So then, after you left Cherie
19 Mitchell's house, can you take your thumb -- I mean
20 your finger -- and draw where you went?
21        MS. PURACAL: And I'm going to object as
22 to vagueness as to timing.
23        THE WITNESS: Yeah. I mean, you know, I
24 drove a lot of places that night. I don't recall
25 the specific path of every little detail. I know

61

1 where -- a lot of the places that I went, but I
2 don't know if one time was before the other or the
3 other time was before that time.
4        But I do know that I went back down and I
5 went and I drove up Central. I believe at that time
6 I stopped at Fast Mart and asked if anybody had seen
7 her or if she was at Fast Mart.
8 BY MR. FRANZ:
9    Q. Then where'd you go?
10    A. I think at that point I went back up
11 Central and I think I took a right on Tenth Street
12 and I drove up to Daniel Lapine and Brent Bartley's
13 house to see if she may have stopped in there. And
14 I think that's when I talked to Quinn Cannon.
15    Q. Okay. And where's Brent Bartley's house?
16    A. Oh, my goodness. It was on Dean Street
17 and North Elm, I think is what it was called. I --
18 It's somewhere --it's somewhere -- I think it's
19 somewhere in --
20    Q. Okay. Let me see if I can help you.
21    A. I don't know.
22    Q. Okay. So here's the description from your
23 handwritten timeline by a time of 9:15. Drove up
24 Central looking for Leah.
25        And so you showed us where Central is.



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

62

1    Drove back down Central, took a left at
2  Stumpters. Stumpters.
3    A.  Stampers.
4    Q.  Stampers. What's Stampers?
5    A.  It's Les Schwab.
6    Q.  And where is that located on the --
7    A.  I think this is Less Schwab right -- Yeah,
8  this would be Les Schwab right here 'cause I believe
9  that's the park, Fifth Street Park.
10    Q.  So when you say took -- took a left, you -
11 - do you know what street you took a left on?
12    A.  We would have been taking a left on Fifth
13  Street.
14    Q.  And then how far up Fifth Street did you
15  go?
16    A.  I would have went, I believe up here and
17  then would have looped around back to Central.
18    Q.  Why did you take that route?
19    A.  I -- I wouldn't even know.  Maybe just to
20  go back up through Central.
21    Q.  So we're still on the map.  Let me show
22  you.  Gosh.  We're going to get killed on these
23  things.
24    Tell me if I'm not loud enough that you're
25  not picking me up.

63

1    I hate to invade your space, but...
2    A.  It's all right.
3    Q.  So where were you at?  Where's Les Schwab?
4    A.  Right there.
5    Q.  Okay.  So --
6    THE REPORTER:  I need you guys to speak
7  up.
8  BY MR. FRANZ:
9    Q.  So --
10    A.  Les Schwab is right there.
11    Q.  So you took a left and went to here?
12    A.  Correct.
13    Q.  You weren't looking in any of these
14  houses?
15    A.  No.
16    Q.  And there was nothing in here that had
17  anything to do with Leah?
18    A.  No, it was basically to loop back around
19  and to go look by Fast Mart again or to go back up
20  Central, is what would have -- I assume I would have
21  been doing.
22    Q.  Okay.  And so the rest of your statement
23  says -- Okay.  I'll read it all so it's in context.
24    Drove up Central looking for Leah.  Drove
25  back down Central, took a left at Stumpters, then

64

1  another left at the next stop sign; came back across
2  from Fast Mark by the hair place.
3    A.  Which would have been right there.
4    Q.  Okay.  So that's consistent with you just
5  making a loop.
6    VIDEOGRAPHER:  Point at that again,
7  please?
8    THE WITNESS:  Right there.
9    VIDEOGRAPHER:  And could you put your mic
10  back on, please?
11    MR. FRANZ:  Oh, yeah.
12    VIDEOGRAPHER:  Thank you.  Appreciate it.
13    MR. FRANZ:  No problem.  We need the age
14  of wireless mics.
15    VIDEOGRAPHER:  We've got them, but they
16  cost more.
17  BY MR. FRANZ:
18    Q.  Then another left, left at the next stop
19  sign.  Came back across from Fast Mart by the hair
20  place and drove back up Central, went to West
21  Coquille turnoff.
22    So take me that route.  You can pull that
23  real close to you, if you want so you don't have to
24  keep taking that off.  Just make sure the -- angle
25  it a little bit towards the video guy.  Okay.

65

1    VIDEOGRAPHER:  That's good.  Thanks.
2    THE WITNESS:  You're welcome.
3    So this would be all the way up Central,
4  going Central through there; going Central all the
5  way through there.  And this looks like West
6  Coquille turnoff at the very end in the middle of
7  this map.
8  BY MR. FRANZ:
9    Q.  So you refer to a West Coquille turnoff.
10  Is that something other people would refer to it
11  also?
12    A.  There's a sign that says, I believe West
13  Coquille turnoff.
14    Q.  So in those days, if I went up to somebody
15  -- well, if I just approach you and said, where's
16  the West Coquille turnoff, you'd know exactly where
17  I meant?
18    A.  I would -- I would -- I mean I know.  I
19  would -- I mean people should know if they live in
20  that town, it's pretty small.
21    Q.  So is that a place that you and Leah would
22  stop and park once in a while?
23    A.  I wouldn't say a place that we would
24  frequent.  I think we may have stopped there like
25  once.  It's not -- There's nothing to look at



NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

66

1 really.
2    Q.  And why would you have stopped there one
3 time?
4    A.  I don't even know.  I mean most the time
5 we would hang out at Fast Mart or our places.
6 Sometimes it's -- I don't know.
7    Q.  So do you remember running into Kris,
8 Kristen Steinhoff, at the West Coquille turnoff?
9    A.  I do not.  I remember running into her at
10 Fast Gas.
11    Q.  And you were at the trial when she
12 testified she ran into you at the West Coquille
13 turnoff?  Do you remember that?
14    A.  I don't remember that, no.
15    Q.  Do you remember her testifying ever?
16    A.  I remember her testifying.  I don't
17 remember her specific testimony of that.
18    Q.  Okay.  Now, distance-wise.  And so let's
19 use the pin by the telephone booth by the high
20 school by a service station that we don't' know for
21 sure what it is.
22        What is the distance from that pin, that
23 pay phone, to your house?
24    A.  I wouldn't even know.  I have no clue.
25    Q.  Do you have an estimate of how long it

67

1 would -- It's close to the high school.
2        So do you have an estimate to get to your
3 classes from the high school from your home, how far
4 it was?
5    A.  Like 20 minutes.
6    Q.  And I know it's not --
7        But can you kind of point your finger
8 where your house would be, so that we know it's off
9 the map?  I'm assuming it's off the map.
10    A.  It would be way over here.
11    Q.  Okay.
12    A.  I'm -- I mean, it's hard to tell with --
13 yeah.  I mean, I do see, this is Highway 42 South.
14 I believe that's Highway 42 South, and so it goes
15 way out this way.
16    Q.  And then is there a park by where you just
17 had your finger?
18    A.  That's Sturdivant Park, I believe.
19    Q.  On the map does it show where you were
20 stopped by the police officer that night?
21    A.  I don't --
22    MS. PURACAL:  Object as to vagueness.
23 BY MR. FRANZ:
24    Q.  Were you stopped by a police officer?
25        What park is that called?

68

1    A.  Sturdivant.
2    Q.  Sturdiman (sic).  Were you stopped by a
3 police officer June 28th by Sturdiman?
4    A.  I was.
5    Q.  Maybe this --
6        And actually, do you have a tab that we
7 can mark these so we can --
8    THE REPORTER:  Exhibit sticker?
9    MR. FRANZ:  Yeah.  So what is my last
10 numbers?  555?
11    MS. HENDERSON:  44 is your last one.
12    MR. FRANZ:  So could we mark Exhibit 545.
13    THE REPORTER:  Would you like me to place
14 it on this map, sir?
15    MR. FRANZ:  Yes, or...
16    THE REPORTER:  Any preference on where?
17 Top corner?
18    MR. FRANZ:  I think that top left-hand
19 corner looks pretty safe.
20    THE REPORTER:  Exhibit 545 marked.
21    (WHEREUPON, Exhibit 545 was marked for
22 identification.)
23    MR. FRANZ:  And then Exhibit 546.
24    THE REPORTER:  Exhibit 546 marked.
25    (WHEREUPON, Exhibit 546 was marked for

69

1 identification.)
2    MR. FRANZ:  Want to stick it up there.
3    MS. PURACAL:  Mr. Franz, are you done with
4 this one, so we can just --
5    MR. FRANZ:  We're just -- No, we're not
6 done.  So maybe --
7    MS. PURACAL:  Okay.
8    MR. FRANZ:  Will two fit on there?  I
9 think two will fit on there.
10 BY MR. FRANZ:
11    Q.  So does Exhibit 546 show better where you
12 were stopped by the officer --
13    A.  It shows --
14    Q.  -- by the park?
15    A.  It shows Sturdivant Park better, yes.
16    Q.  Can you point to the park?
17    A.  Right there.
18    Q.  And where were you traveling when you were
19 stopped?  Show -- Can you show us by the finger?
20    MS. PURACAL:  Object as to vagueness.  You
21 can answer, if you know.
22    THE WITNESS:  I would have been traveling
23 -- It's the bypass going around Coquille.  And then
24 I would have been traveling back into town.
25 BY MR. FRANZ:


NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

70

1    Q.  Do you know if you had come from the West
2  Coquille turnoff?
3    A.  I -- My recollection is I was driving into
4  town this way, because I was driving the loop.  And
5  I drove the loop multiple times that night.
6    Q.  So to do the loop, you would have -- you
7  would have entered from the West Coast (sic) --
8    A.  So to do the loop, like we can start at
9  the West Coquille turn.
10    Q.  Okay.
11    A.  To do the loop, you would basically drive
12  all the way through here and then you would loop
13  around, just like that.
14    Q.  Okay.  So you're heading back into town,
15  and then the officer was heading which direction?
16    A.  I believe he was heading toward the West
17  Coquille turnoff.
18    Q.  And then where --
19      How did he stop you?  Did you see him turn
20  around?  Or what happened?
21    A.  He turned around and then came up behind
22  me and turned his red lights on.
23    Q.  And then you -- do you --
24      Did you pull over in front of the bar?  Or
25  where'd you stop?

71

1    A.  I -- I don't remember.  I -- I thought I
2  had pulled into the, it's called a CFN gas place.
3  That's where I thought I pulled into when I got
4  pulled over.
5    Q.  Why don't you think that's still the same?
6    A.  I mean, he said that we pulled off on 42
7  South.
8    Q.  Go with what you -- what your testimony
9  is, unless his testimony -- unless what he said, you
10  agree with.
11    A.  No.  I just had always thought -- had
12  thought that I had pulled into there.  I don't quite
13  remember.
14    Q.  Okay.  So let's put a pin where -- where
15  you think that you -- you stopped your car.  And
16  it's a black pin.
17    A.  (Complied.)
18      MR. FRANZ:  Show the video down there.
19  Okay.
20  BY MR. FRANZ:
21    Q.  And what time was that?
22    A.  I don't recall.
23    Q.  Okay.  So I was back to --
24      Did you work in Sun River?
25    A.  Yes.

72

1    Q.  When did you work in Sun River?
2    A.  2008 to 2009 time frame, I believe.
3    Q.  And where did you live when you were
4  there?
5    A.  I lived in Bend.  I -- I don't know.  It's
6  like -- I don't know the street.
7    Q.  And who'd you live with, if anyone, in
8  Bend?
9    A.  I lived with Maegan Edgerton and my -- her
10  and my daughter.
11    Q.  And your daughter's name?
12    A.  My daughter's name's Violet.
13    Q.  And when was Violet born?
14    A.  10/11/07.
15      MS. PURACAL:  And I'll just note for the
16  record that we're going to put anything with respect
17  to Violet under the protective order.
18      MR. FRANZ:  Certainly.
19  BY MR. FRANZ:
20    Q.  Okay.  So who did you work for when you
21  were in Sun River?
22    A.  Sun River Resort.
23    Q.  And the --
24      Who was your employer?
25    A.  Sun River Resort.

73

1    Q.  Okay.
2    A.  Yeah, I think.
3    Q.  And when you say the resort, you mean the
4  -- the --
5    A.  So --
6    Q.  -- lodging --
7    A.  So they have a golf course.  They have a
8  restaurant.  They have a banquet rest -- like a
9  banquet, it's called the Great Hall.  They do all
10  the banquets there.  They have lodging there.  I
11  mean it's -- Sun River's like its own little
12  community.  And Sun River Resort is like the main
13  thing there.
14    Q.  Right.  So you know where Tennis Village
15  is?
16    A.  No, I do not.
17    Q.  You know where the tennis courts are by
18  grand hall?  Is it grand hall or Great Hall?
19    A.  It's the Great Hall.
20    Q.  Do you know where the tennis courts are?
21    A.  No.
22    Q.  Okay.
23    A.  I stayed in a room there when I first went
24  up there for an interview.  I went into the main
25  lodge for where their main restaurant is.  But I

94

1 was so busy I didn't make copies. So we're probably
2 going to have to --
3     MS. PURACAL: We'll just take a break.
4     MR. FRANZ: -- take a pause, make copies.
5 You can bill me.
6     MS. PURACAL: Bill you one page at a time.
7     VIDEOGRAPHER: Do you want to go off the
8 record now or --
9     MR. FRANZ: Yeah, let's -- 'cause it's
10 going to -- 'cause of their -- The entire exhibit's
11 114 pages, so...
12     VIDEOGRAPHER: The time is 11:19; we're
13 off the record.
14     (WHEREUPON, a recess was taken.)
15     VIDEOGRAPHER: We're on the record. The
16 time is 12:50.
17 BY MR. FRANZ:
18     Q. Did you ever have a -- a verbal
19 altercation with David Breakfield over his dating
20 Maegan Edgerton?
21     A. I wouldn't say verbal altercation. I
22 would classify it more as we talked about what
23 Maegan was doing.
24     Q. Okay. Take me through that. What do you
25 mean?

95

1     A. So I was actually -- We had broke up for a
2 little bit. And she told me to meet her and to come
3 pick her up. When I went there to pick her up, she
4 was getting a ride home from David.
5     And from what I recall after that, I think
6 she got out and she was frustrated. I don't really
7 remember an interaction we had. And I remember I
8 told David, from what I remember, is that I told him
9 that, look, I was out here. She told me to come out
10 here to get her. She's with you. And I said, to be
11 honest, I said, she's probably playing both of us.
12 And I said, so you can take it for whatever value
13 you want. And I said, I'm going to pursue her. I
14 said, I love her. And so, you know, I said, it's --
15 where it goes from there is her choice.
16     Q. Did you ever threaten him?
17     A. No, I did not.
18     Q. Did he ever hit you?
19     A. No.
20     Q. So going back to June 2000, other than
21 Leah, who was your best friend?
22     A. In June? I don't really know. I mean, I
23 hung out with Brent Bartley. I hung out with like
24 Mike Pizzola and Ricky Crook. I mean, I wouldn't
25 classify them as my best friends. I mean, my

96

1 parents were best friends more compared to them.
2     Q. And so if -- and -- and excluding Leah.
3 So let's just say, in June, you ran out of gas. Who
4 would you call?
5     A. My --
6     Q. And you can't call Ghostbusters.
7     MS. PURACAL: Object just as to
8 speculation.
9     THE WITNESS: I mean, if I was to make a
10 phone call, I would probably call my parents.
11 BY MR. FRANZ:
12     Q. And if you needed money, who would you
13 call?
14     MS. PURACAL: Object as to speculation.
15     THE WITNESS: My parents.
16 BY MR. FRANZ:
17     Q. And if you got in some kind of trouble,
18 who would you call?
19     MS. PURACAL: Same objection.
20     THE WITNESS: My parents.
21 BY MR. FRANZ:
22     Q. Okay. How many --
23     So going to the evening, June 28th, 2000,
24 after 9:00 p.m., how many times did you go back to
25 the grandmother's house of Brent?

97

1     A. Two, maybe three times, I believe.
2     Q. Okay. So could you bring one of the
3 boards up? I think one of the boards is going to
4 show -- it may be the one that shows more. To --
5     First, let's locate the --
6     A. This one?
7     Q. -- grandmother's house. I think that's
8 the one that will show the grandmother's house. I
9 think the --
10     A. Okay.
11     Q. -- other one's blown up too much.
12     Does that picture show Grandma's house?
13     A. Well, looking at it, it would -- it's
14 somewhere in here.
15     Q. Yes, let's --
16     A. I just don't know which one. It's -- I
17 don't know their address. I just know that it was -
18 - it was -- yeah, it was -- 'cause the cemetery's
19 here. You would drive and you'd curl around. Or
20 you could take this road and then you can get back
21 there. I just don't know which one it would be.
22     Q. Okay. So just real rough estimate, just
23 so we know the direction.
24     MS. PURACAL: Objection.
25     THE WITNESS: I mean, I would be -- I

98

1 would be guessing.
2 BY MR. FRANZ:
3    Q.   Okay.  Do you know for sure it's beyond
4 some point?
5    A.   No, I don't.  I -- I'd only been there, I
6 think that time.  Like those two days, those are the
7 only times I think I've ever been out there.
8    Q.   Okay.  And so when you were drawing with
9 your finger, you went so far and then you just kind
10 of stopped.
11    A.   I actually went all the way up.
12    Q.   Okay.  So, after 9:00 p.m., what time
13 did you return to the grandmother's house?
14    A.   I don't know the exact time.  It was
15 probably between 9:30 and 10:00, I had went up there
16 once.
17    Q.   Can you show us the route you took?
18    A.   I more than likely would have took this
19 route.
20    Q.   By the cemetery?
21    A.   Correct.
22         And I may have taken that route.  It just
23 depends.  That was a gravel road at the time.  I
24 don't know if it's paved now.
25         But I more than likely would have went

99

1 this way probably, and then curled up and then drove
2 all the way up here to wherever their house is.
3    Q.   Okay.  And then coming back, how would you
4 come back?
5    A.   I would have continued the same way.
6    Q.   All right.  And then do you remember the
7 second time you went back then, after 9:00 p.m.?
8    A.   I either went there two or three times.  I
9 wouldn't know the time frame of the second time.  I
10 do know the time frame of the third.
11    Q.   Okay.  So what's the time frame of the
12 third?
13    A.   I believe it was roughly 11:00.
14    Q.   And the same route that you just showed
15 us?
16    A.   Correct.
17    Q.   So the route would have taken you by the
18 pay phone?
19    A.   Yes.
20    Q.   All three times?
21    A.   Yes.
22    Q.   Okay.  Then we -- we were talking about
23 Kristen Steinhoff.  And we were talking about the
24 first time you said at Fast Gas.  We marked Fast
25 Gas.  And then I went off on some direction.  Go

100

1 ahead and take me -- what --
2         What transpired the first time with
3 Kristen at Fast Gas?
4    A.   I think -- I think alls it was is I think
5 she was cleaning her car, 'cause there's a little
6 carwash by Fast Gas.  And I was driving by.  I
7 went in the parking lot, and I can't remember why.
8 And I was getting ready to pull out and I saw her.
9 And she asked what I was doing.  I told her I was
10 looking for my girlfriend.
11         And she just said, hey, well, later -- you
12 know, and, I mean, at the time, I have a leaking gas
13 tank.  I have a -- kind of a junky car and
14 headlight's out.  And she's like, well, if you need
15 help, stop by later and I'll help you look -- look
16 for her and drive around.  'Cause she had a -- She
17 was borrowing somebody's car, I believe, at the
18 time.
19    Q.   And did you get gas at that time?
20    A.   No, I don't believe so.
21    Q.   Okay.  Then when'd you next connect up
22 with her?
23    A.   Would have been sometime after midnight.
24    Q.   Okay.  Can you get closer to that or is
25 that about the closest you can do?

101

1    A.   I know I was pulled over by cops twice
2 that night.  And it would have been shortly after
3 the pullover with Danny Lee, because that was the
4 second time I'd been warned for a headlight.  So I
5 didn't want to be caught with a headlight anymore,
6 'cause I probably would have got a ticket.  And so I
7 think it would have been sometime after that, pretty
8 close in time frame.
9    Q.   Can you put a pin where you were stopped
10 by Danny Lee?
11    A.   I can try to find the place.
12    Q.   Come close as not -- as you can.
13    A.   Okay.
14    Q.   You want to use the more blow-up one?
15    A.   Well, I mean, it's -- I -- I think I know
16 right where it is.
17    Q.   Okay.
18    A.   I think.  This looks like to be the middle
19 school.  So this would be Tenth Street, if I'm
20 correct.  And then at the first stop sign, Tenth
21 Street Market is on the left corner.  It's on the
22 corner of the road.  And it looks like it would be
23 right here.
24    Q.   So what were you doing over there at the
25 time you were stopped?



102

1      A.   I may have been basically maybe going back
2   up to Danny Lapine's, 'cause I hadn't been there
3   since roughly 9:15, 9:30 time frame, maybe.  So I
4   might have been going back up there.  Trying to
5   drive roads that maybe she was walking.
6      Q.   Once you started looking for her after
7   9:00 p.m., did you continuously drive the entire
8   time until you started using Steinhoff's, the car
9   she borrowed, or was there a pause of a break more
10  than five minutes?
11     A.   I mean, I got out of my car to stop at
12  Fast Mart, talk to people.  That probably took a
13  good five minutes.  I mean, that night, there was
14  quite a few people at Fast Mart.  I stopped in there
15  probably five, six, seven times maybe.
16         I know I stopped and got gas at the CFN
17  gas place, which is -- it's not a -- it's a gas
18  station, but it's not run by anybody.  It's -- You
19  have a card lock system.  So you can get gas when
20  you need to get gas.  That might have taken five
21  minutes.
22         Going back to Fast Mart and calling my
23  mom.  Going back to Cherie's and talking to Leah's
24  mom, Cory.  That would have at least taken five
25  minutes.

103

1         I don't know how long it took when I
2   stopped and talk -- when I first got there to
3   Cherie's house.  I don't know how long.  That have
4   took -- taken five minutes; I'm not sure.
5         Going into Quinn and -- or Daniel and
6   Brent's house where Quinn was, it's probably under
7   five minutes.
8         Going up to Brent's grandma's, I mean,
9   that -- that definitely would have took five
10  minutes.
11         Things like that.
12     Q.   So would it be fair to say, between 9:00
13  and 12:00, you were at least continuously driving
14  for two hours?
15     A.   Other than the stops that I made and all
16  the stops that I just mentioned, I mean, yeah,
17  that's pretty much what I was doing is driving and
18  looking for Leah.
19     Q.   Okay.  So take us to --
20         Now, you said the card lock.  Where is --
21  Where is that located?  Is -- Does it show on the
22  map?
23     A.   Yeah, it's -- it's the spot that I had
24  mentioned that -- where I thought I got pulled over
25  by Officer Zavala, which is this one right here, the

104

1   black one.
2      Q.   Okay.  So let's put another pin there
3   then.  So that's the place you got gas?
4      A.   Correct.
5      Q.   Okay.  And point to that so I can get a --
6      A.   (Complied.)
7      Q.   Okay.  And that's the place where you got
8   gas?
9      A.   Yes.  Yes.
10     Q.   Okay.  So do you, you know, after
11  midnight, do you actually go to Kristen's house?
12     A.   I do.
13     Q.   Take me through that.  You go to her
14  house.  What happens?
15     A.   I go to her house.  I'm sitting in her
16  living room.  And she's like, well, I got to get
17  ready.  Give me a little bit to get ready.  And I'm
18  kind of just telling her, kind of from the living
19  room, 'cause she's in her bedroom, I think putting
20  makeup on, if I remember right.
21         And told her that I thought, you know, I
22  think Leah might be at a party.  And I had
23  mentioned, you know, I mean, if she was at a party,
24  I mean, a couple previous girlfriends I had were --
25  had cheated on me at parties.  So I kind of was

105

1   concerned about that.
2         Kristen kind of fed into it, said that she
3   might be at a party.  And she's like, well, we can
4   go look for parties.  But she probably is at one.
5   Don't know if we'll find any.
6         And then just kind of waited on her.  And
7   I think I went into the bedroom and told her to kind
8   of hurry up.  And just kind of one thing led to
9   another.  I'm not really proud of it.  But then we
10  started kissing and then we stopped.
11     Q.   Okay.  Now, and I hate to go into details.
12  But I just want to try to confirm the testimony.
13         Did you expose your penis at that time?
14     A.   She took my clothes off and I had taken
15  some of her clothes off, is what I remember.
16     Q.   So you were completely nude?
17     A.   I don't think I was completely nude.
18     Q.   But was your penis exposed?
19     A.   I believe so.
20     Q.   And then what about her vagina, was it
21  exposed?
22     A.   I think it may have been.
23     Q.   Okay.  And were you playing with the
24  vagina?
25     A.   No.  I think we stopped right pretty much

106

1  when we got undressed.
2      Q.  Okay.  And then what happened after that?
3      A.  Told her that I couldn't do this.
4  Couldn't do this to Leah.  And that she stopped and
5  we got dressed and probably shortly after that, we
6  went and got in her car.
7      Q.  Did Leah ever give you any indication at
8  any time that she would cheat on you?
9      A.  No.  No.  I mean, not -- probably not, no.
10     Q.  And do you remember going to Brent's
11  before the first time you went out to Grandma's, to
12  pick Brent up?  Starting on June 28th, the very
13  first time you go to where Brent was living to pick
14  him up to go to Grandma's.
15     A.  Oh.  Oh, so like earlier in the day?
16     Q.  Yes.
17     A.  Jeez.  We were at Leah's grandparents'
18  house for like at least 'til like afternoon time.  I
19  think we would have went over there after that and
20  stopped in there to see what Brent was doing.  I
21  believe he came out with Leah and I to my parents'
22  house.  I think that's when we kind of made the idea
23  of like let's have a -- kind of a -- your -- your
24  girlfriend, my girlfriend, we'll go hang out at your
25  mom's -- or grandma's.

107

1      Q.  Was Leah affectionate?
2      A.  Yeah, she was.
3      Q.  So when she had a chance, she would hold
4  your hand?
5      A.  Yes.
6      Q.  Or sit on your lap?
7      A.  Yeah.
8      Q.  Were anything different that day?
9      A.  No.
10     Q.  Okay.  So then how long did you drive
11  around with Steinhoff?
12     A.  Well, I mean, I think the -- being at her
13  house was at least probably 20 minutes, half hour,
14  'cause that's when I kind of was annoyed waiting on
15  her.
16         Forty-five minutes, an hour.  I'm not
17  sure.  That would be a guess.  But I'm not entirely
18  sure.
19     Q.  Now, had you known Kristen prior to June
20  28th, 2000?
21     A.  I had known her, yes.
22     Q.  And how had you known her?
23     A.  Me, her, Ricky, and like Mike Pizzola, we
24  used drugs together.
25     Q.  And what drugs would you use together?

108

1      A.  Methamphetamines?
2      Q.  Did you use a lot of meth?
3      A.  No.  I mean, I did it here and there.  It
4  wasn't a lot, but I did do it.
5      Q.  Did you do meth that night with Kristen?
6      A.  No, I did not.
7      Q.  So, you know, I've never used any kind of
8  drug.  So I don't even know what the effect.
9         When you take meth, what does it do?  Does
10  it make you happy?  Make you sad?  You personally,
11  does it -- Tell me what it does.
12     A.  I mean, using methamphetamines, it makes
13  you more awake.  Doesn't make you in a bad mood;
14  makes you more talkative, how I remember it.  That's
15  kind of how I would classify it.
16     Q.  Why -- Why'd you take it?
17     A.  I don't even realize -- really, really
18  know why I did.  I know that I broke my neck earlier
19  in my senior year, 'cause I don't believe I'd ever
20  done it before then.  And I did it shortly after
21  that, I believe.
22     Q.  And then marijuana, what's that make you
23  feel like?
24     A.  Giggly.  Good mood.  Relaxed.  Talkative.
25     Q.  So had you used marijuana June 28th?

109

1      A.  Yes, I did.
2      Q.  Who did -- Maybe you don't try to hide it.
3  But how would you hide that?  So you're stopped by a
4  police officer.  I'll just give kind of the same.
5         I thought that you get stopped by a police
6  officer.  So I would be worried somehow he knew I
7  was using marijuana.
8         Did you have that concern when you were
9  stopped by Zavala?
10     A.  I didn't know.  I mean, it's not like I
11  was so -- like so high that I wasn't functionable.
12  I mean, just that's not really the type of person I
13  am.  I do it as a recreation.  If I did it, it
14  wasn't to get like totally knocked out.
15     Q.  So both times you were stopped, you had no
16  concern they were going to figure out you'd been
17  using marijuana?
18     A.  No.  I remember just telling them I
19  couldn't find my girlfriend and asked -- asked them
20  to help.
21     Q.  With regards to Zavala, did it seem like
22  he knew who Leah was?
23         MS. PURACAL:  Object as to speculation.
24         THE WITNESS:  I don't know if he did.  I'm
25  -- I'm not sure.



134

1 that much. I don't know if it was clear sky or not.
2 I remember when the sun was going down, it -- there
3 might have been some clouds, but not a lot. That's
4 all I really remember. I just know for a fact it
5 was not raining.
6    Q. Do you remember what time the sun went
7 down?
8    A. I have no clue, no.
9    Q. Can you remember based on your driving
10 where you were when it got dark?
11    A. I believe it was getting dark when I came
12 in to pick Leah up. It was like that -- What do you
13 call it? -- like dusk. Kind of like that in between
14 lull, I think, would kind of be about what it is.
15    Q. Did you intentionally show up late to pick
16 up Leah?
17    A. No, I did not.
18    Q. Okay. So you'd --
19       You were basically just filling in time
20 from 7:00 p.m. to 9:00 p.m., correct?
21    A. Correct. I was waiting for her to be done
22 at Cherie's.
23    Q. So how come you weren't there spot on at
24 9:00 p.m.?
25    A. I lost track of time 'cause I was out at

135

1 the Mill Pond with David Jenkins, Josh Emler, and
2 Aaron West.
3    Q. Did you smoke pot out there?
4    A. I did.
5    Q. Did -- is that --
6       Would that be an explanation why you lost
7 time -- track of time?
8       MS. PURACAL: Object as to speculation.
9       THE WITNESS: I think it's we were just
10 all talking and then just kind of lost track of
11 time.
12 BY MR. FRANZ:
13    Q. So where were you guys at? What was it
14 called?
15    A. Johnson Mill Pond.
16    Q. I am assuming that's off the map?
17    A. Yes, it is. It's not on the map.
18    Q. Okay.
19    A. Sorry.
20    Q. And how long would it take to get to
21 Leah's house from the pond?
22    A. I -- I'm not sure. I mean, over -- over
23 ten minutes.
24    Q. Did you ever take Kristen Steinhoff out
25 with Ricky Crook to a location and then just sit

136

1 with her to scare her?
2    A. No. We went out to, I believe Poe Lane is
3 what she has said -- I don't know exactly what it's
4 called. It's on the top of Fairview Mountain. -- to
5 go smoke methamphetamines is why we went out there,
6 because she wanted to get out of her house because
7 people were at her house and she didn't want to be
8 there with them.
9    Q. And then did you smoke it out there?
10    A. Yes, we did.
11    Q. Who had the -- the meth?
12    A. Probably both of them.
13    Q. Did you only try to commit suicide one
14 time?
15    A. No, I have not. I've tried to get -- do
16 it more.
17    Q. Okay. Take me through each incident.
18    A. It was probably about a year ago. I don't
19 really know how to take you through it. It's not
20 something that I like to talk about. It's kind of
21 something I'm ashamed of.
22    Q. Are there medical records about it?
23    A. No, there's not.
24    Q. Okay. I'm sorry. Take your time, if you
25 need a break. But --

137

1    A. Just --
2    Q. -- if I don't have any records, I just
3 need to know.
4    A. I don't know. Things haven't been as easy
5 getting out as I thought it would be. I have a lot
6 of stress, a lot of anxiety, a lot of catching up to
7 do, a lot of loss.
8       So, I mean, it's -- sometimes you just
9 feel like there's no way out and the best way is to
10 just stop. I mean, my -- always my thought process
11 is, yeah, like, okay, I can go be with Leah. I can
12 go be with my family that's passed away since all
13 this has happened. That's what I think about.
14       And I have a hard time dealing with the
15 depression that I have, and so I tried to do it
16 again. It's shameful.
17    Q. So what did you do?
18    A. I tried taking a bunch of pills.
19    Q. What kind of pills?
20    A. I don't remember what they were. Aspirin
21 or ibuprofen or Tylenol. Anything I could get my
22 hand on.
23    Q. And then what happened? Somebody
24 intervene or --
25    A. Aleksandra intervened.



178

1    I do remember waking up in the morning and
2  reading it over again and crying. And I told my
3  attorney that I wanted to read this if I get to say
4  anything. And I said at least I want to do is at
5  least read this.
6    Q. And is this the statement that you read at
7  your sentencing?
8    A. Correct, it is.
9    Q. And the -- so the handwrite --
10    The handwritten notations to it, those are
11  yours too?
12    A. Yes, they are.
13    Q. And those were essentially to add some
14  things for when you were reading it at sentencing?
15    A. It was after I went back and like had got
16  typed up and then it got typed wrong or I didn't
17  spell it right.
18    Q. Okay. And then what is the handwriting at
19  the top? It looks like some numbers. Are you able
20  to read that?
21    A. It -- It's me referencing where it's at in
22  the transcript, I believe, of my criminal trial.
23    Q. Okay. So that says --
24    A. 1737 transcript.
25    Q. 1737 transcript?

179

1    A. I believe so, yes.
2    Q. And do you know what that was referencing?
3    A. I think I was just referencing the page on
4  my transcripts then, yeah.
5    Q. But, I mean, was there something on that
6  particular page of the transcript that --
7    A. It would have been this in the --
8    Q. Oh, I see.
9    A. -- in the --
10    Q. You're saying that page 1737 --
11    A. In the transcription --
12    Q. -- of the criminal --
13    A. -- had the --
14    Q. -- transcript contains the transcribed
15  version of you saying -- reading this at your
16  sentencing?
17    A. Yeah. Yes, it does.
18    Q. All right. Thank you.
19    All right. You testified that you and
20  Leah Freeman had been having sex up through the
21  time, you know, through the time of her death; is
22  that correct?
23    A. Correct.
24    Q. And was, to your knowledge, was she
25  pregnant when she died?

180

1    A. I don't believe she was.
2    Q. And were you concerned about her being
3  pregnant?
4    A. No, I was not.
5    Q. Was she scheduled to get --
6    She was not on birth control, correct?
7    A. Not to my knowledge.
8    Q. Was she scheduled, to your knowledge, was
9  she scheduled or planning to go get birth control or
10  go to a doctor to get a prescription for birth
11  control?
12    A. I don't have a specific recollection that
13  she was going. I don't recall that she was. She
14  may have. I -- I don't think that we actually ever
15  discussed it.
16    Q. But you have no knowledge that she even
17  had any interest or it was a topic of discussion for
18  her?
19    A. Not that I --
20    Q. Topic of interest for her.
21    A. Not that I can recall.
22    Q. When did you first learn that Leah
23  Freeman's shoes had been found?
24    A. Probably when they put it out on the news,
25  I believe. I -- I'm not sure.

181

1    Q. But, to your knowledge, that wasn't told
2  to you by a word of mouth or some source like that?
3  In other words, you think you probably read it or
4  heard it on the news?
5    A. Yeah. I just -- I just can't recall. I
6  mean, it's hard to say who it could have came from
7  or if it could have came from the news. But I'm not
8  sure.
9    Q. All right. And you -- do you have a --
10    Was that before or after your -- your
11  polygraph; do you recall?
12    A. I don't recall. But, yeah, I don't
13  recall.
14    Q. When you dropped off Leah Freeman at Cherie
15  Mitchell's house, what did -- was she irritated or
16  upset when you dropped her off?
17    MS. PURACAL: I'm going to object as to
18  vagueness for timing.
19  BY MR. DAVIS:
20    Q. When you dropped Leah Freeman off at
21  Cherie Mitchell's house at around --
22    You dropped her off around 7:00 p.m., on
23  June 28th, correct?
24    A. Correct.
25    Q. Was she irritated or upset when you



186

1    A. She did.
2    Q. -- direct language about fishing poles and
3  --
4    A. Yeah.
5    Q. -- whatnot, correct?
6    A. She did, yeah.
7    Q. And that, in fact, that letter or that --
8  the contents of that letter were read into trial,
9  correct, at your criminal trial?
10    A. It might have been. I'm not sure it -- in
11  -- it might have been.
12    Q. So were you present when Cherie testified
13  that there was some kind of tension between you and
14  Leah when Leah arrived? Do you recall hearing
15  testimony to that effect?
16    A. I don't quite remember what she testified
17  to. But to my knowledge, there wasn't any tension
18  with Leah and I when she left. If there would have
19  been tension, I don't think we would have said I
20  love you to each other.
21        So that might be her interpretation, but
22  it's not mine.
23    Q. What were you --
24        Do you recall what you were wearing that
25  night, June 28th, 2000?

187

1    A. I do not.
2    Q. Do you recall what you were wearing when
3  you -- you had gone to --
4        The day you went to the river was the day
5  before or was it also that day?
6    A. We did not go to the river that day. We
7  had went to the river, I think the day before maybe.
8  We went to the river quite a bit the -- the couple
9  weeks that school got out.
10    Q. You washed your car on June 28th, 2000,
11  correct?
12    A. Yeah, we washed the outside of it.
13    Q. And Leah was involved with that?
14    A. Yeah, we were spraying each other with the
15  hose.
16    Q. And did you change your clothes after you
17  sprayed each other with the hose?
18    A. I don't believe so, 'cause I never --
19  Yeah, I don't believe I did.
20    Q. You got wet when you washed your car and
21  then sprayed each other with the hose?
22    A. Yeah. I mean, but I know that we were
23  there and I didn't get out to my house with her and
24  Brent 'til later in the day. So I mean, I don't
25  carry like extra clothes with me to change.

188

1    Q. Did you change your clothes at any point
2  during the night of June 28th, 2000, including the
3  early morning hours of June 29th?
4    A. No, I did not.
5    Q. No change at all?
6    A. No, I did not.
7    Q. And any statement that Kristen Steinhoff
8  made to law enforcement that you had would be
9  incorrect?
10    A. Correct.
11    Q. Your statements to -- This is just a
12  general question for you, Mr. McGuffin.
13        All the statements you made to police,
14  were -- were they completely accurate? In other
15  words, to the best of your ability?
16    A. Can you like define the -- what's --
17    Q. Were you truthful in your statements to
18  law enforcement?
19    A. No, I was not.
20    Q. What did you --
21        What were you untruthful about?
22    A. I was untruthful about drug use, drinking.
23  I was untruthful about Leah drinking and drug use.
24  I was untruthful to them about Kristen Steinhoff
25  incident with cheating on Leah. That's pretty much

189

1  it.
2    Q. When you say you were untruthful about
3  Kristen Steinhoff and cheating on Leah, what do you
4  mean exactly?
5    A. Can you repeat that?
6    Q. What did you say about Kristen Steinhoff
7  and Leah that was untruthful?
8    A. Well, I told them that I went over to
9  Kristen's. I just didn't tell them what had
10  transpired.
11    Q. In other words, you didn't tell them about
12  kissing and getting to partway along the way to
13  maybe having sex and then stopping; is that right?
14    A. Yeah, I did not --
15    Q. That's what you omitted?
16    A. I did not tell them that.
17    Q. Otherwise, though, it was entirely
18  accurate in terms of your timeline, where you went
19  and what you did?
20    A. I mean, time frame-wise of how long that
21  took, I mean, that whole rough outline of what I
22  wrote down is, the times are guessed.
23    Q. In other words, the -- a guess might be
24  the -- might not be the best word.
25        They're more like estimated?



190

1     A.   I would say guessed.  I mean, I remember
2  ask -- telling, I think telling the cops when I was
3  writing it, I said, I would have to guess.
4     Q.   Okay.  And had you been drinking that
5  night?
6     A.   I remember Leah, I think had a drink and
7  she might not have been able to finish it and I may
8  have had the last bit of it.  But other than that,
9  that would have been it.
10     Q.   And did you smoke pot that night?
11     A.   I smoked marijuana, yes.
12     Q.   How -- Like on how many occasions?  In
13  other words, I'm not asking how much you did at one
14  particular time.  On how many occasions through the
15  night did it occur?
16     A.   The last time would have been the Mill
17  Pond.  And I may have smoked earlier in the day, but
18  I don't have specific recollection of that.
19     Q.   And the Mill Pond was what time?
20     A.   General time frame, I would say it was
21  maybe 8:00 to 9:00 p.m.  Well, just before I left to
22  go get Leah at Cherie Mitchell's.
23     Q.   Okay.  So one of the last things you did
24  was finish smoking pot at the Mill Pond?
25     A.   Correct.

191

1     Q.   And then you left to pick up -- intending
2  to pick up Leah?
3     A.   Correct.
4     Q.   Did you use methamphetamine that night?
5     A.   No, I did not.
6     Q.   And any statement made to the contrary
7  like by Kristen Steinhoff, for instance, that you
8  did that night, was -- that would be incorrect?
9     A.   Correct, it would be incorrect.
10     Q.   Would it be incorrect in that she didn't
11  have correct information?  Or is it incorrect in
12  that it would be a lie?
13     A.   It would be a lie, 'cause I know I didn't
14  do meth that night.
15     Q.   All right.  So you first saw Kristen
16  Steinhoff at --
17     A.   Fast Gas.
18     Q.   You saw her at Fast Gas.
19     A.   Correct.
20     Q.   When was the next time you saw her that
21  night?
22     A.   It would have been after -- sometime after
23  Danny Lee pulled me over, which would have put that
24  after midnight.
25     Q.   And that was when you went to her house?

192

1     A.   I may have.  I -- I don't know if I went
2  specifically directly there.
3     Q.   My question is, when you next saw her, was
4  it at her house or was it somewhere else?
5     A.   No, it was at her house.
6     Q.   And then, if I understand correctly, you
7  guys spend some time at the house.  You were kind of
8  waiting for her to get ready to go.  You kissed and
9  did things of that nature.  And then you left.  Is
10  that right?
11     A.   Correct.
12     Q.   And how long were you gone?
13     A.   I don't know.  I know we drove around
14  everywhere in the town.  I know we went to Matt
15  Sinnott's house because there was a party the night
16  before.  We drove around all of Coquille over and
17  over.
18        I remember getting her a little bit of gas
19  at the CFN gas place before we went back to her
20  house.  And then I dropped her off.  And then I
21  believe that's when I went and looked one more last
22  time to see if Leah was at her house.
23     Q.   Did you see Kristen Steinhoff again that
24  night after you dropped her off?
25     A.   No, I did not.

193

1     Q.   You left -- When you left Kristen
2  Steinhoff's house, you went by Leah's house?
3     A.   I did, yeah.  It was one of the last
4  things I did before I went home.
5     Q.   You didn't knock on the door, right?
6     A.   No, I did not.
7     Q.   Is that when you threw pebbles at the
8  window?
9     A.   Correct.
10     Q.   And what -- Why not knock?
11     A.   She lived with her grandparents.  It was
12  kind of like I didn't want to get -- I mean I didn't
13  want to get her in trouble.  I mean I didn't want to
14  get her in trouble.  Like her grandparents were like
15  pretty straight-laced with like, it was like, don't
16  call after 10:00 and don't wake them up.
17        She would get home sometimes, I remember I
18  would take her home like at 11:00, sometimes like
19  midnight, and we -- her mom, like just be home at
20  this time.  And she wouldn't even be able to open
21  the fridge, 'cause she'd get in trouble for being
22  loud.
23        I didn't want to get her in trouble.  I
24  mean, I saw the glare in the window in the second
25  story.  So I was, okay, I'll just throw a little

194

1 pebble up there, get her attention.
2    Q.   Why would she be in trouble for you
3 dropping by the house to ask where she is?
4        MS. PURACAL:  Objection as to speculation.
5 BY MR. DAVIS:
6    Q.   I'm just asking what your thought process
7 is -- or was?
8    A.   I mean, I know if my friends came out to
9 my parents' house, they'd probably be a little
10 pissed to be getting woke up at whatever time it
11 was, roughly around maybe 2:00, 1:50.
12    Q.   Okay.  But you'd already --
13        You'd already spoken to her mother that
14 night, right?
15    A.   Correct.  I had spoken to her mother on
16 the phone and I had talked to her sister two to
17 three times.
18    Q.   What's her sister's name?
19    A.   Denise Freeman.  I believe it might be
20 Bertrand now.
21    Q.   You spoke to her two or three times?
22    A.   I believe so, yes.
23    Q.   So at that point Denise and Leah's mother
24 are both at least aware that you're looking for her,
25 right?

195

1    A.   Correct.
2    Q.   Did that not counter your thinking that
3 that would get her in trouble?  In other words, that
4 -- that didn't occur to you as reasons for knocking
5 on the door versus not knocking on the door?
6    A.   Well, that was the whole thing is, I mean,
7 I saw the glare in her window that looked like a TV.
8 I thought she was up there.  I mean, who else would
9 have had the glare and the TV.  Thought she was
10 there.  Threw the rocks.  She didn't answer.  Okay,
11 she's home.  And it's time to go home.
12    Q.   So at that point, you were relieved that
13 you believed she was at home?
14    A.   Correct.
15    Q.   When you took the polygraph on July 5th,
16 2000, who -- who was present when you took the
17 polygraph?
18    A.   The only ones I can recall at this time
19 are Dave Hall and I believe it was Mark Granger.
20    Q.   And who talked to you after you took the
21 polygraph?  Like from that group, about -- In other
22 words, the conversation is about the polygraph.  Who
23 talked to you about the polygraph after you took it?
24    A.   I believe they both did.
25    Q.   And what did they tell you about the

196

1 results?
2    A.   I don't recall the specifics.  I don't
3 think that -- I think they said that I was being
4 untruthful and I -- I lied.
5    Q.   So in other words, immediately following
6 the polygraph, in other words, in the hour or two or
7 something following the polygraph, they told you
8 that they thought you had not passed; is that right?
9    A.   Yeah, they were telling me that I lied.
10    Q.   Okay.
11    A.   And I said, that's not possible.
12    Q.   Do you remember talking with Denise,
13 Leah's sister, after you took the polygraph?
14    A.   I don't recall a specific recollection, no.
15    Q.   Do you recall that it occurred at Leah's
16 mother's house?
17    A.   I would have to know -- I don't recall.  I
18 mean, I don't know what she said either.
19    Q.   What -- Do you recall what you told Denise
20 and -- and Ms. Courtright, Leah's mother, about the
21 results of the polygraph?
22    A.   No.
23    Q.   If you told them that you passed, is that
24 because you thought you passed?
25        MS. PURACAL:  Object; misstates testimony.

197

1        THE WITNESS:  I don't believe I would have
2 told them that.  I'm -- What I remember is I had an
3 anxiety attack.  So --
4 BY MR. DAVIS:
5    Q.   You remember throwing up at -- at --
6    A.   I just --
7    Q.   -- the house?
8    A.   -- remember having an anxiety attack.  I
9 don't remember about puking.  But an anxiety attack.
10    Q.   Okay.  So in other words, you would not
11 expect the police reports to reflect that you told
12 them you passed the polygraph --
13    A.   Yeah.
14    Q.   -- because what you're telling me now is
15 that the officers told you, you had not?
16    A.   From my recollection from what they said,
17 yeah.  I mean, that's why I think I left the police
18 station.
19    Q.   After -- I wanted to ask you just about
20 the loop.  I understand, I guess physically or
21 geographically what the loop is.  Is it -- the loop
22 includes --
23        Actually, if you don't mind just doing
24 another kind of finger trace along the -- the
25 portion at the --



210

1 dating her? Or, in other words, I'm just wondering
2 why you would even have this discussion about her if
3 you'd broken up. You're not really dating her. You
4 might be hanging out with her. I'm curious why
5 you're talking about this at all.
6     A. Because she started wanting to hang out
7 with me again. And so I felt he needed to know. I
8 mean, I was there to pick her up. Shortly after
9 that, within the week, she stopped hanging out with
10 him and we started going back out.
11     Q. Is that your only interaction with David
12 Breakfield?
13     A. Yeah, I believe so.
14     Q. And when was that interaction that you
15 just described?
16     A. In 2003. I'm not sure, but, yeah.
17     Q. And did you ever have any other
18 interaction with David Breakfield? Like not in
19 person. By, you know, email? By social media? In
20 any other way?
21     A. I don't think so.
22     Q. Do you recall testimony from a Donna
23 Dennis at your criminal trial?
24     A. I believe so.
25     Q. Do you recall whether she testified that -

211

1 - Well, strike that.
2     MR. FRANZ: Did you say Donna Dennis?
3     MR. DAVIS: I did, yes.
4 BY MR. DAVIS:
5     Q. Do you recall testimony at your criminal
6 trial that someone had witnessed you and Leah
7 Freeman arguing and that you had slammed her against
8 your car or pushed her against the car?
9     A. I --
10     Q. You recall that?
11     A. I recall something along the lines of
12 that.
13     Q. Who was it that gave that testimony?
14     A. I thought that was Donna Dennis.
15     Q. That was not on the night of June 28th,
16 correct, that she stated she had seen that?
17     A. No. That was during the school year.
18     Q. Okay. And was -- was she accurate in what
19 she told the court?
20     A. No, she was not.
21     Q. Do you recall the incident she was
22 referring to?
23     A. I don't recall the incident because I've
24 never slammed Leah up against my car. I've picked
25 her up, put her on the hood of my car. Picked her

212

1 up, put her on the top of my car. I don't recall
2 any instance like that.
3     Q. And, perhaps, she may have misperceived
4 it, like -- But is there anything that you could --
5 that she could have reasonably misunderstood to be
6 you pushing her, slamming her against your car?
7     A. She --
8     MS. PURACAL: Objection; calls for
9 speculation. Go ahead.
10     THE WITNESS: She, I mean, that's -- I
11 mean, she was a -- she was a, from what I remember,
12 she was pretty far away. She probably misperceived
13 it.
14     Me picking her up, putting her on my car,
15 who knows what she saw? Like, you know, she could
16 have easily been incorrect of what she thought she
17 saw to what actually truly happened.
18 BY MR. DAVIS:
19     Q. Do you recall the -- Again, if I've asked
20 this, forgive me.
21     You recall the specific instance she was
22 referring to?
23     A. No, I don't recall no specific instance
24 'cause I've never slammed her up against my car. So
25 --

213

1     Q. Okay.
2     A. -- I just know she's mistaken.
3     Q. But do you recall the specific instance in
4 which she observed something, but was mistaken about
5 what she observed is -- is what I'm asking you.
6     In other words, do you know the event that
7 she's referring to, even if she misunderstood?
8     A. Like the specific day?
9     Q. Correct.
10     A. No, I don't know the specific day.
11     Q. I'm not -- I'm really not really asking
12 about the specific day. In other words, the point
13 is not to -- for you to tell me the day. I'm asking
14 you about the specific incident that she may have
15 misunderstood.
16     A. No.
17     Q. Did you ever say anything to Kristen
18 Steinhoff -- did you ever try to persuade her not to
19 talk to the police?
20     A. I don't believe so.
21     Q. And you never threatened her?
22     A. No. Ricky Crook, I think did.
23     Q. And what was Ricky Crook's interest in
24 having Kristen not talk to the police?
25     A. I think to do with drug use, 'cause they



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800) 528-3335
NAEGELIUSA.COM

214

1  were getting their drugs from, I think the same
2  person.
3      Q.   And when did Ricky Crook threaten Kristen
4  Steinhoff?
5      MS. PURACAL:  Object as to speculation.
6      THE WITNESS:  I don't know when the time
7  frame would have been.  I just remember that he had
8  done it.
9  BY MR. DAVIS:
10     Q.   What were the events surrounding when he
11 did it?  In other words, again not the date is -- is
12 so much important as was -- was Ricky Crook trying
13 to prevent her from talking to the police at grand
14 jury or after grand jury or with -- within relation
15 to any particular law enforcement event?
16     MS. PURACAL:  Object as to speculation.
17     THE WITNESS:  Yeah, I couldn't know.  I
18 don't even think it was around any event.  It was
19 just they were getting high and told her, don't get
20 us caught doing drug -- dealing with meth.
21 BY MR. DAVIS:
22     Q.   And would that have been closer to 2000 or
23 closer to 2010?  In other words, was it in the
24 initial phase of the investigation or was it later?
25     A.   It probably would have been 2000, 2001.  I

215

1  don't know the exact time.
2      Q.   All right.  So, so statements that Kristen
3  made that you had threatened or told her that you
4  had told her not to talk to cops, those were among -
5  - those would be lies, right, 'cause you never
6  actually said that?
7      A.   No.  I mean, I always told -- I mean, I've
8  told people, tell the cops what you want.  Tell them
9  -- Tell them what you know.  I never told somebody
10 to not go talk to the cops about like me.  Like most
11 I've ever said to anybody is that you don't have to
12 talk to the cops.  That's more recent now because I
13 don't trust the cops after all this.  They've turned
14 everything upside around on me.
15     MR. FRANZ:  How are you doing finger-wise?
16 Need a five-minute break or so?
17     THE REPORTER:  I'm fine.  If you all need
18 a break --
19     THE WITNESS:  Can I use the bathroom?
20     MS. PURACAL:  Yeah --
21     MR. DAVIS:  Yeah, let's --
22     MS. PURACAL:  -- why don't we take a
23 break?
24     MR. DAVIS:  -- take a break.
25     MS. PURACAL:  Yeah.

216

1      THE WITNESS:  I've been drinking too much
2  water.
3      VIDEOGRAPHER:  The is 4:13; we're off the
4  record.
5      (WHEREUPON a recess was taken.)
6      VIDEOGRAPHER:  It's 4:30; we're on the
7  record.
8      MR. DAVIS:  Where are we at number-wise?
9      THE REPORTER:  Exhibit 406.
10     (WHEREUPON, Exhibit 406 was marked for
11 identification.)
12 BY MR. DAVIS:
13     Q.   Mr. McGuffin, take a look, if you would,
14 at Exhibit 406.
15     A.   Okay.
16     Q.   Have you seen this document before?
17     A.   I -- I don't believe so.
18     Q.   I'm going to ask you to look at the second
19 page.  Under, I guess it's Section 1.3
20 Family/Marital, there's a statement there, Mr.
21 McGuffin stated he has been together with the mother
22 of his four-year-old child for nine years.  Do you
23 see that?
24     A.   I do.
25     Q.   And looks like this was -- the date of

217

1  this entry, this looks like a -- kind of a case plan
2  report from the Department of Corrections.
3      A.   Correct.
4      Q.   Is that what it looks like to you?
5      A.   Correct, it does.
6      Q.   And do you remember whether you interacted
7  with somebody at corrections with the last name of
8  Kuhlman, K-u-h-l-m-a-n?
9      A.   I don't remember that name, no.
10     Q.   And it looks like whoever the person by
11 the name of Kuhlman is, entered something around
12 August 23rd, 2011, stated that Mr. McGuffin stated
13 he has been together with the mother of his four-
14 year-old child for nine years.  Does it look like
15 that to you?
16     A.   That's what it says, yes.
17     Q.   Do you recall telling someone that -- in -
18 - in -- at the Department of Corrections that you'd
19 been together with the mother of your child for nine
20 years, around the time you entered corrections?
21     A.   I don't recall that.  But, I mean, I do
22 recall what I told everybody that we dated for nine
23 years.
24     Q.   Okay.  Were -- But you weren't together
25 with her at that time, right?

230

1    Q.   Okay.  Do -- Do you recall her testimony?
2    Do you recall her testifying something to --
3    A.   I recall her testifying, yeah.
4    Q.   Okay.  Do you recall --
5    A.   But not what -- Sorry.  Go ahead.
6    Q.   Do you recall her testifying to something
7    to the effect of it's amazing what you can get away
8    with in Coos County now, isn't it?  Do you recall
9    that?
10    A.   I recall she said that, yes.
11    Q.   And is it true that you had said that?
12    A.   I recall her saying that.
13    Q.   And was that true what she had testified
14    to or was it untrue?
15    A.   It was untrue.
16    Q.   You had not said that?
17    A.   I did not say that.
18    Q.   Had you said anything similar to that or
19    something that could be misunderstood as that?
20    A.   No, I did not.
21    Q.   In other words, her statements, her
22    testimony to that effect was entirely made up?
23    A.   She said that to me as I was walking out
24    the building.
25    Q.   She said to you, it's amazing what you can

231

1    get away with?
2    A.   Yes.  'Cause we -- I was there for a
3    criminal proceeding, I think the trespass charge.  I
4    was there with, I believe my attorneys, my mom, and
5    I believe Maegan Edgerton.
6        She was -- We were coming down, I think
7    the second story, and she was coming up the first --
8    from the first floor.  And we were going down.  And
9    as we were walking down the stairs, she looked at
10    me.  And she like smirked and said, oh, well, how
11    court -- how'd court go?
12        And I said -- I said, actually, it went
13    real well.  I said, thank you.
14        And then we started to walk outside the
15    building.  She turned around, started following us,
16    was saying things.  And as we got farther way, she
17    said, it's amazing what you can get away with in
18    Coos County.
19    Q.   So -- sorry.  Bear with me.  All right.
20    Let me change my password.
21        So she -- So she had said what she had
22    testified that you had said; is that right?
23    A.   Correct.
24    Q.   What about Tina Mims or Tina Layman, do
25    you recall her testifying at trial, at your criminal

232

1    trial?
2    A.   I don't recall what she said.  I'd have to
3    see her trial testimony.
4    Q.   Do you recall her testifying that -- that
5    she heard you threaten Kristen Steinhoff and tell
6    her not to talk to the police?
7    A.   That's simply not true.
8    Q.   Do you recall her testifying as to that,
9    though?
10    A.   I mean, I remember something along those
11    lines as those words, but I don't specifically
12    remember her testifying to it.
13    Q.   Okay.
14    A.   I would have to see it.
15    Q.   But it, in any event, that testimony was
16    untrue if she did make such testimony?
17    A.   Correct.
18    Q.   And David Breakfield, do you recall him
19    testifying at your criminal trial?
20    A.   I do.
21    Q.   And he testified, do you -- do you recall
22    this, something to the effect of, I strangled that
23    bitch and I'll strangle you, too?  He testified that
24    you had said that; do you recall that?
25    A.   I recall that he said that.

233

1    Q.   And was that true or untrue?
2    A.   That's untrue.
3    Q.   And was that entirely made up?
4    A.   Yes, it was.
5    Q.   You didn't say anything of that kind?
6    A.   I never said that.
7    Q.   Anything that could have been
8    misunderstood as that?
9    A.   No.
10    Q.   Did you hear him testify that you had
11    said, I've killed before and I'll kill again, or
12    something along those lines?
13    A.   I remember him saying that.
14    Q.   Was that true?
15    A.   No, it was not.
16    Q.   And that was a lie?
17    A.   Correct.
18    Q.   It was entirely made up?
19    A.   Yes, it was.
20    Q.   They're not --
21        Those were not embellishments or
22    dramatizations of things you did say?
23    A.   No.
24    Q.   They're just things -- It was unrelated or
25    unlike anything you'd ever said?



234

1    A.  I never said any of those things.
2    Q.  And to your knowledge, did you hear him
3 testify that before he had gone either to grand jury
4 or to -- or to testify at the grand jury or at
5 criminal trial, that Maegan Edgerton had texted him
6 to tell him he was wrong.  Do you recall him
7 testifying to that effect?
8    A.  I believe something along those lines,
9 yes.
10    Q.  And do you know whether she had done that?
11    A.  I don't know if she did or not.
12    Q.  Did you ever talk to her about that?
13    A.  Not the specific text message, I don't
14 think.  I mean, I may have.  I can't recall.
15    Q.  And are there other witnesses that you're
16 able to identify -- I know I don't -- I haven't
17 handed you a copy of the trial transcript.  But are
18 the --
19        Are there other witnesses that you're able
20 to say, as you sit here today, lied in their
21 testimony?
22    A.  Off the top of my head, no.  I know that
23 other witnesses did lie.  I would have to go -- I
24 would have to basically go through it all over
25 again.  I just can't recall at this time.  I mean,

235

1 it's a lot of -- a lot of witnesses.
2    Q.  Did you ever ask Maegan Edgerton to
3 contact any witnesses who were to testify before the
4 grand jury or criminal trial?  Did you ever ask her
5 to contact them before they gave their testimony?
6    A.  I don't believe so.
7    Q.  And do you know if she ever did?
8    A.  I wouldn't know what she did.
9    Q.  Did you ever contact any witnesses before
10 they gave testimony in terms of -- about what their
11 testimony would be or should be?
12    A.  No.
13    Q.  Did you ever express any preference to
14 anybody before they testified as to what you would
15 prefer their testimony be?
16    A.  No.
17    Q.  And any statements a witness gave to the
18 contrary would also be incorrect?
19    A.  Correct.
20    Q.  And would they even be lies?
21    A.  I mean, if they're saying something I
22 didn't do, it would be a lie.
23    Q.  All right.  All right.  Did you --
24        Do you have any physical injuries while
25 you were incarcerated?

236

1    A.  I -- I sprained my ankle, and I believe I
2 tore my Achilles tendon when I did that.
3        I was jumped by Josh and punched
4 repeatedly in the back of the head.
5        My mind's going blank.
6        MR. FRANZ:  Good time to break while we're
7 paused so he -- he's been going a long time.
8        MR. DAVIS:  I'm happy to do that.  I don't
9 think I have -- I don't think I have too long.  It's
10 probably half an hour or less, and then I know that
11 Amanda had some questions, too.  So I'm -- I'm --
12        MR. FRANZ:  He's gone -- He's gone long
13 enough.
14        MS. PURACAL:  I -- We can keep going.  I
15 mean, how much do you have?
16        MR. FRANZ:  The videographer cannot --
17        VIDEOGRAPHER:  I've got an appointment in
18 Oregon City at 7:00.  I need to get a couple things
19 done before that.  I mean 5:30 would be pushing it.
20 5:15?
21        MS. PURACAL:  5:30.
22        VIDEOGRAPHER:  5:15, maybe.
23        MS. PURACAL:  What time do we have right
24 now?
25        VIDEOGRAPHER:  5:00.

237

1        MR. LAUERSDORF:  4:57.
2        MS. PURACAL:  I mean, how much do you
3 have?
4        MS. ROCKETT:  I don't have that much.
5        MS. PURACAL:  Okay.  What I'm trying to
6 figure out, Jesse, is if we can finish by 5:15, or
7 if that's not a possibility.
8        MR. DAVIS:  I don't know.  Let me, I guess
9 I can sure try and see where we're at and then --
10        MS. PURACAL:  At 5:15 and we'll reassess
11 then?
12        MR. DAVIS:  Yeah.
13        VIDEOGRAPHER:  Yeah, that's good.
14        MR. DAVIS:  Is that okay with --
15        MR. LAUERSDORF:  That's fair.
16        THE WITNESS:  That's fine.
17 BY MR. DAVIS:
18    Q.  Okay.  So you're talking about your
19 injuries.  You think -- you described that you had
20 sprained an ankle.  You got jumped by Josh, whoever
21 Josh was.
22    A.  Yeah, I can't remember his last name right
23 now.
24    Q.  You tore your Achilles.
25    A.  When I sprained my ankle, like that's when



NAEGELI
DEPOSITION & TRIAL     (800) 528-3335
NAEGELIUSA.COM

Nicholas McGuffin    January 12, 2023    NDT Assgn # 62230    Page 65

254

1    Q.   Okay.  And it looks like hers also -- her
2    reported visits also seem to stop in 2016.
3    A.   Yeah.
4    Q.   That's just another error?
5    A.   It is.  It is, yeah.
6    Q.   Okay.
7    A.   Hmm.
8    Q.   So --
9         MR. FRANZ:  So are we -- guys --
10        MR. DAVIS:  Yeah, it's 5:15.
11        MR. FRANZ:  I have to worry about my --
12        MR. DAVIS:  Yeah, it is.  You got to go.
13        MR. FRANZ:  And I'm going to have maybe
14   five to ten minutes rebuttal, I mean.  So --
15        MR. DAVIS:  Okay.
16        MR. FRANZ:  -- I just don't think we're
17   going to get around it.
18        MR. DAVIS:  All right.
19        MR. LAUERSDORF:  Yeah, that's okay.
20        MR. DAVIS:  I'm fine stopping.  I don't --
21   I'm -- I regret not being able to finish, 'cause
22   we're not that far.  But it sounds like we're -- we
23   got to --
24        MR. FRANZ:  We had a good day.
25        MR. DAVIS:  -- return.

255

1         MR. LAUERSDORF:  Yeah, we got another day
2    planned.
3         MR. DAVIS:  Yeah.
4         MR. LAUERSDORF:  So we're good.
5         MR. FRANZ:  We'll be out early on Friday,
6    on a Friday the 13th.
7         THE REPORTER:  We're going to go off the
8    record.
9         VIDEOGRAPHER:  I'll do the read-off,
10   though, first.
11        THE REPORTER:  We'll do the orders
12   tomorrow.
13        VIDEOGRAPHER:  Okay.  All I need to say
14   then is this is the end of today's portion of the
15   deposition of Nicholas McGuffin.  The time is 5:19;
16   we're off the record.
17        (WHEREUPON, the deposition of NICHOLAS
18   McGUFFIN was adjourned at 5:19 p.m.)
19
20
21
22
23
24
25

256

1              CERTIFICATE OF VIDEOGRAPHER
2
3         I the undersigned, Ron Pestes, am a videographer
4    on behalf of NAEGELI Deposition & Trial.  I do hereby
5    certify that I have accurately made the video recording of
6    the deposition of Nicholas McGuffin, in the above captioned
7    matter on the 12th day of January, 2023, taken at the
8    location of 1111 E Burnside, Suite 300, Portland, OR 97214.
9
10        No alterations, additions or deletions were made
11   thereto.
12
13        I further certify that I am not related to any of
14   these parties in the matter and I have no financial
15   interest in the outcome of this matter.
16
17
18
19   Ron Pestes
20   Videographer
21
22
23
24
25

257

1                   CERTIFICATE
2
3         I, Ryan Batterson, do hereby certify that I reported
4    all proceedings adduced in the foregoing matter and that
5    the foregoing transcript pages constitutes a full, true
6    and accurate record of said proceedings to the best of my
7    ability.
8
9         I further certify that I am neither related
10   to counsel or any party to the proceedings nor have any
11   interest in the outcome of the proceedings.
12
13        IN WITNESS HEREOF, I have hereunto set my hand this
14   26th day of January, 2023.
15
16
17
18
19
20   /S/  Ryan Batterson
21
22
23
24
25

NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM