Shaun S. McCrea

---

**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF OREGON


NICHOLAS JAMES MCGUFFIN, as   )  No. 6:20-cv-1163-MK
an individual and as guardian )  (Lead Case)
ad litem, on behalf of S.M.,  )  No. 3:21-cv-1719-MK
a minor,                      )  (Trailing Case)
            Plaintiffs,       )
      v.                      )
MARK DANNELS, PAT DOWNING,    )  Deposition of:
SUSAN HORMANN, MARY KRINGS,   )  Shaun McCrea
KRIS KARCHER, SHELLY MCINNES, )
RAYMOND MCNEELY, KIP OSWALD,  )  December 4, 2023
MICHAEL REAVES, JOHN RIDDLE,  )  December 5, 2023
SEAN SANBORN, ERIC            )
SCHWENNINGER, RICHARD WALTER, )
CHRIS WEBLEY, ANTHONY WETMORE,)
KATHY WILCOX, CRAIG ZANNI,    )
DAVID ZAVALA, ESTATE OF DAVID )
E. HALL, VIDOCQ SOCIETY, CITY )
OF COQUILLE, CITY OF COOS     )
BAY, and COOS COUNTY,         )
            Defendants.       )
_____
```

**Page 2**

```
 1  VIDOCQ SOCIETY,              )
 2          Cross-Claimant.      )
 3  RICHARD WALTER,              )
 4          Cross-Claimant.      )
 5  _____
 6  NICHOLAS JAMES MCGUFFIN, as an )
 7  individual and as guardian ad )
 8  litem, on behalf of S.M., a   )
 9  minor,                        )
10             Plaintiff,         )
11        v.                      )
12  OREGON STATE POLICE,          )
13             Defendant.         )
14
15         DEPOSITION OF SHAUN MCCREA
16       December 4, 2023; 9:51 A.M.
17       December 5, 2023; 9:34 A.M.
18
19       THE VIDEO-RECORDED DEPOSITION OF SHAUN
20  MCCREA was taken at the Oregon Department of
21  Justice, 975 Oak Street, Suite 200, Eugene, Oregon,
22  before Sara Fahey Wilson, CSR/CCR, Certified
23  Shorthand Reporter in and for the State of Oregon
24  and Washington.
25
```

**Page 3**

```
 1                    APPEARANCES
 2
 3  For the Plaintiffs:
 4       Ms. Janis Puracal
 5       Mr. Andrew C. Lauersdorf
 6       MALONEY LAUERSDORF & REINER
 7       1111 East Burnside Street, Suite 300
 8       Portland, Oregon 97214-1850
 9       503-245-1518
10       jcp@mlrlegalteam.com
11       acl@mlrlegalteam.com
12
13  For State Defendants Krings, Riddle, Wilcox, and
14  Oregon State Police:
15       Mr. Jesse B. Davis
16       OREGON DEPARTMENT OF JUSTICE
17       Civil Litigation Section Trial Division
18       100 SW Market Street
19       Portland, Oregon 97201-5702
20       971-673-1880
21       jesse.b.davis@doj.state.or.us
22
23
24
25                            (Continued)
```

**Page 4**

```
 1                 APPEARANCES (Continued)
 2
 3  For Defendants Dannels, Downing, Karcher, McInnes,
 4  McNeely, Oswald, Reaves, Sanborn, Schwenninger,
 5  Shapiro, Webley, Wetmore, Zanni, Zavala, City of
 6  Coquille, City of Coos Bay, and Coos County:
 7       Mr. Robert Franz, Jr.
 8       ROBERT FRANZ, JR. LAW OFFICES
 9       730 B Street
10       Springfield, Oregon 97477-4720
11       541-741-8220
12       rfranz@franzlaw.comcastbiz.net
13
14  For Defendant Vidocq Society:
15       Ms. Rachel C. Jones
16       HWS LAW GROUP - PDX
17       101 SW Main Street, Suite 1605
18       Portland, Oregon 97204
19       503-542-1200
20       rjones@hwslawgroup.com
21       (Appearing remotely)
22
23
24
25                            (Continued)
```

Shaun S. McCrea

```
5
1              APPEARANCES (Continued)
2
3    For Defendant Vidocq Society:
4        Ms. Meredith Sawyer
5        HWS LAW GROUP - SEATTLE
6        1500 Fourth Avenue, Suite 200
7        Seattle, Washington 98101
8        206-262-1200
9        msawyer@hwslawgroup.com
10       (Appearing remotely)
11
12   For Defendant Richard Walter:
13       Ms. Laura Coffin
14       541 Willamette Street, Suite 211
15       Eugene, Oregon 97401
16       541-325-8080
17       lauracoffin@coffin.law
18
19   Also Present by Zoom:
20       Mr. Nick McGuffin
21       Ms. Chelsea Bradley
22       Ms. Megan McCarr
23
24                              (Continued)
25
```

```
6
1              APPEARANCES (Continued)
2
3    Video-Recorded by:
4        Mr. Rob Neidig
5
6    Reported by:
7        Sara Fahey Wilson, CSR, CCR
8        Certified Shorthand Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
7
1                      INDEX
2
3    WITNESS.....................................PAGE
4    SHAUN MCCREA
5        BY MR. DAVIS                          11
6        BY MR. FRANZ                          219
7        BY MS. JONES                          274
8        BY MS. COFFIN                         279
9        BY MR. FRANZ                          280
10       BY MS. PURACAL                        281
11       BY MR. DAVIS                          283
12
13   EXHIBITS....................................PAGE
14   Exhibit 1      August 27th, 2000, Oregon     41
15                  State Police Forensic
16                  Laboratory Report
17   Exhibit 2      Bench Notes                   70
18   Exhibit 3      July 17, 2000, Supplemental  135
19                  Report
20   Exhibit 4      January 21, 2002, Oregon      44
21                  State Police Forensic
22                  Laboratory Report
23   Exhibit 5      September 6, 2000, Letter -  111
24                  Department of State Police
25                  Forensic Laboratory
```

```
8
1                 INDEX (Continued)
2
3    EXHIBITS....................................PAGE
4    Exhibit 6      September 25, 2000, Memo     121
5                   from Wilcox to Reaves
6    Exhibit 7      September 3, 2009, Letter    125
7                   from R. Paul Frasier to
8                   Ms. Lucinda Peel
9    Exhibit 8      (Not referred to)
10   Exhibit 9      Photograph                   143
11   Exhibit 10     June 23, 2011, Export Report 137
12                  Kenn Meneely
13   Exhibit 11     (Not referred to)
14   Exhibit 12     Transcript of Proceedings    172
15                  Excerpt
16   Exhibit 13     July 8, 2000, Letter,        171
17                  Department of State Police
18   Exhibit 14     Photographs                  200
19   Exhibit 15     (Not referred to)
20               (Exhibits 16-19 not marked)
21   Exhibit 20     Box of Documents             259
22   Exhibit 21     Box of Documents             260
23   Exhibit 22     Box of Documents             261
24   Exhibit 23     Box of Documents             261
25   Exhibit 24     Box of Documents             262
```

Exhibit 16, Page 2 of 149

Shaun S. McCrea

```
                                                    9
1                  INDEX (Continued)
2
3     EXHIBITS........................................PAGE
4     Exhibit 25    Box of Documents         263
5     Exhibit 26    Box of Documents         264
6     Exhibit 27    Box of Documents         266
7     Exhibit 28    Box of Documents         267
8     Exhibit 29    Box of Documents         268
9     Exhibit 30    Box of Documents         269
10    Exhibit 31    Box of Documents         270
11    Exhibit 32    Box of Documents         271
12    Exhibit 33    Box of Documents         272
13    Exhibit 34    Box of Documents         272
14    Exhibit 35    Box of Documents         273
15    Exhibit 36    Foam Board Exhibits      273
16    Exhibit 37    (Not referred to)
17    Exhibit 38    Brady Materials File     280
18    Exhibit 39    Document Labeled Various 222
19                  Rumors and Phone Numbers
20    Exhibit 40    July 31, 2000, Letter -  231
21                  R. Paul Frasier to Ms. Shaun
22                  McCrea
23        (Exhibits 20 - 37 not provided to reporter.)
24
25
```

```
                                                   10
1                  INDEX (Continued)
2
3     MARKED TEXT...........................PAGE/LINE
4     INSTRUCTION                          30/ 4
5     INSTRUCTION                          32/ 8
6     INSTRUCTION                          32/23
7     INSTRUCTION                          224/22
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                   11
1          THE VIDEOGRAPHER:  We are on the
2     record.  Today is December 4th, 2023.  The time on
3     the camera indicates 9:51 a.m.  This is the
4     deposition of Shaun S. McCrea in the matter --
5     excuse me -- in the matter of Nicholas James
6     McGuffin v. Mark Dannels, et al.
7          The recording is taking place at
8     Oregon Department of Justice in Eugene.
9          Our court reporter is Sara Wilson.
10          I'm the videographer, Rob Neidig.
11          At this time I'd ask counsel to
12     identify themselves and state whom they represent,
13     and then the reporter will swear in the witness.
14          MR. DAVIS:  Jesse Davis representing
15     the State defendants.
16          MS. PURACAL:  Janis Puracal
17     representing the plaintiffs.
18          MR. FRANZ:  Robert Franz representing
19     the municipal defendants.
20          MS. COFFIN:  Laura Coffin representing
21     Richard Walter.
22          THE VIDEOGRAPHER:  Please swear in the
23     witness.
24          MR. FRANZ:  Can we identify the people
25     on Zoom?
```

```
                                                   12
1          MR. DAVIS:  Oh.
2          Could the people on Zoom identify
3     themselves as well?
4          MS. JONES:  Rachel Jones on behalf of
5     the Vidocq Society.
6          MS. SAWYER:  Meredith Sawyer also on
7     behalf of the Vidocq Society.
8          MS. BRADLEY:  Chelsea Bradley here
9     from the Oregon State Police.
10          MS. MCCARR:  Megan McCarr also from
11     the Oregon State Police.
12          MS. PURACAL:  And I believe my client,
13     Nicholas McGuffin, is also listening in by Zoom.
14
15          SHAUN MCCREA,
16     having been first duly sworn to testify the truth,
17     the whole truth, and nothing but the truth, was
18     examined and testified as follows:
19
20          EXAMINATION
21     BY MR. DAVIS:
22     Q.   Good morning, Ms. McCrea.
23          MR. DAVIS:  Are we ready?
24          MS. PURACAL:  Yes.
25     BY MR. DAVIS:
```

Shaun S. McCrea

41

1    I'm not -- this may not be precisely from
2    Ms. Puracal because I did review Judge Sullivan's
3    opinion.
4          So my understanding and awareness of the
5    Brady issue is that the DNA report that I was given
6    in discovery indicated that there was no other male
7    profile on Leah Freeman's left shoe that was found
8    up on the hillside, the one that had the blood on
9    it, other than Leah Freeman and Officer Kip Oswald,
10   the person who found it.  But the issue is that
11   based on the bench notes that the Oregon State Crime
12   Lab personnel did, there was an indication of
13   another male profile on that shoe of which I was not
14   aware.
15   Q.    Okay.  Okay.
16         The left shoe was found in 2000.  Right?
17   A.    Yes.
18   Q.    And a report was -- was written in 2000
19   describing the DNA analysis done on the left and the
20   right shoes.  Right?
21   A.    I assume it was in 2000.  It was what was
22   given to me in discovery, whenever it was written.
23   Q.    Okay.
24         I'm going to -- I'm going to hand you what
25   will be marked as Exhibit 1.  I have a binder here

42

1    so they are all just going to be in there, but I'll
2    have you look at Exhibit 1.
3          (Deposition Exhibit 1
4           marked for identification.)
5          MS. PURACAL:  I've got it
6    electronically if you want to use those for those
7    guys.
8          MR. DAVIS:  All right.
9    BY MR. DAVIS:
10   Q.    If I can leave that in there, that will
11   make it a little bit easier.
12         MR. DAVIS:  (To the reporter)  This
13   has just been marked by me electronically.  I don't
14   know if you need to mark it.
15   BY MR. DAVIS:
16   Q.    So I've handed you Exhibit 1.  Are you
17   familiar with that --
18   A.    Yes.
19   Q.    -- document?  And is -- that's a report
20   dated August 27th, 2000, from the Oregon State
21   Police Forensic Laboratory?
22   A.    Yes.
23   Q.    And it describes on its first page items
24   described as Exhibit 1 and Exhibit 2.  Now, for
25   clarity of the record, this is Deposition Exhibit 1

43

1    but its contents refer to Exhibits 1 and 2, and
2    those are -- we'll call those OSP Lab Exhibits 1, 2,
3    4, and several others.  Okay?
4          MR. FRANZ:  You lost me there.
5          MR. DAVIS:  Do you have a copy of it?
6          MR. FRANZ:  So you're referring to
7    other exhibits other than Exhibit 1 for her
8    questions?
9          MR. DAVIS:  No.  It's that Deposition
10   Exhibit 1 itself refers to laboratory exhibits, and
11   so --
12         MR. FRANZ:  Okay.
13         MR. DAVIS:  -- the record could be
14   confusing on that, and I just wanted to call that
15   out early on.
16         MR. FRANZ:  Okay.
17   BY MR. DAVIS:
18   Q.    So just for sake of clarity, Exhibit --
19   Lab Exhibit 1 as referenced in Deposition Exhibit 1
20   is the right Nike tennis shoe.  Correct?
21   A.    Yes.
22   Q.    And Exhibit -- Lab Exhibit 2 as referenced
23   in this document is the left Nike shoe?
24   A.    Yes.
25   Q.    The left Nike shoe, as you said, was found

44

1    up on Hudson Ridge.  Right?
2    A.    Yes.
3    Q.    The hillside, as you said?
4    A.    Yes.
5    Q.    And the right shoe was found -- where was
6    the right shoe found?
7    A.    It was found down on -- in town.
8    Q.    Near the cemetery?
9    A.    Yeah, near the cemetery on Elm Street.  I
10   don't remember the name.
11   Q.    Okay.
12         As it relates to the left shoe, turning to
13   the second page, I see in conclusion number one,
14   (as read):  The DNA profile from Exhibit 1,
15   right Nike shoe, and Exhibit 2.1.2, swab from
16   blood on left sole matches the DNA profile
17   from Leah Freeman.
18         Right?
19   A.    Right.
20   Q.    And then as conclusion number 3
21   (as read):  The DNA profiles from Exhibit
22   2.3, left Nike shoe, indicate the presence of
23   DNA from more than one person.  The major
24   profile is consistent with coming from Leah
25   Freeman.  The minor profile is from a male.

Shaun S. McCrea

<table>
<tr><td colspan="2">

**57**

1    A.    SANE.  It's S-A-N-E.

2    Q.    What does that refer to?

3    A.    I don't know what the acronym stands for,

4  but they do the analysis on the rape kits --

5    Q.    I see.  Okay.

6    A.    -- and so it's checking that information.

7    Q.    Okay.  Okay.

8         So this is a difficult question to spit

9  out.  I'll try.  It may not be the best, but I'm

10  going to try.

11    A.    Okay.  I'm ready.

12    Q.    So the basic question is have you ever

13  used a forensic expert to contest or dispute the

14  relevance, you know, or probativeness of a

15  particular piece of forensic evidence?

16         In other words, not disputing the analysis

17  itself, just what inferences should be drawn from

18  the analytical results.

19         Does that make sense?

20         In other words, for example, you know, if

21  DNA is found on a particular item, you still have to

22  ask, So what?  What's the relevance of it being on

23  that item?  And that would -- its relevance would

24  have to do with what the item is, where it was

25  found, who owned it, other kinds of considerations

</td><td>

**59**

1         I know that I hired Karen Lawless in a DNA

2  case to have her review some DNA, and I know that

3  this was after the McGuffin case.  And it was

4  precisely for that purpose, to see if there was a

5  way to explain it away because in the more recent

6  case, the defendant's DNA was on the item, and Karen

7  and I went through a lot of things about different

8  kinds of DNA.  And she didn't testify because she

9  couldn't help me or the defendant.

10         So, yeah, there's -- it's like trying to

11  think of all these examples for you.  But, yeah, if

12  there is an item in which I am concerned -- like, if

13  in this case mixed DNA had been on it, we would have

14  had a much different situation, but we didn't have

15  mixed DNA on anything.

16         And the report that I had said that it

17  was -- it was X, and then I was told in a subsequent

18  report and affirmatively by the district attorney

19  that the only other DNA was Kip Oswald.

20    Q.    So going back to kind of the long arc of

21  my question, you know, the question was about the

22  relevant circumstances and the relationships between

23  the various people involved.

24         Those could be considerations that would

25  go into an argument about the relevance of a

</td></tr>
<tr><td colspan="2">

**58**

1  like that.

2         So my question to you, then, is have you

3  ever had occasion to do that where the argument is,

4  Yes, this person's DNA is on this item but that's

5  not important or it's -- it doesn't prove what the

6  prosecution says it proves?

7         MS. PURACAL:  Objection.  Compound.

8  BY MR. DAVIS:

9    Q.    I'm sure it is compound, but I want you to

10  do your best.

11    A.    Okay.

12         Is your question limited to DNA?  Because

13  originally you started out as any kind of an

14  expert --

15    Q.    It's not limited.

16    A.    -- to basically interpret evidence, what

17  the inferences the jury should take.

18         I mean, clearly in the old days when I did

19  some DUII cases, when you would have a blood alcohol

20  result, I hired an expert to talk to the jury about

21  extrapolation and what they could take from it and

22  how just because the blood alcohol was X didn't mean

23  that at the time the defendant was driving that the

24  blood alcohol would have been above the legal limit.

25         So there's one example.

</td><td>

**60**

1  particular piece of DNA.  Right?

2         In other words, I know that you said

3  McGuffin's DNA wasn't on items, but even had it

4  been, it would not have been particularly

5  informative because of the relationship between

6  Mr. McGuffin and Ms. Freeman?

7         Does that make sense?

8    A.    Well, you're saying if Nick's DNA had been

9  on something it wouldn't have been a big deal

10  because they were boyfriend/girlfriend?

11    Q.    Correct.

12    A.    And you would expect to find his DNA?

13    Q.    Correct.

14    A.    Okay.

15    Q.    Do you disagree with that, is my question?

16         MS. PURACAL:  Objection.  Privilege.

17  Work product.

18  BY MR. DAVIS:

19    Q.    Do you disagree with that idea generally,

20  not regarding Mr. McGuffin?

21    A.    Okay.

22         Now I'm confused about what your idea

23  generally is.  Can you explain -- can you explain it

24  to me so I have it exactly right?

25    Q.    Well, again, I'm just -- I'm just trying

</td></tr>
</table>

Shaun S. McCrea

85

```
1              MR. FRANZ:  What page are you on,
2    Jesse?
3              MR. DAVIS:  I'm on page -- handwritten
4    page 151.
5         A.   Okay.  I got it.
6    BY MR. DAVIS:
7         Q.   Do you -- these are -- I'll just represent
8    to you these are what are called Allele Call Tables.
9    Have you -- had you -- would you have known how to
10   read these in 2000?
11        A.   I don't know.
12        Q.   What about in 2011?
13        A.   I don't know.
14        Q.   Do you think you would have understood
15   them as of the year 2011 at the time of McGuffin's
16   trial?
17        A.   I probably would have needed expert
18   assistance to interpret them.
19        Q.   And do you see there's a little key at the
20   bottom of those pages where it says "key," there's a
21   greater sign equals greater than, less equals less
22   than.
23             Do you see that?
24        A.   Right.
25        Q.   And then there's a parentheses sign,
```

86

```
1    equals 50 dash 150 RFUS?
2         A.   Right.
3         Q.   RFUS?
4         A.   Uh-huh.
5         Q.   Would you have needed an expert to
6    understand that as well in 2011?
7         A.   Probably.
8         Q.   Do you now have a better understanding of
9    how to read these tables?
10        A.   As I sit here today, no.
11        Q.   And I think you've already answered that
12   you think you would have reviewed these pages in
13   your review of documents during the McGuffin case?
14        A.   If they were provided in discovery, yes.
15   And apparently they were, so, yes.
16        Q.   Okay.
17             And you think they were primarily because
18   of the Bates numbers --
19        A.   Yes.
20        Q.   -- on them?  Okay.
21             So do you now understand the August 27th,
22   2000, report that appears in Deposition Exhibit 1 to
23   involve, at least in part, a comparison of these
24   Allele Call Tables with each other?
25             MS. PURACAL:  Objection.  Vague.
```

87

```
1         A.   I mean, what I understand is that the
2    bench notes relate to what's in Exhibit 1.
3    BY MR. DAVIS:
4         Q.   What do you understand that the Bates
5    notes -- excuse me.
6             What do you understand that the bench
7    notes are generally?
8         A.   The bench notes are generally the detail
9    of the lab work that was done by the lab technician
10   at the OSP lab to make a determination regarding the
11   samples for DNA, DNA analysis, and results.
12        Q.   Were you aware at the time of the McGuffin
13   trial whether the OSP lab's DNA unit was accredited
14   in the -- in the sense of what the, sort of,
15   national accrediting bodies were or required?
16        A.   It was my belief that it was.
17        Q.   And were you aware that DNA analysis labs,
18   in order to be accredited, had to have written
19   protocols of a certain -- covering certain subjects?
20             MS. PURACAL:  Objection to the extent
21   that you're getting into work product.  I think
22   we're skirting the line here, Jesse.
23             So are you asking her about Brady
24   evidence or are you asking her about her
25   investigation into the lab?
```

88

```
1              MR. DAVIS:  I'm asking what she knows
2    or knew about lab accreditation, so -- and how it
3    related to results that she might encounter.
4              MS. PURACAL:  I'm going to object to
5    the extent that that does not get into her awareness
6    of Brady evidence.  And it sounds like what you're
7    doing is getting into her investigation and her work
8    product.
9    BY MR. DAVIS:
10        Q.   Were you aware that the OSP lab had
11   protocols governing its DNA analysis at the time of
12   the McGuffin trial?
13        A.   I don't know.
14        Q.   Were you -- were you aware that those
15   protocols governed various aspects of how -- that
16   the laboratory work itself was to be performed?
17             MS. PURACAL:  Objection.  Work
18   product.
19        A.   I'm going to have to agree, it's work
20   product.
21   BY MR. DAVIS:
22        Q.   The state of your knowledge at a certain
23   time is the work product itself?  Isn't the work
24   product the work product and not, sort of, a state
25   of information?
```

Shaun S. McCrea

97

1    Q.    Yes.
2    A.    Yes.
3    Q.    And did you understand Exhibit 4 to mean
4    that Kip Oswald was the only other person whose DNA
5    was found in that particular mixture that would be
6    2.3?
7    A.    That's what the report indicates in
8    Deposition Exhibit 4.
9    Q.    Okay.
10    Now, this was the left shoe, right, the
11    one that had the blood on it?
12    A.    Correct.
13    Q.    And we went over earlier that this had
14    been tested as to, kind of, areas that would be in
15    contact with the wearer of the shoe, right, like the
16    tongue, the ankle, the heel?
17          MS. PURACAL:  Objection.  Calls for
18    speculation and misstates facts.
19    BY MR. DAVIS:
20    Q.    Well, we did go over page 2 on Exhibit 2
21    which described the places where it was sampled.  Do
22    you remember that?
23    A.    I remember you asking me those questions
24    about Deposition Exhibit 1, page 2.
25    Q.    And referring you to Deposition Exhibit 2,

98

1    page 2, that's where we went over the handwritten
2    notes where it described where it had been -- where
3    the cuttings had been taken.
4    A.    Yep.  Uh-huh.
5    Q.    So the tongue, heel, ankle areas, those
6    would be areas where the shoe would come into
7    contact with the wearer of the shoe, and -- I'll
8    leave it at that?
9          MS. PURACAL:  Objection as to -- calls
10    for speculation and an expert opinion.
11          MR. DAVIS:  I really struggle to feel
12    like it's an expert opinion to state whether the
13    heel of a shoe touches the heel of the person
14    wearing the shoe.
15    A.    I think the problem is the question of
16    whether the DNA was on the shoe at the time the
17    person was wearing it.
18    BY MR. DAVIS:
19    Q.    I'm sorry.  I don't think I understood
20    you.
21    A.    You're assuming that the person had the
22    shoe on and, thus, it was in contact with the heel
23    and that was when the DNA was transferred.  We don't
24    know that.
25    Q.    Okay.

99

1          At the time of the McGuffin trial did you
2    know that is why those areas had been sampled?
3    In other words, they were sampled in order to
4    determine who the wearer of the shoe was likely to
5    have been?
6          MS. PURACAL:  Objection.  Misstates
7    facts and calls for speculation.
8    A.    That was not my understanding of the
9    sampling.  It was the sampling for the DNA --
10    whether there was DNA on the shoes.  What I was
11    aware of is the report in Deposition Exhibit 1, the
12    report in Deposition Exhibit 4, which showed me who
13    had -- who the crime lab found DNA from.
14          It was the Oregon State Crime Lab, which I
15    believed to be a reliable source that I could trust,
16    and I was independently told by the prosecution that
17    what was on the shoe -- in the left shoe, in Exhibit
18    4 -- was the only DNA, meaning the other -- in
19    addition to Leah, that it was Kip Oswald, no one
20    else, and so that's what I looked at.
21    BY MR. DAVIS:
22    Q.    And that was a discussion that you had
23    with Paul Frasier, the portion where you said
24    independently told by the DA?
25    A.    I believe it was with Paul Frasier because

100

1    I was -- I was just really -- I was -- well, I was
2    disappointed, let's say.  And I had that discussion.
3          And now we've got a Brady issue because we
4    know that, in fact, the lab should have come clean,
5    but instead in 2000 they do one exam, in 2002 they
6    do another, and they don't -- they don't put in the
7    report what was in the bench notes.
8    Q.    So your description of "they should have,"
9    the source of that information is what?
10    A.    Is since the time of the PCR trial when
11    Mr. Frasier had an independent DNA examiner go back
12    and look at the evidence who determined that, in
13    fact, the Oregon State Crime Lab should have -- did
14    not follow protocols and should have put this
15    information in the reports.
16    Q.    When you say they didn't follow protocols
17    and should have put this in the report, are you --
18    do you yourself understand what the protocols were?
19    Or are you simply taking that, like, from the PCR
20    judgment?
21    A.    I'm taking that from the PCR judgment.
22    Q.    Okay.  All right.
23          Did you -- were you also aware that a swab
24    containing blood found on the left shoe was also
25    tested for DNA?

Shaun S. McCrea

185

```
1      Q.    Okay.
2            Were you aware of the gas leak?
3      A.    I don't remember, honestly.
4      Q.    Do you know where the information about
5   the gas leak -- strike that.
6            Do you know where the information that
7   there was a gas leak came from?
8      A.    As I sit here today, no.
9      Q.    Okay.
10           What -- what other -- what other items are
11  Brady information in the way you've described them
12  today?
13           MS. PURACAL:  Before the witness
14  starts, can I just clarify the record?
15           You're asking her what items she is
16  aware of now today that Plaintiffs in this civil
17  suit have alleged are Brady evidence that was
18  withheld in the criminal case?  Is that right?
19           MR. DAVIS:  That's right.
20           MS. PURACAL:  Okay.
21           THE WITNESS:  Thank you.
22     A.    So there is an email from Susan Hormann,
23  H-O-R-M-A-N-N, sent March 15th, 2010, to P. Smith,
24  City of Coquille.  Subject, FBI MITO testing in Leah
25  Freeman case.  And it talks about the DA wants hairs
```

186

```
1   done because the defense would make an issue if they
2   are not examined.  And the email goes through
3   basically topics to consider before proceeding with
4   the trace evidence.
5   BY MR. DAVIS:
6      Q.    Okay.
7            And is there any information you're given
8   there about the -- sort of the Brady nature of that,
9   like, why that's Brady?
10     A.    Well, number two in that email specifies
11  (as read):  You're almost guaranteed to find
12  foreign hairs in a trace exam.  This ends up
13  giving the defense the bushy haired stranger
14  they are looking for.
15     Q.    And the --
16     A.    The --
17     Q.    Go ahead.
18     A.    The tenor of the email is suggesting -- at
19  least I'm inferring from the tenor of the email --
20  that the suggestion is not to do the hair testing
21  because it would be helpful to the defense and the
22  value of association would be minimal.
23     Q.    Okay.
24           And the bushy haired stranger, is that
25  sort of a term of, like a -- I don't know quite the
```

187

```
1   right way to describe it -- but is that a -- sort of
2   a figment or an artifact of practice?
3            Have you heard that term before?
4      A.    Yes, I've heard that term before.  It
5   means someone other than the defendant committed the
6   crime.
7      Q.    Okay.
8            So that's sort of -- and is it used in
9   that way in that email?
10     A.    Yes, it is.
11     Q.    You have heard that used elsewhere before?
12     A.    Of course.
13     Q.    Okay.
14           What other Brady items -- or items are
15  said to be Brady -- in the materials you have?
16     A.    The second item would be the Oregon State
17  Police report.  I have an interview with Nick
18  Backman, B-A-C-K-M-A-N.  This would have been on
19  September 20th, 2000, by -- I think it's Officer
20  Zanni, Z-A-N-N-I.
21           And Nick Backman indicated that he had
22  seen Leah Freeman at the credit union on the night
23  of June 28th, the night that she disappeared, and
24  Mr. Backman was using an ATM at the credit union.
25           Zanni checked with the credit union and
```

188

```
1   confirmed a $10 withdrawal on June 28th, 2000, at
2   9:04 p.m., and Mr. Backman believes that Leah walked
3   by at that time.  Described her clothes accurately.
4   He then went to Fast Mart to get something to eat
5   and stated there was hardly anyone around.
6            The time of 9:04 is significant because
7   that is a -- that is a sighting of Leah at a time
8   when she -- I think it's -- another witness had
9   tried to put her arguing with Nick at a different
10  location -- so this is a pretty important report.
11     Q.    Do you remember who that other witness
12  was?
13     A.    That would be John Lindegren.
14     Q.    And incidentally, you described that as
15  an OSP report.  It says -- does it say Oregon State
16  Police, like, tip sheet or something?
17     A.    It says -- it says Oregon State Police,
18  and it is a -- I guess that would make him a
19  trooper, or something.  Oregon State Police at the
20  top.
21     Q.    Okay.  Thank you.
22           All right.  And then what other items are
23  in there in your binder as -- to be Brady?
24     A.    So next we have a -- it's handwritten
25  notes of -- I don't know how to pronounce this --
```

Shaun S. McCrea

197

1    There's also -- and I may be missing
2    something because I haven't had this very long.
3    There's also a typewritten report that sets out
4    recording information on the scene, and that's a
5    report -- that's a report that was not provided.
6        Q.    Meaning you did not have that at the time
7    of trial?
8        A.    Correct.  With great detail.  There's a
9    diagram, which I did not have.  There is also
10   handwritten notes.
11       Q.    On the subject of a camera at the body
12   site?
13       A.    Yes.  Yeah, videotape.
14             And a police -- Coquille Police Department
15   property request with the videotape of the crime
16   scene being apparently released to Kris Karcher.
17       Q.    Okay.
18             Anything else sort of on this -- on this
19   subject of the body site and recovery?
20       A.    I think that's it.  Forgive me if I missed
21   something.  Give me just a minute to look at the --
22   and handwritten notes with reference to the camera
23   at the crime scene.
24             (Pause.)
25       Q.    So can I ask about this -- this scene?

198

1    Have you reviewed those documents to determine how
2    they would have affected your defense if you had
3    them?
4        A.    I've reviewed them -- I've just reviewed
5    them very cursorily.
6        Q.    Do you have an impression as to how they
7    would have aided the defense of Mr. McGuffin?
8        A.    My recollection is that one of the
9    prosecution witnesses contended that there was a
10   path to where the body was and that Mr. McGuffin
11   went there and looked down as though he were looking
12   at the body.  So this information indicates that
13   there was really not a path and that the foliage had
14   not been tamped down, or changed, or moved, and so
15   that was not credible -- a credible representation.
16   That's one part of it.
17       Q.    Is there anything else to it?
18       A.    There's -- I may not be finding it in
19   here.  There's also information that there was a
20   claim by Scott Hamilton -- I know that's in here
21   farther on -- there's a claim by Scott Hamilton at
22   trial that Nick McGuffin went down by the river and
23   down to the area where Leah was found.  The
24   implication being that Nick knew where the body was.
25   But, in fact, Hamilton -- the report indicates --

199

1    this is a report of -- I don't have the right one --
2    that (as read):  Hamilton pointed out the spot
3    Mr. McGuffin indicated to him as to where
4    victim's body had been found.  This was not, in
5    fact, the actual location.
6             And at the time that Hamilton claims Nick
7    McGuffin went to that area was after Leah had been
8    found.  And there are handwritten notes that
9    reference that a white cross had been placed in that
10   area.  And it shows from the handwritten notes that
11   the place that Hamilton said Nick McGuffin went was
12   not where the body was found.  It was a ways away
13   from that.
14       Q.    Okay.  All right.  All right.
15             Let's go to your next sort of major
16   subject.
17       A.    There is an email from R. McNelly that
18   talks about information that the State had that --
19   I'm presuming John Riddle is a police officer --
20   found an old document from June 29th, 2000, at 2:12
21   a.m., from Bruce McGuffin's gas card being used at
22   the pumps off by 42 by 42 South and records on the
23   phone booth that was located across from the high
24   school.
25       Q.    Okay.

200

1             I take it you were unaware of whatever it
2    is you're looking at --
3        A.    I did not have --
4        Q.    -- at the time of McGuffin's trial?
5        A.    I knew that there were -- I knew that --
6    the fact of the gas card being used was important,
7    but I didn't know that the prosecution had those
8    documents.  Because I could have then used that to
9    admit that into evidence through them.
10       Q.    You could have gotten the records
11   regarding the -- when the gas card was used?  You
12   could have used that -- you could have introduced
13   those records through the cops?
14       A.    Yes.
15       Q.    Okay.
16             Any other major subjects?
17       A.    I think there's -- I think, Mr. Davis,
18   there's more, but I may not be as conversant as I
19   would like to be.
20       Q.    Okay.  That's fine.
21             We can move on from that.  And since we'll
22   get a copy of that, we'll be able to take a look.
23             Returning briefly to something we were
24   discussing earlier, Ms. Wilcox, as you said, noted,
25   you know, with some emphasis that there was -- with

ccreporting.com

Shaun S. McCrea

281

1    Q.    Okay.
2          And do you have any -- sorry.  Let me
3    rephrase that.
4          Today as you're sitting here are you aware
5    that Richard Walter came to Oregon in connection
6    with ABC's 20/20 episode?
7    A.    No.
8          MS. JONES:  Okay.
9          I believe that is all my questions.
10   Thank you so much.
11         MS. PURACAL:  Anyone else on the Zoom?
12         MS. COFFIN:  I just have one, maybe
13   two questions.  Laura Coffin with Richard Walter.
14
15                 EXAMINATION
16   BY MS. COFFIN:
17   Q.    Ms. McCrea, you said that you -- excuse
18   me -- became aware of Mr. Walter when you -- when
19   you received some Brady material.  Roughly when was
20   that?
21   A.    That would have been a few days ago.
22   Q.    And could you just basically describe what
23   that material was?
24   A.    It appears to be a memorandum or report
25   from the Vidocq organization that sets out a theory

282

1    implicating Mr. McGuffin in the disappearance and
2    killing of Leah McGuffin, and it mentioned
3    "Richard," which I took to be Richard Walter.
4    Q.    And this was a memorandum.  Do you
5    recall -- do you recall whom it was written to?
6    A.    I can -- if you give me just a minute,
7    Ms. Coffin, I can take a look.  I don't know who it
8    was written to.  It says "synopsis of Vidocq Society
9    cases," and it is labeled 207, period, the murder of
10   Leah Freeman, 2000, and then apparently goes through
11   the whole scenario to the point of the outcome.
12   Q.    And that was Deposition Exhibit 38?
13   A.    Correct.
14   Q.    Thank you.
15         MS. COFFIN:  That is all I have.
16         MS. PURACAL:  This is Janis Puracal
17   for Plaintiffs.  I just want to put on the record
18   that I don't think we've marked Deposition 38 --
19   Deposition Exhibit 38 -- but Ms. McCrea discussed it
20   on the record yesterday.  It was the binder of
21   documents that she discussed with counsel for the
22   State defendants, and then she's obviously pointed
23   to it today so we're just going to mark it as
24   Exhibit 38.
25   / / /

283

1          (Deposition Exhibit 38
2          marked for identification.)
3          MS. PURACAL:  Any other questions?
4          MR. DAVIS:  I just think that's
5    something that she needs to say.
6
7                 EXAMINATION
8    BY MR. FRANZ:
9    Q.    So can you tell us what Exhibit 38 is?
10   A.    38 is -- I thought I did this yesterday?
11   But 38 is a binder that contains the order on
12   Plaintiffs' motion to modify subpoena.  It also
13   contains a number of reports, evidence reports, and
14   deposition excerpts that -- the reports either were
15   not in my file or the information was not
16   information that I had.
17         And at the back of the -- at the back of
18   the binder is a copy of Judge Sullivan's general
19   judgment in Mr. McGuffin's post-conviction relief
20   case.
21   Q.    Did you put the notebook together?
22   A.    No.
23   Q.    It was handed to you just like it is?
24   A.    It was -- yes.
25   Q.    And who handed it to you?

284

1    A.    Ms. Puracal.
2          MR. FRANZ:  Thank you.
3
4                 EXAMINATION
5    BY MS. PURACAL:
6    Q.    And I'll just clarify.  There's little
7    Post-It notes on it now.  When I handed you the
8    binder did it have those Post-It notes on it?
9    A.    No.  I went through it and I put -- after
10   my conversation with Mr. Davis yesterday I thought
11   it would be helpful and we could be more efficient
12   and quicker if I put Post-Its on the various pages
13   to get into the various issues so that if I needed
14   to go through it I could do that.
15   Q.    And whose handwriting is on those
16   Post-Its?
17   A.    Mine.
18   Q.    And is the content on those Post-Its -- is
19   that your content that you wrote down?
20   A.    Yes.
21         MS. PURACAL:  Okay.
22         Any other questions -- oh, actually, I
23   should also clarify.
24   BY MS. PURACAL:
25   Q.    When you said a minute ago that these were

**285**

1  not documents that you had in your file.  Are you
2  talking about at the time of trial these were not
3  documents that you had in your file?
4      A.   Yes, that's what I'm saying.
5      Q.   And you also said that this was not
6  information that you had.  Are you saying at the
7  time of the criminal trial this was not information
8  that you had?
9      A.   Correct.
10         MS. PURACAL:  Okay.
11         Any other questions?
12         MR. DAVIS:  I have -- I have a few.
13
14              EXAMINATION
15  BY MR. DAVIS:
16      Q.   This is, again, Jesse Davis.  I'm going to
17  move the mic.  May I?
18         Earlier today, Ms. McCrea, you discussed
19  getting gas at what I think you called Gas Mart.  I
20  just wanted to clarify for the record.  I wasn't
21  familiar with a place called Gas Mart, although
22  there's many marts that show up in the case.
23         When you referred to this Gas Mart, are
24  you talking about an unattended cardlock fueling
25  station where someone can put in a card and get gas

**286**

1  at any hour of the day without at that time the
2  necessary attendant?
3      A.   I believe that's correct.
4      Q.   You testified about releasing a lien or
5  settling sort of a disputed debt in the amount of --
6  the release amount was $58,000?
7      A.   Yes.
8      Q.   And you testified that 24,000 -- 24,000 of
9  that went to you and 24,000 went to the Bonk --
10      A.   I mis -- I misstated myself, didn't I?  24
11  and 24 is 48.  Whatever 58 divided in half is.
12      Q.   Okay.
13      A.   Sorry.  It's like --
14      Q.   So that would be 29,000 went to you and
15  29,000 went to the Bonk firm?
16      A.   Yes.
17      Q.   Thank you.
18         Returning to the bench notes which were
19  discussed yesterday in Deposition Exhibit 2, were
20  you able to understand the content of those notes as
21  you looked at them?
22         MS. PURACAL:  Objection.  Asked and
23  answered.  Work product and privilege.
24  BY MR. DAVIS:
25      Q.   Are you going to stand by those --

**287**

1      A.   Yes.
2      Q.   -- as well?
3         So you are not going to testify as to
4  whether you understood them.  Could you have
5  understood them without the assistance of an expert?
6         MS. PURACAL:  Same objection.
7         MR. DAVIS:  I wanted to just make -- I
8  guess come back to the boxes and just see, is there
9  anything else we need to put on the record about the
10  boxes to make sure that it's clear once we're no
11  longer here together -- anything about them -- are
12  you satisfied with what we've done so far?  I just
13  sort of felt like there was steps we might -- we
14  talked about earlier and left out?
15         MR. FRANZ:  Well, for purposes of the
16  record, they are going to look and see if they can
17  find box 17 -- the 17th box.
18         I don't know if I said it on the
19  record or off the record.  Once copies -- once I
20  have a complete duplicate, any of the other
21  attorneys, including the plaintiffs, can come and
22  look at them in my office if they don't want to pay
23  for a copy and they want to see what it actually
24  looks like.
25         Otherwise, I think we covered

**288**

1  everything except vendor.  Do we need -- are you
2  going to use a Eugene vendor?
3         MS. PURACAL:  I don't know the answer
4  to that.  That's something that our paralegal will
5  figure out.  So I don't know that we need to put
6  that on the record.
7         I can't think of anything else that we
8  need to put on the record.  If there's something
9  that I'm missing, though, Mr. Davis please correct
10  me.
11         MR. DAVIS:  I just recall we had a
12  lengthy off the record discussion about it and
13  worked out a few things.  I just want to make sure
14  that the necessary components of that make it onto
15  the record.
16         So I'm just sort of asking anybody to
17  bring out what they recall that may be helpful.
18  That's it.
19         MS. PURACAL:  I'm hoping that we got
20  everything on the record.  If we didn't, then we'll
21  work it out between counsel.
22         MR. DAVIS:  Okay.
23         And then last, I just wanted to return
24  to Exhibit 38.  I don't think we put that on the
25  record sort of real affirmatively or what is going

Exhibit 16, Page 11 of 149

Shaun S. McCrea

301

1    there anything we haven't discussed yet about things
2    you learned from review of the material in Exhibit
3    38 that you did not previously know?
4        A.    I don't think so with regard to
5    Ms. Wilcox.
6        Q.    Do you recall who John Riddle was from
7    your work on the McGuffin case?
8        A.    Could you help me here?
9        Q.    Of course I can.
10       A.    I'm not --
11       Q.    But the question is do you have any
12   independent recollection right now?
13       A.    I know the name.  I can't put him in
14   context.
15       Q.    So I'll represent to you that John Riddle
16   is a defendant in this action and was a detective
17   for the Oregon State Police who assisted in the
18   investigation as it was renewed in the 2010 time
19   period.
20       A.    Okay.
21       Q.    Does any of the material in this binder
22   that we now have as Exhibit 38 -- does any of that
23   material tell you anything you didn't know
24   previously about Detective Riddle?
25       A.    I don't know.  I'd have to go back and

302

1    look through it all.  If he wrote some of the notes
2    or some of the reports, then, yes.  If not, I don't
3    remember him being directly referenced.
4        Q.    May I take one more look at the Exhibit 38
5    before we --
6        A.    Can I say no?
7        Q.    Yeah, of course you can.
8              (Pause.)
9              Ms. McCrea, the only thing I can think of
10   now is something we may have covered yesterday which
11   is, were you aware at the time of the McGuffin trial
12   that the gas tank in Mr. McGuffin's Mustang had a
13   gas leak?
14             MS. PURACAL:  Objection.  Asked and
15   answered.
16   BY MR. DAVIS:
17       Q.    Go ahead.
18       A.    And I -- at this point I don't remember.
19       Q.    Okay.
20             So you don't remember whether you knew at
21   the time of trial?  Is that -- is that the question
22   you're answering?
23       A.    Yes.
24       Q.    Okay.
25             The last thing is I believe somewhere

303

1    today you had referred to a Leah McGuffin.  If
2    that's correct, were you referring to Leah Freeman?
3        A.    I was -- I meant Leah Freeman.  I think I
4    meant Leah -- I was trying to say Leah, and -- I
5    don't know.  Anyway, yes, it should be Leah Freeman.
6              MR. DAVIS:  Okay.  Thank you.
7              No further questions.  Thank you.
8              MS. PURACAL:  Any other questions?
9              It does not appear so.  I'm presuming
10   that we can go off the record.  Is there anything
11   else, Mr. Franz?  Mr. Davis?
12             MR. FRANZ:  No.
13             MR. DAVIS:  And we will get a copy of
14   this with its Post-It notes as -- through the
15   process that we just described?
16             MS. PURACAL:  Correct.  And when you
17   say "this," just for the record we're pointing to
18   Exhibit 38.
19             MR. DAVIS:  Yes.  Thank you.
20             MS. PURACAL:  And we'll read and sign.
21             We can go off the record.
22             THE VIDEOGRAPHER:  Okay.
23             Off the record at 11:44 a.m.
24             (The deposition was adjourned
25             at 11:44 a.m.)

304

1    State of Oregon    )
2    County of Lane     )  ss.
3
4        I, Sara Fahey Wilson, CSR, a Certified Shorthand
5    Reporter for the State of Oregon, certify that the
6    witness was sworn and the transcript is a true
7    record of the testimony given by the witness; that
8    at said time and place I reported all testimony and
9    other oral proceedings had in the foregoing matter;
10   that the foregoing transcript consisting of 303
11   pages contains a full, true and correct transcript
12   of said proceedings reported by me to the best of my
13   ability on said date.
14       If any of the parties or the witness requested
15   review of the transcript at the time of the
16   proceedings, such correction pages are attached.
17       IN WITNESS WHEREOF, I have set my hand this 15th
18   day of December 2023, in the City of Eugene, County
19   of Lane, State of Oregon.
20
21
22
23   Sara Fahey Wilson, CSR
24   CSR No. 06-0400
25   Expiration Date:  March 31st, 2026



UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an
individual and as guardian *ad litem*, on behalf
of S.M., a minor,

                          Case No. 6:20-CV-01163-MK

          Plaintiff,

        v.

                              **ORDER ON PLAINTIFFS'
MOTION TO MODIFY
SUBPOENA**

MARK DANNELS *et al.*,

          Defendants.

_____

**KASUBHAI,** United States Magistrate Judge:

## BACKGROUND

      Plaintiffs' action arises out of the wrongful conviction of Plaintiff Nicholas McGuffin.

Pl.'s Sec. Am. Compl., ECF No. 143 ("SAC"). Plaintiff McGuffin was convicted in a 2011

action titled *State of Oregon v. Nicholas James McGuffin*, Coos County Circuit Court Case No.

10CR0782 (the "Criminal Case"). His conviction was vacated by judgment in November 2019,

Page 1 — ORDER

and he was released from incarceration several weeks later. *See* Defs.' Resp. to Mot. to Modify

Subpoena of McCrea Ex. 101, ECF No. 211-1 ("Defs.' Resp."). In this action, Plaintiffs' suit

includes claims under § 1983 claims for the alleged fabrication of evidence and suppression of

favorable evidence, and state law claims for negligent training and supervision and negligent

spoliation of evidence. SAC 32-41, 45-46.

   Attorney Shaun McCrea represented Plaintiff in the underlying Criminal Case which led

to Plaintiff's wrongful conviction. Pls.' Mot. for Protective Order 2, ECF No. 207 ("Pls.' Mot.").

In the present action, Plaintiffs requested and received from Ms. McCrea a complete copy of her

file from the Criminal Case (the "McCrea File"). *Id.* After digitally scanning the documents,

reviewing them for privilege, and producing a privilege log, Plaintiffs sent a digital copy of the

McCrea file and privilege log to Defendants. *Id.* Plaintiffs withheld approximately 600

documents from the 35,000 pages of the McCrea file, asserting attorney-client privilege and

work-product protection. Puracal Decl. Ex. 1, ECF No. 208 ("Privilege Log"). On September 8,

2023, the City/County Defendants[1] served Plaintiffs with a notice of intent to issue a subpoena

*duces tecum* to Ms. McCrea, who is not a party in this matter, for "ANY AND ALL RECORDS

relating to Nicholas James McGuffin." Pls.' Mot. 2. Defendants also sent Plaintiffs a notice of a

subpoena to depose Ms. McCrea. *Id.*

   In the present Motion (ECF No. 207), Plaintiffs move for a protective order modifying

the scope of the subpoenas to prevent the disclosure of documents and information that they

argue is protected by attorney-client privilege and the work product doctrine. *Id.* Defendants

respond that Plaintiff McGuffin waived all privileges that relate to issues arising in this case. On

---

[1] Specifically, Defendants Mark Dannels, Pat Downing, Kris Karcher, Shelly McInnes, Raymond McNeely, Kip Oswald, Michael Reeves, Sean Sanborn, Eric Schwenninger, Chris Webley, Anthony Wetmore, Craig Zanni, David Zavala, City of Coquille, City of Coos Bay, Coos County, Oregon, and the Estate of David Hall. Herein after, "Defendants" for purposes of this Order.

Page 2 — ORDER

October 18, 2023, the Court held a hearing on the Motion to Modify the Subpoena. *See* ECF No. 215.

For the foregoing reasons, the motion to modify the subpoena is GRANTED, in part.

## LEGAL STANDARD

Fed. R. Civ. P. 26(b)(1) entitles each party to discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." The Court has broad discretion to determine relevancy for the purposes of Rule 26(b)(1). *Goolsby v. Raney*, 483 F. App'x 326, 329 (9th Cir. 2012). However, even if a discoverable matter is relevant, on timely motion, the issuing court must modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[.]" Fed. R. Civ. P. 45(d)(3)(A)(iii). Federal courts analyze the attorney-client privilege and work product protection separately. *Tennison v. City & Cty. of San Francisco*, 226 F.R.D. 615, 622 (N.D. Cal. 2005) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975) ("The work-product doctrine is distinct from and broader than the attorney-client privilege.").

## DISCUSSION

### I.     Attorney-Client Privilege

"The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The federal law of privilege applies in claims arising under a federal question. Fed. R. Evid. 501. The client may expressly or impliedly waive their attorney-client privilege. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116–17 (9th Cir. 2020). The party asserting privilege

Page 3 — ORDER

has the burden of establishing the applicable privilege. *U.S. v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011).

Courts in the 9th Circuit use the three prong *Hearn* test to determine whether a party waived the attorney-client privilege by placing the information at issue in the case. *United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). Under the *Hearn* test, a plaintiff waives the privilege when (1) he takes an affirmative act, such as filing a suit; (2) his affirmative act puts the privileged information at issue; and (3) allowing the privilege would deny the defendant access to information vital to its defense. *Id.*

A. Plaintiffs' Claims Under *Brady*

In a *Brady* claim, the plaintiff must prove that the defendant withheld exculpatory evidence that he or his criminal defense attorney were unaware of at the time of the conviction. *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018); *see Brady v. Maryland*, 373 U.S. 83 (1963). The plaintiff or his criminal defense counsel's awareness of exculpatory evidence, including an awareness of witnesses who may have had exculpatory evidence, may be used by the defendant in the civil suit to defeat the *Brady* claim. *United States v. Dupuy*, 760 F.2d 1492, 1502 (9th Cir. 1985).

Here, Plaintiff McGuffin waived the attorney-client privilege as it relates to his or Ms. McCrea's awareness of facts that would defeat the *Brady* claim. The first and second prongs of the *Hearn* test are satisfied because Plaintiffs took the affirmative action of bringing a *Brady* claim. The third prong is satisfied because Plaintiff McGuffin or Ms. McCrea's awareness of exculpatory evidence at the time of the criminal conviction is vital to Defendants' affirmative defense of the *Brady* claim. Accordingly, Plaintiff McGuffin waived his privilege regarding

Page 4 — ORDER

those facts. However, Plaintiff McGuffin did not waive his attorney-client privilege as is relates to his communications with Ms. McCrea and her opinions about that evidence.

B. Plaintiffs' State Law Negligence Claims

Plaintiffs allege negligent training and supervision of the Municipal Defendants (Fifth Claim for Relief) and negligent spoliation of evidence by all Defendants (Seventh Claim for Relief). Pls.' SAC ¶¶ 302-08, 314-19. Comparative fault is an affirmative defense to a state law claim for negligence. Or. Rev. Stat. § 31.600(1). Therefore, under *Hearn*, a claim for negligence may waive the attorney-client privilege as it relates to the plaintiff's or his attorney's comparative fault.

According to Defendants, Plaintiff McGuffin waived the attorney-client privilege and opened the door to the discovery of Plaintiff McGuffin and Ms. McCrea's comparative fault in negligently defending the Criminal Case. Defs.' Mot 5. To prove the affirmative defense of comparative fault, Defendants seek discovery of:

> (1) What information Mr. McGuffin gave to Robert and Shaun McCrea about what investigation was needed, what witnesses needed to be contacted or interviewed, and what evidence needed to be found or asked for from the Defendants, including the District Attorney; (2) what witnesses or events gave Mr. McGuffin an alibi; (3) what witnesses knew who killed Leah Freeman or had information about her or Mr. McGuffin; (4) why Mr. McGuffin did not testify and who made the decision that he was not to testify; (5) whether or not certain witnesses should testify, like McGuffin's mother and father; (6) what information was provided by Mr. McGuffin about his killing Ms. Freeman; (7) what Mr. McGuffin said about the fact that McGuffin failed the polygraph examination; (8) why didn't Mr. McGuffin take a second polygraph test as offered by the District Attorney; (9) any accusations by anyone including McGuffin that his criminal defense attorneys were not doing their job or not working hard enough; (10) statements and information exchanged about the timeline McGuffin gave to the police and the timelines he gave to his attorneys; and (11), all information that was withheld from the

Page 5 — ORDER

police, the grand jury, the jury, and/or the District Attorney and
why.

Resp. to Pls.' Mot. to Modify Subpoena at 5-6. Defendants' proposed discovery far exceeds the

scope of the allegations made in Plaintiffs' negligence claims.

     Defendants overreach in their pursuit of discovery relating to their affirmative defense.

The scope of discovery to which Defendants are entitled is defined by the terms of Plaintiffs'

negligence claim, and not in the first instance, Defendants' affirmative defense. Defendants

affirmative defense of negligent defense of the Criminal Case is not reasonably directed to

Plaintiffs' negligence claims. Except for Plaintiff McGuffin or Ms. McCrea's *awareness* of

exculpatory evidence that was allegedly withheld by Defendants, the Defendants' requested

discovery is not relevant nor vital to their defense and fails prongs two and three of the *Hearn*

test.

### C. Privilege Waiver of Plaintiff McGuffin's Post Conviction Relief Proceeding

     Defendants also argue that "Plaintiff McGuffin has waived all privileges related to all of

the disclosures made by him or the McCreas in the post-conviction proceeding, which include

McGuffin's contention that his attorneys committed malpractice. This includes all disclosures

made and raised in the General Judgment of the post-conviction proceedings. . ." Defs.' Resp. 7.

In response, Plaintiffs submit a copy of a Stipulated Protective Order signed by the court in

Plaintiff McGuffin's post-conviction case, preventing the re-disclosure of material protected by

attorney-client privilege and the work product doctrine. Puracal Supp. Decl. Ex. 4, ECF No. 212.

At the discovery hearing held on October 18, 2023, Defendants did not provide a legal argument

in support of their objection to the validity of the Stipulated Protective Order. The Court finds no

reason to invalidate the Stipulated Protective Order in the post-conviction proceeding.

Page 6 — ORDER

## II.     Work-Product Doctrine

Documents or the compilation of materials prepared by agents of the attorney in preparation for litigation may be covered by the work-product doctrine. *U.S. v. Richey*, 632 F.3d 559, 567 (9th Cir. 2011). The primary purpose of the work-product doctrine is to "prevent exploitation of a party's efforts in preparing for litigation." *Admiral Ins. Co.*, 881 F.2d at 1494. Like the attorney-client privilege, the protection of work product is also waivable. *Richey*, 632 F.3d at 567. Special protection is afforded to materials that reveal an attorney's mental impressions and opinions ("opinion" or "core" work product). *Admiral Ins. Co.*, 881 F.2d at 1494; Fed. R. Civ. P. 26(b)(3)(B). Other materials, however, may be ordered produced upon a showing of substantial need for the information and that the information cannot be otherwise obtained without undue hardship. *Admiral Ins. Co.*, 881 F.2d at 1494; Fed R. Civ. P. 26(b)(3)(A)(ii). To obtain the opinion work product of an opposing party, a party must show that the mental impressions of counsel *are at issue* and the need for the material is compelling. *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).

Plaintiffs argue that they have already produced all relevant, non-privileged documents from the McCrea file. Pls.' Mot. 3. Plaintiffs' privilege log shows that they have withheld approximately 600 documents from the McCrea File. Puracal Decl. Ex. 1, ECF No. 208. Defendants do not dispute whether the withheld documents are in fact within the scope of work-product protection. Rather, they argue that they are entitled to have a neutral party examine the withheld documents to determine if they are properly within the scope of protection from production and request the Court's in-camera review of the documents or, in the alternative, the appointment of a Special Master. Defs.' Resp. 4.

The Court will review the withheld documents and determine which, if any, are not protected by the work-product doctrine, consistent with the reasoning in this opinion.

**ORDER**

For the reasons state above, Plaintiffs' Motion for Protective Order to Modify Subpoena (ECF No. 207) is GRANTED, in part. Defendants may ask Ms. McCrea about her awareness of facts pertinent to defeating Plaintiffs' *Brady* claims, including her awareness of witnesses at the time of conviction with exculpatory evidence. Defendants may not ask Ms. McCrea about her communications with Plaintiff McGuffin about those underlying facts. The Court ORDERS Plaintiffs to submit the withheld documents from the McCrea File to the Court for in-camera review within 30 days of this Order.

IT IS SO ORDERED.

DATED this <u>2nd</u> day of November 2023.

<div align="right">

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge

</div>

Page 8 — ORDER

*Discovery list*

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 1. 2010 Search Warrant | 1 – 66 |
| 2. Andrews | 67 – 185 |
| 3. Andy Jackson | 186 – 187 |
| 4. Anonymous Tips | 188 – 193 |
| 5. Arnesen | 194 – 218 |
| 6. Arrant | 219 – 222 |
| 7. Assessor | 223 – 239 |
| 8. Assmus | 240 – 250 |
| 9. Autopsy | 251 – 261 |
| 10. Background Materials | 262 – 434 |
| 11. Barrett | 435 – 438 |
| 12. Bartley Materials | 439 – 563 |
| 13. Bennett | 564 – 565 |
| 14. Bentley Materials | 566 – 579 |
| 15. Benz | 580 – 594 |
| 16. Bibb | 595 – 597 |
| 17. Bob Van Zelf | 598 – 612 |
| 18. Bohanon | 613 – 622 |
| 19. Bonnie Chamley | 623 – 624 |
| 20. Bowersox | 625 – 630 |
| 21. Brenden | 631 – 652 |
| 22. Bryant/McGuffin Jail Records | 653 – 654 |
| 23. Charity Kinsey | 655 – 656 |

1

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 24. Child Fatality | 657 – 662 |
| 25. Coos Bay Crime Lab | 663 – 687 |
| 26. Correspondence | 688 – 749 |
| 27. Cory Bryant | 750 – 752 |
| 28. Court Documents | 753 – 757 |
| 29. Crime Lab Notes | 758 – 1014 |
| 30. Dannels | 1015 – 1044 |
| 31. Dave Chappelle | 1045 – 1049 |
| 32. Davis Work File | 1050 – 1166 |
| 33. Davis | 1167 – 1228 |
| 34. Denny Freeman Notes | 1229 – 1233 |
| 35. Documents from Nick's Bedroom | 1234 – 1284 |
| 36. Dog Team | 1285 – 1288 |
| 37. Downing | 1289 – 1362 |
| 38. Durbin | 1363 – 1366 |
| 39. Ellen Bradley | 1367 – 1369 |
| 40. Elzie Shamblin | 1370 – 1489 |
| 41. England DNA | 1490 – 1526 |
| 42. England Photos of Clothes | 1527 – 1537 |
| 43. Evidence Room Documents | 1538 – 1772 |
| 44. EWS001 | 1773 – 1786 |
| 45. FBI Violent Crime | 1787 – 1796 |
| 46. Ferreria | 1797 – 1802 |

2

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 47. First Search Warrant | 1803 – 1836 |
| 48. Forest Simpson | 1837 – 1863 |
| 49. Garcia | 1864 – 1877 |
| 50. Gish Port Orford PD | 1878 |
| 51. Godfrey | 1879 – 1881 |
| 52. Hall | 1882 – 1910 |
| 53. Hebner | 1911 – 1920 |
| 54. Hermann | 1921 – 1950 |
| 55. James Bryant | 1951 – 1952 |
| 56. January 2010 Press Release | 1953 – 1957 |
| 57. Jeff Grant | 1958 – 1961 |
| 58. Jeff Smith | 1962 – 1964 |
| 59. John Riddle | 1965 – 1968 |
| 60. King | 1969 – 1976 |
| 61. Kinney | 1977 – 1990 |
| 62. Kris Karcher | 1991 – 1995 |
| 63. Kristen Steinhoff | 1996 – 2033 |
| 64. Leader | 2034 – 2035 |
| 65. Leads | 2036 – 2043 |
| 66. Leah Funeral | 2044 – 2050 |
| 67. Leah's Letters to Mitchell | 2151 – 2069 |
| 68. Leah School Records | 2070 – 2114 |
| 69. Lebanon PD | 2115 – 2119 |

3

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 70. Lee | 2120 – 2132 |
| 71. Lichte | 2133 – 2137 |
| 72. Looney | 2138 – 2244 |
| 73. Lorretta Daugherty | 2245 – 2246 |
| 74. Lower Umpqua Hospital | 2247 – 2252 |
| 75. Mark Ranger | 2253 – 2285 |
| 76. McBride | 2286 – 2287 |
| 77. McCool | 2288 – 2299 |
| 78. McGuffin (Nick) Materials | 2300 – 2849 |
| 79. McNeely | 2850 – 2865 |
| 80. Michael Miller | 2866 – 2931 |
| 81. Mike Tabor | 2932 – 2941 |
| 82. Miscellaneous McGuffin Records | 2942 – 2969 |
| 83. Miscellaneous | 2970 – 2991 |
| 84. Miscellaneous Crime Lab Reports | 2992 – 3025 |
| 85. Mitts | 3026 – 3029 |
| 86. Moore | 3030 – 3031 |
| 87. Mundell Papers | 3032 – 3177 |
| 88. Nichols | 3178 – 3196 |
| 89. Oester | 3197 – 3231 |
| 90. Officer Bryant | 3232 – 3233 |
| 91. Oswald | 3234 – 3252 |
| 92. P & P | 3253 – 3254 |

4

**State v. McGuffin**
**Discovery List**

93. Pat Smith                          3255 – 3303

94. Patterson                          3304 – 3320

95. PDX Crime Lab                      3321 – 3335

96. Perske                             3336 – 3366

97. Phone Records                      3367 – 3414

98. Piper                              3415 – 3421

99. PMK001                             3422 – 3546

100. Press                             3547 – 3551

101. RBW001                            3552 – 3557

102. RBW002                            3558 – 3580

103. RBW003                            3581 – 3715

104. RBW004                            3716 – 3819

105. RBW005                            3820 – 3830

106. Reaves                            3831 – 3841

107. Remote Viewing                    3842 – 3845

108. Riddle                            3846 – 3858

109. Roach                             3859 – 3907

110. Robbins                           3908 – 3911

111. Sanborn                           3912 – 3932

112. Schwenninger                      3933 – 3948

113. Sean Sanborn                      3949 -3959

114. Second Search Warrant             3960 – 4029

115. Sero                              4030 – 4062

5

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 116. Shelly Grant | 4063 – 4079 |
| 117. Snyder | 4080 – 4106 |
| 118. Snyder | 4107 |
| 119. Soule | 4108 – 4121 |
| 120. Springfield Lab | 4122 – 4130 |
| 121. Statement Analysis | 4131 – 4140 |
| 122. Stoddard/Wilsey Suicide | 4141 – 4156 |
| 123. Stoddard Photos | 4157- 4159 |
| 124. Stone | 4160 – 4166 |
| 125. Summers | 4167 |
| 126. Timeline | 4168 – 4175 |
| 127. TRV | 4176 – 4179 |
| 128. TSR001 | 4180 – 4335 |
| 129. TSR002 | 4336 – 5010 |
| 130. Ulmer | 5011 – 5048 |
| 131. Unknown OSP Notes | 5049 – 5054 |
| 132. Webb | 5055 – 5086 |
| 133. Webley | 5087 – 5137 |
| 134. West | 5138 – 5139 |
| 135. Wetmore | 5140 – 5154 |
| 136. Wright | 5155 – 5156 |
| 137. Young | 5157 – 5212 |
| 138. Zanni | 5213 – 5414 |

6

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 139. Zavada | 5415 – 5437 |
| 140. Sanborn | 5438 – 5455 |
| 141. Bill Sero | 5456 – 5458 |
| 142. McGuffin Hawaii Property | 5459 – 5467 |
| 143. Breakfield | 5468 – 5469 |
| 144. Webley | 5470 – 5481 |
| 145. Walker | 5482 – 5486 |

Above documents delivered to Shaun McCrea in PDF Format on August 24, 2010.

| | |
|---|---|
| 146. Dannels(2) | 5487 – 5489 |
| 147. Letters to Court | 5490 – 5491 |
| 148. Polygraph Reports on Stemmermann and Zavala | 5492 – 5504 |
| 149. Webley(3) | 5505 – 5518 |

The above four items were transmitted to the McCrea Law Firm by electronic mail on October 6, 2010.

| | |
|---|---|
| 150. Jail Incident | 5519 – 5528 |
| 151. Ranger Polygraph Charts on McGuffin | 5529 – 5538 |
| 152. Ranger File on McGuffin Polygraph | 5539 – 5550 |

The above three items were transmitted to the McCrea Law Firm by electronic mail on November 24, 2010.

| | |
|---|---|
| 153. Vidoq Society Materials | 5551 – 5674 |
| 154. Grand Jury Subpoenas | 5675 – 6060 |
| 155. Sherida Hendricks | 6061 – 6063 |
| 156. Reader's Digest Article on Walters | 6064 - 6075 |

7

**State v. McGuffin**
**Discovery List**

The above four items (153, 154, 155, 156) were sent in digital format to the McCrea Law Firm on December 20, 2010.

| | |
|---|---|
| 157. Lab Report dated 10/26/2010 | 6076 – 6079 |
| 158. Pat Smith Report | 6080 |
| 159. Looney Report | 6081 – 6083 |
| 160. Pat Smith Report | 6084 |
| 161. Email's regarding "Valerie" | 6085 – 6086 |

The above five items and CD058 were mailed to the McCrea law firm March 8, 2011.

| | |
|---|---|
| 162. Lab report dated November 10, 2010 | 6087 – 6089 |

The above item was mailed to the McCrea law firm March 8, 2011.

## <u>DUE TO A MISTAKE IN NUMBERING THE FOLLOWING DISCOVRY ITEMS WERE RENUMBERED AND SENT TO THE MCCREA LAW FIRM ON APRIL 27, 2011.</u>

| | |
|---|---|
| 163. Brenden Notebooks | 6090 – 6385 |
| 164. Car Registrations | 6386 – 6388 |
| 165. Dannels Report | 8389 – 6392 |
| 166. Dave Hall Deschutes County Reports | 6393 – 6674 |
| 165. England Shipping Records | 6675 – 6677 |
| 166. Evidence Accountability Sheets | 6678 – 6710 |
| 167. Evidence Log | 6711 – 6716 |
| 168. Forensic Request Forms | 6717 – 6725 |
| 169. Lab Submission Forms | 6726 – 6779 |
| 170. Leah Medical Records | 6780 – 6811 |

8

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 171. Lloyd Report | 6812 |
| 172. McGuffin Trial Subpoenas | 6813 – 6966 |
| 173. McNeely | 6967 – 6974 |
| 174. Microtrace Reports | 6975 – 6981 |
| 175. Mini-Storage Records | 6982 – 6983 |
| 176. Miscellaneous Documents | 6984 – 6999 |
| 177. Mustang Evidence Sheets | 7000 – 7004 |
| 178. Nichols Notebook | 7005 – 7196 |
| 179. Note from Henry Echol (?) | 7197 – 7198 |
| 180. Overview Maps from Google | 7199 – 7204 |
| 181. Randy Ulmer Materials | 7205 – 7303 |
| 182. Receipt to the McGuffins | 7304 |
| 183. Sanborn Report | 7305 – 7312 |
| 184. Sero Evidence Sheet | 7313 – 7328 |
| 185. Smith Report | 7329 – 7330 |
| 186. Webley Report | 7331 – 7333 |
| 187. Zavala Notebooks | 7334 – 7833 |

The following were sent to the McCrea Law Firm on May 2, 2011.

| | |
|---|---|
| 188. Criminal Histories on civilian witnesses | 7834 – 8195 |
| 189. Kristen Steinhoff Polygraph | 8196 – 8207 |
| 190. Leah Death Certificate | 8208 |
| 191. McNeely Report | 8209 – 8210 |
| 192. Webley Report | 8211 – 8216 |

9

**State v. McGuffin**
**Discovery List**

| | |
|---|---|
| 193. Kyla Stevens Letter | 8217 – 8221 |
| 194. Sanborn Sherida Hendricks Report | 8222 – 8229 |
| 195. Steven's Letter to defendant | 8230 – 8231 |
| 196. Hamilton Polygraph Report | 8232 – 8241 |
| 197. Webley Report | 8242 – 8248 |
| 198. Copies of Bonk reports with witness corrections | 8249 – 8276 |
| 199. Webley Report Received 6-24-2011 | 8277 – 8279 |
| 200. Coos Bay Crime Lab File and Photos | 8280 – 8380 |
| 201. Photos of High School and North Elm | 8381 - 8409 |
| 202. McNeely Report 6-29-2011 | 8410 (rp) |
| 203. Webley Report 6-30-2011 | 8411 – 8414 (rp) |
| 204. Copies of Bonk reports C & P Mitchell witness correct. | 8414 – 8437 (rp) |
|         Note: Bates 8434 missed. Added Blank Pg | |

10

**State v. McGuffin**
**Discovery List**

**CD's and DVD's**

**CD's**

CD001- Coquille Exhibits 256, 38, 69, 258, 270, OSP Lab Photos, Nick
McGuffin Photos, Cemetery, Crime Scene
CD002- Coquille Exhibits 72, search Warrant 2000 McGuffin Home
CD003- Coquille Exhibits 197, 75, 73, CPM003, Car Photos Leah's
Memorial
CD004-Kip Oswald Photos
CD005-Autopsy Photos
CD006-Photos of car (Mundell matter?)
CD007-Photos 92834 Libby Drive
CD008-Kris Karcher scene and autopsy photos
CD009-Napier Photos
CD010-Kip Oswald Polaroid Photos
CD011- Photos seized from McGuffin Home #1
CD012- Photos seized from McGuffin Home #2
CD013- Photos of OR Lic #UTJ480
CD014- Photos of Mustang
CD015- Photos seized from McGuffin Home #3
CD016- Photos McGuffin Person, T-Bird and Scene
CD017- Photos McGuffin SW, cars at memorial, Nick and Leah
CD018- Timeline and tips
CD019- OSP Lab PDF files
CD020- Photos Mundell matter
CD021- Audio of mini-phone tape
CD022- Audio Nick McGuffin
CD023- Audio Kristen Steinhoff
CD024- Audio DA Frasier Phone Messages 01/29/2010
CD025- Audio Edgerton Pre-text call
CD026- Reaves/Hall interview of Nick McGuffin
CD027- OSP Lab Photos of Seized Evidence
CD028- Audio Brent Bartley Interview 1/24/2010
CD029- *Skipped Number (no disc)*
CD030- Audio Kristen Steinhoff Interview
CD031- Audio Nicole Price (Nelson) Interview
CD032- Looney Photos of Elderkin KIA
CD033- Looney Photos of Evidence
CD034- Stoddard Suicide Photos
CD035- John Lundgren Photos
CD036- Damon Mason Interview
CD037- Kristen Steinhoff Interview
CD038- Bruce McGuffin Pretext Call
CD039- Brent Bartley Interview 01/24/2010
CD040- Brent Bartley Interview 03/04/2010 and Kristen Steinhoff Interview

11

**State v. McGuffin**
**Discovery List**

03/04/2010
CD041- Hank Allerd Interview
CD042- Kristen Steinhoff Interview June 17, 2010
CD043- Leah Freeman Grand Jury Audio File July 14, 2010
CD044- Leah Freeman Grand Jury Audio File July 21, 2010 AM Testimony
CD045- Leah Freeman Grand Jury Audio File July 21, 2010 PM Testimony
CD046- Leah Freeman Grand Jury Audio File July 23, 2010 AM Testimony
CD047- Leah Freeman Grand Jury Audio File July 23, 2010 PM Testimony
CD048- Leah Freeman Grand Jury Audio File July 30, 2010 AM Testimony
CD049- Leah Freeman Grand Jury Audio File July 30, 2010 PM Testimony
CD050- Leah Freeman Grand Jury Audio File August 3, 2010
CD051- Leah Freeman Grand Jury Audio File August 4, 2010 AM Testimony
CD052- Leah Freeman Grand Jury Audio File August 4, 2010 PM Testimony
CD053- Leah Freeman Grand Jury Audio File August 11 2010 AM Testimony
CD054- Leah Freeman Grand Jury Audio File August 11, 2010 PM Testimony
CD055- Kristen Steinhoff Interview February 14, 2002
CD056- Kyla Stevens Interview
CD057- Willis and Walker Photos and Diagram of Courtright home
CD058 – Autopsy Photos
CD059 – Tulles Interview
CD060 – Randy Ulmer Interview
CD061 – Discovery #'s 6070 – 7532
CD062 – Photos of Bartley Grandparents' home
CD063 – Photos from CPM003 not previously disclosed and Photos from Coquille Tag #20 not previously disclosed
CD064 – Zavala Recording with Kristen Steinhoff

Items CD059 – CD064 were mailed to the McCrea law firm on March 16, 2011.

CD065 – Discovery #9536 - 7606

Item CD065 was mailed to the McCrea law firm on April 6, 2011

CD066 – Discovery # 7621 – 7774

Item CD066 was mailed to the McCrea Law Firm on April 8, 2011

12

**State v. McGuffin**
**Discovery List**

## DUE TO A NUMBERING MISTAKE Items on CD's 61, 65 and 66 are now on CD067

CD067 - Discovery #6090 – 7833

CD068 – Discovery #7834 – 8216
Scott Hamilton Interview of April 29, 2011

CD068 was sent to the McCrea Law Firm on May 2, 2011.

CD069 – Coos Bay Crime Lab File and Photos
Photos of High School and North Elm

CD069 was sent to the McCrea Law Firm on June 27, 2011

13

**State v. McGuffin**
**Discovery List**

### DVD's

DVD001-Interview of Aubrey Schroder
DVD002-Brent Bartley Grand Jury Testimony WMV Format
DVD003-Brent Bartley Grand Jury Testimony DVD Format
DVD004-Video of Memorial Book Signing, DVD Format #1
DVD005-Video of Memorial Book Signing, DVD Format #2
DVD006-Video of Memorial Book signing WMV Format
DVD007-Video Freeman Grand Jury 2000 DVD Format
DVD008- Search Warrant 56246 Baker Road
DVD009- Lee Interview of Kristen Steinhoff
DVD010- Video Freeman Grand Jury July 14, 2010 DVD Format
DVD011- Video Freeman Grand Jury July 21, 2010 DVD Format #1
DVD012- Video Freeman Grand Jury July 21, 2010 DVD Format #2
DVD013- Video Freeman Grand Jury July 21, 2010 DVD Format #3
DVD014- Video Freeman Grand Jury July 21, 2010 DVD Format #4
DVD015- Video Freeman Grand Jury July 21, 2010 DVD Format #5
DVD016- Video Freeman Grand Jury July 23, 2010 DVD Format #1
DVD017- Video Freeman Grand Jury July 23, 2010 DVD Format #2
DVD018- Video Freeman Grand Jury July 23, 2010 DVD Format #3
DVD019- Video Freeman Grand Jury July 23, 2010 DVD Format #4
DVD020- Video Freeman Grand Jury July 23, 2010 DVD Format #5
DVD021- Video Freeman Grand Jury July 23, 2010 DVD Format #6
DVD022- Video Freeman Grand Jury July 30, 2010 DVD Format #1
DVD023- Video Freeman Grand Jury July 30, 2010 DVD Format #2
DVD024- Video Freeman Grand Jury July 30, 2010 DVD Format #3
DVD025- Video Freeman Grand Jury July 30, 2010 DVD Format #4
DVD026- Video Freeman Grand Jury July 20, 2010 DVD Format #5
DVD027- Video Freeman Grand Jury August 3, 2010 DVD Format
DVD028- Video Freeman Grand Jury August 4, 2010 DVD Format #1
DVD029- Video Freeman Grand Jury August 4, 2010 DVD Format #2
DVD030- Video Freeman Grand Jury August 4, 2010 DVD Format #3
DVD031- Video Freeman Grand Jury August 4, 2010 DVD Format #4
DVD032- Video Freeman Grand Jury August 4, 2010 DVD Format #5
DVD033- Video Freeman Grand Jury August 11, 2010 DVD Format #1
DVD034- Video Freeman Grand Jury August 11, 2010 DVD Format #2
DVD035- Video Freeman Grand Jury August 11, 2010 DVD Format #3
DVD036- Video Freeman Grand Jury August 11, 2010 DVD Format #4
DVD037- Video Freeman Grand Jury August 11, 2010 DVD Format #5
DVD038- Video Freeman Grand Jury August 11, 2010 DVD Format #6
DVD039- Video Freeman Grand Jury August 11, 2010 DVD Format #7

The above CD's and DVD's were mailed to the McCrea law firm on August 27, 2010.

DVD040 – Copy of VHS video tape from Henry Echoll(?)

14

**State v. McGuffin**
**Discovery List**

The above DVD was mailed to the McCrea law firm on March 16, 2011.

>   DVD041 – Video of intersection of Fairview – McKinley Road with Hudson
>   Ridge Road to location where shoe was found by Kip Oswald

The above DVD was mailed to the McCrea law firm on May 25, 2011.

>   DVD042 – Scott Hamilton, Megan Davidson, Tony Giang Phone Search,
>   Webley Report received 6-24-2011, Updated Discovery List

The above was mailed to the McCrea Law Firm June 24, 2011.

**The above lists are current as of June 27, 2011.**

15

| From: | Hormann, Susan [/O=OSP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SUSAN HORMANN944] |
|---|---|
| Sent: | 3/15/2010 11:50:08 AM |
| To: | Psmith@cityofcoquille.org |
| CC: | Grover, Celeste [Celeste.Grover@state.or.us]; Rose, Traci [Traci.Rose@state.or.us] |
| Subject: | Re: FBI Mito testing in Leah Freeman Case |

Lt. Smith,

I have attached the questions from the FBI. I know the DA wants the hairs done because the defense would make an issue if they are not examined. I know you have years of experience doing investigations and I do not want to step on your toes, but I want to be clear in the ramifications of your lab requests. Often people are unaware that hairs can be so easily transferred by direct contact or even through a secondary transfer. The following are topics to consider before proceeding with the trace evidence.

#1 The value of an association with anyone she has been known to have frequent or sustained contact with is minimal since we are unable to say when the hairs were transferred. In other words it has limited probative value to find her boyfriend's hairs or hairs of people that she has had previous contact with, especially recent.

#2 You are almost guaranteed to find foreign hairs in a trace exam. This ends up giving the defense the bushy haired stranger they are looking for.

#3 Trace can also be of great value if say pubic hairs from an individual are found on the interior clothing of a victim or a significant number of hairs that are consistent with coming from an individual that was a complete stranger to the victim or her associates. Also, hairs would be more probative if they are found in her hand or if in a clump. Another type of trace evidence to consider in this case would be fibers found on her clothing/body that are similar (or dissimilar) to that found in suspects' vehicle or trunk if Leah was never in the car prior to her disappearance.

From Les McCurdy at the FBI:
*What is the potential probative value of the hairs? Do you have any info regarding what may have occurred to these items at New Scotland Yard (NSY) and Microtrace? I would expect that Microtrace conducted a microscopic exam with no other analysis but want to better understand how these items may have been handled or treated. What did NSY attempt? Unfortunately, until I have a better understanding of what changed between 2000 to present – especially if the 2000 exam revealed "nothing of forensic significance". Are there DNA reference samples from the victim and 2 subjects?*

*In the end, should we determine that the examinations are worth pursuing we can potentially submit this case through our Regional mtDNA program. We can further discuss that after we determine how/if to proceed. I will wait to hear back from you regarding the work done by Scotland Yard & Microtrace. I would prefer to keep you as the conduit with the local investigators as you already have been in touch with them and have provided previous guidance.*

Once we are able to answer the questions asked by the FBI, we can proceed. Thank you.

Susan Torris Hormann
DNA Supervisor
Portland Forensic Laboratory
13309 SE 84th Ave, Suite 200
Clackamas, Oregon 97015
Direct No. 971-673-8258
Fax 971-673-8309

>>> "Pat Smith" <psmith@cityofcoquille.org> 3/9/2010 4:57 PM >>>

Susan,

Sorry I didn't get back to you sooner. As soon as I get the evidence back from Scotland Yard I'll look to see what kind of report they include. Also, I'll check with Kris Karcher and see if she has anything.

Thanks,

Pat

CONFIDENTIAL

OSP002584

HS1 003247    003247    Form-460 (Rev. 8/88)

WHITE — MASTER
YELLOW — WORKSHEET
CARD — FILE

**OREGON STATE POLICE**

PRIORITY | A | B | C

Backman

## SUBJECT INFORMATION — MAKE NO MARKS IN THIS AREA

| LAST NAME | FIRST NAME | MIDDLE NAME | DEPT. | DEPT. # | SID |
|---|---|---|---|---|---|
| Backman, Dick | J. | | | | |

NICKNAME OR ALIAS | SOC. SEC. # | FILE NUMBER

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE | FBI # |
|---|---|---|---|---|---|
| RT 1 Box 3245 | Coq | OR | | | |

OLD ADDRESS(ES) | GLASSES | FACIAL HAIR
(425 toward Bandon)

| EMPLOYER/ADDRESS | CITY | STATE | WORK PHONE | OCCUPATION |
|---|---|---|---|---|

| RACE | SEX | D.O.B. | PLACE OF BIRTH | AGE | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|
| | | 1/24/77 | | | | | | |

| DR. LIC. # | STATE | VEH. YR. | MAKE | MODEL | COLOR(S) | BODY STYLE |
|---|---|---|---|---|---|---|
| 59341P | | 67 | Chev. | | Blue | |

| VEH. LIC. # | STATE | CONDITION/EQUIP. | OTHER VEH/PLATE(S) |
|---|---|---|---|

| CONCISE TIP INFORMATION | SOURCE NAME/XREF |
|---|---|
| | McGuffin |

Suppose to have Seen
Leah @ Credit Union on Night of 6/28

)

## SOURCE INFORMATION — MAKE NO MARKS IN THIS AREA

| LAST NAME | FIRST NAME | MIDDLE NAME | A.K.A.s |
|---|---|---|---|

| RACE | SEX | D.O.B. | HEIGHT | WEIGHT | HAIR | EYES | OCCUPATION/EMPLOYER |
|---|---|---|---|---|---|---|---|

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|

| HOME PHONE | WORK PHONE | DEPT. | DEPT. # | SID |
|---|---|---|---|---|

| ADDITIONAL INFORMATION | SUSPECT NAME |
|---|---|

WAS INTERViewed @ 1352 on 09-20-00. Believes he did see Victim on 06/28/00
at 2100 when using ATM at Credit Union. CHECKED with Credit Union and confirmed
a 10⁰⁰ withdrawl on 6/28/00 at 9:04 P.M. RP believes Leah walked by AT that time.
He described her clothes accurately. He then went to Fast MART to get something
to eat. He stated there was hardly ANYONE AROUND at FAST MART.

| RECEIVED BY | DATE | TIME | COMPUTER CHECK BY | DATE | TIME |
|---|---|---|---|---|---|
| Zanni | 9-20-00 | 1352 | | | |

| ASSIGNED TO | DATE | CCH |
|---|---|---|
| Zanni | | CRISS |
| 003247 | SUSPENSE DATE  003247 | NCIC   003247 |
| | 9/28/00  1352 | |

Hjordis Lindegren     5-19-10    e library
         A.
     7-8-58    541-396-2258     390-6216
     551 W. 4th Pl.    22 yrs.

1300  - Avid survivor fan.
- Watching survivor on TV. - Brosler over w/ dog.
- ~~Night Rudy got voted off~~ Upset ~~wrong people~~
- watched till end of show. Brosler got up -
took dog for walk. Got back.
- Returned 1/2 hr. later.
- Left around 2100 - returned appr. 2130.
- May have left a few minutes before end but after Rudy voted off.
- Recall John commenting about "uncontrollable juveniles"
after coming back. Leah yelling at somebody.
- Neighbor, Dez, told Hjordis Leah in fight w/ people in house.
* Neighbor
- Dez (couch) / wife Barbara - daughter lives w/ lower ncis
- daughter:
- Elm/ W. 4th pl. facing Elm.    446 N. Elm
- ~~410-63~~    91063 N. Bank - Crockett
- John stopped/talked w/ Dez for while. Continued walk
& passed people in front of house (Leah/Nick).

Lindegren

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD018981

Survivor: Borneo - Wikipedia, the free encyclopedia

Page 1 of 16

# Survivor: Borneo

From Wikipedia, the free encyclopedia
(Redirected from Gretchen Cordy)

***Survivor: Borneo*** is the first season of the United States reality show *Survivor*. It was originally broadcast under the name *Survivor* but its official title has been changed to *Survivor: Borneo* to distinguish it from subsequent installments of the series. Before the change to *Survivor: Borneo*, the season was known universally as *Survivor: Pulau Tiga*, but it was changed again to its present title to avoid confusion with the tenth season, *Survivor: Palau*.[1] The show began filming on March 13, 2000 and ended on April 20, 2000. It aired later that year on CBS. It was set in the South China Sea on the remote Malaysian island of Pulau Tiga in the state of Sabah, about 6 miles (9.7 km) off the north coast of Borneo, Malaysia. The show was released on DVD on May 11, 2004.[1][2]

The sixteen contestants were initially separated into two tribes, named Tagi and Pagong, which represented the names of their beaches.[1] When ten players remained, the contestants merged into one tribe, named Rattana. While Tagi and Pagong's names and makeups were picked by the producers, Rattana was named by contestants Sean Kenniff and Jenna Lewis, because of the large amount of Rattan wood on the island. After 39 days of competition, corporate trainer Richard Hatch was named the Sole Survivor, defeating whitewater rafting guide Kelly Wiglesworth in a 4–3 jury vote. In 2006, it was revealed that Hatch failed to declare his winnings, among other earnings, in his tax return and was sentenced to 51 months imprisonment.[3]

On August 23, 2000, the *Survivor: Borneo* finale received the highest ratings of any *Survivor* episode to date.[4] Richard Hatch, Jenna Lewis, Rudy Boesch, Susan Hawk and Colleen Haskell were invited to participate again in the eighth season of *Survivor*, *Survivor: All-Stars*. Haskell was the only one to turn down the opportunity,[5] while Hatch, Lewis, Boesch and Hawk placed 14th, 3rd, 17th and 13th respectively.

| *Survivor: Borneo* | |
|---|---|
|  | |
| **Filming location** | Pulau Tiga, Sabah, Borneo, Malaysia |
| **Winner** | Richard Hatch (4–3) |
| **Original run** | May 31, 2000 – August 23, 2000 |
| **Filming dates** | March 13, 2000[1] – April 20, 2000 |
| **No. of episodes** | 13 |
| **No. of days** | 39 |
| **No. of survivors** | 16 |
| **Tribes** | Tagi / Pagong / Rattana |
| **All-Stars** | Richard Hatch, Rudy Boesch, Susan "Sue" Hawk, Jenna Lewis |
| **Season chronology** | |
| **Next** | Survivor: The Australian Outback |

*(handwritten: 3 Wednesday nights)*

## Contents

- 1 Summary
- 2 Contestants
- 3 The game

CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER

http://e...

CPD020603

- 3.5 Episode 5: Pulling Your Own Weight
- 3.6 Episode 6: Udder Revenge
- 3.7 Episode 7: The Merger
- 3.8 Episode 8: The Name Is Duplicity
- 3.9 Episode 9: Old and New Bonds
- 3.10 Episode 10: Crack In the Alliance
- 3.11 Episode 11: Long Hard Days
- 3.12 Episode 12: Death of an Alliance
- 3.13 Episode 13: Season Finale

- 4 Voting history
- 5 Production
- 6 Reception
- 7 DVD release
- 8 References
- 9 External links

## Summary

The series premiere began with sixteen people split into two boats, divided into two tribes, Pagong and Tagi. During the first night, neither tribe had a completed shelter or a fire. On day two, after losing the combined reward and immunity challenge, Tagi was sent to Tribal Council, where Sonja Christopher was the first contestant voted out of the game. The tribes then continued to build their shelters and search for food. At the Tagi camp, former Navy SEAL, Rudy Boesch and openly homosexual corporate trainer Richard Hatch formed a strong friendship while B.B. Anderson became an annoyance at the Pagong camp. At the second immunity challenge, contestants were forced to eat a typical Malaysian food called Butok, which is the live larva of a beetle. Both tribes were in a tie after every castaway ate the Butok without refusing. In the tiebreaker, Stacey Stillman ate two Butok before Gervase Peterson, winning immunity for Tagi and sending Pagong to Tribal Council. At Tribal Council on day six, B.B. was sent home from the Pagong tribe. Tagi won the next reward challenge on day seven, winning fishing and diving gear. Richard used the tools to catch many fish and feed the Tagi tribe. Pagong caught and ate a rat, after roasting it first. Pagong won the next immunity challenge on day nine and Stacey was the third person voted out. Gretchen became the motherly tribe member of Pagong, and Rudy became the cook at Tagi, cooking the fish that Richard would catch. Tagi would win both the reward challenge on day ten and the immunity challenge on day twelve, sending Pagong to Tribal Council, where Ramona Gray was the next person voted out.

> Their walk through the jungle at night to the Tribal Council will be an hour trek punctuated by stops to wait for six-foot-long snakes to writhe off the trail. Their bodies will be covered with bug bites as they sleep on the sand or in the jungle. They will catch rats to supplement the diet of rice and water provided.
>
> Mark Burnett, *Survivor: The Ultimate Game* — Page 12

At the following reward challenge on day 13, Pagong won fresh fruit and three egg-laying chickens. Pagong also won the immunity challenge on day 15, as Dirk Been was voted off of the Tagi tribe. After winning the reward challenge on day 16, yet losing the immunity challenge on day 18, Joel Klug was voted off of the Pagong tribe. As the merge approached, Sean Kenniff and Jenna Lewis spent time creating guidelines for the new tribe. The merged tribe was named Rattana, and continued to live at the former Tagi beach. After the first individual immunity challenge on day 21, Greg Buis won immunity for Tribal Council. Gretchen Cordy was then voted out, being tagged as the "biggest overall threat." During the following episode on day 22, each castaway except Jenna was shown a one-minute video clip, that either a family member or friend recorded of themselves talking to the contestant.

Jenna's video was never received, so she was unable to view it. The winner of the reward challenge would get to watch the remainder of their five-minute video. Greg won, and was able to watch the rest of his video. Gervase Peterson won the immunity challenge on day 24, and Greg was voted off. During this episode, Sean developed his "alphabet strategy," where his vote would go in alphabetical order for the duration of his time in the game.

Colleen Haskell would win the next reward challenge on day 25, which was a barbecue dinner for two contestants, and would receive their letters sent by family members or friends at home. Colleen chose Jenna to come to the dinner with her, allowing Jenna to read her letter as well. At the dinner, Colleen and Jenna formed an alliance, and discussed getting Gervase to join them. Gervase agreed, but the three did not have enough votes on their side, as Jenna was the next to be voted off on day 27, with Rudy holding immunity. During the following episode, Gervase was informed that his first son, Gunnar was born. Coincidentally, Gervase won the following reward challenge on day 28, allowing him a phone call home. Richard, however, won immunity on day 30, and Gervase was voted out. Following this, Kelly Wiglesworth decided against working with her alliance of Sue Hawk, Richard, and Rudy anymore. The next reward challenge was won by Sean on day 31, who won a night on a luxury yacht. Little did Sean know until long after getting on the boat that the Captain was his father (Jim Kenniff) who would travel on the yacht with him. Richard joined Sean for breakfast on the yacht the next morning, as Richard was chosen by Sean after the reward challenge. After deciding that if Kelly failed to win immunity, she would be sent home by her former alliance. Kelly won the immunity challenge, and Colleen was voted off on day 33. Kelly continued to win the following reward challenge on day 34. Joined by the show's host, Jeff Probst, Kelly won a night at a bar with a hot meal, a cold beer, and a 5-minute screening of the first episode of *Survivor*. Kelly also won the immunity challenge on day 36, holding off her elimination again, as the tension between herself and Sue grew stronger. Kelly voted with her former alliance to vote Sean out of the game.

As the final three days at the island came, Kelly won immunity again on day 37. The immunity challenge involved the final four contestants being quizzed on how much they knew about their former tribe mates. At Tribal Council, Richard and Sue tied with two votes each. As Kelly and Rudy voted again, Kelly switched her vote to Sue, as Sue was the next voted out. At the final immunity challenge on day 38, Kelly, Richard, and Rudy had to place one hand on the immunity idol held on a pole in the middle of a small well, while the three stood on small stands surrounding the pole. Richard voluntarily stepped out of the challenge on the assumption that the other contestants would "be crazy

> The victory was an extraordinary feeling-I think mostly of relief but certainly of exultation as well. Its surrealness was increased by how utterly depleted I felt. I was exhausted, mentally and physically, and starving. I remember walking around the wrap party thinking that it was done. I'd done what I'd come to do and I could relax. I couldn't wait to go to bed. It felt great and I slept like a baby.
>
> Richard Hatch, *Survivor: The Ultimate Game* — Page 227

not to take [him]" to the final Tribal Council. After four hours and eleven minutes, Rudy accidentally removed his hand when changing his position, giving Kelly another victory. Kelly chose Richard to take to the final two, as she voted Rudy off. After Kelly and Richard pleaded their cases with the jury, each jury member cast a vote for one of the final two contestants. The votes were read during the final Tribal Council on day 39, unlike in every season thereafter, when votes were read months later during a live finale. Richard won the first $1 million prize with four votes to Kelly's three.

# Contestants

There were sixteen contestants overall, divided into two tribes, Pagong and Tagi. After six contestants were eliminated, the tribes were combined, or merged, to form one tribe, Rattana. Seven contestants made up the jury, who ultimately decided who would win the game, and the $1 million grand prize.

Survivor: Borneo - Wikipedia, the free encyclopedia                    Page 4 of 16

| Contestant | Original Tribe | Merged Tribe | Finish | Total Votes[A] |
|---|---|---|---|---|
| **Sonja Christopher** 63, Walnut Creek, CA | Tagi | | 1st Voted Out Day 3 | 4 |
| **B.B. Andersen** 64, Mission Hills, KS | Pagong | | 2nd Voted Out Day 6 | 6 |
| **Stacey Stillman** 27, San Francisco, CA | Tagi | | 3rd Voted Out Day 9 | 6 |
| **Ramona Gray** 29, Edison, NJ | Pagong | | 4th Voted Out Day 12 | 6 |
| **Dirk Been** 23, Spring Green, WI | Tagi | | 5th Voted Out Day 15 | 4 |
| **Joel Klug** 27, Sherwood, AR | Pagong | | 6th Voted Out Day 18 | 4 |
| **Gretchen Cordy** 38, Clarksville, TN | Pagong | | 7th Voted Out Day 21 | 4 |
| **Greg Buis** 24, Ridgewood, NJ | Pagong | | 8th Voted Out 1st Jury Member Day 24 | 6 |
| **Jenna Lewis** 22, Franklin, NH | Pagong | | 9th Voted Out 2nd Jury Member Day 27 | 11 |
| **Gervase Peterson** 30, Willingboro, NJ | Pagong | | 10th Voted Out 3rd Jury Member Day 30 | 6 |
| **Colleen Haskell** 23, Miami Beach, FL | Pagong | Rattana | 11th Voted Out 4th Jury Member Day 33 | 7 |
| **Sean Kenniff** 30, Carle Place, NY | Tagi | | 12th Voted Out 5th Jury Member Day 36 | 9 |
| **Susan "Sue" Hawk** 38, Palmyra, WI | Tagi | | 13th Voted Out 6th Jury Member Day 37 | 5 |
| **Rudy Boesch** 72, Virginia Beach, VA | Tagi | | 14th Voted Out 7th Jury Member Day 38 | 8 |
| **Kelly Wiglesworth** 22, Las Vegas, NV | Tagi | | Runner-Up | 0 |
| **Richard Hatch** 39, Middletown, RI | Tagi | | Sole Survivor | 6 |

## The game

Survivor: Borneo - Wikipedia, the free encyclopedia                    Page 5 of 16

| Episode title[6] | Air date[6] | Challenges[B] | | Eliminated | Vote | Finish |
|---|---|---|---|---|---|---|
| | | Reward | Immunity | | | |
| "The Marooning" | May 31, 2000 | Pagong[C] | | Sonja | 4–3–1 | 1st Voted Out Day 3 |
| "The Generation Gap" | June 7, 2000 | Pagong [D] | Tagi | B.B. | 6–2 | 2nd Voted Out Day 6 |
| "Quest for Food" | June 14, 2000 | Tagi | Pagong | Stacey | 5–2 | 3rd Voted Out Day 9 |
| "Too Little, Too Late?" | June 21, 2000 | Tagi | Tagi | Ramona | 4–2–1 | 4th Voted Out Day 12 |
| "Pulling Your Own Weight" | June 28, 2000 | Pagong | Pagong | Dirk | 4–1–1 | 5th Voted Out Day 15 |
| "Udder Revenge" | July 5, 2000 | Pagong | Tagi | Joel | 4–2 | 6th Voted Out Day 18 |
| "The Merger" | July 12, 2000 | None[F] | Greg | Gretchen | 4–1–1–1–1–1 | 7th Voted Out Day 21 |
| "Thy Name Is Duplicity" | July 19, 2000 | Greg | Gervase | Greg | 6–3 | 8th Voted Out 1st Jury Member Day 24 |
| "Old and New Bonds" | July 26, 2000 | Colleen, [Jenna] | Rudy | Jenna | 4–3–1 | 9th Voted Out 2nd Jury Member Day 27 |
| "Crack In the Alliance" | August 2, 2000 | Gervase | Richard | Gervase | 5–2 | 10th Voted Out 3rd Jury Member Day 30 |
| "Long Hard Days" | August 9, 2000 | Sean, [Richard] | Kelly | Colleen | 4–2 | 11th Voted Out 4th Jury Member Day 33 |
| "Death of an Alliance" | August 16, 2000 | Kelly | Kelly | Sean | 4–1 | 12th Voted Out 5th Jury Member Day 36 |
| "Season Finale" | August 23, 2000 | None | Kelly | Susan[E] | 2–2 | 13th Voted Out 6th Jury Member Day 37 |
| | | | Kelly | Rudy | 1 | 14th Voted Out 7th Jury Member Day 38 |
| | | Jury Vote | | Kelly | 4–3 | Runner-Up |
| | | | | Richard | | Sole Survivor |

### Episode 1: The Marooning

- **Reward/Immunity Challenge:** Quest for Fire! The tribes swam to a raft where they had to pass and light their bamboo torch. Once they got to the beach they had to lift up their raft and run to the big statue. On the way, there were torches that needed to be lit. Once all of the torches are lit, teams had to light up a fire bowl. First tribe to light up the bowl wins immunity.
  - **Reward:** Water proof matches.

16 castaways began an adventure of a lifetime. There were already separated into two tribes. Both tribes made it to their beaches: Tagi in 2 hours, Pagong in 3. At the Tagi tribe, Rudy got on everybody nerves by taking command. No one at Tagi knew what to start doing until Richard spoke up. Richard was able to get everybody to get started on their camp. At the Pagong tribe, B.B. took leadership at camp. Colleen and Greg were wondering off alone. Back at Tagi, Sonja cut her leg but Sean was able to fix it up, and Stacey got annoyed with Rudy and wanted to get rid of him. At the immunity challenge, Pagong won after Sonja stumbled in the water. They voted out Sonja for being the weakest link 4–3–1.

### Episode 2: The Generation Gap

- **Immunity Challenge:** Each castaway was given a grub. If they refused to eat, their tribe would automatically lose.

At Pagong, people began to realize how they liked B.B., and everyone began to realize that Colleen and Greg were together. At Tagi, Richard told stories of him being gay. Richard didn't tell Rudy because he thought if he found out that he was gay Rudy wouldn't want to be near him. Greg kept everyone entertained with the All New Newly Stranded Survivor Game. The next day, B.B. got frustrated with his tribe because most of them were lazy and Ramona was sick. At the immunity challenge, each tribe member ate their grub, so Pagong picked Stacey and Tagi picked Gervase to represent the other team in a race to eat 2 grubs. Tagi won thanks to Stacey. Pagong went to their first tribal council where B.B. was voted out 6–2.

### Episode 3: Quest for Food

- **Reward Challenge:** Each tribe swam out to an inner tube attached to a sunken treasure chest. Once all of the tribe members are at their tube, they would dive down and drag their chest to shore.
  - **Reward:** Fishing supplies.
- **Immunity Challenge:** Each tribe built a stretcher, and raced into the woods to rescue one tribe member stuck in a tree. They then had to carry that tribe member back to the beach and to the first aid tent.

At the Tagi tribe, Stacey still wanted to get rid of Rudy and tried to create a girl alliance to do so, but Susan didn't want to be a part of the plan. At Pagong, Greg and Colleen found a big mud pit that the entire tribe was able to enjoy. At the reward challenge, Tagi won. Back at Pagong, everyone ate rats, including a hesitant Gervase and Ramona. At Tagi, Dirk annoyed everyone with his bible reading. Pagong won the immunity challenge. At tribal council, Tagi voted out Stacey 5–2. A surprised Stacey mentioned that people had changed their votes.

### Episode 4: Too Little, Too Late

- **Reward Challenge:** The castaways had to make a distress signal. the goal was to make the best

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

S.O.S. signal for the plane (with Jeff in it) to see.
- **Reward:** Hammocks, towels and pillows, plus two additional items (one chosen by each tribe).
- **Immunity Challenge:** It was a five part relay race. The first member swam to a buoy, dove down and retrieved a map in a bottle. The second member ran across a floating bridge with the bottle to a waiting place, where the second and third members would paddle to shore. The fourth member would break the bottle, check the map, and sprint into the jungle to find a rope ladder and a key. For the final leg, the two remaining tribe members had to locate a buried treasure chest and dig it up. The first tribe to unearth their treasure chest and bring it back to the start line and have the key inside the lock won.

At Pagong, Ramona started to feel better after having been sick and tried to put her work ethic to place, but Jenna said it might be too late for her. At Tagi, Sean and Dirk were busy fishing, but had no luck; Sean also tried to build a bowling alley. Kelly, Richard, Rudy and Susan created an alliance. At the immunity challenge, Gervase had problems on the sprint into the jungle and Pagong lost. They voted out Ramona 4–2–1.

## Episode 5: Pulling Your Own Weight

- **Reward Challenge:** Tribes would select three tribe members to shoot for the tribe in three rounds. The first one was a blow gun, the second round was a sling shot, and the third round was a spear toss.
  - **Reward:** Fruit and chickens.
- **Immunity Challenge:** One person from each tribe rowed their boat around the buoys, picking up their tribe members waiting in the water. The first tribe to get all members back to shore won.

At Tagi, Dirk and Sean were still trying to fish (with no success) instead of helping around camp. Susan told them that it was a waste of time if they weren't catching anything. At Pagong, everyone felt vulnerable because their tribe was getting smaller. At the reward challenge, Joel helped Pagong win reward with his spear throwing after the first two rounds were tied. At Tagi, Dirk and Sean began to help around the camp but that didn't change their tribe members' minds. At Pagong they decided to let their chickens lay eggs. At the immunity challenge, Gervase help Pagong to victory and Kelly, the white water rafting guide, was upset that "she got beat by a guy who couldn't even swim". At Tagi's tribal council, Dirk was voted out 4–1–1.

## Episode 6: Udder Revenge

- **Reward Challenge:** One at a time, each tribe member raced to a barrack. There were three different items in there (a can opener, a knife, and an Army helmet). The first tribe to get all of their items (with no duplicates) back to the start won reward.
  - **Reward:** Canned foods and a chocolate bar.
- **Immunity Challenge:** Both tribes raced through an Army obstacle course. The first two tribe members raced through the first part and met up with two more members, then they had to go through a puzzle and race to the finish line.

Each tribes were wondering what the merge was going to be like. At Tagi they were afraid that they might get outnumbered after the merge. At Pagong, Joel felt confident because they had the numbers. Colleen thought Joel was an idiot because they weren't merging yet and still had a chance of going in even. Gervase offended the girls by telling them that they were dumber than a cow. At Tagi, Richard

began walking around camp naked. At the reward challenge, Richard brought back a duplicate knife instead of a can opener and Pagong won by default. At Pagong, Gervase tried to create an alliance with Joel to get rid of the girls, and Joel started to get a little bossy, which annoyed the girls. Tagi won the immunity challenge in a very close race. With help from Greg, the women of Pagong voted out Joel 4–2.

## Episode 7: The Merger

- **Immunity Challenge:** All ten castaways submerged themselves underwater to see how long they could hold their breath. The top three castaways then had another competition of releasing buoys along a ladder submerged underwater. The first castaway to release all of their buoys would win immunity.

The day after Pagong voted Joel out, one person from each tribe went to the opposite tribe's camp and would then convene to decide which camp to live on. Jenna went to Tagi and Sean went to Pagong. After a bit of time at camp, Jenna and Sean met with each other at a neutral site (the sandbar) to decide which camp they wanted to live on and what to name the new merge tribe. They were welcomed by a feast, including lobster and wine, and got to stay the night under a canopy shelter and on beds. The next day, Jenna and Sean decided to live at the Tagi beach and named their merged tribe Rattana. All ten castaways are now together and everyone celebrated, except Rudy, who got annoyed because the population doubled. Greg won immunity after a close battle with Sean. At tribal council, the Pagong 5 (as well as Sean) were completely split and voted individually, while the Tagi 4 of Kelly, Richard, Rudy and Susan stayed together and voted out Gretchen 4–1–1–1–1–1–1.

## Episode 8: The Name Is Duplicity

- **Reward Challenge:** Each tribe member was to shoot at an archery target with a bow and arrow. The closest mark to the bullseye won.
  - **Reward:** A video from home and the chance to send a video home to them.
- **Immunity Challenge:** Each member was connected to a piece of rope and needed to go to the checkpoints in number order (1–6) and collect the color carabiners at each check point and then cross the finish line.

At camp, the remaining members of the former Pagong tribe felt vulnerable because the Tagi tribe voted out their leader Gretchen. Susan thought Jenna was going to be really annoying, but after a while realized she wasn't that annoying. Richard started to worry about who voted for him at tribal council. At the reward challenge, Jeff showed everyone a sneak peek at the award challenge except for Jenna because they never received a video for Jenna. Greg went first and no one hit the mark closer, so he won reward and saw his home video from his sister and sent one back to her. Rudy thought there might be some incest behavior between Greg and his sister. Jenna was frustrated about losing the reward challenge and instead of watching Greg's video, continued to practice with the bow and arrow, continually hitting the target closer than Greg's mark. People began to realize that Richard liked Greg because of the way he was playing the game. Greg realized that Richard was a powerful player in this game. Gervase won immunity. At tribal council, the Tagi 4 and Jenna piggy-backed off Sean's alphabet strategy and voted out Greg 6–3.

## Episode 9: Old and New Bonds

- **Reward Challenge:** A rope course with 16 legs, each leg had a medallion with the castaways number on it. First castaway to receive all of their medallions and get back to the center won reward.

http://e... CONFIDENTIAL/SUBJECT TO PROTECTIVE ORDER          CPD0206110

- **Reward:** A barbecue and letters from home.
  - **Immunity Challenge:** The castaways started on a square and moved one square at a time. As they moved, they had to flip over the square they were just on. Each castaway would go until they could no longer move. Last person standing wins immunity.

While Richard was catching fish, people began to realize that nobody voted him out because of it. Rudy didn't made the fire hot enough so the fish wasn't done when it got off the fire, and the attempt to recook it simply burnt it. At the reward challenge, Jenna wanted to win because she didn't hear anything from her family at the last challenge. It was a race between Colleen and Kelly, which Colleen narrowly won. When Colleen won, Jeff told her she could pick one other person and she instantly chose Jenna. After the reward challenge, it was Richard 39th birthday and he celebrated in his "birthday suit". Richard spent his entire birthday naked which disturbed some of his tribe mates, especially Colleen and Jenna. Rudy won immunity over Sean. Sean was convinced that his alphabet strategy of voting for people was the fairest way and that there was no alliance because he wasn't asked to be a part of it. He continued to vote that way and even told Jenna beforehand that he was voting for her but that he didn't think it would make a difference. At tribal council he was once again proven wrong, as Richard, Rudy, and Sue again piggy-backed off his vote and Jenna was voted out 4–3–1.

## Episode 10: Crack In the Alliance

- **Reward Challenge:** Each person started at one end of a balance beam. There were three rounds, where the first half to make it to the other end of the balance beam would move on. The first person to get to the end with both feet on the platform without falling off would win.
  - **Reward:** A slice of Pizza and a phone call home.
- **Immunity Challenge:'** Each castaway had a few minutes to grab all of the kindling necessary to build a fire. They then had to take their torch out to the water to floating woks, light their torch, and bring it back to their pile of wood to start their fire. The first person to burn through their rope won.

Some people were happy that Jenna was voted out because she was getting on everyone nerves. Everyone knew that Sean voted for Jenna and that Kelly didn't, so the remainder of the Tagi alliance felt betrayed by Kelly. The alliance thought about replacing Kelly with Sean because he might have been more valuable. Richard's plan was to catch more fish once Colleen and Gervase were gone. At tree mail, the castaways were surprised by cigars and a note saying that Gervase's son Gunner was born yesterday, which they celebrated. Gervase narrowly beat Richard at the reward challenge and had a chance to call his girlfriend and daughter to see how his baby was doing. He shared his slice of pizza with everyone. While he was making his phone call, Rudy questioned Gervase's life choices (having 4 children without being married) and said that having babies out of wedlock had never happened when he was his age and that the girl would be "taken out of town" and dealt with. At the immunity challenge Richard easily won and at tribal council Gervase was seen as the biggest threat left from Pagong and was voted out 5–2.

## Episode 11: Long Hard Days

- **Reward Challenge:** Each castaway was given a questionnaire about Borneo. The person who answered the most correctly won.
  - **Reward:** The person will go on an overnight trip on a yacht and was given a Visa card.
- **Immunity Challenge:** Each person stood next to each other on a set of 5 planks. One plank would be removed over time until they got down to one plank. Whoever stayed on the longest

would win.

The Tagi alliance began to crumble because Kelly was always talking to the remaining enemy of the alliance, Colleen. Camp life started to take a toll on everyone. Sean won a reward and was surprised to see his dad on the yacht. Sean told Kelly he was going to take her for the feast, but chose Richard instead, which infuriated the women. Sean brought his dad back to camp to meet everyone, who attempted to update them on current events and the stock market (although Sue thought he didn't know anything), and before he left, he gave each person a care package from their loved ones, which rejuvenated their spirits. At the immunity challenge, Rudy fell off first. Rich attempted to annoy people off the planks by singing "99 bottles of beer on the wall"...until he fell off at 64 bottles of beer. On the beach, Rich thought it was funny that Colleen was really trying to win immunity when she had no chance of going home tonight because they were going to blindside Kelly. Sean was third to go, followed almost immediately by Sue. Colleen fell off after 2 hours and 54 minutes, giving immunity to Kelly and foiling the Tagi alliance plans. At tribal council, Sean was grilled for taking Rich on the reward instead of Kelly. Colleen, the last remaining member of Pagong, was voted out 4–2.

## Episode 12: Death of an Alliance

- **Reward Challenge:** Under a time limit of five minutes, tribe members dove into a mud pit and covered their body with as much mud as they can, then raced back and scraped it off into a bucket. They could not carry mud in their arms or in their hands, only their body. The buckets are then weighed, and the heaviest bucket won.
  - **Reward:** A cold beer, then picked up, blindfolded and taken to a mysterious bar to watch the first five minutes of this season.
- **Immunity Challenge:** "Survivor Witch Project": Jeff told the castaways a story about Borneo folklore. Once he was done, the castaways went out to the woods (where the masks with questions on them were scattered) with a video camera to record their answers. The first person to get back to the start with all of the masks and the questions right on tape won immunity.

With only Tagi tribe members left, the two people that felt vulnerable were Kelly and Sean. Kelly mentioned that she didn't trust Rich, while Rich conspired to get Kelly off next. Sean thought he was stuck with the most conniving people ever. Tempers flared at camp as Kelly and Susan had a fight about their alliance since Kelly didn't vote with them again, and Sue said that Kelly made them all look like idiots. Richard attempted to smooth things over, although he said that the fight played to his advantage. Sue got hit by a ray and her hand swelled up. On day 34, all of the castaways talked about how they missed home. Kelly collected 15.9 lbs at the reward challenge, followed by Sean (15.4), Susan (15), Rich (12.4), and Rudy (10). After the reward challenge, Susan and Kelly rekindled their friendship. Kelly went with Jeff to watch the first 5 minutes of episode 1 and talked to Jeff about how the game was going for her. On day 36, Kelly and Susan agreed to keep civil with each other, although Susan told Kelly she didn't want her in the final 3 because she was such a threat. Sean knew he needed to win immunity and attempted to exploit the Kelly-Susan friendship. Kelly won her third challenge in a row. Sean said he was definitely winning this thing even though it would be an uphill battle. Rich tried to decide whether he would be voting for Sean or Rudy, although Rudy was confident that it would be him and Rich in the final 2. While everyone spoke of voting for different people, in the end the original Tagi 4 stuck together and Sean was voted out 4–1.

## Episode 13: Season Finale

- **First Immunity Challenge:** "Fallen Comrades": Jeff asked 10 questions about the jury members. The person who got the most the questions right won immunity.

Survivor: Borneo - Wikipedia, the free encyclopedia

The remaining 4 reflected on how much their bodies have changed, and how the game was played by them and by others. Kelly said she felt like the odd man out and was stressed because she didn't feel safe. She said that she was now playing for herself. Richard, Rudy, and Sue were planning to vote out Kelly if she didn't win immunity. At the challenge, Kelly and Sue were tied after 10 questions, but Kelly got the tiebreaker question correct, giving Kelly won her fourth challenge and third immunity in a row. Directly after at tribal council, there was a 2–2 tie between Richard and Susan. During the revote in which only Rudy and Kelly voted, Kelly changed her vote and Susan was voted out 2–0.

- **Second Immunity Challenge:** "Hands on the Immunity Idol": Each tribe member held on to the immunity idol while standing on a small log. The person who lasted the longest wins immunity.

At 4:00 am on day 38, the remaining 3 were awoken by Jeff, told to put on something comfortable, and took a long boat ride to their rite of passage and final immunity challenge. For their rite of passage, they covered themselves with mud, walked through palm fronds held by locals, passed the torches of their fallen comrades, then passed through a bamboo curtain and walked barefoot through a fire pit. After two hours of holding on the idol, Jeff tempted the three with oranges. After 2 1/2 hours, Richard gave a speech, said he wouldn't be able to outlast Kelly, and stepped down voluntarily. He said that it was a game of odds and he didn't know what the winner would actually do. After three hours, the two left switched positions while keeping their hand on the idol and were to do so every half hour. While the two were still standing on the pole, Rich addressed the alliance to Jeff and how he wasn't surprised that Kelly changed her vote. After 4 hours, 11 minutes, Rudy took his hand off the idol while switching spots, and Kelly won immunity yet again. Rich and Rudy both said it was in Kelly's best interest to keep themselves. At tribal council Kelly voted out Rudy because she thought she might have a better chance of winning against Richard.

At the final tribal council, Gervase asked if there was one, two or three things they would change about their time on the island, if anything at all (Rich said trusting people so easily; Kelly said making an alliance). Jenna asked who they would put in the final 2 and why (Rich said Rudy and Greg; Kelly said Sonja and Gretchen). Sean had no questions, but congratulated the two and thanked Kelly for being capable and keeping camp afloat, and told Rich that he enjoyed his company although he played the game differently. Colleen asked what three character traits got them where they are and are essential to get future players to the finals (Kelly said faith, strong will, and likability; Rich said self-awareness, observation of relationships, and ethics). Greg had them choose a number between 1 and 10 (Rich said 7; Kelly 3). Sue gave her famous "rat and snake" speech. In the end, Rudy, Sue, Sean, and Greg voted for Rich and Jenna, Gervase, and Colleen voted for Kelly. With that, Richard Hatch became Survivor's first millionaire by a vote of 4–3.

## Voting history

| | | | | Original Tribes | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Episode #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Eliminated: | Sonja 4/8 votes | B.B. 6/8 votes | Stacey 5/7 votes | Ramona 4/7 votes | Dirk 4/6 votes | Joel 4/6 votes | Gretchen 4/10 votes | Greg 6/9 votes | Jenna 4/8 votes |
| **Voter** | | | | | **Vote** | | | | |
| Richard | Stacey | | Stacey | | Dirk | | Gretchen | Greg | Jenna |

Survivor: Borneo - Wikipedia, the free encyclopedia                      Page 12 of 16

| Kelly | Rudy | | Rudy | | Dirk | | Gretchen | Greg | Sean |
|---|---|---|---|---|---|---|---|---|---|
| Rudy | Sonja | | Stacey | | Dirk | | Gretchen | Greg | Jenna |
| Susan | Sonja | | Stacey | | Dirk | | Gretchen | Greg | Jenna |
| Sean | Sonja | | Stacey | | Rudy | | Colleen | Greg | Jenna |
| Colleen | | B.B. | | Ramona | | Joel | Richard | Jenna | Richard |
| Gervase | | B.B. | | Colleen | | Jenna | Susan | Jenna | Richard |
| Jenna | | B.B. | | Ramona | | Joel | Gervase | Greg | Richard |
| Greg | | Ramona | | Jenna | | Joel | Jenna | Jenna | |
| Gretchen | | B.B. | | Ramona | | Joel | Rudy | | |
| Joel | | B.B. | | Ramona | | Jenna | | | |
| Dirk | Sonja | | Stacey | | Susan | | | | |
| Ramona | | B.B. | | Colleen | | | | | |
| Stacey | Rudy | | Rudy | | | | | | |
| B.B. | | Ramona | | | | | | | |
| Sonja | Rudy | | | | | | | | |

| Jury vote | | |
|---|---|---|
| Finalist: | Kelly 3/7 votes | Richard 4/7 votes |
| **Juror** | **Vote** | |
| Rudy | | Richard |
| Susan | | Richard |
| Sean | | Richard |
| Colleen | Kelly | |
| Gervase | Kelly | |
| Jenna | Kelly | |
| Greg | | Richard |

## Production

In 1998, CBS offered Mark Burnett the chance to present his idea of this reality show to producers. In October 1999, CBS held a casting call for a new reality show concept. The idea was *Survivor,* in which sixteen people would be stuck on an island 20 miles (32 km) away from the mainland of Borneo. Ten main cameras were set on the island that would film the castaways every day. Every three days, a Tribal Council would be held in which

The abandoned institute is on the island of the boomerang's open "V." This is the leeward side of the island. It faces west, and the South China Sea sunsets turn the sand orange-purple each evening at 6:30. One these shores we built a dock for offloading equipment, then living quarters with cold-water showers for sixty-five personnel-the camera crews, the production staff, and the assorted other individuals vital to producing thirteen hours of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

one castaway would be voted off the island. The last castaway to be on the island would win $1 million.

> prime-time television.
>
> Mark Burnett, *Survivor: The Ultimate Game* — Page 11

Over 6,000 people applied for the show; 800 were then interviewed in sixteen cities. 48 people were then chosen, and after background checks and psychological evaluations done by the producers, the final sixteen contestants and two alternates were picked.[1]

As the survivors awaited the game's start, *Survivor* crews prepared the island for reward and immunity challenges, removing any harmful items, checking for any harmful animals in specific locations, and building a Tribal Council set. Camera and other crews were sent to the island three weeks in advance for testing. On the opposite side of the island from the tribes, headquarters were set up for the producers, and crew to live in on the island. This facility included many traditional trailers with running water, televisions, and one phone line. The Tribal Council set was built two hundred yards from the crew's facility. The Tribal Council set was 30 by 30 feet (9.1 by 9.1 m) with no walls and only a platform. In the middle of the set was a fire lava pit providing fire for the torches, which represented the castaways' life in the game.[1][7]

On March 7, 2000, the contestants were flown to Los Angeles, then to the city of Kota Kinabalu in Malaysian Borneo. From there, they were taken by boat to their island. Contestants were not allowed to speak to one another until they got on the boat headed towards their beaches.[1] The two tribes shared the island of Pulau Tiga, which was divided by over 20 miles (32 km) of forest. The castaways were surrounded by wildlife such as pythons, kraits, adders, monkeys, monitor lizards, and white-bellied sea eagles.[1][7] The show was set to air in the summer of 2000.[1][7]

## Reception

*Survivor: Borneo* received mixed reactions in the media. Bill Carter, a writer for *The New York Times* stated that *Survivor* has "clearly begun to emerge as part of the wider culture, with news and discussion about the show widespread on television and radio talk shows and coverage increasing in newspapers."[8] On the *Late Show with David Letterman*, David Letterman began a segment titled, "Top 10 Things That'll Get You Thrown Off the Survivor Island." During the first season, *USA Today* held coverage of the show as if it were a sporting event, listing which participant was voted off. *USA Today* also held a poll to see who viewers would have voted off. With 26 percent, Susan Hawk won the poll, although it had no effect on the game, as Sue made it to 4th place. CBS's *The Early Show* held an interview with each contestant the day after the episode in which they were voted off aired. By the second week, the show had already gained over 18 million viewers, beating out ABC's show *Who Wants to Be a Millionaire?* in ratings.[9] After the season finale, Carter said that *Survivor* "built over a 13-week run to what was expected last night to be the biggest single television audience ever assembled for a summer television series, far eclipsed every expectation the network had when it acquired the rights to the show last year." Leslie Moonves, the president of CBS Television said that "it has beaten our expectations by about double."[8] The finale of *Survivor* was watched by 51.7 million viewers, the second-highest viewership of any American television episode during the first decade of the 21st

> I always believed it was going to generate strong water cooler conversation. Nobody could have predicted the ratings success. But I knew that the premise — a group of people marooned on an island, where they had to survive by working together, and they had to work against each other to win a million-dollar prize-I knew that premise was superior.
>
> Mark Burnett, *The New York Times*[8]

century, exceeded only by the finale of *Friends*.[10] The finale had higher ratings than the World Series, N.B.A. finals, N.C.A.A. men's basketball finals, and Grammy Awards of that year. CBS was able to make the cost of commercial advertisers up to $600,000 during the season finale.[8]

*Survivor: Borneo* was criticized by the People for the Ethical Treatment of Animals (PETA) in response to footage showing the contestants trapping rats on the island, initially for fish bait but later for human consumption.[11]

> I plead to the jury tonight to think a little bit of the island we have been on. This island is full of, pretty much, only two things - snakes and rats. And in the end of Mother Nature, we have Richard The Snake, who knowingly went after prey; and Kelly, who turned into the rat that ran around like rats do on this island, trying to run from the snake. I believe we owe it to the island spirits we have come to know to let it end in the way that Mother Nature intended: For the snake to eat the rat.
>
> Susan Hawk, *Survivor: Borneo*, Episode 13[12]

Susan Hawk's "snakes and rats" speech given during the final Tribal Council has been considered one of the greatest and more memorable speeches in the show's history,[13][14]

## DVD release

The DVD release of season one was released by CBS Home Entertainment in the U.S. on May 11, 2004, after it had completed broadcast on television. As well as every episode from the season, the DVD release features bonus material including commentary, interviews and behind-the-scenes featurettes.[7][15]

| The Complete First Season | | |
|---|---|---|
| | **Set details**[15] | **Special features**[7] |
| | ■ Audio commentary<br>■ 664 minutes<br>■ 5-disc set<br>■ 1.33:1 aspect ratio<br><br>■ Languages:<br>  ■ English (Dolby Digital 5.1) | ■ Documentaries<br>■ Episode Summaries<br>  ■ Highlights<br>  ■ Immunity Challenges<br>  ■ Reward Challenges<br>  ■ Voting Results<br><br>■ Survivor Profiles<br>■ Survivor Favorite<br>■ Voting History<br>■ Final Words<br>■ The Island |
| | **Release dates**[2] | |
| | ▮◆▮ Canada \| ▤▤ United States | |
| | May 11, 2004 \| May 11, 2004 | |

## References

Survivor: Borneo - Wikipedia, the free encyclopedia                    Page 15 of 16

## Notes

- [A] The **Total Votes** is the number of votes a castaway has received during Tribal Councils where the castaway is eligible to be voted out of the game. It does not include the votes received during the final Tribal Council.
- [B] In the case of multiple tribes or castaways who win reward or immunity, they are listed in order of finish, or alphabetically where it was a team effort; where one castaway won and invited others, the invitees are in brackets.
- [C] The first challenge was a combined reward/immunity challenge. The winning team received immunity and waterproof matches.
- [D] Sometime between day four and six, a reward challenge took place that was not aired. The challenge involved holding weight on poles. Richard held the weight for Tagi, as Joel for Pagong. The reward was a map to a closer water hole.
- [E] The final four vote was tied with Richard and Sue each receiving two votes. In the tie-breaker vote, Rudy continued to vote against Sue while Kelly changed her vote from Richard to Sue.
- [F] There was no reward challenge because of the tribal merge.
- [G] Richard and Susan were not eligible to vote in the second Tribal Council vote.

## General

- "Survivor: Borneo contestants (Archived (http://web.archive.org/web/20051224192138/http://www.cbs.com/primetime/survivor/survivors/). CBS.com. http://web.archive.org/web/20051224192138/http://www.cbs.com/primetime/survivor/survivors/. Retrieved 2007-06-21.
- Burnett, Mark; Martin Dugard (2000). *Survivor: The Ultimate Game*. New York, New York: TV Books. pp. 237.

## Specific

1. ^ [a b c d e f g h i] Burnett, Mark; Martin Dugard (2000). *Survivor: The Ultimate Game*. New York, New York: TV Books. pp. 237.
2. ^ [a b] "Survivor I — Season 1 (Canadian)" (http://www.tvshowsondvd.com/releases/Survivor-Season-1-Canadian/3527). *TVShowsOnDVD.com*. http://www.tvshowsondvd.com/releases/Survivor-Season-1-Canadian/3527. Retrieved 2008-11-21.
3. ^ "Richard Hatch Sentenced To 51 Months" (http://www.thesmokinggun.com/archive/0516061hatch1.html). The Smoking Gun. 05-16-2006. http://www.thesmokinggun.com/archive/0516061hatch1.html.
4. ^ "Variety: 'Survivor' Finale Racks Up Phenomenal Ratings" (http://groups.google.com/group/alt.tv.survivor/browse_thread/thread/1cc03d896fa831eb/9054cb6ca2952f77?lnk=st&q=%22Survivor+Finale+Racks+Up+Phenomenal+Ratings%22&rnum=1&hl=en#9054cb6ca2952f77). Variety. 2000-08-25. http://groups.google.com/group/alt.tv.survivor/browse_thread/thread/1cc03d896fa831eb/9054cb6ca2952f77?lnk=st&q=%22Survivor+Finale+Racks+Up+Phenomenal+Ratings%22&rnum=1&hl=en#9054cb6ca2952f77.
5. ^ Porter, Rick (2004-01-20). "Burnett Wasted Little Time Finding 'Survivor' Stars" (http://tv.zap2it.com/tveditorial/tve_main/1,1002,271|85851|1|,00.html). Zap2it. http://tv.zap2it.com/tveditorial/tve_main/1,1002,271|85851|1|,00.html. Retrieved 2008-11-11.
6. ^ [a b] ""Survivor" (2000) — Episode list" (http://www.imdb.com/title/tt0239195/episodes#season-1). IMDB. http://www.imdb.com/title/tt0239195/episodes#season-1. Retrieved 2008-11-25.
7. ^ [a b c d e] Mark Burnett and Charlie Parsons-Executive Producer, Jeff Probst-Host. (2004). *Never Before*

Survivor: Borneo - Wikipedia, the free encyclopedia                    Page 16 of 16

*Seen Footage.* [DVD]. Paramount Pictures.
8. ^ *a b c d* Carter, Bill (2000-08-24). "CBS Is Surprise Winner in Ratings
   Contest" (http://query.nytimes.com/gst/fullpage.html?res=9D00E6DB1431F937A1575BC0A9669C8B63).
   *The New York Times.* http://query.nytimes.com/gst/fullpage.html?
   res=9D00E6DB1431F937A1575BC0A9669C8B63. Retrieved 2008-11-22.
9. ^ Carter, Bill (06-08-2000). "'Survivor' Is a Strong Draw, Proving Itself a Hit for
   CBS" (http://query.nytimes.com/gst/fullpage.html?
   res=9C05E4DD113FF93AA35755C0A9669C8B63&sec=&spon=&pagewanted=1). *The New York Times.*
   http://query.nytimes.com/gst/fullpage.html?
   res=9C05E4DD113FF93AA35755C0A9669C8B63&sec=&spon=&pagewanted=1. Retrieved 2008-11-22.
10. ^ Hibbert, James (2009-12-02). "Top 10 most-watched shows of the
    decade"
    (http://www.hollywoodreporter.com/hr/content_display/news/e3i70088a26615e879a5897d303a348a7ec?
    pn=1). *The Hollywood Reporter.*
    http://www.hollywoodreporter.com/hr/content_display/news/e3i70088a26615e879a5897d303a348a7ec?
    pn=1. Retrieved 2009-12-05.
11. ^ "Fury at 'tasteless' TV rat barbecue" (http://news.bbc.co.uk/2/low/americas/796293.stm). BBC. 2000-06-
    18. http://news.bbc.co.uk/2/low/americas/796293.stm. Retrieved 2008-12-09.
12. ^ "Survivor: Endgame" (http://www.televisionwithoutpity.com/show/survivor/the_final_four.php?page=1).
    Television Without Pity. 2000-08-23.
    http://www.televisionwithoutpity.com/show/survivor/the_final_four.php?page=1. Retrieved 2008-12-09.
13. ^ Denhart, Andy (2007-05-14). "Broken promises abound on 'Survivor'
    finale" (http://www.msnbc.msn.com/id/18648076/). MSNBC. http://www.msnbc.msn.com/id/18648076/.
    Retrieved 2008-12-09.
14. ^ Probst, Jeff (2008-12-04). "Jeff Probst blogs 'Survivor: Gabon' (episode
    12)" (http://popwatch.ew.com/popwatch/2008/12/jeff-probst-blo.html). *Entertainment Weekly.*
    http://popwatch.ew.com/popwatch/2008/12/jeff-probst-blo.html. Retrieved 2008-12-09.
15. ^ *a b* "Survivor I — Season 1" (http://www.tvshowsondvd.com/releases/Survivor-Season-1/3527).
    *TVShowsOnDVD.com.* http://www.tvshowsondvd.com/releases/Survivor-Season-1/3527. Retrieved 2008-11-
    21.

## External links

- Official CBS Survivor Borneo Website (http://www.cbs.com/primetime/survivor/recaps/?
  season=1)

Retrieved from "http://en.wikipedia.org/wiki/Survivor:_Borneo"
Categories: Islands of Sabah | Survivor seasons

- This page was last modified on 12 May 2010 at 15:52.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms
  may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit
  organization.

- Privacy policy
- About Wikipedia
- Disclaimers

Page 1 of 1

**Paul Frasier**

| From: | Mark Dannels [mdannels@cityofcoquille.org] |
|---|---|
| Sent: | Wednesday, May 19, 2010 8:09 AM |
| To: | Paul Frasier |
| Subject: | RE: Wish List #2 |

Groundhog day again?? LOL

By the way, we spoke to Big John yesterday and he advised and showed us that he went to his sister's residence on Elm, less than a block from Sherri Mitchell's residence and watched Survivor till 9:00 pm on June 28, 2000. He left minutes later and saw Nick McGuffin and Leah together on Elm Street. (he knows both of them) In the original report/information, he thought the Mitchell house was Leah's house and after showing us exactly where he was talking about, he was confused between Leah and Mitchell. It appears he observations were not given much credit due to the mix up?

In brief, that puts Leah and Nick together after 9:00 pm supporting Scott Hamilton too and putting doubt in Nick's story??

Also, most if not all of the names we have spoken to have either said sorry, I can't provide anything to help the case (Nick) or it was a rumor they heard with no merit!!

Thanks,

Mark

**From:** Paul Frasier [mailto:pfrasier@co.coos.or.us]
**Sent:** Tuesday, May 18, 2010 8:41 PM
**To:** mdannels@cityofcoquille.org
**Subject:** Wish List #2

The continuing saga.....This is not as bad as the first.

R. Paul Frasier
District Attorney for Coos County Oregon
250 North Baxter
Coquille, Oregon 97423
541-396-3121 x 307

7/6/00    HIT mtg   9-9:30AM @ Cog. P.D.

Leah Freeman
Last seen
June 28th @
9:15p - 9:30p   Chief REEVES, Dave Hall, Craig Zanni

             Young

            FBI - 2nd agent
            Wm. Soules

Federal Bureau of Investigation

FBI
DAROLD M. HESSEL
Special Agent

530 Center Street N.E.
P.O. Box 511
Salem, OR 97308

(503) 362-6601
Fax: (503) 585-5667

FEDERAL BUREAU OF INVESTIGATION

FBI
WILLIAM M. SOULE
SPECIAL AGENT

POST OFFICE BOX 687
EUGENE, OREGON 97440

(541) 343-5222
FAX: (541) 349-2388
24HR: (503) 224-4181

7/7/00   10A   HIT mtg @ 10A Cog. P.D.
    Full mtg, case history, Investigator's
    reports - time line of Leah

RE: car    Dave Hall will return s.w.
    "clean" car, not wiped
    - mentioned on T.V.
    - would Leah accept ride w/ stranger

    when did they clean car
      esp trunk

can't wipe

KW000254

CONFIDENTIAL

7/6/00   (cont.)

~10:45 A. Start search of 1967
blue Ford Mustang PEA 840
        luminol, ALS, brightlight
exam, interior, exterior,
trunk, engine, underside
vacuum (mostly dust)
duct tape. end (roll did
not look recently used)
photos including tires
car- not recently washed
interior lightly dusty
seats → clean vinyl (did
        not tape lifted)
- start report
~4 p.m. finish w/ car

5p off duty
            F.I.   8 h

_(margin note in blue:)_ Car - dust / roll # recently used / tires # washed / interior lightly dusty

7/7/00      F/lab

sunny/cw in, Lt. Pex on vac.

8A  on duty @ lab
  - sort DV photos
  - work on Cog. case,
    phone Putnam & Bend lab
    brief Lt. Pex
9³⁰A  w/ lab for Coquille
10A @ HIT team mtg in "
  RE: Leah Freeman case
↓ (includ lunch)
1P
1³⁰P w/ for Lab
    @ 12b- fllw up & drug csik
    - phones
~ 5p off duty

            P.E./F.I.   6 h
            C.S.        1 h
            admin.      1 h

KW000003

CONFIDENTIAL

Page 113

1    A.  Well, okay.  Please ask the question again,

2   because you -- I don't know if I had an expectation of

3   there -- of those tools being in the trunk.  They

4   were -- the fact that there was nothing in the trunk is

5   what was kind of unusual.

6    Q.  And we talked about the gas leak.  So how did

7   that gas leak factor into your thinking?

8    A.  I called -- I was told later that perhaps things

9   been taken out of the trunk so that they could repair

10  the gas leak.  That's something I heard somewhere along

11  the line later.  I can't even tell you when.

12   Q.  Was that something that you heard -- sorry.  Who

13  did you hear that from?

14   A.  I don't recall.

15   Q.  You said you could not tell me when you heard

16  that.  Was that before the trial or after the trial?

17   A.  It was before the trial.

18   Q.  Did you make a notation of that anywhere?

19   A.  No.

20   Q.  Did you report that information to anyone?

21   A.  No.  It was reported to me.

22   Q.  And I'm asking, did you, I guess, re-report that

23  information to anyone?

24   A.  Not in a written report.  I can't remember if I

25  talked to anybody else about it or not.

Stumptown Steno
503.888.1416

Page 114

1      Q.  Do you have a memory of talking to someone else

2   about it?

3      A.  Yes.

4      Q.  What was that memory?

5      A.  I was talking, I think, on the phone to somebody

6   and I said, well, where are the items from the trunk?

7   And they said -- or why, and they said, oh, the

8   trunk -- they knew -- they talked to witnesses or

9   something and they said, oh, well, the trunk was

10   cleaned out because they needed to fix the gas leak.

11   But that was after I did the search.  It was around

12   that time, sometime in the next day or two, maybe at

13   one of the meetings, but I can't recall specifically

14   who I talked to or even when.  But it was within a

15   couple of days of when I did the Mustang, because then

16   it was kind of like, okay, that's resolved.  We're

17   done.

18      Q.  With that new information, did you go back and

19   amend your report?

20      A.  No.

21      Q.  Is that something that the OSP protocol would

22   have required an amendment for?

23      A.  No.

24      Q.  Why is that?

25      A.  It wasn't my information.

Stumptown Steno
503.888.1416

Page 115

```
1      Q.  What do you mean it wasn't your information?

2      A.  I did not do that investigation.  I report what

3    I see, what I hear, not what people tell me.

4      Q.  And in your report, you reported that the trunk

5    compartment was empty and there was no spare tire or

6    trunk liner.  Then we saw the search warrant affidavit

7    where Detective Hall then reports again on that

8    information.

9          Did you consider going back to inform Detective

10   Hall that you had resolved that?

11     A.  No.

12     Q.  Why not?

13     A.  That wouldn't have been my job.

14     Q.  I'm going to show you what I have marked as

15   Exhibit 10.

16             (Exhibit No. 10 marked for identification.)

17     Q.  I'll blow this up because I recognize that the

18   writing is very small.  This a conversation log that we

19   received from the Oregon State Police crime lab.  Here

20   on this first entry, it's dated February 1st, 2010.

21   There was a contact from Paul Frasier to -- I think the

22   name here says Putnam, I believe that's Brad Putnam, by

23   phone.  Brad Putnam writes here in this section --

24     A.  Hang on just a second.  Can we get rid of this

25   tab right there so I can read what she's showing?
```



OON 481
7/17/00
EX 2
KW

p.4

Left shoe

#2
"high" velocity (small)
blood droplet
on side of traction
square

swab #1    PHTH ⊕
   trace of small droplet & smear - top of traction squares.

swab #2
   small droplet on side of traction square.

swab #3
   trace of two smears on top of traction squares.

swab #4   PHTH ⊕
   trace of two  "    "    "    "    "    ".

swab #5
   reswabbed above areas ⇒ ABA card & PHTH ⊕.

swab #6
   reswab of all possible blood areas.

Shoe diagram

EX 2
OON481
KW

C.
T
   ⊕
   human
   blood
   KW

S    ○

OSPLab_002004

Page 136

1    Q.  When we started this deposition, you mentioned

2  that you had reviewed some areas of your testimony from

3  the trial.  Did you review your testimony about the

4  medium to high -- sorry.

5        Did you review your trial testimony about the

6  medium to high-velocity blood on the bottom of the

7  shoe?

8    A.  Yes.

9    Q.  What was the basis for that testimony?  Was it a

10  conclusion at that point or still an observation?

11    A.  I'm pretty -- I can't remember the testimony

12  word for word.  It was a description of the blood.

13    Q.  And you and I have -- I guess we should define

14  this.  What's the difference, in your mind, between a

15  description of the blood versus a conclusion?

16    A.  A conclusion would be if I could duplicate it

17  and, you know, go out, put a shoe down, that -- a shoe

18  like that and duplicate that, and I wasn't sure I could

19  do that.

20        And, also, there just wasn't a lot of droplets

21  there.  It was hard to reach a really firm conclusion

22  with such a small sample.

23    Q.  So the first thing you said there was you

24  weren't sure how you could duplicate it.

25    A.  Yes.

Page 137

1    Q.  Does that go back to our earlier conversation

2  about the trainings that you did on blood stain pattern

3  analysis where you were doing experimentation to create

4  those blood droplets?

5    A.  Yes.

6    Q.  And you weren't sure how you could do that with

7  respect to the -- what you saw on the shoe?

8    A.  Yes.

9    Q.  Did you document that idea anywhere, that you

10  weren't sure how you would duplicate this?

11    A.  No.

12    Q.  And did you tell anyone about that, that you

13  weren't sure how to duplicate this?

14    A.  I don't recall.

15    Q.  And then that second idea that it's hard to

16  reach a firm conclusion when you have a such a small

17  sample, are we talking about a small amount of blood?

18    A.  So -- yes, and so few droplets.

19    Q.  So does that get to this idea of you need a

20  pattern?

21    A.  Yes.

22    Q.  Did you document that idea, that it was hard to

23  reach a firm conclusion with such a small amount of

24  blood?  Did you document that anywhere?

25    A.  No.

*[handwritten note in margin: Can't duplicate such small amt # a pattern]*

Page 138

1     Q.  Did you tell anyone about that?

2     A.  I don't recall a specific conversation.  I'm

3     sure we talked about it in the lab.

4              MR. DAVIS:  Counsel, I'd like to take a

5     break when it's convenience.

6              MS. PURACAL:  Sure.

7     Q.  I just have a couple more questions about your

8     testimony at trial, Ms. Wilcox.

9              When you testified at trial, you testified that

10    it could also be caused by getting smacked in the nose

11    and then smacked again.

12             How could this small droplet be caused by

13    getting smacked in the nose?

14    A.  It -- I was trying to make the point, I think,

15    that if you're already bleeding and then you put force

16    behind a bloody object, you can get some of these

17    little small cast-off blood droplets.

18    Q.  And you also testified at trial that it could be

19    caused by having a split lip and then coughing or

20    sneezing.  So how could it be caused by that?

21    A.  If something is already bleeding and you have

22    blood, and then put -- once again, put force behind it

23    as opposed to, you know, if you cut you finger and hold

24    it up and just let the blood drop, it's going to be a

25    pretty good-sized droplet.  Depending on you surface,

Page 139

1    it could be dime-sized, and we didn't have that here.

2        Q.  What was the evidence that you had that the

3    droplet at the area of swab 2 came from Ms. Freeman's

4    nose or lip?

5            MR. DAVIS:  Objection; mischaracterizes the

6    testimony.

7        Q.  You can answer, Ms. Wilcox.

8        A.  I had no idea where the blood came from.  I was

9    asked a question.  I didn't make a conclusion.

10       Q.  How do you account for directionality to

11   determine that the blood could come from Ms. Freeman's

12   nose or lip and end up on the bottom of her shoe?

13           MR. DAVIS:  Objection; mischaracterization.

14       A.  I did not.

15       Q.  You did not make that determination?

16       A.  Correct.

17       Q.  Did you talk to any of the investigators prior

18   to trial about the difference between a description of

19   the blood and a conclusion?

20           MR. DAVIS:  Objection; asked and answered.

21       Q.  You can answer, Ms. Wilcox.

22       A.  I don't remember any specific conversations.

23           MS. PURACAL:  I think we can take a break

24   now.  We'll go off the record for ten minutes and come

25   back at 2:30.

KKarcher

Kristine M. Karcher
December 23, 2021

1      A.   No.  I don't remember.

2      Q.   Did you review the reports of others who had

3 analyzed the shoes?

4      A.   Um ...  What specifically are you asking about the

5 shoes?  Because some things I remember about the shoes.

6      Q.   Well, why don't we start with that.  Can you tell

7 me what you do remember about the shoes?

8      A.   I remember when Kathy Wilcox -- I believe it was

9 Kathy Wilcox -- located blood on the shoe, high-velocity blood

10 on the bottom of the shoe.  And I happened to be in the crime

11 lab picking something up or delivering something when she came

12 out and told Lieutenant Pex that she had found high-velocity

13 blood.  That's about my whole interaction with the shoes.

14      Q.   Did you actually see the bloodstain pattern on the

15 shoe?

16      A.   No.  I never saw the shoe.  It was back in the

17 crime lab.  I wouldn't -- I wouldn't have been allowed back

18 there.

19      Q.   Do you remember anything else about the shoes?

20      A.   No.

21      Q.   And I was wanting to know if you had reviewed Kathy

22 Wilcox's report of examining the shoe.  Do you remember

23 reviewing that report?

24      A.   No.

25      Q.   And I guess I should ask a better question there.

Kristine M. Karcher
December 23, 2021

1    I asked if you remember reviewing the report.  Is it possible
2    that you reviewed the report, or is that not something that you
3    reviewed?

4         A.   That is not something that I routinely review.  I
5    don't -- I don't review analysis.  When it comes back from the
6    crime lab, it doesn't come through me.  I collect and package.
7    I don't test or analyze.  And so we might hear in a briefing
8    what was found, but it -- the report wouldn't have come to me,
9    nor would I have looked at it.

10        Q.   Is that the same for the DNA reports on the shoes?

11        A.   Yes.  Mm-hm.

12        Q.   When we were talking earlier about your role as a
13   death investigator, it sounded like you were gathering
14   information to try and determine the cause and manner of death.
15   Is the reports about the shoes -- does that not impact your
16   opinion on the cause and manner of death?

17        A.   Yes.

18        Q.   I want to make sure that's clear for the
19   transcript.  It does not impact your opinion.  Is that right?

20        A.   It impacts our opinion.  It's information to put
21   within the puzzle.  It's another piece of the puzzle.

22        Q.   Okay.  So it does impact your opinion.  So is there
23   a reason --

24        A.   Yes, it does.

25        Q.   Is there a reason that you did not review the

Kristine M. Karcher
December 23, 2021

1    A.   I don't remember.

2    Q.   What about before grand jury?

3    A.   I don't remember any specific conversations.  But

4 we -- I mean, we would have- -- we could have, but I don't

5 remember.

6    Q.   What did you tell him that it could have been

7 caused by?  High-velocity impact spatter, what it -- could it

8 be caused by.

9    A.   Well, I think I testified that high velocity can be

10 from, like, an explosion or a sneeze or a cough, a gunshot.

11 It's usually very small.  Sometimes it's even like mist, it's

12 so small.

13    Q.   You've testified at trial that it could also be

14 caused by a cut in the mouth.  How would it be caused by a cut

15 in the mouth?

16    A.   You know, that would have been -- what I'm

17 referring to, I believe, is that that could have been where the

18 blood source came from, and then she coughed or sneezed, and it

19 caused the high-velocity blood spatter to come out of her

20 mouth, maybe from like a little nosebleed or a bite in her

21 mouth or a cut from her braces on her -- inside her mouth,

22 something like that.  But there had to have been a source of

23 blood for there to be blood spatter.

24    Q.   What was the evidence that you had that it came

25 from her mouth or her nose?

Kristine M. Karcher
December 23, 2021

1      A.    I had no source.  It was just a possibility.

2      Q.    Were you aware of where the blood was on the shoe?

3      A.    It was on the bottom.  I don't know where on the

4  bottom.  I just had learned it was on the bottom and I think o

5  the shoelace, if I remember right.  But my memory is not good

6  about that shoe.

7      Q.    So how did you account for directionality to

8  determine that the blood could have come from her mouth or her

9  nose and ended up on the bottom of her shoe?

10     A.    Well, I think that it was just a theory, and it's a

11 possibility.  It's a way for there to be blood to spatter on

12 her shoe.  And to get on the bottom of the shoe, it had to have

13 come from above.

14     Q.    And that's what I'm trying to figure out.  So if it

15 came from above, how does it end up on the bottom of her shoe?

16     A.    She probably didn't have her shoe on.  And, again,

17 that's just a theory and a speculation, and I have no idea.

18 But that's just a theory.

19     Q.    So you didn't have any evidence to support th--

20 theory or speculation at that time.  Is that correct?

21     A.    That's correct.

22     Q.    You also testified that it could come from

23 strangulation.  How would that work?

24     A.    Well, strangulation causes a backflow of -- i

25 occludes your circ- -- or it can occlude your circulation.  So

U.S. Legal Support | www.uslegalsupport.com          142

*[handwritten margin note: just possibility blood from mouth]*

*[handwritten margin note: directionality - just a theory - a possibility, theory + speculation to bottom of shoe]*

Kristine M. Karcher
December 23, 2021

Strangulation again a possibility no evidence to support

1  the circulation coming is being pumped from your heart an
2  going to your brain.  And about 20 percent of our blood i
3  our brain.  So when you stop -- all of a sudden stop it, maybe
4  blood -- if you stop the carotid, the blood can't get back --
5  can't get back up there.  If you stop the jugular, the blood
6  can't get back out of the -- of your brain.  So at that point
7  there's a possibility that your heart keeps beating, blood
8  keeps going up there, and it causes all of your veins and
9  capillaries to become engorged and rupture.

10          It's not uncommon to see a bloody nose with a
11  strangulation victim.  It wouldn't be unusual to find damage to
12  the inside of the lips from a strangulation event.  So that was
13  a possibility for the source of the blood.  Again, it was a
14  theory.  No evidence to support that.

15      Q.   Were you the one who arranged the DNA testing on
16  the shoes and the clothing by the lab in England?

17      A.   That was -- arranged?  I made contact with
18  Ms. Taylor, who contacted their lab, and so it was through me
19  and through law enforcement and the DA's office.

20      Q.   And I understand from your testimony earlier that
21  you did not examine the clothing before you took it to the lab
22  in England.  Is that correct?

23      A.   That's correct.

24      Q.   What was the goal of the testing through the lab in
25  England?

**CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER**

SYNOPSIS OF VIDOCQ SOCIETY CASES

207. The Murder of Leah Freeman,  2000

This case was presented by DA R. Paul Frasier, of Coos County, OR (503-378-6347) and Mark
Dannels, Chief of police of Coquille, OR (541-396-2114) with help from Lisa McOwen, OR
DOJ and  Craig Zanni, County Investigator on 21 Jan 2010.   The victim, 15 years old,
disappeared on 28 Jun 2000 and her skeletonized remains were found on 3 Aug 2000 and few
miles away.  Suspicion fell on her older boyfriend who was described as over controlling and
infatuated with Leah.  The Chief of Police appeared to have hindered the investigation of the
case and the investigators found that the high school kids had subscribed to a code of silence
about the case. The suspect was found to be deceptive on two polygraphs tests and his buddy was
found to be deceptive on knowing about the crime.  The suspect and his father were seen burning
"trash" during a "no open fires ban" and the suspect's car trunk was completely sanitized with
the removal of everything down to the gas tank. Since that time, the suspect has attempted
suicide twice when under pressure. Compounding the issue was that although Leah was
murdered, the cause of death could not be determined.   We suggested that this was a PA
organized murder and the tenth anniversary is coming up soon and some publicity may bring out
some information.

Richard advises me that after discussion, they realized that the motive for the crime was that the
BF wanted to get Leah pregnant, not the other way around, and they must have had a fight where
her bloody shoe was found.  It was a PA case and PAs hit for the face, therefore blood, and then
they surmised that the BF put her in the trunk of the car that he was driving and called his father
who came over and switched cars, allowing the BF to drive around being noticed while the father
dumped the body. It explains the sanitation of the car trunk and the unauthorized burning and
that the BF had an alibi of driving around looking for Leah.  His written statements and
polygraphs all indicate that the BF was lying about killing her and his buddy was lying about
knowing about the case but not having killed her.  He told his buddy what happened knowing
that he would not "snitch".

Richard says that the DA was very impressed and indicated that they now saw the case in a new
light and he may have enough to indict.

Remember, she was on her way to get birth control pills and the BF after the crime impregnated
another 14 years old that he could control. ABC is filming the case. The boy friend, Nick
McGuffin was indicted in Aug 2010 and the case was featured on 20/20 on 15 Oct 2010.  Some
changes in the thought process were noted where another girl friend's car was used, not the
father's car.  Jurors found Nicholas James McGuffin guilty of manslaughter, but not murder. Ten
of the 12 jurors voted for the conviction, which indicates McGuffin recklessly killed his 15-year-
old girlfriend in June 2000, but not necessarily intentionally. (27 July 2011)

'I kind of lost control," Court-right said. 'I've fought so hard for so long."

15698820.1:05472-0677

1
1

VIDOCQ_000009

**CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER**

McGuffin will be sentenced Aug. 1. Manslaughter is a Measure 11 crime, so he will face a minimum of 10 years in prison and a maximum of 20. Any sentence will include time served, in this case one year.

District Attorney R. Paul Frasier chose to include manslaughter as a lesser included charge for the jury to consider if it found McGuffin not guilty of murder.

'I did that because I really do not believe that Nick McGuffin woke up that morning and thought, 'I'm going to kill Leah Freeman,'" Frasier said at a press conference after the verdict.

It was a point he made several times during his closing argument Monday.

2
2

VIDOCQ_000010



PEX

Conversation Log

Case # 00N-0481



| Date | Individual/Agency Discussed With (Initiated Contact ✓) | Lab Staff (Initiated Contact ✓) | Contact By [phone, e-mail, v-msg, in-person] | Comments |
|---|---|---|---|---|
| 2-1-10 | Paul Frasier ✓ | Putnam | Phone | Paul called and told me about the Leah Freeman case – I knew that it was being investigated already and we chatted about the case. He told me that they "had the car" that the boyfriend was driving at the time and although it had been processed by Kathy Wilcox it was unclear on exactly what was done. He told me that he had retained Jim Pex and because he was involved initially. Paul told me that he knew that "we hated Jim" and were we going to be mad that he help in the investigation. I told him that we didn't "hate" Jim – I was very disappointed with Jim's current testimony record and found him untruthful at times – I told him that who he chose to assist in an investigation was his decision, OSP had a policy about redoing evidence, but we would continue analysis of any stain found. Paul told me that "Jim would take it down to the frame if necessary". Paul went on to ask about some hairs that had been identified and collected from the tape lifts of the victims shirt – Micro-trace had found them, but now they are at Coquille PD. I told him that if we have standards we would attempt to get DNA off the hairs. We discussed the probative value of the hairs and comparing them to the boyfriend – he agreed that he would have a hard time arguing that they are significant to the proof that boyfriend killed her. |
| 2-1-10 | Pat Smith Coquille PD | Putnam | Phone | I returned Smith's phone call. He wanted to know where to send the hairs. The item is Ex 26 I looked on the form 49's in the case and it appears to be tape lifts collected at the scene by Wilcox. I told him that I would check with DNA, but was inclined to have him go directly to Portland with the evidence. I asked if he knew if the hairs had been evaluated for the possibility of having DNA. He read me a little of the report and we agreed that it was unclear – I believe that they just identified the objects has hair. |

OSPLab_002777

<u>01/28/10 Debriefing 1500 hrs</u>

**Pretext Calls:**
**Bruce-Scott asks for Nick's number**
**"why are they bothering you too?"**
**S-"Yeah"**
**"They're bothering everybody"**
**541-252-1034**

**Nick-Tells Scott**
-say whatever you want
-in reference to the trip to Lee Valley "As far as that part, they don't need to know that"
-They're fucking with me pretty hard
-has told attorney
-re-interates don't need to know about that (trip to Lee Valley)
-you don't have to talk to them
-dropped her off at Cherie's for a couple of hours
-she didn't come back
-Cherie giving her a guilt trip (only reason she went over there)
-not getting along with Cherie
-Cherie talking shit about her
**left early because Cherie & her mom got in an argument**
**Cherie & her mom telling Leah not to date Nick**
-references that he's aware of several people cops have already talked to
-says he's in the Mustang all night (unsolicited)
-didn't have the T-Bird, grounded from it, Dad had the Jeep
-smoked a bowl w/West right before I got Leah

**John working on Ricky Crook polygraph**

**Chief & Lt looked at car:**
**Jim Pex willing to go over car again**
**Pros & cons:** Pex doesn't have great relationship with crime lab
He's a blood splatter expert, but how is he at trace?
Credibility w/courts??? check w/Paul

**Umpqua Forensic Evidence-see what this guy can offer (from the Lt)**
-need Paul's imput

**Lt:phone records**
-need a subpoena before they'll even look at the records

**??How did Nick contact Dad that night??**

**Previous subpoena records shows only the 2244hrs call from Fast Mart payphone**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CPD002161

PEX

Kristine M. Karcher
December 23, 2021

1   bones.  Is that right?

2       A.    That's right.

3       Q.    And there was no evidence of fractures to her face.

4   Correct?

5       A.    No.  Correct.

6       Q.    And her nasal bones were intact.  Do you remember

7   that?

8       A.    Yes.

9       Q.    And the bones around both of her eyes, those were

10  intact as well.  Do you remember that?

11      A.    Yes.

12      Q.    Do you remember that her cheek bones were also

13  intact?

14      A.    Yes.

15      Q.    And her maxilla, that was also intact.  Right?

16      A.    Yes.

17      Q.    And her jaw showed no sign of significant injury?

18  Do you remember that?

19      A.    Yes.

20      Q.    Okay.  Did you review the report from the autopsy?

21      A.    I have seen that report, yes.

22      Q.    You testified at the grand jury that there was a

23  path in the grass like someone had walked over to the edge and

24  looked down.  What was the evidence that you had of someone

25  walking over to the edge?

Kristine M. Karcher
December 23, 2021

1     A.    I think I said that was a path where somebody could

2   have, but it looked more like an animal path.  It could have

3   been either.

4          MS. HENDERSON:  If you want to talk details about

5   grand jury or her trial testimony, it might help to pull that

6   up so that we can be precise.  But I don't know how much

7   further we're going to go into that.

8   BY MS. PURACAL:

9     Q.    Ms. Karcher, I'm showing you what we have marked as

10  Exhibit 2, which is your grand jury testimony.

11    A.    Mm-hm.

12    Q.    It's page 20 of the PDF.  It's page 146 of the

13  transcript.  From line 1 it says -- you're testifying here at

14  the grand jury, and you say "The other thing that was

15  noticeable when we came was it looked like there was a path

16  that somebody -- the grass was tall along the shoulder of the

17  road, but that area it looked like there was a path; that maybe

18  somebody had walked over to the edge and looked down."

19         Do you -- and you also said "It could have been an

20  animal coming back and forth."

21         I'm focused on this part, this part that you say

22  "that maybe somebody had walked over to the edge and looked

23  down."  What was the evidence of that?

24    A.    Well, there was -- any time you find a body

25  that's -- that's out in the woods or in foliage and there's a

Exhibit 16, Page 76 of 149

Kristine M. Karcher
December 23, 2021

 1  path to it, you have to consider that that's -- some person

 2  might have walked on that, and avoid walking on that area.

 3           So we all noticed the path, and it could have been

 4  from somebody walking on it.  More than likely it was an

 5  animal, but it could have been either.  So we had to treat it

 6  as if somebody was walking, if there was evidence that might be

 7  there in that path.

 8       Q.   And what was the evidence that somebody had looked

 9  down?

10       A.   Well, the only reason you would walk over to where

11  the path was was to look down.  I mean, you're right on the

12  edge of the -- the embankment.  It would just make sense that

13  that's what they were doing.  And that's just a -- that's just

14  a theory.  It's not -- we didn't see anybody there looking

15  down, but there would be no other reason for you to be there in

16  that spot.

17       Q.   So did you have any evidence to actually

18  corroborate the idea that somebody walked the edge and lo

19  down?

20       A.   No.

21       Q.   There's no mention of this path or somebody walking

22  to the edge and looking down in anything prior to grand jury in

23  2010.  So how did you remember that detail for those 10 years?

24       A.   That's the reason that we found the alternate path

25  was so not to disturb the path above the body.  That's why we

Kristine M. Karcher
December 23, 2021

1   went down the road and developed a different approach to her
2   body, so that we wouldn't disturb that path until they could
3   assure that there weren't footprints or some pieces of evidence
4   within that path.
5        Q.   So who was it that was responsible for processing
6   the path?
7        A.   It's Lieutenant Pex, and he described that in
8   his -- I believe it's where he's describing the texture of the
9   dirt and the gravel that wouldn't pick up footprints or tire
10  prints.  So he ruled that out.
11       Q.   He ruled what out?
12       A.   He ruled out the fact that you could not obtain
13  evidence from that foliage or from the surface of the ground
14  there.  It would not take tracks or tire prints.
15       Q.   Okay.  So I'm going back to Lieutenant Pex's report
16  which we've got marked as Exhibit 9 here and --
17       A.   If you go down to "The area surrounding the body
18  and below," it says "Our own shoe impressions from walking
19  along the roadway and walking in the designated trail to the
20  body do not" -- they could not pick up shoe impressions.
21       Q.   Okay.  I'm understanding what he's talking about
22  here is the path that you all walked to the body.
23       A.   I think it's the same ground, that it's not going
24  to pick up shoe prints.
25       Q.   Okay.  My question is who processed this other path

Exhibit 16, Page 78 of 149

Kristine M. Karcher
December 23, 2021

1  that you're saying where somebody came to the edge and might

2  have looked down?  Who processed that path?

3       A.   I didn't say anybody walked over there and looked

4  down.  I said it could have been a path that somebody could

5  have walked on for the purpose of looking down.  There was no

6  evidence in that path, nor did Lieutenant Pex find any evidence

7  in that path, that anything other than -- we couldn't even

8  prove that it was an animal path, let alone a human path, but

9  it was there, and we made note of it and worked around it.

10       Q.   Where did you make note of it?

11       A.   In our -- in our development of a different

12  approach to the body.

13       Q.   Okay.  So when you say "made note of it," that's

14  not something that you documented in some way?

15       A.   No.  Not with pen.  We didn't -- I didn't make note

16  of it with pen.  We, on the scene, noticed the path and then

17  found a different route in to Leah's body.

18       Q.   Did you alter -- and I think we talked about this

19  before, but my understanding is that you didn't alter the

20  position of the body in any way before it was extracted from

21  the scene.  Correct?

22       A.   Correct.

23       Q.   And you didn't see anyone else alter the position

24  of the body before it was extracted from the scene.  Correct?

25       A.   Correct.

10-13-09                                    Q 20001905
Bruce McGuffin - report

Susp: Nick McGuffin / Brent Bartley

Loc: N. McGuffin - Church Rd, CB
      56246 Baker Rd, Coquille (McGuffin's rent
      B. Bartley - 1155 N Anderson, CB

Veh: ZTA 378  Sil Dodg Stratus (N.M.)
      D10958 '94 Ford F35 PU (B.M.)
      HND386 Blu '77 Chev PK (L.B.B.)

mtg:
Pictures - Still missing Some (Crime Lab) → Brad
Kris K - No response on the Clothing
         Was Sent to England, trouble getting
         it back

ViDuct - retired L.E.
         Present to them for ideas & Suggestions
         2 going Nov. 19, 2009

Mike Stupfel did a diagram - Looking for
      his work. has located a case
      file - 5 reports, but not his work
✱ Google Earth, or go to site & reconstruct
VanZel helped Stupfel w/the diagram
Dale Oester Did a report / Oester has a
      hand diagram

*(margin, sideways):* Looking for Stupfel diagram

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020539

Riddle will make a Copy?
- Nothing @ his ofc
Sean will Check thru the Case files
again for the Missing diagram
Pat - Contact Dave Hall See what he has
Pat D - Will Check CCSO file

FBI - Analyst for Nick
Tips Management

Web Page - one Central tip line off the
City Web Page
Stay Away from Private Leah Freeman
Page - More Control

Greenacres Auto Wreckers -
67 Ford Mustang - 4 (One has been
Eliminated)
Other 3 don't Match Color Concept
1 title Still reg to original owner doesn't
remember name
Greenacres will hold the Cars

OPS Plan -
Focus - Nick McGuffin
Branches to Father - Report w/his
Thoughts (2005)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER         CPD020540

Kelly met w/ Bruce & he turned-in
report. Also turned in a letter from
someone in jail

Tap on phones - Still waiting
When go public

2 people to interview Nick
Dad + Mom Approached Chief
hoping he will clear son - Unvited
to their home this week
"Hi, I'm here to help"
If Nick is there - Taking Pat w/ him
Get a feeling where they are at

Brent Bartley - Bonnie Chamley Gf.
No longer best buds Paranoid
Dopers
Goes to jail

Interview Chamley

Safeway employee ex of Bartley - Cop
friendly

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020541

Edgerton
Megan - Nick's Current G.F.
living w/him since 18yoa
Interview

Wayne McGuffin - In Hawaii
    - Anti-Cop

Faye & Ray Johnston - Campers who
    Witnessed Car pull up in
    area where body was found

Nick & Brant failed Poly

Brent weak link

Nicole Marie Nelson (Price) ex of Brent

Mom left out of loop

Kristin Steinhoff Ramsey ⟩ Same Circle / Same Stories
Alecia Michaud ⟩ Spread rumors

Driving Nick Around last of night
Nick tried to Sleep w/her? Claim

Sara Swenson



Denise Freeman (Bertrand) Sister
Cory Courtwright
uncle

444 Elm — Where Leah last seen by
      Sherrie Ann Mitchell
      Corey Brigant (BF @ time)

Johnson Mill Pond (Nick + Brent)
      Witnessed by:
Fast Mart

Bill Sero        > poss Susps)
Stemmerman

Leah's shoe found on Elm — Near CHS
      Poss Last Seen Per Witnesses Walking
→ there
  Found by Tony Messerte

9:30 - 9:45 Nick Seen in T-Bird

Mary Fuller + Alicia Hartwell 9:30 Saw
      Leah @ CHS

Nick never Mentions Changing Cars — Called
his mom @ 10:30 to See if Leah

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CPD020543

10 pm back in Mustang

Never looked for Leah @ house
light in bedroom @ 2am
threw rock & no response

No explanation of changing cars

Mom's red T-Bird

Upset frantic point of Crying

Other Shoe (left) found on Hudson ridge

Nick has never been locked into a story
— Always said she was Missing
— never that she was just around
Someplace

Trunk Cutout — Shiny Metal no Carpet
— remove leaking gas tank

remove leaking gas tank
10/13/09

Willberger — Courtney Susp pass in the area
Joel
during time of Leah's death
Get hold of Paul Foster & See why
he looked @ Courtney

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020544

Body Kept in Car only to transport to
dump site — Lee Valley

- Leah poss enr to Bartley Grandparents place

Poss Dumped by Dad — reason why Nick
Switched to T-Bird ?

Wit heard 2 voices (male)

Leader thinks 2 people dumped body
from Car — Zanni believes he's right
Not spot in Road to get out Chat or
take a leak

Vegetation not broke down by road

Mustang not driving around after 9:30pm

Rt Shoe found by CHts
— Planted
— Lost when trying to get out of Car

Left Shoe on Hudson Ridge had blood
Rt Shoe no Blood

Brent inv in helping dad dump body ?

*veg & broke down by road*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020545

\* Interviews \*

Mike Tulles- Worked w/Nick @ Bandon Dunes

Bon Fire on Baker Rd- People who were
    afraid to come forward

Mike Cook

Bentley talked w/some of them
Someone told a little kid you didn't
see anything

Kerry L
~~Gloria~~ Torres — Ex of Brent
    6-10-64
    ODL 3464320

1st - Phone Tap
    - Nick
    - Diff to get one on Dad

Nanny Cams in interview Room -2 @ CQPD
Myrtle Point has the set up
OSP has one.

Chief & Pat - Informal mtg w/McGuffin
    Family this Week

Hit Bartley (cold- Not until gone Public
    Day we goes before it hits Media

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020546

<u>Interviews</u>

Bartley- Riddle & Kelly Andrews
Torres- Ray & BoB * before Bartley * Day B4
    get perspective
Johnstons- Sean
Chamley- Day of   also: Rogers + Schwen

* Prepared Grand Jury Subpeonas before going
    to interviews - Zanni

Frasier- Immunity Letter (Statute of limitation) passed
    - Not to Active participant
    - only helped Cover up some way

Tap- Equip ready in Salem & Available

Bill Fugate - OSP Det Sgt in Roseburg

* Me- Do Packets on Inv

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020547

\* '67 Mustang Cp — Trunk linings
  — get types of options

Stemmerman + Sero's Cars
Stacey Napier Car
Heather Steinhoff's Car        Ple 080/Kia
Crook's Car?

Stemmerman's house in Libby backhoe
back yard — Tomorrow 10/14/09
         2 places to dig

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD020548

LAB # __OON481__
PAGE # __70__ __3__
INITIAL __JP__
DATE __8/4/00__

# 00N481 – F.I.
## August 3 and 4, 2000

It is August 3, 2000, at 4:50 p.m. Bonnie Bertak and I arrived at scene approximately 1 mile east of the Lee Valley Fairview Road turnoff and we are meeting with Detectives at this location.

This is Lt. James Pex and I am going to record information on the scene.

The roadway is a gravel road that is headed Eastbound. We are probably 1-½ miles from the junction where Lee Valley Road connects with the main road that goes between Coquille and Four Corners.

The site exists of a very timbered area, tall grass along the roadway, overhanging trees. The area was secured by a BLM Ranger and members of Coos County Multi-agency search team.

The body is located off the bank, I would say 20 to 30 feet down a steep embankment. From the roadway the only thing that is visible is blue jeans, there is an odor of decay obviously apparent. Beside the roadway we have observed a bottle cap, a beer can and cloth. These items are spread along the roadway, not unusually for a well traveled area. These will be seized.

A path will be prepared along the side hill going to the body and we will extract the body in a body bag and transport it for autopsy. Several photographs will be obtained using 35-mm and video film prior to that extraction.

AT 6:00 p.m. we created a trail at a diagonal angle down below the bodies, we took photographs and extracted.

The area surrounding the body and below is all covered with leaves and detritus not readily applicable to shoe impressions at this point. The roadway up above is not also applicable to shoe impressions or tire tracks. Very hardway with gravel shoulders and dusty at this time. Our own shoe impressions from walking along the roadway and walking in the designated trail to the body do not show up. Therefore I wouldn't expect any others from an earlier date and time to show up either.

After the body was removed the area underneath the body was searched and then a methodical search was conducted up the upgrade leading to the roadway Grass was pushed aside, the soil there is very hard and rocky and did not lend itself to shoe impressions again. No evidence was found coming up the hill. A distance was measured between the edge of the roadway and the body was 20 feet. One old beer can and some broken glass were noted near the body, these were also seized.

lab report of finding body

00N-481 – FI - August 3 - 4, 2000
Freeman, Leah
Page 2

LAB # OON481
PAGE # 4
INITIAL *(illegible)*
DATE 3/4/00

In a continuation of the search, screens were used and the area under the body was sifted for trace evidence and particulates. Several items and evidence were seized from along the roadway and these packaged, sealed and transported back to the laboratory.

We cleared at 7:15 p.m.

The distance between the junction of Fairview Road in Coquille and the scene was 7.9 miles. The distance between the Fairview Road Junction in Coquille to the turnoff at Lee Valley Road is 7 miles. The distance from the junction of Lee Valley Road and Fairview Road to the scene is just under 1.2 miles.

On August 4, 2000, at approximately 9 a.m. I returned to the scene. Deputy Summers had taken a brush cutter and cleared away all the brush and weeds beside the roadway close to where the body went over the embankment. He also cleared away all of the leaves all the way down to the body, and approximately 20 feet on each side of where the body was lying. We did a detailed search of the area and came back with a metal detector, covered the area.

Walked approximately 100 yards in each direction on the roadway scanning the area with a medical detector along the side of the roadway on the north side. A couple of beer cans were located in the underbrush near where the body was found. These were seized. A 7-up pop can was also located about 50 feet east of where the body was found that was also seized.



LAB # ___ 00N481
PAGE # __ p __ 6
INITIAL __ P __
DATE __ 8/4/00

Get distance from junction to site

going down to get body At 6pm
8·3·00

Body placed on plywood inside body Bag + sealed
c evidence tape on the zipper.

Body — blonde hair, one sock, Blue denim pants
cotton tops.
   Did adhesive tape lifts on pants + shirt
at scene prior to removal.
   dug dirt under body + sifted it
   searched hillside above body by hand
   no blood, shoe prints or other evidence

8/4   9ᵃ returned to scene, grass + weeds cut by
Ron Summers(50) from Road down to body
site. Searched again, then went over it c
metal detector.
      Some cans were slugs.

Parts of deer + bloody cardboard ≈ 100' west of
body on roadway. Sample obtained to be sure
it was deer blood.
10³⁰ₐ cleared from scene

006684

EVIDENCE ACCOUNTABILITY RECORD
COQUILLE POLICE DEPARTMENT

#102

| EVIDENCE # | ITEM | QTY. | CASE # | DATE | OFFICER | REMARKS | DISPOSITION |
|---|---|---|---|---|---|---|---|
| 324 | Video Tape of Crime Scene | 1 | 00-1905 | 8-7-00 | Hall Received Pappas | Evidence of Crime Scene | 13 Release to CI Officer 3-22-01 Pappas |
| 325 | Written Form | 1 | 00-1905 | 8-11-00 | Grant | Leah Freeman Evidence | 13 |
| 326 | Sock (2) Photographs | 3 | 00-1905 | 8-14-00 | Return 3-15-01 Brender to Pappas | Possibly missing Sock belongs to Freeman | 13 not Return - sent to crime lab for analysis 8/15/00 cost by BHO #7 disseminated 6-9-03 PML |
| 327 | (1) Pacific Powder Statement (3) Photographs | 4 | 00-2517 | 8-14-00 | Brender | Dumping within 100 yds off State Hiwpres | |
| 388 | Blk Kani Jeans "Blue Sano" | 1 | 00-1905 | 8-14-00 | Cal Hitts Hall | Items Seized from Blue Sano | To Crime Lab 8/18/00 B-16 Return from crime lab 9/14/00 |
| 389 | Pr. Flip Shoes "Blue Sano" | 2 | 00-1905 | 8-14-00 | " | " | To Crime Lab 8-18-00 B-13 |
| 330 | Faded Levi Jeans (Blue Sano) | 1 | 00-1905 | 8-14-00 | Cal Hitts to Hall | " | To Crime Lab 8-18-00 B-16 Return from crime lab 9/14/00 |
| 331 | Tan Shirt (Blue Sano) | 1 | 00-1905 | 8-14-00 | Cal Hitts to Hall | " | To Crime Lab 8-18-00 B-13 Return from crime lab 9/14/00 |
| 332 | Blk Nike Shirt "Blue Sano" | 1 | 00-1905 | 8-14-00 | Cal Hitts Held | " | To Crime Lab 8-18-00 B-16 Return from crime lab 9/14/00 |
| 333 | Blue/Boy/White Sleeper Blue Sano | 1 | 00-1905 | 8-14-00 | Cal Hitts Held | " | To Crime Lab 8-18-00 B-13 Return from crime lab 9/14/00 |
| 334 | Blue Levi's with Belt Blue Sano | 1 | 00-1905 | 8-14-00 | Cal Hitts Held | " | To Crime Lab 8-18-00 B-16 Return from crime lab 9/14/00 |
| 335 | Mens Boxer Shorts Blue Sano | 1 | 00-1905 | 8-14-00 | Cal Hitts Hall | " | To Crime Lab 8-18-00 B-13 Return from crime lab 9/14/00 |
| 336 | Audio Tape Video Tape | 2 | 00-2538 | 8-17-00 | Brender | Dwii Pappas | 14 Copy 6-12-03 |

006684

video KK

006729

#43
006729

# [VI]LLE POLICE DEPARTMENT
## PROPERTY REQUEST

Case Number: 00-1905          Date Requested: 3-21-01
Requesting Officer: HALL          Date and Time needed: 3-22-01

I request the items listed below for: KRIS Karchen Approved By: ____ 3-22-01
                                     (State Reason)

Property Controller Use Only:

| Item # | Description |
|--------|-------------|
| 1 224 | VIDEO TApe Crime Scene |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |

## PROPERTY TRANSFER

Date: 03/22/01          Case Number: CO-1905
The following item(s) was released to: Kris Karcher For Deposit With

Court: _____
              (Department/Divison)
District Attorney: Kris Karchu - DME
                        (Name/Title)
Laboratory: _____
                 (Name of Laboratory)

Item Number:
(from above):          Description of Property

Signature of person with whom property is deposited :
Date and time property is transferred or returned to property room:

notes
very
Good 8/4/00        18 05        Debrief

Zanni/Downing — Michaud — got Lawyer
          from Rehab —        Lawyer - David Terry —


Dale Oester — Justin/Brandon Shelton —
        heard about party — didn't go —
R. Bryant Daniel Jenkins Aaron West
were going to go —
△  [Sara] witnesses deag after —
crying/snive          ried
Ryan David          McNair — Came over
    on 28
Sara met          k —


Heidi Crook — last seen getting into
white Toyota P/u — w/Guy name Steve —
has pager —


Davis/Miller Skylar McNair w/ Pizzola Davidson
watkins — mid school soccer field - beer —
Not at T.J.'s party —


Matt Simhoff — party on 20th
25th Wayne McGuffin — party —
threw them out — Chained Drove —
later that night → Nick — wayne

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000306

Persie) Miller – Megan Pinkley – Sarah Smith –
2030 – 2330 → sees Nick after 2100 –
Comment – Leah – Stabbed/shot not Nick –
Strangled/Beat – then it could have
Been –

Ruth Clausen – Bill Sever – called last
night – wants to wait till he is
sober (off Dope) before talks to Police

Red Book —
Cal Mitts – T J Greve – Nick & Leah
1830 – 1900 at Bartley's house –
Bartley Not there
Brandon Johnson & Michelle     Anthony
A. Michaud –                    Ben Harvey

0700 29th Nick Shows at T.J. Greve –
looking for Leah

Rachel Harvey – Nick Fan –
Ben in California

Patty Harvey – Tana Smith possible friend
of Leah –

Nick Theory
Talked about business men from Portland
+ van hauling people

Maggie Dussus- friends w/ Denise -
20th - xxx -2000 2100 - Max Rest work

2100 -2130 - talked to Denise at Dennys

Between 2130 -2200 - Sees Nick at
Fast Mart
2230 Home -
    Didn't See Leah at all

29th- 0800 Call from Denise-
Search out to Laverne Park
    Powers
Coos Bay -

Mike Pizzela Rick Crook Aaron Kenny

Ap't - Paps Smear - yearly exam-

Nick comment - Acid in tacoma -
    Leah couldn't handle if put in Draft

2130 Matt Nelson Big Pick up on
    Elliott - @ John Lindergens house

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000308

Mike Pizzola - Sr        Jr  Rick
       k- Saw Nick + Leah fighting
    at Exxon Station -
         yelling at Leah -
    Week or 2 before       6/28

Pizzola, Jr  -        Swimming - until five -
    doesn't remember after (70)
    Does Know Sero -
    last Saw 2ster prior to Disappearance

Stemmerman - Libby Dr - Spoke about Sero
    to might help w/ Sero

Frazier:   Deadline on immunity until
    1700 on Monday -
Laurie - SCINT - Toll free Number
    wrong -
Autopsy -  Unknown Homicidal violence
    No bullets -   No marks on ribs
    to Positive ID - forensic Dentist -
                       { muscle piece for tox -
    No under pants
missing sock - ankle high - ankle high  Adidas
                                        3 stripes

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER              CPD000309

Mark northess - HS V.P - doeg in school -
Complete file on monday - Nick

Camera   at crime Scene -

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000310

| From: | R Mcneely [rmcneely@cityofcoquille.org] |
|---|---|
| Sent: | 2/5/2010 9:48:37 AM |
| To: | Assmus, Brian [Brian.Assmus@state.or.us]; Riddle, John [John.Riddle@state.or.us]; Bowersox, Teresa [Teresa.Bowersox@state.or.us]; Webb, Bob [bwebb@ci.bandon.or.us]; Webley, Chris [cwebley@city... Holderfield, Kim [kholderfield@cityofcoquille.org]; Dannels, Mark [mdannels@cityofcoquille.org]; Sm... [psmith@cityofcoquille.org]; Sanborn, Sean [ssanborn@cityofcoquille.org]; Looney, Dan [dlooney@c... Andrews, Kelly [kandrews@co.coos.us]; Karcher, Kris [coosme@co.coos.us]; Frasier, Paul [pfrasier... McOwen, Lisa [lisa.r.mcowen@doj.state.or.us]; Zanni, Craig [knizzi@mycomspan.com]; Schwenninge... [eschwenninger@police.coosbay.org]; Kirby, Michelle [mkirby@police.coosbay.org]; Rogers, Scott [srogers@police.coosbay.org]; Tabor, Mike [mike.tabor@state.or.us]; Leader, Larry [sueleader@veriz... Mike [mktcook@webenet.net]; Kinney, Patrick [pkinney314@yahoo.com] |
| Subject: | Updates |

Just some new information to keep everyone in the loop.

Pat Kinney found out that Nick McGuffin is dating a new girl by the name of Kyla Danae Stevens, DOB 2-23-90.

John Riddle found an old document from June 29, 2000 at 0212 am from Bruce McGuffin's gas card being used at the pumps off 42 by 42 S.. Lisa can we add this to the time line please.

We did find some records on the phone booth that was located across from the high school, looking into that.


The briefing from 2-4-10 went over the following stuff for the people that could not make it.

Ricky Crook did do the polygraph, but did not pass, sort of. Dan Looney can tell you about the sort of. Denise Freeman told her mom that the two officers who talked to her changed her outlook on police and the case, they were very nice and professional. Vehicle processing is 2-5-10 at 1000 hours. Micheal Tulles interview turned out to no notable new leads. Dan Looney found out some new info. on Zach Elderton, purple Kia owner, that may lead to some good stuff. Daniel Lapine did do an interview, but must his info. was on Bill Sero, except he did say Brent Bartley was not telling the truth about his time line back on June 28th and 29th, which is the same thing Lapine told detectives back in 2000.

Sean Sanborn will be in charge of any new tips and the current tip sheets. Chris Webley will be in charge of anything related to the Bill Sero angle. All other stuff can continue to go to Chief, LT, or I.

Next briefing is February 26th at 0900 hours.

Pat Smith and I will be out of town from Feb. 9th thru the 12th for the major crimes team conference in Eugene. Sean Sanborn will be out of town from Feb. 6th thru the 12th. Any info. needs to go to Chief during this time.

THANKS FOR ALL YOUR HARD WORK!!!!!

OSP002416

**<u>01/28/10 Debriefing 1500 hrs</u>**

Pretext Calls:
Bruce-Scott asks for Nick's number
"why are they bothering you too?"
S-"Yeah"
"They're bothering everybody"
541-252-1034

Nick-Tells Scott
-say whatever you want
-in reference to the trip to Lee Valley "As far as that part, they don't need to know that"
-They're fucking with me pretty hard
-has told attorney
-re-interates don't need to know about that (trip to Lee Valley)
-you don't have to talk to them
-dropped her off at Cherie's for a couple of hours
-she didn't come back
-Cherie giving her a guilt trip (only reason she went over there)
-not getting along with Cherie
-Cherie talking shit about her
**left early because Cherie & her mom got in an argument**
**Cherie & her mom telling Leah not to date Nick
-references that he's aware of several people cops have already talked to
-says he's in the Mustang all night (unsolicited)
-didn't have the T-Bird, grounded from it, Dad had the Jeep
-smoked a bowl w/West right before I got Leah

John working on Ricky Crook polygraph

Chief & Lt looked at car:
Jim Pex willing to go over car again
Pros & cons:Pex doesn't have great relationship with crime lab
        He's a blood splatter expert, but how is he at trace?
        Credibility w/courts???check w/Paul

Umpqua Forensic Evidence-see what this guy can offer (from the Lt)
-need Paul's imput

Lt:phone records
-need a subpoena before they'll even look at the records

??How did Nick contact Dad that night??

Previous subpoena records shows only the 2244hrs call from Fast Mart payphone

*(handwritten note:)* Phone 2244 from Fastmart ~ A to mom looking for Leah

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD002161

<u>02/04/10 Briefing @ 0900 hrs</u>

20/20 left messages with Chief & Paul.  Chief called them back.

Mike-Saturday afternoon Cory called him very excited.

-Denise came over and told her mom that the 2 officers who talked to her changed her outlook on the police and the case, they were very nice & professional

-Denise apologized to her mom & their relationship has been restored


Chief-Lisa is updated charts

Dan-Ricky Crook polygraph

-did not pass, sort of:he may have smoked pot before he came in

-is adamant that the machine is wrong

-door still open to talk to him again

-three different versions same questions, would not pass, sort of pass, and pass

-scored as deceptive, but weird

-questions:Where you involved & have you lied or left out anything

Kristin Steinoff interview hasn't happened

Zach Elderton-the purple Kia owner

-right after Leah incident went to Alaska & recently moved to Rollins, MT

-checked him on My Space, sent him an email last week, has not replied yet

-Riddle got a phone number for his ex (mother of his child), she told Dan that Elderton will not return to Oregon, afraid of some type of trouble, wouldn't tell her what

-Need a face to face w/letter of immunity in hand.  Estimate a four day trip.


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER               CPD002169

Stemmerman-not willing to call Dan back

-Paul:serve him w/a grand jury subpoena?

Dan will attempt to call him back today.


Chief:Vehicle processing

-Kris & Pex will be processing the vehicle tomorrow @ 1000 hrs at the storage unit

Kris-Update on clothes in England

-email from Friday, thought they'd be able to mail them the beginning of this week, haven't heard from since.  Was still having problems with Customs

Chief-phone records

-we got them, hard to decipher

-Paul, lots of texts

-Nick on the phone all the time, it's in his Mom's name

-Nick started calling @ 1015 hrs, about 5 mins after Chief & Lt left after notifying him that the case is being re-opened

-Lisa will do follow up on the numbers

-Evidence to the lab

**don't have standards on Leah & Nick

**they have the DNA profiles

-they will be examining the lifts

-sending off on Friday

Paul-Umpqua Medical records


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD002170

-subpeona out, nothing back yet

**Riddle:Brent Bartley**

-spoke with Nylander last Thursday

-Nylander is leaving for Hawaii today

-they have the immunity letter

-interview will be set up after the 13th, mom will be present

-Bartley wants to talk to us

-attorney need to find out what Bartley has to tell us

-Nylander feels he knows something

-Bartley feels he failed the question "did you see Leah after she was dropped off at Cherie's", he did

-"Nick was scared shitless" statement Bartley made to Ranger

-Needs to have explained to him what the letter of immunity means

**Ray:Scott & pretext calls**

-Scott not comfortable calling Nick back after 2nd call to Bruce.  If Nick calls him he either won't answer & call the police prior to calling back or will say he's at work & will call back later.

-doesn't want to call Kristen, but we can use his name with her

-let's see if Nick calls Scott back

**Chief:follow up with Cherie**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      CPD002171

Pat-no new information, couldn't decide which cars he was driving

Chief-Cherie & her mom didn't tell Nick about the argument


Megan-reassign interview

Ray-Megan has a new boyfriend according to her Facebook page

Chief-Nick is always home alone in the morning

Bob Webb turned in his report

Thomas Bounds:cousin of Leah who saw her at the high school & on the payphone at the gas station before she disappeared

-Chief advises that where he was living almost a direct shot to the gas station

-Cory doesn't know if she was told about him seeing her, she was a mess and just doesn't remember

Ray-running down who had the payphone

-Barb running it down through tax records

-get the number for the booth

-possibly calling Bartley's house?


Ray:Micheal Tulles

-guy confessed at a bar that Nick was doing white dope, ran Leah over, stabbed her 30 times, and cut her up with a sawzall

Quin Myers:Dan Lapine's girlfriend

-worked at Claire's

-went to Dan's house that night after work

*[handwritten note, right margin:]* Cops know Leah calling Bartley looking for Nick

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          CPD002172

-Nick showed up & asked her if she'd seen Leah.  Leah had no reason to be there

-Nick seemed pissy

-not sure what car Nick was driving but Ron Slagle would know

-29th:Bill Sero & Nick looked for Leah together, Bill left his sweatshirt in the Mustang

-night of the 29th:She was at Dan's house w/Bill Sero & Alisa

-they watched Deuce Bigelow

-Nick came by again

-Alisa breaks down & starts crying

-Quin left about 2330 hrs

-Sero got arrested later (in the early morning hours) & had Alisa with him

-Josh Thompson would know some stuff

-walking with Ron Slagle a week later, saw Kristen pulled over in front of the now Police Department, she was acting weirder than usual.

-Dan Lapine told her that Sero admitted killing Leah


Ray & Chris:Dan LaPine

-pretty guarded

-reported to Ferry the next day & met them in the back office at P&P

-told them a year after Leah's death, Sero coming down "said he snapped her noodle", did mention a name, they just assumed Leah

-told Quinn to stay away from Sero right after that

-Bartley's statements don't match what he did that day

-was doing acid back then, memory is spotty


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD002173

Others to talk to:

Erika Davidson

Maggie & Ann Yoakum

Anthony Fowler & Tj

Willie Teel


Chief-someone will continue to run down the Sero angle

-Sero passed the polygraph

-Nick & Sero searching for Leah the next day together

-talk to Sero & make it clear that Nick is throwing him under the bus

-do same with Stemmerman

-need buccal swabs & hair lifts from both

-Paul advises they are already in CODIS


Working on organizing the notes and assignments-detail it out.

Packets:

Ron Slagle-John Riddle

Brent Bartley-John Riddle

Megan Edgerton-Bob Webb

Scott Hamilton-Ray McNeeley

Needs Packets:

Dan Lee, Mike Reeves, Dave Hall, Zavala


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD002174

Elzie Shamblin-lived in apartments, there's a whole report from Zanni

Paul-Grand Jury end of March??

-present it as a mini trial

Next briefing February 26 @ 9am

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      CPD002175

WHITE — MASTER
YELLOW — WORKSHEET
CARD — FILE

## OREGON STATE POLICE

PRIORITY  A  B

*[handwritten top right:] Released Bryant + Mcquffin didn't know 145 from Strp Dad, Dave Hall*

**SUBJECT INFORMATION** — MAKE NO MARKS IN THIS AREA

LAST NAME / FIRST NAME: Jenkins, David    MIDDLE NAME    DEPT.    DEPT. #    SID

NICKNAME OR ALIAS    SOC. SEC. #    FILE NUMBER

HOME ADDRESS: 1104 N Grape #4    CITY: Cog.    STATE: OR    ZIP    HOME PHONE: 396-3174    FBI #

OLD ADDRESS(ES)    GLASSES    FACIAL HA

EMPLOYER/ADDRESS    CITY    STATE    WORK PHONE    OCCUPATION

RACE  SEX  D.O.B. 11/7/77  PLACE OF BIRTH    AGE    HEIGHT  WEIGHT  HAIR  EYES  BUILD  COMPL

DR. LIC. #    STATE  VEH. YR.  MAKE    MODEL    COLOR(S)    BODY STYLE

VEH. LIC. #    STATE  CONDITION/EQUIP.    OTHER VEH/PLATE(S)

CONCISE TIP INFORMATION    SOURCE NAME/XREF

Interview w/ Peet on 9-5-00   Zanni/Downing

Info from Peet was that on @ 8-22-00 she was at Michelle Emler's Apt. behind Safeway, when she overheard conversation w/ Nick McGuffin & David Jenkins, where David asked Nick about him getting carried away with strangling Leah.

**SOURCE INFORMATION** — MAKE NO MARKS IN THIS AREA

LAST NAME: Peet    FIRST NAME: Kim    MIDDLE NAME: R.    A.K.A.s

*[handwritten circled note:] Acording to Jenkins and others Nick was not at this party*

RACE W  SEX F  D.O.B. 05-24-86  HEIGHT  WEIGHT  HAIR  EYES    OCCUPATION/EMPLOYER

ADDRESS: 1164 N. Grape Apt #6    CITY: Coquille    STATE: OR    ZIP

HOME PHONE: 396-7045    WORK PHONE    DEPT.    DEPT. #    SID

ADDITIONAL INFORMATION    SUSPECT NAME

Interview w/ Jenkin 9-21-00   Zanni/Down

Jenkins was interview at CCJ on 9-21-00 He did admitt that he was at party at Michelle's (his residence also) At party was David & Richard Bryant, Michelle, David [Jenkin] and Misty (David Bryant's GF) There was a conversation between David Jenkins & Richard Bryant about Leah, because Richard had heard alot of Stuff from his Dad and was stabbing his mouth. David spoke with him.

RECEIVED BY    DATE    TIME    COMPUTER CHECK BY    DATE    TIME

ASSIGNED TO: Dexter    DATE: [    ]/00    SUSPENSE DATE    CCH ___  CRISS ___  NCIC ___

Zanni/Downing

32132

Oester

Hamilton - not right place - no diagram



**ASSIST OUTSIDE AGENCY – HOMICIDE**
**V/ FREEMAN, LEAH NICOLE**
**OSP #00-255176**

**ACTION TAKEN: (Continued)**

HAMILTON stated that he was really uncomfortable at this point and wanted to leave Nick came back up the bank and he had a picture of Leah in his hand He was crying and looking at the picture, then walked up to him and hugged him (HAMILTON) Nick was saying that he could picture Leah laying down there with her head on a rock HAMILTON stated that this really freaked him out and he started walking back towards the car Nick started walking with him and by the time they got the 20' back to the car Nick had quit crying They got back in the car and Nick then drove on up to Chris's

HAMILTON stated that this made him so uncomfortable the he no longer associated as a close friend of Nick McGUFFIN He knows that McGUFFIN is hanging out with Ricky CROOK and that they're smoking lots of "crank"

Nick doesn't drive the Thunderbird anymore because he fell asleep and wrecked it on Fishtrap Road awhile aback

At my request HAMILTON agreed to return with me to where the victim's body was found to point out where McGUFFIN was indicating the body was located

At 3 10 p m , I transported Scott HAMILTON to Lee Valley Road and had him direct me to the location where McGUFFIN had left the road and gone down over the bank

HAMILTON pointed out the spot McGUFFIN indicated to him as where victim's body had been found (This was not in fact the actual location ) HAMILTON also stated that the night this happened, Nick was walking around and walked out of sight a few times towards the river

At 3 45 p m , HAMILTON was transported back to his residence and I broke contact with him (Refer to hand drawn map from my notebook )

From this point I have taken no further investigative actions Unless specifically requested I do not anticipate further action being taken on this case

3:10p - TRANS SCOTT
TO LEE VALLEY RT.
DIRECTED TO DAMNSITE
WHITE CROSS THERE

POINTED OUT SPOT NICCE
LOOKING AROUND. ABOUT
6' CLOSER TO RIVER
FROM WHERE SCOTT STANDS
ALSO WALKED OUT CRESITE
TOWARD RIVER



AREA WHICH WAS
LOOKING

LOG

LOG

FOOT OR BANK?

BODY FOUND

hand drawn map
with cross
detail

3:45p - DROP AMUCOCH

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD007281

Brakefild

Page 113

1    Q.  When was the Gran[d]

2    A.  I -- I don't remember the specific date, sir.

3    Q.  Okay.  Was it early in the investigation in

4    2010?

5    A.  No, it was -- we had basically concluded the

6    investigation and Mr. Frasier was presenting it to

7    Grand Jury.

8    Q.  So the decision was made to present it to Grand

9    Jury for indictment before Brakefield came to your

10   attention, is that right?

11   A.  I'm trying to think if we did two -- from what I

12   recall, that's because the McGuffins were there under

13   subpoena and Wayne flew in from Hawaii, so I -- from

14   what I recall, it was during that timeframe.

15   Q.  Did you have any trouble tracking down

16   Mr. Brakefield?

17   A.  I mean, it didn't start with Brakefield, so I

18   remember it taking me and Webley a few days, but I

19   don't remember, because we started with the name the

20   McGuffins gave us.  That led us, I believe, to another

21   name, and I think that went to Brakefield.  But I don't

22   remember if there was another person -- layers, if you

23   will, in between that that led us to Brakefield.

24   Q.  Okay.  When you did find Mr. Brakefield, did he

25   express any reluctance to talk to you, or was he a

Page 114

1  cooperative fellow?

2  A.  In the beginning I would say he was cooperative,

3  but then I would say later he was -- didn't really want

4  to go testify, so.

5  Q.  Did he say why?

6  A.  I know he got a little upset because we wanted

7  to polygraph him, like we didn't believe him.

8  Q.  Okay.

9  A.  But Dannels, Frasier, and myself felt that his

10  information was important enough that we should

11  polygraph him to make sure he just wasn't being

12  vindictive, you know, to Nick.

13  Q.  So then was he polygraphed?

14  A.  Yes.

15  Q.  And what happened with the results of that

16  polygraph?  Where were they kept?

17  A.  I don't know.  I just know I was told he passed.

18  Q.  Were you present for the polygraph?

19  A.  I don't believe I was.  I don't recall being

20  there.

21  Q.  Okay.  Do you recall Mr. Brakefield saying to

22  you or Officer Webley at any time that -- so Brakefield

23  had said that Mr. McGuffin made some kind of admission

24  to him or something like that.  What was Brakefield's

25  testimony?  What was the substance of this info?

Page 115

1    A.  I don't remember the exact wording, but

2    basically it was -- I remember Paul Frasier calling it

3    basically the confession.

4    Q.  Okay.  And do you recall Mr. Brakefield saying

5    to you or Officer Webley -- telling you that he didn't

6    take what Mr. McGuffin had said seriously and that

7    considered it a joke?

8    A.  I don't -- I remember in trial that his

9    attorney -- I remember thinking at trial that his

10   attorney could've got that from him and the attor

11   didn't.  He -- but I don't remember him saying that in

12   like -- I'd have to look at a report to refresh my

13   memory on that one.

14   Q.  Okay.  Did Mr. Brakefield have an attorney with

15   him at trial?

16   A.  No, but Nick's attorney when he questioned

17   Brakefield.

18   Q.  Oh, okay.  All right.  And if Mr. Brakefield had

19   said that he didn't take it seriously and that he

20   thought that Mr. McGuffin was joking or whatever, you

21   would've written that in a report, or Webley would've

22   written that in a report?

23   A.  Webley would've.  I didn't write the repor

24   Q.  Okay.  So Brakefield, Hamilton.  And then

25   as old leads go, it's just everybody that had

001192                        001192                        001192        26

## OREGON STATE POLICE INCIDENT REPORT          PAGE 1 of 7

**REPORT TYPE:**

☐ INITIAL REPORT
☒ SUPPLEMENTAL

**DISTRIBUTION:** ☐ GHQ Criminal  ☐ GHQ F&W   ☐ GHQ Patrol
☐ ID Documents  ☐ ID Prints  ☐ District  ☐ Explosives
☐ Lab        ☐ DA Coos Co. DA.
☒ Other Coquille Police Dept.
ATTN: Ray Nichols

**INCIDENT # [CAD#]** SP20-255176

ASSOCIATED OSP #s/ _____

OTHER AGENCY #s/ Coquille PD. 00-1905

OFFENSE/ORS/ Murder 163.115 _____ Occr/ 1 Co/ Coos Status/ ACTI
STATUS/ ACTI-OPEN/ACTIVE INVESTIGATION   CLOSA-CLOSED BY ADULT ARREST   CLOSU-CLOSED BY JUVENILE ARREST   COMP-CLOSED
SERVICE COMPLETE   INAC-OPEN/INACTIVE/NO FURTHER INVESTIGATION   UNFD-CLOSED UNFOUNDED   NODA-NO PROSECUTION BY DA
RFSE-VICTIM REFUSED PROSECUTION   DTH-OFFENDER DECEASED

ADDITIONAL OFFENSES/ _____

_____ Occr/___ Co/___ Status/___

_____ Occr/___ Co/___ Status/___

_____ Occr/___ Co/___ Status/___
(SEE NARRATIVE FOR ADDITIONAL OFFENSES ☐ YES ☐ NO)

LEAD/ORIG. AGENCY/ Coquille Police Dept DATE/TIME REPORTED TO OSP/ 07/05/00

DATE/TIME OF THIS REPORT/ 03/07/02      DATE/TIME OF OCCURRENCE/ 06/28/00

IF SUPPLEMENTAL:   DATE/TIME ORIGINAL REPORT/ 06/28/00

ORIGINAL SUBJECT OF REPORT/ Missing Person

SUBJECT OF THIS REPORT/ Assist Outside Agency - Murder

VICTIM/SUSPECT/ FREEMAN, LEAH NICOLE
                    Last        First        Middle        (ADDITIONAL VICTIMS: ☐ YES ☒ NO)
                                                          (CO-DEFENDANTS: ☐ YES ☐ NO)

LOCATION OF
INCIDENT/ Coquille, OR.               COUNTY/ Coos

LOCATION TYPE (Premise)/ UNK

METHOD OF ENTRY/ _____

                                 (list for each appropriate offense)
TOTAL LOSS/ _____      TOTAL DAMAGE/ _____

DOMESTIC VIOLENCE? ☐ YES          THEFT BY COMPUTER? ☐ YES

GANG INVOLVEMENT? ☐ YES describe

BIAS MOTIVATION? ☐ YES describe

WEAPON USED? ☐ YES describe

UNDER INFLUENCE OF:
Alcohol? ☐ YES   Drugs? ☐ YES describe                    ☐ UNKNOWN

The below-named subject is presently a runaway/missing person and I certify that I am the parent, legal
guardian, or reporting party.

Subject/ _____              Reporting Party/ _____
          (PHA ONLY) Last   First   Middle                (PHA ONLY)  Last   First   Middle

Signature/ _____            Date/ _____

REPORTING OFFICER/ JIM DAVIS - DET      BPSST# 13538 DATE/ 03/07/02
                                                          001192
STN/ KLAMATH FALLS #400 ASSGN/ _____ APPROVED/ _____ DATE/ 3-11-02

Zanni 2021-12-17
**DEPO EXHIBIT**
**18**

# OREGON STATE POLICE PERSON PAGE

PAGE 1 of 7

INCIDENT # OO-255196

CODES/ V - VICTIM  C - COMPLAINANT  MP - MISSING PERSON  R - RUNAWAY  S - SUSPECT  PI - PERSON OF INTEREST  ARR - ARRESTED BY OTHER AGENCY
PS - PUBLIC SAFETY OFFICER  M - MENTIONED  W - WITNESS  D - DRIVER  P - PASSENGER  OWN - OWNER  OT - OTHER

**PERSON # 1  NAME/ FREEMAN, LEAH NICOLE**

CODE/ V  AKA/NICKNAME/

ADDRESS/ 1173 KNOTT ST.

CITY/ST/ZIP/ COQUILLE, OR.    PHONE/ 541-396-4027

DL#/     ST/   SOC/     FBI/

SID/ F    LOCAL ID#/     RES STATUS/ ☒YES ☐NO ☐UNK

SEX/ F   RAC/ W   ETHNICITY/ Cauc   DOB/ 10/29/84  HEIGHT/

WEIGHT/    HAIR/    EYES/    SKIN COLOR/

SCARS, MARKS, TATOOS/

EMPLOYER/     WORK HOURS/

ADDRESS/     PHONE/

KNOWN ASSOCIATES/

RELATION TO ASSOC/     CLOTHING/

CAUTIONS/    CORR. STATUS/    POB/

REMARKS/

**\* \* Victim/Missing Persons Only \* \***

INJURY TYPE/ deceased    INJURY LEVEL/

RELATIONSHIP TO OFFENDER/

MISSING PERSON TYPE/     MISSING PERSON STATUS/

SUSPECTED FOUL PLAY? ☐YES ☐NO ☐UNKNOWN    MISSING PREVIOUSLY? ☐YES ☐NO

RECOVERY CIRCUMSTANCES/

CODES/ V - VICTIM  C - COMPLAINANT  MP - MISSING PERSON  R - RUNAWAY  S - SUSPECT  PI - PERSON OF INTEREST  ARR - ARRESTED BY OTHER AGENCY
PS - PUBLIC SAFETY OFFICER  M - MENTIONED  W - WITNESS  D - DRIVER  P - PASSENGER  OWN - OWNER  OT - OTHER

**PERSON # 2  NAME/ STEINHOFF, KRISTEN NIKOLE**

CODE/ M  AKA/NICKNAME/

ADDRESS/ 827 SOUTH 5TH

CITY/ST/ZIP/ COOS BAY, OR.    PHONE/ 541-266-8163

DL#/     ST/   SOC/     FBI/

SID/     LOCAL ID#/     RES STATUS/ ☐YES ☒NO ☐UNK

SEX/ F   RAC/ W   ETHNICITY/ Cauc   DOB/ 06/03/82  HEIGHT/

WEIGHT/    HAIR/    EYES/    SKIN COLOR/

SCARS, MARKS, TATOOS/

EMPLOYER/     WORK HOURS/

ADDRESS/     PHONE/

KNOWN ASSOCIATES/

RELATION TO ASSOC/     CLOTHING/

CAUTIONS/    CORR. STATUS/    POB/

REMARKS/

**\* \* Victim/Missing Persons Only \* \***

INJURY TYPE/    INJURY LEVEL/

RELATIONSHIP TO OFFENDER/

MISSING PERSON TYPE/     MISSING PERSON STATUS/

SUSPECTED FOUL PLAY? ☐YES ☐NO ☐UNKNOWN    MISSING PREVIOUSLY? ☐YES ☐NO

RECOVERY CIRCUMSTANCES/

Form #157  Revised 10/20/97

001194          001194          001194

INCIDENT REPORT – OUTSIDE AGENCY ASSIST – MURDER
VICTIM: FREEMAN, LEAH
MENTIONED: MCGUFFIN, NICK
CASE# SP00-255176

28

PAGE 3

SP00-255176
MURDER
VICTIM: LEAH NOCOLE FREEMAN
COQUILLE POLICE DEPARTMENT – CASE #00-1905

REFER:

ALL STATE POLICE REPORTS BEARING CASE # SP00-255176

ALL REPORTS BY COOS COUNTY SHERIFF'S DEPARTMENT

MENTIONED:

REAVES, MIKE – CHIEF
COQUILLE POLICE DEPARTMENT

NICHOLS, RAY – DETECTIVE
COQUILLE POLICE DEPARTMENT

ZANNI, CRAIG – SERGEANT
COOS COUNTY SHERIFF'S DEPARTMETN

OSWALD, KIP – DEPUTY
COOS COUNTY SHERIFF'S DEPARTMETN

PHILLIPS, BRUCE – DETECTIVE – POLYGRAPH
OREGON STATE POLICE – CENTRAL POINT

HUCK, SHARON – FORENSIC ANALYST
OREGON STATE POLICE – GHQ

JOHNSON, KAREN – FORENSIC ANALYST
OREGON STATE POLICE – GHQ

FRASIER, PAUL – CHIEF DEPUTY DISTRICT ATTORNEY
COOS COUNTY DISTRUCT ATTORNEY'S OFFICE

001194          001194          001194

001195                          001195                          001195

INCIDENT REPORT – OUTSIDE AGENCY ASSIST – MURDER
VICTIM: FREEMAN, LEAH
MENTIONED: MCGUFFIN, NICK
CASE# SP00-255176

*29*

PAGE 4

SUMMARY:

Leah Freeman, the victim in this case, disappeared on the evening of 06/28/00 from Coquille, Oregon. Her badly decomposed body was found on the afternoon of 08/03/00 on Lee Valley Road, several miles from the city of Coquille.

Subsequently, in July 2000, myself and several other investigators from the Oregon State Police were assigned to assist the Coquille Police Department with their investigation. From that initial request I have been called upon on numerous occasions to assist.

During the late part of January 2002 I was contacted by Chief Mike Reaves of the Coquille Police Department, who requested my assistance in reference to new information pertaining to the homicide of Leah Freeman. He advised me that he had developed several persons that needed to be interviewed.

ACTION TAKEN:

On 02/13/02 I contacted Chief Reeves at the Coquille Police Department, at which time we discussed the recent developments in the case.

Chief Reaves had told me earlier that Deputy Kip Oswald of the Coos County Sheriff's Department had agreed to submit to a polygraph in reference to matters surrounding his finding of one of the shoes belonging to the victim Freeman.

On 02/13/02 Detective Bruce Phillips, OSP Central Point arrived and was briefed in reference to the reasons surrounding his scheduled polygraph examination of Deputy Oswald.

At 3:30 PM Detective Phillips, Karen Johnson and Sharon Huck (Forensic analyst's) met with Sergeant Craig Zanni of the Coos County Sheriff's Department.

Sergeant Zanni advised us that Deputy Oswald would be available to take the polygraph at our earliest convenience. He said he had already spoken with Oswald and had briefed him.

Zanni also advised us that he had recently spoken with an informant, who told him that Kristen Steinhoff and Nick McGuffin, who were at one time boyfriend/girlfriend, had conspired in the death of Freeman.

*Oswald's poly & any result to check*

001195                          001195                          001195

001196                          001196                          001196

INCIDENT REPORT – OUTSIDE AGENCY ASSIST – MURDER
VICTIM: FREEMAN, LEAH
MENTIONED: MCGUFFIN, NICK                          30
CASE# SP00-255176

PAGE 5

ACTION TAKEN:

Sergeant Zanni advised that he would attempt to locate a current address for
Steinhoff and relay that information to me.  He also advised that he would contact
Deputy Oswald and have him meet with Detective Phillips and I at the Coos Bay
Patrol Office later this date.

At 9:00 PM, 02/23/02 Detective Phillips and I met with Deputy Kip Oswald at the
Coos Bay Patrol Office. It was decided at that time to schedule the polygraph for
the morning of 02/14/02 at the Coos Bay Patrol Office.

At approximately 10:00 AM, 02/14/02 Detective Pat Downey of the Coos County
Sheriff's Department and I contacted Kristen Steinhoff at her residence and
requested she make her self available for an interview in reference to this case.

She agreed to meet with me at the Coos Bay Patrol Office at 11:30 AM,
02/14/02.

At 11:30 AM Kristen Steinhoff arrived at the Coos Bay Patrol Office.

At 11:45 AM Kristen Steinhoff was interviewed, on tape, in the Criminal Division
Office at the Coos Bay Patrol Office.

The following is a brief overview of her statement.  The tape has been
transcribed and will be attached to this report for reference.

She advised me that she and Nick McGuffin were once classmates at Coquille
High School.  She also was a classmate of Nick McGuffin's best friend, Ricky
Crook.

She advised that on the night Leah Freeman disappeared, she was at home with
her friend Zach and his daughter.  (Later identified as Zachary Elderkin).

She said that about 11:30 PM that night she was taking Zach home when they
encountered Nick McGuffin as he was walking around the parking lot of the
Maytag store in Coquille.  She said she never saw Nick's car.  She said they
stopped and asked him, jokingly, if he was stealing flowers.  She said that he told
her he was trying to find Leah.

001196                          001196                          001196

001197                          001197                          001197

INCIDENT REPORT – OUTSIDE AGENCY ASSIST – MURDER
VICTIM: FREEMAN, LEAH
MENTIONED: MCGUFFIN, NICK
CASE# SP00-255176

31

PAGE 6

ACTION TAKEN:

She said she left the area of the Maytag store and drove Zach to his residence, where they talked for about 15 minutes before she left. She then drove back by the Maytag store on her way to her grandmother's house but didn't see McGuffin. She said she picked up some CD's at her grandmother's house and then drove to the Highway Deli. McGuffin showed up driving his Mustang.. She said McGuffin told her he was driving the Mustang because his dad had taken his T-Bird away from him. She said she had seen him driving the T-Bird earlier that night.

She said she went home, (she and her mother live with her grandmother) where she met up with her boyfriend Scott Hamilton. She said she told Hamilton that McGuffin was coming over in a while to talk to her about Leah.

She said that Scott left and McGuffin showed up to talk about locating Leah. (Her mother was in her bedroom sleeping).

She said McGuffin told her that he and Leah had been fighting and that he thought Leah was pregnant.

She said he told her about going to Leah's house earlier that evening and throwing pebbles at her bedroom window to get her attention, but she didn't come to the window like she had in the past.

She said he then made the comment to her "when all my other girlfriends have done this in the past they have been out cheating on me". She said she never before saw anybody acting the way he acted that night. She said that he was acting like "she was never coming back".

She said that they eventually went out looking for Leah in her vehicle. When they came back to her house she and McGuffin smoked some dope (crank),

She said they were in her bedroom and she was lying back on the bed. McGuffin came over and kissed her and fondled her breasts. She said he also rubbed her crotch on the outside of her clothing, and at the same time was trying to take her pants off. She said that McGuffin had already taken his pants partly off and had part of his penis exposed. She said she finally told him to stop, which he did. He left shortly thereafter.

001197                          001197                          001197

001198                     001198                     001198

INCIDENT REPORT -- OUTSIDE AGENCY ASSIST -- MURDER
VICTIM: FREEMAN, LEAH
MENTIONED: MCGUFFIN, NICK
CASE# SP00-255176

*32*

PAGE 7

She said she felt it was wrong that McGuffin would be doing this to her while at
the same time worrying about where his girlfriend was, especially on the same
night she disappeared.

She said she has had very little contact with McGuffin since she was
subpoenaed to testify before the Grand Jury in reference to this case. She said
McGuffin will hardly acknowledged her since that time.

She said she believes that McGuffin could be involved in the death of Leah
Freeman. (Refer to attached transcript for additional details).

This report will be forwarded to Coos County Chief Deputy District Attorney Paul
Frasier for review.

PAGE 3

001198                     001198                     001198

## MEETING NOTES AUGUST 15, 2000

-- Sock found in fence at CHS 8/14 PM.  Not been exposed to the eliments.
Check and see when lawn mowed.  Who might of placed it there?

-- Poly results on Nick =29 on 'did you kill her'.  (Ranger has never seen
higher then 30 or more - shows extreme deception.

-- FBI analysis of written statements:
        Nick - did not request timeline
                could be the man
                text book stuff within the statement
        Bartley - has conscious
                separation from Leah
                Bartley is our weak link
(Kristin Steinhoff next victim)

LEAH:  Victim
        Missing 6/28
        Spent 6/28 with Cheri and Peggy Mitchell, Brent Bartley & Nick.
        Had app't. 6/29 with Health Dept., pressured by Mom.
        Body found 8/03.
        Prior to 10/99 was active in school, sports, chorus, well liked
                with good circle of friends, good grades.
        After 10/99 started going with Nick.  Grades dropped, Nick's friends.
                Nick introduced to sex and drugs.
        Nick isolated from friends.  Mom disapproved.
        Physically agressive, shy, wouldn't go with stranger.
        Extremely attracted to Nick.  He possessive.  Relationship violent.

CORY:  Mother of Leah
        Reported Leah missing 6/29 1030.
        Last saw Leah 6/28, 1600 hours, left with Nick, (the two getting along
                great - best she had seen them getting along)
        Knew Leah was going to Mitchells'
        Drug user, CCH, intially did not approve of relationship.
        States infatuated with Nick (x 2).
        Still associates with Nick.
        Called by Nick 6/28 at 2215.

NICK:  Boyfriend of Leah - controlling, manipulating, demanding, previous hx of
                treating girls badly.
        Noon - 1900 with Leah
        Smoked THC at Bartleys' - all three go to McGuffins' - then rent movies -
                Haga's ranch - more THC and ETOH.
        1745 Nick and Brent get steaks at McKays.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER        CPD000323

8/15  Mtg. Notes Page 2

Back to Hagas'.  Nick does not eat.  Leah has steak with Brent.
1900 drops Leah off at Cheris'.
Nick and Brent pick up Nicole Price - Hagas' - 1920 Nick jumps up and
        states "I got to **find** Leah".
Meets up with Aaron West, David Jenkins and Josh Emler by Stampers -
        Johnson's Mill Pond.
1930 - 2100 at Pond and driving around.
2108 at Mitchells' - street near Leah's house - driving Central - up street
        near Leah's - back to Central - then back again - stops at
        Fast Mart talks with people.
2108 - 2215 searching for Leah - 2215 at Mitchell's house - calls Leah's
        Mom.
2245 stopped by Zavala on dike, calm, states looking for girlfriend - if he
        sees he is to take her home.
2230 drops Price off at her house.
MN Picks up Brent.  Meets Kristin Steinoff at Fast Mart - go to her house
        45"-1'.
Goes to Leah's - throwes rocks at window - goes home.
School records: abusive language and behavior - evidence of violent
        behavior by classmates.
Uses meth and THC.
Unemployed at time of Leah's disappearance.
Navy Recruiter states that Nick said Leah and him had plans in 2 wks.
Failed polygraph, state "this is not admissable in court - you don't have
        shit."
Obtained an attorney 7/5.
Large display of emotion on demand.
This is about Nick - not Leah, likes attention and cameras.

BRENT:Nick's friend.  21years old.
        Heavy use of ETOH and drugs - lost weight.
        Cries when interviewed prior to finding body.
        Passed poly #1 - failed poly #2, wrt: knowledge and involvement.
        Access to pickup.  ? ODL
        Defensive of Nick - follower. "Nick didn't do it".
        Nervous, Mom states suicidal.

*[handwritten note: Bartley passed 1st poly, they said failed]*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000324



Wish List -
Time line - diary of things they
   think significant
Compare w/ Nick & Bartleys time line

Chart w/ Pics of potential susps &
then work off chart to show
eliminations & cause

Michaud /Stemmerman/Sero mess
- explain them away

Sherrie Murray - Running over story
   Rodney Howard mentioned
- Out on boat, waiting for him to

Amber Patue - Kristen Steinoff Confessed 2
her killed leah so she could have
Nick

Sandra Mites - Port Orford Siting
deceased → Danny Hyatt - Leah buried on Stemmerman
                 Place
Corey Bryant Saw Nick hit Leah?
   → 3rd person report

Tire Iron on Hudson ridge - traced
   back to any mv veh

bomb - explosives

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                CPD020471

MOABLEAU, ANDREW T.
09-28-44

10-13-98 FI Brookings PD
Outreach Mission.

Crazy poem
w/ news

"Do my Beloved Lead"

You have my Swiftly
Swift as a doe,
You have entered my
heart, I will never let
you go
    You have taken me
by your hand
    Together we will
enter enter the promised
land
    Like sheep we will
all come to rest, that
we may sleep
    The waters of my
heart for you have
run so deep
    Swiftly flowing, but
for you Leah, overflow-
ing

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000487

Like the Swift doe,
never, never Slowing
To pause by my
Side, ever there, will
you abide
So we will not
for you long Morn,
but for a moment, and
only a moment this
divide
But in the Morning
When the Sun does
Arise
Your Great Blessing
on us will be of no
Great Surprise
To my Little Leah, my
ever Swiftly running
Doe, My ever present
joy, My Healing little
Doe

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000488

"That which could
not be undone", you
have released me from
you and another little
one, you and she have
now become one
For this I thank
you my little one
For what you have
done
Good night, til
it be morning from
yet another little one
Their are now three
for which I yearn
My little Leah, my
swiftly running Doe
How very much I
wish to meet you,
you will shortly
Very Shortly know
A lover you will know
From —

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD000489

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Moore: Courtney Kuetzer (im @ facebook)
Sero had been calling her trying to get
a ride to BDN - (Selena in Bar w/
Sero arrested)
Courtney afraid of Sero - supposedly
bec. she saw him with bloody sweat shirt

Leader: wife @ fair - 3 girls talking about 1 says
no. He was arrested on warrants

Wetmore: Dec 97 a CZ-52  7.62 × 25 cal. semi-
auto pistol (.30 cal) was sold to Leslie Bartley as
a X-Mas for B/F Terry. Approx 4-6 mo ago heard Brent Bartley
took gun either traded it for drugs or paid off a debt in Drugs.

Young: Nick says can't find Sero's Sweatshirt
Says Sinnotts had parties all
week long. Ian Nick @ Kristen's
Witt Marrow (Pawley, Pizzola       overheard
Says sorry he can't bring Leah back
but he's not God.

Video @ Bachelor's inn of guys who were in
van trying to pick up girls. (old Pan Am).
Clifton DeLoss made threats against
Leah/Nick - (DeLoss broke tail light on Nick's car)

Wetmore: Chief Knights daughter - 2ND or 3rd hand info
Bo Schickerman logging hill behind Morrow Trucking
Red Honda

Additional Lead -
Clifton DeRoss -
"made threats
against L & Leah

CPD000315

WHITE — MASTER
YELLOW — WORKSHEET
CARD — FILE

**OREGON STATE POLICE** 138

PRIORITY
**A**

*(handwritten note, top right):*
6/28
8 - 8³⁰
♀ fightin w/ ♂
blonde
tank top

## SUBJECT INFORMATION    MAKE NO MARKS IN THIS AREA

| LAST NAME | FIRST NAME | MIDDLE NAME | DEPT. | DEPT |
|---|---|---|---|---|
| Ludington, Lisa | | | | |

| NICKNAME OR ALIAS | | SOC. SEC. # | FILE NUMBER |
|---|---|---|---|

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE | FBI # |
|---|---|---|---|---|---|
| | Riverton OR | | | 756-3320 (msg) | |

| OLD ADDRESS(ES) | | | | GLASSES | FACIAL HAIR |
|---|---|---|---|---|---|

| EMPLOYER/ADDRESS | CITY | STATE | WORK PHONE | OCCUPATION |
|---|---|---|---|---|

| RACE | SEX | D.O.B. | PLACE OF BIRTH | AGE | HEIGHT | WEIGHT | HAIR | EYES | BUILD | COMPL |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 01/19/73 | | | | | | | | |

| DR. LIC. # | STATE | VEH. YR. | MAKE | MODEL | COLOR(S) | BODY STYLE |
|---|---|---|---|---|---|---|

| VEH. LIC. # | STATE | CONDITION/EQUIP. | OTHER VEH/PLATE(S) |
|---|---|---|---|

| CONCISE TIP INFORMATION | SOURCE NAME/XREF |
|---|---|

Clling on 6/28 - just before dark &
about 8-8:30 pm she saw a male + female
fighting on W Central [near the high school] in veh.
Associated. Male: 5'8" beard Moustache, short
brown hair, baseball cap, jeans, flannel shirt (red plaid)
Female: blonde hair shoulder length in partial pony

## SOURCE INFORMATION    MAKE NO MARKS IN THIS AREA

| LAST NAME | FIRST NAME | MIDDLE NAME | A.K.A.s |
|---|---|---|---|

| RACE | SEX | D.O.B. | HEIGHT | WEIGHT | HAIR | EYES | OCCUPATION/EMPLOYER |
|---|---|---|---|---|---|---|---|

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|

| HOME PHONE | WORK PHONE | DEPT. | DEPT. # | SID |
|---|---|---|---|---|

| ADDITIONAL INFORMATION | SUSPECT NAME |
|---|---|
| tail - Lt. Blue or White tank-top | |

| RECEIVED BY Traut | DATE | TIME | COMPUTER CHECK BY | DATE | TIME |
|---|---|---|---|---|---|

| ASSIGNED TO | DATE | | |
|---|---|---|---|
| | SUSPENSE DATE | CCH _____ CRISS _____ NCIC _____ | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    CPD001422

Exhibit 16, Page 130 of 149

John talked to Nylander just before Brent did. Nylander wants to review his files first and get back to us next week
-mom still protective

Sean: Paul Davis thinks Bruce is involved
-"Wouldn't surprise me if he dumped the body"

Need to know how Nick & Bruce communicated that night
-how do we get dad there to accomplish the vehicle switch?

T-Bird:
-why are they disassociating themselves from the T-Bird?
-I hour period Nick is in the T-Bird

Lt: Aaron West interview, July 7th
-1830-1900hrs driving around with Nick
-then at Johnson Mill Pond
-around 2100 hrs enr to pick up Leah, advises he's running late because she made him late
-supposed to pick her up at 2000 hrs

Steinoff interview, July 10th
-notes
-stopped to talk to Zach
-got some cd's
-Nick at turn out, talking about Leah
-got an air freshener
-Nick says got into fight with Dad that's why he's driving the Mustang instead of the T-Bird-Nick brought this up
-quotes from Nick:"I hope she didn't do anything stupid" "was throwing rocks at Leah's window trying to get her attention" (tells her this before he's doing it on his timeline)
-Nick was weird, not as usual. There have been times when Leah didn't show up & it didn't bother him.

**Need to go through the evidence**

July 15th-Heidi Crook & Heather Reid
-see's Leah 2100 hrs
-See's Nick @ Fast Mart in T-Bird

Briefing 01/29/10 @ 0800 hrs

*(handwritten note, right margin):* How to get Dad there - Story Created - evidence created - Shades to support

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CPD002162

1
2
3
4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                              FOR THE COUNTY OF MALHEUR

6      NICHOLAS MCGUFFIN , SID # 14504778,        )
                                                  )
7                              Petitioner,         )    Case No. 15CV1030
                                                  )
8                     vs.                         )
                                                  )    GENERAL JUDGMENT
9      MARK NOOTH, Superintendent, SRCI,          )    (Post-Conviction)
                                                  )
10                             Defendant.          )

11

12          The above-entitled matter came before the court on August 12, 2019 for a Trial on a Petition for

13     Post -Conviction Relief.

14

15          NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED:

16                              PRELIMINARY MATTERS

17          At Trial, the Defendant objected to various exhibits by the Petitioner.  The Petitioner filed

18     additional argument and requested clarification on the Courts ruling.  Defendant replied.  The Court,

19     having considered the additional argument, makes the following ruling regarding the Exhibits as listed:

20

21          a.    Exhibits 61 (Backman report) and  64 (Microtrace notes) are admitted for the purpose of

22                showing its effect on trial counsel. During trial Exhibit 61 was admitted in Defense Exhibits

23                103 and 104 and 64 was admitted in Exhibit 103, as attachments to depositions.  This does

24                not constitute an admission of those documents for any and all purposes.

25          b.    The Exhibits22, 24, 26, 27, 28, 31, 32, 36, 40, 58, 61, 64, 68, 29, and Exhibit 1 to the

26                Declaration of Amanda Szarkowski were admitted for their effect on Trial Counsel

27                and the Court's ruling remains unchanged.

28

Page 1 – GENERAL JUDGMENT (Post-Conviction)

c.  The Court reserved ruling on Exhibit 60.  This Exhibit was not properly admitted at

trial as a business record and is excluded.

FINDINGS OF FACT (ALL CLAIMS)

Findings of Facts specific to each claim are included in the legal finding below. The court

makes the following Findings of Facts:

1.  Petitioner was charged with Murder of Leah Freeman, and found guilty of Manslaughter I,

the lessor included offense, after a jury trial in Coos County Circuit Court case 10CR782.

He has exhausted his appeals and brings this action for Post-Conviction Relief.

2.  Leah Freeman was Petitioner's fifteen-year old girlfriend. Both she and Petitioner lived in

Coquille, Oregon.  She disappeared on June 28, 2000.  Petitioner was eighteen years old at

the time Leah Freeman disappeared.  On the night of June 28, after spending most of the

day with Ms. Freeman, Petitioner dropped her off at the home of her friend, Cherie

Mitchell, at about 7:00 p.m.  Petitioner was supposed to pick Ms. Freeman up later.  Ms.

Freeman had an argument with Ms. Mitchell and left the Mitchell home at about 9:00 p.m.,

on foot. Ms. Freeman was seen at various places in Coquille after leaving the Mitchell

residence from around 9 to 9:30 p.m.  At about 11:30 p.m., Tony Messerle found Ms.

Freeman's right shoe on North Elm Street in Coquille.  Messerle turned the shoe over to

police on July 4.  On July 5,  a Coos County Deputy Sheriff, Kim Oswald, found Ms.

Freeman's left shoe on a remote dirt road approximately ten miles from where the left shoe

was found.

3.  Leah Freeman's body was found on August 2, 2000 on an embankment about eight miles

outside of Coquille.  The body was in an advanced state of decomposition. The body was

found approximately three miles from where the left shoe was found.

4.  Petitioner arrived at the Mitchell residence shortly after 9 a.m. to pick Ms. Freeman up.  She

had already left.  At trial, various persons testified they encountered Petitioner driving

around looking for Ms. Freeman and that they had seen Ms. Freeman walking alone.

Page 2 – GENERAL JUDGMENT (Post-Conviction)

5. The initial investigation into Ms. Freeman's disappearance was hampered by failure of local law enforcement to view her disappearance as a criminal matter. Materials were not provided to the District Attorney in 2001 which were later discovered in 2009 and 2010. (Testimony of DA Frasier)

6. A grand jury was convened in July 2000 to investigate the disappearance of Leah Freeman. No charges were brought at that time. In 2008, the case was re-opened and a second grand jury convened in 2010. Petitioner was arrested and charged with Murder on August 24, 2010.

7. Petitioner was represented at trial by Robert and Shaun McCrea. Shaun McCrea was lead counsel at trial. Robert Frasier, who was a deputy district attorney in 2001 and the elected District Attorney in 2011, was lead counsel or the State. Deputy DA Erica Soule was co-counsel for the State. The trial began in July, 2011, and lasted 10 days. Petitioner was acquitted of Murder but found guilty of the lesser included offense of Manslaughter 1 by a 10-2 verdict.

8. Trial Counsel's theory was that the victim was murdered, but not by defendant. She was able to suggest that some other unknown person was responsible, but lacked evidence that specifically pointed to another suspect. Trial Counsel presented a well defended case, resulting in Petitioner receiving a much less onerous sentence that he faced for a Murder conviction. This is not a case where Trial Counsel was obviously and grossly incompetent, particularly at trial, but rather a failure to investigate which would have uncovered exculpatory information which in had a probability of effecting the outcome of the trial.

9. This Court's decision is based on its conclusion the Jury did not have all the information it should have had to make its decision in this case. Whether the outcome would have been different is always a matter of speculation, but it is this Courts conclusion that the Trial Counsel failed to exercise reasonable professional and judgement in two respects, and that

Page 3 – GENERAL JUDGMENT (Post-Conviction)

Petitioner suffered prejudice as a result of this failure.  *Ogle v. Nooth*, 355 Or 570 (2014)

and *Strickland v. Washington*, 104 S. Ct. 2052 (1984).

10. All the witnesses who testified at the PCR trial were credible, and generally consistent in

key issues pertinent to the case.

FINDINGS OF FACT AND LEGAL CONCLUSIONS (SPECIFIC CLAIMS)

1. Claim:  Actual Innocence (Paragraph 7) is denied based on petitioner's failure to establish the

merits of the claim.  The legal basis for denial of relief is failure to establish the factual and legal

merits of the claim.

    a.   Without deciding whether "actual innocence is cognizable at Oregon law in a PCR

proceeding, in this case, Petitioner has not shown, based on newly discovered and reliable

evidence it is more likely than not that no reasonable juror could have found petitioner

guilty beyond a reasonable doubt as articulate in *Reeves v. Nooth*, 294 Or. App. 711

(2018).  He can show that had certain evidence been presented at trial, the is a reasonable

possibility that the outcome would have been difference, as is therefore entitled to relief on

other grounds, as stated below. *Stevens v. State* 322 Or. 101(1995) as quoted in *Ogle* at

355.

    b.   The testimony of DA Frasier which summarized his theory of the case, summarizes the

evidence from which a jury could find defendant committed the crime. This is a concise

summary of evidence from which a jury could find the defendant guilty.

2. Claim:  Ineffective Assistance of Trial Counsel, failure to challenge State's Conclusions regarding

cause and manner of Death  (Paragraph 8 A) is denied based on petitioner's failure to establish the

merits of the claim.  The legal basis for denial of relief is that Trial Counsel's handling of the

medical examiner testimony was a reasonable trial strategy and Petitioner has failed to show

prejudice from counsel's handling of the medical examiner evidence.

    a.   The medical examiner, Dr. Olson, was not able to determine an exact cause of death in this

case due to the advanced state of decomposition of the body.  He did determine that the

Page 4 – GENERAL JUDGMENT (Post-Conviction)

cause of death was homicidal violence of some undetermined type. This is a conclusion

the jury would have made from the evidence and that the defense advanced in their case,

as the defense expert was of the opinion this was likely a homicide.

    b.  A motion in limine to exclude Dr. Olson's opinion would not have been successful. *State*

*v. Simmons*, 279 OR App 756 (2016) and *State v. Rogers* 313 OR 356 (1992).

3.  Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's

conclusions on bloodstain evidence (Paragraph 8 B) denied. The legal basis for denial of relief is

failure to show a factual and legal basis for the claim.

    a.  Trial counsel had a reasonable strategy, developed in consultation with its

forensic expert, trial counsel brought out, through cross examination of prosecution

witness Kathy Wilcox, that blood found on the victim's left show was "high velocity"

splatter. This allowed Trial Counsel to argue the absence of blood droplet on petitioner

and, most significantly, in his car.

    b.  Petitioner has not shown that a motion in limine would have successful.

Analysis of blood evidence at the crime scene is not applicable in this case, as the crime

scene has never been located and there was no blood stain evidence at the location where

the body was found that could be recovered and tested.

    c.  Petitioner called Kenn Meneely as a defense expert on blood spatter evidence.

Petitioner has failed to prove how calling another expert would have provided evidence

that another person killed Leah Freeman, or how Mr. Meneely's expertise and testimony

was deficient.

4.  Claim Ineffective Assistance of Trial Counsel, failure to provide photos of Petitioner showing no

defensive wounds (Paragraph 8 C) is denied based on petitioner's failure to establish the merits of

the claim. The legal basis for denial of relief is that Trial Counsel had strategic reason for not

questioning law enforcement witnesses regarding Petitioner's lack of defensive wounds or

Page 5 – GENERAL JUDGMENT (Post-Conviction)

introducing photographs of Petitioner taken by law enforcement through law enforcement witnesses.

    a.   Trial Counsel intended to introduce the photos through Petitioner and obtain testimony regarding his physical condition at the time of Ms. Freeman's disappearance when Petitioner testified. Petitioner changed his mind about testifying, so she was unable to do this. Her decision not to question the police officer about this is articulated in Exhibit 104 at 36 and is reasonable.

    b.   The photographs were taken on July 28, a month after Ms. Freeman disappeared, diminishing their evidentiary value. The jury heard that a victim of strangulation might leave scratches or bruises on her assailant. There was no evidence that Petitioner had any scratches or bruises presented to the jury. Trial Counsel was not inadequate for not arguing this point in closing.

5.   Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's Timeline (Paragraph 8 D) denied based on petitioner's failure to establish the merits of the claim.

    a.   Trial Counsel was not inadequate for failing to introduce the phone and gas records. (8 D 1 and 2) Trial Counsel intended to introduce the records through Petitioner, and was unable to do so when he elected not to testify. The records do not provide an alibi for Petitioner. It is unlikely the Trial Court would have allowed a continuance to bring in custodians of the records. Petitioner is unable to show prejudice because these records were not admitted.

    b.   The email from Chief Daniels to DA Frasier would not have been admissible as hearsay. Counsel was not inadequate for failing to seek admission of this document. (8 D 3)

    c.   Trial Counsel was not inadequate for failing to request "missing reports" in discovery. (8 D 4).

    d.   Trial Counsel was not inadequate in her cross examination of Denise Bertrand and has failed to show prejudice as a result of any alleged inadequacy. (8 D 5)

Page 6 – GENERAL JUDGMENT (Post-Conviction)

e.   Trial Counsel was not inadequate for failing to call Nicole Price as a witness.  (8 D 6)
There is no evidence that Price would have added anything that was not covered in the
testimony of Brent Bartley.  Price was vague about times, had been drinking, and had no
additional information that would have affected the outcome of the trial.  It was not
unreasonable for trial counsel, as a matter of trial strategy, to elect not to call her as a
witness.

f.   Trial Counsel was not inadequate for not calling Kristy Christoferson and Amanda
Landmark to testify at trial. (8 D 7)  Other witnesses testified that they had seen Petitioner
looking for the victim at various times and places in Coquille the night she disappeared.
Christoferson could not be located at the time of trial.  Ms. Landmark has no memory of
what happened that night, where other witnesses who did testify were specific and detailed
about seeing Petitioner.  Petitioner is unable to show prejudice for failing to call these
witnesses.

g.   Trial Counsel was not inadequate for failing to produce a timeline of petitioner's
movements on June 28.  Counsel provided a timeline in the form of testimony and
presented a coherent argument regarding events for the jury.  Counsel did not make a chart
or specific exhibit for the jury.  This was a strategic decision, as any timeline in this case
will have gaps due to the vague nature of the witness testimony as to specific times, and
information from Petitioner could not be included as he chose not to testify.  A timeline
could emphasize the time gaps to Petitioner's detriment.  Petitioner is unable to show
prejudice.

6.   Claim  (8 E) Ineffective Assistance of Trial Counsel, failure to request, and offer into evidence
DNA Evidence (Paragraph 8 E)  is  allowed; The legal basis for relief is that there is more than a
mere possibility that counsel's acts or omissions effected the outcome of the case.

a.   Trial Counsel retained the services of Kenn Meneely, as an expert.  Mr. Meneely is not a
DNA expert, and trial counsel did not retain one.  This decision was based the conclusions

Page 7 – GENERAL JUDGMENT (Post-Conviction)

in the 2001 report from the Oregon State Crime lab of testing on the victim's shoes (Ex

18). That report stated that the victim's DNA was found on both shoes, and that male

DNA was found on the left shoe that did not match Petitioner. In 2002, the analyst, Mary

Krings, compared the DNA on the left shoe against Deputy Oswald, and reported it was a

match to him.

b.  In 2001, the shoes were sent to England for testing at Forensic Science Service (FFS).

FSS reported traces of blood on the sole, inside heel and lace end of the left shoe. (Ex 9)

c.  Trial Counsel had these reports, as well as Ms. Krings handwritten allele charts

interpreting the electropherograms (the bench notes).

d.  The bench notes show there was DNA of an unknown male in the samples. This was not

noted in the report.

e.  Trial Counsel did not retain a DNA expert to review the bench notes or actual laboratory

analysis. She relied on the conclusion in the 2001 report without further investigation.

f.  Relying on the conclusions in the report, Trial Counsel stipulated to the introduction of the

DNA reports.

g.  At trial, Kathy Wilcox, the prosecution expert on DNA, testified that Ms. Freeman's DNA

was the only DNA found on the right shoe. She further testified that the only DNA found

on the left shoe was from the victim and Deputy Oswald.

h.  These conclusions were incorrect. Review of the results shoe that unknown male DNA

was found on both shoes, not belonging to Petitioner, and those results were known in

2001 and 2002 when the reports were generated.

i.  There is a factual dispute as to whether the OSP lab protocols in 2001 and 2002 required

the trace DNA amounts found be reported. This case went to trial in 2011. Significant

advances in the detection of trace amounts of DNA occurred in that ten-year period, and

by 2011, there is no dispute the results would have been reported at that time, or, that had a

defense expert asked, the results would have been disclosed.

Page 8 – GENERAL JUDGMENT (Post-Conviction)

j.  At trial, the State argued that there was no unknown DA on the shoes.  After the PCR case
    was filed, the Coos County District Attorney took the unusual step of hiring an
    independent expert, Thomas Fedor, to review the DNA results.  Mr. Fedor is of the
    opinion that the OSP crime lab made errors and that the reliance on protocols or analyst
    discretion in 2001 is suspect.  (Ex. 15 and 16).

k.  In preparation of this case, the OSP lab reviewed the DNA evidence and prepared new
    reports (Ex 17 and 18).  This report reports in detail the presence of unknown male DNA
    on both shoes, and that the DNA is not from at various males associated with the case.

l.  Trial Counsel did not object to the testimony at the trial regarding the DNA.  Without the
    information that other unknown male DNA was found, Trial Counsel made the reasonable
    strategic decision to downplay the DNA evidence and argue that Petitioner's DNA was not
    found on the shoes.

m.  Trial Counsel's theory of the case was that the victim was murdered, and that some other
    unknown person was the perpetrator.  However, without the DNA evidence, Trial Counsel
    was reduced to showing that Petitioner could not have committed the crime and was not
    able to produce any evidence of an alternative theory.

n.  Had Counsel retained the services of an expert in DNA analysis, a review of the bench
    notes, protocols and the FFS reports would have resulted in Counsel learning the
    conclusion in the 2001 and 2002 reports were incomplete at best.  Counsel would then
    have been able present evidence that could lead a jury to conclude another unknown male
    was responsible for the victim's death.  Trial Counsel now acknowledges this. (Ex. 104)

o.  The Court finds the testimony of Patrick Sweeny credible and persuasive on this issue.
    Sweeny testified of the necessity of consulting with at least one and probably two experts
    regarding the DNA evidence, in order to understand the science and confront the State's
    experts.  It was his opinion that Trial Counsel performance fell below the standard of

Page 9 – GENERAL JUDGMENT (Post-Conviction)

competence in this type of case, a Murder where the defense theory was that someone else committed the offense.

p.  While understandable given the language of the reports, Counsel's failure to retain an expert and investigate further, and question the State's witness on the reports constitutes a failure to engage in a reasonable investigation, and a failure to exercise reasonable professional skill and judgment.

q.  Petitioner was prejudiced by Trial Counsel's failure to investigate, retain and offer and expert at trial and otherwise correct the DNA evidence offered at trial.

7.  Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's "bad guy" evidence (Paragraph 8 F) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief failure to prove factual and legal basis of claim.

a.  An objection by Trial Counsel to the letters and diaries of the victim would have not been successful.  The materials were admissible under OEC 801(3).  Trial Counsel relied on letters and materials by the victim in its defense, and objection to the materials would have undermined its use of the victim's letters.

b.  Petitioner has failed to show prejudice as the evidence would  and did have come in through other witnesses.

8.  Claim: Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's admission evidence (Paragraph 8 GI) is denied based on petitioner's failure to establish the merits of the claim.  The legal basis for denial of relief is failure to prove factual or legal basis of claim

a.  Counsel's decision not to call Meagan Edgerton, Kathy McGuffin or herself as witness were a reasonable trial strategy.  Counsel handled the statement on the Courthouse steps allegedly made by Petitioner by placing it in context to minimize its relation to this case. Trial Counsel filed a motion in limine regarding the testimony,  and it was never argued that the witness to the statement Melissa Beebee, made the statement.  It can only be concluded that this assert now is not correct.

Page 10 – GENERAL JUDGMENT (Post-Conviction)

b. Counsel was not inadequate for failing to call Wayne McGuffin to testify. Counsel made a reasonable strategic decision not to call Wayne McGuffin as his testimony could have been detrimental to Petitioner.

9. Claim: Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's evidence regarding cleaning the Mustang (Paragraph 8 H) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is failure to prove factual and legal basis for claim. Trial Counsel employed a reasonable strategy in her cross examination of Kathy Wilcox, and Petitioner is unable to show prejudice in any event.

10. Claim Ineffective Assistance of Trial Counsel, failure to effectively challenge the State's investigation (Paragraph 8 I) allowed regarding the Backman report (Ex 61). The remainder of the claim is denied, based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is failure to show factual or legal basis for claim.

a. The Backman report, for whatever reason, was not known to either the State or defense at the time of trial. The report has a Bates stamp on it, but does not appear in the discovery logs, and neither the District Attorney or Trial counsel recall seeing it prior to the PRC proceedings.

b. The information provided by Mr. Backman was favorable to the defense, and directly contradicts the State's witness, John Lindegren, that he saw the defendant with the victim at around nine in the evening. Backman was using an ATM and had the withdrawal slip with a time of 9:04 p.m. He stated he saw the victim walk by while he was using the ATM.

c. While other witnesses saw the victim in the vicinity of the bank that night, their testimony is vague as to time. While this testimony would have corroborated Backman's, it was not duplicative, as none of the other witnesses can provide an exact time.

d. Backman's statement makes it more likely that Lindegren confused the victim and defendant with Ms. Mitchell and her boyfriend. Lindegren is the only witness who

Page 11 – GENERAL JUDGMENT (Post-Conviction)

testified that the victim and defendant were together after he dropped her at the home of Ms. Mitchell and contradicts the defendant's claim that he did not see the victim again that evening. While trial counsel argued Lindegren was mistaken, she had no evidence he was wrong. Disclosure of the report could have led to admissible evidence in the form of Mr. Bachman's testimony and been used to impeach Mr. Lindegren. It would have provided a definite time and location of the victim. It would rebut the argument that the Petitioner was lying to the police when he told them he did not see Leah Freeman again after he dropped her off at the Mitchells earlier in the evening, making all his other statements about what he did that evening suspect.

e.   PCR counsel has not located Mr. Backman to determine what his actual testimony would have been. Whether he could have been located in 2011 for trial is not known as no one attempted to locate him then. Whether he can ever be found is not known. This is not a situation where Trial Counsel decided not to call him for strategic reasons, but rather a failure to investigate critical evidence that in all probability would have had a significant impact at trial, and Mr. Backman is distinctive from all the other witnesses now suggested by Petitioner as possible trial witnesses.

f.   There is a possibility, based on the report of the Backman interview not being in the discovery log, that it was in fact not disclosed. If that were the case, it would be a clear *Brady* violation. As indicated below, this Court does not find sufficient evidence it was not in the discovery. It is also possible, given the volume of discovery in the case, that Counsel missed it and if that is the case this error was critical.

g.   Deputy Oswald existed or that it contained anything admissible or exculpatory.

h.   The OSP log would not have been admissible at trial.

i.   The tip sheet and Microtrace notes were not admissible at trial. The Backman information is discussed above.

Page 12 – GENERAL JUDGMENT (Post-Conviction)

j.   There is no evidence the original death certificate and affidavit, if admitted would have changed the outcome at trial.

k.   Petitioner's spoliation argument regarding a bank video failure for failure to show the video contained any exculpatory or relevant information

11. Claim Ineffective Assistance of Trial Counsel, failure to investigate and present evidence of third-party guilt (Paragraph 8 J) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is that Trial Counsel's decision not to present evidence regarding suspicious males and grey cars in the Coquille at the time of Ms. Freeman's disappearance was a reasonable strategic decision, based on the information counsel had at the time regarding the DNA analysis.

a.   Her conclusion that this evidence was too attenuated and would make the defense look desperate (Ex 104 at 89-90) is reasonable, particularly considering the Trial Court pretrial ruling that it would not allow rumors and local gossip to be admitted.

b.   Petitioner is not able to show prejudice in that attempts to enter this evidence would not have been successful.

12. Claim Ineffective Assistance of Trial Counsel, failure to effectively investigate or call witnesses (Paragraph 8 K) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is that counsel made a reasonable strategic decision not to call each of the witnesses now identified by the Petitioner.

a.   The testimony of Mona Hathaway regarding the El Camino would have required speculation or conjecture not likely to have been allowed by the Court, and in any event, Trial Counsel's conclusion that testimony about random grey cars in the area would have been seen as desperation by the jury and detracted from more specific evidence regarding other possible specific suspects.

b.   Trial Counsel's decision not to call Charity Kinsey and Shelley Kinsey was a reasonable strategic decision in the absence of any evidence connecting the two attacks.

Page 13 – GENERAL JUDGMENT (Post-Conviction)

c. Trial Counsel was not inadequate in her handling of the paint chip evidence. Trial Counsel argued the chip was not connected to Petitioner's car, that it was not compared to Scott Hamilton's car. Petitioner is not able to show the chip is actually connected to some other suspect, and is therefore unable to show prejudice.

d. Trial Counsel was not inadequate regarding failure to seek admission of the poem sent to the victim's funeral. This poem is vague and not a confession of someone else. It was reasonable for Trial Counsel to conclude this evidence was weak and to attenuated and its admission would again signal desperation to the jury.

e. Trial Counsel's decision not to call Kathy McGuffin as a witness was reasonable, based on her analysis of the witnesses based on her training and experience and a balance of the risk to reward.

f. Overall, counsel's selection of lay witnesses was a reasonable strategic decision based on her analysis of the case and the information she had at the time of trial. It is certainly possible that her decisions might have been different had she had the information regarding the unknown DNA but overall her handling of witnesses did not fall below the standard of permissible professional conduct.

13. Claim Ineffective Assistance of Trial Counsel, failure to object to State's closing (Paragraph 8 L) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is that statements made by the prosecution in closing argument when viewed in context were not improper.

a. Specifically, the statements do not constitute improper vouching, an improper comment on Petitioner's right to remain silent or are made outside the scope of the evidence. Petitioner has failed to show prejudice.

b. Trial Counsel made a strategic decision not to continuously interrupt closing with objections was reasonable, particularly in light to the Trial Courts response when she did object. Petitioner has not shown that had Trial Counsel objected the objections would have

Page 14 – GENERAL JUDGMENT (Post-Conviction)

been sustained, or that the failure to object effected the outcome of trial. The Trial Court correctly instructed the jury regarding argument. Petitioner has failed to show a legal basis for relief.

14. Claim Ineffective Assistance of Trial Counsel, failure to object to non-unanimous verdict (Paragraph 8 M) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is *State v. Broome*, 276 Or. App.595 (2016) and *Apodaca v. Oregon*, 406 US 404, 92 S. Ct 1628, 32 L Ed 2nd 183 (1972). At the time of Petitioner's trial, State and Federal courts allow a non-unanimous verdict in all crimes but Murder. Petitioner is unable to show prejudice as had Trial Counsel objected to a non-unanimous verdict in the Manslaughter charge, the motion would have been denied by the trial court and the appellate court would have sustained the denial on appeal.

15. Claim Ineffective Assistance of Appellate Counsel, failure to effectively challenge the State's "bad guy" evidence (Paragraph 9) is denied based on petitioner's failure to establish the merits of the claim. The legal basis for denial of relief is failure to show factual and legal basis for the claim. The materials, as noted above, were legally admissible and this issue could not have been raised by trial counsel as plain error.

16. Claim Violation of Discovery and *Brady v. Maryland, 373 US 83, 83 St. Ct 1194, 10 L ed 215 (1963).* is allowed. The legal basis for relief is that had the withheld material been disclosed, there is a reasonable probability that the result at trial would have been different.

1. Male DNA was detected on the victim's shoes during testing in 2000 that was not the defendants. This information was not disclosed at trial. DNA from another male is material and exculpatory. The basis for this conclusion, the actual forensic analysis (the "bench notes") was disclosed but not interpreted in the report.

2. In 2000, when the original testing was conducted, it is contended that existing OSP lab protocols did not require disclosure of the DNA in the report, at the discretion of the examiner.

Page 15 – GENERAL JUDGMENT (Post-Conviction)

3. By 2010, when the case was re-opened, significant advances had been made in DNA testing allowing for more detailed and thorough analysis of trace amounts of DNA. A report prepared at that time with the same information would have disclosed the trace DNA on both shoes from unknown males.

4. In 2010, the only DNA reported on the victim's shoes was that of the victim and Deputy Oswald, a police officer who had handled the shoe. While the allele charts and electropherograms were disclosed, the conclusion that there was unknown male DNA in the sample was not. The OSP report and trial testimony presented to the jury and not challenged by the defense, made it appear to the jury that there was no other DNA on the shoes, which was not true and was known to the State at the time of trial, although the District Attorney, also relying on the conclusions in the 2001 report, also did not know about the other DNA, resulting in his argument at trial that no other DNA was found on the shoes other than the victim and the deputy sheriff who had handled the shoe.

5. As a result of the investigation in the PCR case, the OSP lab re-assessed the data thoroughly and completely, and determined there was additional unknown male DNA in the tested materials. There is a possibility that the same unknown male contributed DNA to both the left and right shoes. The conclusions a reader is likely to draw from the 2000 and the 2017 reports are strikingly different and would have altered the trial strategy employed by Trial Counsel. These conclusions are supported by the conclusions of the expert called in the PCR case, Dr. Nasir

6. While the unknown DNA could have been deposited by innocent transfer, it is also possible it was not. This would be a factual question for the jury.

7. Trial counsel did not investigate this matter further as a matter of trial strategy, which was based on the information she had at the time. Had she been presented with the conclusion that other male DNA was found on the shoes, the trial strategy would have been different, particularly if the other material unlawfully withheld had been disclosed, as discussed below.

Page 16 – GENERAL JUDGMENT (Post-Conviction)

Trial counsel's failure to investigate the DNA evidence and hire a DNA expert, discussed

above, was a result in large part due to the State's failure to disclose the conclusion that other

male DNA was found on the shoes.

8.  The District Attorney was laboring under the same lack of information.  This is not a case

where the District Attorney, who sincerely and passionately has sought to determine what

happened to the victim, deliberately withheld exculpatory information.  Rather, the material

from the OSP lab provided information in its report and through the testimony of Kathy

Wilcox that created a false impression that no other DNA was found on the shoes.  This failure

is a failure to disclosed exculpatory information.

9.  The failure to disclose the Nick Backman interview has not been proven.  The District

Attorney does not recall the document, but it is Bate stamped and hole punched, so it is

reasonable to conclude it was in the discovery matters.

10. If the report was in fact disclosed, but somehow not seen by either the District Attorney or

Trial Counsel, it would be a clear failure of defense counsel to investigate and properly present

evidence at trial, as the failure to present this information raises the possibility that the result at

trial would have been different, as discussed above.

11. The other alleged Brady violations do not rise to the level that had the material been disclosed,

it would have been likely to have changed the outcome of the trial or would not have been

admissible or led to admissible evidence.


For the claims allowed above, the following relief is granted:  Conviction for Manslaughter I is

set aside and the case is remanded to the Trial Court for further proceedings consistent with this

order.


This matter involves Federal; and/or State Constitutional issues.

The court adopts all oral findings made on the record and incorporates them into this judgment.

Page 17 – GENERAL JUDGMENT (Post-Conviction)

All questions presented were decided. This judgment shall constitute a final General Judgment for the purposes of appellate review and for purposes of res judicata.

DATED this 26th day of November, 2019.    Signed: 11/29/2019 04:51 PM

Sr. Judge Patricia Sullivan, Circuit Judge    Circuit Court Sr. Judge Patricia A. Sullivan

CERTIFIED TO BE A TRUE
COPY OF THE ORIGINAL

Page 18 – GENERAL JUDGMENT (Post-Conviction)