# Transcript of the Testimony of
# KATHLEEN MARIE MCGUFFIN

**Date:** September 8, 2023

**Case:** MCGUFFIN v. DANNELS, et al.

Case No.:  6:20-cv-01163 MK

ISLAND COURT REPORTING AND TRANSCRIPTION SERVICES
Phone:1-844-933-9800
Fax:1-866-936-1233
Email:admin@islandcourtreporting.com
Internet: www.islandcourtreporting.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an) CIVIL NO.
individual and as guardian   ) 6:20-cv-01163-MK
of S.M., a minor,            )
                             )
   Plaintiffs,       )
                     )
   vs.               )
                     )
MARK DANNELS, PAT DOWNING,   )
SUSAN HORMANN, MARY KRINGS,  )
KRIS KARCHER, SHELLY MCINNES,)
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC           )
SCHWENNINGER, RICHARD WALTER,)
CHRIS WEBLEY, ANTHONY WETMORE,)
KATHY WILCOX, CRAIG ZANNI,   )
DAVID ZAVALA, JOEL D. SHAPIRO )
AS ADMINISTRATOR OF THE ESTATE)
OF DAVID E. HALL, VIDOCQ     )
SOCIETY, CITY OF COQIULLE,   )
CITY OF COOS BAY, and COOS   )
COUNTY,         )VIDEOTAPED DEPOSITION
                )     OF
   Defendants.  )KATHLEEN MARIE MCGUFFIN
_____)
VIDOCQ SOCIETY,        )
                       )
   Cross-Claimant,     )
                       )
   vs.                 )
                       )
MARK DANNELS, PAT DOWNING,   )
SUSAN HORMANN, MARY KRINGS,  )
KRIS KARCHER, SHELLY MCINNES,)
RAYMOND MCNEELY, KIP OSWALD, )
MICHAEL REAVES, JOHN RIDDLE, )
SEAN SANBORN, ERIC           )
SCHWENNINGER, RICHARD WALTER,)
CHRIS WEBLEY, ANTHONY WETMORE,)
KATHY WILCOX, CRAIG ZANNI,   )
(caption continues on next page)

Page 2

1    DAVID ZAVALA, JOEL D. SHAPIRO )
     AS ADMINISTRATOR OF THE ESTATE)
2    OF DAVID E. HALL, VIDOCQ     )
     SOCIETY, CITY OF COQIULLE,   )
3    CITY OF COOS BAY, and COOS   )
     COUNTY               )
4                         )
       Cross-Defendants.  )
5    _____)
     NICHOLAS JAMES MCGUFFIN, as an)
6    individual and as guardian   )
     ad litem, on behalf of S.M., )
7    a minor,             )
                          )
8        Plaintiff,       )
                          )
9        vs.              )
                          )
10   OREGON STATE POLICE,      )
                          )
11       Defendant.       )
     _____)
12
13
14
15
16       VIDEOTAPED DEPOSITION OF KATHLEEN MARIE MCGUFFIN
17   Taken on behalf of the Plaintiff, at 27-2168 Hawaii
18   Belt Road, Papaikou, Hawaii, commencing at 10:07 a.m.
19   HST/1:07 p.m. PDT, on Friday, September 8, 2023,
20   pursuant to Notice.
21
22
23   REPORTED BY:
24   TERI HOSKINS, CSR. NO. 452
     Registered Merit Reporter
25

Page 3

1             APPEARANCES
2    FOR PLAINTIFF:
3        MALONEY LAUERSDORF REINER, PC
         BY:  JANIS C. PURACAL, ESQ.
4          ANDREW C. LAUERSDORF, ESQ.
         1111 E. Burnside Street, Suite 300
5        Portland, Oregon 97214
         (503)245-1518
6        jcp@mlrlegalteam.com
         acl@mlrlegalteam.com
7
8
         FOR DEFENDANTS CITY OF COQUILLE, CITY OF COOS BAY,
9        COOS COUNTY, CRAIG ZANNI, CHRIS WEBLEY, ERIC
         SCHWENNINGER, SEAN SANBORN, RAY MCNEELY, KRIS KARCHER,
10       PAT DOWNING, MARK DANNELS, KIP OSWALD, MICHAEL REAVES,
         DAVID ZAVALA, ANTHONY WETMORE, AND SHELLY MCINNES:
11
         LAW OFFICE OF ROBERT E. FRANZ, JR.
12       BY:  ROBERT E. FRANZ, JR., ESQ. (remotely)
            SARAH R. HENDERSON, ESQ. (remotely)
13       PO Box 62
         Springfield, Oregon 97477
14       (541)741-8220
         rfranz@franzlaw.comcastbiz.net
15       shenderson@frazlaw.comcastbiz.net
16
17   FOR DEFENDANTS OREGON STATE POLICE, JOHN RIDDE, SUSAN
     HORMANN, MARY KRINGS, KATHY WILCOX:
18
         OREGON DEPARTMENT OF LABOR
19       BY:  TODD MARSHALL, ESQ. (remotely)
         100 SW Market Street
20       Portland, Oregon 97201
         (971)673-1880
21       todd.marshall@doj.state.or.us
22
23
24
25   (Appearances continued)

Page 4

1             APPEARANCES
2    FOR DEFENDANT RICHARD WALTER:
3        LUVAAS COBB
         BY:  ERIC S. DEFREEST, ESQ. (remotely)
4        777 High Street, Suite 300
         Eugene, Oregon 97401
5        (541)484-9292
         edefreest@luvaascobb.com
6
7
8    FOR DEFENDANT VIDOCQ SOCIETY:
9        HWS LAW GROUP
         BY:  RACHEL JONES, ESQ. (remotely)
10       101 SW Main Street, Suite 1605
         Portland, Oregon 97204
11       (503)524-1200
         rjones@hwslawgroup.com
12
13
14   ALSO PRESENT:
15       NICHOLAS MCGUFFIN
16       MARY MARVIN PORTER, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

1    CONTENTS
2    DEPONENT                                    PAGE
3     KATHLEEN MARIE MCGUFFIN
4      EXAMINATION BY MS. PURACAL        7
5      EXAMINATION BY MR. FRANZ          84
6      EXAMINATION BY MR. MARSHALL       98
7      EXAMINATION BY MS. JONES          105
8
9
10               EXHIBITS
11   DEPOSITION EXHIBIT                         PAGE
12   Exhibit 1   Photograph of Nick and Leah     12
13   Exhibit 2   Phone records
14   Exhibit 3   Gas records
15   Exhibit 4   Photographs, going to visit dad
16   Exhibit 5   Photographs, V. growing up
17   Exhibit 6   Video
18
19
20
21
22
23
24
25

Page 6

1              Friday, September 8, 2023
2              10:07 a.m. HST/1:07 p.m. PDT
3
4          VIDEOGRAPHER:  Good morning.  This is the
5    videotaped deposition of Kathy McGuffin taken by the
6    Plaintiff in the matter of Nicholas James McGuffin
7    versus Mark Dannels, et al., Case No. 6:20-cv-01163-MK
8    in the U.S. District Court for the District of Oregon,
9    Eugene Division.
10         The video deposition is being held at
11   27-2168 Hawaii Belt Road, Papaikou, Hawaii 96781.  The
12   video deposition is being held on September the 8th,
13   2023, at 10:07 a.m.
14         The court reporter is Teri Hoskins from the
15   firm of Island Court Reporter.  Videographer is Mary
16   Marvin Porter of Island Eyes Video.
17         Will the counsel for the defendant please
18   introduce themselves.
19         Can they do that -- hear me?
20         MS. PURACAL:  Did the defendants want to
21   start, on Zoom, by introducing yourself?
22         MR. FRANZ:  Robert Franz for the municipal
23   defendants.
24         MR. MARSHALL:  Todd Marshall on behalf of
25   the State defendants.

Page 7

1          MS. JONES:  Rachel Jones on behalf of Vidocq
2    Society.
3          MR. DEFREEST:  Eric DeFreest on behalf of
4    Richard Walter.
5          VIDEOGRAPHER:  Will the counsel for the
6    plaintiff please introduce themselves.
7          MS. PURACAL:  Janis Puracal on behalf of
8    Plaintiffs.
9          MR. LAUERSDORF:  Andrew Lauersdorf on behalf
10   of Plaintiff.
11         VIDEOGRAPHER:  Will the court reporter
12   please swear in the witness at this time.
13
14         KATHLEEN MARIE MCGUFFIN,
15   having been first duly sworn or affirmed to tell the
16   truth, the whole truth, and nothing but the truth, was
17   examined and testified as follows:
18
19              EXAMINATION
20   BY MS. PURACAL:
21      Q.  All right, Mrs. McGuffin.
22      A.  Yes.
23      Q.  Can you give us your full name and spelling
24   for the record.
25      A.  Kathleen Marie McGuffin, K-a-t-h-l-e-e-n,

Page 8

1    M-a-r-i-e, M-c-G-u-f-f-i-n.
2       Q.  How are you related to Nicholas McGuffin?
3       A.  Nicholas is my son.
4       Q.  When was Nick born?
5       A.  He was born April 25th, 1982.
6       Q.  And where was he born?
7       A.  In Portland, Oregon.
8       Q.  Besides Nick, how many other children do you
9    have?
10      A.  One.
11      Q.  What is his name?
12      A.  Wayne McGuffin.
13      Q.  How old is Wayne?
14      A.  Wayne is 43.
15      Q.  How are you related to V.M.?
16      A.  V. is my granddaughter.
17      Q.  And besides V., how many grandchildren do
18   you have?
19      A.  One other grandchild, so two all together.
20      Q.  Where are you currently living?
21      A.  In Orchidland, in Hawaii, on the Big Island.
22      Q.  How long have you lived in Hawaii?
23      A.  A little over a year.
24      Q.  Where did you live before Hawaii?
25      A.  In Coquille, Oregon.

ISLAND COURT REPORTING & TRANSCRIPTION SERVICES
(808) 933-9800

Page 13

1  extra clothes on her -- on her back, so Nick and I
2  were taking pictures, and we turned around, and she
3  had put on a set of Nick's blue jeans and his football
4  Jersey, so...
5      Q.  Was that -- high school.  You said senior
6  photos.  Was that Nick's senior photos?
7      A.  Nick's senior photos, yes.
8      Q.  Did you get a chance to observe Nick and
9  Leah together?
10     A.  Yes.
11     Q.  What were they like together?
12     A.  They were -- they were very good together.
13 They had a couple squabbles -- you'd hear them
14 squabble -- but it was nothing major, and -- no, they
15 got along very good.  They enjoyed going places
16 together and just being together.
17     Q.  Did you ever see them fight?
18     A.  Just arguments.
19     Q.  Ever any physical violence?
20     A.  Never any physical.
21     Q.  Let's talk about the summer of 2000 before
22 Leah went missing.
23         In June of 2000, did --
24     MR. FRANZ:  Excuse me, Janis.
25     MS. PURACAL:  Yes.

Page 14

1      MR. FRANZ:  Could you speak a little bit
2  slow -- slower?  Because we're getting a delay --
3      MS. PURACAL:  Oh, sure.  Yeah.
4      MR. FRANZ:  -- so the words are merging
5  together.
6      MS. PURACAL:  Sure.  We'll try and -- we'll
7  try and do better.
8  BY MS. PURACAL:
9      Q.  Okay.  We're going to talk about the summer
10 of 2000.
11     A.  Okay.
12     Q.  In June of 2000, did Nick have his own car?
13     A.  Yes.
14     Q.  What kind of car did he have?
15     A.  He had a blue older-model Mustang.
16     Q.  And do you know what year that was?
17     A.  It was a '68 or '69.  I think it's '68.  I'm
18 not positive.
19     Q.  Where did he get that car?
20     A.  Dad bought it for him.
21     Q.  So your dad.  That would be his grandfather?
22     A.  I believe so, yes.
23     Q.  In June of 2000, in the weeks before Leah
24 went missing, did Nick have access to one of Bruce's
25 cars?

Page 15

1      A.  Yes, he did.
2      Q.  What car was that?
3      A.  That was a Ford Thunderbird.
4      Q.  What color was the Thunderbird?
5      A.  It was maroon, and it was an older edition,
6  too.  It wasn't old as the Mustang, but it was an
7  older vehicle too.
8      Q.  Why did Nick have access to the Thunderbird?
9      A.  He -- the Mustang had a gas leak in it, so
10 he was driving the -- it was -- Bruce's car was the
11 Thunderbird, so he was driving Bruce's car, because
12 his tank leaked.
13     Q.  At some point, did Bruce take away the keys
14 to the Thunderbird?
15     A.  Yes, he did.  It was the Monday night before
16 Leah disappeared.  Him and Bruce had met up at -- at
17 home.  We were there, and he was upset with Nick
18 because he hadn't done -- applied for the jobs that he
19 was supposed to be applying for; and so he took --
20 took the keys away and told him he didn't get the
21 T-bird back until he got a job.
22     Q.  And how do you know that -- that Bruce took
23 those keys away?
24     A.  Because I was right there.
25     Q.  Do you know where those keys were placed?

Page 16

1      A.  Yes.  They were placed in the headboard of
2  our -- in our bedroom, in our -- mine -- Bruce and my
3  bedroom.
4      Q.  Did you see them there?
5      A.  Yes, I did.
6      Q.  In June of 2000, did you have a vehicle?
7      A.  Yes, I did.
8      Q.  What kind of vehicle did you have?
9      A.  It was a burnt orange Ford Ranger, a little
10 pickup.
11     Q.  Do you remember what day Leah disappeared?
12     A.  Yeah, June 28th, 2000.
13     Q.  Did you work that day?
14     A.  Yes, I did.
15     Q.  What time did you get home from work?
16     A.  I got home probably 4:00 to 4:30.
17     Q.  Who was at home when you got there?
18     A.  Bruce.
19     Q.  Anybody else?
20     A.  Nope.
21     Q.  So Nick wasn't there?
22     A.  No.
23     Q.  What did you do that evening?  Do you
24 remember?
25     A.  Yep.  It was -- come home, just kind of

4 (Pages 13 to 16)

Page 17

1 relax for a few, ate dinner, and watched TV, and then
2 probably about 9:00, 9:30, went to bed.
3      Q.  Do you remember if you were on call at that
4 point in time?
5      A.  That evening, I -- I would have went on
6 call.
7      Q.  Okay.  Can you tell us what it means to be
8 on call?
9      A.  On call is a -- smaller hospitals do it,
10 because they don't staff a position throughout the
11 night, and so they just take from the regular staff
12 and they take call; they're able to be at home.  And
13 they just call you when they need an x-ray -- I'm an
14 x-ray tech -- and just when they need you, then you go
15 in and do -- do what they wanted.
16      Q.  Okay.  So on that night, the night of
17 June 28th, 2000, you were on call --
18      A.  Yes.
19      Q.  -- that night?
20         What do you remember about that night after
21 you went to bed?
22      A.  Let's see.  Went to bed at 9:00, 9:30.  It
23 was probably about 10:15 or so, phone rang.  We
24 were -- Bruce and I were in bed, and it was Nick.  He
25 was wondering if Leah had called or we had heard from

Page 18

1 her, and that he was looking for her, and that was it.
2 And we hung up and then went back to bed.
3         Probably, then, about 2 -- between 2:00 and
4 2:30 -- not exact, but -- Nick came home, and it was
5 Nick, because he walked by our bedroom door, which are
6 adjacent to each other, and he said "I'm home" or "I'm
7 here," and -- and then I went back to bed.  Bruce was
8 still in bed.
9         And around 4:00 -- 4:00 to 4:30, I got a
10 phone call.  I answered it right away, because I was
11 on call; and it was some random person calling, and I
12 don't remember what they said, but -- then they hung
13 up.  And then at that point, both Nick and Bruce had
14 got up.  Nick got up because he wanted to know who was
15 on the phone, and Bruce went to the bathroom.  And we
16 told Nick who was on the phone, and then we all went
17 back to bed.  He took the hand phone from the living
18 room phone and took it to bed with him so he could
19 answer the phone.  And then that was the night.
20      Q.  Okay.  I'm going to back up a little bit --
21      A.  Okay.
22      Q.  -- and ask you some details about that.
23      A.  Okay.
24      Q.  So that call that you said that you got at
25 about 10:00-something --

Page 19

1      A.  Uh-huh.
2      Q.  -- that night, did you know the time at that
3 time?  Did you look at a clock?
4      A.  I think it was on -- on the phone.  Yes.
5      Q.  Okay.  And do you remember the exact time
6 that you got that call?
7      A.  No, I don't know the exact time.
8      Q.  Would it help to refresh your recollection
9 if you looked at your phone records?
10      A.  Probably, yes.
11      Q.  Okay.  I'm going to hand you what I have
12 marked as Exhibit 2.  I'm going to hand you this so
13 that you can look at the time, and then I'm going to
14 take it away from you and I'm going to ask you the
15 question again.
16      A.  Okay.
17      Q.  And we're looking for June 28th, 2000.
18         MR. FRANZ:  I'm going to object.  The
19 document is hearsay.
20         THE WITNESS:  There we go, 6/28/00, 10:44.
21 BY MS. PURACAL:
22      Q.  And I'm not -- I'm going to take that away
23 from you --
24      A.  Oh, sorry.
25      Q.  -- and I'm going to ask you the question

Page 20

1 again.
2         Do you remember the exact time that you got
3 the phone call?
4      A.  Yes, I do now.
5      Q.  What's the exact time you got the phone
6 call?
7      A.  10:44 p.m. on June 28th.
8      Q.  In June of 2000, you had a 1-800 number.  Is
9 that right?
10      A.  Yes.
11      Q.  And why did you have that 1-800 number?
12      A.  We had the 1-800 number -- my husband was
13 a -- was a truck driver, so he was either long hauling
14 or driving a long truck, and it just made him --
15 easier when he was out on the road to have a number
16 that he could just dial and be direct to our house,
17 because there was no cell -- we didn't have cell
18 phones then.
19      Q.  Did Nick also have access to that 800
20 number?
21      A.  Yes, he did.
22      Q.  At that time, that 10:44 p.m. time, when you
23 got that phone call from Nick, was Bruce there with
24 you?
25      A.  Yes.

ISLAND COURT REPORTING & TRANSCRIPTION SERVICES
(808) 933-9800

Page 21

1    Q.  Where was he?
2    A.  He was in bed.
3    Q.  Did Bruce leave the house after that call?
4    A.  No, he did not.
5    Q.  Did you go back to sleep after Nick called?
6    A.  Yes.
7    Q.  And tell me a little bit about your -- I
8  guess your sleep pattern at that point in time.  Were
9  you a light sleeper?  A heavy sleeper?
10    A.  I'm generally --
11      MR. FRANZ:  Excuse me.  Excuse me.  Jan, I
12  can't understand your question.  I'm sorry.
13      MS. PURACAL:  That's okay.
14      MR. FRANZ:  Could you slow it down?
15      MS. PURACAL:  That's --
16      MR. FRANZ:  It was good, but it --
17      VIDEOGRAPHER:  Who's that talking?
18      MR. FRANZ:  -- I can't under- --
19      VIDEOGRAPHER:  Can you turn their volume
20  down?  There's so much --
21      MS. PURACAL:  Yes.  We're going to turn the
22  volume down a little bit on the Zoom here, a little
23  bit, but I can hear you still, Robert.  And so I will
24  slow my questions down again.
25

Page 22

1  BY MS. PURACAL:
2    Q.  Okay.  We were talking there about after
3  that 10:44 p.m. call.
4    A.  Yes.
5    Q.  And I asked you if you had gone back to
6  sleep.
7    A.  And yes, I did.
8    Q.  Okay.  Were you a light sleeper at that
9  point?
10    A.  Yes.
11    Q.  Why was that?
12    A.  Mostly I'm a light sleeper, because Nick was
13  gone, and when they get home, I feel safe that they're
14  fine; but mostly, also, too, I'm on call for the
15  hospital, and I was that night, and it's just a normal
16  feeling, when you're on call; you know the phone is
17  going to ring, so you kind of anticipate it.
18    Q.  And then you talked next about that -- that
19  time between 2:00 and 2:30 in the morning when Nick
20  came home.
21    A.  Uh-huh.
22    Q.  At that point in time, was Bruce still there
23  with you?
24    A.  Yes, he was.
25    Q.  Where was he?

Page 23

1    A.  He was in bed.
2    Q.  Next to you?
3    A.  Yes.
4    Q.  Did Nick come home at any point before that
5  time?
6    A.  Before the 2:30, no.
7    Q.  And then you also talked about that phone
8  call that you got between 4:00 and 4:30 in the
9  morning.
10    A.  Yes.
11    Q.  At that point in time, was Bruce still in
12  bed next to you?
13    A.  Yes, he was.
14    Q.  And was Nick still at home asleep?
15    A.  I don't know if he was sleeping, but he was
16  home.
17    Q.  Okay.  Do you remember what time you woke up
18  to get ready for work the next morning?
19    A.  It was probably between 7:00 and 7:30.
20    Q.  And at that point, was Nick still at home?
21    A.  Yes.
22    Q.  And was Bruce still at home?
23    A.  Yes.
24    Q.  What do you remember about that morning
25  while you were getting ready for work?

Page 24

1    A.  I got ready, and I was just heading out the
2  door.  The phone rang, and it was Cory, Leah's mother,
3  and she wanted to talk to -- wanted to know if Leah
4  was here, and then she wanted to talk to Nick, and
5  then told him that she hadn't came home.  And Nick
6  said, "Okay, I'll -- give me a few minutes.  I'll be
7  right there," and then he left and went over to Cory's
8  house, and then I went to work.
9    Q.  At some point, did you become aware that the
10  police suspected that Bruce was involved in Leah's
11  murder?
12    A.  Yes.
13    Q.  Did you see Bruce leave the house at any
14  point on the night of June 28th, 2000?
15    A.  Not at all.  He did not leave.
16    Q.  What about your other son, Wayne?  Was he
17  living with you on June 28th, 2000?
18    A.  No.  He was living with my sister, who lives
19  over in North Bend, and was living there full-time.
20    Q.  And North Bend is a different town?
21    A.  Yes.
22    Q.  Did you provide information to the police
23  about where Bruce was on the night of June 28th, 2000?
24    A.  Yes.  At some point I did.
25      MR. FRANZ:  Object to the form of the

ISLAND COURT REPORTING & TRANSCRIPTION SERVICES
(808) 933-9800

Page 25

1  question. It's vague.
2  BY MS. PURACAL:
3      Q.  You can go ahead if you understand my
4  question.
5      A.  Ask it again, please.
6      Q.  Sure.
7          I asked if you -- at some point, did you
8  provide information to the police about where Bruce
9  was on the night of June 28th?
10     A.  Yes.  Definitely.
11     Q.  At some point, did you also become aware
12 that the police suspected that Nick switched cars on
13 the night that Leah disappeared?
14     A.  Yes.
15     Q.  When you came home from work on June 28th,
16 2000, did you see the marine -- the maroon
17 Thunderbird?
18     A.  Yes.
19     Q.  Where was it?
20     A.  Parked in the driveway.
21     Q.  And can you just explain to us what the
22 driveway looks like?
23     A.  We have -- our house sits right here.  It's
24 a long house.  And then you come up the driveway, and
25 you just pull in right in front of the house.  There's

Page 26

1  steps right here, and you go right in the door right
2  here, and -- so it's just right outside the front
3  door.
4      Q.  And where did you park in relation to the
5  stairs?
6      A.  I parked adjacent to the Thunderbird, with a
7  space in between.
8      Q.  So did you have to pass by the
9  Thunderbird --
10     A.  Yes.
11     Q.  -- to get in the house?
12         Did you see the Thunderbird leave your
13 driveway at any point that night?
14     A.  No.
15     Q.  Do you know where the keys to the
16 Thunderbird were on the night of June 28th, 2000?
17     A.  Yes.  They were still in the bed head -- or
18 headboard of -- in the bedroom of our bedroom.
19     Q.  Did you see them there?
20     A.  Yes.
21     Q.  Did you inform the police, or did you
22 provide the police with information about Bruce taking
23 away the keys to the Thunderbird?
24     A.  Yes.
25     Q.  Did you also provide the police with

Page 27

1  information about where the Thunderbird was parked on
2  the night of June 28, 2000?
3      A.  Yes.
4      Q.  What about your Ranger pickup?  Where was
5  that on the night of June 28th, 2000?
6      A.  It was parked in the front, adjacent to the
7  Thunderbird.
8      Q.  Who had the keys to that truck on that
9  night?
10     A.  I did.
11     Q.  Did you ever give Nick the keys to use the
12 truck that night?
13     A.  That night, no.
14     Q.  Why was that?
15     A.  Because I was on call for the hospital, and
16 if they called, I had to go immediately, so I needed
17 transportation.
18     Q.  Did you provide the police with information
19 about where the Ranger was parked on the night of
20 June 28, 2000?
21     A.  Yes.
22     Q.  You had a Cardlock account to get gas for
23 the cars?
24     A.  Yes.
25     Q.  That was back in 2000?

Page 28

1      A.  Yes.
2      Q.  Can you explain to us, what is a Cardlock
3  account?
4      A.  It's mostly for truck drivers.  They can --
5  their families can use it also, and it's just a gas
6  station that you can go to.  There's no attendant, so
7  you have to pump your own gas.  And it's all
8  computerized, and it goes to the -- the billing, and
9  then you can just stop there and pump your gas at any
10 hour of the night.
11     Q.  How did it work?  Did you have to have the
12 card or a code?
13     A.  I think you had to have both.  You put a
14 card in, and then I think you had to punch a code
15 after that.
16     Q.  And why did you have that Cardlock account?
17     A.  The Cardlock account was same reason for the
18 800 number.  It made it easier for Bruce on the
19 highway, because when he stops and refills, it's
20 hundreds and hundreds of dollars, and it just made it
21 easier to do it that way and then just get a bill at
22 the end of the month.
23     Q.  Did Nick have access to that Cardlock
24 account?
25     A.  Yes, he did.

ISLAND COURT REPORTING & TRANSCRIPTION SERVICES
(808) 933-9800

Exhibit 21, Page 7 of 10

Page 29

1    Q.  Did you see the account statement for the
2  Cardlock account for June of 2000?
3    A.  Yes.
4    Q.  Do you know the exact time that your
5  Cardlock account was accessed on the night of
6  June 28th, 2000?
7    A.  No, I just know it was accessed that night.
8    Q.  Would it help to refresh your recollection
9  if you saw a copy of that account statement?
10    A.  Probably.
11    Q.  Okay.  I'm going to -- we're going to do the
12  same thing we did last time.
13    A.  Uh-huh.
14    Q.  We're going to show you this, what I've got
15  marked as Exhibit 3, and then I'm going to take it
16  away from you and I'm going to ask you the question
17  again.
18    A.  Okay.
19    Q.  Okay.  And we're looking for the time that
20  it was accessed on June 28th, 2000.
21    MR. FRANZ:  Okay.  Let me make an objection.
22  I'll make an objection as to all exhibits not timely
23  provided, and then I'm going to make an objection lack
24  of foundation, as to this exhibit, and hearsay.
25    MR. MARSHALL:  Lack of foundation.

Page 30

1  Objection, lack of foundation and hearsay.
2  BY MS. PURACAL:
3    Q.  And I'm --
4    MR. FRANZ:  Beg your pardon?
5  BY MS. PURACAL:
6    Q.  I'm going to go ahead and take that away
7  from you.
8    Can you tell me what time was your Cardlock
9  account accessed on the night of June 28, 2000?
10    A.  10:44.
11    Q.  Do you want to look at that again?
12    A.  Yeah.  My memory is getting to me.  Sorry.
13    Q.  That's okay.
14    A.  Okay.  June 28th.
15    Q.  Okay.  Now can you tell me what time was
16  your Cardlock account accessed on the night --
17    A.  10:19.
18    Q.  Okay.
19    A.  p.m.
20    Q.  Do you know who it was that accessed your
21  Cardlock account on the night of June 28th, 2000?
22    A.  It was Nick.
23    Q.  How do you know it wasn't Bruce?
24    A.  Because Bruce was home with me.
25    Q.  After Leah disappeared, did you help Nick

Page 31

1  try to get the word out about Leah missing?
2    A.  Yes.  We -- yes, we -- I did.  I helped
3  Nick -- the first thing we did was make fliers, and
4  then we were able to get -- a friend of ours owns a
5  store that has a copier, so we were able to get a
6  bunch of color copies out there.  Did that.  I didn't
7  do a lot of searching like Nick -- and my husband
8  helped him a few times, but I didn't, because I was
9  working and -- but I helped with the fliers and all
10  that.
11    Q.  Did you -- you mentioned Nick and your
12  husband out searching for Leah.
13    Did you ever see Nick out searching for Leah
14  with anyone else?
15    A.  Yes.  He was out with -- at the beginning
16  with Maggie Downs, Brent Bartley and him spent a lot
17  of time searching, and then he was with Denise, who
18  was Leah's sister, at the beginning, too.
19    Q.  How was Nick's mood during those first few
20  weeks of looking for Leah?
21    A.  Very distraught, no sleep, so he was just
22  not with it a lot of times, just tired because he
23  wasn't getting any rest, anxious because he wanted to
24  find Leah.
25    Q.  Did you think that Leah had just run away?

Page 32

1    A.  No, I didn't.
2    MR. FRANZ:  Object, form of the question.
3    MR. MARSHALL:  Objection, form.
4    MR. FRANZ:  (Indiscernible).
5    (Court reporter clarified.)
6    MR. MARSHALL:  Sorry, let me be clear on the
7  record.  State is objecting as -- leading.
8    COURT REPORTER:  Thank you.
9    MS. PURACAL:  And was there another
10  objection?
11    MR. FRANZ:  Did you get my objection?
12    MS. PURACAL:  I don't think we heard you,
13  Robert.
14    MR. FRANZ:  Okay.  Need to slow down, then.
15    MS. PURACAL:  Sure.
16    MR. FRANZ:  Yeah.  I'm objecting as to
17  relevancy.
18  BY MS. PURACAL:
19    Q.  How much did you see about Leah's
20  disappearance on the local news?
21    A.  It was on the news quite -- the first --
22  first six weeks until her -- she was found, and even
23  shortly thereafter, just constantly every day.
24    Q.  In those first few days after Leah went
25  missing, did you ever talk to the Coquille Police

8  (Pages 29 to 32)

Page 33

1  Department?
2      A.  In the first few days?
3      Q.  Yes.
4      A.  Just with leads that I had gotten and called
5  in to them.
6      Q.  Do you remember going to the police
7  department?
8      A.  On the one -- when Nick had -- oh, he was
9  called down to test -- or to give them some
10  information.  Oh, it was on the -- excuse me.  It was
11  Friday, the Friday after she disappeared.  I went down
12  to the police station with Nick, and I think it was --
13  Brent Bartley was with us, and the police just wanted
14  to give him a -- account of his timeline that night,
15  anything that he might know.  And yes, I was there
16  with him for that.
17      Q.  Can you describe what that looked like?
18      A.  The area was the old jail area, the old city
19  area.
20      (Sarah Henderson joined the
21  videoconference.)
22      THE WITNESS:  And he went down the stairs,
23  and he went into a big open room.  We were sitting
24  there.  She -- Dannels and -- I forget his name --
25  Dave Hall went with the officers in front, and me and

Page 34

1  Nick were sitting there, and then Brent was sitting
2  right behind us.
3  BY MS. PURACAL:
4      Q.  At that time, on June 30th --
5      A.  Uh-huh.
6      Q.  -- did you have any concerns about Nick
7  going to talk to the police?
8      A.  No.
9      Q.  What did you think was the purpose of that
10  meeting with the police?
11      A.  We thought they just wanted --
12      MR. FRANZ:  Object to relevancy.
13      You have to let me get my objection in.  So
14  objection, relevancy.
15  BY MS. PURACAL:
16      Q.  Go ahead.
17      A.  See, I lose train of thought when I get an
18  objection.
19      Q.  That's okay.
20      A.  Could you repeat the question?
21      Q.  Of course.
22      On that day, June 30th, what did you think
23  the purpose of the meeting was?
24      A.  Oh, to give them Nick's timeline and
25  anything that he may know.

Page 35

1      Q.  And when we were talking about that meeting
2  on June 30th, this is back in 2000?
3      A.  Right.  Correct.
4      Q.  So I think you might have said it was Chief
5  Dannels at that point.
6      A.  Oh, excuse me.  No.  Yes, it was Chief
7  Reeves.
8      Q.  Okay.
9      A.  Yeah.  Sorry.
10      Q.  That's okay.
11      At some point, did your impression of the
12  police change?
13      MR. FRANZ:  Object, irrelevant.
14      THE WITNESS:  Yes, it did.  It was June --
15  July 7th.  It was two days after -- July 6th,
16  July 7th, in there.  Nick had been called down to the
17  police station to -- they wanted to talk to him again,
18  so he went -- him and Bruce went down there.  And I
19  was at work, and Bruce was there.  Nick was testifying
20  all day long.  Finally, at some point late in the day,
21  he -- because he was working on no sleep at all, and
22  he finally said he was done, and at that point, we
23  thought, well, this isn't going the way we thought it
24  was, so we got an attorney.
25

Page 36

1  BY MS. PURACAL:
2      Q.  And what do you mean by that it was not
3  going the way that you thought it was?
4      A.  Just that the police were being one-sided,
5  and just looking at Nick, and were not looking at, we
6  didn't think, any of the other leads.  And that --
7  that's what I think -- thought.
8      Q.  Do you remember what Nick was doing the
9  night before that interview with the police?
10      A.  That would have been -- so it was July 5th
11  that he went down there.  Excuse me.  It was July 4th.
12  He had -- him and Bruce had decided we had -- put
13  fliers everywhere in Coos County and Coquille and
14  North Bend area, that maybe we should try going up and
15  down 101, Highway 101; and so they headed south from
16  Bandon and spent -- stopping at every little
17  community, seeing if -- had the fliers, seeing if
18  anybody had seen her.
19      They called late -- later that evening and
20  said they made it all the way to California, Crescent
21  City, and were thinking about turning around and
22  coming back, and they would continue the next day.
23  And so they got home -- I don't know -- wee hours in
24  the morning, and then the police department called it
25  just after -- shortly thereafter.

9 (Pages 33 to 36)

Page 109

1    MR. MARSHALL: State is ordering.
2    MR. FRANZ: Franz is ordering.
3    MR. DEFREEST: Copy.
4    MS. JONES: Copy, please.
5    MR. MARSHALL: State is a copy, by the way.
6    (The deposition concluded at 12:50 p.m.
7    HST/3:50 p.m. PDT.)
8    (Exhibit Nos. 1-6 were marked for
9    identification.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 110

1              CERTIFICATE
2
3    STATE OF HAWAII    )
                        ) SS.
4    COUNTY OF HAWAII   )
5
6        I, TERI HOSKINS, CSR #452, State
     of Hawaii, do hereby certify that the foregoing
7    transcript is a true and correct record of the
     proceedings; that on Friday, September 8, 2023 at
8    10:07 a.m. HST/1:07 p.m. PDT, there appeared before me
     the witness whose deposition is contained herein; and
9    that prior to being examined, the witness was by me
     duly sworn; that said proceedings were taken by me
10   stenographically and thereafter reduced to typewriting
     under my supervision; and that I am neither counsel
11   for, related to, nor employed by any of the parties to
     this case and have no interest, financial or
12   otherwise, in the outcome.
         That, if applicable, the witness was
13   notified through counsel, by mail, or by telephone to
     appear and sign; that if the transcription is not
14   signed, either the reading and signing were waived by
     the witness and all parties, or the witness has failed
15   to appear and the original is therefore kept on file
     without signature pursuant to Court rules.
16       IN WITNESS WHEREOF, I have hereunto set my
     hand this 2nd day of October, 2023.
17
18       _____
         TERI HOSKINS, CSR #452
19       Registered Merit Reporter
20
21
22
23
24
25

Page 111

1          ACKNOWLEDGEMENT OF DEPONENT
2        I, KATHLEEN MARIE MCGUFFIN, do hereby
3    acknowledge that I have read and examined the
4    foregoing testimony, and the same is a true, correct
5    and complete transcription of the testimony given by
6    me and any corrections appear on the attached Errata
7    Sheet signed by me.
8
9    _____    _____
10    (DATE)              (SIGNATURE)
11
12   Signed before me this _____ day of
13   _____, 2023.
14
15   _____
16   (WITNESS)
17   (Sign before witness.  Witness does not need to be
18   notary)
19
20   MCGUFFIN v. DANNELS, et al.
21   CIVIL NO. 6:20-cv-01163-MK
22   DEPOSITION TAKEN ON Friday, September 8, 2023
23
24
25

Page 112

1          ERRATA SHEET
2    IN RE: MCGUFFIN v. DANNELS, et al.
3    CIVIL NO. 6:20-cv-01163-MK
4    DEPOSITION TAKEN ON Friday, September 8, 2023
5    DEPOSITION OF KATHLEEN MARIE MCGUFFIN
6    IF THERE ARE NO CHANGES, INITIAL _____ AND SIGN BELOW
7
8    PAGE LINE      CORRECTION AND REASON
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   _____ _____
23    (DATE)          (SIGNATURE)
24   (ATTACH ADDITIONAL PAGES IF NECESSARY; INCLUDE PAGE
25   AND LINE NUMBERS ON PAGES SUBMITTED.)

28 (Pages 109 to 112)

Exhibit 21, Page 10 of 10