John J. Lindegren

### Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as )
an individual and as )
guardian ad litem, on )
behalf of S.M., a minor, )
) Case No.
Plaintiffs, ) 6:20-CV-01163-MK
vs. )
)
MARK DANNELS, PAT DOWNING, )
SUSAN HORMANN, MARY KRINGS, )
KRIS KARCHER, SHELLY )
MCINNES, RAYMOND MCNEELY, )
KIP OSWALD, MICHAEL REAVES, )
JOHN RIDDLE, SEAN SANBORN, )
ERIC SCHWENNINGER, )
RICHARD WALTER, CHRIS )
WEBLEY, ANTHONY WETMORE, )
KATHY WILCOX, CRAIG ZANNI, )
DAVID ZAVALA, JOEL D. )
SHAPIRO AS ADMINISTRATOR OF )
THE ESTATE OF DAVID E. )
HALL, VIDOCQ SOCIETY, CITY )
OF COQUILLE, CITY OF )
COOS BAY, and COOS COUNTY, )
)
Defendants. )

DEPOSITION OF JOHN J. LINDEGREN

January 4, 2023

Wednesday

10:38 a.m.

### Page 2

THE DEPOSITION OF JOHN J. LINDEGREN was taken at the Coos Bay Public Library, 525 Anderson Avenue, in the City of Coos Bay, the State of Oregon, before Denise C. Zito Smith, CSR, Certified Shorthand Reporter, in and for the State of Oregon.

APPEARANCES

For the Plaintiffs:
MALONEY LAUERSDORF REINER, PC
1111 East Burnside Street
Suite 300
Portland, Oregon 97214
(503)245-1518
acl@mlrlegalteam.com
BY: ANDREW C. LAUERSDORF

and

MALONEY LAUERSDORF REINER, PC
1111 East Burnside Street
Suite 300
Portland, Oregon 97214
(503)245-1518
jcp@mlrlegalteam.com
BY: JANIS C. PURACAL

(Continuing)

### Page 3

(Continuing)

For Defendants
City of Coquille,
City of Coos Bay,
Coos County, Craig
Zanni, Chris
Webley, Eric
Schwenninger, Sean
Sanborn, Ray
McNeely, Kris
Karcher, Pat
Downing, Mark
Dannels,
Kip Oswald,
Michael Reaves,
David Zavala,
Anthony Wetmore,
Shelly McInnes:
LAW OFFICE OF ROBERT E. FRANZ, JR.
PO Box 62
730 B Street
Springfield, Oregon 97477
(541)741-8220
rfranz@franzlaw.comcastbiz.net
BY: ROBERT E. FRANZ, JR.
(Appeared via telephone)

For Defendants
Vidocq Society and
Richard Walter:
WOOD SMITH HENNING & BERMAN, LLP
12755 Southwest 69th Avenue
Suite 100
Portland, Oregon 97223
(971)256-4023
kschaffer@wshblaw.com
BY: KARIN L. SCHAFFER
(Appeared via telephone)

For Defendants
Oregon State
Police, John
Riddle, Susan
Hormann,
Mary Krings,
Kathy Wilcox:
OREGON DEPARTMENT OF JUSTICE
100 Southwest Market Street
Portland, Oregon 97201
(971)673-1880
jesse.b.davis@doj.state.or.us
BY: JESSE B. DAVIS
(Appeared via telephone)

Also Present: (None.)

Reported By: Denise C. Zito Smith, CSR

### Page 4

I N D E X

| WITNESS | PAGE |
|---|---|
| JOHN J. LINDEGREN | |
| BY MR. LAUERSDORF | 5 |
| BY MR. FRANZ | 219 |
| BY MR. DAVIS | 230 |

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Oregon State Police Report | 151 |
| No. 2 | Supplemental Report | 156 |
| No. 3 | Incident Report | 172 |
| No. 4 | Photocopies of Photographs | 181 |
| No. 5 | Marked Photocopies of Photographs | 190 |
| No. 6 | Incident Report | 193 |

REQUEST FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| (None.) | |

INSTRUCTION NOT TO ANSWER

| DESCRIPTION | PAGE |
|---|---|
| (None.) | |

John J. Lindegren

Page 5

```
 1         JOHN J. LINDEGREN,
 2  having been first duly sworn or affirmed to
 3  testify the truth, the whole truth, and nothing
 4  but the truth, was examined and testified as
 5  follows:
 6
 7              EXAMINATION
 8  BY MR. LAUERSDORF:
 9       Q.   Mr. Lindegren, my name is
10  Andy Lauersdorf.  You and I have met once before
11  today; is that right?
12       A.   That is right, sir.
13       Q.   And you understand that I'm an
14  attorney representing the plaintiffs in this
15  matter?  This is a lawsuit which is filed by
16  Mr. McGuffin against the City of Coquille and
17  former Police Chief Mark Dannels and a number of
18  other defendants; do you understand that?
19       A.   I do, sir.
20       Q.   And I represent Mr. McGuffin; do you
21  understand that?
22       A.   I do, sir.
23       Q.   Okay.  Can you please state your full
24  name as given at birth?
25       A.   John James Lindegren,
```

Page 6

```
 1  L-i-n-d-e-g-r-e-n.
 2       Q.   Okay.  Have you been known by any
 3  other names or nicknames?
 4       A.   None.  Well, yeah, a lot of nicknames
 5  probably, but nothing that I can probably say.
 6       Q.   How about Big John, does that count as
 7  one?
 8       A.   Yes.  Big John, Wedge.
 9       Q.   Any others that if we were to ask
10  around about you they might not know you as
11  Big John, but they would know you as something
12  else?
13       A.   I don't think so.
14       Q.   Where were you born; place of birth?
15       A.   North Bend.
16       Q.   North Bend, Oregon?
17       A.   Yes, sir.
18       Q.   And what's your date of birth?
19       A.   7/8/1958.
20       Q.   What's your current address?
21       A.   General delivery, Myrtle Point,
22  Oregon, is my mailing address.  I live up above
23  Powers right now.  No address.
24       Q.   And that's in a trapper shack?
25       A.   Yeah.  I'm up there trapping.
```

Page 7

```
 1       Q.   And when you say general delivery, is
 2  that a post office box or --
 3       A.   Yes, in Myrtle Point, Oregon.  That's
 4  where I get any of my mail.
 5       Q.   Is there a PO box number there?
 6       A.   No, sir.
 7       Q.   Okay.  Are you currently employed?
 8       A.   Yeah, for myself, I guess.  A trapper.
 9       Q.   Just like as a general contractor or a
10  handyman?
11       A.   Yeah.  I'm a carpenter by trade, a
12  journeyman level, but right now I'm not pounding
13  nails.  I am catching coyotes for different
14  property owners that -- yeah, it keeps them away
15  from their livestock.
16       Q.   And journeyman level, are you union?
17       A.   Not now.
18       Q.   Okay.  So we're here today to conduct
19  your deposition; do you understand that?
20       A.   I do, sir.
21       Q.   And you are here to testify today in
22  response to a subpoena that you received?
23       A.   That is correct.
24       Q.   I'm going to show you this document.
25  If you can take a look at that and read it over
```

Page 8

```
 1  and tell me if you recognize that at all?
 2       A.   Yeah, I've seen it.
 3       Q.   That's the subpoena that you were
 4  served with?
 5       A.   Yes, sir.
 6       Q.   And that commanded you to appear at
 7  the Coos Bay Public Library in Coos Bay, Oregon,
 8  on January 4th at 10:30 a.m.; is that right?
 9       A.   That is correct.
10       Q.   And today is Wednesday, January 4,
11  2023, and it's approximately 10:42 a.m.; do you
12  agree with that?
13       A.   I agree.
14       Q.   And you were on time.  It's 10:42, but
15  I'll just say for the record you were here --
16       A.   I was here at 10:00.
17       Q.   You were here early, that's right.
18            And this is the Coos Bay Public
19  Library; is that right?
20       A.   It is.
21       Q.   And that's in Coos Bay, Oregon?
22       A.   Yes, sir.
23       Q.   And your deposition today --
24            MR. LAUERSDORF:  Is it being broadcast
25  over the URL at all or just over the phone?
```

**133**

1  Q. Okay. Do you know if Randy Ulmer and
2  Ray McNeely served at the Coquille Police
3  Department at the same time?
4  A. I believe so.
5  Q. Do you know how long --
6  A. No idea. You'd have to ask them.
7  Q. Okay. And that interview was
8  recorded?
9  A. Yes.
10 Q. Was anyone there besides McNeely and
11 possibly Ulmer?
12 A. Not that I remember.
13 Q. And what specifically did you tell
14 police at that time?
15 A. I told him I was over at my sister's
16 house, and I watched the Survivor, and then I left
17 there and I came down. I said I saw two people
18 there, I went home. And they said, Do you know
19 who the people were? And I says, Yeah, I'm
20 relatively absolutely sure it was Leah Freeman.
21 Q. And how is it that you're absolutely
22 sure?
23 A. I knew her mother and I knew
24 Rich Courtright. I knew Rich, I'd hunted with
25 him, and I knew her mom, and I knew -- I knew

**134**

1  quite a few people.
2  Q. And I get that, but this is another
3  one of those places where I'm wondering about the
4  distinction between did you know the name? Did
5  you know the family?
6  A. I hunted with Rich. So, yeah, I knew
7  him okay. We cut firewood together, we elk hunted
8  together.
9  Q. Okay. But did you know her,
10 Leah Freeman?
11 A. Are you talking about Leah?
12 Q. Freeman.
13 A. Oh, I thought you were talking about
14 Mr. Courtright.
15 Q. No.
16 A. I'm trying to explain to you how I
17 knew her.
18 Q. Right. And what you're explaining is
19 you knew her family members --
20 A. Right.
21 Q. -- and you knew of her?
22 A. Yeah. I met her and knew her. I
23 never talked to her or anything, but I had seen
24 her.
25 Q. When did you meet her?

**135**

1  A. Oh, over the years several times, I'm
2  sure, because I'd been around those people most of
3  my life.
4  Q. Okay. So you knew her family members.
5  How many times did you actually speak
6  with Ms. Freeman?
7  A. Leah?
8  Q. Yes.
9  A. Probably once.
10 Q. Where was that?
11 A. Can't tell you. I probably -- I
12 talked to her several years earlier.
13 Q. So how old was she when you talked to
14 her?
15 A. I don't know, 10, 11. Young.
16 Q. So by the time you saw the person on
17 North Elm Street, Leah Freeman would have gone
18 through puberty, she would have matured a lot, she
19 looked a little bit different than a ten-year-old;
20 right?
21 A. Absolutely.
22 Q. So how many times --
23 A. But I'm sure I'd seen her around town,
24 not to talk to her, but I knew who she was. I
25 knew who Cory was and knew...

**136**

1  Q. By 2010 Leah Freeman's picture had
2  been in the paper a lot; right?
3  A. I guess so.
4  Q. And posters had been posted all over
5  town; right?
6  A. Yeah.
7  Q. So everybody in town probably knew
8  what Leah Freeman looked like by 2010; is that
9  fair?
10 A. Yeah, absolutely fair.
11 Q. Okay. And probably same is true with
12 Nick McGuffin; right?
13 A. Yeah.
14 Q. By 2010 there were a lot of rumors
15 going around that Nick McGuffin had murdered
16 Leah Freeman?
17 A. Yeah. Well, I'll tell you just like I
18 told him, I says, I'm absolutely positive almost
19 that it was Leah Freeman that I saw.
20 Q. Did you tell him that you were
21 absolutely positive that it was Nick McGuffin you
22 saw?
23 A. I did not.
24 Q. What did you tell him about --
25 A. I said, I think it was. It looked

137

1 like him. I said, Good chance of it. I don't
2 know absolutely 100 percent.
3         MR. FRANZ: Andy, could you speak a
4 little bit slower and closer? It's hard to hear
5 your question.
6         MR. LAUERSDORF: Okay. I'm sorry.
7 BY MR. LAUERSDORF:
8    Q.   So you told McNeely that you weren't
9 sure that it was McGuffin?
10   A.   I said I wasn't absolutely positive.
11 I thought it was, but I don't know Mr. McGuffin
12 all that well. And I described the individual I
13 saw, and I says, I believe it was, but I don't
14 know.
15   Q.   Okay. You said you only spoke with
16 Leah Freeman once before she went missing?
17   A.   Yeah.
18   Q.   And that was when she was about ten
19 years old?
20   A.   Yeah.
21   Q.   Who was with you when you spoke to her
22 at that time?
23   A.   I don't know. Probably either her
24 Uncle Rich or somebody, you know, somebody in the
25 family, because I just don't necessarily talk to a

138

1 young girl on her own.
2    Q.   Did you and Ms. Freeman go to the same
3 church?
4    A.   No. I doubt it.
5    Q.   Can you tell me the names of some of
6 her friends at that time?
7    A.   I can't tell you. I don't hang out
8 with young girls, so I wouldn't know.
9    Q.   Right. You would have been, what, 42
10 at the time?
11   A.   Your guess is as good as mine.
12 Probably.
13   Q.   What was her mom's name?
14   A.   Corliss. People called her Cory.
15   Q.   How did you know Cory?
16   A.   I've known her for a lot of years. A
17 local family. I knew who her dad was and brothers
18 were, I knew her sister. It's a small area.
19   Q.   Cory's sister?
20   A.   Yeah.
21   Q.   When was the last time you talked to
22 Cory Courtright before Leah disappeared?
23   A.   What, sir?
24   Q.   When was the last time you spoke with
25 Cory Courtright before Leah disappeared?

139

1    A.   I can't say.
2    Q.   What was Leah's dad's name?
3    A.   I don't know. Oh, I do know.
4 Denny Freeman.
5    Q.   How did you know Denny Freeman?
6    A.   He owned Denny's Pizza.
7    Q.   Did you know him personally or did
8 you --
9    A.   I didn't know him personally. I did
10 business with him, and he used to race four-wheel
11 drives. So I knew he had a real hot international
12 Scout with a Pontiac big block in it that was
13 really fast.
14   Q.   Did you know anything about his
15 relationship with Leah Freeman?
16   A.   None.
17   Q.   Did you ever see them together?
18   A.   If I did, I can't remember.
19   Q.   What was Leah's sister's name?
20   A.   Her sister's name?
21   Q.   Yes.
22   A.   I have no idea.
23   Q.   How about her stepmother, what is her
24 stepmother's name?
25   A.   I have no idea.

140

1    Q.   Do you know names of any of her step
2 siblings?
3    A.   Don't know.
4    Q.   How about her uncles, how many uncles
5 does she have?
6    A.   She has Rich Courtright, and then she
7 has old -- he was an airborne guy. Vietnam. He
8 used to work for the post office. What was his
9 name? Got himself in a little legal trouble,
10 purpose snatching at the --
11   Q.   Okay.
12   A.   What was his name? A Vietnam. 101st
13 Airborne, Vietnam. I'm trying to think of it. A
14 referee, a football referee, high school football
15 referee also.
16   Q.   How about her aunts, do you know any
17 of the names of any of her aunts?
18   A.   I know a Terri.
19   Q.   Terri what?
20   A.   She was married to the guy who worked
21 at the post office who was the Airborne guy.
22   Q.   How often did you run into Terri
23 before Leah disappeared?
24   A.   I would see her whenever around town.
25 I didn't have a relationship with her in any way.

173

1  in discovery from the City of Coquille Police.  If
2  you want to take a look at the date there under
3  the summary, it says May 18, 2010; is that right?
4       A.   That's what it says.
5       Q.   Okay.  If you look at the second page
6  of the report, there's an officer's signature
7  there.  And up above it it says, "date/officer:
8  6/1/2010, McNeely, Jr."  Do you see that?
9       A.   Right down here (indicating)?
10      Q.   That's the signature.  Up above it
11 there's a -- in print there's a --
12      A.   Yeah.  Date, officer, McNeely, Jr.,
13 and the incident number.  Yeah, I see it.
14      Q.   Okay.  And so in the report there --
15 so McNeely is saying -- if you look under "Action
16 Taken" he's saying, "On May 18, 2010, around
17      1352 hours, OSP Detective Teresa Bowersox
18      and I met with John James Lindegren
19      at the Coquille Police Department."
20      Does that refresh your recollection at
21 all about what year you met with McNeely?
22      A.   No.  I know I only met with McNeely
23 once or twice, and it was a long time in between.
24      Q.   Okay.  The next -- third paragraph
25 down there, see where it starts, "I asked

174

1  Lindegren"?
2       A.   Yeah.  "If he remembered anything
3  about the night"?
4       Q.   Yeah.
5       A.   Yeah.
6       Q.   And then he says, "Lindegren heard
7       from someone that Freeman was missing,
8       and he knew he had just seen Freeman
9       with McGuffin the night before by
10      his sister's house."
11      But if I understood you correctly
12 earlier, you said you told McNeely that you
13 weren't 100 percent sure it was McGuffin?
14      A.   Yeah.  I told him, I says, you know, I
15 know -- I can relatively say that I knew who
16 Freeman was, but I'm not absolutely positive it
17 was McGuffin.
18      Q.   Okay.  And then on the next line there
19 he says, "Lindegren told me he remembers that
20      night because he was watching the
21      TV show Survivor with his sister."
22      Do you see that?
23      A.   Yeah.
24      Q.   So one of the things I was wondering
25 about is when you read what Randy Ulmer wrote --

175

1       A.   I did.
2       Q.   -- he said you were walking the dog --
3       A.   I wasn't.
4       Q.   -- and there was nothing else.
5       And then on the tip sheet that we saw
6  that you said you didn't have anything to do with,
7  nothing was mentioned about Survivor there either.
8       So one of the things I'm wondering
9  about is this is now May 2010, this is ten years
10 later?
11      A.   Yeah.
12      Q.   What was it that triggered your memory
13 of watching Survivor in 2010?
14      A.   Something is up with this stuff here
15 that I don't understand.  I remember the night,
16 and I remember walking by there, and I remember
17 talking to the cops just a little time after they
18 come out -- my sister came out, I went in, around
19 2000 I remember talking to them.  I don't remember
20 talking to them in 2010.
21      Q.   Okay.  Okay.
22      A.   I only remember talking to them one
23 time, and that was just a week or two or three or
24 whatever, you know, after the disappearance.
25      Q.   Okay.

176

1       A.   I don't remember talking to them at
2  any time after that.
3       Q.   Okay.  And do you remember when you
4  started talking to them if you -- or around that
5  time if you actually remembered watching Survivor
6  or if that's something that Jordie told you you
7  guys had done?
8       A.   I remember watching it.
9       Q.   Okay.  All right.
10      So if you go down there, after that it
11 says, "Lindegren's sister still currently lives at
12 551 West 4th Street in Coquille," I guess that's
13 not right, right, because it's 4th Place in
14 Coquille?
15      A.   Yeah.  551 West 4th Place.
16      Q.   Right.  And she lived there on
17 June 28, 2000?
18      A.   Yes.
19      Q.   And then he says, "Lindegren told me
20      he left his sister's house around
21      2100 hours or so and saw Leah Freeman
22      and Nick McGuffin around 2115 hours
23      on June 28th."
24      But here's my question.  You said
25 earlier that it takes a total of ten minutes to

177
1  get from your sister's house to your home --
2      A.   Yeah.
3      Q.   -- down on West Central.
4           So if you left at 2100 hours --
5      A.   Well, at the end -- what I said was I
6  left at the end of Survivor, which was 9:00. I
7  pet the dog, I talked to my sister a minute. I
8  didn't want to dine and dash. So I probably left
9  at ten minutes after 9:00 or even 15 minutes
10 after. And from where I saw these people from her
11 house is 100 yards.
12     Q.   Okay. So it would have taken you
13 what, one, two minutes to go 100 yards?
14     A.   Yeah.
15     Q.   Okay.
16     A.   So just what I said -- 9:15 might have
17 been 9:12, might have been 9:13, might have been
18 9:14.
19     Q.   But when we spoke earlier you made
20 that noise, remember (making noise).
21     A.   Yeah.
22     Q.   You were (making noise) trying to get
23 out of there?
24     A.   Yeah. I was trying to get out of
25 there, but I didn't -- I got out of there as fast

178
1  as I could.
2      Q.   Okay.
3      A.   But I do believe that's a correct
4  time, 10 after to 15 after, around in there,
5  that's accurate.
6      Q.   Could it have been as early as 9:00?
7      A.   No.
8      Q.   But you said you just basically patted
9  the dogs on the head and then left.
10     A.   Yeah. Wrestled around with them,
11 talked with my sister, asking her if she was going
12 to work the next day, and then (making noise), out
13 the door I went.
14     Q.   Then down there if you go -- see where
15 it starts, "May 19, 2010"?
16     A.   Yeah.
17     Q.   So there he says, "May 19, 2010,
18 around 1200 hours" --
19     A.   I don't even remember old Webley
20 having much to do with anything.
21     Q.   Do you remember meeting Webley up on
22 North Elm Street?
23     A.   I remember a woman maybe. I don't
24 remember much about this incident right here.
25     Q.   Okay. Well, he says there that

179
1  (reading): "Officer Webley and I met Lindegren on
2  West 4th Street in Coquille by North Elm."
3      A.   Which officer?
4      Q.   This is McNeely who's writing the
5  report.
6      A.   Okay.
7      Q.   He says, "Officer Webley and I" --
8  meaning McNeely -- "met Lindegren on West 4th
9      Street in Coquille by North Elm.
10     Lindegren placed traffic cones
11     where he had" --
12     A.   I remember a woman. I don't remember
13 McNeely.
14     Q.   Okay. Do you remember placing traffic
15 cones where --
16     A.   I remember some traffic cones. I
17 don't remember about what they wanted me to do
18 with them or anything. I showed up, I did what
19 they wanted me to do and left.
20     Q.   Do you remember if you placed the
21 traffic cones or if they placed the traffic cones?
22     A.   I don't know. I can't say for
23 absolute 100 percent.
24     Q.   Okay. Do you see if you go on there
25 it says, "Lindegren placed traffic cones where he

180
1      had seen Freeman and McGuffin on
2      June 28, 2000, around 2115 hours."
3           And there's one more sentence. Then
4  after that it says, "Lindegren put himself around
5      5 to 7 feet from where Freeman
6      and McGuffin were standing."
7           Is that --
8      A.   No. It was farther than that.
9      Q.   Accurate? Because earlier you said
10 25 to 30 feet; right?
11     A.   It was longer than this room. This
12 room is about 16 feet.
13     Q.   Okay. And he says, "Lindegren
14     remembers saying hi to Freeman
15     and McGuffin as he passed them."
16     A.   I may have said hello.
17     Q.   Okay. But you're not certain?
18     A.   I'm not sure now.
19     Q.   Okay.
20     A.   I know whoever was there never said
21 elbow to me.
22     Q.   Okay. And then he says, "Lindegren
23     had me stand in the photo where
24     the pickup was parked that night."
25          Do you see that last sentence?

### Page 181

1  A. (Reading): "Had me stand in the photo
2  where the pickup was parked that
3  night." Okay.
4  Q. Do you remember any of that?
5  A. I don't.
6  Q. Okay.
7  A. This happened May 19, 2010. I can
8  only -- just like I told you before, I can only
9  remember so much about anything that happened
10 earlier than that. I only remember talking to
11 McNeely one time, when my sister said they were
12 looking for me and I went in and they interviewed
13 me, and then I took off and...
14 Q. Okay.
15     MR. LAUERSDORF: I'm going to have you
16 mark this as Exhibit 4.
17     (Deposition Exhibit No. 4
18     marked for identification.)
19 BY MR. LAUERSDORF:
20 Q. So I've had the court reporter hand
21 you what's been marked as Exhibit 4. And that's
22 the group of photos that we were provided in
23 discovery by I think the Coquille Police
24 Department.
25     Have you ever seen any of those photos

### Page 182

1  before?
2  A. I have not.
3  Q. Do those photos refresh your
4  recollection about that day at all?
5  A. No.
6  Q. About the day you were out there with
7  McNeely?
8  A. I see the pictures. I don't remember
9  the incident.
10 Q. Okay.
11 A. On the top picture of number 4 here, I
12 see two cones here, that would be somewhat close
13 to where the pickup was parked.
14 Q. Okay.
15 A. And I don't know what they --
16 Q. You're talking about page 1 of
17 Exhibit 4?
18 A. Yes.
19 Q. Who's in that photo?
20 A. It's me, and I believe it's
21 Mr. McNeely.
22 Q. Do you recognize that to be
23 Mr. McNeely?
24 A. Yeah.
25 Q. And so he says in his report there

### Page 183

1  (reading): "Lindegren had me stand
2  in the photo where the pickup was
3  parked that night."
4     Is he standing where the pickup was
5  parked that night?
6  A. No. I am standing where the pickup
7  was parked.
8  Q. Was the pickup parked in the middle of
9  the road?
10 A. It was parked right here on the road,
11 but on the right side of the lane with the grille
12 facing that way (indicating throughout).
13 Q. Okay. So the --
14 A. I walked around the truck this way.
15 Q. With the grille facing towards West
16 4th Place?
17 A. Yes.
18 Q. Okay. And West 4th Place, that white
19 house near the center of the photo, that's on
20 West 4th Place; right?
21 A. Yes.
22 Q. Okay. So the truck was facing that
23 way?
24 A. Yes, sir.
25 Q. And it was approximately where those

### Page 184

1  two cones are?
2  A. Yes.
3  Q. Did you put those cones there, or did
4  somebody else put those cones there?
5  A. I don't think I did. I can't remember
6  much about this at all. I remember something to
7  do with the cones, but I have no idea what.
8  Q. Okay. So if we go to page 2 there,
9  that's another photo of the same scene, just kind
10 of taken from further back; right?
11 A. Yes. It looks like it to me.
12 Q. And is that the driveway you were
13 talking about on the --
14 A. This one here, yes.
15 Q. Behind the brown truck?
16 A. Yeah.
17 Q. That's the driveway where you saw the
18 two folks?
19 A. When I saw the people.
20 Q. And they were further down that
21 driveway?
22 A. They were farther up this driveway.
23 They were almost to the end of this house.
24 Q. Hold on, because that's a different
25 page.

185

1   A.   I'm sorry.
2   Q.   I want to talk about page 2 right now.
3   A.   Okay.
4   Q.   Do you see that tan or beige pickup
5   truck there?
6   A.   I do.
7   Q.   Is that the truck?
8   A.   No.
9   Q.   Do you recall that truck being there
10  on that night?
11  A.   I don't.
12  Q.   How about that blue Buick there?
13  A.   Don't know.
14  Q.   Do you recall ever seeing that --
15  A.   I never paid attention.
16  Q.   Okay.  Do you recall any vehicles
17  being parked on the side of the road where McNeely
18  is standing in that photo?
19  A.   No, I don't.
20  Q.   Let's go to page 3.  That's a good
21  photo of the driveway?
22  A.   Right.
23  Q.   That's a carport down at the end of
24  the driveway?
25  A.   Actually, it's -- yeah, it's a --

186

1   actually, that's a little rental house is what
2   that is.
3   Q.   Okay.
4   A.   And that little cover over it is a
5   mylar, a roof, a clear roof.  And I saw the people
6   right here, pretty much at the end of the house or
7   maybe a little bit in this direction.
8   Q.   Okay.  At the end of the house toward
9   where the mylar roof is, or at the end of the
10  house where the mailbox is?
11  A.   The front house here --
12  Q.   Yeah.
13  A.   -- within -- I don't know.  Within the
14  last window in the end of the house.  So that
15  would be about 30 feet.
16  Q.   Okay.  So not where the cones are?
17  A.   No.
18  Q.   Okay.  Then you go to the next page.
19  That is you and Officer McNeely again; is that
20  right?
21  A.   Yeah.
22  Q.   But this view is facing towards West
23  4th Street; right?
24  A.   Yes.  You're right.
25  Q.   And so where you're standing there, is

187

1   that about where you saw these two folks for the
2   first time when you were walking down North Elm
3   Street on --
4   A.   No.  I seen them back in the driveway
5   on the last picture --
6   Q.   Right.  But I mean --
7   A.   Right there stationary.  They were
8   standing.  They weren't moving.  They were
9   stationary.
10  Q.   But where were you?
11  A.   Walking down this road.  I walked
12  around the truck where McNeely is, because the
13  truck was parked right here (indicating
14  throughout).
15  Q.   Okay.
16  A.   I went around this way, and went down
17  to 4th.
18  Q.   Okay.  So the truck was between you
19  and them?
20  A.   Yeah.
21  Q.   Okay.  And so then remember we talked
22  about this earlier and I said to you, Did you see
23  them while you were walking down North Elm Street?
24  And you said, No.  I didn't see them until I got
25  to the driveway --

188

1   A.   Yeah.
2   Q.   -- and I looked down the driveway?
3   So where you're standing there is
4   about where the driveway is.  So is that about
5   where --
6   A.   Right.
7   Q.   So let me finish.
8   Is that about where you were the first
9   time you saw them?
10  A.   Yeah.  Right where I'm standing there,
11  yeah, probably really close.
12  Q.   Okay.  And then --
13  A.   I was a little more towards where --
14  probably where McNeely is.
15  Q.   Okay.
16  A.   Because the truck was parked here,
17  right up here.
18  Q.   Where the cones are?
19  A.   Yeah.
20  Q.   Okay.  And I'm going to have you
21  actually draw some things in on the same set of
22  photos, but I'm going to give you a different copy
23  because we're going to create a new exhibit.  So
24  I'm going to have you draw some things in in a
25  second, but right now I'm just trying to get a

**209**

1  officers.  I do remember with the Gabriel Morris I
2  had an FBI officer.
3      Q.   Okay.  When you talked to Randy Ulmer,
4  did you go to him or did he come to you?
5      A.   I can't picture me going to go talk to
6  him.  He had to come talk to me.
7      Q.   But you don't remember where you were
8  when you talked to him?
9      A.   I have no idea, sir.
10     Q.   Then after you mentioned the FBI
11 officers, he says, "Okay."  And you say, "And I
12     told them, and they said, Well,
13     thank you very much.  We'll be
14     talking to you.  And that was about
15     ten years ago."
16          So if I understand correctly what
17 you're telling the grand jury there is that you
18 hadn't talked to anybody in the ten years between
19 when Randy Ulmer talked to you and you're at the
20 grand jury?
21     A.   Evidently.  Yeah, I had very little
22 contact with any cops of any kind, very little.
23 They never showed me pictures of the people, never
24 did a lineup.  I thought it was odd.
25     Q.   Okay.

**210**

1      A.   I thought they would do a lineup so I
2  could prove I knew what I was talking about, and
3  never did anything like that.  Never did -- didn't
4  talk to me hardly much.
5      Q.   Did you ask them about that at all?
6      A.   No.  I just figured they know more
7  about cop work than I do.  But I'd have done it a
8  lot different.
9      Q.   Okay.  Okay.  Then he goes on, and he
10 says in line 14, "Now, earlier this year, the
11     police came back to you and talked
12     with you about that?"  And you say,
13     "Absolutely."
14          Line 17 it says -- do you see where
15 I'm at?
16     A.   I see it now.
17     Q.   I'm at line 17 now.  (Reading):  "And
18     did they ask you to go with them
19     and point out where you were?"
20     "Answer:  Yes."
21     A.   Yeah, I see that.
22     Q.   Line 20.  (Reading):  "And did you do
23     that, sir?"  And you say, "Yes, sir,
24     I did."  "And you showed them exactly
25     where this all occurred?"  And you

**211**

1      say, "Absolutely."
2      A.   "Absolutely."  I see that.
3      Q.   Now, line 25 he says, "I'm going to
4      have one of those officers come
5      and tell the grand jury exactly
6      where that was at and so forth."
7           Did anybody ever explain to you -- did
8  Frasier ever explain to you why he didn't want you
9  to explain to the grand jury where they were at?
10     A.   No.  I can't even remember testifying
11 there.
12     Q.   Okay.  Do you remember him putting any
13 photos in front of you at the grand jury or
14 anything?
15     A.   No.
16     Q.   And nobody ever --
17     A.   This is the first time I saw any
18 photos.
19     Q.   Okay.  And nobody ever explained to
20 you why he wanted to have the officers explain
21 what you pointed out rather than have you explain
22 what you were pointing out?
23     A.   Again, I did not have hardly any
24 contact with them for, like, years and years and
25 years --

**212**

1      Q.   Okay.
2      A.   -- you know.
3      Q.   Then if you go down to line 20, one of
4  the grand jurors asks you a question.
5  Apparently --
6      A.   Number 20?
7      Q.   Yeah.  Apparently it's a female
8  because your answer was, "No, ma'am."  But she
9  says, "Do you know what color the pickup was?"
10     And you said, "No, ma'am.  See, I
11     had not known -- you know, if I
12     had known something was up, I
13     would have took, you know, mental
14     notes, but I was just heading home."
15     A.   Uh-huh.  I do believe it was brown
16 now, but I could not -- I could not even state
17 100 percent.
18     Q.   So you believe it's brown now, after
19 reading the police reports we discussed today?
20     A.   Yeah.
21     Q.   Okay.  But back when you were
22 testifying in front of the grand jury, you didn't
23 know what color it was?
24     A.   Yeah.  And I probably didn't -- to be
25 honest, because it was so -- so immaterial to me,

**Page 229**

1  Q.  Would you like to have seen that
2  before you testified today?
3  A.  Would I have liked to see it before I
4  testified?  No.  It doesn't matter.  You ask me
5  the questions now, and I will answer them to the
6  best of my ability.
7       I can't even remember testifying at
8  the grand jury.  I do remember testifying at the
9  trial.
10 Q.  Do you think that transcript is a fake
11 of your grand jury testimony, or do you think that
12 you just don't --
13 A.  Well, I don't think they're fake.
14 That would be kind of hard to believe, wouldn't
15 it?  I guess there's a possibility, like a 1 in
16 100 million, but I believe that I did go there,
17 but I just don't remember it.
18      MR. FRANZ:  Okay.  That's all the
19 questions I have.  Thanks a lot.
20      THE WITNESS:  Thank you, sir.
21      MR. DAVIS:  This is Jesse Davis.  Are
22 you able to hear me, Mr. Lindegren?
23      THE WITNESS:  I am, sir.
24      MR. DAVIS:  My voice may break a
25 little bit.  I've got a little bit of the cold and

**Page 230**

1  flu that's been going around, so I apologize for
2  that.  I'll try to talk slowly so that we don't
3  have any trouble with the transcript, and I'll ask
4  you to do the same.
5
6            EXAMINATION
7  BY MR. DAVIS:
8  Q.  Going back to your conversation with
9  Andrew Lauersdorf, what else did you guys talk
10 about during your conversation?
11 A.  He liked to come down here because he
12 liked to take his pickup out in the mud and
13 squirrel around a little bit, he told me that he
14 had a case down here with the old World War II
15 hangar at the airport here, and we might have
16 talked a little about trapping from my side, and
17 that's about all I recall, sir.
18 Q.  All right.  Thank you.
19      Returning to your transcript that
20 you've been shown today, is it accurate to say
21 that it looks like from your grand jury transcript
22 and from what you were told about your testimony
23 at the criminal trial that you've said different
24 things today than what you've said during those
25 occasions where you've testified?  Does that

**Page 231**

1  question make sense?
2  A.  From what I've read here in these
3  transcripts and what I remember that you guys have
4  talked to, yeah.  I told you what I remember when
5  I was being interviewed earlier, and that's all I
6  can -- that's all I can go by, sir, is what I
7  remember.
8  Q.  Understood.
9       So it looks like there's been, you
10 know, at least three occasions where you've
11 testified under oath about what you saw; right?
12 A.  I believe you're right.
13 Q.  And they may not be perfectly
14 consistent with each other; right?
15 A.  I agree.
16 Q.  Is it the case that in each instance
17 you testified truthfully as best you remembered it
18 at that time?
19 A.  Yeah.
20 Q.  And that's true for today as well?
21 A.  Yes.  I'm not a bullshitter.
22 Q.  Right.  And it sounds like you
23 understand or believe that you're not a
24 bullshitter, but that still your memory might be
25 different at one different time than another, and

**Page 232**

1  that's why the times when you've testified might
2  not be consistent with each other?
3  A.  Correct.  That's the only answer I
4  got.  It's been 22 years ago.
5  Q.  Understood.
6       And did you ever get the sense in
7  talking with any law enforcement officer that that
8  law enforcement officer was attempting to
9  influence or manipulate you in what you were going
10 to say or testify?
11 A.  I have no idea.  They asked me
12 questions.  I don't know the game.  Could I have
13 been led?  I probably could have, because I'm just
14 an old hillbilly.  I ain't none all that brilliant
15 when it comes to law work.  Could I have been led?
16 Yeah, probably.  But did anybody outwardly try
17 anything with me?  No.  They would never try that.
18 Anybody try to talk me into testifying some way, I
19 would never have done it, and I would whip their
20 ass.
21 Q.  Mr. Lindegren, you broke up when you
22 spoke, but that's okay as long as the court
23 reporter was able to get your testimony --
24 A.  Yeah, she's nodding her head.
25      I will repeat it, if you wish?

John J. Lindegren

233

1   Q.   That would be fine.
2   A.   Okay.  Yeah.  Could I have been led,
3   yeah, probably.  I'm just a darn hillbilly, you
4   know.  I ain't no law enforcement guru or no
5   attorney guru.  You know, you guys are way above
6   my pay grade.  But did anybody just come out and
7   say, This is what we want you to say or do or
8   anything?  No, they would never say that to me.
9   If they did, I'd whip their ass, I said.
10  Q.   Thanks, Mr. Lindegren.  It sounds like
11  it's the case that if someone asked you questions,
12  you answer those questions truthfully and then you
13  moved on.  Is that true?
14  A.   That's correct.
15  Q.   Before last night when you met with
16  Andrew Lauersdorf, had you had any contact with
17  anybody on what I would describe as Mr. McGuffin's
18  legal team, meaning, Mr. Lauersdorf or Ms. Puracal
19  who's there with you?  Did you have any
20  conversations or contact with anybody else from
21  their team?
22  A.   Yeah, I did.  I don't know -- a woman
23  kept sending me text messages and stuff.  Ramirez
24  maybe.  And she was trying to set up a meeting.
25  And then I contacted his law office several times

234

1   through her and the number and nobody ever got
2   back to me, but I don't know if the attorney here
3   ever got my message or not.  That's the only
4   contact.
5        This was going to happen at the Mill
6   Casino months ago, and then it was -- she
7   contacted me with a text message and said it was
8   canceled.  That's the only contact I've had with
9   any law office.
10  Q.   Okay.  Thank you.
11       And that person named Ramirez, that
12  was a woman, you said?
13  A.   Uh-huh.  Yeah.  Achez (phonetic) or
14  something.  That was her name.  Achaz or Chez
15  or -- real pretty voice, but I have no idea who it
16  is.  But I called and I sent text messages trying
17  to get a -- because I didn't want to have to drive
18  all the way over here to North Bend, 100 miles
19  from my house.  I get four miles to the gallon in
20  my old truck.  And I wanted to set it up some
21  other place, and we never could get together.  I
22  called this woman who was his secretary, I
23  believe, at his law office.  I sent her text
24  messages, plus I talked to her on the phone a
25  couple of times, but that didn't happen so here I

235

1   am today.
2   Q.   Okay.  Thank you.
3        Before today, did you ever have any
4   discussions with the person you described as
5   Ms. Ramirez or anybody else?  Did you ever just
6   talk about the substance of your -- of the things
7   you talked about today, your discussions with law
8   enforcement back in 2000 or 2010?  Did any of
9   those discussions occur before last night?
10  A.   Nothing.  No.
11  Q.   So all of those text messages or
12  contacts with Ms. Ramirez were just about setting
13  up times --
14  A.   Setting up dates and a place for the
15  deposition.
16  Q.   All right.  Thank you.
17       MR. DAVIS:  One moment while I take a
18  quick look here.  I don't have any more questions.
19  Thank you.
20       MR. LAUERSDORF:  Ms. Schaffer?
21       MS. SCHAFFER:  This is Karin Schaffer.
22  I have no questions for this witness.
23       MR. LAUERSDORF:  Let's take a break
24  for just a second.  I want to see if I have any
25  follow-up.

236

1        (Recess:  3:32 p.m. to 3:33 p.m.)
2        MR. LAUERSDORF:  I don't have any
3   follow-up, so from my perspective, we're done.
4        (Deposition concluded at 3:34 p.m.)

John J. Lindegren

237

```
1   State of Oregon    )
                       ) ss.
2   County of Douglas  )

3

4           I, Denise C. Zito Smith, CSR, a
5   Certified Shorthand Reporter for the State of
6   Oregon, hereby certify that the witness was sworn
7   and the transcript is a true record of the
8   testimony given by the witness; that at said time
9   and place I reported by stenotype all testimony
10  and other oral proceedings had in the foregoing
11  matter; that the foregoing transcript consisting
12  of 236 pages contains a full, true, and correct
13  transcript of said proceedings reported by me to
14  the best of my ability on said date.
15          If any of the parties or the witness
16  requested review of the transcript at the time of
17  the proceedings, such correction pages are
18  included.
19          IN WITNESS WHEREOF, I have set my hand
20  this 18th day of January 2023, in the City of
21  Canyonville, County of Douglas, State of Oregon.
22

23  _____
24  Denise C. Zito Smith
    Oregon CSR No. 01-0375
25  Expires 9/30/2024
```

```
1   Case Name:  McGuffin vs. Dannels, et al.
2   Deponent:   John J. Lindegren
3
    Page    Line    Reason          Correction
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18          I hereby certify that I have read the
    deposition taken January 4, 2023, and that this
19  deposition, together with any corrections or
    additions, is a true and accurate record of my
20  testimony:
21
22  _____
23  Witness's Signature
24
25
```