Kristine M. Karcher
December 23, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVE HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, COOS COUNTY, and OREGON STATE POLICE,<br><br>　　　　　Defendants. | Civil No.<br>6:20-cv-01163-MK<br><br>VIDEOCONFERENCE<br>DEPOSITION |

DEPOSITION UPON ORAL EXAMINATION

OF KRISTINE M. KARCHER

Kristine M. Karcher
December 23, 2021

### Page 2

1  BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
2  Civil Procedure, the deposition of KRISTINE M. KARCHER, an
3  adverse-party witness, was taken remotely via videoconference
4  on behalf of the Plaintiffs, before JEAN M. KOSTNER, a
5  Certified Court Reporter for Oregon, on Thursday, the 23rd day
6  of December, 2021, at the hour of 9:00 a.m., in the State of
7  Oregon.

### Page 3

1            APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3       Janis C. Puracal, OSB #132288
4       Andrew C. Lauersdorf, OSB #980739
        Christine A. Webb, OSB #184744
5       MALONEY LAUERSDORF REINER, PC
        1111 East Burnside Street, Suite 300
6       Portland, Oregon  97214
        (503) 245-1518
7       jcp@mlrlegalteam.com
        acl@mlrlegalteam.com
8       caw@mlrlegalteam.com
9  ON BEHALF OF THE DEFENDANTS:
10      Sarah R. Henderson
        LAW OFFICE OF ROBERT E. FRANZ, JR.
11      Post Office Box 62
        Springfield, Oregon  97477
12      (541) 741-8220
        shenderson@franzlaw.comcastbiz.net
13         (Representing City of Coquille, City of Coos Bay,
        Coos County, Craig Zanni, Chris Webley, Eric
14      Schwenninger, Sean Sanborn, Ray McNeely, Kris
        Karcher, Pat Downing, Mark Dannels, Kip Oswald,
15      Michael Reaves, David Zavala, Anthony Wetmore,
        Shelly D. McInnes)
16
        Jesse B. Davis
17      OREGON DEPARTMENT OF JUSTICE
        100 Southwest Market Street
18      Portland, Oregon  97201
        (503) 947-4700
19      jesse.b.davis@doj.state.or.us
           (Representing Oregon State Police, John Riddle,
20      Susan Hormann, Mary Krings, Kathy Wilcox)
21      Karin L. Schaffer
        WOOD SMITH HENNING & BERMAN LLP
22      12755 Southwest 69th Avenue, Suite 100
        Portland, Oregon  97223
23      (971) 256-4023
        kschaffer@wshblaw.com
24         (Representing Vidocq Society and Richard Walter)
25

### Page 4

1  ALSO PRESENT:
2       Nick McGuffin
3
   REPORTED BY:
4
        Jean M. Kostner, CSR #90-0051
5       Subcontractor for:
        US LEGAL SUPPORT

### Page 5

1                INDEX OF TESTIMONY
2
3  WITNESS                                            PAGE
4    KRISTINE M. KARCHER
5       Examination by Ms. Puracal . . . . . . . .      8
6
7
8
9
10
11
12
13
14
15            REQUESTS FOR INFORMATION
16
   Information Requested by Ms. Puracal:       PAGE    LINE
17
18    Bates number ranges of police reports
      referred to by Ms. Karcher                 17      3
19
      PowerPoint slides                          25     12
20
      Search to be made for videotape
21    of crime scene                            185     12

Page 6

| EXHIBIT NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 2 | Grand Jury Testimony - Kris Karcher, 07/21/10 (25 pages) | 160 |
| 3 | Photo of Bent Arm Takedown | 62 |
| 4 | Coos County Sheriff's Office Incident Narrative, No. 20-10627, 07/05/00 (17 pages) | 66 |
| 5 | Karcher Reports (6 pages) | 71 |
| 6 | Coos Bay Police Department Report, 08/03/00 (2 pages) | 78 |
| 8 | Coquille Police Department Supplemental Report, 09/20/00 (8 pages) | 91 |
| 9 | Pex Report, 08/03/00 (4 pages) | 93 |
| 10 | Google Earth - 1.2 Miles from Fairview to Body Location | 94 |
| 13 | Photographs (77 pages) | 109 |
| 14 | Google Earth - Zoom on Location | 126 |
| 15 | Photos from Trial (12 pages) | 110 |
| 16 | FSS Lab Report, 10/03/01 (44 pages) | 146 |
| 17 | Microtrace Notes | 153 |
| 18 | Autopsy Report, 08/04/00 (8 pages) | 164 |
| 19 | Evidence Log | 180 |
| 20 | Property Request | 181 |
| 21 | Dannels Press Conference | 189 |
| 23 | ABC News Video - What Happened to Leah Freeman, Part 2 | 194 |

Page 7

| | | |
|---|---|---|
| 24 | ABC News Video - What Happened to Leah Freeman, Part 3 | 197 |
| 25 | ABC News Video - What Happened to Leah Freeman, Part 4 | 199 |
| 26 | ABC News Video - What Happened to Leah Freeman, Part 5 | 200 |

Page 8

1    KRISTINE M. KARCHER,
2 called as a witness on behalf of the Plaintiffs, having been
3 first duly sworn to tell the truth, the whole truth, and
4 nothing but the truth, was examined and testified as follows:
5         THE WITNESS: Yes.
6              EXAMINATION
7 BY MS. PURACAL:
8    Q.   Good morning, Ms. Karcher.  I'm Janis Puracal.  I'm
9 one of the attorneys representing the plaintiffs, Nicholas
10 McGuffin and his daughter, in this lawsuit.  Do you understand
11 that we're here today for a deposition?
12    A.   Yes.
13    Q.   Can you give us your name as given at birth.
14    A.   Kristine with a K, K-R-I-S-T-I-N-E, Marie Karcher,
15 K-A-R-C-H-E-R.
16    Q.   Have you ever changed your name?
17    A.   No.
18    Q.   Have you ever used a nickname?
19    A.   Kris.
20    Q.   Have you ever used an alias?
21    A.   No.
22    Q.   Can you give us your place and date of birth?
23    A.   Roseburg, Oregon.
24    Q.   What's your current address?  A work address is
25 fine.

Page 9

1    A.   250 North Baxter, in Coquille 97423.
2    Q.   Who is your current employer?
3    A.   I work for Coos County.  My immediate supervisor is
4 the district attorney, Paul Frasier.
5    Q.   Are you contractually an employee of the county?
6    A.   No.  I'm an hourly employee.
7    Q.   It's hourly with the county.  Is that correct?
8    A.   Yes.
9    Q.   And you said that your immediate supervisor is the
10 district attorney, Paul Frasier.  Is that because the deputy
11 medical examiner reports to the prosecutor, or is that actually
12 the chain of command?
13    A.   That's the chain of command.
14    Q.   What's your DPSST number?
15    A.   I believe it's 40567.
16    Q.   What's your current title?
17    A.   Chief medicolegal death investigator.
18    Q.   Did your title used to be chief deputy medical
19 examiner?
20    A.   Yes.
21    Q.   Did it change at some point?
22    A.   It did.  The State Medical Examiner's Office now
23 refers to all deputy medical examiners as medicolegal death
24 investigators.  We're all the same, but they've just changed
25 our titles.

Kristine M. Karcher
December 23, 2021

Page 70

1  A.  Both, I would say.
2      MS. PURACAL:  I see that it's about 10:40.  Why
3  don't we take a five-minute break and come back.  I'm just
4  going to pull up an exhibit.  So we'll come back on the record
5  at about 10:45.
6      THE WITNESS:  Okay.
7      (Recess taken from 10:38 a.m. to 10:47 a.m.)
8      MS. PURACAL:  Back on the record.
9  BY MS. PURACAL:
10     Q.  And I'll just make sure that I note this,
11 Ms. Karcher.  I noticed that there are times where you might be
12 anticipating my question and starting to answer, and I think
13 there are probably times where I'm anticipating your answer and
14 I start to ask the question.  And so just going forward, if we
15 could both just do a better job of waiting until the other one
16 finishes, and that will help our court reporter a lot to create
17 a better transcript.  Does that make sense?
18     A.  Yes, it does.  Sorry.
19     Q.  My apologies.
20         And then the other thing I just wanted to make sure
21 that you understand.  I asked you that question about the major
22 crime team and my understanding that it also goes by some other
23 names, like the H.I.T. Team or the major crime task force.
24 When I say the "major crime team" going forward, I'm meaning
25 that team, whether it goes by some other name or not.  Can we

Page 71

1  have that understanding between us?
2      A.  Yes, we can.
3      Q.  When you're working on an investigation, a death
4  investigation, how do you make sure that your reports get to
5  the prosecutor?
6      A.  I send them to him.  I make hard copies and give
7  him a hard copy along with usually a disk of my pictures.
8      Q.  So is that your responsibility to get those to the
9  prosecutor?
10     A.  And to the lead investigator, yes.  Mm-hm.
11     Q.  Was that the way it was back in 2000 on the Freeman
12 investigation?
13     A.  Yes.  It would have been.
14     Q.  I'm going to show you what I have marked as
15 Exhibit 5.  This is a six-page PDF.  And I'll go through each
16 of the pages with you.  These are the pages that were disclosed
17 in the criminal case against Mr. McGuffin that came from you,
18 as in they're anything to do with what you did as far as
19 written documents, these were the documents that were
20 disclosed.
21         So the first page is an email from someone named
22 Diane Taylor to you about -- I think she's talking about the
23 England lab and the possibility of doing touch DNA through the
24 England lab.  Does that look familiar?
25     A.  Yes.

Page 72

1      Q.  And is that correct?  Who is Diane Taylor?
2      A.  Diane Taylor was -- when we were at one of those
3  major crime team conferences that was put on by Douglas County,
4  she was a guest speaker.  And she had come from England.  She's
5  an inspector working in England, and she had came, and she
6  spoke on the DNA that they were doing over there.
7          And so Detective Mitts and I were at that
8  conference, and Detective Mitts then came up with the idea of
9  what about those clothes that our lab couldn't process because
10 of the decomp; I wonder if they could do something with those.
11 So that started the process.  We talked to Diane at that
12 conference, and then we followed up with -- with her.
13     Q.  The next page of this is on the Coos County Medical
14 Examiner's Office letterhead, and it's a summary -- it looks
15 like when you were out at the scene where the body was found,
16 but several years later, in March of 2003, to retrieve some
17 maggot casings.  Do you remember that report as well?
18     A.  Yes, I do.
19     Q.  And then the next page is a letter to the FBI lab
20 about those maggot casings and doing a drug screening on those.
21 Do you remember that as well?
22     A.  Yes, I do.
23     Q.  And then the next page is the report from the FBI,
24 where they give you the results of that drug examination.  Do
25 you remember that?

Page 73

1      A.  I don't remember that document, but I remember the
2  results.
3      Q.  Okay.  And that was a document that went to you,
4  though.  Right?  You just don't remember it?
5      A.  Right.
6      Q.  That's a two-page document, and then the last page,
7  I think, is blank.  Those are the only documents that I have,
8  as far as any kind of a reporting from you, in the Freeman
9  investigation.  Do you remember writing any kind of report in
10 the Freeman investigation?
11     A.  I don't remember writing anything, but, um, that
12 was a long time ago.  I can't imagine not having written
13 something.
14     Q.  When you say you can't imagine not having written
15 something, why is that?
16     A.  Because I have information of -- I was part of
17 finding the body and what little bit I was involved in with the
18 investigation or being helpful with the investigation, being an
19 assistant at times with the investigation.  But I don't -- I
20 don't specifically remember writing anything, but, again, it
21 would be unlike me not to have written something.  Yeah, I just
22 honestly don't remember.
23     Q.  Do you know when the last time was that you saw a
24 report that you wrote in the Freeman investigation?
25     A.  No.  I do not.

Page 74
1  Q.  I know at the beginning of the deposition we talked
2 about what you reviewed in preparation for your deposition.
3 Did you review any kind of report or notes that you wrote for
4 the Freeman investigation?
5  A.  No. I didn't.
6  Q.  When you were writing your reports or your notes
7 back in 2000, where were you putting those documents?
8  A.  They were kept in my desk in my office. And then
9 they went in -- the long-term ones went into a file cabinet.
10 They have since gone into totes that are in a storage unit that
11 our office keeps.
12  Q.  Where is that storage unit?
13  A.  It is in what's called -- upstairs at the Owen
14 Building, which is owned by the county and houses several
15 offices there.
16  Q.  Is that a building in Coquille?
17  A.  Coquille. Sorry. Yes. It's in Coquille.
18  Q.  Do you know the address of that building?
19  A.  No, I don't.
20  Q.  Do you know --
21  A.  But it's only a block away from the courthouse.
22  Q.  Okay. Is it also on North Baxter, then?
23  A.  No, it's not.
24  Q.  Do you know what street it's on?
25  A.  No, I don't. I think it's Central, but I'm not

Page 75
1 certain.
2  Q.  Have you looked in those -- in that storage unit to
3 see if there are any reports or notes from the Freeman
4 investigation?
5  A.  Yes, we have.
6  Q.  And I take it you did not find any?
7  A.  Nope, we did not find anything.
8  Q.  Is there any other place where your notes or
9 reports from the Freeman investigation might be?
10  A.  Well, we have -- we have searched everything that
11 we can think of, um, and have not located any notes, any of my
12 reports.
13  Q.  Do you remember testifying at grand jury in 2010?
14  A.  I remember being in grand jury, yes.
15  Q.  Do you know if you had any notes or reports with
16 you when you testified?
17  A.  I would not have gone in with any notes. I
18 generally never go in with notes into grand jury. I don't
19 remember. I truly just don't remember.
20  Q.  Would you have testified from your photographs?
21  A.  Possibly.
22  Q.  Do you have any independent recollection of whether
23 you did that?
24  A.  No, I do not.
25  Q.  And what about in 2011, when you testified at the

Page 76
1 criminal trial against Mr. McGuffin? Did you have any notes or
2 reports with you at that trial?
3  A.  No, I didn't. That I remember. I do not remember
4 any notes there.
5  Q.  Is there a reason why you generally don't go into
6 grand jury or trial with notes or reports?
7  A.  It's -- they're usually presented by the district
8 attorney and provides me the infor- -- you know, whatever I'm
9 testifying to. I do a lot of photographs, testify by
10 photographs, but generally I don't go in with, like, a report
11 or anything like that.
12  Q.  And I'm trying to understand why. You said -- and
13 I might have misheard this. It sounded like you said that
14 the -- is it the reports and the notes are provided by the DA?
15  A.  I usually know the information, and I don't -- I
16 don't go in with a report. I'm -- I'm certain there in the
17 past I have at some point, but, generally speaking, I do not go
18 in with my report.
19       If it's a -- I'll go in oftentimes with what's
20 called a "trauma gram," which is based on -- it's like a body
21 map, like what you see in an autopsy, and I -- where I've
22 listed all their injuries. I'll use that to testify from
23 rather than showing them pictures. I will testify to that.
24       As far as the report itself, I usually have that
25 information in my head. I don't generally -- and when I'm in

Page 77
1 there, the district attorney generally has my report. So if I
2 would need to refer to it, I would just ask, and I would look
3 at my report.
4  Q.  Do you remember in the Freeman investigation if the
5 district attorney had your report for the grand jury or the
6 trial?
7  A.  I do not remember.
8  Q.  Do you remember if you created a trauma gram in the
9 Freeman investigation?
10  A.  No, I didn't.
11  Q.  And you said you generally testified -- it's what
12 you have in your head. So what happens in a case like this
13 case where the scene investigation happened in 2000 but you
14 didn't go to grand jury until 2010? Do you review your reports
15 and notes before you go into grand jury?
16  A.  Yes. Usually.
17  Q.  Do you have any recollection of whether you
18 reviewed notes or reports before you went into the grand jury
19 in 2010?
20  A.  I so wish I did, but I don't.
21  Q.  And I just want to make sure that's clear for the
22 record. You so wish you had a recollection, or you so wish you
23 had a report?
24  A.  I so wish I had the report and a recollection of
25 the -- of testifying, but I -- I just don't. I -- I don't know

Kristine M. Karcher
December 23, 2021

Page 154

1  Q.  Do you remember testifying to your opinions about
2  the cause and manner of death and saying that there were no
3  abrasions or road rash or anything on her jeans?
4  A.  Yes.
5  Q.  Did you look at the jeans or any of these
6  examinations of the jeans before you came to that opinion?
7  A.  I would have -- I did not -- I saw the jeans.  I
8  took them off of her.  That's the extent of my exposure to her
9  jeans.  We looked for areas of road rash when we took those off
10 and did not see any.  What they're referring to is -- I have no
11 idea what they're referring to.  It was nothing I saw when we
12 took her clothes off.
13 Q.  And then after you took her clothes off and you had
14 sent them out for these analyses at the England lab and at
15 Microtrace, what did you do to determine what that analysis
16 revealed?
17 A.  With regards to --
18 Q.  To the jeans.
19 A.  -- what all?  I know.  Are you looking at -- I
20 mean, are you asking what -- who I went to?  Who I talked to?
21 Help me out here.  What are you --
22 Q.  I'm asking you --
23 A.  I don't -- go ahead.
24 Q.  I'm asking who you talked to and what you talked
25 about.

Page 155

1  A.  I don't remember talking to anyone about --
2  specifically about the abrasions on her jeans.
3  Q.  What was your involvement in the examination of the
4  Mustang, Mr. McGuffin's Mustang?
5  A.  Um ...  I helped Lieutenant Pex with the Mustang.
6  I think I took pictures.  Um ...  He had a vacuum, a filter
7  vacuum that -- and he vacuumed the vehicle and gathered trace
8  evidence in the vacuum, in a filter in the vacuum.
9  Q.  Was that in 2010, closer to the criminal trial?
10 A.  I think so, yes.
11 Q.  Okay.  Why were you involved in examining the car?
12 As a medical examiner, I understand why you're involved in
13 examining the body, but why are you involved in examining the
14 car?
15 A.  Remember when I go back -- I do things that will
16 help the team.  We're a small county, and so we all work
17 together.  All of the agencies come together, and you gather
18 manpower that way.  Um ...  I do a lot of things that don't
19 make sense to -- and is not part of what you would call a
20 medical examiner role.  But I'm a forensic nurse, and so
21 there's things that I can be helpful with.
22      I can take photos.  I can help Lieutenant Pex.  He
23 needed someone to help him, if I remember right.  I
24 volunteered, said I could help him.  And plus, I learn when I
25 work with -- when I was working with him.  And so I think

Page 156

1  that's the only reason I was probably helping him, was he just
2  needed an extra pair of hands.
3  Q.  What was your training to examine a vehicle at that
4  point in time?
5  A.  Other than it just being a possible crime scene,
6  there was none.
7  Q.  What were you looking for with respect to the
8  examination of the Mustang?
9  A.  Well, I believe Lieutenant Pex was looking for any
10 sort of evidence that might be linked to the case that would
11 help with the case.
12 Q.  Mr. McGuffin's Mustang was first examined on July 6
13 of 2000.  Were you involved in that examination with
14 Ms. Wilcox?
15 A.  I don't -- I can remember seeing the Mustang.  I
16 don't remember if I actually was helping her with that.  If I
17 was, it was just to be an extra person, but I don't remember.
18 I do not remember helping her.
19 Q.  Okay.  And you testified at the grand jury that you
20 saw the Mustang back in 2000.  So how did you see it?
21 A.  If I remember right, it was parked in the driveway
22 of their house.  That's where I think that I saw it.  It was
23 either in pictures, I saw it there, or I was actually there.
24 And I truly don't remember.  It's not -- you know, it wouldn't
25 be something normally that I do.

Page 157

1  Q.  When you say "it was parked in the driveway of
2  their house," who's the "their" we're talking about?
3  A.  Um ...  The McGuffins' residence.
4  Q.  Okay.  Did you see that vehicle when it was at the
5  crime lab for examination?
6  A.  I don't re- -- I don't remember where it was when
7  Lieutenant Pex and I -- when I photographed it and assisted
8  him.  I don't remember where it was parked.
9  Q.  What about in 2000?  Did you see it when it was at
10 the crime lab for examination?
11 A.  I don't remember seeing it at the crime lab.
12 Q.  Did you review the report from Ms. Wilcox before
13 you helped Lieutenant Pex in 2010?
14 A.  No.  I don't believe so.
15 Q.  Did you review any information about the original
16 examination before you helped Lieutenant Pex?
17 A.  No.
18 Q.  What information did you have about the Mustang
19 before you helped Lieutenant Pex in 2010?
20 A.  I don't think I had any information about the
21 Mustang in 2010.
22 Q.  After the autopsy did you talk to the prosecutor
23 about the possibility that Ms. Freeman might have been
24 strangled?
25 A.  Did I talk to him when?

Kristine M. Karcher
December 23, 2021

Page 158

1  Q.  At any point after the autopsy.
2  A.  I don't remember speaking to him specifically about
3 that.  Hm-mm.
4  Q.  Did you ever tell any member of the team that
5 strangulation was a possibility?
6  A.  Um, I -- I would not say I wouldn't because since
7 you don't have -- when you don't have any other cause of death,
8 you always have to consider strangulation.  So it -- it could
9 have been discussed.  I don't remember.
10  Q.  What was the evidence of strangulation?
11  A.  There is no evidence of strangulation.  It's the
12 lack of any other injury and her being dead is why you would
13 consider strangulation.
14  Q.  But no affirmative evidence of strangulation, so
15 no -- nothing -- no clinical findings to support the theory of
16 strangulation.  Is that right?
17  A.  That's right.
18  Q.  Are you familiar with the Plattner scale?
19  A.  I don't believe so.
20  Q.  There's a study from 2004 in which they talk about
21 the different clinical findings associated with different
22 degrees of strangulation.  Are you familiar with anything like
23 that?
24  A.  It doesn't ring a bell to me.
25  Q.  At the autopsy they -- they never found any broken

Page 159

1 bones.  Is that right?
2  A.  That's right.
3  Q.  And there was no evidence of fractures to her face.
4 Correct?
5  A.  No.  Correct.
6  Q.  And her nasal bones were intact.  Do you remember
7 that?
8  A.  Yes.
9  Q.  And the bones around both of her eyes, those were
10 intact as well.  Do you remember that?
11  A.  Yes.
12  Q.  Do you remember that her cheek bones were also
13 intact?
14  A.  Yes.
15  Q.  And her maxilla, that was also intact.  Right?
16  A.  Yes.
17  Q.  And her jaw showed no sign of significant injury?
18 Do you remember that?
19  A.  Yes.
20  Q.  Okay.  Did you review the report from the autopsy?
21  A.  I have seen that report, yes.
22  Q.  You testified at the grand jury that there was a
23 path in the grass like someone had walked over to the edge and
24 looked down.  What was the evidence that you had of someone
25 walking over to the edge?

Page 160

1  A.  I think I said that was a path where somebody could
2 have, but it looked more like an animal path.  It could have
3 been either.
4     MS. HENDERSON:  If you want to talk details about
5 grand jury or her trial testimony, it might help to pull that
6 up so that we can be precise.  But I don't know how much
7 further we're going to go into that.
8 BY MS. PURACAL:
9  Q.  Ms. Karcher, I'm showing you what we have marked as
10 Exhibit 2, which is your grand jury testimony.
11  A.  Mm-hm.
12  Q.  It's page 20 of the PDF.  It's page 146 of the
13 transcript.  From line 1 it says -- you're testifying here at
14 the grand jury, and you say "The other thing that was
15 noticeable when we came was it looked like there was a path
16 that somebody -- the grass was tall along the shoulder of the
17 road, but that area it looked like there was a path; that maybe
18 somebody had walked over to the edge and looked down."
19     Do you -- and you also said "It could have been an
20 animal coming back and forth."
21     I'm focused on this part, this part that you say
22 "that maybe somebody had walked over to the edge and looked
23 down."  What was the evidence of that?
24  A.  Well, there was -- any time you find a body
25 that's -- that's out in the woods or in foliage and there's a

Page 161

1 path to it, you have to consider that that's -- some person
2 might have walked on that, and avoid walking on that area.
3     So we all noticed the path, and it could have been
4 from somebody walking on it.  More than likely it was an
5 animal, but it could have been either.  So we had to treat it
6 as if somebody was walking, if there was evidence that might be
7 there in that path.
8  Q.  And what was the evidence that somebody had looked
9 down?
10  A.  Well, the only reason you would walk over to where
11 the path was was to look down.  I mean, you're right on the
12 edge of the -- the embankment.  It would just make sense that
13 that's what they were doing.  And that's just a -- that's just
14 a theory.  It's not -- we didn't see anybody there looking
15 down, but there would be no other reason for you to be there in
16 that spot.
17  Q.  So did you have any evidence to actually
18 corroborate the idea that somebody walked the edge and looked
19 down?
20  A.  No.
21  Q.  There's no mention of this path or somebody walking
22 to the edge and looking down in anything prior to grand jury in
23 2010.  So how did you remember that detail for those 10 years?
24  A.  That's the reason that we found the alternate path
25 was so not to disturb the path above the body.  That's why we

Kristine M. Karcher
December 23, 2021

Page 162

1 went down the road and developed a different approach to her
2 body, so that we wouldn't disturb that path until they could
3 assure that there weren't footprints or some pieces of evidence
4 within that path.
5      Q.   So who was it that was responsible for processing
6 the path?
7      A.   It's Lieutenant Pex, and he described that in
8 his -- I believe it's where he's describing the texture of the
9 dirt and the gravel that wouldn't pick up footprints or tire
10 prints.  So he ruled that out.
11     Q.   He ruled what out?
12     A.   He ruled out the fact that you could not obtain
13 evidence from that foliage or from the surface of the ground
14 there.  It would not take tracks or tire prints.
15     Q.   Okay.  So I'm going back to Lieutenant Pex's report
16 which we've got marked as Exhibit 9 here and --
17     A.   If you go down to "The area surrounding the body
18 and below," it says "Our own shoe impressions from walking
19 along the roadway and walking in the designated trail to the
20 body do not" -- they could not pick up shoe impressions.
21     Q.   Okay.  I'm understanding what he's talking about
22 here is the path that you all walked to the body.
23     A.   I think it's the same ground, that it's not going
24 to pick up shoe prints.
25     Q.   Okay.  My question is who processed this other path

Page 163

1 that you're saying where somebody came to the edge and might
2 have looked down?  Who processed that path?
3      A.   I didn't say anybody walked over there and looked
4 down.  I said it could have been a path that somebody could
5 have walked on for the purpose of looking down.  There was no
6 evidence in that path, nor did Lieutenant Pex find any evidence
7 in that path, that anything other than -- we couldn't even
8 prove that it was an animal path, let alone a human path, but
9 it was there, and we made note of it and worked around it.
10     Q.   Where did you make note of it?
11     A.   In our -- in our development of a different
12 approach to the body.
13     Q.   Okay.  So when you say "made note of it," that's
14 not something that you documented in some way?
15     A.   No.  Not with pen.  We didn't -- I didn't make note
16 of it with pen.  We, on the scene, noticed the path and then
17 found a different route in to Leah's body.
18     Q.   Did you alter -- and I think we talked about this
19 before, but my understanding is that you didn't alter the
20 position of the body in any way before it was extracted from
21 the scene.  Correct?
22     A.   Correct.
23     Q.   And you didn't see anyone else alter the position
24 of the body before it was extracted from the scene.  Correct?
25     A.   Correct.

Page 164

1      Q.   I'm going to show you what I have marked as
2 Exhibit 18.  This is a copy of the autopsy report.  And I
3 understand that you reviewed this report from Dr. Olson.  Here
4 at the top it lists the individuals who are attending the
5 autopsy.  But I don't see your name there.  You were at the
6 autopsy, though.  Correct?
7      A.   Yes, I was.
8      Q.   Okay.  Do you know why it doesn't list you as being
9 at the autopsy?
10     A.   Dr. Olson forgot me, I guess.
11     Q.   Did you have any part in writing this report?
12     A.   No.  This is Dr. Olson's autopsy report.
13     Q.   At what point did you review the report?
14     A.   Um ...  I've -- more than likely soon after I got
15 it I would have looked at it.  Um ...  And I've recently
16 reviewed it.  Probably within the last two weeks.  But ...
17     Q.   If I scroll down a bit here on the first page, in
18 this first full paragraph under "History," it says "She was
19 found down a steep embankment approximately 10 to 20 feet from
20 the road."  Where did Dr. Olson get this measurement 10 to 20
21 feet from the road?
22          MS. HENDERSON:  I'll object to form as lacking
23 foundation.
24          You can answer, if you have knowledge.
25     A.   I don't have any knowledge as to where he got that.

Page 165

1 I mean, he was getting briefed by law enforcement.  He was
2 also -- I don't know if he was able to view pictures at the
3 time, but if we would have had those pictures developed, he
4 would have been able to view those.  So I'm not sure where he
5 got those measurements.
6 BY MS. PURACAL:
7      Q.   Okay.  So help me understand this, because
8 Lieutenant Pex says the body was 20 to 30 feet down; you've
9 said it's somewhere between 8 to 12 feet down; and we've got
10 Dr. Olson saying it's somewhere from 10 to 20 feet down.  So do
11 you all --
12     A.   All of them are --
13     Q.   Do you have an understanding of how far the body
14 was down the embankment?
15          MS. HENDERSON:  I'll object to the form of the
16 question as calling for speculation, as well as asked and
17 answered as far as personal knowledge.
18          You can answer again.
19     A.   This is 10 to 20 feet from the road.  The
20 embankment itself is probably 8 to 12 feet, the length from the
21 very top of the embankment to where she's laying.  Um ...  If I
22 went on the other side of that tall pile of -- I mean, the tall
23 grass and measured, it would be more than that.  The embankment
24 itself, in my opinion, was anywhere from, like, 10 to 12 feet.
25 So I don't know -- he's saying from the road.  And I don't know

Kristine M. Karcher
December 23, 2021

Page 202

1  original.
2          MS. HENDERSON:  And also, Jean, we will reserve the
3  right to read and sign, and we'll take a copy, please.
4          MR. DAVIS:  We'll take a copy as well as.  This is
5  Jesse Davis.  Thank you.
6          No questions on my end.
7          COURT REPORTER:  Ms. Schaffer?
8          MS. SCHAFFER:  Yeah, no questions on my end, but
9  we'll go ahead and order a copy of it as well.
10         MS. PURACAL:  There are no further questions at
11 this time, and I will go ahead and end it.
12         Ms. Karcher, thank you for your time today.  I
13 appreciate it.
14         THE WITNESS:  You're welcome.
15
16         (WHEREUPON, the deposition ended at the hour
17          of 3:26 p.m.)
18
19                     -o0o-
20
21
22
23
24
25

Page 203

1  STATE OF OREGON    )
                      )   ss. C E R T I F I C A T E
2  County of Douglas  )
3
4       I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6       Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, KRISTINE M. KARCHER, appeared
8  remotely before me via zoom videoconference at the time and
9  place set forth in the caption hereof;
10      That, at said time and place, I reported in stenotype
11 all testimony adduced and oral proceedings had in the foregoing
12 matter, to the best of my ability;
13      That, thereafter, my notes were reduced to typewriting,
14 and that the foregoing transcript, pages 1 through 202, both
15 inclusive, constitutes a full, true, and correct transcript of
16 all such testimony adduced and oral proceedings had and of the
17 whole thereof.
18      IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19 stamp this 14th day of January, 2022, in the City of Roseburg,
20 County of Douglas, State of Oregon.
21
22                    *Jean M. Kostner*
                      _____
23                    JEAN M. KOSTNER
                      Certified Court Reporter
24                    CSR No. 90-0051
25