Terence O'Connor
June 20, 2024

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor,<br>　　　　　Plaintiffs,<br><br>　　v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br>　　　　　Defendants.<br><br>VIDOCQ SOCIETY,<br>　　　　　Cross-Claimant,<br><br>　　v.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY | Civil No.<br>6:20-cv-01163-MK<br>(Lead Case)<br><br>VIDEOCONFERENCE<br>DEPOSITION |

Terence O'Connor
June 20, 2024

```
                                                   Page 2                                                          Page 4
 1  OF COOS BAY, and COOS COUNTY,    )                      1       Meredith Sawyer
            Cross-Defendants.        )                              HWS LAW GROUP
 2                                   )                      2       101 Southwest Main Street, Suite 1605
    NICHOLAS JAMES MCGUFFIN, as an   ) Civil Case No.               Portland, Oregon  97204
 3  individual and as guardian ad    ) 3:21-cv-01719-MK     3       (206) 262-1200
    litem, on behalf of S.M., a      )                              msawyer@hwslawgroup.com
 4  minor,                           )                      4          (Representing Vidocq Society)
             Plaintiffs,             )                      5       Laura Coffin, OSB #075825
 5                                   )                                for Eric S. DeFreest, OSB #920475
         v.                          )                      6       LUVAAS COBB
 6                                   )                              777 High Street, Suite 300
    OREGON STATE POLICE,             )                      7       Eugene, Oregon  97401
 7           Defendant.              )                              (541) 484-9292
    _____    )                      8       edefreest@luvaascobb.com
 8                                                                     (Representing Richard Walter)
 9                                                          9
10                                                         10   ALSO PRESENT:
             DEPOSITION UPON ORAL EXAMINATION              11       Mark Williamson
11                                                         12
                   OF TERENCE O'CONNOR                          REPORTED BY:
12                                                         13
13      BE IT REMEMBERED THAT, pursuant to the Oregon Rules of      Jean M. Kostner, CSR #90-0051
14  Civil Procedure, the deposition of TERENCE O'CONNOR was taken  14    Subcontractor for:
15  remotely via videoconference on behalf of the Plaintiffs,           US LEGAL SUPPORT
16  before JEAN M. KOSTNER, a Certified Court Reporter for Oregon, 15
17  on Thursday, the 20th day of June, 2024, at the hour of        16
18  9:00 a.m., in the State of Oregon.                             17
19                                                         18
20                                                         19
21                                                         20
22                                                         21
23                                                         22
24                                                         23
25                                                         24
                                                           25

                                                   Page 3                                                          Page 5
 1                 APPEARANCES                              1              INDEX OF TESTIMONY
 2                                                          2
    ON BEHALF OF THE PLAINTIFFS:
 3                                                          3   WITNESS                                        PAGE
        David B. Owens
 4      LOEVY & LOEVY                                       4      TERENCE O'CONNOR
        100 South King Street, Suite 100
 5      Seattle, Washington  98104                          5          Examination by Mr. Owens . . . . . . . . .    7
        (312) 590-5449
 6      david@loevy.com                                     6          Further Examination by Mr. Owens . . . . .   56
 7      Andrew C. Lauersdorf, OSB #980739
        Janis C. Puracal, OSB #132288                       7          Examination by Ms. Coffin  . . . . . . . .   57
 8      MALONEY LAUERSDORF REINER, PC
        1111 East Burnside Street, Suite 300                8
 9      Portland, Oregon  97214                             9
        (503) 245-1518
10      acl@mlrlegalteam.com                               10
        jcp@mlrlegalteam.com
11                                                         11
12  ON BEHALF OF THE DEFENDANTS:                           12
13      Sarah R. Henderson, OSB #153474                    13
        LAW OFFICE OF ROBERT E. FRANZ, JR.
14      Post Office Box 62                                 14
        Springfield, Oregon  97477
15      (541) 741-8220                                     15
        shenderson@franzlaw.comcastbiz.net
16         (Representing City of Coquille, City of Coos Bay, 16
           Coos County, Craig Zanni, Chris Webley, Eric
17         Schwenninger, Sean Sanborn, Ray McNeely, Kris   17
           Karcher, Pat Downing, Mark Dannels, Kip Oswald,
18         Michael Reaves, David Zavala, Anthony Wetmore,  18
           Shelly D. McInnes)
19                                                         19
        Todd Marshall, OSB #112685
20      OREGON DEPARTMENT OF JUSTICE                       20
        100 Southwest Market Street
21      Portland, Oregon  97201                            21
        (971) 673-1880
22      todd.marshall@doj.state.or.us                      22
           (Representing Oregon State Police, John Riddle,
23         Susan Hormann, Mary Krings, Kathy Wilcox)       23
24                                                         24
25                                                         25
```

Terence O'Connor
June 20, 2024

| | Page 6 |
|---|---|
| 1 | INDEX OF EXHIBITS |
| 2 | DEPOSITION |
| 3 | EXHIBIT NO.    DESCRIPTION                              PAGE |
| 4 | |
| 5 | 1    Notice of Deposition  (17 pages)              8 |
| 6 | 2    Responses and Objections to Plaintiff's |
| 7 |      First Revised FRCP 30(b)(6) Notice and |
|   |      FRCP 34 Request for Production of |
|   |      Documents  (137 pages)                       12 |
| 8 | |
| 9 | 3    2007 Coquille Police Department |
|   |      Policy Manual (346 pages)                    24 |

Page 7

1      TERENCE O'CONNOR,
2  called as a witness on behalf of the Plaintiffs, having been
3  first duly sworn to tell the truth, the whole truth, and
4  nothing but the truth, was examined and testified as follows:
5         THE WITNESS:  Yes.
6                 EXAMINATION
7  BY MR. OWENS:
8      Q.  Good morning, sir.  Could you state and spell your
9  name for the record, please.
10     A.  My name is Terence O'Connor, spelled.
11 T-E-R-E-N-C-E; last name O'Connor, O, apostrophe, C-O-N-N-O-R.
12     Q.  And you understand that you're here to provide
13 testimony today as the corporate designee on certain topics for
14 the City of Coquille.  Correct?
15     A.  Correct.
16     Q.  And we'll go ahead and just mark this as Exhibit
17 Number 1.  And since we're doing this on -- via Zoom, the way
18 that exhibits work is I'll show you them on my screen after
19 marking them, and I'll put them in the chat as well to send to
20 other folks.  But because it's a technological issue
21 electronically and I'm not particularly good at technology, if
22 there are any issues you have with wanting me to zoom in or
23 zoom out on a document or to scroll up or down, let -- feel
24 free to let me know.  Okay?
25     A.  Okay.

Page 8

1         (Document marked for identification as Deposition.
2         Exhibit 1.)
3         MS. HENDERSON:  Just FYI, before you jump in,
4  David, we're having a weird issue on Terence's computer, so I
5  may just -- I'm just putting mine in front of him so he can
6  see.
7         MR. OWENS:  Okay.
8         MS. HENDERSON:  We still have audio, but we don't
9  have --
10        MR. OWENS:  Yeah.
11        MS. HENDERSON:  -- video for some reason.
12        MR. OWENS:  Okay.  All right.
13        MR. MARSHALL:  Fun times.
14        MR. OWENS:  Okay.
15        THE WITNESS:  I can look forward, then.
16        MR. OWENS:  Okay.  Great.
17 BY MR. OWENS:
18     Q.  So as I mentioned, you're going to be providing
19 testimony today under oath on behalf of the City of Coquille on
20 the topics that you've been designated to provide testimony
21 for.  Correct?
22     A.  Correct.
23     Q.  And I just want to show you Exhibit 1, which is the
24 notice of deposition, which I'll also share in the chat for all
25 counsel so they have a copy of that.

Page 9

1         All right.  Mr. O'Connor, are you able to see that?
2      A.  Yes.
3      Q.  Got it.  And I'm not going to go through all 17
4  pages of it now unless you would like me to, but is this a
5  document that you're familiar with and prepared to provide
6  testimony about some of the topics contained herein?
7      A.  Yes.
8      Q.  Great.  And what did you do to prepare for this
9  deposition today?
10     A.  Essentially I was given some documents from
11 testimony that had already been provided by Officer Sanborn,
12 Chief Reaves, and Chief Dannels.
13     Q.  Okay.  Did you read the testimony that had been
14 provided to you?
15     A.  I did not -- I did not read all gazilion pages that
16 were composed.  I just referenced a few sections just to get a
17 feel for, you know, what kind of questions might be asked to
18 get the ol' -- get the ol' brains working.
19     Q.  Fair enough.  And you mentioned three different
20 deposition transcripts, and that was of former Chief Reaves.
21 Is that right?
22     A.  Correct.
23     Q.  And then former Chief Dannels.  Is that correct?
24     A.  Correct.
25     Q.  And who was the third one?  I missed it.

Terence O'Connor
June 20, 2024

Page 14

1 testimony that was provided in the excerpts that we just went
2 over in Exhibit 2?
3    A.  No, I have not.
4    Q.  Did you talk to former Officer Sanborn about the
5 testimony that was provided to you that was highlighted in
6 Exhibit Number 2?
7    A.  No, I have not.
8    Q.  Are there any other steps or aspects of what you
9 did to prepare for this deposition today that you haven't told
10 me about already?
11    A.  No.  I've told you everything I've done.
12    Q.  Got it.  And just to get us on the same page, what
13 was your -- what's been your experience, just generally, as an
14 employee for the City of Coquille?
15    A.  Generally I was employed as the city manager from
16 about I think it was March of 2000 until 2010.
17    Q.  Okay.  Do you know who the city manager became
18 after you left?
19    A.  Uh, gosh.  Yeah.  It was a fellow that's now in
20 Pennsylvania.  I can't remember his name.
21    Q.  Hm.
22    A.  Young fellow.  Well, he was young at that time.
23    Q.  Got it.  So as I understand it -- well, let me just
24 ask it this way.  In any of the deposition transcripts that you
25 read or were provided in advance of the deposition today, was

Page 15

1 there anything that you noticed, even if you didn't read all of
2 it for content, that you disagreed with?
3    A.  No.
4    Q.  Was there anything that stood out to you as
5 inaccurate?
6    A.  No.
7    Q.  Was there anything that you thought was a
8 misrepresentation?
9    A.  Nothing that -- no.
10    Q.  All right.  So I'm going to go back to Exhibit
11 Number 1.  And we're going to just go through and discuss some
12 of the topics that haven't been designated, and I'm going to
13 try to -- my best to not repeat questions that were asked in
14 those 137 pages.  But I don't have encyclopedic knowledge of
15 them and also it may be necessary for us to get on the same
16 page so I can ask follow-up questions.  Okay?
17    A.  Okay.
18    Q.  All right.  And so I just want to make sure that
19 we're on the same page, that in 2000 and through 2011 the City
20 of Coquille had a police department that was about eight police
21 officers.  Is that correct?
22    A.  I believe it varied between like six and eight
23 depending on employee's circumstances, yes.
24    Q.  And that the person responsible for making policy
25 for the Coquille Police Department during that period of time

Page 16

1 would have been the chief of police.  Is that correct?
2    A.  That is correct.
3    Q.  All right.  Who was the chief of police in 2000?
4    A.  2000 was Mike Reaves.
5    Q.  Okay.  And I believe that Mr. Dannels became the
6 chief in August of 2008.  Is that correct?
7    A.  Yes.
8    Q.  And was he the chief throughout beyond 2011?
9    A.  No.  He -- he left to go back to Arizona before
10 that time.  Just prior to that.  I believe it might have been
11 2010 or thereabouts.  Maybe the latter half of 2010.
12    Q.  Okay.  Who was the chief at the latter half of 2010
13 and into 2011?
14    A.  Um, it would have been the captain at that time.  I
15 promoted her.  Her name is Janice -- Janice Blue.  She followed
16 Mark Dannels.
17    Q.  And was the last name Blue?
18    A.  I believe that's correct.
19    Q.  B-L-U-E?
20    A.  B-L-U-E.
21    Q.  Thank you.  So as the city manager, what type, if
22 any, of oversight did that person have in 2000 over the
23 Coquille Police Department?
24    A.  City manager's responsibility for oversight of the
25 police department essentially started and ended with the police

Page 17

1 chief.  He was the department head for -- for that unit of the
2 city, and my requirements -- or I guess my responsibilities
3 were with him and was not involved in any day-to-day or
4 organizational operations as much as they existed on a -- on a,
5 shall we say, macro level.  I didn't delve into the management
6 of the department itself, only with the chief and the broader
7 policy questions as the department related to the city.
8    Q.  Okay.  There was testimony in those pages that the
9 City at some point moved from a policy manual that had been --
10 that was on its own that had been generated to a policy manual
11 that had been prepared by Lexipol.  Are you familiar with that
12 transition?
13    A.  Yes.
14    Q.  Can you tell me --
15    A.  Maybe not completely, not necessarily, but yes, I
16 remember that time period.
17    Q.  Got it.  And just one thing I should have mentioned
18 earlier, Mr. O'Connor, is that it's very important that we only
19 have one person talking at a time.  So I'm going to ask you
20 some questions that are very obvious that you're going to be
21 very familiar with --
22    A.  Okay.
23    Q.  -- and in normal conversation it would be natural
24 for you to be, like, oh, I know what he's asking me and to just
25 start answering, and it wouldn't be rude at all.  And so I'm

Terence O'Connor
June 20, 2024

Terence O'Connor
June 20, 2024

Page 38

1  made at city council meetings?
2    A.  Yes.
3    Q.  If complaints were made about the quality of police
4  work at a city council meeting, were there any formal
5  procedures for what would happen in investigating or inquiring
6  about those complaints?
7    A.  Depending upon the nature of the complaint, it
8  would be passed to me to provide a response to the council, if
9  they wanted additional information on that particular matter;
10 in which case I would then get with the police department to
11 ascertain whether what was being said was something that was
12 accurate.  And if it was, you know, what would be the response?
13 And that response would then be given back to the city council.
14   Q.  Okay.  And do you have any recollection of
15 complaints having been made about the quality of police work in
16 the Coquille Police Department while you were the city manager?
17   A.  Yes.
18   Q.  And do you recall complaints having been made about
19 the honesty of officers' conduct during investigations?
20   A.  No.
21   Q.  Do you have any memory of complaints being made
22 about officers -- well, actually let me just read it to you
23 directly so I'm not paraphrasing.
24   A.  Okay.
25   Q.  Okay.  Actually, let me just back up.  If

Page 39

1  complaints were made by citizens about the police department at
2  a city council meeting, is that something that -- how would you
3  go about discussing that with the mayor, if at all?
4    A.  I wouldn't necessarily discuss it with the mayor.
5  I would discuss it with the city council.  If the mayor had a
6  particular question -- the city council was pretty responsive
7  to the idea that it was the entire city council that acted as
8  the governing body, not the mayor, under our form of
9  government.  So to the extent of which the mayor had a
10 question, he would ask the question there at the council
11 meeting.
12         The response again, as I said before, would either
13 result in my going and having conversations with the police
14 department and then reporting back to council, if not having
15 that matter discussed openly right there at the city council
16 meeting with the police chief in attendance.
17   Q.  Yeah.  You said a moment ago something about "our
18 form of government."  What did you mean by that?
19   A.  It's a city manager form of government, which means
20 the mayor holds ceremonial responsibilities but no
21 administrative or directive responsibilities in the
22 organization, as opposed to a strong mayor where the mayor is
23 the chief executive officer of the city.
24         In Coquille the city -- or the city manager is the
25 chief executive officer, and the mayor is just a member of the

Page 40

1  council, who is elected by the council.
2    Q.  I see.  Thank you.
3         So do complaints about officers -- that officers
4  abuse their power essentially by writing traffic tickets and
5  performing arbitrary stops, things like that, does that sound
6  like a familiar complaint that was brought to the City of
7  Coquille while you were the city manager?
8    A.  I would -- I would -- I would say yes, that's
9  probably accurate.
10   Q.  Okay.  And the City was aware of a group of people
11 called The Concerned Citizens of Coquille.  Correct?
12   A.  Correct.
13   Q.  And The Concerned Citizens of Coquille asked for a
14 civilian review board be established.  Correct?
15   A.  I don't recall that, but I remember the concerned
16 citizens.
17   Q.  Okay.  What do you remember about the concerned
18 citizens?
19   A.  Just as you described it.  It was a group of
20 citizens, some in the city, some outside the city, that had
21 concerns about traffic stops and things of that nature and
22 officer attitudes.
23   Q.  Okay.  Were any steps done to implement any changes
24 or in response to the complaints made by The Concerned Citizens
25 of Coquille?

Page 41

1    A.  At that particular time, we were transitioning from
2  Chief Reaves to Chief Dannels, and one of the directives, if
3  you will, that I gave Chief Dannels was he needed to do more in
4  engaging with the community and doing a better job of
5  interfacing police officer responses, tactics, interfacing with
6  the community to alleviate some of the perceived concerns that
7  the citizens had brought forth.
8    Q.  And was -- was there any kind of ever former --
9  excuse me, formal citizen review or participation in police
10 policy-making implemented by the City of Coquille?
11   A.  No.
12   Q.  Why not?
13   A.  City did not feel at the time that one was
14 warranted.
15   Q.  Can you tell me why?
16   A.  That was a policy decision made by the city
17 council.  It was a political decision.
18   Q.  Okay.  Anything else you can tell me about that?
19   A.  No.
20   Q.  Okay.  Between 2000 and 2012, did the City have any
21 written policies about how to conduct identification
22 procedures?
23   A.  Clarification, "identification procedures."
24   Q.  Sure.  Sometimes police refer to them as a six-pack
25 or a photo array.  You put somebody in a lineup, things like --

Page 42

```
 1    A.   No.  Not to my knowledge.
 2         MR. OWENS:  We've been going for about an hour, and
 3  I don't expect us to be here all day, but we'll take breaks
 4  from time to time.  And if at any point you need a break, feel
 5  free to ask.
 6         I'm going to just take a quick comfort break here.
 7  If we can just go off the record for about five minutes and use
 8  the bathroom.
 9         (Recess taken.)
10         MR. OWENS:  We're back on the record.  My
11  apologies.
12  BY MR. OWENS:
13    Q.   Mr. O'Connor, I just wanted to ask a couple of
14  other questions about more specifically one of the topics.  And
15  I can show you the notice, but I know you're familiar with it.
16  It pertains to the death investigation involving Leah Freeman
17  and officers' work and action pursuant to that investigation.
18  You're familiar with that topic?
19    A.   Yes.
20    Q.   Got it.  And am I right that it's the City of
21  Coquille's position that the officers involved in the
22  investigation conformed to the practices and policies, customs
23  of the City of Coquille and their actions?
24    A.   Yes.
25    Q.   And the -- am I right that it's the City's position
```

Page 43

```
 1  that none of the officers who participated in the Leah Freeman
 2  death investigation departed from or violated the practices of
 3  the Coquille Police Department?
 4    A.   That's correct.
 5    Q.   And one of the topics sort of also related to the
 6  Leah Freeman death investigation is the allegations made in the
 7  complaint in this action.  You're familiar with that?
 8    A.   No.  Could you clarify that for me, please.
 9    Q.   Sure.  You are giving a deposition today on behalf
10  of the City of Coquille because a lawsuit has been filed.
11  Right?
12    A.   Right.
13    Q.   And that lawsuit names some former Coquille Police
14  Department officers and chiefs of police as defendants.
15  Correct?
16    A.   Correct.
17    Q.   That lawsuit also names the City of Coquille as a
18  defendant in the lawsuit.  Correct?
19    A.   Correct.
20    Q.   And the lawsuit alleges that there has been
21  misconduct committed that caused Mr. McGuffin's wrongful
22  conviction.  Correct?
23    A.   Correct.
24    Q.   And the City denies that it or any of its officers
25  committed any misconduct.  Correct?
```

Page 44

```
 1    A.   Correct.
 2    Q.   All right.  And so the actions that were undertaken
 3  by Chief Dannels, Officer Sanborn, others, the City of Coquille
 4  has no problem with those actions, even having the opportunity
 5  to have reviewed them during the course of responding to this
 6  lawsuit.  Right?
 7    A.   Correct.
 8    Q.   Shifting gears, I know you mentioned something
 9  about there's some record retention policies that pertain to
10  some things that have to be purged, some things are kept,
11  et cetera.  Does that topic sound familiar?
12    A.   Yes.
13    Q.   Am I right that the documents generated pursuant to
14  the Leah Freeman death investigation, since it was a homicide
15  investigation, should have been subject to permanent retention?
16    A.   Correct.
17    Q.   Were Coquille police officers between 2000 and 2012
18  permitted to destroy their handwritten notes?
19    A.   I do not believe that there was any requirement for
20  them to keep handwritten notes.
21    Q.   If they made handwritten notes, were they required
22  to produce them, or were they permitted to destroy them?
23    A.   I do not know.  That would be a -- that would be a
24  departmental policy.
25    Q.   Okay.  So one topic is -- I asked a little bit
```

Page 45

```
 1  about citizen complaints --
 2    A.   Yes.
 3    Q.   -- just a few minutes ago.  And I know that there's
 4  a disciplinary process that exists for complaints that are
 5  filed, say, against a patrol officer, and that's investigated
 6  by a supervisor, something like that.  Right?
 7    A.   Right.
 8    Q.   What if the complaint is made against the chief of
 9  police himself?  How would that have been handled between 2000
10  and 2012 for the City of Coquille Police Department?
11    A.   That would have been handled by me as his
12  supervisor.
13    Q.   And did you sustain any complaints against Chief
14  Reaves?
15    A.   No.
16    Q.   Did you sustain any complaints against Chief
17  Dannels?
18    A.   No.
19    Q.   Did you sustain any complaints against Chief Blue?
20    A.   No.
21    Q.   Did you ever conduct any internal audits from the
22  city manager side to review citizen complaints made against the
23  police department in your tenure?
24    A.   No.  Well, let me -- let me rephrase that.  As much
25  as that there were complaints made, if they were not
```

Terence O'Connor
June 20, 2024

Page 50

1  Number 1 again.
2          And we've been talking specifically about the death
3  of Leah Freeman, which is Topic Number 12.  Do you see that?
4      A.   Yes.
5      Q.   Okay.  And I want to go down very slowly because my
6  computer doesn't like all of the things I have open, so thanks
7  for your patience.
8          All right.  Do you see Topic Number m. here?
9      A.   Yes.
10     Q.   Okay.  And that says "Whether or not CPD and its
11 employees adhered to or complied with all of Coquille's,
12 including CPD's, policies, practices, and procedures during
13 their involvement in any investigation of the death of Leah
14 Freeman, investigation of Nicholas McGuffin, and the
15 prosecution of Nicholas McGuffin."  Do you see that?
16     A.   Yes.
17     Q.   And I asked you earlier about the Leah Freeman
18 aspect of this, but I didn't mention Nicholas McGuffin.  And so
19 I'm going to do that now.  Okay?
20     A.   Okay.
21     Q.   It's the City's testimony that the CPD and all of
22 the employees adhered to and complied with Coquille policies
23 and practices as it pertains to the investigation of Nicholas
24 McGuffin and his prosecution specifically.  Correct?
25     A.   Correct.

Page 51

1      Q.   And it's the City's testimony, even today, years
2  after this lawsuit has been initiated and years after the
3  charges against Mr. McGuffin have been dismissed, that no
4  employee did anything that violated his constitutional rights
5  or departed from Coquille practice.  Correct?
6      A.   Correct.
7      Q.   All right.  Topic Number 13 pertains to the
8  engagement and reliance upon Richard Walter, Mark McLish, and
9  the Vidocq Society during the investigation and prosecution of
10 Nicholas McGuffin.  Do you see that?
11     A.   Yes.
12     Q.   All right.  Now, some of -- there are several
13 topics -- subtopics here, and based upon the testimony that
14 you've given me today so far, I'm going to try to cut to the
15 chase.  Is there any additional testimony that you can provide
16 to me other than that which has already been provided in
17 designations about the engagement and reliance upon Richard
18 Walter, Mark McLish, or the Vidocq Society by the City of
19 Coquille Police Department?
20     A.   That's correct.
21     Q.   All right.  So let me just ask a better question.
22 Am I right that you don't have any additional testimony that
23 you can provide about this topic?
24     A.   Correct.
25     Q.   All right.  Now, Topic Number 14 pertains to

Page 52

1  Coquille's, including CPD's, engagement and collaboration with
2  ABC News to publicize information about the investigation of
3  Nicholas McGuffin and the death of Leah Freeman.  Do you see
4  that?
5      A.   Yes, I do.
6      Q.   All right.  Can you provide any testimony about the
7  decision-making process and basis for Coquille's decision to
8  engage and collaborate with ABC News?
9      A.   My recollection of that event was that ABC News
10 contacted Chief Dannels with a request to come to Coquille and
11 do a story, and that Chief Dannels conferred with DA Frasier to
12 clear that aspect, that it was not going to jeopardize
13 anything.  And as a result of DA Frasier not having any
14 objections and Chief Dannels not having any objections, ABC
15 News was told that they could come to Coquille.
16     Q.   Got it.  And I guess what I'm wondering is the
17 decision to become participat- -- to have Coquille officers and
18 the chief of police participate in the ABC investigation, is
19 that something that was within the policy-making and decision
20 authority of Chief Daniel -- Dannels, excuse me?
21     A.   Yes.
22          MS. SAWYER:  Object to form.
23          Could you -- could you reread the question back?
24          COURT REPORTER:  Sure.
25          (Reporter read back last question.)

Page 53

1          MS. SAWYER:  Thank you.
2  BY MR. OWENS:
3      Q.   All right.  Did you have any involvement in a
4  dispute between Chief Blue's complaints about Officer McNeely?
5      A.   Yes.
6      Q.   What was your involvement?
7          MS. HENDERSON:  Just to interject, can we stipulate
8  that this is under protective order, the employment stuff?  I
9  believe we've done it all under protective order -- and we're
10 going to answer -- in previous depositions.
11         MR. OWENS:  Sure.
12         MS. HENDERSON:  Thanks.
13         Go ahead.
14         THE WITNESS:  Should I answer?
15         MS. HENDERSON:  Yeah, you can answer.
16     A.   It was personnel actions, so the city manager was
17 required by city policy to conduct a hearing.
18 BY MR. OWENS:
19     Q.   Okay.  Was that a public hearing?
20     A.   No.  A personnel matter.
21     Q.   Got it.  What was the result of the hearing?
22     A.   The result of the hearing was that I found that
23 Officer McNeely did in fact violate policies and procedures of
24 the department and the City and that disciplinary action should
25 be implemented.

Page 58

```
 1  evidence from Richard Walter in their investigation of the
 2  case?
 3       A.   Any evidence?
 4       Q.   Yes.
 5       A.   No.
 6       Q.   To your knowledge from those briefings, did the
 7  City of Coquille provide or give to Mr. Walter any evidence?
 8  Did he have -- in other words -- let me rephrase.
 9            Did Mr. Walter ever have in his custody or control
10  any evidence given to him by the City of Coquille related to
11  the investigation?
12            MR. OWENS:  Objection; form and foundation.
13  BY MS. COFFIN:
14       Q.   Okay.  Let me ask it a different way.  Did
15  Mr. Walter, to your memory, ever participate in any of those
16  briefings?
17       A.   Not with me.
18       Q.   Was it your impression that he was one of the
19  people investigating the case along with police officers?
20            MR. OWENS:  Objection to the form of the question
21  and foundation.
22            THE WITNESS:  So does that mean I answer or not?
23            MS. HENDERSON:  Yes, you can answer.  Yes.
24            MR. OWENS:  Yes, I'm sorry.
25            THE WITNESS:  I'm sorry.  Now I'm lost again.
```

Page 59

```
 1  Sorry.
 2            MR. OWENS:  That's all right.
 3       A.   He never participated in any meetings with any of
 4  those briefings.  And let me clarify what those briefings were.
 5  Those briefings were typically either at a staff meeting where
 6  we generally had all department heads that got together to just
 7  talk about the operational issues that we saw coming for the
 8  oncoming week or issues that arose that we needed to come
 9  together to think about how we were going to respond to.
10            They were not detailed operational briefings, like
11  you would see in a movie or something.  There's no charts.
12  There's no -- there's no pointers.  There's -- it's just a
13  verbal communication to me, as the chief executive officer, to
14  keep me apprised of where things were and how things were
15  progressing.  It wasn't the detail work.  It wasn't getting
16  involved in the operational aspects, so to speak, of any
17  department.
18            So with respect to the question about the Vidocq
19  Society, it would have been a conversation of, you know, these
20  guys -- these guys approached us and, you know, we've done some
21  background work in seeing what they've done elsewhere in the
22  country, so let's participate with them, and, you know, it's a
23  cold case; let's see what maybe some fresh eyes could do.
24            Was evidence transferred?  No.  Was documentation?
25  I'm supposing that it was.  But certainly not evidence in the
```

Page 60

```
 1  sense of, you know, here's Exhibit A in the courtroom, you
 2  know, and your chain of custody, none of that was violated.
 3  BY MS. COFFIN:
 4       Q.   Thank you.  And to your knowledge, did the City
 5  have any contract with Richard Walter?
 6       A.   No.
 7       Q.   Did the City, to your knowledge, have any contract
 8  with the Vidocq Society?
 9       A.   No.
10            MS. COFFIN:  Those are -- those are all of my
11  questions.
12            THE WITNESS:  Yes, ma'am.
13            MS. COFFIN:  Thank you.
14            MR. MARSHALL:  We will reserve our questions for
15  the time of trial.  Thank you.
16            MR. OWENS:  I think we're done.
17
18            (WHEREUPON, the deposition ended at the hour
19            of 11:54 a.m.)
20
21                          -o0o-
22
23
24
25
```

Page 61

```
 1  STATE OF OREGON      )
                         )   ss. C E R T I F I C A T E
 2  County of Douglas    )
 3
 4       I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
 5  state of Oregon, do hereby certify that:
 6       Pursuant to Notice, TERENCE O'CONNOR appeared remotely
 7  before me via Zoom videoconference at the time and place set
 8  forth in the caption hereof;
 9       That, at said time and place, I reported in stenotype
10  all testimony aduced and oral proceedings had in the foregoing
11  matter, to the best of my ability;
12       That, thereafter, my notes were reduced to typewriting,
13  and that the foregoing transcript, pages 1 through 60, both
14  inclusive, constitutes a full, true, and correct transcript of
15  all such testimony aduced and oral proceedings had and of the
16  whole thereof.
17       IN WITNESS WHEREOF, I have hereunto set my hand and CSR
18  stamp this 15th day of August, 2024, in the City of Roseburg,
19  County of Douglas, State of Oregon.
20
21
22                          JEAN M. KOSTNER
                            Certified Court Reporter
23                          CSR No. 90-0051
24
25
```