Sean M. Sanborn
December 16, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NICHOLAS JAMES MCGUFFIN, as an        )
individual and as guardian ad         )
litem, on behalf of S.M., a           ) Civil No.
minor,                                ) 6:20-cv-01163-MK
                                      )
            Plaintiffs,               ) VIDEOCONFERENCE
                                      ) DEPOSITION
     v.                               )
                                      )
MARK DANNELS, PAT DOWNING,            )
SUSAN HORMANN, MARY KRINGS,           )
KRIS KARCHER, SHELLY MCINNES,         )
RAYMOND MCNEELY, KIP OSWALD,          )
MICHAEL REAVES, JOHN RIDDLE,          )
SEAN SANBORN, ERIC                    )
SCHWENNINGER, RICHARD WALTER,         )
CHRIS WEBLEY, ANTHONY WETMORE,        )
KATHY WILCOX, CRAIG ZANNI,            )
DAVID ZAVALA, ESTATE OF DAVE          )
HALL, VIDOCQ SOCIETY, CITY OF         )
COQUILLE, CITY OF COOS BAY,           )
COOS COUNTY, and OREGON STATE         )
POLICE,                               )
                                      )
            Defendants.               )
_____ )

DEPOSITION UPON ORAL EXAMINATION

OF SEAN M. SANBORN

Sean M. Sanborn
December 16, 2021

## Page 2

1    BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
2  Civil Procedure, the deposition of SEAN M. SANBORN, an
3  adverse-party witness, was taken remotely via videoconference
4  on behalf of the Plaintiffs, before JEAN M. KOSTNER, a
5  Certified Court Reporter for Oregon, on Thursday, the 16th day
6  of December, 2021, at the hour of 9:00 a.m., in the State of
7  Oregon.

## Page 3

```
 1              APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4      Andrew C. Lauersdorf, OSB #980739
        Christine A. Webb, OSB #184744
 5      Janis C. Puracal, OSB #132288
        MALONEY LAUERSDORF, REINER, PC
 6      111 East Burnside Street, Suite 300
        Portland, Oregon  97214
 7      (503) 245-1518
        acl@mlrlegalteam.com
 8      caw@mlrlegalteam.com
        jcp@mlrlegalteam.com
 9
10  ON BEHALF OF THE DEFENDANTS:
11      Sarah R. Henderson
        LAW OFFICE OF ROBERT E. FRANZ, JR.
12      Post Office Box 62
        Springfield, Oregon  97477
13      (541) 741-8220
        shenderson@franzlaw.comcastbiz.net
14        (Representing City of Coquille, City of Coos Bay,
          Coos County, Craig Zanni, Chris Webley, Eric
15        Schwenninger, Sean Sanborn, Ray McNeely, Kris
          Karcher, Pat Downing, Mark Dannels, Kip Oswald,
16        Michael Reaves, David Zavala, Anthony Wetmore,
          Shelly D. McInnes)
17
        Todd Marshall
18      OREGON DEPARTMENT OF JUSTICE
        100 Southwest Market Street
19      Portland, Oregon  97201
        (503) 947-4700
20      todd.marshall@doj.state.or.us
          (Representing Oregon State Police, John Riddle,
21        Susan Hormann, Mary Krings, Kathy Wilcox)
22      Karin L. Schaffer
        WOOD SMITH HENNING & BERMAN LLP
23      12755 Southwest 69th Avenue, Suite 100
        Portland, Oregon  97223
24      (971) 256-4023
        kschaffer@wshblaw.com
25        (Representing Vidocq Society and Richard Walters)
```

## Page 4

```
 1  ALSO PRESENT:
 2      Craig Zanni
        Chris Webley
 3      Richard Walter
 4
    REPORTED BY:
 5
        Jean M. Kostner, CSR #90-0051
 6       Subcontractor for:
            US LEGAL SUPPORT
```

## Page 5

```
 1                INDEX OF TESTIMONY
 2
 3  WITNESS                                              PAGE
 4     SEAN M. SANBORN
 5         Examination by Mr. Lauersdorf  . . . . . . .    7
```

Sean M. Sanborn
December 16, 2021

## Page 6

```
 1              INDEX OF EXHIBITS
 2   DEPOSITION
 3   EXHIBIT NO.        DESCRIPTION              IDENTIFIED
 4
 5      1     Oregon Criminal Justice Information
              Records Inquiry System  (18 pages)      77
 6
        2     Control Holds - Bent Arm Takedown       85
 7
        3     Geddry Blog - Welcome to Coquille
 8            (85 pages)                              98
 9      5     Brady List For Coos County             109
10      6     Dannel's Press Conference  (5 pages)   139
11      7     ABC News Video - What Happened to
              Leah Freeman                           165
12
        9     ABC News Video - What Happened to
13            Leah Freeman                           173
14     13     Coquille Police Incident Report
              Kyla Stevens  (10 pages)               181
15
```

## Page 7

```
 1              SEAN M. SANBORN,
 2   called as a witness on behalf of the Plaintiffs, having been
 3   first duly sworn to tell the truth, the whole truth, and
 4   nothing but the truth, was examined and testified as follows:
 5              THE WITNESS:  I do.
 6                     EXAMINATION
 7   BY MR. LAUERSDORF:
 8       Q.  Good morning, Mr. Sanborn.  My name is Andy
 9   Lauersdorf.  You and I have never met before.  Is that correct?
10       A.  That's correct, sir.
11       Q.  But you understand that I am an attorney
12   representing the plaintiffs in this matter?
13       A.  I do.
14       Q.  And this is a matter -- this is a lawsuit filed by
15   Mr. McGuffin against a number of defendants, including
16   yourself.  Is that correct?
17       A.  Yes, sir.
18       Q.  Okay.  Could you please state your name as given at
19   birth.
20       A.  Sean Michael Sanborn, S-A-N-B-O-R-N.
21       Q.  Have you ever gone by any nicknames?
22       A.  I have not.
23       Q.  Have you ever legally changed your name?
24       A.  I have not.
25       Q.  Have you ever used any aliases?
```

## Page 8

```
 1       A.  No.
 2       Q.  Okay.  What's your place and date of birth?
 3       A.  I was born in Coos Bay, Oregon, on March 24th,
 4   1979.
 5       Q.  Okay.  What's your current address?
 6       A.  Home address?
 7       Q.  You can give a business address.  That's fine.
 8       A.  250 North Baxter Street, Coquille, Oregon 97423.
 9       Q.  And what's your current phone number there?
10       A.  (541) 396-7874 is my desk number.
11       Q.  Okay.  I can see from your uniform that you are
12   currently employed by the Coos County Sheriff's Office.  Is
13   that correct?
14       A.  Yes, sir.
15       Q.  And what's your title at the sheriff's office?
16       A.  Sergeant.
17       Q.  When did you start there?
18       A.  I started at the sheriff's office in March of 2013.
19       Q.  Okay.  And what's your DPSST?
20       A.  48434.
21       Q.  Okay.  So you're here today to be deposed.  Do you
22   understand that?
23       A.  Yes, sir.
24       Q.  And this is the time and place previously agreed
25   upon.  It's Thursday, December 16th, 2021, and it is
```

## Page 9

```
 1   approximately 9:03 a.m.  Do you agree with all of that?
 2       A.  I do.
 3       Q.  Okay.  The deposition is being conducted using the
 4   cloud-based peer-to-peer software platform Zoom over a URL
 5   provided by U.S. Legal Support.  Do you understand that?
 6       A.  Yes, sir.
 7       Q.  And are you okay with that?
 8       A.  Yes.
 9       Q.  Okay.  Will you please state your current location
10   for the record.
11       A.  I am at The Mill Casino and Hotel.  I'm not certain
12   of the address.
13       Q.  Is that in North Bend, Oregon?
14       A.  It is, sir.
15       Q.  And that's in Coos County.  Is that correct?
16       A.  Correct.
17       Q.  Okay.  Are there other people in the room with you?
18       A.  Yes.  My attorney, Ms. Sarah Henderson, is in the
19   room with me.
20       Q.  Okay.  Anyone else?
21       A.  No.
22       Q.  Okay.  You don't plan to use any iPhones or other
23   electronic devices during your deposition, do you?
24       A.  I do not.
25       Q.  Okay.  Okay.  I understand that Ms. Henderson is
```

Sean M. Sanborn
December 16, 2021

Page 46

1 So depending on what you did that day, then you are evaluated
2 on your performance for that day at the end of each day.  So in
3 that sense, I was.
4      Q.   Okay.  And are those written evaluations?
5      A.   Yes.
6      Q.   So where would the records of those evaluations be
7 found?
8      A.   I have no idea where they're at now.
9      Q.   So if you had been out on a call with Mr. Bryant
10 during your FTEP period and something came up and a witness or
11 a suspect needed to be interviewed and Bryant said, "Have at
12 it; go interview this person," and you conducted the interview,
13 then later Bryant would give a written evaluation of your
14 competency in conducting that interview?
15      A.   Yes.  And it is in several areas, and I don't
16 recall if that was a specific area.  I know it is for the Coos
17 County Sheriff's Office, interviewing and interactions with
18 people, but I don't recall if it was for Coquille or not.  I
19 just know that I did -- I did receive an FTEP evaluation at the
20 end of every -- every shift or shortly thereafter.
21      Q.   Okay.  Fair enough.  And then you would go over
22 those evaluations with your FTO?
23      A.   Yes.
24      Q.   Okay.  But as far as testing you, like written exam
25 or some kind of computer thing where you sit down and are asked

Page 47

1 a series of questions about interviewing and interrogation
2 techniques, did they do anything like that?
3      A.   Not that I recall.
4      Q.   Okay.  And did they have any written policies or
5 procedures specific to interviewing and interrogating
6 techniques?
7      A.   I don't remember.  I'm sorry.
8      Q.   Okay.  That's okay.
9           During your employment with the Coquille PD, did
10 the City of Coquille or the Coquille Police Department provide
11 you any training on confirmation or expectation bias and how
12 those phenomena affect criminal investigations?
13      A.   Can you repeat the question, please.  There was a
14 lot there.
15      Q.   Did they provide you any training about bias and
16 how bias can affect an investigation?  Confirmation bias,
17 expectation bias, those kind of things.
18      A.   Not that I recall.
19      Q.   Do you know if they had any written policies or
20 procedures on how to control for bias during a training
21 investigation?
22      A.   I don't remember.
23      Q.   Did they provide any training on documenting a
24 crime scene?
25      A.   I don't remember.

Page 48

1      Q.   Okay.  Do you recall if the City of Coquille or
2 Coquille PD had any written policies or procedures on how to
3 document a crime scene?
4      A.   I don't remember.
5      Q.   Did they provide you with a camera as part of your
6 employment?
7      A.   Uh ...  What type of camera are you referring to?
8      Q.   Any kind of camera.  Just a camera that you could
9 keep in your patrol unit to pho- -- to take photographs.
10 Sometimes it might be of a DV victim; sometimes it might be of
11 a crime scene; sometimes it might be something else.  Did
12 they --
13      A.   Yes.
14      Q.   -- provide you with that?
15           Okay.  And did they train you on how to use the
16 camera?
17      A.   I don't remember.
18      Q.   During your employment with the Coquille Police
19 Department, did the City of Coquille or the Coquille Police
20 Department provide you any training in collecting and
21 preserving evidence?
22      A.   Yes.
23      Q.   How often did they provide those trainings?
24      A.   I don't know.
25      Q.   Was that also part of the FTO or FTEP process?

Page 49

1      A.   Yes.
2      Q.   Okay.  Outside of that process were there any
3 trainings specifically on gathering and preserving evidence?
4      A.   I don't remember.
5      Q.   Do you recall if the City of Coquille or the
6 Coquille Police Department had any written policies or
7 procedures on collecting and preserving evidence?
8      A.   Yes.
9      Q.   And would those have been on Lexipol?
10      A.   Yes.
11      Q.   Do you remember anything specific about those
12 policies or procedures?
13      A.   I do not.
14      Q.   While you were employed with Coquille Police
15 Department, did the City of Coquille or Coquille Police
16 Department provide you any training on what are commonly
17 referred to as "Brady obligations"?
18      A.   I don't remember.
19      Q.   Okay.  What's your understanding of what I'm asking
20 when I use the term "Brady obligations"?
21      A.   What I understand about Brady is the truthfulness
22 of an officer as he testifies and -- or through action or
23 inaction does something wrong and is found to be unable to
24 testify, or the DA's office is not willing to let them testify
25 as a witness in any further proceedings.

Page 50

1  Q.  Okay.  And where is that -- where does your
2  understanding of that come from?
3  A.  15 years of law enforcement.
4  Q.  Okay.  Is that something you've heard referred to
5  as a "Brady list"?
6  A.  Yes.
7  Q.  Okay.  Has anyone in the City of Coquille or -- did
8  the City of Coquille or the Coquille Police Department ever
9  provide you with any training on your obligation to turn over
10 evidence in an investigation to the defense team?
11 A.  Yes.  As a matter of policy, we were to log all
12 evidence into the Coos County -- or not -- I'm sorry -- the
13 Coquille Police Department evidence room in accordance with
14 policy and procedure.  But as far as it went from there, that
15 wasn't my bailiwick.
16 Q.  Okay.  So that's my question.  Did the Coquille
17 Police Department or the City of Coquille provide you with any
18 training on where it went from there once a suspect was
19 indicted and a prosecution was taken on?
20 A.  No.  That was not my area of responsibility.
21 Q.  Okay.  Do you know who at Coquille Police
22 Department controlled or was assigned control of the evidence
23 after a case was indicted and a prosecution ensued?
24 A.  Pat Smith was -- was the evidence custodian for
25 most of the time that I was there.  Um ... Randy Ulmer was

Page 51

1  also, for a very short period of time while I was there, until
2  he was terminated.  And I think it was -- I don't recall there
3  being -- oh, Dave Pierce, for a period of time while I was
4  there, I believe was -- worked in the evidence room.
5  Q.  Is that P-E-A-R-C-E?
6  A.  P-I-E-R-C-E.
7  Q.  P-I-E-R-C-E.  Okay.
8      And Pat Smith, when he was the evidence custodian,
9  who would his direct report have been?
10 A.  The chief of police.
11 Q.  Okay.  And would that have been Dannels at that
12 time?
13 A.  When I first got there, it was Mike Reaves and then
14 Mark Dannels and then Janice Blue.
15 Q.  Okay.  And do you recall what -- if we were to
16 think of the different chiefs as different reigns, periods of
17 rule, during which reigns was Pat Smith the evidence custodian
18 or in charge of the evidence?
19 A.  Certainly during Chief Dannels.  Possibly during
20 Mike Reaves.  And I'm not certain about Janice's.
21 Q.  Okay.  So, then -- okay.  So if I understand
22 correctly, as far as what would happen or who was responsible
23 for the evidence once a suspect was indicted, that wasn't
24 something that you had a role in, but were there written
25 policies and procedures about what was supposed to happen with

Page 52

1  the evidence after a suspect was indicted?
2  A.  Certainly there was policy and procedure over the
3  handling of evidence.  Specifically over what happens once an
4  individual is indicted, I am not certain.
5  Q.  Okay.  Were there any policies -- were you ever
6  provided any training on discovery obligations and what your
7  obligation as a law enforcement officer is to turn over
8  discovery to a criminal defendant?
9  A.  No.  Again, I didn't -- when I worked for the City
10 of Coquille, I didn't really deal with that.  The most that I
11 would deal with something of that nature is if I was going to
12 court and the district attorney was requesting that a specific
13 piece of evidence be brought to court.  That would be signed
14 out to me; I would take it with me to trial and -- or the
15 proceeding and turn it over to the district attorney for the
16 course of that proceeding, bring it back, put it away when we
17 were done.
18 Q.  Okay.  Either at the Coquille Police Department or
19 at the Coos County Sheriff's Office, have you ever been
20 provided any training on your obligation to turn over evidence
21 regardless of what the district attorney requests?
22 A.  No.
23 Q.  Okay.  Are there any written policies or procedures
24 on that at Coos County Sheriff's Office?
25 A.  Not that I'm aware of.

Page 53

1  Q.  Are you aware -- were there any policies or
2  procedures on that at Coquille PD while you were there?
3  A.  I don't know.
4  Q.  Okay.  While you were employed with the Coquille
5  Police Department, did the City of Coquille or the Coquille
6  Police Department provide you any training on note-taking or
7  report-writing?
8  A.  Yes.
9  Q.  Okay.  And how often was that training conducted?
10 A.  That was, again, indoctrinal training through the
11 FTEP program, as far as report-writing and note-taking.
12 Q.  Okay.  So that was, again, a function of working
13 with your FTO and in the FTEP program.  You would write a
14 report, and you would get evaluated on the quality of that
15 report.  Is that fair?
16 A.  That is fair.
17 Q.  Okay.  And there would be written evaluations of
18 your competency in report-writing?
19 A.  Yes.
20 Q.  Okay.  Is that -- did that occur only during the
21 FTEP period, or would that kind of evaluation go on after the
22 FTEP period and after your probationary period?
23 A.  So at Coquille Police Department we would turn our
24 reports into the sergeant, our supervisor, and there were
25 periods of time where if a report was lacking in some area

Sean M. Sanborn
December 16, 2021

Page 190
1  A.  That was -- that was a tactic that was discussed
2  and that was brought back from Vidocq. I don't remember who
3  told me to go out and do that that day, and I don't even
4  remember what day it was, but that was the reason for it.
5  Q.  Okay. Was there any explanation given of why
6  Vidocq had suggested that tactic? Did Vidocq ever explain to
7  anybody, you or anyone on the cold case team that you're aware
8  of, about why you should do that?
9  A.  I was not -- and, again, there was discussion that
10 I don't specifically remember, but I know that that was
11 something that was discussed with -- well, I think probably
12 Chief Dannels or the sheriff would probably be able to answer
13 that question better.
14 Q.  Okay.
15 A.  I don't -- I don't know specific -- I had never
16 talked to anybody from Vidocq, and I can tell you what I've
17 heard, but at that point it's just hearing from somebody else
18 that you could probably ask that question to. It's better.
19 Q.  Yeah, that's fair enough. Okay.
20     Have you understood all of the questions that I've
21 asked of you today?
22 A.  Yes.
23 Q.  Have all of your answers been truthful and
24 accurate?
25 A.  Yes.

Page 191
1  Q.  Is there anything you would like to add to make
2  sure that the record is accurate and complete at this point?
3  A.  No.
4     MR. LAUERSDORF: Okay. Well, with that, then, I'm
5  done with my questions. I'll open it up for if any of the
6  other attorneys want to ask any questions, and if not, we can
7  be done.
8     If the attorneys would stay on for a minute after
9  we -- just a second after we go off the record, I would
10 appreciate that.
11    MS. HENDERSON: Before we go off the record, I
12 would just like to get it on this one. We would like to read
13 and sign, please.
14    MR. LAUERSDORF: Okay. Fair enough.
15    Does anyone else have any questions?
16    Okay. Hearing nothing, I think we can go off the
17 record.
18    (Discussion off the record.)
19    COURT REPORTER: Are you ordering the original?
20    MR. LAUERSDORF: Sure, yeah. We'll order the
21 original.
22    COURT REPORTER: So, Ms. Henderson, are you
23 ordering a copy?
24    MS. HENDERSON: I will take a copy. Thank you.
25    COURT REPORTER: And anybody else going to want a

Page 192
1  copy?
2     MR. MARSHALL: Jean, the State may very well want
3  copies of all of these, but I have to confer with Jesse, and
4  we'll get back with you in due time.
5     COURT REPORTER: Okay. Thank you.
6
7       (WHEREUPON, the deposition ended at the hour
8       of 2:32 p.m.)
9
10            -o0o-

Page 193
1  STATE OF OREGON    )
                     )  ss.  C E R T I F I C A T E
2  County of Douglas  )
3
4  I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6  Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, SEAN M. SANBORN, appeared
8  remotely before me via Zoom videoconference at the time and
9  place set forth in the caption hereof;
10 That, at said time and place, I reported in stenotype
11 all testimony adduced and oral proceedings had in the foregoing
12 matter, to the best of my ability;
13 That, thereafter, my notes were reduced to typewriting,
14 and that the foregoing transcript, pages 1 through 192, both
15 inclusive, constitutes a full, true, and correct transcript of
16 all such testimony adduced and oral proceedings had and of the
17 whole thereof.
18 IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19 stamp this 30th day of December, 2021, in the City of Roseburg,
20 County of Douglas, State of Oregon.
21
22
23            JEAN M. KOSTNER
               Certified Court Reporter
24             CSR No. 90-0051
25

```
                                                                    1

 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3      I, Sean Sanborn, do hereby certify under penalty

 4   of perjury that I have read the foregoing transcript

 5   of my Deposition taken on December 16, 2021; that I

 6   have made such corrections as appear noted on the

 7   Deposition Errata Page, attached hereto, signed by me;

 8   that my testimony as contained herein, as corrected,

 9   is true and correct.

10

11

12   Dated this ____24th____ day of

13

14   _____JANUARY_____, 2022, at

15

16   _250 N. Baxter St, Coquille_____,

17   ~~California.~~  Oregon

18

19

20

21

22

23   _____

24               Sean Sanborn

25
```

```
                                                              2

 1                     DEPOSITION ERRATA SHEET
 2      Page No. 73   Line No. 11
 3      Change: USSA for OSSA
 4      Reason for
 5        change:_____
 6      Page No._____ Line No._____
 7      Change:_____
 8      Reason for
 9        change:_____
10      Page No._____ Line No._____
11      Change:_____
12      Reason for
13        change:_____
14      Page No._____ Line No._____
15      Change:_____
16      Reason for
17        change:_____
18      Page No._____ Line No._____
19      Change:_____
20      Reason for
21        change:_____
22
23
24      _____    1/24/2022
25      Sean Sanborn                 Month/Date/Year
```