Craig S. Zanni
December 17, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf of S.M., a minor, | ) ) ) Civil No. ) 6:20-cv-01163-MK |
| Plaintiffs, | ) ) VIDEOCONFERENCE ) DEPOSITION |
| v. | ) ) |
| MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, ESTATE OF DAVE HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, COOS COUNTY, and OREGON STATE POLICE, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION UPON ORAL EXAMINATION

OF CRAIG S. ZANNI

Craig S. Zanni
December 17, 2021

Page 2

1  BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
2  Civil Procedure, the deposition of CRAIG S. ZANNI, an
3  adverse-party witness, was taken remotely via videoconference
4  on behalf of the Plaintiffs, before JEAN M. KOSTNER, a
5  Certified Court Reporter for Oregon, on Friday, the 17th day of
6  December, 2021, at the hour of 9:00 a.m., in the State of
7  Oregon.

Page 3

```
                    APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
     Andrew C. Lauersdorf, OSB #980739
     Janis C. Puracal, OSB #132288
     MALONEY LAUERSDORF, REINER, PC
     1111 East Burnside Street, Suite 300
     Portland, Oregon  97214
     (503) 245-1518
     acl@mlrlegalteam.com
     jcp@mlrlegalteam.com

ON BEHALF OF THE DEFENDANTS:
     Sarah R. Henderson
     LAW OFFICE OF ROBERT E. FRANZ, JR.
     Post Office Box 62
     Springfield, Oregon  97477
     (541) 741-8220
     shenderson@franzlaw.comcastbiz.net
        (Representing City of Coquille, City of Coos Bay,
         Coos County, Craig Zanni, Chris Webley, Eric
         Schwenninger, Sean Sanborn, Ray McNeely, Kris
         Karcher, Pat Downing, Mark Dannels, Kip Oswald,
         Michael Reaves, David Zavala, Anthony Wetmore,
         Shelly D. McInnes)

     Todd Marshall
     Jesse B. Davis
     OREGON DEPARTMENT OF JUSTICE
     100 Southwest Market Street
     Portland, Oregon  97201
     (503) 947-4700
     todd.marshall@doj.state.or.us
     jesse.b.davis@doj.state.or.us
        (Representing Oregon State Police, John Riddle,
         Susan Hormann, Mary Krings, Kathy Wilcox)
     Karin L. Schaffer
     WOOD SMITH HENNING & BERMAN LLP
     12755 Southwest 69th Avenue, Suite 100
     Portland, Oregon  97223
     (971) 256-4023
     kschaffer@wshblaw.com
        (Representing Vidocq Society and Richard Walter)
```

Page 4

ALSO PRESENT:
     Nick McGuffin

REPORTED BY:

     Jean M. Kostner, CSR #90-0051
        Subcontractor for:
           US LEGAL SUPPORT

Page 5

                    INDEX OF TESTIMONY

WITNESS                                                   PAGE
     CRAIG S. ZANNI
          Examination by Mr. Lauersdorf . . . . . . . .    8
          Examination by Ms. Schaffer . . . . . . . .    242

                                                  PAGE    LINE
     Objections marked for record                  209      21
                                                   210      12

                    REQUESTS FOR INFORMATION

     Information Requested by Mr. Lauersdorf:     PAGE    LINE

     Copies of the policies and procedures,
          including historical copies               42      16

## Page 6

```
                INDEX OF EXHIBITS
 DEPOSITION
 EXHIBIT NO.        DESCRIPTION              IDENTIFIED

 Exhibit 1    Brady List                         209
 Exhibit 2    Coos County Sheriff's Office Incident
              Narrative/File No. 20-10627  (17 pages)   79
 Exhibit 3    Coos County Sheriff's Office Incident
              Narrative/File No. 20-10627B (15 pages)  107
 Exhibit 4    OSP Forensic Lab Supplemental Report
              (10 pages)                         127
 Exhibit 5    Evidence Log, Coquille Police Department  128
 Exhibit 6    Coquille Police Department Property
              Request                            130
 Exhibit 8    Coos County Sheriff's Office Incident
              Narrative/File No. 20-10627C (8 pages)  136
 Exhibit 10   Coos County Sheriff's Office Incident
              Narrative/File No. 20-10627ss (5 pages) 143
 Exhibit 11   Coos County Sheriff's Office Incident
              Narrative/File No. 20-10627s (8 pages)  146
 Exhibit 12   Handwritten Poem  (5 pages)        154
 Exhibit 13   H.I.T. Team Meeting Notes  (38 pages)  155
 Exhibit 14   Police Report (Backman)            175
 Exhibit 15   Police Report (Jenkins)            189
 Exhibit 16   Letter from Bentley Investigations to
              Detective Sergeant Craig Zanni, 06/11/01  194
 Exhibit 17   Information Alert                  198
 Exhibit 18   OSP Incident Report  (7 pages)     203
```

## Page 7

```
 Exhibit 20   Synopsis of Vidocq Society Cases  (2 pages)  219
 Exhibit 21   Dannels' Press Conference  (5 pages)  232
 Exhibit 28   Control Holds - Bent Arm Takedown   240
```

## Page 8

CRAIG S. ZANNI, called as a witness on behalf of the Plaintiffs, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION

BY MR. LAUERSDORF:

Q. Okay. Sheriff Zanni, my name is Andrew Lauersdorf. You and I have never met before. Is that correct?

A. As far as I know, that's correct.

Q. Okay. And you understand that I'm an attorney. Right?

A. Yes.

Q. And you understand that I represent the plaintiffs in this matter, Mr. McGuffin and his daughter?

A. Yes.

Q. Okay. And this is a lawsuit involving some claims that Mr. McGuffin has filed against a number of defendants, including yourself. Is that right?

A. Yes.

Q. Can you please state your name as given at birth.

A. Craig Steven Zanni.

Q. Steven with a V or with a P-H?

A. V.

Q. And what's your place and date of birth?

## Page 9

A. California, Mount Shasta, 1951.

Q. And who is your current employer?

A. The citizens of Coos County.

Q. Okay. And you've been working for the Coos County Sheriff's Office for quite a while. Right?

A. Yep.

Q. Since -- when did you start with the sheriff's office?

A. Originally, I started here on February 15th, 1977.

Q. Okay. And then were you elected to the office of sheriff in 2011?

A. Yes.

Q. Okay. So your current title is sheriff. Is that right?

A. Correct.

Q. What's your DPSST number?

A. 8614. But they add a 0 in front of it because it won't enter into the computer without the 0.

Q. Okay. You're here today to be deposed. Do you understand that?

A. Yes.

Q. This is the time and place previously agreed upon. It's Friday, December 17th, 2021, and it's approximately 9:05 a.m. Do you agree with that?

A. Yes.

Craig S. Zanni
December 17, 2021

### Page 134

1   A.   Not that I'm aware of.
2        MR. LAUERSDORF:  All right.  It looks like it's
3   about 12:05.  I know I took you a little bit past the 90-minute
4   mark there.  People are probably getting hungry and tired a
5   little bit, and we could use a little bit of a break before
6   getting into the afternoon session.
7        My proposal would be that we break for 30 minutes
8   for lunch.  I'm open to suggestions, if people feel like more
9   time is needed, but that would be my thought.  How do people
10  feel?
11       MS. HENDERSON:  We're probably going to have to go
12  offsite, and that's been our plan, to get lunch.  Not too far
13  away, though.  So we're going to need a little bit more time
14  than that.
15       How much time, since you're familiar with the
16  place?
17       THE WITNESS:  Probably an hour, hour and 15
18  minutes, probably.
19       MS. HENDERSON:  We can make it happen in an hour.
20  And we don't have any time restrictions as far as our location
21  here this evening, so is it okay with everyone that we take an
22  hour?
23       MR. LAUERSDORF:  Okay.  No.  Why don't we take --
24  why don't we reconvene at 12:15.  Is that okay?
25       THE WITNESS:  That will work.

### Page 135

1        MR. LAUERSDORF:  I'm sorry.  1:15.
2        MS. HENDERSON:  Yes.  Sounds good.
3        MR. LAUERSDORF:  Okay.  Now we'll go off the
4   record.
5        (Lunch recess taken from 12:06 p.m. to 1:15 p.m.)
6   BY MR. LAUERSDORF:
7    Q.  Welcome back, Sheriff Zanni -- Zanni.  Sorry.
8    A.  It doesn't matter.  Just don't call me late for
9   meals.
10   Q.  Okay.  I'm going to share -- go back and share my
11  screen with you again, and we're going to go back to Exhibit 5
12  for just a minute there.  Can you see Exhibit 5 in front of you
13  now?
14   A.  Yes.
15   Q.  Okay.  Do you know or have you been made aware of
16  the reason why the videotape of the crime scene, reflected as
17  Evidence Number 224 on Exhibit 5, was not produced to
18  Mr. McGuffin for use as evidence in his criminal trial?
19   A.  No.
20   Q.  When -- when did the information about the location
21  of the body become public knowledge?  When was that made
22  public?
23   A.  That, I couldn't tell you.
24   Q.  Oh, okay.  Do you know who made the decision to
25  disclose the location of the body?

### Page 136

1    A.  No, I don't.
2    Q.  Okay.  Do you recall Mr. Frasier issuing a press
3   release on the discovery of the body?
4    A.  Not independently.  I'm sure he probably did, but I
5   don't recall it.
6    Q.  Okay.  And you don't recall having any discussions
7   with him about that?
8    A.  No.
9    Q.  Okay.  Did the location of the body leak before the
10  decision was made to make it public?
11   A.  I don't know.
12   Q.  Okay.  Do you know who Meagan Smith is?
13   A.  I recognize the name, but I don't know why.
14   Q.  Okay.  Well, let me see if I can show you ...  So
15  I'm going to share my screen with you again here.  Do you see
16  the screen in front of you, what's -- what will be marked
17  Exhibit 8?
18   A.  Okay.  It has "52" up in the right-hand corner?
19   Q.  Yeah.  Do you recognize it at all?
20   A.  Yes.
21   Q.  That's a report -- it looks like it was authored by
22  you.  It's got a date/time printed of September 12, 2000, and
23  it looks like you were reporting on events that occurred on
24  August 29th, 2000.  Does that sound right?
25   A.  Yes.

### Page 137

1    Q.  Okay.  I'm going to take you to page 8 of that
2   document.  And up here -- and if want to go back and read it,
3   you certainly can.  I can scroll back for you.  I'll represent
4   to you that what you're recording on here is a conversation
5   that you had with Leah Freeman's mother, Corliss Freeman.  And
6   here, in the second paragraph, she indicates -- "Corliss
7   indicated that the cross at Lee Valley was not put up by the
8   family but by Meagan Smith, who was a friend of her
9   daughter's."
10   A.  Okay.
11   Q.  What cross were you talking about there?
12   A.  We had been informed that somebody had put up some
13  kind of a memorial cross thing.
14   Q.  Did you go out and look at it?
15   A.  I believe I did.  I don't recall independently that
16  I did, though.
17   Q.  Okay.  Do you recall taking any photos of it?
18   A.  I don't believe I did, no.
19   Q.  Okay.  Did you ever -- do you recall ever seeing
20  any photos of the cross in the criminal file?
21   A.  Not that I recall.
22   Q.  Okay.  Who brought up the cross in your
23  conversation with Ms. Freeman here?
24   A.  I don't recall.
25   Q.  Okay.  Do you recall specifically what was said

Page 138

1 other than what's in your report?
2    A.   No.
3    Q.   Did you, at any time, interview Meagan Smith about
4 the cross?
5    A.   Don't recall.  If I did, it should be in the
6 report.
7    Q.   Okay.  Do you have any idea how Meagan Smith knew
8 where the loca- -- where the -- where Leah's remains were
9 found?
10   A.   No.
11   Q.   Did you hear about -- or, I guess, did you
12 interview anyone else who had been going out to the location in
13 August of 2000, the location where the remains were found?
14   A.   I don't recall.
15   Q.   Okay.  Do you recall doing any investigation into
16 people going out there in August of 2000?
17   A.   I don't recall.
18   Q.   Okay.  In January 2010, Officer Schwenninger and
19 McNeely from Coquille PD reported that Scott Hamilton was
20 telling them that Mr. McGuffin had taken him out to the
21 location where the body had been retrieved sometime after it
22 was retrieved.  Do you remember reading that report or learning
23 of that report at some point?
24   A.   I remember hearing about the information.  I don't
25 recall reading the report, no.

Page 139

1    Q.   Okay.  Do you have any recollection or
2 understanding of when Hamilton said he went out there with
3 Mr. McGuffin?
4    A.   Not off the top of my head, no.
5    Q.   Okay.  As far as Mr. Hamilton telling police that
6 he had been out there with Mr. McGuffin, when did you learn of
7 that information?
8    A.   I -- I can't recall.
9    Q.   And was that part -- do you know if you learned it
10 as part of a briefing --
11   A.   Not that --
12   Q.   -- on the case?
13   A.   I don't recall at all.
14   Q.   Okay.  And why would that -- why would
15 Mr. Hamilton's report have been significant to the Freeman
16 investigation?
17   A.   Well, it was information that -- regarding what was
18 going on.
19   Q.   Okay.  Did it have any tendency to implicate
20 Mr. McGuffin or anyone else in Ms. Freeman's death?
21   A.   I would assume that would -- that's what it would
22 indicate.
23   Q.   Okay.  And so what about Meagan Smith?  Did her
24 being out there and putting a cross out there implicate her at
25 all?

Page 140

1    A.   I don't know.  You would have to ask someone else.
2    Q.   Okay.  Who would I ask?
3    A.   Anybody.  I don't know.  I reported what
4 information I got.
5    Q.   Okay.  But -- okay.  And that wasn't information
6 that you -- that you got, the information about Mr. Hamilton
7 and Mr. McGuffin?
8    A.   I don't understand the question.
9    Q.   Well, you said, "You would have to ask somebody
10 else.  I reported the information I got."  And so I'm just
11 wondering if the information about Mr. Hamilton telling this
12 story to police was information you got or not.
13        MS. HENDERSON:  I'll object to the form of the
14 question as vague.  I mean, when you say "got," at any point in
15 the --
16        MR. LAUERSDORF:  Yeah.
17        MS. HENDERSON:  -- last 20 years?  I mean,
18 that's ...
19 BY MR. LAUERSDORF:
20   Q.   At any point while the investigation was pending up
21 until the time Mr. McGuffin was indicted.
22   A.   I don't recall.
23   Q.   Did you do any investigation to narrow down the
24 timing of Mr. McGuffin's visit with Mr. Hamilton?
25   A.   I -- I don't -- I don't recall.  If I did, it would

Page 141

1 be in the reports.
2    Q.   Do you recall, when you first were assigned to the
3 case back on July 5th, 2000, interviewing Bill Middleton?
4    A.   I believe I spoke to Mr. Middleton, yes.
5    Q.   And do you recall Mr. Middleton telling you that he
6 thought that Ms. Freeman may have been pregnant at the time of
7 her disappearance?
8    A.   I really don't recall the details of that
9 conversation.
10   Q.   Okay.
11   A.   He may have told me that, but I don't recall it
12 independently.
13   Q.   Did you do anything to investigate whether or not
14 Ms. Freeman was pregnant at the time of her disappearance?
15   A.   Personally, no, but I believe some investigation
16 was done on that.
17   Q.   Okay.  And you know from the autopsy report that
18 there was -- that she wasn't pregnant at the time of her
19 disappearance.  Right?
20        MS. HENDERSON:  I object to the form of the
21 question as assuming facts.
22        You can answer.
23   A.   That's my understanding.
24 BY MR. LAUERSDORF:
25   Q.   Oh, I'm sorry.  Did you read the autopsy report at

Page 210

1  BY MR. LAUERSDORF:
2      Q.  Well, Kip Oswald would have been an employee of the
3  Coos County Sheriff's Office while you were there.  Correct?
4      A.  Yes.
5      Q.  And would he have been an employee of the Coos
6  County Sheriff's Office while you were the sheriff?
7      A.  Based on when he was at the sheriff's office?
8      Q.  Yes.
9      A.  Yes.
10     Q.  So do you know why he would be listed on District
11 Attorney Frasier's Brady list for Coos County?
12         MS. HENDERSON:  Same objection, and I'm going to
13 instruct my client not to answer.  Again, it's not
14 authenticated.  We have no idea what this document is.  It's
15 also listed as confidential, I believe, somewhere.
16         If you want to ask him about his personal
17 knowledge, that's fine, but we're not going to go any further
18 with this exhibit.
19         MR. LAUERSDORF:  Ms. Kostner, mark that for the
20 record, please.
21 BY MR. LAUERSDORF:
22     Q.  My understanding, for the record, is that your
23 attorney has instructed you not to answer and that you are
24 refusing to answer any further questions that I may ask with
25 regard to Exhibit 1 or the information contained therein.  Is

Page 211

1  that correct?
2      A.  Yes.
3      Q.  Okay.  Is Deputy Oswald still employed by the Coos
4  County Sheriff's Office?
5      A.  No.
6      Q.  Why not?
7      A.  He resigned and went to work for the North Bend
8  Police Department.
9      Q.  Okay.  Was he asked to resign?
10     A.  Not that I know of.
11     Q.  Were you ever involved in any disciplinary
12 investigations related to Deputy Oswald?
13     A.  Not that I recall.
14     Q.  Were you ever -- are you aware of any acts or
15 conduct of Deputy Oswald that would reflect on his veracity?
16         MS. HENDERSON:  I'll object to the question as
17 vague, ultra broad.  If you want to ask something about the
18 admissibility of impeachment evidence, felony convictions,
19 something like that within the last 10 years --
20         MR. LAUERSDORF:  Yeah, I'm asking about prior bad
21 acts.
22         MS. HENDERSON:  Okay.  So what dates are we dealing
23 with here?
24         MR. LAUERSDORF:  Any dates.
25         MS. HENDERSON:  I mean, can you lay some foundation

Page 212

1  for it as to when he was involved with the Freeman
2  investigation, within 10 years of that?
3          MR. LAUERSDORF:  No.  We can -- we can say any
4  dates.  Deputy Oswald is a party in this matter.  He's a party
5  defendant.  He's going to be deposed.  He's going to presumably
6  take the stand at trial, and I have a right to know if Sheriff
7  Zanni has any information, personal information, that reflects
8  on Deputy Oswald's reputation for truth.
9          MS. HENDERSON:  I mean, if we want to have a debate
10 about what character evidence is or is not admissible, I feel
11 like this is not the forum for it.  So, you know, I --
12         MR. LAUERSDORF:  So are you instructing him not to
13 answer?
14         MS. HENDERSON:  I think what we should do now is go
15 ahead and rephrase your question.  If I have an objection, I'll
16 register it, and we'll go from there.
17 BY MR. LAUERSDORF:
18     Q.  Are you aware of any conduct of Deputy Oswald that
19 would reflect on his propensity for truth?
20         MS. HENDERSON:  I'll just simply object to the form
21 of the question as maybe potentially involving speculation,
22 lack of foundation.
23         If you know, you can answer.
24     A.  I know what I've heard occurred.
25 ///

Page 213

1  BY MR. LAUERSDORF:
2      Q.  What have you heard?
3          MS. HENDERSON:  Same objection.
4      A.  That he was laid off from North Bend because of an
5  incident that I do not know the details of, but I had just
6  heard the rumors that float along in the police community about
7  why that occurred.
8  BY MR. LAUERSDORF:
9      Q.  Okay.  So do you know if he's still a police
10 officer?
11     A.  No.  He has retired.
12     Q.  Retired, or was his DPSST certification revoked?
13     A.  I don't believe it was revoked.  I believe he's
14 retired, to the best of my knowledge.
15     Q.  What was the status of the Freeman investigation
16 when you retired from Coos County Sheriff's Office in February
17 2004?
18     A.  Ending.  Unresolved at that time.  Investigation
19 continuing.
20     Q.  Had it slowed at that point?
21     A.  Pardon?
22     Q.  Had it slowed at that point?  Had the pace of the
23 investigation slowed at that point?
24     A.  Yes.
25     Q.  Why had it slowed at that point?

Craig S. Zanni
December 17, 2021

Page 214

1  A.  Most of the leads that had been provided had been
2  tracked down, to my knowledge.
3  Q.  Was there an open grand jury at that point?
4  A.  I'm not -- I don't know for sure. I don't recall.
5  Q.  Did you ask Mr. Frasier or anyone else at the Coos
6  County District Attorney's Office to present the case to grand
7  jury at any time before your retirement in February 2004?
8  A.  Not that I'm aware of.
9  Q.  Did you ask Mr. Frasier to present the case to
10 grand jury at any time during your service as director from
11 2004 to April of 2007?
12 A.  Not that I'm aware of.
13 Q.  Did you recommend or suggest to anyone at any time
14 between 2000 and 2007 that the case be submitted to the Coos
15 County District Attorney's Office for presentation to grand
16 jury?
17 A.  Not that I recall.
18 Q.  Why not?
19 A.  I didn't believe there was enough information at
20 that time to bring it to the district attorney.
21 Q.  What information did you think was still lacking?
22     MS. HENDERSON:  Object to form.  Calls for
23 speculation.
24     You can answer.
25 A.  Lots of information.  DNA information,

Page 215

1  documentation of all of the information we had.  From my
2  position, working on the -- not being the case officer directly
3  involved with Coquille Police Department, I don't know all of
4  the information they had, but I wasn't aware of enough being
5  put together to present to the grand jury.
6  BY MR. LAUERSDORF:
7  Q.  At some point Chief Reaves resigned and was
8  replaced by Chief Dannels.  Is that correct?
9  A.  It's my understanding, yes.
10 Q.  Do you know the reasons for Chief Reaves
11 resignation?
12 A.  No, I don't.
13 Q.  Okay.  At some point after your retirement you were
14 asked to get involved in the Freeman investigation again.  Is
15 that correct?
16 A.  I was asked if I would sit in on the -- on a review
17 of the case, yes.
18 Q.  And who asked you to do that?
19 A.  Chief Dannels.
20 Q.  And what specifically did he ask you?
21 A.  I don't remember the date.  He pulled up one day in
22 front of my house, asked if he could speak with me, and I had
23 not met him before that.  He indicated that he was going to --
24 wanting to relook at the Freeman case and if I would be willing
25 to sit in and provide information that I was aware of and be

Page 216

1  part of looking at that.
2  Q.  Do you recall what month that occurred in?
3  A.  No, I don't.
4  Q.  Do you recall what year?
5  A.  No, I don't.  I was retired.  I didn't even wear a
6  watch then.
7  Q.  Do you recall how long you had been retired at that
8  point?
9  A.  No, I don't.
10 Q.  Okay.  And he asked you to sit in on something.
11 What did he ask you to sit in on?  Some kind of meeting or ...
12 A.  A meeting.  They were going to review the Leah
13 Freeman case and see if there's things that could be done.
14 Q.  When he asked you about this, did he talk about a
15 single meeting, or was he -- did he mention participation with
16 a team of individuals?
17 A.  I don't think he mentioned it either way.  I think
18 it was just would I be willing to sit in at that point, if I
19 would be willing to participate.
20 Q.  And had you conducted any investigation into Leah
21 Freeman's murder between the time you retired in 2004 and when
22 Mr. Dannels asked you to get involved again?
23 A.  No.  Not that I recall.
24 Q.  So at the time that you were director of the
25 interagency task force between 2004 and 2007, did you have

Page 217

1  any -- were you participating in the Freeman investigation at
2  all at that point?
3  A.  Not that I recall.
4  Q.  Had you developed any new leads during the time
5  between your retirement and when Chief Dannels asked you to get
6  involved again?
7  A.  No.
8     MR. DAVIS:  Counsel, can you unshare your screen so
9  that you can return to a viewable size?
10    MR. LAUERSDORF:  Sure.  Sorry.
11    MR. DAVIS:  Thank you.
12 BY MR. LAUERSDORF:
13 Q.  Okay.  So were you aware or did Chief Dannels
14 mention any new evidence being uncovered during the time that
15 you were retired?
16 A.  Not that I recall.
17 Q.  Okay.  And so after Chief Dannels asked you to get
18 involved, what did you say?
19 A.  That, sure, I'd be willing to come and sit in.
20 Q.  Okay.  And then what did you do to bring yourself
21 back up to speed before getting involved with the -- with Chief
22 Dannels?
23 A.  I shaved.  No.  Nothing really.  I knew what I knew
24 or could remember, and at that point I wasn't asked to review
25 anything or prepare anything.  I was simply asked to attend a

Page 218
1  meeting, which I did.
2      Q.   Okay.  Did you go back and review any of your old
3  reports?
4      A.   No.
5      Q.   Did you, by any chance, review any of the OSP lab
6  reports?
7      A.   No.
8      Q.   Did you -- were you aware of the Chorley laboratory
9  report from England at any time?
10     A.   Later on, yes, I had heard about it.
11     Q.   Did you review it at all at any point?
12     A.   No.
13     Q.   Do you recall going back and reviewing anything
14 before you met with Chief Dannels' team for the first time?
15     A.   No.
16     Q.   When you rejoined the investigation at Chief
17 Dannels' request, did Chief Dannels have a theory developed
18 about Ms. Freeman's murder?
19     A.   I don't recall.
20     Q.   Did he mention any suspects at that time?
21     A.   I don't recall.
22     Q.   Do you remember traveling to Pennsylvania to meet
23 with some folks from the Vidocq Society?
24     A.   Yes.  I was invited along.
25     Q.   How did that come about?

Page 219
1      A.   Um ... I'm not really sure.  I just -- Chief
2  Dannels contacted me and asked if I would be interested in
3  going back there with them.  They were going to meet with a
4  bunch of people who were retired agents, forensic
5  psychologists, crime lab people that would provide a review of
6  the case, and if I would be interested in going, if they had
7  questions.
8      Q.   Did he say why he wanted you to go?
9      A.   Not particularly, no.
10     Q.   Okay.  And who paid for your travel and expenses
11 for that trip?
12     A.   The City of Coquille, I believe.
13     Q.   And who went with you?
14     A.   Um ...  I remember Chief Dannels, and I'm trying to
15 remember who else went.  I think -- I don't remember if
16 DA Frasier went and -- I don't recall who else.  I think there
17 were four of us, but I don't recall who all the four were.
18          MS. HENDERSON:  Sorry to interrupt.  I think
19 somebody is unmuted who is not speaking.  We have an echo on
20 our end.
21          MR. LAUERSDORF:  Okay.  It looks like it's
22 straightened out.
23 BY MR. LAUERSDORF:
24     Q.   Okay.  I'm going to show you what's been marked or
25 will be marked as Exhibit 20.  Do you happen to recognize that

Page 220
1  at all?  Have you ever seen that document before?
2      A.   Not that I recall, no.
3      Q.   That document was produced in discovery by the
4  Vidocq defendants in this matter.  It's got a Bates label at
5  the bottom VIDOCQ_000009.  It's titled "Synopsis of Vidocq
6  Society Cases, 207.  The Murder of Leah Freeman, 2000."
7           Do you see that?
8      A.   Yes.
9      Q.   In there the author of the report is reporting that
10 the District Attorney Paul Frasier; Chief Dannels; Lisa McOwen,
11 from DOJ; and yourself, Craig Zanni, County Investigator, came
12 out and presented the Freeman case to the Vidocq Society on
13 January 21st, 2010.  Does that sound right?
14     A.   That sounds right.
15     Q.   Okay.  And what specifically did you present to the
16 Vidocq folks?
17     A.   Primarily, I just presented the information that
18 we've spoken about and answered questions.
19     Q.   Okay.  What information did you -- was it a
20 presentation, or was it just a straight, sit-down
21 question-and-answer?
22     A.   I think the chief talked a little bit, and then I
23 added a few things, like, you know, the car had been searched,
24 and we had done follow-up and chased out leads and tracked down
25 other people who had moved from the area during that time.  And

Page 221
1  that was about it.
2      Q.   And what was Lisa McOwen's role in that
3  presentation?
4      A.   I -- if I recall correctly, she had been working on
5  trying to develop a timeline or something.  I don't -- I don't
6  recall specifically.
7      Q.   And was the timeline discussed during the meeting
8  with Vidocq?
9      A.   I believe so, but I don't recall specifically.
10     Q.   And what questions were you asked by the folks at
11 Vidocq?
12     A.   I do not recall.
13     Q.   Do you remember the names of any specific Vidocq
14 members that you met with?
15     A.   No, other than the one you had mentioned earlier
16 today.  And I don't even remember his name now.  I'm sorry.
17     Q.   Richard Walter?
18     A.   Yes.
19     Q.   Do you recall any of the purported specializations
20 of any of the folks that you had met with from Vidocq?
21     A.   No, I don't recall those specifically.
22     Q.   Okay.  The author of this document is reporting
23 that the chief of police appeared to have hindered the
24 investigation.  What did you or any of the people you were with
25 tell the Vidocq Society about the chief of police hindering the

Craig S. Zanni
December 17, 2021

Page 230

1  MR. LAUERSDORF: Yes.
2      (Discussion off the record.)
3  BY MR. LAUERSDORF:
4      Q.  Was Kris Karcher at that dinner?
5      A.  I do not recall.
6      Q.  How about Chris Webley?
7      A.  I don't know.
8      Q.  How about Officer McNeely, Junior?
9      A.  I don't recall.
10     Q.  Do you know who the case officer was on the Freeman
11 investigation at that time?
12     A.  I believe it was Ray McNeely, Junior.
13     Q.  But you don't recall whether he was at the dinner
14 or not?
15     A.  No, I don't.
16     Q.  What was discussed at the dinner with Mr. Walter?
17     A.  Well, a myriad of subjects, but I was sitting at a
18 different part of the table, and I was with my wife, and my
19 wife and I are very close, so they -- I listened, and they
20 discussed, and that was about it.
21     Q.  Was the Freeman investigation discussed at that
22 dinner?
23     A.  I'm certain that it was, but I don't recall the
24 details of that.
25     Q.  Okay.  Was the strategy for taking the case to

Page 231

1 grand jury discussed at that dinner?
2      A.  I believe it probably was, but I don't recall the
3 details of that.
4      Q.  Was the strategy for taking the case to grand jury
5 discussed at the meeting with Vidocq in Pennsylvania?
6      A.  I don't recall.
7      Q.  Take any notes of that meeting?
8      A.  No, I did not.
9      Q.  Okay.  So, let's see.  You were asked to have
10 dinner and meet with Mr. Walter.  When Mr. Walter was out here,
11 did you have any meetings with him besides the dinner?
12     A.  No, I did not.
13     Q.  Okay.  And then you were asked about the best way
14 to present the case to grand jury and provided your advice to
15 Mr. Frasier.  Was there anything --
16     A.  Well, I don't know that he asked me.  I think it
17 was just a discussion that came up.
18     Q.  Okay.  Was there anything else you were asked to do
19 with regard to the Freeman investigation after your meeting
20 with Vidocq?
21     A.  Not that I recall.
22     Q.  Okay.  And then so at some point -- oh, shoot.
23 Have I been sharing the whole time?  I'm sorry.
24         At some point Chief Dannels has a press conference.
25 Right?

Page 232

1      A.  Mm-hm.
2      Q.  About reopening the investigation.  Were you at
3 that press conference?
4      A.  I believe so, no.
5      Q.  Okay.  Did you -- have you ever seen a press
6 release from that press conference or ever talk to anybody
7 about it?
8      A.  I heard about it, but, no, I didn't talk to anybody
9 about it, but I don't believe I've ever seen any press release.
10     Q.  Okay.  I'm going to show you what's been marked as
11 Exhibit 21.  And I'll kind of go slow here.
12        This is the -- the print copy of Dannels' press
13 release on January 25th, 2010.  Now, if I understand correctly
14 from that Vidocq report, this would have been four days after
15 you came back from your meeting with Vidocq.  Is that right?
16     A.  Probably, from the dates.  I don't recall
17 independently.
18     Q.  Okay.  Do you recall if the reopening-the-case
19 press release happened pretty quickly after the Vidocq meeting?
20     A.  I do not because I wasn't paying much attention to
21 it.
22     Q.  Okay.  So Chief Dannels says here 15 months ago he
23 and Paul Frasier joined forces to revitalize the investigation.
24 Over the past 15 months they have "assembled a cold case team
25 made up of investigators that had originally been involved with

Page 233

1 Leah's investigation or possessed an expertise that would
2 assist us in reorganizing the investigation."
3        Were you a member of the cold case team that he was
4 referring to there?
5      A.  I would assume that they considered me part of
6 that.
7      Q.  Okay.  What work had you done on the case in the 15
8 months prior to meeting with Vidocq?
9      A.  Not much of anything that I recall, other than
10 being a resource.
11     Q.  What's your -- who else was on the cold case team
12 for those 15 months?
13     A.  I think Larry Leader was involved on one or two
14 meetings.  Dale Oester, I believe, was retired at the time;
15 might have been involved in a couple of the meetings.  Tom
16 Benz, a retired OSP sergeant, might have been in a few of those
17 meetings.  I don't think Pat was retired at the time, but he
18 may have been.  I don't remember.
19     Q.  How about Kris Karcher?
20     A.  Um ...  She probably was.
21     Q.  How about Paul Frasier?  Was he involved in those
22 meetings?
23     A.  I -- I believe he was probably at some of them,
24 yes.
25     Q.  Was -- do you recall if Larry Leader was at the

Page 246
1  DECLARATION UNDER PENALTY OF PERJURY
2
3      I, CRAIG S. ZANNI, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on December 17, 2021;
6  that I have made such corrections as appear noted on the
7  Deposition Errata Page, attached hereto, signed by me;
8  that my testimony as contained herein, as corrected, is
9  true and correct.
10
11     Dated this _____day of_____,
12  20____, at _____, _____.
13
14
15
16     _____
17          CRAIG S. ZANNI
18
19
20
21
22
23
24
25

Page 247
1  DEPOSITION ERRATA SHEET
2  Page No._____ Line No._____
3  Change:_____
4  Reason for change:_____
5  Page No._____ Line No._____
6  Change:_____
7  Reason for change:_____
8  Page No._____ Line No._____
9  Change:_____
10 Reason for change:_____
11 Page No._____ Line No._____
12 Change:_____
13 Reason for change:_____
14 Page No._____ Line No._____
15 Change:_____
16 Reason for change:_____
17 Page No._____ Line No._____
18 Change:_____
19 Reason for change:_____
20 Page No._____ Line No._____
21 Change:_____
22 Reason for change:_____
23
24 _____    _____
25 CRAIG S. ZANNI                 Dated

Page 248
1  STATE OF OREGON    )
                      )  ss. C E R T I F I C A T E
2  County of Douglas  )
3
4      I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6      Pursuant to stipulation of counsel for the respective
7  parties, hereinbefore set forth, CRAIG S. ZANNI, appeared
8  remotely before me via Zoom videoconference at the time and
9  place set forth in the caption hereof;
10     That, at said time and place, I reported in stenotype
11 all testimony adduced and oral proceedings had in the foregoing
12 matter, to the best of my ability;
13     That, thereafter, my notes were reduced to typewriting,
14 and that the foregoing transcript, pages 1 through 245 (VOLUMES
15 I and II), both inclusive, constitutes a full, true, and
16 correct transcript of all such testimony adduced and oral
17 proceedings had and of the whole thereof.
18     IN WITNESS WHEREOF, I have hereunto set my hand and CSR
19 stamp this 4th day of January, 2022, in the City of Roseburg,
20 County of Douglas, State of Oregon.
21
22     _____
23          JEAN M. KOSTNER
            Certified Court Reporter
24          CSR No. 90-0051
25