Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian ad litem, on behalf Of S.M., a minor,<br><br>        Plaintiffs,<br><br>   vs.<br><br>MARK DANNELS, PAT DOWNING, SUSAN HORMANN, MARY KRINGS, KRIS KARCHER, SHELLY MCINNES, RAYMOND MCNEELY, KIP OSWALD, MICHAEL REAVES, JOHN RIDDLE, SEAN SANBORN, ERIC SCHWENNINGER, RICHARD WALTER, CHRIS WEBLEY, ANTHONY WETMORE, KATHY WILCOX, CRAIG ZANNI, DAVID ZAVALA, JOEL D. SHAPIRO AS ADMINISTRATOR OF THE ESTATE OF DAVID E. HALL, VIDOCQ SOCIETY, CITY OF COQUILLE, CITY OF COOS BAY, and COOS COUNTY,<br><br>        Defendants. | Civil No.<br>6:20-cv-01163-MK |

DEPOSITION OF MARY KRINGS

Taken in behalf of Plaintiffs

May 05, 2022

* * *

Stumptown Steno
503.888.1416

```
 1         BE IT REMEMBERED THAT, pursuant to the Oregon

 2   Rules of Civil Procedure, the remote deposition of MARY

 3   KRINGS was taken by Amanda K. Fisher, Certified

 4   Shorthand Reporter, on May 05, 2022, in the City of

 5   Portland, County of Multnomah, State of Oregon.

 6

 7

 8                         APPEARANCES:

 9

10      MALONEY LAUERSDORF REINER, PC
        Counsel for Plaintiffs
11      1111 E. Burnside Street
        Suite 300
12      Portland, Oregon 97214
        acl@mlrlegalteam.com
13      jpuracal@forensicjusticeproject.org
            BY:   ANDREW C. LAUERSDORF
14                JANIS C. PURACAL

15

16      LAW OFFICE OF ROBERT E. FRANZ, JR.
        Counsel for Defendants: City of Coquille, City of
17      Coos Bay, Coos County, Craig Zanni, Chris Webley,
        Eric Schwenninger, Sean Sanborn, Ray McNeely,
18      Kris Karcher, Pat Downing, Mark Dannels, Kip Oswald,
        Michael Reaves, David Zavala, Anthony Wetmore,
19      Shelly McInnes
        PO Box 62
20      Springfield, Oregon 97477
        shenderson@franzlaw.comcastbiz.net
21          BY:   SARAH R. HENDERSON

22

23      OREGON DEPARTMENT OF JUSTICE
        Counsel for Defendants: Oregon State Police, John
24      Riddle, Susan Hormann, Mary Krings, Kathy Wilcox
        100 SW Market Street
25      Portland, OR 97201
```

```
 1      todd.marshall@doj.state.or.us
            BY:   JESSE B. DAVIS
 2                TODD MARSHALL

 3
        WOOD SMITH HENNING & BERMAN LLP
 4      Counsel for Defendants: Vidocq Society and Richard
        Walter
 5      12755 Southwest 69th Avenue
        Suite 100
 6      Portland, Oregon 97223
        kschaffer@wshblaw.com
 7          BY:   KARIN L. SCHAFFER

 8
        Also present:  Nicholas McGuffin, Susan Hormann,
 9                     Marla Kaplan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<mark>

Page 4

I N D E X

Examinations                                               Page

BY MS. PURACAL:                                               5

BY MR. DAVIS:                                               138


E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Case jacket | 52 |
| 2 | OSP lab letter | 60 |
| 3 | Allele call table | 93 |
| 4 | OSP lab letter | 100 |
| 5 | Conversation log | 104 |
| 6 | Lab protocols | 110 |
| 7 | OSP lab letter | 119 |
| 8 | OSP lab letter | 121 |
| 9 | OSP lab memo | 123 |
| 11 | OSP lab letter | 129 |

```
 1              PORTLAND, OREGON; THURSDAY, MAY 05, 2022
 2                            9:00 A.M.
 3                           *    *    *
 4                          MARY KRINGS
 5          called as a witness in behalf of Plaintiffs,
 6            having first been sworn by the Reporter,
 7                       testifies as follows:
 8
 9                          EXAMINATION
10
11          MS. PURACAL:  Why don't we do introductions
12   for the record so that we can see everybody.
13          For Plaintiffs, this is Janis Puracal, and
14   I have my co-counsel Andrew Lauersdorf here, as well as
15   the Plaintiff, Nick McGuffin.
16          MS. HENDERSON:  This is Sarah Henderson.
17   I'm attending on behalf of the City and County
18   Defendants.
19          MS. SCHAFFER:  Good morning, this is Karin
20   Schaffer and I'm attending on behalf of the Vidocq
21   Society and Richard Walter, sometimes referred to as
22   the Vidocq Defendants.
23          MR. DAVIS:  Morning, this is Jesse Davis.
24   I'm here on behalf of Mary Krings, as well as the State
25   Defendants and the Oregon State Police.
```

Page 87

1  to 150 range would not be reproducible in your
2  experience, is that right?
3      A.  Well, no, because there are some circumstances
4  that might give you more confidence.  As I said, I
5  can't recall what those might be exactly, but in my
6  experience, generally not a mixture, that are not very
7  clear.  I don't remember an instance where I would have
8  that level of confidence in a mixture.
9      Q.  When you say mixture, can we define that?  What
10 do you mean when you say mixture?
11     A.  Mixture of DNA from more than one person.
12     Q.  So you define mixture as anything more than one
13 person?
14     A.  Yes.
15     Q.  So any time you have DNA contributed from more
16 than one person, then you would not interpret the data
17 between 50 and 150?
18     A.  I don't remember a specific instance when I did.
19 I'm not saying that as an absolute I wouldn't ever.  I
20 can't recall doing it.
21     Q.  When we were talking a little bit earlier about
22 the conclusion on Exhibit 2.3 from the left shoe, and
23 you said that you could not determine the number of
24 contributors there, is that because you
25 determine -- that you had never seen there would be

Page 94

1  conclusions for Exhibit 1, and I was trying to
2  understand which of these three exhibit numbers you
3  were reporting on -- and maybe we can revisit that
4  conversation.
5       Which of these samples were you reporting the
6  results of in your -- your August 27th, 2000?
7    A.  I don't remember writing that report.  But, from
8  looking at it recently, I believe that 1.1 and 1.3
9  would've have been the same sentence.
10   Q.  Would've been the same sentence?  What does that
11 mean?
12   A.  In the report.
13   Q.  You would've reported it the same way for 1.1 or
14 1.3?
15   A.  I believe I would, yes.
16   Q.  For Exhibit 1.3 here, I see that you've
17 indicated that there's a Y peak in the sample.
18       Do you see that?
19   A.  Yes.
20   Q.  The Y peak at the amelogenin location, that
21 tells us that there's male DNA in the sample?
22   A.  That's the -- the Y peak in general indicates
23 male DNA.
24   Q.  We know in the Freeman case, the victim,
25 Ms. Freeman, was female, right?

Page 95

1    A.   Yes.
2    Q.   So the presence of that Y peak tells us that
3    there a male on the sample, and so we know that that
4    didn't come from the female, Ms. Freeman, right?
5    A.   That's one possible interpretation.  Like I
6    said, the -- I don't know what it -- if it's in
7    parenthesis, that means it's below the threshold, so.
8    Q.   A Y peak below the threshold still would not
9    indicate a female, though.  It would still indicate a
10   male, correct?
11   A.   If it were a true Y allele, it would.  That's
12   the issue of the confidence level.  It may be.  It may
13   not be.  It may be.
14   Q.   And I see on Exhibit 1.3 that we also have at
15   least one location here, the D5S location, where we've
16   got three alleles that are all above the 150 threshold.
17        Do you see that?
18   A.   Yes.
19   Q.   So why didn't you report the presence of a
20   potential second contributor based on this three
21   alleles all above the 150 threshold at this locus?
22   A.   The 12 is in a stutter position for the 13, and
23   it's not unusual to have some elevated stutter.  So
24   it's not -- of itself not definite that it is from
25   another person.

1    Q.  Did you believe that 12 to be stutter?
2    A.  I don't know.  I don't remember at the time, and
3    I don't remember looking at -- I don't remember exactly
4    what the electropherogram looks like.
5    Q.  Let's see if I can find it.
6        I think I found here.  I'm going to share my
7    screen with you again, and this is -- we're going back
8    to Exhibit 2, and I'm on page 27 of that PDF here, and
9    I see the electropherogram.
10       Do you see here it's got Exhibit 1.3 noted on
11   there?
12   A.  Yes.
13   Q.  I see that it's dated July 31st, 2000.
14   A.  Okay.
15   Q.  And see your initials here at the top, is that
16   right?
17   A.  Yes.
18   Q.  If we go down to that locus here where we've got
19   the 11, the 12, and the 13, I don't see any indication
20   that you determined that that 12 is stutter.
21       Do you?
22   A.  I don't remember if I determined that
23   definitively or not.
24   Q.  Well, I noticed that on some of your other
25   electropherogram, for example, the one for 2.4 on page

```
 1   41 of the PDF, I see that you've noted where it's
 2   stutter in green, and then you crossed it out.
 3          Do you see that?
 4      A.  Hmm.  Yes.  Yes.
 5      Q.  If we go back here to our allele table for
 6   sample -- sorry, for Exhibit 1.3, do you have any
 7   reason to believe that you determined that the 12 is
 8   stutter?
 9      A.  I don't have any reason to believe that it was
10   definitely determined to be stutter.
11      Q.  Do you have any reason to believe that it
12   was -- any reason to suggest that at the time you
13   believed it to be stutter?
14      A.  Other than general knowledge that elevated
15   stutterer is not uncommon.
16      Q.  And we just looked at the electropherograms.  I
17   don't see anything on there where you've indicated that
18   the 12 is stutter.  You agree that there was nothing on
19   the documentation that that was stutter, correct?
20      A.  The -- those -- the other electropherogram, that
21   was -- I don't believe that was the same thing.
22      Q.  Well, I understand we looked at two different
23   electropherogram, right?  We looked at one for 1.3 and
24   we looked at one for 2.4.  And we were looking at the
25   ones for 2.4 where you actually notate on the
```

1   electropherogram when you determined something is
2   stutter.  Right?
3       A.  Yes, and that's not -- that's not what I'm
4   saying.  I don't believe that they're measuring the
5   same thing for the same reasons.
6       Q.  Can you explain that to me.
7       A.  What would you -- I -- I -- I'm not sure that
8   the second electropherogram was calculating elevated
9   stutter or just stutter.  That electropherogram had a
10  lot of problems with it.
11      Q.  Which one?
12      A.  The -- the one with all the markings on it.
13      Q.  The one for 2.4?
14      A.  That sounds right.
15      Q.  That we just looked at?
16      A.  Yes.
17      Q.  My question was about Exhibit 1.3 and whether
18  you had any reason to believe that at the time you
19  determined that 12 allele to be stutter?
20      A.  I do not remember anything from the time, and I
21  don't know that it was ever determined to be stutter.
22      Q.  So why did you not report the information about
23  Exhibit 1.3, given that you knew that there were at
24  least three alleles at this one locus here that were
25  above the 150 range?

Page 99

```
 1     A.   I don't -- I don't know that 12 is a -- another
 2   allele or if it's elevated stutter, which is not
 3   uncommon.
 4     Q.   I don't see on this allele chart where you have
 5   ever recorded any of the alleles that you believe to be
 6   stutter, or that you note to be stutter in your
 7   electropherograms.  It appears that you are reporting
 8   those that you determined to be true alleles.
 9          Do you disagree with that?
10     A.   No.  I don't understand what you're saying.
11     Q.   Okay.  So if we go back here to the document
12   that we looked at before, Exhibit 2, and we were
13   looking at page 41, and we were looking at, as an
14   example, the electropherogram for Exhibit 2.4.  We can
15   see, for example, here that you've crossed out the 16
16   allele and noted that it's stutter.
17          If we then look at your allele call sheet, and
18   we go down to 2.4, we can see that you don't note that
19   16 because you've determined it's stutter.
20     A.   Yes.  For 2.4, it appears that some of those
21   were determined to be stutter.
22     Q.   And so you did not note them on your allele call
23   sheet?
24     A.   I don't know.
25     Q.   Okay.  I'm going to show you what I have marked
```

Page 142

```
 1                   C E R T I F I C A T E
 2    STATE OF OREGON       )
 3                          ) ss.
 4    COUNTY OF MULTNOMAH   )
 5
 6         I, Amanda K. Fisher, a Certified Shorthand
 7    Reporter, do hereby certify that, pursuant to
 8    stipulation of counsel for the respective parties
 9    hereinbefore set forth, MARY KRINGS remotely appeared
10    before me at the time and place set forth in the
11    caption hereof; that at said time and place I reported
12    in Stenotype all testimony adduced and other oral
13    proceedings had in the foregoing matter; that
14    thereafter my notes were reduced to typewriting under
15    my direction; and that the foregoing transcript, pages
16    1 to 141, both inclusive, constitutes a full, true and
17    accurate record of all such testimony adduced and oral
18    proceedings had, and of the whole thereof.
19         Witness my hand and stamp at Portland, Oregon,
20    May 16, 2022.
21
22                       _____
23                       AMANDA K. FISHER
                         CSR No. 3229
24
25
```