Barbara Cohan-Saavedra
February 14, 2024

Barbara Cohan-Saavedra
February 14, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION
* * *

NICHOLAS JAMES MCGUFFIN, as and  :
individual and as guardian        :
ad litem, on behalf of S.M., a    :
minor,                            :
          Plaintiffs,        : NO. 6:20-cv-01163-MK
    - vs -                      :        (Lead Case)
MARK DANNELS, PAT DOWNING, SUSAN  :
HORMANN, MARY KRINGS, KRIS        :
KARCHER, SHELLY MCINNES, RAYMOND  :
MCNEELY, KIP OSWALD, MICHAEL      :
REAVES, JOHN RIDDLE, SEAN         :
SANBORN, ERIC SCHWENNINGER,       :
RICHARD WALTER, CHRIS WEBLEY,     :
ANTHONY WETMORE, KATHY WILCOX,    :
CRAIG ZANNI, DAVID ZAVALA, JOEL   :
D. SHAPIRO AS ADMINISTRATOR OF    :
THE ESTATE OF DAVE E. HALL,       :
VIDOCQ SOCIETY, CITY OF COQUILLE, :
CITY OF COOS BAY, COOS COUNTY,    :
and OREGON STATE POLICE,          :
         Defendants.        :

* * *

Oral deposition of BARBARA

COHAN-SAAVEDRA, taken at the law offices of STEVENS &

LEE, 1500 Market Street, 18th Floor, Philadelphia,

Pennsylvania, 19102, on Wednesday, February 14, 2024,

beginning at approximately 12:08 p.m. EST, before Lisa

M. Cooper, Court Reporter.

* * *
U.S. LEGAL SUPPORT
Northeast Processing Center
1818 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
U.S. Legal Support | www.uslegalsupport.com
(877) 479-2484

Barbara Cohan-Saavedra
February 14, 2024

Barbara Cohan-Saavedra
February 14, 2024

Page 2

1  A P P E A R A N C E S :
2
3      MALONEY LAUERSDORF REINER, P.C.
       BY:  ANDREW C. LAUERSDORF, ESQUIRE
4      BY:  JANIS C. PURACAL, ESQUIRE (VIA ZOOM)
       1111 East Burnside Street, Suite 300
       Portland, Oregon  97214
5      acl@mlrlegalteam.com
       jcp@mrlegalteam.com
6      -- Representing the Plaintiffs
7
       HWS LAW GROUP
8      BY:  ANTHONY R. SCISCIANI, III, ESQUIRE
       BY:  MEREDITH A. SAWYER (VIA ZOOM)
9      101 SW Main Street, Suite 1605
       Portland, Oregon  97204
10     ascisciani@hwslawgroup.com
       msawyer@hwslawgroup.com
11     -- Representing the Defendants, Vidocq
       Society
12
13     LUVAAS COBB
       BY:  ERIC S. DEFREEST, ESQUIRE
14     777 High Street, Suite 300
       Eugene, Oregon  97401
15     edefreest@luvaascobb.com
       -- Representing the Defendant, Richard Walter
16
17     OREGON DEPARTMENT OF JUSTICE
       BY:  JESSE B. DAVIS, ESQUIRE (VIA ZOOM)
18     100 SW MARKET STREET
       PORTLAND, OREGON  97201
19     jesse.b.davis@doj.state.or.us
       -- Representing the State Defendants
20
21     LAW OFFICE OF ROBERT E. FRANZ, JR.
       BY:  SARAH R. HENDERSON, ESQUIRE (VIA ZOOM)
22     P.O. Box 62
       Springfield, Oregon  97477
23     shenderson@franzlaw.comcastbiz.net
       -- Representing the Municipal Defendants
24
25

Page 3

1               I N D E X
2
3   WITNESS                                PAGE
4
5   BARBARA COHAN-SAAVEDRA
6
7       By:  Mr. Lauersdorf             5
8
9            *   *   *
10
11
12          E X H I B I T S
13
14  NUMBER         DESCRIPTION           PAGE
15  Cohan-1    Notice of Deposition       8
16  Cohan-13   Vidocq Synopsis           28
17  Cohan-2    Constitution and Bylaws   46
18  Cohan-3    Vidocq Journal           110
19  Cohan-4    Vidocq Website           122
20  Cohan-5    Resignation of R. Walter 191
21
22           *   *   *
23     U.S. Legal Support | www.uslegalsupport.com
24
25

Page 4

1           (It is hereby stipulated by and
2   among counsel for the respective parties
3   that signing, sealing, certification, and
4   filing are waived, and that all objections,
5   except as to the form of the question, are
6   reserved until the time of trial.)
7           *   *   *
8           BARBARA COHAN-SAAVEDRA:
9   after having been first duly sworn, was
10  examined and testified as follows:
11          *   *   *
12      MR. LAUERSDORF:  For the record, Andrew
13  Lauersdorf, from Maloney, Lauersdorf and
14  Reiner, on behalf of the plaintiffs in this
15  matter.
16      MR. SCISCIANI:  Anthony Scisciani, HWS
17  Law Group, counsel for defendant, Vidocq
18  Society.
19      MR. DEFREEST:  Eric DeFreest of Luvaas
20  Cobb, for defendant, Richard Walter.
21      MR. DAVIS:  Jesse Davis, on behalf of
22  the State defendants.
23      SARAH HENDERSON, Law Office of Robert E.
24  Franz, Jr., for the Municipal defendants.
25      MS. SAWYER:  Meredith Sawyer, HWS Law

Page 5

1   Group, also on behalf of Vidocq defendants
2   near.
3           MS. PURACAL:  Janis Puracal on behalf
4   of plaintiff.
5           *   *   *
6           EXAMINATION
7           *   *   *
8   BY MR. LAUERSDORF:
9       Q.      Is it Cohan?
10      A.      Cohan.
11      Q.      Cohan.  And then I think I found somewhere
12  that there was a hyphen in there somewhere?
13      A.      Yeah.  But I use -- you can just use Cohan.
14  It's easier.  My husband's last name is not an easy
15  one.
16      Q.      Okay.  Ms. Cohan, my name is Andy Lauersdorf.
17  You and I have never met before today, is that correct?
18      A.      That's correct.
19      Q.      I'm an attorney representing the plaintiffs
20  in this matter, which is a lawsuit filed by Mr.
21  McGuffin and his daughter against the City of Coquille
22  and a number of other defendants, including the Vidocq
23  Society.  Do you understand that?
24      A.      I do.
25      Q.      Okay.  Can you please state your full name as

Barbara Cohan-Saavedra
February 14, 2024

Page 6

1  given at birth?
2  A.      My name is Barbara, middle initial J., last
3  name Cohan, C-O-H-A-N.
4  Q.      Okay.  Is that your maiden name?
5  A.      Yes.
6  Q.      Okay.  And then at some point were you known
7  as Barbara Cohan Duffy?
8  A.      For a period of time, yes.
9  Q.      Okay.  And then you also go by Barbara Cohan
10  Saavedra?
11  A.      That is correct.
12  Q.      Are you currently employed?
13  A.      I am.
14  Q.      Where are you employed?
15  A.      At Phoenix Lithographing Corporation.
16  Q.      And what's job title there?
17  A.      General counsel.
18  Q.      Okay.  And you're also associated with the
19  Vidocq Society, is that correct?
20  A.      I am.
21  Q.      And how long have you been associated with
22  the Vidocq Society?
23  A.      I've been a member since 1994.
24  Q.      Did you say 1994?
25  A.      Correct.

Page 7

1  Q.      Okay.  Do you recall what month in 1994?
2  A.      I applied for membership in April of 1994 and
3  was admitted either that month or the following month.
4  Q.      What -- what inspired you to apply for
5  membership to the Vidocq Society?
6  A.      I had started going to meetings the year
7  prior to that, in 1993.  And I was very impressed by
8  the organization and excited to be a part of it.
9  Q.      Okay.  Is that while you were still employed
10  as an AUSA?
11  A.      Yes.
12  Q.      Okay.  And that -- what District were you in
13  when you --
14  A.      Eastern District of Pennsylvania.
15  Q.      Okay.  What positions have you held with the
16  Vidocq Society?
17  A.      I've been on the Board, I don't know the
18  exact date, but it's approximately 20 years.  I served,
19  for a time, as membership chair.  And I am presently
20  the public information officer.
21  Q.      Do you remember what year you joined the
22  Board?
23  A.      I really don't.  I'm guessing that it's about
24  20 years.
25  Q.      Okay.  And is that multiple terms?  Or is

Page 8

1  that like --
2  A.      That's multiple terms.  I've stood
3  for reelection each time and was reelected.
4  Q.      Okay.  So it's consecutive terms?
5  A.      Consecutive terms.
6  Q.      Okay.  Do you have a Curriculum Vitae that
7  reflects your time with the Vidocq Society and your
8  areas of expertise?
9  A.      I'm not sure whether I have it on my CV.
10  I've been in my present job for a very long time, so I
11  haven't updated it.
12  Q.      And did I ask you this already, with your
13  present job you're general counsel?
14  A.      Correct.
15  Q.      Okay.
16          MR. LAUERSDORF:  We will mark this
17          Exhibit-1.
18              *   *   *
19          (Whereupon, the above-mentioned document
20          was marked for identification as Cohan-1.)
21              *   *   *
22  BY MR. LAUERSDORF:
23  Q.      Okay.  So the court reporter's handed you
24  what's been marked as Exhibit-1.  Can you take a look
25  at that document and tell me if you've ever seen that

Page 9

1  document before?
2  A.      Yes.  I have.
3  Q.      And that's the Plaintiff's Federal Rule of
4  Civil Procedure 30(b)(6) and 34 Deposition Notice to
5  Defendant Vidocq Society, is that correct?
6  A.      That is correct.
7  Q.      And have you had a chance to look through
8  that document carefully at some point in the past?
9  A.      At several points, yes.
10  Q.      Okay.  And you're appearing for deposition
11  today as the designee of the defendant Vidocq Society,
12  is that correct?
13  A.      That is correct.
14  Q.      And so they have designated you, or Vidocq
15  Society has designated you as its representative to
16  testify regarding the topics set forth in Exhibit-1, is
17  that correct?
18  A.      Yes, sir.
19  Q.      And you understand as the Vidocq Society
20  designee you are testifying on behalf of the Vidocq
21  Society?
22  A.      Yes.
23  Q.      You understand that you are expected to
24  testify regarding all of the knowledge and information
25  that the Vidocq Society possesses on the topics listed

Barbara Cohan-Saavedra
February 14, 2024

Page 28

1    years, so defendants very often work with people
2    who had anything to do with their cases.
3    BY MR. LAUERSDORF:
4    Q.       So let me interrupt you there.  Have you been
5    sued in your personal capacity at any time after --
6    let's say in the last five years?
7    A.       Not in the last five years, no.
8    Q.       Okay.  Has the Vidocq Society been sued by
9    anyone?
10   A.       To my knowledge, the Vidocq Society has never
11   been sued.
12   Q.       Okay.  Has the Vidocq Society ever sued
13   anyone?
14   A.       To my knowledge, we have not.
15   Q.       Have you ever, in your personal capacity,
16   sued anyone in the last five years?
17   A.       No.
18   Q.       Okay.  If I understand correctly, Vidocq --
19   it says the Vidocq Society was formed in 1990, is that
20   correct?
21   A.       That is correct.
22   Q.       What was the first official act of the Vidocq
23   Society?
24   A.       Please explain what you mean by official act.
25   Q.       What was the -- I guess how -- how did the

Page 27

1    agreement to form the Vidocq Society come to fruition?
2    A.       As I understand it, Richard Walter, Bill
3    Fleischer and Frank Bender, who were three friends, had
4    met for lunch.  And they began discussing the breadth
5    of their -- each of their experience in their
6    respective fields.  And the topic came up, we have so
7    much expertise, even just among the three us, and we
8    know so many people who have expertise in various
9    aspects, wouldn't it be cool to pool that and try to
10   help the smaller police departments who don't have that
11   kind of resource.  And it was from that that the
12   Society emerged.
13   Q.       Okay.
14   A.       That's how it started.
15   Q.       And so once they all agreed that that would
16   be cool, what -- what did they do next?
17   A.       They began to schedule luncheons to discuss
18   it.  And they would each invite people they knew, in
19   the field of law enforcement, and in the field of
20   forensics, to just get together and brainstorm how they
21   could pool their expertise and their resources to guide
22   police departments.
23   Q.       Okay.
24   A.       Who needed that kind of guidance.
25   Q.       Okay.  So when was the first official meeting

Page 28

1    of the Vidocq Society?
2    A.       It was sometime in 1990.  I don't have a
3    date.  And there were no notes taken, or minutes, or
4    anything of that nature, so it -- this all comes from
5    an oral history, as it were.
6    Q.       Okay.  Did you -- in reviewing and preparing
7    for the deposition, did you review a document that's
8    referred to as the Synopsis?  The Vidocq Society
9    Synopsis.
10   A.       We have worked with lots of synopses.  I'm
11   not sure which one you're referring to.
12   Q.       Okay.  It's --
13            MR. LAUERSDORF:  For you folks on Zoom
14   call, we're going to mark Exhibit-13.
15                        *   *   *
16            (Whereupon, the above-mentioned document
17            was marked for identification as Cohan-13.)
18                        *   *   *
19            MR. SCISCIANI:  So the Notice is
20   Exhibit-1 and this is Exhibit-13.
21            MR. LAUERSDORF:  That's correct.
22   BY MR. LAUERSDORF:
23   Q.       I'm marking it out of order so that she has
24   a chance to see what I'm referring to when I refer to
25   the synopsis.

Page 29

1    A.       Yep.  I did review this.
2    Q.       Okay.  And so the meeting that's listed there
3    first on that document, the North Carolina Bathtub
4    murders.  It says that that case was presented
5    September 27th, 1990.  Would the first official meeting
6    of the Vidocq Society have occurred before September
7    1990?
8    A.       It would.  Because by this document there was
9    another case presented June 4th, 1990.  It's the second
10   one listed.
11   Q.       Okay.  Do you know if -- oh, because they're
12   not --
13   A.       They're not in strict chronological order.
14   Q.       Okay.  So how about June 14th, 1990, do you
15   know if that was the first -- would have been the first
16   official meeting of the Vidocq Society?
17   A.       This document is the only reference I saw to
18   anything that was presented in 1990.  So based upon
19   that, I would assume that, yes, this is the first.
20   There's nothing to indicate otherwise.
21   Q.       Okay.  And if there was an earlier meeting,
22   that would be something that you would have to obtain
23   from an oral history or consulting with somebody today?
24   A.       I would say so, yes.
25   Q.       Okay.  And do you know how many members were present at the

Barbara Cohan-Saavedra
February 14, 2024

Barbara Cohan-Saavedra
February 14, 2024

Page 32

1  first official meeting?
2  A.    There was no indication on this document how
3  many were present.
4  Q.    Okay.  Do you know how many members the
5  Vidocq Society had when -- at the time of its first
6  meeting?  Whether they attended or not.
7  A.    I don't know how many were at the first
8  meeting.  I do know that beginning with the first
9  meeting it grew at each successive meeting, as
10  additional people joined.  But I have no idea how many
11  people were at the first meeting.
12  Q.    Okay.  What are the names of the folks that
13  Mr. Walter and Mr. Bender and Mr. Fleischer, what are
14  -- who are the folks that they -- the first folks that
15  they invited?
16  A.    There were a number of people that the people
17  I spoke to identified as charter members.  And they --
18  they -- they characterized charter members as those who
19  have been with the Society from the beginning.  There
20  does not appear, on any of our membership documents,
21  anything that identifies certain people as charter
22  members.  That would be from oral history.
23  Q.    Who are the people that, at this point in
24  time, the Vidocq Society recognizes as charter members?
25  A.    I'm not a hundred percent certain here.  This

Page 31

1  is based on my memory of my conversations with Bill
2  Fleischer.
3  Q.    Okay.
4  A.    Who is the source of this information.  I
5  believe that Gary Debuvitz, D-E-B-U-V-I-T-Z, was a
6  charter member.  Joseph O'Kane, O, apostrophe, K-A-N-E,
7  was a charter member.  I can't think of any others, off
8  the top of my head.
9  Q.    But Richard Walter and Frank Bender would
10  have certainly have been?
11  A.    Clearly.  They were the founders.
12  Q.    Okay.  Do you know if Mr. Gaughan was a
13  charter member?
14  A.    I don't.
15  Q.    How about Mr. Lobovsky?
16  A.    I -- I am certain that Mr. Lobovsky was not.
17  Q.    Okay.
18  A.    Mr. Gaughan may have been, but I'm not
19  certain.
20  Q.    Okay.  And then, if I understand correctly,
21  the Vidocq Society was incorporated as a domestic
22  nonprofit corporation in June of 1991, is that correct?
23  A.    That is correct.
24  Q.    And so would the first official meeting of
25  the Vidocq Society be the same -- the same first

Page 33

1  referred in Exhibit-13?
2  A.    It might.  Do you want me to look?
3  Q.    Yeah.  If you don't mind.
4  A.    What was the date of the incorporation?
5  Q.    It was June of 1991.  I don't recall the
6  specific date.
7  A.    Is there a specific date?
8  Q.    There is.  I can do a little bit of digging
9  to find it.
10  A.    Well, I note that on Exhibit-13 there is a
11  case presented on June 20 of 1991.
12  Q.    Okay.
13  A.    Which, if the incorporation was prior to
14  that, during that month, that would have been the --
15  either the first meeting following incorporation, or
16  the last meeting before it was incorporated.
17  Q.    Okay.  Are there -- since 1990 or early 1991,
18  are there any meetings of the general membership that
19  are not reflected in this synopsis?  In Exhibit-13.
20  A.    I didn't -- when I reviewed this document, I
21  didn't compare it with the calendar to make sure that
22  every meeting is covered in this.
23  Q.    Okay.
24  A.    That was not the -- as I understand it, not
25  the intent of this document.  So I could figure out, at

1  least for the later ones, if this corresponds to each
2  of our meetings.  But I didn't do that inquiry, so I
3  really can't answer your question.
4  Q.    Okay.  But there is a calendar that you were
5  able to refer to?
6  A.    No.  When we meet at the Union League, I
7  would be able to check our records vis-a-vis the Union
8  League, because we pay them for that space.
9  Q.    Okay.
10  A.    When we used to meet at the Downtown Club,
11  that would be reflected, because we paid to use the
12  room for each of those meetings.  So it would be
13  possible to construct a calendar, but no such calendar
14  exists independently.
15  Q.    Okay.  And that -- to construct that -- that
16  calendar would have to be constructed from accounting
17  records or?
18  A.    Yes.
19  Q.    Okay.  And do those records still exist?
20  A.    I have no idea.  I think they -- they might.
21  Q.    Okay.
22  A.    If I can expand a little bit.
23  Q.    Please.
24  A.    When I was membership chair, one of the

Exhibit 90, Page 5 of 38

Barbara Cohan-Saavedra
February 14, 2024

Page 38

1  A.      Um-hum.
2  Q.      Okay.  And then does the -- does the Board
3  set any expectations for the officers, or the
4  directors, about what they will keep and what they can
5  throw away?
6  A.      Are you talking --
7          MR. SCISCIANI:  Object to form.  Go
8  ahead.
9          THE WITNESS:  I have a question about
10         your question.
11 BY MR. LAUERSDORF:
12 Q.      Please.  Yeah.
13 A.      Are you talking about today?  Or are you
14 talking about some point in the past?
15 Q.      Today.
16         MR. SCISCIANI:  Same objection.  Go
17         head.
18         THE WITNESS:  Today, the Society is in
19         the process of becoming increasingly
20         structured.  And as part of that structure,
21         we are in the very early stages of
22         establishing a position within the Society of
23         archivist, so that we can centralize our
24         documents and have a document retention
25         policy.

Page 39

1  BY MR. LAUERSDORF:
2  Q.      Okay.  Why -- why hasn't something like that
3  been done prior to this point?
4  A.      Because -- you have to understand the way the
5  Society works.  If -- if we were investigating cases,
6  then we would keep records of those cases.  But we
7  don't.  We are -- we're a resource.  I describe it to
8  some people as like the Encyclopedia Britannica.  If
9  you don't have knowledge about a particular technique,
10 issue, whatever, you go to a reference book, you find
11 out how to do it and then you go do what you have to
12 do.
13         The Society, although it started as a largely
14 association or organization with a noble purpose, over
15 the years has become more structured.  And in that
16 structure our core values, our core mission, has not
17 changed at all.  The mission is, we have a group of
18 people who have very deep and broad knowledge on a
19 variety of subjects.  If a homicide happens in
20 Philadelphia, which had 500-and-some homicides last
21 year, we have a homicide department that knows exactly
22 what to do.  We have --
23 Q.      The Society does?
24 A.      No.  I'm talking about the police department
25 right now.

Page 40

1  Q.      Okay.
2  A.      The police department, they have detectives
3  who do nothing but homicides.  Your average cop on the
4  street, because of the number of homicides we have,
5  knows what to do.  They know not to mess up a scene.
6  They know to call in the homicide detectives, who know
7  what witnesses to look at, what evidence to gather.
8  But in a small town, where there are typically no
9  homicides, or very few, even their most experienced
10 detectives lack the breadth of knowledge that comes
11 from experience of how best to keep a case from going
12 cold.
13         So when they come to us, it's the equivalent
14 of opening a reference book.  We say to them, "Have you
15 looked at this?  Have you looked at that?  Have you
16 thought about this?", with the view towards guiding
17 them to their obtaining things of potential evidentiary
18 value in their own investigations.  But the -- the
19 investigation remains theirs, which is why we don't
20 write reports.  We don't keep statistics.  We don't
21 keep files.  Because it's not our case.
22         We exist just to be say, "Hey, have you
23 thought about trying this?"  And sometimes it works.
24 And sometimes it doesn't.  Typically, we don't even
25 follow up in the months after a presentation if we're

Page 41

1  -- if they're not asking us questions, to even find out
2  what happened with the case.  So we don't have
3  statistics on how many cases our advice yielded a -- an
4  arrest or a conviction or whatever.  That's not our
5  role.
6  Q.      Okay.
7  A.      Does that answer your question?
8  Q.      Well --
9  A.      I didn't mean for it to be that long, but you
10 need to understand that.
11 Q.      That answers my question.  And my followup
12 is, is that explanation for the Society in its current
13 iteration?  Or has that --
14 A.      That core --
15 Q.      -- has the Society's perspective always been
16 the case?
17 A.      I'm sorry.  I interrupted you.
18 Q.      That's okay.
19 A.      Will you repeat that?
20 Q.      Yeah.  Is that explanation -- is that an
21 explanation, about the Vidocq Society, in its current
22 iteration, or has that -- the Vidocq Society's
23 perspective always been the case?
24 A.      That core mission has never changed.
25 Q.      Okay.

Exhibit 90, Page 6 of 38

Barbara Cohan-Saavedra
February 14, 2024

Page 42

1  A.      Whether the Society, in its inception, was
2  largely social, or now, when it's more structured. But
3  that core mission has never ever changed. Throughout
4  my 30 years almost.
5  Q.      Okay.
6  A.      With the Vidocq Society.
7  Q.      And so during that time has the Vidocq
8  Society written policies, or protocols, about its
9  members being -- actually doing investigation? Or
10 being actively involved in an investigation.
11         MR. SCISCIANI: Objection to form.
12         THE WITNESS: I'm not sure I understand
13      what you mean by that.
14 BY MR. LAUERSDORF:
15 Q.      Is there any kind of written policy, or
16 procedure, that expressly prohibits Vidocq Society
17 members from engaging in investigation, investigative
18 tasks, on the cases that are brought to Vidocq by law
19 enforcement?
20         MR. SCISCIANI: Object to form. Answer
21      it again.
22         MR. DEFREEST: Join the objection.
23         THE WITNESS: And I would tell you that
24 I really can't answer that, because the term
25 investigative tasks is so broad that I couldn't -- we

Page 43

1  -- you couldn't begin to address it. Because of the
2  various disciplines we have, an investigative task with
3  respect to one. A medical examiner might be very
4  different from an investigative task from someone who
5  is a statement analyst, or a fingerprint examiner, or a
6  polygraph person.
7  Q.      Okay. What about something just as simple as
8  interviewing witnesses?
9          MR. SCISCIANI: Object to form. You can
10      answer, if you can.
11         THE WITNESS: To my knowledge, we do not
12      interview witnesses. If that happened in the
13      past, I'm not saying it couldn't have
14      happened, but it -- it would be outside the
15      norm if it did.
16 BY MR. LAUERSDORF:
17 Q.      Okay.
18 A.      Because we're not the investigators.
19 Q.      Okay. And so that would be -- it would be
20 outside of the norm, because there was some kind of
21 understanding among the members that that wasn't the
22 role of the Society or its members, is that right?
23 A.      Yeah. And the Society doesn't micromanage
24 its members, because its members are experienced,
25 highly regarded professionals in their respective

Page 44

1  fields.
2  Q.      Okay.
3  A.      We're not dealing with novices who are just
4  coming into this.
5  Q.      Okay. So let me ask you now. That
6  understanding among the membership, that things like
7  interviewing witnesses is generally not the rule of the
8  Society or its members, is that understanding written
9  down somewhere? Or is that just a word of mouth --
10 A.      No. I would say that that is understood.
11 Q.      Okay. Is that --
12 A.      Today.
13 Q.      Okay. Is that something that has been
14 routinely communicated to the membership over the life
15 of the Vidocq Society?
16 A.      I wouldn't say it was communicated. I would
17 say it was understood.
18 Q.      Okay. Has there ever been a time when the
19 Board, or other members of the Vidocq Society, had to
20 have a discussion with a member about crossing the --
21 the understood line?
22 A.      I would say, based upon my knowledge from
23 talking to people and reviewing documents, to the
24 extent that that may have happened at all, it would
25 have been in the very early days of the Society.

Page 45

1  Q.      Okay. From which year to which year?
2  A.      Probably prior to 2000. By I couldn't be
3  sure.
4  Q.      Okay. So maybe the first decade?
5  A.      Possibly.
6  Q.      Okay. So when the Vidocq Society was first
7  incorporated as a nonprofit in 1991, what was the
8  leadership structure of the organization at that time?
9  A.      I don't know that there was a formal
10 leadership structure, but I believe that Bill Fleischer
11 was, at all times in the early days, the commissioner
12 of the Society. I do not know if there were any other
13 defined roles at that time.
14 Q.      Were there any other officers at that time?
15 A.      I don't know.
16 Q.      Was there a Board of Directors?
17 A.      I don't know. I would surmise that once it
18 was incorporated they would have formed a Board of
19 Directors shortly thereafter, but I couldn't tell you
20 when.
21 Q.      Okay. So you don't know when the Board was
22 established?
23 A.      I do not.
24 Q.      Or who the original directors were?
25 A.      I do not.

Barbara Cohan-Saavedra
February 14, 2024

Page 46

1  Q.      Or who the original officers were?
2  A.      No.  Except that Bill Fleischer was the
3  commissioner.
4  Q.      Okay.  How many members were there in June of
5  1991?
6  A.      I don't know.
7          MR. LAUERSDORF:  Mark that as Exhibit-2.
8                  *  *  *
9          (Whereupon, the above-mentioned document
10  was marked for identification as Cohan-2.)
11                 *  *  *
12         MR. SCISCIANI:  Before we do that, could
13  we take just a quick break?
14         MR. LAUERSDORF:  Sure.
15                 *  *  *
16         (Whereupon, a short break was taken at
17  1:14 p.m.)
18                 *  *  *
19         MS. SAWYER:  Andy.  There are two people
20  on the Zoom call that haven't been identified
21  for the record.  Could those folks be
22  identified for the record?
23         MS. CARR:  Hello.  This is Megan Carr on
24  behalf of OSP.
25         MS. SAWYER:  And my client, Nick

Page 47

1  McGuffin, is also on the line.
2  BY MR. LAUERSDORF:
3  Q.      I'm going to speak up a little bit.  I trust
4  that you'll understand that I'm not hollering at you.
5  A.      If you did, it's no big deal.
6  Q.      All right.  So before we took the break I had
7  the court reporter hand you what's been marked as
8  Exhibit-2.  Can you take a look at that document, look
9  it over and tell me if you recognize that document at
10  all.
11  A.      Okay.  I sort of recognize it.
12  Q.      Okay.
13  A.      This appears to be one of the iterations of
14  the Society's constitution and bylaws.  It does not
15  bear a date.  And there's at least one thing in here
16  that suggests to me that this may have been a draft and
17  not a final copy.
18  Q.      Okay.  What is it on the document that
19  suggests to you that that may have been a draft?
20  A.      On page 7, at the end of paragraph B, as in
21  Boy.
22  Q.      Oh, the question marks?
23  A.      The question marks.
24  Q.      Okay.
25  A.      Suggest to me that this is not a final copy.

Page 48

1  Q.      Okay.
2  A.      And the absence of a date.  I -- I have no
3  idea when this particular iteration would have been
4  used.
5  Q.      Okay.  And based on something you said
6  earlier, I'm also guessing that this is likely not the
7  original constitution and bylaws of the Vidocq Society.
8  Is that fair or not?
9  A.      It's likely, but I can't be certain.
10  Q.      Okay.  Do you have -- do you recognize this
11  as the current iteration of the constitution and bylaws
12  of the Vidocq?
13  A.      It definitely is not.
14  Q.      Okay.  Where would that document be located?
15  A.      I have a copy of that in my computer.
16  Q.      Okay.
17  A.      I wrote it.  Or I wrote portions of it.
18  Q.      Okay.  Do you know when the first version of
19  the Constitution and Bylaws of the Vidocq Society was
20  adopted?
21  A.      I do not.
22  Q.      Okay.  Do you know who drafted the first
23  version of the Constitution and Bylaws of the Vidocq
24  Society?
25  A.      I would be guessing.

Page 49

1  Q.      What's your best guess?
2  A.      My best guess would be Bill Fleischer, who
3  was our commissioner.  And at the time there was an
4  attorney named Ken Freeman?
5  Q.      Okay.
6  A.      Who is now deceased.  Who was a member of the
7  Society.  And he provided guidance.  So I'm sure that
8  others would have participated in that process.  But I
9  think its most likely that those two would have been
10  involved.
11  Q.      Okay.  Would Mr. Freeman have been a charter
12  member?
13  A.      I believe he probably was.  But I cannot be
14  certain.
15  Q.      Okay.
16  A.      As I told you, there is no formal record of
17  who was and was not charter members.
18  Q.      Okay.  When did the Vidocq Society start
19  maintaining a membership role?
20  A.      Joe O'Kane, who I mentioned earlier, was a --
21  the membership chair for a very long time.  His -- he
22  did not -- I don't know whether it was he didn't know
23  how to use a computer, or just didn't like it, but
24  everything he kept was by hand.  And it was terribly
25  disorganized.  At some point, around, I want to say it

Barbara Cohan-Saavedra
February 14, 2024

Page 54

1  constitution and bylaws, we'll work from this document
2  and if you can tell me --
3  A.     Certainly.
4  Q.     -- where it's accurate and where it's not,
5  okay?
6  A.     Um-hum.
7  Q.     Up at the top there in Article I Name, it
8  Name, it indicates that the guiding principle for the
9  Vidocq Society is Veritas Veritatum, truth begets
10  truth.  Do you know who came up with veritas veritatum
11  as the guiding principle for the Vidocq Society?
12  A.     I don't.  But I first heard it from Bill
13  Fleischer.
14  Q.     And what did Mr. Fleischer explain to you was
15  meant by that term?
16  A.     Essentially that everything we do, our very
17  existence, is to help people get to the truth.
18  Q.     Okay.  And so is the truth begets truth, in
19  parenthesis there, is that the literal translation of
20  veritas veritatum?
21  A.     I have no idea.  I took one semester of
22  Latin.
23  Q.     Okay.  Well, if the guiding principle is
24  truth begets truth, does the Vidocq Society accept that
25  the converse would also be true?  Do you understand

Page 55

1  what I mean by that?
2  A.     That requires speculation that I'm not
3  prepared to engage in.
4  Q.     Okay.  Given that veritas veritatum, or truth
5  begets truth, is the guiding principle of the Society,
6  what steps does the Society take, or the members of the
7  Society take, to make sure that the information they're
8  being given by law enforcement is true and accurate?
9  And the information that they are sharing with law
10  enforcement is truthful and accurate?
11  MR. SCISCIANI: Object to form.  Answer
12  if you can.
13  THE WITNESS:  If -- let me give you an
14  analogy to answer that.
15  BY MR. LAUERSDORF:
16  Q.     Okay.
17  A.     If you go to your doctor and you recite your
18  symptoms to that doctor, and the doctor gives you
19  advice, suggestions, based upon what you told that
20  doctor, if you misstated, or lied about your symptoms,
21  it's your problem.  If a law enforcement agency
22  consults the Vidocq Society, to go back to my old
23  analogy, much the way you would consult a reference
24  book.  And if you look up the wrong thing, or you input
25  the wrong information, then what you get isn't going to

Page 56

1  help you very much.
2  So because the control over the
3  investigation, because the actual real investigation
4  into a particular case remains solely within the
5  purview of the investigating agency, it's on them if
6  they don't give us honest and truthful stuff.  Because
7  it will make whatever suggestions we give them likely
8  worthless.
9  Q.     But the analogy breaks down on some level,
10  doesn't it?  Because if I go to my doctor and I give my
11  doctor bad information, and he gives me a bad
12  diagnosis, that is on me.  That's only going to affect
13  me.
14  A.     Um-hum.
15  Q.     In -- in the context that you're talking
16  about, if law enforcement gives you bad information and
17  then you suggest, based on that information, this is
18  your suspect, that's not affecting either law
19  enforcement or the Vidocq Society, that's affecting
20  that person that's been identified as a suspect,
21  correct?
22  MR. SCISCIANI:  Object to form.  Answer
23  if you can.
24  THE WITNESS:  I don't think we say that
25  is your suspect.  As a general rule, we will

Page 57

1  say, The evidence that you have shown us
2  would suggest that you should be looking at
3  that person.  But we're not making an arrest
4  decision.  We're not making the decision to
5  take certain investigative steps.
6  We are trying to suggest, to the
7  investigating agents, that they look in this
8  particular area or another for evidence that
9  might have some value in their investigation.
10  But whether to follow those steps or not is
11  completely up to them.
12  BY MR. LAUERSDORF:
13  Q.     Okay.
14  A.     I think the -- the doctor analogy may not be
15  perfect.  I think the reference book one is.
16  Q.     Okay.  So does -- does the Vidocq Society
17  have any kind of written, or unwritten, policy about
18  naming suspects?  About its members specifically naming
19  a person or -- or something as a suspect?
20  MR. SCISCIANI:  Object to form.
21  THE WITNESS:  I would say that we don't.
22  When cases are presented, and -- and -- very
23  often when cases are presented, the
24  investigators have already focused on one or
25  more likely suspects.  And what the Society

Barbara Cohan-Saavedra
February 14, 2024

Page 58

1    will generally do, and it's going to vary
2    case to case, and it's going to vary based
3    upon the types and the quantity and the
4    quality of the evidence that they have
5    developed, the Society will suggest ways to
6    perhaps rule out other people.  To rule out
7    particular people, or to sharpen the focus
8    on a person, or persons, that the Society,
9    based upon the evidence they've shown us,
10   suggests may be the perpetrator.
11   BY MR. LAUERSDORF:
12   Q.       Okay.
13   A.       But the decision of focusing on a particular
14   person is theirs, not ours.
15   Q.       Okay.  And so is that --
16   A.       But when the case is being presented, if the
17   evidence is suggesting, if it's pointing in one
18   direction or another, the Society may say, We think
19   you're on the right track.  But it's an opinion only.
20   We don't exert any influence over that investigation.
21   If that makes any sense to you.
22   Q.       And that's -- and are you talking
23   about in the Vidocq Society's current iteration?  Or
24   from the Vidocq Society's perspective has that always
25   been, at least theoretically, true?

Page 59

1    A.       I think, at least theoretically, that's
2    always been part of our mission.
3    Q.       Okay.  So if somebody acted inconsistently
4    with that mission, that would be -- that wouldn't be
5    something that the Vidocq Society was promoting or
6    approving of?
7            MR. SCISCIANI:  Object to form.
8            MR. DEFREEST:  Join the objection.
9            THE WITNESS:  That's fair.
10   BY MR. LAUERSDORF:
11   Q.       Okay.  So it says here, in Article 2, when we
12   get into the objectives there, the first bullet point,
13   the objectives of the organization shall be, the first
14   part is, To render pro bono assistance to law
15   enforcement jurisdictions in the solving of cold case
16   homicides or other crimes.  Is that -- is that
17   consistent with the actual constitution and bylaws of
18   the Vidocq Society?
19   A.       Probably.
20   Q.       Okay.  Do --
21   A.       I mean, I don't have --
22   Q.       You don't have the Constitution and --
23   A.       I don't have it in front of me and I haven't
24   memorized it, so.
25   Q.       Okay.  And if I understood something you said

Page 60

1    earlier, you were saying, if I understood it correctly,
2    that the original thought, the Society, the Society was
3    formed for the purpose of serving smaller law
4    enforcement jurisdictions?
5    A.       Or those with less experience that we were
6    able to provide.  Yes.
7    Q.       Okay.  So smaller law enforcement
8    jurisdictions and -- and, generally, that's because
9    they lack experience and they lack resources, is that
10   right?
11   A.       More -- yes.  That's true.
12   Q.       That was the thinking?
13   A.       Yeah.
14   Q.       Okay.  Okay.  So the Vidocq Society works
15   only for law enforcement, is that right?
16   A.       Um-hum.
17   Q.       What -- it says there, In solving of cold
18   case homicides or other crimes.  What other crimes does
19   -- do people -- does Vidocq invite presentations on?
20   A.       I think the other crimes doesn't mean that
21   somebody would present a case based on another crime.
22   But in the course of somebody bringing us a homicide
23   there may be ancillary crimes that were committed.
24   There could have been an arson involved in the same
25   case.

Page 61

1    Q.       Okay.
2    A.       If somebody is shot and then they burn the
3    building down, then you've got an arson involved too.
4    I think that's all that means.
5    Q.       Okay.
6    A.       But I'm not aware of -- no, I shouldn't say
7    that.  Generally they are cases determined to have been
8    homicides.  There are rare cases where the cause of
9    death was undetermined.  Considered likely homicide.
10   And we were asked to opine on whether it should be
11   pursued as a homicide.  What do we think?  Do we think
12   that might have been?  But those mostly occurred in the
13   very early days.  And I don't recall, in recent years,
14   anything that wasn't a homicide.
15   Q.       Okay.  It says there, if you -- at the first
16   bullet point, you see sub 1, where I'm at?
17   A.       Um-hum.
18   Q.       It says, Provided that such cases, 1, be
19   brought to the Society's attention by recognized law
20   enforcement agencies.  What -- what does it mean to be
21   a recognized law enforcement agency for the Vidocq
22   Society purposes?
23   A.       A real police department or sheriff's office.
24   I think --
25   Q.       Okay.

Exhibit 90, Page 10 of 38

Barbara Cohan-Saavedra
February 14, 2024

Page 62

1  A.      I think the use of recognized is superfluous.
2  Q.      Okay.  So it's a public agen -- it's a police
3  agency?
4  A.      Yeah.
5  Q.      It's not something that somebody can apply to
6  and obtain recognition from the Vidocq Society?
7  A.      Exactly.
8  Q.      And then it says, Or by immediate
9  family members who can assure the Society of the
10 cooperation and interest of the relevant recognized law
11 enforcement agency.  Is that -- is that accurate?
12 A.      Not today.
13 Q.      Okay.  That's one of the things I was
14 wondering about.  Because the website --
15 A.      That's what makes me think this is very old.
16 Q.      Okay.  Then in bullet point 2 it says, To
17 offer law enforcement jurisdictions in-service seminars
18 in topics related to the functioning of cold case
19 units.  So that -- there again we're talking about
20 public police agencies, correct?
21 A.      Correct.
22 Q.      And when you say in-service, are you talking
23 about when you're providing the training they are on
24 the clock?  They are being sent there by their agencies
25 to be trained?

Page 63

1  A.      I'm not sure what this means by in-service.
2  Q.      Okay.
3  A.      I think it's a term of art.
4  Q.      Okay.
5  A.      But we -- this -- this has been true
6  throughout our existence.  Because one of the ways in
7  which we can help law enforcement agencies is not
8  solely in reviewing cases, but in teaching them how to
9  -- how to -- some of these arcane techniques that they
10 can then apply in their cases.
11 Q.      Okay.  But it's -- okay.  So does the Vidocq
12 Society have an understanding of what is meant in this
13 constitution by in-service?
14 A.      I don't know what that would mean at this
15 point.
16 Q.      Okay.  And then the last bullet point there
17 is, To offer in-service seminars to the membership
18 relating to the application of forensic techniques as
19 they may be used in solving cold case homicides.  And
20 the -- the use of the term forensic there, does it have
21 its, you know, ordinary meaning, related to, connected
22 with, or used in courts of law, especially with
23 reference to the scientific analysis of evidence?
24 A.      I don't know that it would necessarily mean
25 the scientific analysis.

Page 64

1  Q.      I guess what I'm asking is, does the Vidocq
2  Society have a particular definition of the term
3  forensic?  What does the Vidocq Society mean when it
4  uses the term forensic?
5  A.      I think when we use it, it's of or relating
6  to investigations.  I -- I think there is definitely --
7  I think the way the term is used in this
8  document, it's vague.
9  Q.      Okay.
10 A.      It's vague.  But I think this entire bullet
11 point basically deals with knowledge sharing among the
12 members.
13 Q.      Okay.  Are there any specific techniques that
14 are intended?
15 A.      I don't think it's so much techniques.  I've
16 attended several of these type seminars.  Maybe this
17 will answer your question.  In one, Philadelphia's
18 chief medical examiner came and talked to us about
19 gunshot wounds.  And injuries from car accidents.  And
20 what types of things to look for in various kinds of
21 injuries.
22         In another we had a -- a seminar on blood
23 pattern analysis.  Not to make us experts, but just to
24 give us a level of understanding of those techniques as
25 they apply.

Page 65

1  Q.      Okay.  And is that same training made
2  available or provided to law enforcement jurisdictions
3  as well?
4  A.      Yes.  Yes.
5  Q.      Okay.  So --
6  A.      I'm sorry.  And to finish my answer.
7  Sometimes those trainings are to fill in when a
8  presenting police department has had to cancel at the
9  last minute.
10 Q.      Right.
11 A.      They'll ask somebody, can you get up and talk
12 about this and that?
13 Q.      Right.  Okay.  So -- but as we're here
14 talking today, do you -- does the Vidocq Society
15 understand, or is it using the term forensic to mean
16 anything other than the commonly understood dictionary
17 definition of the term forensic?
18 A.      I would say it's the commonly understood
19 dictionary definition.
20 Q.      Okay.  So my next question was going to be
21 about how often different techniques are taught.  But
22 it sounds like what you're saying is that it's not
23 necessarily the teaching of specific techniques, it's
24 more the -- kind of the broad overview of different
25 subject areas.

Barbara Cohan-Saavedra
February 14, 2024

Page 66

1  A.        It is.  And there's a difference between what
2  is presented strictly to law enforcement agencies and
3  what is presented to the membership.
4  Q.        Okay.  And what's the difference?
5  A.        Because when the Society goes out into the
6  field, they're usually done far away.  Either a law
7  enforcement agency, or, in many cases, a sponsoring
8  educational institution, will sponsor the seminar.
9  They will fly our members out to present the seminar
10 and then they invite all of the neighboring law
11 enforcement agencies to attend.
12 Q.        Okay.
13 A.        And sometimes they're more general.  How to
14 work a cold case.  How to identify a cold case.  What
15 steps will help you in investigating your cold cases.
16 And it's just being a reference book.
17 Q.        Okay.  So in which types of forensic
18 techniques did the Vidocq Society provide training when
19 it was initially established in 1991?
20 A.        I have no idea.
21 Q.        In which forensic techniques did the Vidocq
22 Society provide training as of 2010?
23           MR. SCISCIANI:  Object to form.
24           THE WITNESS:  I could not tell you.
25 That was -- I don't think that that was

Page 67

1           specifically covered in the deposition notice
2           with -- with dates.
3  BY MR. LAUERSDORF:
4  Q.        Okay.
5  A.        So I didn't inquire at that level of
6  specificity.
7  Q.        Okay.  Would there be records of -- of --
8  with those kind of specifics still in existence with
9  the Vidocq Society?
10 A.        Probably not.
11 Q.        Okay.
12 A.        I think that would be more oral history.  And
13 the person -- the main person I would ask would be Ed
14 Gaughan.
15 Q.        Okay.
16 A.        Who has been our training coordinator for
17 some time.
18 Q.        Okay.  He's listed on the website as the
19 training coordinator?
20 A.        Yes, he is.
21 Q.        Okay.  Let's move on to Article 3, the Board
22 of Directors.  What is the function of the Board of
23 Directors of the Vidocq Society?
24 A.        To give structure and guidance to the Society
25 in its activities.

Page 68

1  Q.        Okay.  And so some Boards, you know, are more
2  hands on.  They actually run the show.  And some Boards
3  are more, you know, the officers run the show and we
4  just kind of oversee things, right.  Is there -- along
5  that spectrum, where does the Vidocq Society Board of
6  Directors fall?
7           MR. SCISCIANI:  Object to form.
8           THE WITNESS:  That depends on what you
9  mean by running the show.
10 BY MR. LAUERSDORF:
11 Q.        Okay.  Does the Board have to approve
12 decisions that are made and actions that are taken by
13 the Society's officers?
14 A.        That depends on the actions and the
15 decisions.
16 Q.        Okay.
17 A.        I don't mean to be --
18 Q.        That's -- that's okay.  When the -- when the
19 Board was first established, what were the -- what were
20 the powers of the Board?
21 A.        In 1991?
22 Q.        I still don't know when it was first
23 established, so.
24 A.        Well, we know that it was organized as a
25 corporation, as a nonprofit corporation in '91.  So I

Page 69

1  am assuming that there was a Board at that point.  But
2  I don't know for certain.
3  Q.        Okay.  And if there were any records of that,
4  with that information, where would it be?
5  A.        It would be oral history.
6  Q.        Okay.  So given that you're assuming, you
7  wouldn't know how many directors the Board had?
8  A.        No.
9  Q.        Okay.  How many different directors have
10 served on the Board since you've been involved with
11 Vidocq, starting in 1994?  Or let me just say between
12 1994 and 2010?
13 A.        Well, I will tell you, until I joined the
14 Board, I couldn't tell you the answer to that question,
15 because I didn't count the number of people on the
16 Board.
17 Q.        Okay.
18 A.        And your questions, in the deposition notice,
19 didn't drill down to that level of detail, so I didn't
20 inquire.
21 Q.        Okay. is there -- does Vidocq have any
22 records of who has served on its Board over the years?
23 A.        No.  But since I've been on the Board, and in
24 the time that I maintained the membership data, that
25 identifies who was on the Board during that period.  I

Barbara Cohan-Saavedra
February 14, 2024

Page 70

1  do have -- in my computer, I have minutes of many Board
2  meetings, which would reflect which members were
3  present, which members were absent, and would have the
4  names of the people on the Board.
5  Q.        Okay.
6  A.        So -- with gaps.  I don't -- I didn't retain
7  all of the minutes.  But that information is, I think,
8  retrievable.
9  Q.        Okay.  How many Board members are there
10 currently?
11 A.        I think nine.
12 Q.        And how many officers?
13 A.        Nine or ten.  At present the commissioner is
14 Michael Rieders, R-I-E-D-E-R-S.  The first deputy
15 commissioner is Howard Lobovsky  The second deputy
16 commissioner is Tom McAndrew.  We have two former
17 commissioners who are commissioners emeritus.  That
18 would be Bill Fleischer and Ben Redmond.  We have a
19 secretary, who is Stacy, S-T-A-C-Y, Forchetti,
20 F-O-R-C-H-E-T-T-I.  I think she's anglicized the
21 pronunciation, but I didn't.  John Cohen is the
22 treasurer.  I think that's it for officers.
23 Q.        Okay.  Have those numbers been consistent
24 throughout the time that you have served on the Board,
25 or as an officer of the --

Page 71

1  A.        Largely, yes.
2  Q.        Okay.  If you move down there to Sections 2
3  and 3, are there still three categories of membership?
4  A.        Yes.
5  Q.        And so how many full members are there of the
6  Vidocq Society?
7  A.        At present I think we're at 81.  But I'm not
8  a hundred percent certain.  I know we're very close to
9  capacity.
10 Q.        Okay.  So the -- I think I saw something in
11 here about the full membership would be limited to --
12 or shall not exceed 82.
13 A.        Yes.  That was the number of years that
14 Eugene-Francois Vidocq lived.
15 Q.        Okay.  So that is still true?
16 A.        That is still true.
17 Q.        There's an 82 member cap?  On full members.
18 A.        Correct.
19 Q.        Okay.  How many special members are there in
20 Vidocq currently?
21 A.        I don't know.  But when I was still
22 membership chair, I believe the number of special
23 members was approximately 120 or 130.
24 Q.        Okay.
25 A.        That's just ball park.

Page 72

1  Q.        Do you think it's -- that number has stayed
2  consistent since you left the membership chair?
3  A.        I believe it has.  Because we've had people
4  who left, people who added.  I don't think there's been
5  any sharp increase or decrease in those numbers.
6  Q.        And how many honorary members are there of
7  Vidocq Society?
8  A.        The honorary category tends to be people who
9  live outside the Country.  Are members who are in
10 Italy, for example, would be an honorary member.
11 They're not paying dues.  Or if an active member moves
12 so far away that they're not working on anything,
13 they're not attending meetings, rather than pay dues,
14 they take on honorary membership until such time as
15 they relocate to the area.  So we have a number of
16 members.  That way they're there if we need them.
17 Q.        Okay.
18 A.        There is one woman who's a forensic
19 entomologist.  Not every case requires that type of
20 expertise.  So as an honorary member she's there if we
21 need to consult her.
22 Q.        Okay.
23 A.        But she's gone.  I don't know the number
24 presently.  But it's usually no more than a couple of
25 dozen.

Page 73

1  Q.        Okay.  And is an -- are honorary memberships
2  something that are applied for?  Or something that is
3  bestowed?
4  A.        It is.  In the case of people who are, like
5  we have one guy in Egypt, another guy in Italy.  We
6  just make them that type of member.  It's bestowed
7  because there's no dues, there's no voting.  But they
8  are there if we need to consult them.
9  Q.        Okay.
10 A.        And it's not really applied for, but it's
11 requested by a member who is really remote, or so
12 advanced in age that they -- they don't really want to
13 participate anymore, but they want to continue an
14 affiliation with the Society.
15 Q.        Okay.  But it's generally something that they
16 want.  It's not something that the Society identifies
17 somebody and says, Hey, we're making you an honorary
18 member.
19 A.        Precisely.
20 Q.        Okay.  Who came up with the honorific VSM?
21 A.        Probably Bill.
22 Q.        And if I understand correctly, that just
23 means Vidocq Society --
24 A.        Vidocq Society Member.
25 Q.        Okay.

Barbara Cohan-Saavedra
February 14, 2024

Barbara Cohan-Saavedra
February 14, 2024

Page 90

1  Q.    So then when Fred -- when Mr. Bornhofen
2  needed to report about the cases that were currently
3  under management, would he come to you and ask you for
4  information?  Or would you actually get a report?
5  A.    Yeah, he would e-mail me and say "What's
6  going on with this case?"
7  Q.    Okay.
8  A.    And I would say, it looks like it's not going
9  to go anywhere.
10  Q.    Okay.  And then he would collect those
11  e-mails and then report at the meeting this is --
12  A.    Yes.  And -- and the Board minutes might
13  reflect.  But usually when he would report, it would be
14  this case looks like it's going to be a live
15  presentation.  They have a few more things they want to
16  check.  They're waiting for this or that to come back
17  from the lab before they present to us.  Because when
18  an agency presented a case to us, it was helpful if lab
19  results were already in.  To the extent that they had
20  any evidence.  Check it for fingerprints.  See if you
21  got prints.  See if the prints turn anything up.
22         It was -- it was -- our assistance to them,
23  during a case presentation, would have much more value
24  to them if they had that information.  And could answer
25  the questions that we were asking.  So that's what the

Page 91

1  individual members were doing, was coordinating with
2  the investigating agency to get the case either tight
3  enough to present or where both parties would agree,
4  you know what, this isn't going to go anywhere.  We
5  have no witnesses.  We have no evidence that we can
6  look for.  There is nothing you can help us with.
7  Q.    So would there be written records, then, of
8  cases currently under management of the Vidocq Society
9  at any given point in time?
10  A.    Only -- no.  Only to the extent.  Well, if
11  Fred kept them.
12  Q.    Actually, if you're e-mailing back and forth
13  with Mr. Bornhofen about a particular case, or you're
14  -- you're liaising with a particular agency, would those
15  e-mails be kept somewhere?
16  A.    Well, most of the contacts with the agency
17  would have been by phone, not e-mail.
18  Q.    Okay.
19  A.    And similarly with Fred.  I mean, I would
20  call Fred and say, listen, you know, I talked to the
21  detectives.  They're busy.  They don't want to pursue
22  this anymore.  I say we close the file on it.
23  Q.    And then would Fred make a record of that so
24  he was able to report at the next meeting?
25  A.    I don't know what Fred would do.

Page 92

1  Q.    Okay.  Is the synopsis a -- is that what the
2  synopsis is?  Or no?
3  A.    Fred prepared this synopsis.  Because it
4  covers the period when -- when Fred was our case
5  manager.
6  Q.    In preparing for the deposition did you talk
7  to Fred about his --
8  A.    Fred is dead.
9  Q.    Oh, I'm sorry.  Did you talk to anybody about
10  the synopsis and what its purpose was?
11  A.    Yes.  I talked to Bill Gill and he said he
12  had no clue.  He only knew that he had this document
13  from Fred.
14  Q.    Okay.  And then -- so -- so why does the
15  synopsis end in 2013?  Is that when Mr. Bornhofen --
16  A.    That's about when -- when Bill took over.
17  Q.    So the Vidocq Society didn't have any
18  kind of written or unwritten or understood policy about
19  maintaining a synopsis like this?
20  A.    No.
21  Q.    Okay.  Was there any kind of policy, written
22  or unwritten, about maintaining records of the cases
23  that were currently under management with the Vidocq
24  Society at any given point in time?
25  A.    No.  Because we weren't managing them.  I

Page 93

1  mean, we were calling it managing.  The cases on which
2  -- that had been brought to us for consultation, or to
3  see if we could help, but I wouldn't call it managing.
4  Q.    Okay.  Do you know if these -- these terms
5  under management appear in the current iteration of the
6  constitution?
7  A.    I don't believe they do.  But I don't have
8  that in front of me, so I couldn't tell you.
9  Q.    Okay.  So because -- because this is the only
10  thing I have, or that I've been provided, I'm going to
11  continue to use the term under management if that's
12  okay.
13  A.    Go whatever suits you.
14  Q.    Okay.
15  A.    But, if I could just jump in to clarify my
16  answer.  If you look at item number 121 on Exhibit-13,
17  that was one of the cases that had been assigned to me.
18  Q.    Okay.
19  A.    And I was simply the liaison.  There was no
20  investigation to be done.
21  Q.    That's the Martin M. Burkle?
22  A.    Yeah.  I agreed to work it.  Meaning, I would
23  look at it, see if there appeared to be any way to
24  revive it.  That's what's meant by work the case.
25  Because that's all I was allowed to do.

U.S. Legal Support | www.uslegalsupport.com

Barbara Cohan-Saavedra
February 14, 2024

Page 94

1  Q.    And that's one where the coroner had ruled
2  the cause of death undetermined, right?
3  A.    Correct.
4  Q.    Okay.  So -- but then -- okay.  Well, using
5  the term as it appears here, or however the Vidocq
6  Society intended it, how many cases did the Vidocq
7  Society have under management when it incorporated in
8  1991?
9  A.    I have no idea.  That's not something you
10  asked for specifically.  And it's not something I
11  looked for.  I don't know if that's even -- it's
12  something anybody would know.  It would be a matter of
13  oral history.
14  Q.    Okay.  How many cases did the Vidocq Society
15  have under management as of January 1st, 2010?
16  A.    I don't know.
17  Q.    Is that -- would there be records of that
18  somewhere?
19  A.    I doubt it.
20  Q.    That would also just be oral history?
21  A.    Pardon me?
22  Q.    That would also just be oral history?
23  A.    Oral history, or to the extent that you could
24  divide it from Exhibit-13, that information could,
25  because there are dates on here, somebody could go

Page 95

1  through this and try to -- try to figure it out.
2  Q.    Okay.
3  A.    But as far as I'm aware, this document is the
4  only thing that exists by which that information could
5  be gleaned.
6  Q.    Okay.  So in there it also says -- I'm
7  looking still on Exhibit-2, Article 2, Section 2, Case
8  manager shall receive all cases submitted to the
9  Society for consideration.  Is that -- do you know
10  whether that language appears in the current
11  Constitution and Bylaws?
12  A.    I don't know.  But I think that likely that
13  it does.
14  Q.    Okay.  And what records are kept of submitted
15  cases?
16  A.    Depending on how they're submitted to us for
17  consideration.  In some cases it just starts with an
18  e-mail or a phone call.
19  Q.    Okay.
20  A.    If it looks like it's a case that's going to
21  be presented, the case manager asks the assigned
22  investigator to prepare a brief synopsis of the case to
23  be shared with our members.  In the -- going back to
24  the time around -- since you're concerned with the time
25  around 2010, in that time period, those synopses were

Page 96

1  distributed at the beginning of each meeting.  To the
2  members in attendance.
3  Q.    Exhibit-13?
4  A.    Not this, no.
5  Q.    Okay.
6  A.    The individual synopsis prepared by the
7  investigator of the case that's to be presented that
8  day.
9  Q.    Okay.
10  A.    And typically those ran 2, 3, 4 pages.  At
11  max.  Those would be distributed to the members
12  attending the meeting so that they could understand
13  what had been done, and then say, during and after the
14  presentation, "Have you thought about looking at this?"
15  "Have you thought about this?"  "Do you still have this
16  evidence?"  "Could this be submitted to see if maybe
17  you could get fingerprints?"
18  But it gives the Vidocq Society members a
19  general understanding of what the case is about.
20  Because absent that synopsis, our meetings used to be
21  only two hours, now they're about two and a half.
22  There is too much information that has to be imparted,
23  and not enough time for that back and forth process
24  that we do.  So by giving us the synopsis we get a
25  sense of the CliffsNotes version of the investigation,

Page 97

1  and could say -- oh, if I may give you an example.
2  Q.    Sure.
3  A.    There was one case, I can't remember which
4  one it was, where the murder weapon was, I believe it
5  was a brick.  And it was found at the scene.  It had
6  blood on it.  And one of our members said, "Do you
7  still have the brick?"  And the guy said, yeah.  He
8  said, well, when you grab a brick with enough force to
9  strike someone and kill them, your hand is going to
10  shed epithelial cells, and those cells may still be
11  present in the brick.  And if you get it tested, with
12  today's technology, that may assist you in identifying
13  the person who committed this homicide.
14  That's the kind of thing that happens in our
15  meetings.  So there is no directing the investigation.
16  It's, Hey, have you thought of this?  The -- the
17  synopsis gives us the structure from which to do that.
18  If that makes sense.
19  Q.    Yeah, it does.  But I'm more interested --
20  what I'm asking about, what I'm more interested in, is
21  the records that are kept, by the Vidocq Society, of
22  the cases that are submitted to the Society.  Are the
23  synopses that are submitted by law enforcement --
24  A.    Those were destroyed at the end of each
25  meeting usually.

Barbara Cohan-Saavedra
February 14, 2024

Page 98

1  Q.        By the members who received them?
2  A.        No.  We collected them at the end of each
3  meeting.
4  Q.        Okay.  And then Vidocq destroyed all of them?
5  A.        Well, the meetings used to be at the Downtown
6  Club.
7  Q.        Okay.
8  A.        I worked in the U.S. Attorney's Office, which
9  at that time was directly across the street.  So, just
10 as a matter of convenience, I would collect them and
11 I'd take them across the street and I'd dump them into
12 our shredder bins to be collected and turned into
13 mulch.
14 Q.        Okay.  And that was the U.S. Attorney's
15 Office's shredder bins?
16 A.        They were these great big bins that looked
17 like trash cans and.  They had a slit on them and they
18 were collected and then literally turned into mulch.
19 Q.        Right.
20 A.        We used --
21 Q.        But the U.S. Attorney's Office used them to
22 shred --
23 A.        Sensitive documents.
24 Q.        -- sensitive documents.
25 A.        Correct.

Page 99

1  Q.        So Vidocq Society also used them to shred --
2  A.        Yeah.
3  Q.        -- sensitive documents.
4  A.        But it wasn't shredding, it's mulching.
5  Q.        Mulching, okay.
6  A.        It's way beyond shredding.
7  Q.        Okay.
8  A.        Shredded documents can be reassembled.
9  Mulched documents cannot.
10 Q.        Okay.  So -- and would you do that -- so
11 there would be no record, you know, not even one of
12 these summaries kept so that Vidocq can --
13 A.        Occasionally a member would fold it up and
14 stick it in their pocket.  And I believe it was turned
15 over to you, the one for this particular case.  When I
16 reached out to the membership and sent a blast saying
17 do you have anything, I -- I echoed the questions you
18 asked in the deposition notice.  One of our members did
19 a search and found this particular case, which we refer
20 to as the Oregon case, and found the -- the
21 investigator's summary.  And I gave that to counsel and
22 they provided it to you.
23 Q.        Which member was that?
24 A.        That was John Nemec, N-E-M-E-C, who is a
25 Board member.

Page 100

1  Q.        Okay.  So -- so the Vidocq Society -- did the
2  Vidocq Society have a written policy about destroying
3  the --
4  A.        It was not a written policy.
5  Q.        Okay.  It was just understood?
6  A.        It was understood.  And in later years, we
7  had -- I created a cover sheet that said, Law
8  Enforcement Sensitive.  All copies, whether digital or
9  hard copy, must be destroyed at the end of this
10 meeting.
11 Q.        Okay.
12 A.        Because we now send them by e-mail.
13 Q.        Okay.  So that -- that relates to the
14 synopsis that the law enforcement agency prepares and
15 sends to the membership as a prelude to the -- to the
16 presentation?
17 A.        Correct.
18 Q.        What I'm interested in is --
19 A.        The case managers?
20 Q.        Yeah, the communication that goes back and
21 forth between the public agency reaching out to the
22 Vidocq Society, the Vidocq Society, and saying, yeah,
23 this is who we are.  This is what we do.  What records
24 are kept of which agencies have reached out, and which
25 cases they've reached out about?

Page 101

1          MR. SCISCIANI:  Object --
2          THE WITNESS:  Generally none.
3          MR. SCISCIANI:  -- to form.  Go ahead.
4  Sorry.
5          THE WITNESS:  Sorry.  Generally none.
6  BY MR. LAUERSDORF:
7  Q.        Okay.  And why is that?
8  A.        Only those that are necessary for -- in other
9  words, while a case is still active, the case manager
10 would retain all of the correspondence.  Once we step
11 away from it, having suggested whatever we're going to
12 suggest, and the ball's back in the investigating
13 agency's court to do with it what they will, there's no
14 need for us to keep anything.
15 Q.        Okay.  So how do you keep track of -- like,
16 what about records of cases that have been rejected?
17 What records are kept of that?
18 A.        There's no need for us to keep any records of
19 that.  And we don't.
20 Q.        So how do you -- how do you keep track of --
21 so what I'm getting at, I'm -- I guess what I'm trying
22 to figure out is, if an agency reaches out to you, and
23 they make a presentation, and the Vidocq Society, some
24 members give them some advice, and you don't hear from
25 them for a while, and these cold cases go on for

Barbara Cohan-Saavedra
February 14, 2024

1  that was usually kind of light, fluffy stuff to
2  maintain regular contact with the members.  It would
3  generally announce the people who were new members or
4  announce deaths of members.  And at times they would
5  solicit articles from the members on a topic that may
6  be relevant to the membership.
7  Q.       Okay.
8  A.       And it would announce publications that if --
9  if a member wrote a book they would let people know
10 that.
11 Q.       Okay.
12          MR. LAUERSDORF:  Can you mark that as
13          Exhibit-3.
14                 *   *   *
15          (Whereupon, the above-mentioned document
16          was marked for identification as Cohan-3.)
17                 *   *   *
18 BY MR. LAUERSDORF:
19 Q.       Take a look at what has been marked as
20 Exhibit-3 as handed to you and tell me if you recognize
21 that document at all.
22 A.       This is a very old copy of -- of the Vidocq
23 Society Journal.
24 Q.       Yeah.  That's the only one I could find.  But
25 that's what I just wanted to ask.  Is that what is --

Page 111

1  when the bylaws refer to the Journal, is that what
2  they're talking about?
3  A.       That's the journal they're talking about.
4  Q.       Okay.  There's -- if you go to page 4 of the
5  Journal, of that particular exhibit, Exhibit-3 -- well,
6  let me ask you.  There were no -- no copies of the
7  Vidocq Journal have been produced in this discovery in
8  this matter.  Do you know why that is?
9  A.       I do not.
10 Q.       Does that mean that there --
11 A.       Were they requested?
12 Q.       Yes.  I believe so.
13 A.       I don't know.
14 Q.       And I'm just wondering if that means that
15 there is no mention of Nicholas McGuffin, or Leah
16 Freeman, or the Leah Freeman case in any issue of the
17 Vidocq Journal?
18 A.       To my knowledge there is no mention of it
19 anywhere.
20 Q.       Okay.
21 A.       Because I have retained copies of the
22 Journal.  And one of the things that I did to prepare
23 for this, is I ran the terms Oregon and McGuffin and
24 Leah.  Not Freeman, because I know lots of people named
25 Freeman.  But I ran those three and the entire --

Page 113

1  A.       Okay.
2  Q.       Okay.
3  A.       And noth -- nothing came up.  And I do have
4  old copies of the Journal in my computer.
5  Q.       Okay.
6  A.       So they were definitely not named.
7  Q.       Are the -- are all the past issues of the
8  Journal archived?
9  A.       No.  Just like everything else, it's up to
10 the individual members if they want to keep it.
11 Q.       Okay.  So if you look at page 4 there, it's
12 an article on the Vidocq training committee and what
13 most Vidocq members don't know?
14 A.       Um-hum.
15 Q.       And they're talking about the Vidocq training
16 committee is a group of members who volunteer to travel
17 on their own time and they do these five day seminars.
18 Do you see where I'm at?
19 A.       Um-hum.
20 Q.       It says, We usually look at -- they do five
21 day seminars, *and we usually look at 10 to 15 cases
22 during a five day seminar.  That's not a typo, 10 to 15
23 cases.*  So there are cases presented to Vidocq, or its
24 membership, outside of the context of the Vidocq
25 meetings that occur?

Page 113

1  A.       No.  No.  No.  The process that happens at
2  these seminars where the attendees will bring cases to
3  the presenters, in this case the presenters are members
4  of the Vidocq Society training committee.
5  Q.       Okay.
6  A.       It -- they are functioning as the case
7  manager would function, in reviewing a case, to see if
8  there is anything where we might be able to assist them
9  to move it forward.  Where we could make suggestions of
10 actions they could take to move their cases forward.
11 Q.       Where -- where would the information on those
12 cases, those 10 to 15 cases that are presented while
13 they're out in the field training, where would the
14 information on those cases be?
15 A.       What do you mean by information?
16 Q.       Well, any kind of summary of who they met
17 with, when they met, what the case was about, what case
18 they met on, anything like that?
19          MR. SCISCIANI:  Object to form.
20          THE WITNESS:  I don't -- well, two
21          things.  I didn't ask, because you didn't
22          include that in your deposition notice.  And
23          the answer is I don't know.  But it should
24          be, just like anything else, it's not -- the
25          documents -- they're not -- what are the records of the

Barbara Cohan-Saavedra
February 14, 2024

**Page 116**

1  Vidocq Society's activity with respect to that
2  case.
3       If it's not a case that the Society is
4  working, if -- if Ed Gaughan is out in
5  Arizona and a local police officer brings him
6  a case and says, What do you think of
7  this?  We did this, we did this, we did this,
8  we did this.  One of two things is going to
9  happen.  Ed may look at that case --
10 actually, one of three things.
11      Ed may look at that case and say, you
12 should put this together for presentation and
13 then pass it on to the case manager, who
14 would schedule it for a meeting and treat it
15 just like any other case that had been
16 brought directly to the case manager.
17      Second thing that could happen is Ed
18 could look at it and say, looks like you got
19 nothing.  Looks like there's no chance of
20 improving it.  That's -- that's often the
21 case with a random homicide where a traveler
22 is killed on -- on a roadside someplace, and
23 there's literally no physical evidence.
24 There's nothing to be worked on.
25      And the -- and the middle of that would

**Page 117**

1  detectives have taken our members to crime scenes to
2  assist in cases.  So they're -- they might bring them
3  the file and have them review the file and then take
4  them out to the crime scene and the Vidocq Society
5  would walk the crime scene or -- do you know what they
6  would do at the crime scene?
7              MR. SCISCIANI:  Object to form.
8              THE WITNESS:  I -- i would have to be
9              speculating.
10 BY MR. LAUERSDORF:
11      Q.     Okay.  And then it mentions that these are
12 five day seminars.  How often does the Vidocq Society
13 put on these five day seminars?
14      A.     They're not very frequent.  Maybe once or
15 twice a year.
16      Q.     Do you know how often they were done between
17 1990 and 2010?
18      A.     I do not.
19      Q.     Do you know how often Richard Walter spoke at
20 any of these five day seminars?
21      A.     I do not know.  I don't believe that was
22 asked.
23      Q.     What subjects did Mr. Richard Walter present
24 on at these five day seminars?
25              MR. SCISCIANI:  Object to form.

**Page 115**

1              be where Ed may look at it and say, hey, do
2              you still have the murder weapon?  You might
3              be able to get epithelial cells out of that
4              thing if you still have it.  And maybe that's
5              enough.  There's no reason for us to keep
6              records.
7  BY MR. LAUERSDORF:
8       Q.     Okay.  It says there -- it says, that's not a
9  typo, 10 to 15 cases, and we've helped to move some of
10 those cases forward.  It says, In more than one
11 instance, detectives attending the seminar will go back
12 to their department at the end of the day, grab the
13 file and show up at our hotel.  Can you imagine looking
14 at crime scene photos and reviewing reports by the high
15 beams of a police car in a hotel parking lot?  On other
16 occasions detectives have taken our members to crime
17 scenes to assist in cases.
18      So what that suggests to me is that, in the
19 process of these five day seminars, police officers
20 from local agencies are going back to their departments
21 and removing agency files from their offices and then
22 bringing them to individual Vidocq Society members for
23 review at a remote location.  Is that what that says?
24      A.     That's what this sounds like.
25      Q.     Okay.  And -- the -- the local officers --

**Page 117**

1              THE WITNESS:  I have no knowledge of
2              that.
3  BY MR. LAUERSDORF:
4       Q.     Okay.  It also says there, in the second
5  paragraph down, fourth sentence, where it starts with
6  "Attendance", do you see where I'm at?
7       A.     Um-hum.
8       Q.     Attendance is limited to credentialed law
9  enforcement and homicide prosecutors.  So, you had
10 mentioned earlier these -- that the seminars that
11 sometimes you put on in collaboration with universities
12 or other educational facilities.  When you're doing it
13 in collaboration with those educational facilities, is
14 it still limited to badged officers?  Credentialed
15 officers?
16      A.     Yes.
17      Q.     Or can the university invite whoever it
18 wants?
19      A.     No.  It's -- they're just hosting it for the
20 law enforcement agencies.  It's not open to students
21 and people like that.
22      Q.     Okay.  So is that a condition of the Vidocq
23 Society's willingness to teach at those presentations?
24 That it can only be limited to credentialed officers?
25      A.     It's not necessarily a condition.  It's understanding.

Barbara Cohan-Saavedra
February 14, 2024

Page 126

1  indicating that Vidocq -- The Vidocq Society's been in
2  service to law enforcement nationwide since 1990,
3  right?
4  A.      Yes.
5  Q.      And its mission is to provide expert
6  assistance to law enforcement agencies?
7  A.      Yes.
8  Q.      And that's for the purpose of solving their
9  cold case homicides, right?
10 A.      Um-hum.
11 Q.      And for law enforcement, solving the case
12 means clearing the case by arrest and conviction, if
13 possible, correct?
14         MR. SCISCIANI:  Object to form.
15         THE WITNESS:  Not necessarily.
16 BY MR. LAUERSDORF:
17 Q.      Okay.  In what other ways does it work toward
18 solving cases?
19 A.      Well, it could be determined that a homicide
20 wasn't even a homicide.  I mean, it's to find out the
21 truth of what happened.
22 Q.      Okay.
23 A.      That's how we interpret it.
24 Q.      Okay.  But later on, and we'll get to this on
25 the website, it says that you don't take cases unless

Page 127

1  they've already been explicitly established as a
2  homicide.
3         MR. SCISCIANI:  Object to form.
4  BY MR. LAUERSDORF:
5  Q.      So when it comes to you, it's already been
6  determined that it's a homicide.
7  A.      Okay.
8  Q.      The goal in solving it is to clear it by
9  arrest or conviction, if -- if possible, right?
10 Sometimes it's not possible.
11 A.      In our view, from the Vidocq Society, solving
12 it is finding out the truth of what happened, and who
13 the likely perpetrator is.  It's up to the -- the
14 agency to take those next steps of arrest and
15 conviction.  We're not part of that.
16 Q.      Yeah.  And I understand Vidocq is not --
17 A.      Yeah, I just wanted to clarify.
18 Q.      -- doesn't have the authority to make
19 arrests.  I get that.  But the goal is to help law
20 enforcement, public police agencies, solve their --
21 their cold cases.  Right?  Their cold homicide cases.
22 A.      Yes.
23 Q.      Okay.
24 A.      But by solve, from the Vidocq Society's
25 perspective, it's to identify the likely perpetrator.

Page 128

1  That's where we end.  Their solving takes it steps
2  further.  We do not.
3  Q.      And how -- how the crime occurred, right?
4  A.      Yeah.
5  Q.      Yeah.  Okay.  And you emphasize there, on the
6  first page, and then -- on several pages.  It's on the
7  first page and the second page, and I think some other
8  pages, that the Society does not conduct independent
9  investigations.  Is that right?
10 A.      Um-hum.
11 Q.      And that the Vidocq Society only works with
12 public law enforcement agencies, correct?
13 A.      Correct.
14 Q.      And that's to examine evidence, provide
15 knowledgable guidance and act as a catalyst for law
16 enforcement agencies and prosecutors.
17 A.      Where is that?  That's not on here.
18 Q.      It's on page 2 there.
19 A.      Well, you were on page 1.
20 Q.      Well, it -- it talks about being a catalyst
21 at the bottom of page 1.  It acts as a catalyst to
22 assist law enforcement agencies only at their
23 limitation, right?
24 A.      Um-hum.
25 Q.      And then if you go to page 2, the paragraph

Page 129

1  that begins "For more than 25 years".
2  A.      Okay.
3  Q.      It's provided expert assistance to law
4  enforcement agencies across the United States as they
5  work to solve their cold case homicides.  The Society
6  does not conduct independent investigations.  We act as
7  a catalyst and assist law enforcement agencies, only at
8  their invitation.
9  A.      Um-hum.
10 Q.      And then on the next paragraph is, If you
11 represent an agency with investigative jurisdiction
12 over such a case and would like fellow professionals to
13 examine the evidence and provide knowledgable guidance,
14 please contact the Society.  So I combined a little bit
15 of that.
16 A.      Okay.
17 Q.      And paraphrased it into the question, that
18 the Society is emphasizing that the Vidocq Society only
19 works with public law enforcement agencies.  And to the
20 extent they do, it's to examine evidence, provide
21 knowledgable guidance, and act as a catalyst for law
22 enforcement agencies and prosecutors.  Is that fair?
23         MR. SCISCIANI:  Object to form.
24         THE WITNESS:  Um-hum.
25         MR. DEFREEST:  Join the objection.

Barbara Cohan-Saavedra
February 14, 2024

Page 138

1  A.      No.
2  Q.      Okay.  So if law enforcement brought a case
3  to Vidocq and said, here is everything we have got.
4  Here are all the reports, here are the photos, here's
5  the autopsy record, here's the blood stain spatter.  Do
6  your analysis.  And that Vidocq member used that
7  information to their advantage to go to the family and
8  say, Hey, you should hire my firm to look into this for
9  you.  To investigate this for you.  That would create a
10  conflict, right?
11          MR. SCISCIANI:  Object to form.
12  BY MR. LAUERSDORF:
13  Q.      Or a potential for a conflict?
14          MR. SCISCIANI:  Same objection to form.
15          MR. DEFREEST:  Join objection.
16          THE WITNESS:  It calls for such a degree
17      of speculation.  Because every Vidocq Society
18      member is a professional in either forensics,
19      or private investigation, or something.  To
20      my knowledge, there was only one case in
21      which the potential for that monetization
22      existed.  And the member, very wisely,
23      brought the question to the Board and said, I
24      have been approached by the family of a
25      murder victim and they want to retain me, and

Page 139

1      remunerate me, for working on this.
2          It was a case that was investigated by
3      the agency, unsuccessfully, brought to the
4      Vidocq Society with no improvement in the
5      investigation.  The Vidocq society had
6      no ideas that bore fruit.  And the case
7      remained cold.  The member approached the
8      Board and said, What is the Board's opinion
9      if I were to be remunerated, since the Vidocq
10      Society is no longer investigating this case?
11          And the Board's decision was, It would
12      be unethical.  It would be in violation of
13      our principles.  You may not do it.  And that
14      member, it was actually two members, they
15      resigned.
16  BY MR. LAUERSDORF:
17  Q.      And were those members Richard Walter and
18  Patrick Zirpoli?
19  A.      Yes, sir.
20  Q.      So then it indicates on there, again, We
21  don't work directly with family or friends of the
22  deceased, or with other interested parties.  I think
23  you already explained that's something that has changed
24  over the years.  At least for the very early years of
25  the Society?

Page 140

1  A.      Um-hum.
2  Q.      Cases that have not been ruled a homicide,
3  that's something that's changed as well, right?  On the
4  synopsis there were a number of cases where ruled
5  suicide and the family disagreed and they came to --
6  A.      Exactly.
7          -- Vidocq to -- okay.  So then, we go to page
8  -- if we go back to page 3 of 8.  On the section, How
9  does Vidocq Society assist law enforcement?  The
10  website lays out how things proceed once a police
11  agency has requested the Vidocq Society's assistance
12  with a cold case investigation.  Is that right?
13  A.      Where are you?
14  Q.      It says, Most often -- it's the second
15  sentence in that --
16  A.      Okay.
17  Q.      -- paragraph.  Most often once a case is
18  accepted the lead investigators are invited, at the
19  Society's expense, to present their case to our members
20  at one of our monthly meetings.  Do you see where I'm
21  at?
22  A.      Yep.
23  Q.      Okay.  And so at that point, after the police
24  agency has requested the Vidocq Society's assistance,
25  Vidocq -- it says, Vidocq Society pays for the officers

Page 141

1  from the police agency, or the prosecutor's office, to
2  come out to Philadelphia and present the case and share
3  their case files with the Vidocq Society members,
4  right?
5  A.      Um-hum.
6  Q.      That's -- and that was true in 2010 and
7  that's true today, is that right?
8  A.      It -- it is true that they're invited to do
9  that.  Typically they don't bring the whole case file.
10  They'll bring a synopsis.  Occasionally they'll bring
11  polygraph charts or photographs.  More often than not
12  we don't see the whole file.
13  Q.      Okay.
14  A.      At -- at the monthly meeting.
15  Q.      Okay.
16  A.      We're talking about a two to two and a half
17  hour meeting.
18  Q.      Right.  And that's at the Vidocq Society's
19  expense?
20  A.      Yes, sir.
21  Q.      And then after that presentation, it says,
22  There are many members who offer to spend additional
23  time with the police agency to review additional
24  materials and offer additional guidance.  Is that
25  right?

Barbara Cohan-Saavedra
February 14, 2024

Page 142

1  A.      That is correct.
2  Q.      Okay.  And sometimes provide onsite
3  assistance, right?  I think we're getting onto the next
4  page there.
5  A.      Yeah.  The post presentation assistance is
6  coordinated by a committee within the Vidocq Society,
7  called the Post Presentation Committee.  And it's
8  guided by the head of that committee, who coordinates
9  all of the activities, so it's not just the members
10 flying out willy-nilly.
11 Q.      Okay.  But it -- when it's coordinated, it
12 says there on the website, members can travel --
13 A.      Yeah.
14 Q.      -- at the Society's expense, to the
15 jurisdiction to conduct a more detailed review of the
16 evidence --
17 A.      Correct.
18 Q.      -- in the case and offer additional ideas.
19 And then it also says, Onsite assistance may be
20 provided, even where a case has not been presented, at
21 one of the Society's monthly meetings.  So that's
22 something that occurs as well?
23 A.      Infrequently, yes.
24 Q.      But that's all at the Vidocq Society's
25 expense, is that right?

Page 143

1  A.      It depends.  To my knowledge, the Society
2  pays to fly the investigators to Philadelphia and one
3  nights lodging, you know, on a per diem.  I don't know
4  to what extent the Society pays for all of these other
5  things.  I think -- in a rare case, the Society can pay
6  to fly people out.  But as I explained before, our
7  funds are so limited that we try to reserve them for
8  the presentations that are coming to our monthly
9  meetings.
10 Q.      Would there be records of that, when the
11 Society pays for those expenses?
12 A.      There would be financial records.
13 Q.      Okay.  Did the Society pay for Richard Walter
14 to travel to Coquille, Oregon to appear on ABC's 20/20?
15 A.      We have no records of making that payment.
16 Q.      Are there any records of authorizing Mr.
17 Walter to proceed in that fashion?
18 A.      Not that I'm aware of.
19 Q.      Okay.  Is that something that the
20 commissioner would have had to have delegated?
21         MR. SCISCIANI:  Object to form.
22         MR. DEFREEST:  Join the objection.
23         THE WITNESS:  No, I think -- I think
24         that's speculative.  It could have -- if it
25         was authorized it could have been authorized

Page 144

1  by a case manager, with the approval of the
2  Board, or the commissioner.  But to my
3  knowledge, the -- our financial records were
4  examined and there is no record of the
5  Society paying for that.
6  BY MR. LAUERSDORF:
7  Q.      Okay.  But he certainly was there.  He went.
8  A.      Clearly.
9  Q.      Okay.  And there are no records of any
10 discussions, any authorization for him to go, anything
11 like that, that you've seen?
12 A.      Not that I'm aware of.
13 Q.      Okay.  Have you seen the ABC 20/20 episode
14 regarding Leah Freeman?
15 A.      I saw it years ago.
16 Q.      Okay.
17 A.      I have not seen it since.
18 Q.      And do you recall, in that, the references to
19 the Vidocq Society and Mr. Walter talking about the
20 Vidocq Society?
21 A.      To be honest, I don't.
22 Q.      Okay.
23 A.      I know there were references to the Vidocq
24 Society, but I saw it when it aired.  And I don't think
25 I've seen it since.

Page 145

1  Q.      Okay.  And there -- that last paragraph there
2  with regard to, "How does Vidocq Society assist?"  It
3  says, the Society can also offer forensic assistance,
4  including, as examples, DNA testing, blood stain
5  spatter analysis, reading of an autopsy report and its
6  accompanying photographs, study of polygraph charts,
7  and 911 call analysis.  Is that right?
8  A.      Yes.
9  Q.      And there's some other things that fall in
10 there, like statement analysis I saw is one that seems
11 to come up a lot.  Is that right?
12 A.      Pardon me?
13 Q.      Statement analysis is one that seems to come
14 up a lot?
15         MR. SCISCIANI:  Object to form.
16         THE WITNESS:  It comes up occasionally.
17 BY MR. LAUERSDORF:
18 Q.      At least in the -- I'm talking about my
19 review of Exhibit-13.  Did you happen to notice that?
20 Or make note of that?
21 A.      I don't remember specifics.  There were a lot
22 of cases listed in that.
23 Q.      There were.  And there were also, at times,
24 where somebody from the Vidocq Society would take --
25 would administer polygraph exams.  Is that still

Barbara Cohan-Saavedra
February 14, 2024

Page 146

1  something that gets done?
2  A.      That was very early when that was done.
3  Q.      Okay.  But in any event, it says here, on the
4  website, that the Society offers forensic assistance
5  and these different things.  I want to ask a little bit
6  about -- well, let me back up.  Back up a little bit.
7  When -- so Vidocq works with police agencies throughout
8  the Country, is that right?
9  A.      Correct.
10 Q.      Has Vidocq ever worked with the same police
11 agency more than once?
12 A.      Yes.
13 Q.      Which agencies?
14 A.      I don't know.  I don't believe that was
15 asked, so I didn't inquire.
16 Q.      Okay.  Has the Vidocq Society ever worked
17 with a police agency other than the Coquille Police
18 Department?
19 A.      I don't know.  It's possible.
20 Q.      Has the Vidocq Society ever worked with the
21 Coquille Police Department other than the Freeman case?
22 A.      Not that I'm aware of.
23 Q.      And police have to choose to work with the
24 Vidocq Society as well, right?
25 A.      Absolutely.

Page 147

1  Q.      They can decide whether to use Vidocq Society
2  to assist, or not use the Vidocq Society, is that
3  right?
4  A.      Yes.  And they can also decide to accept or
5  completely disregard the suggestions that the members
6  pose.
7  Q.      Okay.  And then, if they do choose to work
8  with the Vidocq Society, though, then the Vidocq
9  Society and police work together to try to solve the
10 case, is that right?
11 A.      No.
12         MR. SCISCIANI:  Object to form.
13         THE WITNESS:  No.  That's not correct.
14 BY MR. LAUERSDORF:
15 Q.      Okay.  If you go to page 6 of 8.  There's a
16 section on 5 of 8 that starts, How can you request the
17 assistance of the Vidocq Society?
18 A.      Um-hum.
19 Q.      And then 6 of 8 that ends after the bullet
20 list, it says, The law enforcement agency with
21 investigative jurisdiction must invite and welcome the
22 involvement of the Vidocq Society, and agree to assist
23 the Society's efforts.  So that -- that sounds like
24 you're talking about a reciprocal corporation.
25 A.      No.

Page 148

1          MR. SCISCIANI:  Object to form.
2          MR. DEFREEST:  Sorry, Counsel, where are
3  you?
4          MR. LAUERSDORF:  Page 6 of 8.  Top
5  paragraph, just under the bullet point list.
6          MR. DEFREEST:  Thank you.
7  BY MR. LAUERSDORF:
8  Q.      So when it says that the law enforcement
9  agency has to agree to assist the Society's effort,
10 what does that mean?  What's the agreement?
11 A.      Very simple.  If you're going to come present
12 a case to the Society, you need to review your evidence
13 before you come out.  You need to prepare a summary.
14 You need to put together a PowerPoint or something to
15 present to the Society.  That's what it means.
16 Q.      They have to agree to provide information?
17 A.      Well, they have to do their homework
18 to -- to make a presentation that is worthy of the time
19 of this room full of people.  We've had police agencies
20 who came out and hadn't reviewed their cases and did
21 really pathetic presentations that you couldn't even
22 tell what they had done, what they hadn't done.  They
23 had evidence they hadn't tested.
24         So when the members would say, "Have you
25 thought about doing this?"  "Well, I just got the file.

Page 149

1  I haven't really looked at it yet."  And it basically
2  wasted the money that it cost to bring them in and
3  everybody's time.  So the kind of corporation that
4  that's talking about, it requires both parties.  We
5  show up, we spend money to book a room.  We bring in
6  the projector and the laptop and all the other stuff.
7          You have to at least know your case.  You
8  have to at least prepare the case synopsis.  You have
9  to bring either photographs or something that you can
10 show the members, when you're doing that.  Because if
11 you do -- if you don't do that, it's a waste of
12 everybody's time.  That's all that's talking about.
13 Q.      Can you go back to page 4 of 8, where you're
14 talking about the forensic assistance that the Society
15 provides.
16 A.      Um-hum.
17 Q.      The last sentence there it says, In all cases
18 opinions provided by the members are their own and are
19 not formally or legally binding on the Vidocq Society.
20 When was that language added to the website?
21 A.      I don't know when it was added.  But it was
22 included in a number of other places as well.
23 Q.      And why is that language added to the
24 website?
25 A.      Very simple.  When you get a group of, even

Barbara Cohan-Saavedra
February 14, 2024

Page 150

1   experienced forensic experts, there are going to be
2   disagreements among those experts.  So 3 different
3   people can get up at one of these meetings and say, "I
4   think maybe you should look in this direction."  Or "I
5   think maybe you should look in that direction."  Or
6   "Have you thought about looking at this?"  People will
7   disagree with each other.
8   Q.      Okay.
9   A.      So there's not a unified opinion or
10  suggestion.  That's why we put that in.  Just as --
11  just as the investigating agency is free to accept or
12  reject the suggestions that come out of those meetings,
13  "We think you should look at this evidence."  "Why
14  don't you -- have you looked or thought about looking
15  at that?"  Even among the members, there is going to be
16  disagreement.  So it's simply saying, if you talked to
17  two different members, that's not necessarily the
18  consensus from the organization.
19  Q.      Isn't it a disclaimer, really?  A liability
20  disclaimer.
21          MR. SCISCIANI:  Object to form.
22          Argumentative.
23          THE WITNESS:  It's that and more.
24  BY MR. LAUERSDORF:
25  Q.      Okay.

Page 151

1   A.      How you interpret it is up to you, but I'm
2   telling you what gave rise to putting that in.
3   Q.      Okay.  That's what I'm asking, is what the
4   Society's intent was in putting the language in there.
5   And what the Society thinks that that language means.
6   A.      Well, we -- there were a number of reasons
7   for putting it in.  But a very important reason for
8   putting it in is that there are often broad
9   disagreements among our members, on looking at the same
10  evidence, about what it could or could not indicate.
11  Q.      Okay.
12  A.      It's not up to us.  It's up to the
13  investigating agency.  So if they get a suggestion, or
14  input, from several different people, and those are
15  inconsistent, it -- it's important for the Society to
16  make clear, even though we tell the investigating
17  agencies you're free to accept or reject whatever we
18  say.  Similarly you may hear totally conflicting things
19  from two different people.
20  Q.      Okay.
21  A.      It's up to you.
22  Q.      But this doesn't -- there's nothing in this
23  that prohibits law enforcement from using those expert
24  opinions as evidence, or calling Vidocq members as
25  expert witnesses at trial if a case --

Page 152

1   A.      As individuals?
2   Q.      -- goes that far?  Well, yeah.  I guess --
3   A.      If they did that they would be doing that in
4   their individual capacity, not as Vidocq Society
5   members.
6   Q.      Okay.
7           MR. SCISCIANI:  Take just a quick break?
8           MR LAUERSDORF:  Sure.
9                   *   *   *
10          (Whereupon, a short break was taken at
11  3:54 p.m.)
12                  *   *   *
13  BY MR. LAUERSDORF:
14  Q.      So before the meeting law enforcement sends a
15  summary, or a three or four page synopsis of the case.
16  What other kinds of materials do police provide to
17  Vidocq in advance of the presentation?
18  A.      When you say to Vidocq, are you talking bout
19  to the case manager?  Or to the body of membership at
20  the presentation?
21  Q.      Either or.  Anybody that --
22  A.      Well, it's going to vary.
23  Q.      Okay.  So could it be police reports?
24  A.      It could be police reports.  Generally --
25  let's start with the presentation to the membership.

Page 153

1   When they actually present their case.
2   Q.      Okay.
3   A.      Usually the only things that the membership
4   has in hand are -- is that little synopsis.  Now, their
5   -- their PowerPoint usually includes maps, autopsy
6   photos, rarely police reports.  Almost never.  It may
7   include written statements, if any were taken.  It
8   usually has bullet points as -- as a PowerPoint would.
9   Q.      How about recorded statements?
10  A.      No.  I do remember some 911 calls that they
11  played the audio.  But I don't remember any, like, post
12  arrest statements or anything like -- of that nature.
13  I'm not saying it never happened.  I don't recall any.
14  Q.      Okay.  Do they provide Vidocq with a theory
15  of the crime?  Their existing theory.
16  A.      Some presenters do.  Some do not.  Usually
17  they -- they keep that close to the vest to see what
18  the members are suggesting.
19  Q.      Okay.  What about a theory of the suspect?
20  Could they present --
21  A.      Usually they present us with a list of
22  suspects.
23  Q.      Okay.  And what about the criminal history of
24  their suspects?  Suspects or suspect.  Did they provide
25  that information?

U.S. Legal Support | www.uslegalsupport.com

Barbara Cohan-Saavedra
February 14, 2024

Page 154

1  A.      I don't -- I don't remember many cases where
2  they did that.  Very often the members would inquire
3  about post offense criminal history.  Like if they --
4  if a police agency will tell us, well, these are the
5  five people we think are our prime suspects, the
6  members will very often ask questions, well, in the 22
7  years since this happened, or the 40 years since this
8  happened, what has this person done?  Do they have no
9  police involvement, or do they have a long criminal
10 history?
11 Q.       And then that information will be provided?
12 A.      If they have it.
13 Q.       Okay.  How about lab reports?
14 A.      Occasionally they will.
15 Q.       Photos from the crime scene?
16 A.      Yes.
17 Q.       Photos of evidentiary items?
18 A.      If -- yes.  If they have them available.
19 Q.       And then do police share confidential
20 information with Vidocq?
21 A.      What do you mean by that?
22 Q.       Information that the police do not want to
23 share with the public.
24 A.      Yes.  Occasionally we will have a police
25 agency request that when they do their presentation

Page 155

1  that there are no members of the press present, or they
2  don't want like non-law enforcement people in the room.
3  We've done a few things where we had asked people to
4  step out, where there are things that are kept very
5  confidential.  Yes.
6  Q.       Okay.  Is there frequently press in the room?
7  A.      Occasionally.
8  Q.       Okay.  So what kinds of confidential
9  information will trigger asking people to step out?
10 A.      Usually it would be aspects of the crime
11 scene that had not been made public, that only the
12 perpetrator would know.  That if they got out, then it,
13 it affects the purity of the investigation.
14 Q.       So -- and then Vidocq members will provide
15 input during the presentation, right?  They'll ask
16 questions.  And do they provide ideas for
17 investigation?
18 A.      Usually they're questions.  They're put in
19 the form of the questions.  "Have you thought about
20 looking at this?"  "Do you still have this evidence?"
21 That's the most common.
22 Q.       Okay.
23 A.      "Is this evidence still available?"  "Have
24 you thought to look here or there?"
25 Q.       Do they suggest witnesses to interview?

Page 156

1  A.       Sometimes.  And usually we always have the --
2  the presenters.  We pay for two people to come in.  And
3  the purpose of that, when you were asking about
4  recordkeeping before.  The purpose of having two
5  presenters is so that one does the presentation, the
6  other makes notes of ideas that are coming in the form
7  of questions from the members.
8  Q.       Okay.
9  A.       So that you don't -- that's one of the many
10 reasons you're not going to have the Society
11 maintaining records.  It's kept within the
12 investigating agency.
13 Q.       Were you present during the presentation of
14 the Freeman case?
15 A.       I don't remember whether I was or not.  It
16 was a really long time ago.
17 Q.       Okay.  Do they make suggestions about
18 forensic testing to pursue?
19 A.       Yes.  In the example that I gave you about
20 the brick that might have epithelial cells from which
21 they might extract DNA.
22 Q.       Do they offer theories of the crime, or
23 theories of potential suspects?
24 A.       At times.  Every case is different.  And
25 every police agency is different.  And the thoroughness

Page 157

1  with which they have investigated up to that point is
2  going to be different.  We've had presentations where
3  the police agency really did pretty much everything
4  humanly possible, and they present to us and we go,
5  "We've got nothing.  You've done it all.  You've
6  checked everything."  Other times there is so much not
7  yet done, that there will be repeated not so much
8  suggestions as ideas.
9  Q.       Okay.
10 A.       Have you looked at this?  Have you thought
11 about testing this?  Have you gotten a credit report on
12 this?  Person looking for motive.  Have you looked at
13 this person's bank records, if you think it was a hit
14 for money, to see if there was a large withdrawal of
15 money around this time.  Have you thought to check
16 this?
17 Q.       Would they make suggestions about who is a
18 viable suspect and who isn't?
19 A.       Generally not.  I -- I've heard people say,
20 Hey, you really ought to look at the husband to -- to
21 check this or that.  But usually it's the police agency
22 who is presenting the long list of suspects, and we're
23 just suggesting ways to narrow it.
24 Q.       And then prosecutors do, at times, attend
25 these presentations, is that right?

Barbara Cohan-Saavedra
February 14, 2024

Page 162

```
1  A.         Would you repeat that question for me?
2  Q.         Yeah.  Were there any expectations among the
3  Vidocq Society members, Board members, officers, or
4  whatever, that Mr. Walter would report to them on his
5  activities in Coquille.
6              MR. SCISCIANI:  Same objection.
7              MR. DEFREEST:  Same objection.
8              THE WITNESS:  Should I answer?
9              MR. SCISCIANI:  If you can.
10             THE WITNESS:  To the best of my
11             knowledge, Mr. Walter's traveling to Coquille
12             was not done by the Vidocq Society.
13 BY MR. LAUERSDORF:
14 Q.         Okay.
15 A.         We have no records to indicate that the trip
16 was paid or done under the auspices of the Vidocq.
17 Q.         Did -- after the 20/20 episode came out, did
18 the Vidocq Society do anything to disclaim any of the
19 information that was presented in the 20/20 special?
20 A.         Not that I'm aware of.
21 Q.         Did they do anything to correct the record of
22 any information that was presented in the 20/20
23 special?
24             MR. SCISCIANI:  Object to form.
25             MR. DEFREEST:  Object to form.
```

Page 163

```
1              THE WITNESS:  I can't answer that
2              question, because I don't know whether and to
3              what extent a record needed to be corrected.
4              Having not seen it in the last 14 years, or
5              however many years since the 20/20 thing
6              aired.
7  BY MR. LAUERSDORF:
8  Q.         If there were any inaccuracies or anything
9  that needed to be corrected, are you aware of Vidocq
10 taking any action to make those corrections?
11             MR. SCISCIANI:  Object to form.
12             THE WITNESS:  I can't answer that,
13             because I don't know whether there were any
14             inaccuracies.  I don't know what he said.
15 BY MR. LAUERSDORF:
16 Q.         If not for its relationship with police
17 agencies, Vidocq would not be given access to the kind
18 of confidential investigative materials that it's able
19 to review from law enforcement, is that right?
20             MR. SCISCIANI:  Object to form.
21             THE WITNESS:  Your question suggests
22             that it benefits the Vidocq Society to review
23             these things.  It doesn't.  It goes the other
24             way.
25 BY MR. LAUERSDORF:
```

Page 164

```
1  Q.         So the Vidocq Society -- the members of the
2  Vidocq Society get no benefit from what they do in the
3  Society?
4  A.         Oh, we get very great benefit from it.
5  Q.         Okay.  So.
6  A.         We get -- let me give you an example.
7  Q.         Coming back to it.  Let me --
8              MR. SCISCIANI:  Let her finish the
9              answer, please.
10             THE WITNESS:  Yeah, let me give you an
11             example.
12 BY MR. LAUERSDORF:
13 Q.         Okay.
14 A.         Are you familiar with the case of the Boy in
15 the Box?
16 Q.         Yeah.
17 A.         The identification of the remains of a child
18 who was found on February 25th, 1956, '57.
19 Q.         Yeah.
20 A.         I can't begin to describe to you the amount
21 of -- satisfaction isn't even the right word.  That kid
22 was the same -- he was the same age and looked exactly
23 like my little brother when -- when his remains were
24 found.  His photo was in every supermarket, in every
25 gas bill, on telephone poles, on TV, throughout the
```

Page 165

```
1  City.
2              When I joined the Vidocq Society and I
3  learned that they had an interest in pursing this very
4  nontraditional application of the Society's expertise,
5  I was overjoyed.  Because it's personal.  There's no
6  conviction.  There's never going to be an arrest in
7  that.  But what we all got out of that a year ago, when
8  he was finally identified through genealogical DNA as
9  Joseph Augustus Zarelli, is something you can't imagine
10 if you hadn't fell it.  That's what we get out of it.
11 What we get out of sharing the expertise that we have.
12 It becomes personal.
13 Q.         And you wouldn't able to do that work without
14 the cooperation of law enforcement, is that right?
15             MR. SCISCIANI:  Object to form.
16             THE WITNESS:  It's not even cooperation.
17             Without law enforcement bringing these things
18             to the Society, that's correct.
19 BY MR. LAUERSDORF:
20 Q.         Right.  Without the information they provide
21 to you?
22 A.         Yep.
23 Q.         Right.  The Zirpoli case is one that's
24 interesting to me, because I know there was a book
25 written about it.
```

Exhibit 90, Page 25 of 38

Barbara Cohan-Saavedra
February 14, 2024

Page 170

1    MR. SCISCIANI:  Object to form.
2    THE WITNESS:  No.
3    BY MR. LAUERSDORF:
4    Q.    Okay.
5    A.    First of all, never say never.  But as a
6    general rule, we don't solve cases.  We did not write
7    The Murder Room.  Michael Capuzzo is an author.  He is
8    not a member of the Vidocq Society.  Had that book been
9    penned by Bill Fleischer, you might be right.  But he
10   didn't.  Can I add something to clarify?
11   Q.    Sure.
12   A.    In all the years that I've been in the Vidocq
13   Society, I have attended events with Bill Fleischer,
14   above all, but other members as well, and whether it's
15   a member of the public or a member of the press, they
16   all think that what we do is pretty cool.  We do too.
17   But the first question everyone asks is, how many cases
18   have you solved?
19        And the answer, regardless of who I was with,
20   whether it was Bill Fleischer, or Ben Redmond, or any
21   of the other officers and members of the Board of the
22   Society, the answer is always the same.  We don't solve
23   cases.  We provide guidance, based on experience, for
24   police officers, for law enforcement agencies to solve
25   their own cases.  That's why we exist.

Page 171

1    Q.    This -- there is an entry in Exhibit-13,
2    entry number 147.
3    A.    Is it a -- can you give me a case number or a
4    page number?
5    Q.    Page 35.  It's labeled Vidocq000117 at the
6    bottom.
7    A.    Okay.
8    Q.    That's The Murder of Lisa Ann Carbello.  And
9    the last sentence in that entry says, Unsolved as of
10   October 26, 2023.  Do you see where I'm at?
11   A.    Um-hum.
12   Q.    Do you know who added that entry?
13   A.    It likely would have been Bill Gill.
14   Q.    Okay.  So what is Vidocq's expectation, as
15   far as Mr. Gill, or somebody else, going back and
16   updating the information in this synopsis?
17   A.    It may be a case that somebody was interested
18   in and may have asked Bill, Hey, what do you think of
19   this?  Was it solved?  Did you ever get anybody?  He
20   might have called the agency and they said "No".
21   Q.    Okay.  But there is no practice of going back
22   and clarifying, or correcting, things that have been
23   misstated in the synopsis?
24   A.    Not in terms of the synopsis.  But several
25   years ago, and I think it was at the behest of Bill

Page 172

1    Gill.  Many years ago I used to design forms for a
2    living.  So they asked me to design a form.  This was
3    before we had a post presentation group.  They asked me
4    to design a form that could be given to the presenters
5    sometime after they presented the case to the Society.
6        And the -- the focus of that form, and I
7    don't know whether I still have it in my computer, but
8    I might.  The focus of that form was not "Was the case
9    solved?"  But rather, "Were the suggestions or the
10   ideas that you gleaned from your interactions with the
11   Society helpful to you in your work in your further
12   investigation?"  Because it was the first organized
13   attempt to kind of go back and -- and see if we helped.
14   Not, "Was there an arrest?"  "Is somebody in jail?"
15   That may have been asked as well.
16        But the -- most of the questions focused on
17   what could we have done to make it easier for you to
18   present?  What else could we do in the future to make
19   it easier for people to present?  And what -- out of
20   your interactions with our members, what was most
21   helpful to you?  So that underscores what our focus is
22   and always has been.
23   Q.    Is the Vidocq Society -- has the Vidocq
24   Society ever been approached by law enforcement to
25   conduct kind of a postmortem on a case?  Like, there's

Page 173

1    a number of cases in Exhibit-13, and I'll -- I'll just
2    represent to you, there is a number of cases in
3    Exhibit-13 where the agency came in, said, We think
4    this is our guy, but we just can't prove it.
5        Vidocq folks made some suggestions.  They go
6    out, they make an arrest, they prosecute and the
7    gentleman, or person, is either acquitted, or later it
8    turns out that it wasn't the right guy.  Do -- does law
9    enforcement -- do those agencies ever come back to
10   Vidocq and say, "Hey, we want to know how we got this
11   wrong.  Can you guys sit down with us and help us
12   figure out where we went wrong in our investigation?"
13   A.    I'm not aware that that has happened.
14   Q.    Okay.  Is that something that the Vidocq
15   Society would be willing or interested in doing?
16   A.    We're always interested in things that would
17   get us closer to the truth.
18   Q.    Okay.  Let me go back to the forensic
19   assistance in clearing the DNA testing.  What is
20   Vidocq's role in DNA testing in cases which Vidocq is
21   consulting?
22   A.    Please clarify your question.  Are you
23   talking about a particular time frame?
24   Q.    Has it changed over time?
25   A.    DNA has changed over time.

Barbara Cohan-Saavedra
February 14, 2024

Page 178

1  the lab reports back to the agency?
2  A.      As it would with any other police agency they
3  deal with.
4  Q.      Does -- does the Vidocq Society make
5  recommendations on how to submit the DNA for testing?
6  Chain of custody issues, things like that?
7  A.      That's a matter uniquely within the purview
8  of the police department.
9  Q.      Does -- do members of the Vidocq Society ever
10 handle physical evidence?
11 A.      Not that I am aware of.  We usually see
12 photographs of the evidence.  The only physical
13 evidence, that I'm aware that might be handled, would
14 be polygraph charts.
15 Q.      Okay.  And they handle those for purposes of
16 restoring them?  Or reanalyzing them?
17 A.      No.  They look at them and -- just to see.
18 Because polygraph examiners can -- can differ on
19 a result.  There are various qualities of polygraph
20 examiners.  And a poor examiner may miss something.
21 One of our members is the head of an international
22 organization of polygraph people.  That's all he does.
23 He teaches polygraph all over the world.
24         So he might look at a chart and say, um, I
25 don't know that I would interpret this the way your

Page 179

1  polygrapher did.  You may want to take it to somebody
2  else to look at.
3  Q.      Do you know if anybody looked at any
4  polygraph charts or polygraph data in the Freeman case?
5  A.      I'm not aware of any.
6  Q.      Okay.  So when it's reported in the synopsis
7  that Mr. McGuffin failed polygraphs, that's just
8  something that whoever was writing that would have
9  taken from law enforcement?
10         MR. SCISCIANI:  Object to form.
11         THE WITNESS:  That would have been
12         reported to us by the police department.
13 BY MR. LAUERSDORF:
14 Q.      Okay.  Was anybody at the Vidocq Society
15 supervising Richard Walter when he was consulting, or
16 guiding, the Freeman investigation?  Or providing
17 guidance, I guess?
18         MR. DEFREEST:  Object to form.
19         MR. SCISCIANI:  Join.
20         THE WITNESS:  What do you mean by
21         supervising?
22 BY MR. LAUERSDORF:
23 Q.      Was anybody monitoring what he was doing?
24 Anybody from the Vidocq Society?
25 A.      No.

Page 180

1  Q.      Why not?
2  A.      Because that's not what we do.  If -- if
3  Richard was offering professional assistance, he was
4  doing so as an individual.  As a professional.  Just
5  like any other member can render assistance as a
6  professional.  We don't have a hierarchy where
7  professionals are supervised by others.  Because we're
8  not -- we're not investigating.  That's how the police
9  departments work.
10 Q.      But the Society was aware, at that time, of
11 -- well, let me ask you this.  Was -- did Richard
12 Walter ever serve on the Board of the Vidocq Society?
13 A.      Not that I'm aware of.
14 Q.      Did he ever hold any officer position?
15 A.      No.  Except that of Founder.  And I -- let me
16 correct that.  I have no written documentation, and
17 I've seen none, to indicate that he ever held a
18 position on the Board.  I only know that since I've
19 been on the Board Richard has never been a member of
20 the Board.  I -- I can't be certain of what, if
21 anything, happened prior to that.
22 Q.      Okay.  Who was involved in establishing the
23 requirements for membership at the Vidocq Society?
24 A.      That was done before I joined.  I know there
25 were requirements as of 1994 when I joined.  The

Page 181

1  requirements have changed over time.  But I don't know,
2  the initial requirements, who was -- who was involved
3  in that.  Initially, as I said earlier, it was largely
4  a social organization.  So, really, the only thing that
5  would have been required is some experience or skill in
6  a forensic discipline that could assist the Society in
7  furthering its work.
8  Q.      Was Richard Walter involved in establishing
9  the criteria for membership at any time?
10 A.      I have no information to indicate that he did
11 or did not.
12 Q.      Was he involved in establishing the criteria
13 for case selection at any time?
14 A.      I do not believe that he was.
15 Q.      Was he involved in establishing rules for how
16 a meeting would be run?
17 A.      I have no information to indicate that he was
18 or that he did or did not.
19 Q.      Was he involved in establishing rules for, or
20 guiding, how Vidocq Society members would engage in
21 their consulting work?
22 A.      I don't know what you mean by consulting
23 work.
24 Q.      How they would engage with law enforcement.
25 A.      I don't believe so.

Barbara Cohan-Saavedra
February 14, 2024

Page 198

1          C E R T I F I C A T I O N

2

3          I, Lisa M. Cooper, a Court Reporter and

4     Notary Public, do hereby certify the foregoing to

5     be a true and accurate transcript of my original

6     stenographic notes taken at the time and place

7     hereinbefore set forth.

8          Witness my hand and official seal this

9     14th day of February A.D. 2024.

10

11

12

13

14          

15     _____

          Lisa M. Cooper

16          Court Reporter and Notary Public

17

18

19

20          (The foregoing certification of this

21     transcript does not apply to any reproduction of

22     the same by any names, unless under the direct

23     control and/or supervision of the certifying

24     reporter.)

25

ERRATA

| Page | Line | Incorrect | Should read |
|------|------|-----------|-------------|
| 21 | 17 | Lobovsky, L-O-B-O-V-S-K-Y | Lebofsky, L-E-B-O-F-S-K-Y |
| 22 | 8 | Lobovsky[1] | Lebofsky |
| 27 | 3 | Fleischer[1] | Fleisher |
| 29 | 9 | June 4th, 1990 | June 14th, 1990 |
| 34 | 1 | Event Bright | Eventbrite |
| 44 | 7 | rule | role |
| 70 | 21 | John | Jon |
| 76 | 23 | censored | censured |
| 93 | 13 | Go | Do |
| 94 | 24 | divide | divine |
| 106 | 11 | meetings | minutes |
| 128 | 23 | limitation | invitation |
| 135 | 21 | corporation | cooperation |
| 137 | 9 | Intelinet | Intellenet |
| 146 | 17 | with a police agency | with an Oregon police agency |
| 147 | 24 | corporation | cooperation |
| 149 | 3 | corporation | cooperation |
| 165 | 3 | pursing | pursuing |
| 165 | 10 | fell | felt |

Signed 4 March 2024

---

[1]These corrections should be made throughout the transcript.  I have not noted subsequent instances.

Barbara J. Cohan
June 27, 2024

```
            IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF OREGON

                    EUGENE DIVISION


NICHOLAS JAMES MCGUFFIN, as an    )
individual and as guardian ad     )
litem, on behalf of S.M., a       ) Civil No.
minor,                            ) 6:20-cv-01163-MK
               Plaintiffs,        ) (Lead Case)
                                  )
       v.                         ) VIDEOCONFERENCE
                                  ) DEPOSITION
MARK DANNELS, PAT DOWNING,        )
SUSAN HORMANN, MARY KRINGS,       )
KRIS KARCHER, SHELLY MCINNES,     )
RAYMOND MCNEELY, KIP OSWALD,      )
MICHAEL REAVES, JOHN RIDDLE,      )
SEAN SANBORN, ERIC                )
SCHWENNINGER, RICHARD WALTER,     )
CHRIS WEBLEY, ANTHONY WETMORE,    )
KATHY WILCOX, CRAIG ZANNI,        )
DAVID ZAVALA, JOEL D. SHAPIRO     )
AS ADMINISTRATOR OF THE ESTATE    )
OF DAVID E. HALL, VIDOCQ          )
SOCIETY, CITY OF COQUILLE, CITY   )
OF COOS BAY, and COOS COUNTY,     )
               Defendants.        )
                                  )
VIDOCQ SOCIETY,                   )
               Cross-Claimant,    )
                                  )
       v.                         )
                                  )
MARK DANNELS, PAT DOWNING,        )
SUSAN HORMANN, MARY KRINGS,       )
KRIS KARCHER, SHELLY MCINNES,     )
RAYMOND MCNEELY, KIP OSWALD,      )
MICHAEL REAVES, JOHN RIDDLE,      )
SEAN SANBORN, ERIC                )
SCHWENNINGER, RICHARD WALTER,     )
CHRIS WEBLEY, ANTHONY WETMORE,    )
KATHY WILCOX, CRAIG ZANNI,        )
DAVID ZAVALA, JOEL D. SHAPIRO     )
AS ADMINISTRATOR OF THE ESTATE    )
OF DAVID E. HALL, VIDOCQ          )
SOCIETY, CITY OF COQUILLE, CITY   )
```

Barbara J. Cohan
June 27, 2024

Page 2

```
 1   OF COOS BAY, and COOS COUNTY,    )
         Cross-Defendants.            )
 2                                    )
                                      )
     NICHOLAS JAMES MCGUFFIN, as an   ) Civil Case No.
 3   individual and as guardian ad    ) 3:21-cv-01719-MK
     litem, on behalf of S.M., a      )
 4   minor,                           )
                   Plaintiffs,        )
 5                                    )
         v.                           )
 6                                    )
     OREGON STATE POLICE,             )
 7                   Defendant.       )
     _____ )
 8
 9
10
                DEPOSITION UPON ORAL EXAMINATION
11
                     OF BARBARA J. COHAN
12
13        BE IT REMEMBERED THAT, pursuant to the Oregon Rules of
14   Civil Procedure, the deposition of BARBARA J. COHAN was taken
15   remotely via videoconference on behalf of the Plaintiffs,
16   before JEAN M. KOSTNER, a Certified Court Reporter for Oregon,
17   on Thursday, the 27th day of June, 2024, at the hour of 8:00
18   a.m., in the State of Oregon.
19
20
21
22
23
24
25
```

Page 3

```
 1                      APPEARANCES
 2
        ON BEHALF OF THE PLAINTIFFS:
 3
          Andrew C. Lauersdorf, OSB #980739
 4        Janis C. Puracal, OSB #132288
          Mia Stigler, OSB #240362
 5        MALONEY LAUERSDORF REINER, PC
          1111 East Burnside Street, Suite 300
 6        Portland, Oregon  97214
          (503) 245-1518
 7        acl@mlrlegalteam.com
          jcp@mlrlegalteam.com
 8        ms@mlrlegalteam.com
 9
        ON BEHALF OF THE DEFENDANTS:
10
          Sarah R. Henderson, OSB #153474
11        LAW OFFICE OF ROBERT E. FRANZ, JR.
          Post Office Box 62
12        Springfield, Oregon  97477
          (541) 741-8220
13        shenderson@franzlaw.comcastbiz.net
          (Representing City of Coquille, City of Coos Bay,
14        Coos County, Craig Zanni, Chris Webley, Eric
          Schwenninger, Sean Sanborn, Ray McNeely, Kris
15        Karcher, Pat Downing, Mark Dannels, Kip Oswald,
          Michael Reaves, David Zavala, Anthony Wetmore,
16        Shelly D. McInnes)
17        Jesse B. Davis, OSB #052290
          OREGON DEPARTMENT OF JUSTICE
18        100 Southwest Market Street
          Portland, Oregon  97201
19        (971) 673-1880
          jesse.b.davis@doj.oregon.gov
20        (Representing Oregon State Police, John Riddle,
          Susan Hormann, Mary Krings, Kathy Wilcox)
21
          Anthony R. Scisciani, III, OSB #070013
22        Meredith A. Sawyer
          HWS LAW GROUP
23        101 Southwest Main Street, Suite 1605
          Portland, Oregon  97204
24        (206) 262-1200
          ascisciani@hwslawgroup.com
25        msawyer@hwslawgroup.com
          (Representing Vidocq Society)
```

Page 4

```
 1            Eric S. DeFreest, OSB #920475
              LUVAAS COBB
 2            777 High Street, Suite 300
              Eugene, Oregon  97401
 3            (541) 484-9292
              edefreest@luvaascobb.com
 4              (Representing Richard Walter)
 5
          ALSO PRESENT:
 6
              Megan Carr, OSP
 7            D. Jacobs, OSP
 8
          REPORTED BY:
 9
              Jean M. Kostner, CSR #90-0051
10              Subcontractor for:
                    US LEGAL SUPPORT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   INDEX OF TESTIMONY
 2
 3   WITNESS                                         PAGE
 4     BARBARA J. COHAN
 5        Examination by Mr. Lauersdorf . . . . . .    7
 6        Examination by Mr. DeFreest . . . . . . .   74
 7
 8
 9
10
11
12
13
14
15               REQUESTS FOR INFORMATION
16
     Information Requested by Mr. Lauersdorf:   PAGE   LINE
17
18       Source document for changes made in 2019   15    4
19       Blast email and responses                   18   24
20       In response to Requests 46 through 50 in
         Request for Production, all documents
21       mentioned or referred to in pages 17
         through 20                                   20    2
22
23
24
25
```

Barbara J. Cohan
June 27, 2024

Page 6

INDEX OF EXHIBITS

DEPOSITION
EXHIBIT NO.        DESCRIPTION                    IDENTIFIED

EXH 6     Vidocq Society Code of Ethics and
          Conduct (3 pages)                          55

EXH 7     Letter from William Fleisher to
          Margaret Olson, 06/06/13  (2 pages)        47
EXH 9     Email from CPD Dannels to Fred Bornhofen   49
EXH 10    Email from Fred Bornhofen to CPD Dannels
          (2 pages)                                  51

EXH 11    Letter from Fred Bornhofen to CPD Dannels
          (2 pages)                                  52
EXH 12    Coquille Police Case Summary with
          Handwritten Notes  (6 pages)               62

EXH 13    Synopsis of Vidocq Society Cases  (68 pages) 53

EXH 14    Constitution of the Vidocq Society
          (10 pages)                                 13
EXH 15    Defendant Vidocq Response to Plaintiffs'
          Second Set of Requests for Production
          (12 pages)                                 16
EXH 16    Draft Statement of the Vidocq Society,
          12/09/22  (2 pages)                        16

EXH 17    Minutes of Board Meetings  (203 pages)     20

EXH 18    Vidocq Society Membership                  32

EXH 19    Vidocq Society Policies and Procedures
          (30 pages)                                 41

Page 7

                    BARBARA J. COHAN,
called as a witness on behalf of the Plaintiffs, having been
first duly sworn to tell the truth, the whole truth, and
nothing but the truth, was examined and testified as follows:
        THE WITNESS: I do.
                    EXAMINATION
BY MR. LAUERSDORF:
    Q.    Okay. Ms. Cohan, my name is Andy Lauersdorf. You
remember we met in February of this year. Right?
    A.    That's correct.
    Q.    And you understand that I am an attorney
representing the plaintiffs in this lawsuit?
    A.    I do.
    Q.    And this is a lawsuit in which the plaintiffs are
suing the Vidocq Society and one of its former members, Richard
Walter. Do you understand that?
    A.    I do.
    Q.    Can you please state your full name as given at
birth.
    A.    My name is Barbara J. Cohan.
    Q.    Okay. What's your current position or title with
Vidocq Society?
    A.    I'm a member of the board of directors. I was the
public information officer, but because of the time constraints
of this deposition, I stepped aside and yielded to someone else

Page 8

for that position.
    Q.    Okay. And you were a member of the board of
directors in 2009 and 2010. Is that correct?
    A.    Yes, sir.
    Q.    Okay. You're appearing for your deposition today
or continuing deposition today as the designee for the
Defendant Vidocq Society. Is that correct?
    A.    It is.
    Q.    And you understand that as Vidocq Society's
designee, you are testifying on behalf of Vidocq Society.
Right?
    A.    Yes.
    Q.    And you understand that the answers that you
provide today will be binding on the Vidocq Society. Correct?
    A.    Yes.
    Q.    Do you consent to testify on behalf of the Vidocq
Society?
    A.    I do.
    Q.    And you understand that when I refer to you or ask
if you did something or if you have something or if you know
something, the "you" that I'm referring to is the Vidocq
Society. Correct?
    A.    Correct.
        MR. SCISCIANI: And, Counsel, I'll just interject
to confirm for the record the agreement that we reached coming

Page 9

into this deposition, and that is that the limitation for your
questioning on behalf of plaintiff has agreed to be limited to
two hours.
        MR. LAUERSDORF: That's correct.
BY MR. LAUERSDORF:
    Q.    This is the time and place previously agreed upon.
It's Thursday, June 27th, 2024, and it's approximately
8:00 a.m. Pacific Daylight Time, 11:00 a.m. Eastern Daylight
Time. Do you agree with that?
    A.    Yes.
    Q.    And the deposition is being conducted and recorded
using the cloud-based peer-to-peer software platform Zoom over
a URL provided by U.S. Legal. Do you understand that?
    A.    Yes.
    Q.    Will you please state your current location for the
record.
    A.    I am at my office at Phoenix Lithographing
Corporation.
    Q.    Are there other people in the room with you?
    A.    No.
    Q.    I understand that you're represented by Attorney
Anthony Scisciani and that Mr. Scisciani is appearing remotely.
So he's not there in the room with you?
    A.    Correct.
    Q.    Okay. So you will recall that you're free to take

Barbara J. Cohan
June 27, 2024

Page 10

1  a break to confer with Mr. Scisciani at any time. We have to
2  work things a little bit different because you can't just step
3  out with him, so just give us a heads up and let me know if you
4  need to take a break. Okay?
5      A.  I sure will.
6      Q.  The court reporter is recording your answers under
7  an oath administered a few moments ago. Do you understand
8  that?
9      A.  Yes.
10     Q.  And do you still understand what it means to be
11  under oath?
12     A.  Pardon me?
13     Q.  And do you still understand what it means to be
14  under oath?
15     A.  Yes.
16     Q.  And you're still expected to give the same careful
17  and considered answers you would give in a court of law. Do
18  you understand that?
19     A.  Of course.
20     Q.  Are you suffering from any type of illness today?
21     A.  I am not.
22     Q.  Are you aware of any reason why you might not be
23  able to understand or answer the questions asked of you today?
24     A.  No.
25     Q.  Did you review the transcript of Vidocq Society's

Page 11

1  testimony from the February 14th, 2024, deposition before or in
2  preparation for today?
3      A.  I read it last night.
4      Q.  Did you identify any inaccuracies in the previous
5  testimony?
6      A.  There was one.
7      Q.  Where was that?
8      A.  I believe in my testimony I was asked if Richard
9  Walter had ever been a member of the board of directors of the
10  Vidocq Society. At the time of the first part of my
11  deposition, I had no recollection that he had ever done so.
12  However, in a detailed review of the board of directors
13  minutes, I did see that, I believe it was in 2012, Mr. Fleisher
14  moved to make Mr. Walter an ex officio member of the board, and
15  he thereafter did attend board of directors meetings. That was
16  the only inaccuracy that I could find.
17     Q.  Okay. And what is Vidocq's understanding of the
18  phrase "ex officio"?
19     A.  I have no idea why Mr. Fleisher called it that, but
20  that's what he did.
21     Q.  Okay. Okay. Any other inaccuracies that you
22  identified while reading the transcript?
23     A.  No, I did not.
24     Q.  Was there any other testimony that requires
25  correction or clarification?

Page 12

1      A.  I don't believe so.
2      Q.  Did you review any other documents to prepare for
3  today's deposition?
4      A.  I went through the emails -- I'm sorry, the board
5  of director minutes again with a fine-tooth comb with a better
6  understanding of the issues to be covered in the deposition.
7  And I also reviewed very briefly the documents that have
8  recently been produced to you.
9      Q.  Okay. Were the board of directors meeting
10  minutes -- were those some of the documents that you reviewed
11  in preparation for the February 14th sitting of your
12  deposition?
13     A.  Yes.
14         COURT REPORTER: Mr. Lauersdorf, this is the court
15  reporter. Could we go off the record just for a second?
16         MR. LAUERSDORF: Sure.
17         (Discussion off the record.)
18  BY MR. LAUERSDORF:
19     Q.  Okay. So let's see. I want to take you through
20  some portions of your deposition transcript. Do you -- well,
21  I'll just show it to you.
22         Okay. Can you see what I'm trying to share?
23     A.  Yes.
24     Q.  Okay. And I'll represent to you that this is the
25  transcript of your deposition. I can take you back to the

Page 13

1  starting page and show that it's got your name on it and
2  everything if you'd like, but for expedience sake I'll just
3  represent to you that this is the transcript of your --
4      A.  Mm-hm.
5      Q.  -- previous testimony.
6      A.  That's fine.
7      Q.  On page 17 I was asking you about the things you
8  had reviewed, and you said there at line 16 "I went through the
9  Vidocq Society's Constitution and Bylaws in its present form as
10  well as its prior iterations." Do you recall that?
11     A.  Yes.
12     Q.  And then one of the things we did was ask to have
13  the present form and the prior iterations produced in
14  discovery. Do you see what I'm showing you now?
15     A.  Yes.
16         (Document marked for identification as Deposition
17  Exhibit 14.)
18  BY MR. LAUERSDORF:
19     Q.  Okay. I'm showing you what's been marked as
20  Exhibit 14. I'll make it smaller so you can see the whole
21  document. If you need me to make that larger, please let me
22  know, and I'll go ahead and expand it.
23         What do you recognize this document to be?
24     A.  I believe that this is the most recent version of
25  the Society's constitution.

Barbara J. Cohan
June 27, 2024

Page 34

1  representation, it is as accurate as the information from which
2  I took the data that I put in this spreadsheet.
3       Q.  Right.  And that was information that came from
4  Vidocq Society.  Right?
5       A.  No.  This was information that came from two or
6  three different members of the Vidocq Society, including Joe
7  O'Kane, who was the previous membership chair.
8       Q.  Okay.  And as the membership chair, he would have
9  been maintaining this information on behalf of Vidocq Society.
10 Right?
11      A.  Presumably, yes.
12      Q.  So you see here on the tab that says "Board,"
13 that's where we're at right now.  Do you recognize the
14 members -- can you tell by the members who are listed here as
15 members of the board what date and time this document refers to
16 as far as board membership?
17           MR. SCISCIANI:  Object to form.  Vague.
18           Answer if you can.
19      A.  I really can't.  Um -- let me look at it.
20           I believe I testified previously this is a document
21 that was not maintained when I relinquished my chairmanship of
22 the -- of the board.  However, let me just see.  I -- I believe
23 this would be current to no later than the year 2020.
24 BY MR. LAUERSDORF:
25      Q.  Okay.

Page 35

1       A.  And that is because Column AH and AI would
2  reflect -- it's redacted but it's the dues payment for the year
3  2020.
4       Q.  Okay.  And then do you see Column -- Row 5, Column
5  F?
6       A.  Pardon me?  I can't -- you're garbling again.
7       Q.  Do you see Row 5, Column F, the William Fleisher
8  entry?
9       A.  Yes.
10      Q.  It says "Commissioner Emeritus (1/16/2020)"?
11      A.  Correct.
12      Q.  So would it be fair to conclude that it was up to
13 date through at least 1/16/2020?
14      A.  Assuming that the docu- -- the source documents
15 were current to that date, yes.
16      Q.  Okay.  Let me take you back to Exhibit 17.  If we
17 go back to 2000- -- June 17th, 2010, here, the --
18      A.  Whoa, whoa.  What document are you looking at now?
19      Q.  Exhibit 17, I'm showing you.
20      A.  I'll have to bring it up again.  Hold on.
21      Q.  Can you not see it on the screen I'm showing you?
22      A.  It is really small because I have split screen now.
23 Hang on.
24           Okay.  I've got it.
25      Q.  Okay.  So what I'm showing you on the screen is the

Page 36

1  upper portion of page 31 of the PDF.  It's Bates-labeled at the
2  bottom VIDOCQ 001789.  And I'm just referring you to the
3  members of the board who are being reported present or absent.
4  Do you see where I'm at?
5       A.  Yes.
6       Q.  Okay.  So the present members are Fleisher --
7  that's William Fleisher?  Is that correct?
8       A.  Yes.
9       Q.  And Gordon is Nathan Gordon.  Is that correct?
10      A.  Yes.
11      Q.  And Olkowski is Stanley Olkowski, III.  Is that
12 correct?
13      A.  That is correct.
14      Q.  Gill is William Gill.  Is that right?
15      A.  Yes, sir.
16      Q.  Cohan is you.  Is that correct?
17      A.  Yes.
18      Q.  Redmond is Benjamin Redmond.  Is that right?
19      A.  Yes.
20      Q.  Bornhofen is Fred Bornhofen.  Is that correct?
21      A.  Yes.
22      Q.  Maxwell is John Maxwell.  Is that correct?
23      A.  Yes.
24      Q.  Warren is David Warren.  Is that right?
25      A.  Yes.

Page 37

1       Q.  Gaughan is Edward Gaughan.  Is that right?
2       A.  Yes.  It's Gaughan.
3       Q.  Gaughan.  Okay.  And Lazinger is Zeff Lazinger.  Is
4  that right?
5       A.  Correct.
6       Q.  And then the members who are absent.  Weinberg is
7  Donald Weinberg.  Is that right?
8       A.  Yes.
9       Q.  O'Kane is Joseph O'Kane.  Correct?
10      A.  Yes.
11      Q.  Perlman is Adrienne Sekula-Perlman.  Is that right?
12      A.  Yes.
13      Q.  And Freeman is Kenneth Freeman.  Is that correct?
14      A.  Yes.
15      Q.  Were there any other board members from Vidocq
16 Society as of June 17th, 2010?
17      A.  What was your question?
18      Q.  Were there any other board members, sitting board
19 members, of Vidocq Society as of June 17th, 2010, other than
20 those names we've mentioned?
21      A.  I don't have a present recollection.  However, if
22 you combine present and absent, presumably that is the total of
23 the board members as of that date.
24      Q.  Okay.  Who was the secretary as of that date?
25      A.  Um, I don't know.

Barbara J. Cohan
June 27, 2024

Page 38

1    Q.   Okay.
2    A.   Not off the top of my head, I don't know.
3    Q.   Joseph O'Kane, he was a -- when he wasn't doing
4  Vidocq work, he was a special agent with U.S. Customs Service.
5  Is that right?
6    A.   I don't know if he was in 2010, but I do know that
7  he had been a supervisor with the United States Customs
8  Service.
9    Q.   Okay.  And Edward Gaughan, he was with the
10 Philadelphia PD.  Is that right?
11   A.   He was.
12   Q.   And was he still with the PD at the time that he
13 was on the board in 2010?
14   A.   I don't know.
15   Q.   Stanley Olkowski was a deputy inspector general.
16 Do you know who that was -- who he was with?
17   A.   I believe for the City of Philadelphia, but I'm not
18 certain.
19   Q.   Do you know if he still held that position in June
20 of 2010?
21   A.   I don't know.
22   Q.   Benjamin Redmond was an inspector general for the
23 City of Philadelphia and a regional director for the IRS.  Is
24 that right?
25   A.   Correct.  I don't know if he held both of those in

Page 39

1  2010.
2    Q.   And do you know if he held either of those
3  positions in 2010?
4    A.   I don't know.
5    Q.   Bill Gill or William Gill was a regional inspector
6  general for the treasury department.  Is that right?
7    A.   I believe he was.  I don't think he still had that
8  position at this time.
9    Q.   In 2010?
10   A.   I don't think he did.
11   Q.   Okay.
12   A.   But I'm not certain.
13   Q.   What about Fred Bornhofen?  What did he do when he
14 wasn't working with Vidocq?
15   A.   Um, I think that Fred Bornhofen had something to do
16 with perhaps NCIS.  Something with the Navy.
17   Q.   NCI --
18   A.   But I'm not certain.
19   Q.   NCIS is what?
20   A.   Naval Criminal Investigative Service.
21   Q.   Okay.  And then in 2010, were you still with the
22 U.S. Attorney's Office?
23   A.   I was not.
24   Q.   Where were you working in 2010?
25   A.   In 2010 I was here at Phoenix Lithograph

Page 40

1  Incorporation.
2    Q.   When did you leave the U.S. Attorney's Office?
3    A.   In 2005.
4    Q.   John Maxwell, he was a chief inspector with
5  Philadelphia PD.  Is that right?
6    A.   That's correct.
7    Q.   Do you know if he held that position in 2010?
8    A.   I don't know whether he did or not.  I think he may
9  have retired at that point, but I'm not sure.
10   Q.   David Warren, he was an FBI special agent in
11 charge.  Is that right?
12   A.   I thought Dave Warren had been with customs.
13   Q.   Oh, okay.  Do you know if he was still with customs
14 in 2010?
15   A.   I don't know whether he was or was not.
16   Q.   And then William Fleisher was a deputy special
17 agent in charge with the Customs Service as well.  Is that
18 right?
19   A.   Yes, but I don't think he was at that point.
20   Q.   Do you know who was the secretary of the Vidocq
21 Society at any point in 2009?
22   A.   I'm not certain.
23   Q.   Who was the secretary of the Vidocq Society at any
24 point in 2010?
25   A.   I -- I couldn't tell you off the top of my head.

Page 41

1  I -- going through the minutes, in some cases it identifies who
2  the secretary is, and from that you can figure out who the
3  secretary was at that point in time.  I could look at these
4  minutes and know that it was not Stanley Olkowski because his
5  minutes had a different format than these.
6    Q.   Okay.  How about in 2011?  Who was the secretary of
7  the Vidocq Society at any point in 2011?
8    A.   You could tell the same way I could by looking at
9  the minutes for that period.
10   Q.   Okay.
11   A.   But I couldn't tell you off the top of my head.
12        (Document marked for identification as Deposition
13        Exhibit 19.)
14 BY MR. LAUERSDORF:
15   Q.   I'll show you what's been marked or what will be
16 marked as Exhibit 19.  Can you see that?  Or can you see a
17 document --
18   A.   I can bring it up.  It's very small on my screen.
19 Hang on.
20        Okay.  I have it.
21   Q.   Okay.  Do you recognize that set of documents at
22 all?
23   A.   Set of documents?  Okay.  Hang on.  I have to
24 scroll through it.
25   Q.   It's about 30 pages.

Barbara J. Cohan
June 27, 2024

Page 62

1          Answer if you can.
2      A.   We --
3          MR. SCISCIANI:  Also outside the scope of the
4  30(b)(6) designated topics.
5          Answer if you can.
6      A.   I would have to speculate.  But the point is we
7  have no contact with -- with the prosecution generally in any
8  case.  We have no way of knowing if the law enforcement agency
9  had decided that it wasn't going to disclose something.  That
10 is something so far outside our purview that I couldn't even
11 begin to speculate on that.
12         (Document marked for identification as Deposition
13         Exhibit 12.)
14 BY MR. LAUERSDORF:
15     Q.   Okay.  Well, let's look at Exhibit 12.  Do you
16 recognize this document?
17     A.   Hang on.
18          Yes.
19     Q.   This is the case summary that Coquille Police
20 Department provided to Vidocq Society prior to its time to
21 present in January of 2010.  Is that correct?
22     A.   This is a document that was provided to me in
23 response to my email blast.  One of our members had retained
24 this document, and it appears to be the case summary that was
25 given to our members at the time of the presentation of this

Page 63

1  case.
2      Q.   Right.  So if your members had a copy of this
3  presentation and learned that there was information in here
4  that was false, would they report that information to the
5  prosecutor or to the Coquille Police Department involved?
6          MR. SCISCIANI:  Same objection.  It's vague,
7  ambiguous, incomplete and improper hypothetical.
8          Answer if you can.
9      A.   I would have to speculate.  We -- if we knew that
10 there -- is your question if we knew that there was something
11 in this summary that was false?  Is that the question?
12 BY MR. LAUERSDORF:
13     Q.   That's correct.
14         MR. SCISCIANI:  Same objections.
15     A.   I -- I would be speculating.  I think that in the
16 first part of my deposition we may have even discussed this.
17 If a police department puts something in the case summary that
18 they bring to the Vidocq Society and they have included false
19 information in that summary, first, the Society would have no
20 way of knowing whether that was or was not false.  Second, the
21 effect of the inclusion of either omitted information or false
22 information in the summary would make any conclusion or any
23 suggestion or any guidance that the Society provided to that
24 law enforcement agency less usable, less reliable, less
25 helpful.

Page 64

1  BY MR. LAUERSDORF:
2      Q.   I understand that.  That's not the question.  The
3  question is if it came -- if a Vidocq Society member learned
4  that something in the case summary was false, would they be
5  allowed to report that?  Or would the code of ethics require
6  them not to disclose that information?
7          MR. SCISCIANI:  Same objection.  It's vague;
8  ambiguous; compound; incomplete, improper hypothetical; as well
9  as asked and answered.
10         Answer if you can.
11     A.   Again, I would be speculating.  But I would hope
12 and assume that if a member actually learned that this case
13 summary, for example, contained false information, and if they
14 felt that it was appropriate to take that, let's say, to the
15 chief of police or to the district attorney, they would seek
16 and obtain permission under the ethics guidelines from the
17 commissioner or the chairman or someone else on the board to
18 take that to the appropriate authorities.  But that is sheer
19 speculation.
20 BY MR. LAUERSDORF:
21     Q.   All right.  Let's move on.  Vidocq does not have
22 any written policies about how its members interact with its
23 law enforcement clients.  Is that correct?
24         MR. SCISCIANI:  Objection.  Vague, ambiguous.
25         Answer if you can.

Page 65

1      A.   I'm not sure what you even mean by that, how they
2  interact with law enforcement.
3  BY MR. LAUERSDORF:
4      Q.   Does Vidocq have any written policies other than
5  what we've discussed today or has already been produced to the
6  plaintiffs?
7      A.   My answer would be no.
8      Q.   Okay.
9      A.   Not written policies.
10     Q.   Does Vidocq believe that it has -- what is your
11 understanding of the Brady case or Brady obligation?
12     A.   Could you clarify your question?
13     Q.   Yeah.  What's your understanding of the Brady
14 obligation to produce exculpatory information to a criminal
15 defendant?
16         MR. SCISCIANI:  Objection.  Outside the scope of
17 30(b)(6) designated topics.
18         Answer if you can.
19         MR. LAUERSDORF:  It's Topic 4(g), 4(h), and 4(o)
20 for the record.
21         MR. SCISCIANI:  4(g)?
22         MR. LAUERSDORF:  4(g), 4(h), and 4(o).
23         MR. SCISCIANI:  4(g) is documentation and reporting
24 of conclusions.  H is documentation of communications between
25 members.  O is confidentiality and external information

Barbara J. Cohan
June 27, 2024

Page 66

1  sharing. Is that --
2          MR. LAUERSDORF: Confidentiality and external
3  information sharing within Brady.
4          MR. SCISCIANI: So you're asking for the Vidocq
5  Society's definition and understanding of what Brady is under
6  those topics? My objection stands. It's outside the scope of
7  the topics.
8          The witness can answer if she can. My objection is
9  noted.
10         A. With respect to the Vidocq Society, I cannot answer
11 that.
12 BY MR. LAUERSDORF:
13         Q. In your experience as an assistant U.S. attorney,
14 do you understand what a Brady obligation is?
15         A. I certainly do.
16         Q. And it's Vidocq's position that it does not have
17 any type of Brady obligation when it works with its law
18 enforcement clients. Is that correct?
19         MR. SCISCIANI: Same objection. Outside the scope
20 of 30(b)(6) notice topics.
21         Answer if you can.
22         A. The -- the Vidocq Society members who work with law
23 enforcement are not attorneys. But because the Society does
24 not own any of the information that it comes across, any Brady
25 obligation would remain with the investigating agency and the

Page 67

1  prosecuting agency. We're a reference book. That's all we
2  are.
3  BY MR. LAUERSDORF:
4          Q. Vidocq does not provide any training to its members
5  on Brady obligations. Is that correct?
6          A. None that I'm aware of.
7          Q. When Vidocq Society learned of the Drake
8  allegations in June of 2003, what was done? What did it do to
9  investigate those allegations?
10         A. You asked me that earlier, and I told you I did not
11 know.
12         Q. Does Vidocq have any documents from any
13 investigation into the Drake allegation?
14         A. None except that thing you showed me, the letter
15 from Mr. Fleisher.
16         Q. Did Vidocq Society reprimand or counsel Richard
17 Walter when Vidocq Society learned of the Drake allegations?
18         A. I only know what is in Mr. Fleisher's letter.
19         Q. Did Vidocq Society put any safeguards in place to
20 make sure that Walter or other Vidocq Society members could not
21 engage in similar conduct in the future?
22         A. Could you repeat your question clearly? It's very
23 hard to understand you.
24         Q. Did the Vidocq Society put any safeguards in place
25 to make sure that Mr. Walter or other Vidocq Society members

Page 68

1  could not engage in similar conduct in the future?
2          MR. SCISCIANI: Object to form. Vague and
3  ambiguous, foundation, assumes facts not in evidence.
4          Answer if you can.
5          MR. DEFREEST: I join in the objections.
6          A. I can't answer that.
7  BY MR. LAUERSDORF:
8          Q. Did Vidocq Society put any safeguards in place to
9  make it less likely that Mr. Walter or other Vidocq Society
10 members would be accused of misconduct in the future?
11         MR. SCISCIANI: Same objections.
12         MR. DEFREEST: Same objections.
13         A. Counsel, the misconduct of which you speak is
14 misconduct in the individual's personal capacity, not as a
15 Vidocq Society member. Um, should the Society learn of
16 misconduct and should those allegations be borne out, then the
17 Society, in compliance with its Constitution and bylaws, could
18 consider and reprimand or expel that member.
19 BY MR. LAUERSDORF:
20         Q. So the question was did the Vidocq Society put any
21 safeguards in place to make it less likely that Richard Walter
22 or other Vidocq Society members would be accused of similar
23 misconduct in the future?
24         MR. SCISCIANI: Same objections, as well as asked
25 and answered.

Page 69

1          MR. DEFREEST: Join in the objections.
2          A. In their personal capacity?
3  BY MR. LAUERSDORF:
4          Q. In the Vidocq Society's capacity.
5          MR. SCISCIANI: Same objections.
6          MR. DEFREEST: Join in objections.
7          A. I couldn't even answer that. It's speculative.
8  BY MR. LAUERSDORF:
9          Q. Did the Vidocq Society provide any specific
10 training to Mr. Walter or other Vidocq members as a result of
11 the decisions in the Drake case?
12         A. I know only what was contained in Mr. Fleisher's
13 letter.
14         Q. Did the Vidocq Society make any effort to disclose
15 Drake's allegations to its law enforcement partners?
16         A. I don't know the answer to that.
17         Q. Did Vidocq Society make any effort to disclose
18 Drake's allegations to members of law enforcement who sought
19 out Vidocq Society's assistance?
20         A. I am not aware of any.
21         Q. Did Vidocq Society make any effort to disclose
22 Drake's allegations to members of law enforcement who were
23 introduced to Richard Walter through the Vidocq Society?
24         A. I don't believe so.
25         Q. Did Vidocq Society disclose Drake's allegations to

Barbara J. Cohan
June 27, 2024

Page 74

1  clarification.
2              EXAMINATION
3  BY MR. DEFREEST:
4      Q.  Ms. Cohan, my name is Eric DeFreest.  I represent
5  Richard Walter in this matter.
6      A.  Okay.
7      Q.  So with the institutional knowledge of Vidocq
8  Society, does it have any documentation of how Mr. Walter was
9  invited to travel out to Oregon in 2010?
10     A.  No, sir, we do not.
11     Q.  At the time of 2009 and 2010, Mr. Fred Bornhofen
12  was the case manager for Vidocq Society.  Correct?
13     A.  I believe he was, yes.
14     Q.  Is there any documentation that Vidocq Society is
15  aware of of how Mr. Bornhofen addressed case management of the
16  Leah Freeman matter?
17     A.  Other than the documents that have already been
18  shown to me, no.
19     Q.  Is there any documentation or record that you are
20  aware of of Vidocq Society's interaction with ABC News or its
21  affiliates with regard to the Leah Freeman matter?
22     A.  No, sir.  Only the reference that was in the board
23  of director minutes indicating that 20/20 was going to be doing
24  a program and that they would be attending the meeting.
25  That's -- that's pretty much all there is.

Page 75

1              MR. DEFREEST:  Thank you very much.  I appreciate
2  your time.
3              THE WITNESS:  My pleasure.
4              MR. SCISCIANI:  Anyone else?
5              MR. DAVIS:  This is Jesse Davis.  I don't have any
6  questions.  Thank you.
7              MS. HENDERSON:  No questions from me.  This is
8  Sarah.
9              MR. SCISCIANI:  Okay.  Sounds like we're done.
10             COURT REPORTER:  Are you ordering this,
11  Mr. Lauersdorf?
12             MR. LAUERSDORF:  Yes, I will order the PDF.
13             MR. SCISCIANI:  I would like a PTX.
14             MR. DAVIS:  Just the PDF for me, please.
15             MR. DEFREEST:  I would like a PDF.
16             MS. HENDERSON:  I will order a PDF and a text file
17  as well.  Thank you, Jean.
18
19                  (WHEREUPON, the deposition ended at the hour
20                  of 10:12 a.m.)
21
22                  -o0o-
23
24
25

Page 76

1  STATE OF OREGON      )
                        )
2  County of Douglas    )        ss.  C E R T I F I C A T E
3
4      I, JEAN M. KOSTNER, Certified Shorthand Reporter for the
5  state of Oregon, do hereby certify that:
6      Pursuant to Notice, BARBARA J. COHAN appeared remotely
7  before me via Zoom videoconference at the time and place set
8  forth in the caption hereof;
9      That, at said time and place, I reported in stenotype
10 all testimony adduced and oral proceedings had in the foregoing
11 matter, to the best of my ability;
12     That, thereafter, my notes were reduced to typewriting,
13 and that the foregoing transcript, pages 1 through 75, both
14 inclusive, constitutes a full, true, and correct transcript of
15 all such testimony adduced and oral proceedings had and of the
16 whole thereof.
17     IN WITNESS WHEREOF, I have hereunto set my hand and CSR
18 stamp this 8th day of July, 2024, in the City of Roseburg,
19 County of Douglas, State of Oregon.
20
21
22                  _____
                    JEAN M. KOSTNER
23                  Certified Court Reporter
                    CSR No. 90-0051
24
25