UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 6:20-cv-01163-MTK (Lead Case) |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| MARK DANNELS, *et al.*, | |
| Defendants. | |

| | |
|---|---|
| NICHOLAS JAMES MCGUFFIN, as an individual and as guardian *ad litem*, on behalf of S.M., a minor, | Case No. 3:21-cv-01719-MTK (Trailing Case) |
| Plaintiffs, | |
| v. | |
| OREGON STATE POLICE, | |
| Defendant. | |

**KASUBHAI,** United States District Judge:

Plaintiff Nicholas James McGuffin ("McGuffin"), as an individual and as guardian *ad litem* on behalf of his minor daughter, S.M. ("Plaintiffs"), bring this civil rights action arising out of McGuffin's wrongful conviction for manslaughter. Second Am. Compl. ("SAC"), ECF No. 143. Before the Court is Defendants' Mark Dannels, Kris Karcher, Raymond McNeely, Kip

Oswald, Michael Reaves, Sean Sanborn, Eric Schwenninger, Chris Webley, Craig Zanni, David

Zavala, City of Coquille, Coos County, Oregon, and the Estate of David E. Hall ("Municipal

Defendants") Motion for Summary Judgment. Mot. for Summ. J. "Defs.' Mot.," ECF No. 281.

For the reasons explained below, the Municipal Defendants' Motion is GRANTED in part and

DENIED in part.

## BACKGROUND

On June 28, 2000, Leah Freeman ("Freeman") went missing. Her body was discovered

several weeks later, and her death was declared a homicide. The case went cold but eleven years

later, Freeman's boyfriend, McGuffin, was convicted of manslaughter for her death. A court

granted him post-conviction relief for the State's failure to disclose exculpatory DNA evidence,

and other reasons as well. After serving more than nine years of a ten-year prison sentence,

McGuffin was released from prison and all charges were dismissed. McGuffin alleges that the

Municipal Defendants and others conspired against him by fabricating, suppressing, and

withholding evidence.

## I.    Freeman's Disappearance

McGuffin grew up in Coquille, Oregon, and attended Coquille High School, where he

and Freeman met and began dating. In the summer of 2000, Freeman was fifteen years old and

had recently finished her freshman year of high school; McGuffin was eighteen years old and

had just graduated.

On June 28, 2000, at around 7:00 p.m., McGuffin dropped off Freeman at the home of

Freeman's friend, Cherie Mitchell. McGuffin was driving his blue Mustang. McGuffin Depo at

106:10-25, ECF No. 330-10 at 12. In deposition for this lawsuit, McGuffin testified that this was

the last time that he ever saw, spoke with, or interacted with Freeman. McGuffin Depo. at 58:25-71:22, 95:23-104:4, 190:19-195:14, ECF No. 330-10 at 5–8, 9–11, 16–17.

McGuffin was planning to return to Mitchell's house to pick up Freeman at 9:00 p.m. McGuffin Depo. at 58:25-59:4, 106:17-25, 134:19-22, ECF No. 330-10 at 5, 12–13. However, sometime before 9:00 p.m., Freeman and Mitchell got into an argument and Freeman left Mitchell's house on foot. Many people saw Freeman walking alone toward the high school between roughly 9:00 p.m. to 9:30 p.m. Sometime between 9:15 p.m. and 9:30 p.m., Freeman was seen standing by herself across the street from the high school, between the cemetery and the gas station. McGuffin Crim. Trial Transcript at 88:22–90:8, 94:17–19, ECF No. 284-1 at 396.

At "around 9:08" p.m., McGuffin arrived back at the Mitchell's to pick up Leah, but she had already left on foot. 2000 Grand Jury Transcript (Mitchell) at 9:1, ECF No. 286-13 at 10; McGuffin Crim. Trial Transcript at 74:5-10, ECF No. 284-1 at 604. McGuffin then began searching for Freeman. Many people saw or interacted with McGuffin during his search, including Freeman's mother, sister, and friends, as well as McGuffin's family and friends.[1] At around 10:00 p.m., McGuffin went back to Mitchell's house to see if Freeman had returned, but she was not there. McGuffin borrowed Mitchell's phone and called Freeman's mother to tell her that he was looking for Freeman. Criminal Trial Transcript (Courtright) at D3 56:2–12, ECF No. 284-1 at 364. Freeman's mother told McGuffin that Freeman had not come home and McGuffin responded that he would continue looking for her.

---

[1] *See* Pls.' Resp. in Opp. to State Defs.' Mot. for Summ. J. ("Pls.' Resp.") at 11-12, ECF No. 326, citing evidence in the record showing the time and place that eight individuals interacted with McGuffin from 9:00 p.m. to 10:00 p.m. on June 28, 2000.

McGuffin drove around for several hours looking for Freeman. The parties cite evidence creating a dispute about whether McGuffin was driving his blue Mustang, or whether he switched to his parents' red Thunderbird, discussed in more detail below.

McGuffin's Mustang also had a gas leak, and he could only put a few gallons in the tank at a time. Sometime after midnight, he asked a friend, Kristen Steinhoff, to drive him around to continue looking for Freeman. McGuffin was in Steinhoff's bedroom waiting for her to get ready and they started kissing. McGuffin Depo. at 105:65–10, ECF No. 330-10 at 11. They got undressed but did not have sex. McGuffin Depo. at 105:11–106:6, ECF No. 330-10 at 11–12. McGuffin testified in deposition that he told Steinhoff that he "[c]ouldn't do this to Leah," and so they stopped and got dressed. McGuffin Depo. at 106:3–6, ECF No. 330-10 at 12. Steinhoff then borrowed her mother's boyfriend's purple Kia and drove McGuffin around town looking for Freeman. After searching for a while, McGuffin returned to his Mustang.

In the early morning hours of June 29, 2000, McGuffin drove past Freeman's house and thought that he saw a light on in Freeman's upstairs bedroom. Believing that she had returned home, McGuffin drove away and arrived to his home around 2:30 a.m. Kathy McGuffin Deposition at 17:20–18:8, 22:18–23:6, ECF No. 330-21.

## II.    The Original Investigation

On June 29, 2000, at around 7:30 a.m., Freeman's mother called McGuffin and reported that Freeman had not come home last night. McGuffin joined Freeman's sister to search for Freeman. McGuffin then went with Freeman's sister and Freeman's mother to the Coquille Police Department ("CPD") to report that Freeman was missing. Chief of Police, Defendant Reaves, initially decided that Leah must have been a runaway and his search was limited to driving around town. 2016-05-31 Letter from DA Fraisier to Reim at 2, ECF No. 330-64. A

missing person investigation was started, which then became a homicide investigation. The

Original Investigation was conducted by Municipal Defendants Reaves, Hall, McInnes,[2] and

Zavala, of the City of Coquille Police Department ("CPD") as well as Downing, Oswald, and

Zanni of the Coos County Sheriff's Office, Karcher of the Office of the Coos County Medical

Examiner, as well as others (collectively, the "Original Investigating Officers").

Defendant Reaves appointed CPD officer Hall to lead the Original Investigation. Michael

Reaves Depo. at 54:12–58:18, ECF No. 330-54. Defendant Hall[3] had never worked a major

crime investigation or murder case, and by his own account he lacked the necessary training to

lead the Freeman investigation. Frasier PCR Deposition at 21:12–25:1, ECF No. 330-62;

Schwenninger Case Notes at 3, ECF No. 330-48 at 11.

On the night of Freeman's disappearance, at around 11:30 p.m., a passerby had found a

shoe in the road near the cemetery. Criminal Trial Transcript D5 127:16–132:17, ECF. No. 284-1

at 920-25. He thought that the shoe belonged to one of his kids, so he brought it home. However,

a few days later, after hearing that there was a missing girl, he brought the shoe to the police. The

police examined the shoe and determined that it was Freeman's right shoe ("right (cemetery)

shoe"). 2000-07-17 OSP Lab Wilcox Report at 20, ECF No. 296 at 181.

On July 5, 2000, Coos County Sheriff's Deputy, Defendant Kip Oswald, was driving on

Hudson Ridge, a remote forested area where teenagers were known to party, when he discovered

what was later determined to be Freeman's left shoe ("left (Hudson Ridge) shoe"). Criminal

Trial Transcript D5 140:11–144:13, ECF No. 284-1 at 934–38. Hudson Ridge was

approximately ten miles from the cemetery where Freeman was last seen alive and where her

---

[2] McInnes is no longer a defendant in this case.

[3] Officer Hall is now deceased, and Plaintiffs' claims are asserted against his estate but for
simplicity the Court refers to him and his estate as Defendant Hall.

right shoe was found. *Id.* Defendant Oswald picked up the left (Hudson Ridge) shoe without wearing gloves or preserving the scene. He later delivered the shoe to the CPD. *Id.* The crime lab determined that the left (Hudson Ridge) shoe had bloodstains on it. 2000-07-17 OSP Lab Wilcox Report at 1, ECF No. 296 at 179; 2001-10-03 FSS Lab Report at 15, ECF No. 330-63. McGuffin's DNA was not found on the shoe. Nonetheless, the Original Investigators identified McGuffin as the lead suspect and executed search warrants for his Mustang, his parents' Thunderbird, and the McGuffin's home.

On August 3, 2000, police located Freeman's body in the woods on an embankment of the Coquille River, approximately eight miles from the location where she was last seen alive and approximately three miles from the location where Defendant Oswald testified that the left (Hudson Ridge) shoe was found. Criminal Trial Transcript D6 218:21–220:7, ECF No. 284-1 at 1293–95. Freeman's body was clothed but her shoes were missing. Autopsy Report at 2–3, ECF No. 330-5. The Original Investigation included interviews of dozens of witnesses, DNA testing of Freeman's shoes and clothing, polygraph examinations, forensic testing of physical evidence including McGuffin's property and vehicles, and DNA swabs from persons of interest.

On August 17, 2000, Chief Deputy District Attorney Paul Frasier set up a grand jury but it did not result in any charges being filed. Reaves Decl. at 4, ECF No. 282. Over the next several weeks, there were no significant developments in the investigation of Freeman's death and the case went cold.

### III.     Cold Case Investigation

In 2008, Paul Frasier took office as the District Attorney. That same year, Defendant Reaves retired as Chief of the CPD and Defendant Mark Dannels was hired as the new Chief. Defendant Dannels made a commitment to taking a fresh look at the Freeman case. Dannels

Decl. at 2, ECF No. 283. He assembled a team of "Cold Case Investigators" which, in addition to

Dannels, included Municipal Defendants McNeely (CPD), Sanborn (CPD), Zanni (Coos County

Sheriff), Karcher (Coos County Medical Examiner), and Eric Schwenninger (Coos Bay PD).

Sec. Am. Compl. ¶ 95, ECF No. 143. The Cold Case Investigators also included Susan Horman

(Oregon State Police Lab), Kathy Wilcox (Oregon State Police Lab), and John Riddle (Oregon

State Police).[4] *Id.*

In July 2009, Dannels was approached by Vidocq Society, a private, volunteer

organization made up of a diverse group of professionals with expertise in the criminal justice

system. The mission of Vidocq Society is to act as a resource to law enforcement agencies in

their effort to solve cold homicide cases. Richard Walter was a founding member of Vidocq

Society and purportedly specialized in creating suspect profiles. Vidocq Society, and Walter in

particular, worked with Defendant Dannels and the District Attorney to try to solve Freeman's

murder. As it turned out, Walter was a discredited expert, already known for fabricating evidence

in criminal cases.[5]

## IV. McGuffin's Arrest, Conviction, and Post-Conviction Relief

In August 2010, McGuffin was indicted and arrested for the murder of Freeman. Over

100 people testified at the grand jury proceedings, but no physical evidence linked McGuffin to

Freeman's murder. On July 5, 2011, McGuffin's criminal trial began. On July 18, 2011, the jury

found McGuffin not guilty of murder but guilty of the lesser included charge of manslaughter.

---

[4] Horman, Wilcox, and Riddle are not Municipal Defendants.
[5] *See Drake v. Portuondo*, 321 F.3d 338, 342 (2d Cir. 2003) ("It is now apparent that Walter's testimony concerning his qualifications was perjurious."); *Drake v. Portuondo*, 553 F.3d 230, 238 (2d Cir. 2009) ("Walter's deposition on remand confirms that he grossly exaggerated most of his qualifications and outright lied about some of them.").

The jury's verdict was nonunanimous.[6] McGuffin was sentenced to ten years imprisonment plus three years of post-prison supervision. Criminal Case Judgment, ECF No. 330-71.

After exhausting the appeals process, in 2015, McGuffin filed for post-conviction relief. On November 29, 2019, the court denied McGuffin's claim of actual innocence, but vacated his conviction based on the discovery of exculpatory DNA evidence that the OSP lab knew about but failed to disclose. PCR Judgment, ECF No. 296 at 1–20. The PCR court found that the OSP lab failed to disclose that Freeman's left (Hudson Ridge) shoe contained unknown male DNA that did not match McGuffin or Defendant Oswald who had found the shoe. PCR Judgment at 16, ECF No. 296 at 18. The District Attorney did not believe that McGuffin was innocent and argued that there was evidence in the record from which a jury could find him guilty. District Attorney's Motion to Dismiss at 5, ECF No. 290-1. However, due to the passage of time affecting the memories of witnesses, the fact that McGuffin only had six months of imprisonment remaining of his sentence, and the wishes of Freeman's family to avoid the re-traumatization of another trial, on December 17, 2019, the District Attorney unilaterally moved the court to dismiss all charges against McGuffin. District Attorney's Motion to Dismiss at 4–6, ECF No. 290-3. The court granted the motion, and McGuffin was released from custody. McGuffin has always maintained his innocence. Criminal Trial Transcript (Sentencing) at 1738:18–1742:11, ECF No. 284-1 at 1799–1803.

On July 20, 2020, McGuffin filed this lawsuit alleging that the Municipal Defendant fabricated, withheld, and suppressed evidence in a conspiracy to bring charges against him. McGuffin's minor daughter, S.M. brings a claim under the Fourteenth Amendment alleging that

---

[6] The Supreme Court has since held that the Sixth Amendment right to jury trial requires a unanimous verdict to convict a defendant of a serious offense. *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020).

the Municipal Defendants deliberate indifference caused her father to be wrongfully imprisoned, depriving her of her protected liberty interest in parental companionship.

The Court discusses the specific evidence in the record relied on by Plaintiffs in opposing summary judgment in the discussion section, below.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Service, Inc.*, 809 F.2d at 630.

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re*

*Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party

bears the burden of designating "specific facts demonstrating the existence of genuine issues for

trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a

situation, the non-moving party must do more than raise a "metaphysical doubt" as to the

material facts at issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).

## DISCUSSION

The Municipal Defendants repeatedly failed to support their arguments with citations to

evidence in the record or to address the facts in the light most favorable to Plaintiffs. The record

before the Court is voluminous and contains numerous examples of evidence from which a

reasonable jury could conclude that each of the Municipal Defendants participated in the

deprivation of Plaintiffs' rights.

## I.    Fabrication of Evidence

Plaintiffs contend that the Municipal Defendants' deprived McGuffin of his right to a fair

trial under the Due Process Clause of the Fourteenth Amendment by fabricating evidence against

him. Plaintiffs' claims are conspiratorial in nature. Each piece of evidence in the record adds to a

constellation that only a jury can interpret. The evidence creating a dispute of fact about whether

the Municipal Defendants fabricated evidence meets the minimum sufficiency to survive

summary judgment.

"[T]here is a clearly established constitutional due process right not to be subjected to

criminal charges on the basis of false evidence that was deliberately fabricated by the

government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001). "A plaintiff can

prove deliberate fabrication in several ways. Most basically, a plaintiff can produce direct

evidence of deliberate fabrication. Alternatively, a plaintiff can produce circumstantial evidence related to a defendant's motive." *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (citations omitted).

Examples of direct evidence of deliberate falsification include documenting evidence that does not exist, reporting witness statements that were "never made" *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017), or materially mischaracterizing witness statements, *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010). "[M]aterial omissions" in an officer's report can also constitute direct evidence of deliberate fabrication. *See Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997), as amended (Oct. 9, 1997). An omission or mischaracterization is material if it "manipulate[s] the inferences" that can be drawn from the evidence. *Id.* When there is direct evidence of deliberate fabrication, the plaintiff is not required to show that the officer knew or should have known that the plaintiff was innocent. *Spencer*, at 800. The Constitution prohibits the deliberate fabrication of evidence, irrespective of the officer's motive. *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022).

To prove deliberate fabrication based on circumstantial evidence, the plaintiff must:

> support[ ] at least one of the following two propositions: (1) [d]efendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Caldwell*, 889 F.3d at 1112 (quoting *Devereaux*, 263 F.3d at 1076).

Here, the Court addresses several examples of evidence in the record from which a jury could conclude that each Municipal Defendant participated in the fabrication of evidence against McGuffin.

1.     Fabrication of Evidence About Freeman's Shoes

Plaintiffs assert that the Municipal Defendants fabricated evidence to support a false narrative that McGuffin caught up to Freeman by the high school, got into a fight with her near the cemetery, and hit her in the face causing her to bleed onto her shoe.

On the night of Freeman's disappearance, at around 11:30 p.m., a passerby found what was later determined to be Freeman's right shoe near the cemetery in town. Criminal Trial Transcript D5 127:16–132:17, ECF. No. 284-1 at 920-25. In July 2000, Oregon State Police, Criminalist Kathy Wilcox,[7] examined the right (cemetery) shoe and reported that "no blood was detected on this shoe." 2000-07-17 OSP Lab Wilcox Report (Ex. 119) at 20, ECF No. 296 at 181. Chief Dannels wrote about Freeman's shoes in a case summary that was provided to Vidocq Society, including, Walter. Dannels described in the case summary that the right (cemetery) shoe had Freeman's DNA on it and that the left (Hudson Ridge) shoe had Freeman's blood on it. Dannels Case Summary for Vidocq at 3-4, ECF No. 330-4. Despite Wilcox's 2000 report, and Dannels' case summary, Chief Dannels announced in a 2010 appearance on the television show "20/20" that the right (cemetery) shoe was found "with blood on it." 2010-10-15 Transcript of ABC News 20/20 Episode at 11, ECF No. 330-1. The 20/20 television episode showed Chief Dannels and Walter[8] standing next to the cemetery discussing their theory of the case. 2010- 10-15 Excerpt of Video of ABC News 20/20 Episode at 7:18, ECF No. 330-2. After Chief Dannels stated that the right (cemetery) shoe had blood on it, Walter said, "I would suggest to you that she was forcibly taken from that point. She got probably smashed in the face." 2010-10-15 Transcript of ABC News 20/20 Episode at 11, ECF No. 330-1.

---

[7] Wilcox is not a Municipal Defendant.
[8] Walter is not a Municipal Defendant.

The misinformation that the right (cemetery) shoe had blood on it continued through McGuffin's criminal trial. As part of her report on Freeman's shoes, Wilcox took a photograph of Freeman's left (Hudson Ridge) shoe and labeled where she took a blood swab. The original copy of the photograph was not labeled as the left shoe or the right shoe. A copy of the original photograph was produced to the district attorney and then to McGuffin's defense counsel on the day he was arraigned. Puracal Decl. Ex. 7, ECF No. 330-7. A second copy of the shoe was later produced to the District Attorney and to McGuffin's criminal defense before McGuffin's criminal trial in 2011. In the second copy of the photograph, Wilcox incorrectly labeled the shoe in the photograph as the right shoe. 2000-07-17 Wilcox Report at 29, ECF No. 296 at 190. The incorrectly labeled photograph was introduced at McGuffin's criminal trial where Wilcox identified it as the right shoe. Criminal Trial Transcript at D6 86:4-21, ECF No. 284-1 at 1160. On cross-examination, Wilcox admitted that the photograph was incorrectly labeled as the right shoe when it was, in fact, a photograph of the left (Hudson Ridge) shoe. Criminal Trial Transcript D6 136:7–15, ECF No. 284-1 at 1211. In closing argument, the State summarized the narrative told by Dannels and Walter on 20/20, placing the bloody shoe at the cemetery, which Dannels knew to be false:

> [McGuffin] finds her by the high school. He tries to get her into the car. She loses a shoe. She ends up with a bloody lip or a bloody nose. She screams, which is what was heard by Mr. Bounds. And in an effort to keep her quiet, or in anger, he strangles her. And then it goes downhill from there. He panics, changes clothes, switches cars, body gets dumped. He has to cover for himself. Has to go around asking questions. "Where is Leah?"

Criminal Trial Transcript at D9 156:2–11, ECF No. 284-1 at 1756. The incorrectly labeled photograph of the bloody shoe was then sent into the jury room. Criminal Trial Exhibit No. 31, ECF No. 330-9.

The Municipal Defendants argue that Dannels' appearance and statements on 20/20 were not evidence used to convict McGuffin. However, a reasonable jury could conclude that Dannels' statements on 20/20, which conflict with his internal summary of the evidence to Vidocq, show that Dannels knowingly misrepresented the evidence to further a false narrative about Freeman's murder. That narrative was mirrored by the State in its closing argument of McGuffin's criminal trial. A jury could conclude that Dannels' statement provides circumstantial evidence that he framed the investigation in a manner that he knew was contradicted by the evidence. When assessed cumulatively with the other examples of fabrication and suppression below, whether Dannels participated in and directed the use of "investigative techniques that were so coercive and abusive that [he] knew or should have known that those techniques would yield false information" remains in dispute. *Devereaux*, 263 F.3d at 1076.

2.    Fabrication of a Police Report Suggesting that McGuffin Drove Home to Switch Cars

There is also evidence in the record from which a jury could conclude that the Municipal Defendants fabricated evidence to support their narrative that McGuffin drove home shortly after the murder and switched cars from his Mustang to his parents' Thunderbird. The theory of the case against McGuffin was that he transported Freeman's body in his Mustang and then drove around town in the Thunderbird pretending to look for Freeman as a means of manufacturing an alibi.

On the night of Freeman's disappearance, at 10:30 p.m., CPD officer Zavala pulled McGuffin over for driving his Mustang with a broken headlight. Two weeks later, after McGuffin was targeted as a potential suspect, on July 12, 2000, Defendant Zavala wrote a report of the June 28, 2000, traffic stop. 2000-06-28 Coquille PD Zavala Report, ECF. No. 292-6 at 2. Defendant Zavala reported that McGuffin told Defendant Zavala that he was looking for

Freeman, asked if he had seen her, and asked him to keep an eye out. 2000-06-28 Coquille PD

Zavala Report, ECF. No. 292-6 at 2. Defendant Zavala also reported that after letting McGuffin

off with a warning for the headlight, he "saw Nick [McGuffin] drive over the bridge, which at

the time struck me as odd. I was trying to figure out why Nick drove over the bridge if he was

looking for Leah, when Nick knew she was last seen in town." 2000-06-28 Coquille PD Zavala

Report, ECF. No. 292-6 at 2. Defendant Chief Reaves signed off on the report.

    In support of their allegation that Zavala fabricated his report of McGuffin driving over

the bridge, McGuffin testified in deposition for this lawsuit that he was driving a loop in town

that evening and did not drive home until the end of the night, around 2:30 a.m. McGuffin Depo.

at 69:11-71:7, ECF No. 330-10. Notes and emails from the HIT Team could show that the

Municipal Defendants knew that Zavala's report was fabricated because it was contradicted by

objective evidence in the record that put McGuffin (1) at the gas station at 10:19 p.m. near where

Zavala pulled him over and (2) at the pay phone at Fast Mart in town at 10:44 p.m., around the

same time when Zavala purportedly saw McGuffin driving in the opposite direction towards his

home. *Compare* 2000-06-28 Coquille PD Zavala Report at 2, ECF No. 292-6 *with* 2000-07-21

Fax to Hall with Gas Records ECF No. 330-43 (transaction for gas at 22:19) and 2010-01-28

HIT Team Notes at 4 ECF No. 330-42 (Fast Mart payphone call at 22:44). The narrative that

McGuffin switched cars was relied on by the Municipal Defendants in obtaining a search warrant

and was central to the State's theory of the case. 07-13-2000 Hall Search Warrant Affidavit at

13, ECF No. 288-3; Grand Jury (2010) (Dave Hall) at 66:7–11, ECF No. 295-1 at 186.

    In replying to Plaintiffs' response motion, the Municipal Defendants do not address the

evidence in the record creating a dispute of fact about whether Zavala fabricated his report of

McGuffin driving over the bridge and whether the Municipal Defendants knew that the report

was false. Defs.' Reply at 21, ECF No. 337. Instead, the Municipal Defendants argue that Zavala did not fabricate evidence of McGuffin switching cars because his report only states that he saw McGuffin driving over the bridge. This argument misses the point: evidence that Zavala fabricated the police report could be used to show that he and the other Municipal Defendants continued to push a narrative that McGuffin switched cars despite knowing that it was false. A jury could conclude that Zavala and Reaves (who signed off on the report) fabricated evidence that McGuffin drove over the bridge, constituting direct evidence of deliberate fabrication. *See Spencer*, 857 F.3d at 798. A jury could also conclude that Hall fabricated evidence to support his application for a search warrant in which he claimed that McGuffin switched cars.

       3.    <u>Fabrication of Witness Statement that McGuffin Switched Cars</u>

    Plaintiffs contend that the Municipal Defendants then fed the false narrative that McGuffin switched cars to witnesses through repeated interviews, resulting in multiple witnesses who either claimed to have seen McGuffin driving his parents' Thunderbird that evening or over time changed their stories about what car McGuffin was driving on the night of Freeman's disappearance.

    For example, on July 3, 2000, CPD officer Ulmer interviewed Aaron West and reported that West hung out with McGuffin and two other friends at Johnson Pond on June 28, 2000 at around 8:00 p.m. 2000-07-03 Coquille PD Ulmer Report re West at 4, ECF No. 330-36. McGuffin then left to pick up Freeman from the Mitchell's house. 2000-07-03 Coquille PD Ulmer Report re West at 4, ECF No. 330-36. Ulmer reported that, after McGuffin left, West and the two friends went to Fast Mart, and McGuffin stopped by about fifteen minutes later to see if they had seen Freeman. *Id.* Ulmer's report does not mention anything about West stating that McGuffin had switched cars. On July 7, 2000, West was interviewed again, this time by Defendant Zavala. 2000-07-07 Coquille PD Zavala Report re West at 4, ECF No. 330-37.

Zavala's report of West's recounting of June 28, 2000 is detailed but does not mention anything about McGuffin switching cars. *Id.* Plaintiffs assert, and the Municipal Defendants do not dispute, West's recollection of what McGuffin was driving shifted after he was subjected to two more interviews, a polygraph, and a grand jury, all within a few weeks. In one interview, West reportedly said McGuffin was in the Mustang; in another interview, West reportedly said McGuffin was in the Thunderbird; and during his polygraph pre-test interview, West reportedly said McGuffin was in the Mustang and then switched to the Thunderbird. 2000-07-27 Roach Report re West at 2, ECF No. 330-38; 2000-08-07 Young Report re West, ECF No. 330-29; 2000-07-27 Ranger Report re West at 3, ECF No. 330-40. Plaintiffs provide evidence in the form of an expert opinion that repeated interviews by police can impact a witness' memory and subsequent testimony, leading to false memories and testimony. Report of Dr. Brian Cutler at ¶ 13, ECF No. 330-28 at 6.

McGuffin's mother told the police that, on the night Freeman disappeared, the red Thunderbird was parked in her driveway all night and the keys to the Thunderbird were in the headboard in her bedroom, where they remained all night. Kathy McGuffin Deposition at 14:23–27:21, ECF No. 330-21. McGuffin's mother testified in deposition for this lawsuit that she gave this information to the CPD. *Id.* at 26:12–27:3. McGuffin's mother's information about the Thunderbird remaining at home that night does not appear in any of the police reports given to the District Attorney. The Municipal Defendants knew about the information, however, because it appears in a January 28, 2010 note from the HIT team. 2010-01-28 HIT Team Note at 5, ECF No. 330-42. Omitting McGuffin's mother's statement from the police reports, which go into great detail about what cars McGuffin was driving and when, creates circumstantial evidence that the Municipal Defendants were intentionally framing the evidence in a manner that

supported the fabricated narrative that McGuffin had switched cars. Drawing all reasonable inferences in favor of Plaintiffs, the record contains evidence from which a jury could find that the Municipal Defendants who conducted witness interviews knowingly pursued the false narrative about McGuffin switching cars by conducting repeated interviews in which they fed the witnesses false information.

        4.     <u>Fabrication that a Witness Saw McGuffin with Freeman after 9:00 p.m.</u>

Plaintiffs assert that the Municipal Defendants intentionally misled a witness into stating he saw McGuffin with Freeman outside Mitchell's house just after 9:00 p.m., undermining McGuffin's alibi that he was driving alone looking for Freeman at that time. The Municipal Defendants then allegedly fabricated a police report to bolster the witness' credibility while also suppressing evidence that could be used for impeachment purposes. Plaintiffs rely on the following evidence in support of this claim.

On August 7, 2000, CPD Chief Reaves interviewed John Lindegren, a local carpenter. Lindegren Depo. at 6:2–19, 7:11–13, ECF No. 330-22 at 2; 2000-08-07 Coquille PD Reaves Report of Lindegren, ECF No. 330-23. Chief Reaves reported that Lindegren said that on June 28, 2000, he was doing concrete work at his sister's house and that when he left, he saw a female speaking with a white male less than a block from the Mitchell's residence. 2000-08-07 Coquille PD Reaves Report of Lindegren, ECF No. 330-23; 2010-05-19 Email from Dannels to Frasier, ECF No. 330-25. Ten years later, during the Cold Case Investigation, Chief Dannels wrote in an email to the District Attorney that Lindegren's observations were not given much credit because "[i]n the original report/information, he thought the Mitchell house was Leah's house and after showing us exactly where he was talking about, he was confused between Leah and Mitchell." 2010-05-19 Email from Dannels to Frasier, ECF No. 330-25.

On May 18, 2010, Chief Dannels, McNeely, and Webley, reinterviewed Lindegren, despite concerns over the credibility of Lindegren's purported sighting of McGuffin with Freeman. 2010-05-18 Coquille PD McNeely Report of Lindegren, ECF No. 330-26; 2010-05-19 Email from Dannels to Frasier, ECF No. 330-25. Lindegren now claimed that, rather than doing concrete work, he had been watching the television show "*Survivor*" at his sister's house on the night that Freeman disappeared. McNeely told the District Attorney that Lindegren said that he recalled that night in particular because it was the episode of *Survivor* in which a contestant named "Rudy" was voted off. *See* 2016-09-01 Letter from DA Frasier to DOJ at 5, ECF No. 330-27; *see also* Grand Jury (2010) at 89:1–2 (John Lindegren), ECF No. 295-1 at 1037; Grand Jury (2010) at 97:9–15 (Hjordis Lindegren), ECF No. 295-1 at 1028. Lindegren stated that after the episode ended at 9:00 p.m., he left and saw McGuffin and Freeman outside Mitchell's house.

McNeely then wrote a report of the interview with Lindegren and attached a copy of a cable television guide to the report. McNeely wrote in the report, "A check did confirm that the TV show Survivor aired on the night of June 28, 2000 from 2000 hours to 2100 hours." 2010-05-18 Coquille PD McNeely Report of Lindegren at 1, ECF No. 330-26. The District Attorney found Lindegren credible based on his detailed recollection about what he was doing that night and McNeely's report confirming that *Survivor* had aired that night. 2016-09-01 Letter from DA Frasier to DOJ at 5, ECF No. 330-27. However, McNeely and Webley did not report or disclose to the District Attorney that they had done additional research on Wikipedia and discovered that the episode in which Rudy was voted off did not air until several weeks after Freeman's disappearance. Puracal Decl., 2010-05-19 Coquille PD Wikipedia Printout (Attachment 2), ECF No. 330-14 at 12; 2010-05-19 Handwritten Notes re Hjordis Lindegren (Attachment 1), ECF No. 330-30 at 6; First RFA to Webley, ECF No. 330-30 at 2; Puracal Decl., RFA No. 2 to McNeely,

ECF No. 330-14 at 2. McNeely and Webley did not produce a printout of the *Survivor* Wikipedia page with their handwritten notes confirming that Lindegren's specific recollection, which the District Attorney relied on to bolster Lindegren's credibility at the grand jury, was impossible. Frasier Civil Suit Deposition at 149:5–154:25, ECF No. 330-3 at 150. At the grand jury, McNeely testified that he did not go as far as checking whether Rudy had been voted off on the episode that aired on June 28, 2000, but had "verified that [*Survivor*] was on that time." Grand Jury (2010) at 138:4–141:18 (McNeely), ECF No. 295-1 at 1126.

In deposition for this lawsuit, Lindegren testified that he told McNeely that he did not know McGuffin all that well, and that he believed that the man he saw was McGuffin, but he was not absolutely sure. Lindegren Depo. at 136:20–137:14, 174:6–17, ECF No. 330-22 at 3–5. McNeely's report of the 2010 interview does not include Lindegren's equivocation. 2010-05-18 McNeely Report re Lindegren, ECF No. 330-26. When asked about the tactics used by McNeely and Webley to obtain a witness statement in 2010, Lindegren testified in deposition for this lawsuit that, although no one came right out and said, "This is what we want you to say or do," he believed that he was probably led into believing that he had seen Freeman with McGuffin. Lindegren Deposition at 232:6–233:9, ECF No. 330-22 ("Could I have been led? I probably could have, Because I'm just an old hillbilly. I ain't none all that brilliant when it comes to law work. Could I have been led? Yeah, probably."). Lindegren was the only witness at the criminal trial who allegedly saw McGuffin with Freeman after 9:00 p.m., which undermined McGuffin's alibi that he was driving around looking for Freeman at that time.

Based on this evidence, a jury could conclude that McNeely and Webley fabricated evidence when they wrote a report "confirming" that *Survivor* aired that night while suppressing evidence in their possession undermining the Rudy episode story that the District Attorney had

relied on in deciding to call Lindegren to testify at the grand jury and to bolster his credibility. McNeely is absolutely immune from liability for his testimony at the grand jury. *Little v. City of Seattle*, 863 F.2d 681, 684 (9th Cir. 1988). However, his testimony at the grand jury, that he never looked up whether the *Survivor* episode that aired that night was the one where Rudy was voted off, is contradicted by the handwritten notes on the Wikipedia printout and could be used to show that the 2010 report of the Lindegren interview contained intentional mischaracterizations and material omissions, both of which provide direct evidence of deliberate fabrication. *Costanich*, 627 F.3d at 1111 (mischaracterizations can provide direct evidence of fabrication); *see Liston*, 120 F.3d at 973 (material omissions can provide direct evidence of fabrication).

The record contains evidence supporting Plaintiffs' fabrication claim against Dannels, McNeely, and Webley.

### 5. Fabrication of Evidence that McGuffin's Mustang had been Sanitized

Plaintiffs assert that the Municipal Defendants fabricated evidence that McGuffin's car had been "wiped clean" and the trunk had been "sanitized," to create the false impression that McGuffin transported Freeman's body in the trunk and then engaged in a sophisticated cover up to hide the blood evidence. The following evidence creates a dispute of fact in support of this claim.

On July 5, 2000, McGuffin consented to the search and seizure of his blue Mustang. 2000-07-05 McGuffin Consent to Search at 12, ECF No. 310-15. The Municipal Defendants took McGuffin's car to Wilcox, who examined it on July 6, 2000. 2000-07-06 Wilcox Report of Car at 8–9, ECF No. 310-15. Wilcox photographed the exterior and interior of the car and noted in her report that "[t]he interior surfaces did not appear to have been recently wiped clean." 2000-07-06 Wilcox Report of Car at 8, ECF No. 310-15. She also noted that "[t]he trunk

compartment was empty. There was no spare tire or any type of trunk liner." *Id.* Wilcox reported

that "[n]o blood was found" during her inspection of McGuffin's car. *Id.* Wilcox did not report

any signs of the car having been sanitized or sterilized and her field notes indicate that the

"[e]xamination d[id] not reveal any signs of cleaning[.]"2000-07-06 Wilcox Field Notes at 15,

ECF No. 310-15. Wilcox also noted the presence of dirt, debris, trash, and loose tools inside the

vehicle as well as loose dirt and debris inside of the trunk, and that there was no spare tire or a

trunk liner in the trunk. Wilcox Photographs of Mustang, ECF No. 330-31.

> After her inspection of the Mustang, Wilcox called Defendant Hall because she thought

that it was important to tell him that there were no items in the trunk such as a spare tire or a

liner, indicating that the trunk had been cleaned out. Kathy Wilcox Depo. at 109:22–110:06, ECF

No. 330-6 at 6–7. In Wilcox's Handwritten notes from a July 7, 2000, meeting with Municipal

Defendants Reaves, Hall, Zanni and other members of the HIT Team, Wilcox wrote "'clean' car,

not wiped . . . when did they clean car esp. trunk[?]" 2000-07-07 Wilcox Handwritten Notes

from HIT Meeting, ECF No. 330-34. Wilcox's handwritten notes from the HIT Team meetings

were not produced to the District Attorney. Frasier Civil Suit Deposition at 76:20–78:15, ECF

No. 330-3 at 4. Within a day or two of her July 6, 2000, inspection of the Mustang, Wilcox was

informed that the trunk was emptied to repair a gas leak. Kathy Wilcox Depo. at 113:6–115:13,

ECF No. 330-6 at 18.

> Despite Wilcox's report from 2000 that McGuffin's Mustang had not been wiped or

sanitized, Dannels appeared on "20/20" in 2010 and reported that McGuffin's Mustang "was

cleaned and wiped." 2010-10-15 Transcript of ABC News 20/20 Episode at 19, ECF No. 330-1.

After McGuffin's criminal conviction was set aside, Dannels appeared on another episode of

"20/20" and stated that "I was told . . . that the trunk had been sterilized." 2020-02-28 Transcript

of ABC News 20/20 Episode at 40, ECF No. 330-33. Wilcox testified during McGuffin's criminal trial that the seats of the Mustang had been "wiped clean." Criminal Trial Transcript at D6 81:12–13, ECF No. 284-1 at 1155.

Similar to Dannels' false statements on 20/20 regarding the presence of blood on Freeman's right (cemetery) shoe, Dannel's statement on 20/20, that the Mustang had been cleaned and wiped, conflicts with Wilcox's report and notes describing that there were no signs that the Mustang had been wiped. A jury could find that Dannels knowingly furthered the false narrative that McGuffin transported Freeman's body in the Mustang and then wiped the car clean. A jury could conclude that Dannels' statement on 20/20 provides circumstantial evidence that he framed the investigation in a manner that he knew was inconsistent with Wilcox's examination of the evidence. The narrative that McGuffin wiped and sanitized his Mustang was relied on at the grand jury and trial. Whether Dannels and others "used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information" remains in dispute. *Devereaux*, 263 F.3d at 1076. A Jury could conclude that there is circumstantial evidence that the Cold Case Investigators knowingly fabricated a false narrative that McGuffin had sanitized his Mustang.

### 6.  Fabrication that McGuffin Dumped Freeman's Body

Plaintiffs assert that the following evidence shows that the Municipal Defendants fabricated evidence that McGuffin dumped Freeman's body down an embankment and then looked down at the body where it landed.

On August 3, 2000, police discovered Freeman's body down an embankment off Lee Valley Road in Coquille, near the Coquille River. 2000-08-08 OSP Pex Report at 1, ECF No. 330-44. Defendant Kris Karcher (a Deputy Medical Examiner with the Coos County Sherriff's Office) went to the scene but did not produce the original report. The original report from the

criminalist in charge of the scene noted that Freeman's "left arm was across her chest and the right arm was folded under her. Her legs were also crossed." 2000-08-08 OSP Pex Report at 1, ECF No. 330-44. The report did not state that Freeman's body was rolled down the embankment.

Plaintiffs contend that Defendant Karcher fabricated the narrative that Freeman was rolled down the embankment to create the false impression that McGuffin had hastily dumped Freeman's body from the road. The "dump and roll" narrative was repeated by Chief Dannels in his case summary to Vidocq Society and by Karcher at the 2010 grand jury where she testified that Freeman's body was found with one arm in front, one arm in back and her legs crossed, indicating that she had been dumped and rolled. Grand Jury (2010) (Kris Karcher) at 146:20–147:5, ECF No. 295-1 at 254–55. The autopsy report described in detail the positioning of Freeman's body and is inconsistent with Karcher's testimony at the grand jury proceedings about the position of Freeman's body. *Compare* 2000-08-04 Autopsy Report at 2–3, ECF No. 330-5 *with* Grand Jury (2010) (Kris Karcher) at 146:20–147:5, ECF No. 295-1 at 254–55.

Plaintiffs assert that Defendant Karcher also fabricated evidence of a "path" starting from the side of the road where, according to Karcher, the vegetation was broken down such that it looked like someone had walked over to the edge and looked down, creating the impression that McGuffin dumped the body from the road, went to the edge, and looked down at the body. Pls.' Resp. at 29. A handwritten note from a HIT Team meeting on October 13, 2009, states: "vegetation not broke down by road." 2009-10-13 HIT Team Notes at 7, ECF No. 330-46. The October 13, 2009 HIT Team meeting note was never produced to the District Attorney or the criminal defense. Frasier Civil Suit Deposition at 75:13–78:15, ECF No. 330-3 at 4–5; Shaun McCrea Deposition 185:10–21, 197:18–198:16, ECF No. 330-16 at 8–9.

At the 2010 grand jury, Karcher testified:

> The other thing that was noticeable when we came was it looked like there was a path that somebody -- the grass was tall along the shoulder of the road, but that area it looked like there was a path; that maybe somebody had walked over to the edge and looked down. The -- the thing -- the -- um, the foliage was kind of down. It could have been an animal, you know, coming back and forth through there, but, um, I did notice that.

Grand Jury (2010) (Kris Karcher) at 146:1–8, ECF No. 295-1 at 254. In deposition for this lawsuit, Defendant Karcher testified that there was no evidence to corroborate the idea that the path was created by a person and, "[m]ore than likely it was an animal, but it could have been either." Kris Karcher Deposition at 159:22–161:20, 162:25–163:9, ECF No. 330-45 at 7–8. Defendant Karcher did not write down or document her observations about the path. Kris Karcher Deposition at 163:13–17 ECF No. 330-45 at 8. While Karcher is immune from liability for her in-court testimony, the discrepancies between the HIT Team notes, the grand jury testimony, and her deposition testimony could show that she conducted the investigation with a reckless disregard for the truth, constructing a false narrative that carried through to the State's theory of the case at trial.

### 7.   Fabrication of Testimony that McGuffin Saw Freeman's Body

Plaintiffs assert evidence in the record shows that Defendants Schwenninger and McNeely worked with Defendant Hall to illicit false testimony from Hall's stepson, Richard Bryant, and that the Municipal Defendants withheld evidence that Bryant had heard details about the case from Defendant Hall.

On September 21, 2000, Defendant Zanni and another officer conducted an interview in which they reported that a witness had heard Bryant talking about Freeman at a party and that Bryant "had heard a lot of stuff from his Dad and was blabbing his mouth." 2000-09-21 CCSO Zanni Note re Richard Bryant, ECF No. 330-49. The fact that Bryant may have heard details about the case from his stepfather, Defendant Hall, was never disclosed to the District Attorney,

and Defendant Zanni's report of the interview was never produced in the criminal matter. Frasier Civil Suit Deposition at 186:15–189:21, ECF No. 330-3 at 21.

In 2002, Bryant and McGuffin shared a jailcell for reasons unrelated to this case. Grand Jury (2010) (Richard Bryant) at 7:22–8:9, ECF No. 295-1 at 940–41. In 2010, Defendants Schwenninger and McNeely reached out to Defendant Hall, who was no longer working for the CPD, to see if he had any suggestions for aiding in the Cold Case Investigation. Hall suggested that they approach Bryant to see if Bryant would cooperate with their efforts to bring charges against McGuffin. Schwenninger Case Notes at 3, ECF No. 330-48 at 11. Bryant then testified at the 2010 Grand Jury that, while they were in jail together, McGuffin became emotional talking about Freeman and said, "I can just – I can see her laying there and I couldn't do anything to help her, and I can't do anything about it." Grand Jury (2010) (Richard Bryant) at 8:15–17, ECF No. 295-1 at 941. When testifying at the criminal trial in 2011, Bryant gave a slightly altered testimony, suggesting that McGuffin had actually seen Freeman's body and knew how it was positioned: "[McGuffin] was crying and telling me that, you know, he can picture her laying there and her head sitting on a rock and there was nothing he could do about [it]." Criminal Trial Transcript at D6 65:21–24, ECF No. 284-1 at 1139. Bryant was confronted on cross-examination about the inconsistency of his testimony, and he maintained that his trial testimony was what he remembered from their jail cell conversation in 2002. Criminal Trial Transcript at D6 66:6–24, ECF No. 284-1 at 1140. Because the Municipal Defendants never disclosed Zanni's report that Bryant may have learned details of the case from Hall, McGuffin was not able to confront Bryant about having learned confidential details of the case from his stepfather and lead investigator, Hall.

The Municipal Defendants argue that the only evidence that Hall, Schwenninger, and McNeely elicited false testimony from Bryant is that Hall led the original investigation and was Bryant's stepfather. This argument fails to address evidence in the record (Zanni's report) that Bryant knew information about the investigation from Hall and that Hall later told Schwenninger and McNeely that they should interview Bryant to see if he could help. Drawing all inferences in favor of Plaintiffs, a reasonable jury could conclude that Hall disclosed nonpublic information to Bryant about the position of Freeman's body which Bryant used to suggest that McGuffin had seen Freeman's body. A jury must decide whether Hall, Schwenninger, and McNeely fabricated evidence by eliciting Bryant's allegedly false testimony.

## II.    Withholding or Suppressing Exculpatory Evidence

Plaintiffs assert that the Municipal Defendants' deprived McGuffin of his right to a fair trial under the Due Process Clause of the Fourteenth Amendment by withholding, suppressing, or destroying exculpatory evidence.

Withholding material information from the accused violates the Due Process Clause. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Information is material if it favors the accused "either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The suppression of so-called *Brady* material violates due process, "irrespective of the good faith or bad faith of the prosecution." *Id.*

Whether information favors the accused is a low standard. *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). "*Brady* is not confined to evidence that affirmatively proves a defendant innocent: Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." *Id.* Prejudice results if "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles v. Whitley*, 514 U.S. 419,

441 (1995). That is, whether cumulatively, "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

*Brady* material includes information that would allow the accused an opportunity to attack (1) the probative value of physical evidence; (2) the circumstances in which evidence was obtained; (3) the thoroughness of the police's investigation; and (4) the "uncritical attitude on the part of the police." *Id.* at 445. "When, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." *Id.* at 446 n.15.

Here, the Municipal Defendants fail to address the evidence in the light most favorable to the nonmoving party. They ignore the ways in which a jury could find the evidence exculpatory, and they improperly draw inferences in their own favor. A jury must evaluate the evidence and determine whether the Municipal Defendants suppressed or destroyed evidence that could have given McGuffin an opportunity to attack the probative value of the evidence used against him based on the circumstances in which it was obtained, the thoroughness of the Municipal Defendants' investigation, and whether they took an "uncritical attitude" when building a case against him. *Id.* at 445. A jury could "infer[] from circumstantial evidence" that each Defendant "acted with deliberate indifference to or reckless disregard for [McGuffin's] rights and to the truth" by suppressing the evidence described above. *Mellen v. Winn*, 900 F.3d 1085, 1101 (9th Cir. 2018) (quoting *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)).

### 1.    Suppression of Evidence Showing Investigatory Misconduct

For example, Dannels did not disclose that the narrative that McGuffin caught up to Freeman, argued with her, and hit her in the face, causing her to bleed on her right (cemetery)

shoe came from his joint efforts with Walter, a man already known for fabricating evidence in criminal cases.[9]

McNeely and Webley did not disclose the Wikipedia page and their handwritten notes undermining Lindegren's story that he remembered seeing Freeman with McGuffin on the night she disappeared because that was the night that Rudy was voted off *Survivor*.

Dannels and Sanborn did not disclose the HIT Team notes documenting Wilcox telling the HIT Team that the car had not been wiped, undermining their fabricated narrative that McGuffin cleaned out his car after dumping Freeman's body. Frasier Civil Suit Deposition at 76:20–78:15, ECF No. 330-3 at 4.

The Municipal Defendants did not disclose the HIT Team notes which could have shown that they knew Zavala's report of McGuffin driving over the bridge was false because McGuffin was getting gas and using a payphone in town in the opposite direction at that time. *Compare* 2000-06-28 Coquille PD Zavala Report at 2, ECF No. 292-6 *with* 2000-07-21 Fax to Hall with Gas Records ECF No. 330-43 (transaction for gas at 22:19) and 2010-01-28 HIT Team Notes at 4 ECF No. 330-42 (Fast Mart payphone call at 22:44).

Oswald, who found Freeman's left shoe on Hudson Ridge, testified in deposition for this case that he also found cigarette butts, paper, cans, and a piece of string which he collected with gloves and placed in a bag with Freeman's left shoe. *See* Expert Report of Russ Hicks at 34, ECF No. 330-29, *citing* Deposition of Kip D. Oswald, December 22, 2021, at 157. There is no record that Oswald turned in those other items. Plaintiffs provide evidence in the form of expert

---

[9] *See Drake v. Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003) (Walter "was a charlatan, and . . . his testimony was, medically speaking, nonsense."); *Drake v. Portuondo*, 553 F.3d 230, 244 (2d Cir. 2009) (describing Walter's false and highly prejudicial expert testimony as "conjur[ed] up . . . quackery").

testimony that those items were key pieces of evidence given the close proximity that they were found by Freeman's left (Hudson Ridge) shoe, which contained the presence of male DNA that did not match McGuffin or Oswald and remains unknown. Expert Report of Russ Hicks at 33–37, ECF No. 330-29. A jury could conclude that Oswald suppressed the fact that he failed to properly collect or preserve potentially key pieces of evidence found by Freeman's left (Hudson Ridge) shoe or that he destroyed the evidence.

The Cold Case Investigators failed to disclose the October 13, 2009 HIT Team note stating: "vegetation not broke down by road." 2009-10-13 HIT Team Notes at 7, ECF No. 330-46; Frasier Civil Suit Deposition at 75:13–78:15, ECF No. 330-3 at 4–5; Shaun McCrea Deposition 185:10–21, 197:18–198:16, ECF No. 330-16 at 8–9. The HIT Team note could have been used to impeach Karcher's testimony that there was a path at the top of the embankment indicating that McGuffin had peered over the edge and looked down on Freeman's body.

Schwenninger and McNeely failed to disclose Zanni's report that Bryant had learned details about the Freeman case from his stepfather, Hall. 2000-09-21 CCSO Zanni Note re Richard Bryant, ECF No. 330-49; Frasier Civil Suit Deposition at 186:15–189:21, ECF No. 330-3 at 21. Bryant then testified at McGuffin's trial that while in jail together, McGuffin had disclosed details about the location and positioning of Freeman's body.

The materiality of omitted evidence is assessed cumulatively with other evidence, not merely in terms of its probative value standing alone. *United States v. Ross*, 372 F.3d 1097, 1107–08 (9th Cir. 2004), *on reh'g in part,* 138 F. App'x 902 (9th Cir. 2005). The Court finds that these suppressions, if proved, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Based on the record before the Court, Plaintiffs have met their burden of showing disputes of material fact

precluding summary judgment on Plaintiffs' claims for the withholding and suppression of evidence that would have undermined the jury's confidence in reaching a verdict.

      2.    <u>Suppression of Zanni's Tip Sheet Confirming the Time and Place Freeman Was Observed Walking Alone</u>

Plaintiffs cite the following evidence in support of their allegations that the Municipal Defendants suppressed records of an ATM transaction that confirmed the precise time and place that a witness observed Freeman walking alone. The Court finds that there is no dispute that this information was disclosed to the District Attorney, satisfying the Municipal Defendants' obligations under *Brady*.

McGuffin has always maintained that he never saw or spoke with Freeman after dropping her off at Mitchell's house at 7:00 p.m. on June 28, 2000. McGuffin Depo. at 96:23–104:4, 190:19–195:14, ECF No. 330-10. On July 28, 2000, McGuffin stated in a police interview that he had talked with Nick Backman, who told him that on the night Leah disappeared, Backman saw Freeman a few minutes after 9:00 PM, near the credit union. 2000-09-20 CCSO Zanni Note re Backman at 2, ECF No. 290-17 at 3. On September 20, 2000, Defendant Zanni interviewed Nick Backman, who confirmed that he had seen Freeman on the night of her disappearance while he was using the credit union's ATM. 2000-09-20 CCSO Zanni Note re Backman at 4, ECF No. 290-17 at 5. Defendant Zanni wrote in the tip sheet, "checked with Credit Union and confirmed a $10 withdrawal on 6/28/00 at 9:04 p.m." 2000-09-20 CCSO Zanni Note re Backman at 4, ECF No. 290-17 at 5 (cleaned up).

Zanni's corroboration of the precise time that Backman used the ATM is significant because Backman was the only witness who could provide more than an estimate of the time that he saw Freeman. Freeman walking alone by the credit union at 9:04 p.m. contradicted the State's narrative and Lindegren's testimony that he saw Freeman with McGuffin outside Mitchell's

house at that time. Shaun McCrea Depo. at 187:16–188:13, ECF No. 330-16 at 8. The precise

time that Backman saw Freeman alone was therefore material information, favorable to

McGuffin.

The Municipal Defendants argue that there is no dispute that they produced Zanni's tip to

the District Attorney, satisfying their constitutional obligation under *Brady*. "Investigators satisfy

their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the

prosecutors." *Broam v. Bogan*, 320 F.3d 1023, 1033 (9th Cir. 2003) (quoting *McMillian v.

Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996)). Defendant Sanborn was responsible for

reviewing and producing the tip sheets during the Cold Case Investigation. 2008-09-24 Sanborn

re Investigation at 2, ECF No. 330-11 at 2; 2010-02-05 Email from McNeely to HIT Team, ECF

No. 330-12. Whether Zanni's tip sheet was disclosed to the criminal defense remains in dispute.

*Compare* 2000-09-20 CCSO Zanni Backman Note, ECF No. 290-17 at 5 (with Bates number

003247) *with* Criminal Case Discovery Bates numbered "003247," ECF No. 330-15; *see also*

Shaun McCrea Depo. at 187:14–188:13, ECF No. 330-16 at 8. The District Attorney testified in

his deposition that he did not know that Backman existed, much less that there may have been an

ATM receipt or other records confirming the time and place that Backman saw Freeman walking

alone. Frasier Civil Suit Deposition at 181:6–183:13, ECF No. 330-3 at 19. However, there is no

dispute that the District Attorney Bates stamped Zanni's tip sheet. Frasier Civil Suit Deposition

at 179:10–25, 183:14–185:25, ECF No. 330-3 at 19–20. Zanni's tip sheet was therefore produced

to the prosecutor, satisfying the Municipal Defendants obligations under *Brady*.

Plaintiffs assert that the Municipal Defendants suppressed an ATM receipt that

corroborated Backman's statement. However, there is no evidence in the record to support

Plaintiffs' assertion that the Municipal Defendants ever obtained an ATM receipt or other

records from the credit union. Rather, Zanni's tip sheet states that he "checked with Credit Union and confirmed a $10 withdrawal on 6/28/00 at 9:04 p.m." 2000-09-20 CCSO Zanni Note re Backman at 4, ECF No. 290-17 at 5 (cleaned up). Moreover, if the receipt did exist, it would be duplicative of the information detailed in Zanni's tip sheet, which was undisputably produced to the District Attorney. Summary judgment is granted in favor of the Municipal Defendants on Plaintiffs' claim as it relates to the suppression of evidence confirming Backman's use of the ATM.

### III.    Destruction of Evidence

Plaintiffs assert evidence in the record shows that the Municipal Defendants withheld, suppressed, or destroyed exculpatory evidence. The Municipal Defendants ignore their burden of addressing the evidence in the light most favorable to Plaintiffs, best illustrated by their arguments about what the "real facts" and the "real story" show about the destruction of evidence. Defs.' Mot. at 40–41. The Municipal Defendants' argument on this point is gratuitously dramatic and lacks compelling substance. "Reality"—as determined by examining disputed evidence in the record—remains a factual question which must be answered by the jury. The record before the Court is voluminous and highly disputed. Except for Zanni's tip sheet regarding Backman's use of the ATM, discussed above, the Municipal Defendants fail to carry their burden of showing that there is no dispute concerning the destruction of evidence.

"The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). However, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material . . . which might have exonerated the defendant." *Id.* A claim for

destruction of evidence in violation of Due Process requires proof that the officer acted in bad faith, often evidenced by the officer's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.* "[R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id.* at 58. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

As described above, there are numerous examples of evidence in the record from which a jury could conclude that the Municipal Defendants suppressed and fabricated evidence. On this record, a jury could also find that the Municipal Defendants were acting in bad faith and destroyed evidence of their wrongdoing. In addition to the examples that stem from the fabrications and suppression described above, a jury could find that Defendant Kris Karcher (a Deputy Medical Examiner with the Coos County Sheriff's Office) destroyed the only copy of a video recording documenting the crime scene where Freeman's body was found.

On August 3, 2000, OSP Lab Criminalist, Lt. James Pex,[10] was called to process the scene where Freeman's body was found and he video recorded his processing of the crime scene ("Crime Scene Video"). 2000-08-03 Pex Dictated Notes from Scene at 1, ECF No. 330-47. The Crim Scene Video was given to Defendant Zanni and then to Defendant Hall, who logged it into evidence. 2000-08-07 Evidence Log – scene tape at 2, ECF No. 292-11.

---

[10] Pex is not a Municipal Defendant.

On March 22, 2001, Defendant Karcher checked the Crime Scene Video out of evidence with Hall's permission. 2001-03-21 Property Request at 2, ECF No. 292-12. Karcher was preparing to travel to England to hand deliver evidence to the United Kingdom National Forensic Science Service Laboratory ("FSS Lab") for advanced forensic testing. The FSS Lab was going to perform DNA testing on Freeman's clothes and shoes but also requested other items for review including photographs and video recordings of the crime scene because "[a]ny review would be more effective if as much as possible were supplied[.]" Fourth Franz Decl. Ex. 1 ("5026") 4 – Scientific Evidence – England DNA Materials at 21, ECF No. 290-1. When the Cold Case Investigators began working on the case in 2008, they discovered that the FSS Lab had not returned Freeman's clothes and shoes. *Id.* at 3. The FSS Lab ceased operations in 2012. The District Attorney testified in his deposition in this case that he was unaware of the Crime Scene Video. Frasier Civil Suit Deposition at 194:20–197:21, 198:15–25, 202:1–203:6, ECF No. 330-3 at 23, 25. The Crime Scene Video that Karcher checked out of evidence was never returned and remains missing.

The Municipal Defendants argue that "[t]he only reasonable explanation for what happened to [the Crime Scene Video] is that it was delivered to the FSS Lab in England and never returned." Defs.' Mot. at 47. However, the Municipal Defendants fail to cite direct evidence that the FSS Lab ever possessed the Crime Scene Video, thus, whether the Municipal Defendants delivered the Crime Scene Video to the FSS Lab and whether the FSS Lab failed to return it remains in dispute. The record shows that the Crime Scene Video was checked out of evidence by Karcher and never returned. Drawing all reasonable inferences in favor of Plaintiffs, a jury could conclude that Karcher destroyed the Crime Scene Video.

The Municipal Defendants also argue that there is no evidence that the Crime Scene Video contained anything exculpatory. However, the FSS Lab requested any videos of the crime scene because viewing them would make their review of the physical evidence "more effective." Fourth Franz Decl. Ex. 1 ("5026") 4 Scientific Evidence, England DNA Materials at 21, ECF No. 290-1. Plaintiffs assert that the Crime Scene Video could have been used to impeach Karcher's testimony that the physical evidence showed that Freeman's body had been dumped over an embankment and then looked down on from above.

"Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *California v. Trombetta*, 467 U.S. 479, 486 (1984). The officer's conduct can provide circumstantial evidence that the material was destroyed in bad faith. *Youngblood*, 488 U.S. at 58. As described below, the record contains evidence from which a jury could conclude that Karcher conspired with others to violate McGuffin's constitutional rights, providing circumstantial evidence that the disappearance of the Crime Scene Video was intentional. The record contains other examples of Karcher's failure to preserve evidence. In preparation for her deposition in this lawsuit, Karcher testified that all of her notes and reports from the Freeman investigation were put in a storage unit kept by her office, however, she then testified that "we searched everything that we can think of, um, and have not located any notes, [or] any of my reports." Karcher Depo. at 73:7–77:7, ECF No. 330-45. Karcher is the last known Defendant who possessed the Crime Scene Video and any notes she may have taken on the contents of the video are also missing. Drawing all reasonable inferences in favor of Plaintiffs, the Court cannot rule as a matter of law that it was not apparent to Karcher that the Crime Scene Video may have contained exculpatory evidence at the time it went missing and if Karcher destroyed the video, that she was not acting

in bad faith. Material facts remain in dispute precluding summary judgment on Plaintiffs' destruction of evidence claim.

## IV.     Malicious Prosecution and Illegal Pretrial Detention

Plaintiffs contend that the Municipal Defendants accused McGuffin of criminal activity and then exerted influence to initiate, continue, and perpetuate judicial proceedings against him without probable cause, resulting in an illegal pretrial detention.

Plaintiffs' § 1983 claims for malicious prosecution and illegal pretrial detention both arise under the same constitutional framework of the Fourth Amendment. *See Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 562 (2024); *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 367 (2017). The fact that McGuffin was subject to pretrial detention is not in dispute. These claims survive or fail based on whether the Municipal Defendants caused the initiation of grand jury proceedings against McGuffin without probable cause.

Federal courts rely on state common law for the elements of a malicious prosecution claim. *Thompson v. Clark*, 596 U.S. 36, 43 (2022). To prevail on a malicious prosecution claim under Oregon law, the claimant must demonstrate (1) the institution or continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the claimant's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceedings; and (6) injury or damage as a result. *Miller v. Columbia Cnty.*, 282 Or. App. 348, 360 (2016).[11]

---

[11] A federal claim for malicious prosecution under § 1983 also requires a plaintiff to show that the defendants prosecuted him for the purpose of denying him a "specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). For the reasons explained above, a jury could "infer[] from circumstantial evidence" that each Defendant "acted with deliberate indifference to or reckless disregard for" McGuffin's rights, including his Fourth Amendment Right to be free from unreasonable search or seizure, therefore acting with the purpose of denying McGuffin of a specific constitutional right. *Mellen*, 900 F.3d at 1101.

Here, the Municipal Defendant argue that they "cannot be held liable for McGuffin's prosecution, malicious or not, because they did not initiate the prosecution of McGuffin. (See various Declarations of Defendants)." Defs.' Mot. at 37–38. Rather, the Municipal Defendants contend that "after months of investigation, Paul Frasier decided to submit the case to a grand jury." Defs.' Mot. at 29. Setting aside the fact that merely invoking the phrase "various Declarations of Defendants" is not an adequate citation to evidence creating a dispute of fact, the Municipal Defendants' argument fails because there is evidence from which a jury could find that the Municipal Defendant improperly influenced the District Attorney in his decision to initiate the proceedings.

"Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). "However, the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.*

As explained above, the record contains evidence from which a jury could find that the Municipal Defendants "knowingly provided misinformation[,] . . . concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct[.]" *Id.* Drawing all inferences in favor of Plaintiffs, a jury could conclude that this conduct "was actively instrumental in causing the initiation of legal proceedings." *Id.* For example, a jury could find that, despite initial

concerns about Lindegren's credibility, the District Attorney decided to call Lindegren to testify at the grand jury proceedings because McNeely and Webley fabricated evidence bolstering Lindegren's credibility (attaching the television guide that "confirmed" *Survivor* aired) while suppressing evidence that undermined Lindegren's credibility (withholding the Wikipedia page confirming that the Rudy episode of *Survivor* aired after Freeman's disappearance). A jury could conclude that the District Attorney's decision to initiate the grand jury proceedings was causally related to his finding that Lindegren was credible; Lindegren's testimony placed Freeman with McGuffin after 9:00 p.m., undermining McGuffin's alibi. There is ample evidence in this record from which a jury could find that the Municipal Defendants engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of the grand jury proceedings and McGuffin's pretrial detention. If a jury were to conclude that the Municipal Defendants caused the initiation of the grand jury proceedings, then a jury could also find that the Municipal Defendants caused McGuffin's pretrial detention.

The Municipal Defendants also argue that, because McGuffin was indicted by a grand jury, they had probable cause and Plaintiffs' malicious prosecution and illegal pretrial detention claims necessarily fail. Proof of probable cause is a complete defense to malicious prosecution and illegal pretrial detention claims. *Gustafson v. Payless Drug Stores Nw., Inc.*, 269 Or. 354, 356 (1974); *Manuel*, 580 U.S. at 365. An indictment by a grand jury "constitutes *prima facie*— but not *conclusive*—evidence of probable cause." *Awabdy*, 368 F.3d at 1067; *Gerstein v. Pugh*, 420 U.S. 103, 117 n.19 (1975). "Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy*, 368

F.3d at 1067; *Manuel*, 580 U.S. at 367 (illegal pretrial detention occurs when the "probable-cause determination is predicated solely on a police officer's false statements.").

"Whether the defendant had probable cause to institute the criminal proceeding is a matter for the court to decide and not the jury." *Gustafson*, 269 Or. at 357. However, "'[i]f the facts or inferences are in dispute'" then the Court decides whether the defendants had probable after facts are determined by the jury. *Id.* (quoting *Varner v. Hoffer*, 267 Or. 175, 179 (1973)). Whether the Municipal Defendants acted with malice "is a question for the jury" which may be inferred from a lack of probable cause. *Id.* at 366.

For the reasons explained above, Plaintiffs have shown a dispute of fact about whether the Municipal Defendants fabricated police reports, manipulated witnesses, and withheld, suppressed, or destroyed evidence. Plaintiffs have rebutted the *prima facie* finding of probable cause and a jury must resolve the disputed facts before the Court can determine probable cause. Similarly, this record contains evidence from which a jury could infer through circumstantial evidence that the Municipal Defendants acted with malice in their reckless disregard to McGuffin's rights and to the truth. Material facts remain in dispute, precluding summary judgment on Plaintiffs' malicious prosecution and illegal pretrial detention claims.

## V.     Conspiracy to Violate a Constitutional Right

Plaintiffs assert that each of the Municipal Defendants agreed to participate in the unlawful investigation of McGuffin for a crime he did not commit. More specifically, Plaintiffs allege a conspiracy between the CPD, the Coos County Sheriff's Office, State Defendants (Hormann, Krings, Riddle and Wilcox), and Walter of Vidocq Society to deprive McGuffin of his constitutional rights under the Fourth and Fourteenth Amendments.

To prove a conspiracy under § 1983, "a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989). In addition, the Plaintiffs must show that the defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy. *Sykes v. State of Cal. (Dep't of Motor Vehicles)*, 497 F.2d 197, 200 (9th Cir. 1974). The agreement, however, "need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Mendocino Env't Ctr.*, 192 F.3d at 1301. That is because "[d]irect evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available." *Id.* at 1302. "Moreover, 'questions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment.'" *Id.* (brackets omitted) (quoting *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985)).

Here, the Municipal Defendants argue they are entitled to summary judgment on Plaintiffs' conspiracy claim because Plaintiffs cannot prove an underlying constitutional violation. However, for the reasons explained above, whether the Municipal Defendants deprived McGuffin of his constitutional rights remains in dispute.

The Municipal Defendants also argue there is no evidence of overt acts in furtherance of an improper purpose. Plaintiffs' evidence of a conspiracy, according to the Municipal Defendants, merely shows "simple collaboration, information sharing, and reasonable reliance on other members of the investigation, many of whom had specialized training or expertise."

Defs.' Mot. at 44. However, "[t]he possibility that other inferences could be drawn that would provide an alternate [and benign] explanation for the [defendants' cooperative] actions does not entitle them to summary judgment." *Mendocino Env't Ctr.*, 192 F.3d at 1303. To survive summary judgment, the plaintiff "merely" needs to show that circumstantial evidence allows for a rational or reasonable inference of a conspiracy, the "inference need not be [the] most likely" explanation. *Id.* (citing *United Steelworkers of America*, 865 F.2d at 1542). Evidence that officers across multiple agencies, acting in close cooperation in planning and conducting their investigation, each "contributed misinformation . . . is highly probative as to the existence of an agreement, implicit or explicit, among the" officers to conspire against the plaintiff. *Id.*

Plaintiffs provide evidence from which a jury could find that the Municipal Defendants had an agreement to conspire against McGuffin. For example, a jury could find that the Municipal Defendants who participated in the Original Investigation worked with the Oregon State Police Crime Lab to either (1) fabricate evidence that the male DNA on Freeman's left shoe came from Oswald (who found the shoe on Hudson Ridge), or (2) suppress the known presence of unidentified male DNA that was neither Oswald's nor McGuffin's. 2000-09-25 Memo from Wilcox and Krings to Reaves, ECF No. 296 at 191; 2002-01-21 OSP Lab Krings Report, ECF No. 295-3 at 50; PCR Judgment at 16, ECF No. 296 at 18. As described above, there is also evidence from which a jury could find that Cold Case Investigators collaborated with the Oregon State Police Lab and Walter to fabricate evidence of the presence of blood on Freeman's right (cemetery) shoe. Moreover, Dannels' appearance with Walter on 20/20, in which they each made false statements to further a narrative inculpating McGuffin "permits the inference of an improper motive[.]" *Mendocino Env't Ctr.*, 192 F.3d at 1302 (actively publicizing inaccurate information to the media provided circumstantial evidence of conspiracy).

The record contains additional examples of misinformation provided by the Municipal Defendants in collaboration with other agencies. While this same evidence could show a good faith attempt between investigators across agencies to solve Freeman's murder, "it is the jury which weighs the contradictory evidence and inferences and draws the ultimate conclusion as to the facts." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–01 (1962) (internal quotation marks omitted). The Municipal Defendants are not entitled to summary judgment on Plaintiffs' conspiracy claim.

## VI.    Failure to Intervene

Plaintiffs assert that each of the Municipal Defendants knew that McGuffin's constitutional rights were being violated during the investigation and initiation of proceedings but failed to intervene. "[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), *as amended* (Oct. 31, 2000) (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81, 116 (1996)). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.* The Municipal Defendants argue that Plaintiffs' Failure to Intervene claim fails because (1) there was no constitutional violation, and (2) none of the Municipal Defendants witnessed or otherwise had reason to believe a constitutional violation occurred such that they would have had an opportunity to intervene. The Municipal Defendants' argument provides no citations to evidence in the record and fails to address the facts in the light most favorable to Plaintiffs.

For the reasons explained above, material facts remain in dispute about whether the Municipal Defendants violated Plaintiffs' constitutional rights. Unlike in *Cunningham*, where

several of the officers "had no realistic opportunity" to prevent their fellow officers from

shooting at the plaintiffs, here, because the Original Investigation took place over many months

and the Cold Case Investigation took place over several years, there is evidence in the record

from which a jury could conclude that each Municipal Defendant was aware of the suppression

and fabrication of evidence in violation of McGuffin's constitutional rights and realistically "had

an opportunity to intercede." 229 F.3d 1271, 1289–90 (9th Cir. 2000), *as amended* (Oct. 31,

2000) (internal quotation marks omitted). Material issues of fact preclude summary judgment on

Plaintiffs' failure to intervene claim.

## VII.    *Monell* Liability

Plaintiffs bring a *Monell* claim against Coos County and the City of Coquille. Section

1983 permits a cause of action for constitutional violations by persons. In certain circumstances,

a municipality may be held liable as a "person" under § 1983. *Monell v. Dep't of Soc. Servs. of

City of New York*, 436 U.S. 658, 690–91 (1978). Unlike a claim for negligence, however, "a

municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a

municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Liability

only attaches where the municipality itself causes the constitutional violation through the

"execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

government as an entity is responsible under § 1983." *Id.* at 694.

There are three methods by which a plaintiff may establish municipal liability under

*Monell*. First, a local government may be liable where the "execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflict[s] the injury." *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776,

802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694)). Second, a local government can fail to train employees in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [government entity] can reasonably be said to have been deliberately indifferent to the need." *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). Third, a local government may be held liable if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez*, 891 F.3d at 802–03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

Here, the Municipal Defendants argue that Plaintiffs' *Monell* claim fails because (1) there was no underlying constitutional violation and (2) "as set forth in the various declarations of the Defendants, neither Coos County or the City of Coquille had a policy, practice, or custom of having its law enforcement officers violate the provisions of the Fourth Amendment or the Fourteenth Amendment to the Constitution of the United States." Defs.' Mot. at 48.

As to the Municipal Defendants' first argument, for the reasons explained above, material facts remain in dispute, precluding the Court from ruling as a matter of law that no constitutional violation occurred. As to the second argument, the Municipal Defendants again provide a legal conclusion unsupported by a proper citation to evidence in the record demonstrating that they are entitled to summary judgment. Plaintiffs respond with citations to multiple examples of specific evidence in the record from which a jury could conclude that Coos County and the City of Coquille acted with deliberate indifference, causing the deprivation of McGuffin's constitutional rights.

For example, Chief Reaves and Chief Dannels were both directly involved in the

Freeman investigation, and each had final policy making authority for the Coquille Police

Department during their respective tenures. Rule 30(b)(6) Deposition of City of Coquille at

15:24–17:7, ECF No. 330-53 (CPD policy makers were Reaves from 2000 to 2008 and Danells

from 2008 to 2010). A jury could find that the City of Coquille violated McGuffin's

constitutional rights through the actions of these official policy makers, who either acted with

deliberate indifference or ratified their subordinates' deprivation of McGuffin's constitutional

rights.

There is also evidence from which a jury could find that Coos County and the City of

Coquille failed to implement obvious procedural safeguards to prevent constitutional violations

by failing to enact a policy or separately by failing to train or supervise its agents. A

municipality's failure to train is only actionable when it amounts to "deliberate indifference,"

which "ordinarily" requires a pattern of similar constitutional violations. *Connick v. Thompson*,

563 U.S. 51, 62 (2011).  However, "in a narrow range of circumstances, a pattern of similar

violations might not be necessary to show deliberate indifference" where "the unconstitutional

consequences of failing to train could be so patently obvious that a city could be liable under §

1983 without proof of a pre-existing pattern of violations." *Id.* (internal quotations and citations

omitted).

Here, for example, Coos County did not have a policy or provide training to its officers

on their constitutional obligations under *Brady* when handling exculpatory material. Expert

Report of Russ Hicks at 28, ECF No. 330-29; Kip Oswald Deposition at 65:4–66:11, ECF No.

330-58. Coos County Sheriff's Deputy Oswald, who found Freeman's bloody shoe on Hudson

Ridge, testified in deposition for this case that he had "never heard of *Brady* until recently" and

"didn't have any understanding of *Brady*" during the Freeman investigation. Kip Oswald Deposition at 65:4–66:11, ECF No. 330-58. For the City of Coquille, Chief Dannels, and Officers Sanborn, Zavala, and Webley testified that they could not recall any training on their obligations under *Brady*. Mark Dannels Depo. at 118:9–23, ECF No. 330-51 at 5; Sean Sanborn Depo. at 49:14–50:20, ECF No. 330-55 at 4; David Zavala Depo. at 35:22–36:16, ECF No. 330-56 at 4; and Chris Webley Depo. at 47:6–23, ECF No. 330-57 at 4. Because police officers are not attorneys, they are not "equipped with the tools to find, interpret, and apply legal principles." *Connick*, 563 U.S. at 70. Failing to provide a police officer with any training on the constitutional obligations triggered by the handling of exculpatory material has the obvious consequence of depriving an accused person of their right to due process. A jury may find that Coos County and the City of Coquille acted with deliberate indifference by failing to have adequate written policies on *Brady* or by failing to provide any training on *Brady* obligations.

Plaintiffs provide additional examples of evidence in the record from which a jury could conclude that Coos County or the City of Coquille acted with deliberate indifference. On reply, the Municipal Defendants rebut none of the evidence creating a dispute of fact about whether Coos County and the City of Coquille caused Plaintiffs' constitutional rights to be violated.

The Municipal Defendants' second argument, purportedly evidenced by "various Declaration of Defendants" is a legal conclusion unsupported by citations to specific evidence in the record. The docket in this case contains nearly four hundred entries, and the record before the Court on summary judgment easily exceeds 10,000 pages of exhibits. "It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 at 386. Under LR 56-1(a), "[a] party's factual positions must be supported by citations, by page and line as

appropriate, to the particular parts of materials in the record." The Municipal Defendants fail to present a legal argument supported by citations to evidence in the record supporting their motion for summary judgment.

## VIII.    Plaintiff S.M.'s Fourteenth Amendment Right to Parental Companionship

Plaintiffs bring a claim for the violation of S.M.'s Fourteenth Amendment right to parental companionship, alleging that the Municipal Defendants deprived S.M. of the care, comfort, consortium, love, and emotional and financial support from her father, McGuffin, during and after his imprisonment. SAC ¶ 274. The Municipal Defendants incorrectly assert that S.M.'s claims arise under the Fourth and not the Fourteenth Amendment. "[C]laims of children who are taken into state custody" arise under the Fourth Amendment. *Hardwick v. Cnty. of Orange*, 980 F.3d 733, 741 (9th Cir. 2020). However, claims of children who have a parent seized by the State, through unlawful imprisonment or excessive use of force, arise under the Fourteenth Amendment. *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1019 (C.D. Cal. 2000) ("the unlawful imprisonment of Destiny's father constituted a complete deprivation of his companionship and society for the term of his imprisonment"); *Smith v. City of Fontana*, 818 F.2d 1411, 1418–19 (9th Cir. 1987) (excessive use of lethal force), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999).

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire*, 726 F.3d at 1075. "[W]hether a particular interference with a liberty interest constitutes a substantive or a procedural due process violation depends on whether the interference was for purposes of oppression, rather than for the purpose of furthering legitimate state interests." *Smith*, 818 F.2d at 1419 (internal quotation marks and citation

omitted). "[T]he state has no legitimate interest in interfering with this liberty interest through the use of" investigatory practices that involve the fabrication or suppression of evidence. *See Id.* at 1419–20. "Such an action constitutes the very sort of affirmative abuse of government power which the substantive protections of the due process clause are designed to prevent." *Id.* at 1420.

Here, the Municipal Defendants argue that "[t]his claim fails because none of the conduct of the Municipal Defendants as supported by the factual record 'shocks the conscience' as required to support this claim." Defs.' Mot. at 49. "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). An officer's "deliberately indifferent conduct will generally 'shock the conscience' so long as the . . . official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075. For the reasons explained above, material questions of fact preclude summary judgment on whether the Municipal Defendants acted in a deliberately indifferent manner and thus the Court cannot rule as a matter of law that the officers' conduct does not shock the conscience.

The Municipal Defendants also argue that CPD officer Hall, who Chief Reaves designated as the lead officer in the Original Investigation, cannot be liable because S.M. was not born when Hall left the CPD in 2002.[12] To "bring a section 1983 claim based on the interference with familial companionship[,]" the child is not required to prove that "the official was trying to break up their family." *Smith*, 818 F.2d at 1420 n.12. Evidence creating a dispute of fact about

---

[12] Hall resigned from the Coquille Police Department on April 26, 2002. Training and Employment Records of David Hall at 1, ECF No. 338-13. Neither party provides S.M.'s birthdate but she was at least three years old during the Cold Case Investigation. Schwenninger Case Notes Attachment 4 at 1, ECF No. 330-48 at 9 (noting McGuffin "has a three year old little girl").

whether the state official's action was an abuse of government power that "was more than merely negligent" is sufficient to survive summary judgment. *Id.* Accordingly, whether Hall acted with the subjective intent of depriving S.M. of a relationship with her father is irrelevant. As described above, there is evidence in the record that Hall may have disclosed nonpublic information to his stepson Bryant about the Freeman investigation. Then, in 2010, after S.M. was born and Hall had left the CPD, Hall recommended to the Cold Case Investigators that they speak with Bryant to see if Bryant knew anything about McGuffin. Bryant then testified against McGuffin at trial. Criminal Trial Transcript at D6 65:21–24, ECF No. 284-1 at 1139. For the reasons explained above, a jury must decide whether Hall fabricated evidence by disclosing nonpublic information to Bryant and then recommending to the Cold Case Investigators that they speak with Bryant to elicit false testimony against McGuffin. Hall participated in the Freeman investigation after leaving CPD and after S.M. was born. The Municipal Defendants provide no substantive argument concerning the other Municipal Defendants and summary judgment is denied.

## IX.    Qualified Immunity

The Municipal Defendants assert they are entitled to qualified immunity on each of the federal claims. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). The purpose of qualified immunity is to "strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th

Cir. 2011) (quoting *Pearson*, 555 U.S. at 231). Qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231.

"Determining whether officials are owed qualified immunity involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, the Court has already found that Plaintiffs have presented sufficient evidence from which a reasonable jury could find that each of the Municipal Defendants engaged in conduct that violated the constitution. The first prong of the analysis is satisfied, and the remaining question is whether the rights allegedly violated were clearly established in light of the specific context of the case. The Supreme Court has emphasized that the asserted right "must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (brackets and internal quotation marks omitted).

Plaintiffs have the burden of proving that the rights violated were clearly established at the time of the violation. *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023). The Court finds that the constitutional right at issue here have been clearly established since before the Freeman investigation began and that under the circumstances presented here, each Municipal Defendant was on notice that their conduct (when viewed in the light most favorable to Plaintiffs) violated the constitution.

Under the Fourteenth Amendment, "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074–75. Caselaw recognizing this specific right is not even necessary "because the proposition is virtually self-evident[.]" *Id.* at 1075. The Municipal Defendants were on notice of their constitutional obligations to disclose exculpatory information, including information that would have allowed McGuffin to attack the (1) the probative value of physical evidence; (2) the circumstances in which evidence was obtained; (3) the thoroughness of the police's investigation; and (4) the "uncritical attitude on the part of the police." *Kyles*, 514 U.S. at 445. "Although the determination of what constitutes material, exculpatory evidence may require the exercise of legal judgment that the prosecuting attorney is better trained, not to mention better positioned, to make, police must still be expected to recognize and determine what evidence should be preserved and turned over to the prosecutor." *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1220 n.12 (9th Cir. 2015) (quotation marks omitted).

The destruction of evidence of apparent exculpatory value was also established before the Freeman investigation. *Youngblood*, 488 U.S. at 57–58. Regarding Plaintiffs' claims for malicious prosecution and illegal pretrial detention, the Fourth Amendment clearly prohibits police officers from "improperly exert[ing] pressure on the prosecutor, knowingly provid[ing] misinformation to him, conceal[ing] exculpatory evidence, or otherwise engag[ing] in wrongful or bad faith conduct[,]"causing the defendant to be charged or detained without probable cause. *Awabdy*, 368 F.3d at 1067 (citing *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997)).

The Municipal Defendants fail to rebut Plaintiffs' arguments. They provide no legal analysis showing that the rights at issue were not clearly established and they fail to explain how

the cases cited by Plaintiffs are distinguishable from the circumstances presented here. For example, after asserting the Chief Reaves' conduct did not violate McGuffin's constitutional rights, the Municipal Defendants argue that Reaves is entitled to qualified immunity because "there is no clearly established constitutional right to be free from the type of conduct Chief Reaves engaged in." Defs.' Reply at 27. Paraphrasing, the Municipal Defendants argue that there is no clearly established right to be free from conduct that does not violate a constitutional right. In addition to being circular, the Municipal Defendants' argument conflates the first and second prongs of the qualified immunity analysis. If there was no dispute that Reaves' conduct did not violate McGuffin's constitutional rights, then there would be no need to proceed to the analysis of whether the right was clearly established. The second prong of the qualified immunity analysis presumes that the officer's conduct violated a constitutional right. The issue is whether the officer should nonetheless be granted immunity from suit because the right at issue was not clearly established at the time of the incident such that a reasonable officer would have understood his conduct to be unlawful under the circumstances. *Torres*, 648 F.3d at 1123. The Municipal Defendants' assertion of qualified immunity for the remaining Municipal Defendants is equally cursory and invalid. Defendants Dannels, Hall, Karcher, McNeely, Oswald, Reaves, Sanborn, Schwenninger, Webley, Zanni, and Zavala were each on notice that the conduct detailed above, when viewed in the light most favorable to Plaintiffs, violated the constitution. None of the Municipal Defendants are entitled to qualified immunity.

Last, the Municipal Defendants argue that they are entitled to qualified immunity on S.M.'s Fourteenth Amendment claim because there is no clearly established right of a child to have their parent be free from lawful imprisonment. This argument wrongly presumes that there is no dispute that McGuffin was lawfully imprisoned. The right to be free of abusive government

action which deprives a child of parental companionship was clearly established at the time of

the Freeman investigations. *Smith*, 818 F.2d at 1420 n.12; *Ovando*, 92 F. Supp. 2d at 1019 ("the

unlawful imprisonment of Destiny's father constituted a complete deprivation of his

companionship and society for the term of his imprisonment"). The Municipal Defendants are

not entitled to qualified immunity on Plaintiff S.M.'s Fourteenth Amendment claim.

## X.    Attorney Fees Under 42 U.S.C. § 1988(b)

The Municipal Defendants argue that Plaintiffs' claim for attorney fees should be

dismissed because § 1988 "does not constitute a separate, independent claim for relief." Defs.'

Mot. at 58. Attorney fees may not "be awarded in an independent action which is not to enforce

any of the civil rights laws listed in § 1988." *N. Carolina Dep't of Transp. v. Crest St. Cmty.*

*Council, Inc.*, 479 U.S. 6, 12 (1986). Here, Plaintiffs bring an action to enforce civil rights claims

under § 1983 so the claim for attorney fees is not an independent action unrelated to the civil

rights laws listed in § 1988. The Court cannot resolve whether Plaintiffs are entitled to attorney

fees until the merits of the underlying action are decided.

## XI.    State Law Claims

### A.    False Imprisonment

The tort of false imprisonment, "sometimes called false arrest[,] . . . consists of four

elements: (1) the tortfeasor must confine the plaintiff; (2) the tortfeasor must intend the act that

causes the confinement; (3) the plaintiff must be aware of the confinement; and (4) the

confinement must be unlawful. *Singh v. McLaughlin*, 255 Or. App. 340, 348 (2013).

The Municipal Defendants argue that this claim fails because none of the Municipal

Defendants arrested McGuffin. "Under Oregon law, a plaintiff 'is not required to prove that the

defendant was the sole, or exclusive, instigator of his arrest, but that the defendant participated

by taking an active part in bringing about the arrest.'" *Id.* at 348 (quoting *Pearson v. Galvin*, 253

Or. 331, 337 (1969)). "'Instigating' an arrest encompasses 'words or acts which direct, request, invite or encourage the false imprisonment itself.'" *Singh*, 255 Or. App. at 350 (quoting Restatement (Second) of Torts § 45A cmt. c (1965)). The record contains evidence from which a jury could find that the Municipal Defendants provided misinformation, concealed exculpatory evidence, or otherwise engaged in wrongful conduct. Viewing the evidence most favorably to Plaintiffs, a jury could find that each of the Municipal Defendants were "instigators" of McGuffin's false imprisonment.

Next, the Municipal Defendants argue that the claim fails because McGuffin was lawfully arrested pursuant to a valid arrest warrant. However, on the record before the Court, the validity of the arrest warrant remains in dispute. Plaintiffs have shown a dispute of fact about whether the Municipal Defendants initiated the grand jury proceedings through the fabrication of police reports, manipulation of witness statements, and withholding, suppression, or destruction of exculpatory evidence. Because Plaintiffs have rebutted the *prima facie* finding of probable cause from which the arrest warrant was issued, a jury must resolve the disputed facts before the Court can determine whether the warrant was valid.

Last, the Municipal Defendants quote an outdated version of Or. Rev. Stat. § ("ORS") 30.265(1) to support their argument that the substitution provision of the Oregon Tort Claims Act forces Plaintiffs to substitute the individual officers for their public body employer. Defs.' Mot. at 53–54. Plaintiffs correctly respond that ORS 30.265(1) was amended in 2011 and now allows for claims against individual officers under circumstances undisputed in this action. ORS 30.265(4). The Municipal Defendants abandon their argument on reply and the Court finds the substitution provision provides no basis for dismissing the individual officers from this claim.

## B.     Malicious Prosecution

The Municipal Defendants argue that Plaintiffs' state law claim for malicious prosecution fails because the criminal proceedings against McGuffin did not terminate in his favor. To prevail on a malicious prosecution claim under Oregon law, the claimant must demonstrate (1) the institution of continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the claimant's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceedings; and (6) injury or damage as a result. *Miller*, 282 Or. App. at 360. While "[d]ismissal of an indictment at the request of the district attorney is generally sufficient to satisfy the requirement that the criminal proceeding has terminated in the favor of the plaintiff," *Rose v. Whitbeck*, 277 Or. 791, 798–99 (1977), the dismissal must also "reflect adversely on the merits of the action." *Perry v. Rein*, 215 Or. App. 113, 130 (2007). The prosecutor's motivations for dismissing a complaint are directly relevant to the question of favorable termination. *Perry*, 215 Or. App at 128. A fact-specific inquiry is ordinarily required. *Id.* at 126.

Here, after the court granted McGuffin post-conviction relief and vacated his conviction, the District Attorney unilaterally moved to dismiss the criminal case. District Attorney's Motion to Dismiss Criminal Case at 3, ECF No. 290-3 at 4. The district attorney's unilateral decision to dismiss an indictment provides circumstantial evidence of a favorable termination because it "fairly implies lack of a reasonable ground for his prosecution." *Gumm v. Heider*, 220 Or. 5, 24 (1960) (quoting *Halberstadt v. New York Life Ins. Co.*, 194 N.Y. 1, 10 (1909)). The District Attorney noted that there was evidence from which a jury could still find McGuffin guilty. *Id.* at 4, ECF No. 290-3 at 5. However, prior to filing the motion to dismiss, the District Attorney told a news reporter,

> There is unknown male DNA on those shoes. Does it exonerate McGuffin? Maybe, but I don't know. If [*sic*] could be anyone in the chain of command who touched those shoes without gloves . . . I just can't reemphasize enough that this is not the fault of this office. We didn't do anything wrong.

Jillian Ward, *Nicholas McGuffin's Manslaughter Conviction Overturned in the Death of Leah Freeman*, THE WORLD LINK (December 3, 2019) at 6, ECF No. 330-61. Viewing the evidence in Plaintiffs' favor, the District Attorney was motivated to dismiss the charges because there was evidence possibly exonerating McGuffin and he was concerned with preserving the public's opinion about the integrity of his office. The District Attorney's considerations in moving to dismiss therefore emphasized evidence of McGuffin's guilt and the hurdles presented in prosecuting a defendant twenty years after the crime was committed. The credibility of the District Attorney's stated reasons for dismissing the charges is a fact-specific inquiry that remains in dispute and must be decided by a jury. The Court cannot rule as a matter of law that the criminal proceedings did not terminate in McGuffin's favor.

The Municipal Defendants also argue that the state law claim "fails for the same reasons as Plaintiffs' federal malicious prosecution claim under § 1983." Defs.' Mot. at 54. Accordingly, the Municipal Defendants' arguments regarding malicious prosecution fail for the same reasons explained by the Court in Discussion Section IV above.

### C.    Civil Conspiracy

The Municipal Defendants argue that civil conspiracy is not a tort recognized by Oregon courts. Their argument is unsupported and is contrary to this Court's prior ruling on the issue. July 17, 2021, F&R at 17–18, ECF No. 83, *adopted* ECF No. 99 ("civil conspiracy under Oregon law is a way 'in which the person may become jointly liable for another's tortious conduct.'" (quoting *Granewich v. Harding*, 329 Or. 47, 53 (1999)). Plaintiffs have presented evidence creating a dispute of fact about the existence of a meeting of the minds and overt acts supporting a claim for conspiracy.

### D.        Negligent Training and Supervision and Negligent Spoliation of Evidence

The Municipal Defendants argue that Plaintiffs' claim for negligent training and supervision and claim for negligent spoliation of evidence are barred by the statute of ultimate repose. Under ORS 12.115(1), "any action for negligent injury to person or property . . . [that] commenced more than 10 years from the date of the act or omission complained of" is barred. ORS 12.115(1); ORS 30.265(6)(d). This Court previously found that the statute, by its terms, did not apply here because Plaintiffs seek damages for negligent injuries to "reputation and rights" which are not negligent injuries to "person or property." July 17, 2021, F&R at 22–23, ECF No. 83, *adopted* ECF No. 99 (quoting ORS 112.115(1)). This Court's interpretation of the phrase "negligent injury to person or property" was consistent with the Oregon Court of Appeals' subsequent interpretation of the phrase. *See Marshall v. PricewaterhouseCoopers, LLP*, 316 Or. App. 416, 427–30 (2021), *rev'd and remanded*, 371 Or. 536 (2023). However, after this Court's ruling on the issue, the Oregon Supreme Court reversed the Oregon Court of Appeals and held that the legislature intended the term "'property'. . . to include 'tangible assets' such as money, and 'intangible rights.'" *Marshall v. PricewaterhouseCoopers, LLP*, 371 Or. 536, 548 (2023).

The question presented in *Marshall* was whether the legislature intended on excluding "actions for negligent injury to economic interests from" the statute of ultimate repose. *Id.* at 557. The Oregon Supreme Court explained that "the phrase 'injuries to person or property' was associated with the broad concept of 'civil injury,' . . . which may be redressed by means of civil action" and held that this included negligent injury to an economic interest. *Id.* at 542. Plaintiffs argue that *Marshall* never addressed application of the statute to the type of injury alleged here— specifically, an injury to constitutional rights caused by state action. Plaintiffs' argument, however, is undermined by the Oregon Supreme Court's interpretation that "the text, context, and legislative history [of ORS 12.115(1)] . . . point to a legislative compromise that permitted

*all negligence claims* to be governed by a 'discovery' rule for purposes of the statute of limitations and also subject to an outside limit on when the claim can be brought." *Marshall v. PricewaterhouseCoopers, LLP*, 371 Or. 536, 548 (2023). The Oregon Supreme Court's opinion is binding and final. Plaintiffs' claims for negligent training and supervision and negligent spoliation of evidence are barred by the statute of ultimate repose because the complained of acts or omissions occurred more than ten years before the commencement of this lawsuit.

### E.    Intentional Infliction of Emotional Distress ("IIED")

The Municipal Defendants argue that Plaintiffs' IIED claims are barred by the statute of limitations and also fail for failure to timely serve tort claim notice. The Court has already considered and rejected these arguments. July 17, 2021, F&R at 20–22, ECF No. 83, *adopted* ECF No. 99; *see* Municipal Defendants' Motion to Dismiss at 14, ECF No. 49; Plaintiffs' Response at 15–16, ECF No. 51. Unlike the Municipal Defendants' argument on the statute of ultimate repose, the Municipal Defendants provide no new precedent or other explanation for why the Court should reconsider its prior ruling. Plaintiffs' tort claim notice was timely and the IIED claim is not barred by the statute of limitations.

To succeed on a claim for IIED, the plaintiff must prove that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's actions caused the plaintiff severe emotional distress, and (3) the defendant's actions transgressed the bounds of socially tolerable conduct." *Schiele v. Montes*, 231 Or. App. 43, 48 (2009). "'Liability [for IIED] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *House v. Hicks*, 218 Or. App. 348, 358 (2008) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether the conduct may be characterized as extreme or outrageous is examined within the context of the relationship

between the plaintiff and the defendant. *Delaney v. Clifton*, 180 Or. App. 119, 130 (2002) (special relationship such as that of common carrier-passenger may create a heightened duty) (quoting *Rosenthal v. Erven*, 172 Or. App. 20, 23 (2001)). Whether a defendant's conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" is a question for the court. *House*, 218 Or. App. at 358.

Here, the Court finds that fabricating or suppressing evidence to obtain a criminal conviction is utterly intolerable in a civilized community and that a jury could find that the remaining elements of McGuffin's IIED claim are met. Summary judgment is denied on McGuffin's IIED claim against the Municipal Defendants. However, Plaintiff S.M. has presented no evidence from which a jury could conclude that the Municipal Defendants intended to cause her emotional distress. Summary judgment is granted in favor of the Municipal Defendants on S.M.'s IIED claim.

### F.    Intentional Spoliation of Evidence

The Municipal Defendants argue that intentional spoliation of evidence is not a tort recognized by Oregon courts. Their argument is unsupported by a legal citation and is contrary to this Court's prior ruling on the issue. July 17, 2021, F&R at 26, ECF No. 83, *adopted* ECF No. 99 (citing *Marcum v. Adventist Health Sys./W.*, 215 Or. App. 166, 191 (2007), *rev'd on other grounds*, 345 Or. 237 (2008) (recognizing tort claim for spoliation of evidence)). As explained above and at length, Plaintiffs have presented evidence from which a jury could find that each of the Municipal Defendants suppressed evidence, including evidence of their own wrongful conduct. The claim remains for the jury to decide.

### CONCLUSION

The Municipal Defendants' Motion for Summary Judgment (ECF No. 281) is GRANTED in part and DENIED in part.

I.     **First Claim: Section 1983**

    A.     **Count 1: Fourteenth Amendment**
        DENIED.

    B.     **Count 2: Malicious Prosecution**
        DENIED.

    C.     **Count 3: Illegal Pretrial Detention Following the Issuance of Legal Process**
        DENIED.

    D.     **Count 4: Failure to Disclose Exculpatory Evidence**
        Summary judgment is GRANTED in favor of the Municipal Defendants as it relates to the suppression of evidence confirming the timing of Backman's use of the ATM, which the Court finds was produced to the District Attorney.

        Summary judgment is DENIED in all other respects.

    E.     **Count 5: Failure to Intervene**
        DENIED.

    F.     **Count 6: Conspiracy**
        DENIED.

    G.     **Count 7: Destruction of Exculpatory Evidence**

        Summary judgment is GRANTED in favor of the Municipal Defendants as it relates to the destruction of evidence confirming the timing of Backman's use of the ATM, which the Court finds was produced to the District Attorney.

        Summary judgment is DENIED in all other respects.

    H.     **Count 8: *Monell* Liability**
        DENIED.

    I.     **Count 9: Violation of S.M.'s Fourteenth Amendment Rights**
        DENIED.

II.     **State Law Claims**

    A.     **Second Claim: False Imprisonment**
        DENIED.

**B.**     **Third Claim: Malicious Prosecution**

DENIED.

**C.**     **Fourth Claim: Civil Conspiracy**

DENIED.

**D.**     **Fifth Claim: Negligent Training and Supervision**

Summary judgment is GRANTED in favor of the Municipal Defendants.

**E.**     **Sixth Claim: Intentional Infliction of Emotional Distress**

Summary judgment is DENIED on Plaintiff McGuffin's claim.

Summary judgment is GRANTED in favor of the Municipal Defendants on Plaintiff S.M.'s claim.

**F.**     **Seventh Claim: Spoliation of Evidence**

Summary judgment is GRANTED in favor of the Municipal Defendants on Plaintiffs' claim for *negligent* spoliation of evidence.

Summary judgment is DENIED for the claim of *intentional* spoliation of evidence.

**III.**     **Eighth Claim: Attorney Fees under § 1988**

DENIED.

DATED this 2nd day of July 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge